## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

      *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, *et al.*,

      *Defendants*.

Case No. 4:23-cv-218-MW-MAF

## PLAINTIFFS' EMERGENCY MOTION
## FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and A. Doe ("Plaintiffs"), respectfully move the Court for a preliminary injunction against the enforcement of SB7050's non-citizen restrictions by Defendants Cord Byrd, in his official capacity as Secretary of State, and Ashley Moody, in her official capacity as Attorney General.

The provision of SB7050 that pertains to non-citizens—section 97.0575(1)(f)—enacts discriminatory restrictions on third-party voter registration organizations and their individual staff's First Amendment rights to core political speech and association. Section 97.0575 also violates the Fourteenth Amendment's Equal Protection Clause by discriminating against Plaintiffs Herrera-Lucha,

Martínez, and Doe on the basis of their citizenship status. As more fully set forth in Plaintiffs' memorandum in support of this motion, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm from the enforcement of SB7050 in the absence of preliminary relief. The balance of equities tilts strongly in Plaintiffs' favor, and an injunction protecting their constitutional rights is in accord with the public interest. Because the Law and its attendant harms will take effect on July 1, 2023, absent relief from this Court, Plaintiffs' need for relief is urgent. Therefore, a preliminary injunction should issue.

**<u>MEMORANDUM IN SUPPORT</u>**

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ...................................................................8

II.  STATEMENT OF FACTS ....................................................................10

   A.  Plaintiffs' Engagement in Voter Registration Activities ........................... 10

   B.  The Challenged Law's Burdensome Provisions ........................................ 11

   C.  The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts ..................................................................................................... 13

III.  ARGUMENT ..........................................................................................20

   A.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction................... 21

   B.  Plaintiffs Will Likely Prevail on the Merits............................................... 23

      1.  Plaintiffs Have Standing. ..................................................................... 23

      2.  Plaintiffs' First Amendment Claim Will Likely Succeed.......................... 25

      3.  Plaintiffs' Equal Protection Claim Will Likely Succeed. .......................... 36

   C.  The Public Interest and Balance of Hardships Favor Injunctive Relief..... 41

IV.  CONCLUSION ........................................................................................42

# TABLE OF AUTHORITIES

## Cases

*American Booksellers v. Webb*,
   919 F.2d 1493 (11th Cir. 1990) ..................................................... 31, 33

*American-Arab Anti-Discrimination Committee v. City of Dearborn*,
   418 F.3d 600 (6th Cir. 2005) ............................................................... 32

*Arcia v. Florida Secretary of State*,
   772 F. 3d 1335 (11th Cir. 2014) ......................................................... 24

*Arizona Dream Act Coalition v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ............................................................... 39

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011) ............................................................................. 29

*Bernal v. Fainter*,
   467 U.S. 216 (1984) ............................................... 37, 38, 40, 41

*Bloedorn v. Grube*,
   631 F.3d 1218 (11th Cir. 2011) ..................................................... 20, 41

*Cabell v. Chavez-Salido*,
   454 U.S. 432 (1982) ............................................................................. 38

*Cate v. Oldham*,
   707 F.2d 1176 (11th Cir. 1983) ........................................................... 21

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ............................................................................... 32

*Clean-up '84 v. Heinrich*,
   590 F.Supp. 928 (M.D. Fla. 1984) ...................................................... 21

*Clean Up '84 v. Heinrich*,
   759 F.2d 1511 (11th Cir. 1985) ........................................................... 33

*Dandamudi v. Tisch*,
   686 F.3d 66 (2d Cir. 2012) .................................................................. 37

*Department of Agriculture v. Moreno*,
   413 U.S. 528 (1973) ....................................................................... 39, 40

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................. 21

*Estrada v. Becker,*
    917 F.3d 1298 (11th Cir. 2019) ................................................ 38, 39

*Florida State Conference of the NAACP. v. Browning,*
    522 F.3d 1153 (11th Cir. 2008) ..................................................... 24

*Georgia Coalition for the People's Agenda v. Kemp,*
    347 F. Supp. 3d 1251 (N.D. Ga. 2018) ........................................... 22

*Gonzalez v. Immigration & Customs Enforcement,*
    416 F. Supp. 3d 995 (C.D. Cal. 2019) ............................................ 16

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................... 24

*In re Griffiths,*
    413 U.S. 717 (1973) ....................................................................... 41

*Indiana State Conference of the NAACP v. Lawson,*
    326 F.Supp.3d 646 (S.D. Ind. 2018) .............................................. 22

*KH Outdoor v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) ............................................... 21, 42

*Kusper v. Pontikes,*
    414 U.S. 51 (1973) ......................................................................... 27

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ....................................................................... 39

*League of Women Voters of Florida v. Browning (Browning I),*
    575 F. Supp.2d 1298 (S.D. Fla. 2008) ................................. 29, 30, 35

*League of Women Voters of Florida v. Browning (Browning II),*
    863 F.Supp.2d 1155 (N.D. Fla. 2012) ...................................... passim

*League of Women Voters of Florida v. Cobb,*
    447 F. Supp. 2d 1314 (S.D. Fla. 2006) ..................................... passim

*League of Women Voters of Florida v. Detzner,*
    314 F.Supp.3d 1205 (N.D. Fla. 2018) ............................................ 41

*League of Women Voters of Florida v. Lee,*
    595 F.Supp.3d 1042 (N.D. Fla. 2022) ............................................ 13

*League of Women Voters of Missouri v. Ashcroft,*
    336 F. Supp. 3d 998 (W.D. Mo. 2018) ........................................... 22

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................... 22

*LeClerc v. Webb,*
    419 F.3d 405 (5th Cir. 2005) ............................................................. 39

*Massachusetts v. Oakes,*
    491 U.S. 576 (1989) ........................................................................ 30

*Nationalist Movement v. City of Cumming,*
    934 F.2d 1482 (11th Cir. 1991) ....................................................... 30

*Pinson v. JPMorgan Chase Bank, National Association,*
    942 F.3d 1200 (11th Cir. 2019) ....................................................... 25

*Priorities USA v. Nessel,*
    2022 WL 4272299 (E.D. Mich. Sept. 15, 2022) .............................. 28

*Project Vote v. Kemp,*
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ............................................ 22

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) ........................................................................ 31

*Romer v. Evans,*
    517 U.S. 620 (1996) ........................................................................ 39

*Smith v. California,*
    361 U.S. 147 (1959) ................................................................... 31, 32

*Speech First v. Cartwright,*
    32 F. 4th 1110 (11th Cir. 2022) .................................................. 24, 30

*Tennessee State Conference of NAACP. v. Hargett,*
    420 F.Supp.3d 683 (M.D. Tenn. 2019) ........................................... 27

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ........................................................................ 29

*Towbin v. Antonacci,*
    885 F.Supp.2d 1274 (S.D. Fla. 2012) ............................................. 21

*United States v. Carolene Products Co.,*
    304 U.S. 144 (1938) ........................................................................ 38

*United States v. Williams,*
    553 U.S. 285 (2008) ........................................................................ 31

*Video Software Dealers Association v. Webster,*
    773 F.Supp. 1275 (W.D. Mo. 1991) ............................................... 32

*Village of Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) ........................................................................ 33

*Vital Pharmaceuticals v. Alfieri*,
  23 F.4th 1282 (11th Cir. 2022) .......................................................... 20

*VoteAmerica v. Schwab*,
  No. CV 21-2253-KHV, 2023 WL 3251009 (D. Kan. May 4, 2023) ........... 27, 29

*Weaver v. Bonner*,
  309 F.3d 1312 (11th Cir. 2002) .......................................................... 31

**Statutes**

52 U.S.C. § 20501 ........................................................................... 9

Fla. Stat. § 97.0525 ................................................................... 34, 41

Fla. Stat. § 97.057 .................................................................... 34, 41

Fla. Stat. § 97.0575 ................................................ 8, 11, 13, 33, 35, 12,

Fla. Stat. § 104.011 .............................................................. 36, 40, 42

Fla. Stat. § 104.012 .............................................................. 36, 40, 42

Fla. Stat. § 104.42 ............................................................... 36, 40, 42

Fla. Stat. § 117.01 ......................................................................... 40

Fla. Stat. § 817.02 ......................................................................... 40

**Other Authorities**

ACLU of Florida,
  *Citizens on Hold: A Look at ICE's Flawed Detainer System in Miami-Dade
  County* (Mar. 20, 2019) ................................................................... 17

*Florida Senate Floor Debate on SB7050* (Apr. 26, 2023) .................................. 34

S. Rep. No. 103-6 (1993) ................................................................... 9

Plaintiffs Hispanic Federation and Poder Latinx ("Organizational Plaintiffs"), and Verónica Herrera-Lucha, Norka Martínez, and A. Doe ("Individual Plaintiffs") submit this memorandum in support of their motion for a preliminary injunction.

## I.   PRELIMINARY STATEMENT

This case asks whether a state can substantially interfere with private organizations' and individuals' right to associate with, encourage, communicate with, and assist eligible citizens with registering to vote. It cannot. Plaintiffs challenge section 97.0575(1)(f) of the Florida Statutes as amended by SB7050 (the "Law"), which suppresses the protected speech and association of voter-engagement organizations (including their staff and volunteers) and reduces access to the franchise by restricting voter registration efforts.[1] The Law is already negatively affecting Plaintiffs' critical work, and will have a draconian impact on Organizational Plaintiffs' voter registration efforts and prohibit Individual Plaintiffs from engaging in protected speech activity when it takes effect on July 1, 2023. It should be enjoined.

Organizational Plaintiffs are civic organizations that encourage political participation by helping underrepresented communities register to vote. Known as third-party voter registration organizations ("TPVROs"), Organizational Plaintiffs' staff and volunteers explain the importance of voter registration and participation,

---

[1]   Statutory citations are to the statutes as amended by SB7050, Laws of Fla. ch. 2023-120.

distribute and collect voter registration applications from Floridians who are eligible to vote, and deliver completed applications to election officials.

Without groups like Organizational Plaintiffs, fewer individuals register to vote. Congress has specifically recognized that "unfair registration laws and procedures can have a direct and damaging effect on voter participation" and has sought to lower barriers to voter participation by, among other things, "permit[ting] organizations to go to the voter with organized registration drives." S. Rep. No. 103-6, at 2, 12 (1993); 52 U.S.C. § 20501. Organizational Plaintiffs provide that opportunity to underrepresented communities throughout Florida.

Individual Plaintiffs are non-citizens, authorized to work in the United States, who engage in voter registration activities. Their canvassing skills and relationships in their communities enable TPVROs to engage underrepresented communities and support eligible citizens' access to the franchise.

Plaintiffs' voter registration activities are core political speech and association critical to American democracy. But the Law turns Plaintiffs' core First Amendment activity into a high-risk enterprise. It limits their effectiveness in promoting democratic participation, interferes with their ability to register voters, and chills speech by placing overbroad and unwarranted limitations on who can assist voters with registration and imposing substantial fines for noncompliance. And it discriminates against Individual Plaintiffs based on their citizenship status. The

Court should enjoin these flagrant violations of the First and Fourteenth Amendments.

## II.    STATEMENT OF FACTS

### A. Plaintiffs' Engagement in Voter Registration Activities[2]

Organizational Plaintiffs are registered TPVROs. TPVROs play an important role in registering voters. Organizational Plaintiffs help reach voters who might not otherwise register to vote, including voters with limited access to technology or limited English-language proficiency. Both organizations operate statewide. HF Decl. ¶ 7; Poder Decl. ¶ 7. Hispanic Federation has registered more than 90,000 voters since the 2016 election cycle, including eligible voters in each of Florida's 67 counties. HF Decl. ¶ 11. Poder Latinx has registered over 48,000 eligible Florida voters. Poder Decl. ¶ 10.

Individual Plaintiffs likewise play a role in registering eligible Floridians. Plaintiff Herrera-Lucha has canvassed for TPVROs since 2016. She currently serves as State Field Director for Mi Vecino, a registered TPVRO. In that role, she both does direct canvassing work to register eligible voters and plans and coordinates Mi Vecino's Florida voter registration campaigns. Herrera-Lucha Decl. ¶¶ 7-10.

---

[2]    Plaintiffs summarize the facts most relevant to their preliminary injunction motion; the facts are presented more fully in Plaintiffs' Declarations, attached as exhibits hereto. *See* Ex. 1, Decl. of Frederick Vélez III Burgos ("HF Decl."); Ex. 2, Decl. of Nancy Batista ("Poder Decl."); Ex. 3, Decl. of Verónica Herrera-Lucha ("Herrera-Lucha Decl."); Ex. 4, Decl. of Norka Martínez ("Martínez Decl."); Ex. 5, Decl. of A. Doe ("Doe Decl.").

Plaintiffs Martínez and Doe both currently work in paid staff positions as canvassers who help eligible Floridians register to vote. Martínez Decl. ¶¶ 9-11; Doe Decl. ¶ 12-15, 18.

While Individual Plaintiffs cannot themselves vote, they view voter registration as an important way to help eligible citizens exercise their rights and engage on issues critical to all who live in their communities. Individual Plaintiffs believe that helping eligible citizens in their underrepresented communities to register to vote will help American democracy more fully reflect and promote its constituents' values. Herrera-Lucha Decl. ¶ 25; Martínez Decl. ¶¶ 16, 23; Doe Decl. ¶ 11, 19-20.

### B. The Challenged Law's Burdensome Provisions

The Law requires that, before engaging in voter registration activities, a TPVRO must affirm to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications on behalf of" the TPVRO is "a citizen of the United States." Fla. Stat. § 97.0575(1)(f).

The Law imposes a $50,000 fine on TPVROs for each violation—specifically, for "each such person" collecting or handling applications on the organization's behalf. *Id.* It authorizes the Secretary of State to refer any instance in which he "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement. *Id.* § 97.0575(8).

There is no cap on the amount that any one organization can be fined for such persons' assistance, nor is knowledge of the violation required to impose fines. Help from three volunteers the organization didn't know were non-citizens would cost $150,000 in fines. Assistance from 15 people the organization didn't know were non-citizens would cost $750,000 in fines—nearly $100,000 more than Hispanic Federation's entire 2022 Florida programming budget. HF Decl. ¶ 15.

The Law's impermissibly vague and overbroad commands exacerbating its harsh penalties. Regulated individuals and organizations cannot know which requirements apply to them, or which steps to take to ensure compliance. For example, the Law nowhere defines the words that describe the conduct at issue—"collecting" and "handling."[3] It's also unclear whether the Law bans non-citizens from reviewing applications to make sure eligible registrants have correctly filled them out; supervising other canvassers who physically collect applications; encouraging eligible citizens to complete applications if the non-citizen doesn't touch the application; directing eligible citizens to the organization's online application portal; or even being present in an office where applications are processed. *See, e.g.*, HF Decl. ¶ 34. The statutory language leaves these—and myriad

---

[3]   TPVROs "must register and provide" to state officials "[t]he names, permanent addresses, and temporary addresses, if any, of each registration agent registering persons to vote" who "collect or handle voter registration applications." Fla. Stat. § 97.0575(1). The Law expressly excludes "persons who only solicit applications" from the regulations, but does not otherwise define "collect" or "handle." *Id.*

other questions—unaddressed. The Law's vague and overbroad requirements will diminish Plaintiffs' participatory messaging and chill constitutionally-protected core political speech.

Absent relief from this Court, the Law will take effect on July 1, 2023. The Law is only one of a number of recently-enacted burdens that SB7050 imposes on TPVROs to hamper their mission and limit the efficacy of their work. *See also, e.g.*, Fla. Stat. § 97.0575(4), (5)(a), (7), (11). And it follows a broader pattern in Florida of chilling third-party voter registration activities under the guise of election integrity, including restrictions passed in 2011 that this Court invalidated for placing an undue burden on TPVROs, *see League of Women Voters of Fla. v. Browning* (*Browning II*), 863 F.Supp.2d 1155, 1167-68 (N.D. Fla. 2012), and restrictions passed after the 2020 election that are subject to ongoing litigation, *see League of Women Voters of Fla. v. Lee*, 595 F.Supp.3d 1042 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part*, 66 F.4th 905 (11th Cir. 2023).

## C. The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts

The Law severely burdens Plaintiffs' voter registration activities, as well as the communities and constituencies Plaintiffs serve, in at least six distinct ways.

*First*, the Law will decimate Organizational Plaintiffs' voter registration workforce. Concretely, it will result in Hispanic Federation losing approximately 70 percent of its canvassers. HF Decl. ¶ 23. It will also paralyze Poder Latinx's voter

registration work, as approximately 90 percent of its staff are non-citizens. Poder Decl. ¶ 24. The Law will prevent both groups from employing those people to assist in registering voters. The abrupt loss of the assistance and speech these non-citizen volunteers and staff provide will severely restrict Organizational Plaintiffs' effectiveness to promote democratic participation.

Without its non-citizen staff, Poder Latinx cannot engage in the constitutionally-protected speech needed to meet its registration goals. Because of the Law, Poder Latinx has already been unable to fill open positions, and has had to turn down otherwise qualified candidates based solely on their citizenship. If the Law takes effect, instead of expanding its voter registration work, Poder Latinx will be lucky to field a single team to register voters. Poder Decl. ¶¶ 21-22.

*Second*, any attempt to comply with the Law will tie up significant resources, because the ban on non-citizens handling and collecting voter registration forms will result in Plaintiffs losing non-citizen staff's experience and institutional knowledge. Many of Organizational Plaintiffs' most experienced canvassers will be instantly affected: people who have risen to senior and leadership positions, those who have developed deep relationships with the communities Plaintiffs serve, and those who train Organizational Plaintiffs' new canvassers. HF Decl. ¶¶ 25-26; Poder Decl. ¶¶ 24-27.

Losing these relationships will have tangible impacts on Organizational

Plaintiffs' speech and association. Non-citizen employees' relationships with local businesses allow canvassers to register voters on the businesses' properties. The loss of those relationships will silence Organizational Plaintiffs, because the staff that local businesses know and trust can no longer engage in voter registration. Poder Decl. ¶ 26; HF Decl. ¶ 25.

Organizational Plaintiffs will also have to redirect funding that would have gone to community programming towards hiring, vetting, and training new staff and volunteers, as well as rebuilding institutional knowledge and relationships. For example, to comply with the new Law, Hispanic Federation will need to divert resources from its capacity-building efforts to strengthen Latino nonprofits, community organizing, and public policy advocacy in the areas of education, health, economic empowerment, and the environment. HF Decl. ¶¶ 38, 43. And Poder Latinx will need to divert resources from its issue-based organizing around climate justice and economic justice. Poder Decl. ¶ 39.

*Third*, because the Law applies with strict liability and imposes a $50,000 fine for each non-citizen who handles or collects voter registration forms, Organizational Plaintiffs will be forced to take significant additional measures to ensure their staff and volunteers are citizens. These measures will frustrate efforts to work with potential staff and volunteers who are, in fact, U.S. citizens. HF Decl. ¶ 32; Poder Decl. ¶¶ 33-34. That is so, because confirming citizenship status is not always easy.

15

For example, one court recently described determining citizenship as a "complex inquiry" that "illustrates the fluidity one may experience with respect to immigration status," turning on factors such as "which parent is a citizen, when that parent became a citizen, whether the person's parents were married, whether and when the U.S. citizen parent lived in the United States and for how long, whether the father legitimated the child," whether (and when) "the child lived in the custody of the U.S. citizen parent or parents," and "whether a person's grandparent(s) were U.S. citizens or whether a person or their parent(s) served in the U.S. Armed Forces." *Gonzalez v. Immigr. & Customs Enf't*, 416 F.Supp.3d 995, 1004 (C.D. Cal. 2019), *rev'd and vacated on other grounds*, 975 F.3d 788 (9th Cir. 2020).

There is no reliable government database for Plaintiffs to determine an employee or volunteer's citizenship status. Even federal government officials routinely mistake persons' status, because the central immigration database "'frequently' shows naturalized citizens as green card holders" and gives "no information on derivative citizenship," which is why "many U.S. citizens become exposed to possible false arrest when ICE relies [] on deficient databases." *Id.* at 1018 (citation omitted). Difficulty determining status is a problem known to Florida, as reflected by recent reports about ICE mistakenly targeting hundreds of

incarcerated U.S. citizens in Miami-Dade County for deportation.[4]

Because Organizational Plaintiffs would be strictly liable for even inadvertent violations, they will also have to turn away help from *citizens* whose status cannot be readily verified. For example, Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can show *proof* of citizenship, requiring it to turn away even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish the requisite proof. HF Decl. ¶ 32. And Poder Latinx will sever community-service partnerships that enabled local student volunteers to register voters, because of the added hurdle of confirming students' citizenship status. Poder Decl. ¶ 34.

*Fourth*, the threat of investigation and civil enforcement will meaningfully limit Organizational Plaintiffs' voter registration work. Even the threat of an investigation by the Department of State or Attorney General for a violation of the Law will chill Plaintiffs' speech and association, let alone the threat of enforcement. The threat of fines materially compounds this chilling effect. It threatens Organizational Plaintiffs with substantial monetary liability, which will chill their voter registration speech and activities, and is already affecting their planning for Florida's 2023 local elections. HF Decl. ¶¶ 36-42; Poder Decl. ¶¶ 37-43.

---

[4]   ACLU of Florida, *Citizens on Hold: A Look at ICE's Flawed Detainer System in Miami-Dade County* (Mar. 20, 2019), https://www.aclufl.org/en/publications/citizens-hold-look-ices-flawed-detainer-system-miami-dade-county.

The fine imposed for just one non-citizen volunteer or staffer is $50,000—a substantial amount. This fine naturally chills TPVROs' operations. Hispanic Federation's budget last year for Florida programming was approximately $650,000, making any $50,000 penalty a severe budgetary hit. A single fine would force cutbacks in civic engagement programs and put public health initiatives—like Hispanic Federation's vaccine program—at risk as well. This chilling effect's political and health implications will disproportionately fall on the communities of color that Hispanic Federation chiefly serves. HF Decl. ¶¶ 38-45.

In response to the Law's threat of civil penalties, some organizations are considering halting all voter registration activities as of July 1, 2023. They have multiple sound reasons to do so: because of the threat of costly fines, for example, Hispanic Federation's largest funders have already said they will withhold donations earmarked for voter registration efforts in Florida. *Id.* ¶ 37. Moreover, even if Organizational Plaintiffs do not cease these activities, they will significantly scale back the volume of voter registration drives they conduct, because most of their staff and volunteers will be banned from participating. *Id.* ¶ 41; Poder Decl. ¶ 42.

*Fifth*, the Law will impact and harm the communities and constituents that Plaintiffs serve. Plaintiffs will register substantially fewer citizens to vote than they could absent the Law. Organizational Plaintiffs work closely with Latino citizens to help them register to vote, relying in part on a network of key community activists

who help shape the organizations' agendas and who play a critical role in implementing their programs. The Law will impact Latino voters who are part of the community and constituency that Organizational Plaintiffs serve through their voter registration programs. HF Decl. ¶¶ 44-45; Poder Decl. ¶¶ 45-47.

*Sixth*, the Law will have devastating personal and professional consequences for Individual Plaintiffs, all of whom are currently employed in paid staff positions to assist eligible Floridians with registering to vote. Herrera-Lucha Decl. ¶¶ 11, 20-21; Martínez Decl. ¶ 15; Doe Decl. ¶¶ 18, 23-24. Individual Plaintiffs revere our Nation's democratic ideals. They relish the opportunity to educate and engage community members, helping them understand the significance of their right to vote. They believe that enabling better access to democracy can build accountability and positive change. And because they cannot vote as non-citizens, the voter registration work they do is critical to ensuring that their communities receive adequate representation, as they must rely on eligible voters to protect their interests. Herrera-Lucha Decl. ¶¶ 24-25; Doe Decl. ¶¶ 17, 19-20.

Individual Plaintiffs' rights to engage in political speech and association with TPVROs and community members about the importance of civic engagement and voting will be significantly diminished if the Law goes into effect. The Law will also harm them personally and professionally. As the State Field Director for a registered TVPRO, Plaintiff Herrera-Lucha both canvasses and oversees other canvassers. If

the Law takes effect, she cannot retain this role, which will harm Herrera-Lucha's career and financially impact her ability to provide for herself and her four dependents. Herrera-Lucha Decl. ¶¶ 20-21. Plaintiff Martínez is limited in her physical health, and her work as a canvasser has enabled her to support her family while caring for her wellbeing. If the Law takes effect, she can no longer work as a canvasser or support her family in a way consistent with her physical limitations. Martínez Decl. ¶¶ 15, 20-21. Likewise, the Law will prevent Plaintiff Doe from holding a job where she helps register eligible voters in Florida and will deprive her of her main source of income and the ability to conduct meaningful work that supports her community. Doe Decl. ¶ 23-25.

## III.   ARGUMENT

A preliminary injunction is warranted if plaintiffs show: (1) a likelihood of suffering irreparable harm; (2) a substantial likelihood of success on the merits; (3) the balance of hardships favor them; and (4) the injunction serves the public interest. *Vital Pharms. v. Alfieri*, 23 F.4th 1282, 1290-91 (11th Cir. 2022).

A preliminary injunction's main purpose is to keep the status quo until a final decision on the merits can be reached. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). As the Law has not gone into effect, enjoining it will maintain the status quo pending the decision on the merits.

**A. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.**

Both Organizational and Individual Plaintiffs will suffer—and have already suffered—harms to their First Amendment rights because of the Law's onerous burdens on speech and association, and its facial citizenship-based classification. *See supra* Section II.C. Loss of these "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "[e]ven a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because Plaintiffs' harms "cannot be made whole by money damages and because [the Law] has [a] chilling effect on the free speech and associational rights of [Plaintiffs] and those similarly-situated." *Towbin v. Antonacci*, 885 F.Supp.2d 1274, 1295 (S.D. Fla. 2012); *see also Clean-up '84 v. Heinrich*, 590 F.Supp. 928 (M.D. Fla. 1984). "[T]he intangible nature of the benefits flowing" from these rights means that "if th[ey] are not jealously safeguarded, persons will be deterred ... from exercising [them] in the future." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).

Extinguished opportunities to register voters also constitute irreparable harm, because "when a plaintiff loses an opportunity to register a voter, the opportunity is

21

gone forever." *Browning II*, 863 F.Supp.2d at 1167.[5] Interrupting voter registration operations causes organizations and their workforce to lose valuable time and opportunity to engage in core political speech and add new registrants to the election rolls, irreparably harming them. *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006). That means Organizational Plaintiffs "will [] suffer irreparable injury distinct from the injuries of eligible voters," because "Plaintiffs' organizational missions, including registration and mobilization efforts, will ... be frustrated and [] resources will be diverted" in response to the Law. *Ga. Coal. for People's Agenda v. Kemp*, 347 F.Supp.3d 1251, 1268 (N.D. Ga. 2018). Those "mobilization opportunities cannot be remedied once lost." *Id.*

Individual Plaintiffs will be irreparably harmed by the loss of opportunity to engage in protected voter registration activities and will suffer such harm on the basis of their citizenship status. The Law will also diminish their ability to speak and associate with their community at other events: TPVROs often integrate voter registration efforts into events that educate or serve their communities in other ways, *see, e.g.*, HF Decl. ¶ 17; Poder Decl. ¶ 16, and the Law significantly deters organizations from including Individual Plaintiffs in any activity that could involve

---

[5]    *See also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *League of Women Voters of Mo. v. Ashcroft*, 336 F.Supp.3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of NAACP v. Lawson*, 326 F.Supp.3d 646, 662-63 (S.D. Ind. 2018); *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1350 (N.D. Ga. 2016); *League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1339 (S.D. Fla. 2006).

voter registration. The self-censorship that the Law promotes will carve Individual Plaintiffs out of activities that do not directly involve handling or collecting voter registration forms, impeding Individual Plaintiffs' speech and associational activities. Absent relief, Plaintiffs will lose opportunities to educate community members and help voters register.

Plaintiffs are also currently irreparably harmed because they cannot plan for the future. The Law's overbreadth and vagueness, *see infra* Section III.B.2.b, make it impossible for Plaintiffs to foresee what voter registration activities they can undertake. Each day of planning that Plaintiffs lose diminishes the effectiveness of their voter registration activities and deepens the irreparable injury on Plaintiffs' ability to carry out their mission.

And the Law's prohibition, if it takes effect, will be irreparable. Its threatened impact has already imperiled Organizational Plaintiffs' funding, and if effected, it will endanger their ability to continue operating altogether. HF Decl. ¶¶ 36-43; Poder Decl. ¶¶ 37-44. The Law will also require Organizational Plaintiffs to terminate some of their most experienced personnel, whose experience and knowledge are irreplaceable.

## B. Plaintiffs Will Likely Prevail on the Merits.

1. Plaintiffs Have Standing.

The Law is already inflicting injuries that confer Article III standing on

Plaintiffs. It will continue to do so after its effective date in several ways.

*First*, the Law's limitations on non-citizen assistance in voter registration activities and concurrent financial penalties will chill Plaintiffs' First Amendment activities, including their voter registration efforts. *See supra* Section II.C. "Litigants who are being chilled from engaging in constitutional activity ... suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." *Speech First v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

*Second*, the Law will harm Organizational Plaintiffs by impeding voter-registration activities central to their missions, while forcing them to divert time and resources to attempt to comply with the Law at the expense of other organizational priorities. *See supra* Section II.C; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). And "an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *see Browning*, 522 F.3d at 1165 (organization's diversion of personnel and time to respond to election law established standing).

These injuries are traceable to the Law's challenged provisions. The injunction requested would remedy Plaintiffs' harm by lifting the threat of significant civil penalties, removing the need for Plaintiffs to divert their resources, and eliminating the direct harm to their voter registration activities.

Individual Plaintiffs' standing is also clear: not only will the Law preclude them from engaging in protected speech and association, they will lose their current sources of income—jobs handling and collecting voter registration applications—as a result. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1207 (11th Cir. 2019) ("economic harm is a quintessential injury in fact").

<u>2. Plaintiffs' First Amendment Claim Will Likely Succeed.</u>

The Law imposes burdens on core political expression and association, *infra* Section III.B.2.a, which are only magnified by the Law's overbreadth and vagueness, *infra* Section III.B.2.b. None of the resulting burdens survive exacting scrutiny or even rational basis review, *infra* Section III.B.2.c.

*a.* *The Law restricts core First Amendment freedoms.*

Laws regulating voter registration touch on "core First Amendment activity." *Browning II*, 863 F.Supp.2d at 1158-59. And laws restricting third-party voter registration activity "reduce[] the total quantum of speech." *Cobb*, 447 F.Supp.2d at 1332 (citation omitted). It's clear why: "as part of [] voter registration drives, [plaintiffs] persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions." *Id.* at 1333; *see supra* Section II.A & C. Indeed, Plaintiffs' efforts to help others register to vote are themselves political statements; they signal that Plaintiffs value

the democratic process and believe in the capacity of popular will to shape the government's composition and direction.

Because "this case involves a limitation on political expression," the Law must meet "exacting scrutiny." *Meyer v. Grant*, 486 U.S. 414, 420 (1988); *see also Buckley v. Am. Const. L. Found*., 525 U.S. 182, 204 (1999). In *Meyer*, for example, the Supreme Court applied "exacting scrutiny" in striking down a law that banned paying people who circulated ballot-initiative petitions, finding it "restricted political expression." *Meyer*, 486 U.S. at 420-22.

As in *Meyer*, Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Id.* at 422. Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions," *id*. at 421, and is intimately intertwined with the whole of Plaintiffs' speech and associative activities. *See also Buckley*, 525 U.S. at 186-87 (striking down a similar restriction as in *Meyer*). When Plaintiffs handle and collect Florida citizens' voter registration applications, they engage those citizens regarding the importance of voting, civic engagement, and other issues of organizational importance. HF Decl. ¶¶ 17, 19, 26; Poder Decl. ¶¶ 16, 18, 27.

Nor is Plaintiffs' protected First Amendment activity severable from any "purely logistical aspects of the voter registration process." *Tenn. State Conf. of*

*N.A.A.C.P. v. Hargett*, 420 F.Supp.3d 683, 699 (M.D. Tenn. 2019). It cannot be "sliced and diced" to avoid constitutional scrutiny. *See id.* Courts have consistently recognized that this kind of expressive political speech cannot be disaggregated to avoid cutting into protected activity. *Cf. Meyer*, 486 U.S. at 421-22 ("[C]irculati[ng] a petition involves ... interactive communication concerning political change."); *see also Cobb*, 447 F.Supp.2d at 1332 (finding restrictive third-party voter registration law "analogous to [the law] in *Meyer*").

The Law also restricts Plaintiffs' association with their staff, volunteers, and other Florida citizens through voter registration activities. *Supra* Section II.A & C. There is no "doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) (citations omitted). "An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" *VoteAmerica v. Schwab*, --- F.Supp.3d ---, No. CV 21-2253-KHV, 2023 WL 3251009, at *10 (D. Kan. May 4, 2023) (citations omitted). "Public endeavors which 'assist with voter registration are intended to convey a message that voting is important,' and [those that] expend resources 'to broaden the electorate to include allegedly under-served communities' qualify as expressive conduct which implicates the First Amendment freedom of

association." *Id.* (citation omitted).

The Law will impede Plaintiffs' associational rights by limiting the audience they can reach, and their ability to broaden the electorate. It prohibits non-citizen staff and volunteers—and, given its strict liability standard and substantial fines, citizens who cannot or are unwilling to furnish proof of citizenship—from engaging eligible voters. In so doing, the Law severely burdens Organizational Plaintiffs' associational rights, eliminating the majority of the workforce that they rely on to broaden the base of public participation. Its burdens will necessarily reduce the volume and reach of Organizational Plaintiffs' voter registration activity, *see* HF Decl. ¶ 41; Poder Decl. ¶ 42, inhibiting their association with Florida citizens through voter registration outreach. And of course, it bans Individual Plaintiffs from engaging in these associational activities altogether. *See supra* Section II.C.

Further, the Law violates the right to "associate for political purposes" and freely engage with members of the public. *Buckley*, 525 U.S. at 215 (citation omitted). It "decreases the pool" of volunteers and staff who will engage in voter registration activity, "limit[ing] the number of voices who will convey" Plaintiffs' messages and decreasing "'the size of the audience [Plaintiffs] can reach.'" *Id.* at 183 (citations omitted); *Priorities USA v. Nessel*, No. 2:19-CV-13341, 2022 WL 4272299, at *6 (E.D. Mich. Sept. 15, 2022) (distinguishing absentee-ballot regulation from *Meyer* because the challenged law did not "restrict[] the number of

persons who could convey the political message"); HF Decl. ¶ 24; Poder Decl. ¶ 24.

The Law's onerous requirements—and the substantial strict liability fines they threaten—burden Plaintiffs' political expression, diminishing their ability to convey their message and engage more individuals in the political process. The Law burdens Plaintiffs' political speech, and is "accordingly 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (citation omitted).

The standard does not change if the Court approaches the level of scrutiny through the *Anderson-Burdick* framework. *See generally VoteAmerica*, 2023 WL 3251009, at *15. In applying that framework, courts "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997). "Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest." *Id.*

The Law's burdens on Plaintiffs' speech and association rights are severe. They are the kind of "direct restrictions or preconditions" on constitutionally-protected activity that courts have warned against. *See League of Women Voters of Fla. v. Browning* (*Browning I*), 575 F.Supp.2d 1298, 1322 (S.D. Fla. 2008). In

*Browning I*, plaintiffs challenged a measure that imposed disclosure requirements and deadlines on TPVROs' activities. The district court explained that "Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity." *Browning I*, 575 F.Supp.2d at 1321-22. But the court concluded that the challenged law did *not* "direct[ly] restrict[] or precondition[] [] those interactions," because it did "not ... restrict[] ... who is eligible to participate in voter registration drives or what methods or means [TPVROs] may use to solicit new voters and distribute registration applications." *Id.*

The Law here does precisely what *Browning* warned against: it restricts "who is eligible to participate in voter registration drives" and the "methods or means [TPVROs] may use to solicit new voters and distribute registration applications." *Id.* By banning most of Organizational Plaintiffs' staff—and, likewise, precluding Individual Plaintiffs—from participating in voter registration, the Law limits the means by which Plaintiffs can register voters.

> b. *The Law's overbreadth and vagueness magnify the burdens on Plaintiffs' speech and association.*

The Law is also unconstitutionally overbroad. "[O]verbreadth doctrine is designed 'to prevent the chilling of protected expression.'" *Speech First*, 32 F.4th at 1125 (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989)); *Nationalist Movement v. City of Cumming*, 934 F.2d 1482, 1485 (11th Cir. 1991). Overbreadth

"results when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1502 (11th Cir. 1990); *see United States v. Williams*, 553 U.S. 285, 292 (2008). Courts are especially concerned about overbroad and vague laws that may improperly chill speech. *See Reno v. Am. Civ. Liberties Union,* 521 U.S. 844, 871-72 (1997).

A statute's overbreadth is judged by its "'possible direct and indirect burdens on speech.'" *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002) (citations omitted). Here, the Law's indirect burdens plainly reveal its overbreadth. For example, Hispanic Federation will no longer work with canvassers who fail to provide proof of citizenship, including even U.S.-citizen staff and volunteers who cannot (or choose not to) furnish such proof. HF Decl. ¶ 32. And Poder Latinx will cease its partnerships with local schools and student canvassers because of the added hurdle of confirming students' citizenship status. Poder Decl. ¶ 34. These two acts of "self-censorship, compelled by the State," will reduce Organizational Plaintiffs' ability to engage in plainly lawful and protected activities to broaden the electorate, and so their burden will "become the public's burden," resulting in fewer eligible Floridians registering to vote. *Smith*, 361 U.S. at 153-54.

The Law's breadth is "magnified by [] strict-liability phrasing." *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010). Because the absence of a scienter

requirement "may tend to work a substantial restriction on the freedom of speech and of the press," strict liability "cannot be applied in settings where [it has] the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Smith v. California*, 361 U.S. 147, 150-51 (1959). Here, the Law imposes a monetary fine large enough to put TPVROs out of business without any kind of scienter requirement. That risk is magnified because the key prohibited activities of "collecting" or "handling" are undefined. The Law will thereby impose a "a severe limitation on" TPVROs' ability to engage with eligible voters. *Id.* at 153.[6] Thus, the Law's "strict liability component … chills the exercise of First Amendment rights" and is unconstitutional because "any statute that chills the exercise of First Amendment rights must contain a knowledge element." *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) (citation omitted).

Imprecise laws may also be attacked via vagueness challenge under the Due Process Clause. *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999); Compl. ¶¶ 111-118 (alleging due process violation). The Law fails to define what constitutes "collecting or handling voter registration applications," particularly regarding non-

---

[6]    Though *Smith* examined a criminal law, where "a fine may be imposed by the state for violating the Act," the Law still "carries … the risk of self-censorship discussed in *Smith*." *Video Software Dealers Ass'n v. Webster*, 773 F.Supp. 1275, 1282 (W.D. Mo. 1991), *aff'd*, 968 F.2d 684 (8th Cir. 1992).

citizens who manage or supervise other employees' registration activities, input or transmit applicants' data electronically, or inadvertently come into contact with an application at a TPVRO office or event. HF Decl. ¶ 34. Its vagueness makes it all the more overbroad. In conducting its analysis, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 n.6 (1982). Thus, the Law's vagueness "affects overbreadth analysis," because "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'" *Id*.

Because Organizational Plaintiffs and other TPVROs will be "inhibited in utilizing their protected first amendment communications [due to] the overly broad statute," the Law is unconstitutionally overbroad. *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1514 (11th Cir. 1985). To the extent any of the conduct section 97.0575 proscribes can be lawfully prohibited, the Law reaches "at least potentially, protected speech," *Am. Booksellers*, 919 F.2d at 1502, by deterring Plaintiffs from communicating civic and political messages, and from engaging in associational activity important to advancing their missions and beliefs, providing the public with fewer options to register to vote and fewer opportunities to associate with Plaintiffs in meaningful civic activities. In this way, the Law's overbreadth and vagueness amplify the severity of its burdens on Plaintiffs' speech.

      *c.*  *The Law is not designed to serve any legitimate government interest,*
         *nor narrowly tailored to serve a compelling one.*

The Law's provisions are not meaningfully designed to serve any legitimate government interest. SB7050 classifies *all* non-citizens as untrustworthy based solely on their citizenship status, including lawful permanent residents and veteran non-citizens who have served in the U.S. military. It also blanket-bans, *e.g.*, non-citizens who can work in Florida's Division of Elections and Department of Highway Safety & Motor Vehicles from voter registration activities, notwithstanding that they have access to the same information found on voter registration forms, *see* Fla. Stat. §§ 97.0525, .057.

During legislative debate, the bill's sponsors cited "protecting [] sensitive information" on completed registration forms as the Law's rationale; they also voiced their view "that there are certain rights in our country that only citizens get to enjoy."[7] And Senator Hutson, who co-introduced the bill, commented that it was meant to ensure "illegal[s]" didn't handle voter registration applications.[8]

These comments ignore that Florida's government entrusts non-citizens to work in various positions where they handle the same "sensitive information" at

---

[7]   *Fla. Senate Floor Debate on SB7050*, at 49:36-50:49 (Apr. 26, 2023), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000.

[8]   *Fla. Senate Floor Debate on SB7050*, at 48:35-49:02 (Apr. 26, 2023), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000&Redirect=true.

issue. Nor does SB7050 exempt non-citizens who are *lawfully* in the United States. And no evidence of non-citizens mishandling voter registration applications was presented or discussed during SB7050's two Senate committee hearings.

To be sure, the state "has a substantial interest in seeing that those who collect voter-registration applications actually get them to an appropriate voter-registration office." *Browning II*, 863 F.Supp.2d at 1163. That "interest is sufficient" to know "the identity of those who run a voter-registration organization and [that] of any employee or volunteer who collects voter-registration applications." *Id.* But Organizational Plaintiffs already submit that information to the Division of Elections under current law. Fla. Stat. § 97.0575(1)(c); HF Decl. ¶ 31; Poder Decl. ¶ 32.

The Law's wholesale ban on a specific class from engaging in voter registration activities, as well as its punitive fines, are a different thing altogether. The Law: (a) completely prohibits a (suspect) class of employees and volunteers from engaging in registration work without any evidence or legitimate basis for believing that they will not properly return the application, *cf. Browning I*, 575 F.Supp.2d at 1322, and (b) carries a fine sufficient to put TPVROs out of business for inadvertent mistakes about a person's citizenship status or about what constitutes the undefined "collecting" or "handling" that the law prohibits, *cf. Cobb*, 447 F.Supp.2d at 1338-39 ("The instant case is distinguishable from [cases challenging disclosure requirements] because the threat of fines has rationally chilled Plaintiffs'

exercise of free speech and association, as well as that of Plaintiffs' volunteers.").

The state's interests in the integrity of the voter registration process and registration records are already directly addressed by other provisions of Florida law. For example, it is already a crime to submit false voter registration information, Fla. Stat. § 104.011; offer an eligible citizen financial consideration in exchange for becoming a registered voter, *id.* § 104.012(1); or alter a voter registration application without the applicant's consent, *id.* § 104.012(4). And the supervisor of elections has authority "to investigate fraudulent registrations" and report findings to prosecutors. *Id.* § 104.42(1). There is no evidence that these provisions are insufficient or that the challenged provisions further protect the integrity of the voter registration process. *See Meyer*, 486 U.S. at 426-27 (state failed to show challenged procedures were necessary where pre-existing procedures were "adequate to the task of minimizing the risk of improper conduct").

Ultimately, not only is the Law *not* narrowly tailored to serve any compelling government interest, it serves no purpose other than to make it prohibitively difficult for civic organizations to help legitimate, qualified, eligible citizens register to vote.

### 3. Plaintiffs' Equal Protection Claim Will Likely Succeed.

The Law also discriminates against Individual Plaintiffs because of their citizenship status, in violation of the Equal Protection Clause.

Ordinarily, "a state law that discriminates on the basis of alienage can be

sustained only if it can withstand strict judicial scrutiny." *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984); *see also Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012) ("[T]reating groups differently based on the members' alienage [i]s akin to discriminating against a group because of their race or color."). The Supreme Court has applied strict scrutiny to invalidate laws excluding non-citizens from "employment in permanent positions in the competitive class of the state civil service," "membership in the State Bar," "the practice of civil engineering," and appointment as a notary. *Bernal*, 467 U.S. at 220, 226 (citations omitted).

While there is a limited "narrow political-function exception" to strict scrutiny, *Bernal*, 467 U.S. at 220-21, it is not applicable here. This exception is cabined to roles that "routinely exercise discretionary power" of the state, "plac[ing] them in a position of direct authority over other individuals," like probation officers, teachers, or police. *Id.* Individuals who collect or handle voter registration applications are not "invested either with policymaking responsibility or broad discretion in the execution of public policy." *Id.* at 226. Nor, for that matter, do they routinely "exercise [] authority over individuals." *Id.*[9]

---

[9]   Courts apply a two-part test to determine if a citizenship-based restriction fits the political-function exception. Courts ask whether: (1) the regulation is "sufficiently tailored," and (2) the regulation applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions,'" or "officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Id.* at 221-22 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 440 (1982)) (citations omitted). Neither factor applies. *See infra*.

*Bernal* proves the point. There, the Supreme Court struck down a statute prohibiting non-citizens from being notaries. *Id.* at 222-23. The Court "recognize[d] the critical need for a notary's duties to be carried out correctly and with integrity"— much like those of persons who register voters. *Id.* at 225. But it reasoned that "a notary's duties ... hardly implicate responsibilities that go to the heart of a representative government." *Id.* Rather, roles that come within the "the political-function exception" are "invested either with policymaking responsibility or broad discretion in the execution of public policy that requires the routine exercise of authority over individuals." *Id.* at 226. Neither notaries (in *Bernal*) nor TPVRO employees (here) are so invested.

Further, strict scrutiny is especially warranted for laws, like this one, "that affect[] *resident* aliens," and reach further than "*illegal* aliens." *Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (emphasis in original). "The Supreme Court has noted [] a 'more searching judicial inquiry' may be needed when a state law targets 'discrete and insular minorities' [with] no direct voice in the political process." *Id.* at 1310 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)). And it "has in fact found that resident aliens are the type of 'discrete and insular' minorities [with] no political voice [who] qualify for heightened scrutiny." *Id.*; *see also, e.g.*, *LeClerc v. Webb*, 419 F.3d 405, 417 (5th Cir. 2005) ("Characterizing resident aliens as a *Carolene Products* minority reconciles the

breadth of rights and responsibilities they enjoy with their lack of political capacity.").

Individual Plaintiffs have thus shown a likelihood of success on their equal protection claims. The Law explicitly discriminates against non-citizens on the basis of their citizenship status—a suspect classification. There is no compelling reason for this discrimination. In debates, legislators cited no examples of non-citizens mishandling or failing to return voter registration forms.

Even if those problems existed, preventing an entire suspect class of people from an activity based on their citizenship status serves no compelling—or even rational—goal. Rather, by legislators' admission, the Law intends to prevent non-citizens—or, more specifically, as SB7050 co-sponsor Senator Hutson stated, "illegal[s]"—from helping register eligible voters. The Law is marked by "a dogged animus against" non-citizens, which "[t]he Supreme Court has made very clear [] cannot constitute a legitimate state interest[.]" *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 970 (9th Cir. 2017) (citing *Romer v. Evans*, 517 U.S. 620, 634 (1996)). "[A] bare [] desire to harm a politically unpopular group," *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), cannot serve "legitimate state interests." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring in the judgment).

*Moreno* highlights the Law's discrimination against Individual Plaintiffs. In *Moreno*, the Court struck down a law preventing households where unrelated

individuals lived from receiving food stamps because it purposefully "discriminate[d] against hippies." 413 U.S. at 534. The government's asserted interest—preventing food stamp fraud—did not meet even rational basis review. *Id.* at 535-38. Lawmakers assert similar fraud-prevention motives here. But as in *Moreno*, SB7050 is overinclusive and "does not operate [] as rationally to further the prevention of fraud." *Id.* at 537. Other election code provisions already do that, *see* Fla. Stat. §§ 104.011, .012, .42, and additional nondiscriminatory laws criminalize identification-theft-related behavior, *see, e.g.*, Fla. Stat. § 817.02 (criminalizing obtaining property by false personification). Because the Law does not serve a rational interest, it cannot survive any level of constitutional scrutiny.

Nor is the Law sufficiently tailored to serve Defendants' purported goals. At a minimum, it is "fatally underinclusive," specifying "only one particular post with respect to which the State asserts a right to exclude aliens" while allowing non-citizens to perform other similar functions. *Bernal*, 467 U.S. at 222. For example, a "permanent resident alien may apply and be appointed" as a notary public, a position that also involves handling signatures and other personal information. Fla. Stat. § 117.01(1). And non-citizens can have access to the same information on completed registration forms, *e.g.*, if they serve on Florida's Elections Commission or various state agencies. Fla. Stat. §§ 97.0525, .057. Such underinclusivity "tends to undercut the [] claim that the classification serves legitimate political ends." *Bernal*, 467 U.S.

at 221. Moreover, "it is appropriate that a State bear a heavy burden when it deprives [aliens] of employment opportunities." *In re Griffiths*, 413 U.S. 717, 722 (1973). Defendants fail to satisfy that burden.

### C. The Public Interest and Balance of Hardships Favor Injunctive Relief.

"The vindication of constitutional rights and the enforcement of a federal statute serve the public interest almost by definition. And allowing responsible organizations to conduct voter-registration drives—thus making it easier for citizens to register and vote—promotes democracy." *Browning II*, 863 F.Supp.2d at 1167. "Quite simply, allowing for easier and more accessible voting for all segments of society serves the public interest." *League of Women Voters of Fla. v. Detzner*, 314 F.Supp.3d 1205, 1224 (N.D. Fla. 2018).

An injunction wouldn't alter the existing framework that ensures only qualified voters can register, and it would leave open a critical path to voter registration. Ensuring this pathway stays open particularly serves the public interest.

Nor would an injunction harm the public. It only preserves the status quo pending determination on the merits. *See Bloedorn*, 631 F.3d at 1229. An injunction preventing the Law's implementation: (a) would not alter qualifications to be an eligible voter in Florida; (b) would not change any of the robust statutes that already govern improper voter registration (*e.g.*, Fla. Stat. §§ 104.011, .012, .42); and (c) would only prevent the imposition of extraordinary burdens on civic organizations

and non-citizen individuals. The injunction will not cause harm; it just preserves Florida law as-is.

Moreover, the state will suffer no harm from being enjoined from enforcement because the Law will likely be found unconstitutional, *supra* Section III.D. The state has no valid interest in enforcing an unconstitutional enactment. *KH Outdoor*, 458 F.3d at 1272-73.

## IV.   CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin the Law and grant all relief that it deems just and proper.

## LOCAL RULE 7.1(C) CERTIFICATE OF CONFERRAL

On June 1, 2023, counsel for Plaintiffs conferred with counsel for both Defendants. The Defendants oppose the Motion.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 7,958 words.

Respectfully submitted this 8th day of June, 2023,

*/s/ Nicholas L.V. Warren*

Adriel I. Cepeda Derieux\*                      Nicholas L.V. Warren (FBN 1019018)
Julie A. Ebenstein (FBN 91033)          **ACLU Foundation of Florida**
Megan C. Keenan\*                                336 East College Avenue, Suite 203
Dayton Campbell-Harris\*                     Tallahassee, FL 32301
Sophia Lin Lakin\*                                   (786) 363-1769
**American Civil Liberties**                   nwarren@aclufl.org
**Union Foundation**

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
acepedaderieux@aclu.org
jebenstein@aclu.org
mkeenan@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Roberto Cruz (FBN 18436)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org

Cesar Z. Ruiz*
Fulvia Vargas De-Leon[†]
Ghita Schwarz[†]
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
fvargasdeleon@latinojustice.org
gschwarz@latinojustice.org

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Estee M. Konor[†]
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

Evan Preminger[†]
Rayne Ellis[†]
**Arnold & Porter Kaye Scholer LLP**
250 W. 55th Street
New York, NY 10019
(212) 836-7786
evan.preminger@arnoldporter.com
rayne.ellis@arnoldporter.com

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*
*[†] Motion for leave to appear pro hac vice forthcoming*