# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

HISPANIC FEDERATION, et al.,

     *Plaintiffs*,

v.                        Case No. 4:23-cv-218-MW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

     *Defendants*.

_____/

## SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

1

## INTRODUCTION

Plaintiffs seek extraordinary relief. None is warranted. The provision of Florida's election code that Plaintiffs challenge will not affect them until September 30, 2023. Till then, much of the dispute must shift to Florida's rulemaking process. Rulemaking will flesh out definitional issues (resolving many of Plaintiffs' concerns about vagueness and overbreadth) and otherwise crystalize the issues in dispute. Allowing this process to run its course would also further foundational principles of comity and federalism.

Comity and federalism aside, Plaintiffs are not entitled to the relief they seek. The provision they challenge concerns third-party voter registration organizations ("3PVROs"). 3PVROs remain the source of endless complaints. Regulating them makes sense. As does trying different policy approaches to see what works.

The Florida Legislature gets to choose the policies. There's nothing extraordinary about that. The U.S. and Florida Constitutions entrust the Florida Legislature with authority to make such changes. *See* U.S. Const. art I., § 4; Fla. Const. art. III, § 1; Fla. Const. art. VI, § 1. The Florida Legislature exercised its prerogative in passing Senate Bill 7050 ("SB 7050"), which the Governor signed into law. *See* Chapter 2023-120, Laws of Florida ("2023 Law"). This Court should now decline Plaintiffs' invitation to upend the measured policy changes. It should deny the motion for preliminary injunction.

## STATEMENT OF THE CASE AND FACTS

### I.    The provision of Florida law being challenged.

Plaintiffs Hispanic Federation, Poder Latinx, Veronica Herrera-Lucha, Norka

Martínez, A. Doe, and B. Doe ("Plaintiffs") claim that the following provision of the

2023 Law governing section 97.0575 3PVROs violates federal law:

> 1.  Section 97.0575(1)(f), Florida Statutes, which requires a 3PVRO to
>     affirm that each person collecting or handling voter registration
>     applications on behalf of the 3PVRO is a citizen of the United States,
>     and provides that a 3PVRO is liable for a $50,000 fine for each non-
>     U.S. citizen who collects or handles voter registration applications on
>     behalf of the 3PVRO ("**Non-U.S. Citizen Volunteer Restriction**").[1]

*See* ECF No. 1 (Plaintiffs' Complaint).[2]  Plaintiffs only seek to preliminarily enjoin the

Secretary's and the Attorney General's respective enforcement of this provision. *See*

ECF No. 32 (Plaintiffs' Preliminary-Injunction Motion).

### II.    The 2023 Law builds on Florida's solid foundation.

The 2023 Law builds upon the solid foundation of Florida's election laws by

amending numerous provisions of chapters 97, 98, 99, 100, 101, 102, 103, 104, 105, and

106 of the Florida Election Code. *See* Ch. 2023-120, pp. 1-5, Laws of Fla. (summarizing

the statutory provisions amended by the 2023 Law), http://laws.flrules.org/2023/120;

---

[1] This provision applies to employees as well. For consistency's sake, it will be
referred to as Non-U.S. Citizen Volunteer Restriction.

[2] Two other challenges have been brought against specific provisions contained
in the 2023 Law. 4:23-cv-215 (N.D. Fla. 2023); 4:23-cv-216 (N.D. Fla. 2023).

*see also* § 97.011, Fla. Stat. (explaining that chapters 97 to 106 of the Florida Statutes

constitute the "Florida Election Code"). Updates to the Florida Election Code include:

- Mandating that all those whose duties require verification of signatures to undergo signature match training, Ch. 2023-120, § 1, Laws of Fla.;

- Regulating 3PVROs, a frequent source of complaints, *id.* at § 4;

- Ensuring voter information cards provide voters with up-to-date access to their most current polling place locations, *id.* at § 5;

- Increasing information governmental entities must provide for list registration maintenance purposes, *id.* at § 11;

- Enhancing requirements for post-election reports, *id.* at §§ 12, 36;

- Mandating that candidate oaths provide voters with notice of outstanding fines, fees, or penalties owed by candidates for violations of state and local ethics requirements, *id.* at § 15, 43;

- Closing the "ghost candidate" loophole in both primary and general elections, *id.* at § 23;

- Narrowing the category of individuals who can request vote-by-mail ballots on behalf of a voter, *id.* at § 26;

- Clarifying the prohibition against voting more than one ballot at any election, *id.* at § 41; and

- Ensuring that voter guides are transparent, *id.* at § 49.

The Florida Legislature enacted the 2023 Law—including the challenged

provision applicable to 3PVROs—to further Florida's important interests in, among

other things, safeguarding election integrity, preventing voter fraud, and promoting

4

uniformity, efficiency, and confidence in the election system as a whole.[3]  The process used to enact the 2023 Law was run-of-the mill.

Florida's most recent sixty-day legislative session took place from March 7 to May 5, 2023. *See* Art. II, § 3(b), (d), Fla. Const. SB 7050—which became the 2023 Law— was introduced on March 30, 2023. *See* Fla. S. Bill History of SB 7050 (2023), https://www.flsenate.gov/Session/Bill/2023/7050/?Tab=BillHistory. Like most bills, SB 7050 was the subject of various revisions. *See id.* After weeks of committee hearings, floor hearings, amendments, and debate, the Senate on April 26 and the House on April

---

[3] *See, e.g.*, Fla. S. Floor, Debate Regarding SB 7050 – Part 2, at 1:43:18-1:43:53 (April 26, 2023) (Bill Sponsor Senator Burgess: "Related to third-party voter registration organizations, since 2005 there have been regulations on 3PVROs. In every election cycle, there are issues with certain actors within these organizations. . . . I agree that voting is a sacred part of our democracy. And that's why our bill holds those who are custodians of a person's access to voting to a very high standard."), https://thefloridachannel.org/videos/4-26-23-senate-session-part-2/; Fla. S. Floor, Debate Regarding SB 7050 – Part 1, at 59:57-1:44 (April 26, 2023) (Senator Burgess: "The reality is if a third-party voter registration organization fails to submit timely somebody's voter registration, that voter is disenfranchised. . . . And so that's why it's important that we continue to ensure that 3PVROs are adhering to their mission and meeting a standard that we're laying out in law to protect their fiduciary responsibility that they voluntarily seek by asking for voter [sic] registrations."), https://thefloridachannel.org/videos/4-26-23-senate-session-part-1/; Fla. S. Comm. on Fiscal Policy, Debate Regarding SB 7050, at 7:52:20-7:52:25 (April 20, 2023) (Senator Burgess: "Why are we making [all] these changes [in SB 7050]? Well we're doing a great job, but we can always improve in our process."), https://thefloridachannel.org/videos/4-20-23-senate-committee-on-fiscal-policy/; Fla. S. Comm. on Ethics and Elections, Debate Regarding SB 7050, at 23:31-23:40 (April 4, 2023) (Senator Burgess: "This bill strengthens requirements for third-party voter registration organizations to protect individuals who entrust their personal information and voter registration applications to them."), https://thefloridachannel.org/videos/4-4-23-senate-committee-on-ethics-and-elections/.

28 passed the final text of SB 7050. *See id.* Governor DeSantis approved SB 7050 on May 24, 2023. *See* Ch. 2023-120, p. 55, Laws of Fla.

The 2023 Law is consistent with the Legislature's longstanding regulation of 3PVROs as fiduciaries. Florida law provides that "[a] third-party voter registration organization that collects voter registration applications serves as a *fiduciary* to the applicant." § 97.0575(3)(a), Fla. Stat. (emphasis added); *see* Ch. 2005-277, Laws of Fla. (creating section 97.0575, Florida Statutes). A 3PVRO's primary duty as a fiduciary—a role it voluntarily undertakes—is ensuring that each voter registration application entrusted to it by an applicant is "promptly delivered" to the Division of Elections or the supervisor of elections in the county in which the applicant resides "within [the statutorily prescribed number of] days after the application [is] completed by the applicant, but not after registration closes for the next ensuing election." § 97.0575(3)(a), Fla. Stat. If a 3PVRO fails to deliver a voter registration application prior to the book-closing deadline, that applicant's right to vote is extinguished. *See* § 97.053(2), Fla. Stat. (explaining that an applicant is not eligible to vote in an election unless their completed voter registration application is received by a voter registration official and verified prior to the date of book closing for an election); § 97.055, Fla. Stat. (establishing the book-closing deadline for elections).

Over the years, Florida has amended section 97.0575 on several occasions to ensure that 3PVROs are adhering to their fiduciary duties. *See* Ch. 2007-30, § 2, Laws

of Fla.; Ch. 2011-40, § 4, Laws of Fla.; Ch. 2021-11, § 7, Laws of Fla.[4] The 2023 Law was not enacted in a vacuum. While many 3PVROs ably fulfill their fiduciary duties, recent history shows that some unfortunately do not. *See generally* App. at 89 (Declaration of Andrew Darlington).

As explained in the declaration of Andrew Darlington, the current Director of the Department of State's Office of Election Crimes and Security ("Office"), the Office regularly receives complaints of 3PVROs violating Florida's election laws via a variety of sources including election fraud complaints, 3PVRO complaints, and complaints from supervisors of elections or their staff. App. at 90-91. Relatedly, Florida law requires the Office to submit an annual report to the President of the Senate, the Speaker of the House of Representatives, and the Governor detailing information on the Office's investigations of alleged election law violations or election irregularities conducted during the prior calendar year. App. at 90-91; *see* § 97.022(7), Fla. Stat. The Office submitted its most recent report on January 15, 2023 for the 2022 calendar year,

---

[4] Florida law imposes fiduciary duties on a variety of other relationships including brokers to clients, §§ 475.01, 475.278, Fla. Stat., trustees to beneficiaries, § 518.11, Fla. Stat., managing members of LLCs to members, § 605.04091, Fla. Stat., corporate directors to shareholders, § 607.0830, Fla. Stat., general partners to limited partners, § 620.1408, Fla. Stat., partners to partners, § 620.8404, Fla. Stat., and guardians to wards, § 744.446, Fla. Stat. Florida has a long history of recognizing fiduciary relationships and their concomitant duties. *See, e.g.*, *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (explaining that "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation" (quoting Restatement (Second) of Torts § 874 cmt. a.)); *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927) (describing the general parameters of a fiduciary relationship).

which is incorporated by reference in Director Darlington's declaration and attached hereto. App. at 90-91; *see generally* App. at 97 (January 15, 2023 Florida Department of State Office of Election Crimes and Security Report). As evidenced in the report, during 2022, the Office reviewed a large number of complaints involving 3PVROs. App. at 97-188. Notably, the Office reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Florida Statutes, and assessed statutory fines against those 3PVROs that did not comply with the statutory requirements. App. at 90-91.

Also incorporated by reference in Director Darlington's declaration and attached hereto are a sampling of 3PVRO complaints received, 3PVRO fine letters issued, and 3PVRO referrals made by the Department of State between the years 2016 and 2023. App. at 91; *see generally* App. at 362. The Office is concerned with the quantity and types of violations of Florida's election laws by 3PVROs alleged in or evidenced by these documents (especially those that resulted in the assessment of fines, those that resulted in referrals to other agencies for further investigation, and those that resulted in criminal prosecution). App. at 91. The types of violations alleged in or evidenced by these documents include among other things:

  a. 3PVROs failing to deliver voter registration applications to election officials before the book closing deadline for federal or state elections. (Whenever a new applicant's voter registration application is not delivered by a 3PVRO prior to the book closing deadline, that voter is deprived of the right to vote in the next election.)

      b.  3PVROs failing to deliver voter registration applications to the division or the supervisor of elections in the county in which the applicant resides within 14 days after applications are completed by applicants.

      c.  3PVROs failing to deliver voter registration applications to the correct supervisor of elections in the county in which the applicant resides.

      d.  3PVRO agents charged or alleged with violation of a criminal statute.

App. at 91. Also incorporated by reference to Director Darlington's declaration are news articles, a press release, and a letter that discuss 3PVRO issues. App. at 960.

Director Darlington's declaration further explains that, generally speaking, the 2023 Law Florida promotes the State's interests in safeguarding election integrity, preventing voter fraud, and promoting uniformity, efficiency, and confidence in the election system as a whole. App. at 91-95. The 2023 Law reflects the State's continuing efforts to protect the right to vote by ensuring that 3PVROs are abiding by their fiduciary duties under Florida law. App. at 91-95.

The provision of the 2023 Law that Plaintiffs challenge is reasonable, rational, constitutional, and legal voting regulation. Notwithstanding these facts, Plaintiffs filed suit and are seeking preliminary injunctive relief.

### III.   The 3PVRO-related provision won't apply to Plaintiffs until September 30, 2023.

As noted above, Plaintiffs seek to enjoin enforcement of the Non-U.S. Citizen Volunteer Restriction. They fear that the challenged provision of the 2023 Law (and their perceived harms) will take effect on July 1, 2023. Not true.

The 2023 Law states that "this act shall take effect July 1, 2023" "[e]xcept as otherwise expressly provided in this act." Ch. 2023-120, § 52, Laws of Fla. The 2023 Law goes on to say that "[t]he requirements of [section 97.0575] are retroactive for any third-party voter registration organization registered with the department as of July 1, 2023, and must be complied with within 90 days after the department provides notice to the third-party voter registration organization of the requirements contained in this section." *Id.* at § 4 (renumbering and amending § 97.0575(12), Fla. Stat.). The Department of State intends to issue the requisite notice—which starts the ninety-day clock within which Plaintiffs' must comply with the new requirements—on July 1, 2023. Accordingly, at the earliest, Plaintiffs need not comply with the 2023 Law's changes to section 97.0575 until September 30, 2023. *See* § 97.0575(12), Fla. Stat.

Indeed, Notices of Rule Development regarding the Rules governing 3PVROs and vote-by-mail ballots were published on June 22, 2023 and Plaintiffs (along with other stakeholders) are invited to the workshop scheduled for July 10, 2023 to participate in crafting the language and forms. *See* Fla. Admin. Code. R. 1S-2.042 (Third-Party Voter Registration Organizations); Fla. Admin. Code R. 1S-2.055 (Vote-by-mail

Requests); Fla. Admin. Reg. § 1, Vol. 49, No. 122[5]; *see also* § 97.012(1)-(2), Fla. Stat.; §

97.012(9), Fla. Stat.; § 101.62(1)(a), Fla. Stat.; § 101.62(6), Fla. Stat.; § 101.662, Fla. Stat.;

§ 120.54, Fla. Stat.  Copies of the current drafts of Rule language are attached hereto.

App. at 1-87. Florida law authorizes stakeholders and members of the public to provide

comments to the Division about the proposed rules, including any proposed changes

thereto. *See generally* § 120.54, Fla. Stat. Plaintiffs are welcome to share their perspective.

The proposed rules concern the provision at issue before this Court. The

proposed rules elucidate the meaning of the phrase "collecting or handling" as used in

the Non-U.S. Citizen Volunteer Restriction. If adopted, the proposed rules will almost

certainly moot various aspects of Plaintiffs' claims and their related request for

preliminary injunctive relief. At the very least, any finalized rules have the potential to

narrow the scope of the issues now before this Court. And, rulemaking should be

complete prior to the challenged requirements becoming effective on October 1, 2023.

No preliminary injunction is appropriate or necessary.

## RELEVANT LEGAL STANDARD

The "extraordinary and drastic remedy" of a preliminary injunction, *McDonald's*

*Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998), requires the movant to clearly

establish: (1) a substantial likelihood of success on the merits; (2) irreparable harm

---

[5] Available at: http://www.FLRules.org/gateway/View_Notice.asp?id=27257308 (3PVRO); http://www.FLRules.org/gateway/View_Notice.asp?id=27257405 (vote-by-mail).

absent the injunction; (3) harm to the movant that outweighs any harm to the opposing party; and (4) that the injunction furthers the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The first two factors are the most important and, when the State is the non-moving party, the last two factors merge. *Swain v. Junior*, 958 F.3d 1081, 1088, 1091 (11th Cir. 2020). The opposing party also doesn't have "the burden of coming forward and presenting its case against a preliminary injunction." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 442 (1974)). And, absent class certification, "injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021) (cleaned up) (emphasis added).

## ARGUMENT

Given the ongoing rulemaking, *Burford* abstention (or deferral of any preliminary injunction until after September 30, 2023) is appropriate. Alternatively, this Court should deny the motion because Plaintiffs can't meet any of the four prongs necessary to obtain a preliminary injunction. There is no likelihood of success on constitutional or statutory grounds. There is no irreparable harm. And the equities and public interest tilt decidedly in the State's favor.

## I.  THIS COURT SHOULD ABSTAIN OR OTHERWISE DEFER RULING ON PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION.

### A.  *Burford* abstention is appropriate at this juncture.

Federal courts should abstain from deciding cases where doing so furthers the "paramount interests of another sovereign" and the "principles of comity and federalism." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). Those interests and principles weigh in favor of abstention "when, by exercising its jurisdiction, a federal court would interfere with an ongoing state administrative proceeding or action." *Deal v. Tugalo Gas Co.*, 991 F.3d 1313 (11th Cir. 2021). In other words, such abstention—*Burford* abstention—is appropriate to avoid "disrupt[ion] [of] a state's effort, through its administrative agencies, to achieve uniformity and consistency in addressing a problem." *Siegel*, 234 F.3d at 1173.

As in this response, and in the attachments, the State is in the process of rulemaking. That process should conclude before October 1, 2023. Federal judicial intervention before then would interfere with the rulemaking process; however, rulemaking has the potential to resolve many of the issues—such as vagueness and overbreadth—now before this Court. Any remaining issues would be further streamlined. If ever a case called for abstention, this is it.  And so, the Secretary asks this Court to exercise its discretion and abstain. *Cf. Harman v. Forssenius*, 380 U.S. 528, 534 (1965) ("Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law,

abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication.").

**B.    Deferring is otherwise appropriate at this juncture.**

Or this Court can defer ruling on Plaintiffs' motion until after September 30, 2023. This is for two reasons.

*First*, the requested injunctive relief is unnecessary to maintain the status quo. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001). As explained previously, notwithstanding the July 1, 2023 effective date of the 2023 Law, Plaintiffs need not comply with any of the 2023 Law's changes to section 97.0575 until September 30, 2023. *See* § 97.0575(12), Fla. Stat. That's because the Department's July 1, 2023 notice to Plaintiffs will start running the ninety-day clock within which Plaintiffs' must comply with such changes. *See id.* In other words, Plaintiffs' request to preliminarily enjoin the enforcement of a provision of section 97.0575—i.e., the Non-U.S. Citizen Volunteer Restriction—is already being accomplished for a ninety-day period by automatic operation of Florida law. No temporary injunction is necessary to maintain the status quo at this time.

*Second*, and relatedly, many aspects of Plaintiffs' challenges to the provision of the 2023 Law will almost certainly become moot within the ninety-day period. Among

14

other things, Florida law provides the Department with broad authority to "adopt by rule uniform standards for the proper and equitable interpretation and implementation . . . of the Election Code" and "[p]rovide uniform standards for the proper and equitable implementation of the registration laws by administrative rule." § 97.012(1)-(2), Fla. Stat.; *see* § 120.54, Fla. Stat. Consistent with those and other grants of authority, the Department of State has initiated rulemaking to implement the 2023 Law's changes to section 97.0575 3PVROs. *See also* § 97.012(9), Fla. Stat.; § 101.62(1)(a), Fla. Stat.; § 101.62(6), Fla. Stat.; § 101.662, Fla. Stat. The rules will have a real-world winnowing effect on Plaintiffs' claims and will necessarily narrow the scope of injunctive relief being sought by them. And once final, there is no reasonable expectation that the Department will repeal them. *See A.R. v. Sec'y Fla. Ag. for Health Care Admin.*, 769 F. App'x 718, 724-28 (11th Cir. 2019) (discussing the standards for mootness and determining that the district court properly dismissed certain counts within the plaintiffs' complaint as "moot" after the Florida Agency for Healthcare Administration promulgated a new rule).

Under the circumstances, it makes little sense to decide Plaintiffs' preliminary-injunction motion on a truncated timeline during a ninety-day period. Again, Plaintiffs are not yet affected by the changes to the 2023 Law they seek to enjoin. The rulemaking will clarify state law, through a state process. Those clarifications will resolve many of the claims now before this Court such as how to comply with the Non-U.S. Citizen

Volunteer Restriction. Interpretive concerns of the phrase "collecting or handling" will also be addressed. So the State asks this Court to stay its hand.

## II.   ALTERNATIVELY, THIS COURT SHOULD DENY PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION.

If the Court is inclined to rule on Plaintiffs' preliminary-injunction motion, the motion should be denied.

### A.   Plaintiffs are unlikely to succeed on the merits.[6]

### i.   The Non-U.S. Citizen Volunteer Restriction isn't vague.

**a.** Plaintiffs are unlikely to succeed on the merits of their vagueness challenge against the Non-U.S. Citizen Volunteer Restriction. "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). A vague statute involves not just points of imprecision or confusion, but "hopeless indeterminacy" and "grave uncertainty." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213-14 (2018). "Courts should not lightly declare laws to be void for vagueness." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66

---

[6] Plaintiffs contend that they have standing to challenge the Non-U.S. Citizen Volunteer Restriction. Given the expedited briefing schedule, the Secretary generally focuses his attention on Plaintiffs' preliminary-injunction arguments instead of Plaintiffs' standing arguments. Nonetheless, this Court has "an independent obligation to examine" its "own jurisdiction" and may do so sua sponte. *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (cleaned up).

F.4th 905, 946 (11th Cir. 2023). "Facial vagueness [only] occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *Id.* (citation omitted).

**b.** Plaintiffs argue that the Non-U.S. Citizen Volunteer Restriction is vague because the statute does not define what it means to "collect[] or handl[e]" voter registration applications. *See* § 97.0575(1)(e)-(f), Fla. Stat. That's wrong. "[A] statute is not ambiguous merely because it contains a term without a statutory definition." *United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997).

The plain meaning of the words "collect" and "handle" allay any concerns. "[C]ollect" is commonly understood to mean "to gather" "from a number of persons." *Merriam-Webster's Collegiate Dictionary* 243 (11th ed. 2005). "[H]andle," ordinarily means "to manage with the hands." *Merriam-Webster's Collegiate Dictionary* 565 (11th ed. 2005); *see The American Heritage Dictionary* 796 (5th ed. 2018) (same). Both words thus require some physical custody. The physical custody requirement becomes clearer still when considering the words together. For example, a postman who "collects" letters from mailboxes takes physical possession of the letters. He continues to "handle" the letters on behalf of the senders until he gives them to the recipient or another postman responsible for processing the letters.

"Person[s] collecting or handling voter registration applications on behalf of [3PVROs]" are much like the postman. *See* § 97.0575(5)(a), Fla. Stat.; *see also* § 97.053, Fla. Stat. (providing an avenue for the "hand deliver[y]" of voter registration

applications by the applicant or a "third party"). They "collect" physical applications directly from applicants, and continue to "handle" the physical applications on behalf of the applicants until taking the applications to the Division of Elections, the supervisor of elections for the county in which the applicant resides, or to another agent of the 3PVRO responsible for actually delivering the applications to election officials.

The statute thus provides people of reasonable intelligence with notice of what "collecting or handling" voter registration applications means: physically collecting or handling completed voter registration applications—not *blank* forms—or otherwise exercising custody over completed voter registration applications. Contrary to Plaintiffs' position, there are no restrictions on encouraging eligible citizens to complete applications without the non-citizen touching the application, directing eligible citizens to online content, or supervising those who collect or handle completed applications. And it's equally clear that a 3PVRO volunteer physically reviewing a completed voter registration form falls within the statute's ambit.

**c.** To the extent that Plaintiffs harbor doubt about the meaning of the statute because the word "handle" can also mean "to have overall responsibility for supervising or directing," *Merriam-Webster's Collegiate Dictionary* 565 (11th ed. 2005), they ignore the statute's context. The statutory prohibition applies to "collecting or handling *voter registration applications*," § 97.0575(1)(e), Fla. Stat. (emphasis added), not collecting or handling *persons* who collect or handle voter registration applications. Had the Florida Legislature intended to accomplish what the Plaintiffs say, it could have done so by

stating "collecting or handling, or supervising or directing the collecting or handling, of voter registration applications." It didn't.

> ## ii. The Non-U.S. Citizen Volunteer Restriction isn't overbroad.

Plaintiffs are also unlikely to succeed on the merits of their overbreadth challenge against the Non-U.S. Citizen Volunteer Restriction. A statute is impermissibly overbroad under the First Amendment—and facially unconstitutional—if its "application to protected speech [is] substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications." *League of Women Voters*, 66 F.4th at 948 (quoting *Virginia v. Hicks*, 539 U.S. 113, 120 (2003)). "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second is to determine whether the challenged statute as construed prohibits a substantial amount of protected speech in comparison to its legitimate sweep. *See id.* at 297. "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 (1988) (citation omitted). "[P]erfection is not required." *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1378 (11th Cir. 2021) (citation omitted).

The Non-U.S. Citizen Volunteer Restriction is not overbroad. As explained above, the statute prohibits non-citizens from collecting or handling voter registration

applications. No more. No less. As explained in greater detail below, the statute doesn't concern protected speech—much less a substantial amount of protected speech. Overbreadth isn't implicated. Plaintiffs' concerns about strict liability are ameliorated by the Department's pending rules. And, as further explained below, even if the statute did encompass some protected speech, the State's interests outweigh any potential First Amendment concerns.

### iii.   The Non-U.S. Citizen Volunteer Restriction complies with the First Amendment.

**a.** More broadly, Plaintiffs are unlikely to succeed on their First Amendment challenge to the Non-U.S. Citizen Volunteer Restriction. The First Amendment protects the freedom of speech and the freedom to associate. At its heart is the freedom to engage in "political discourse" and "direct one-on-one communication" about politics. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). A related right is the freedom to politically associate. *NAACP v. Button*, 371 U.S. 415, 417 (1961). That said, the First Amendment doesn't protect non-expressive conduct. *Rumsfeld v. FAIR*, 547 U.S. 47, 65-66 (2006). If conduct isn't "inherently expressive," it doesn't come within the First Amendment's ambit. *Id.* Otherwise, "an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

**b.** In this instance, Plaintiffs say that the Non-U.S. Citizen Volunteer Restriction infringes on their First Amendment rights to engage in core political speech and to

politically associate. That's because some of Plaintiffs' volunteers—non-citizens—can't engage with eligible voters, and that Plaintiff organization can't enlist their support. The problem with this argument is twofold.

*First*, the argument depends, in part, on an expansive reading of the prohibition imposed. To reiterate, based on text and context, the Secretary interprets "collecting or handling voter registration applications on behalf of" 3PVROs as physically collecting or handling *completed* voter-registration applications on behalf of 3PVROs. That prohibition doesn't apply to *blank* applications. And that prohibition doesn't concern the *supervision* of those who collect or handle completed applications. The rulemaking now underway will test that interpretation. At the very least, because the Secretary must promote election uniformity, his interpretation of this provision of the State's election-code provision should be given weight. *See Hamer v. Musselwhite*, 376 F.2d 479, 481 (5th Cir. 1967). That's the interpretation this Court must assess. *See generally Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

*Second,* regulating who can collect and handle *completed* voter-registration applications is a regulation of non-expressive conduct, not speech. Non-citizens can still walk up to eligible voters, discuss the importance of voting and registering to vote, discuss politics more generally, encourage someone to register to vote, and even provide a blank voter-registration application. The non-citizens just can't collect or handle completed voter-registration forms with critical applicant-specific information on the completed form. Collecting or handling completed voter registration forms conveys no

message; the person with custody simply acts as a fiduciary for the registrant. Neither speech nor expressive conduct is thus being regulated. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) (regulations concerning "the receipt and delivery of completed voter-registration applications" are "non-expressive activities"); *LWVFL v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008) (the "collection and handling of voter registration applications is not inherently expressive activity"); *see also Feldman v. Reagan*, 843 F.3d 366, 392 (9th Cir. 2016) (en banc) ("ballot collection" isn't "expressive conduct protected under the First Amendment").

The Supreme Court's decision in *Meyer* doesn't require a contrary result. *Meyer* concerned a state's attempt to bar proponents of initiative petitions from paying signature gatherers. 486 U.S. at 421. That prohibition violated the First Amendment because it "limit[ed] the number of voices" that could convey the proponents' "message," which "limit[ed] [the proponents'] ability to make" their petition "the focus of statewide discussion." *Id.* at 422-23. The prohibition, in turn, "reduc[ed] the total quantum of speech on a public issue." *Id.* at 423. Critically, the "petition itself [was] the protected speech," and the "circulation and submission of an initiative petition [was] closely intertwined with the underlying political ideas put forth by the petition." *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 897 n.13 (5th Cir. 2012).

But the petition process is very different that the voter-registration process. The "very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign." *Id.* In the voter-registration context, the

22

constitutionally protected activities—encouraging voting—doesn't "implicate a third-party's right to process the application." *Id.* That's because "[v]oter registration applications are individual, not associational, and may be successfully submitted without the aid of another." *Id.*

Nor does receiving and moving a completed application from Point A to Point B convert non-expressive conduct into protected speech or conduct. "One does not 'speak'" "by handling another person's 'speech'"—a completed application. *Steen*, 732 F.3d at 390. It also doesn't matter that speech occurred before the prohibited conduct. "While political organizations undoubtedly engage in protected activities," voter-registration "collection does not acquire First Amendment protection merely because it is carried out along with protected activities and speech." *Feldman*, 843 F.3d at 393.

Saying that collection and handling of completed applications communicates an organization's mission strains credulity as well. Imagine if an organization's goal was to *discourage* voting and voter registration. In that scenario, under Plaintiffs' theory, the First Amendment would be "used to protect that group's 'right' to successfully achieve its expressive goals of preventing others from voting by throwing the registration cards away." *Andrade*, 488 F. App'x at 897 n.12. That can't be.

**c.** The Non-U.S. Citizen Volunteer Restriction also runs the *Anderson-Burdick* gauntlet unscathed. *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test assesses whether election-related regulations satisfy the requirements of the First and Fourteenth Amendments. If the regulations

impose a severe burden on the right to vote, then the regulations must withstand strict scrutiny. *Wa. State Grange v. Wa. State Republican Party*, 552 U.S. 442, 450-51 (2008). If the burden is modest, then a reasonable, nondiscriminatory regulation need only be backed by an important governmental interest. *Id.* Post-hoc rationalizations can be enough. *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). Specific evidence to support governmental interest isn't needed, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009), because states can act "without waiting for" problems "to occur and be detected within its own borders." *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). States have a compelling interest in maintaining orderly election administration and in "avoiding confusion, deception, and even frustration of the democratic process." *Cowen v. Sec'y of Ga.*, 22 F.4th 1227, 1234 (11th Cir. 2022) (citations omitted). They also have a compelling interest in "ensuring that all voter registration[] applications are properly and timely submitted," in "holding third-party voter registration organizations accountable for the applications they collect," and in "preventing instances of fraud." *Browning*, 575 F. Supp. 2d at 1310, 1323 (noting that the Department "submitted approximately thirteen written complaints received in 2004 by the Division of Elections relating to persons who registered to vote with third-party organizations, following which, these persons unsuccessfully attempted to exercise their right to vote" and that "[a]t the time of voting, the complainants were advised they were not registered to vote because the forms they had filled out had never been turned in").

In this instance, the State has strong and compelling interests in safeguarding election integrity, preventing voter fraud, and promoting confidence in the election system as a whole. The Non-U.S. Citizen Volunteer Restriction safeguards election integrity and prevents voter fraud by prohibiting ineligible-to-vote non-citizens from collecting and handling voter registration applications. It also promotes voter confidence by reasonably ensuring that applicants' voter registration applications are not collected or handled by such persons. Prohibiting non-citizens from collecting or handling voter registration applications is the least restrictive means to achieve those interests. The State legitimately concluded that non-citizens should not be trusted with the responsibility of ensuring that voter registration applications are timely delivered to election officials. Though all legal non-citizens are welcome to Florida, they can't vote, serve on a jury, or hold public office. It makes sense to also exclude them from serving as fiduciaries for citizens seeking to register to vote.

In sum, the Non-U.S. Citizen Volunteer Restriction regulates non-expressive conduct. It's not a content-based restriction on protected speech. Plaintiffs can freely associate with non-citizens who wish to solicit voter registration. Plaintiffs can still benefit from whatever institutional knowledge their non-citizen volunteers possess. And the State isn't "plac[ing] any restrictions on" the "methods or means third-party voter registration organizations may use to *solicit* new voters and *distribute* registration applications." *Browning*, 575 F. Supp. 2d at 1322 (emphasis added). "Instead," the Non-U.S. Citizen Volunteer Restriction "simply regulates an administrative aspect of the

electoral process—the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants." *Id.* (emphasis added). The State has compelling interests in such regulations to safeguard the integrity of the elections and each registration application.

### iv.   The Non-U.S. Citizen Volunteer Restriction satisfies the Equal Protection Clause.

**a.** Plaintiffs are unlikely to succeed on the merits of their Equal Protection challenge against the Non-U.S. Citizen Volunteer Restriction. The Supreme Court has "never suggested that" restraints imposed by States on aliens are "inherently invalid, nor" has it "held that all limitations on aliens are suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Instead, the level of judicial scrutiny (and the evidence required to satisfy that scrutiny) depends on several considerations.

The category of alien matters. The Supreme Court has subjected restraints on resident aliens to strict scrutiny. *E.g.*, *Graham v. Richardson*, 403 U.S. 365, 376 (1971). Rational-basis review applies to other categories, such as nonimmigrant aliens or illegal aliens. *Estrada v. Becker*, 917 F.3d 1298, 1308-10 (11th Cir. 2019) (illegal aliens); *LeClerc v. Webb*, 419 F.3d 405, 418 (5th Cir. 2005) (nonimmigrant aliens). This is so because, unlike resident aliens, other aliens have temporary ties to the country and may be generally removable. *Estrada*, 917 F.3d at 13010; *LeClerc*, 419 F.3d 405 at 418.

But even when strict scrutiny applies, the Supreme Court has carved out an exception for restraints on positions or occupations that serve a "political function." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). The exception is a two-prong test.

*First*, courts must examine the tailoring of the restraint. A restraint "that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the" restraint "serves legitimate political ends." *Bernal v. Fainter*, 467 U.S. 216, 221-22 (1984) (citation omitted).

*Second*, the restraint must apply to positions whose "functions" "go to the heart of representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). For example, the Supreme Court stated that "persons holding state elective or important nonelective executive, legislative, and judicial positions," and those "officers who participate directly in the formulation, execution, or review of broad public policy," fall within this description. *Id.*; *see also Cabell*, 454 U.S. at 440 n.7 (stating that this "language is far reaching and no limits on it were suggested"). For this prong, what matters is whether the "actual *function*" of the position has "power of the sort that a self-governing community could properly entrust only to full-fledged members of that community." *Bernal*, 467 U.S. at 223-24 (emphasis in the original).

**b.** Florida's Non-U.S. Citizen Volunteer Restriction passes constitutional muster. Illegal aliens should not be in the country. They are subject to deportation at any time. Allowing these illegal aliens to collect and handle completed applications risks the applications never making it to an election official. Similar risks apply to those here

legally, but temporarily; someone on a student visa might leave shortly before the expiration of the visa and before ensuring that a voter registration application they collected gets to the relevant election official. Rational basis is thus satisfied.

For the resident aliens—those who reside in the United States and can work in the United States but remain citizens of another country—the political-function exception applies. *First*, the Non-U.S. Citizen Volunteer Restriction isn't overinclusive; "it applies narrowly to only one category of persons: those wishing to" collect and handle completed voter-registration applications. *Id.* at 223. And the provision isn't underinclusive; it ensures that only those with strong, "unequivocal legal bond[s]" to the community are *collecting* and *handling* completed voter-registration applications. *Ambach v. Norwick*, 441 U.S. 71, 75 (1979). Merely having access to "the same information on completed forms" is different from undergoing the fiduciary duty of handling and collecting completed applications. ECF No. 32 at 40.

*Second*, the proper collection and handling of completed voter-registration applications "go[es] to the heart of representative government." *Sugarman*, 413 U.S. at 647. To be sure, those who collect and handle completed applications aren't vested with discretion or engage in policy making. *Cabell*, 454 U.S. at 446-47; *Foley*, 435 U.S. at 296. But for members of the political community to receive a "ballot" or select "a legislator," *Foley*, 435 U.S. at 296, their voter-registration application must be collected and handled properly. The proper handling of this piece of paper by a citizen of the United States is thus "crucial to the continued good health of a democracy," *Ambach*, 441 U.S. at 79,

28

arguably more so than the exclusions for teachers and cops the Supreme Court has upheld. *See generally id.* at 68 (states can prohibit non-citizens from serving as teachers); *Foley*, 435 U.S. at 291 (states can prohibit non-citizens from serving as police officers). Citizens have the most direct stake in the results of the elections for which the forms are being collected.

### B.      Plaintiffs haven't shown irreparable harm.

Irreparable harm must be "serious and *immediate*." *Siegel*, 234 F.3d at 1177 (emphasis in the original). Absent an injunction, harm must be "imminent." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). After all, "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (emphasis in the original).

There's no immediate or imminent harm to Plaintiffs in this case. That's because (1) the 2023 Law, by its very terms, delays enforcement of its 3PVRO provision against Plaintiffs until September 30, 2023, and (2) the Department of State is engaging in rulemaking that is likely to moot many of Plaintiffs' arguments. These two factors militate against granting their preliminary-injunction motion and militate in favor of (at the very least) deferring judgment until the rulemaking is completed.

### C.     Plaintiffs fail to establish the remaining factors.

The remaining preliminary-injunction factors weigh against granting a preliminary injunction. The public benefits from the State ensuring proper election administration. *Cowen*, 22 F.4th at 1234; *Browning*, 575 F. Supp. 2d at 1323.

The public is also served when the State enforces its laws. The State is harmed when it's prevented from doing so. *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (the State is "harmed" when it can't "apply its own laws"); *see also Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating" its laws, "it suffers a form of irreparable harm." (cleaned up)).

Because Plaintiffs haven't established a constitutional violation, haven't shown irreparable harm, and haven't shown that the extraordinary relief they request in the public interest, these factors tilt decidedly in the State's favor.

### CONCLUSION

This Court should deny the motion for preliminary injunction. The kind of "extraordinary" and "drastic" relief that Plaintiffs seek is simply not warranted here. *McDonald's Corp.*, 147 F.3d at 1306. The State of Florida has made a measured decision to regulate its elections—a decision entrusted to it by the federal and state constitutions. Neither the law nor the facts provide a basis to preliminarily enjoin the Non-U.S. Citizen Volunteer Restriction.

Dated: June 23, 2023

Respectfully submitted,

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Joshua E. Pratt (FBN 119347)
jpratt@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

## **LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to Local Rule 7.1(F), this motion and memorandum of law contains 7,197 words excluding the case style, signature block, and any certificate of service.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil