## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

      *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, *et al.*,

      *Defendants*.

Case No. 4:23-cv-218-MW-MAF

## <u>PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

I.   The Court should decline to exercise *Burford* abstention or otherwise delay resolution of Plaintiffs' emergency motion. ...........................................1

   A.  Burford abstention is inapplicable and unwarranted. ......................1

   B.  Plaintiffs will suffer immediate and irreparable harm without relief. .............4

II.  The Law discriminates against non-citizens in violation of the Fourteenth Amendment's Equal Protection Clause. ..............................................8

III.   The Law severely burdens Plaintiffs' expression in violation of the First Amendment. ........................................................................11

   A.  The text of the Law is impermissibly vague and overbroad. .........................11

   B.  The Law severely burdens Plaintiffs' expressive conduct, even assuming Defendants' draft rules are implemented. ............................................12

   C.  Defendants' argument wrongly segregates settled expressive conduct from intertwined purported non-expressive conduct. ....................................16

CONCLUSION ........................................................................18

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. U.S. Army Corps of Engineers*,
424 F.3d 1117 (11th Cir. 2005) .......................................................................6

*Ambach v. Norwick*,
441 U.S. 71 (1979)...........................................................................................9

*Bernal v. Fainter*,
467 U.S. 216 (1984)................................................................................ 8, 9, 10

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) .....................................................................4

*BT Investment Managers v. Lewis*,
559 F.2d 950 (5th Cir. 1977) .........................................................................2

*Cabell v. Chavez-Salido*,
454 U.S. 432 (1982)........................................................................................9

*Cafe, Gelato & Panini LLC v. Simon Prop. Group, Inc.*,
No. 20-60981-CIV, 2021 WL 2037798 (S.D. Fla. May 21, 2021) .....................2

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................4

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .....................................................................13

*Greene v. Secretary of State for Georgia*,
52 F.4th 907 (11th Cir. 2022) ........................................................................5

*In re Shek*,
947 F.3d 770 (11th Cir. 2020) .......................................................................6

*League of Women Voters of Florida v. Browning*,
575 F. Supp. 2d 1298 (S.D. Fla. 2008).............................................................15

*League of Women Voters of Florida v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006)..................................................... 16, 17

*McNeese v. Board of Education for Community Unit School District 187*,
    373 U.S. 668 (1963)....................................................................................3

*Meyer v. Grant*,
    486 U.S. 414 (1988)................................................................... 15, 16

*New Orleans Public Service., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989)................................................................................2, 3

*Quackenbush v. Allstate Insurance Co.*,
    517 U.S. 706 (1996)......................................................................................1

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997)..................................................................................12

*Rindley v. Gallagher*,
    929 F.2d 1552 (11th Cir. 1991) .....................................................................2, 4

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ...........................................................5

*SE Property Holdings, LLC v. McElheney*,
    No. 5:12-cv-164-MW/EMT, 2021 WL 9181838 (N.D. Fla. Mar. 8, 2021)........6

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) ..................................................................1, 3

*Tennessee State Conference of NAACP v. Hargett*,
    420 F. Supp. 3d 683 (M.D. Tenn. 2019) ....................................... 13, 14, 15, 17

*Uber Promotions, Inc v. Uber Techs, Inc.*,
    162 F. Supp. 3d 1253 (N.D. Fla. 2016) ............................................................5

*VoteAmerica v. Schwab*,
    --- F. Supp. 3d ---, No. CV 21-2253-KHV, 2023 WL 3251009 (D. Kan.
    May 4, 2023)...................................................................... 13, 16, 17

*Voting for America, Inc. v. Andrade*,
    488 F. App'x 890 (5th Cir. 2012).......................................................... 14, 17, 18

*Wreal, LLC v. Amazon.com*,
   840 F.3d 1244 (11th Cir. 2016) ..............................................................5

**Statutes**

Fla. Stat. § 106.24 ...................................................................................10

Fla. Stat. § 120.536 .................................................................................11

Fla. Stat. § 97.0525 .................................................................................10

Fla. Stat. § 97.057 ...................................................................................10

Fla. Stat. § 97.0575 ......................................................................... 3, 6, 14

**Other Authorities**

Florida Division of Elections, *Rules*,
   https://dos.myflorida.com/elections/laws-rules/rules/ .........................8

## PRELIMINARY STATEMENT

Section 97.0575(1)(f) of the Florida Statutes as amended by SB7050 (the "Law") suppresses the protected speech and associational rights of third-party voter registration organizations ("TPVROs") and their staff.  In so doing, the Law brazenly discriminates against non-citizens by prohibiting them from collecting and handling voter registration forms.  This ban's impact will effect imminent irreparable harm on Organizational Plaintiffs, Hispanic Federation and Poder Latinx, and on resident non-citizens, including Individual Plaintiffs, who proudly serve their communities by registering those eligible to vote.  Only preliminarily enjoining the Law can protect Plaintiffs' constitutional rights and maintain the status quo.  Defendants' arguments suggesting otherwise obfuscate the issues by misreading both precedent and the Law, and ignore Plaintiffs' evidence in their opening papers.

**I.   The Court should decline to exercise *Burford* abstention or otherwise delay resolution of Plaintiffs' emergency motion.**

**A. *Burford* abstention is inapplicable and unwarranted.**

Defendants' *Burford* abstention arguments are misplaced.  "*Burford* [is] an 'extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.'"  *Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (en banc) (citation omitted).  It "only rarely favors abstention . . . ." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996).  So rarely that "[t]he Eleventh Circuit appears never to have determined that a court was required to

abstain under *Burford*."  *Cafe, Gelato & Panini LLC v. Simon Prop. Grp., Inc.*, No. 20-60981-CIV, 2021 WL 2037798, at *4 (S.D. Fla. May 21, 2021).

*Burford* abstention "is concerned with protecting complex state administrative processes from undue federal interference."  *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (1989) (citation omitted).  It "does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state [] law or policy."  *Id.*  The Eleventh Circuit has specifically concluded that *Burford* abstention is not necessary where Plaintiffs, as here, "attack [] a single statute" that is "part of a large and perhaps complex regulatory scheme," but "whose possible invalidation could scarcely be expected to disrupt Florida's entire system of [] regulation."  *Rindley v. Gallagher*, 929 F.2d 1552, 1557 (11th Cir. 1991) (quoting *BT Inv. Managers v. Lewis*, 559 F.2d 950, 955 (5th Cir. 1977).  Here, "no overriding state interest, special state competence, or threat to Florida's administration of its own affairs" warrants "denying [Plaintiffs] access to their chosen federal forum."  *Id.*

In *Siegel*, the *en banc* Eleventh Circuit declined to apply *Burford* in the context of a similarly targeted voting-related challenge.  Where the case simply "does not threaten to undermine all or a substantial part of Florida's process of conducting elections and resolving election disputes," *Burford* isn't implicated.

2

*Siegel*, 234 F.3d at 1173.  And as in *Siegel*, Plaintiffs here "target certain discrete practices set forth in a particular state statute." *Id.*

Whatever future case may theoretically call for *Burford* abstention, this isn't it.  Plaintiffs challenge a provision of a single statute: Fla. Stat. 97.0575(1)(f).  To resolve Plaintiffs' equal protection claim, "no inquiry beyond the four corners of the [Law] is needed to determine whether it [] facially" violates the Fourteenth Amendment.  *New Orleans Pub. Serv., Inc.*, 491 U.S. at 363.  *See also McNeese v. Bd. of Ed. for Cmty. Unit Sch. Dist. 187*, 373 U.S. 668, 674 (1963) ("The right alleged is [] plainly federal in origin and nature," for "petitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment.") (citation omitted).  Defendants' proposed draft rulemaking cannot cure the fact that the Law facially classifies based on a person's alienage.  And "no underlying issue of state law control[s] th[e] litigation." *Id.*

Similarly, reviewing the Law's constitutionality under the First Amendment "would not unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity." *New Orleans Pub. Serv., Inc.*, 491 U.S. at 363.  It is not enough that Plaintiffs' case may enjoin the Law's enforcement. "[N]o doctrine requir[es] abstention merely because resolution of a federal question may result in the overturning of a state policy." *Id.* (citation and quotation marks omitted).  "The state of Florida's ability to regulate [voter registration] will not be

seriously affected if the [challenged] procedure is declared unconstitutional." *Rindley*, 929 F.2d at 1557.

Defendants do not even "explain in what manner the regulatory system would be disrupted" should this Court maintain the status quo by granting Plaintiffs' preliminary injunction motion. *Id.* Indeed, Defendants nowhere contend or otherwise explain why the Secretary could not continue the rulemaking process even if this Court preliminarily enjoins Defendants from enforcing the single challenged provision. Moreover, an injunction would only preserve the status quo until the case is resolved on the merits. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011). The Court would be able to consider any rulemaking that ultimately takes place at a later stage of this litigation, without risking the ongoing irreparable harm to Plaintiffs in the meantime.

**B. Plaintiffs will suffer immediate and irreparable harm without relief.**

Defendants' minimal discussion of irreparable harm, ECF No. 60 ("Opp.") at 29, doesn't address or dispute Plaintiffs' arguments concerning the current and imminent harms to their livelihood and organizational mission that they will suffer, including the deprivation of constitutional rights that constitutes irreparable harm under *Elrod v. Burns*, 427 U.S. 347, 373 (1976). ECF No. 32 ("Mot.") at 21–23. Even Defendants' purported construction of the Law would still effectively shutter the Organizational Plaintiffs. Accepting *arguendo* the premise that non-citizens can

4

"walk up to eligible voters, discuss the importance of voting and registering to vote, discuss politics more generally, encourage someone to register to vote, and even provide a blank voter-registration application," Opp. 21, the Law would still prevent the vast majority of Organizational Plaintiffs' workforce from collecting completed forms, processing them, and returning them to the supervisors of elections, all of which are necessary for the TPVRO to *actually effectuate* their mission of registering voters.[1]

Defendants' sole argument concerning irreparable harm is that enforcement will be delayed "until September 30, 2023," so—Defendants say—there is no need for "'speedy and urgent action'" to protect Plaintiffs' rights.  Opp. 29 (quoting *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016).  That misses the mark.  Plaintiffs are being harmed right now because they have to take steps *now* to comply with the Law.  *See* ECF No. 32-1 ¶¶ 28, 34, 42; ECF No. 32-2 ¶¶ 31, 36, 43. But even harm three months from now is immediate enough for such speedy action. *See Uber Promotions, Inc v. Uber Techs, Inc.*, 162 F. Supp. 3d 1253, 1276 (N.D. Fla. 2016) ("[I]t is not all future injuries that matter, but only those that would occur before a decision on the merits can be rendered." (citations and quotation marks

---

[1] Plaintiffs' showing of irreparable harm, as well as their substantial likelihood of success on the merits, tilts the balance of hardships and public interest in their favor. *Cf. Greene v. Sec'y of State for Ga.*, 52 F.4th 907, 916 (11th Cir. 2022) (Branch, J., concurring) ("The public 'has no interest in enforcing an unconstitutional law.'") (quoting *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010)).

omitted)).  The relevant inquiry is whether Plaintiffs will be harmed before litigation would reasonably conclude.  So a "district court may grant preliminary injunctive relief when the moving party shows that . . . irreparable injury during the pendency of the suit will be suffered unless the injunction issues immediately . . . ." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005).

In any event, Defendants' claim that "Plaintiffs need not comply with . . . changes to section 97.0575 until September 30, 2023," cannot be squared with their acknowledgement that the Law is effective on July 1, and that the Law's textual requirements "are *retroactive* for any third-party voter registration organization . . . *as of July 1, 2023*."  Opp. 10 (emphasis added) (quoting Fla. Stat. § 97.0575). Florida law usually "means what it says."  *SE Prop. Holdings, LLC v. McElheney*, No. 5:12-cv-164-MW/EMT, 2021 WL 9181838, at *6 (N.D. Fla. Mar. 8, 2021).  And the Secretary gives no reason why on October 1, the Law's draconian fines could not be retroactively assessed on Plaintiffs for infractions back to July 1.  *Cf. In re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) (surplusage canon "disfavor[s] an interpretation" that renders any "clause, sentence, or word . . . void or insignificant").

The retroactivity provision speaks for itself: even if Defendants do not complete rulemaking until September 30, fines can be assessed for conduct that Plaintiffs engaged in as of July 1.  The import is equally clear: if Plaintiffs don't

terminate non-citizen staff or volunteers who collect and handle voter registration by July 1, they would still potentially be liable for draconian fines so large they would easily put them out of business.  Only enjoining the Law can prevent these harms from taking place on July 1.

The proposed draft rule Defendants cite does nothing to prevent the ongoing harm to Plaintiffs or the harms that will effectively end their voter registration programs on July 1.  It isn't binding.  At this point, Defendants have merely noticed a rulemaking workshop.  Plaintiffs cannot safely rely on the proposed draft rule to conform their conduct to the Law on and after July 1 because it is a *draft*.  Moreover, there is nothing in the proposed rule that suggests in any way that Plaintiffs' non-citizen staff or volunteers can continue their activities to directly register voters. Even before July 1, Plaintiffs are already being harmed because they have to act to plan for these changes.  *See* ECF No. 32-1 ¶¶ 28, 34, 42; ECF No. 32-2 ¶¶ 31, 36, 43.  This planning and preparation is all the more necessary because the law is vague and overbroad and carries such hefty penalties.  *Id.*

Finally, even taking Defendants' timeline at face value, it is far from clear that rulemaking will be concluded by the time the Law takes effect.  Defendants notably hedge, only saying that "rulemaking *should be* complete prior to the challenged requirements becoming effective on October 1, 2023."  Opp. at 11, 29 (emphasis

added).[2]   But regardless of whether the rulemaking is complete by that date, Plaintiffs would still be subject to retroactive liability for massive fines if they continue to employ non-citizen employees or volunteers to conduct voter registration after July 1.

## II. The Law discriminates against non-citizens in violation of the Fourteenth Amendment's Equal Protection Clause.

Defendants concede that "restraints on resident aliens" such as Individual Plaintiffs Herrera-Lucha, Martínez, and Doe,[3] and the employees of Hispanic Federation and Poder Latinx are subject to "strict scrutiny." Opp. 26.  For the reasons Plaintiffs previously explained at length, Mot. 36–38, Defendants' arguments concerning the "political function" exception, Opp. 27–28, are wrong.  Under strict scrutiny, the Law cannot stand.  And even if the court finds strict scrutiny inapplicable, Defendants' response confirms why the law fails to satisfy rational basis.

The "narrow political-function exception" is not applicable.  *Bernal v. Fainter*, 467 U.S. 216, 220–21 (1984).  Courts apply a two-step test to determine when a citizenship-based restriction falls within the exception: (1) whether the

---

[2] Defendants' track record of expedited rulemaking is not strong.  The Secretary still has open rulemakings for statutes enacted in 2021 and 2022.  Fla. Div. of Elections, *Rules* (last updated Jan. 30, 2023), https://dos.myflorida.com/elections/laws-rules/rules/.

[3] *See* Decl. of Verónica Herrera-Lucha ¶ 2; Decl. of Norka Martínez ¶¶ 6–7; Decl. of A. Doe ¶¶ 7–8.  Ms. Herrera-Lucha is a permanent resident, while Ms. Martínez and Doe have work authorizations while their asylum claims are considered.

regulation is "sufficiently tailored," and (2) whether the regulation applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions,'" or "officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Id.* at 221–22 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 440 (1982)) (citations omitted).  Defendants concede *Bernal* is controlling.  Opp. 27.  Under *Bernal*, neither factor applies.

On the Law's "tailoring," Defendants argue that the Law is neither overinclusive because it is limited to non-citizens who register voters, nor underinclusive because, according to Defendants, non-citizens lack sufficient legal bonds to the communities they work in.[4]  Opp. 28.  But the Law "indiscriminately sweep[s] within its ambit" *all* non-citizens (including legal permanent residents like Ms. Herrera-Lucha and individuals with federal government-issued work authorizations such as Doe and Ms. Martínez) over-inclusively, irrespective of their background or legal status.  *Bernal*, 467 U.S. at 222.  At the same time, it is "fatally

---

[4] Defendants suggest the Law is not underinclusive because they intend it to ensure "only those with strong 'unequivocal legal bond[s]' to the community are collecting and handling voter registration forms."  Opp. 28 (quoting *Ambach v. Norwick*, 441 U.S. 71, 75 (1979)).  This is wrong in two ways.  Whether a law is underinclusive does not turn on the "legal bond[s]" non-citizens have to their communities.  Underinclusivity concerns whether the State prohibits non-citizens from some of the same activities, duties, or information access in other positions and functions. *Bernal*, 467 U.S. at 222–23.  But even if "legal bond[s]" were a factor—which they are not— Individual Plaintiffs would satisfy it.  Individual Plaintiffs all reside in Florida legally and maintain strong bonds with the communities they serve.  Herrera-Lucha Decl.¶ 2, 12–14, A. Doe Decl. ¶ 7– 8, 17, Martínez Decl. ¶ 6–7, 14.  These "unequivocal legal bond[s]" to their communities further expose the law's under-inclusiveness.  Opp. 28 (quoting *Ambach*, 441 U.S. at 75).

underinclusive": Non-citizens can be entrusted with the same information as collectors and handlers of voter registration forms while serving on Florida's Elections Commission or within other state agencies.  Fla. Stat. §§ 106.24, 97.0525, 97.057.  The political-function exception is therefore inapplicable based on the first prong alone.

The Law cannot satisfy the political-function exception's second prong either.  Defendants argue the Law's focus on "properly" handling voter registration forms meets it because those actions "go to the heart of a representative" democracy.  Opp. 28.  But the Supreme Court rejected virtually the same argument in *Bernal*, where Texas argued that notaries "perform functions that 'go to the heart of representative government,'" in support of their non-citizen ban.  *Bernal*, 467 U.S. at 223.  As the Supreme Court explained: "The focus of our inquiry has been whether a position" provides someone "broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population," like teachers or police officers.  *Id*. at 224–25.  Defendants concede that individuals who collect and handle voter registration forms "aren't vested with discretionary or engage in policy making."  Opp. 28.  The exception's second prong is thus not met here, making strict scrutiny appropriate.[5]

---

[5] To the best that Plaintiffs glean from Defendants' response, they do not (and cannot) argue that the Law is narrowly tailored.  To the extent any such argument is made, Plaintiffs rest on their opening brief (Mot. 40–41).

Defendants cannot adequately explain how the law meets either strict or rational basis scrutiny.  Opp. 26–29.  Notably, while they referenced a "compelling interest" in their First Amendment analysis, Opp. 24, they nowhere argue that the law is tailored (narrowly or otherwise) to advance it.  Nor can they meet this burden, given the restriction's obvious over-inclusiveness.  Plaintiffs have therefore shown a likelihood of success on the merits of their Equal Protection Clause challenge.

**III.**  **The Law severely burdens Plaintiffs' expression in violation of the First Amendment.**

    **A. The text of the Law is impermissibly vague and overbroad.**

Plaintiffs' Motion (at 25–36) explains how the Law's text punishes Plaintiffs for engaging in protected speech.  Defendants' main response is to suggest the sweep of the Law's burdens on protected activity will be narrowed by rulemaking, citing language from the Secretary's proposed draft rule.  Because the Legislature did not indicate that section 97.0575 was subject to rulemaking, any rule that the agency attempts to promulgate could not cure the defects in the Law as passed.  *See* Fla. Stat. § 120.536(1).  And there is no indication that this draft language will become effective.  The proposed draft language is just that—a draft with no binding effect.  Plaintiffs must conform their conduct to the Law as it is written.  In the meantime, Plaintiffs are saddled with an overbroad and vague law.  Though Defendants suggest Plaintiffs' First Amendment argument relies on "an expansive reading of the prohibition imposed," Defendants' briefing raises only *more* questions about how a

reasonable person should interpret the Law as written, because their cramped construction both ignores and rewrites its text.[6]

Plaintiffs do not have the luxury of assuming the narrower construction of the nebulous terms in the Law, especially not under threat of a retroactive $50,000 fine for each mistake they make. Critically, while the draft rule purports to invent a mechanism for Organizational Plaintiffs to avoid strict liability for non-citizen volunteers and employees, the Law's text provides no such protection. Each of these overbreadth and vagueness problems compounds the Law's chilling effect. *See Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 871–72 (1997).

### B. The Law severely burdens Plaintiffs' expressive conduct, even assuming Defendants' draft rules are implemented.

Even if Defendants' draft rules are ultimately implemented, the Law would still impermissibly prohibit Plaintiffs from engaging in protected conduct. To determine whether conduct is expressive, courts look to whether "the reasonable person would interpret it as *some* sort of message, not whether an observer would

---

[6] For instance: Defendants now suggest that non-citizens are only banned from collecting or handling only "completed" voter registration applications, and "not *blank* forms" (Opp. 18). But that limit—indeed, the word "completed"—appears nowhere in the text. Defendants also intimate that the Law will only affect "some of Plaintiffs' volunteers" who are non-citizens (Opp. 21), ignoring that the Law will affect all non-citizen staff and volunteers, including approximately 70% of Hispanic Federation's canvassers and approximately 90% of Poder Latinx's staff. HF Decl. ¶ 23. And Defendants reject out of hand that the word "handle" can also mean "to have overall responsibility for supervising or directing," Opp. 18–19 (citing *Merriam-Webster's Collegiate Dictionary* 565 (11th ed. 2005)), asserting without support that the Legislature could have drafted the statute differently had it selected that definition.

necessarily infer a *specific* message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243–44 (11th Cir. 2018) (in certain contexts, outdoor food sharing constituted expressive conduct) (citations omitted).  Conduct does not "lose[] its expressive nature just because it is also accompanied by other speech." *Id.*  "[T]he critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." *Id.*

TPVROs and their non-citizen canvassers' assistance with voter registration is "intended to convey a message that voting is important," and their endeavors to "broaden the electorate to include allegedly under-served communities qualify as expressive conduct which implicates the First Amendment." *VoteAmerica v. Schwab*, --- F. Supp. 3d ---, No. CV 21-2253-KHV, 2023 WL 3251009, at \*10 (D. Kan. May 4, 2023) (citations omitted).  Even when considered apart from the voter engagement and application distribution and assistance that precedes it, collecting and delivering potential voters' applications—acts necessary to the organization's mission of registering voters and broadening the electorate—expresses that message. The collection and handling of the completed voter registration application marks the point at which the organization actually enables the applicant to become *registered to vote*.  The "creation of a new voter *is* a political change . . . registering to vote is not a politically neutral act." *Tenn. State Conf. of NAACP v. Hargett*, 420 F. Supp. 3d 683, 702–03 (M.D. Tenn. 2019).

Defendants' assertion that collection and handling of completed applications does not communicate an organization's mission or individual message falls short. Opp. 23.[7] Defendants admit that at least some portions of Plaintiffs' conduct are protected, including approaching and engaging voters and even soliciting applications. Opp. 21. And the Law burdens the aspects of voter registration activity that Defendants concede are protected by placing preconditions on how those activities can be conducted. Even if non-citizens "can still walk up to eligible voters, discuss the importance of voting and registering to vote, discuss politics more generally, encourage someone to register to vote, and even provide a blank voter-registration application," they cannot help voters complete the process of registering—the core of the critical role that TPVROs play in the voter registration process—because they cannot "collect or handle completed voter-registration forms with critical applicant-specific information on the completed form." *Id.*

In the field, non-citizens would be unable to fulfill TPVROs' missions of registering voters unless constantly escorted by a citizen available to "handle" the

---

[7] Defendants further cite a footnote in an unreported out-of-circuit case for the assertion that, "under Plaintiffs' theory, the First Amendment would be 'used to protect that group's 'right' to successfully achieve its expressive goals of preventing others from voting by throwing the registration cards away.'" Opp. 23 (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 897 n.12 (5th Cir. 2012)). This misses the mark. At a minimum, regardless of any protection the First Amendment afforded such conduct, the State would have a sufficiently compelling interest in banning TPVROs from throwing away voters' completed applications to restrict such conduct. Unsurprisingly, Florida law *already* prohibits TPVROs from failing to deliver any voter registration application that the organization collects. Fla. Stat. § 97.0575(5)(a).

form once an applicant puts pen to paper, and who maintains custody of the completed voter registration applications, preventing Plaintiffs from fulfilling their mission of engaging eligible voters in the registration process.  And in the office, non-citizens would lose all functional utility to TPVROs, as they cannot exercise any physical custody over the applications that need to be processed and returned to supervisors of elections.  In these ways, the Law restricts "who is eligible to participate in voter registration drives" and the "methods or means [TPVROs] may use to solicit new voters and distribute registration applications." *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008).

Defendants also draw a false distinction between the petition process discussed in *Meyer v. Grant*, 486 U.S. 414 (1988), and the voter-registration process at issue in the present case.  Opp. 22–23.  Like handling a petition, handling a voter registration is core political activity.  "A petition in support of a ballot initiative might lead to a change in one law or a few laws, but a change in the composition of the electorate can lead to a change of *any* law." *Tenn. State Conf. of NAACP*, 420 F. Supp. 3d at 702.  Defendants also ignore how the effect of the Law mirrors *Meyer*'s analysis regarding the reduced quantum of speech.  Even if non-citizens are able to speak and encourage people to register to vote under the proposed draft rule, they are only able to do so in an *effective* manner if they are accompanied by a citizen.  Without a citizen escort, a non-citizen couldn't complete the voter

registration process, significantly limiting the amount and utility of their expressive conduct.

Finally, even if it would be possible to ensure that non-citizens are constantly accompanied by a citizen during voter registration work, courts have recognized that under the First Amendment, Plaintiffs are entitled to "select what they believe to be the most effective means of conducting their voter registration drives to ensure their voices are heard in the political process." *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) (citing *Meyer*, 486 U.S. at 424); *VoteAmerica*, 2023 WL 3251009, at *13, *15 ("Planning and proper preparation could not remedy plaintiff's loss: its ability to advocate its pro-advance mail voting message to underrepresented voters through the means it believes to be the most effective."). The Law improperly interferes with Plaintiffs' advocacy.

### C. Defendants' argument wrongly segregates settled expressive conduct from intertwined purported non-expressive conduct.

To avoid the implications of the Law's burden on these concededly protected activities, Defendants try to carve out specific components of Plaintiffs' conduct and analyze them apart from the other First Amendment protected activities with which they are intertwined. *See* Opp. 23 (characterizing Plaintiffs' conduct as merely "receiving and moving a completed application from Point A to Point B").

As courts have recognized, Defendants' contrived parsing of the conduct involved in registering voters is unsound. *See* Mot. 26–27. "As a matter of simple

behavioral fact," voter registration drives "historically have involved both encouraging and facilitating registration, including, at least in many cases, by physically transporting applications." *Tenn. State Conf. of NAACP*, 420 F. Supp. 3d at 699.   Because "the collection and submission of applications is inextricably intertwined with the expressive and advocatory aspects of the drive, and it is impossible to burden one without, in effect, burdening the other," *id.* at 706, the activity proscribed here "comes within the protections of the First Amendment." *Cobb*, 447 F. Supp. 2d at 1333–34.   Thus, "[f]or constitutional purposes, the First Amendment does not countenance slicing and dicing plaintiff's actions." *VoteAmerica*, 2023 WL 3251009, at *13.

Defendants cite *Voting for America, Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013), for the proposition that "regulations concerning the receipt and delivery of completed voter-registration applications are 'non-expressive activities.'"  Opp. 21– 22.  But even in *Voting for America*, the court and all parties embraced that at least "some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter registration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registrations were processed successfully." *Voting for Am.*, 732 F.3d at 389; *see also id.* at 391–92 (reciting that "[n]o party argues that the law prevents anyone . . . from passing out registration forms" as a basis for concluding that "the 'total quantum of speech' is unaffected).

Here, the word "handling" could readily be interpreted to prohibit all but the first of these activities. Although Defendants disclaim the Law's application to the distribution of blank voter registration, nothing in the Law's text limits its scope to "completed" applications. *Cf.* Opp. 18. And non-citizens risk running afoul of the Law by helping voters fill out their applications—especially if helping necessitates physically or touching indicating something on the form—or even asking about the information that the voter provided, given that the Law is purportedly designed to shield such information from non-citizens.

*Voting for America* also repeatedly emphasized that it was "unclear" whether requiring only county residents "to collect and deliver completed voter registration applications even incidentally affects Appellees' activities," given "testimony that [Appellees] prefer to hire local people to handle the actual registrations." 732 F.3d at 392; *id.* at 390. Those facts could not be further from the present case, where Organizational Plaintiffs have explained that the Law would bar the vast majority of their workforce and volunteers from voter registration work, and expressly forbids Individual Plaintiffs from handing voter registration applications.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for preliminary injunctive relief.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 4,526 words.

Respectfully submitted this 26th day of June, 2023,

*/s/ Julie A. Ebenstein*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Roberto Cruz (FBN 18436)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org

Cesar Z. Ruiz*
Fulvia Vargas De-Leon[†]
Ghita Schwarz[†]
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115

Julie A. Ebenstein (FBN 91033)
Adriel I. Cepeda Derieux*
Megan C. Keenan*
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
acepedaderieux@aclu.org
mkeenan@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Estee M. Konor*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

Evan Preminger*
Rayne Ellis*
**Arnold & Porter Kaye Scholer LLP**
250 W. 55th Street
New York, NY 10019
(212) 836-7786
evan.preminger@arnoldporter.com

19

(212) 392-4752                                    rayne.ellis@arnoldporter.com
cruiz@latinojustice.org
fvargasdeleon@latinojustice.org
gschwarz@latinojustice.org

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

*Attorneys for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and A. Doe*

*\*Admitted pro hac vice*
*[†] Motion for leave to appear pro hac vice forthcoming*