# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**FLORIDA STATE CONFERENCE**
**OF BRANCHES AND YOUTH UNITS**
**OF THE NAACP, et al.,**

     *Plaintiffs,*

v.                                   **Case Nos.: 4:23cv215-MW/MAF**
                                          **4:23cv218-MW/MAF**

**CORD BYRD, in his official capacity**
**as Florida Secretary of State, et al.,**

     *Defendants.*

_____/

## PRELIMINARY INJUNCTION[1]

This case arises from Florida's latest assault on the right to vote. Plaintiffs

move to preliminarily enjoin two amendments to section 97.0575, Florida Statutes.

One new provision bars noncitizens from registering citizens to vote, thus

discriminating based on alienage, one of the most questionable classifications in

equal protection jurisprudence. The other exposes individuals working for third-

---

[1] This Court is issuing a truncated order with respect to two of the three motions before this Court based on the parties' evidence demonstrating that they intended to conduct voter registration work on the Fourth of July but for the challenged provisions. Given that the Plaintiffs in Case No.: 4:23cv216 raised some overlapping claims against the same challenged provisions, but under different theories, in addition to claims against two other amended statutes not at issue in these cases, this Court will address their motion by separate order so as not to delay granting relief that is warranted in Case Nos.: 4:23cv215 and 4:23cv218.

party voter registration organizations to felony prosecutions for retaining voter information without telling them to whom the prohibition applies, what they can retain, and when they can retain it.

Florida may, of course, regulate elections, including the voter registration process. Here, however, the challenged provisions exemplify something Florida has struggled with in recent years; namely, governing within the bounds set by the United States Constitution. When state government power threatens to spread beyond constitutional bounds and reduce individual rights to ashes, the federal judiciary stands as a firewall.[2] The Free State of Florida is simply not free to exceed the bounds of the United States Constitution.

For the reasons that follow, Plaintiffs are entitled to a preliminary injunction.

---

[2] The meaning of "firewall" here— "a wall or partition designed to inhibit or prevent the spread of fire"—has featured in legal documents in the United States since the Early Republic. *Firewall*, def. 2, *Oxford English Dictionary* (3d ed. 2015); *see, e.g.*, 1797 N.Y. Laws 99 (requiring that "the exterior walls of [certain] dwelling houses, stores and other buildings . . . shall be made, erected and constructed either of stone or brick or of timber faced with brick, with party or fire walls rising twelve inches above the roof, and shall be covered . . . with . . . safe materials against fire, and not with boards or shingles . . . ."). In world literature, however, "firewall" tends to denote a wall *made of* fire, or "an unbroken line of flames forming a barrier." *Firewall*, def. 1, *Oxford English Dictionary* (3d ed. 2015). For example, the thirteenth-century Old Norse *Saga of the Völsungs* recounts that the legendary Germanic hero Sigurd (or Siegfried) passed through a wall of flame to seek the hand of Brynhild (or Brunhilda) on Gunnar's behalf. *Cf. Django Unchained* (2012) (recounting, in a conversation between Django and Dr. King Schultz, how Siegfried walks through "a circle of hellfire" to rescue Brunhilda). Both definitions have shaped more recent, figurative definitions of "firewall," including that in the computer science context.

I

These cases involve multiple constitutional challenges to newly enacted changes to section 97.0575, Florida's statute regulating third-party voter registration organizations (3PVROs).[3] These organizations offer a convenient alternative for Florida citizens to complete and submit voter registration applications so that they can participate in our democratic system. Based on the evidence they submitted in support of their motions, Plaintiffs' organizations are driven to serve their communities, connect with Floridians—particularly some of the most marginalized citizens in our state—about the importance of voting, and properly register as many new voters as possible. Now, Plaintiffs assert, their jobs, operations, and missions will be disrupted, if not frustrated entirely, because of the challenged provisions. Accordingly, Plaintiffs in both cases filed these actions almost immediately after the challenged provisions were signed into law. Plaintiffs have now moved for preliminary injunctive relief to prevent Defendants from enforcing these provisions once they take effect on July 1, 2023.

---

[3] In Case No.: 4:23cv215, Plaintiffs include several 3PVROs, including the Florida State Conference of Branches and Youth Units of the NAACP (Florida NAACP), and individuals who work for two of the Plaintiff 3PVROs. For purposes of this Order, this Court will refer to these Plaintiffs as the "Florida NAACP Plaintiffs." In Case No.: 4:23cv218, Plaintiffs also include different 3PVROs, including the Hispanic Federation, and individuals who work for other 3PVROs. This Court will refer to these Plaintiffs as the "Hispanic Federation Plaintiffs."

The Hispanic Federation Plaintiffs assert in their motion, ECF No. 32 in Case No.: 4:23cv218, that the new "citizenship requirement" for collecting or handling voter registration applications on behalf of 3PVROs violates the First and Fourteenth Amendments for multiple reasons. *See* § 97.0575(1)(f), Florida Statutes (2023). Likewise, the Florida NAACP Plaintiffs assert in their motion, ECF No. 55 in Case No.: 4:23cv215, that the citizenship requirement violates the Constitution for some of the same reasons, in addition to other constitutional infirmities. As the record evidence demonstrates, Plaintiffs in both cases rely heavily on noncitizens[4] to assist or lead voter registration efforts, including collecting or handling voter registration applications on behalf of the 3PVROs with which they work or volunteer. In addition, several individual Plaintiffs are themselves noncitizens and will be prohibited from continuing their voter registration work because of the citizenship requirement.

---

[4] Because this challenged provision includes a classification for all "noncitizens," this Court uses the same language here. However, this Court recognizes that the individual Plaintiffs in these cases are legally permitted to work in the United States, and that the 3PVROs in these two cases who employ noncitizens to work as canvassers employ only those who are legally permitted to work in the United States. *See, e.g.*, ECF No. 54-5 ¶ 17 in Case No.: 4:23cv215 ("UnidosUS conducts background checks on its canvassers and only hires canvassers who are U.S. citizens or legal permanent residents in the United States."); ECF No. 54-10 ¶¶ 15–16 in Case No.: 4:23cv215 (noting that between sixty and seventy of employed canvassers are noncitizens; stating that "Alianza conducts background checks on canvassers and only hires canvassers who are legally able to work in the United States."); ECF No. 32-1 ¶ 23 in Case No.: 4:23cv218 ("Many of Hispanic Federation's canvassers are non-citizens. Canvassers are citizens of Venezuela, the Dominican Republic, Colombia, or Mexico, but all our employees are authorized to work in the United States."); ECF No. 32-2 ¶ 23 in Case No.: 4:23cv218 ("The majority of Poder Latinx's canvassers are non-citizens. Many of our canvassers are citizens of Venezuela or Colombia, but all of our employees are authorized to work in the United States.").

The Florida NAACP Plaintiffs also assert that a new "information retention ban" violates the First and Fourteenth Amendments for multiple reasons. This provision makes it a third-degree felony for someone collecting voter registration applications on behalf of a 3PVRO to copy a voter's application or retain "a voter's personal information" for "any reason other than to provide such application or information to the [3PVRO] in compliance with [the] section." § 97.0575(7), Fla. Stat. (2023). The Florida NAACP Plaintiffs argue that this provision violates their First Amendment speech and association rights because it "severely limits 3PVROs' ability to communicate a pro-voting message by eliminating the most organic way to obtain and retain voters' contact information." ECF No. 55-1 at 45. Further, the NAACP Plaintiffs argue that the information retention ban is overbroad in violation of the First Amendment and impermissibly vague in violation of the Fourteenth Amendment.

On the parties' request, this Court consolidated these preliminary injunction motions for purposes of briefing and scheduling a hearing. This Court held a hearing on the motions on June 28, 2023, after which this Court took the motions under advisement. This Order follows.[5]

---

[5] As noted *supra*, note 1, this Court will address the third motion before this Court in Case No.: 4:23cv216 by separate order.

II

At the outset, this Court must address Defendants' abstention arguments. Specifically, Defendants assert that this Court should (A) abstain from hearing these cases under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); or (B) defer ruling on these cases until after September 30, 2023—when, in the Defendants' view, the Plaintiffs will be on the hook for statutory violations. For the following reasons, this Court will do neither.

A

First, Defendants' *Burford* argument. Defendants assert that *Burford* abstention is warranted because the State of Florida "is in the process of rulemaking," which "has the potential to resolve many of the issues—such as vagueness and overbreadth" and "streamline" the remaining issues. ECF No. 92 at 15 in Case No.: 4:23cv215. Defendants insist that "[f]ederal courts should abstain from deciding cases where doing so furthers the 'paramount interests of another sovereign' and the 'principles of comity and federalism.' " *Id.* (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)). "If ever a case called for abstention." Defendants claim, "this is it." *Id.*

The Florida NAACP Plaintiffs raise four arguments against *Burford* abstention. First, the Florida NAACP Plaintiffs contend that "[a]bstention is improper when a party alleges that certain [federal constitutional] rights are

threatened." ECF No. 94 at 4 in Case No.: 4:23cv215 (quoting *League of Women Voters of Fla., Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1283 (N.D. Fla. 2018)). Second, they argue that "[c]ourts have long recognized that abstention is particularly inappropriate in an overbreadth or vagueness case grounded upon the First Amendment." ECF No. 94 at 5 (quoting *Hobbs v. Thompson*, 448 F.2d 456, 462 (5th Cir. 1971)).[6] Third, "Defendants' promised rulemaking will not inform judicial review of the statute" because, as the Florida NAACP Plaintiffs note, "Florida law prohibits courts from "deferr[ing] to an administrative agency's interpretation of [a] statute"; they "must instead interpret such statute or rule de novo." ECF No. 94 at 6 (quoting Fla. Const. art. V, § 21). Fourth, the Florida NAACP Plaintiffs insist that Defendants' proposed rulemaking "will neither address nor alleviate the statute's facial discrimination against noncitizens . . . or its restriction on noncitizens' ability to make and enforce employment contracts . . . ." ECF No. 94 at 6. The Hispanic Federation Plaintiffs raise similar arguments. *See* ECF No. 62 at 6–9 in Case No.: 4:23cv218.

"Under the '*Burford* abstention' doctrine, a federal court can decline to adjudicate—and can dismiss—a case that is otherwise within its jurisdiction, but only in a very particular, and 'narrow,' set of circumstances." *Deal v. Tugalo Gas*

---

[6] This Court notes that in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

*Co., Inc.*, 991 F.3d 1313, 1326 (11th Cir. 2021). The Supreme Court explained the

parameters of *Burford* abstention as follows.

> Where timely and adequate state-court review is available, a federal
> court sitting in equity must decline to interfere with the proceedings or
> orders of state administrative agencies: (1) when there are "difficult
> questions of state law bearing on policy problems of substantial public
> import whose importance transcends the result in the case then at bar";
> or (2) where the "exercise of federal review of the question in a case
> and in similar cases would be disruptive of state efforts to establish a
> coherent policy with respect to a matter of substantial public concern."
> *Colorado River Water Conservation Dist. v. United States, supra,* 424
> U.S., at 814, 96 S.Ct., at 1245.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361

(1989). "Any way you slice it, *Burford* is 'an extraordinary and narrow exception,'

to a federal court's 'virtually unflagging obligation' to exercise jurisdiction . . . ."

*Deal*, 991 F.3d at 1327 (internal citations omitted). The decision to abstain under

*Burford* rests in the sound discretion of the district court. *See id.*

This Court declines Defendants' invitation to shirk its "virtually unflagging

obligation" to hear these cases for three reasons. First, as Plaintiffs note, Defendants

make no showing as to how this Court's resolution of some of Plaintiffs' claims—

in particular, their equal protection challenge to the citizenship requirement—would

in any way *interfere* with an "ongoing administrative proceeding or action." *See*

*Deal*, 991 F.3d at 1326. In other words, Defendants have not explained how they

plan to "regulate away" the alleged suspect classification on the face of section

97.0575(1)(f)'s citizenship requirement.

8

Second, even for the claims that *are* implicated in Defendants' proposed rulemaking, *Burford* abstention is inappropriate because neither (1) difficult questions of state law in an area of substantial public import, nor (2) any disruption to the State of Florida's attempt to achieve uniform regulations in an area of substantial public concern, outweighs the importance of this Court resolving Plaintiffs' federal constitutional claims.

This Court recognizes the public importance of regulating 3PVROs. Even so, these cases do not present difficult questions of state law bearing on public policy problems whose importance transcends any result in these cases. The importance of the Department of State's eventual interpretation and application of the challenged provisions does not overcome Plaintiffs' interest in this Court's prompt ruling on their federal constitutional claims—claims which concern, among other things, their rights to be free from invidious discrimination and to reasonable notice of what actions may result in their staff's, members', and volunteers' criminal prosecution. The Eleventh Circuit has ruled similarly in past cases challenging Florida's election laws. *Cf. Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (finding *Burford* abstention inappropriate where candidates for the offices of President and Vice President of the United States challenged the State of Florida's manual election recount procedures).

Nor is abstention warranted in these cases to avoid disrupting state efforts to

establish a coherent policy with respect to a matter of substantial public concern. As the Eleventh Circuit explained, a "central purpose furthered by *Burford* abstention is to protect complex state administrative processes from undue federal interference." *Siegel*, 234 F.3d at 1173. And here, like in *Siegel*, the constitutional claims at issue do "not threaten to undermine all or a substantial part" of Florida's regulatory scheme. Rather, Plaintiffs' claims "target certain discrete" provisions "set forth in a particular state statute." *See id.* Plaintiffs' discrete challenges to one of Florida's laws regulating 3PVROs does not threaten to undermine all—or even a substantial part—of the state's regulatory scheme.

Third, the specific circumstances of these cases make abstention inappropriate. The federal constitutional rights at issue are vital, and Plaintiffs' potential injuries are serious. Moreover, as Plaintiffs note, any delay to permit Defendants to regulate away any constitutional concerns may well be barred by the Florida Constitution. Specifically, article V, section 21 of the Florida Constitution mandates that "a state court or an officer hearing an administrative action pursuant to general law may not defer to an administrative agency's interpretation of such statute or rule, and must instead interpret such statute or rule de novo." Finally, Defendants have identified no legal principle supporting their notion that a state agency can cure an otherwise unconstitutional statute and that a federal court, as a result, should abstain from ruling on a federal constitutional challenge to the statute's

text.

To sum up, Defendants urge this Court to dismiss these cases under *Burford* and allow state courts to eventually decide Plaintiffs' claims with the benefit of a rulemaking to which state courts can afford *no* deference—all the while allowing Plaintiffs to suffer ongoing irreparable harm, lose their livelihoods, and risk felony prosecutions. This turns comity into comedy. This Court declines to abandon its "virtually unflagging obligation" to exercise jurisdiction, *see Deal*, 991 F.3d at 1327. *Burford* abstention is not appropriate here.

## B

Next, Defendants request that this Court defer ruling on the motions for preliminary injunction until September 30, 2023. This Court declines to exercise its discretion to do so for many of the same reasons it declines to abstain under *Burford*—namely, the importance of the federal constitutional rights at issue and the unlikelihood that further rulemaking can or will resolve the issues here. Additionally, as the Florida NAACP Plaintiffs note, *see* ECF No. 94 at 7 in Case No.: 4:23cv215, section 97.0575(12) arguably allows for retroactive punishments for any violations of the section after July 1, 2023—not September 30, 2023, as Defendants claim.[7]

---

[7] Defendants invoke *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) in support of their argument that this Court should defer ruling on Plaintiffs' motions for preliminary injunction. At the hearing, Defendants asserted that they do not interpret section

*     *     *

For the reasons set out above, this Court declines to abstain from addressing Plaintiffs' federal constitutional claims under *Burford* or to defer ruling until after September 30, 2023. Having addressed Defendants' arguments in favor of delay, this Court turns to the merits of Plaintiffs' motions.

### III

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant

---

97.0575(12) to impose any requirements on 3PVROs until September 30, 2023. Tr. at 99. Defendants believe it would "create[] a *Pennhurst* issue" if this Court were to grant the motions for preliminary injunction now, as if section 97.0575 imposed liabilities on Plaintiffs on the statute's effective date of July 1, 2023. Tr. at 100. As best as this Court can discern, Defendants believe *Pennhurst* calls for deferral here because an injunction "would enjoin a state official from doing something that he is not doing based on what [Plaintiffs] say is the appropriate interpretation of state law . . . ." Tr. at 10.

Defendants' *Pennhurst* argument fails for several reasons. First, *Pennhurst*'s holding concerns the Eleventh Amendment's bar on federal courts' jurisdiction over state law claims. *Pennhurst*, 465 U.S. at 106. What *Pennhurst* unequivocally *does not* prevent is exactly what Plaintiffs are doing here—seeking prospective relief for a violation of federal constitutional law against a state official in their official capacity under *Ex parte Young*. *See id.* at 102. Second, to the extent Defendants call upon "the spirit" of *Pennhurst*—presumably, general notions of federalism and comity—where state officials promise not to violate individuals' rights for a few months, this Court is unpersuaded. Section 97.0575(12) allows Defendants to punish Plaintiffs for conduct that occurs on July 1, 2023. Regardless, Plaintiffs begin to suffer irreparable harm starting on July 1, 2023. The challenged provisions go into effect on that date, and Plaintiffs must begin to order their lives and organizational activities—including hiring, firing, and retraining employees and volunteers—to avoid impending fines and felony prosecutions. Indeed, failure to comply with the law's requirements within ninety days of notice from the Department of State results in *automatic* cancellation of the organizations' registrations, an imminent injury that is affecting Plaintiffs *now*.

12

outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And because standing is always "an indispensable part of the plaintiff's case,"

13

this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

A

The "affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [a] plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting). Any evaluation of Plaintiffs' claims, thus, necessitates an inquiry into Plaintiffs' ability to bring such claims.

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations [as would be appropriate at the pleading stage], but must set forth by affidavit or other evidence

specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

Plaintiffs fall into two categories: individuals and organizations. This Court will address each category's standing, in turn, with respect to each of the challenged provisions. This Court starts with the individual Plaintiffs' standing to challenge the citizenship requirement.

1

As to the citizenship requirement, both the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs consist of (1) individuals who are noncitizens and, thus, injured directly by the citizenship requirement and (2) 3PVROs asserting organizational and associational injuries, among other theories of standing. This Court first addresses the individual Plaintiffs' standing.

The Florida NAACP Plaintiffs include Esperanza Sánchez, an individual, who submitted a sworn declaration attesting to her asserted injuries. ECF No. 54-8 in Case No.: 4:23cv215. This Court has reviewed Ms. Sánchez's declaration and finds it credible.

Ms. Sánchez asserts she is originally from Colombia but is now a permanent resident of the United States. ECF No. 54-8 ¶¶ 6, 10 in Case No.: 4:23cv215. She is currently studying to take the citizenship exam, *id*., and works for Plaintiff

UnidosUS to supervise a team of fifteen canvassers, *id*. ¶¶ 2–3. Ms. Sánchez's team helps people register to vote. *Id*. ¶ 3. Her employer, UnidosUS, is a registered 3PVRO in the State of Florida. ECF No. 54-5 ¶ 10 in Case No.: 4:23cv215.[8]

As an organizer, Ms. Sánchez makes sure that everyone on her team knows the requirements for voter registration organizations in Florida and that they follow the law. ECF No. 54-8 ¶ 17 in Case No.: 4:23cv215. As part of her duties, Ms. Sánchez distributes voter registration applications to her canvassing team and picks them up after they are finished canvassing. *Id*. ¶¶ 3, 14. Additionally, she ensures that the applications her team receives from voters are complete and that they are returned to the correct county offices on time. *Id*. ¶ 8.

According to Ms. Sánchez, were it not for the citizenship requirement, she would continue her work as an organizer in 2023 and 2024. *Id*. ¶ 7. Ms. Sánchez asserts she will not be able to collect voter registration applications or otherwise participate in voter registration due to possible fines imposed on her employer, Plaintiff UnidosUS. *Id*. In addition, she asserts that over eighty percent of her canvassing team are also noncitizens. *Id*. ¶ 9. She is concerned about losing her job as an organizer for UnidosUS, as the law restricts her ability to register voters, and

---

[8] This Court has also considered Jared Nordlund's declaration, ECF No. 54-5 in Case No.: 4:23cv215, and finds it credible. Mr. Nordlund is the Florida State Advocacy Director for Plaintiff UnidosUS, "a nonprofit organization and one of the nation's largest Latino civil rights and advocacy organizations." *Id*. ¶ 2.

she is concerned that UnidosUS will not be able to carry out its voter registration efforts as effectively without the help of their noncitizen canvassers. *Id.* ¶¶ 18–19.

Similarly, the Hispanic Federation Plaintiffs include another individual noncitizen, Veronica Herrera-Lucha, who submitted a sworn declaration attesting to her asserted injuries. ECF No. 32-3 in Case No.: 4:23cv218. This Court has also reviewed Ms. Herrera-Lucha's declaration and finds it credible.[9]

Ms. Herrera-Lucha is a lawful permanent resident and has lived in Florida since 2016. *Id.* ¶ 2. She obtained a law degree in El Salvador and a Masters in International Law in Spain. *Id.* ¶ 4. She is currently employed as the Florida State Field Director for Mi Vecino, Inc., a 3PVRO, and is responsible for overseeing the organization's voter registration activities. *Id.* ¶¶ 8–10. Ms. Herrera-Lucha is paid a salary of $55,000 per year for this work and supports four family members with it. *Id.* ¶ 11. Her work is important to her as a way to serve her community, raise

---

[9] At the hearing, Defendants did not object to the Hispanic Federation Plaintiffs supplementing the record with certified translations of their individual Plaintiffs' declarations, including Ms. Herrera-Lucha's declaration. Tr. at 109 ("[T]o the extent that the translations are materially the same and there's an attestation, we do not object."). This Court gave the Hispanic Federation Plaintiffs until noon on Friday, June 30, 2023, to supplement the record with the certified declarations and gave Defendants until 5:00 p.m. on Friday, June 30, 2023, to file any objections to them. *Id.* at 110. The Hispanic Federation Plaintiffs timely filed duplicates of their translated declarations, including Ms. Herrera-Lucha's declaration, along with a certification as to their translations. ECF No. 66-1 in Case No.: 4:23cv218. Defendants did not file any objections to the certified translations. This Court has also reviewed the certified translation, *id.*, and finds it to be both credible and substantially the same as the original translation of the declaration.

awareness about Spanish-speaking candidates, and increase the number of eligible voters originally from Puerto Rico and Haiti. *Id.* ¶ 25.

Ms. Herrera-Lucha's work has her canvassing throughout the year. *Id.* ¶ 12. For instance, in July 2023, she is scheduled to participate in Independence Day events and right-to-vote celebrations in Osceola, Orange, and Polk Counties. *Id.* During voter registration events, Ms. Herrera-Lucha asserts that she always interacts with multiple individuals and collects voter registration forms. *Id.* ¶ 13. Before the citizenship requirement was enacted, she had planned to continue conducting voter registration activities in the future, with the goal of engaging with as many community members as possible and expanding Mi Vecino, Inc.'s voter registration work. *Id.* ¶¶ 15–17. However, she believes the citizenship requirement will prohibit her from collecting or handling voter registration applications on behalf of Mi Vecino, Inc. *Id.* ¶ 18. She fears the citizenship requirement will impact her ability to continue to earn a steady income in the field of voter registration and will frustrate her career trajectory and professional development by prohibiting her from doing the voter registration work that she loves. *Id.* ¶¶ 19–21.

Ms. Sánchez's and Ms. Herrera-Lucha's declarations demonstrate that both individuals face concrete, particularized, actual, and imminent injuries. Simply put, effective July 1, 2023, these individuals can no longer collect or handle voter registration applications on behalf of the 3PVROs for which they currently work

because they are noncitizens. The provision facially discriminates against these Plaintiffs because they are noncitizens, forces them to halt their efforts to communicate with would-be voters and properly register as many applicants as possible for fear of incurring devastating liability for their employers, and directly interferes with their employment. These concrete injuries are sufficient for purposes of challenging the citizenship requirement under each theory they raise in their motions.

These injuries, namely the disruption to their employment, their livelihoods, and their mission to register voters on behalf of the organizations they work for, are also fairly traceable to the Defendants in both of these motions. Section 97.0575 itself authorizes the Defendant Secretary of State to investigate alleged violations of the statute and refer them to the Attorney General for prosecution. § 97.0575(8), Fla. Stat. (2023) ("If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement."). On top of this, 3PVROs that fail to comply with the citizenship requirement within ninety days of the Department of State providing notice of the requirements of the law "shall automatically result in the cancellation of the [3PVRO's] registration." *Id*. § 97.0575(12).

Relatedly, the Defendant Attorney General is specifically authorized to "institute a civil action for a violation of" the citizenship requirement. *Id*. §

97.0575(8). "An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order." *Id*. Were it not for the $50,000 penalty for each noncitizen who violates the citizenship requirement and Defendants' authority to penalize 3PVROs for such violations, the individual Plaintiffs would continue collecting or handling voter registration applications on behalf of the 3PVROs for which they work.

Finally, Plaintiffs have also demonstrated why an order enjoining these Defendants from enforcing the citizenship requirement is substantially likely to redress their injuries. Removing the threat of enforcement—the risk of a $50,000 fine, automatic cancellation of the 3PVROs' registrations, and further civil enforcement by the Attorney General—would directly redress Plaintiffs' injuries. In other words, they could continue the voter registration work that they have been hired to do, without fear of Defendants penalizing their organizations with devastating fines, automatic cancellation of their registrations, and other civil enforcement actions.

"At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, if there is one plaintiff in each case who demonstrates standing "to assert these rights as his own," this Court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." *Vill. of*

20

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). With respect to the citizenship requirement, this Court concludes that at least one individual Plaintiff from each case has standing for purposes of pursuing preliminary injunctive relief against each Defendant. Consequently, the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs have established standing to seek an order enjoining Defendants from enforcing the citizenship requirement.[10]

This Court now turns to the Florida NAACP Plaintiffs' standing to challenge enforcement of the information retention ban.

### 2

With respect to the Florida NAACP Plaintiffs' challenge to section 97.0575(7)'s information retention ban, only the organizational plaintiffs raise these claims. Accordingly, this Court first addresses whether they have demonstrated organizational standing to challenge this provision.

---

[10] By focusing the analysis in this Order on the individual Plaintiffs' standing to challenge the citizenship requirement, this Court in no way suggests that the remaining Plaintiffs have failed to establish standing for purposes of a preliminary injunction. On the contrary, this Court is satisfied that most, if not all, of the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs have standing to pursue preliminary injunctive relief with respect to the citizenship requirement. Both groups of Plaintiffs have submitted lengthy briefs addressing the contours of their standing in this regard, along with multiple declarations that set out with precision the imminent injuries they face based on the challenged provision. Nonetheless, given the need for expediency at this juncture, this Order focuses on the individual plaintiffs discussed above. Satisfied that these Plaintiffs have standing to challenge the citizenship requirement, this Court need not address the remaining Plaintiffs in this Order. *See Arlington Heights*, 429 U.S. at 264 & n.9.

21

"To establish standing, an organization, like an individual, must prove that it either suffers actual present harm or faces a threat of imminent harm." *City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Organizational standing allows an organization to assert claims based on injuries to the organization itself. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes.") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Organizations can establish standing by demonstrating a direct injury to the organization or an injury based on a diversion-of-resources theory. For standing based on a diversion of resources, "[a]n organization suffers actual harm 'if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *City of S. Miami*, 65 F.4th at 638 (alteration in original) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008)). The Florida NAACP Plaintiffs assert that they have suffered both a direct organizational injury and a diversion-of-resources injury.

This Court, however, need not address their diversion-of-resource theory because the record is clear that the Florida NAACP Plaintiffs have directly suffered

a concrete, particularized, actual, and imminent injury.[11] Take, for example, Marcos Vilar's declaration on behalf of Alianza for Progress and Alianza Center (the "Alianza organizations"), which this Court has reviewed and finds credible. As Florida-registered 3PVROs, the Alianza organizations carry out their mission of increasing civic engagement by registering voters. ECF No. 54-10 ¶¶ 3, 4, 7 in Case No.: 4:23cv215. When the Alianza organizations register voters, they ordinarily retain their contact information and "engage with these voters in the future, to encourage them to get out to vote, and to make sure they have all necessary voting information." *Id.* ¶ 12. But now that section 97.0575(7) threatens their staff, members, and volunteers *with felony prosecutions* if they copy or retain a voter's personal information, the Alianza organizations will no longer be able to carry out their mission of increasing political participation by contacting voters they have registered. The information retention ban directly impedes the Alianza

---

[11] Although this Court need not address it, this Court also concludes that the Florida NAACP Plaintiffs have established an injury under a diversion-of-resources theory as well. Specifically, these organizations demonstrate that they will divert resources to mitigate the risk that *their own staff, members, and volunteers* will face felony prosecutions for carrying out the organizations' practice of retaining voter information so that they can later encourage them to vote in the future. The Florida NCAAP Plaintiffs' "diversion of personnel and time" to counteract section 97.0575(7)'s "negation of the organizations' efforts" to fulfill their purpose is exactly the type of cognizable diversion-or-resources injury. *See Browning*, 522 F.3d at 1166.

organizations'—as well as the other Florida NAACP Plaintiffs'—ability to accomplish their missions.[12]

This injury is imminent. Starting on July 1, 2023, section 97.0575 takes effect and starts a ninety-day clock for 3PVROs to reorder their operations to comply with, among other requirements, the information retention ban. And although section 97.0575(12) contemplates a ninety-day window for 3PVROs to comply with the section's new requirements, it does not mention a similar grace period for *individuals* facing a felony conviction for violating the information retention ban. It is no answer to say that the Florida NAACP Plaintiffs' injury—the impairment of their ability to reengage voters after registration—occurs only when they seek to reengage them. Given the singular opportunity the Florida NAACP Plaintiffs have to retain a voter's information upon registration, their injury is realized when they forego that opportunity to retain a voter's information.

This injury is neither speculative nor self-inflicted. For standing purposes, the Florida NAACP Plaintiffs have shown that two phrases in the challenged provision—"personal information" and "in compliance with this section"—are at

---

[12] While Defendants may posit that the Florida NAACP Plaintiffs can still conduct general voter outreach. But these organizations have demonstrated that the *targeted* voter outreach made possible by retaining a voter's contact information is central to their purpose of increasing civic engagement. Even if the Florida NAACP Plaintiffs can conduct similarly targeted outreach through more burdensome measures, like using the voter rolls at a local Supervisor of Elections Office to look up voters' contact information by name, they have still suffered an injury. The fact that a statute leaves open a more burdensome avenue of communication does not relieve its burden on the targeted group. *See Meyer v. Grant*, 486 U.S. 414, 424 (1988).

least arguably vague. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). And despite Defendants' insistence that their own interpretation of section 97.0575(7) and the Florida Department of State's proposed rulemaking permit the sort of information retention that Florida NAACP Plaintiffs' staff, members, and volunteers have conducted in the past, these promises offer little solace to individuals facing a felony prosecution for violating the statute. Defendants have made no showing that their interpretation or rulemaking would save an individual from being formally charged under section 97.0575(7).[13]

The Florida NAACP Plaintiffs make clear that before the challenged provision was passed, they had a practice of retaining information from the voters they register and that, but for the information retention ban, they would continue to do so. These organizations have also demonstrated that the alleged vagueness of section 97.0575(7) leaves them to guess at whether their staff, members, or volunteers will be criminally prosecuted for continuing to retain information to reengage voters as part of their organizations' get-out-the-vote mission. And Defendants make clear they intend to enforce this provision against these organizations' individual staff, members, and volunteers—an inference permitted by

---

[13] As this Court noted on the record, the Florida NAACP Plaintiffs' injury comes from not only the risk that their staff, members, and volunteers could be convicted of a felony, but also from the *threat* of their arrest and felony prosecution. *See* Tr. at 91. Defendants conceded this point at the hearing, acknowledging that when someone "is subject to arrest, that's a pretty big deal." *Id.*

their defense of this provision, *see Harrell*, 608 F.3d at 1257, and evidenced by their stated intent to start the deadline for compliance as soon as possible, *see* ECF No. 92 at 12 in Case No.: 4:23cv215. This Court concludes that these organizations have established a substantial likelihood of success in proving a cognizable injury sufficient for standing to challenge section 97.0575(7) as vague.[14]

For the same reasons that Ms. Sánchez's and Ms. Herrera-Lucha's injuries are fairly traceable to Defendants and redressable with an injunction from this Court, these organizations meet those standing requirements as well. The challenged statute authorizes the Defendant Secretary of State to investigate alleged violations of section 97.0575(7) and refer them to the Defendant Attorney General for felony prosecution. § 97.0575(7)–(8), Fla. Stat. (2023). Removing the threat of Defendants' investigation and felony prosecution would directly redress these organizations' injuries—namely, their inability to retain voter information to reengage them in the future. Accordingly, the Florida NAACP Plaintiffs have established standing to pursue preliminary injunctive relief with respect to their void-for-vagueness claim.

B

This Court now turns to the substance of Plaintiffs' claims. The Hispanic

---

[14] Because this Court only reaches the merits of the Florida NAACP Plaintiffs' vagueness challenge, it need not determine whether they have standing to bring their First Amendment challenges at this juncture. To be sure, though, this Court does not suggest that the Florida NAACP Plaintiffs have failed to establish standing for their First Amendment claims.

Federation Plaintiffs challenge the citizenship requirement. The Florida NAACP Plaintiffs challenge both the citizenship requirement and the information retention ban. Both groups of Plaintiffs raise overlapping claims with respect to these provisions. This Court will address the claims asserted with respect to each challenged provision, starting with the citizenship requirement.

1

This Court starts with Plaintiffs' challenges to the citizenship requirement. Effective July 1, 2023, section 97.0575(1)(f) requires 3PVROs to provide to the Department of State's Division of Elections an affirmation stating that each person collecting or handling voter registration applications on behalf of that organization is a United States citizen. They must provide this affirmation in the required format *before* engaging in any voter registration activities. § 97.0575(1), Fla. Stat. (2023). Third-party voter registration organizations will be liable for a $50,000 fine for each noncitizen who collects or handles voter registration applications on behalf of that organization. *Id*. § 97.0575(1)(f). The Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs assert this provision amounts to a facially discriminatory law in violation of the Equal Protection Clause of the Fourteenth Amendment, as it impermissibly discriminates based on alienage.

"It is established, of course, that an alien is entitled to the shelter of the Equal Protection Clause." *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973). "Under the

Equal Protection Clause, 'No state shall . . . deny to any person within its jurisdiction the equal protection of the laws.' " *Estrada v. Becker*, 917 F.3d 1298, 1308 (11th Cir. 2019) (quoting U.S. Const. amend. XIV, § 1). And, "[a]s a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

Defendants do not dispute that the citizenship requirement, on its face, discriminates against all noncitizens. In response, however, they argue this Court must look beyond the face of the statute and parse the text into two subgroups to determine the applicable standard of review. Defendants assert that within the noncitizen classification, this Court should apply rational basis review to noncitizens who are here illegally. And as for noncitizens who are here legally—namely, lawful permanent residents, also known as "green card" holders, and lawful temporary residents—Defendants argue that the classification is permissible because it falls within the "political function" exception. This Court will address each argument in turn.

First, this Court rejects Defendants' argument that this Court should subject the challenged provision to varying levels of scrutiny based on subgroups that exist nowhere in the statute. Defendants cite no authority—binding or persuasive— suggesting that this Court should take a scalpel to the statutory text and divide a sub-

classification of "illegal aliens" from separate sub-classifications of lawful residents when the Florida Legislature declined to be so precise.

To be sure, this Court understands why Defendants insist this Court should ignore the statute's plain language so that, perhaps, some aspect of the classification at issue might survive judicial review. When a state discriminates against "undocumented aliens"—or noncitizens who are here illegally—and the classification at issue burdens no fundamental rights, rational basis review applies. *See Estrada*, 917 F.3d at 1308–10. For example, in *Estrada*, the Eleventh Circuit held that rational basis review applied to an equal protection challenge to Georgia's policy that prevented any person who was "not lawfully in the United States" from attending specific state schools within Georgia's university system. *Id*. at 1301. But when the classification on its face applies to *all* noncitizens, *regardless* of their documentation or immigration status, the classification is subject to strict scrutiny. *See, e.g.*, *Sugarman*, 413 U.S. at 642, 646 (applying "close scrutiny" and holding that state statute "which denies *all* aliens the right to hold positions in New York's classified competitive civil service" violated the Fourteenth Amendment's equal protection guarantee (emphasis added)); *Bernal*, 467 U.S. at 227–28 (applying strict scrutiny to Texas statutory requirement that prevented *all* noncitizens from becoming notaries public). Here, the Florida Legislature means what it says—*all* noncitizens, not just illegal aliens, are subject to this provision. Accordingly, this

Court agrees with Plaintiffs that *Bernal* provides the appropriate analytical framework with respect to their challenge to Florida's ban on *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs. That is, absent some other exception, this Court must apply strict scrutiny to the classification to determine if it violates the Equal Protection Clause.

Second, Defendants assert that an exception to strict scrutiny applies here—namely, the "political function" exception. Both sides agree that *Bernal* provides the test this Court must use to determine whether the "political function" exception applies in this case. They disagree, however, as to its application.

In *Bernal*, the Supreme Court articulated a two-pronged test to determine a "political function" exception. "To determine whether a restriction based on alienage fits within the narrow political-function exception," this Court must first examine "the specificity of the classification." *Bernal*, 467 U.S. at 221 (citation omitted). "[A] classification that is substantially overinclusive or underinclusive tends to undercut the governmental claim that the classification serves legitimate political ends." *Id.* (citation omitted). "Second, even if the classification is sufficiently tailored," it may be applied "only to persons holding state elective or important nonelective executive, legislative, and judicial positions, those officers who participate directly in the formulation, execution, or review of broad public policy, and hence perform

functions that go to the heart of representative government." *Id*. at 221–22 (internal quotation marks and citation omitted).

As to the first prong, like in *Bernal*, the classification here "does not indiscriminately sweep within its ambit a wide range of offices and occupations but specifies only one particular post with respect to which the State asserts a right to exclude aliens." *Id*. at 222. The citizen requirement is not overinclusive—"it applies narrowly to only one category of persons: those wishing to [collect or handle voter registration applications on behalf of third-party voter registration organizations]." *Id*.

"Less clear is whether [the citizenship requirement] is fatally underinclusive." *Id*. As counsel for the Florida NAACP Plaintiffs argued at the hearing, United States postal workers also collect and handle voter registration applications submitted by mail, and noncitizens are allowed to be postal workers. Moreover, at the hearing, Defendants had no response to the Hispanic Federation Plaintiffs' argument that noncitizens are also permitted to serve on Florida's Elections Commission and work for other state agencies. *See* ECF No. 62 at 15 in Case No.: 4:23cv218.

Instead, Defendants suggest that the law is not underinclusive solely because it discriminates only against those noncitizens who would otherwise "undergo[] the fiduciary duty of handling and collecting completed applications." ECF No. 60 at 28 in Case No.: 4:23cv218. But employees of several state agencies are also responsible

31

for handling completed voter registration applications, and the State of Florida apparently has not decided to exclude all noncitizens from these positions. *See* § 97.053(1), Fla. Stat. (2023) ("Voter registration applications, changes in registration, and requests for a replacement voter information card must be accepted in the office of any supervisor, the [Division of Elections], a driver license office, a voter registration agency, or an armed forces recruitment office when hand delivered by the applicant or a third party during the hours that the office is open or when mailed."); § 448.09, Fla. Stat. (2023) (prohibiting public and private employment only for noncitizens who are not authorized to work under the immigration laws of the United States). Thus, it is a closer call as to whether the citizenship requirement is fatally underinclusive. But that is not the end of the inquiry.

Even assuming, without deciding, that Florida's ban on all noncitizens from collecting or handling voter registration applications is not fatally underinclusive, the law fails the second prong of the "political function" test. That is, the citizenship requirement does not apply only to persons holding state elective or important nonelective executive, legislative, and judicial positions and, thus, participating directly in the formulation, execution, or review of broad public policy. Without dispute, 3PVRO staff, members, and volunteers are not public employees of any branch of state government. Nor do they participate directly in the formulation, execution, or review of broad public policy.

The focus of the inquiry for this second prong is "whether a position was such that the officeholder would necessarily exercise broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population—power of the sort that a self-governing community could properly entrust only to full-fledged members of that community." *Bernal*, 467 U.S. at 223–24. Here, Defendants expressly concede that "those who collect and handle completed applications aren't vested with discretion or engage in policy making." ECF No. 60 at 28 in Case No.: 4:23cv218.

In short, Defendants urge this Court to deviate from settled law and construe this exception far more broadly than the Supreme Court has ever permitted. Their request runs counter to the Supreme Court's admonition that "the political-function exception must be *narrowly* construed; otherwise *the exception will swallow the rule* and depreciate the significance that should attach to the designation of a group as a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate." *Bernal*, 467 U.S. at 222 n.7 (emphasis added). Accordingly, the "political function" exception does not apply here. Full stop.

Because the political function exception does not apply here and Defendants come forward with no other applicable exception, this Court must apply strict scrutiny. *Id*. at 227. "To satisfy strict scrutiny, the State must show that [the challenged provision] furthers a compelling state interest by the least restrictive

means practically available." *Id*. Even at the preliminary injunction stage, Defendants carry the burden of proving that the challenged provision satisfies strict scrutiny. *Otto v. City of Boca Raton, Florida*, 981 F.3d 854, 868 (11th Cir. 2020) (applying strict scrutiny in First Amendment challenge to local ordinance and reversing denial of preliminary injunction based, in part, on government's failure to prove ordinance satisfied strict scrutiny).

In their briefs, Defendants do not even attempt to demonstrate how the citizenship requirement satisfies strict scrutiny. At the hearing, Defendants focused on the state's legitimate interest in ensuring voter registration applications are turned in on time and the risk that noncitizens may leave the country before they can turn in such applications on behalf of the 3PVROs for which they work or volunteer. *See* Tr. at 84 ("And timeliness is the bucket under which it falls . . . . Timeliness is a concern for 3PVROs, and timeliness we try to tie to the issues that come with resident alien and illegal alien [sic], someone here on a temporary basis . . . . Timeliness is a broad heading."). But Defendants point to no record evidence indicating that noncitizens, as a class, have such a fleeting presence in this country as to justify a wholesale ban on their collecting or handling voter registration applications. *See Bernal*, 467 U.S. at 2319 ("There is nothing in the record that indicates that resident aliens, as a class, are so incapable of familiarizing themselves with Texas law as to justify the State's absolute and classwide exclusion.").

34

This Court is in no way dismissing the gravity of the problem posed by late-filed voter registration applications. If 3PVROs turn applications over to the appropriate election officials too late, would-be voters who chose to register with those 3PVROs may be precluded from voting in the next election based on the untimely submission of their applications. This is a serious issue. And Defendant Byrd filed evidence demonstrating that untimely submissions occur. *See* ECF No. 60-1 at 93 ¶ 7 in Case No.: 4:23cv218 ("The Office reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Florida Statutes. The Office assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements."). Indeed, several 3PVROs have been fined for turning in late applications this year, including the Republican Party of Duval County (ten late applications, *id*. at 385), the Clay County Democratic Executive Committee (one late application, *id*. at 383), and Plaintiff Alianza Center, Inc. (five late applications, *id*. at 408).

Thus, the State of Florida has identified a problem with respect to untimely submission of voter registration applications. The hard part for Defendants is identifying any connective tissue between the problem and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs. At the hearing, Defendants

acknowledged the dearth of evidence connecting noncitizens to late-filed voter registration applications. And their papers don't even attempt to justify the law under strict scrutiny. At the very least, Defendants must be able to marry the solution to the problem. But Defendants have failed to do that here.

Relatedly, the citizenship requirement is also *not* the least restrictive means to tackle the problem of late voter application submissions. Indeed, along with the citizenship requirement, Florida also enacted higher fines for late submissions, while also reducing the amount of time available for 3PVROs to submit such applications ahead of the book closing deadline. *See* § 97.0575(5), Fla. Stat. (2023). With respect to this provision, increasing the penalties for late submissions is at least rationally related to solving the problem of late submissions. It is certainly less restrictive than banning an entire class of people from collecting or handling voter registration applications. In short, Defendants' attempt to justify the citizenship requirement based on "timeliness" is simply not enough to meet strict scrutiny's "stringent requirements." *Bernal*, 467 U.S. at 2319.

The same is true with respect to Defendants' secondary argument in defense of the citizenship requirement. At the hearing, Defendants also sought to justify the classification under the "broad heading" of "voter integrity," based on the state's concern that noncitizens are illegally voting. Tr. at 84–85. But Defendants conceded that banning all noncitizens from collecting or handling voter registration

applications is not a perfect fit to alleviate the state's concern about "voter integrity." *Id*. at 85. Nonetheless, Defendants erroneously asserted this imperfect fit is "good enough" because rational basis review should apply. *Id*. As this Court has already explained at length, the classification at issue is subject to strict scrutiny. Therefore, this Court rejects Defendants' "good enough" approach to justifying discrimination in this case. Defendants must come forward with proof that the provision is the least restrictive means to furthering the state's interest. This they have not done.

"Without a factual underpinning, the State's asserted interest lacks the weight [the Supreme Court has] required of interests properly denominated as compelling." *Bernal*, 467 U.S. at 228. Accordingly, Defendants have not demonstrated that the citizenship requirement furthers a compelling state interest by the least restrictive means practically available.

This Court concludes that Plaintiffs are substantially likely to succeed on their claim that the citizenship requirement violates the Equal Protection Clause of the Fourteenth Amendment. At this juncture, because they are substantially likely to succeed on the merits of their equal protection claim, this Court need not address the merits of the balance of the Florida NAACP Plaintiffs' and Hispanic Federation Plaintiffs' claims as to the citizenship requirement. Next, this Court turns to the merits of Plaintiffs' challenge to the information retention ban.

2

This Court now turns to the Florida NAACP Plaintiffs' vagueness challenge to section 97.0575(7), the information retention ban. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion); *accord Kolender v. Lawson*, 461 U.S. 352, 357 (1983). For the reasons set out below, this Court concludes that section 97.575(7) is unconstitutionally vague because it suffers from the twin evils of (1) failing to provide notice of what is prohibited and (2) authorizing or encouraging arbitrary and discriminatory enforcement.

This Court starts, as it must, by looking at the statute at issue. This Court has a duty to construe statutes as constitutional if it can. *See Boos v. Barry*, 485 U.S. 312, 330 (1988). However, the nature of this Court's duty to narrowly construe a challenged statute varies depending on whether the challenged statute is state or federal law. When a federal law is at issue, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is *fairly possible*." *Boos*, 485 U.S. at 331 (emphasis added). If, on the other hand, a state law is at issue, this Court cannot "adopt a narrowing construction . . . unless

38

such a construction is *reasonable and readily apparent*." *Id.* at 330 (emphasis added); *accord Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). Only a state court can supply the requisite construction to save an otherwise vague state statute. *Gooding v. Wilson*, 405 U.S. 518, 520 (1972).

"The distinction is an important one" because "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts 'must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements.' " *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (quoting *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011)); *see also Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant to rewrite the terms of a *state* statute.") (emphasis in original); *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) (explaining that "the 'unless' clause" in "unless such construction is reasonable and readily apparent" is an "important federalism principle [that] should be invoked sparingly and with caution").

So, the question before this Court is not whether there is *any* reading that would render the statute constitutional. Nor is it whether there is a possible, plausible, or simply reasonable reading that would render the statute constitutional. Instead, the question is whether there is a constitutional reading of the statute that is

both *reasonable* and *readily apparent* and, thus, does not require this Court to rewrite the statute. *See Citizens for Responsible Gov. State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194–95 (10th Cir. 2000) (declining state's invitation to give statute at issue "a construction more restrictive than that provided by [its] plain language") (quoting *Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir. 1987)).

With that in mind, this Court turns to the text of the challenged provision. Section 97.0575(7) provides:

> If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

§ 97.0575(7), Fla. Stat. (2023) (emphasis added).

To understand what this section prohibits, a person of ordinary intelligence must know three things: (1) to whom does the statute apply; (2) which information falls within its reach; and (3) what is the person prohibited from doing with that information. Knowing the answers to each of these questions is critical to avoiding arrest for a third-degree felony.

Plaintiffs assert that the phrase "personal information" is vague. That is, Plaintiffs argue the statute provides no notice of what information falls within its

40

reach. ECF No. 55-1 at 51 in Case No.: 4:23cv215. In addition, Plaintiffs assert the phrase "in compliance with this section" likewise renders the statute vague. *Id*. This phrase implicates both (1) to whom the statute applies and (2) what that person is prohibited from doing with the information at issue. Defendants, for their part, argue that the meaning of the phrase "personal information" is clear, and that the Florida Department of State's rulemaking will obviate any vagueness concerns with this term or the phrase "in compliance with this section." ECF No. 92 at 31–32 in Case No.: 4:23cv215.

With respect to Defendants' suggestion that the Department of State can "clarify" the statute, they are mistaken. Rewriting state statutes is the sole province of the state's legislative branch. Likewise, assigning authoritative constructions to a state's statutory text is the sole province of the state's judicial branch. Rewriting the laws it enforces is not within the purview of the executive branch, and Defendants' assurance that the Department of State will fix the problem is a nonstarter.

What the Defendants can do—and what they have attempted to do in this case—is propose a construction of the statute for this Court to consider. Indeed, this Court must "consider any limiting construction" that the "enforcement agency has proffered." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982). But Defendants cannot propose a possible reading of the statute and assert that their construction is authoritative while rejecting Plaintiffs' possible

reading of the statute. Again, absent clarification from the Florida Legislature or an interpretation by Florida's state courts, this Court can only adopt Defendants' proposed construction if it is both reasonable and readily apparent from the face of the statute.

This Court must make clear the question before it. The question is not how the statute *actually applies.* That is to say, this Court is not construing the statute to apply it in a particular, well-defined context. Rather, the question is whether a person of ordinary intelligence can understand what the statute prohibits and to whom it applies. Thus, the canons of construction, while still relevant, take on less significance. And while this is a Court of law—not of grammar—the "ordinary principles of English prose" are not "irrelevant" to the definition's construction. *See Flora v. United States*, 362 U.S. 145, 150 (1960). This is especially true here, where the question is how a person of ordinary intelligence would read the statute.

This Court acknowledges the obvious up front. Clearly, the challenged provision prohibits individuals who engage directly with voters and collect completed applications from the voters from copying those completed applications for their own personal use. Perhaps they plan to contact these voters later to advertise their personal business or solicit donations for their church. But retention of information for such personal reasons, on the face of section 97.0575, is "not in

compliance with this section." Another possible reading is that *anyone* who works for a 3PVRO and receives collected applications is prohibited from retaining certain information—and therein lies the rub.

The statute does not necessarily limit its prohibitions only to people who are collecting information directly from voters out in the community. Arguably, the statute applies to all persons who collect voter registration applications on behalf of 3PVROs. This includes the chain of command and the chain of custody within a given 3PVRO, from the canvasser to the field organizer, to the quality control personnel, to the person who finally delivers the completed applications to the appropriate elections officials. At every step in this chain, individuals are collecting voter registration applications on behalf of a 3PVRO, and thus, they are subjecting themselves to the threat of prosecution under this statute.[15] The problem here is that the statute offers no readily apparent construction as to whom it applies. Is it limited solely to folks who are directly engaging with voters and collecting completed applications from them? Or does it apply to anyone further up the chain who would

---

[15] For example, Plaintiff Esperanza Sánchez attested in her declaration that (1) she supervises a team of 15 canvassers on behalf of UnidosUS, a 3PVRO, (2) she distributes voter registration applications to her canvassing team and picks them up when they are done, and (3) she checks that applications her canvassing team receives from voters are complete and turned into the correct county offices on time. *See* ECF No. 54-8 in Case No.: 4:23cv215. Thus, Ms. Sanchez is not always simply engaging directly with voters to fill out applications and then turning them over to the 3PVRO. Instead, she is acting as an agent of the 3PVRO in various capacities— canvasser, supervisor, quality control, and the final link in the chain of custody prior to delivery to the appropriate elections official.

retain voter information for get-out-the-vote purposes? What about a 3PVRO employee who collects completed applications from volunteers in the community?

The statute also contemplates that such persons are permitted to copy voter registration applications or other "personal information" for a specific purpose—"to provide such application or information to the third-party voter registration organization in compliance with this section." *See* § 97.0575(7), Fla. Stat. (2023). Aside from turning the applications over to the 3PVRO for delivery to the appropriate elections official within the time afforded by the statute, there does not appear to be any other way for an individual "to provide such application or information to the [3PVRO] in compliance with this section." That seems consistent with this aspect of the Department of State's proposed gloss:

> Each voter registration application contains a voter's personal information that is not generally available to the public. For purposes of section 97.0575(7), F.S., a person collecting a voter registration application on behalf of a 3PVRO for the reason of providing such application (including the voter's personal information contained therein) to the 3PVRO shall be deemed to be "in compliance with this section" with respect to providing such application to the 3PVRO if the person:
>
> 1. Provides such application to the 3PVRO and
>
> 2. Does not retain such application after providing it to the 3PVRO.

ECF No. 92-1 at 73 in Case No.: 4:23cv215.

This Court reiterates that it must "consider any limiting construction" that the "enforcement agency has proffered." *Flipside*, 455 U.S. 489, 494 n.5. But this Court

is without power to impose a narrowing construction on a state law "unless such a construction is *reasonable and readily apparent*." *Boos*, 485 U.S. at 330 (emphasis added). And while the proposed rule, cited above, attempts to answer the question about what individuals are prohibited from doing with voter information, the Department's additional "clarifications" call this interpretation into serious doubt. As explained below, this only underscores the statute's vagueness.

Section 97.0575(7)'s plain language only applies to individuals, not the 3PVRO as an organization. Thus, it is reasonable to read the statute as prohibiting only individuals who collect such information from copying or retaining that information, except for purposes of providing the information to the 3PVRO. In other words, the plain language of the provision includes no similar prohibition on copying or retaining information for the 3PVRO itself. But this reveals an inherent ambiguity of the statute in the context to which it applies. 3PVROs are, of course, made up of individuals—staff, members, volunteers, etc. And these individuals work together in various ways to collect voter registration applications at various points along the chain of custody until they are finally delivered to the appropriate elections official. *See* ECF No. 54-8 in Case No.: 4:23cv215. Accordingly, the Department of State's proposed definition of "in compliance with" this statute only leads to further ambiguity as it fails to address what individuals working for the 3PVRO may do

with the voter registration applications or voter information once they receive it from those individuals who collected it directly from voters.

Seemingly recognizing this ambiguity, the Department of State has also proposed prohibiting 3PVROs, as organizations, from copying voter registration applications or retaining certain voter information after they have delivered the applications to the appropriate elections official. ECF No. 92-1 at 74 in Case No.: 4:23cv215. But this prohibition is found nowhere in section 97.0575(7), nor is it reasonable or readily apparent that the statute's prohibitions extend so broadly. Indeed, the Department of State's proposed rule serves only to contradict an intuitive reading of the statute; namely, that it applies solely to those individuals who are directly engaging with voters in the community as opposed to the 3PVROs as organizations or those who work for them and collect completed applications from further up the chain of custody.

The vagueness of the challenged provision is only underscored by the Department of State's attempt to redefine what the statute actually applies to— "personal information." In the context of the statute itself, "personal information" is described as including—but not limited to—"the voter's Florida driver license number, Florida identification card number, social security number, or signature." Based on these examples, Defendants argue that "personal information" means "private, non-public information." ECF No. 92 at 31 in Case No. 4:23cv215 (internal

quotation marks omitted). Of course, had the Florida Legislature intended to include only "private" or "non-public information," it could have said so directly. Instead, the statute leaves open a broad universe of what could be considered "personal" information and does not, on its face, limit that reach to only "information that is not generally available to the public."

The Department of State's attempt at limiting the universe of information is but one possible interpretation. Nonetheless, even if the Florida Legislature intended for "personal information" to mean "private, non-public information," in this day and age, the possibilities for what constitutes "private" or "non-public" information are both sweeping and shifting. Defendants' suggestion that such information *necessarily excludes* voters' email addresses, telephone numbers, or mailing addresses is not readily apparent from the statute's text. And Defendants' proposed construction begs the question of whether something is private or "not generally available to the public" depends upon the efforts to which someone must go to locate the information. For example, what about home addresses or phone numbers? What about private email addresses? This Court cannot pretend we live in a different era when everyone still had a phonebook with phone numbers and addresses for nearly everyone in town. While someone's home phone number and home address may have been publicly available in the 1990s, a person of ordinary intelligence would have good reason to think such information is "private" nowadays inasmuch as

phonebooks are no longer widely disseminated, if at all. But even if this Court accepts Defendants' proffered construction of "personal information," this only answers one question posed by the statute—that is, to which information the statute applies. Defendants' construction offers no answers for the fundamental questions of to whom the statute applies and when their conduct—retention of information— becomes a felony.

This Court must give meaning to all terms in a statute. *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1273 (N.D. Fla. 2021). But on its face, section 97.0575(7) offers only a standardless prohibition on retention of voter information— whatever that information may be. This indiscernible standard provides no notice of the conduct prohibited by the section and encourages arbitrary enforcement.

It bears repeating that the Fourteenth Amendment tolerates a lower degree of vagueness for laws, like section 97.0575(7), that impose *criminal liability. See Flipside*, 455 U.S. at 498 ("The degree of vagueness that the Constitution tolerates— as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."). Here, under the standard set by the Florida Legislature and proposed by Defendants, a person of ordinary intelligence would not be able to understand when they could copy voters' applications or retain their personal information, if at all. And while a "scienter requirement may mitigate a law's vagueness," *Flipside*, 455 U.S. at 499, the challenged provision lacks even

48

that. Even more troubling, this indiscernible standard lends itself to arbitrary enforcement. Without a reasonable and readily apparent meaning for what is prohibited and who is subject to that prohibition, section 97.0575(7) fails to provide "any standard by which [the law's enforcers] can judge whether an individual" improperly retained a voter's personal information. *See Morales*, 527 U.S. at 66. In short, the Florida NAACP Plaintiffs' staff, members, and volunteers are left to guess when they may violate section 97.0575(7) and risk arrest and felony prosecution. [16]

Here, the Florida Legislature has drafted a criminal statute that contemplates *some* individuals retaining *some* information for *some* undefined purpose. The penalties for running afoul of these illusory standards include arrest, prosecution, and ultimately a felony conviction. Even Defendants conceded at the hearing that the threat of arrest is "a pretty big deal." Tr. at 91.[17] The statute's text is so devoid

---

[16] "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id* at 499. "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* While this Court recognizes that the question of whether the law does, in fact, interfere with First Amendment rights is a nuanced one, the Florida NAACP Plaintiffs have made a colorable argument that their get-out-the-vote activities are imbued with First Amendment protection and that this provision directly interferes with their corresponding free speech and association rights. But because the challenged provision runs afoul of the Due Process Clause's fair notice requirement for criminal statutes, this Court need not determine if it would likewise violate the more stringent vagueness standard for laws that interfere with First Amendment rights.

[17] At the hearing, Defendants made the dubious argument that their proposed rulemaking would provide a legal defense to avoid conviction. However, it certainly offers no shelter from arrest or prosecution, which, as noted above, Defendants agreed "is a pretty big deal."

of meaning that it cannot possibly give people of ordinary intelligence fair notice of what information they are allowed to retain and for what purposes they may do so. And it is no answer for Defendants to suggest they won't take any action against these Plaintiffs based on the Florida Department of State's "clarification" of the statute. Simply put, neither the Department nor this Court is permitted to rewrite section 97.0575(7) to cure its vagueness.[18] This Court concludes that the Florida NAACP Plaintiffs have established a substantial likelihood of success on the merits of their vagueness challenge to the information retention ban in section 97.0575(7). As such, this Court need not address the merits of the balance of the Florida NAACP Plaintiffs' claims with respect to this statute.

---

[18] Although this Court would appreciate the opportunity to certify this important question of state law construction to the Supreme Court of Florida, it is without authority to do so. *See* Fla. R. App. P. 9.150 (permitting only "the Supreme Court of the United States or a United States court of appeals" to certify a question of law to the Supreme Court of Florida); *see also Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023) (certifying question of statutory construction to Florida Supreme Court and noting that "certification affords the State's highest court an opportunity to interpret [Florida's amended riot statute] in a way that may obviate the plaintiffs' constitutional concerns"). Thus, clarification from the Florida Supreme Court is unavailable at this juncture. To be sure, though, it is no answer to suggest this Court should abstain from ruling on the Florida NAACP Plaintiffs' vagueness claim until a Florida state court assigns some limiting construction to the challenged provision or the Florida Supreme Court answers a certified question regarding the statute's construction. Voter registration is happening *now*, individuals' rights and liberty are at stake *now*, and the statute's enforcers have yet to finalize their own construction of the statute. Accordingly, this Court must address the issue *now* rather than leave individuals guessing as to whether they will be subject to arrest or felony prosecution until the Florida Legislature amends the statute or the state courts assign some limiting construction to the statute as written.

C

Recall that the remaining preliminary injunction factors are (1) that Plaintiffs will suffer irreparable injury absent an injunction, (2) that the harm not granting an injunction causes to Plaintiffs outweighs the harm an injunction would cause to Defendants, and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors weigh in favor of granting Plaintiffs' motion for preliminary injunction.

First, absent an injunction, Plaintiffs will suffer irreparable injury because their voter registration operations will be substantially interrupted once the challenged provisions take effect. For example, the Organizational Plaintiffs stand to lose the ability to have their noncitizen canvassers—in some instances, the vast majority of their canvassing workforces—continue collecting or handling voter registration applications, thus limiting their ability to register new voters, or immobilizing their voter registration efforts altogether, until they can recruit and hire new employees and volunteers. And the individual Plaintiffs are explicitly banned from collecting or handling voter registration applications, thus extinguishing their opportunities to directly register new voters. "[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *League of Women Voters of Fla.*

51

*v. Browning*, 863 F. Spp. 2d 1155, 1167 (N.D. Fla. 2012) (Hinkle, J.). "If an injunction does not issue now, there will be no way to remedy the plaintiffs' continuing loss through relief granted later in this litigation." *Id.*

Second, weighing Plaintiffs' injuries against Defendants' interest, the scale tips decisively in Plaintiffs' favor. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because the state "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* Third, and finally, this Court is persuaded that an injunction would not be adverse to the public interest. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73.

In sum, because Plaintiffs have carried their burden as to all four of the preliminary injunction factors with respect to their equal protection and vagueness claims, this Court finds that they are entitled to a preliminary injunction with respect to these claims.

IV

This Court next considers whether Plaintiffs must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-

established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, considering that the challenged provision's unlawful impact on Plaintiffs' Fourteenth Amendment rights weighs against requiring a bond, this Court waives the bond requirement.

V

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency*

53

*v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner*, 999 F. Supp. 2d at 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to move to stay under Rule 62.

## VI

Tomorrow, Floridians across the state will commemorate our Nation's birthday. They will endure the heat of the Florida summer to celebrate the Fourth of July with family and friends at barbecues and picnics. They will gather with their communities at public parks for music and fireworks. They will cheer and sweat at parades and block parties. And amid these patriotic festivities, some may feel moved, for the first time, to embrace their solemn privilege as citizens by registering to vote.

That's where Plaintiffs come in. Absent the challenged provisions at issue in these cases, individuals like Ms. Herrera-Lucha and 3PVROs like the Florida NAACP and Hispanic Federation would be engaging with their communities and

registering new voters. In doing so, they would embody those democratic ideals that, for nearly two hundred forty-seven years, have made our system the envy of the world.

The importance of the interests at stake in these cases cannot be overstated. As counsel for the Florida NAACP Plaintiffs put it, "the very nature and purpose of the 3PVROs, in this case and generally, is to reach communities and exist in a space that is outside of the government, that is to reach marginalized voters who have traditionally lacked that kind of connection and access to the state government . . . ." Tr. at 104. "These 3PVROs exist precisely to address the voters who do not feel taken care of by the government and who have been marginalized by these traditional means . . . ." *Id*. In a land that professes deliverance of the "tired," the "poor," the "huddled masses yearning to breathe free,"[19] 3PVROs encourage those who join us as citizens to also join in citizenship's highest right and cardinal task: voting. We have "a Republic" only if we "keep it"[20]; our government remains "of," "by," and "for the people"[21] only if the people are heard. And to vote is to lift one's voice and sing in our vast, clamoring chorus of democracy.

---

[19] Emma Lazarus, *The New Colossus*.

[20] Attributed to a conversation between Elizabeth Willing Powel and Benjamin Franklin.

[21] Abraham Lincoln, *Gettysburg Address*.

55

The State of Florida is correct to seek integrity in our electoral system. Sound election laws ensure the people are heard without distortion from negligent and bad-faith actors. Here, however, Florida's solutions for preserving election integrity are too far removed from the problems it has put forward as justifications. It is no answer to assert the Florida Legislature's work here was "good enough." Tr. at 85. Such shoddy tailoring between restriction and government interest presents a dubious fit under rational basis review, and it falls woefully short of satisfying the strict scrutiny this Court must apply. And a provision as vague as the information retention ban, notwithstanding the Secretary of State's *post-hoc* intent to clarify its reach, can serve no end but arbitrary punishment. The United States Constitution demands more than "good enough."

Ms. Herrera-Lucha, a noncitizen who, herself, lacks the right to vote, has spent years registering and encouraging citizens to exercise that solemn right. She may, at least for now, continue to do so and add more voices to the millions of others singing a more perfect Union into existence.

Accordingly,

**IT IS ORDERED:**

1.  The Florida NAACP Plaintiffs' motion for a preliminary injunction, ECF

No. 55 in Case No.: 4:23cv215, is **GRANTED**.[22]

2. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered:

    a. Section 97.0575(1)(f), Florida Statutes (2023); and

    b. Section 97.0575(7), Florida Statutes (2023).

3. The preliminary injunction binds the above-listed Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

4. The Hispanic Federation Plaintiffs' motion for a preliminary injunction, ECF No. 32 in Case No.: 4:23cv218, is **GRANTED**.

5. Defendant Secretary of State Cord Byrd, in his official capacity, and Defendant Attorney General Ashley Moody, in her official capacity, must take no steps to enforce the following until otherwise ordered:

    a. Section 97.0575(1)(f), Florida Statutes (2023).

6. The preliminary injunction binds the above-listed Defendants and their

---

[22] As this Court noted above, given that the Florida NAACP Plaintiffs and the Hispanic Federation Plaintiffs are entitled to relief based on their equal protection and vagueness claims, this Court need not address the balance of their asserted constitutional infirmities with respect to the challenged provisions.

officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

**SO ORDERED on July 3, 2023.**

**s/Mark E. Walker_____**
**Chief United States District Judge**