# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

HISPANIC FEDERATION, PODER
LATINX, VERÓNICA HERRERA-
LUCHA, NORKA MARTÍNEZ, and
ELIZABETH PICO,

*Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Florida Secretary of State, and
ASHLEY MOODY, in her official
capacity as Florida Attorney General,

*Defendants*.

Case No. 4:23-cv-00218

## REVISED COMPLAINT NAMING ALL PLAINTIFFS FILED PURSUANT TO ECF NO. 78

Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico, bring this action against Defendants Florida Secretary of State Cord Byrd and Florida Attorney General Ashley Moody in their official capacities, and allege the following:

## INTRODUCTION

1.     This is a lawsuit challenging harsh, unnecessary, and irrational restrictions on community-based voter registration speech and activity, in violation of the First and Fourteenth Amendments and federal civil rights statutes.

2.      Plaintiffs bring this action to prevent enforcement of a new Florida law that unconstitutionally burdens and chills their core political speech and associational rights, diminishing their efforts—and the efforts of other individuals and community-based groups—to encourage civic engagement and democratic participation by assisting Florida citizens in registering and exercising their fundamental right to vote. The individual plaintiffs also seek to prevent enforcement of this law because it unconstitutionally discriminates against them on the basis of their citizenship status.

3.      Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Plaintiffs' endeavors to assist others in registering to vote are themselves political and philosophical statements, signaling that Plaintiffs value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government. This untailored and overbroad law cannot possibly survive the exacting scrutiny applied to such restrictions on political speech.

4.      The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections." H.R. REP. NO. 103-9, at 3,

(1993). Such registration laws "disproportionately harm voter participation by various groups, including the disabled and racial minorities." *Id.*

5.      Civic organizations have routinely taken steps to assist individuals in registering to vote in order to ensure broad participation in elections. These community-based voter registration efforts are particularly important in Florida, which ranks 47th in the percentage of its citizen voting age population registered to vote out of all 50 states and the District of Columbia.

6.      Instead of enacting sensible regulations regarding voter registration and encouraging the registration of all eligible Florida voters, on May 24, 2023, Governor Ron DeSantis signed Senate Bill 7050 into law. Laws of Fla. ch. 2023-120 (CS for SB 7050). The bill revises section 97.0575 of the Florida Statutes and adds a host of burdens on organizations and individuals who assist their fellow Floridians in registering to vote, including provisions that make Florida uniquely restrictive among the states. *Id.* § 4. The bill will take effect on July 1, 2023. *Id.* § 52.

7.      Among other things, the newly-revised section 97.0575 ("the Law") requires that, before engaging in any voter registration activities, a third-party voter registration organization must provide the Department of State's Division of Elections with an affirmation that each person collecting or handling voter

registration applications on behalf of the organization "is a citizen of the United States." Fla. Stat. § 97.0575(1)(f).[1]

8.  In the event of a violation, the Law imposes a $50,000 fine on the organization for "each such person" collecting or handling a registration application on the organization's behalf, Fla. Stat. § 97.0575(1)(f), and authorizes the Secretary of State to refer any instance in which the Secretary "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement, *id.* § 97.0575(8).

9.  The majority of Plaintiffs Hispanic Federation's and Poder Latinx's voter registration canvassers are non-citizens who are authorized to work in the United States, *i.e.*, legal permanent residents or participants in deferred action or temporary protected status programs. The Law leaves Hispanic Federation and Poder Latinx with no ability to conduct voter registration activity at any significant scale without risking substantial civil sanctions. And the Law will prevent the individual plaintiffs from collecting or handling voter registration applications altogether.

10.  The Law is inordinately burdensome and will render Plaintiffs' voter registration activities costlier, more resource-intensive, and less effective. Coupled with civil penalties that could consume large portions of these civic organizations'

---

[1]  Unless otherwise noted, statutory citations are to the statute as amended by SB 7050. *See* Laws of Fla. ch. 2023-120, § 4 (amending Fla. Stat. § 97.0575 (2022)).

budgets, these regulations carry devastating consequences and violate Plaintiffs' constitutional rights.

11.   The Law will also chill protected speech by Plaintiffs' staff and volunteers who *are* U.S. citizens, both because of the difficulties associated with confirming citizenship status, and because Plaintiffs cannot maintain the same level of activity while shouldering the burden of the added risks and drain of resources that carrying out their protected activities in compliance with the Law would require.

12.   The Law transforms core civic expression and constitutionally protected activity into an extraordinarily risky enterprise. Hiring staff and encouraging volunteers to participate in voter registration activity is an important part of the Plaintiffs' associational activity and their organizational missions. But in light of the significant limitations on who can associate with Plaintiffs and the immense civil liability the Law creates, Plaintiffs anticipate—and are already experiencing—a decline in their ability to recruit volunteers and hire staff to disseminate their message of democratic participation and conduct their voter registration work.

13.   Because Plaintiffs' voter registration efforts will be deterred, burdened, or scaled back as a result of these requirements, the Law will result in an overall reduction in the total quantum of speech, expression, and association Plaintiffs engage in.

14.    The Law further unlawfully discriminates against individual plaintiffs Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico on the basis of their citizenship status in violation of the Fourteenth Amendment's Equal Protection Clause, and unlawfully interferes with their statutory rights to make contracts under 42 U.S.C. § 1981.

15.    These onerous and overbroad requirements do not serve, and cannot be justified by, any compelling or even legitimate interest.

16.    Unless the challenged provision of the Law is enjoined, Plaintiffs' constitutionally protected political speech and activity will continue to be chilled. Plaintiffs, as well as many other individuals and groups, will communicate fewer civic and nonpartisan political messages and refrain from engaging in associational activity important to advancing their missions and beliefs. The public—and particularly the Latino communities that Plaintiffs serve—will have fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful civic activities. And the individual plaintiffs, all of whom have authorization to work, will lose their source of employment and income as canvassers solely because of their citizenship status, with devastating attendant financial consequences for themselves and their families.

17.    For these reasons, and those specifically alleged herein, Plaintiffs seek a declaratory judgment and injunction prohibiting Defendants from enforcing the

challenged requirements of the Law and permitting Plaintiffs' constitutionally protected community-based voter registration speech and activities to continue.

## JURISDICTION AND VENUE

18.    This action is brought under the Constitution and laws of the United States. The Court, therefore, has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1357, and 42 U.S.C. §§ 1981 and 1983. It also has jurisdiction to grant the declaratory relief requested under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and Federal Rule of Civil Procedure 57.

19.    This Court has personal jurisdiction over each Defendant because each is a citizen of Florida and their principal places of business are in Tallahassee.

20.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District, and because a substantial portion of the events giving rise to these claims occurred in this District.

## PARTIES

### A. Plaintiffs

21.    Plaintiff HISPANIC FEDERATION is a 501(c)(3) nonprofit, nonpartisan, community organizing, and advocacy organization. Hispanic Federation's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions through work in the areas of education, health, immigration, civic engagement, economic empowerment, and the

environment, including by promoting voter engagement. Hispanic Federation works locally, statewide in Florida, and nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential pillars: membership services, advocacy services, and community assistance programs.

22.     Hispanic Federation carries out its voter engagement work through all three essential service pillars. This work assists the Hispanic electorate to register to vote, apply for vote-by-mail ballots, and vote on election day and during early voting. These activities are meant to ensure the representation of the Hispanic community's interests in government by helping Hispanic voters become involved in elections and civic participation. Hispanic Federation engages with voters across Florida, but primarily operates in Broward, Hillsborough, Lake, Miami-Dade, Orange, Osceola, Polk, Seminole, and Volusia Counties.

23.     Hispanic Federation is a registered third-party voter registration organization. During the 2016 and 2020 election cycles, Hispanic Federation registered over 78,000 voters.

24.     Plaintiff PODER LATINX is a fiscally sponsored project of Tides Advocacy, a California nonprofit public benefit corporation. Poder Latinx is a social justice, organizing, and civic engagement organization whose mission is to help ensure that Latinx communities, inclusive of immigrants and people of color, are

decision-makers in our democracy. Poder Latinx works locally and statewide in Florida to expand the electorate by conducting year-round civic engagement activities, community empowerment, leadership development, and issue-based organizing with a focus on three key issues: immigrant justice, climate justice, and economic justice.

25.    Poder Latinx carries out its mission to expand the electorate by encouraging people to register to vote through in-person activities, via digital campaigns, and telephone banking. In 2020, Poder Latinx's voter turnout program knocked on 105,000 doors ahead of the 2020 election. Poder Latinx's civic engagement work is focused on educating voters on how to exercise their right to vote, the accepted types of identification necessary to vote, how to request vote-by-mail ballots, and how to return their ballots. Poder Latinx's voter registration, voter education, and civic engagement work is carried out throughout the state of Florida with a specific focus on Lake, Lee, Orange, Osceola, Palm Beach, Polk, Seminole, and Volusia Counties.

26.    Poder Latinx is a registered third-party voter registration organization. Since 2019, Poder Latinx has registered over 40,000 Florida voters.

27.    Plaintiff VERÓNICA HERRERA-LUCHA is a Florida resident. She is a citizen of El Salvador and a Lawful Permanent Resident of the United States. She is currently employed as the Florida State Field Director of Mi Vecino, a registered

third-party voter registration organization. Ms. Herrera-Lucha has been canvassing for third-party voter registration organizations since 2016, both as a volunteer and as a paid staff member. She is a community leader in Polk, Osceola, and Orange Counties with training from three supervisors of elections of three counties.  She also holds a Juris Doctor degree from Universidad de Administracion de Negocios in El Salvador, a Master's degree in political sciences from the Universidad Catolica Centroamericana in El Salvador, and holds a Diploma in Citizenship Participation from the U.S. State Department. Ms. Herrera-Lucha is a mother with four dependents, and her current job at Mi Vecino is both professionally and economically important to her.

28.    Plaintiff ELIZABETH PICO is a Florida resident. She is a Venezuelan citizen who has applied for asylum in the United States and has been granted Temporary Protected Status (TPS) and work authorization by federal immigration authorities. She currently works at least 30 hours per week as a canvasser, helping to register people to vote in Florida. Ms. Pico has been canvassing for third-party voter registration organizations since 2019, both as a volunteer and as a paid staff member.

29.    Plaintiff NORKA MARTÍNEZ is a Florida resident. She has applied for asylum in the United States, and has been granted Temporary Protected Status ("TPS") and work authorization from federal immigration authorities. She currently

works in a paid staff position as a canvasser who helps to register people to vote in Florida. Ms. Martínez is limited in her physical health, and her work as a canvasser has enabled her to take care of her health while also being able to support and provide for her family.

**B. Defendants**

30.    Florida's Secretary of State, CORD BYRD, is the State's chief election officer. *See* Fla. Stat. § 97.012. The Secretary's duties consist of, among other things, "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). To that end, he may adopt "uniform standards for the proper and equitable interpretation and implementation" of the election laws. *Id.* The statutory responsibilities of the Secretary and his Division of Elections also include managing voter registration and overseeing third-party voter registration organizations, including collecting the third-party voter registration organization's affirmations that they are in compliance with the Law. *Id.* § 97.0575(1). If the Secretary reasonably believes that a person or organization has violated the Law, he may refer the matter to the Attorney General for enforcement. *Id.* § 97.0575(8).

31.    Florida's Attorney General, ASHLEY MOODY, is tasked with the power and responsibility to enforce the Law, after receiving a referral from the Secretary. Fla. Stat. § 97.0575(8). The Attorney General may institute a civil action for a violation of the Law or to prevent a violation of the Law. *Id.*

11

## FACTS

### A. Third-Party Voter Registration Organizations

32.     Third-party voter registration organizations play an important role in registering voters. Between 2009 and November 5, 2021, Florida's supervisors of elections received over 2,149,700 voter registration applications from third-party voter registration organizations.

33.     Plaintiffs Hispanic Federation and Poder Latinx are registered third-party voter registration organizations. Both organizations help reach voters who might not otherwise register to vote, including voters with limited access to technology or limited proficiency in the English language.

34.     Third-party voter registration efforts are especially important in Florida. According to the U.S. Census Bureau, approximately 9,770,000 Florida citizens were registered to vote as of November 2022, out of a citizen voting age population of 15,449,000.[2] Therefore, as of November 2022, approximately 37 percent of eligible Floridians were *not* registered to vote. The Census Bureau's data establishes that Florida's voter registration numbers are among the worst in the country, ranking 47th in the percentage of its citizen voting age population registered to vote out of all 50 states and the District of Columbia.

---

[2]     U.S. Census Bureau, *Voting and Registration in the Election of November 2022* (April 2023), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-586.html.

35.    Eligible Floridians can register to vote using a state-issued voter registration form. An online voter registration system is also available. That online system has previously crashed, however, before crucial deadlines. For example, the online system crashed right before book closing for the 2018 general election, resulting in Floridians being unable to register online right before the deadline. The online system malfunctioned again in 2020, which again resulted in voters being unable to register online the night before the deadline.

## B. Florida's Pattern of Increasing Burdens on Third-Party Voter Registration Organizations

36.    The Law follows a pattern in Florida of chilling third-party voter registration activities under the guise of election integrity.

37.    In 2011, the Florida Legislature passed HB 1355, an omnibus election bill to address "fraud" following the 2008 election. Laws of Fla. ch. 2011-40. HB 1355 reduced the amount of time third-party voter registration organizations could submit voter registration applications from 10 days to 48 hours. The change had a racially discriminatory effect, as third-party voter registration organizations register Black and Hispanic voters at twice the percentage as white voters. And for the reasons alleged here, this Court invalidated the 48-hour requirement for placing an undue burden on third-party voter registration organizations. *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167–68 (N.D. Fla. 2012).

38.     The Florida Legislature sharpened its voter registration regulations again following the 2020 election. 2021's SB 90 required third-party voter registrations to provide a disclaimer and meet delivery restrictions that severely impeded their efforts. Laws of Fla. ch. 2021-11. In particular, SB 90 required third-party voter registration organizations to provide a disclaimer to voter registration applicants expressing "that the organization might not deliver the application" properly. *Id.* § 7, at 8 (amending Fla. Stat. § 97.0575(3)(a)). This suggestion that a third-party voter registration organization may not register a voter properly degraded the trust community members have with these organizations.

39.     SB 90 also penalized third-party voter registration organizations if they failed to deliver registration applications to the "supervisor of elections in the county in which the applicant resides" within 14 days. *Id.* These provisions, among other election code changes, are subject to ongoing litigation in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part, sub nom. League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).

**C. SB 7050's Non-Citizen Provision**

40.     The regulatory assault against third-party voter registration organizations continued in 2023 with SB 7050.

14

41.    SB 7050 is a purported 'solution' in search of a problem. Put simply, SB 7050 classifies all non-citizens as untrustworthy based solely on their citizenship status, including non-citizens who have served in the U.S. military and are veterans. The prohibition exists, even though non-citizens can work in Florida's Division of Elections and Department of Highway Safety & Motor Vehicles, with access to the same information contained on voter registration forms.

42.    When Florida Senators debated the justification for SB 7050's non-citizen ban, the bill's sponsors merely cited "protecting [] sensitive information" on completed registration forms and "that there are certain rights in our country that only citizens get to enjoy."[3] This is plainly inconsistent with non-citizens' eligibility for eligibility for positions in Florida's government that involve handling the same information at issue here.

43.    Senator Travis Hutson, who co-introduced the bill, later commented that they wanted to make sure "illegal[s]" were not handling voter registration applications, although SB 7050 contains no exception for non-citizens who are legally present in the United States. No evidence of non-citizens mishandling voter registration applications was discussed during SB 7050's two Senate committee hearings.

---

[3]    Fla. Senate Floor Debate on SB 7050, at 49:36–50:49 (Apr. 26, 2023), *available at* https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000.

44.     On May 24, 2023, Governor Ron DeSantis signed SB 7050 into law.

45.     The Law requires that, before engaging in any voter registration activities, a third-party voter registration organization must provide the Division of Elections with an affirmation that "each person collecting or handling voter registration applications on behalf of" the organization "is a citizen of the United States." Fla. Stat. § 97.0575(1)(f).

46.     In the event of a violation, the Law imposes a $50,000 fine on the organization for "each such person" collecting or handling the application on the organization's behalf, Fla. Stat. § 97.0575(1)(f), and authorizes the Secretary of State to refer any instance in which he "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement, *id.* § 97.0575(8).

47.     There is no cap on the total amount that any organization could be fined for such persons' assistance, nor is there any knowledge requirement to impose such a fine. Assistance from three persons who the organization did not realize were non-citizens would result in a fine of $150,000. Assistance from fifteen persons who the organization did not realize were non-citizens would result in a fine of $750,000.

48.     Exacerbating the Law's harsh penalties, the Law's commands are impermissibly vague and overbroad, such that the regulated individuals and organizations do not know which requirements apply to them and what steps to take

16

to ensure proper compliance with the Law. For example, the words describing the conduct at issue—"collecting" and "handling"—are nowhere defined. By way of example, it is unclear whether the Law forbids legal permanent residents from reviewing applications to ensure compliance with registration requirements, supervising other canvassers who are physically collecting applications, encouraging an eligible citizen to complete an application without physically touching the application, directing eligible citizens to the organization's online application portal, or even being present in an office where applications are being processed. All of these, and a myriad of other questions, are not addressed by the statutory language. The Law's vague and overbroad requirements will diminish the participatory message of Plaintiffs, other civic organizations, and civic-minded individuals and chill constitutionally protected core political speech.

49.     The non-citizen provision is only one of a number of burdens that SB 7050 imposes on third-party voter registration organizations to hamper their mission and limit the efficacy of their work. For example:

- SB 7050 also requires that, before engaging in any voter registration activities, a third-party voter registration organization must provide the Division of Elections with an affirmation that each person collecting or handling voter registration applications on behalf of the organization has not been convicted of a felony violation of the Election Code, a

felony violation of an offense specified in sections 825.103 or 98.0751(2)(b)–(c) or in chapters 817, 831, or 837 of the Florida Statutes. Fla. Stat. § 97.0575(1)(f).

- SB 7050 requires third-party voter registration organizations to provide a receipt to the registrant requiring extensive information. *Id.* § 97.0575(4).

- SB 7050 shortens the period in which a third-party voter registration organization must deliver an application to the supervisor of elections from 14 to 10 days, and imposes daily fines for late-submitted applications. *Id.* § 97.0575(5)(a).

- SB 7050 prohibits a person collecting registration applications from retaining the registrants' personal information for any reason other than to register to vote, meaning that such information cannot be used for other civic education or get out the vote efforts. *Id.* § 97.0575(7).

- SB 7050 prevents third parties from assisting voters to apply to vote-by-mail, only allowing supervisors of elections to accept vote-by-mail applications from voters or their immediate family members. *Id.* § 101.62(1)(a).

- And SB 7050 imposes a new fine on third-party voter registration organizations for "mail[ing] or otherwise provid[ing] a voter

registration application upon which any information about an applicant has been filled in before it is provided to the applicant." *Id.* § 97.0575(11).

**D. The Law's Impact on Plaintiffs**

50.    The Law imposes severe burdens on the voter registration activities engaged in by Plaintiffs and similar groups and individuals. These requirements will limit Plaintiffs' effectiveness in promoting democratic participation, make it costlier and more resource-intensive to conduct voter registration, and chill speech because of the overbroad and unwarranted limitations the Law places on who can assist voters with registration applications, as well as the substantial fines for noncompliance with these limitations.

51.    The Law prohibits Plaintiffs from continuing to employ most of their existing workforce. Plaintiffs can no longer rely on many of their most experienced canvassers to assist with voter registration efforts, including those who have risen to senior and leadership positions within the organization, and those who have developed deep relationships with the communities Plaintiffs serve.

52.    Specifically, the Law will result in Hispanic Federation losing approximately 70 percent of its canvasser workforce. And the Law will freeze Poder Latinx's voter registration work: Approximately 90 percent of Poder Latinx's staff are non-citizens, including its field organizers, community organizers, canvassers,

19

and a quality control agent charged with ensuring voter registration forms are correctly completed.

53.    Poder Latinx's non-citizen staff include canvassers who knock on doors, field leads who drive the canvassers to different communities, and community organizers who coordinate community engagement programs. All of these staff members are paid, and they handle completed voter registration forms in the field. These staff then return completed voter registration forms to county supervisors of elections after Poder Latinx performs quality assurance checks. Without these non-citizen staff members, Poder Latinx cannot complete its voter registration activities and engage in constitutionally protected speech.

54.    Because of the Law, Poder Latinx has already been unable to fill open, paid positions, and has had to turn down otherwise qualified candidates who applied for those positions based solely on their citizenship.

55.    The Law's prohibition on non-citizens handling and collecting voter registration forms will result in Plaintiffs losing not only their non-citizen staff, but the institutional knowledge they carry. Without these non-citizen staff members, Plaintiffs cannot sustain their voter registration activities and are unable to engage in constitutionally protected speech, and will have to divert substantial resources to hiring and training new staff and volunteers.

56.    Many of Hispanic Federation's non-citizen canvassers who handle and

return voter registration forms have worked with Hispanic Federation since 2016 and are among the organization's most experienced canvassers. These non-citizen volunteers and staff have developed deep relationships within their communities, including with local business owners who allow Hispanic Federation to conduct voter registration efforts at their locations. These senior non-citizen volunteers also train new canvassers. Losing these senior members would decimate the senior ranks of Hispanic Federation's voter registration leaders, leaving them unable to participate in their First Amendment protected speech.

57.    The Law also burdens Poder Latinx with the loss of institutional knowledge and relationships its non-citizen staff have. Like Hispanic Federation, Poder Latinx field leads and community organizers build relationships with businesses in the community—like grocery stores and restaurants—who allow Poder Latinx canvassers to register voters on their properties. Without these relationships, Poder Latinx's speech will be limited. The staff those local businesses know are now prohibited from engaging in voter registration work.

58.    Likewise, the knowledge and training that Poder Latinx non-citizen staff have will be gone forever. Many senior staff at Poder Latinx have worked their way up: from canvassers, to field leads, to organizers. Knowledge obtained on their journey to Poder Latinx organizers is shared with new staff starting work as canvassers. The Law's prohibition on non-citizens handling and collecting voter

registration forms will result in Poder Latinx losing all of its non-citizen staff, including the institutional knowledge they carry. Instead of expanding voter registration work across the state, Poder Latinx will be lucky to field a single team to register voters with the Law in place.

59.    The Law will also effectively prevent Plaintiffs from working with many U.S. citizens as well. The Law requires voter registration organizations to affirm that all of the people handling and collecting applications on their behalf are citizens, but confirming citizenship status is no easy task. As one court recently explained:

> Determining whether a person acquired or derived citizenship is a complex inquiry and illustrates the fluidity one may experience with respect to immigration status.
>
> For derivative citizenship, the analysis can turn on, among other things: which parent is a citizen, when that parent became a citizen, whether the person's parents were married, whether and when the U.S. citizen parent lived in the United States and for how long, whether the father legitimated the child, whether the child lived in the custody of the U.S. citizen parent or parents, and at what point the child lived in the custody of the U.S. citizen parent(s).
>
> In some cases, a determination on derivative citizenship may depend on knowing whether a person's grandparent(s) were U.S. citizens or whether a person or their parent(s) served in the U.S. Armed Forces.

*Gonzalez v. Immigr. & Customs Enf't*, 416 F. Supp. 3d 995, 1004 (C.D. Cal. 2019)

(citations and paragraph numbers omitted), *rev'd and vacated on other grounds*, 975

F.3d 788 (9th Cir. 2020).

60.   There is no reliable government database for Plaintiffs to search to determine the citizenship status of an employee or volunteer. Indeed, even government officials routinely mistake persons' citizenship status, because the central immigration database "'frequently' shows naturalized citizens as green card holders" and "provides no information on derivative citizenship," which is why "many U.S. citizens become exposed to possible false arrest when ICE relies solely on deficient databases." *Gonzalez*, 416 F. Supp. 3d at 1018 (citation omitted).

61.   Difficulty determining citizenship status is a known problem in Florida, as recent public reports have demonstrated:

> Miami-Dade County's records show that between February 2017 and February 2019, ICE sent the jail 420 detainer requests for people listed as U.S. citizens, only to later cancel 83 of those requests—evidently because the agency determined, after the fact, that its targets were in fact U.S. citizens. The remaining individuals' detainers were not canceled, and so they continued to be held for ICE to deport them.

ACLU of Florida, *Citizens on Hold: A Look at ICE's Flawed Detainer System in Miami-Dade County* (Mar. 20, 2019), https://www.aclufl.org/en/publications/citizens-hold-look-ices-flawed-detainer-system-miami-dade-county.

62.   Because the Law imposes a strict liability standard that threatens Plaintiffs with substantial financial penalties based on a mistake about an employee's or volunteer's citizenship status, Plaintiffs will have to turn away help even from

citizens. For example, Hispanic Federation will no longer let individuals assist with voter registration efforts unless they can demonstrate *proof* of citizenship, requiring them to turn down even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish the requisite proof.

63.    The Law's strict liability standard and substantial fines have also dissuaded Poder Latinx from re-engaging certain volunteer bases altogether. For example, Poder Latinx will no longer maintain its community service partnerships that enabled local student volunteers to assist with voter registration efforts, because of the added hurdle of confirming the students' citizenship status.

64.    Even the threat of an *investigation* by the Department of State or Attorney General's Office for a violation of the Law is sufficient to chill Plaintiffs' speech and association, let alone the threat of enforcement.

65.    The harm from losing staff members and institutional knowledge is further compounded by the threat of fines. The Law's fines threaten Plaintiffs with substantial monetary liability, which will chill their voter registration speech and activities and is already affecting their planning for Florida's 2023 local elections.

66.    Even the fine imposed for one noncitizen volunteer or staffer is a substantial amount of money that creates a chilling effect on voter registration organizations. For example, Hispanic Federation's largest funders expressed they may withhold donations unless voter registration efforts cease in Florida, as a result

of the $50,000 penalty. Even if Hispanic Federation is able to maintain its funding sources, Hispanic Federation's budget last year for its Florida programming comprised just over $600,000, which makes each $50,000 penalty a severe hit on their programming budget. A $50,000 fine would result not only in civic engagement programs being cut back, but also public health initiatives—like Hispanic Federation's vaccine program—facing financial cuts as well. The political and health implications will fall disproportionately on communities of color where Hispanic Federation focuses its services.

67.    Plaintiffs will have to curtail their voter registration activities and divert scarce resources to comply with the myriad regulations the Law imposes. If Plaintiffs continue engaging in voter registration efforts, the Law will force them to expend significant time and resources toward hiring and training new staff and rebuilding the community relationships that are necessary to their work. These organizations do not have the staff resources to effectively comply with section 97.0575's requirements and continue their current levels of voter registration activities. The new requirements will significantly and unnecessarily burden Plaintiffs' scarce organizational resources that they would otherwise spend helping voters register, following up with voters, and undertaking other activities to advance their missions.

68.    In response to the Law's threat of civil penalties, some organizations are considering imposing a moratorium on *all* voter registration activities starting

July 1, 2023.

69.    Even if Plaintiff organizations do not impose a complete moratorium on all voter registration activities, they are likely to significantly scale back the volume of voter registration drives they conduct to help Floridians register—either intentionally or simply because a majority of their staff and volunteers will be forbidden from assisting. This scaling-back of voter registration activity will be necessary because Plaintiffs anticipate—and, indeed, are already experiencing—a decline in staff and volunteer engagement or difficulty recruiting new staff or volunteers to engage in these activities given the Law's limitations.

70.    The Law will also impact and harm the communities and constituents that Plaintiffs serve and work with, including both citizens and non-citizens.

71.    Plaintiffs will register substantially fewer citizens to vote than they could absent the Law. In this way, the Law will impact Hispanic voters who are part of the community and constituency Hispanic Federation serves through its voter registration programs. Hispanic Federation works closely with Hispanic citizens to help them register to vote, relying on part on a network of key community activists who help shape Hispanic Federation's agenda and who play a critical role in implementing Hispanic Federation's programs. Thus, the Law will impact and harm Hispanic Federation's constituents.

72.    Likewise, the Law will impact the Latinx community, which is part of

the constituency Poder Latinx serves through its voter registration programs. Poder Latinx works closely with Latinx citizens to help them register to vote and mobilize them to vote, relying in part on a network of key community activists who help shape Poder Latinx's agenda and who play a critical role in implementing Poder Latinx's programs. Thus, the Law will impact and harm Poder Latinx's constituents.

73.    As for the individual plaintiffs, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico are all current canvassers, employed in paid staff positions to assist and encourage Floridians to register to vote. Their jobs involve handling and collecting voter registration applications. Their jobs provide them with a source of income to care for themselves and their families.  If the Law takes effect, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico will no longer be able to work as canvassers, and would lose the stability and income that their jobs provide.

74.    For example, Plaintiff Verónica Herrera-Lucha is the Florida State Field Director of Mi Vecino, a registered third-party voter registration organization. In this role, she both canvasses and oversees other canvassers doing voter registration work. If the Law takes effect, she will be unable to hold this position. The Law will harm Ms. Herrera-Lucha professionally, and will financially impact her ability to provide for herself and her four dependents.

75.    Plaintiff Norka Martínez is limited in her physical health, and her work

as a canvasser has enabled her to take care of her health while also being able to support and provide for her family. If the Law takes effect, she will no longer be able to work as a canvasser, and would lose the support for her family and stability for her own health that her work provided.

76.    Plaintiff Elizabeth Pico currently works at least 30 hours per week as a canvasser, helping to register people to vote in Florida. If the Law takes effect, she will no longer be able to work as a canvasser, and would lose her main source of income as well as meaningful work that supports her community.

77.    As a result of the Law, each of the individual plaintiffs will have their core political speech and association not just chilled—but prohibited.

## CLAIMS FOR RELIEF

### COUNT I: Free Speech and Association
**(Violation of Plaintiffs' First Amendment Rights**
**Pursuant to 42 U.S.C. § 1983)**

78.    Plaintiffs incorporate Paragraphs 1–3, 6–8, 9–13, 15–50, and 51–79 of this Complaint into this section by reference.

79.    The Law imposes severe burdens on the voter registration activities engaged in by Plaintiffs and similarly situated third-party voter registration organizations and individuals. These requirements will limit Plaintiffs' effectiveness in promoting democratic participation, make it costlier and more resource-intensive for Hispanic Federation and Poder Latinx to conduct voter registration, and chill

28

speech because of the overbroad and unwarranted limitations they place on who can assist voters with registration applications, as well as the substantial fines for noncompliance with these limitations.

80.     The First Amendment to the U.S. Constitution prohibits abridgment of freedom of speech.

81.     The Law directly restricts Hispanic Federation's and Poder Latinx's core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political and philosophical statement.

82.     Moreover, the Law implicates Hispanic Federation's and Poder Latinx's associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote. In addition to limiting Hispanic Federation's and Poder Latinx's associational activities with voters, the Law completely forecloses the individual plaintiffs from associational activity with both voters *and* with the plaintiff organizations themselves.

83.     Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*,

486 U.S. 414, 422–23 (1988). "Public endeavors which 'assist with voter registration are intended to convey a message that voting is important,' and public endeavors which expend resources 'to broaden the electorate to include allegedly under-served communities' qualify as expressive conduct which implicates the First Amendment freedom of association." *VoteAmerica v. Schwab*, --- F. Supp. 3d ---, Case No. 21-2253-KHV, 2023 WL 3251009, at *10 (D. Kan. May 4, 2023) (quoting *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020)).

84.    "[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) (citation omitted).

85.    The Law's onerous requirements, coupled with substantial civil penalties, burden Hispanic Federation's and Poder Latinx's political expression, diminishing their ability to convey and advance their message by engaging more individuals in the political process.

86.    The threat of civil penalties for failure to ensure that each and every individual handling completed voter registration forms—both paid and volunteer—is U.S. citizen is a severe burden on Hispanic Federation's and Poder Latinx's First

Amendment rights. The threat of civil penalties is further compounded by the Law's strict liability standard. Taken together, these threats will severely restrict Hispanic Federation's and Poder Latinx's abilities to hire or partner with would-be canvassers.

87.     The imposition of substantial financial penalties, which are multiplied by each non-citizen person who assists the organization, severely burdens Hispanic Federation's and Poder Latinx's First Amendment rights. Even the financial penalty levied for one inadvertent violation would constitute a large percentage of Hispanic Federation's and Poder Latinx's budgets and when imposed would decimate their ability to conduct any of their civic work.

88.     The Law is an impermissible content-based restriction on speech because speakers who engage in protected activity about voter registration are subject to restrictions that do not apply to other messages.

89.     Punitive civil sanctions, such as those imposed by section 97.0575(1)(f), also inhibit the exercise of First Amendment freedoms.

90.     Because of the chilling effect of the risk of punitive civil sanction, section 97.0575 unconstitutionally infringes upon the First Amendment rights of Hispanic Federation and Poder Latinx. And as for the individual plaintiffs, they will have their core political speech and association not just chilled, but prohibited. Chilling Plaintiffs' voter registration activities will "reduce[] the voices available to convey political messages." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring).

Reducing the voices available to speak in favor of political participation and voter registration runs afoul of the First Amendment.

91.     These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest, and serve little purpose other than to dissuade civic organizations and individuals from engaging in voter registration activity. Under the exacting scrutiny applied in *Meyer*, or any other level of scrutiny, these requirements fail.

### COUNT II: Substantial Overbreadth
### (Violation of Plaintiffs Hispanic Federation's and Poder Latinx's First Amendment Rights Pursuant to 42 U.S.C. § 1983)

92.     Plaintiffs incorporate Paragraphs 1–3, 6–8, 9–13, 15–26, 31–50, and 51–79 of this Complaint into this section by reference.

93.     The Law imposes severe burdens on the voter registration activities engaged in by Hispanic Federation, Poder Latinx, and similar third-party voter registration organizations. These requirements will limit Hispanic Federation's and Poder Latinx's effectiveness in promoting democratic participation, make it costlier and more resource-intensive to conduct voter registration, and chill speech because of the overbroad and unwarranted limitations they place on who can assist voters with registration applications, as well as the substantial fines for noncompliance with these limitations.

94.     To the extent any of the conduct proscribed by section 97.0575 can be lawfully prohibited under the First Amendment, the Law is unconstitutionally overbroad, as it regulates a substantial amount of constitutionally protected expression. *See United States v. Williams*, 553 U.S. 285, 292 (2008).

95.     "The overbreadth doctrine is designed 'to prevent the chilling of protected expression.'" *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989)).

96.     In construing the overbreadth doctrine, courts recognize the breadth of a law can be "magnified by its strict-liability phrasing." *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010). Here, the threat of liability for even *unknowing* conduct, coupled with the high fine resulting from such liability, will require third-party voter registration organizations to forego registration opportunities that would have been plainly lawful because of the heightened diligence required to confirm the organizations are operating within the Law's confines.

97.     A statute's overbreadth is judged by its "'possible direct and indirect burdens on speech.'" *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002) (citations omitted). The indirect burdens imposed by the Law plainly demonstrate its overbreadth. For example, Hispanic Federation will no longer permit individuals to assist with voter registration efforts unless they can demonstrate *proof* of citizenship, requiring them to turn down even U.S.-citizen staff and volunteers who cannot

furnish the requisite proof. And Poder Latinx will no longer maintain its community service partnerships that enabled local student volunteers to assist with voter registration efforts, because of the added hurdle of confirming the students' citizenship status.

98.    Because Hispanic Federation, Poder Latinx, and other third-party voter registration organizations will be "inhibited in utilizing their protected first amendment communications because of the existence of the overly broad statute," the Law is unconstitutionally overbroad. *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1514 (11th Cir. 1985).

### COUNT III: Burden on Political Speech and Association in Connection with the Fundamental Right to Vote
### (Violation of Plaintiffs Hispanic Federation's and Poder Latinx's First and Fourteenth Amendment Rights, Pursuant to 42 U.S.C. § 1983)

99.    Plaintiffs incorporate Paragraphs 1–8, 9–13, 15–26, 31–50, and 51–73 of this Complaint into this section by reference.

100.   The Law imposes severe burdens on the voter registration activities and communications engaged in by Hispanic Federation, Poder Latinx, and similar third-party voter registration organizations. These requirements will limit Hispanic Federation's and Poder Latinx's effectiveness in promoting democratic participation, make it costlier and more resource-intensive to conduct voter registrations, and chill speech because of the overbroad and unwarranted limitations they place on who can assist voters with registration application and the substantial

fines for noncompliance with these limitations. The Law will also impact and harm the communities and constituents that Hispanic Federation and Poder Latinx serve and work with, including both citizens and non-citizens. Hispanic Federation and Poder Latinx will register substantially fewer citizens to vote than they could absent the Law.

101.   Voter registration is a pre-requisite to exercising the fundamental right to vote in Florida.

102.   The Law directly interferes with the fundamental right to vote by frustrating efforts to help individuals register who are otherwise often left out of government-run registration processes.

103.   The Law also directly interferes with the ability of members of Hispanic Federation and Poder Latinx to register to vote through voter registration efforts by banning their non-citizen staff, members, and volunteers from collecting and handling voter registration applications.

104.   The Law directly restricts Hispanic Federation's and Poder Latinx's voter registration activity, which is protected by the First Amendment, and thus, in turn, implicates the right to vote.

105.   The Law also directly interferes with the ability of unregistered citizens in the communities where Hispanic Federation and Poder Latinx operate to register to vote.

106.   The burdens that the Law places on Hispanic Federation and Poder Latinx—and the fundamental voting rights of the individuals in the communities they serve—are substantial.

107.   Compliance with the Law, to the extent it could even be achieved, would hamper Hispanic Federation's and Poder Latinx's ability to operate their voter registration programs and would require the expenditure of substantial additional resources, diverting resources from other core organizational activities. Hispanic Federation and Poder Latinx would have to expend substantial additional staff and volunteer time and additional person and financial resources, much of which they simply do not have.

108.   The State does not have interests that make these substantial burdens on Hispanic Federation's and Poder Latinx's rights necessary.

### COUNT IV: Due Process – Void for Vagueness
### (Violation of Plaintiffs' Fourteenth Amendment Rights, Pursuant to 42 U.S.C. § 1983)

109.   Plaintiffs incorporate Paragraphs 1–2, 6–8, 9–13, 15–36, 46–49, 63–70, and 72 of this Complaint into this section by reference.

110.   Exacerbating the Law's harsh penalties, the Law's commands are impermissibly vague and overbroad, such that the regulated individuals and organizations do not know which requirements apply to them and what steps to take to ensure proper compliance with the Law.

111.   Under due-process principles, a law is "'void for vagueness if its prohibitions are not clearly defined.'" *Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

112.   "Unconstitutionally vague laws fail to provide 'fair warning' of what the law requires, and they encourage 'arbitrary and discriminatory enforcement' by giving government officials the sole ability to interpret the scope of the law." *Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022) (quoting *Grayned*, 408 U.S. at 108–09).

113.   "The First Amendment context amplifies these concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister*, 29 F.4th at 1258–59 (quoting *Grayned*, 408 U.S. at 109); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (explaining that when "a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts").

114.  The words used to describe the proscribed conduct at issue— "collecting" and "handling," Fla. Stat. § 97.0575(1)(f)—are nowhere defined in the Law.

115.   By way of example, it is unclear whether the Law forbids legal permanent residents from reviewing applications to ensure compliance with registration requirements, supervising other canvassers who are physically collecting applications, encouraging an eligible citizen to complete an application without physically touching the application, directing eligible citizens to the organization's online application portal, or even being present in an office where applications are being processed. All of these, and a myriad of other questions, are not addressed by the statutory language.

116.   The Law's vague and overbroad requirements will diminish the participatory message of Plaintiffs, other civic organizations, and civic-minded individuals and chill constitutionally protected core political speech.

### COUNT V: Equal Protection –
### Differential Treatment of Non-Citizens
**(Violation of Plaintiffs Verónica Herrera-Lucha's, Norka Martínez's, and Elizabeth Pico's Fourteenth Amendment Rights, Pursuant to 42 U.S.C. § 1983)**

117.   Plaintiffs incorporate Paragraphs 1–2, 6–8, 15–32, 41–47, 49, and 74–79 of this Complaint into this section by reference.

118.   Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico are all current canvassers, employed in paid staff positions to assist Floridians with registering to vote. These jobs provide them with a source of income to care for themselves and their families. Verónica Herrera-Lucha, Norka Martínez, and

Elizabeth Pico are lawfully present in the United States: they are Lawful Permanent Residents, or have Temporary Protected Status and work permits. But because they are not U.S. citizens and their current jobs involve handling and collecting ballot applications, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico will lose their jobs if the Law takes effect, and would lose the stability and income that their jobs provide. This financial impact will be severe—for example, it will make it difficult for Ms. Pico and her family to continue to afford their rent.

119.    "As a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). The Supreme Court has applied strict scrutiny to invalidate laws excluding non-citizens from "employment in permanent positions in the competitive class of the state civil service," "membership in the State Bar," "the practice of civil engineering," and appointment as a notary. *Id.* at 220, 226 (citations omitted).[4]

120.    Strict scrutiny is especially warranted when assessing "state laws that affect[] *resident* aliens," and are not limited solely to "*illegal* aliens." *Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (emphasis in original). "The Supreme

---

[4]    Because individuals who collect and handle voter registration applications are not "invested either with policymaking responsibility or broad discretion in the execution of public policy that requires the routine exercise of authority over individuals," the "narrow political-function exception" to strict scrutiny does not apply here. *Bernal*, 467 U.S. at 221, 225–26.

Court has noted that a 'more searching judicial inquiry' may be needed when a state law targets 'discrete and insular minorities' who have no direct voice in the political process," *id.* at 1310 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)), and "has in fact found that resident aliens are the type of 'discrete and insular' minorities who have no political voice and thus qualify for heightened scrutiny," *id.*[5]

121.   The Law's exclusion of non-citizens—including Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico, members of Hispanic Federation's and Poder Latinx's staff, and many people in the constituencies that Hispanic Federation and Poder Latinx serve—from assisting third-party voter registration organizations with collecting and handling voter registration applications cannot withstand strict scrutiny.

122.   There is no compelling (or even rational) reason to exclude all non-citizens from handling and collecting voter registration applications.

123.   Nor is the Law narrowly tailored to serve Defendants' aims. At minimum, the Law is "fatally underinclusive," specifying "only one particular post

---

[5]   *See, e.g.*, *Foley v. Connelie*, 435 U.S. 291, 294 (1978) ("[T]he Court has treated certain restrictions on aliens with 'heightened judicial solicitude,' a treatment deemed necessary since aliens—pending their eligibility for citizenship—have no direct voice in the political processes." (citation omitted)); *LeClerc v. Webb*, 419 F.3d 405, 417 (5th Cir. 2005) ("Characterizing resident aliens as a *Carolene Products* minority reconciles the breadth of rights and responsibilities they enjoy with their lack of political capacity.").

with respect to which the State asserts a right to exclude aliens" while allowing non-citizens to perform other similar functions. *Bernal*, 467 U.S. at 222. For example, a "permanent resident alien may apply and be appointed" as a notary public, a position which likewise involves handling signatures and other personal information. Fla. Stat. § 117.01(1). And non-citizens can also work in Florida's Division of Elections and Department of Highway Safety & Motor Vehicles, with access to the same information contained on voter registration forms.

### COUNT VI: Non-Citizens' Rights to Contract
### (Violation of Plaintiffs Verónica Herrera-Lucha's, Norka Martínez's, and Elizabeth Pico's Rights under 42 U.S.C. § 1981)

124.   Plaintiffs incorporate Paragraphs 1–2, 6–8, 15–32, 41–47, 49, and 74–79 of this Complaint into this section by reference.

125.   The Law is also preempted by a core federal civil rights statute, 42 U.S.C. § 1981.

126.   The Law prohibits non-citizens—including Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico, members of Hispanic Federation's and Poder Latinx's staff, and many people in the constituencies that Hispanic Federation and Poder Latinx serve—from entering into contracts to collect and handle applications on behalf of third-party voter registration organizations.

127.   Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico are all current canvassers, employed in paid staff positions to assist Floridians with

registering to vote. These jobs provide them with a source of income to care for themselves and their families. Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico are lawfully present in the United States: they are Lawful Permanent Residents, or have Temporary Protected Status and work permits. But because they are not citizens of the United States and their current jobs involve handling and collecting ballot applications, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico will lose their jobs if the Law takes effect, and would lose the stability and income that their jobs provide. The Law inappropriately interferes with their right to make and enforce contracts under Section 1981.

128.   Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

129.   When Congress amended the statute in 1970 to replace the term "citizens" with "all persons within the jurisdiction of the United States," Congress explicitly expanded the guarantee of equal contract rights to non-citizens. *See Gen.*

*Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 385 (1982); *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 653–54 (5th Cir. 1974).[6]

130.   In enacting Section 1981, Congress occupied the field regarding the right of non-citizens to make and enforce contracts. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (describing Section 1981, then codified at 8 U.S.C. § 41, as part of a "comprehensive legislative plan for the nation-wide control and regulation of immigration and naturalization").

131.   Congress having so provided, this Law is preempted by Section 1981.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.   Declare that section 97.0575(1)(f) of the Florida Statutes, as amended by SB 7050, violates the First and Fourteenth Amendments, as well as 42 U.S.C. § 1981;

B.   Preliminarily and permanently enjoin Defendants from enforcing section 97.0575(1)(f), particularly the civil penalties contained therein;

C.   Award Plaintiffs reasonable attorneys' fees and their costs of suit; and

---

[6]   "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

D.   Grant any other relief this Court deems just and proper.

Respectfully submitted this 24th day of July, 2023,

*/s/ Julie A. Ebenstein*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Roberto Cruz (FBN 18436)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org

Cesar Z. Ruiz*
Fulvia Vargas De-Leon†
Ghita Schwarz†
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org
fvargasdeleon@latinojustice.org

Julie A. Ebenstein (FBN 91033)
Adriel I. Cepeda Derieux*
Megan C. Keenan*
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
acepedaderieux@aclu.org
mkeenan@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Estee M. Konor*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

Evan Preminger*
Rayne Ellis*
**Arnold & Porter Kaye Scholer LLP**
250 W. 55th Street
New York, NY 10019
(212) 836-7786
evan.preminger@arnoldporter.com
rayne.ellis@arnoldporter.com

gschwarz@latinojustice.org

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer
LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice*
*[†] Motion for leave to appear pro hac vice forthcoming*