

# Transcript of Robert M. Stein, Ph.D.

**Date:** January 3, 2024
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF FLORIDA

3                  TALLAHASSEE DIVISION

4    FLORIDA STATE CONFERENCE        :

5    OF BRANCHES AND YOUTH           :

6    UNITS OF THE NAACP, et al.,     :

7                      Plaintiffs,:

8       v.                      :Case Nos.

9    CORD BYRD, in his official      :4:23-cv-215-MW/MAF

10   capacity as Florida Secretary  :4:23-cv-216-MW/MAF

11   of State, et al.                :4:23-cv-218-MW/MAF

12                  Defendants.:

13                  -----------

14           Videoconference Deposition of

15              ROBERT M. STEIN, Ph.D.

16             Wednesday, January 3, 2024

17                    9:07 a.m.

18

19

20   Job No.:  518912

21   Pages:  1 - 345

22   Reported By:  Dawn M. Hart, RPR/RMR/CRR

1          Pursuant to Notice, before Dawn M. Hart,

2     RPR/RMR/CRR and Notary Public.

3                    A P P E A R A N C E S

4          ON BEHALF OF THE AMERICAN CIVIL LIBERTIES

5          UNION PLAINTIFFS RE HISPANIC FEDERATION V.

6          BYRD CASE ENDING IN 218:

7               MEGAN C. KEENAN, ESQUIRE

8               VOTING RIGHTS PROJECT

9               915 15th Street, Northwest

10              Washington, DC 20005

11              (740) 632-0671

12         ON BEHALF OF THE FLORIDA NAACP PLAINTIFFS:

13              MINDY JOHNSON, ESQUIRE

14              MAKEBA RUTAHINDURWA, ESQUIRE

15              ELIAS LAW GROUP LLP

16              700 13th Street, Northwest, #600

17              Washington, DC 20005

18              (202) 968-4490

19

20

21

22

```
 1          A P P E A R A N C E S (Continued)

 2      ON BEHALF OF THE DEFENDANT FLORIDA SECRETARY

 3      OF STATE:

 4          JOSHUA PRATT, ESQUIRE

 5          HOLTZMAN VOGEL BARAN

 6          TORCHINSKY & JOSEFIAK, PLLC

 7          119 South Monroe Street, Suite 500

 8          Tallahassee, Florida 32301

 9          (850) 879-3339

10  OTHER PARTICIPANTS:

11      Frank Mari, Esquire re Defendants Supervisors

12      of Elections for Brevard, DeSoto, Flagler,

13      Gilchrist, Highlands, Jefferson, Madison

14      Counties

15      Dayton Campbell-Harris re Hispanic

16      Federation, Staff Attorney, Voting Rights

17      Project, ACLU, (425) 516-8400

18      Stephanie A. Morse, re Florida Attorney

19      General, Special Counsel, Complex Litigation

20      Office of the Attorney General, PL-01 The

21      Capitol, Tallahassee, Florida 32399-1050

22      (850) 414-3664
```

1          A P P E A R A N C E S (Continued)

2    OTHER PARTICIPANTS:

3        Bob Swain re Kim Barton, Supervisor of

4        Elections for Alachua County, Deputy

5        County Attorney, Alachua County Attorney's

6        Office, 12 SE 1st Street, Gainesville,

7        Florida 32601, (352) 374-5218

8        Jerry Olivo re Glades, Hardee, Hendry,

9        Holmes, Levy and Okeechobee County SOEs

10       Henderson, Franklin, Starnes & Holt, P.A.

11       1715 Monroe Street, Fort Myers, Florida

12       33901, (239) 344-1168

13       Sarah Jonas re Volusia County Supervisor

14       of Elections, Lisa Lewis, Assistant

15       County Attorney, 123 W. Indiana Avenue,

16       DeLand, Florida 32720

17       (386) 736-5950

18       Jared D. Kahn re Julie Marcus, Pinellas

19       County Supervisor of Elections

20       Matt Smith, Pinellas SOE

21

22

1          A P P E A R A N C E S (Continued)

2     OTHER PARTICIPANTS:

3          Noah Sjostrom re Florida Attorney General

4          Office of Florida Attorney General

5          Assistant Attorney General, General

6          Civil Division - Complex Litigation

7          PL-01 The Capitol, Tallahassee 32399-

8          1050, (850) 414-3635

9          Stephen M. Todd, Sr. Assistant County

10         Attorney, Litigation Division, Hillsborough

11         County Attorney's Office, 610 E. Kennedy

12         Boulevard, 27th Floor, Tampa, Florida

13         33602, (813) 272-5670

14         Ben Koon, Esquire re Palm Beach County

15         Supervisor of Elections, The Markarian Group,

16         2925 PGA Boulevard, Suite 204, Palm Beach

17         Gardens, Florida 33410, (561) 626-4700

18         Dale A. Scott re Citrus SOE, Roper, P.A.,

19         255 South Orange Avenue, Suite 750, Orlando,

20         Florida 32803, (407) 897-5150

21         Shilpa Jindia

22         Brent Ferguson

1          A P P E A R A N C E S (Continued)

2    OTHER PARTICIPANTS:

3          Leigh Rosenbloom

4          Christi Hankins

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    C O N T E N T S

2  EXAMINATION OF ROBERT M. STEIN, Ph.D.          PAGE

3        By Ms. Keenan                              9

4        By Ms. Johnson                           190

5        By Ms. Keenan                            324

6                    E X H I B I T S

7        (Exhibits attached to the transcript.)

8  R. STEIN DEPOSITION EXHIBITS                   PAGE

9   Exhibit 1      Deposition Notice re Stein      13

10  Exhibit 2      Stein-Alford Expert Report      20

11  Exhibit 3      Smith Expert Report             64

12  Exhibit 4      Smith Rebuttal Expert           65

13                 Report

14  Exhibit 5      Herron/Smith paper re          117

15                 HB 1355

16  Exhibit 6      Grimmer/Hersh paper How        158

17                 Election Rules Affect Who

18                 Wins

19  Exhibit 7      Grimmer paper Obstacles to     178

20                 Estimating Voter ID Laws'

21                 Effect on Voter Turnout

22

1              E X H I B I T S  (Continued)

2          (Exhibits attached to the transcript.)

3    R. STEIN DEPOSITION EXHIBITS                PAGE

4     Exhibit 8    Cantoni paper Strict ID      181

5                  Laws Don't Stop Voters

6     Exhibit 9    (Not Marked)                 --

7     Exhibit 10   Stein transcript re Arizona   33

8                  case 10/26/23

9     Exhibit 11   (Not Marked)                 --

10    Exhibit 12   Stein Expert Report re        74

11                 Virginia v. Brink case

12    Exhibit 13   Lichtman Expert Report       214

13    Exhibit 14   Herron Expert Report         232

14    Exhibit 15   Herron Rebuttal Report       247

15    Exhibit 16   Joshua Douglas paper         325

16

17

18

19

20

21

22

1                P R O C E E D I N G S

2              ROBERT M. STEIN, Ph.D.

3         being first duly sworn or affirmed to

4    testify to the truth, the whole truth, and nothing

5    but the truth, was examined and testified as

6    follows:

7     EXAMINATION BY COUNSEL FOR THE AMERICAN CIVIL

8              LIBERTIES UNION PLAINTIFFS

9    (HISPANIC FEDERATION V. BYRD CASE ENDING IN 218)

10   BY MS. KEENAN:

11        Q    Good morning, Dr. Stein.  We're now on

12   the record.  It's January 3rd, 2024, at 9:07 a.m.

13   Thank you so much for being here today.  Just to

14   introduce myself, my name is Megan Keenan.  I'm

15   part of the team of attorneys who represent the

16   Plaintiffs and Hispanic Federation versus Byrd,

17   and I'll be one of the attorneys questioning you

18   today.

19         Dr. Stein, how many times have you been

20   deposed before?

21        A    Several.  I'd say at least -- in my

22   lifetime time?  20.

1       Q     Okay.

2       A     More recently my resume indicates

3   probably a dozen.

4       Q     Okay.  So I'm sure you're generally

5   familiar, but I just want to walk through a couple

6   of ground rules as a reminder for today's

7   deposition.  First, everything is being

8   transcribed, so we need to speak clearly, give

9   verbal answers, and make sure we aren't speaking

10  over each other.  Does that sound okay to you?

11      A     Yes.

12      Q     All right.  There are a lot of lawyers

13  here attending for other parties, including the

14  Defense counsel who retained you.  They, of

15  course, have the right to object to my questions

16  as we go, so if Defense counsel or others on this

17  Zoom call start speaking when I complete a

18  question, please give them a moment to get any

19  objections on the record.

20          Once those objections are stated, you

21  should typically answer whatever question I've

22  posed unless I withdraw it or your counsel

1    specifically instructs you not to answer the

2    question.  Does that sound okay to you?

3         A    Yes.

4         Q    Okay.  If at any point you don't

5    understand a question that I ask, please do tell

6    me and I'll try to explain or rephrase it.  If you

7    don't tell me that you don't understand the

8    question, I will assume that you do understand it.

9    Does that work for you?

10        A    Yes.

11        Q    Okay.  If you need a break at any point,

12   just say so, we'll do our best to accommodate as

13   long as there's not a question pending.

14             I have a couple of questions about the

15   remote deposition setup because we're in separate

16   rooms.  So is anyone in the room with you now?

17        A    No.

18        Q    It looks like you have a computer screen

19   in front of you to appear via Zoom.  Can you tell

20   me how many screens you have up in front of you?

21        A    One.

22        Q    And is there anything other than this

1    Zoom program open on your computer screen?

2         A    Yes, my report, and the report of the

3    different experts for the Plaintiff.

4         Q    Okay.  Do those reports have any

5    annotations other than the things that were, you

6    know, submitted in the reports themselves?

7         A    No.

8         Q    Okay.  Do you have your email or any

9    Chat or messaging program open?

10        A    They're in, yeah, they're open on the

11   bottom.

12        Q    Okay.  During the deposition, we'd ask

13   that you keep the email and the Chat messaging

14   systems off the screen just as a matter of form.

15   And same with any smartphone you may have in the

16   room, if you can keep that aside while we're on

17   the record.  Can we agree to that for the day?

18        A    Yes.

19        Q    Can you think of any reason why you

20   might not be able to understand and respond

21   accurately and truthfully to my questions today?

22        A    No.

1     Q    All right.  I'm going to share my screen

2  so we can talk through some Exhibits.  I'll also

3  make sure I drop them in the Chat because I didn't

4  see any sort of an upload function prior to this

5  deposition.

6          So first I will share my screen.  Are

7  you able to see this clearly?

8     A    Yes.

9     Q    All right.  Great.  And I will drop

10 what's been premarked as Exhibit 1 into the Chat

11 here.

12          (Exhibit 1 was marked for identification

13 and is attached to the transcript.)

14    Q    Do you recognize this as the Deposition

15 Notice you received in this case?

16    A    Yes.

17    Q    Okay.  Did you do anything to prepare

18 for today's deposition?

19    A    Yes.

20    Q    What did you do to prepare for the

21 deposition?

22    A    I reread my report with Professor

1    Alford, I reread the Plaintiffs' experts' reports,

2    their rebuttal reports.  I had a meeting with Josh

3    on Friday, went over SB 7050 again, reread

4    sections of it -- oh, and spoke with John Alford,

5    my colleague, and that's it.  That's pretty much

6    it.  I've been over the reports several times

7    since, I think Friday, yes, before New Year's.

8        Q    That's helpful.  I have a couple of

9    follow-up questions about that.  You mentioned

10   that you spoke with counsel on Friday.  Was that

11   the only time you spoke with counsel on behalf of

12   this deposition?

13       A    I believe so.  I've had conversations

14   with counsel before, but specifically regarding

15   the deposition, we met Friday and went over many

16   of the same things you just asked me, you know,

17   don't talk over, things like that.

18       Q    Great.  How long was that meeting in

19   total, to the best of your recollection?

20       A    I'd say about an hour, hour and 15

21   minutes.

22       Q    Okay.  And was it just -- you mentioned

1    Josh.  Was anyone else present at that meeting?

2         A    It was another attorney, and I

3    apologize, I don't remember his name, and there

4    was, of course, John Alford.

5         Q    That's no problem.  Okay.  Other than

6    the people we've already discussed, and we'll talk

7    more about Dr. Alford later, have you spoken with

8    anybody else about today's deposition?

9         A    No.

10        Q    Since submitting your report, did you do

11   any independent research or internet searches

12   about this case?

13        A    I read the Plaintiffs' experts' rebuttal

14   reports, specifically Professor Herron's and

15   Professor Smith's.  I reread articles they cited

16   in those reports, but I didn't do any internet

17   searches.  Oh, I did reread, and with Josh's

18   assistance, some of the Secretary of State's, I

19   don't know if they're called rulings or

20   recommendations or directives, regarding aspects

21   of SB 7050 implementation issues so that I was

22   familiar with those.

1      Q    Okay.

2      A    And I did read those.  I didn't do a

3  search for those, though, I think Josh provided me

4  with information that clarified the law and its

5  implementation.

6          MR. PRATT:  And, Professor, I'd also

7  just ask, moving forward, for any conversations we

8  had or any other documents produced by counsel,

9  that we would please refrain from referring to

10  those if we could.  Thank you.

11      Q    Just to make sure I understand what --

12          MS. KEENAN:  And if you want to object

13  to privilege or anything, please let me know.

14      Q    -- but are we talking about the

15  rule-making documents?  Does that sound familiar?

16  Maybe rules promulgated by the Agency that you may

17  have reviewed, Dr. Stein?

18          MR. PRATT:  We'll object to privilege.

19  This is just part of general information,

20  background for the case, just so the doctor is

21  aware.

22      Q    Okay.  Did you rely on that information

1    in coming to your conclusions in this case in any

2    way?

3        A    I don't think I relied on them.  They

4    clarified information, but I don't think they in

5    any way changed or altered or were the basis of my

6    report.

7        Q    Did you request to see that information?

8            MR. PRATT:  Objection.  Privilege.

9    Communications between the parties' attorney and

10   their experts are beyond the scope of, you know,

11   what's able to be looked into.

12           MS. JOHNSON:  I definitely understand,

13   and I don't want to tread on anything privileged,

14   but I do think it's important to know what

15   information the expert needed to come to his

16   conclusions in this case.

17           So I'm just trying to get to the bottom

18   of whether Dr. Stein believed that information was

19   necessary to advance his conclusions in this case.

20       Q    Maybe it's helpful to ask, did you

21   request to receive that information before, or

22   after you submitted the report in this case?

1        A     No.

2        Q     Okay.  I was trying to get at the

3   temporal nature.  Did you review that information

4   before you submitted the report in this case?

5        A     No.

6        Q     Okay.  Thank you, that's helpful.

7              Do you know how many hours you've spent

8   working on this case?

9        A     I could look it up, but I would say at

10  least 40 hours in total, not including today's

11  deposition.

12       Q     Okay.  And do you have a general sense

13  of how that time has been spent to sort of break

14  down those 40 hours into component parts?

15       A     Yeah.  I mean I have a, I submit a time

16  sheet to the attorneys which details the nature of

17  my work.

18       Q     Okay.  Have you submitted any bills in

19  this case to date?

20       A     Yes.

21       Q     And the report mentions that the

22  compensation in this case is $600 an hour.  Is

1    that the rate for each of you, or is that rate

2    divided between you and Dr. Alford?

3        A    That's for each of us.

4        Q    Okay.  Are you aware of how much you've

5    been compensated for this case to date?

6        A    I have submitted, I'd have to look at my

7    spreadsheets, but I have not received any

8    compensation to date.  I just submitted, you know,

9    time sheets before the end of the year.

10       Q    Okay.  Is $600 an hour your typical

11   compensation rate?

12       A    It is now, yes.

13       Q    And when did that rate go up?

14       A    I'd say sometime in October, November,

15   in another case that I was working on.

16       Q    Okay.  At this point, though, $600 is

17   your standard hourly rate.  Do you ever charge

18   more or less in a case these days?

19       A    I have charged less, I've not charged

20   more.

21       Q    And why would you charge less than your

22   typical rate in a case?

1      A     I would say that the rate has a linear

2  and positive --

3      Q     Oh.

4      A     I don't have a differential rate at this

5  time.

6      Q     That's helpful.  Thank you.

7            I'm next going to share what's been

8  premarked as Exhibit 2, and I'll also put this

9  into the Chat for folks to see.

10           (Exhibit 2 was marked for identification

11  and is attached to the transcript.)

12     Q     Do you recognize this as the report that

13  you and Dr. Alford submitted?

14     A     Yes.

15     Q     And on Page 22 of this report, I believe

16  you attached your CV.  Does that look right to

17  you?

18     A     Yeah.  I mean that's not my CV.  Little

19  lower.  Yes, that's it.

20     Q     Okay.  So starting on Page 23, we see a

21  Curriculum Vitae up at the top.  It looks like

22  this was submitted current as of June 2023.  Does

1    this CV still accurately summarize your education,

2    work experience and qualifications?

3         A    Yeah.  I am sure there are some

4    additional publications since June that are not

5    listed.

6         Q    Did you prepare this CV?

7         A    Yes.

8         Q    It sounds like there may be some

9    updates, but are you aware of anything that's

10   incorrect in this CV to start?

11        A    No, not incorrect.  Probably incomplete.

12        Q    Okay.  And you mentioned that there may

13   be some publications that need to be added.  What

14   about in your litigation experience, anything

15   about your work as an expert witness that needs to

16   be added since June of 2023?

17        A    I think it's complete.  I'd have to

18   scroll down for me to doublecheck, and I think

19   those are at the end of the resume, but -- I think

20   this one is pretty up to date, but I'm not

21   positive.

22        Q    Okay.  Great.  We'll scroll down there

1    in a minute.  I want to make sure we focus on the

2    first page here first.

3              First, are each of the degrees you

4    mentioned here in political science?

5        A    Yes.

6        Q    You list a number of fields of

7    specialization below the educational background

8    including elections and election administration.

9    Can you describe what you mean by fields of

10   specialization?

11       A    Those are the fields in which I conduct

12   research and publish, the journals to which I

13   submit my articles and publications generally

14   cover those topics, and those also cover the

15   subject matters I teach.

16       Q    Okay.  And are those fields you've

17   listed terms of art, or are they just descriptions

18   in your own words about your areas of

19   specialization?

20       A    I think they -- in the American

21   Political Science Association listing of fields,

22   these are common names.  And common --

1      Q    Okay.  And so can you describe what you

2   mean when you say that one of your fields of

3   specialization is elections and election

4   administration?

5      A    It's the conduct -- election sciences,

6   election administration is the conduct of

7   elections which touches on how, where, when and

8   under what conditions individuals cast ballots in

9   elections, how those elections are administered,

10  equipped, staffed, and how outcomes are determined

11  in terms of counts.

12     Q    Of course, I think we both understand

13  that's a pretty broad field.  Are there areas

14  within elections and elections administration that

15  have been a particular focus of your work, or do

16  you really cover the full gamut?

17     A    I guess modes of voting are one area

18  that I have -- again, you have to talk to my

19  colleagues, but I'm probably best known for my

20  work on election day vote centers, early voting,

21  mail-in voting, mechanisms like voting equipment.

22  I have done work on voter turnout, and I have also

1   published papers on how to evaluate elections,

2   which is what we would loosely call in the broader

3   field policy evaluation.  Do we know that an

4   election method, election machine, voting scheme

5   does what it's supposed to do, and why, if it

6   doesn't, what are the factors that might mitigate

7   outcomes, desired outcomes.

8        Q    You list a number of different fields of

9   specialization here.  How long has elections and

10  election administration specifically been one of

11  your fields of specialization?

12       A    That's a good question.  I would say

13  since the, since -- I've been teaching elections

14  since I took my Ph.D., but election

15  administration, I would say for the last 25 to 30

16  years.  That is, if you look at my Vitae, you'll

17  see publications on this topic starting probably

18  in 1994.  The first paper I wrote was called Early

19  Voting:  An Introduction, which I think speaks for

20  itself, both myself and the topic.

21       Q    Great.  You've mentioned early voting,

22  vote centers, voter turnout.  How much work have

1    you done specifically on voter registration

2    issues?

3         A    I would say that's not an essential

4    focus, but it's almost impossible to study

5    election administration and not have studied voter

6    registration.

7              I have probably several published and

8    unpublished and book chapters, articles that touch

9    on the issue of voter registration, but I wouldn't

10   say that it is a -- I'd say it's probably about a

11   fifth to maybe a third of my work.  It's just hard

12   not to study voter registration when you're

13   looking at voter turnout, for instance.

14        Q    Sure.  In your CV, you've listed at

15   least some of your, you know, publications, your

16   research grants, that sort of thing.  Are any of

17   the ones listed in here relating to registration

18   specifically?

19        A    You'll have to go down a little bit.

20   Those are my -- keep on going, keep on going.

21   Slow down.

22             There's a paper, look at the fourth one

1    down, called How to Measure and Assess Turnout

2    Effects of Election Reforms that I'd say is

3    probably, you know, a paper that has garnered, and

4    it's a recent paper with my graduate student

5    Andrew Menger, but that touches on all aspects of

6    voter registration, voter turnout.  It's a broad

7    paper that has been cited as how we should

8    evaluate any of these election reforms, and we go

9    through a lot of discussion on voter registration.

10        Q    Okay.  Is it fair to say that you're

11   typically looking at voter registration as one

12   element of voter turnout, or do you study voter

13   registration in and of itself as well?

14        A    It's a hard, I don't mean to be evasive,

15   but that's a hard, I mean that's an interesting

16   question.

17             Is there an article that I have

18   published solely on voter registration?  I've

19   written papers on voter registration as it affects

20   turnout.  I can't think of a paper that I've

21   written in this list here that solely looks at

22   registration and not as it has consequences for

1  voter participation.

2       Q    Okay.  I'm going to keep going down to

3  the recent expert testimony that we touched on

4  briefly earlier.

5            So this is on Page 35 of Exhibit 2,

6  which is labeled Page 13 of the CV.  If you can

7  take a look at this recent expert testimony

8  section first and let me know if there's anything

9  missing since June 2023, that would be really

10 helpful.

11      A    No.  That covers everything I've done

12 since, as I said, 2014.  There are cases which

13 I've been an expert witness in before 2014, but I

14 can't honestly remember any of them pertaining to

15 elections or election administration.

16      Q    Okay.  I guess to follow-up on that, how

17 long have you been doing work as an expert witness

18 in total, including unrelated to elections?

19      A    Probably since 1980, 1979, but there was

20 probably a hiatus.  You'll see on my resume I was

21 a Chair and academic Dean, so there was a big, I

22 think hiatus would be the right word, in which I

1   didn't do very much work in expert witnessing.

2        Q    And you mentioned some of that earlier

3   work was not, to the best of your recollection,

4   about elections.  What other subject matter have

5   you testified about as an expert?

6        A    My other area of expertise, I suppose,

7   is survey research.  And I conducted a large

8   number of surveys dealing with a wide range of

9   topics.  The one that comes to mind were nuclear

10  power plant citings, emergency preparedness,

11  evacuations from hurricanes; something I'm sure

12  you in Florida appreciate.  But to my

13  recollection, virtually all of it was based on

14  work that I was asked to do because of my skills

15  at doing public opinion surveys.

16       Q    Okay.  You mentioned that your

17  election-related expert testimony began around

18  2014.  In that time, since 2014, have you been an

19  expert for a Plaintiff in a voting rights case?

20       A    Yes.

21       Q    Do you have a sense of a breakdown of

22  what percentage of time you do work for Plaintiffs

1    or Defendants in voting rights cases?

2         A    I don't.  I mean I'd have to sit down

3    and kind of work it through, but to the question

4    you specifically asked me, and I'm going to make

5    certain I have it here.

6              Oh, there it is, expert report in the

7    case of Virginia Elizondo and Spring Branch,

8    that's the Plaintiff in that case.  But I, you

9    know, again, I'd have to go back through here.

10   Most of these I've worked for municipal and state

11   jurisdictions.

12        Q    Okay.  That was going to be my next

13   question, actually.  Do you know how much of your

14   work has been on behalf of government entities or

15   officials as a rough percentage?

16        A    You know, again, if I count, I'd have

17   to, you know, you can see, I have worked for -- 1,

18   2 -- so 1, 2, 3, 4, 5, 6, 7, 8, 9 -- I'd say

19   probably 60/40, 70/30 I've represented states.

20   And in the, I think there are two here I've

21   represented individuals or Plaintiffs.  Does -- is

22   the NAACP one not on here?

1          I apologize.  I've omitted several here

2    that I have forgotten about.  I was the expert

3    witness in the NAACP lawsuit -- oh, there it is.

4    If you press me, I'd say it's probably getting now

5    closer to 50/50, Jayla Allen versus Waller

6    County --

7          Q    Oh, I see.

8          A    -- was the expert for the NAACP Legal

9    defense.  I was the expert, and continue to be the

10   expert, in the Spring Branch Independent School

11   District case.  I was the expert in the State of

12   Pennsylvania's lawsuit defending then-President

13   Trump.

14          I'd say close to 50/50.  And what I

15   didn't mention, you might want to look at the

16   bottom where it says consultant.

17         Q    Uh-humh.

18         A    In many instances, I was brought in by

19   different foundations to represent individuals who

20   were negotiating, not lawsuits, but negotiating

21   with local governments in the design,

22   implementation of election procedures, vote

1    centers, early voting, voter registration, and

2    purchasing of voting equipment.

3        Q    Okay.  Got it.  It sounds like it's been

4    a solid mix; is that fair?

5        A    Yeah.

6        Q    Okay.

7        A    I -- yes.  My view is that I tend to

8    take the cases on the basis of what I think I can

9    make a useful contribution to.

10        Q    Okay.  How many of the cases you've

11    worked on have involved laws that specifically

12    restrict voter registration efforts?

13        A    The Mark Wandering Medicine case, the

14    Thomas Poor Bear case.  The Virginia case

15    challenging the State's ballot access actually

16    ended up involving much more voter registration.

17            Let me look at the other one.  The

18    Arkansas versus Arkansas United, that involved

19    aspects, all aspects of elections, including voter

20    registration.

21        Q    You mentioned that Democratic Party of

22    Virginia versus Spring case and how that ended up

1    involving a lot of registration work.  Could you

2    tell me a little bit about what you were asked to

3    analyze in that case?

4         A    Yeah, it was an interesting one.  It

5    involved the requirement of a full, help me here,

6    nine-digit Social Security ID.  I think Virginia

7    and one other state right now are the only two

8    states that require that.  And so the issue was

9    whether or not the State should go to an

10   abbreviated shortened Social Security number, and

11   would that involve less registration among

12   targeted populations, non-whites in particular.

13        Q    And do you recall generally the

14   substance of your opinion in that case?

15        A    I'd have to -- I mean there were so many

16   issues there.  I represented the State.  I

17   honestly have to, I'd have to refresh my memory.

18             There were some questions about whether

19   voters knew their nine-digit Social Security

20   number, and whether or not it had an effect,

21   compared to other states which do not require the

22   full Social Security number, on race or

1    registration.

2         Q    I'll represent to you that I haven't

3    been able to find a copy of this report, but I am

4    going to show you what's been premarked as Exhibit

5    10.  This is a previous deposition transcript of

6    yours.  And I'm going to go to Page 40 here just

7    to see if this refreshes your memory on this case.

8              If you could start at Line 9, and then

9    just go ahead and read to yourself, let me know

10   when you get to the bottom of this page and I'll

11   show you a little bit of the next page.

12        A    Yes, okay.

13        Q    I'm going to keep scrolling just a

14   little bit, yeah, just to here.  This is all there

15   is on this case.  Let me know when you've read

16   through Page 41, Line 9 in what's been marked as

17   Exhibit 10.

18             I'm also placing Exhibit 10 in the Chat

19   so folks have access to it.

20             (Exhibit 10 was marked for

21   identification and is attached to the transcript.)

22        A    Okay.

1      Q     And I'm just asking because I haven't

2   been able to see this report.  So when you say you

3   did several analyses to see if giving away your

4   Social Security number was a deterrent to third

5   party registration, do you recall much about what

6   those analyses looked like?

7      A     You know, I'm reading the deposition.

8   Yes, I did several analysis to see if it was a

9   deterrent to third party registration.  That was

10  it.

11            (Reading.)

12            I mean as my deposition indicates, it

13  does refresh my memory, I've looked at data on

14  third party registrations to see whether or not

15  states that required the nine-digit Social

16  Security number had lower or higher or no

17  different rates of third party registration.

18     Q     Okay.  And is that what you mean when

19  you say you did some empirical work to show that

20  it's probably not the case?

21     A     Yes.

22     Q     Okay.  I'm going to go back to Exhibit 2

1    which is your CV.

2            You told us you'd been deposed up to

3    maybe a dozen or so times.  Do you know how many

4    times you've testified at trial as an expert in

5    voting rights cases?

6        A    I was called to a trial this late

7    November/early December, and I was sitting here

8    like we are now, and I was never called.  Is that

9    the right word?  So I spent a whole day with my

10   jacket on, ready, but I was never actually --

11   what's the word?  I wasn't --

12       Q    Called is right.

13       A    Yeah.  I was told to be prepared to

14   testify in an hour, in the Arizona case.  I hope I

15   listed that.  I may have been -- I did not list

16   that, and I do apologize.  That was a very recent

17   case on Arizona's laws -- but I never testified.

18   To the best of my knowledge, the last time I

19   testified at a trial was probably in the mid to

20   late 1980s.

21       Q    So not in an election-related case?

22       A    Not to my recollection, no.  All of my

1    work has been expert reports and depositions.

2         Q    Okay.  And when you say the Arizona

3    case, I'm flipping back to Exhibit 10 briefly, is

4    that the Mi Familia Vota District of Arizona case

5    from 2023 that you see here?

6         A    Yes.

7         Q    And it sounds like you submitted a

8    report, and we can see here you were deposed in

9    that case, but you didn't testify at trial; am I

10   getting that correctly?

11        A    Yes, I was called and I had an airline

12   ticket and I was supposed to be in Arizona, in

13   Phoenix.  Then they said you don't have to fly out

14   but you can do it on Zoom, but I never testified.

15        Q    Okay.  Other than that Arizona case, any

16   other cases that come to mind since this, really

17   between the Brink case and the present, there's

18   only one listed here, in the Vet Voice Foundation

19   case.  Are there any others you can think of?

20        A    This needs to be updated.  I'm also an

21   expert witness in the Colorado lawsuit over

22   signature verification for mail-in voting.

1        Q     Okay.  And were you retained by the

2    State in that case?

3        A     Yes, I was.

4        Q     And the same is true in the Arizona

5    case, or no?

6        A     I'm sorry, I couldn't hear your

7    question.

8        Q     Sorry.  In the Arizona case were you

9    also retained by the State?

10        A     Yes, I was.

11        Q     All right.  Have any parts of your prior

12    testimony or reports been limited by a court?

13        A     Not -- no.

14        Q     Have you ever had any testimony excluded

15    because a court determined that you were not

16    qualified to provide expert testimony on a

17    particular topic?

18        A     No.

19        Q     Has your testimony or report ever been

20    excluded for any other reason?

21        A     No.

22        Q     Has your testimony ever been criticized

1    in a judicial decision to your knowledge?

2         A    Not to my knowledge, no.

3         Q    Were any of the cases that we've talked

4    about today or that appear in your CV with the

5    same counsel you're working for now?

6         A    Mr. Pratt are you referring to and his

7    colleagues?

8         Q    Yes.

9         A    No.

10        Q    Okay.  And so how did you learn about

11   this case?

12        A    Oh, it's a good question.  John Alford,

13   I think, brought me to the attention, or

14   recommended me to the attorneys.

15        Q    And so you received outreach from Dr.

16   Alford before you received outreach from Defense

17   counsel in this case; is that right?

18        A    That's correct.

19        Q    Are you aware of how Dr. Alford came to

20   contact you?

21        A    He said that he was an expert witness on

22   a case in Florida, and that it called for someone

1    who might have knowledge of a literature research

2    on both voter registration and election

3    administration, and he knew of my work and

4    research in the area and thought I might be

5    helpful.

6         Q     When did Dr. Alford contact you, if you

7    remember?

8         A     Say late September, October, maybe.

9    First brought it up, and you know, I could go back

10   and look at my records, but I'd say closer

11   probably to October.

12        Q     So he contacts you around October, and

13   then you submitted this report, I'm just scrolling

14   up now to Page 21, on November 27; is that right?

15        A     That's correct.

16        Q     Do you recall how long after Dr. Alford

17   reached out to you that you began to do the work

18   necessary to form the opinions in this report?

19        A     Again, I'd have look at my time sheets,

20   but you know, I think the -- when John asked,

21   first approached me, he said, would you be

22   interested in and would you be willing or

1    interested in talking to the attorneys so they

2    could understand what they were, what the nature

3    of the case was.

4              The attorney sent me the, I guess the

5    right word is pleadings, you know, the things that

6    you, Plaintiffs filed.  I read those first.  And

7    again, I have to look at my time sheets, I'm sure

8    I talked to the attorneys after that so that I

9    could clarify any questions I might have had.

10             And I probably began, again, I'd have to

11   look at my time sheet, probably late October or

12   early November before I actually started work on

13   writing the report, you know, actually writing it,

14   but obviously I had read a lot before that.

15        Q    Okay.  I'm going to scroll up to the top

16   of the report.  It says this is the expert report

17   of Robert M. Stein, Ph.D., and John R. Alford,

18   Ph.D.  Prior to this report, had you ever

19   submitted a joint report in your expert work in

20   litigation?

21        A    I can only think of one or two that I've

22   done, but yes, I have.  Yes.

1      Q     And who are those reports with, to the

2    best of your knowledge?

3      A     I have to go back, but I did -- the

4    survey research work I have done is always, I say

5    always, I am certain with other colleagues.

6      Q     And when you say survey research work,

7    do you mean survey research work as an expert in

8    litigation, or as an academic, publishing?

9      A     No, no, no, I did, I would say in the

10   '80s and '90s, early '90s I did a good deal of

11   survey research as an expert in cases involving,

12   as I've mentioned before, the citing of a nuclear

13   power plant in south Texas and issues dealing with

14   emergency preparedness and flood control.

15     Q     Okay.  What about since 2014 when you

16   started to shift more toward election-related

17   litigation, any joint reports since then?

18     A     No.

19     Q     How do you know Dr. Alford?

20     A     He's a colleague in my department.

21     Q     Have you worked with him prior to this

22   case?

1      A    Yes.

2      Q    Have you published articles together?

3      A    No, no, we have not.

4      Q    In what capacity have you worked with

5   Dr. Alford prior to this case?

6      A    We were originally, what's the right

7   word, in the Spring Branch lawsuit, we had

8   originally worked on that together, and then were

9   separated when the school district decided to,

10  what's the right word, get a new attorney.

11          We have further worked on redistricting

12  plans for different school districts and

13  municipalities and County governments.

14     Q    And when you say you've worked on, for

15  example, the redistricting cases, do you mean you

16  were both experts retained to work on the same

17  case or that you've worked on parallel cases?

18     A    No, I'm sorry, I misspoke.  We did the

19  redistricting.  We were not experts in lawsuits.

20  We were requested by the jurisdictions to design

21  their, in almost all cases, single member district

22  forms of representation for various, I'd say the

1  overwhelming majority of school districts, some

2  cities and some counties.

3       Q    And so in that capacity, did you work

4  for what I understand to be Dr. Alford's company,

5  it's NDC, right?  Are you familiar with that

6  company?

7       A    I am not.

8       Q    Okay.  Was that in your capacity as a

9  Professor?

10          I know that -- oh, I'm sorry.  I'm

11  thinking of the wrong company.

12          I can withdraw the question about NDC.

13  It's a different expert I have in mind.

14          In what capacity were you two helping to

15  redraw the redistricting plans?  Were you retained

16  by a state or by a municipal body, or can you tell

17  me a little bit about how that worked?

18       A    At the University, we have a variety of

19  centers, but we were approached by the

20  jurisdiction, Spring -- excuse me, City of

21  Houston, Goose Creek School District, and they

22  would call one or both of us.  We've been doing

1  this for, I would say 40 years, so we had a

2  reputation.  And we did it as consulting work.  We

3  did not do it through the University, although the

4  University properly thinks this is an outreach

5  that we should do.

6      Q    Okay.  When you say you've been doing

7  this for 40 years, do you mean with John Alford

8  for 40 years, or that each of you have been doing

9  this for 40 years?

10     A    I'd have to check my records.  I mean

11  I've been at Rice and in Houston since 1979.  I

12  think that's 45 years.  I think I've been doing

13  redistricting in every decennial period since

14  1980.

15          John didn't come to Rice until, I'd have

16  to look at his resume, but I want to say the mid

17  '80s, so if we go back up there and see what year

18  he came to Rice, yeah.

19     Q    Yeah, '85 it looks like.

20     A    '81, yeah, '81.  Oh, God, that's a long

21  time ago.  So we've been working together, I

22  cannot recall all of the ones I did with John and

1    I did by myself or with somebody else, so -- but I

2    would say that if I were to reconstruct, I would

3    say an overwhelming majority of the redistricting

4    cases, projects were done with John.  Sometimes

5    with other people in my department as well.

6         Q    Okay.  I have a couple more follow-up

7    questions.  Just first for, just to make sure I'm

8    reading it right, it looks like he became an

9    Associate Professor at Rice in 1985, right?

10        A    Yes.

11        Q    Okay.  And so since 19 -- had you worked

12   with Dr. Alford prior to 1985?

13        A    Oh, I would think so.  I mean I would

14   think that I was working with him when he came to

15   Rice in 1981.

16        Q    And where are you seeing that he came to

17   Rice in 19 --

18        A    Oh, I'm sorry, I stand corrected, '85,

19   since he came to Rice.  I'm sorry.  He just got

20   his degree.

21             Yeah, I would say '85 is probably the

22   time we started.  But again, I can't imagine, I've

1   known John before he came to Rice, but I don't

2   believe I did any redistricting work with him

3   before he came to Rice.

4       Q   How did you know him prior to him coming

5   to Rice?

6       A   He was, I was aware of his scholarly

7   work.  We met at conferences.  His colleague, or

8   corroborator John Hibbing and I have known each

9   other since we all took our degrees within the

10  late '70s, early '80s.

11      Q   Okay.  Since 1985, do you have a, even a

12  ballpark estimate of how many projects you've

13  worked on with Dr. Alford?

14      A   I would have to guess.  I would say

15  they're in the double digits.

16      Q   More than a dozen?

17      A   Yes.

18      Q   Do you think more than 25?

19      A   I think that might be more at the high

20  end.

21      Q   I guess I'm going to ask this about this

22  specific case rather than all of the other

1    projects, but how did you divide up the work?

2         A    It's -- so I guess --

3              MR. PRATT:  I'm going to object on the

4    basis of privilege.  The witness can answer to the

5    extent that you don't divulge kind of the

6    conversations that you specifically had with

7    Professor Alford as those conversations would have

8    been at the direction of counsel.

9         A    You want to repeat your question?

10        Q    Yeah, I'll make the question more

11   specific, and we can talk about the scoping

12   issues.

13             But I guess the first question I had was

14   did you and Dr. Alford decide who would handle

15   which sections of the report, or did counsel?

16        A    No, Professor Alford and I made that

17   decision.

18        Q    Okay.  Did you take the primary role in

19   researching any, my first question is researching

20   any part of this report?

21        A    I think the, if you can scroll down a

22   little bit for me on the report to, go to about

1   Page 10.

2        Q    Okay.

3        A    Keep on going.  A little further.  Keep

4   on going.  I'm sorry, I apologize.

5        Q    No, it's okay.

6        A    Keep on going, keep on going, keep on

7   going -- no -- keep on going.  You're doing fine.

8        Q    Okay.

9        A    I don't want to take -- stop.

10            (Reading.)

11            This, starting at Page 14 is probably my

12   major -- is that the right word?  This is the work

13   that I brought to the project.

14        Q    So I wanted to talk about what that

15   means.  Starting at Page 14 is the major work you

16   brought to the project is what you just said, and

17   let's start with this section.

18            So Page 14 begins by talking about

19   something in Professor Smith and Herron's report

20   and how it, the report claims that they overlooked

21   two bodies of research.  And then this part of the

22   report goes on to describe two bodies of research.

1          Did you, did you bring to this project

2    the description of those two bodies of work?

3          A    Yes.

4          Q    Okay.  And then beneath those two

5    bodies, the summaries of those two bodies of work,

6    there are a handful of sections, one titled Early

7    Voting on Page 15 of the report, one titled Voter

8    ID Requirement starting on Page 16, and one titled

9    The Conditional Effects of Election Laws on Voter

10   Turnout.  Would you describe each of those three

11   subsections as work that you brought to the

12   project?

13         A    Yes.

14         Q    Going down a bit further, that -- so 14

15   through 20 you would describe as the major work

16   you brought to the project; is that right?

17         A    Yes.  I would say that I was responsible

18   for all of the material and the writing in that

19   section.

20         Q    What, if anything, was Dr. Alford's role

21   in preparing Pages 14 through 20 of this report?

22         A    Well, of course, he obviously read it,

1    made suggestions and edits to the text.

2         Q    Okay.

3         A    And -- oh, I'm sorry.

4         Q    No, you're fine, please.

5         A    And I'd have to check my memory more

6    carefully.  May have made suggestions for

7    inclusion of papers that I may have overlooked.

8         Q    Do you recall whether you accepted any

9    of those suggestions or edits?

10        A    I'm sorry, I couldn't hear you again.

11   You were --

12        Q    Do you recall whether you accepted any

13   of Dr. Alford's suggestions or edits to this

14   portion of the paper?

15        A    I am certain I did, yes.  I don't recall

16   that his edits and suggestions were, what's the

17   right word, were the subject of conversation or my

18   rejection.

19        Q    Did you understand that you had the

20   final say on what made it into this section of the

21   report?

22        A    No.

1        Q     Okay.

2        A     I drafted -- I wrote the section and

3    then shared it with John.  He made comments and

4    suggestions, and we agreed this was what we would

5    submit regarding Pages 14 to 20.

6        Q     And are you aware of which, if any, of

7    the papers are sourcing that was suggested

8    initially by Dr. Alford rather than you in this

9    section of the report?

10       A     I don't.  I mean I'm not being evasive,

11   I just don't.  His -- I don't recall.

12       Q     Okay.  And what about any of the edits

13   that he made beyond sourcing, do you recall any of

14   the specific edits he may have had to the section

15   that you wrote?

16       A     Not that I can recall.  I know there

17   were edits, typos, editorial phrasing, maybe even

18   transposed numbers, but I don't recall

19   specifically.

20       Q     Was that the nature of the edits,

21   though, editorial phrasing, transposing numbers,

22   and perhaps adding sources?

1        A     Yes.

2        Q     Is any portion of Pages 14 through 20

3    primarily written by Dr. Alford?

4        A     No.

5        Q     Okay.  You started on Page 14 when you

6    got to the section, the Effect of Past Election

7    Laws on Voter Turnout, I believe that's where you

8    told me to stop scrolling.  Does that seem right

9    to you?

10       A     Yes.

11       Q     What about at the bottom of Page 13, the

12   header over that section, it's called Cost-Benefit

13   Theories of Voter Registration and Turnout, and

14   there's two paragraphs before you get to the

15   header on Page 14 that says the Effect of Past

16   Election Laws on Voter Turnout.  Who is the

17   primary author of those two paragraphs?

18       A     Professor Alford.

19       Q     Okay.  Did you play any role in drafting

20   those two paragraphs?

21       A     In the drafting, no.

22       Q     And what was your role as to these two

1   paragraphs of the report?

2       A    Of course I read them and made comments

3   and suggested edits, but they were not any more

4   than editorial.

5       Q    Do any of these two paragraphs include

6   opinions that you do not agree with?

7       A    No.

8       Q    What about opinions that you didn't

9   personally reach in this litigation that you would

10  view as Dr. Alford's conclusions as opposed to

11  your own?

12      A    I don't understand.  Can you repeat, or

13  just rephrase that?

14      Q    Sure, I'll rephrase that.

15           The sections that Dr. Alford primarily

16  drafted, are you adopting those opinions as your

17  own, or do you view this as those are Dr. Alford's

18  opinions and Pages 14 to 20 are my opinions?

19           MR. PRATT:  Objection.  Form.

20      A    What I -- as, maybe the global answer

21  would be we coauthored this expert report and the

22  opinions in here are those that I also subscribe

1   to and share with Professor Alford.

2       Q    Okay.  So would you say, is it fair to

3   say you agree with the contents of the entire

4   report?

5       A    Yes.

6       Q    I want to keep going up, though.  I'm

7   going to start at the top so we're not scrolling

8   backwards just to make it a little less confusing.

9            The report begins by explaining your and

10  Dr. Alford's position about Dr. Lichtman's report

11  starting on Page 2, Dr. Herron's report starting

12  on Page 3, and just scrolling a little bit more,

13  Dr. Smith's report beginning on Page 8.

14           Did Dr. Alford draft each of these

15  sections of the report?

16           MR. PRATT:  Object.  Form.

17      A    To the best of my recollection -- let's

18  start off, he wrote the section --

19      Q    We can go one-by-one.  So let's start

20  with Dr. Lichtman.  Do you recall whether Dr.

21  Alford wrote this section of the report?

22      A    He drafted that section of the report.

1      Q    Do you recall whether Dr. Alford had
2  already drafted this section of the report before
3  he called and brought you on to assist with Pages
4  14 to 20?
5      A    I'm sorry, you went too fast here.  Say
6  it again.
7      Q    Sorry about that.
8           Do you recall whether Dr. Alford had
9  drafted this section of the report before he
10 brought you on to help with Pages 14 to 20?
11     A    Not to my knowledge, no.
12     Q    So after Dr. Alford drafted this
13 section, what was your role?
14     A    Well, maybe I should step back a step.
15     Q    Sure.
16     A    In my earlier testimony, I mentioned
17 that when John approached me about the case, he
18 told me the broad parameters.  He then shared with
19 me, with the approval, actually, I think the
20 lawyers, I have to check the email, I think the
21 lawyers sent me a number of documents.  Almost all
22 of them were pleadings or expert reports.

1          Before I agreed, and I think Mr. Pratt

2    will have to verify this, I think before I was

3    even considered as an expert in the case, I had

4    read everything that was sent to me.  That

5    included Mr., Professor Lichtman's report,

6    Professor Herron's report and Professor Smith's

7    report, and the papers that were with them.

8          So I had read Lichtman's report.  I had

9    read Herron's report.  I had read Smith's report.

10    I had read the pleadings in the case.

11    Q    Sure.  And I think what I was trying to

12    ask is, at the time that Dr. Alford contacted you

13    to bring you, to see if you were interested in

14    working on this case with him, did he send you a

15    draft report that he had begun working on?

16    A    No.  I'm sorry.  No, he did not.

17    Q    Okay.  So Dr. Alford drafts this section

18    of the report.  What is your role from that point?

19    A    What we had done is discuss all the

20    experts' reports before we did any drafting of our

21    report.  So we had agreed on what we thought of

22    Professor Lichtman's report.  John drafted that

1    section.

2         Q    Okay.  And is that the procedure that

3    you undertook for each of the sections describing

4    a Plaintiffs' expert report?

5         A    We discussed writing the report before

6    we drafted any sections.  After that discussion

7    where we kind of agreed on what we were going to

8    write in our expert report, we then divided up

9    sections of that report for each of us to draft.

10             This section John Alford drafted

11   regarding Dr. Lichtman's report.

12        Q    Okay.  And are you saying, then, that

13   these two, I think this is only one paragraph

14   about Dr. Lichtman, this reflects a conversation

15   that you and Dr. Alford had had prior to him

16   drafting this paragraph?

17        A    Yes.

18        Q    Okay.  Is there anything that Dr. Alford

19   went ahead and wrote that you hadn't discussed

20   prior to writing the report?

21        A    Not to my memory, no.

22        Q    And is that true about Dr. Herron's

1    report as well?

2        A    That is correct, yes.

3        Q    So you both read Dr. Herron's report

4    prior to drafting anything, right?

5        A    Yes.

6        Q    You had a conversation about your

7    thoughts on the report, right?

8        A    Yes.

9        Q    And then Dr. Alford drafted this section

10   about Dr. Herron's report?

11       A    Now my memory is -- has to be jogged.

12   Can you just scroll down a little bit?

13       Q    Of course.  Let me know when to stop.

14       A    This sections are drafted by John.

15       Q    Okay.

16       A    Keep on going.

17       Q    There's a summary here.  Also drafted

18   by --

19       A    Yeah, I think I actually drafted this

20   summary myself.

21       Q    Okay.  So you think you drafted the

22   summary on Page 4 about Dr. Herron's report?

1        A     Yes.

2              And continuing here, Missing Measures

3    and Analysis, I drafted this language, but John

4    did some editing to it.  He reorganized -- is that

5    the right word?  The words were probably, I know

6    the words were written by me originally, and John

7    reorganized it and put headings, like Missing

8    Measures and Analysis in the Herron Expert Report.

9        Q     Okay.  I'm going to ask you similar

10   things about what you drafted here, but other

11   counsel are going to ask you about this portion

12   about Herron and Lichtman's report, so I'm mostly

13   just confirming the drafting part of this stage.

14   Are we still in the section that you primarily

15   drafted, going from Page 5 into Page 6?

16       A     Yes.

17       Q     What about this table here?

18       A     Yes, I drafted that.

19       Q     We're going into a second table.  Is

20   this your drafting as well?

21       A     Yes.

22       Q     I'm now scrolling through Page 7, and

1    then up to the part where it says Dr. Smith's

2    report, is all of that, from where we started on

3    Page 4 through Page 8, is that your drafting?

4         A    Yes.

5         Q    And what about starting at the bottom of

6    Page 8 with Dr. Smith's report, who drafted this

7    section?

8         A    John Alford.

9         Q    Did you follow the same procedure where

10   you both read the report, discussed, and then he

11   drafted?

12        A    Yes, we did.

13        Q    I'm going to keep scrolling through just

14   to make sure it's not divided in the same way.

15   Let me know if you see anything here that you

16   drafted primarily as to Dr. Smith.

17             So I'm scrolling through Page 8 now.

18   Now I'm scrolling through the bottom of Page 9,

19   top of Page 10, through the bottom of Page 10.  So

20   all of Dr. Alford?

21        A    Yes.

22        Q    Now I'm on Page 11 through Page 12, is

1    that all Dr. Alford?

2          A     Yes.

3          Q     What about Figure 1, this is a

4    reproduction from Herron and Smith's Figure 4,

5    right?

6          A     That is correct, yes.

7          Q     Do you recall whether either of you took

8    the primary drafting responsibility as to the

9    Herron and Smith article?

10         A     Professor Alford did the drafting of

11   that and the text.

12         Q     And we've already talked about Page 13.

13               Okay, I think that covers who drafted

14   what.  You've said before that you have adopted

15   each of the opinions in this report, and that you

16   agree with them.  Do you also feel equipped to

17   talk about each of the sections of the report,

18   including the ones you didn't have the primary

19   role in drafting or researching?

20         A     Yes.

21         Q     Apart from Dr. Alford, did anyone assist

22   you in preparing your report?

1      A    No.

2      Q    Are all of the sources that you relied

3  upon disclosed in this report?

4      A    Yes.

5      Q    Are you sure that the same is true for

6  Dr. Alford?

7      A    I assume it is the case, yes.

8      Q    We can, we have another deposition with

9  him, so I'm sure we can ask him that question.

10         How did you identify the sources that

11  you relied upon in the sections of the report that

12  you drafted?

13     A    Say that again, I didn't hear the first

14  part.  How did I?

15     Q    How did you identify the sources you

16  relied upon in the sections you drafted?

17     A    I guess the answer to that is I read a

18  lot.  This is my field of researching and of

19  teaching, and I'd like to think that I have a wide

20  knowledge of work that is published at least, even

21  non-published work.  And I try to keep abreast of

22  the field.  And so particularly the sections

1   beginning, I think on 14, I think that is a -- I'd

2   like to think is a comprehensive, if not

3   exhaustive, listing of work that I think is

4   relevant to the topics I discussed.

5        Q    Okay.  I'm not asking you which sources,

6   but I'm asking did counsel provide you with any of

7   the sources that you relied upon in this report?

8        A    Other than the experts' reports, the

9   pleadings from the Plaintiffs' attorneys and the

10  statute on SB 7050 and other statutes that were

11  discussed mostly by the Plaintiffs, no, none of

12  the -- those are the only things that the

13  attorneys provided me.

14       Q    Were there any documents or other

15  information that you ever asked to see in forming

16  your conclusion that you did not get to see?

17       A    No, not to my recollection.

18       Q    Did you conduct any interviews to help

19  you form your opinions or prepare your report?

20       A    Interviews, could you kind of explain

21  what you mean by --

22       Q    Sure.  I'm mostly trying to figure out

1    if this is just reviewing papers, data analytics,

2    or if you conducted any interviews in the course

3    of preparing your report?

4         A    No, I did not conduct any interviews

5    with, you know, other scholars, or for that matter

6    -- no, my work was based on published

7    peer-reviewed journal articles and in some cases

8    non-published conference papers, things like that.

9         Q    Are there any other documents or

10   information that you would have wanted to help in

11   forming your opinions in this case?

12        A    That's a good question.  No.

13        Q    You mentioned that you had reviewed a

14   series of Plaintiffs' experts' reports in this

15   case.  I'm going to start by sharing what's been

16   premarked as Exhibit 3, and I'm going to scroll to

17   Page 4 of that PDF.  It's labeled as Page 1 of the

18   Expert Report of Daniel A Smith, Ph.D.

19             (Exhibit 3 was marked for identification

20   and is attached to the transcript.)

21        Q    Do you recognize this as Dr. Smith's

22   primary report in this case?

1        A      Yes.

2        Q      And is this one of the reports that you

3   reviewed in forming your opinions in this case?

4        A      Yes.

5        Q      You mentioned that since you submitted

6   your report you've also reviewed a series of

7   rebuttal reports.  I'm now sharing on my screen

8   what's been premarked as Exhibit 4.  Do you

9   recognize this as Dr. Smith's rebuttal report?

10              (Exhibit 4 was marked for identification

11  and is attached to the transcript.)

12       A      Yes.

13       Q      And have you read this report in its

14  entirety?

15       A      Yes.

16       Q      You have not submitted any report

17  containing conclusions about this rebuttal expert

18  report; is that right?

19       A      That is correct, yes.

20       Q      Before I get into some of the

21  methodology and other opinions in this case, it's

22  been a little over an hour on the record, would

1   now be an okay time to take a five-minute break?

2        A    That would be fine, yes.

3             MS. KEENAN:  Okay.  So I think we can go

4   off the record at 10:12.  We'll be back at 10:17,

5   if that works for everybody.

6             (A recess was taken at 10:12 a.m.)

7             MS. KEENAN:  It's 10:18 and we're back

8   on the record.

9   BY MS. KEENAN:

10       Q    So I wanted to ask before we get into

11  specific conclusions here, what is your

12  understanding of your function in this litigation?

13       A    I'm sorry, I didn't hear the end of that

14  sentence.

15       Q    What is your understanding of your

16  function in this litigation?

17       A    I was asked to review the expert's

18  reports and offer my opinion on their reports.

19       Q    And is that your understanding of your

20  precise assignment here, to review and comment on

21  the Plaintiffs' experts' reports?

22       A    Yes.

1      Q     Apart from the opinions included in the

2   report you've submitted, do you anticipate forming

3   any additional opinions in this case?

4      A     I do expect to form opinions on the

5   Plaintiffs' rebuttal reports, which I have not

6   responded to in writing, but I have read and have

7   formed opinions.

8      Q     But you've not submitted any written

9   report as to those rebuttal reports; is that

10  right?

11     A     That is correct, yes.

12     Q     And do you intend to?

13     A     I don't know.  I haven't been asked.

14  Obviously I have read the reports and I am

15  prepared today to discuss those reports, and I

16  have formed opinions on them, but I have not been

17  asked to write an expert -- I don't know, what

18  would you call it, rebuttal to the rebuttal.

19     Q     Yeah, sometimes surrebuttal, but sure,

20  yeah, same thing.

21           I just realized I haven't dropped

22  Exhibits 3 and 4 into the Chat for the other

1    counsel who are attending, so I'm going to do that

2    but don't let it distract you, it's the same ones

3    we already reviewed.

4            In reviewing the record in this case and

5    the articles that you cited as sources, did you

6    find anything inconsistent with the opinions

7    included in your reports?

8        A    I'm not certain I understand the

9    question, so I'll let you rephrase it before I

10   ask.

11       Q    Sure.  So you told us earlier today that

12   you reviewed a number of pleadings and other

13   documents from this case that counsel submitted to

14   you; is that right?

15       A    Yes.

16       Q    And you also reviewed, as cited in your

17   report, a series of articles, books, other

18   publications that you relied on in forming your

19   opinions, right?

20       A    Yes.

21       Q    In any of that literature or case

22   material, did you find anything inconsistent with

1   the opinions included in your report?

2       A    Again, I'm not trying to be obtuse.  So

3   I had formed some opinions about the experts'

4   reports, I read articles and cite them in my

5   expert report that seemed to, that I think support

6   my opinions.  Are there things in the papers I

7   read that would not support my positions?  I can't

8   think of any at this time.

9       Q    Okay.  Do you have a standard

10  methodology that you use as an expert?

11      A    Is there a standard methodology I use as

12  an expert?  That's a, kind of a broad question.  I

13  would hope you would help me and narrow it down to

14  what I might be experting about.  Voter turnout --

15      Q    Let's say in election cases, and I'll

16  start by saying it at that level and ask if

17  there's a standard methodology you use across the

18  election cases you've worked on since 2014.  If

19  the answer to that is no, I can get more specific.

20      A    And I don't mean to be pedantic here,

21  there is an article on my resume that I think

22  speaks to that.  It's the article on how to

1    evaluate voter turnout in the -- I apologize, I'm

2    getting old, the journal is the Journal on

3    Political Institutions.  That is what I think to

4    be the seminal methodology I both would advise and

5    use for evaluating a wide range of election laws.

6           Q     That's the 2020 article you mentioned

7    earlier with Andrew Menger?

8           A     Andrew Menger, yes.

9           Q     Okay, great.

10          A     If you would --

11          Q     Oh, I'm sorry, I thought I was showing

12   my screen.  I'm highlighting it on my screen.

13          A     I will only say if you're looking for a

14   piece that would say to you, Bob, this is a

15   methodology I recommend for evaluating, it would

16   be the paper How to Measure and Assess Turnout.  I

17   wrote that obviously some years ago with Andrew

18   Menger.

19                I will just note out of pride because I

20   think very highly of the Plaintiffs' experts, they

21   cite that paper at least once, if not twice, in

22   their own published work as how we should proceed

1    in evaluating turnout effects, as well as other

2    election reforms.

3         Q    And just to make sure, I'm on Page 27 of

4    Exhibit 2, and this is the article you're talking

5    about, How to Measure and Assess the Turnout

6    Effects, right?

7         A    That's correct.

8         Q    Okay, great.  Is the methodology that

9    you applied in this case consistent with the one

10   described in that paper?

11        A    Yes.

12        Q    And how so?  Could you explain how you

13   applied that methodology in this case?

14        A    A standard methodology for evaluating a

15   whole range of public policies is what's known as

16   a difference-in-difference test.  We don't always

17   have the data for doing that, but the short answer

18   is in that paper, I discuss all the different ways

19   in which researchers have evaluated election

20   reforms.  I use the word reforms loosely, but

21   we'll call them election laws, and that defied the

22   full cross-sectional time series, that's a lot, or

1    the difference-in-difference design as I discuss

2    in my expert report as the preferred method for

3    evaluating the impact of election law.

4         Q    And you said that sometimes the data

5    isn't available to conduct a

6    difference-in-difference report.  What kind of

7    data is required to conduct a

8    difference-in-difference report, at a high level?

9         A    You need to have information about the

10   alleged or anticipated outcome of the law before

11   and after it was adopted in the target populations

12   you're looking at.  And you need to have an

13   understanding of who those target populations are,

14   if they're target, voters, registered voters,

15   voters of different racial and ethnic backgrounds.

16   And you need to be able to have a baseline against

17   the adoption of a law; the baseline being before

18   and after, and they're -- I hope that's

19   responsive.

20        Q    It is.  It's very helpful.

21             You didn't conduct any sort of

22   difference-in-difference analysis in this case,

1    right?

2         A    No, I did not.

3         Q    Why not?

4         A    I wasn't asked to.  I was asked to read

5    the Plaintiffs' reports, but I was not asked to

6    conduct any independent analysis.

7         Q    Have you previously conducted

8    difference-in-difference analysis in your work as

9    an expert in litigation?

10        A    Yes.

11        Q    Do you recall any cases where you might

12   have done that?

13        A    I believe I did it in the Virginia case.

14   I did it in the -- can you scroll down to the

15   cases?  I know we did it in one of the Lakota

16   Tribe cases.

17        Q    There we go.

18        A    Thank you.  I'm pretty certain I did it

19   in the Mark Wandering Medicine case versus Linda

20   McCullough.  I may have done it in the Thomas Poor

21   Bear.  I did it in the Waller, Jayla Allen versus

22   Waller County.  I'm pretty certain I did it in the

1    Arkansas case.

2         Q    With an assist from a colleague I was

3    able to get a copy of the Virginia report during

4    the break so I premarked that as Exhibit 12.

5              (Exhibit 12 was marked for

6    identification and is attached to the transcript.)

7         Q    Do you recognize this as your report

8    from that case?

9         A    Yes.

10        Q    And this is one of the cases where you

11   said you did a difference-in-difference analysis,

12   right?

13        A    I believe I did.  I think I compared

14   states -- I may not have.  Again, I'll have to

15   reread the report.  It's been some time.  I may

16   not have done it.

17             Actually, I think so.

18        Q    Okay.  So I can see, for example, that

19   you compiled in this case data from the 2014,

20   2016, 2018, and '20 EAVS survey, right?

21        A    Yes.

22        Q    You looked at the share of registration

1    applications submitted by third party registration

2    drives using that data?

3        A    Yes.

4        Q    And you reported out analyzes based on

5    some of that EAVS and other elections data, right?

6        A    That's correct.

7        Q    Okay.  I'm going to drop this in the

8    Chat and at our next break, I'd like for you to

9    take a quick look at it and let me know what the

10   difference-in-difference analysis is that you did

11   in this case, but we don't need to do that here on

12   the record.  I'll put this in the Chat now so we

13   have a copy of it.  Give me one moment.

14            Okay.  But for now, I'm going to go back

15   to your report in this case.  And I want to start

16   with the portion of the report beginning on Page 8

17   of Exhibit 2, which is about Dr. Smith's report.

18            On Pages 8 and 9 you lay out Dr. Smith's

19   description of the purposes of his report and a

20   series of conclusions that he offers; is that

21   right?

22       A    Yes.

```
 1        Q     And on Page 9 you state that Dr. Smith's
 2   conclusions detail various statistics that support
 3   the conclusion that 3PVROs register a non-trivial
 4   number of Florida citizens.  Did I read that
 5   correctly?
 6        A     Yes.
 7        Q     You do not offer any critiques of
 8   Dr. Smith's conclusions about the number of
 9   Florida voters who have relied on 3PVROs to
10   register to vote, do you?
11        A     That is correct.
12        Q     You don't offer any critiques of his
13   conclusion about the number of Florida voters who
14   have relied on 3PVROs to update their voter
15   registration either, right?
16        A     That is correct.
17        Q     You don't offer any critiques of
18   Dr. Smith's conclusions that these numbers are
19   likely an undercount based on data provided by the
20   Florida Department of Elections, right?
21        A     That is correct.
22        Q     You don't offer any critiques of
```

1    Dr. Smith's conclusions that voters of color rely

2    most heavily on 3PVROs, right?

3        A    No.   Right.

4        Q    I'm sorry, did you speak?

5        A    Yes.  The word "rely" would be a -- I

6    would say that a higher -- we do not dispute that

7    a higher proportion of voters of color, Hispanic

8    and black, have registered to vote through third

9    party registrations.  It's the word "rely" that I

10   would object to.

11       Q    I understand what you're saying.

12            You're saying you're not opining about

13   the total number of voters, but you'd agree that

14   Dr. Smith's conclusions showed that voters of

15   color disproportionately used 3PVROs in order to

16   register to vote?

17       A    I would -- and again, I'm not trying to

18   be argumentative here.

19       Q    Sure.

20       A    The word you use is an important word to

21   me.  So I would simply say that there is a higher

22   proportion of non-white registrations through

1    third party registrations.  The word "use, rely,"

2    I would not want to use, and I can explain if you

3    want my explanation now or later.

4        Q    I think the answer you gave is

5    sufficient based on the question I asked, but I

6    would like for you to explain why "use" or "rely"

7    is problematic so that I can avoid using that term

8    in the future if it's imprecise.  Can you let me

9    know why you're resisting the word "use" or

10   "rely"?

11       A    In the report I point out that there's

12   evidence that suggests that a higher proportion of

13   people of color are registered through third party

14   registration.  The question is why.

15            And the question goes further to whether

16   or not this impedes or enhances their likelihood

17   of both registering and voting.  And I believe

18   as -- I'm sorry.

19       Q    No, go ahead, I'm sorry.

20       A    As I've written in the report, the

21   evidence seems to suggest, and the history of

22   third party registrations would suggest, that

1    African Americans and Hispanics are sought out,

2    are targeted for registration and updating of

3    their registration by specific third party groups,

4    partisan groups like Mi Familia Vota, the NAACP,

5    the Democratic Party of Florida.  They go to and

6    actively solicit these registrations.  They don't

7    actively solicit registrations from voters who are

8    not inclined to vote Democratic or from those

9    groups that they represent, Hispanic and African

10   American groups.

11          So the idea that African Americans and

12   Hispanics "use" implies an element of

13   volunteerism, a seeking out and that there isn't

14   an alternative mechanism such as the DMV or other

15   places where voters can actively seek to register.

16          Again, the history of third party voter

17   registration, a history that I have read, I did

18   not include in my report and would be happy to

19   share with you at this time if you want, a very

20   fine history of third party shows that this is an

21   active targeting.  And I think what we have here

22   is not a volunteer, or a seeking out or using of

1    something, but rather a solicitation that may, in

2    fact, as Mr. Herron, Professor Herron and Smith

3    suggest, underwrite the cost of registering for

4    one group of voters possibly to the exclusion of

5    other voters.

6        Q    Okay.  So I have some follow-up

7    questions on that.

8             First, I heard you say that these were

9    partisan groups, and you listed Mi Familia Vota

10   and NAACP.  Are you offering the testimony that

11   those are partisan groups?

12       A    I wouldn't say that they are groups who

13   would -- they're not obviously registered

14   political parties.  In some cases they're not able

15   to advocate for or endorse candidates, but I would

16   say that their efforts on behalf of registering

17   voters disproportionately favors one party over

18   another.

19       Q    And would you be surprised to learn that

20   either of those entities are actually nonpartisan,

21   nonprofit organizations?

22       A    I'm not surprised.  Let me pose the

1    question to you.  What proportion of third party

2    registrations are Democratic and Republican

3    registrations?

4          Q    We can talk about that a little later.

5          A    Can I finish?

6          Q    What you cite --

7          A    You asked me a question, I'm trying to

8    respond.

9          Q    Sure.

10         A    I would not deny that these are

11   nonprofit, nonpartisan organizations that do not

12   affiliate with, nor do they endorse and advocate.

13   I would suggest that if we looked at the record,

14   which I have not, that the areas and geographies

15   in which third parties listed in Professor

16   Herron's original expert report, with the

17   exclusion of the Republican Party of Florida, are

18   disproportionately likely to register voters not

19   just of color, but who are more likely to vote

20   Democratic.  That to me is a reason.  If somebody

21   actively targets a population for registration, it

22   wouldn't be a surprise to me that their efforts

1    would net a higher proportion of registrations

2    that are among African Americans and Hispanics.  I

3    don't believe they actively and randomly assign

4    geographies or voters to register.  They go after

5    voters in specific areas of specific racial and

6    ethnic backgrounds that produces the high rate of

7    third party registrations among African Americans

8    and blacks.

9         It doesn't answer the question, however,

10   could blacks and Hispanics register another way.

11   Do they register another way, and are they impeded

12   from registering if third parties are in any way

13   disadvantaged by SB 7050.

14        Q    Okay.  Again, a lot of questions based

15   on that.  First, you just said it doesn't answer

16   the question of could they register another way,

17   do they register another way, or are they impeded

18   from registering another way.  But you'd agree it

19   does literally answer the question of do they

20   register another way when we see that they did, in

21   fact, register through a 3PVRO, right?

22        A    No.

1          Q      So you would say that the evidence that

2     Dr. Smith has assembled about who individually has

3     registered through a 3PVRO does not answer the

4     question of whether that number of individuals did

5     register through a 3PVRO?

6          A      I don't understand your question.

7                 Let me try to answer it, however.

8          Q      Well, if you don't understand the

9     question, I'll rephrase it.  That was one of the

10    things we agreed about at the beginning.  So I'll

11    try it again.

12                You said a moment ago that the evidence

13    that Dr. Smith assembled doesn't answer the

14    question of do voters of color vote another way,

15    sorry, register another way.  Did I understand

16    your testimony correctly, or is that not what you

17    said?

18         A      Maybe I should ask the, Ms. Hart to

19    repeat what I just said.  That might be helpful.

20                MS. KEENAN:  Sure, if you have it in

21    front of you, if the stenographer has it, I

22    understood the line to begin with, could they

1    register another way, do they register another way

2    and are they impeded from registering another way.

3    We're just trying to figure out if that's the

4    correct series of --

5         A    That's correct.

6              (The record was read as follows:

7              It doesn't answer the question, however,

8    could blacks and Hispanics register another way.

9    Do they register another way, and are they impeded

10   from registering if third parties are in any way

11   disadvantaged by SB 7050.)

12        Q    And so I understand, I understand your

13   objections about could they register another way,

14   or would they be impeded from registering another

15   way.  What I'm asking is right now, we know the

16   question of how they did, in fact, register based

17   on the data that you don't dispute in Dr. Smith's

18   report?

19        A    So to answer that question I'm going to

20   have to remember, and there were two reports, as

21   of course we know, Professor Herron's and

22   Professor Smith's.  Professor Herron's was far

1    more detailed and more computational analytic than

2    Professor Smith's.

3             We raised in our report, Professor

4    Alford and I, the possibility that a diminution in

5    third party registrations among African Americans

6    and Hispanics might have been offset by

7    registrations through other modes, including the

8    DMV, Department of Motor Vehicles.  That was not

9    an analysis that Mr., Professor Herron or Smith,

10   particularly Professor Herron, followed up.  To my

11   knowledge, Professor Smith never brought that up.

12   He never looked at other modes of registration.

13   Professor Herron did.

14            We raised in the report that, I believe

15   a table that Professor Herron included in his

16   report suggested, suggested there might have been

17   an uptick in DMV registrations among voters of

18   color as a result of the drop in third party

19   registrations.

20      Q    So I want to be clear.  I'm not asking

21   about offsetting or what might happen based on

22   this law.  I'm asking about the data in

1   Dr. Smith's report which you said you reviewed,

2   right?

3             Sorry, I need a verbal answer for the

4   transcript.

5             I'm sorry, can you hear me?

6        A    I did.  I didn't know if there was a

7   question there or not.

8        Q    Sure.  Exhibit 3 is the Smith report

9   that you said you reviewed, right?

10       A    Yes.

11       Q    Okay.  And so I'm going to go to the

12  Summary of Findings.  You'd agree that this

13  summary of findings includes specific data about

14  how many voters were registered in Florida due to

15  the activities of 3PVROs, yes?

16       A    Yes.

17       Q    And you'd agree that based on that data

18  we know that they did, in fact, register through a

19  3PVRO, right?

20       A    As of September, yes.

21       Q    Right.  And he provides that data, told

22  about the number of Floridians as a whole, you'd

1    agree, based on the data he reviewed, right?

2        A    Yes.

3        Q    And also he provides a series of tables

4    that show how many voters of color and voters

5    living in certain counties were registered through

6    3PVROs, right?

7        A    Yes.

8        Q    And you don't dispute that any of that

9    data shows that those people did, in fact,

10   register through 3PVROs, right?

11       A    That's correct.

12       Q    What you are objecting to is what you

13   called volunteerism or whether these entities are

14   soliciting applications from certain people.  Do I

15   understand that to be the source of your

16   objection?

17       A    I don't know if it's an objection.  I

18   would say that Professor Smith --

19       Q    You don't include -- I'm going to go

20   back to your report.  I don't think the word

21   "solicit" or "volunteerism" appear in your report

22   even once, but please let me know if it's included

1  in your report.

2       A    I think we have a discussion of how

3  third party registrations occur, that's correct,

4  but no, I do not use the word solicitation or

5  volunteerism.  I'm simply suggesting that it

6  shouldn't be, it shouldn't be surprising that

7  groups that solicit disproportionately non-white

8  persons to register will have a higher share of

9  registrations through third parties.

10      Q    I understand you're saying that here

11  today.

12           MR. PRATT:  Counsel, it may be a little

13  bit of a Zoom disconnect, but if you can please

14  maybe let Dr. Stein finish his answer.

15           MS. KEENAN:  I'm sorry.  I thought he

16  was finished.

17      Q    Go ahead if you're not finished.

18      A    It might be helpful here to go back to

19  what you asked me earlier, which is the charge.

20  We understand our charge to be whether or not the

21  experts' reports demonstrate that the adoption and

22  implementation of SB 7050 would impede the

1    registration and voter turnout of non-whites.

2         Q    Yes.  And in -- oh, sorry, I thought you

3    were done again.

4         A    I'm trying, I'm trying.  I'm always

5    accused of talking quickly, so --

6              We evaluated the research done.  I will

7    make it clear that we don't dispute the high

8    proportion, higher proportion of third party

9    registrations among voters of color.  We just

10   don't think it's consequential, or more

11   importantly, we don't believe the Plaintiffs have

12   shown that it is consequential to the rate of

13   registration among non-whites and their ability to

14   vote.  And we further believe that the design of

15   the research cannot show that.

16             It does show that there is a higher

17   share of third party registrations among African

18   Americans and Hispanics.  It doesn't show that

19   that in any way impedes those groups of voters

20   from registering or has, however brief the time

21   series is, Professor Herron points out that it's

22   hard to compare the periods before and after SB

1   7050 was adopted and implemented.  But we don't

2   think it shows that voter registration among

3   African Americans and Hispanic voters has been

4   impeded as a result of SB 7050.  And that, I

5   think, is the summation of our report.

6          Q    So now that does sound like the

7   summation, that last answer sounds like the

8   summation of your report, but you said a whole

9   bunch of other stuff that I just want to confirm

10  is not in your report.  And the first is, I have

11  it down that you said that those organizations,

12  3PVROs, solicit applications from non-white voters

13  sometimes to the exclusion of white voters.  That

14  is not an opinion that is in your report; is that

15  right?

16         A    You know, if -- can you -- can I -- I

17  need to pull up my report so I can show you where

18  we do discuss that, but I'm not able --

19         Q    I have the report up.  You can tell me

20  where it is, where to go.

21         A    Would you have any objection if I were

22  to have control over the screen so I could go

1    through the report?

2         Q    No, I don't think so.  Let me see if I

3    can do that.  I don't --

4         A    You do it under Screen Share.

5              (A discussion was held off the record.)

6         A    Okay, got it.  I got it.

7              All right.  Let's go up to my report.

8    Section -- go up a little further.  Trying to go

9    up and find --

10             So if you look at the summary, here we

11   discuss the possibility that declines in non-white

12   registration by third party were substituted by

13   DMVs.

14        Q    And that, first of all, that's in the

15   Herron summary on Page 4, right?

16        A    Yes.

17        Q    Not in the section on Dr. Smith?

18        A    No, that is true.

19        Q    And it doesn't, it doesn't suggest that

20   3PVROs are registering non-white voters to the

21   exclusion of white voters, which is what you said,

22   right?

1        A       Yes.

2        Q       That conclusion is not in your report?

3        A       That is correct.  I am now bringing that

4    up in my reading of the rebuttal report.

5        Q       But you didn't offer any opinion to that

6    effect in your report, right?

7        A       That is correct.

8        Q       And you said earlier if you take a look

9    at the record, and I have not, I would suggest

10   that you might find, and then you went on to make

11   a suggestion about what might be in there.  But

12   you'd agree that you have not looked at the record

13   as it relates to the 3PVRO registration, right?

14       A       I have read about the history of third

15   party registrations and I did not include that

16   report that I read in my report.  But in light of

17   the rebuttal reports, I have noted that the

18   history of third party registrations is to target

19   populations that are specifically of color.

20       Q       But again, that's not based on the

21   record in this case, right?

22       A       No, it is not.

1          Q     And it's not based on anything you

2     included -- go ahead.

3          A     Other than what I'm just telling you is

4     part, that is I have not written a rebuttal report

5     to the rebuttal of reports of Professor Herron and

6     Smith, so this is only based on their original

7     expert reports.  Since then, and since I wrote

8     this report, I have offered now an opinion that it

9     shouldn't be a surprise that third party

10    registrations of the sort that are described in

11    these reports are disproportionately non-white

12    voters.

13         Q     But you have not offered, in the report

14    you've actually provided to the parties, you've

15    not offered any support for that conclusion that

16    you're offering for the first time today in this

17    deposition; is that fair to say?

18         A     That is fair to say, yes.

19         Q     Okay.  I think I can move on from this

20    line of questioning for now.

21               I want to go back to, I think that I am

22    going to stop the control and go back to the

1    section I was on.  Give me one moment to get

2    there.

3            So after that first sentence that we've

4    already read and discussed you say:  However,

5    neither his conclusions, nor his analysis in the

6    body of the report, provide empirical evidence of

7    an actual demonstrated disparate impact, if any,

8    of SB 7050 on black or Hispanic citizens

9    registering to vote or updating their existing

10   registration through 3PVROs.  Did I read that

11   correctly on Pages 9 and 10?

12       A    Yes.

13       Q    I want to make sure I understand what

14   you mean when you say Dr. Smith's report provides

15   no empirical evidence of an actual demonstrated

16   disparate impact.  First, this sentence focuses on

17   a disparate impact.  Setting aside whether SB 7050

18   disparately impacts certain groups of voters, does

19   your report contest that SB 7050 has any impact on

20   voters?

21       A    Would you read the last part of that

22   sentence for me?  If any on black or Hispanic

1    citizens registering to vote or updating their

2    existing voter registrations.

3         Q    Right.  So an actual demonstrated

4    disparate impact, if any, of SB 7050 on black or

5    Hispanic citizens registering to vote or updating

6    their registration.  I think I read that the first

7    time, right?

8         A    Yeah, you just didn't mention

9    registration.

10             We don't think that the evidence shows

11   that the impact of SB 7050 has a, that it

12   significantly impairs non-white, black and

13   Hispanic citizens from registering to vote, only

14   that they don't have, or don't register at the

15   same rates through third parties.

16        Q    Right.  And I understand -- that's why

17   I'm trying to focus on the word "disparate" and

18   what it means.  So I understand that you're

19   offering the conclusion that there's no evidence

20   of a disparate impact, in other words, the black

21   and Hispanic citizens are affected at a rate

22   different than how white citizens are affected by

1   SB 7050.

2           What I'm asking is, do you contest that

3   SB 7050 has an effect on citizens of Florida,

4   setting aside whether that effect is disparate?

5       A   I don't know what effect you're

6   referring to so I can't -- the answer is I don't

7   know whether or not SB 7050 had an effect on

8   voters.  What I do know, or what I have offered

9   is, I don't believe the reports of Professor

10  Herron and Smith have demonstrated that it has a

11  disparate impact on voter registration between

12  non-white and white voters.

13          It may or may not have had an impact,

14  but that wasn't what we were asked to evaluate.

15  We were asked to evaluate did they, Professor

16  Smith and Herron, provide evidence to support the

17  conclusion that there are disparate effects

18  between white and non-white voter registrations as

19  a result of the adoption and implementation of

20  7050.

21      Q   And so I understand that's what you were

22  looking at, but I want to be clear.  Does that

1   mean you weren't looking at whether there is

2   evidence to suggest that SB 7050 affects any

3   Florida citizens in terms of their ability to

4   register to vote?

5        A    We find no -- we did not look, nor did

6   we, nor were we instructed to answer that

7   question.  We were asked to evaluate the evidence

8   that Herron and Smith brought to bear on the

9   question they posed, and we don't find it

10  compelling and supportive of their conclusions.

11       Q    I understand that you're characterizing

12  that as the question they posed, but I just want

13  to be clear that you were asked only to look at

14  whether there was sufficient evidence to support a

15  disparate impact of SB 7050, and not the question

16  of whether there was evidence of an impact of 7050

17  on any Florida citizen's ability to vote

18  regardless of that disparate impact angle.

19       A    That is correct, we were not asked the

20  latter.

21       Q    Okay.  And as for evidence relating to

22  disparate impact, you would agree that Dr. Smith

1    provided evidence from data provided by the

2    Florida Department of Elections that black and

3    Hispanic registered voters in Florida are more

4    than five times more likely than white registered

5    voters in Florida to register with or update their

6    registration with 3PVROs based on the existing

7    data, right?

8         A    We did not dispute that finding.

9         Q    And you would agree that Dr. Smith

10   provided evidence from data provided by the

11   Florida Department of Elections that less than one

12   in 50 white registered voters in Florida most

13   recently relied on 3PVRO to register or update

14   their registration, right?

15        A    We did not dispute those numbers, no.

16        Q    Have you reviewed any of the

17   declarations submitted in this case that were not

18   submitted by expert Plaintiff witnesses?

19        A    My only recollection is in the pleadings

20   where I read about people who, actual Plaintiffs

21   who were affected by SB 7050.  I did read those,

22   but my recollection of them is very faint.

1      Q     You didn't offer any opinions in your

2   report contesting the impact of SB 7050 on any of

3   the individual Plaintiffs in this case, right?

4      A     That is correct.

5      Q     I notice that you don't cite any

6   empirical evidence about voter registration in

7   Florida in your report; is that fair to say?

8      A     We did not conduct any, any empirical

9   analyses.  We simply reviewed what was presented

10  to us from the Plaintiffs.

11     Q     What kind of empirical evidence would

12  show that SB 7050 has an actual demonstrated

13  disparate impact in the way you've described it in

14  your report?

15     A     If you scroll up in my report, or our

16  report, to Tables 1 and 2.

17     Q     Okay.  Scroll up, like here?

18     A     Yeah, keep on going.  Just a little

19  further.  Go up a little further.

20           Keep on going.  One more, I think one

21  more bullet.

22     Q     Okay.

1          A      Two empirical conditions need to be

2    shown to support Professor Herron's conclusion.

3    If you -- I'll just read it, or I don't mean to be

4    cumbersome, but it's the best words I can use.

5          Q      Of course.

6          A      And I want to be clear here, conclusion

7    that SB 7050 discriminated against non-white

8    citizen voting age persons registering to vote.

9    First, he needs to demonstrate that the difference

10   between the proportion of non-white and white

11   citizen voting age persons who registered to vote

12   and registered to vote by third parties was

13   significantly lower after the adoption of 7050

14   than before its adoption and implementation.

15              Second, if the decline in the proportion

16   of non-white citizen voting age persons who

17   registered to vote by a third party was

18   significantly greater than the observed white

19   citizen voting age persons, was this decline

20   offset by an increase in non-white citizen voting

21   age persons registering to vote by another mode of

22   voter registration.

1            So there are two parts to this.  One, if

2     you go up one bullet, you'll see that we didn't

3     think that Mr. Herron, Professor Herron was

4     comparing the proportions of persons eligible to

5     register to the total number of persons who did

6     register.

7          Q    Okay.  And like I said earlier, someone

8     else is going to talk to you about Professor

9     Herron, so I don't mean to cut you off, but

10    that's -- another group is going to talk to you

11    about Professor Herron.  I just want to focus on

12    these empirical conditions that you pointed to as

13    an answer to my question.

14            I'm looking at the same text you just

15    read, and I can see an important part of each of

16    these is what you talked about earlier when you

17    were describing how you conduct a difference-in-

18    difference analysis, you talked about how it's

19    important to have a baseline before and after,

20    right?

21          A    Correct.

22          Q    So you focus on whether the difference

1    is significantly lower after the adoption of SB

2    7050 than before the adoption and implementation,

3    right?

4         A    Correct.

5         Q    Are you aware that the SB 7050

6    citizenship requirement was enjoined this summer

7    before it had a chance to be implemented?

8         A    I was not.

9         Q    Are you aware that the SB 7050

10   citizenship requirement has not yet been enforced

11   by the Secretary of State or Attorney General of

12   Florida?

13        A    I was not.

14        Q    Would you agree that if the SB 7050

15   citizenship requirement has not yet been enforced,

16   these types of empirical evidence, and

17   particularly the baseline you mentioned, do not

18   currently exist?

19        A    Say -- could you repeat -- so are you

20   suggesting that we don't know the number of

21   citizen voting age persons in the State of

22   Florida?

```
 1        Q       No, no.  I'm suggesting that we don't
 2   know the difference before and after the
 3   implementation of SB 7050 if SB 7050 has not, in
 4   fact, been implemented and enforced yet.  Do you
 5   agree with that?
 6               MR. PRATT:  Objection.  Form.
 7        A       So I am confused.  Are you suggesting
 8   that SB 7050 hasn't been implemented?
 9        Q       I am saying that SB 7050 has not been
10   enforced by the Secretary or the Attorney General
11   at this point in time, yes.  And I'm asking
12   whether that makes it impossible to do the before
13   and after baseline that you have suggested in your
14   report.
15               You don't have to agree that that's what
16   happened, but positing that that's true, I
17   understand you may not have that information, if
18   it is true that SB 7050 has not yet been enforced,
19   then we can't create a baseline for before and
20   after the enforcement of SB 7050; you would agree
21   with that?
22               MR. PRATT:  Objection.  Form.
```

1      A     The entire Plaintiffs' reports, both

2   Smith and Herron, is based on the fact that SB

3   7050 has been implemented requiring third parties

4   to do things they didn't do before that impeded

5   their efforts to register voters.  So am I wrong

6   in saying that SB 7050 --

7      Q     I'm not asking what you think those

8   reports were trying to do, respectfully.  I'm just

9   asking if, in fact, that is true that SB 7050 has

10  not been enforced, would you agree that it would

11  not be possible to create a before and after

12  baseline of a law that had not yet been enforced?

13     A     So I'll answer your question this way.

14  If a law that was adopted, but not implemented in

15  any way, why are we here today?

16     Q     I can represent to you, Doctor, that we

17  have already pursued litigation that has frozen

18  the law from being enforced, that that is the

19  result of the litigation that we are here

20  discussing today, and that as a result of the

21  litigation to date, the citizenship requirement

22  has not yet been enforced.

```
 1        A     That is not --
 2        Q     What I'm asking you is, assuming that is
 3   true, I'm not asking you about your knowledge of
 4   the fact, I'm just asking you, assuming that is
 5   the case, do you agree that there would be no way
 6   to do a before and after baseline of a law that
 7   had not yet been enforced?
 8        A     I would agree that a law not enforced
 9   could not be evaluated.
10        Q     Okay.
11        A     I would not agree that that is the case
12   about SB 7050.
13        Q     I'm going to move on to the next
14   paragraph of this section of Dr. Smith.  This
15   says -- give me one second.
16              Can you read this paragraph on your
17   screen to yourself and let me know when you've
18   finished?
19        A     (Reviewing.)
20              I have finished.
21        Q     Okay.  First, when you say, there's only
22   speculation about the possibility that changes
```

1    like these can increase costs to voters and that

2    those costs in turn can lead to decreased

3    participation.  What is absent is any evidence

4    that these kinds of indirect potential costs have

5    been demonstrated to have an actual impact on

6    voter registration or turnout.

7            Did I read that correctly?

8        A    Yes.

9        Q    Okay.  This is your assessment of the

10   introductory paragraphs in Dr. Smith's report; is

11   that right?

12       A    Yes.

13       Q    Okay.  I want to go back over to

14   Exhibit 3, which is the Smith report.

15           You would agree that is -- I'm going to

16   show you the report.  You can take a look.  This

17   is the paragraph you've excerpted, right?

18       A    Yes.

19       Q    And when I go to the report, you'd agree

20   that that is actually Paragraph No. 16 on the Cost

21   of Voting, right?

22       A    I'll take your word for it.  Yes, it

1    looks like it very much.

2        Q    In the introductory paragraphs of the

3    Smith report, we have Purpose of Engagement, we

4    have Qualifications, we have Summary of Findings.

5    You don't see that paragraph in any of these

6    sections, right?

7        A    I don't see it.  You're scrolling

8    quickly, but no, I don't.

9        Q    So we see that as a paragraph here,

10   Paragraph 16, right?

11       A    Correct.

12       Q    Are you aware of anywhere else in the

13   Smith report that this literature is discussed?

14       A    I'm not.

15       Q    Okay.  I'm going to go back to

16   Exhibit 2.

17            When you say in that paragraph I just

18   asked you to read, there is certainly the

19   potential to provide such an empirical assessment,

20   is that, again, a reference to the sort of before

21   and after baseline difference-in-difference

22   analysis that we discussed earlier?

1       A     That is included in it, but there are

2   other empirical assessments that could be made

3   that were not made.

4       Q     And what kinds of other empirical

5   analyses other than those could be made?

6       A     I think what we're, what we're saying

7   here is that we have no evidence that voters

8   incurred a cost in registering to vote because of

9   the adoption of provisions in 7050.  All of these

10  requirements for non-citizens not to be allowed to

11  register, to return registrations in a shorter

12  period of time and the increased fines, those are

13  costs imposed on third parties, they're not costs

14  imposed on voters.  They're imposed on the third

15  parties' efforts to register voters.

16          We don't see any evidence that there

17  were costs imposed on voters as a result of the

18  new requirements in SB 7050 that were imposed on

19  third parties.  Unless I've read the law

20  incorrectly, voters were not fined, voters were

21  not required to return their ballot, excuse me,

22  their registrations in a certain designated time.

1    Only the third parties.

2           So what I would be looking for in that

3    sentence there is certainly the potential to

4    provide such empirical assessment.  It would

5    require evidence that SB 7050 did things to

6    require voters to, particularly of color, to do

7    something that voters, white voters would not have

8    to do to register.

9       Q    Would you agree that the requirement in

10   SB 7050 preventing noncitizens from collecting or

11   handling voter registration applications impacts

12   the ability of those noncitizens to interact with

13   individual voters?

14      A    So when SB 7050 says only citizens can

15   register voters through third parties --

16      Q    Right.

17      A    -- that if there were noncitizens who

18   were registering voters, and now couldn't register

19   them, those same noncitizens could not interact

20   with potential registered voters, no, they could.

21   All the law says is that they can't register them.

22           If you were a noncitizen and you

1   approached me before SB 7050 to register and I

2   took it upon myself to have you fill out my

3   registration, and now SB says, no, Megan Keenan

4   can't register me.  She can still urge me and

5   encourage me to register.  She can still be my

6   friend and talk to me.  But she simply cannot be

7   part of a third party registration.

8          So the answer to your question is no, it

9   doesn't impede the relationship between the

10  noncitizen and the potential registered voter.  It

11  simply prevents that noncitizen from being part of

12  a third party registration activity.

13     Q    Sure, and I can be more precise.  I

14  understand that might be your interpretation of

15  the law at issue.  But you would agree that

16  positing that I'm the noncitizen in this situation

17  per your example, that Megan Keenan can no longer

18  collect or handle a voter registration

19  application, including by handing that application

20  to a voter or collecting it from a voter, you

21  would agree with that?

22     A    Yes.

1          MR. PRATT:  Objection to the form.

2     A    Sorry.

3          THE WITNESS:  Did Josh have something

4    he --

5          MR. PRATT:  Just an objection to form.

6          You can answer.

7     A    So there's no question in my reading of

8    the law that denying noncitizens the right to

9    participate in third party voter registration

10   changes the potential relationship between that

11   noncitizen working with a third party to register

12   voters and the citizen, but it doesn't necessarily

13   prevent that noncitizen from participating in

14   efforts to get people registered to vote.  They

15   just simply can't participate and handle the

16   registration as part of a third party.

17     Q    And I understand that's your

18   interpretation of the law.  That's not the

19   question I'm asking.  I'm just asking if

20   collecting or handling, that's the terms that are

21   expressly prohibited by the law, you would agree

22   that noncitizens cannot collect a voter

1   registration application from a potential voter

2   anymore, right?

3       A    That's correct.  Yes, that's my

4   understanding of the law.

5       Q    Okay.  The next question I have is, and

6   again, you haven't examined any of the

7   declarations by the organizations or individuals

8   who purport to be affected by the potential

9   enforcement of SB 7050, right?

10      A    I may -- I am certain I read them, but I

11  have no detailed recollection of them.

12      Q    And you don't have any basis to dispute

13  them?

14      A    No.

15      Q    Moving on to the bottom of Page 10.  I'm

16  starting with the sentence that says, this is in

17  contrast to the earlier published assessment of

18  Florida's HB 1355 where Herron and Smith report a

19  test of the impact of HB 1355 on registrations for

20  blacks, Hispanics and whites in their Figure 4,

21  reproduced below as Figure 1.  Did I read that

22  correctly?

1      A    Yes.

2           THE WITNESS:  Ms. Keenan, could I just

3   interrupt?  Could I just get a glass of water for

4   five minutes?

5           MS. KEENAN:  Oh, my gosh.  Of course.

6   Absolutely.

7           THE WITNESS:  I apologize, I should have

8   done that earlier.

9           MS. KEENAN:  We can go off the record at

10  11:16.

11          (A recess was taken at 11:16 a.m.)

12          MS. KEENAN:  We can go back on record

13  now at 11:17.

14  BY MS. KEENAN:

15      Q    So you characterized that published

16  assessment of Florida's HB 1355 by saying there is

17  no evidence of statistically significant

18  differences in registration rates among whites,

19  blacks, or Hispanics after the adoption of HB

20  1355, right?

21      A    That's correct.

22      Q    Okay.  First, you would agree HB 1355 is

1     not one of the laws at issue in this case, right?

2          A     That is correct.

3          Q     That law, it was passed in 2011, right?

4          A     That was my recollection.  I would agree

5     with that.  I don't know for certain, but it

6     preceded this SB 7050, yes.

7          Q     Now, I know you told us earlier that

8     this section of the report, and particularly the

9     Smith/Herron article, was Dr. Alford's primary

10    responsibility in drafting the report, right?

11         A     He drafted this section, yes.

12         Q     So to the extent you know, how did you

13    reach the conclusion that the Smith and Herron

14    paper finds no evidence of statistically

15    significant differences in registration among

16    whites, blacks, or Hispanics after the adoption of

17    HB 1355?

18         A     Well, if you -- can you scroll up to the

19    table, figures that we reproduced from the report?

20         Q     Sure.

21         A     So this is the three graphs, and what

22    we've noticed was that they were all

1    significant -- well, we noticed that there were

2    downward sloping lines.

3        Q    So you formed this opinion -- I'm sorry,

4    were you done?  I couldn't tell.

5        A    Yeah -- no, let me -- I was going to

6    tell you -- could you scroll down a little bit to

7    the footnote?

8        Q    Of course.

9        A    So the registration differences by race,

10   registrants no older than 20.  Note:  Light gray

11   lines denote -- this is what they thought, or

12   offered, in their published paper were the effects

13   of this earlier law that also may have impeded

14   voter registrations and its impact on African

15   American, Hispanic and whites.  And when we looked

16   at the table, we saw that the line was steeper

17   after adoption for whites than it was for African

18   Americans and Hispanics.

19           We read in their rebuttal report, I

20   believe it's Mr. Herron's and Smith's, that they

21   have done subsequent analysis that suggested that

22   these slopes were significantly different and

1    greater for non-whites, Hispanics and African

2    Americans, but we didn't see that in the original

3    publication.

4         Q    Okay.  So just to break that down a

5    little bit, you took a look at this figure from

6    the original publication; is that right?

7         A    Correct.

8         Q    And you visually inspected the lines,

9    right?

10        A    Correct.

11        Q    And then you made opinions based on what

12   you thought those lines visually showed in terms

13   of the slopes and the effects they had across

14   groups; does that sound right?

15        A    Go down to our text.  We didn't --

16             You're going up.  Go down.

17        Q    Okay.

18        A    I think, I hope I'm right here.

19        Q    I don't think it's down.

20        A    I'm sorry, you're right, you were going

21   the right way, I apologize.

22        Q    That's okay.

1      A      We just didn't see, there was no

2  evidence of statistically significant differences

3  across these three groups.  We didn't see anything

4  reported in the article that suggested that those

5  slopes were statistically significantly different

6  across the racial groups.

7      Q      Okay.  I'm going to share what's been

8  premarked as Exhibit 5.

9             (Exhibit 5 is marked for identification

10  and is attached to the transcript.)

11      Q      Would you agree this is the Herron and

12  Smith report about the effects of House Bill 1355

13  on voter registration in Florida?

14      A      Yes.

15      Q      This is the paper you discuss in your

16  report, right?

17      A      Correct.

18      Q      And looking here, we see the figures.

19  These resemble the figures in your report, right?

20  I think here is Figure 3, I believe you said it

21  was -- hold on, I'm just going to check my number

22  here.

1          It says their Figure 4 reproduced below

2    as Exhibit 1.

3          MS. KEENAN:  Keep scrolling.  There we

4    are.

5      Q    This is Figure 4 from that article,

6    right?

7      A    That's correct.

8      Q    This is where, this is the article you

9    pulled this figure from when you put it in your

10   report, right?

11     A    Yes.

12     Q    Okay.

13     A    Wait, wait, can you just go up a little

14   bit?  I just want to make certain -- stop.

15     Q    Sure.

16     A    (Reviewing.)

17          Okay.  That's it, that's the figure that

18   we put in our report.

19     Q    Okay.  And give me one second.  I'm

20   having a pagination problem.  I'm going to stop my

21   Screen Share for one second just while I sort

22   something out.

1          Okay, I'm sorry, I'm looking at the

2    wrong page number.  I'm going to reshare my screen

3    again.

4          So we're back where we started.  This is

5    Page 298, Figure 4, what we were just looking at,

6    right?

7        A    Yes.

8        Q    I'm going to scroll up to Page 297, and

9    I'm asking you to take a look at the paragraph,

10   the first word "visually" is highlighted.

11         Go ahead and read that and let me know

12   when you're done reading it.

13       A    (Reviewing.)

14         Yep, I've read it.

15       Q    So this says:  Visually speaking, one

16   takes from Figure 4 the idea that the three main

17   racial groups in Florida all suffered from drops

18   in voter registration in late 2011 as compared

19   with late 2007.

20         Did I read that correctly?

21       A    That's correct.

22       Q    And that's what you were talking about

1    in your report, that visually speaking, it looks

2    like they all suffered drops.  It looked to you

3    like white voters suffered a more significant

4    drop, right?

5        A    Can you just stop for that and go back

6    to our report for a moment?

7        Q    Of course.

8        A    Because I know where you're going to go

9    and I want to speed you up.  Can you go to the

10   text above, I think it is, where we say, let me

11   emphasize -- read the last sentence in that

12   paragraph.

13       Q    I think that's the one I read you when

14   we started.  There is no evidence of statistically

15   significant --

16       A    There is no evidence of statistically

17   significant, what's the next word, differences in

18   the registration rates among white, blacks, or

19   Hispanics after the adoption.  You with me?  So

20   what are we comparing here?  Are we comparing

21   whites, blacks and Hispanics to each other, or are

22   we comparing whites to time, blacks to time, and

1    Hispanics.  The answer is we're comparing white

2    registrations to black registrations, black

3    registrations to Hispanics, and Hispanics to

4    whites.

5            Now, go back to the article, to Page

6    297.  Read carefully, and John will want to be

7    involved in this as well.  Where was the

8    highlight?  There is -- keep on reading,

9    nonetheless, when we fit regressions to the

10    registration differences in the three panels, one

11    of the six estimates of coefficient times, the

12    only statistically significant estimate is that

13    for African Americans.  So what are we comparing

14    here?  African Americans to time, whites to time,

15    Hispanics.

16            That is not the question John and I

17    raised.  We want to know whether the slopes in

18    figure, just below, go below, scroll down just a

19    little bit.  Are those slopes significantly

20    different from each other, not whether they're

21    significantly different from time.

22            I'm sure you're aware of this, but there

1   is a difference between significance, magnitude of

2   effect, and we're asking a different question.

3   We're asking was the drop that we see here

4   significantly different for Hispanics and whites,

5   whites and blacks, not whether it was

6   significantly different from time.

7        Q    So I have a couple of follow-up

8   questions.

9        A    Do you understand that difference?

10        Q    Of course, I understand that difference,

11   but it sounds like you're saying --

12        A    Hold on.  I haven't finished my answer.

13        Q    Sir, respectfully, I'm asking the

14   questions, and if you ask me a question, it's my

15   turn to speak.

16        A    All right.

17        Q    I'm asking you the question.  It sounds

18   like what you're saying is that this report you

19   cited and the report you conducted are asking

20   different questions.  Is that what you're saying?

21        A    That is substantially correct.

22        Q    Okay.

1      A     Not only are we asking a different

2   question, but as I'm sure you know, in the

3   rebuttal report from Herron and Smith, both

4   address this particular table, they shift over to

5   the question that we were asking and offer

6   evidence to show that there are significant

7   differences in these slopes across different

8   racial and ethnic groups, evidence that we didn't

9   have at the time of their original report.

10      Q     Sure.  But what you're doing here is

11   you're contrasting, you're saying they do not

12   offer any empirical -- back in your report, just

13   for the record, Exhibit 2, starting on Page 11.

14           You're saying Dr. Herron and Dr. Smith

15   are able to conclude that blacks and Hispanics are

16   more likely to be registered via 3PVROs than are

17   non-Hispanic whites, but they do not offer any

18   empirical evidence to support the speculation that

19   the impact of SB 7050 on actual voter registration

20   rates has been different for these groups.  I read

21   that correctly, right?

22      A     Correct.

1      Q      And you're saying that is the question

2   about whether, comparing those slopes to each

3   other, right?

4      A      Correct.

5      Q      But then you say, this is in contrast to

6   the earlier published assessment of Florida's

7   HB 1355 where Herron and Smith report a test of

8   the impact of HB 1355 on registrations for blacks,

9   Hispanics, and whites in their Figure 4, right?

10  So you're contrasting this report with what we

11  just looked at, Exhibit 5, right?

12     A      Correct.

13     Q      But now you're saying that Exhibit 5

14  doesn't perform a comparison of those slopes,

15  right?

16     A      It does.

17            MR. PRATT:  Objection.

18     A      Can I talk?  It does show a contrasting

19  difference between the impact of the, I forgot the

20  name, 1355 on blacks, whites and Hispanics.  It

21  just doesn't test for the significance of it.  It

22  only tests for the significance over time.  So

1    it's time versus Hispanic, African America and

2    white.  It doesn't compare the slopes.

3            So they show a picture that compares

4    slopes, but they don't test the difference of

5    those slopes.

6        Q    Right.  What they're doing is comparing

7    against time like you said before, right?

8        A    Correct.

9        Q    Not comparing the slopes, right?

10       A    Correct.  But they have evidence --

11       Q    In contrast to the earlier published

12   assessment where they reported tests on the impact

13   of HB 1355 on registration for blacks, Hispanics

14   and whites in their Figure 4, what they were doing

15   is reporting a test of the impact on registrations

16   for those groups against time, not against each

17   other, right?

18       A    They did both.  Maybe I should be -- you

19   didn't hear me the first time.  If you look at the

20   table in the journal article, the figure, that

21   contrasts, to me, if you looked at the slope for

22   whites, don't you think that's steeper than the

1    slope for blacks and Hispanics?

2         Q    I'm not going to speak to what these

3    tables show.  I'm not a political scientist.  I'm

4    saying what the report says.

5         A    I will answer the question this way.

6    They show a picture that to any reasonable person

7    would suggest that the slope, the decline is

8    greater among whites than it is Hispanics and

9    African Americans.  But they report in the second

10   paragraph above that the slope was only

11   significant for African Americans, not Hispanics

12   and not whites.

13             So they answer both questions, but leave

14   us wondering whether or not the statistically

15   significant differences in those slopes between

16   racial groups has been answered.  That's all.  The

17   picture tells me --

18        Q    You would agree -- go ahead, sorry.  I

19   thought you were done.

20        A    -- there would have been a statistical

21   test, which by the way they do perform in their

22   rebuttal report so it's not like they didn't think

1    it was important, they just didn't think it was

2    important to do when they wrote the article in

3    2014.

4              So we're sort of left with, again, and I

5    think you're right, we do have, we do ask

6    different questions.  We asked whether this was

7    consequential for disparate effects of SB 7050 or

8    1355 on these different racial groups.  But the

9    evidence is like, it's right in front of me.  That

10   line for the whites is steeper, and I would

11   imagine if we had 100 people walking into this

12   Zoom they would say, yeah, it looks like a bigger

13   drop.  Now whether it's statistically significant

14   is another question.

15        Q    And that's the question that's not

16   answered in the report, right?

17        A    In this paper, it's answered.  In the

18   report, it's not addressed.

19        Q    In this paper on our screen, Exhibit 5,

20   you think that question is answered?  That the

21   differences across in the slopes --

22        A    No, no.

1        Q      -- was significantly significant?

2        A      Let me go back.  All they're telling you

3    is that these drops in slopes are only significant

4    for African Americans.

5        Q      Right.

6        A      But nonetheless, the question that

7    remains unanswered, but visually suggestive, is

8    that these slopes are not the same, and are they

9    significantly different between each other.

10       Q      And like you just said, that question of

11   whether there are statistical differences between

12   the slopes is not answered in this paper that you

13   called attention to in your report --

14       A      That is correct.

15       Q      -- right?

16              Okay.  I'm going to go back to your

17   report, then.

18              Okay.  I'm going to move on to the

19   bottom of Page 13 now that we have discussed that

20   figure.  Do you see the sentence that begins with,

21   in addition to the limited empirical test

22   discussed above?

1        A     Yes.

2        Q     Can you explain what you mean here by

3   limited empirical test?

4        A     Well, we didn't get -- go up and I'll

5   read it again.

6              Little further.

7              Up, up, up.

8              There is no evidence of statistically

9   significant differences in registration rates

10  among whites, blacks or Hispanics after the

11  adoption of 1355.

12             Now go down, and that first statement

13  that says, in addition to the limited empirical

14  test, that limited empirical test refers to the

15  last sentence of the paragraph above the figure.

16       Q     So you're referring to the limited

17  empirical test that the experts performed in

18  relation to a different line in 2011?

19       A     Yeah, in addition to the limited

20  empirical test discussed above.  What was

21  discussed above?

22       Q     Well, there's a lot discussed above,

1    that's why I'm asking.  You talked about Lichtman,

2    you talked about Herron, you talked about Smith

3    and then you talked about this article.

4          A    Okay.

5          Q    So I'm just trying to understand.  This

6    is no longer about HB 1355, so that's why I'm

7    trying to figure out what you're referencing back

8    up to.

9          A    It is, in addition to their limited

10   empirical test discussed above, both 1355 and what

11   is discussed earlier regarding the best way to

12   evaluate the impact of 13 -- I'm sorry, of 7050.

13   So it refers to both, the 1350 paper -- 1355

14   paper, and it refers to our overall critique that

15   they did not test what we think is a key question,

16   what is the impact of 7050 on voter registration

17   differences among blacks and Hispanics.  So it

18   encompasses everything above.

19         Q    Okay.  Do you believe that the experts

20   conducted any limited empirical tests in their

21   reports in this case?

22         A    Yes.

1        Q      And can you explain what that is for

2    Dr. -- not Dr. Herron, but Dr. Smith, what's the

3    limited empirical test that you believe Dr. Smith

4    conducted in this case, just so I have an

5    understanding of what you mean?

6        A      Okay.  It is our understanding that, if

7    you're parsing the two reports separately, in

8    Dr. Smith's case, he's contesting, or he's, he's

9    showing, or he's claiming that by limiting the

10   ability, that the provisions of SB 7050 impede the

11   registration rates of non-whites.  And we don't

12   think that he has conducted the type of analysis

13   that shows that.  He has only shown that a

14   disproportionately larger number of non-whites

15   registered through third parties than register --

16   than whites.  That is the number of people who

17   register by third parties as a percentage of the

18   total number of third party registrations is

19   skewed towards non-whites.

20            And he's shown there is reason to

21   believe that the adoption and implementation of

22   SB 7050 has curtailed the rate at which non-whites

1   register through third parties.  He has not

2   answered the question, does this have

3   consequential effects on the overall registration

4   rates between whites and non-whites.  And we think

5   the design we suggested above is a preferred

6   design for doing that.

7        Q    And I understand you're focused on that

8   disparate impact question, but you would agree

9   that in the Summary of Findings, and I'm back at

10  Exhibit 3 in Dr. Smith's report, I'm just looking

11  at the Summary of Findings as a summary of what

12  his report was about, the first one doesn't have

13  anything to do with rates or disparate impact,

14  right?

15       A    That's correct.

16       Q    Okay.  What about the second one?

17       A    No, it doesn't.

18       Q    How about Paragraph 9?

19       A    No, it doesn't.

20       Q    What about Paragraphs 10, 11, and 12?

21       A    It doesn't.

22       Q    Okay.  What about Paragraph 13 and 14?

1        A      Well, there -- at 14 and 15 they do.

2    Particularly 15.

3        Q      Where in 14 does it reference race or

4    disparate impact?

5        A      Only in 15.

6        Q      Okay.  So the Summary of Findings

7    includes Paragraphs 7 through 15, and you're

8    saying in Paragraph 15, I'm just going to read it

9    aloud, says:

10            According to FDOE data, voters of color

11   and voters living in a dozen counties that account

12   for more than 7 million registered voters in

13   Florida rely most heavily on 3PVROs.

14            Did I read that correctly?

15       A      Yes.

16       Q      And so when you're saying the question

17   that Dr. Smith was trying to answer is about

18   disparate impact, that's because of the word

19   "rely," right?

20       A      That's correct.

21       Q      Okay.  But you would agree that if this

22   paragraph just said, voters of color and voters

1  living in a dozen counties disproportionately

2  register through 3PVROs, you would not dispute

3  that, right?

4      A    I would not dispute that in his report

5  or in Professor Herron's report.

6      Q    So it's really just the word "rely" and

7  then Paragraph 15 in the entire Smith report that

8  you're taking any issue with; is that right?

9      A    If we look at Smith's report, and of

10  course, I include Herron's in this, my

11  understanding is that he shows that voters of

12  color rely heavily on third party voter

13  registrations, and I don't take issue with that.

14      Q    Okay.  All right.  I'm going to return

15  to your report, then.

16          And to the extent, I guess, to the

17  extent that's the empirical work that Dr. Smith

18  does in his report, you don't contest any of that

19  empirical evidence, do you?

20      A    I would not contest the empirical

21  finding in Paragraph -- is it 15, of his, of

22  Dr. Smith's report.  And maybe I'm reading into

1    the report, the consequences of that would suggest

2    that this impedes voter registration among

3    non-whites.

4         Q    Sure.  I think you can have causal

5    concerns about that, but not with the actual

6    content of Dr. Smith's report, right?

7         A    I would say that there is nothing in 15,

8    and for that matter, regarding the previous

9    paragraphs, that I would disagree with on the

10   reliance of third party registrations.  The

11   conclusion that this implies is that this imposes

12   costs on voter registration and therefore impedes

13   voter registration among non-whites.

14        Q    Okay.

15        A    And let me go back to the report, if you

16   would, just for a second, or go to the laws

17   restricting voter registration efforts by 3PVROs

18   increase the costs of voting and can lead to voter

19   disenfranchisement, including those already

20   registered to vote.  That is what we think is the

21   lacking empirical evidence.

22        Q    Sure.  It's that line in Paragraph 16,

1    like I said.

2            Okay.  But you don't see that conclusion

3    anywhere else in the report, do you?  And

4    certainly not in the data relied upon in this

5    report, or the empirical analysis that Dr. Smith

6    does, right?

7            MR. PRATT:  Objection to form.

8    A    So let's go back up to that quote again.

9    Q    Sure.

10   A    I want to be certain I'm reading it

11   right.

12   Q    This is 16, right?

13   A    Right.  That conclusion or statement or

14   sentence, I mean Dr. Smith is an efficient writer

15   and didn't need to repeat himself, but it says,

16   laws restricting voter registration efforts by

17   3PVROs increase the costs of voting and can lead

18   to voter disenfranchisement.

19           We don't believe the empirical evidence

20   supports that conclusion.  We're not taking issue

21   with the earlier statement in 15, but this seems

22   to suggest that the whole reason for restricting

1   third party voter registrations is to limit voter

2   registration and voter participation, particularly

3   among non-whites, and we don't think that that

4   conclusion is supported by the evidence.  Only

5   that third party registrations are more widely

6   used by non-whites.

7        Q    And I just want to be clear.  You took

8   that from the sentence that says, laws restricting

9   voter registration by 3PVROs increase the costs of

10  voting and can lead to voter disenfranchisement of

11  eligible citizens, including of those already

12  registered to vote, right?

13       A    And if -- keep on reading.  It goes into

14  full effect.

15       Q    Right.  If SB 7050 goes into full

16  effect, the costs of voting for all eligible

17  citizens residing in Florida who seek to become

18  registered to vote, as well as to individuals

19  currently registered to vote in Florida who want

20  to update their registrations, will likely

21  increase, right?

22       A    Right.

1        Q      But certainly that sentence doesn't say

2   anything about differences by race or disparate

3   impact, does it?

4        A      All one has to do is read Paragraph 15.

5   If you go up to 15.

6        Q      Which you don't disagree with?

7               MR. PRATT:  Counsel, if you could please

8   let him finish the answer, please.  Thank you.

9        A      Could you go up to 15?

10       Q      Sure.

11       A      It preceded 16.  I read 15 to suggest

12  that non-whites rely on third party registrations.

13              When I read 16, it doesn't take a leap

14  of faith to suggest that the restrictions on voter

15  registration efforts by third party voter

16  organizations, or third party registrations will

17  not only increase the costs, but do it disparately

18  for non-whites.  Maybe I'm reading much into

19  David, into David -- into Dan's statements, but I

20  think that's a reasonable interpretation of 15 and

21  16.

22       Q      Well, I want to be clear what you're

1    inferring and what the report says.  What the

2    report says in 15 you don't disagree with.  You've

3    said that a number of times on the record, right?

4         A    The report --

5         Q    What the report says in Paragraph 15,

6    you don't disagree with that.  You've said that a

7    number of times, right?

8              MR. PRATT:  Objection.  Form.

9         A    We found no evidence to suggest or no

10   analysis to suggest that more non-whites register

11   by third parties.  We also found in 16 reason to

12   believe that if you restrict third party

13   registrations, you will restrict non-white

14   registrations.  That's what we contest.  That's

15   what we think is deficient.

16        Q    But not Paragraph 15, right?

17        A    No.

18        Q    Okay.  And what you're saying is if the

19   last sentence of Paragraph 16 is true, I'm going

20   to read it again, if SB 7050 goes into full

21   effect, the costs of voting for all eligible

22   citizens residing in Florida who seek to become

1    registered to vote, as well as to individuals

2    currently registered to vote in Florida who want

3    to update their registrations, will likely

4    increase.

5            You're saying if that sentence were

6    true, it would necessarily imply that non-white

7    citizens would be disproportionately impacted and

8    that's why you're quibbling with it, right?

9        A    No.

10       Q    Okay, then I don't think I understand at

11   all what you're saying about the relationship

12   between 15 and 16.  15 you haven't disputed, but

13   16 you're saying you dispute because of something

14   in 15, so I'm not sure I understand the

15   relationship you're drawing.

16           MR. PRATT:  Objection.  Form.

17       A    I didn't hear a question, so I'm not

18   being silent, I'm just -- is there a question

19   here?

20       Q    Tell me where I'm going wrong about why,

21   how these two sentences, the last one, why do you

22   keep drawing it back to 15 is the question I'm

1    going to ask you.  I read these two as stand-alone

2    sentences.  I'm asking why you keep drawing it

3    back to 15?

4         A    I think I've answered your question

5    before.

6         Q    I'd like you to answer it because I

7    don't believe that you have.  The question being

8    why you are drawing the last sentence of 16 back

9    up with 15 in describing your objection to it?

10        A    If -- what was my objection?  I'm not

11   certain I understood.  You said --

12        Q    I don't understand it either.  That's

13   what I'm trying to get to the bottom of.

14        A    Okay, well, I'll repeat it one more

15   time.  15 suggests, and we don't contest, that

16   more people of color register by third parties

17   than do whites.

18             The charge in the last sentence is that

19   if you adopt and implement 7050, you'll increase

20   the costs for all eligible voters, but

21   disproportionately so for non-white voters given

22   what we know in 15.

1           It seems logical to conclude that if, in

2   fact, more people register as a proportion of

3   total population by third parties who are

4   non-white, that if you restrict third party

5   registrations, you will, in fact,

6   disproportionately impede non-white registrations.

7   That we contest.

8           It's not -- I mean the language you're

9   looking for, the black letter language you're

10  looking for is not in Smith's report.  And I will

11  only say that the inference is to me very strong

12  that what is suggested here is that SB 7050, if it

13  goes into effect, and has at times, my

14  understanding, has gone into effect, will increase

15  the costs of registering to vote for non-whites

16  and impede their ability to register.  That's how

17  I read the Paragraphs 15 and 16.

18          And we don't think that that has been

19  substantiated in Herron's report.  And again, in

20  this report, we find no empirical evidence to show

21  that it will impede non-white registrations, and

22  for that matter, white registrations.  We don't

1    see any evidence of that.  And we don't see the

2    design that would test it.

3         Q    Okay.  I think I've got it now.  I'm

4    going to move on to what you discuss here on the

5    bottom of Page 13 into 14.  You describe a

6    cost-benefit theory for how SB 7050 could impact

7    voter registration, all other things being equal,

8    that you saw in Dr. Smith's report.

9              Other than -- I'm going back to

10   Exhibit 3.  Other than Paragraph 16, can you

11   explain what you're talking about when you talk

12   about the cost-benefit theory in Dr. Smith's

13   report?

14        A    Well, if you go back up to an earlier --

15   and again, I don't have control over this so

16   you'll have to just keep --

17        Q    I can scroll.

18        A    It refers to a body of research on the

19   costs of voting.

20        Q    That's the same paragraph.  One second.

21   That's here.

22        A    Here we go.

1      Q     That's Paragraph 16.  Other than

2   Paragraph 16, is there anywhere that the

3   cost-benefit theory appears in Dr. Smith's report?

4      A     Not that I know of.  I mean I'm sure

5   it -- he refers -- this is where he makes his case

6   for the cost of voting.

7      Q     When you say I'm sure, do you mean

8   you're sure he doesn't reference it elsewhere, or

9   you're sure he does reference it elsewhere?

10     A     It's referenced here.  I don't know if

11  it's referenced -- my knowledge of the report

12  isn't photographic, so if we could do a word

13  search.  But it's sufficient for me to say that he

14  makes the argument that the cost of voting theory

15  will have this impact on registration.

16     Q     Okay.  But I want to be clear about how

17  far this extends into your critique of the Smith

18  report, so I'm happy to scroll through.  I don't

19  see it anywhere else in the report.  We can go

20  page-by-page if that would be helpful.

21     A     Well, the argument that Professor Smith

22  makes is if you increase the cost of voter

1    registration, and we contest that, we don't think

2    that SB 7050 increases the cost of registering for

3    voters, it increases the cost for third parties to

4    register voters.  That's Distinction No. 1.

5                 Distinction No. 2 is that there is a

6    literature on the cost of voting that suggests, as

7    Professor Smith writes here, that legal

8    restrictions on the exercise of the franchise can

9    create institutional barriers to participation,

10   which impart significant burdens on and lower the

11   probability of voting.

12                I don't know where that quote -- I guess

13   it comes from Hansen and Rosen -- Rosenstone and

14   Hansen.  That's a 1993 citation.

15                If you go to my report, you'll find that

16   I discuss a whole bunch of legislation that was

17   adopted to reduce the cost of voting or to

18   increase the cost of voting, voter ID, early

19   voting, and election day voting.  And in every

20   instance, the theory of cost of voting, sometimes

21   known also as rational choice theory, doesn't

22   produce the desired effect of the law.  If you

1    make it easier for people to vote, they don't

2    vote.  If you impose a cost, a voter ID, a

3    photographic voter ID, which would presume to

4    increase the cost for people to vote, it actually

5    doesn't have any substantial effect.  In fact,

6    early voting, which was thought to be probably the

7    most costless means of voting, has produced

8    negative effects on turnout.

9            So my point is that this explanation

10   fails to take into consideration a whole host of

11   confounders which in the report Dan Smith reports

12   about.  There may be other confounders.  So we

13   just find the cost of voting argument and the

14   expectation in the out years after SB 7050 is

15   further implemented not to be intuitive and may,

16   in fact, not produce the effects that he discusses

17   here.

18       Q    So I was going to get into that second

19   paragraph, that second half of your report

20   starting on Page 14, but first, you mentioned that

21   the first objection you had before you get into

22   the literature was that the costs are actually on

1    the third parties and not on voters.  That opinion

2    is not contained in your report, is it?

3         A    No, it is not.  It is not.  It's a

4    response I made, my response today to the rebuttal

5    report, which I didn't have when I wrote this

6    report.

7         Q    And which you didn't write any sort of

8    supplemental report about?

9         A    I have not written a supplemental report

10   on the rebuttal report, no, I have not.

11        Q    So now let's go into this Cost-Benefit

12   Theory to Voter Registration and Turnout section.

13   Here you suggest that the cost-benefit theory,

14   that they are, these assertions are inherently

15   speculative as the careful conditional wording of

16   them would suggest.

17             I take it that's the use in Exhibit 3 of

18   the words "can lead" and "will likely increase;"

19   is that what you mean by the "conditional

20   language"?

21        A    Yes.

22        Q    And so is your objection that this is --

1   I'll rephrase.

2        Do you think that an observation has to

3   be a certainty rather than a prediction in order

4   to constitute a valid expert opinion?

5        A    I think it has to be tempered against

6   the evidence.  They cite Rosenstone and Hansen.

7   That's a 1993 paper.  They know a vast body of

8   literature that has been published since then that

9   would lessen, or should have lessened, their

10  confidence that it would likely increase or,

11  what's the other phrase, can lead.  I think they

12  should have been aware of the fact that there is a

13  host of research that shows that election laws

14  adopted to decrease or increase the cost of voting

15  has not produced those effects.  And they should

16  have been aware of the fact that the non-intuitive

17  findings from this research can be explained by a

18  bunch of other conditional relationships.

19        I can explain those conditional

20  relationships if you are interested.  But these

21  are fine scholars, and I want to be very clear, I

22  have a high regard for their work.  They should

1   have -- I know they know this work because it's

2   cited in their papers published on their Vitae.

3          They know about the research on voter ID

4   laws, they know about the research on voter

5   turnout from early voting.  They should have been

6   more circumspect and suggested there were

7   intervening variables that can affect the impact

8   of voting laws that seem to have an effect on

9   cost.  Most scholars no longer believe the cost of

10  voting is a direct and unimpeded relationship.

11  It's complicated.

12     Q    So you drew attention to the 1993 study

13  that I'm highlighting here in Paragraph 15.  You'd

14  agree there are also studies from 1978, 1993,

15  1995, 2011, 2013 and 2018, right, in this

16  paragraph?

17     A    Yeah, but I don't want to be picky here.

18  The Rosenstone and Wolfinger papers on voter

19  registration, 1978, and the Aldrich as well, that

20  world has changed.  Verba, Schlozman and Brady, I

21  don't know why it was cited.  The Brady and

22  McNulty paper is all about changing boundaries to

1    precincts.  The Leighley/Nagler paper actually

2    doesn't support the conclusion they're making

3    here.

4             If you read their book, you would know

5    that they had, actually point out how early voting

6    has a negative effect on voter turnout.

7             The Piemonte, et al. paper is probably

8    the strongest piece of evidence that increasing

9    obstacles and legal restraints on registering and

10   voting, and not just registering, but on voting,

11   can impede turnout.

12            But some of these citations I'm a little

13   confused about and would not, if we looked at them

14   carefully, they would not be, I think you in the

15   lawyer world call it on point.  They would not

16   talk about either registration or even always

17   about the cost of voting.  Nevertheless --

18        Q    Go ahead.

19        A    I'll stop there.

20        Q    The Piemonte one that you just cited is

21   the most recent paper.  That's the one you said is

22   the most on point, right?

1      A     That is not the most recent paper.  I'm

2    surprised they didn't cite the 2023 paper that

3    just came out, or 2020 --

4      Q     The most recent paper cited in their

5    report I'm saying.

6      A     In their report.  And looks at a host of

7    other, what I will call obstacles to voting, but

8    not necessarily costs.

9            I should note that the Piemonte paper

10   doesn't directly test the cost hypothesis.  It

11   simply says here are some measures that cohere

12   together that purport to represent costs of

13   voting.

14     Q     Okay.  Is that in your report?

15     A     No, no.

16     Q     What about your opinion that you just

17   gave about this 2013 cite not being on point, is

18   that in your report?

19     A     Actually I cite the Leighley and Nagler,

20   I think I, I could be wrong, but in my report I

21   probably cited at least the Leighley paper --

22   book, if not the Lee and Piemonte as examples of

1    research that has shown that we get what we call

2    non-intuitive or counterintuitive findings about

3    the costs of voting.

4         Q    Okay.  Do you know where you said that

5    in your report?

6         A    Yes.  Let's keep on going on.  Go down

7    to the citations.

8              Stop right there.

9              This is on voter -- I was wrong, I did

10   not cite -- just keep on -- I can't remember all

11   the citations.

12        Q    Sure.

13        A    (Reading.)

14             No, I don't think I cited any of those

15   citations.

16        Q    Okay.  So the next thing I was going to

17   ask you about is -- oh, you would agree you've

18   previously made predictions in your work as an

19   expert witness, right?

20        A    Say that again.

21        Q    You would agree you've previously made

22   predictions in your work as an expert witness?

1       A       I'm sorry, you're breaking up.  I

2   couldn't hear the first part about, what about

3   predictions?

4       Q       You would agree that you have previously

5   made predictions in your work as an expert

6   witness, right?

7       A       I have made predictions, in this case?

8       Q       No, no, just in your work as an expert

9   witness in Federal Court.

10      A       I wouldn't use the word "prediction,"

11  no.  I'm simply drawing conclusions that lead to

12  reasonable hypotheses about what might likely

13  happen.  And I think predictions would be fair.  I

14  have made probabilistic statements about the

15  likelihood of certain election laws producing

16  certain types of effects.  So yeah, I've made --

17  the word "prediction" would be not one I would

18  use.  I'd simply say likelihood of something

19  happening.  And I do it in this case as well.

20      Q       Okay.  Just as to the word

21  "predictions," I'm going to go to what's been

22  marked as Exhibit 10 briefly.  This is that

1  deposition in the District Court in Arizona that

2  we talked about previously.

3       I'm on Page 85, Line 9, the question

4  says:  And, Professor Stein, you, yourself, have

5  made predictions as an expert witness, correct?

6       And in Line 12 it says the witness says,

7  yes, yes.

8       And Line 14 says, under penalty of

9  perjury in Federal Court, correct?

10       And in Line 16 the answer says yes.

11       Did I read that correctly?

12  A    Yes.

13  Q    I can just keep going just to make it a

14  little bit easier.  This next section of the

15  deposition is about that Boockvar case that you

16  submitted a report in; do you recall that?

17  A    Yes.

18  Q    And this question is looking at Page 10

19  of that report, and you say it reflects what you

20  wrote at that time.  In that report you stated,

21  quote, it is my considered opinion that expanding

22  mail-in voting and providing drop boxes should

1    serve as a corrective for the depressing effects

2    the COVID-19 pandemic will likely have on voter

3    turnout.

4            Did I read that correctly?

5        A    Yes.

6        Q    So you've even used the words "will

7    likely have" in your expert reports, right?

8        A    Yes.  I have made statements about what

9    I think is likely to occur.  I would probably

10   have, and I did use, the word "prediction," so I

11   am corrected, but I would not have used that word

12   "prediction," I would have said likely.  The

13   language I used in the Pennsylvania case is more

14   preferable.

15       Q    Sure.

16           Going back to your report, Exhibit 2,

17   again, I'm going to go back up to where we were on

18   Page 14.  You say, thus, their reliance on

19   rational choice theory to predict the impact of SB

20   7050 is incomplete and overlooks research that

21   offers alternative explanations about how this

22   legislation might impact voter registration and

1    voting.

2           I understand -- we'll get to in a minute

3    the reasons you think it is incomplete and

4    overlooks research, but my question is slightly

5    different right now, which is, are you offering

6    any opinion that rational choice theory is not a

7    legitimate means of work in political science?

8       A    Oh, no, no.  I mean it's been a

9    cornerstone of the profession.

10      Q    Okay.  So moving on to the section that

11   you say you drafted, that's the Effect of Past

12   Election Laws on Voter Turnout, your report says

13   there are two bodies of research that are relevant

14   in assessing the potential effect of SB 7050 on

15   voting that you argue Professor Smith overlooked.

16          Did I read that correctly?

17      A    Yes.

18      Q    I want to break those two apart.  First,

19   you say a significant number of research papers,

20   cited and discussed below, have shown the effect

21   of election laws intended to reduce the costs of

22   voting, or alleged to increase the costs of

1    voting, have either null or minimal and

2    non-consequential effects on voting.

3            I read that correctly, right?

4        A    Yes.

5        Q    And those are the ones you discuss down

6    here on early voting, on voter ID and that sort of

7    thing.  Am I understanding the relationship

8    between those correctly when you say "cited and

9    discussed below"?

10       A    Yes, yes.  I mean that includes that,

11   but it's not exclusive of the second.

12       Q    The second body of research, also cited

13   and discussed below, you say it posits the

14   relationship between voting and the costs of

15   voting is mediated through or conditional on other

16   factors which either enhance or mute the effect of

17   election laws on voting.

18           Did I read that correctly?

19       A    Yes.

20       Q    And you cite the Grimmer and Hersh paper

21   as something that best summarizes this body of

22   research; is that right?

1      A     Yes.

2      Q     And you linked to that paper in your

3 report in Footnote 3, right?

4      A     Yes.

5      Q     I'm now going to share what's been

6 premarked as Exhibit 6, this is the Grimmer and

7 Hersh report titled How Election Rules Affect Who

8 Wins, right?

9            (Exhibit 6 was marked for identification

10 and is attached to the transcript.)

11      A     Yes.

12      Q     Fair to say you're familiar with this

13 report?

14      A     Yes.

15      Q     I'm going to go on Page 2, and I want to

16 talk about what this paper is studying.  On Page

17 2, I'm starting with this paragraph that says, and

18 the evidence shows the laws have small effects on

19 turnout and essentially no effect on partisan

20 advantage in a state.  Did I read that correctly?

21      A     Yes.

22      Q     And the next sentence says, this is the

1  puzzle we address:  Why do election laws bear such

2  a modest relationship to who wins and who loses,

3  right?

4       A    Correct.

5       Q    The paper goes on to say, our answer is

6  that modern election reforms target narrow shares

7  of the population, have a small effect on turnout,

8  and/or are imprecisely targeted at members of

9  political parties.

10           Did I read that correctly?

11      A    Yes.

12      Q    Okay.  So this report is focusing on the

13  impact of election reforms on voter turnout, and

14  specifically on the partisan effect of those

15  reforms, right?

16      A    Yes.

17      Q    Okay.  The report doesn't purport to

18  address the effect of any laws on registration

19  rates alone, right?

20      A    Say that again.

21      Q    Sure.  I understand, just to give you

22  context, I understand the report addresses the

1    effect on turnout, but the report doesn't purport

2    to address the effect of any of these laws on

3    registration rates alone, just on turnout, right?

4         A    No.

5         Q    Where does the report address the effect

6    of the laws on registration rates specifically?

7         A    Repeat, could you repeat your question

8    that you originally asked?

9         Q    Sure.

10         A    Two parts to the question.

11         Q    I think I said I understand the report

12    purports to address ultimate turnout, right, and I

13    think you said yes, right?

14         A    No.

15         Q    You do not think that the report

16    addresses turnout?

17         A    Hold on.  Could you go back and read

18    what the paper -- you read it to me already so why

19    are you asking -- it purports to study turnout and

20    partisan vote shares, but --

21         Q    Right.

22         A    Okay.

1        Q     Oh, yeah, I'm not trying to exclude the

2    partisan effect.

3        A     I don't recall.  I'd have to reread it

4    and search that it specifically addresses issues

5    of voter registration.

6        Q     Okay.  I'm going to ask you about

7    something that it does say about registration, so

8    my question is whether you recall that it

9    addresses the effect of any laws on registration

10   rates.

11       A     I don't recall.

12       Q     So I'm going to go to Page 6 of this

13   report.

14             See the Section 2.1, the Scope of

15   Election Laws?

16       A     Yes.

17       Q     Okay.  This report does purport to

18   discuss several registration rules, is the term

19   they use, for example, same-day registration,

20   automatic registration, online registration, and

21   preregistration.  Do you see that there in the

22   report?

1        A      Yes.

2        Q      And then on Page 7 the paper cites a

3   series of studies showing that those laws do

4   affect turnout.  Would you agree with that?

5        A      Do you read that, as Menger and Stein

6   note, much of the research on the effects of these

7   laws on turnout relies on -- yeah, I know that

8   work.

9               And go back up to what you have cited as

10  voter registration laws.

11       Q      Sure.  Registration rules, same-day

12  registration, automatic, online and

13  preregistration.

14       A      Yes, they've all --

15       Q      Okay.  Go ahead.

16       A      Those are research, particularly on

17  same-day registration, do have positive effects on

18  turnout.

19       Q      And so the studies cited here in

20  Paragraph 7 in particular, I don't need to read

21  the whole thing out loud to you, you can read it

22  to yourself, would you agree that the studies

1    cited here report an increase in voter turnout by

2    between one and 5.8 percent on the various

3    registration rules discussed here?

4          A    Yes.

5               MR. PRATT:  Objection.  Form.

6          A    Well, I mean it talks about in-person,

7    vote by mail, it talks about preregistration of

8    young adults, automatic registration, and of

9    course, same-day registration all have been shown

10   to have significant and positive effects on voter

11   turnout.

12         Q    Okay.

13         A    I should note just for passing, I didn't

14   see in this third party registrations.

15         Q    To your knowledge, does this report

16   discuss third party registrations?

17         A    To my knowledge, I don't recall it

18   having discussed third party registrations.

19         Q    You would agree each of the rules that

20   you just talked about increase access to

21   registration, right?

22         A    Yes.

1      Q    This paper, to the best of your
2  knowledge, doesn't examine the effect of voter
3  registration rules that decrease avenues for
4  registering voters, right?
5      A    Not to my knowledge, no.
6      Q    And like you said, it doesn't say
7  anything about 3PVROs specifically, does it?
8      A    No, it does not.  Not to my -- I don't
9  recall.
10     Q    I'm going to move ahead to Pages 10 --
11  okay, so this is the part of the paper about
12  modeling how election laws affect outcomes, right?
13     A    Yes.
14     Q    Okay.  And in particular this is the
15  part of the paper that talks about trying to
16  determine the partisan effect of a law, right?
17     A    Yes.
18     Q    Would you agree that nothing in
19  Dr. Smith's report purports to be identifying the
20  partisan effect of SB 7050?
21     A    I would agree with that.
22     Q    Would you agree that the effect of a law

1    on race is not the same as the effect of a law on

2    party?

3            A    No.

4            Q    You would disagree with that?

5            A    I think there is substantial research in

6    the discipline, I think that's not a, that is not

7    yet a fixed judgment.  The high correlation

8    between partisanship and racial voting is the

9    subject of lots of research, and I'm inclined to

10   believe there is a relationship, although I do not

11   believe it to be one-to-one.

12           Q    So in the paper that you say best

13   summarizes the theory described in your report, it

14   says expressly, quote, the effect of a law on race

15   is not the same as the effect of a law on party.

16   That's at Page 26 of the same paper.  You disagree

17   with that is what you're telling us?

18           A    No, I completely agree with it.  It's

19   just --

20           Q    I think what I asked you --

21           A    Excuse me, can I finish?

22           Q    You're welcome to, sure.

1      A      Because what did I just say a minute

2    ago?  I don't believe it's a one-to-one

3    relationship.  Nor does Justin and Eitan believe

4    the effect of law on race is not the same as the

5    effect of a law on party.  That to me means that

6    there is, there could be a relationship, but it's

7    not the same.  It's not a one-to-one.  That's how

8    I interpret that sentence.  I don't think it's a

9    rejection of the relationship between race,

10   partisanship and election.

11     Q      Sure.  Maybe I misunderstood the answer

12   to your last question.  I asked you if this

13   statement was true and you said no.  So are you

14   now saying you agree with this statement?

15     A      I agree that the effect of a law on race

16   is not the same as the effect of law on party, but

17   I do believe --

18     Q      Correct.

19     A      -- that the effect --

20     Q      That's all I asked you.  That's all I

21   asked you.

22     A      You'll have to suffer with my answer.

1          I do believe there's a relationship

2   between the two, and I do believe that Grimmer and

3   Hersh also believe the same.  It's simply that it

4   deviates, that's all.

5          Q    Right.  Okay, maybe I misunderstood your

6   last answer.  I think we agree on that point.

7          The publication that I have in Exhibit

8   6, it doesn't suggest that no law could have an

9   effect on voter turnout, right?

10         A    Correct.

11         Q    So I'm going to go to Page 42 for a

12   minute.

13         Here in the last paragraph it says:

14   Policies that target a large politically

15   homogenous share of the population, a racial

16   group, a religious group, a group of party

17   registrants, and have a large effect on turnouts

18   specifically for that group, should raise serious

19   alarm about the consequences for election

20   outcomes.

21         Did I read that correctly?

22         A    Yes.

1      Q     So I want to turn back to a few examples

2   in your report.  First you talk about early

3   voting, right?

4      A     Correct.

5      Q     You'd agree early voting laws have no

6   effect on registration rates?

7      A     I have no knowledge of the effect of

8   early voting on registration rates.

9      Q     Okay.  Would you agree that early voting

10  laws don't affect who can register voters?

11     A     No, I don't believe early voting has an

12  effect on who can register voters.

13     Q     And to your knowledge, early voting laws

14  don't affect 3PVROs, do they?

15     A     Not exactly.  It's not -- can you go

16  down to the citations below on early voting?

17     Q     Do you mean on the next page?

18     A     Yeah, beyond 15 or 16.

19     Q     Sure.  I think it's 5 through 8 it looks

20  like?

21     A     The article, and I don't write this up,

22  but Burden, Canon, Mayer and Moynihan, you with

1   me?

2        Q    I'm here.  It's in Footnote 7.

3        A    Effect of Early Voting on Voter Turnout.

4   They also looked at the effect of same-day

5   registration and early voting.  With me?

6        Q    They look at how early voting affects

7   same-day registration, is that what you're saying?

8        A    Yes.  And the two of them together had

9   an effect, a positive effect, modest positive

10  effect.

11            So yes, there's been some research on

12  early voting and voter registration.

13       Q    Okay.  Got it.  Maybe to be more

14  precise, early voting doesn't directly regulate

15  registration, does it?

16            MR. PRATT:  Objection.  Form.

17       A    I will say that in states that have both

18  early voting and same registration, same-day

19  registration, then early voting does have an

20  effect on voter registration.

21       Q    Sure.  And you don't do anything to

22  disaggregate states that do have early voting and

1    same-day registration and states that don't in

2    this report, do you?

3         A    No, other than to cite the Burden, et

4    al. paper.

5         Q    Okay.  It seems like the gist of this

6    section of your report suggests that according to

7    the rational choice theory, early voting --

8    rational choice theory would have predicted,

9    rather, that early voting would have a positive

10   effect on turnout, right?

11        A    Yes.

12        Q    Your report acknowledges that some

13   studies have found increases in turnout associated

14   with early voting, right?

15        A    A handful of studies have found a

16   positive effect.

17        Q    Right.  You cite two of them in your

18   report?

19        A    Yes.

20        Q    You claim that the majority of the

21   studies have failed to find a significant positive

22   turnout effect or found a significant negative

1   effect, right?

2          A     That's correct.

3          Q     Okay.  There you cite three studies,

4   right?

5          A     Yes.

6          Q     It might be four.  Hold on.  I don't

7   want to discount you.

8          A     Yeah, and 8.

9          Q     I see four, right?

10         A     You want to add Rigby.

11         Q     I think -- I'm just trying to figure

12   out -- I think you've cited Burden, Larocca,

13   Richey and Rigby for that proposition; is that

14   right?

15         A     Right.

16         Q     Okay.  Are the sources cited in this

17   report the total number of studies on turnout

18   associated with early voting?

19         A     I'm sure they're not.

20         Q     So when you say majority, do you mean

21   majority of the studies that you cite in your

22   report, or what do you mean?  Can you give me a

1    scope of "majority"?

2        A    Yeah, I would say the following.

3    They're the majority of peer-reviewed publications

4    that one would find in a standard search of the

5    literature using Google Scholar.  There are

6    probably papers that are not published in peer-

7    reviewed journals, books, edited volumes, center

8    reports, research center reports, but I use a

9    standard of peer-reviewed journal articles that

10   one would find in a standard search on Google

11   Scholar.

12       Q    And is this the total number of,

13   Footnotes 5 through 7, is that the total number of

14   searches that would return on a standard search

15   for peer-reviewed articles on Google Scholar?

16       A    I would think there would be more,

17   there might be a few more that I did not include,

18   but I can't recall if that was the case.

19       Q    You told us earlier that all the sources

20   you relied upon in forming your conclusions in

21   this case were cited here.  Is that -- should I

22   take that to mean that these are the set that you

1   reviewed in assessing the majority, or are there

2   other studies you reviewed that you would count

3   toward the denominator there?

4       A    No, I would say that this is all of the

5   papers I reviewed on early voting that I'm

6   familiar with.

7       Q    Okay.  Am I right that one of the

8   studies you cite for having found small increases

9   in turnout associated with early voting is your

10  own?

11      A    Yes.

12      Q    Next you go on to talk about voter ID

13  requirements, right?

14      A    Yes.

15      Q    You'd agree that voter ID requirements

16  don't affect voter registration rates, right?

17      A    No, not to my knowledge.

18      Q    Okay.  Just when you say no, are you

19  agreeing that they don't affect?  I just want to

20  make sure I understand.

21      A    Let me qualify.

22      Q    Okay.

1      A      There are a lot of states that do and --

2 do not require photographic ID to register, but do

3 require it to vote.  Wisconsin, for instance,

4 doesn't require you to have a photo ID to register

5 but it does to vote.

6      Q      Right.

7      A      Other states actually require both.  And

8 I believe, I don't have the full count, I have it

9 somewhere in my files, that a majority of states

10 with a restrictive voter ID law do require it to

11 register to vote.

12     Q      That's part of what I want to talk about

13 here.  The voter ID requirement that you discuss

14 in your report, at least based on the studies that

15 I reviewed that were cited, seem to focus on voter

16 ID laws at the polling place.  Do you disagree

17 with that, that the reports cited here are

18 about --

19     A      No, I think that's fair.  The mail-in

20 voting requirements are a relatively new body of

21 work and I don't know of any published reports on

22 strict voter ID requirements for mail-in voting.

1    I do know they exist, but I don't know of any

2    research on that and how it affects mail-in

3    voting.

4          Q    Okay.  But the ones you're talking about

5    in this report focus on voter ID requirement at

6    the polling place, not at the time of

7    registration; is that right?

8          A    Right, yes.

9          Q    And so in that way, again, the voter ID

10   requirements at the polling place don't have any

11   sort of immediate effect on 3PVROs registering

12   people to vote, right?

13         A    I don't know.  I think it's a subject

14   of -- you raise a very interesting question.  If

15   the state, for instance, does require a third, a

16   photographic ID to register, then I do think it

17   has an impact on voter registration.  If the state

18   doesn't require a photo ID to register but does

19   require a photo ID to vote, then I think it has

20   what we call a bait and -- to me, interesting

21   question.  It can have a depressing effect on

22   turnout.  People can come to the polling place and

1    say, but I'm registered.  Nobody told me I needed

2    to have a driver's license or other photographic

3    ID.

4            So I think -- the answer is I don't know

5    of anyone who's done any research on it, but I

6    don't think it should preclude us suggesting it

7    could have a very, very chilling effect on voter

8    registration.

9        Q    Okay.  But the example you just gave was

10   about an effect on turnout, right?

11       A    Yeah.  But I mean if the state also

12   requires that you have an ID to register to vote,

13   then one might presume, I don't know if it's true

14   or not, that registration rates might be expected

15   to be lower in states where there is a

16   photographic ID, particularly among younger voters

17   and underrepresented populations of color.

18       Q    Sure.  But like you said, the report

19   doesn't focus on those requirements to have a

20   photo ID at the time of registration, right?

21       A    My report?

22       Q    Right, yeah.

1    A    No, no, I don't think there's a single

2    citation here dealing with voter registration

3    laws.

4    Q    Okay.  On the voter ID requirement

5    issue, your report states that research on the

6    turnout effect of voter ID requirements have

7    produced null results or weak and

8    non-consequential effects on turnouts for all

9    voters and for underrepresented groups, i.e.,

10   non-Anglos and younger voters.  Did I read that

11   correctly?

12   A    Yes.

13   Q    One of the reports that you cite for

14   that proposition, specifically in Footnote 9,

15   right after you say have produced null results, is

16   another Grimmer paper called Obstacles to

17   Estimating Voter ID Laws' Effect on Voter Turnout,

18   right?

19   A    Yes.

20   Q    Okay.  I'm going to share what's been

21   premarked as Exhibit 7, which is the Grimmer

22   report titled Obstacles to Estimating Voter ID

1    Laws' Effect on Turnout.

2              (Exhibit 7 was marked for identification

3    and is attached to the transcript.)

4         Q    Just starting here with the abstract,

5    you can see that it says, widespread concern that

6    voter identification laws suppress turnout among

7    racial and ethic minorities has made empirical

8    evaluations of these laws crucial.  But problems

9    with administrative records and survey data impede

10   such evaluations.

11             Did I read that correctly?

12        A    Yes.

13        Q    And it states, in the same part in the

14   abstract, when errors are corrected, one can

15   recover positive, negative, or null estimates of

16   the effect of voter ID laws on turnout, precluding

17   firm conclusions.

18             Did I read that correctly?

19        A    Yes.

20        Q    Okay.  And it states that this paper

21   highlights more, quote, more general problems with

22   available data for research on election

1    administration.

2              Did I read that correctly?

3        A    Yes.

4        Q    Going down to Page 6, 6 of the PDF which

5    is Exhibit 7, it's labeled as Page 1050 of the

6    report, the subsection here is called Implications

7    for Future Research.  Do you see that?

8        A    Yes.

9        Q    And then within that subsection on

10   Implications for Future Research, but on the next

11   page, which is Page 7 of Exhibit 7, would you

12   agree that the authors of this paper state here

13   where I'm highlighting, our attempts to address

14   measurement and specification issues, with the

15   paper they're critiquing, still fail to produce

16   the robust results required to support public

17   policy recommendations.  Using these data and this

18   research design, we can draw no firm conclusions

19   about the turnout effects of strict voter ID laws.

20             Did I read that correctly?

21       A    That's correct.

22       Q    Okay.  I'm going to go through one more

1    report, I think, before we break for lunch if that

2    works okay for you, Dr. Stein.  Are you okay to

3    continue through one more of the reports you've

4    cited in here?

5         A    Yes.

6         Q    Great.  You also cite a report by, I'm

7    not sure if I'm saying this correctly, Cantoni and

8    Pons?

9         A    Yes.

10        Q    And you claim it finds that voter ID

11   laws have no negative effect on registration or

12   turnout overall or for any group defined by race,

13   gender, age, or party affiliation, right?

14        A    Yes.

15        Q    And you would agree this is an example

16   of where the voter ID laws being studied were

17   requirements to provide an ID at their polling

18   place, not at the time of registration?

19        A    I'm not positive of that, but yes,

20   that's my recollection of the Cantoni paper.

21        Q    I'm going to share on my screen what's

22   been premarked as Exhibit 8 which is the Cantoni

1   paper called Strict ID Laws Don't Stop Voters,

2   Evidence From a U.S. Nationwide Panel, 2008 to

3   2018.

4           (Exhibit 8 was marked for identification

5   and is attached to the transcript.)

6       Q    I'm going to turn to Page 2624 of the

7   article.  This one, even in PDF, is paginated

8   consistent with the article's page numbers so

9   that's what I'm referring to here.

10          In Section 2A the paper describes the

11  history of what it calls strict ID laws.  Do you

12  see that here?

13      A    Yes.

14      Q    Okay.  I'd like you, I'm going to zoom

15  out a little bit.  Can you still see it okay?

16      A    Yes.

17      Q    I'd like you to review Section 2A.  Just

18  let me know when you get to the bottom and I'll

19  scroll.

20      A    (Reviewing.)

21          I've read that first paragraph.

22      Q    Okay.  I'm just going to scroll down

1   here.  I think it might be the whole -- oh, no, go

2   ahead.

3       A    Okay.

4       Q    Just so you don't -- I don't think any

5   of this part is relevant, this is more about the

6   type of ID considered valid, but I'll let you take

7   a look at that just so you don't feel I'm shorting

8   you the rest of that.  Let me know when you finish

9   this first paragraph.

10      A    All right.  I'm up to "do."

11      Q    Okay, great.  So based on what you're

12  reading so far, this is repeatedly talking about

13  photo ID at the polls, right?

14      A    Yes.

15      Q    And then turning one more to Page 2636,

16  here it's clarifying that the strict ID laws do

17  not change registration requirements.  Do you see

18  that?

19      A    Yes.

20      Q    And it goes on to evaluate the same sort

21  of potential downstream consequences of requiring

22  photo IDs at the polls that you discussed a little

1    bit earlier, right?

2         A    Yes.

3         Q    But you'd agree that this report is

4    about the type of strict ID laws that do not

5    change registration requirements, right?

6         A    That's my understanding.

7         Q    Okay.  And if you take a look at page

8    2617 and 2618 below, the last paragraph on 2617

9    starts with the sentence, strict ID laws' overall

10   effects do not increase over time.  They remain

11   close to zero and nonsignificant whether the

12   election is a midterm or a Presidential election,

13   and whether the laws are the more restrictive type

14   that stipulate photo IDs.

15         Did I read that correctly?

16         A    Yes.

17         Q    Okay.  But the next paragraph contrasts

18   those results with, quote, I'll read the whole

19   sentence, these results contrast with the large

20   participation effects of other dimensions of

21   election administration, including specifically,

22   quote, voter registration laws, right?

1       A       Yes.

2       Q       Okay.  And it cites two studies about

3    the participation effects of voter registration

4    laws as distinct from the voter ID laws at the

5    polling place, right?

6       A       Yes.

7       Q       One of those cites is the same as the

8    1978 cite in the Smith report; is that right?

9       A       I think you confuse Rosenstone and

10   Wolfinger with Rosenstone and Hansen.  That's

11   Rosenstone and Wolfinger 1978.  Rosen -- I

12   apologize, it was not Rose -- Rosenstone and

13   Hansen were quoted earlier.  Okay, I apologize.

14   Right below.

15      Q       Just to be clear, the Smith report --

16      A       Hansen below as well.

17      Q       Yes.  The Smith report cites both the

18   Rosenstone and Wolfinger paper that appears in the

19   Cantoni paper, and the Rosenstone and Hansen paper

20   that you were describing, right?

21      A       Yes.

22      Q       Okay.  Honestly, I only have a handful

1    more before I think we can take a break and then I

2    might have some cleanups.  I think it's probably

3    best if I just go ahead and ask my handful about

4    election day vote centers, unless you're starving

5    for lunch.  It's totally up to you.  We can always

6    come back and do it after.  How are you feeling

7    about continuing for a few more minutes here?

8        A    I would just like to add something that

9    you implied in one of your earlier questions.

10       Q    I mean if you need to clarify your

11   answer, go ahead.  I don't think there's a

12   question pending, but you can go ahead.

13       A    Go ahead.  Proceed with your questions.

14   I'll bring it up later.

15       Q    Your counsel can ask you questions about

16   anything you need to clarify, so I think that's

17   probably the best protocol for that sort of thing.

18            I'm going back to Exhibit 2 to talk

19   about this last section here about the Conditional

20   Effects of Election Laws on Voter Turnout.  Do you

21   see that?

22       A    Hold on.  I just -- something popped up

1  on my screen.

2          Okay, go ahead.

3      Q    No worries.

4      A    Go ahead.

5      Q    This section talks about election day

6  vote centers, right?

7      A    Yes.

8      Q    And those centers allow voters to cast

9  their ballots at any election day polling location

10  in a voter's jurisdiction, right?

11      A    Yes.

12      Q    Laws that create election day vote

13  centers don't alter registration requirements, to

14  your knowledge, do they?

15      A    Not unless they have a same-day

16  registration.

17      Q    Right.  Okay.  And you discuss these

18  centers as an example of conditional effects of

19  election laws?

20      A    Yes.

21      Q    On Page 19 your report says, the

22  implementation of vote centers can also mitigate,

1    if not remove, any positive effect centers have on

2    voter turnout.  The inadequate implementation of

3    voter centers can produce congestion of polling

4    places and longer waiting times to vote, both

5    resulting in a strong deterrent to voting.

6              Did I read that correctly?

7        A    Yes.

8        Q    So that's an example of how a reform

9    that would appear to increase access to voting

10   could actually have unintended negative effects on

11   turnout, right?

12       A    Correct.

13       Q    You've not offered any conclusions in

14   this report about how banning noncitizens from

15   collecting and handling voter registration

16   applications could have a positive effect on

17   turnout, right?

18       A    No, I have not.

19       Q    And you haven't offered any conclusions

20   about how banning noncitizens from collecting and

21   handling voter registration applications could

22   have a positive effect on registration rates,

1    right?

2         A      No.

3              MS. KEENAN:  Okay.  I'm going to take

4    the lunch break to see if I have any wrap-up

5    questions.  I think we can go off the record at

6    12:37.

7              (A recess was taken at 12:37 p.m.)

8              AFTERNOON SESSION (1:14 p.m.)

9    BY MS. KEENAN:

10        Q      I only have a handful of additional

11   questions.  I am going to share my screen again.

12             Okay.  So I am back in Dr. Smith's

13   report, and I'm on Page 30, Paragraph 53.  Do you

14   see where I am?

15        A      Yes.

16        Q      I know I asked you about Paragraph 15 a

17   couple of times, but I think this is the actual

18   part of the report that discusses the findings.  I

19   just wanted to confirm that you didn't dispute the

20   data discussed in Paragraph 53 of Dr. Smith's

21   report either?

22        A      That I didn't -- I didn't hear the --

1          Q      You didn't dispute the data discussed in

2    Paragraph 53.

3          A      Oh, no, we did not.

4          Q      Okay.  And then the last thing I think I

5    forgot to ask you was, going back to Page 8 of

6    Exhibit 2, which is your own report, I know that

7    you said that Dr. Alford drafted the portion about

8    Dr. Smith's report in the first instance.  Do you

9    recall what, if any, edits you made to the section

10   of the report, as to the section of your report

11   about Dr. Smith's report, namely Pages 18 through

12   13 [sic]?

13         A      I don't recall making any what I call

14   substantive.  I may have made some typographical

15   changes, but I don't recall making any substantive

16   changes.

17             MS. KEENAN:  All right.  Well, with

18   that, I'm ready to pass the deposition, I believe

19   to Mindy next.

20

21

22

1                   EXAMINATION BY COUNSEL FOR

2               THE FLORIDA NAACP PLAINTIFFS

3    BY MS. JOHNSON:

4        Q    Please let me know if at any point you

5    can't hear me clearly, and I'll attempt to resolve

6    any technical issues.

7                My name is Mindy Johnson, and I

8    represent what we're referring to as the NAACP

9    Plaintiffs in this litigation.  And I'll be asking

10   you a few questions today, specifically related to

11   your expert report and also Dr. Herron and

12   Dr. Lichtman's expert reports, okay?

13               So before I proceed, can we agree that

14   the same ground rules that counsel already went

15   over this morning apply to the rest of this

16   deposition?

17       A    Yes.

18       Q    Okay.  And the same rules go, that if

19   you need a break at any point, just let me know,

20   and as soon as you answer any pending question,

21   happy to take breaks.

22       A    Yes.

1       Q    Great.  I have attempted to

2  cross-reference all of the background that we

3  already went through as part of your deposition

4  this morning, but I do have a few additional

5  questions about your background and your

6  engagement in this case.  If there is some

7  redundancy, please bear with me, but I've

8  attempted to try and limit myself to new

9  questions, okay?

10      A    Okay.

11      Q    So one question I wanted to clarify is

12 you mentioned a few times that you reviewed

13 pleadings in this case.  Do you mean the

14 Complaints of the parties in this case?

15      A    Yes.

16      Q    Are you aware of whether you also relied

17 upon any of the preliminary injunction briefing or

18 materials informing your expert opinions?

19      A    I did not.

20      Q    You also testified that you are

21 currently a Professor at Rice University; is that

22 correct?

1        A    Yes.

2        Q    Are you currently teaching any courses

3   at Rice University?

4        A    Yes.

5        Q    What courses?

6        A    This fall I taught the introductory

7   course in the master's of social policy

8   evaluation, intro course, and I taught the

9   undergraduate survey research seminar.  This

10  semester I'll teach the graduate level course in

11  public policy, and in the fall my teaching

12  requirements will be the undergraduate course in

13  election administration, and, oh, campaigns and

14  elections.

15       Q    Have you taught any classes together

16  with Dr. Alford?

17       A    I have lectured in his class.  He

18  teaches, and will be teaching a course in the

19  fall.  Every election season we have a, Federal

20  election season we have a course, and I have

21  lectured in his class on, surprisingly, election

22  administration.

1       Q     Okay.  How often would you say you've

2  lectured in his classes?

3       A     I mean over the years?  Probably every

4  semester, every other year when he's taught that

5  course, and I do two, maybe as many as three

6  lectures.  Two, two primary.

7       Q     Are you familiar with Dr. Alford's

8  scholarship?

9       A     Scholarship?

10      Q     Yes.

11      A     Yes, very familiar with it.

12      Q     And have you ever referenced Dr. Alford

13  in your own scholarship?

14      A     Yes, I have, his more recent work on

15  genetics and hereditary effects on voting.

16      Q     How would you describe Dr. Alford's area

17  of expertise?

18      A     As in the nature of his expertise?

19      Q     Yes.

20      A     So he has, I would say kind of two

21  careers in political science if that's the right

22  way.  In this early career, I'd say the first 10,

1   20 years, he and several of his coauthors,

2   particularly Jim Hibbing, were known as

3   Congressional scholars and they studied

4   Congressional, with a very, very specific focus on

5   Congressional voting and incumbency effects.  And

6   they were probably, I would go so far as to say,

7   John Hibbing was a National Academy of Science

8   member, and John Alford were the stars of that

9   field.

10          And then John Alford, excuse me, got

11  very interested in biopolitics and genetics and

12  literally spent quite a few years, I would even go

13  so far as, if I looked at his vitae, to say 10

14  years retooling and reschooling and virtually

15  received a Ph.D. in biogenetics and started

16  publishing what many considered to be path mark

17  papers with John Hibbing on the biologic and

18  genetic basis of political behavior.

19      Q    How would you describe your own

20  expertise?

21      A    Much more modestly.  I started off as an

22  urban scholar.  My work was principally in the

1    area of what you would call Federal pork barrel.

2    I studied aid transfers, the economics and the

3    politics of the Federal pork barrel.  I wrote --

4    or, again, like a lot of academics, I'd say the

5    first 10 to 20 years of my career were in that

6    area.

7              I then shifted after, I guess it was

8    early '90s, late '80s, and with the 2000 -- well,

9    with the advent of early voting, started a pretty

10   robust research career on voting administration

11   which probably dates even before the 2000

12   election.

13             My other area of expertise, if you're in

14   Florida and you want to hire me, is I'm quite the

15   expert on flooding and evacuations and

16   mitigations.  I work with a lot of civil engineers

17   trying to figure out why all their wonderful ideas

18   don't work with voters and people, and that's

19   another whole other area you'll see on my vitae.

20        Q    Where would you say that your areas of

21   expertise overlap with Dr. Alford's areas of

22   expertise?

1      A      I don't know if it overlaps it.  It

2 compliments it is the word I would use.  John is

3 quite the scholar on his two expertise,

4 particularly in this genre.  He knows the law,

5 Voting Rights Act law very well.  He's quite an

6 expert on what we call political behavior,

7 particularly from his days working in election

8 administration.  And my expertise tends to be --

9            (Interruption.)

10            (A discussion was held off the record.)

11            MS. JOHNSON:  Just, I think the same

12 rules.  If you end up needing to look at your

13 phone for any reason, just let me know.

14            THE WITNESS:  I kept it off before and

15 then my wife called me and told me she brought me

16 lunch, so that was the --

17 BY MS. JOHNSON:

18      Q      You were describing how you would say

19 that your areas of expertise, I think your words

20 were compliment Dr. Alford.

21      A      Yeah.  He knows behavior and I

22 essentially, you would know that as the area of

1    public administration.  So I'm quite knowledgeable

2    about the research and, of how do we conduct

3    elections, you know, the who, the one, the where.

4    I'm particularly focused on election laws

5    particularly never do what they're supposed to do,

6    that genre.

7            So it's a compliment.  He knows

8    something I don't know, and I know something he

9    doesn't know.  That's how he invited me into the

10   case.  The attorneys, Joshua asked, you know, does

11   somebody know this, and John said, I got this

12   person.  I'm not certain I'm the right person, but

13   I do, I read a lot.

14        Q    Are you familiar with Dr. Alford's other

15   expert work?

16        A    Some of it.  We've -- as I've said to

17   Ms. Keenan, John and I have worked together on

18   redistricting, not lawsuits, but we've actually

19   drawn the boundaries and plans.  John does a lot

20   of that work.  He has been involved in other cases

21   and he has recommended me on more than one

22   occasion, the Arizona case, the Virginia case, on

1   my vitae the Georgia case, of course this one.

2          So I sort of know what he's doing and

3   he'll call me up and say one day, I need -- he

4   draws a line.  He won't -- I'll read this stuff,

5   but you know it better than I, so ... it's more of

6   a question of if I have the time.  I have

7   grandchildren.  He doesn't.

8      Q    What are the examples when he's called

9   you and said you know this area better than I do,

10  can you name some of the areas?

11     A    This case, this specific one, he felt

12  that I was much more familiar with the literature

13  on election law and its impact on both voter

14  turnout, voter registration and performance.

15         The Georgia case was an interesting one.

16  I don't know if you're familiar.  Georgia has a

17  ballot access rule.  People want to get on the

18  ballot to run for offices.  It's an extremely high

19  bar, difficult.  And he knew that I had read that

20  literature for a course, I teach a course on

21  ballot access -- not on ballot access, but a large

22  portion.  So he said, it would be a lot easier,

1  you know, if you were the person.  I don't even

2  think John was involved in that case.

3            Colorado and -- no, they didn't.  But

4  Arizona had an election law adopted much like

5  Florida, and John knew that I was familiar, again

6  with, I do a lot of work for election.  Maricopa

7  County I've worked for.  I've done work in New

8  Mexico.  So he knew I knew both the laws, I knew

9  the people, and yes, I had published on those

10 topics.

11      Q    Have you done election law work in

12 Florida previously?

13      A    No, I have not.

14      Q    Do you consider Dr. Alford to be

15 well-respected in your field?

16      A    Yes, yes, I do.

17      Q    And this might be similar to what you've

18 already just testified to, but do you have an

19 understanding of why there are two authors to the

20 expert report in this case?

21      A    I think it's goes back to my earlier

22 answer.  Complimentarity.  It just seemed to be a

1  logical -- again, it's a single report.  We both,

2  I would expect John to say tomorrow, or whenever

3  he's deposed, everything in the report we agree

4  to.  But there was no question, as Ms. Keenan

5  pointed out, or asked, we drafted different

6  sections that reflected probably our, if not our

7  expertise, our familiarity, so it was more

8  efficient.

9        Q    And so is it fair to say that you

10  endorse every portion of the report as if you

11  wrote it yourself?

12        A    Yes.

13        Q    Have you ever done any research on

14  Florida election laws?

15        A    I've written papers on multistate,

16  multi-jurisdiction studies in which Florida,

17  either the state, some counties or jurisdictions.

18  I just completed research on poll worker

19  recruitment and retention, and I believe there's

20  several jurisdictions in Florida that are included

21  in that.  And yes, I have talked extensively with

22  election officials in different counties,

1    particularly in the pan hand, and have been in

2    conferences with them.

3         Q    Can you name the counties that you can

4    think of sitting here today?

5         A    Tallahassee County, and is it Pete -- I

6    get Pima in Arizona is -- I can't remember.

7    Broward, it was in the study, I believe Miami was

8    in our study.

9              Now, there were, I should be very

10   careful here to say that there are 19 coauthors on

11   these papers Waiting to Vote and Guardians at the

12   Gate on poll workers, and my collaborators were

13   responsible for making relationships with the

14   local election officials and then we surveyed

15   them.  I was sort of a PI, principal investigator,

16   and myself and my students handled the data

17   collection, data analysis and writing up the

18   papers in which Florida jurisdictions were

19   included.

20             So yes, I had to read all the Florida

21   election laws, particularly pertaining to poll

22   workers and in-person voting.  That's what we

1  focused on principally.

2      Q    Did the survey questions you asked

3  include any questions about third party voter

4  registration organizations?

5      A    That's a very good question.  Yeah, my

6  recollection would be that we touched on those

7  issues, but I don't recall ever asking about a

8  particular third party group that registered

9  voters.  We asked questions about poll watchers.

10 We asked questions about partisan poll workers,

11 but I don't recall the word "third party

12 registration" actually being in the survey.

13     Q    Do you recall if there were questions

14 about voter registration generally as part of the

15 survey?

16     A    There were questions in the survey about

17 checking people in with proper voter registration

18 identification.

19     Q    Okay.  Anything else you can think of

20 sitting here?

21     A    No, not responsive to that question

22 about voter registration.

1          Q     Other than the multidistrict surveys and

2     study you just described, is there any other

3     research that you've done into Florida election

4     laws?

5          A     No.

6          Q     Have you ever researched third party

7     voter registration organizations in Florida or

8     otherwise?

9                Have you ever researched third party

10    voter registration organizations in Florida or

11    otherwise?

12         A     Otherwise, yes.  I've read -- the word

13    "extensive" wouldn't be, but I've probably read

14    more than most people in my field on the history

15    and the practice of third party registrations.

16    And I've relied on at least one or two reports --

17    you're going to ask me which ones, and I'd have to

18    log on and get my papers -- but all of them were,

19    I didn't know a lot about third party

20    registrations and I schooled myself on that one by

21    reading.

22         Q     So you can't think of the names or the

1    titles of what you've reviewed?

2        A    If it's okay -- I'll pull up the paper,

3    if it's okay with you.  Give me a second.  I know

4    exactly, I think I know exactly where it is.

5              Be careful what you wish for, right?

6              Yeah, it's by the Responsive Governing

7    Organization, which is like a non-partisan group,

8    and it's called the History of Third Party Voter

9    Registration Drives.  And I would be happy to

10   share it with you.  It was not cited in my -- I

11   read it, oh, gosh, months -- I wouldn't say months

12   ago, it's a May 17, 2003, so it couldn't have been

13   months ago, but I read it awhile back, and it kind

14   of, what's the right word?  Gave me background.  I

15   don't cite it.  I can't even tell you that I --

16             This morning Ms. Keenan was asking me

17   questions, and I want to be very clear, I would

18   have, I wouldn't use I draw, I drew on it in

19   response to the rebuttal reports from Professor

20   Herron and Smith.  But that's my knowledge of

21   third party, the history, and it goes back, you

22   know, quite a bit.

1      Q      And so when you say that you relied on

2    it as part of understanding the rebuttal reports

3    of Dr. Smith and Dr. Herron, can you explain what

4    you mean?

5      A      It was what I told Ms. Keenan before.

6    Specifically I was impressed by how targeted and

7    focused third party voter registration drives are.

8    I was particularly interested in the mechanics,

9    how are these third -- I have anecdotal evidence,

10   you know, of how it's done.  Many of my students

11   in my courses actually get involve as registrars.

12           What I didn't know is what the history

13   was.  And I was very impressed -- well, I wouldn't

14   say impressed, but it led me to make my comments

15   earlier on which are in the deposition.  But

16   basically these are targeted efforts.  They are

17   direct solicitations to people both by geography

18   and by racial and ethnic origin of the voter.

19     Q      Do you have an understanding of the

20   universe that was included in that report?

21     A      The universe?

22     Q      Geographically, for example.

1       A      I think it's the U.S.  It's a U.S.

2   study, all 50 states and historical, and goes back

3   to the early 19th century.

4       Q      Is there any other research that you've

5   reviewed on third party voter registration

6   organizations?

7       A      Other than what is in the Plaintiffs'

8   experts' reports, no.

9       Q      Have you previously produced any expert

10  reports related to third party voter registration

11  laws?

12      A      No, I have not.

13      Q      Have you taught any classes about third

14  party voter registration?

15      A      Have I heard any?

16      Q      Taught any classes.

17      A      Have I taught any classes?  No, no.  I

18  mean I've taught -- yes, there is on my vitae, on

19  my resume, on my, what do you call those?

20  Curriculum, syllabi, probably a whole bunch on

21  voter turnout studies and voter turnout and voter

22  registration experiments.  Yes, I'm pretty

1    familiar with that literature.

2        Q    Do you recall ever teaching on third

3    party voter registration organizations

4    specifically in your courses?

5        A    Yes.  I'd have to say that David

6    Nickerson's work comes out for political

7    scientists, who I still think is affiliated with

8    Temple, working full-time for the Democracy Fund;

9    Don Green, Alan Gerber, Costas, and you're going

10   to ask me to pronounce his last name and I can't.

11   It's Panagopoulos.

12            THE WITNESS:  Ms. Hart, I will later on

13   spell the name for you.

14       A    These are scholars who have done a lot

15   of work on voter registration drives and third

16   parties.  I -- yes, absolutely.

17       Q    And I'm happy to break it down by

18   author, but can you describe what kind of work or

19   research the individuals you've named have done on

20   voter registration drives?

21       A    Well, the famous one is something called

22   Make a Plan.  So there are studies that contact

1    unregistered or general eligible voters and they

2    try to get them to both register and to vote.  And

3    they usually do it by asking them to articulate a

4    plan for registering and for voting.  And the

5    researcher keeps a record of that and then sees

6    whether or not the voter actually executes that.

7              In psychology, that's a widely used

8    method.  It's like, are you going to visit your

9    mother, Mindy, next Easter?  And you say, yeah, I

10   always -- well, Mindy, are you, have you bought a

11   plane ticket, have you gotten someone to take care

12   of the dog?  The more tasks you start identifying

13   that you've done, the more likely you are to vote.

14             I've seen that done.  I've read research

15   on that both for turnout and voter registration,

16   and I should say that I was a Director of a

17   center, it's on my Vitae, the Center for Civic

18   Engagement, where we actively work with national

19   organizations to help register college students.

20   And I've advised high school students here in

21   Houston on preregistration projects.  These are

22   high school students who are going to come of age

1   and can preregister before they turn 18.

2        Q    And do you know what the authors found

3   in their study?

4        A    Well, the experimental work was very,

5   very efficacious, making a plan, extremely

6   efficacious on both turnout.  The registration

7   studies that come to mind are the ones that

8   attempt to get voters to go online to do

9   registration as opposed to requesting a paper, a

10  registration form to be sent, and they have been

11  very efficacious.

12       Q    Are there any other registration studies

13  that you just mentioned that you haven't yet

14  described?

15       A    I'm sure there are, but I can't think --

16  I mean I'd have to go back through my syllabus,

17  and I know there are, not the word scores, but

18  there are more than the two or three that I just

19  mentioned.

20       Q    Understood.  Sitting here and having

21  them on the top of your head, are there any others

22  that you can describe?

1        A      Lisa Bryant at UC Fresno and another

2     woman at Menlo College have done registration

3     drives with Hispanic populations, and so has

4     Costas, and they've compared different types of

5     treatment effects.  My recollection is they were

6     usually multimedia, email with a social --

7     websites, like the Facebook, those are the ones,

8     but -- and my recollection was they were not quite

9     as efficacious and as effective as some of the

10    ones that stand out that I remember are Making the

11    Plan.

12        Q      Anything else?

13        A      Nothing.  You're scratching the bottom

14    of the barrel for me.

15        Q      Great.  And are you aware of what

16    methods third party voter registration

17    organizations in Florida use to conduct outreach

18    to voters?

19        A      The research I'm talking, that we just

20    discussed, these are all done by scholars,

21    academics, sometimes with the active endorsement

22    and support of third parties; Democracy Fund comes

1    out to mind, Mi Familia Vota.

2           My resume doesn't include it, but I have

3    worked for Mi Familia Vota.  In fact, I've done as

4    many as five major research projects for them,

5    both for high school registrations and specific

6    engagement, but these are scholars who collaborate

7    with, I think the best way to put it is they get

8    access to the lists of voters to contact, even

9    money.  The published work would fully disclose

10   it.  It's where I had this anecdotal impression

11   that third party registration was a very active,

12   proactive.  It didn't, you know, wait for people

13   to come in like the Department of Motor Vehicles

14   or the County Courthouse.  These are groups that

15   actively sought out and targeted groups.

16          One of my colleagues here I didn't

17   mention, Melissa Marshall, with whom I'm close and

18   have, the word collaborate is wrong, she's asked

19   me to advise her, and they, they have a big grant

20   to register and mobilize underrepresented voters

21   and, 7 million-dollar grant to be exact.  That's

22   large scale here in Harris County.

1         And they -- actually, where I really got

2    the insight was they said to me, can you tell us

3    where unregistered African American and Hispanic

4    voters of a particular age are, and I assisted

5    them in the demographic analysis.

6         So that's where I got my insight into --

7    and then when I read this report from, I can't

8    remember the center now, I said, well, gee, this

9    isn't unique.  It's not contemporary, but it's

10   been the history of third party registrations.

11        Q    So the grant you just described and the

12   outreach you just described, that was for a Texas

13   County; is that correct?

14        A    Harris County, yes.

15        Q    Okay.  And so outside of what these

16   studies have mentioned about Florida third party

17   voter registration organizations' activities, do

18   you have any additional understanding of the

19   activities of Florida third party voter

20   registration organizations?

21        A    Only what I've read in the Plaintiffs'

22   reports, and again, these other sources I've

1    mentioned.

2         Q    And you mentioned working with Mi

3    Familia Vota.  Do you have any additional

4    understanding of Mi Familia Vota's third party

5    voter registration activities in Florida?

6         A    Other than what I've read in the

7    Plaintiffs' report, no.

8         Q    Apart from this case, have you ever been

9    asked to opine on the impact of third party voter

10   registration organizations on voter registration

11   or turnout?

12        A    No.

13        Q    Have you ever testified in Florida

14   courts?

15        A    No.

16        Q    Okay.  I think that covers the

17   background.  So now we're going to spend some time

18   looking at the actual reports.  My plan is to do

19   some back-and-forth, looking at your report and

20   looking at the rebuttal report, for example,

21   produced by Dr. Herron.  So it might be a little

22   tedious at times flipping between.  If at any

1    point you need to look back at something or need

2    us to refer to a different page, just let me know,

3    okay?

4         A    Got it.

5         Q    Great.

6              MS. JOHNSON:  So, Makeba, if you don't

7    mind helping pull up Dr. Lichtman's report to

8    start.

9              And I apologize, what Exhibit number are

10   we on next?

11             MS. RUTAHINDURWA:  I had left off 12,

12   Mindy, if that's helpful.

13             MS. JOHNSON:  So we'll mark this as

14   Exhibit 13.

15             (Exhibit 13 was marked for

16   identification and is attached to the transcript.)

17        Q    We can, again, scroll if you need, but

18   have you seen this before, Dr. Stein?

19        A    Yes.

20        Q    And is this the expert report of

21   Dr. Lichtman that you mentioned reviewing earlier?

22        A    Yes.

1      Q     Have you reviewed this report in its

2   entirety?

3      A     I've read this report, but as our report

4   indicated, we did not take it, I guess the nicest

5   way is, we did not focus on Professor Lichtman's

6   report other than to write what we wrote on Pages

7   2 and 3.

8      Q     Great.  So we'll take a look at that

9   now.  We can look at your report next; it's

10  already been marked as Exhibit 2.  And we'll start

11  on Page 1, or actually Page 2.  I apologize.

12        Okay.  Up at the top paragraph, you

13  wrote that Defendant's counsel requested that we

14  respond to the appropriateness of Dr. Lichtman's

15  conclusions.  Did you write that sentence, or did

16  Dr. Alford?

17     A     I think John Alford wrote, drafted that

18  statement.

19     Q     Okay.  What do you understand "respond

20  to the appropriateness of Dr. Lichtman's

21  conclusions" to mean?

22     A     Well, we felt that, as I've written in

1    the report here, he offered no new empirical

2    analysis aside from referencing what, with Dr.

3    Herron's report.  I don't think he even referenced

4    Dan Smith's report.  It's either speculative

5    assertions, as we write, that might happen as a

6    result of implementation of 7050.  It was a

7    repetition of, of what we call negative impacts

8    without any empirical support or actual observed

9    impacts.

10            I guess I just -- we didn't find

11   anything in it that was helpful, I think would be

12   the nicest way to put it, understanding how

13   SB 7050 has, or might, impact voter registration,

14   particularly among non-white voters.  It did

15   review a lot of history and background, but it

16   just didn't seem to be, I guess the word you guys,

17   it didn't seem to be on point.  It didn't seem to

18   be about SB 7050, other than speculating about

19   what might happen, but not offering any evidence

20   to that effect.

21       Q    I have a few follow-up questions related

22   to some of the things you just mentioned.

1        Have you ever relied on another expert's

2   empirical analysis in providing an expert opinion

3   or testimony?

4        A    Oh, sure.  Yeah.  I mean not expert, but

5   I've relied on other scholars' empirical work, if

6   that's what you mean, as opposed to the expert

7   reports.  My own report with John relies on other

8   scholars and other researchers.  And we do have a

9   standard.  We rely on peer-reviewed publications.

10  It doesn't mean that we won't cite other work, it

11  just means that that's what we're most confident.

12        Professor Lichtman's report didn't seem

13  to use, other than Professor Herron and Smith's

14  claims, now Professor Herron and Smith do far more

15  empirical work, but Lichtman seemed to be kind of

16  repeating what they found to justify his

17  arguments.

18        So we, again, didn't find anything

19  unique or different, maybe unique might be a

20  little hard, but we found nothing different in

21  Professor Lichtman's report that was helpful in

22  understanding the impact of SB 7050.

1     Q    Is it your opinion that it was

2  inappropriate for Dr. Lichtman to rely on the

3  quantitative or empirical analyses of Dr. Herron?

4     A    No, I don't think it's -- I mean we have

5  issues, as we've written in the report, with that,

6  with that work of Dr. Herron's and Dr. Smith's,

7  but it just didn't seem like Professor Lichtman's

8  report added to the discussion and understanding

9  of SB 7050's impact.

10     Q    You understand that your charge, I think

11  is how you've phrased it earlier, was different in

12  relation to Dr. Lichtman's report as it was to

13  respond to Dr. Herron and Dr. Smith?

14     A    No, I don't know that there was -- we

15  had a clear idea of what we were charged with

16  doing.  I -- I'm not absolutely certain what Dr.

17  Lichtman's charge was and how it was different

18  from Herron and Smith.

19     Q    And so just to make sure we're on the

20  same page, I'm not asking whether Dr. Lichtman's

21  charge was different than Dr. Herron's and Smith,

22  I'm asking whether your charge, responding to the

1    expert reports, was different in regards to

2    Dr. Lichtman's report than it was for Dr. Smith

3    and Dr. Herron's report?

4        A    No, it was the same.  We were asked to

5    assess the experts' reports pertaining to whether

6    or not SB 7050 would have, and had, a disparate

7    effect on voter registration and ultimately voter

8    enfranchisement by race and ethnicity.  So we

9    tended to see the charge in reading the three

10   reports as the same.

11       Q    If we scroll down on this page, you see

12   that you addressed Dr. Lichtman's report, on Pages

13   2 and then the top of Page 3, in a total of one

14   paragraph; is that correct?

15       A    Yes.

16       Q    So you provide no discussion of

17   Dr. Lichtman's report outside of this single

18   paragraph?

19       A    No, we do not.

20       Q    Who wrote this discussion of

21   Dr. Lichtman's report?

22       A    Well, we both wrote it, but I would say

1    that Dr. Alford did the draft of this.

2         Q    Okay.  And in your testimony a few

3    minutes ago, and in the second sentence of this

4    paragraph, you refer to Dr. Lichtman's report as

5    speculative.  What specific assertions in

6    Dr. Lichtman's report do you believe were

7    speculative?

8         A    I mean I could go through each line of

9    his report if you want, but I think the overall

10   tenor of the report is speculative about what

11   might happen or a repeat of the claims made by

12   opponents of SB 7050, and of course, Herron and

13   Smith's findings.

14        Q    You didn't include a list of what you

15   considered to be speculative assertions of

16   Dr. Lichtman?

17        A    There's none here.

18        Q    And sitting here, can you name

19   specifically what you believe to be speculative?

20        A    I would have to go back through the

21   report.

22        Q    Okay.  On the bottom of Page 2 you

1   write, in this report, we will be addressing the

2   quantitative empirical evidence in the reports and

3   as such will not be commenting on the narrative

4   discussion in Dr. Lichtman's report, nor will we

5   be commenting on a similar narrative section of

6   Dr. Herron's report.

7          Were you instructed to only address the

8   quantitative portions of the expert reports

9   produced by Plaintiff?

10      A    Were we expected?

11      Q    Were you asked to address only the

12   quantitative aspects of the reports?

13      A    No.  We indicated to the attorneys that

14   this is the scope of what we could do for them.

15      Q    Did you and Dr. Alford discuss whether

16   to respond to any of the narrative discussions as

17   you reference them in this paragraph?

18          MR. PRATT:  Objection.  I'm going to

19   assert a privilege on any communications between

20   Dr. Alford and Dr. Stein which would have been,

21   you know, within the purview of instruction from

22   counsel.

1          You can answer questions to the extent,

2     about the report, which portions were written by

3     you, et cetera.

4          Q     Separate from any instructions from

5     counsel, which you do not need to disclose, did

6     you and Dr. Alford discuss whether to address the

7     narrative portions of Dr. Herron and

8     Dr. Lichtman's report as you reference them in

9     this report?

10         A     Did we -- I'm not -- I'm not quite

11    certain I understand the question.  I know there

12    was an objection, but I'm not certain I understood

13    it.

14         Q     Sure.  My question, and again, if it

15    goes to conversations with counsel, you do not

16    need to respond, is how the decision was made not

17    to address the narrative portions of the expert

18    reports that were produced by Plaintiffs?

19         A     I think we mutually agreed on that

20    almost simultaneously.  We had read the reports,

21    we were, we knew what we could do and what we

22    couldn't do in terms of our expertise, and we knew

1    what our charge was, and we just didn't think

2    there was anything in Dr. Lichtman's report that

3    went to the issues that we were going to examine,

4    the impact of SB 7050 on registrations,

5    particularly among non-whites, and we found

6    nothing in the narrative, as we refer to it, as

7    helpful in understanding that.  We didn't see any

8    empirical claims.  So we -- and we saw no reason

9    to respond to that because there was, the nicest

10   way to put it, there was nothing to respond to.

11        Q    Is it fair to say that your testimony is

12   that you don't have the expertise to respond to

13   Dr. Lichtman's narratives?

14             THE WITNESS:  Hold on.  The battery in

15   my hearing aid just went out.

16             MS. JOHNSON:  We can go off the record.

17             (Interruption.)

18        A    Okay.  I'm sorry.  Could you repeat your

19   question?

20             MS. JOHNSON:  Let's go back on the

21   record.

22

1   BY MS. JOHNSON:

2       Q    My question is, do you believe you have

3   the expertise to respond to all of the information

4   in Dr. Lichtman's report?

5       A    I do believe I have the expertise, yes.

6   I just don't think there's anything, given the

7   charge that we had, that we needed to respond to.

8   He offered no new evidence that there was a

9   disparate impact.  He repeated many of the claims

10  that opponents, I call it the popular press

11  opponents had raised.  But it was Herron and Smith

12  who attempted to address, in a systematic and

13  empirical way, whether or not those claims of

14  effects have occurred and would continue.  I

15  didn't find anything in Professor Lichtman's

16  report that added to that evidence.

17      Q    And I believe you mentioned expertise as

18  part of your last answer in the discussion that

19  you and Dr. Alford had in what to respond to in

20  the expert reports.  So my question is to

21  understand what role did expertise play in

22  deciding not to respond in detail as to Dr.

1    Lichtman or Dr. Herron's reports in the narrative

2    portions.

3        A    Well, we did respond.  We may not have

4    responded in great length, but we did say, there

5    seemed, our response, let me repeat, our response

6    was that there was not anything that we thought

7    was, I'm sorry, directly -- I can't roll up or

8    down on your --

9        Q    This is the entirety of the paragraph

10   about Dr. Lichtman up on the screen right now.

11       A    Dr. Lichtman's report just offered no

12   new evidence, empirical quantitative evidence,

13   that we felt we could respond to.  That was our

14   expertise.  That was our expert judgment, that

15   there just wasn't anything that we could respond

16   to or required us to respond to outside of what we

17   have written in the report.

18       Q    And you also mentioned scope as part of

19   the decision of what to respond to.  How was scope

20   a component of deciding what to respond to in your

21   expert report?

22       A    Scope.  The scope of our investigations

1    was to review the Plaintiff, the Plaintiffs'

2    experts' report regarding the impact of SB 7050

3    on, disparate effects on voter registration.  That

4    was the scope of our work.  There are things in

5    the Lichtman report that go beyond what we

6    considered to be quantitative empirical analysis

7    and evidence of that impact.

8        Q    Why do you believe that the discussions

9    and the materials that Dr. Lichtman included in

10   his report are not helpful in assessing the impact

11   of SB 7050 on voters?

12       A    Because they don't address quantitative

13   empirical analysis, but rather hypotheses,

14   speculation, occasionally intent, which we're not

15   able to evaluate.

16       Q    Is it your opinion that the materials

17   that Dr. Lichtman included are not helpful in

18   assessing legislative intent?

19       A    That was outside the scope of our

20   analysis, so that's why we didn't address

21   ourselves to legislative intent.

22       Q    So you don't have an opinion one way or

1  the other whether Dr. Lichtman's report provides

2  helpful materials on legislative impact?

3      A    There is nothing in the scope of our

4  report, unless you see it, and I'll ask you to

5  draw attention to our report where we discuss the

6  scope of legislative intent.

7      Q    I don't believe there's any in there,

8  but I'm just confirming while we have you here

9  under deposition today whether you have an opinion

10  either way on the opinions that Dr. Lichtman

11  offers on legislative intent.

12      A    I have not formed an opinion on those

13  because they were beyond the scope of what our

14  charge was.

15      Q    And I recognize some of this might be a

16  little bit tedious, but it is helpful for me to

17  understand the exact scope of the opinion, so I do

18  appreciate you bearing with me.

19      A    I hope you have a grandfather that's my

20  age and you're nice to him.

21      Q    I do, I do.  And he would be very fed up

22  with me, I think, at this point as well.

1           The next question I did have, do you

2    agree that statements of the legislature may be

3    relevant to assessing legislative intent in

4    passing a law?

5        A    I don't have an opinion on that in this

6    case.

7        Q    And do you have an opinion of whether

8    presentations to the legislature may be relevant

9    to assessing legislative intent of a law?

10       A    I don't have an opinion on that in this

11   case.

12       Q    Do you agree that the processes in which

13   a law is passed through the legislature may be

14   relevant to legislative intent of a law?

15       A    What was that now, processes?

16       Q    Process in passing a law, do you believe

17   that that may be relevant to the legislative

18   intent of the law?

19       A    Again, I don't have an opinion on that

20   in this case.

21       Q    Okay.  Do you have an opinion on whether

22   historical analysis of discrimination in a state

1    may be relevant to understanding any present day

2    discrimination?

3         A    I don't have an opinion about that in

4    this case.

5         Q    Do you have an understanding of whether

6    that's discussed in many election cases?

7         A    I have read Dr. Lichtman's report and

8    have the impression that he believes that to be

9    true.  And he's quite an eminent scholar in his

10   field, so I would expect to have read that.  And

11   yes, I have read that in other works, historical

12   analysis.  But again, I don't know how relevant it

13   is in this case.  I haven't formed an opinion.

14        Q    And so just to confirm what I think you

15   just said, beyond Dr. Lichtman's report, you have

16   seen in other cases a discussion of historical

17   context and analysis?

18        A    Yes, I have.

19        Q    Have you ever provided an expert

20   analysis regarding intentional discrimination?

21        A    On -- say that again.

22        Q    Intentional discrimination.

1    A    I didn't hear the --

2    Q    Intentional.

3    A    Oh.  Have I been an expert in cases

4    involving intentional discrimination?

5    Q    Have you provided an opinion,

6    specifically?

7    A    No, I have not.  You know, some might

8    think I have, but I don't recall in my expert

9    reports, in the cases that are on my resume, where

10   I've ever addressed this issue of intent and its

11   effect on discrimination.

12   Q    Are you aware that some Plaintiffs in

13   this case have alleged intentional discrimination

14   claims?

15   A    Yes, I have.

16   Q    Do you have any familiarity with what

17   type of evidence courts typically review in

18   assessing intentional discrimination claims?

19   A    I do not.

20   Q    Are you aware of what courts typically

21   find helpful in assessing intentional

22   discrimination claims?

1          A     I do not.

2          Q     So is it fair to characterize your

3    opinion as saying you didn't find the type of

4    analysis that Dr. Lichtman provided helpful to

5    you?

6          A     The word "helpful" would be a difficult

7    word.  We just didn't see it as relevant within

8    the scope of what we had been charged to do, which

9    was to respond to the experts' reports regarding

10   the impact of SB 7050.  So, we thought the issues

11   that he raised were well-outside the scope of what

12   we could assess.  Not to say that they're wrong or

13   that they're right.  I think the word

14   "speculative" is not pejorative, it's just what

15   they were.  Hypotheses would be the nice way to

16   put it.  But we didn't see many -- we didn't find

17   any way to assess them in his report.

18         Q     And so I believe this is consistent with

19   what you just said, but please correct me if I'm

20   wrong.  You're not offering the opinion of whether

21   the Court should or should not find this type of

22   analysis helpful?

1      A     That would be up for the Court.  We just

2   did not find it helpful for us to respond to the

3   charge that we'd been asked, you know, to engage

4   in.

5      Q     And you offer no opinion on the extent

6   to which SB 7050 was a result of intentional

7   discrimination?

8      A     We do not.  You know, I don't believe

9   there's anything in our report that addresses that

10  question.

11     Q     We're going to move on and talk now

12  about Dr. Herron's expert report, as well as his

13  rebuttal report.  So I'll go ahead and mark his

14  opening report as Exhibit 14.

15            (Exhibit 14 was marked for

16  identification and is attached to the transcript.)

17     Q     We'll take a look at this first.

18            Do you recognize this document?

19     A     Yes.

20     Q     Did you read Dr. Herron's opening expert

21  report in its entirety?

22     A     Yes.

1      Q      When was the last time that you read Dr.

2   Herron's opening expert report?

3      A      I probably looked at it last yesterday.

4   I did look at it.  I wouldn't say I read it in its

5   entirety, but I have been reviewing it the last

6   couple of days.

7      Q      Understood.  So this is going to get to

8   the part where we're going to be doing a lot of

9   flipping back and forth between your report and

10  Dr. Herron's report, so again, if at any point you

11  need clarification or need to look at a separate

12  document, just let us know.

13              So we'll go back to your report, on Page

14  3.  And you start off in describing Dr. Herron's

15  report as saying, quote, Dr. Herron first offers a

16  speculative account of the possible impact of SB

17  7050 based on academic theory.

18              Do you see that?

19      A      Yes.

20      Q      Who wrote this portion of the expert

21  report; you, or Dr. Alford?

22      A      These sentences here, I believe, are

1    John Alford's draft.

2        Q    Why do you believe this portion of Dr.

3    Herron's report is speculative?

4        A    Well, as we write, it establishes, and I

5    think, you know, again, I'd have to go into his

6    report to find the quotes, only one possible

7    scenario of what might have occurred, all things

8    being equal.  It doesn't look at empirical

9    evidence and its impacts on the actual, what we

10   think is a key issue, which is disparate impacts

11   on black and Hispanic registration.

12           It's a narrow analysis of what happens

13   when SB 7050 is implemented to the third party

14   registrations and the possible differential rate

15   of non-white registrations.  But to us, the key

16   question, I think we call it the key issue, is of

17   does this law affect non-white voter registration

18   and enfranchisement.  So we think it's a narrower

19   interpretation of what we think is the key issue.

20       Q    When you say "one possible explanation

21   for what happens," what do you mean?

22       A    Well, it's possible, not that Dr. Herron

1    tests this, that lower registration rates only

2    among non-whites is not due to third party

3    registration restrictions in the law, but offset

4    by non-white registrations through other methods

5    and modes.  We speculate on that as well.  It's

6    not our job to test those hypotheses.  We think

7    that there are alternative ways in which

8    non-whites who might not be registered through

9    third parties could still register to vote at the

10   Department of Motor Vehicles.

11        Q    And we'll discuss some of those specific

12   opinions of Dr. Herron's as we go through, but

13   just to confirm what you said, you do not have any

14   data to suggest that the overall non-white or

15   black or Hispanic registration rate has declined

16   across different registration methods, correct?

17        A    To suggest, is that the word you're

18   asking?  Yes, we do, and it's Dr. Herron's data.

19   In our report, we mention, I think, a table in

20   which he shows that the decline in third party

21   registration among non-whites is matched by an

22   increase in Motor Vehicle registrations among the

1    same people.  Speculative, suggestive, since it's

2    subject to empirical analysis, but we do suggest

3    that this is a possible avenue to pursue.  Hence

4    the alternative, what do we call it, scenarios

5    that might have occurred.

6         Q    And is this the comparison of 2021 to

7    2023 data that you describe in your expert report?

8         A    That is correct.

9         Q    And you understand that 2021 and 2023

10   are not similarly positioned years in an election

11   cycle?

12        A    That is Professor Herron's contention,

13   yes.

14        Q    You disagree with that contention?

15        A    I would simply say that it seems to suit

16   him when he does analysis on that period for

17   registrations, but doesn't seem to suit him when

18   we compare his own table.  So you'll have to ask

19   Professor Herron.

20             I accepted the two periods represent a

21   period before and after the adoption and

22   implementation of SB 7050.  Michael might have a

1  different view, but it seems to suit him well for

2  other analysis.

3        So I -- and I did read in his rebuttal

4  report he doesn't believe that our comparisons are

5  valid.  It is in his report, and we'll let the

6  Court make that decision.

7        Q    Do you have an understanding of whether

8  Dr. Herron uses comparisons of 2019 to 2023

9  throughout various places in his report?

10       A    I think those are, you know, a similar

11  period of comparison.

12       Q    So you do agree that Dr. Herron uses

13  comparisons of 2019 to 2023 throughout places in

14  his report?

15       A    Those are some of his comparisons.

16       Q    And that those are both years before a

17  Presidential election?

18       A    Again, I'm aware that he has made that

19  statement, yes.

20       Q    And you're aware that 2019 and 2023 are

21  both the years in advance of a Presidential

22  election?

1          A     I'm aware of that, yes.

2          Q     Do you have an expectation, or

3    understanding of whether you'd expect voter

4    registration to be higher in years preceding a

5    Presidential election?

6          A     I have no knowledge of that.

7          Q     No guess one way or the other?

8          A     Like I said, I have no knowledge.  One

9    could speculate about it, but I have no knowledge.

10   It could be higher or lower depending on the

11   nature of the Presidential election.  A

12   competitive race for Presidency might not have as

13   high an effect on voter registration and turnout

14   as a noncompetitive.

15         Q     And -- I forgot the question.  It will

16   probably come back to me.

17               I have some more questions about the

18   specific 2021 -- oh, it came back to me.

19               Are you aware of what years there are

20   versions of the voter file available with

21   registration method also tracked?

22         A     I'm not specific in the years.  I know

1  there are limitations to the available data that

2  are, and Professor Herron was quite specific, but

3  I didn't -- I'd have to go back into the report

4  and find them.  But I am aware that there were

5  data limitations, yes.

6      Q    And so if I represent to you that Dr.

7  Herron noted in his report that he only had a 2021

8  version of the voter file as well as 2023 versions

9  of the voter file available with registration

10  method available to him, would you have any way to

11  dispute that statement?

12      A    Would I have any way to what?

13      Q    Disagree with his claim of what data was

14  available to him.

15      A    I don't disagree with the data that was

16  available.  I would never suggest for a moment

17  that Professor Herron would be misrepresenting

18  what was available.  It's unfortunate that the

19  data he needs to test his propositions is not

20  available, but that simply is another limitation

21  of his analysis, not one that's due to Professor

22  Herron.  It's simply, you know, we don't know what

1    the future is going to hold or we cannot make

2    appropriate analyses for answering the question,

3    what was the impact of SB 7050.  The data

4    limitations is not Michael's fault, but it is a

5    limitation nonetheless.

6        Q    You testified earlier that sometimes

7    you're making an educated guess based on the

8    available information of what will happen.

9        A    You didn't come clear.  You need to get

10   closer to your mic.  It's hard to hear what you're

11   saying.  Say it again.

12       Q    You testified earlier that sometimes

13   you've made an educated guess on what you believe

14   will happen in regards to an election law.

15       A    Educated guess.  You'll have to explain

16   that to me.

17       Q    Sure.  I think that's what, I remember

18   you using words similar to that when you were

19   answering Ms. Keenan's questions, or correct me if

20   I'm wrong, but you've described how sometimes

21   you're making, maybe you called it educated

22   prediction of what you believe will happen?

1       A      I think what I suggested is that there

2  is empirical evidence in the literature to suggest

3  that one can infer, make a probabilistic, if you

4  want, educated guess about the future.  And that's

5  done in my report when I talk about the literature

6  on election reform or election laws and their

7  impact on voter turnout.

8       Q      And that's something that experts do

9  regularly in your field?

10      A      Yes, they make, they opine on what they

11 think might likely happen, yes.

12      Q      So when you use the word "speculative"

13 here to describe Dr. Herron's predictions, what do

14 you mean by speculative?

15      A      I don't think that the evidence he

16 presented and the analysis he did was sufficient

17 to establish that there would be a significant

18 diminution in non-white voter registration as a

19 result of the adoption of SB 7050.  And I think we

20 offer in the report plenty of examples of election

21 laws that have been adopted with similar

22 intuitions about the impact, and they don't come

1  to fruition because the empirical work that

2  attempts to find out what those outcomes are is

3  far more complicated.

4          I don't believe that Professor Herron

5  did the type of analysis that needed to be done

6  here with the existing data to establish even a

7  speculative or probabilistic or predicted or

8  educated guess.  I think we have to have better

9  data and a different research design and

10  potentially a longer period of time to see what

11  the impact of this law is.

12      Q    Ms. Keenan walked through this before,

13  but none of the papers and studies that you're

14  referring to studied the impact of election

15  regulations on third party voter registration

16  organizations; is that correct?

17      A    So you're asking about the work that I

18  cited in the report on Page 14 and on?

19      Q    Yes.

20      A    And you're asking whether or not, I

21  think what you're asking is are they directly

22  related to voter registration.  Some are, most are

1    not, but that wasn't the purpose of citing that

2    work.  The purpose of citing that work was to

3    establish the fact that there are many, many

4    election laws like SB 7050 where people speculate

5    about the outcome of the election law on turnout,

6    registration, disparate effects, and often those

7    predictions are wrong either because they don't

8    take into account these mitigating or conditional

9    variables, they don't use the right research

10   designs, or they don't have the data.

11            In Michael Herron's case, and I think to

12   some extent in the Smith case, at least two, if

13   not all three, of those conditions prevail to

14   lessen my confidence in the speculation,

15   hypotheses, predictions of these two experts.

16        Q    And so when you're referring to the laws

17   in those studies as like SB 7050, my question to

18   you is whether any of those studies were conducted

19   on laws that regulate the conduct of third party

20   voter registration organizations.

21        A    They, to my knowledge, none do, no.

22        Q    You also mention that Dr. Herron's

1    report was, in this sentence you say based on

2    academic theory.  Do you take issue with the

3    academic theories that Dr. Herron refers to in

4    this passage?

5         A    I think they were -- I take issue with

6    their incompleteness of the literature.  And

7    again, I come back to the same literature I

8    reviewed.  He is very well-versed in the

9    literature and knows that many election laws,

10   which are intended to increase turnout, possibly

11   impose costs, often do not because of these

12   conditional or mitigating circumstances.  I felt

13   that he was incomplete in his review of the

14   literature as was, I think, as I mentioned with

15   Ms. Keenan before, in the report from Professor

16   Smith.

17        Q    Would you characterize SB 7050 as a law

18   intended to increase turnout?

19        A    I think the Plaintiffs' claim, it wasn't

20   the intention here, or the goal was multi-faceted,

21   some of which may have been to secure and protect

22   the voter registration and voting from voter

1    fraud, impersonation.  And I know there are claims

2    I've read in the Lichtman report of other

3    intentions, negative intentions on, on suppressing

4    turnout.

5         Q    Right.  So just to make sure I'm

6    understanding, those are representations that have

7    been made of SB 7050's intent to decrease access

8    to certain types of voter registration; is that

9    correct?

10        A    Yes.  I think the, you know, my reading

11   of the Plaintiffs -- is the word pleadings right?

12   That there were multiple intentions, some of which

13   were to reduce access for purposes of securing

14   voter integrity and, I mean integrity of the voter

15   registration process.

16        Q    And so my question to you is whether

17   you've seen anything, or would personally

18   characterize SB 7050 as a law intended to increase

19   voter turnout?

20        A    I've seen no, you know, evidence either

21   way.

22        Q    Okay.  Would you agree that academic

1    theories, including some of those referred to by

2    Dr. Herron in his report, are generally supported

3    by peer-reviewed research and literature?

4         A     Yes.

5         Q     And would you agree that academics often

6    rely upon academic theories to proffer

7    explanations about real life behavior?

8         A     Yes.

9         Q     I'm on Page 3 as well of your report.

10   We're looking at the sentence, I think the last

11   full sentence on the page.  It starts, quote, it

12   does not provide empirical evidence of such

13   impacts and does not address the key issue of

14   actual disparate impacts on black and Hispanic

15   registration relative to non-Hispanic white

16   registration.

17         So my first question for you here is, is

18   "it" referring to Dr. Herron's expert report?

19         A     Yes.

20         Q     I'd like to go ahead now and take a look

21   at Dr. Herron's rebuttal report.  So we'll go

22   ahead and enter this as the next Exhibit.

1          (Exhibit 15 was marked for

2     identification and is attached to the transcript.)

3          Q     And it's Exhibit 15.  Do you recognize

4     this document?

5          A     Yes.

6          Q     And did you review the rebuttal report

7     of Dr. Herron in its entirety?

8          A     Yes.

9          Q     When do you recall reviewing Dr.

10    Herron's rebuttal expert report?

11         A     Within the last several days.

12         Q     So we'll turn now to Paragraph 12 of Dr.

13    Herron's rebuttal report.  And I'll read it.  Dr.

14    Herron writes, quote, according to the

15    Stein-Alford Report, Professor Herron's findings

16    demonstrate that a higher proportion of non-white

17    voters than white voters register to vote via

18    third parties.  And he included the citations at

19    Page 80 of your report.

20         Quote, the report expresses the same

21    point in writing that Dr. Herron is able to

22    conclude, that blacks and Hispanics are more

1  likely to be registered via 3PVROs than are

2  non-Hispanic whites.  And he includes a citation

3  to Page 11.

4          And so I believe you testified earlier

5  that you do not dispute that, the empirical

6  findings of Dr. Herron and Dr. Smith show that

7  black and Hispanic voters are more likely to

8  register via third party voter registration

9  organizations; is that correct?

10      A    Yes.

11      Q    Okay.  So then moving down to Paragraph

12  14, Dr. Herron writes, quote, if any racial group

13  in Florida disproportionately registers to vote

14  via 3PVRO, then this group will be

15  disproportionately affected by a law whose

16  provisions restrict and raise the operating cost

17  for 3PVROs.  It is best and logical for the

18  authors of the Stein-Alford Report to acknowledge

19  my report's finding that there is a group of

20  registered voters in Florida whose members

21  disproportionately registered to vote via 3PVRO

22  and yet claim that this finding does not address

1    the matter of whether the group is

2    disproportionately affected by SB 7050's

3    provisions regarding third party voter

4    registration organizations.

5            So my question to you is, what is your

6    response to Paragraph 14 in Dr. Herron's rebuttal

7    report?

8        A    My response goes like this.  It's very

9    much what I think I tried to express with Ms.

10   Keenan.

11           First, third party registrations are

12   higher among non-whites; we don't dispute that.

13   The question is why.  And the answer we think may

14   be that third party voter registration

15   organizations target non-white voters for

16   registration.

17           Two, if in fact SB 7050 suppresses third

18   party efforts to register voters, it doesn't

19   necessarily suppress non-white voter registration.

20   There may be an accompanying offsetting increase

21   in alternative methods of voter registration that

22   wasn't examined or pursued by Professor Herron.

1              Finally, the costs that are imposed are

2       not on the registered voter.  They're costs

3       imposed on the third parties.  So it seems that

4       there is a question here that we raised, and we

5       talked about it before in the table that shows it,

6       when voter registration declined among non-whites

7       through third party, it may have increased in

8       other ways.  We did not investigate that.  We

9       simply raise it as a possibility that wasn't

10      addressed.

11              We see no, finally, decrease in overall

12      non-white voter registration.  And that can only

13      be assessed, as we indicated in our report, by

14      comparing before and after the adoption of

15      SB 7050, the ratio of citizen vot -- of non-white

16      registrants to citizen voting age non-white

17      registrants, to the ratio of white registrants and

18      white citizen voting age population before and

19      after.  That wasn't done here.  So we're not

20      convinced that this evidence shows that SB 7050

21      had a disproportionate disparate effect on voter

22      registrations among non-whites.

1        We don't -- if you go up to 13, or I
2    think, yeah, Paragraph 13, we don't dispute that
3    third party registration organizations target
4    non-whites, hence the higher share of non, of
5    third party registrations being non-white.
6        Q    We'll walk through, I think, each of
7    those points through the questioning as we go
8    through different portions of Dr. Herron's
9    rebuttal report, but to start, what is your
10   opinion on the impact of organizations potentially
11   choosing to reach out to non-white voters on
12   whether that somehow nullifies or affects Dr.
13   Herron's conclusions?
14       A    So you're asking me, given the term, the
15   specifics of SB 7050, has it -- I think I've said
16   this on more than one occasion.  We don't disagree
17   that Professor Herron's findings demonstrate that
18   a higher proportion of non-white voters and white
19   voters registered to vote by third parties.  And
20   that it is possible, possible, that as a
21   consequence of SB 7050 and its implementation,
22   that a higher proportion of non-white voter

1   registration has declined, or at least the

2   absolute.

3           But we don't see evidence that this is,

4   has affected non-white voter registrations through

5   other methods, total non-white registrations.  And

6   we're not convinced, as we said, that the key

7   issue here is that this law has had an adverse

8   effect on non-white voter registration and

9   enfranchisement.

10      Q    But my question, and I'll attempt to

11  phrase it better this time, is what relevance is

12  it whether third party voter registration

13  organizations target non-white voters?

14      A    I don't understand.  What relevance is

15  that to --

16      Q    To Dr. Herron's conclusions that you're

17  disputing.

18      A    I don't know what the relevance is.

19      Q    In your answer a few minutes ago I

20  believe you stated that as a first point for how

21  you respond to Paragraph 14.  So my question is

22  trying to understand how it would undermine, or if

1    it would undermine, Dr. Herron's conclusions if,

2    in fact, third party voter registration

3    organizations do target non-white voters.

4         A    It's my understanding that the

5    provisions of the laws, SB 7050, may have had an

6    adverse effect on the ability of third parties to

7    register non-white registered -- unregistered

8    voters.  It does not suggest that those provisions

9    would have prevented non-whites from registering.

10              That's what I, to use your word,

11   relevance, the relevance here is I don't see a

12   demonstration that the conditions of SB 7050 had

13   an adverse effect on non-white voter

14   registrations.  It had an adverse effect

15   potentially on third parties registering

16   non-whites and other voters, but it didn't mean,

17   nor does he demonstrate in his report, that it had

18   an adverse effect on non-white registrations.

19        Q    So accepting what you've said the

20   literature finds that many third party voter

21   registration organizations do target non-white

22   voters in order to help them with their

1    registration, would a law that impacts or limits

2    third party voter registration organizations

3    necessarily have an impact on non-white voters?

4         A    It might.  But again, that is a subject

5    to some testing, and Professor Herron attempts to

6    offer such a test.

7              I would not dispute his effort.  All I

8    am suggesting is it doesn't seem to be relevant to

9    the question we were asking which is, is this

10   restriction on third party registrations

11   sufficient to diminish non-white voter

12   registrations by other methods, and we see no

13   evidence of that.  We see some speculative

14   evidence that it might not, but we don't see a

15   test.

16             And again, our report is short and

17   simple.  We offer a difference-in-difference

18   design that qualifies the base of non-white voters

19   to the total number of available non-white voters

20   to register, and that's CVAP.

21        Q    And you testified earlier that

22   difference-in-difference ratios are widely

1    accepted as strong methodology in reaching

2    opinions in these types of case.

3         A    Do I?

4         Q    You testified earlier that

5    difference-in-difference ratios are a common or

6    preferred methodology in reaching conclusions and

7    analyzing data in cases such as this one.

8         A    Yes.

9         Q    I'd like to look next at Paragraphs 31

10   and 32 of Dr. Herron's rebuttal report where he's

11   discussing some of the difference-in-difference

12   ratios that he reached in this case.  So I'll read

13   to start, quote, with this as background, the

14   contents of Tables 21 and 22 of my expert report

15   are divided into pre SB 7050 months (January

16   through June) and post SB 7050 months (July

17   through August), and they indicate that new voter

18   registrations overall in Florida were down almost

19   19 percent in July through August compared to

20   being down roughly four percent in January through

21   June.  And he cites his paragraph and page number

22   of his report.  The associated

1    difference-in-difference is approximately negative

2    15 percent.

3            And I'll go ahead and read Paragraph 32

4    and then ask my question.  So, quote, according to

5    Tables 21 and 22, the associated

6    difference-in-difference for third party voter

7    registration organization voter registrations is

8    roughly negative 28 percent, which is the greatest

9    in magnitude drop across the voter registration

10   methods of all the methods listed in the two

11   tables.  The difference-in-difference constitutes

12   evidence of the impact of SB 7050 on voter

13   registrations in Florida, countering the claim in

14   the Stein-Alford Report that my expert report,

15   quote, does not provide empirical evidence of the

16   impact of SB 7050 on voter registration in

17   Florida.  And he cites Page 3.

18           My question for you is, what response do

19   you have to these paragraphs in Dr. Herron's

20   rebuttal report?

21       A    Twofold.  I believe that the change in

22   third party voter registration rates after the

1  adoption/implementation of SB 7050 probably are

2  accurate.  What I don't know is whether or not the

3  difference-in-difference constitutes evidence of

4  the impact of SB 7050 on voter registration.

5  Voter registration is different than the method of

6  voter registration.

7          So what we know here is that third party

8  voter registration may have gone down with a

9  difference-in-difference.  We do not know whether

10 or not overall voter registration as a result of

11 the decline in third party voter registration went

12 down, and that is because the latter question must

13 establish a baseline.

14         One of the reasons that voter

15 registration may have declined is not because of

16 third party voter registration restrictions via SB

17 7050, but because there may have been fewer people

18 eligible to register to vote.  That is to say,

19 even if you're not looking at the racial

20 differences in voter registration, but you're

21 looking at overall voter registration, you have to

22 know what the base of eligible registrants are.

1    Citizen voting age population.  As we report in

2    our expert report, you should have a

3    ratio-of-ratio differences.

4           And the ratio in the second sentence,

5    the difference-in-difference constitutes evidence

6    is not evidence of lower voter registration.  It

7    is merely evidence of lower third party

8    registrations.  Evidence of less voter

9    registration would have to look at the ratio of

10   total registrants over total citizen voting age.

11          For instance, if we were at 90 percent

12   of registration among citizen voting age

13   population, it would be very hard to improve on

14   that.  So what we have to know is what is the base

15   from which we are making the generalization that a

16   change in the law decreased, rather than increased

17   or had no effect, on registrations.  That data is

18   simply not available, or not presented by

19   Professor Herron.

20      Q    So to start with the last part of what

21   you just testified to, do you have CVAP, I think

22   is the shorthand if you agree, of this type of

1    data available for 2023?

2         A    I don't know if it's available.  I've

3    read Professor Herron's report and he says it's

4    not available on a month-by-month basis.  I've

5    seen citizen voting age population data at

6    different levels of analysis for 2022, and I

7    believe, I believe, but it might take me some time

8    to find it for 2023, but I think it is available

9    now.

10              And if it was not available, I'm not

11   arguing with Michael on the issue of the monthly

12   data, that's unfortunate, but without that data,

13   you can't test that second sentence.  And let me

14   be very clear.  It's the second sentence, this

15   difference-in-difference constitutes evidence of

16   the impact of SB 7050 on voter registrations in

17   Florida.  It does not.  Without that denominator,

18   without knowing what the size of citizen voting

19   age population is, we can't make a

20   difference-in-difference test.

21              It's unfortunate the data may not be

22   available, but to say the least, not the problem

1    for the, for my colleague John and I, it would be

2    incumbent on Michael to come up with the design to

3    control for that base.

4        Q    We'll talk more about the design that

5    Dr. Herron did select, but just to confirm, you

6    don't have any evidence to offer that there is

7    CVAP data available for 2023?

8        A    Not at this time, no.

9        Q    Do you have any understanding of whether

10   there's CVAP data available for 2022?

11       A    I believe it's available, but again, I

12   make no, no -- what's the word?  Claim in our

13   report. I simply said that was what was needed to

14   do an adequate test.

15       Q    And if Dr. Herron represents that the

16   most recent CVAP data available is from 2021, do

17   you have any reason to, or basis to dispute his

18   claim?

19       A    Again, I have no basis, no, to dispute

20   that claim.

21       Q    Is it your understanding that groups

22   would need to wait two years after a law goes into

1   effect in order to ever have a chance to offer

2   empirical evidence about its impact?

3         A    Could you repeat that?  I couldn't hear

4   the first part.

5         Q    Sure.  My question is, assuming that Dr.

6   Herron is correct about the two-year delay in the

7   availability of CVAP data, is it your testimony

8   that Plaintiffs would need to wait two years after

9   a law goes into effect in order to ever be able to

10  offer an empirical analysis of its impact?

11        A    No.  You can offer, and Michael Herron

12  does, offer opinions about what the impact of the

13  law is.  You can offer opinions.  What I'm

14  suggesting is this is a design that would be

15  preferred.

16             I've seen people even use the 2021 data.

17  I don't believe that Michael did.  I think it was

18  also not available on a monthly basis, but again,

19  that's not my claim.  People can make judgments,

20  and as you pointed out, I've agreed that people

21  can make speculative hypotheses.  But the design,

22  again, let me repeat, the difference-in-difference

1    constitutes evidence for the impact is not

2    evidence.  Let me be clear.  He didn't offer a

3    two-year, or even using the 2021 CVAP.  He claims

4    that by showing that third party voter

5    registrations have declined as a result of the

6    adoption of SB 7050, that we can conclude that

7    overall registrations have gone down.  We cannot

8    conclude that.

9            We don't have -- he didn't marshal the

10   evidence necessary for doing that.  Whether he has

11   it or not or whether it's available, I don't

12   disagree.  I don't disagree the data may not be

13   available.  What I disagree with is that he should

14   not have said in this second sentence, we see that

15   the overall difference is a decline in voter

16   registration.  He can't know that.  He can

17   speculate about that, but he then says, this is

18   evidence of it, third party registrations may have

19   gone down, but he then links that to the decline

20   in overall registrations.  I don't know that to be

21   true, and I don't think he does either.

22       Q    In looking at Paragraph 31, back at what

1    I've read before but will repeat, Dr. Herron wrote

2    that new voter registrations overall in Florida

3    were down almost 19 percent in July through August

4    compared to being down roughly four percent in

5    January through June.

6            So my question is how is that not a

7    conclusion of overall voter registration decline?

8        A    Because as I said in our report, we

9    don't know what the base is.  The appropriate

10   analysis for assessing the impact of SB 7050 on

11   voter registration is to compare two ratios.  Two.

12   Ratio No. 1, total new registrations over citizen

13   voting age population.  Second ratio time 2.  Same

14   number, total new registrations over total CVAP,

15   for the two different time periods.  He doesn't

16   have that data, doesn't present that data, doesn't

17   speculate about it, doesn't raise it as a

18   potential threat to this conclusion.

19           The 19 percent decline could simply, be

20   simply that most people were registered to vote in

21   Florida in the period, the second period, what he

22   calls the post SB 7050 months.  I don't know that

1    because I don't know what the CVAP population

2    looked like.  Michael claims he doesn't know it

3    either.  I wouldn't -- I would speculate maybe,

4    but I wouldn't write it as "this is evidence" as

5    he writes here.  The difference-in-difference

6    constitutes evidence of the impact of voter

7    registration.  It doesn't.  It may be suggestive,

8    but it doesn't constitute evidence.  Am I wrong in

9    reading that sentence, this

10   difference-in-difference constitutes evidence?

11   No.

12          Now, if he disagrees with the design,

13   that it should be a comparison of ratios and not

14   just the numerator, the numerator would be the

15   number of new registrations.  What I want to know

16   is the number of new registrations over the

17   possible number of new registrations that could

18   have existed at time 1 versus time 2.  If time 1

19   had a high rate of registrations and time 2 had a

20   lower rate, then I would conclude that there's

21   something, some evidence of post SB 7050 months

22   may have impacted registrations, but we don't get

1    that test.

2         Q    And according to Dr. Herron's analysis

3    of the voter file, he presents evidence that new

4    voter registrations overall in Florida were down

5    almost 19 percent, correct?  Your issue is with

6    the source that he uses?

7         A    My issue is with the?

8         Q    The source of the data that he uses.

9         A    No.  My issue is with the design.

10   Again, the best way to know whether registrations

11   go up or down is to ask, first, how many people

12   could be registered.  Could you imagine a world

13   where everyone was registered?  Do you know of a

14   state in this country where everyone is a

15   registered voter?  That's a quiz.  It's called

16   North Dakota.  Everyone -- there is no voter

17   registration in North Dakota.  So how do you

18   calculate voter registration when everyone is

19   registered?

20             In the State of Florida, you have voter

21   registration.  So we don't assume that everyone is

22   registered to vote.  We do that by asking, how

1    many people are legally eligible to register.  We

2    then take that number and compare it to the number

3    of people who are registered and we get a rate.  I

4    don't know what the rate of registration is in

5    Florida, but that rate has to be compared before

6    and after.  That is a well-accepted design called

7    a difference-in-difference.  That's not what

8    Michael Herron did.

9        Q    You testified that it's a well-accepted

10   design.  Is it the only accepted design for

11   reaching conclusions and analyzing voter data?

12       A    Is it the only method used, or is it the

13   only acceptable method?

14       Q    Well, break -- is it the only -- we'll

15   start with used.  Is it the only method used when

16   analyzing voter data?

17       A    Well, obviously not in Michael Herron's

18   case.  But I would argue it is a widely accepted

19   and preferred method for doing

20   difference-in-difference.  And if you want at a

21   later date I will offer you research and designs

22   that recommend this type of difference, this

1  ratio.

2          I even would speculate, knowing Michael

3  Herron's work and Dan, that they have used this

4  design before themselves.

5      Q     And so not disputing that that is a

6  well-accepted design and a method, my question to

7  you is whether it is the only method used in

8  analyzing voter data?

9      A     No, I would have to say it is not the

10  only method used.  And clearly in this case for

11  Professor Herron and Smith it was used -- another

12  method was used.

13      Q     And do you have an understanding of

14  whether Courts have accepted other designs in

15  analyzing voter registration data?

16      A     I do not.

17      Q     So what is your opinion that this is the

18  only method that you would accept in analyzing the

19  voter data based on?

20      A     I believe this is a preferred method.

21  It is one that gives us greater confidence.  As

22  the authors in, as Michael, Professor Herron and

1    Dan Smith have pointed out, there are plenty of

2    confounders here.  And Professor Herron is very

3    careful in trying to get comparable time periods

4    as you've raised before.  Getting a Presidential

5    and non-Presidential election time period could be

6    problematic, and I'm not disagreeing.  But a more

7    basic one is asking the simple question, if

8    registration numbers go up, is that a preferred

9    measure to knowing how many registered, eligible

10   registered voters are in the state relative to the

11   number of eligible citizen voting age population.

12   I consider that superior, and I suspect, I would

13   hope the Court would find that more convincing.

14        Q    Do you have any understanding of whether

15   Dr. Herron's opinions similar to those he offers

16   in this case analyzing voter registration data

17   from the voter file have already been credited by

18   Florida courts?

19        A    I do not.

20        Q    And you don't have any understanding one

21   way or the other whether the 11th Circuit has

22   credited a similar analysis by Dr. Herron?

1      A     I do not.

2            MS. JOHNSON:  Okay.  I think this may be

3      a good time for a break.  Let's say maybe 10

4      minutes, if that's okay.

5            MR. PRATT:  Sure.  2:55 works, Eastern

6      time?

7            MS. JOHNSON:  Yes, sounds great.  Off

8      the record.

9            (A recess was taken at 2:44 p.m.)

10           (Back on the record at 2:55 p.m.)

11     BY MS. JOHNSON:

12        Q     Okay, I think we'll take a look back at

13     your expert report again.

14           MS. JOHNSON:  Makeba, if you don't mind

15     pulling it up.

16        Q     So Exhibit 2, which is your expert

17     report, and we'll look at Page 4.  We'll look at

18     the third bullet, which is something you've

19     mentioned already today.

20           You wrote, quote, Professor Herron's

21     analysis does not consider the possibility that

22     declines in the proportion of non-whites

1    registering to vote by a third party were

2    substituted by registrations by another model,

3    e.g., DMV.

4            Did I read that correctly?

5        A    That should probably be mode.  That's a

6    typo.  As in mode of registration.  But that's a

7    small point.

8        Q    Got it.  Okay.  Other than that typo, do

9    you agree that I read it correctly?

10       A    Yes.

11       Q    Who wrote this; you, or Dr. Alford?

12       A    I'm pretty certain I wrote that, I

13   drafted that.

14       Q    Turn to Dr. Herron's rebuttal report for

15   his response.  I'll be looking at Paragraph 118 on

16   Page 39.

17           Here we go.  118.  Dr. Herron wrote,

18   quote, the Stein-Alford Report offers no compared

19   evidence on either the cost of registering to vote

20   via 3PVRO or the cost of registering to vote at a

21   DMV office.  Indeed the Stein-Alford Report does

22   not offer any comparative evidence on the cost of

1    registering to vote with the various methods of

2    voter registration available in Florida.

3            Do you agree with Dr. Herron that you do

4    not offer any comparative evidence about the cost

5    of registering to vote via various registration

6    methods in your expert report?

7        A    No, we do not offer such evidence.

8        Q    Okay.  We'll go ahead and look at

9    Paragraph 119.  Notwithstanding, quote,

10   notwithstanding this lack of evidence, the authors

11   of the Stein-Alford Report do suggest that

12   3PVRO's, quote, target, unquote, minority voters

13   when seeking to register eligible Floridians to

14   vote, Page 8, noting that the Stein-Alford Report

15   refers to non-white voters, which I treat as

16   shorthand for minority voters.  The authors of the

17   Stein-Alford Report do not make a similar point

18   about Florida DMV offices, i.e., they do not claim

19   that officials in DMV offices target eligible

20   minority voters for voter registration purposes.

21   Thus, the only comparative point made in

22   Stein-Alford Report about voter registration via

1    3PVRO and voter registration at a DMV office is

2    one implying that for minority voters, the former

3    method of registration is less costly than the

4    latter.

5            What is your response to this paragraph

6    of Dr. Herron's rebuttal report?

7        A    Could you go down further on that?  I

8    just want to read the next sentence after that.

9        Q    Absolutely.

10           This is seemingly at odds with

11   Stein-Alford Report's statement that it is, quote,

12   is not, quote, obvious, end quote, that voter

13   registration via 3PVRO is less costly than voter

14   registration at a DMV office.

15       A    I don't have much of a reaction to this.

16   I've read this paragraph a half a dozen times,

17   maybe 10.  John and I have read it together.  I do

18   not know how it's responsive to our question,

19   could voter registration at the DMV offset any

20   decreases in third party voter registration.

21           Again, I'm not going to repeat for the

22   record how we would have done that.  I think I

1    made it very clear about the

2    difference-in-difference.  But it strikes me that

3    the costliness of third party voter registrations

4    and the DMV is simply an interesting question, but

5    we don't know whether or not the number of

6    non-white voters who registered at the DMV went

7    up, down, or relative to the availability of

8    voter, citizen voting age population relative to

9    the three, the third party.

10            So I don't know how this, I don't know

11   what to respond to this in saying, I don't know if

12   the DMV is more or less costly to the voter.  We

13   don't -- you know, third party registration, as we

14   suggested in the report, is a service that is

15   provided to third parties -- by third parties to

16   predominantly targeted non-white voters.  The DMV

17   is when somebody wants to get a driver's license,

18   so you have to actually go to the DMV and get the

19   driver's license.  A third party voter

20   registration might be thought of as a subsidy, but

21   again, the issue for us has always been, does the

22   law, SB 7050, have a diminishing effect on voter

1    registrations disparate between non-white and

2    white, and we think that it could have been offset

3    by the DMV.  That is, we don't dispute that third

4    party registrations may have gone down.  We just

5    don't know if they went up in the DMV relative to

6    the available population to be registered, that's

7    all.

8            I don't know how to respond to this

9    paragraph, and I'm not certain it's even

10   responsive to anything we wrote in our report.

11       Q    Just to confirm something, I think you

12   just said you don't disagree with Dr. Herron that

13   you only offer a claim that 3PVROs target

14   minorities but do not allege that the DMV has any

15   kind of similar targeting of minority voters,

16   correct?

17       A    No claim of that.

18       Q    Let's look back at your report.  We're

19   going to turn to Page 5, the next page.  Okay.

20   And we're going to look at that first paragraph on

21   Page 5 to start.

22            MS. JOHNSON:  If you can scroll back to

1     the bottom of 4, I forgot that it starts there.

2          Q    Okay.  So I'll read, you wrote, quote,

3     Professor Herron relies on comparing the

4     proportion of persons registering to vote by

5     race/ethnicity and method.  Professor Herron

6     reports a significantly greater proportion of

7     non-whites than whites who register to vote via

8     third party registrations and that this number

9     declines significantly after the adoption and

10    implementation of SB 7050.  We believe this is an

11    inappropriate measure of the incidence of

12    non-white and white total voter registrations and

13    registration by method.

14              So my first question is, did you or Dr.

15    Alford write this portion of your report?

16         A    Who wrote this portion of the report, is

17    that your question?  I did.

18         Q    Okay.

19         A    I drafted it, yes.

20         Q    Why do you believe that it's

21    inappropriate that Dr. Herron, or why do you

22    believe it's inappropriate as "inappropriate" is

1    used in this paragraph?

2         A    I think I've answered that question.

3         Q    It's fine if you want to refer to your

4    earlier testimony, you don't need to repeat again,

5    but I want to have an understanding because this

6    is a different portion of your report.

7         A    I'll go back and repeat what I said, I

8    think.  When looking at rates of registration, you

9    have to have a base from which to make

10   comparisons.  So if the rate -- that is to say the

11   number of registered voters over the total number

12   of persons who could be a registered voter is a

13   rate.  So if there's a thousand people who are

14   citizen voting age population, or a thousand

15   people who are African American, Hispanic or white

16   citizen voting age population, the question you

17   want to ask is, of those thousand people, how many

18   are registered, because the denominator, the

19   number below, can vary both across racial groups

20   and between and over time.  You must have a way to

21   standardize.  Otherwise what you're comparing are

22   essentially very different numbers that aren't

1    comparable.

2            So what we suggested is that you compare

3    two ratios, before and after the adoption and

4    implementation of SB 7050.  Professor Herron

5    doesn't do that.  He only compares total number.

6    He only compares numerators.  And what we don't

7    know is that we would, we might expect the

8    denominator to be bigger or smaller for different

9    racial and ethnic groups and across time.

10   Therefore, the preferred measure is a

11   difference-in-difference.  That's why they call it

12   a difference-in-difference.  It's a difference in

13   the difference over time of these two ratios.  And

14   I don't see any analysis that includes citizen

15   voting age population in the denominator.  He just

16   gives us raw numbers.

17       Q    The denominator in the calculations that

18   Dr. Herron performs are the total number of voters

19   in Florida's voter file, correct?

20       A    Yes.

21       Q    Have you ever relied upon voter files

22   when engaging in your expert work?

1        A      That's a very good question.

2               I honestly don't remember.  Probably in

3      my research, but not in my expert testimony.

4        Q      And when you refer to your research that

5      reviewed voter files, was that peer-reviewed and

6      published research?

7        A      Yes.

8        Q      Are you familiar with other, whether

9      other experts in your field rely upon voter files

10     in reaching part of their expert conclusions?

11       A      I know Michael Herron and Dan Smith do,

12     yes.  I can't think of others.

13       Q      You don't know one way or the other

14     whether other experts also use voter files to

15     reach conclusions?

16       A      In cases I've been involved in, or just

17     from my general knowledge?  I can't recall.

18       Q      Okay.

19       A      I'm sure they do, yes, I just can't

20     recall names and cases.

21       Q      Do you allege that any of Dr. Herron's

22     calculations were incorrect?

1       A     Any of Dr. Herron's populations?

2       Q     Calculations.

3       A     Oh, calculations.

4             No, we have done no independent analysis

5       or reanalysis of his data.

6       Q     Do you disagree with Dr. Herron's

7       finding that at least six to seven percent of all

8       voter registrations have been facilitated by third

9       party voter registration organizations?

10      A     We have not contested that, no.

11      Q     Do you agree that according to the voter

12      file, black registered voters in Florida use third

13      party voter registration organizations to register

14      to vote roughly five to six times as often as

15      white voters?

16      A     We did not contest that.

17      Q     Do you disagree with Dr. Herron that

18      according to the voter file, Hispanic voters have

19      used third party voter registration organizations

20      roughly four to five times as much as white

21      voters?

22      A     We have not contested that finding.

1        Q     Let's take a look at Dr. Herron's

2    rebuttal report again, Paragraph 63 this time.

3              I'll let you read the paragraph yourself

4    for just a second because I'm only going to read a

5    portion of it.

6        A     (Reviewing.)

7              I've read it.

8        Q     Okay.  So the part I want to focus on is

9    the last sentence, quote, indeed the Stein-Alford

10   Report does not provide evidence that even a

11   single conclusion in my expert report would have

12   been different had I divided the counts of third

13   party voter registrations (and other registrations

14   by other methods) by counts of citizens of voting

15   age in Florida.

16             And my question is, what is your

17   response to this portion of Dr. Herron's rebuttal

18   report?

19       A     I think this is not germane to the

20   question that we raise with Dr. Herron's report.

21   Let me be absolutely clear, because I've only said

22   this several times.  We have not contested the

1    share of third party voter registrations that

2    might be African American, Hispanic.  I'm going to

3    repeat that again so it's not asked.  We don't

4    dispute that a higher proportion of third party

5    voter registrations occur among non-white voters,

6    okay?  Is that clear?

7           We have said that the consequence of

8    SB 7050 on total voter registration and total

9    voter registration by race and ethnicity requires

10   a different strategy design.  That design would

11   look at the total number of registrations, new,

12   and the total number of citizen voting age

13   population by race and ethnicity.

14          We did not, I'll repeat carefully, we

15   did not, maybe I misread my own report and you'll

16   have to show me in my report, we did not say that

17   Professor Herron should have taken the ratio of

18   third party voter registration rates over the

19   total number of citizen voting age population.

20          Would you go back to my report, please,

21   and we'll go to, I think it's the top -- I think

22   it's right there.

1              Professor Herron reports a significantly

2    greater proportion of non-whites than whites who

3    register to vote via third party and that this

4    number declines significantly after the adoption.

5    We believe this is an inappropriate measure of the

6    incidence of non-white and total white voter

7    registrations and registrations by method.

8              So what I'm trying to suggest here is it

9    isn't that he should have taken the total number

10   of third party registrations over CVAP.  What he

11   should have taken is the total number of

12   registrations over CVAP and the total number of

13   registrations by race and ethnicity over the total

14   number of citizen voting age by race and

15   ethnicity.

16             We don't take, and I've said, we don't

17   take issue with the rate of third party

18   registrations by race and ethnicity.  We take

19   issue with the consequence of it on total

20   registrations.  We believe there isn't evidence

21   here that SB 7050 depressed total registrations by

22   race and ethnicity.  Not, we do not take issue

1  with how the law may or may not have affected

2  third party registrations.  We take issue with

3  whether or not that finding has consequences for

4  non-white voter registration.

5       Q    Let's look back at Dr. Herron's rebuttal

6  report again, on Page 28.  Starting with the

7  section header there, I'll read it.  Dr. Herron

8  wrote, quote, CVAP normalizations are consistent

9  with findings in my expert report.

10           Have you reviewed this section of Dr.

11  Herron's rebuttal report?

12      A    You're talking Paragraph 77?

13      Q    Yes.  And the subsequent paragraphs in

14  this section, 5.2.2.

15      A    Putting aside the fact that the universe

16  of Floridians who --

17           (Reading.)

18      Q    We're going to look down at the

19  paragraph on the next page.  I was just asking

20  whether you read this section.

21      A    I've read it, yes, and I'm reading it

22  now again.

1      Q     I am going to give you time to review

2   whatever you need, but just to expedite, so we'll

3   go on to the next page.

4            You'll see that Dr. Herron included a

5   new table, table 7, which he's titled, quote,

6   3PVRO Voter Registration Rates Based on CVAP

7   August 2021 Voter File.  Do you see that?

8      A     Yes.

9      Q     And then looking down to the next page,

10   on 86, Paragraph 86, Dr. Herron summarizes what he

11   found in Table 7.  He writes, quote, I concluded

12   from Table 7 that black citizens of voting age in

13   Florida use 3PVRO voter registration at greater

14   rates than white citizens of voting age in

15   Florida.  Because the correlation between missing

16   method of voter registration and race, the

17   black/white gap in 3PVRO registration rates is

18   conservative.

19            Do you have a response to this portion

20   of Dr. Herron's rebuttal report?

21      A     Yes.  And again, I don't contest, nor

22   does John, and you'll have him, that third party

1    voter registrations are greater among non-whites.

2    What we raised as a central issue is whether the

3    consequences of these laws, of this law,

4    provisions of this law had an adverse effect on

5    total voter registrations as a consequence of what

6    it may or may not have done to third party voter

7    registrations.  That can only be assessed by the

8    design that we outlined in our report, our expert

9    report.

10          What Michael has done here for one

11   period, 20 -- is it 2021?  August 2021 is simply

12   take the total number of third party voter

13   registrations for African Americans, Anglos, I

14   believe there were Hispanics in that category as

15   well, and divided it by the total number of CVAP.

16          Again, if you go back to our report, the

17   difference-in-difference design that we would have

18   recommended would be to compare the two ratios,

19   total registration, CVAP registration for race and

20   ethnicity.

21          This is not responsive to the point and

22   recommendation we made.  Michael took CVAP and did

1  it for -- go back to the table.  Above -- stop.

2  That is for August 2021.  But his analysis, his

3  most important analysis is to show that before and

4  after the adoption of SB 7050 there was a

5  demonstrable decline in third party registrations,

6  particularly among non-white voters.  We're not

7  contesting that.  We're saying that it is

8  non-consequential for, this effect, this finding

9  is non-consequential for the outcome of voter

10  registration for non-whites.  To do that we

11  recommended an analysis that Michael doesn't do

12  here.  I don't see the before and after.  I just

13  see that he divided the total number of

14  registrants, white, black and Hispanic, by CVAP,

15  which I would imagine is reasonably correlated

16  with total registered voters.

17          What I want to know, John and I raised,

18  is is this law and its implementation

19  consequential to voter registration among

20  non-whites.  That can only be done -- not only, it

21  can be better done, or preferred, a preferential

22  way to do it is the difference-in-difference

1    design of the two ratios.  This is not two ratios,

2    this is just comparing for one year -- or one

3    month, I should say.

4        Q    Let's go back to your report and then

5    look at Pages 6 and 7 and the number of

6    hypotheticals that you presented on these pages.

7    I am happy to let you review as much as you need,

8    but my question is going to be, why did you choose

9    to provide hypothetical numbers rather than

10   conducting an actual analysis and calculation

11   using real numbers?

12       A    Without being, and I really do mean not

13   to be snarky, but I don't work for the Plaintiff.

14   I was using this as a hypothetical.  The object of

15   our criticism is not the quality.  I want to be

16   very clear here, it's not the quality of Professor

17   Herron or Smith's research.  It is not the quality

18   of the data they were able to en masse.  It is not

19   their analytical strategy.  It is their

20   methodology.

21            This is not the way to assess the effect

22   of this law on non-white voter registration.  This

1    is purely a hypothetical example of the design

2    that should have been used.  It is not the design

3    that was used by Herron or Smith.  And we believe

4    this is the preferred design.

5              The numbers, as Michael suggests, are

6    not representative -- although I was surprised

7    that one of my numbers was actually quite close --

8    but they were just hypothetical examples to

9    demonstrate how we could show that the effects of

10   this law may or may not have diminished and

11   widened or narrowed the gap between voter

12   registration for white and non-white voters.

13       Q    Would you have access to the same data

14   that Dr. Herron used in his report?

15       A    I believe we do, yes.

16       Q    And to potentially save us from flipping

17   back and forth, but we can, I believe you just

18   mentioned that Dr. Herron responds in his rebuttal

19   report with an analysis showing that the 2019

20   numbers presented in this table are not accurate;

21   is that correct?

22       A    Yes.  I never -- let me be very clear.

1    I never purported that these numbers were actual

2    representations of real data in the State of

3    Florida.  I think I made it very clear they were

4    hypothetical numbers simply to illustrate what

5    might look like disparate and non-disparate

6    effects of SB 7050 on voter registration.

7         Q    And so you don't disagree with the 2019

8    calculations that Dr. Herron provided in his

9    rebuttal report?

10        A    Do I -- I'm sorry, I didn't hear that.

11        Q    You don't disagree with any of the 2019

12   calculations that Dr. Herron provided in his

13   rebuttal report?

14             MR. PRATT:  Objection.  Form.

15        A    I have no basis for knowing whether

16   those calculations are right or wrong.  I do have

17   a basis for knowing that the design, the

18   methodology, is not one that I think is superior

19   for answering the question that we were charged

20   with.

21        Q    Go back to Dr. Herron's rebuttal report.

22   We're going to look at Paragraph 105.

1          Okay, I'll read it.  Dr. Herron writes,

2    quote, as I point out in my expert report, SB 7050

3    was effective as of July 1st, 2023, and he cites

4    where he says that in his opening report, putting

5    aside the invented (and in the case of the 2019

6    rates, demonstrably wrong) voter registration

7    rates, subtracting 2023 and 2019 rates will result

8    in differences confounded by the fact that SB 7050

9    was not effective in the first half of 2023.

10          Do you have a response to this paragraph

11    of Dr. Herron's rebuttal report?

12        A    No, I don't disagree.  I assume that his

13    statement is actually accurate.

14        Q    And so would you agree that this is a

15    flaw in the research design that you propose

16    should have been undertaken?

17        A    No.  The concern here is it's a flaw in

18    Professor Herron's research design.  It may be

19    that we cannot effectively, accurately assess the

20    impact of SB 7050 on voter registration rates for

21    the very reasons that he raises.  It wasn't

22    effective for the first half, and he goes on to

1    explain why.  That difference merely -- what I

2    read from that is maybe we should have waited

3    until the second half of 2023 before we did the

4    evaluation.  That would, if I were doing scholarly

5    work, I'd say, I'll wait until the data is

6    available.  We don't know what the future will

7    hold.

8            It's, you know, he's speculating, but

9    he, himself, does this type of before/after

10   analysis.  We just think that he should have used

11   a different design.  He claims that CVAP wasn't

12   available on a monthly basis and that the SB 7050

13   wasn't in effect after the first half of 2023.

14   Would you agree that we're now in the second half

15   of 2023?  He could have done the analysis in the

16   last.  I know he is a very hardworking person, but

17   this doesn't change our evaluation of his

18   findings.

19       Q    Do you have an understanding of whether

20   Dr. Herron did, in fact, analyze the voter file

21   data from the second half of 2023?

22       A    I do not.

1        Q     Look at Page 7 of your report.  Back to

2    your report.  Right under Table 2 you write,

3    quote, we could not find in Professor Herron's

4    expert report any information that reported the

5    difference-in-difference ratios of white and

6    non-white registrations to white and non-white

7    citizen voting age populations for comparable the

8    periods preceding and following the adoption of SB

9    7050.

10            Who wrote this portion of the report?

11       A     I did.

12       Q     Okay.  Let's look at Dr. Herron's

13    rebuttal report.  We'll look at Paragraph 51.

14            So this is a new table that Dr. Herron

15    prepared in his rebuttal report.  And in paragraph

16    51 Dr. Herron wrote, quote, Table 4 shows that the

17    non-white difference-in-difference is roughly

18    negative 26 percent and the white

19    difference-in-difference is roughly negative

20    18 percent.  Non-white voters thus had a greater

21    post SB 7050 drop in voter registrations between

22    2019 and 2023 compared to white voters.  This is

1   consistent with SB 7050 having diminished voter

2   registrations disproportionately among non-white

3   voters compared to white voters, which is what

4   would be expected given, 1, SB 7050's provisions

5   regarding 3PVROs, and 2, the fact that non-white

6   voters are disproportionate users of voter

7   registration via 3PVRO.

8           My question is, what response do you

9   have to this portion of Dr. Herron's rebuttal

10  report?

11      A    I'll simply repeat the same thing I said

12  before.  This analysis doesn't take into

13  consideration the base from which these numbers

14  are calculated, citizen voting age population, and

15  it makes what I consider to be a speculative

16  relationship between the decline in third party

17  voter registration and third party voter

18  registration by race and the overall rates of

19  registration.  This is not the empirical analysis

20  that would be needed to test that.

21      Q    You disagree with the calculations that

22  Dr. Herron conducted in Table 4?

1      A      Absolutely not.  Absolutely not.

2    Calculations are different than research design.

3    He simply is unresponsive to the issues that we --

4    I am certain Michael is careful, and I take

5    objection to your suggestion that his calculations

6    are wrong and I think otherwise.  That's

7    offensive.  Michael does fine work and you should

8    know that.

9           What he has not done here is address the

10   key question, and I want to be very clear about

11   that.  Michael has done more research on these

12   questions and should know better.  This is not

13   responsive to the criticism or issues that we

14   raised.  He, his calculations, I assume, are

15   accurate.  It is not his calculations.  It is

16   simply the methodology by which he reaches the

17   conclusion that this is consistent with SB 7050

18   having a diminishing, having diminished voter

19   registration proportionately among non-whites.

20   That doesn't show -- that's not here in the table.

21           Two, which is what would be expected,

22   would be expected, given that SB 7050's provisions

1    regarding third party voter registrations and to

2    the fact that non-white voters were

3    disproportionate.

4              The logic here is tortured.  There's no

5    empirical evidence that links the effect of

6    SB 7050 on third party voter registrations, which

7    in turn links it to overall registration rates

8    among non-whites.  Why?  Because the design, not

9    the calculation, is what I think is incorrect.

10   The design would have been a

11   difference-in-difference analysis of ratios.

12   That's not done here.

13             Missing is the citizen voting age

14   population denominator needed to make this

15   analysis sufficient to at least show that there

16   was decline before and after the adoption of

17   SB 7050.  It's not here.  Calculations are

18   accurate.  It is simply not the appropriate

19   analysis or strategy or methodology, not

20   calculations.  I disagree with that.

21      Q    You mentioned that Dr. Herron has

22   experience with these, with this area of law; is

1    that correct?

2        A    I don't know if he has experience with

3    this area of law.  He has a great experience with

4    this type of data, yes, evidence his expert

5    report, his rebuttal report.

6            I think he chose to ask a different

7    question than Mike -- than John Alford and I have

8    asked.  Although in the report, he does say,

9    SB 7050 had a disparate effect on not only voter

10   registrations for non-whites, but on

11   enfranchisement.  I don't believe he's tested that

12   hypothesis.  He's simply shown that there's a

13   possibility that SB 7050 may have reduced overall

14   third party voter registrations and the share of

15   those registrations that are non-white.  What he

16   has not shown is that SB 7050 has had a disparate

17   effect on the registration rates of non-whites

18   relative to whites.

19       Q    We'll go back to your report and look at

20   Page 7.

21           And we're going to look at the next

22   bullet point on Page 7, which I believe is

1    something you referenced earlier in your

2    testimony.  You wrote, quote, post January 2012

3    registrations reported in Tables 13 and 15 of

4    Professor Herron's expert report show that DMV

5    registrations among black and Hispanic voters were

6    37 percent and 36 percent respectively, and 3PVRO

7    registrations were 15 percent and 11 percent in

8    August 2021.  In the September 2023 voter file,

9    black and Hispanic DMV registration rose to

10   44 percent and 42 percent respectively, while

11   3PVRO dropped to 13 percent and 10 percent among

12   blacks and Hispanics.

13          Though conclusions about the aggregate

14   numbers are subject to an ecological fallacy, they

15   are suggestive of substitution of DMV registration

16   for third party registration among non-white

17   voters.  Professor Herron neither comments on this

18   aggregate change, nor does he test to see if

19   non-white citizen voting age persons were

20   substituting registering at the DMV (or any of the

21   other options available for registering to vote)

22   for third party voter registration organizations.

1          Is it your opinion that when a voter

2    registration method is no longer available or not

3    as accessible to voters, you'd expect perfect

4    substitution into other methods of voter

5    registration?

6       A    No.  I would expect some substitution,

7    but I don't know at this point what that rate

8    would be.  It could range from zero to, as you

9    said, 100 percent, but I would have thought at the

10   very least it would have been tested and at least

11   examined.

12          And let me also note here that again,

13   the same recommendation, which is to look at

14   registration rates by citizen voting age

15   population for each racial and ethnic group.

16      Q    It says, your conclusion in this

17   paragraph, that burdening third party voter

18   registration organizations may not burden voters

19   who do substitute to other voter registration

20   methods depend upon assuming that every voter that

21   would have registered with a third party voter

22   registration organization will now register by

1    other means.

2         A    No.  That would be your conclusion.  My

3    conclusion is only that there was an option other

4    than third party.  And remember, third party,

5    unless we'll get to it, I guess on Page 8, we talk

6    about it, third party registrations are solicited

7    registrations.  DMV and other modes of voting,

8    other modes of registration are not solicitations,

9    although when you get your driver's license

10   renewed in Florida, they ask you if you want to

11   have yourself registered.  So you can turn down

12   voter registration at the DMV.

13            I don't know what the rates of

14   substitution are, but I would have thought that

15   Professor Herron would have looked at that table

16   and said, whoa, maybe we need to look more

17   carefully at whether or not there is substitution.

18   I don't know.  And no, we did not do any such

19   analysis.  It just seems a logical conclusion to

20   make that there might be substitution here.  We're

21   raising it and simply suggesting it should have

22   been looked at.  We did not.

1              And then my second point, which I've

2    repeated many times, sorry, is that even here we

3    don't see the base or standardizing to the citizen

4    voting age population that registered by third

5    party versus DMV or other methods.

6         Q    Do you agree that it's possible that

7    there will be a set of voters who do not register

8    to vote at all if 3PVROs face additional burdens

9    under SB 7050?

10        A    Say that again, it would be?

11        Q    Do you agree that it's possible that

12   there will be a set of voters who do not register

13   to vote at all now that 3PVROs face additional

14   regulations under SB 7050?

15        A    Absolutely I think it's possible, yes.

16   There will be some voters who will not register to

17   vote, yes.

18        Q    Is it also possible that voters will use

19   an alternate method of registration to register to

20   vote following SB 7050 but that they will incur

21   additional burdens or costs in doing so?

22        A    It's possible, yes.

1        Q    Do you agree that if one method of

2    registration becomes less available to voters, it

3    will increase the likelihood that they will use

4    other methods of voter registration?

5        A    Again, it's possible, but it's an

6    empirical question that should have been examined

7    in this report before we rushed to conclusions

8    about the effects, disparate effects on non-white

9    voters.

10       Q    And I believe you said this a few

11   minutes ago, but you do not have any data

12   comparing the costs of registering to vote via the

13   various methods available in Florida?

14       A    No.

15       Q    You've reviewed Dr. Herron and

16   Dr. Smith's paper that we looked at a bit earlier

17   analyzing Florida House Bill 1355?

18       A    Yes.

19       Q    You mention it in your report?

20       A    Yes.

21       Q    What explanation do you have for Dr.

22   Herron and Dr. Smith's finding in that paper that

1  a drop of overall registrations after HB 1355 was

2  demonstrated after additional regulations were

3  placed on 3PVROs?

4      A      What explanation do I have for their

5  finding?

6      Q      In that paper that there was an overall

7  drop in voter registration following additional

8  regulations of 3PVROs in House Bill 1355?

9      A      I don't have an explanation.

10      Q      Okay.

11      A      They do.  They have an explanation.

12      Q      You disagree with the findings of that

13  paper?

14      A      No.  I think they offer the paper as

15  evidence for both a decline in overall voter

16  registration and evidence of a disparate effect

17  for African Americans.  And as I said this

18  morning, the issue that we were concerned with was

19  whether or not the -- if you were to put up, can

20  you put the paper back up?  It might help.

21      Q      Sure.  I don't know if we have that

22  pulled up, but I am --

1        A       All right.  We don't need it.

2        Q       -- happy to take a break and get it.

3    I'm not meaning to withhold it.

4        A       The short answer was, we saw a decline

5    in voter registration among all racial/ethnic

6    groups.  The slope in Figure 3 appeared to me, and

7    to Professor Alford, as being steeper for white

8    voters than for African American and for Hispanic

9    voters.

10           Professor Herron and Smith report in

11   that 2014 paper that the slope only for African

12   Americans was statistically significant.  What we

13   thought was relevant, but not addressed in that

14   paper and not in their citing of it in their

15   expert report, was whether there were differences

16   in the slope between white and black, white and

17   Hispanic, and Hispanic and black, not whether or

18   not the comparison was between registration rates

19   over time by race.  That is, were there disparate

20   effects.  And we didn't, we didn't see any

21   evidence of that or any test of that in the 2014

22   paper.

1      Q      And so I believe what you just testified
2 to was material not covered within the paper that
3 we're discussing.  But just to confirm my
4 question, you don't disagree with any of the
5 findings that Dr. Herron and Dr. Smith reached in
6 that paper?
7      A      No.  I find nothing in that paper that
8 -- no.
9      Q      Okay.  We will move to Page 8 of your
10 expert report, and look at the paragraph here.
11 I'll read it.  You wrote, quote, Professor
12 Herron's findings demonstrate that a higher
13 proportion of non-white voters than white voters
14 registered to vote via third parties.  This,
15 however, may simply reflect the finding reported
16 in Table 1 of his expert report that an
17 overwhelming proportion of third party
18 registrations are conducted by groups that target
19 non-whites and/or Democratic voters.  Nine of the
20 top ten sources of voter registration applications
21 submitted by third party voter registration
22 organizations are affiliated with non-white

1    organizations and/or the Florida Democratic Party.

2    We suspect this accounts for the higher rate of

3    third party voter registrations among non-white

4    voters.  This expectation is confirmed by Herron's

5    regression analysis of the incidence of third

6    party registrations.  See Table 17.  Herron

7    reports a significant negative coefficient for

8    party registration as a Republican and the

9    likelihood of registering by a third party.

10            Okay.  I'm going to go ahead and flip to

11   Dr. Herron's rebuttal report to look at his

12   response to this paragraph.  I will be on

13   Paragraph 114.

14            Dr. Herron writes -- I'm going to start

15   a little bit into the sentence since the first is

16   a transition.  Quote, my regression results do not

17   show that political party affiliation, quote,

18   accounts for, unquote, disproportionately high

19   3PVRO registration usage among black and Hispanic

20   registered voters in Florida.  If political party

21   affiliation were to, quote, account for, unquote,

22   3PVRO registration usage among black and Hispanic

1    registered voters in Florida, then Table 17's (and

2    Table 23's) regression estimates associated with

3    race would not be statistically significant.  They

4    are, however, significant (and in the case of

5    Table 23's estimates, key are the marginal effects

6    in Table 18, which are also significant).

7              And I'll read Paragraph 15 and then ask

8    my question.  Overall, the regression results in

9    my expert report show that after controlling for

10   political party affiliation, voter race (black or

11   Hispanic) has a significant positive effect on

12   whether a voter registered to vote via a 3PVRO.

13   As a sidenote, the race estimates in Table 17 of

14   my expert report are several times greater than

15   corresponding political party estimates, implying

16   that the marginal effect of being black or

17   Hispanic (compared to being white) on the

18   likelihood of having registered to vote via 3PVRO

19   is greater than the marginal effect of Democratic

20   party affiliation (compared to Republican

21   political party affiliation) on the likelihood of

22   having registered to vote via 3PVRO.

1          So my question is whether you

2    disagree -- or how you would respond, let's say,

3    to either of these paragraphs in Dr. Herron's

4    rebuttal report.

5          A    I wouldn't disagree with 14 or 15.  The

6    numbers are, he's accurately reported his own

7    numbers.  This is the same question that

8    Ms. Keenan asked and is whether or not race/

9    ethnicity is a one-to-one correspondence

10   partisanship.  It is not.  Not every black voter

11   and every, particularly in Florida, not every

12   Hispanic voter is a Democrat.  It simply suggests

13   that there is a targeting more on race and

14   ethnicity than there is on party.  Nevertheless,

15   my -- hold on.  Can you roll up to Paragraph 113?

16        Q    Sure.

17             Including portions of the paragraph we

18   just looked at in your expert report.

19        A    Yeah, I want to reread 14, make

20   certain -- you were reading it kind of quickly.

21             Yeah, I mean am I mistaken in saying

22   that both race, ethnicity and party were

1   significant, but it was no question in Michael's

2   mind, and I have to go back and look at the

3   report, that race and ethnicity accounted for --

4   they had stronger effects on third party

5   registration than party.

6           And again, this is the question

7   Ms. Keenan asked.  I never suggested for a moment

8   there was a one-to-one correspondence between race

9   and ethnicity, in this case black and Hispanic,

10  and voting Democratic.  My point simply is that

11  the number of, or the share of third party voter

12  registrations that are non-white is because of an

13  effort to target that population believing that

14  they may be underrepresented or that the CVAP

15  share of black and Hispanic voters that are

16  registered is well below what is desirable or even

17  comparable to the general population.  But I don't

18  disagree with this.  It just simply says that race

19  is probably a stronger target variable than

20  partisanship.

21      Q    Turn to your conclusions about, or

22  discussion of the cost of voting in your report.

1   And I don't believe I ask questions about specific

2   portions, but we'll have it up in case we need to

3   take a look at something.

4           Is your opinion that you're offering

5   that the cost of voting is no longer an accepted

6   theory in your field?

7       A    Oh, no.  No.  Absolutely not.

8       Q    That cost of voting is something that

9   academics and experts rely upon frequently?

10      A    No.

11      Q    Can you explain why?

12      A    I mean we can have this discussion.

13  There's, the cost of voting theory has evolved

14  over time.  So, for instance, if you read

15  Rosenstone and Hansen's work, some of the early

16  Wolfinger and Rosenstone's work on voter

17  registration, you would find that a pure cost

18  explanation was the widely accepted theory.

19          Some 30 years later, the cost and

20  benefit theory of voting has evolved and voters,

21  and researchers recognize it's much more complex.

22  Or to put it simply, there are more conditional

1    and mitigating factors between the imposition of a

2    cost on a voter, whatever that cost may be, and

3    their likelihood of registering or voting.

4              So I guess what I'm saying is the theory

5    has evolved.  Your idea, I don't want to read

6    words into your statement, but the simple notion

7    that there's a direct relationship between the

8    imposition of some type of cost by law and the

9    likelihood that someone will register or vote is

10   no longer widely accepted.  And people recognize

11   that there are intervening and confounding

12   variables.

13             And that was the purpose in my report,

14   or my report with John, of talking about how early

15   voting might not have increased turnout, might

16   have decreased it because there was an intervening

17   variable called political parties and candidates

18   who do things that might actually depress turnout

19   rather than increase turnout in early voting

20   states.

21        Q    Do you have an understanding of whether

22   courts accept expert opinions related to the cost

1    of voting?

2         A    I have no knowledge of that.

3         Q    Okay.  We'll take a quick look at Dr.

4    Herron's rebuttal report, Paragraph 125 this time.

5    I'll read it first.  He wrote, quote, in terms of

6    my citing social science research on the cost of

7    voting, this reflects how I conduct social science

8    research in general.  In my expert report in this

9    litigation, I use academic literature to provide

10   context for my empirical analysis of SB 7050 and

11   voter registration in Florida.  My conclusions

12   about the disproportionate effect of SB 7050's

13   provisions regarding 3PVROs on black and Hispanic

14   registered voters in Florida follow from data.

15   Scholars of election administration regularly

16   invoke ideas like the cost of voting and the cost

17   of registering to vote when they use data to study

18   changes in a state's election administration rules

19   and procedures, exemplified here by the changes

20   that SB 7050 has imposed on Florida's election

21   administration, rules and procedures.

22              Do you disagree with any part of what

1  Dr. Herron wrote in Paragraph 125?

2      A    I do not disagree with it.  I think it's

3  incomplete, and I think it doesn't even reflect

4  Professor Herron's own work, scholarly work on his

5  vitae, and I don't think it even reflects his work

6  in this case.  Let me explain.

7          He makes a great deal of effort to get

8  the periods before and after the adoption of

9  SB 7050 to be in alignment.  Now what do we mean

10  by alignment?  And you've raised this point

11  before.  We want to have periods where there are

12  competitive Presidential elections and periods

13  post the 7050's adoption where there were

14  competitive Presidential elections.  He doesn't

15  want to mix apples and oranges; maybe midterm

16  elections to a Presidential.

17          What Michael is saying in essence by

18  doing that with his research is that there are

19  confounders.  There are things that could have

20  affected voter registration independent of 7050.

21          So I would have added to that statement,

22  which I agree with, scholars of election

1  administration regularly invoke ideas about the

2  cost of voting.  I do as well.  But what they also

3  invoke are the mitigating or confounding or

4  conditional factors that might also rival the

5  effect of SB 7050.  He didn't write that here, but

6  he, in fact, uses that research goal or research

7  tenet in his own research.  He wants to have

8  comparable periods.

9         What he's really doing is trying to

10 control for confounders.  I believe that my

11 review, the section I wrote of our report that

12 talks about early voting and voter ID laws and

13 vote centers is exemplary of that problem.  That

14 there are many intervening, mitigating factors to

15 the adoption of these state laws that might affect

16 their outcome or their impact on disparate voter

17 registration by race and ethnicity.  Some of them

18 are, in fact, considered by Michael in his

19 analysis by setting up the before and after very

20 carefully.

21         However, the shortness of the time

22 period, the absence of a base for knowing whether

1  registration went up or down relative to the

2  eligible population of people that could register

3  are missing pieces that lead me to be doubtful

4  that his conclusions about the disparate effects

5  of this law on racial registration are true.

6          Q    Do you agree that registering to vote

7  and voting is costly?

8          A    No, no, I don't believe that registering

9  to vote is costless.

10         Q    Costly, I'm sorry.

11         A    Oh, costly.  I'm sorry, you -- I think

12  there are costs to registering to vote, yes,

13  absolutely.

14         Q    Do you agree that voters will generally

15  register using the method that is of the lowest

16  cost to them?

17         A    Absolutely not.  And I have evidence for

18  that.  I have evidence that voters will often do

19  things that are seemingly irrational in terms of

20  cost to voting.  You want an example or should I

21  just say, leave it at that.

22         Q    -- your reasoning.

1      A      Well, there's a paper on my vitae that I

2   wrote with Andrew Menger that shows that when

3   voters are given the least costly way of voting,

4   they choose the most costly way.  And that is in

5   the State of Oregon, Washington, Colorado, Utah,

6   Wyoming and Vermont.  All of these states have

7   vote by mail.

8           So the most convenient way of voting

9   would be to mail you a ballot, even if you don't

10  know there's an election.  So every citizen in

11  those states gets a ballot.  And they get it in

12  the mail.  And they get a return envelope that is

13  already self-addressed and stamped to return by

14  mail, which they can go to their Post Office to do

15  or just leave in their mailbox.  That isn't

16  costless, but it's darn low in cost, right?

17          Would you want to guess what proportion

18  of voters in all of those states choose to walk

19  their ballot into a polling location three days or

20  fewer before election day?  Do you want a multiple

21  choice, or do you want to take a gamble?

22      Q      You can go ahead.

1       A       Would you say it's less than 50 percent,

2    or more than 50 percent?

3       Q       You can go ahead and tell me.

4       A       I'll save you the time.  I'm the one

5    that's getting old here.  63 percent on average,

6    with a standard deviation of about two percent,

7    walk their ballot in on three days or fewer, so

8    they're basically voting on election day.  They're

9    taking the most costly way.

10             Now you want to ask me why they do that?

11   I can go on and explain in that paper, but you

12   could read it.  I think it's Political Research

13   Quarterly some year.

14             So don't tell me that voters don't often

15   choose costly ways to cast their ballots or even

16   to register.  And it is not, by the way, a

17   distrust in the Postal Service.  The motivating

18   reasoning for why people walk their ballot in,

19   even though they can mail it, is they want to be

20   seen and see others voting.  There is a social

21   value, an intrinsic value, in being seen and

22   seeing other people.

1          And did I mention also, in that article,

2    these are the voters that walk their ballot into a

3    location that's closest to their election day

4    voting precinct, so they want their neighbors to

5    see them.  It won't do them any good to pass their

6    ballot in in a neighborhood where they don't live.

7          So you think of cost as a dollar amount,

8    or pecuniary, or time, or even knowledge, which

9    may be lacking in some voters.  What I'm

10   suggesting here is there's far more complexity to

11   voting than simply the idea that a third party

12   might knock on your door and have a non-citizen

13   ask you to register and then take that option

14   away.

15          Voting and registration are more complex

16   and involve far more information than was included

17   in Michael's study.  Not that Michael was

18   deficient; he simply couldn't look at those

19   things.  They weren't, as he pointed out, in some

20   instances, they weren't available to him.  Like

21   the CVAP voting or that the law had only, I think,

22   been in effect for one month, or is it three

1     months before 2023?  Half the year.

2         Q    Have you ever looked --

3         A    I'm sorry for being so pedantic.

4         Q    Oh, no, that's helpful.  Have you ever

5     looked at whether voters have reported a similar

6     extrinsic value in interacting with civic

7     organizations in registering to vote?

8         A    I know of some research on that, yes.

9     Not published.  I know that when, there's some

10    studies that show that when your neighbors ask you

11    to vote and vote for a certain candidate, there's

12    a higher rate of compliance.

13        Q    And the studies you were just describing

14    related to costs associated with voting, did your

15    study also include costs related to voter

16    registration?

17        A    No.  No, it's just voting.

18        Q    Okay.  Would you agree that registering

19    to vote with the assistance of a third party voter

20    registration organization is a low cost method of

21    registering?

22        A    I would say it is less costly than some

1    other methods.

2          Q    If a voter registers with a 3PVRO, they

3    do not have to travel to a government office,

4    correct?

5          A    Yes, I think, you know, if you think of

6    the -- I'm trying to remember how many different

7    modes of registration Michael included in his

8    report, but I would consider them among the lower

9    cost end of the continuum, yes.

10         Q    Do you agree, or disagree with Dr.

11   Herron that SB 7050's regulations of third party

12   voter registration organizations increased the

13   cost to voters in Florida?

14         A    I don't know if they've increased the

15   cost to voters.  I do not know that.

16         Q    Do you agree with Dr. Herron's

17   characterization of SB 7050's restrictions on

18   third party voter registration organizations as

19   non-trivial?

20         A    I would say this.  He has shown that the

21   adoption of the law and its restrictions has

22   diminished the share of non-white third party

1   voter registrations.  He has further shown that

2   probably is because they have targeted, third

3   party voter registration organizations, at least

4   non-white voters and some Democrats.  So the two

5   seem to go together.  He has not shown that this

6   has an adverse effect on overall registration

7   rates among non-white voters.

8        Q     In preparing your report, did you

9   analyze the interest that the State has offered in

10  defense of the new regulations that are being

11  challenged in SB 7050?

12       A     Did I analyze, or did I read?  I read

13  those reasons, yes.

14       Q     Did you reach an opinion on the interest

15  that the State has offered in defense of the

16  challenged provisions of SB 7050?

17       A     No, I did not.  I was not asked to offer

18  an opinion.

19       Q     Okay.  Have you reviewed the legislative

20  record in this case?

21       A     Other than what is written in the

22  reports by the Plaintiffs' experts, that's the

1  extent of my understanding of the legislative

2  record.

3      Q    In your report, for now, sitting here,

4  do you have an analysis to offer on the effects,

5  or the likely effects, of the provisions that

6  Plaintiffs challenge in SB 7050?

7      A    I don't know.  I don't.  I think the

8  hypotheses or speculations, even Professor

9  Lichtman's, are reasonable questions for future

10 analysis.  It does not appear to me that the

11 expert reports have offered a methodology for

12 doing that, and they haven't demonstrated, in my

13 view, that these effects have occurred.  But I

14 think there are deficiencies in their design, in

15 their data, as we've mentioned, that if corrected,

16 would be what I would call reasonable tests of

17 those hypotheses.

18     Q    And my question was whether you

19 conducted any analysis on the --

20     A    Oh, I have not.  Not of their data, no.

21     Q    Do you offer any opinions on what

22 benefits of the challenged provisions of SB 7050

1    could be?

2         A    No, I have not.

3         Q    Do you offer an opinion on whether any

4    of the challenge provisions will carry with them

5    benefits for election integrity or administration

6    simplicity, for example?

7         A    No, I have not.

8         Q    Do you offer any opinions on the harms

9    of the challenge provisions of SB 7050?

10        A    No, I have not.

11        Q    Are you aware of evidence of voter fraud

12   in Florida?

13        A    Am I aware of any evidence of voter

14   fraud?  I'm not, other than what I have read in, I

15   think specifically Professor Herron's report.

16        Q    Do you offer any opinions about the

17   extent of any voter fraud in Florida?

18        A    No, I have not.

19        Q    Do you offer any opinions about any

20   potential fraud committed by third party voter

21   registration organizations in Florida?

22        A    No, other than what I have read in the

1    report, I have no such opinions or knowledge.

2         Q     And do you agree, or disagree that voter

3    fraud is rare?

4         A     That I would agree with, yes.

5         Q     Okay.

6         A     I don't know about Florida, but I would

7    agree with that as a general statement, yes.

8              MS. JOHNSON:  Okay.  I think if we can

9    take maybe just a 10-minute break now, I think

10   we'll be able to wrap up shortly after.  I just

11   want to go through my notes, and then hopefully we

12   can conclude.

13             We can go off the record.

14             (A recess was taken at 3:59 p.m.)

15             (Back on the record at 4:09 p.m.)

16             MS. JOHNSON:  Thank you, Dr. Stein.  I

17   don't have any further questions for you.  And

18   pass to my colleague who might.

19             THE WITNESS:  Have a good day.

20

21

22

1      FURTHER EXAMINATION BY COUNSEL FOR THE

2    COUNSEL FOR THE AMERICAN CIVIL LIBERTIES UNION

3    PLAINTIFFS (HISPANIC FEDERATION V. BYRD CASE

4    ENDING IN 218)

5    BY MS. KEENAN:

6         Q    Hi, again, Dr. Stein.  This is Megan

7    Keenan again representing the Hispanic Federation

8    Plaintiffs.  I just had a few follow-up questions

9    based on some information that came up in your

10   questions with the NAACP Plaintiffs.

11          Do you recall earlier when you said that

12   the papers you cited in your report showed that

13   certain registration rules had a positive effect

14   on voter turnout?

15        A    Yes.

16        Q    And you testified at that time that

17   those papers didn't talk specifically about third

18   party registration efforts, right?

19        A    To the best of my knowledge, no.  They

20   dealt with three types, same-day and election day,

21   and I think online voter registration, as in the

22   internet.

1        Q      Right.  But you referenced in your

2    discussion just a few minutes ago, or it may have

3    been an hour at this point, that you reviewed a

4    white paper on the history of third party voter

5    registration drives after reading the rebuttal

6    reports.  Do you recall that?

7        A      Yes, I do.

8        Q      I'm going to share my screen with what

9    I've marked as Exhibit 15 [sic], and I believe

10   that's the right number.  Is this that white paper

11   that you reviewed?

12             (Exhibit 16 was marked for

13   identification and is attached to the transcript.)

14       A      Yes, Douglas.  Joshua Douglas, yes.

15       Q      I just wanted to go take a look at page

16   15.  Do you see the paragraph starting, the NVRA

17   has been a huge success, at least when measuring

18   the rates of voter registration?

19       A      Yes.

20       Q      I'm just going to read a few lines here.

21   After that sentence I just read the paper goes on

22   to say, the law helped to ease voter registration

1    drives, allowing groups and individuals to go into

2    communities and bring a simple form to register

3    voters.  Voter registration increased by

4    1.82 percent, or about 3,390,000 people, in the

5    states subject to the NVRA during the 22 months

6    after it was implemented before the 1996

7    Presidential election.  Third party voter

8    registration drives contributed significantly to

9    the rise in registration.

10           Did I read that correctly, in the paper

11   that you cited?

12        A    Yes.

13        Q    Okay.  This is from the questioning from

14   the NAACP Plaintiffs.  I believe you mentioned --

15   I can stop sharing my screen now -- that online

16   registration and Make A Plan registration efforts

17   were efficacious.  Do you remember testifying

18   about that?

19        A    Yes.

20        Q    What do you mean when you say that those

21   types of efforts are "efficacious"?

22        A    My recollection of the research, and

1    what I mean is they increase voter registration,

2    and I believe there is evidence that they not only

3    increase registration, they did so among

4    underrepresented populations.  And I believe in

5    the case of Making a Plan, they had a positive

6    effect on voter turnout.

7        Q    When you talk about whether something is

8    efficacious, does that include the sort of

9    comparison against time that you've talked about a

10   number of times today?

11       A    Yes, it would be the difference-in-

12   difference design, that is to say, when you looked

13   at people who -- so you have a population of

14   people who you think are underrepresented in the

15   electorate, not registered, and there are 1,000.

16   And you look at the proportion of people in that

17   population who are registered at time 1.  And then

18   you do, you make your plan of Make a Plan to vote,

19   that's a kind of, it's called a randomized

20   controlled experiment.  You don't have -- I don't

21   want to get pedantic here, but there's a big

22   difference between randomized controlled

1    experiments, I consider those the gold standard,

2    and these studies that I make reference to.

3    Particularly the Nickerson paper are the very best

4    type of work.

5            When you don't get to control who you

6    contact, you then do these

7    difference-in-difference designs.  But in essence,

8    they're always the same calculation.  The control

9    is much greater when you randomize.

10           But yes, the papers I recall are the

11   best, and that were David Nickerson, Kevin

12   Arsenel, and of course, Don Green.  They're all

13   part of a group of researchers that work together.

14       Q    And so just to make sure I understand

15   what that time comparison shows, the idea is that

16   a registration rule is efficacious if prior to the

17   implementation of that rule we can see the number

18   of voters being registered, and that after the

19   implementation of that rule, you can see an

20   increase in the number of voters being registered

21   that you're tying it to that rule being

22   efficacious; is that right?

1        A      Yeah, with -- let me emphasize here.

2        Q      Sure.

3        A      It isn't the number of voters.  It's the

4   number of voters relative to their base.  So

5   what's real important here is that, you know, in

6   these randomized experiments, they're very short

7   periods.  They were days and weeks.  What they

8   were able to do is do follow-up on these voters in

9   terms of their likelihood of voting.  But the

10  important point is you were looking at number of

11  voters relative to their representation in the

12  population.  They were looking at young voters in

13  like colleges particularly, but it could be race

14  and ethnicity or other demographics.

15       Q      And those studies show that without

16  those registration rules in place, fewer folks

17  were being registered to vote within that base; is

18  that right?

19       A      It wasn't a negative.  That is to say,

20  again, the finding was you had a positive change

21  in the rate of registration, and on the making the

22  plan to vote, a higher rate of voting among those

1    populations that were eligible, in this case

2    registered to vote, and they were showing a link

3    between registration, making a plan and voting.

4        Q   And I understand you're saying it's a

5    positive trend, but we're comparing it against

6    people who didn't make a plan versus people who

7    did make a plan, and you can see the difference

8    that --

9        A   Yes.

10       Q   -- making a plan makes, right?

11       A   Remember, the difference was that one

12    line was straight, and the other line went like

13    this.  So it wasn't that not making a plan led you

14    to be less likely to vote.  You didn't go down,

15    you just stayed -- there was no change.

16          So one line, like in the SS article that

17    Michael Herron wrote, all the lines went down,

18    some more steeper than others.  So the question

19    then became was the treatment more efficacious for

20    one group over another type of group, and a lot

21    has to depend on where you start.

22          If you're at 10 percent registration

1    rate among African Americans, it won't take a lot

2    of effort to move that up to 20 percent, but --

3    you're still maybe well below the other group

4    where there was no effect, but they still had a

5    higher intersect.

6              So this is my point.  These things get

7    kind of complex and you have to look at intersect.

8    Do you know what I mean by that?  Where did you

9    start, where did you finish.  And it may be that I

10   got a 10 percent increase from 5 to 15, but white

11   voters returning at 80 percent.

12             So, you know, what is consequential in

13   our expert report really means kind of common

14   sensical, right?  Some techniques have an effect,

15   and they even have a statistically significant

16   effect; they're just not consequential.  They

17   don't matter.

18             Now in voting, you know, this is the

19   problem of knowing that you can't control all the

20   variables, the parties, candidates.

21        Q    Sure.  I did want to ask one more

22   follow-up question based on the charts you just

1    brought up, and I'm just going to go back to your

2    report, rather than to the Herron-Smith report.

3             In these figures, a number of times

4    you've referenced how the slope goes downward

5    after the Bill was implemented.  Do you -- oh, I'm

6    sorry, I thought I was sharing my screen.  Let me

7    share it again.  This is Exhibit 2, and it's

8    Figure 1 on Page 13.

9             And you're referencing how these slopes

10   are going downward in each of these charts; is

11   that right?

12        A    That's correct.

13        Q    And I just want to make sure I'm

14   understanding you correctly.  You take that to

15   mean that after the law took effect, within each

16   of these groups registration rates went down?

17        A    That's the appearance of those graphs,

18   yes.

19        Q    So what you're disputing is any

20   differential effect across the three groups,

21   right, whether it's statistically significant, the

22   difference in the slopes comparing group to group,

1  right?

2      A    Yes.

3      Q    Okay.  But you don't dispute that this

4  law that affected voter registration in Florida

5  caused the registration rates for each group to go

6  downward, right?

7      A    No.  I apologize if I'm going to -- I

8  don't dispute what Michael and Dan found.  If you

9  recall, the only slope that was significant over

10  time was for African Americans.  The other two

11  slopes are non-significant.  I don't question

12  that.

13      What Michael said was the effect of 1355

14  was to have a negative and significant effect on

15  African American registrations.  That's not the

16  case for Hispanics, he said, and it's not the case

17  for whites, even though it looks -- and things are

18  deceiving, right, because you know what a

19  confidence ban is here, so standard errors are

20  just huge.

21      However, we don't -- I don't disagree

22  with the paper.  It should be noted here by matter

1    of fact, for the record, I was one of the three

2    peer review people that read this paper for S&PQ.

3    So I liked the paper and I did strongly support

4    its publication, and they know that. They know

5    because they release the names of the reviewers.

6           What I questioned was in their report,

7    in their expert report, they used this as an

8    example. And now 1355 is not 7050, there are

9    plenty of differences, but they used it as

10   illustrative. My problem is the comparison should

11   have been made between the white/Hispanic,

12   white/African American, and even African American.

13   Those slopes could be significantly different.

14   The overall effect of the law seems to have only

15   depressed black voter registration, nobody else.

16           But what I thought was important for the

17   -- and is the right word here analogy or

18   comparison? Is that 1355 looks like 7050, then

19   the comparison should have been made between

20   African American/white, Hispanic and white, and it

21   wasn't. And it didn't seem to me to support their

22   argument.

1          Now, their -- well, that's it.  I'll

2     stop there.

3          Q    Fair.  And just one follow-up question

4     about the -- that's helpful, and to know the peer

5     review part is helpful.

6          When it comes to comparing the groups to

7     each other to figure out whether the differences

8     in the slopes were statistically significant in

9     this paper, is that a comment that you gave the

10    authors when you did the peer review of this

11    paper?

12         A    Not only is it a comment, but I actually

13    in my, I found my review somewhere, I think I even

14    suggested that they do that in the revisions.

15    They didn't.  And there's nothing wrong, there's

16    nothing wrong with this paper.  It's just that

17    since -- it was written in 2014, it was written

18    probably in 2012, 2013.  But when they bring it

19    into their expert report making a comparison to

20    7050, I then say, well, then let's see how the

21    lines compare.  They didn't do that in their

22    expert report.

1       Q     Sorry.  But just to be clear, you did

2   support the publication of this paper here, not --

3       A     Yes.

4       Q     -- the report in this case?

5       A     I forgot the paper.  And John, I must

6   say John wrote this section of the -- he drafted

7   it, and I had -- until I saw it in their report, I

8   mean in Michael's report, I think -- no, it's

9   in -- Dan raises it in his report.  I could be

10  wrong which of them brought it up in their expert

11  report, I had forgotten about the paper.

12      Q     At what point did you remember this

13  paper and that you had had a role in peer-

14  reviewing it?

15      A     I remembered this paper when I read the,

16  I think it was Dan's report, and I said, oh, my

17  gosh, I remember that.  But I didn't rush to the

18  paper.  I said, I remember that paper.  They are

19  rather prolific.

20            It was John who said, hey, have you

21  looked at this paper recently, and I said I

22  didn't.  And he showed me the paper, and we looked

1    at the graphs, and I said, yeah.  And you have to

2    read the paper pretty carefully to see what's

3    going on.

4            I was also surprised to see how steep

5    the slope was for the whites.  And you probably

6    can't see it, but you can see how big the standard

7    errors are around that fitted line, so not much is

8    going to be significant there, even though the

9    standard errors on some of the others are large.

10           I think, I know we didn't make this

11   point in the paper, in the report, but I should

12   mention it now.  The magnitude of the effects,

13   even though they may be significant, are not very

14   large for African Americans.

15       Q    Okay.  I think -- I just want to clarify

16   one more thing about the timeline.  And I'm sorry,

17   I just didn't realize this was going to come up.

18           I think a minute ago you said that Dr.

19   Alford had drafted this portion of the report and

20   so you hadn't realized at this point about the

21   paper.  And so I'm wondering at what point after

22   he drafted that portion of the report you realized

1    this was a paper that you were already familiar

2    with.

3          A    Oh, I was familiar with the paper when I

4    read the report, and I don't know if I brought it

5    up to John or John brought it up to me, but before

6    he drafted this section of the report, we both

7    went back over the paper again, and that's when we

8    both, I have to say probably John was the first to

9    say because I was looking at the other figures as

10   well, but this is No. 1.  He said, does this make

11   sense to you?  Does it support the conclusion that

12   this Bill did what 7050.

13          So at that point it became obvious to me

14   there may be an issue here that we need to raise

15   in our report, yes.  But John didn't write the

16   draft until after we had both -- well, I have to

17   say I reread the paper, and I think John said he

18   hadn't read it completely until he saw it in the

19   report.  And then when he, we discussed what was

20   important in the report and what was not.

21          Q    Okay.  You didn't write in the report,

22   though, that you had peer-reviewed or had

1    familiarity with this report previously?

2         A     No.  I am 90 percent certain I read this

3    paper as a journal review.  I tried to find my

4    review of the paper, but I haven't found it yet.

5    I read about 50 or 60 papers a year.

6              It is sufficient to say that I had read

7    this paper well before, 10 years, at least 10

8    years ago, and so I am familiar with it.

9         Q     Sure.

10        A     You're probably know, if you read the

11   paper, that we cite each other.

12        Q     And I guess I want to make sure I

13   understand.  I think I heard you say earlier that

14   you found the review and you saw you provided a

15   comment about this issue, but then maybe I heard

16   you say you didn't find --

17        A     I found my writeup of notes on the

18   paper.  I can't be certain that is the review I

19   submitted to the journal.  I will search my files,

20   but I'm certain it was -- 10 years ago is, even

21   for me, a long time ago.

22        Q     Okay.

1      A    I have used this paper in my classes, so

2  I have all these notes on the paper.  And we, I

3  mean you should know that Michael and Dan, I mean

4  they're much younger than I am.  They're barely

5  50, although Dan says he's going to retire soon,

6  which I think is insane.  But we've known each

7  other at least 10, 15 years.

8      Q    Sure.

9      A    So it's hard to know when the

10  conversation, my notes, but I'm familiar with the

11  paper.  John wasn't.  John hadn't seen the paper

12  ever before, and he was quicker, I think, to see

13  the issue.  And maybe I'm a little myopic.  I kind

14  of -- I didn't see it until John said, you see

15  these slopes?  And I said, oh, yeah, they're

16  different.

17          And you can't really see the standard

18  errors real well in the paper because they kind of

19  get whitened out.  I said, how could that not be

20  significant?  And when you squinch in, you see the

21  standard errors and you go, that's not very

22  common, because I'm assuming that white voters are

1  a much larger portion of the electorate in

2  Florida, so it's not surprising across time you'll

3  get these big standard errors with black and

4  Hispanic voters or the -- I thought they're

5  concentrated in certain counties.

6       Q    I understand you might not know when

7  exactly those notes are from or if those are the

8  ones ultimately submitted in the review, do you

9  know when you found the notes that you had written

10  up about this report?

11       A    I did when I was looking at my syllabi

12  because that's the best way to know where I had

13  written.  Because I said, how could I have missed

14  this paper?  And I have, you know, I have weekly

15  written assignments for my students and then I

16  write up the answers before they do, and I noticed

17  I had written up this paper before.

18            And I can't even be certain it's my

19  notes because it doesn't have my name on it, and

20  my students are often required to read papers and

21  report on them in class, so it gets a little

22  incestuous.

1          But the best way to put it is I was

2     familiar with the paper, but not in the way that

3     John -- John gets the credit for pointing out to

4     me these different slopes.  I actually said, well,

5     wait a minute, whites had a bigger drop.  And he

6     said, well, read the paper carefully again and

7     notice that Dan and Mike only report a significant

8     decline for African Americans, and the decline was

9     rather small, but it was statistically

10    significant.

11          MS. KEENAN:  Okay.  Josh, we might be in

12    touch about requesting some of these notes, but we

13    can handle that off the record.

14          I don't have any further questions for

15    the witness.  Thanks so much for your time, Dr.

16    Stein.

17          THE WITNESS:  Have a good week.

18          MR. PRATT:  Ms. Keenan, just to confirm,

19    is that the completion of Plaintiffs' questions in

20    this deposition for the witness?

21          MS. KEENAN:  I want to check and make

22    sure Mindy is still here.

1           MS. JOHNSON:  Yes.  Nothing more from
2   me.
3           MR. PRATT:  Thank you, Ms. Johnson.
4   Thank you, Ms. Keenan.
5           Good afternoon, Dr. Stein.  Good to see
6   you again.
7           THE WITNESS:  Have a very good week.
8   Happy New Year, everyone.
9           MR. PRATT:  Well, on that note, I
10  actually don't have any questions for you so
11  hopefully you can go spend some time with your
12  grandkids.
13          Before you go, I guess just for the
14  Court Reporter, we'll read, not waive, a copy of
15  this transcript, please, and then we'll just place
16  an order, just, you know, regular speed for the
17  transcript for the Secretary's Office.  I don't
18  know if you wanted to ask for the other orders
19  from Plaintiffs.
20          (Off the record at 4:31 p.m.)
21
22

1           ACKNOWLEDGMENT OF DEPONENT

2       I, Robert M. Stein, Ph.D., do hereby

3   acknowledge that I have read and examined the

4   foregoing testimony, and the same is a true,

5   correct and complete transcription of the

6   testimony given by me, and any corrections appear

7   on the attached Errata sheet signed by me.

8

9

10   _____     _____

11           (DATE)                      (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

1          CERTIFICATE OF SHORTHAND REPORTER

2          I, Dawn M. Hart, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the foregoing transcript is a true and

5    correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    waived; and that I am neither counsel for, related

10   to, nor employed by any of the parties to this

11   case and have no interest, financial or otherwise,

12   in its outcome.

13         IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 5th day

15   of January, 2024.

16   My commission expires:

17   January 2, 2025

18

19

20

21   NOTARY IN AND FOR THE

22   STATE OF MARYLAND

## A

**abbreviated**
32:10
**ability**
89:13, 97:3,
97:17, 109:12,
131:10, 142:16,
253:6
**able**
12:20, 13:7,
17:11, 33:3,
34:2, 72:16,
74:3, 80:14,
90:18, 123:15,
226:15, 247:21,
261:9, 287:18,
323:10, 329:8
**above**
120:10, 126:10,
128:22, 129:15,
129:20, 129:21,
129:22, 130:10,
130:18, 132:5,
286:1
**abreast**
62:21
**absence**
313:22
**absent**
106:3
**absolute**
252:2
**absolutely**
113:6, 207:16,
218:16, 272:9,
280:21, 294:1,
300:15, 309:7,
314:13, 314:17
**abstract**
178:4, 178:14
**academic**
27:21, 41:8,
233:17, 244:2,
244:3, 245:22,
246:6, 311:9
**academics**
195:4, 210:21,

246:5, 309:9
**academy**
194:7
**accept**
267:18, 310:22
**acceptable**
266:13
**accepted**
50:8, 50:12,
236:20, 255:1,
266:10, 266:18,
267:14, 309:5,
309:18, 310:10
**accepting**
253:19
**access**
31:15, 33:19,
163:20, 187:9,
198:17, 198:21,
211:8, 245:7,
245:13, 288:13
**accessible**
298:3
**accommodate**
11:12
**accompanying**
249:20
**according**
133:10, 170:6,
247:14, 256:4,
265:2, 279:11,
279:18
**account**
133:11, 233:16,
243:8, 305:21
**accounted**
308:3
**accounts**
305:2, 305:18
**accurate**
257:2, 288:20,
290:13, 294:15,
295:18
**accurately**
12:21, 21:1,
290:19, 307:6
**accused**
89:5

**acknowledge**
248:18, 344:3
**acknowledges**
170:12
**acknowledgment**
344:1
**aclu**
3:17
**across**
69:17, 116:13,
117:3, 117:6,
123:7, 127:21,
235:16, 256:9,
276:19, 277:9,
332:20, 341:2
**act**
196:5
**active**
79:21, 210:21,
211:11
**actively**
79:6, 79:7,
79:15, 81:21,
82:3, 208:18,
211:15
**activities**
86:15, 212:17,
212:19, 213:5
**activity**
110:12
**actual**
94:7, 94:15,
95:3, 98:20,
99:12, 106:5,
123:19, 135:5,
188:17, 213:18,
216:8, 234:9,
246:14, 287:10,
289:1
**actually**
29:13, 31:15,
35:10, 40:12,
40:13, 55:19,
58:19, 74:17,
80:20, 93:14,
106:20, 146:4,
146:22, 150:1,
150:5, 151:19,

174:7, 187:10,
197:18, 202:12,
205:11, 208:6,
212:1, 215:11,
273:18, 288:7,
290:13, 310:18,
335:12, 342:4,
343:10
**add**
171:10, 185:8
**added**
21:13, 21:16,
218:8, 224:16,
312:21
**adding**
51:22
**addition**
128:21, 129:13,
129:19, 130:9
**additional**
21:4, 67:3,
188:10, 191:4,
212:18, 213:3,
300:8, 300:13,
300:21, 302:2,
302:7
**address**
123:4, 159:1,
159:18, 160:2,
160:5, 160:12,
179:13, 221:7,
221:11, 222:6,
222:17, 224:12,
226:12, 226:20,
246:13, 248:22,
294:9
**addressed**
127:18, 219:12,
230:10, 250:10,
303:13
**addresses**
159:22, 160:16,
161:4, 161:9,
232:9
**addressing**
221:1
**adequate**
260:14

**administered**
23:9
**administration**
22:8, 23:4,
23:6, 23:14,
24:10, 24:15,
25:5, 27:15,
39:3, 179:1,
183:21, 192:13,
192:22, 195:10,
196:8, 197:1,
311:15, 311:18,
311:21, 313:1,
322:5
**administrative**
178:9
**adopt**
141:19
**adopted**
61:14, 72:11,
90:1, 104:14,
145:17, 148:14,
199:4, 241:21
**adopting**
53:16
**adoption**
72:17, 88:21,
96:19, 100:13,
100:14, 102:1,
102:2, 108:9,
113:19, 114:16,
115:17, 120:19,
129:11, 131:21,
236:21, 241:19,
250:14, 257:1,
262:6, 275:9,
277:3, 282:4,
286:4, 292:8,
295:16, 312:8,
312:13, 313:15,
319:21
**adults**
163:8
**advance**
17:19, 237:21
**advantage**
158:20
**advent**
195:9

**adverse**
252:7, 253:6,
253:13, 253:14,
253:18, 285:4,
320:6
**advise**
70:4, 211:19
**advised**
208:20
**advocate**
80:15, 81:12
**affect**
7:17, 149:7,
158:7, 162:4,
164:12, 168:10,
168:14, 173:16,
173:19, 234:17,
313:15
**affected**
95:21, 95:22,
98:21, 112:8,
248:15, 249:2,
252:4, 283:1,
312:20, 333:4
**affects**
26:19, 97:2,
169:6, 175:2,
251:12
**affiliate**
81:12
**affiliated**
207:7, 304:22
**affiliation**
180:13, 305:17,
305:21, 306:10,
306:20, 306:21
**affirmed**
9:3
**affixed**
345:14
**african**
79:1, 79:9,
79:11, 82:2,
82:7, 85:5,
89:17, 90:3,
115:14, 115:17,
116:1, 121:13,
121:14, 125:1,

126:9, 126:11,
128:4, 212:3,
276:15, 281:2,
285:13, 302:17,
303:8, 303:11,
331:1, 333:10,
333:15, 334:12,
334:20, 337:14,
342:8
**after**
17:22, 39:16,
40:8, 55:12,
57:6, 72:11,
72:18, 82:4,
89:22, 94:3,
100:13, 101:19,
102:1, 103:2,
103:13, 103:20,
104:11, 105:6,
107:21, 113:19,
114:16, 115:17,
120:19, 129:10,
146:14, 177:15,
185:6, 195:7,
236:21, 250:14,
250:19, 256:22,
260:22, 261:8,
266:6, 272:8,
275:9, 277:3,
282:4, 286:4,
286:12, 291:9,
291:13, 295:16,
302:1, 302:2,
306:9, 312:8,
313:19, 323:10,
325:5, 325:21,
326:6, 328:18,
332:5, 332:15,
337:21, 338:16
**afternoon**
188:8, 343:5
**again**
14:3, 23:18,
29:9, 29:16,
39:19, 40:7,
40:10, 45:22,
50:10, 55:6,
62:13, 69:2,

74:14, 77:17,
79:16, 82:14,
83:11, 89:3,
92:20, 107:20,
112:6, 119:3,
127:4, 129:5,
136:8, 139:20,
142:19, 143:15,
152:20, 155:17,
159:20, 175:9,
188:11, 195:4,
199:5, 200:1,
212:22, 214:17,
217:18, 222:14,
228:19, 229:12,
229:21, 233:10,
234:5, 237:18,
240:11, 244:7,
254:4, 254:16,
260:11, 260:19,
261:18, 261:22,
265:10, 269:13,
272:21, 273:21,
276:4, 280:2,
281:3, 283:6,
283:22, 284:21,
285:16, 298:12,
300:10, 301:5,
308:6, 324:6,
324:7, 329:20,
332:7, 338:7,
342:6, 343:6
**against**
72:16, 100:7,
125:7, 125:16,
148:5, 327:9,
330:5
**age**
100:8, 100:11,
100:16, 100:19,
100:21, 102:21,
180:13, 208:22,
212:4, 227:20,
250:16, 250:18,
258:1, 258:10,
258:12, 259:5,
259:19, 263:13,
268:11, 273:8,

276:14, 276:16,
277:15, 280:15,
281:12, 281:19,
282:14, 284:12,
284:14, 292:7,
293:14, 295:13,
297:19, 298:14,
300:4
**agency**
16:16
**aggregate**
297:13, 297:18
**ago**
44:21, 70:17,
83:12, 166:2,
204:12, 204:13,
220:3, 252:19,
301:11, 325:2,
337:18, 339:8,
339:20, 339:21
**agree**
12:17, 53:6,
54:3, 61:16,
77:13, 82:18,
86:12, 86:17,
87:1, 92:12,
97:22, 98:9,
102:14, 103:5,
103:15, 103:20,
104:10, 105:5,
105:8, 105:11,
106:15, 106:19,
109:9, 110:15,
110:21, 111:21,
113:22, 114:4,
117:11, 126:18,
132:8, 133:21,
149:14, 152:17,
152:21, 153:4,
162:4, 162:22,
163:19, 164:18,
164:21, 164:22,
165:18, 166:14,
166:15, 167:6,
168:5, 168:9,
173:15, 179:12,
180:15, 183:3,
190:13, 200:3,

228:2, 228:12,
237:12, 245:22,
246:5, 258:22,
270:9, 271:3,
279:11, 290:14,
291:14, 300:6,
300:11, 301:1,
312:22, 314:6,
314:14, 318:18,
319:10, 319:16,
323:2, 323:4,
323:7
**agreed**
51:4, 56:1,
56:21, 57:7,
83:10, 222:19,
261:20
**agreeing**
173:19
**ahead**
33:9, 57:19,
78:19, 88:17,
93:2, 119:11,
126:18, 150:18,
162:15, 164:10,
182:2, 185:3,
185:11, 185:12,
185:13, 186:2,
186:4, 232:13,
246:20, 246:22,
256:3, 271:8,
305:10, 315:22,
316:3
**aid**
195:2, 223:15
**airline**
36:11
**al**
1:6, 1:11,
150:7, 170:4
**alachua**
4:4, 4:5
**alan**
207:9
**alarm**
167:19
**aldrich**
149:19

**alford**
14:1, 14:4,
15:4, 15:7,
19:2, 20:13,
38:12, 38:16,
38:19, 39:6,
39:16, 40:17,
41:19, 42:5,
44:7, 45:12,
46:13, 47:7,
47:14, 47:16,
51:8, 52:3,
52:18, 53:15,
54:1, 54:14,
54:21, 55:1,
55:8, 55:12,
56:12, 56:17,
57:10, 57:15,
57:18, 58:9,
60:8, 60:20,
61:1, 61:10,
61:21, 62:6,
85:4, 189:7,
192:16, 193:12,
194:8, 194:10,
196:20, 199:14,
215:16, 215:17,
220:1, 221:15,
221:20, 222:6,
224:19, 233:21,
270:11, 275:15,
296:7, 303:7,
337:19
**alford's**
43:4, 49:20,
50:13, 53:10,
53:17, 54:10,
114:9, 193:7,
193:16, 195:21,
197:14, 234:1
**alignment**
312:9, 312:10
**all**
10:12, 13:1,
13:9, 26:5,
28:13, 31:19,
33:14, 35:22,
37:11, 42:21,

44:22, 46:9,
46:22, 49:18,
55:21, 56:19,
60:2, 60:20,
61:1, 62:2,
71:18, 91:7,
91:14, 108:9,
109:21, 114:22,
119:17, 120:2,
122:16, 126:16,
128:2, 134:14,
137:16, 138:4,
139:21, 140:11,
141:20, 143:7,
149:22, 152:10,
162:14, 163:9,
166:20, 167:4,
172:19, 173:4,
177:8, 182:10,
189:17, 191:2,
195:17, 201:20,
203:18, 206:2,
210:20, 224:3,
234:7, 243:13,
254:7, 256:10,
274:7, 279:7,
300:8, 300:13,
303:1, 303:5,
315:6, 315:18,
328:12, 330:17,
331:19, 340:2
**allege**
274:14, 278:21
**alleged**
72:10, 156:22,
230:13
**allen**
30:5, 73:21
**allow**
186:8
**allowed**
108:10
**allowing**
326:1
**almost**
25:4, 42:21,
55:21, 222:20,
255:18, 263:3,

265:5
**alone**
159:19, 160:3
**aloud**
133:9
**already**
15:6, 55:2,
61:12, 68:3,
94:4, 104:17,
135:19, 137:11,
160:18, 190:14,
191:3, 199:18,
215:10, 268:17,
269:19, 315:13,
338:1
**also**
13:2, 16:6,
20:8, 22:14,
23:22, 33:18,
36:20, 37:9,
53:22, 58:17,
61:16, 65:6,
68:16, 87:3,
115:13, 139:11,
145:21, 149:14,
157:12, 167:3,
169:4, 176:11,
180:6, 186:22,
190:11, 191:16,
191:20, 225:18,
238:21, 243:22,
261:18, 278:14,
298:12, 300:18,
306:6, 313:2,
313:4, 317:1,
318:15, 337:4
**alter**
186:13
**altered**
17:5
**alternate**
300:19
**alternative**
79:14, 155:21,
235:7, 236:4,
249:21
**although**
44:3, 165:10,

288:6, 296:8,
299:9, 340:5
**always**
41:4, 41:5,
71:16, 89:4,
150:16, 185:5,
208:10, 273:21,
328:8
**america**
125:1
**american**
2:4, 9:7,
22:20, 79:10,
115:15, 212:3,
276:15, 281:2,
303:8, 324:2,
333:15, 334:12,
334:20
**americans**
79:1, 79:11,
82:2, 82:7,
85:5, 89:18,
90:3, 115:18,
116:2, 121:13,
121:14, 126:9,
126:11, 128:4,
285:13, 302:17,
303:12, 331:1,
333:10, 337:14,
342:8
**among**
32:11, 82:2,
82:7, 85:5,
85:17, 89:9,
89:13, 89:17,
90:2, 113:18,
114:15, 120:18,
126:8, 129:10,
130:17, 135:2,
135:13, 137:3,
176:16, 178:6,
216:14, 223:5,
235:2, 235:21,
235:22, 249:12,
250:6, 250:22,
258:12, 281:5,
285:1, 286:6,
286:19, 293:2,

294:19, 295:8,
297:5, 297:11,
297:16, 303:5,
305:3, 305:19,
305:22, 319:8,
320:7, 327:3,
329:22, 331:1
**amount**
317:7
**analogy**
334:17
**analyses**
34:3, 34:6,
99:9, 108:5,
218:3, 240:2
**analysis**
34:8, 59:3,
59:8, 72:22,
73:6, 73:8,
74:11, 75:10,
85:9, 94:5,
101:18, 107:22,
115:21, 131:12,
136:5, 139:10,
201:17, 212:5,
216:2, 217:2,
226:6, 226:13,
226:20, 228:22,
229:12, 229:17,
229:20, 231:4,
231:22, 234:12,
236:2, 236:16,
237:2, 239:21,
241:16, 242:5,
259:6, 261:10,
263:10, 265:2,
268:22, 269:21,
277:14, 279:4,
286:2, 286:3,
286:11, 287:10,
288:19, 291:10,
291:15, 293:12,
293:19, 295:11,
295:15, 295:19,
299:19, 305:5,
311:10, 313:19,
321:4, 321:10,
321:19

**analytic**
85:1
**analytical**
287:19
**analytics**
64:1
**analyze**
32:3, 291:20,
320:9, 320:12
**analyzes**
75:4
**analyzing**
255:7, 266:11,
266:16, 267:8,
267:15, 267:18,
268:16, 301:17
**andrew**
26:5, 70:7,
70:8, 70:17,
315:2
**anecdotal**
205:9, 211:10
**angle**
97:18
**anglos**
285:13
**annotations**
12:5
**another**
15:2, 19:15,
62:8, 80:18,
82:10, 82:11,
82:16, 82:17,
82:18, 82:20,
83:14, 83:15,
84:1, 84:2,
84:8, 84:9,
84:13, 84:14,
100:21, 101:10,
127:14, 177:16,
195:19, 210:1,
217:1, 239:20,
267:11, 270:2,
330:20
**answer**
10:21, 11:1,
47:4, 53:20,
62:17, 69:19,

71:17, 78:4,
82:9, 82:15,
82:19, 83:3,
83:7, 83:13,
84:7, 84:19,
86:3, 88:14,
90:7, 96:6,
97:6, 101:13,
104:13, 110:8,
111:6, 121:1,
122:12, 126:5,
126:13, 133:17,
138:8, 141:6,
154:10, 159:5,
166:11, 166:22,
167:6, 176:4,
185:11, 190:20,
199:22, 222:1,
224:18, 249:13,
252:19, 303:4
**answered**
126:16, 127:16,
127:17, 127:20,
128:12, 132:2,
141:4, 276:2
**answering**
240:2, 240:19,
289:19
**answers**
10:9, 341:16
**anticipate**
67:2
**anticipated**
72:10
**anybody**
15:8
**anymore**
112:2
**anyone**
11:16, 15:1,
61:21, 176:5
**anything**
11:22, 13:17,
16:13, 17:13,
21:9, 21:14,
27:8, 49:20,
57:18, 58:4,
60:15, 68:6,

68:22, 93:1,
117:3, 132:13,
138:2, 164:7,
169:21, 185:16,
202:19, 210:12,
216:11, 217:18,
223:2, 224:6,
224:15, 225:6,
225:15, 232:9,
245:17, 274:10
**anywhere**
107:12, 136:3,
144:2, 144:19
**apart**
61:21, 67:1,
156:18, 213:8
**apologize**
15:3, 30:1,
35:16, 48:4,
70:1, 113:7,
116:21, 184:12,
184:13, 214:9,
215:11, 333:7
**appear**
11:19, 38:4,
87:21, 187:9,
321:10, 344:6
**appearance**
332:17
**appeared**
303:6
**appears**
144:3, 184:18
**apples**
312:15
**application**
110:19, 112:1
**applications**
75:1, 87:14,
90:12, 109:11,
187:16, 187:21,
304:20
**applied**
71:9, 71:13
**apply**
190:15
**appreciate**
28:12, 227:18

**approached**
39:21, 43:17,
55:17, 110:1
**appropriate**
240:2, 263:9,
295:18
**appropriateness**
215:14, 215:20
**approval**
55:19
**approximately**
256:1
**area**
23:17, 28:6,
39:4, 193:16,
195:1, 195:6,
195:13, 195:19,
196:22, 198:9,
295:22, 296:3
**areas**
22:18, 23:13,
81:14, 82:5,
195:20, 195:21,
196:19, 198:10
**aren't**
10:9, 276:22
**argue**
156:15, 266:18
**arguing**
259:11
**argument**
144:14, 144:21,
146:13, 334:22
**argumentative**
77:18
**arguments**
217:17
**arizona**
8:7, 35:14,
36:2, 36:4,
36:12, 36:15,
37:4, 37:8,
154:1, 197:22,
199:4, 201:6
**arizona's**
35:17
**arkansas**
31:18, 74:1

**around**
28:17, 39:12,
337:7
**arsenel**
328:12
**art**
22:17
**article**
26:17, 61:9,
69:21, 69:22,
70:6, 71:4,
114:9, 117:4,
118:5, 118:8,
121:5, 125:20,
127:2, 130:3,
168:21, 181:7,
317:1, 330:16
**article's**
181:8
**articles**
15:15, 22:13,
25:8, 42:2,
64:7, 68:5,
68:17, 69:4,
172:9, 172:15
**articulate**
208:3
**aside**
12:16, 94:17,
96:4, 216:2,
283:15, 290:5
**asked**
14:16, 28:14,
29:4, 32:2,
39:20, 63:15,
66:17, 67:13,
67:17, 73:4,
73:5, 78:5,
81:7, 88:19,
96:14, 96:15,
97:7, 97:13,
97:19, 107:18,
127:6, 160:8,
165:20, 166:12,
166:20, 166:21,
188:16, 197:10,
200:5, 202:2,
202:9, 202:10,

211:18, 213:9,
219:4, 221:11,
232:3, 281:3,
296:8, 307:8,
308:7, 320:17
**asking**
34:1, 63:5,
63:6, 84:15,
85:20, 85:22,
96:2, 103:11,
104:7, 104:9,
105:2, 105:3,
105:4, 111:19,
119:9, 122:2,
122:3, 122:13,
122:17, 122:19,
123:1, 123:5,
130:1, 141:2,
160:19, 190:9,
202:7, 204:16,
208:3, 218:20,
218:22, 235:18,
242:17, 242:20,
242:21, 251:14,
254:9, 265:22,
268:7, 283:19
**aspects**
15:20, 26:5,
31:19, 221:12
**assembled**
83:2, 83:13
**assert**
221:19
**assertions**
147:14, 216:5,
220:5, 220:15
**assess**
26:1, 70:16,
71:5, 219:5,
231:12, 231:17,
287:21, 290:19
**assessed**
250:13, 285:7
**assessing**
156:14, 173:1,
226:10, 226:18,
228:3, 228:9,
230:18, 230:21,

263:10
**assessment**
106:9, 107:19,
109:4, 112:17,
113:16, 124:6,
125:12
**assessments**
108:2
**assign**
82:3
**assignment**
66:20
**assignments**
341:15
**assist**
55:3, 61:21,
74:2
**assistance**
15:18, 318:19
**assistant**
4:14, 5:5, 5:9
**assisted**
212:4
**associate**
45:9
**associated**
170:13, 171:18,
173:9, 255:22,
256:5, 306:2,
318:14
**association**
22:21
**assume**
11:8, 62:7,
265:21, 290:12,
294:14
**assuming**
105:2, 105:4,
261:5, 298:20,
340:22
**attached**
7:7, 8:2,
13:13, 20:11,
20:16, 33:21,
64:20, 65:11,
74:6, 117:10,
158:10, 178:3,
181:5, 214:16,

232:16, 247:2,
325:13, 344:7
**attempt**
190:5, 209:8,
252:10
**attempted**
191:1, 191:8,
224:12
**attempts**
179:13, 242:2,
254:5
**attending**
10:13, 68:1
**attention**
38:13, 128:13,
149:12, 227:5
**attorney**
3:16, 3:18,
3:20, 4:5, 4:15,
5:3, 5:4, 5:5,
5:10, 15:2,
17:9, 40:4,
42:10, 102:11,
103:10
**attorney's**
4:5, 5:11
**attorneys**
9:15, 9:17,
18:16, 38:14,
40:1, 40:8,
63:9, 63:13,
197:10, 221:13
**august**
255:17, 255:19,
263:3, 284:7,
285:11, 286:2,
297:8
**author**
52:17, 207:18
**authors**
179:12, 199:19,
209:2, 248:18,
267:22, 271:10,
271:16, 335:10
**automatic**
161:20, 162:12,
163:8
**availability**
261:7, 273:7

**available**
72:5, 178:22,
238:20, 239:1,
239:9, 239:10,
239:14, 239:16,
239:18, 239:20,
240:8, 254:19,
258:18, 259:1,
259:2, 259:4,
259:8, 259:10,
259:22, 260:7,
260:10, 260:11,
260:16, 261:18,
262:11, 262:13,
271:2, 274:6,
291:6, 291:12,
297:21, 298:2,
301:2, 301:13,
317:20
**avenue**
4:15, 5:19,
236:3
**avenues**
164:3
**average**
316:5
**avoid**
78:7
**aware**
16:21, 19:4,
21:9, 38:19,
46:6, 51:6,
102:5, 102:9,
107:12, 121:22,
148:12, 148:16,
191:16, 210:15,
230:12, 230:20,
237:18, 237:20,
238:1, 238:19,
239:4, 322:11,
322:13
**away**
34:3, 317:14
**awhile**
204:13

**B**

**back**
29:9, 34:22,

36:3, 39:9,
41:3, 44:17,
55:14, 66:4,
66:7, 75:14,
87:20, 88:18,
93:21, 93:22,
106:13, 107:15,
113:12, 119:4,
120:5, 121:5,
123:12, 128:2,
128:16, 130:7,
132:9, 135:15,
136:8, 140:22,
141:3, 141:8,
143:9, 143:14,
155:16, 155:17,
160:17, 162:9,
168:1, 185:6,
185:18, 188:12,
189:5, 199:21,
204:13, 204:21,
206:2, 209:16,
214:1, 220:20,
223:20, 233:9,
233:13, 238:16,
238:18, 239:3,
244:7, 262:22,
269:10, 269:12,
274:18, 274:22,
276:7, 281:20,
283:5, 285:16,
286:1, 287:4,
288:17, 289:21,
292:1, 296:19,
302:20, 308:2,
323:15, 332:1,
338:7
**back-and-forth**
213:19
**background**
16:20, 22:7,
191:2, 191:5,
204:14, 213:17,
216:15, 255:13
**backgrounds**
72:15, 82:6
**backwards**
54:8

**bait**
175:20
**ballot**
31:15, 108:21,
198:17, 198:18,
198:21, 315:9,
315:11, 315:19,
316:7, 316:18,
317:2, 317:6
**ballots**
23:8, 186:9,
316:15
**ballpark**
46:12
**ban**
333:19
**banning**
187:14, 187:20
**bar**
198:19
**baran**
3:5
**barely**
340:4
**barrel**
195:1, 195:3,
210:14
**barriers**
145:9
**barton**
4:3
**base**
254:18, 257:22,
258:14, 260:3,
263:9, 276:9,
293:13, 300:3,
313:22, 329:4,
329:17
**based**
28:13, 64:6,
75:4, 76:19,
78:5, 82:14,
84:16, 85:21,
86:17, 87:1,
92:20, 93:1,
93:6, 98:6,
104:2, 116:11,
174:14, 182:11,

233:17, 240:7,
244:1, 267:19,
284:6, 324:9,
331:22
**baseline**
72:16, 72:17,
101:19, 102:17,
103:13, 103:19,
104:12, 105:6,
107:21, 257:13
**basic**
268:7
**basically**
205:16, 316:8
**basis**
17:5, 31:8,
47:4, 112:12,
194:18, 259:4,
260:17, 260:19,
261:18, 289:15,
289:17, 291:12
**battery**
223:14
**beach**
5:14, 5:16
**bear**
31:14, 73:21,
97:8, 159:1,
191:7
**bearing**
227:18
**became**
45:8, 330:19,
338:13
**because**
11:15, 13:3,
28:14, 34:1,
37:15, 70:19,
108:8, 120:8,
133:18, 140:13,
141:6, 149:1,
166:1, 223:9,
226:12, 227:13,
242:1, 243:7,
244:11, 257:12,
257:17, 257:17,
263:8, 264:1,
276:5, 276:18,

280:4, 280:21,
284:15, 295:8,
308:12, 310:16,
320:2, 333:18,
334:5, 338:9,
340:18, 340:22,
341:12, 341:13,
341:19
**become**
137:17, 139:22
**becomes**
301:2
**before**
2:1, 9:20,
14:7, 14:14,
17:21, 18:4,
19:9, 27:13,
38:16, 40:12,
40:14, 41:12,
46:1, 46:3,
52:14, 55:2,
55:9, 56:1,
56:2, 56:20,
57:5, 61:14,
65:20, 66:10,
68:9, 72:10,
72:17, 89:22,
100:14, 101:19,
102:2, 102:7,
103:2, 103:12,
103:19, 104:4,
104:11, 105:6,
107:20, 110:1,
125:7, 141:5,
146:21, 180:1,
185:1, 190:13,
195:11, 196:14,
205:5, 209:1,
214:18, 236:21,
237:16, 242:12,
244:15, 250:5,
250:14, 250:18,
263:1, 266:5,
267:4, 268:4,
277:3, 286:3,
286:12, 291:3,
291:9, 293:12,
295:16, 301:7,

312:8, 312:11,
313:19, 315:20,
318:1, 326:6,
338:5, 339:7,
340:12, 341:16,
341:17, 343:13,
345:2

**began**
28:17, 39:17,
40:10

**begin**
83:22

**beginning**
54:13, 63:1,
75:16, 83:10

**begins**
48:18, 54:9,
128:20

**begun**
56:15

**behalf**
2:4, 2:12, 3:2,
14:11, 29:14,
80:16

**behavior**
194:18, 196:6,
196:21, 246:7

**being**
9:3, 9:13,
10:7, 51:10,
72:17, 104:18,
110:11, 140:18,
141:7, 143:7,
151:17, 180:16,
202:12, 234:8,
251:5, 255:20,
263:4, 287:12,
303:7, 306:16,
306:17, 316:21,
318:3, 320:10,
328:18, 328:20,
328:21, 329:17

**believe**
14:13, 20:15,
46:2, 52:7,
73:13, 74:13,
78:17, 82:3,
85:14, 89:11,

89:14, 96:9,
115:20, 117:20,
130:19, 131:3,
131:21, 136:19,
139:12, 141:7,
149:9, 165:10,
165:11, 166:2,
166:3, 166:17,
167:1, 167:2,
167:3, 168:11,
174:8, 189:18,
200:19, 201:7,
220:6, 220:19,
224:2, 224:5,
224:17, 226:8,
227:7, 228:16,
231:18, 232:8,
233:22, 234:2,
237:4, 240:13,
240:22, 242:4,
248:4, 252:20,
256:21, 259:7,
260:11, 261:17,
267:20, 275:10,
275:20, 275:22,
282:5, 282:20,
285:14, 288:3,
288:15, 288:17,
296:11, 296:22,
301:10, 304:1,
309:1, 313:10,
314:8, 325:9,
326:14, 327:2,
327:4

**believed**
17:18

**believes**
229:8

**believing**
308:13

**below**
22:7, 112:21,
118:1, 121:18,
156:20, 157:9,
157:13, 168:16,
183:8, 184:14,
184:16, 276:19,
308:16, 331:3

**ben**
5:14

**beneath**
49:4

**benefit**
309:20

**benefits**
321:22, 322:5

**best**
11:12, 14:19,
23:19, 28:3,
35:18, 41:2,
54:17, 100:4,
130:11, 157:21,
164:1, 165:12,
185:3, 185:17,
211:7, 248:17,
265:10, 324:19,
328:3, 328:11,
341:12, 342:1

**better**
198:5, 198:9,
242:8, 252:11,
286:21, 294:12

**between**
17:9, 19:2,
36:17, 96:11,
96:18, 100:10,
110:9, 111:10,
122:1, 124:19,
126:15, 128:9,
128:11, 132:4,
140:12, 157:8,
157:14, 163:2,
165:8, 166:9,
167:2, 213:22,
221:19, 233:9,
274:1, 276:20,
284:15, 288:11,
292:21, 293:16,
303:16, 303:18,
308:8, 310:1,
310:7, 327:22,
330:3, 334:11,
334:19

**beyond**
17:10, 51:13,
168:18, 226:5,

227:13, 229:15

**big**
27:21, 211:19,
327:21, 337:6,
341:3

**bigger**
127:12, 277:8,
342:5

**bill**
117:12, 301:17,
302:8, 332:5,
338:12

**bills**
18:18

**biogenetics**
194:15

**biologic**
194:17

**biopolitics**
194:11

**bit**
25:19, 32:2,
33:11, 33:14,
43:17, 47:22,
49:14, 54:12,
58:12, 88:13,
115:6, 116:5,
118:14, 121:19,
154:14, 181:15,
183:1, 204:22,
227:16, 301:16,
305:15

**black**
77:8, 94:8,
94:22, 95:4,
95:12, 95:20,
98:2, 121:2,
142:9, 234:11,
235:15, 246:14,
248:7, 279:12,
284:12, 284:17,
286:14, 297:5,
297:9, 303:16,
303:17, 305:19,
305:22, 306:10,
306:16, 307:10,
308:9, 308:15,
311:13, 334:15,

341:3
**blacks**
82:8, 82:10,
84:8, 112:20,
113:19, 114:16,
120:18, 120:21,
120:22, 122:5,
123:15, 124:8,
124:20, 125:13,
126:1, 129:10,
130:17, 247:22,
297:12
**bob**
4:3, 70:14
**bodies**
48:21, 48:22,
49:2, 49:5,
156:13
**body**
43:16, 94:6,
143:18, 148:7,
157:12, 157:21,
174:20
**boockvar**
154:15
**book**
25:8, 150:4,
151:22
**books**
68:17, 172:7
**both**
23:12, 24:20,
39:2, 42:16,
43:22, 58:3,
60:10, 70:4,
78:17, 104:1,
123:3, 125:18,
126:13, 130:10,
130:13, 169:11,
174:7, 184:17,
187:4, 198:13,
199:8, 200:1,
205:17, 208:2,
208:15, 209:6,
211:5, 219:22,
237:16, 237:21,
276:19, 302:15,
307:22, 338:6,

338:8, 338:16
**bottom**
12:11, 17:17,
30:16, 33:10,
52:11, 60:5,
60:18, 60:19,
112:15, 128:19,
141:13, 143:5,
181:18, 210:13,
220:22, 275:1
**bought**
208:10
**boulevard**
5:12, 5:16
**boundaries**
149:22, 197:19
**boxes**
154:22
**brady**
149:20, 149:21
**branch**
29:7, 30:10,
42:7
**branches**
1:5
**break**
11:11, 18:13,
66:1, 74:4,
75:8, 116:4,
156:18, 180:1,
185:1, 188:4,
190:19, 207:17,
266:14, 269:3,
303:2, 323:9
**breakdown**
28:21
**breaking**
153:1
**breaks**
190:21
**brent**
5:22
**brevard**
3:12
**brief**
89:20
**briefing**
191:17

**briefly**
27:4, 36:3,
153:22
**bring**
49:1, 56:13,
185:14, 326:2,
335:18
**bringing**
92:3
**brink**
8:11, 36:17
**broad**
23:13, 26:6,
55:18, 69:12
**broader**
24:2
**brought**
30:18, 38:13,
39:9, 48:13,
48:16, 49:11,
49:16, 55:3,
55:10, 85:11,
97:8, 196:15,
332:1, 336:10,
338:4, 338:5
**broward**
201:7
**bryant**
210:1
**bullet**
99:21, 101:2,
269:18, 296:22
**bunch**
90:9, 145:16,
148:18, 206:20
**burden**
168:22, 170:3,
171:12, 298:18
**burdening**
298:17
**burdens**
145:10, 300:8,
300:21
**byrd**
1:9, 2:6, 9:9,
9:16, 324:3
_____
C
_____
**calculate**
265:18

**calculated**
293:14
**calculation**
287:10, 295:9,
328:8
**calculations**
277:17, 278:22,
279:2, 279:3,
289:8, 289:12,
289:16, 293:21,
294:2, 294:5,
294:14, 294:15,
295:17, 295:20
**call**
10:17, 24:2,
43:22, 67:18,
71:21, 150:15,
151:7, 152:1,
175:20, 189:13,
195:1, 196:6,
198:3, 206:19,
216:7, 224:10,
234:16, 236:4,
277:11, 321:16
**called**
15:19, 24:18,
26:1, 35:6,
35:8, 35:12,
36:11, 38:22,
52:12, 55:3,
87:13, 128:13,
177:16, 179:6,
181:1, 196:15,
198:8, 204:8,
207:21, 240:21,
265:15, 266:6,
310:17, 327:19
**calls**
181:11, 263:22
**came**
38:19, 44:18,
45:14, 45:16,
45:19, 46:1,
46:3, 151:3,
238:18, 324:9
**campaigns**
192:13
**campbell-harris**
3:15

**can't**
26:20, 27:14,
45:22, 69:7,
96:6, 103:19,
109:21, 110:4,
111:15, 152:10,
172:18, 190:5,
201:6, 203:22,
204:15, 207:10,
209:15, 212:7,
225:7, 259:13,
259:19, 262:16,
278:12, 278:17,
278:19, 331:19,
337:6, 339:18,
340:17, 341:18

**candidate**
318:11

**candidates**
80:15, 310:17,
331:20

**cannot**
44:22, 89:15,
110:6, 111:22,
240:1, 262:7,
290:19

**canon**
168:22

**cantoni**
8:4, 180:7,
180:20, 180:22,
184:19

**capacity**
1:10, 42:4,
43:3, 43:8,
43:14

**capitol**
3:21, 5:7

**care**
208:11

**career**
193:22, 195:5,
195:10

**careers**
193:21

**careful**
147:15, 201:10,
204:5, 268:3,

294:4

**carefully**
50:6, 121:6,
150:14, 281:14,
299:17, 313:20,
337:2, 342:6

**carry**
322:4

**cases**
27:12, 29:1,
31:8, 31:10,
35:5, 36:16,
38:3, 41:11,
42:15, 42:17,
42:21, 45:4,
64:7, 69:15,
69:18, 73:11,
73:15, 73:16,
74:10, 80:14,
197:20, 229:6,
229:16, 230:3,
230:9, 255:7,
278:16, 278:20

**cast**
23:8, 186:8,
316:15

**category**
285:14

**causal**
135:4

**caused**
333:5

**center**
172:7, 172:8,
208:17, 212:8

**centers**
23:20, 24:22,
31:1, 43:19,
185:4, 186:6,
186:8, 186:13,
186:18, 186:22,
187:1, 187:3,
313:13

**central**
285:2

**century**
206:3

**certain**
29:5, 41:5,

50:15, 68:8,
73:18, 73:22,
87:5, 87:14,
94:18, 108:22,
112:10, 114:5,
118:14, 136:10,
141:11, 153:15,
153:16, 197:12,
218:16, 222:11,
222:12, 245:8,
270:12, 274:9,
294:4, 307:20,
318:11, 324:13,
339:2, 339:18,
339:20, 341:5,
341:18

**certainly**
107:18, 109:3,
136:4, 138:1

**certainty**
148:3

**certificate**
345:1

**certify**
345:3

**cetera**
222:3

**chair**
27:21

**challenge**
321:6, 322:4,
322:9

**challenged**
320:11, 320:16,
321:22

**challenging**
31:15

**chance**
102:7, 261:1

**change**
182:17, 183:5,
256:21, 258:16,
291:17, 297:18,
329:20, 330:15

**changed**
17:5, 149:20

**changes**
105:22, 111:10,

189:15, 189:16,
311:18, 311:19

**changing**
149:22

**chapters**
25:8

**characterization**
319:17

**characterize**
231:2, 244:17,
245:18

**characterized**
113:15

**characterizing**
97:11

**charge**
19:17, 19:21,
88:19, 88:20,
141:18, 218:10,
218:17, 218:21,
218:22, 219:9,
223:1, 224:7,
227:14, 232:3

**charged**
19:19, 218:15,
231:8, 289:19

**charts**
331:22, 332:10

**chat**
12:9, 12:13,
13:3, 13:10,
20:9, 33:18,
67:22, 75:8,
75:12

**check**
44:10, 50:5,
55:20, 117:21,
342:21

**checking**
202:17

**chilling**
176:7

**choice**
145:21, 155:19,
156:6, 170:7,
170:8, 315:21

**choose**
287:8, 315:4,

315:18, 316:15
**choosing**
251:11
**chose**
296:6
**christi**
6:4
**circuit**
268:21
**circumspect**
149:6
**circumstances**
244:12
**citation**
145:14, 177:2,
248:2
**citations**
150:12, 152:7,
152:11, 152:15,
168:16, 247:18
**cite**
69:4, 70:21,
81:6, 99:5,
148:6, 151:2,
151:17, 151:19,
152:10, 157:20,
170:3, 170:17,
171:3, 171:21,
173:8, 177:13,
180:6, 184:8,
204:15, 217:10,
339:11
**cited**
15:15, 26:7,
68:5, 68:16,
122:19, 149:2,
149:21, 150:20,
151:4, 151:21,
152:14, 156:20,
157:8, 157:12,
162:9, 162:19,
163:1, 171:12,
171:16, 172:21,
174:15, 174:17,
180:4, 204:10,
242:18, 324:12,
326:11
**cites**
162:2, 184:2,

184:7, 184:17,
255:21, 256:17,
290:3
**cities**
43:2
**citing**
41:12, 243:1,
243:2, 303:14,
311:6
**citings**
28:10
**citizen**
100:8, 100:11,
100:16, 100:19,
100:20, 102:21,
111:12, 250:15,
250:16, 250:18,
258:1, 258:10,
258:12, 259:5,
259:18, 263:12,
268:11, 273:8,
276:14, 276:16,
277:14, 281:12,
281:19, 282:14,
292:7, 293:14,
295:13, 297:19,
298:14, 300:3,
315:10
**citizen's**
97:17
**citizens**
76:4, 94:8,
95:1, 95:5,
95:13, 95:21,
95:22, 96:3,
97:3, 109:14,
137:11, 137:17,
139:22, 140:7,
280:14, 284:12,
284:14
**citizenship**
102:6, 102:10,
102:15, 104:21
**citrus**
5:18
**city**
43:20
**civic**
208:17, 318:6

**civil**
2:4, 5:6, 9:7,
195:16, 324:2
**claim**
170:20, 180:10,
239:13, 244:19,
248:22, 256:13,
260:12, 260:18,
260:20, 261:19,
271:18, 274:13,
274:17
**claiming**
131:9
**claims**
48:20, 217:14,
220:11, 223:8,
224:9, 224:13,
230:14, 230:18,
230:22, 245:1,
262:3, 264:2,
291:11
**clarification**
233:11
**clarified**
16:4, 17:4
**clarify**
40:9, 185:10,
185:16, 191:11,
337:15
**clarifying**
182:16
**class**
192:17, 192:21,
341:21
**classes**
192:15, 193:2,
206:13, 206:16,
206:17, 340:1
**cleanups**
185:2
**clear**
85:20, 89:7,
96:22, 97:13,
100:6, 137:7,
138:22, 144:16,
148:21, 184:15,
204:17, 218:15,
240:9, 259:14,

262:2, 273:1,
280:21, 281:6,
287:16, 288:22,
289:3, 294:10,
336:1
**clearly**
10:8, 13:7,
190:5, 267:10
**close**
30:14, 183:11,
211:17, 288:7
**closer**
30:5, 39:10,
240:10
**closest**
317:3
**coauthored**
53:21
**coauthors**
194:1, 201:10
**coefficient**
121:11, 305:7
**cohere**
151:11
**collaborate**
211:6, 211:18
**collaborators**
201:12
**colleague**
14:5, 41:20,
46:7, 74:2,
260:1, 323:18
**colleagues**
23:19, 38:7,
41:5, 211:16
**collect**
110:18, 111:22
**collecting**
109:10, 110:20,
111:20, 187:15,
187:20
**collection**
201:17
**college**
208:19, 210:2
**colleges**
329:13
**color**
77:1, 77:7,

77:15, 78:13,
81:19, 83:14,
85:18, 87:4,
89:9, 92:19,
109:6, 133:10,
133:22, 134:12,
141:16, 176:17
**colorado**
36:21, 199:3,
315:5
**come**
17:15, 36:16,
44:15, 175:22,
185:6, 208:22,
209:7, 211:13,
238:16, 240:9,
241:22, 244:7,
260:2, 337:17
**comes**
28:9, 145:13,
207:6, 210:22,
335:6
**coming**
17:1, 46:4
**comment**
66:20, 335:9,
335:12, 339:15
**commenting**
221:3, 221:5
**comments**
51:3, 53:2,
205:14, 297:17
**commission**
345:16
**committed**
322:20
**common**
22:22, 255:5,
331:13, 340:22
**communications**
17:9, 221:19
**communities**
326:2
**company**
43:4, 43:6,
43:11
**comparable**
268:3, 277:1,

292:7, 308:17,
313:8
**comparative**
270:22, 271:4,
271:21
**compare**
89:22, 125:2,
236:18, 263:11,
266:2, 277:2,
285:18, 335:21
**compared**
32:21, 74:13,
119:18, 210:4,
255:19, 263:4,
266:5, 270:18,
292:22, 293:3,
306:17, 306:20
**compares**
125:3, 277:5,
277:6
**comparing**
101:4, 120:20,
120:22, 121:1,
121:13, 124:2,
125:6, 125:9,
250:14, 275:3,
276:21, 287:2,
301:12, 330:5,
332:22, 335:6
**comparison**
124:14, 236:6,
237:11, 264:13,
303:18, 327:9,
328:15, 334:10,
334:18, 334:19,
335:19
**comparisons**
237:4, 237:8,
237:13, 237:15,
276:10
**compelling**
97:10
**compensated**
19:5
**compensation**
18:22, 19:8,
19:11
**competitive**
238:12, 312:12,

312:14
**compiled**
74:19
**complaints**
191:14
**complete**
10:17, 21:17,
344:5
**completed**
200:18
**completely**
165:18, 338:18
**completion**
342:19
**complex**
3:19, 5:6,
309:21, 317:15,
331:7
**complexity**
317:10
**compliance**
318:12
**complicated**
149:11, 242:3
**compliment**
196:20, 197:7
**complimentarity**
199:22
**compliments**
196:2
**component**
18:14, 225:20
**comprehensive**
63:2
**computational**
85:1
**computer**
11:18, 12:1
**concentrated**
341:5
**concern**
178:5, 290:17
**concerned**
302:18
**concerns**
135:5
**conclude**
123:15, 142:1,

247:22, 262:6,
262:8, 264:20,
323:12
**concluded**
284:11
**conclusion**
63:16, 76:3,
76:13, 92:2,
93:15, 95:19,
96:17, 100:2,
100:6, 114:13,
135:11, 136:2,
136:13, 136:20,
137:4, 150:2,
263:7, 263:18,
280:11, 294:17,
298:16, 299:2,
299:3, 299:19,
338:11
**conclusions**
17:1, 17:16,
17:19, 53:10,
65:17, 66:11,
75:20, 76:2,
76:8, 76:18,
77:1, 77:14,
94:5, 97:10,
153:11, 172:20,
178:17, 179:18,
187:13, 187:19,
215:15, 215:21,
251:13, 252:16,
253:1, 255:6,
266:11, 278:10,
278:15, 297:13,
301:7, 308:21,
311:11, 314:4
**conditional**
49:9, 147:15,
147:19, 148:18,
148:19, 157:15,
185:19, 186:18,
243:8, 244:12,
309:22, 313:4
**conditions**
23:8, 100:1,
101:12, 243:13,
253:12

conduct
22:11, 23:5,
23:6, 63:18,
64:4, 72:5,
72:7, 72:21,
73:6, 99:8,
101:17, 197:2,
210:17, 243:19,
311:7
conducted
28:7, 64:2,
73:7, 122:19,
130:20, 131:4,
131:12, 243:18,
293:22, 304:18,
321:19
conducting
287:10
conference
1:4, 64:8
conferences
46:7, 201:2
confidence
148:10, 243:14,
267:21, 333:19
confident
217:11
confirm
90:9, 188:19,
229:14, 235:13,
260:5, 274:11,
304:3, 342:18
confirmed
305:4
confirming
59:13, 227:8
confounded
290:8
confounders
146:11, 146:12,
268:2, 312:19,
313:10
confounding
310:11, 313:3
confuse
184:9
confused
103:7, 150:13

confusing
54:8
congestion
187:3
congressional
194:3, 194:4,
194:5
consequence
251:21, 281:7,
282:19, 285:5
consequences
26:22, 135:1,
167:19, 182:21,
283:3, 285:3
consequential
89:10, 89:12,
127:7, 132:3,
286:19, 331:12,
331:16
conservative
284:18
consider
199:14, 268:12,
269:21, 293:15,
319:8, 328:1
consideration
146:10, 293:13
considered
56:3, 154:21,
182:6, 194:16,
220:15, 226:6,
313:18
consistent
71:9, 181:8,
231:18, 283:8,
293:1, 294:17
constitute
148:4, 264:8
constitutes
256:11, 257:3,
258:5, 259:15,
262:1, 264:6,
264:10
consultant
30:16
consulting
44:2
contact
38:20, 39:6,

207:22, 211:8,
328:6
contacted
56:12
contacts
39:12
contained
147:2
containing
65:17
contemporary
212:9
content
135:6
contention
236:12, 236:14
contents
54:3, 255:14
contest
94:19, 96:2,
134:18, 134:20,
139:14, 141:15,
142:7, 145:1,
279:16, 284:21
contested
279:10, 279:22,
280:22
contesting
99:2, 131:8,
286:7
context
159:22, 229:17,
311:10
continue
30:9, 180:3,
224:14
continued
3:1, 4:1, 5:1,
6:1, 8:1
continuing
59:2, 185:7
continuum
319:9
contrast
112:17, 124:5,
125:11, 183:19
contrasting
123:11, 124:10,

124:18
contrasts
125:21, 183:17
contributed
326:8
contribution
31:9
control
41:14, 90:22,
93:22, 143:15,
260:3, 313:10,
328:5, 328:8,
331:19
controlled
327:20, 327:22
controlling
306:9
convenient
315:8
conversation
50:17, 57:14,
58:6, 340:10
conversations
14:13, 16:7,
47:6, 47:7,
222:15
convinced
250:20, 252:6
convincing
268:13
copy
33:3, 74:3,
75:13, 343:14
cord
1:9
cornerstone
156:9
correct
38:18, 39:15,
58:2, 61:6,
65:19, 67:11,
71:7, 75:6,
76:11, 76:16,
76:21, 84:4,
84:5, 87:11,
88:3, 92:3,
92:7, 97:19,
99:4, 101:21,

102:4, 107:11,
112:3, 113:21,
114:2, 116:7,
116:10, 117:17,
118:7, 119:21,
122:21, 123:22,
124:4, 124:12,
125:8, 125:10,
128:14, 132:15,
133:20, 154:5,
154:9, 159:4,
166:18, 167:10,
168:4, 171:2,
179:21, 187:12,
191:22, 212:13,
219:14, 231:19,
235:16, 236:8,
240:19, 242:16,
245:9, 248:9,
261:6, 265:5,
274:16, 277:19,
288:21, 296:1,
319:4, 332:12,
344:5, 345:5
**corrected**
45:18, 155:11,
178:14, 321:15
**corrections**
344:6
**corrective**
155:1
**correctly**
36:10, 76:5,
83:16, 94:11,
106:7, 112:22,
119:20, 123:21,
133:14, 154:11,
155:4, 156:16,
157:3, 157:8,
157:18, 158:20,
159:10, 167:21,
177:11, 178:11,
178:18, 179:2,
179:20, 180:7,
183:15, 187:6,
270:4, 270:9,
326:10, 332:14
**correlated**
286:15

**correlation**
165:7, 284:15
**correspondence**
307:9, 308:8
**corresponding**
306:15
**corroborator**
46:8
**cost**
80:3, 106:20,
108:8, 144:6,
144:14, 144:22,
145:2, 145:3,
145:6, 145:17,
145:18, 145:20,
146:2, 146:4,
146:13, 148:14,
149:9, 150:17,
151:10, 248:16,
270:19, 270:20,
270:22, 271:4,
308:22, 309:5,
309:8, 309:13,
309:17, 309:19,
310:2, 310:8,
310:22, 311:6,
311:16, 313:2,
314:16, 314:20,
315:16, 317:7,
318:20, 319:9,
319:13, 319:15
**cost-benefit**
52:12, 143:6,
143:12, 144:3,
147:11, 147:13
**costas**
207:9, 210:4
**costless**
146:7, 314:9,
315:16
**costliness**
273:3
**costly**
272:3, 272:13,
273:12, 314:7,
314:10, 314:11,
315:3, 315:4,
316:9, 316:15,

318:22
**costs**
106:1, 106:2,
106:4, 108:13,
108:17, 135:12,
135:18, 136:17,
137:9, 137:16,
138:17, 139:21,
141:20, 142:15,
143:19, 146:22,
151:8, 151:12,
152:3, 156:21,
156:22, 157:14,
244:11, 250:1,
250:2, 300:21,
301:12, 314:12,
318:14, 318:15
**could**
16:10, 18:9,
32:1, 33:8,
39:9, 40:2,
40:9, 63:20,
71:12, 82:10,
82:16, 83:22,
84:8, 84:13,
90:22, 102:19,
105:9, 108:2,
108:5, 109:19,
109:20, 113:2,
113:3, 115:6,
138:7, 138:9,
143:6, 144:12,
151:20, 160:7,
160:17, 166:6,
167:8, 176:7,
187:10, 187:16,
187:21, 220:8,
221:14, 222:21,
223:18, 225:13,
225:15, 231:12,
235:9, 238:9,
238:10, 261:3,
263:19, 264:17,
265:12, 268:5,
272:7, 272:19,
274:2, 276:12,
288:9, 291:15,
292:3, 298:8,

312:19, 314:2,
316:12, 322:1,
329:13, 334:13,
336:9, 340:19,
341:13
**couldn't**
37:6, 50:10,
109:18, 115:4,
153:2, 204:12,
222:22, 261:3,
317:18
**counsel**
3:19, 9:7,
10:14, 10:16,
10:22, 14:10,
14:11, 14:14,
16:8, 38:5,
38:17, 47:8,
47:15, 59:11,
63:6, 68:1,
68:13, 88:12,
138:7, 185:15,
190:1, 190:14,
215:13, 221:22,
222:5, 222:15,
324:1, 324:2,
345:9
**count**
29:16, 173:2,
174:8
**countering**
256:13
**counterintuitive**
152:2
**counties**
3:14, 43:2,
87:5, 133:11,
134:1, 200:17,
200:22, 201:3,
341:5
**country**
265:14
**counts**
23:11, 280:12,
280:14
**county**
4:4, 4:5, 4:9,
4:13, 4:15,

4:19, 5:9, 5:11,
5:14, 30:6,
42:13, 73:22,
199:7, 201:5,
211:14, 211:22,
212:13, 212:14
**couple**
10:5, 11:14,
14:8, 45:6,
122:7, 188:17,
233:6
**course**
10:15, 15:4,
23:12, 49:22,
53:2, 58:13,
64:2, 84:21,
100:5, 113:5,
115:8, 120:7,
122:10, 134:10,
163:9, 192:7,
192:8, 192:10,
192:12, 192:18,
192:20, 193:5,
198:1, 198:20,
220:12, 328:12
**courses**
192:2, 192:5,
205:11, 207:4
**court**
1:1, 37:12,
37:15, 153:9,
154:1, 154:9,
231:21, 232:1,
237:6, 268:13,
343:14
**courthouse**
211:14
**courts**
213:14, 230:17,
230:20, 267:14,
268:18, 310:22
**cover**
22:14, 23:16
**covered**
304:2
**covers**
27:11, 61:13,
213:16

**covid**
155:2
**create**
103:19, 104:11,
145:9, 186:12
**credit**
342:3
**credited**
268:17, 268:22
**creek**
43:21
**criticism**
287:15, 294:13
**criticized**
37:22
**critique**
130:14, 144:17
**critiques**
76:7, 76:12,
76:17, 76:22
**critiquing**
179:15
**cross-reference**
191:2
**cross-sectional**
71:22
**crr**
1:22, 2:2
**crucial**
178:8
**cumbersome**
100:4
**current**
20:22
**currently**
102:18, 137:19,
140:2, 191:21,
192:2
**curriculum**
20:21, 206:20
**curtailed**
131:22
**cut**
101:9
**cv**
20:16, 20:18,
21:1, 21:6,
21:10, 25:14,

27:6, 35:1, 38:4
**cvap**
254:20, 258:21,
260:7, 260:10,
260:16, 261:7,
262:3, 263:14,
264:1, 282:10,
282:12, 283:8,
284:6, 285:15,
285:19, 285:22,
286:14, 291:11,
308:14, 317:21
**cycle**
236:11

**D**

**dakota**
265:16, 265:17
**dale**
5:18
**dan**
146:11, 216:4,
267:3, 268:1,
278:11, 333:8,
336:9, 340:3,
340:5, 342:7
**dan's**
138:19, 336:16
**daniel**
64:18
**darn**
315:16
**data**
34:13, 64:1,
71:17, 72:4,
72:7, 74:19,
75:2, 75:5,
76:19, 84:17,
85:22, 86:13,
86:17, 86:21,
87:1, 87:9,
98:1, 98:7,
98:10, 133:10,
136:4, 178:9,
178:22, 179:17,
188:20, 189:1,
201:16, 201:17,
235:14, 235:18,

236:7, 239:1,
239:5, 239:13,
239:15, 239:19,
240:3, 242:6,
242:9, 243:10,
255:7, 258:17,
259:1, 259:5,
259:12, 259:21,
260:7, 260:10,
260:16, 261:7,
261:16, 262:12,
263:16, 265:8,
266:11, 266:16,
267:8, 267:15,
267:19, 268:16,
279:5, 287:18,
288:13, 289:2,
291:5, 291:21,
296:4, 301:11,
311:14, 311:17,
321:15, 321:20
**date**
18:19, 19:5,
19:8, 21:20,
104:21, 266:21,
344:11
**dates**
195:11
**david**
138:19, 207:5,
328:11
**dawn**
1:22, 2:1,
345:2
**day**
12:17, 23:20,
35:9, 145:19,
185:4, 186:5,
186:9, 186:12,
198:3, 229:1,
315:20, 316:8,
317:3, 323:19,
324:20, 345:14
**days**
19:18, 196:7,
233:6, 247:11,
315:19, 316:7,
329:7

dayton
3:15
dc
2:10, 2:17
deal
41:10, 312:7
dealing
28:8, 41:13,
177:2
dealt
324:20
dean
27:21
deceiving
333:18
december
35:7
decennial
44:13
decide
47:14
decided
42:9
deciding
224:22, 225:20
decision
38:1, 47:17,
222:16, 225:19,
237:6
declarations
98:17, 112:7
decline
100:15, 100:19,
126:7, 235:20,
257:11, 262:15,
262:19, 263:7,
263:19, 286:5,
293:16, 295:16,
302:15, 303:4,
342:8
declined
235:15, 250:6,
252:1, 257:15,
262:5
declines
91:11, 269:22,
275:9, 282:4
decrease
148:14, 164:3,

245:7, 250:11
decreased
106:2, 258:16,
310:16
decreases
272:20
defendant
3:2
defendant's
215:13
defendants
1:12, 3:11,
29:1
defending
30:12
defense
10:14, 10:16,
30:9, 38:16,
320:10, 320:15
deficiencies
321:14
deficient
139:15, 317:18
defied
71:21
defined
180:12
definitely
17:12
degree
45:20
degrees
22:3, 46:9
deland
4:16
delay
261:6
democracy
207:8, 210:22
democrat
307:12
democratic
31:21, 79:5,
79:8, 81:2,
81:20, 304:19,
305:1, 306:19,
308:10
democrats
320:4

demographic
212:5
demographics
329:14
demonstrable
286:5
demonstrably
290:6
demonstrate
88:21, 100:9,
247:16, 251:17,
253:17, 288:9,
304:12
demonstrated
94:7, 94:15,
95:3, 96:10,
99:12, 106:5,
302:2, 321:12
demonstration
253:12
denominator
173:3, 259:17,
276:18, 277:8,
277:15, 277:17,
295:14
denote
115:11
deny
81:10
denying
111:8
department
41:20, 45:5,
76:20, 85:8,
98:2, 98:11,
211:13, 235:10
depend
298:20, 330:21
depending
238:10
deponent
344:1
deposed
9:20, 35:2,
36:8, 200:3
deposition
1:14, 7:8, 7:9,
8:3, 10:7,

11:15, 12:12,
13:5, 13:14,
13:18, 13:21,
14:12, 14:15,
15:8, 18:11,
33:5, 34:7,
34:12, 62:8,
93:17, 154:1,
154:15, 189:18,
190:16, 191:3,
205:15, 227:9,
342:20, 345:3
depositions
36:1
depress
310:18
depressed
282:21, 334:15
depressing
155:1, 175:21
deputy
4:4
describe
22:9, 23:1,
48:22, 49:10,
49:15, 143:5,
193:16, 194:19,
207:18, 209:22,
236:7, 241:13
described
71:10, 93:10,
99:13, 165:13,
203:2, 209:14,
212:11, 212:12,
240:20
describes
181:10
describing
57:3, 101:17,
141:9, 184:20,
196:18, 233:14,
318:13
description
49:2, 75:19
descriptions
22:17
design
30:21, 42:20,

72:1, 89:14,
132:5, 132:6,
143:2, 179:18,
242:9, 254:18,
260:2, 260:4,
261:14, 261:21,
264:12, 265:9,
266:6, 266:10,
267:4, 267:6,
281:10, 285:8,
285:17, 287:1,
288:1, 288:2,
288:4, 289:17,
290:15, 290:18,
291:11, 294:2,
295:8, 295:10,
321:14, 327:12
**designated**
108:22
**designs**
243:10, 266:21,
267:14, 328:7
**desirable**
308:16
**desired**
24:7, 145:22
**desoto**
3:12
**detail**
76:2, 224:22
**detailed**
85:1, 112:11
**details**
18:16
**determine**
164:16
**determined**
23:10, 37:15
**deterrent**
34:4, 34:9,
187:5
**deviates**
167:4
**deviation**
316:6
**difference**
100:9, 101:18,
101:22, 103:2,

122:1, 122:9,
122:10, 124:19,
125:4, 262:15,
266:22, 277:12,
277:13, 291:1,
327:12, 327:22,
330:7, 330:11,
332:22
**difference-in**
101:17, 327:11
**difference-in-di-
fference**
71:16, 72:1,
72:6, 72:8,
72:22, 73:8,
74:11, 75:10,
107:21, 254:17,
254:22, 255:5,
255:11, 256:1,
256:6, 256:11,
257:3, 257:9,
258:5, 259:15,
259:20, 261:22,
264:5, 264:10,
266:7, 266:20,
273:2, 277:11,
277:12, 285:17,
286:22, 292:5,
292:17, 292:19,
295:11, 328:7
**differences**
113:18, 114:15,
115:9, 117:2,
120:17, 121:10,
123:7, 126:15,
127:21, 128:11,
129:9, 130:17,
138:2, 257:20,
258:3, 290:8,
303:15, 334:9,
335:7
**different**
12:3, 24:8,
30:19, 34:17,
42:12, 43:13,
71:18, 72:15,
95:22, 115:22,
117:5, 121:20,

121:21, 122:2,
122:4, 122:6,
122:20, 123:1,
123:7, 123:20,
127:6, 127:8,
128:9, 129:18,
156:5, 200:5,
200:22, 210:4,
214:2, 217:19,
217:20, 218:11,
218:17, 218:21,
219:1, 235:16,
237:1, 242:9,
251:8, 257:5,
259:6, 263:15,
276:6, 276:22,
277:8, 280:12,
281:10, 291:11,
294:2, 296:6,
319:6, 334:13,
340:16, 342:4
**differential**
20:4, 234:14,
332:20
**difficult**
198:19, 231:6
**digits**
46:15
**dimensions**
183:20
**diminish**
254:11
**diminished**
288:10, 293:1,
294:18, 319:22
**diminishing**
273:22, 294:18
**diminution**
85:4, 241:18
**direct**
149:10, 205:17,
310:7
**direction**
47:8, 345:8
**directives**
15:20
**directly**
151:10, 169:14,

225:7, 242:21
**director**
208:16
**disadvantaged**
82:13, 84:11
**disaggregate**
169:22
**disagree**
135:9, 138:6,
139:2, 139:6,
165:4, 165:16,
174:16, 236:14,
239:13, 239:15,
251:16, 262:12,
262:13, 274:12,
279:6, 279:17,
289:7, 289:11,
290:12, 293:21,
295:20, 302:12,
304:4, 307:2,
307:5, 308:18,
311:22, 312:2,
319:10, 323:2,
333:21
**disagreeing**
268:6
**disagrees**
264:12
**discipline**
165:6
**disclose**
211:9, 222:5
**disclosed**
62:3
**disconnect**
88:13
**discount**
171:7
**discriminated**
100:7
**discrimination**
228:22, 229:2,
229:20, 229:22,
230:4, 230:11,
230:13, 230:18,
230:22, 232:7
**discuss**
56:19, 67:15,

71:18, 72:1,
90:18, 91:11,
117:15, 143:4,
145:16, 157:5,
161:18, 163:16,
174:13, 186:17,
221:15, 222:6,
227:5, 235:11

**discussed**
15:6, 57:5,
57:19, 60:10,
63:4, 63:11,
94:4, 107:13,
107:22, 128:19,
128:22, 129:20,
129:21, 129:22,
130:10, 130:11,
156:20, 157:9,
157:13, 163:3,
163:18, 182:22,
188:20, 189:1,
210:20, 229:6,
338:19

**discusses**
146:16, 188:18

**discussing**
104:20, 255:11,
304:3

**discussion**
26:9, 57:6,
88:2, 91:5,
196:10, 218:8,
219:16, 219:20,
221:4, 224:18,
229:16, 308:22,
309:12, 325:2

**discussions**
221:16, 226:8

**disenfranchiseme-
nt**
135:19, 136:18,
137:10

**disparate**
94:7, 94:16,
94:17, 95:4,
95:17, 95:20,
96:4, 96:11,
96:17, 97:15,

97:18, 97:22,
99:13, 127:7,
132:8, 132:13,
133:4, 133:18,
138:2, 219:6,
224:9, 226:3,
234:10, 243:6,
246:14, 250:21,
274:1, 289:5,
296:9, 296:16,
301:8, 302:16,
303:19, 313:16,
314:4

**disparately**
94:18, 138:17

**disproportionate**
250:21, 293:6,
295:3, 311:12

**disproportionate-
ly**
77:15, 80:17,
81:18, 88:7,
93:11, 131:14,
134:1, 140:7,
141:21, 142:6,
248:13, 248:15,
248:21, 249:2,
293:2, 305:18

**dispute**
77:6, 84:17,
87:8, 89:7,
98:8, 98:15,
112:12, 134:2,
134:4, 140:13,
188:19, 189:1,
239:11, 248:5,
249:12, 251:2,
254:7, 260:17,
260:19, 274:3,
281:4, 333:3,
333:8

**disputed**
140:12

**disputing**
252:17, 267:5,
332:19

**distinct**
184:4

**distinction**
145:4, 145:5

**distract**
68:2

**district**
1:1, 1:2,
30:11, 36:4,
42:9, 42:21,
43:21, 154:1

**districts**
42:12, 43:1

**distrust**
316:17

**divide**
47:1

**divided**
19:2, 57:8,
60:14, 255:15,
280:12, 285:15,
286:13

**division**
1:3, 5:6, 5:10

**divulge**
47:5

**dmv**
79:14, 85:8,
85:17, 270:3,
270:21, 271:18,
271:19, 272:1,
272:14, 272:19,
273:4, 273:6,
273:12, 273:16,
273:18, 274:3,
274:5, 274:14,
297:4, 297:9,
297:15, 297:20,
299:7, 299:12,
300:5

**dmvs**
91:13

**doctor**
16:20, 104:16

**document**
232:18, 233:12,
247:4

**documents**
16:8, 16:15,
55:21, 63:14,

64:9, 68:13

**dog**
208:12

**doing**
27:17, 28:15,
43:22, 44:6,
44:8, 44:12,
48:7, 71:17,
123:10, 125:6,
125:14, 132:6,
198:2, 218:16,
233:8, 262:10,
266:19, 291:4,
300:21, 312:18,
313:9, 321:12

**dollar**
317:7

**don**
207:9, 328:12

**done**
23:22, 25:1,
27:11, 40:22,
41:4, 45:4,
56:19, 73:12,
73:20, 74:16,
89:3, 89:6,
113:8, 115:4,
115:21, 119:12,
126:19, 176:5,
199:7, 199:11,
200:13, 203:3,
205:10, 207:14,
207:19, 208:13,
208:14, 210:2,
210:20, 211:3,
241:5, 242:5,
250:19, 272:22,
279:4, 285:6,
285:10, 286:20,
286:21, 291:15,
294:9, 294:11,
295:12

**door**
317:12

**double**
46:15

**doublecheck**
21:18

**doubtful**
314:3
**douglas**
8:15, 325:14
**down**
18:14, 21:18,
21:22, 25:19,
25:21, 26:1,
27:2, 29:2,
47:21, 49:14,
58:12, 69:13,
73:14, 90:11,
115:6, 116:4,
116:15, 116:16,
116:19, 121:18,
129:12, 152:6,
157:5, 168:16,
179:4, 181:22,
207:17, 219:11,
225:8, 248:11,
255:18, 255:20,
257:8, 257:12,
262:7, 262:19,
263:3, 263:4,
265:4, 265:11,
272:7, 273:7,
274:4, 283:18,
284:9, 299:11,
314:1, 330:14,
330:17, 332:16
**downstream**
182:21
**downward**
115:2, 332:4,
332:10, 333:6
**dozen**
10:3, 35:3,
46:16, 133:11,
134:1, 272:16
**draft**
54:14, 56:15,
57:9, 220:1,
234:1, 338:16
**drafted**
51:2, 53:16,
54:22, 55:2,
55:9, 55:12,
56:22, 57:6,

57:10, 58:9,
58:14, 58:17,
58:19, 58:21,
59:3, 59:10,
59:15, 59:18,
60:6, 60:11,
60:16, 61:13,
62:12, 62:16,
114:11, 156:11,
189:7, 200:5,
215:17, 270:13,
275:19, 336:6,
337:19, 337:22,
338:6
**drafting**
52:19, 52:21,
56:20, 57:16,
58:4, 59:13,
59:20, 60:3,
61:8, 61:10,
61:19, 114:10
**drafts**
56:17
**draw**
179:18, 204:18,
227:5
**drawing**
140:15, 140:22,
141:2, 141:8,
153:11
**drawn**
197:19
**draws**
198:4
**drew**
149:12, 204:18
**driver's**
176:2, 273:17,
273:19, 299:9
**drives**
75:2, 204:9,
205:7, 207:15,
207:20, 210:3,
325:5, 326:1,
326:8
**drop**
13:3, 13:9,
75:7, 85:18,

120:4, 122:3,
127:13, 154:22,
256:9, 292:21,
302:1, 302:7,
342:5
**dropped**
67:21, 297:11
**drops**
119:17, 120:2,
128:3
**due**
86:14, 235:2,
239:21
**duly**
9:3
**during**
12:12, 74:3,
326:5

**E**

**each**
10:10, 19:1,
19:3, 22:3,
44:8, 46:8,
49:10, 54:14,
57:3, 57:9,
61:15, 61:17,
101:15, 120:21,
121:20, 124:2,
125:16, 128:9,
163:19, 220:8,
251:6, 298:15,
332:10, 332:15,
333:5, 335:7,
339:11, 340:6
**earlier**
27:4, 28:2,
55:16, 68:11,
70:7, 88:19,
92:8, 101:7,
101:16, 107:22,
112:17, 113:8,
114:7, 115:13,
124:6, 125:11,
130:11, 136:21,
143:14, 172:19,
183:1, 184:13,
185:9, 199:21,

205:15, 214:21,
218:11, 240:6,
240:12, 248:4,
254:21, 255:4,
276:4, 297:1,
301:16, 324:11,
339:13
**early**
23:20, 24:18,
24:21, 31:1,
35:7, 40:12,
41:10, 46:10,
49:6, 145:18,
146:6, 149:5,
150:5, 157:6,
168:2, 168:5,
168:8, 168:9,
168:11, 168:13,
168:16, 169:3,
169:5, 169:6,
169:12, 169:14,
169:18, 169:19,
169:22, 170:7,
170:9, 170:14,
171:18, 173:5,
173:9, 193:22,
195:8, 195:9,
206:3, 309:15,
310:14, 310:19,
313:12
**ease**
325:22
**easier**
146:1, 154:14,
198:22
**easter**
208:9
**eastern**
269:5
**eavs**
74:20, 75:5
**ecological**
297:14
**economics**
195:2
**edited**
172:7
**editing**
59:4

**editorial**
51:17, 51:21,
53:4
**edits**
50:1, 50:9,
50:13, 50:16,
51:12, 51:14,
51:17, 51:20,
53:3, 189:9
**educated**
240:7, 240:13,
240:15, 240:21,
241:4, 242:8
**education**
21:1
**educational**
22:7
**effective**
210:9, 290:3,
290:9, 290:22
**effectively**
290:19
**effects**
26:2, 49:9,
71:1, 71:6,
96:17, 115:12,
116:13, 117:12,
127:7, 132:3,
146:8, 146:16,
148:15, 153:16,
155:1, 157:2,
158:18, 162:6,
162:17, 163:10,
177:8, 179:19,
183:10, 183:20,
184:3, 185:20,
186:18, 187:10,
193:15, 194:5,
210:5, 224:14,
226:3, 243:6,
288:9, 289:6,
301:8, 303:20,
306:5, 308:4,
314:4, 321:4,
321:5, 321:13,
337:12
**efficacious**
209:5, 209:6,

209:11, 210:9,
326:17, 326:21,
327:8, 328:16,
328:22, 330:19
**efficient**
136:14, 200:8
**effort**
254:7, 308:13,
312:7, 331:2
**efforts**
31:12, 80:16,
81:22, 104:5,
108:15, 111:14,
135:17, 136:16,
138:15, 205:16,
249:18, 324:18,
326:16, 326:21
**eitan**
166:3
**either**
61:7, 76:15,
80:20, 141:12,
150:16, 157:1,
157:16, 188:21,
200:17, 216:4,
227:10, 243:7,
245:20, 262:21,
264:3, 270:19,
307:3
**election**
7:17, 22:8,
23:3, 23:5,
23:6, 23:20,
24:4, 24:10,
24:14, 25:5,
26:2, 26:8,
27:15, 30:22,
39:2, 49:9,
52:6, 52:16,
69:15, 69:18,
70:5, 71:2,
71:19, 71:21,
72:3, 145:19,
148:13, 153:15,
156:12, 156:21,
157:17, 158:7,
159:1, 159:6,
159:13, 161:15,

164:12, 166:10,
167:19, 178:22,
183:12, 183:21,
185:4, 185:20,
186:5, 186:9,
186:12, 186:19,
192:13, 192:19,
192:20, 192:21,
195:12, 196:7,
197:4, 198:13,
199:4, 199:6,
199:11, 200:14,
200:22, 201:14,
201:21, 203:3,
229:6, 236:10,
237:17, 237:22,
238:5, 238:11,
240:14, 241:6,
241:20, 242:14,
243:4, 243:5,
244:9, 268:5,
311:15, 311:18,
311:20, 312:22,
315:10, 315:20,
316:8, 317:3,
322:5, 324:20,
326:7
**election-related**
28:17, 35:21,
41:16
**elections**
3:12, 4:4,
4:14, 4:19,
5:15, 22:8,
23:3, 23:7,
23:9, 23:14,
24:1, 24:9,
24:13, 27:15,
27:18, 28:4,
31:19, 75:5,
76:20, 98:2,
98:11, 192:14,
197:3, 312:12,
312:14, 312:16
**electorate**
327:15, 341:1
**element**
26:12, 79:12

**elias**
2:15
**eligible**
101:4, 137:11,
137:16, 139:21,
141:20, 208:1,
257:18, 257:22,
266:1, 268:9,
268:11, 271:13,
271:19, 314:2,
330:1
**elizondo**
29:7
**else**
15:1, 15:8,
45:1, 101:8,
107:12, 136:3,
144:19, 202:19,
210:12, 334:15
**elsewhere**
144:8, 144:9
**email**
12:8, 12:13,
55:20, 210:6
**emergency**
28:10, 41:14
**eminent**
229:9
**emphasize**
120:11, 329:1
**empirical**
34:19, 94:6,
94:15, 99:6,
99:8, 99:11,
100:1, 101:12,
102:16, 107:19,
108:2, 108:4,
109:4, 123:12,
123:18, 128:21,
129:3, 129:13,
129:14, 129:17,
129:20, 130:10,
130:20, 131:3,
134:17, 134:19,
134:20, 135:21,
136:5, 136:19,
142:20, 178:7,
216:1, 216:8,

217:2, 217:5,
217:15, 218:3,
221:2, 223:8,
224:13, 225:12,
226:6, 226:13,
234:8, 236:2,
241:2, 242:1,
246:12, 248:5,
256:15, 261:2,
261:10, 293:19,
295:5, 301:6,
311:10
**employed**
345:10
**en**
287:18
**encompasses**
130:18
**encourage**
110:5
**end**
19:9, 21:19,
46:20, 66:13,
196:12, 272:12,
319:9
**ended**
31:16, 31:22
**ending**
2:6, 9:9, 324:4
**endorse**
80:15, 81:12,
200:10
**endorsement**
210:21
**enforced**
102:10, 102:15,
103:4, 103:10,
103:18, 104:10,
104:12, 104:18,
104:22, 105:7,
105:8
**enforcement**
103:20, 112:9
**enfranchisement**
219:8, 234:18,
252:9, 296:11
**engage**
232:3

**engagement**
107:3, 191:6,
208:18, 211:6
**engaging**
277:22
**engineers**
195:16
**enhance**
157:16
**enhances**
78:16
**enjoined**
102:6
**enter**
246:22
**entire**
54:3, 104:1,
134:7
**entirety**
65:14, 215:2,
225:9, 232:21,
233:5, 247:7
**entities**
29:14, 80:20,
87:13
**envelope**
315:12
**equal**
143:7, 234:8
**equipment**
23:21, 31:2
**equipped**
23:10, 61:16
**errata**
344:7
**errors**
178:14, 333:19,
337:7, 337:9,
340:18, 340:21,
341:3
**esquire**
2:7, 2:13,
2:14, 3:4, 3:11,
5:14
**essence**
312:17, 328:7
**essential**
25:3

**essentially**
158:19, 196:22,
276:22
**establish**
241:17, 242:6,
243:3, 257:13
**establishes**
234:4
**estimate**
46:12, 121:12
**estimates**
121:11, 178:15,
306:2, 306:5,
306:13, 306:15
**estimating**
7:20, 177:17,
177:22
**et**
1:6, 1:11,
150:7, 170:3,
222:3
**ethic**
178:7
**ethnic**
72:15, 82:6,
123:8, 205:18,
277:9, 298:15,
303:5
**ethnicity**
219:8, 275:5,
281:9, 281:13,
282:13, 282:15,
282:18, 282:22,
285:20, 307:9,
307:14, 307:22,
308:3, 308:9,
313:17, 329:14
**evacuations**
28:11, 195:15
**evaluate**
24:1, 26:8,
70:1, 96:14,
96:15, 97:7,
130:12, 182:20,
226:15
**evaluated**
71:19, 89:6,
105:9

**evaluating**
70:5, 70:15,
71:1, 71:14,
72:3
**evaluation**
24:3, 192:8,
291:4, 291:17
**evaluations**
178:8, 178:10
**evasive**
26:14, 51:10
**even**
46:11, 51:17,
56:3, 62:20,
87:22, 150:16,
155:6, 181:7,
194:12, 195:11,
199:1, 204:15,
211:8, 216:3,
242:6, 257:19,
261:16, 262:3,
267:2, 274:9,
280:10, 300:2,
308:16, 312:3,
312:5, 315:9,
316:15, 316:19,
317:8, 321:8,
331:15, 333:17,
334:12, 335:13,
337:8, 337:13,
339:20, 341:18
**ever**
19:17, 37:14,
37:19, 37:22,
40:18, 63:15,
193:12, 200:13,
202:7, 203:6,
203:9, 207:2,
213:8, 213:13,
217:1, 229:19,
230:10, 261:1,
261:9, 277:21,
318:2, 318:4,
340:12
**every**
44:13, 145:19,
192:19, 193:3,
193:4, 200:10,

298:20, 307:10,
307:11, 315:10
**everybody**
66:5
**everyone**
265:13, 265:14,
265:16, 265:18,
265:21, 343:8
**everything**
10:7, 27:11,
56:4, 130:18,
200:3
**evidence**
78:12, 78:21,
83:1, 83:12,
94:6, 94:15,
95:10, 95:19,
96:16, 97:2,
97:7, 97:14,
97:16, 97:21,
98:1, 98:10,
99:6, 99:11,
102:16, 106:3,
108:7, 108:16,
109:5, 113:17,
114:14, 117:2,
120:14, 120:16,
123:6, 123:8,
123:18, 125:10,
127:9, 129:8,
134:19, 135:21,
136:19, 137:4,
139:9, 142:20,
143:1, 148:6,
150:8, 158:18,
181:2, 205:9,
216:19, 221:2,
224:8, 224:16,
225:12, 226:7,
230:17, 234:9,
241:2, 241:15,
245:20, 246:12,
250:20, 252:3,
254:13, 254:14,
256:12, 256:15,
257:3, 258:5,
258:6, 258:7,
258:8, 259:15,

260:6, 261:2,
262:1, 262:2,
262:10, 262:18,
264:4, 264:6,
264:8, 264:10,
264:21, 265:3,
270:19, 270:22,
271:4, 271:7,
271:10, 280:10,
282:20, 295:5,
296:4, 302:15,
302:16, 303:21,
314:17, 314:18,
322:11, 322:13,
327:2
**evolved**
309:13, 309:20,
310:5
**exact**
211:21, 227:17
**exactly**
168:15, 204:4,
341:7
**examination**
7:2, 9:7,
190:1, 324:1
**examine**
164:2, 223:3
**examined**
9:5, 112:6,
249:22, 298:11,
301:6, 344:3
**example**
42:15, 74:18,
110:17, 161:19,
176:9, 180:15,
186:18, 187:8,
205:22, 213:20,
288:1, 314:20,
322:6, 334:8
**examples**
151:22, 168:1,
198:8, 241:20,
288:8
**excerpted**
106:17
**exclude**
161:1

**excluded**
37:14, 37:20
**exclusion**
80:4, 81:17,
90:13, 91:21
**exclusive**
157:11
**excuse**
43:20, 108:21,
165:21, 194:10
**executes**
208:6
**exemplary**
313:13
**exemplified**
311:19
**exercise**
145:8
**exhaustive**
63:3
**exhibit**
7:9, 7:10,
7:11, 7:12,
7:14, 7:16,
7:19, 8:4, 8:6,
8:7, 8:9, 8:10,
8:12, 8:13,
8:14, 8:15,
13:10, 13:12,
20:8, 20:10,
27:5, 33:4,
33:17, 33:18,
33:20, 34:22,
36:3, 64:16,
64:19, 65:8,
65:10, 71:4,
74:4, 74:5,
75:17, 86:8,
106:14, 107:16,
117:8, 117:9,
118:2, 123:13,
124:11, 124:13,
127:19, 132:10,
143:10, 147:17,
153:22, 155:16,
158:6, 158:9,
167:7, 177:21,
178:2, 179:5,

179:11, 180:22,
181:4, 185:18,
189:6, 214:9,
214:14, 214:15,
215:10, 232:14,
232:15, 246:22,
247:1, 247:3,
269:16, 325:9,
325:12, 332:7
**exhibits**
7:7, 7:8, 8:2,
8:3, 13:2, 67:22
**exist**
102:18, 175:1
**existed**
264:18
**existing**
94:9, 95:2,
98:6, 242:6
**expanding**
154:21
**expect**
67:4, 200:2,
229:10, 238:3,
277:7, 298:3,
298:6
**expectation**
146:14, 238:2,
305:4
**expected**
176:14, 221:10,
293:4, 294:21,
294:22
**expedite**
284:2
**experience**
21:2, 21:14,
295:22, 296:2,
296:3
**experiment**
327:20
**experimental**
209:4
**experiments**
206:22, 328:1,
329:6
**expert's**
66:17, 217:1

**experting**
69:14

**expertise**
28:6, 193:17,
193:18, 194:20,
195:13, 195:21,
195:22, 196:3,
196:8, 196:19,
200:7, 222:22,
223:12, 224:3,
224:5, 224:17,
224:21, 225:14

**experts**
12:3, 14:1,
15:13, 17:10,
42:16, 42:19,
56:20, 63:8,
64:14, 66:21,
69:3, 70:20,
88:21, 129:17,
130:19, 206:8,
219:5, 226:2,
231:9, 241:8,
243:15, 278:9,
278:14, 309:9,
320:22

**expires**
345:16

**explain**
11:6, 63:20,
71:12, 78:2,
78:6, 129:2,
131:1, 143:11,
148:19, 205:3,
240:15, 291:1,
309:11, 312:6,
316:11

**explained**
148:17

**explaining**
54:9

**explanation**
78:3, 146:9,
234:20, 301:21,
302:4, 302:9,
302:11, 309:18

**explanations**
155:21, 246:7

**express**
249:9

**expresses**
247:20

**expressly**
111:21, 165:14

**extends**
144:17

**extensive**
203:13

**extensively**
200:21

**extent**
47:5, 114:12,
134:16, 134:17,
222:1, 232:5,
243:12, 321:1,
322:17

**extremely**
198:18, 209:5

**extrinsic**
318:6

**F**

**face**
300:8, 300:13

**facebook**
210:7

**facilitated**
279:8

**fact**
80:2, 82:21,
84:16, 86:18,
87:9, 103:4,
104:2, 104:9,
105:4, 142:2,
142:5, 146:5,
146:16, 148:12,
148:16, 211:3,
243:3, 249:17,
253:2, 283:15,
290:8, 291:20,
293:5, 295:2,
313:6, 313:18,
334:1

**factors**
24:6, 157:16,
310:1, 313:4,

313:14

**fail**
179:15

**failed**
170:21

**fails**
146:10

**faint**
98:22

**fair**
26:10, 31:4,
54:2, 93:17,
93:18, 99:7,
153:13, 158:12,
174:19, 200:9,
223:11, 231:2,
335:3

**faith**
138:14

**fall**
192:6, 192:11,
192:19

**fallacy**
297:14

**familia**
36:4, 79:4,
80:9, 211:1,
211:3, 213:3,
213:4

**familiar**
10:5, 15:22,
16:15, 43:5,
158:12, 173:6,
193:7, 193:11,
197:14, 198:12,
198:16, 199:5,
207:1, 278:8,
338:1, 338:3,
339:8, 340:10,
342:2

**familiarity**
200:7, 230:16,
339:1

**famous**
207:21

**far**
84:22, 144:17,
182:12, 194:6,

194:13, 217:14,
242:3, 317:10,
317:16

**fast**
55:5

**fault**
240:4

**favors**
80:17

**fdoe**
133:10

**fed**
227:21

**federal**
153:9, 154:9,
192:19, 195:1,
195:3

**federation**
2:5, 3:16, 9:9,
9:16, 324:3,
324:7

**feel**
61:16, 182:7

**feeling**
185:6

**felt**
198:11, 215:22,
225:13, 244:12

**ferguson**
5:22

**few**
168:1, 172:17,
185:7, 190:10,
191:4, 191:12,
194:12, 216:21,
220:2, 252:19,
301:10, 324:8,
325:2, 325:20

**fewer**
257:17, 315:20,
316:7, 329:16

**field**
23:13, 24:3,
62:18, 62:22,
194:9, 199:15,
203:14, 229:10,
241:9, 278:9,
309:6

**fields**
22:6, 22:9,
22:11, 22:16,
22:21, 23:2,
24:8, 24:11
**fifth**
25:11
**figure**
61:3, 61:4,
63:22, 84:3,
112:20, 112:21,
116:5, 117:20,
118:1, 118:5,
118:9, 118:17,
119:5, 119:16,
121:18, 124:9,
125:14, 125:20,
128:20, 129:15,
130:7, 171:11,
195:17, 303:6,
332:8, 335:7
**figures**
114:19, 117:18,
117:19, 332:3,
338:9
**file**
238:20, 239:8,
239:9, 265:3,
268:17, 277:19,
279:12, 279:18,
284:7, 291:20,
297:8
**filed**
40:6
**files**
174:9, 277:21,
278:5, 278:9,
278:14, 339:19
**fill**
110:2
**final**
50:20
**finally**
250:1, 250:11
**financial**
345:11
**find**
33:3, 68:6,

**fire**
68:22, 91:9,
92:10, 97:5,
97:9, 142:20,
145:15, 146:13,
170:21, 172:4,
172:10, 216:10,
217:18, 224:15,
230:21, 231:3,
231:16, 231:21,
232:2, 234:6,
239:4, 242:2,
259:8, 268:13,
292:3, 304:7,
309:17, 339:3,
339:16
**finding**
98:8, 134:21,
248:19, 248:22,
279:7, 279:22,
283:3, 286:8,
301:22, 302:5,
304:15, 329:20
**findings**
86:12, 86:13,
107:4, 132:9,
132:11, 133:6,
148:17, 152:2,
188:18, 220:13,
247:15, 248:6,
251:17, 283:9,
291:18, 302:12,
304:5, 304:12
**finds**
114:14, 180:10,
253:20
**fine**
48:7, 50:4,
66:2, 79:20,
148:21, 276:3,
294:7
**fined**
108:20
**fines**
108:12
**finish**
81:5, 88:14,
138:8, 165:21,
182:8, 331:9

**finished**
88:16, 88:17,
105:18, 105:20,
122:12
**firm**
178:17, 179:18
**first**
9:3, 10:7,
13:6, 22:2,
22:3, 24:18,
27:8, 39:9,
39:21, 40:6,
45:7, 47:13,
47:19, 62:13,
80:8, 82:15,
90:10, 91:14,
93:16, 94:3,
94:16, 95:6,
100:9, 105:21,
113:22, 119:10,
125:19, 129:12,
132:12, 146:20,
146:21, 153:2,
156:18, 168:2,
181:21, 182:9,
189:8, 193:22,
195:5, 232:17,
233:15, 246:17,
249:11, 252:20,
261:4, 265:11,
274:20, 275:14,
290:9, 290:22,
291:13, 305:15,
311:5, 338:8
**fit**
121:9
**fitted**
337:7
**five**
98:4, 113:4,
211:4, 279:14,
279:20
**five-minute**
66:1
**fixed**
165:7
**flagler**
3:12

**flaw**
290:15, 290:17
**flip**
305:10
**flipping**
36:3, 213:22,
233:9, 288:16
**flood**
41:14
**flooding**
195:15
**floor**
5:12
**florida**
1:2, 1:4, 1:10,
2:12, 3:2, 3:8,
3:18, 3:21, 4:7,
4:11, 4:16, 5:3,
5:4, 5:12, 5:17,
5:20, 28:12,
38:22, 76:4,
76:9, 76:13,
76:20, 79:5,
81:17, 86:14,
96:3, 97:3,
97:17, 98:2,
98:3, 98:5,
98:11, 98:12,
99:7, 102:12,
102:22, 117:13,
119:17, 133:13,
137:17, 137:19,
139:22, 140:2,
190:2, 195:14,
199:5, 199:12,
200:14, 200:16,
200:20, 201:18,
201:20, 203:3,
203:7, 203:10,
210:17, 212:16,
212:19, 213:5,
213:13, 248:13,
248:20, 255:18,
256:13, 256:17,
259:17, 263:2,
263:21, 265:4,
265:20, 266:5,
268:18, 271:2,

271:18, 279:12,
280:15, 284:13,
284:15, 289:3,
299:10, 301:13,
301:17, 305:1,
305:20, 306:1,
307:11, 311:11,
311:14, 319:13,
322:12, 322:17,
322:21, 323:6,
333:4, 341:2
**florida's**
112:18, 113:16,
124:6, 277:19,
311:20
**floridians**
86:22, 271:13,
283:16
**fly**
36:13
**focus**
22:1, 23:15,
25:4, 95:17,
101:11, 101:22,
174:15, 175:5,
176:19, 194:4,
215:5, 280:8
**focused**
132:7, 197:4,
202:1, 205:7
**focuses**
94:16
**focusing**
159:12
**folks**
20:9, 33:19,
329:16
**follow**
60:9, 311:14
**follow-up**
14:9, 27:16,
45:6, 80:6,
122:7, 216:21,
324:8, 329:8,
331:22, 335:3
**followed**
85:10
**following**
172:2, 292:8,

300:20, 302:7
**follows**
9:6, 84:6
**footnote**
115:7, 158:3,
169:2, 177:14
**footnotes**
172:13
**foregoing**
344:4, 345:3,
345:4
**forgot**
124:19, 189:5,
238:15, 275:1,
336:5
**forgotten**
30:2, 336:11
**form**
12:14, 39:18,
53:19, 54:16,
63:19, 67:4,
103:6, 103:22,
111:1, 111:5,
136:7, 139:8,
140:16, 163:5,
169:16, 209:10,
289:14, 326:2
**formed**
67:7, 67:16,
69:3, 115:3,
227:12, 229:13
**former**
272:2
**forming**
63:15, 64:11,
65:3, 67:2,
68:18, 172:20
**forms**
42:22
**fort**
4:11
**forth**
233:9, 288:17
**forward**
16:7
**found**
139:9, 139:11,
170:13, 170:15,

170:22, 173:8,
209:2, 217:16,
217:20, 223:5,
284:11, 333:8,
335:13, 339:4,
339:14, 339:17,
341:9
**foundation**
36:18
**foundations**
30:19
**four**
171:6, 171:9,
255:20, 263:4,
279:20
**fourth**
25:22
**franchise**
145:8
**frank**
3:11
**franklin**
4:10
**fraud**
245:1, 322:11,
322:14, 322:17,
322:20, 323:3
**frequently**
309:9
**fresno**
210:1
**friday**
14:3, 14:7,
14:10, 14:15
**friend**
110:6
**front**
11:19, 11:20,
83:21, 127:9
**frozen**
104:17
**fruition**
242:1
**full**
23:16, 32:5,
32:22, 71:22,
137:14, 137:15,
139:20, 174:8,

246:11
**full-time**
207:8
**fully**
211:9
**function**
13:4, 66:12,
66:16
**fund**
207:8, 210:22
**further**
42:11, 48:3,
49:14, 78:15,
89:14, 91:8,
99:19, 129:6,
146:15, 272:7,
320:1, 323:17,
324:1, 342:14
**future**
78:8, 179:7,
179:10, 240:1,
241:4, 291:6,
321:9

**G**

**gainesville**
4:6
**gamble**
315:21
**gamut**
23:16
**gap**
284:17, 288:11
**gardens**
5:17
**garnered**
26:3
**gate**
201:12
**gave**
78:4, 151:17,
176:9, 204:14,
335:9
**gee**
212:8
**gender**
180:13
**general**
3:19, 3:20,

5:3, 5:4, 5:5,
16:19, 18:12,
102:11, 103:10,
178:21, 208:1,
278:17, 308:17,
311:8, 323:7
**generalization**
258:15
**generally**
10:4, 22:13,
32:13, 202:14,
246:2, 314:14
**genetic**
194:18
**genetics**
193:15, 194:11
**genre**
196:4, 197:6
**geographically**
205:22
**geographies**
81:14, 82:4
**geography**
205:17
**georgia**
198:1, 198:15,
198:16
**gerber**
207:9
**germane**
280:19
**getting**
30:4, 36:10,
70:2, 268:4,
316:5
**gilchrist**
3:13
**gist**
170:5
**give**
10:8, 10:18,
75:13, 94:1,
105:15, 118:19,
159:21, 171:22,
204:3, 284:1
**given**
141:21, 224:6,
251:14, 293:4,

294:22, 315:3,
344:6, 345:5
**gives**
267:21, 277:16
**giving**
34:3
**glades**
4:8
**glass**
113:3
**global**
53:20
**goal**
244:20, 313:6
**god**
44:20
**goes**
48:22, 78:15,
137:13, 137:15,
139:20, 142:13,
159:5, 182:20,
199:21, 204:21,
206:2, 222:15,
249:8, 260:22,
261:9, 290:22,
325:21, 332:4
**gold**
328:1
**gone**
142:14, 257:8,
262:7, 262:19,
274:4
**good**
9:11, 24:12,
38:12, 41:10,
64:12, 202:5,
269:3, 278:1,
317:5, 323:19,
342:17, 343:5,
343:7
**google**
172:5, 172:10,
172:15
**goose**
43:21
**gosh**
113:5, 204:11,
336:17

**gotten**
208:11
**governing**
204:6
**government**
29:14, 319:3
**governments**
30:21, 42:13
**graduate**
26:4, 192:10
**grandchildren**
198:7
**grandfather**
227:19
**grandkids**
343:12
**grant**
211:19, 211:21,
212:11
**grants**
25:16
**graphs**
114:21, 332:17,
337:1
**gray**
115:10
**great**
13:9, 14:18,
21:22, 24:21,
70:9, 71:8,
180:6, 182:11,
191:1, 210:15,
214:5, 215:8,
225:4, 269:7,
296:3, 312:7
**greater**
100:18, 116:1,
126:8, 267:21,
275:6, 282:2,
284:13, 285:1,
292:20, 306:14,
306:19, 328:9
**greatest**
256:8
**green**
207:9, 328:12
**grimmer**
7:16, 7:19,

157:20, 158:6,
167:2, 177:16,
177:21
**ground**
10:6, 190:14
**group**
2:15, 5:15,
80:4, 101:10,
167:16, 167:18,
180:12, 202:8,
204:7, 248:12,
248:14, 248:19,
249:1, 298:15,
328:13, 330:20,
331:3, 332:22,
333:5
**groups**
79:3, 79:4,
79:9, 79:10,
80:9, 80:11,
80:12, 88:7,
89:19, 94:18,
116:14, 117:3,
117:6, 119:17,
123:8, 123:20,
125:16, 126:16,
127:8, 177:9,
211:14, 211:15,
260:21, 276:19,
277:9, 303:6,
304:18, 326:1,
332:16, 332:20,
335:6
**guardians**
201:11
**guess**
23:17, 27:16,
40:4, 46:14,
46:21, 47:2,
47:13, 62:17,
134:16, 145:12,
195:7, 215:4,
216:10, 216:16,
238:7, 240:7,
240:13, 240:15,
241:4, 242:8,
299:5, 310:4,
315:17, 339:12,

343:13
**guys**
216:16

**H**

**half**
146:19, 272:16,
290:9, 290:22,
291:3, 291:13,
291:14, 291:21,
318:1
**hand**
201:1, 345:14
**handful**
49:6, 170:15,
184:22, 185:3,
188:10
**handing**
110:19
**handle**
47:14, 110:18,
111:15, 342:13
**handled**
201:16
**handling**
109:11, 111:20,
187:15, 187:21
**hankins**
6:4
**hansen**
145:13, 145:14,
148:6, 184:10,
184:13, 184:16,
184:19
**hansen's**
309:15
**happen**
85:21, 153:13,
216:5, 216:19,
220:11, 240:8,
240:14, 240:22,
241:11
**happened**
103:16
**happening**
153:19
**happens**
234:12, 234:21

**happy**
79:18, 144:18,
190:21, 204:9,
207:17, 287:7,
303:2, 343:8
**hard**
25:11, 26:14,
26:15, 89:22,
217:20, 240:10,
258:13, 340:9
**hardee**
4:8
**hardworking**
291:16
**harms**
322:8
**harris**
211:22, 212:14
**hart**
1:22, 2:1,
83:18, 207:12,
345:2
**hb**
7:15, 112:18,
112:19, 113:16,
113:19, 113:22,
114:17, 124:7,
124:8, 125:13,
130:6, 302:1
**he'll**
198:3
**head**
209:21
**header**
52:12, 52:15,
283:7
**headings**
59:7
**hear**
37:6, 50:10,
62:13, 66:13,
86:5, 125:19,
140:17, 153:2,
188:22, 190:5,
230:1, 240:10,
261:3, 289:10
**heard**
80:8, 206:15,

339:13, 339:15
**hearing**
223:15
**heavily**
77:2, 133:13,
134:12
**held**
91:5, 196:10
**help**
32:5, 55:10,
63:18, 64:10,
69:13, 208:19,
253:22, 302:20
**helped**
325:22
**helpful**
14:8, 17:20,
18:6, 20:6,
27:10, 39:5,
72:20, 83:19,
88:18, 144:20,
214:12, 216:11,
217:21, 223:7,
226:10, 226:17,
227:2, 227:16,
230:21, 231:4,
231:6, 231:22,
232:2, 318:4,
335:4, 335:5
**helping**
43:14, 214:7
**hence**
236:3, 251:4
**henderson**
4:10
**hendry**
4:8
**hereby**
344:2, 345:3
**hereditary**
193:15
**hereunto**
345:13
**herron's**
15:14, 48:19,
54:11, 56:6,
56:9, 57:22,
58:3, 58:10,

58:22, 81:16,
84:21, 84:22,
100:2, 115:20,
134:5, 134:10,
142:19, 216:3,
218:6, 218:21,
219:3, 221:6,
225:1, 232:12,
232:20, 233:2,
233:10, 233:14,
234:3, 235:12,
235:18, 236:12,
241:13, 243:11,
243:22, 246:18,
246:21, 247:10,
247:13, 247:15,
249:6, 251:8,
251:13, 251:17,
252:16, 253:1,
255:10, 256:19,
259:3, 265:2,
266:17, 267:3,
268:15, 269:20,
270:14, 272:6,
278:21, 279:1,
279:6, 280:1,
280:17, 280:20,
283:5, 283:11,
284:20, 289:21,
290:11, 290:18,
292:3, 292:12,
293:9, 297:4,
304:12, 305:4,
305:11, 307:3,
311:4, 312:4,
319:16, 322:15
**herron-smith**
332:2
**hersh**
7:16, 157:20,
158:7, 167:3
**hey**
336:20
**hi**
324:6
**hiatus**
27:20, 27:22
**hibbing**
46:8, 194:2,

194:7, 194:17
**high**
46:19, 72:8,
82:6, 89:7,
148:22, 165:7,
198:18, 208:20,
208:22, 211:5,
238:13, 264:19,
305:18
**higher**
34:16, 77:6,
77:7, 77:21,
78:12, 82:1,
88:8, 89:8,
89:16, 238:4,
238:10, 247:16,
249:12, 251:4,
251:18, 251:22,
281:4, 304:12,
305:2, 318:12,
329:22, 331:5
**highlands**
3:13
**highlight**
121:8
**highlighted**
119:10
**highlighting**
70:12, 149:13,
179:13
**highlights**
178:21
**highly**
70:20
**hillsborough**
5:10
**himself**
136:15, 291:9
**hire**
195:14
**hispanic**
2:5, 3:15, 9:9,
9:16, 77:7,
79:9, 90:3,
94:8, 94:22,
95:5, 95:13,
95:21, 98:3,
115:15, 125:1,

210:3, 212:3,
234:11, 235:15,
246:14, 248:7,
276:15, 279:18,
281:2, 286:14,
297:5, 297:9,
303:8, 303:17,
305:19, 305:22,
306:11, 306:17,
307:12, 308:9,
308:15, 311:13,
324:3, 324:7,
334:11, 334:20,
341:4
**hispanics**
79:1, 79:12,
82:2, 82:10,
84:8, 85:6,
89:18, 112:20,
113:19, 114:16,
115:18, 116:1,
120:19, 120:21,
121:1, 121:3,
121:15, 122:4,
123:15, 124:9,
124:20, 125:13,
126:1, 126:8,
126:11, 129:10,
130:17, 247:22,
285:14, 297:12,
333:16
**historical**
206:2, 228:22,
229:11, 229:16
**history**
78:21, 79:16,
79:17, 79:20,
92:14, 92:18,
181:11, 203:14,
204:8, 204:21,
205:12, 212:10,
216:15, 325:4
**hold**
117:21, 122:12,
160:17, 171:6,
185:22, 223:14,
240:1, 291:7,
307:15

**holmes**
4:9
**holt**
4:10
**holtzman**
3:5
**homogenous**
167:15
**honestly**
27:14, 32:17,
184:22, 278:2
**hope**
35:14, 69:13,
72:18, 116:18,
227:19, 268:13
**hopefully**
323:11, 343:11
**host**
146:10, 148:13,
151:6
**hour**
14:20, 18:22,
19:10, 35:14,
65:22, 325:3
**hourly**
19:17
**hours**
18:7, 18:10,
18:14
**house**
117:12, 301:17,
302:8
**houston**
43:21, 44:11,
208:21
**however**
82:9, 83:7,
84:7, 89:20,
94:4, 304:15,
306:4, 313:21,
333:21
**huge**
325:17, 333:20
**hurricanes**
28:11
**hypotheses**
153:12, 226:13,
231:15, 235:6,

243:15, 261:21,
321:8, 321:17
**hypothesis**
151:10, 296:12
**hypothetical**
287:9, 287:14,
288:1, 288:8,
289:4
**hypotheticals**
287:6

---
**I**
---

**id**
7:20, 8:4,
32:6, 49:8,
145:18, 146:2,
146:3, 149:3,
157:6, 173:12,
173:15, 174:2,
174:4, 174:10,
174:13, 174:16,
174:22, 175:5,
175:9, 175:16,
175:18, 175:19,
176:3, 176:12,
176:16, 176:20,
177:4, 177:6,
177:17, 177:22,
178:16, 179:19,
180:10, 180:16,
180:17, 181:1,
181:11, 182:6,
182:13, 182:16,
183:4, 183:9,
184:4, 313:12
**idea**
79:11, 119:16,
218:15, 310:5,
317:11, 328:15
**ideas**
195:17, 311:16,
313:1
**identification**
13:12, 20:10,
33:21, 64:19,
65:10, 74:6,
117:9, 158:9,
178:2, 178:6,

181:4, 202:18,
214:16, 232:16,
247:2, 325:13
**identify**
62:10, 62:15
**identifying**
164:19, 208:12
**ids**
182:22, 183:14
**illustrate**
289:4
**illustrative**
334:10
**imagine**
45:22, 127:11,
265:12, 286:15
**immediate**
175:11
**impact**
72:3, 94:7,
94:16, 94:17,
94:19, 95:4,
95:11, 95:20,
96:11, 96:13,
97:15, 97:16,
97:18, 97:22,
99:2, 99:13,
106:5, 112:19,
115:14, 123:19,
124:8, 124:19,
125:12, 125:15,
130:12, 130:16,
132:8, 132:13,
133:4, 133:18,
138:3, 143:6,
144:15, 149:7,
155:19, 155:22,
159:13, 175:17,
198:13, 213:9,
216:13, 217:22,
218:9, 223:4,
224:9, 226:2,
226:7, 226:10,
227:2, 231:10,
233:16, 240:3,
241:7, 241:22,
242:11, 242:14,
251:10, 254:3,

256:12, 256:16,
257:4, 259:16,
261:2, 261:10,
261:12, 262:1,
263:10, 264:6,
290:20, 313:16
**impacted**
140:7, 264:22
**impacts**
94:18, 109:11,
216:7, 216:9,
234:9, 234:10,
246:13, 246:14,
254:1
**impairs**
95:12
**impart**
145:10
**impede**
88:22, 110:9,
131:10, 142:6,
142:16, 142:21,
150:11, 178:9
**impeded**
82:11, 82:17,
84:2, 84:9,
84:14, 90:4,
104:4, 115:13
**impedes**
78:16, 89:19,
135:2, 135:12
**impersonation**
245:1
**implement**
141:19
**implementation**
15:21, 16:5,
30:22, 88:22,
96:19, 100:14,
102:2, 103:3,
131:21, 186:22,
187:2, 216:6,
236:22, 251:21,
257:1, 275:10,
277:4, 286:18,
328:17, 328:19
**implemented**
90:1, 102:7,

103:4, 103:8,
104:3, 104:14,
146:15, 234:13,
326:6, 332:5
**implications**
179:6, 179:10
**implied**
185:9
**implies**
79:12, 135:11
**imply**
140:6
**implying**
272:2, 306:15
**important**
17:14, 77:20,
101:15, 101:19,
127:1, 127:2,
286:3, 329:5,
329:10, 334:16,
338:20
**importantly**
89:11
**impose**
146:2, 244:11
**imposed**
108:13, 108:14,
108:17, 108:18,
250:1, 250:3,
311:20
**imposes**
135:11
**imposition**
310:1, 310:8
**impossible**
25:4, 103:12
**imprecise**
78:8
**imprecisely**
159:8
**impressed**
205:6, 205:13,
205:14
**impression**
211:10, 229:8
**improve**
258:13
**in-person**
163:6, 201:22

**inadequate**
187:2
**inappropriate**
218:2, 275:11,
275:21, 275:22,
282:5
**incestuous**
341:22
**incidence**
275:11, 282:6,
305:5
**inclined**
79:8, 165:9
**include**
53:5, 79:18,
87:19, 92:15,
134:10, 172:17,
202:3, 211:2,
220:14, 318:15,
327:8
**included**
56:5, 67:1,
68:7, 69:1,
85:15, 87:22,
93:2, 108:1,
200:20, 201:19,
205:20, 226:9,
226:17, 247:18,
284:4, 317:16,
319:7
**includes**
86:13, 133:7,
157:10, 248:2,
277:14
**including**
10:13, 18:10,
22:8, 27:18,
31:19, 61:18,
85:7, 110:19,
135:19, 137:11,
183:21, 246:1,
307:17
**inclusion**
50:7
**incomplete**
21:11, 155:20,
156:3, 244:13,
312:3

**incompleteness**
244:6
**inconsistent**
68:6, 68:22
**incorrect**
21:10, 21:11,
278:22, 295:9
**incorrectly**
108:20
**increase**
100:20, 106:1,
135:18, 136:17,
137:9, 137:21,
138:17, 140:4,
141:19, 142:14,
144:22, 145:18,
146:4, 147:18,
148:10, 148:14,
156:22, 163:1,
163:20, 183:10,
187:9, 235:22,
244:10, 244:18,
245:18, 249:20,
301:3, 310:19,
327:1, 327:3,
328:20, 331:10
**increased**
108:12, 250:7,
258:16, 310:15,
319:12, 319:14,
326:3
**increases**
145:2, 145:3,
170:13, 173:8
**increasing**
150:8
**incumbency**
194:5
**incumbent**
260:2
**incur**
300:20
**incurred**
108:8
**indeed**
270:21, 280:9
**independent**
15:11, 30:10,

73:6, 279:4,
312:20
**indiana**
4:15
**indicate**
255:17
**indicated**
215:4, 221:13,
250:13
**indicates**
10:2, 34:12
**indirect**
106:4
**individual**
99:3, 109:13
**individually**
83:2
**individuals**
23:8, 29:21,
30:19, 83:4,
112:7, 137:18,
140:1, 207:19,
326:1
**infer**
241:3
**inference**
142:11
**inferring**
139:1
**information**
16:4, 16:19,
16:22, 17:4,
17:7, 17:15,
17:18, 17:21,
18:3, 63:15,
64:10, 72:9,
103:17, 224:3,
240:8, 292:4,
317:16, 324:9
**informing**
191:18
**inherently**
147:14
**initially**
51:8
**injunction**
191:17
**insane**
340:6

**insight**
212:2, 212:6
**inspected**
116:8
**instance**
25:13, 145:20,
174:3, 175:15,
189:8, 258:11,
309:14
**instances**
30:18, 317:20
**institutional**
145:9
**institutions**
70:3
**instructed**
97:6, 221:7
**instruction**
221:21
**instructions**
222:4
**instructs**
11:1
**integrity**
245:14, 322:5
**intend**
67:12
**intended**
156:21, 244:10,
244:18, 245:18
**intent**
226:14, 226:18,
226:21, 227:6,
227:11, 228:3,
228:9, 228:14,
228:18, 230:10,
245:7
**intention**
244:20
**intentional**
229:20, 229:22,
230:2, 230:4,
230:13, 230:18,
230:21, 232:6
**intentions**
245:3, 245:12
**interact**
109:12, 109:19

**interacting**
318:6
**interest**
320:9, 320:14,
345:11
**interested**
39:22, 40:1,
56:13, 148:20,
194:11, 205:8
**interesting**
26:15, 32:4,
175:14, 175:20,
198:15, 273:4
**internet**
15:11, 15:16,
324:22
**interpret**
166:8
**interpretation**
110:14, 111:18,
138:20, 234:19
**interrupt**
113:3
**interruption**
196:9, 223:17
**intersect**
331:5, 331:7
**intervening**
149:7, 310:11,
310:16, 313:14
**interviews**
63:18, 63:20,
64:2, 64:4
**intrinsic**
316:21
**intro**
192:8
**introduce**
9:14
**introduction**
24:19
**introductory**
106:10, 107:2,
192:6
**intuitions**
241:22
**intuitive**
146:15

**invented**
290:5
**investigate**
250:8
**investigations**
225:22
**investigator**
201:15
**invited**
197:9
**invoke**
311:16, 313:1,
313:3
**involve**
32:11, 205:11,
317:16
**involved**
31:11, 31:18,
32:5, 121:7,
197:20, 199:2,
278:16
**involving**
31:16, 32:1,
41:11, 230:4
**irrational**
314:19
**issue**
25:9, 32:8,
110:15, 114:1,
134:8, 134:13,
136:20, 177:5,
230:10, 234:10,
234:16, 234:19,
244:2, 244:5,
246:13, 252:7,
259:11, 265:5,
265:7, 265:9,
273:21, 282:17,
282:19, 282:22,
283:2, 285:2,
302:18, 338:14,
339:15, 340:13
**issues**
15:21, 25:2,
32:16, 41:13,
47:12, 161:4,
179:14, 190:6,
202:7, 218:5,

223:3, 231:10,
294:3, 294:13
**itself**
24:20, 26:13

**J**

**jacket**
35:10
**january**
1:16, 9:12,
255:15, 255:20,
263:5, 297:2,
345:15, 345:17
**jared**
4:18
**jayla**
30:5, 73:21
**jefferson**
3:13
**jerry**
4:8
**jim**
194:2
**jindia**
5:21
**job**
1:20, 235:6
**jogged**
58:11
**john**
14:4, 15:4,
38:12, 39:20,
40:17, 44:7,
44:15, 44:22,
45:4, 46:1,
46:8, 51:3,
55:17, 56:22,
57:10, 58:14,
59:3, 59:6,
60:8, 121:6,
121:16, 194:7,
194:8, 194:10,
194:17, 196:2,
197:11, 197:17,
197:19, 199:2,
199:5, 200:2,
215:17, 217:7,
234:1, 260:1,

272:17, 284:22,
286:17, 296:7,
310:14, 336:5,
336:6, 336:20,
338:5, 338:8,
338:15, 338:17,
340:11, 340:14,
342:3
**johnson**
2:13, 7:4,
17:12, 190:3,
190:7, 196:11,
196:17, 214:6,
214:13, 223:16,
223:20, 224:1,
269:2, 269:7,
269:11, 269:14,
274:22, 323:8,
323:16, 343:1,
343:3
**joint**
40:19, 41:17
**jonas**
4:13
**josefiak**
3:6
**josh**
14:2, 15:1,
16:3, 111:3,
342:11
**josh's**
15:17
**joshua**
3:4, 8:15,
197:10, 325:14
**journal**
64:7, 70:2,
125:20, 172:9,
339:3, 339:19
**journals**
22:12, 172:7
**judgment**
165:7, 225:14
**judgments**
261:19
**judicial**
38:1
**julie**
4:18

**july**
255:16, 255:19,
263:3, 290:3
**june**
20:22, 21:4,
21:16, 27:9,
255:16, 255:21,
263:5
**jurisdiction**
43:20, 186:10
**jurisdictions**
29:11, 42:20,
200:17, 200:20,
201:18
**justify**
217:16
**justin**
166:3

**K**

**kahn**
4:18
**keenan**
2:7, 7:3, 7:5,
9:10, 9:14,
16:12, 66:3,
66:7, 66:9,
83:20, 88:15,
110:3, 110:17,
113:2, 113:5,
113:9, 113:12,
113:14, 118:3,
188:3, 188:9,
189:17, 197:17,
200:4, 204:16,
205:5, 242:12,
244:15, 249:10,
307:8, 308:7,
324:5, 324:7,
342:11, 342:18,
342:21, 343:4
**keenan's**
240:19
**keep**
12:13, 12:16,
25:20, 27:2,
33:13, 48:3,
48:6, 48:7,

**54:6**, 58:16,
60:13, 62:21,
99:18, 99:20,
118:3, 121:8,
137:13, 140:22,
141:2, 143:16,
152:6, 152:10,
154:13
**keeps**
208:5
**kennedy**
5:11
**kept**
196:14
**kevin**
328:11
**key**
130:15, 234:10,
234:15, 234:16,
234:19, 246:13,
252:6, 294:10,
306:5
**kim**
4:3
**kind**
29:3, 47:5,
57:7, 63:20,
69:12, 72:6,
99:11, 193:20,
204:13, 207:18,
217:15, 274:15,
307:20, 327:19,
331:7, 331:13,
340:13, 340:18
**kinds**
106:4, 108:4
**knew**
32:19, 39:3,
198:19, 199:5,
199:8, 222:21,
222:22
**knock**
317:12
**knowing**
259:18, 267:2,
268:9, 289:15,
289:17, 313:22,
331:19

**knowledge**
35:18, 38:1,
38:2, 39:1,
41:2, 55:11,
62:20, 85:11,
105:3, 144:11,
163:15, 163:17,
164:2, 164:5,
168:7, 168:13,
173:17, 186:14,
204:20, 238:6,
238:8, 238:9,
243:21, 278:17,
311:2, 317:8,
323:1, 324:19
**knowledgeable**
197:1
**known**
23:19, 46:1,
46:8, 71:15,
145:21, 194:2,
340:6
**knows**
196:4, 196:21,
197:7, 244:9
**koon**
5:14

**L**

**labeled**
27:6, 64:17,
179:5
**lack**
271:10
**lacking**
135:21, 317:9
**lakota**
73:15
**language**
59:3, 142:8,
142:9, 147:20,
155:13
**large**
28:7, 167:14,
167:17, 183:19,
198:21, 211:22,
337:9, 337:14
**larger**
131:14, 341:1

**larocca**
171:12
**last**
24:15, 35:18,
90:7, 94:21,
120:11, 129:15,
139:19, 140:21,
141:8, 141:18,
166:12, 167:6,
167:13, 183:8,
185:19, 189:4,
207:10, 224:18,
233:1, 233:3,
233:5, 246:10,
247:11, 258:20,
280:9, 291:16
**late**
35:6, 35:20,
39:8, 40:11,
46:10, 119:18,
119:19, 195:8
**later**
15:7, 78:3,
81:4, 185:14,
207:12, 266:21,
309:19
**latter**
97:20, 257:12,
272:4
**law**
2:15, 16:4,
72:3, 72:10,
72:17, 85:22,
104:12, 104:14,
104:18, 105:6,
105:8, 108:19,
109:21, 110:15,
111:8, 111:18,
111:21, 112:4,
114:3, 115:13,
145:22, 164:16,
164:22, 165:1,
165:14, 165:15,
166:4, 166:5,
166:15, 166:16,
167:8, 174:10,
196:4, 196:5,
198:13, 199:4,

199:11, 228:4,
228:9, 228:13,
228:14, 228:16,
228:18, 234:17,
235:3, 240:14,
242:11, 243:5,
244:17, 245:18,
248:15, 252:7,
254:1, 258:16,
260:22, 261:9,
261:13, 273:22,
283:1, 285:3,
285:4, 286:18,
287:22, 288:10,
295:22, 296:3,
310:8, 314:5,
317:21, 319:21,
325:22, 332:15,
333:4, 334:14
**laws**
7:20, 8:5,
31:11, 35:17,
49:9, 52:7,
52:16, 70:5,
71:21, 114:1,
135:16, 136:16,
137:8, 148:13,
149:4, 149:8,
153:15, 156:12,
156:21, 157:17,
158:18, 159:1,
159:18, 160:2,
160:6, 161:9,
161:15, 162:3,
162:7, 162:10,
164:12, 168:5,
168:10, 168:13,
174:16, 177:3,
177:17, 178:1,
178:6, 178:8,
178:16, 179:19,
180:11, 180:16,
181:1, 181:11,
182:16, 183:4,
183:9, 183:13,
183:22, 184:4,
185:20, 186:12,
186:19, 197:4,

199:8, 200:14,
201:21, 203:4,
206:11, 241:6,
241:21, 243:4,
243:16, 243:19,
244:9, 253:5,
285:3, 313:12,
313:15
**lawsuit**
30:3, 30:12,
36:21, 42:7
**lawsuits**
30:20, 42:19,
197:18
**lawyer**
150:15
**lawyers**
10:12, 55:20,
55:21
**lay**
75:18
**lead**
106:2, 135:18,
136:17, 137:10,
147:18, 148:11,
153:11, 314:3
**leap**
138:13
**learn**
38:10, 80:19
**least**
9:21, 18:10,
25:15, 62:20,
70:21, 151:21,
174:14, 203:16,
243:12, 252:1,
259:22, 279:7,
295:15, 298:10,
315:3, 320:3,
325:17, 339:7,
340:7
**leave**
126:13, 314:21,
315:15
**lectured**
192:17, 192:21,
193:2
**lectures**
193:6

**led**
205:14, 330:13
**lee**
151:22
**left**
127:4, 214:11
**legal**
30:8, 145:7,
150:9
**legally**
266:1
**legislation**
145:16, 155:22
**legislative**
226:18, 226:21,
227:2, 227:6,
227:11, 228:3,
228:9, 228:14,
228:17, 320:19,
321:1
**legislature**
228:2, 228:8,
228:13
**legitimate**
156:7
**leigh**
6:3
**leighley**
150:1, 151:19,
151:21
**length**
225:4
**less**
19:18, 19:19,
19:21, 32:11,
54:8, 98:11,
258:8, 272:3,
272:13, 273:12,
301:2, 316:1,
318:22, 330:14
**lessen**
148:9, 243:14
**lessened**
148:9
**let's**
48:17, 54:17,
54:19, 69:15,
91:7, 136:8,

147:11, 152:6,
223:20, 269:3,
274:18, 280:1,
283:5, 287:4,
292:12, 307:2,
335:20
**letter**
142:9
**level**
69:16, 72:8,
192:10
**levels**
259:6
**levy**
4:9
**lewis**
4:14
**liberties**
2:4, 9:8, 324:2
**license**
176:2, 273:17,
273:19, 299:9
**lichtman**
8:12, 54:20,
57:14, 130:1,
214:21, 217:15,
218:2, 220:16,
225:1, 225:10,
226:5, 226:9,
226:17, 227:10,
231:4, 245:2
**lichtman's**
54:10, 56:5,
56:8, 56:22,
57:11, 59:12,
190:12, 214:7,
215:5, 215:14,
215:20, 217:12,
217:21, 218:7,
218:12, 218:17,
218:20, 219:2,
219:12, 219:17,
219:21, 220:4,
220:6, 221:4,
222:8, 223:2,
223:13, 224:4,
224:15, 225:11,
227:1, 229:7,

229:15, 321:9
**life**
246:7
**lifetime**
9:22
**light**
92:16, 115:10
**liked**
334:3
**likelihood**
78:16, 153:15,
153:18, 301:3,
305:9, 306:18,
306:21, 310:3,
310:9, 329:9
**likely**
76:19, 81:18,
81:19, 98:4,
123:16, 137:20,
140:3, 147:18,
148:10, 153:12,
155:2, 155:7,
155:9, 155:12,
208:13, 241:11,
248:1, 248:7,
321:5, 330:14
**limit**
137:1, 191:8
**limitation**
239:20, 240:5
**limitations**
239:1, 239:5,
240:4
**limited**
37:12, 128:21,
129:3, 129:13,
129:14, 129:16,
129:19, 130:9,
130:20, 131:3
**limiting**
131:9
**limits**
254:1
**linda**
73:19
**line**
33:8, 33:16,
83:22, 93:20,

115:16, 127:10,
129:18, 135:22,
154:3, 154:6,
154:8, 154:10,
198:4, 220:8,
330:12, 330:16,
337:7
**linear**
20:1
**lines**
115:2, 115:11,
116:8, 116:12,
325:20, 330:17,
335:21
**link**
330:2
**linked**
158:2
**links**
262:19, 295:5,
295:7
**lisa**
4:14, 210:1
**list**
22:6, 24:8,
26:21, 35:15,
220:14
**listed**
21:5, 22:17,
25:14, 25:17,
35:15, 36:18,
80:9, 81:15,
256:10
**listing**
22:21, 63:3
**lists**
211:8
**literally**
82:19, 194:12
**literature**
39:1, 68:21,
107:13, 145:6,
146:22, 148:8,
172:5, 198:12,
198:20, 207:1,
241:2, 241:5,
244:6, 244:7,
244:9, 244:14,

246:3, 253:20,
311:9
**litigation**
3:19, 5:6,
5:10, 21:14,
40:20, 41:8,
41:17, 53:9,
66:12, 66:16,
73:9, 104:17,
104:19, 104:21,
190:9, 311:9
**little**
20:18, 25:19,
32:2, 33:11,
33:14, 43:17,
47:22, 48:3,
54:8, 54:12,
58:12, 65:22,
81:4, 88:12,
91:8, 99:18,
99:19, 115:6,
116:5, 118:13,
121:19, 129:6,
150:12, 154:14,
181:15, 182:22,
213:21, 217:20,
227:16, 305:15,
340:13, 341:21
**live**
317:6
**living**
87:5, 133:11,
134:1
**llp**
2:15
**local**
30:21, 201:14
**location**
186:9, 315:19,
317:3
**log**
203:18
**logic**
295:4
**logical**
142:1, 200:1,
248:17, 299:19
**long**
11:13, 14:18,

24:9, 27:17,
39:16, 44:20,
339:21
**longer**
110:17, 130:6,
149:9, 187:4,
242:10, 298:2,
309:5, 310:10
**look**
18:9, 19:6,
20:16, 24:16,
25:22, 27:7,
30:15, 31:17,
39:10, 39:19,
40:7, 40:11,
44:16, 75:9,
91:10, 92:8,
97:5, 97:13,
106:16, 116:5,
119:9, 125:19,
134:9, 169:6,
182:7, 183:7,
196:12, 214:1,
215:8, 215:9,
232:17, 233:4,
233:11, 234:8,
246:20, 255:9,
258:9, 269:12,
269:17, 271:8,
274:18, 274:20,
280:1, 281:11,
283:5, 283:18,
287:5, 289:5,
289:22, 292:1,
292:12, 292:13,
296:19, 296:21,
298:13, 299:16,
304:10, 305:11,
308:2, 309:3,
311:3, 317:18,
325:15, 327:16,
331:7
**looked**
17:11, 34:6,
34:13, 74:22,
81:13, 85:12,
92:12, 115:15,
120:2, 124:11,

125:21, 150:13,
169:4, 194:13,
233:3, 264:2,
299:15, 299:22,
301:16, 307:18,
318:2, 318:5,
327:12, 336:21,
336:22
**looking**
25:13, 26:11,
70:13, 72:12,
96:22, 97:1,
101:14, 109:2,
117:18, 119:1,
119:5, 132:10,
142:9, 142:10,
154:18, 213:18,
213:19, 213:20,
246:10, 257:19,
257:21, 262:22,
270:15, 276:8,
284:9, 329:10,
329:12, 338:9,
341:11
**looks**
11:18, 20:21,
26:21, 44:19,
45:8, 107:1,
120:1, 127:12,
151:6, 168:19,
333:17, 334:18
**loosely**
24:2, 71:20
**loses**
159:2
**lot**
10:12, 26:9,
32:1, 40:14,
62:18, 71:22,
82:14, 129:22,
174:1, 195:4,
195:16, 197:13,
197:19, 198:22,
199:6, 203:19,
207:14, 216:15,
233:8, 330:20,
331:1
**lots**
165:9

loud
162:21
low
315:16, 318:20
lower
20:19, 34:16,
100:13, 102:1,
145:10, 176:15,
235:1, 238:10,
258:6, 258:7,
264:20, 319:8
lowest
314:15
lunch
180:1, 185:5,
188:4, 196:16

**M**

machine
24:4
made
47:16, 50:1,
50:6, 50:20,
51:3, 51:13,
53:2, 108:2,
108:3, 108:5,
116:11, 147:4,
152:18, 152:21,
153:5, 153:7,
153:14, 153:16,
154:5, 155:8,
178:7, 189:9,
189:14, 220:11,
222:16, 237:18,
240:13, 245:7,
271:21, 273:1,
285:22, 289:3,
334:11, 334:19
madison
3:13
maf
1:9, 1:10, 1:11
magnitude
122:1, 256:9,
337:12
mail
163:7, 315:7,
315:9, 315:12,

315:14, 316:19
mail-in
23:21, 36:22,
154:22, 174:19,
174:22, 175:2
mailbox
315:15
main
119:16
major
48:12, 48:15,
49:15, 211:4
majority
43:1, 45:3,
170:20, 171:20,
171:21, 172:1,
172:3, 173:1,
174:9
make
10:9, 13:3,
16:11, 22:1,
29:4, 31:9,
45:7, 47:10,
54:8, 60:14,
71:3, 89:7,
92:10, 94:13,
118:14, 146:1,
154:13, 173:20,
205:14, 207:22,
218:19, 237:6,
240:1, 241:3,
241:10, 245:5,
259:19, 260:12,
261:19, 261:21,
271:17, 276:9,
295:14, 299:20,
307:19, 326:16,
327:18, 328:2,
328:14, 330:6,
330:7, 332:13,
337:10, 338:10,
339:12, 342:21
makeba
2:14, 214:6,
269:14
makes
103:12, 144:5,
144:14, 144:22,

293:15, 312:7,
330:10
making
150:2, 189:13,
189:15, 201:13,
209:5, 210:10,
240:7, 240:21,
258:15, 327:5,
329:21, 330:3,
330:10, 330:13,
335:19
many
9:19, 11:20,
14:15, 18:7,
30:18, 31:10,
32:15, 35:3,
46:12, 86:14,
87:4, 193:5,
194:16, 205:10,
211:4, 224:9,
229:6, 231:16,
243:3, 244:9,
253:20, 265:11,
266:1, 268:9,
276:17, 300:2,
313:14, 319:6
marcus
4:18
marginal
306:5, 306:16,
306:19
mari
3:11
maricopa
199:6
mark
31:13, 73:19,
194:16, 214:13,
232:13
markarian
5:15
marked
8:6, 8:9,
13:12, 20:10,
33:16, 33:20,
64:19, 65:10,
74:5, 117:9,
153:22, 158:9,

178:2, 181:4,
214:15, 215:10,
232:15, 247:1,
325:9, 325:12
marshal
262:9
marshall
211:17
maryland
345:22
masse
287:18
master's
192:7
matched
235:21
material
49:18, 68:22,
304:2
materials
191:18, 226:9,
226:16, 227:2
matt
4:20
matter
12:14, 28:4,
64:5, 135:8,
142:22, 249:1,
331:17, 333:22
matters
22:15
maybe
16:16, 17:20,
25:11, 35:3,
39:8, 51:17,
53:20, 55:14,
83:18, 88:14,
125:18, 134:22,
138:18, 166:11,
167:5, 169:13,
193:5, 217:19,
240:21, 264:3,
269:3, 272:17,
281:15, 291:2,
299:16, 312:15,
323:9, 331:3,
339:15, 340:13
mayer
168:22

**mccullough**
73:20
**mcnulty**
149:22
**mean**
18:15, 20:18,
22:9, 23:2,
26:14, 26:15,
29:2, 32:15,
34:12, 34:18,
41:7, 42:15,
44:7, 44:10,
45:13, 51:10,
63:21, 69:20,
94:14, 97:1,
100:3, 101:9,
129:2, 131:5,
136:14, 142:8,
144:4, 144:7,
147:19, 156:8,
157:10, 163:6,
168:17, 171:20,
171:22, 172:22,
176:11, 185:10,
191:13, 193:3,
205:4, 206:18,
209:16, 215:21,
217:4, 217:6,
217:10, 218:4,
220:8, 234:21,
241:14, 245:14,
253:16, 287:12,
307:21, 309:12,
312:9, 326:20,
327:1, 331:8,
332:15, 336:8,
340:3
**meaning**
303:3
**means**
48:15, 95:18,
146:7, 156:7,
166:5, 217:11,
299:1, 331:13
**measure**
26:1, 70:16,
71:5, 268:9,
275:11, 277:10,

282:5
**measurement**
179:14
**measures**
59:2, 59:8,
151:11
**measuring**
325:17
**mechanics**
205:8
**mechanism**
79:14
**mechanisms**
23:21
**mediated**
157:15
**medicine**
31:13, 73:19
**meeting**
14:2, 14:18,
15:1
**megan**
2:7, 9:14,
110:3, 110:17,
324:6
**melissa**
211:17
**member**
42:21, 194:8
**members**
159:8, 248:20
**memory**
32:17, 33:7,
34:13, 50:5,
57:21, 58:11
**menger**
26:5, 70:7,
70:8, 70:18,
162:5, 315:2
**menlo**
210:2
**mention**
30:15, 95:8,
211:17, 235:19,
243:22, 301:19,
317:1, 337:12
**mentioned**
14:9, 14:22,

21:12, 22:4,
24:21, 28:2,
28:16, 31:21,
41:12, 55:16,
64:13, 65:5,
70:6, 102:17,
146:20, 191:12,
209:13, 209:19,
212:16, 213:1,
213:2, 214:21,
216:22, 224:17,
225:18, 244:14,
269:19, 288:18,
295:21, 321:15,
326:14
**mentions**
18:21
**merely**
258:7, 291:1
**messaging**
12:9, 12:13
**met**
14:15, 46:7
**method**
24:4, 72:2,
208:8, 238:21,
239:10, 257:5,
266:12, 266:13,
266:15, 266:19,
267:6, 267:7,
267:10, 267:12,
267:18, 267:20,
272:3, 275:5,
275:13, 282:7,
284:16, 298:2,
300:19, 301:1,
314:15, 318:20
**methodology**
65:21, 69:10,
69:11, 69:17,
70:4, 70:15,
71:8, 71:13,
71:14, 255:1,
255:6, 287:20,
289:18, 294:16,
295:19, 321:11
**methods**
210:16, 235:4,

235:16, 249:21,
252:5, 254:12,
256:10, 271:1,
271:6, 280:14,
298:4, 298:20,
300:5, 301:4,
301:13, 319:1
**mexico**
199:8
**mi**
36:4, 79:4,
80:9, 211:1,
211:3, 213:2,
213:4
**miami**
201:7
**mic**
240:10
**michael**
236:22, 243:11,
259:11, 260:2,
261:11, 261:17,
264:2, 266:8,
266:17, 267:2,
267:22, 278:11,
285:10, 285:22,
286:11, 288:5,
294:4, 294:7,
294:11, 312:17,
313:18, 317:17,
319:7, 330:17,
333:8, 333:13,
340:3
**michael's**
240:4, 308:1,
317:17, 336:8
**mid**
35:19, 44:16
**midterm**
183:12, 312:15
**might**
12:20, 24:6,
30:15, 39:1,
39:4, 40:9,
46:19, 69:14,
73:11, 83:19,
85:6, 85:16,
85:21, 88:18,

92:10, 92:11,
110:14, 153:12,
155:22, 171:6,
172:17, 176:13,
176:14, 182:1,
185:2, 199:17,
213:21, 216:5,
216:13, 216:19,
217:19, 220:11,
227:15, 230:7,
234:7, 235:8,
236:5, 236:22,
238:12, 241:11,
254:4, 254:14,
259:7, 273:20,
277:7, 281:2,
289:5, 299:20,
302:20, 310:15,
310:18, 313:4,
313:15, 317:12,
323:18, 341:6,
342:11
**mike**
296:7, 342:7
**million**
133:12
**million-dollar**
211:21
**mind**
28:9, 36:16,
43:13, 209:7,
211:1, 214:7,
269:14, 308:2
**mindy**
2:13, 189:19,
190:7, 208:9,
208:10, 214:12,
342:22
**minimal**
157:1
**minorities**
178:7, 274:14
**minority**
271:12, 271:16,
271:20, 272:2,
274:15
**minute**
22:1, 156:2,

166:1, 167:12,
323:9, 337:18,
342:5
**minutes**
14:21, 113:4,
185:7, 220:3,
252:19, 269:4,
301:11, 325:2
**misread**
281:15
**misrepresenting**
239:17
**missed**
341:13
**missing**
27:9, 59:2,
59:7, 284:15,
295:13, 314:3
**misspoke**
42:18
**mistaken**
307:21
**misunderstood**
166:11, 167:5
**mitigate**
24:6, 186:22
**mitigating**
243:8, 244:12,
310:1, 313:3,
313:14
**mitigations**
195:16
**mix**
31:4, 312:15
**mobilize**
211:20
**mode**
100:21, 270:5,
270:6
**model**
270:2
**modeling**
164:12
**modern**
159:6
**modes**
23:17, 85:7,
85:12, 235:5,

299:7, 299:8,
319:7
**modest**
159:2, 169:9
**modestly**
194:21
**moment**
10:18, 75:13,
83:12, 94:1,
120:6, 239:16,
308:7
**money**
211:9
**monroe**
3:7, 4:11
**month**
287:3, 317:22
**month-by-month**
259:4
**monthly**
259:11, 261:18,
291:12
**months**
204:11, 204:13,
255:15, 255:16,
263:22, 264:21,
318:1, 326:5
**more**
10:2, 15:7,
19:18, 19:20,
31:16, 41:16,
45:6, 46:16,
46:18, 46:19,
47:10, 50:5,
53:3, 54:12,
69:19, 81:19,
85:1, 89:10,
98:3, 98:4,
99:20, 99:21,
110:13, 120:3,
123:16, 133:12,
137:5, 139:10,
141:14, 141:16,
142:2, 149:6,
155:13, 169:13,
172:16, 172:17,
178:21, 179:22,
180:3, 182:5,

182:15, 183:13,
185:1, 185:7,
193:14, 194:21,
197:21, 198:5,
198:12, 200:7,
203:14, 208:12,
208:13, 209:18,
217:14, 238:17,
242:3, 247:22,
248:7, 251:16,
260:4, 268:6,
268:13, 273:12,
294:11, 299:16,
307:13, 309:21,
309:22, 316:2,
317:10, 317:15,
317:16, 330:18,
330:19, 331:21,
337:16, 343:1
**morning**
9:11, 190:15,
191:4, 204:16,
302:18
**morse**
3:18
**most**
29:10, 77:2,
98:12, 133:13,
146:7, 149:9,
150:21, 150:22,
151:1, 151:4,
203:14, 217:11,
242:22, 260:16,
263:20, 286:3,
315:4, 315:8,
316:9
**mostly**
59:12, 63:11,
63:22
**mother**
208:9
**motivating**
316:17
**motor**
85:8, 211:13,
235:10, 235:22
**move**
93:19, 105:13,

128:18, 143:4,
164:10, 232:11,
304:9, 331:2
**moving**
16:7, 112:15,
156:10, 248:11
**moynihan**
168:22
**much**
9:13, 14:5,
19:4, 24:22,
28:1, 29:13,
31:16, 34:5,
107:1, 138:18,
162:6, 194:21,
198:12, 199:4,
249:9, 272:15,
279:20, 287:7,
309:21, 328:9,
337:7, 340:4,
341:1, 342:15
**multi-faceted**
244:20
**multi-jurisdicti-
on**
200:16
**multidistrict**
203:1
**multimedia**
210:6
**multiple**
245:12, 315:20
**multistate**
200:15
**municipal**
29:10, 43:16
**municipalities**
42:13
**must**
257:12, 276:20,
336:5
**mute**
157:16
**mutually**
222:19
**myers**
4:11
**myopic**
340:13

**myself**
9:14, 24:20,
45:1, 58:20,
110:2, 191:8,
201:16, 203:20

**N**

**naacp**
1:6, 2:12,
29:22, 30:3,
30:8, 79:4,
80:10, 190:2,
190:8, 324:10,
326:14
**nagler**
150:1, 151:19
**name**
9:14, 15:3,
124:20, 190:7,
198:10, 201:3,
207:10, 207:13,
220:18, 341:19
**named**
207:19
**namely**
189:11
**names**
22:22, 203:22,
278:20, 334:5
**narrative**
221:3, 221:5,
221:16, 222:7,
222:17, 223:6,
225:1
**narratives**
223:13
**narrow**
69:13, 159:6,
234:12
**narrowed**
288:11
**narrower**
234:18
**national**
194:7, 208:18
**nationwide**
181:2
**nature**
18:3, 18:16,

40:2, 51:20,
193:18, 238:11
**ndc**
43:5, 43:12
**necessarily**
111:12, 140:6,
151:8, 249:19,
254:3
**necessary**
17:19, 39:18,
262:10
**need**
10:8, 11:11,
21:13, 72:9,
72:12, 72:16,
75:11, 86:3,
90:17, 100:1,
136:15, 162:20,
185:10, 185:16,
190:19, 198:3,
214:1, 214:17,
222:5, 222:16,
233:11, 240:9,
260:22, 261:8,
276:4, 284:2,
287:7, 299:16,
303:1, 309:2,
338:14
**needed**
17:15, 176:1,
224:7, 242:5,
260:13, 293:20,
295:14
**needing**
196:12
**needs**
21:15, 36:20,
100:9, 239:19
**negative**
146:8, 150:6,
170:22, 178:15,
180:11, 187:10,
216:7, 245:3,
256:1, 256:8,
292:18, 292:19,
305:7, 329:19,
333:14
**negotiating**
30:20

**neighborhood**
317:6
**neighbors**
317:4, 318:10
**neither**
94:5, 297:17,
345:9
**net**
82:1
**never**
35:8, 35:10,
35:17, 36:14,
85:11, 85:12,
197:5, 239:16,
288:22, 289:1,
308:7
**nevertheless**
150:17, 307:14
**new**
14:7, 42:10,
108:18, 174:20,
191:8, 199:7,
216:1, 224:8,
225:12, 255:17,
263:2, 263:12,
263:14, 264:15,
264:16, 264:17,
265:3, 281:11,
284:5, 292:14,
320:10, 343:8
**next**
20:7, 29:12,
33:11, 75:8,
105:13, 112:5,
120:17, 152:16,
154:14, 158:22,
168:17, 173:12,
179:10, 183:17,
189:19, 208:9,
214:10, 215:9,
228:1, 246:22,
255:9, 272:8,
274:19, 283:19,
284:3, 284:9,
296:21
**nice**
227:20, 231:15
**nicest**
215:4, 216:12,

223:9
**nickerson**
328:3, 328:11
**nickerson's**
207:6
**nine**
304:19
**nine-digit**
32:6, 32:19,
34:15
**noah**
5:3
**nobody**
176:1, 334:15
**non**
251:4
**non-anglos**
177:10
**non-citizen**
317:12
**non-citizens**
108:10
**non-consequential**
157:2, 177:8,
286:8, 286:9
**non-disparate**
289:5
**non-hispanic**
123:17, 246:15,
248:2
**non-intuitive**
148:16, 152:2
**non-partisan**
204:7
**non-presidential**
268:5
**non-published**
62:21, 64:8
**non-significant**
333:11
**non-trivial**
76:3, 319:19
**non-white**
77:22, 88:7,
90:12, 91:11,
91:20, 93:11,
95:12, 96:12,
96:18, 100:7,

100:10, 100:16,
100:20, 139:13,
140:6, 141:21,
142:4, 142:6,
142:21, 216:14,
234:15, 234:17,
235:4, 235:14,
241:18, 247:16,
249:15, 249:19,
250:12, 250:15,
250:16, 251:5,
251:11, 251:18,
251:22, 252:4,
252:5, 252:8,
252:13, 253:3,
253:7, 253:13,
253:18, 253:21,
254:3, 254:11,
254:18, 254:19,
271:15, 273:6,
273:16, 274:1,
275:12, 281:5,
282:6, 283:4,
286:6, 287:22,
288:12, 292:6,
292:17, 292:20,
293:2, 293:5,
295:2, 296:15,
297:16, 297:19,
301:8, 304:13,
304:22, 305:3,
308:12, 319:22,
320:4, 320:7
**non-whites**
32:12, 89:1,
89:13, 116:1,
131:11, 131:14,
131:19, 131:22,
132:4, 135:3,
135:13, 137:3,
137:6, 138:12,
138:18, 139:10,
142:15, 223:5,
235:2, 235:8,
235:21, 249:12,
250:6, 250:22,
251:4, 253:9,
253:16, 269:22,

275:7, 282:2,
285:1, 286:10,
286:20, 294:19,
295:8, 296:10,
296:17, 304:19
**noncitizen**
109:22, 110:10,
110:11, 110:16,
111:11, 111:13
**noncitizens**
109:10, 109:12,
109:17, 109:19,
111:8, 111:22,
187:14, 187:20
**noncompetitive**
238:14
**none**
63:11, 220:17,
242:13, 243:21
**nonetheless**
121:9, 128:6,
240:5
**nonpartisan**
80:20, 81:11
**nonprofit**
80:21, 81:11
**nonsignificant**
183:11
**normalizations**
283:8
**north**
265:16, 265:17
**northern**
1:2
**northwest**
2:9, 2:16
**nos**
1:8
**notarial**
345:14
**notary**
2:2, 345:21
**note**
70:19, 115:10,
151:9, 162:6,
163:13, 298:12,
343:9
**noted**
92:17, 239:7,

333:22
**notes**
323:11, 339:17,
340:2, 340:10,
341:7, 341:9,
341:19, 342:12
**nothing**
9:4, 135:7,
164:18, 210:13,
217:20, 223:6,
223:10, 227:3,
304:7, 335:15,
335:16, 343:1
**notice**
2:1, 7:9,
13:15, 99:5,
342:7
**noticed**
114:22, 115:1,
341:16
**noting**
271:14
**notion**
310:6
**notwithstanding**
271:9, 271:10
**november**
19:14, 35:7,
39:14, 40:12
**nuclear**
28:9, 41:12
**null**
157:1, 177:7,
177:15, 178:15
**nullifies**
251:12
**number**
22:6, 24:8,
28:8, 32:10,
32:20, 32:22,
34:4, 34:16,
55:21, 68:12,
76:4, 76:8,
76:13, 77:13,
83:4, 86:22,
101:5, 102:20,
117:21, 119:2,
131:14, 131:16,

131:18, 139:3,
139:7, 156:19,
171:17, 172:12,
172:13, 214:9,
254:19, 255:21,
263:14, 264:15,
264:16, 264:17,
266:2, 268:11,
273:5, 275:8,
276:11, 276:19,
277:5, 277:18,
281:11, 281:12,
281:19, 282:4,
282:9, 282:11,
282:12, 282:14,
285:12, 285:15,
286:13, 287:5,
308:11, 325:10,
327:10, 328:17,
328:20, 329:3,
329:4, 329:10,
332:3

**numbers**
51:18, 51:21,
76:18, 98:15,
181:8, 268:8,
276:22, 277:16,
287:9, 287:11,
288:5, 288:7,
288:20, 289:1,
289:4, 293:13,
297:14, 307:6,
307:7

**numerator**
264:14

**numerators**
277:6

**nvra**
325:16, 326:5

**O**

**object**
10:15, 16:12,
16:18, 47:3,
54:16, 77:10,
287:14

**objecting**
87:12

**objection**
17:8, 53:19,
87:16, 87:17,
90:21, 103:6,
103:22, 111:1,
111:5, 124:17,
136:7, 139:8,
140:16, 141:9,
141:10, 146:21,
147:22, 163:5,
169:16, 221:18,
222:12, 289:14,
294:5

**objections**
10:19, 10:20,
84:13

**observation**
148:2

**observed**
100:18, 216:8

**obstacles**
7:19, 150:9,
151:7, 177:16,
177:22

**obtuse**
69:2

**obvious**
272:12, 338:13

**obviously**
40:14, 49:22,
67:14, 70:17,
80:13, 266:17

**occasion**
197:22, 251:16

**occasionally**
226:14

**occur**
88:3, 155:9,
281:5

**occurred**
224:14, 234:7,
236:5, 321:13

**october**
19:14, 39:8,
39:11, 39:12,
40:11

**odds**
272:10

**offensive**
294:7

**offer**
66:18, 76:7,
76:12, 76:17,
76:22, 92:5,
99:1, 123:5,
123:12, 123:17,
232:5, 241:20,
254:6, 254:17,
260:6, 261:1,
261:10, 261:11,
261:12, 261:13,
262:2, 266:21,
270:22, 271:4,
271:7, 274:13,
302:14, 320:17,
321:4, 321:21,
322:3, 322:8,
322:16, 322:19

**offered**
93:8, 93:13,
93:15, 96:8,
115:12, 187:13,
187:19, 216:1,
224:8, 225:11,
320:9, 320:15,
321:11

**offering**
80:10, 93:16,
95:19, 156:5,
216:19, 231:20,
309:4

**offers**
75:20, 155:21,
227:11, 233:15,
268:15, 270:18

**office**
3:20, 4:6, 5:4,
5:11, 270:21,
272:1, 272:14,
315:14, 319:3,
343:17

**officer**
345:2

**offices**
198:18, 271:18,
271:19

**official**
1:9

**officials**
29:15, 200:22,
201:14, 271:19

**offset**
85:6, 100:20,
235:3, 272:19,
274:2

**offsetting**
85:21, 249:20

**often**
193:1, 243:6,
244:11, 246:5,
279:14, 314:18,
316:14, 341:20

**oh**
14:4, 15:17,
20:3, 29:6,
30:3, 30:7,
38:12, 43:10,
44:20, 45:13,
45:18, 50:3,
70:11, 89:2,
113:5, 152:17,
156:8, 161:1,
182:1, 189:3,
192:13, 204:11,
217:4, 230:3,
238:18, 279:3,
309:7, 314:11,
318:4, 321:20,
332:5, 336:16,
338:3, 340:15

**okeechobee**
4:9

**old**
70:2, 316:5

**older**
115:10

**olivo**
4:8

**omitted**
30:1

**once**
10:20, 70:21,
87:22

**one-by-one**
54:19

**one-to-one**
165:11, 166:2,
166:7, 307:9,
308:8
**ones**
25:17, 44:22,
61:18, 68:2,
157:5, 175:4,
203:17, 209:7,
210:7, 210:10,
341:8
**online**
161:20, 162:12,
209:8, 324:21,
326:15
**only**
14:11, 32:7,
36:18, 40:21,
57:13, 63:12,
70:13, 93:6,
95:13, 97:13,
98:19, 105:21,
109:1, 109:14,
121:12, 123:1,
124:22, 126:10,
128:3, 131:13,
133:5, 137:4,
138:17, 142:11,
184:22, 188:10,
212:21, 221:7,
221:11, 234:6,
235:1, 239:7,
250:12, 266:10,
266:12, 266:13,
266:14, 266:15,
267:7, 267:10,
267:18, 271:21,
274:13, 277:5,
277:6, 280:4,
280:21, 285:7,
286:20, 296:9,
299:3, 303:11,
317:21, 327:2,
333:9, 334:14,
335:12, 342:7
**open**
12:1, 12:9,
12:10

**opening**
232:14, 232:20,
233:2, 290:4
**operating**
248:16
**opine**
213:9, 241:10
**opining**
77:12
**opinion**
28:15, 32:14,
66:18, 90:14,
92:5, 93:8,
115:3, 147:1,
148:4, 151:16,
154:21, 156:6,
217:2, 218:1,
226:16, 226:22,
227:9, 227:12,
227:17, 228:5,
228:7, 228:10,
228:19, 228:21,
229:3, 229:13,
230:5, 231:3,
231:20, 232:5,
251:10, 267:17,
298:1, 309:4,
320:14, 320:18,
322:3
**opinions**
39:18, 53:6,
53:8, 53:16,
53:18, 53:22,
61:15, 63:19,
64:11, 65:3,
65:21, 67:1,
67:3, 67:4,
67:7, 67:16,
68:6, 68:19,
69:1, 69:3,
69:6, 99:1,
116:11, 191:18,
227:10, 235:12,
255:2, 261:12,
261:13, 268:15,
310:22, 321:21,
322:8, 322:16,
322:19, 323:1

**opponents**
220:12, 224:10,
224:11
**opposed**
53:10, 209:9,
217:6
**option**
299:3, 317:13
**options**
297:21
**orange**
5:19
**oranges**
312:15
**order**
77:15, 148:3,
253:22, 261:1,
261:9, 343:16
**orders**
343:18
**oregon**
315:5
**organization**
204:7, 256:7,
298:22, 318:20
**organizations**
80:21, 81:11,
90:11, 112:7,
138:16, 202:4,
203:7, 203:10,
206:6, 207:3,
208:19, 210:17,
212:17, 212:20,
213:10, 242:16,
243:20, 248:9,
249:4, 249:15,
251:3, 251:10,
252:13, 253:3,
253:21, 254:2,
279:9, 279:13,
279:19, 297:22,
298:18, 304:22,
305:1, 318:7,
319:12, 319:18,
320:3, 322:21
**origin**
205:18
**original**
81:16, 93:6,

116:2, 116:6,
123:9
**originally**
42:6, 42:8,
59:6, 160:8
**orlando**
5:19
**others**
10:16, 36:19,
209:21, 278:12,
316:20, 330:18,
337:9
**otherwise**
203:8, 203:11,
203:12, 276:21,
294:6, 345:11
**ourselves**
226:21
**out**
36:13, 39:17,
63:22, 70:19,
75:4, 75:18,
78:11, 79:1,
79:13, 79:22,
84:3, 89:21,
110:2, 118:22,
130:7, 146:14,
150:5, 151:3,
162:21, 171:12,
181:15, 195:17,
200:5, 207:6,
210:10, 211:1,
211:15, 223:15,
242:2, 251:11,
261:20, 268:1,
290:2, 317:19,
335:7, 340:19,
342:3
**outcome**
72:10, 243:5,
286:9, 313:16,
345:12
**outcomes**
23:10, 24:7,
164:12, 167:20,
242:2
**outlined**
285:8

**outreach**
38:15, 38:16,
44:4, 210:17,
212:12
**outside**
212:15, 219:17,
225:16, 226:19
**over**
10:10, 14:3,
14:6, 14:15,
14:17, 36:21,
52:12, 65:22,
80:17, 90:22,
106:13, 123:4,
124:22, 143:15,
183:10, 190:15,
193:3, 258:10,
263:12, 263:14,
264:16, 276:11,
276:20, 277:13,
281:18, 282:10,
282:12, 282:13,
303:19, 309:14,
330:20, 333:9,
338:7
**overall**
130:14, 132:3,
180:12, 183:9,
220:9, 235:14,
250:11, 255:18,
257:10, 257:21,
262:7, 262:15,
262:20, 263:2,
263:7, 265:4,
293:18, 295:7,
296:13, 302:1,
302:6, 302:15,
306:8, 320:6,
334:14
**overlap**
195:21
**overlaps**
196:1
**overlooked**
48:20, 50:7,
156:15
**overlooks**
155:20, 156:4

**overwhelming**
43:1, 45:3,
304:17
**own**
22:18, 53:11,
53:17, 70:22,
173:10, 189:6,
193:13, 194:19,
217:7, 236:18,
281:15, 307:6,
312:4, 313:7

---
**P**

**page**
7:2, 7:8, 8:3,
20:15, 20:20,
22:2, 27:5,
27:6, 33:6,
33:10, 33:11,
33:16, 39:14,
48:1, 48:11,
48:15, 48:18,
49:7, 49:8,
52:5, 52:11,
52:15, 54:11,
54:12, 54:13,
58:22, 59:15,
59:22, 60:3,
60:6, 60:17,
60:18, 60:19,
60:22, 61:12,
64:17, 71:3,
75:16, 76:1,
91:15, 112:15,
119:2, 119:5,
119:8, 121:5,
123:13, 128:19,
143:5, 146:20,
154:3, 154:18,
155:18, 158:15,
158:16, 161:12,
162:2, 165:16,
167:11, 168:17,
179:4, 179:5,
179:11, 181:6,
181:8, 182:15,
183:7, 186:21,
188:13, 189:5,

214:2, 215:11,
218:20, 219:11,
219:13, 220:22,
233:13, 242:18,
246:9, 246:11,
247:19, 248:3,
255:21, 256:17,
269:17, 270:16,
271:14, 274:19,
274:21, 283:6,
283:19, 284:3,
284:9, 292:1,
296:20, 296:22,
299:5, 304:9,
325:15, 332:8
**page-by-page**
144:20
**pages**
1:21, 49:21,
51:5, 52:2,
53:18, 55:3,
55:10, 75:18,
94:11, 164:10,
189:11, 215:6,
219:12, 287:5,
287:6
**paginated**
181:7
**pagination**
118:20
**palm**
5:14, 5:16
**pan**
201:1
**panagopoulos**
207:11
**pandemic**
155:2
**panel**
181:2
**panels**
121:10
**papers**
24:1, 26:19,
50:7, 51:7,
56:7, 64:1,
64:8, 69:6,
149:2, 149:18,

156:19, 172:6,
173:5, 194:17,
200:15, 201:11,
201:18, 203:18,
242:13, 324:12,
324:17, 328:10,
339:5, 341:20
**paragraph**
57:13, 57:16,
105:14, 105:16,
106:17, 106:20,
107:5, 107:9,
107:10, 107:17,
119:9, 120:12,
126:10, 129:15,
132:18, 132:22,
133:8, 133:22,
134:7, 134:21,
135:22, 138:4,
139:5, 139:16,
139:19, 143:10,
143:20, 144:1,
144:2, 146:19,
149:13, 149:16,
158:17, 162:20,
167:13, 181:21,
182:9, 183:8,
183:17, 188:13,
188:16, 188:20,
189:2, 215:12,
219:14, 219:18,
220:4, 221:17,
225:9, 247:12,
248:11, 249:6,
251:2, 252:21,
255:21, 256:3,
262:22, 270:15,
271:9, 272:5,
272:16, 274:9,
274:20, 276:1,
280:2, 280:3,
283:12, 283:19,
284:10, 289:22,
290:10, 292:13,
292:15, 298:17,
304:10, 305:12,
305:13, 306:7,
307:15, 307:17,

311:4, 312:1,
325:16
**paragraphs**
52:14, 52:17,
52:20, 53:1,
53:5, 106:10,
107:2, 132:20,
133:7, 135:9,
142:17, 255:9,
256:19, 283:13,
307:3
**parallel**
42:17
**parameters**
55:18
**parsing**
131:7
**part**
9:15, 16:19,
47:20, 48:21,
59:13, 60:1,
62:14, 93:4,
94:21, 101:15,
110:7, 110:11,
111:16, 153:2,
164:11, 164:15,
174:12, 178:13,
182:5, 188:18,
191:3, 202:14,
205:2, 224:18,
225:18, 233:8,
258:20, 261:4,
278:10, 280:8,
311:22, 328:13,
335:5
**participants**
3:10, 4:2, 5:2,
6:2
**participate**
111:9, 111:15
**participating**
111:13
**participation**
27:1, 106:3,
137:2, 145:9,
183:20, 184:3
**particular**
23:15, 32:12,

37:17, 123:4,
162:20, 164:14,
202:8, 212:4
**particularly**
62:22, 85:10,
102:17, 109:6,
114:8, 133:2,
137:2, 162:16,
176:16, 194:2,
196:4, 196:7,
197:4, 197:5,
201:1, 201:21,
205:8, 216:14,
223:5, 286:6,
307:11, 328:3,
329:13
**parties**
10:13, 17:9,
80:14, 81:15,
82:12, 84:10,
88:9, 93:14,
95:15, 100:12,
104:3, 108:13,
108:15, 108:19,
109:1, 109:15,
131:15, 131:17,
132:1, 139:11,
141:16, 142:3,
145:3, 147:1,
159:9, 191:14,
207:16, 210:22,
235:9, 247:18,
250:3, 251:19,
253:6, 253:15,
273:15, 304:14,
310:17, 331:20,
345:10
**partisan**
79:4, 80:9,
80:11, 158:19,
159:14, 160:20,
161:2, 164:16,
164:20, 202:10
**partisanship**
165:8, 166:10,
307:10, 308:20
**parts**
18:14, 37:11,

101:1, 160:10
**pass**
189:18, 317:5,
323:18
**passage**
244:4
**passed**
114:3, 228:13
**passing**
163:13, 228:4,
228:16
**past**
52:6, 52:15,
156:11
**path**
194:16
**pdf**
64:17, 179:4,
181:7
**pecuniary**
317:8
**pedantic**
69:20, 318:3,
327:21
**peer**
172:6, 334:2,
335:4, 335:10,
336:13
**peer-reviewed**
64:7, 172:3,
172:9, 172:15,
217:9, 246:3,
278:5, 338:22
**pejorative**
231:14
**penalty**
154:8
**pending**
11:13, 185:12,
190:20
**pennsylvania**
155:13
**pennsylvania's**
30:12
**people**
15:6, 45:5,
78:13, 87:9,
87:14, 98:20,

111:14, 127:11,
131:16, 141:16,
142:2, 146:1,
146:4, 175:12,
175:22, 195:18,
198:17, 199:9,
202:17, 203:14,
205:17, 211:12,
236:1, 243:4,
257:17, 261:16,
261:19, 261:20,
263:20, 265:11,
266:1, 266:3,
276:13, 276:15,
276:17, 310:10,
314:2, 316:18,
316:22, 326:4,
327:13, 327:14,
327:16, 330:6,
334:2
**percent**
163:2, 255:19,
255:20, 256:2,
256:8, 258:11,
263:3, 263:4,
263:19, 265:5,
279:7, 292:18,
292:20, 297:6,
297:7, 297:10,
297:11, 298:9,
316:1, 316:2,
316:5, 316:6,
326:4, 330:22,
331:2, 331:10,
331:11, 339:2
**percentage**
28:22, 29:15,
131:17
**perfect**
298:3
**perform**
124:14, 126:21
**performance**
198:14
**performed**
129:17
**performs**
277:18

perhaps
51:22
period
44:13, 108:12,
236:16, 236:21,
237:11, 242:10,
263:21, 268:5,
285:11, 313:22
periods
89:22, 236:20,
263:15, 268:3,
292:8, 312:8,
312:11, 312:12,
313:8, 329:7
perjury
154:9
person
126:6, 197:12,
199:1, 291:16
personally
53:9, 245:17
persons
88:8, 100:8,
100:11, 100:16,
100:19, 100:21,
101:4, 101:5,
102:21, 275:4,
276:12, 297:19
pertaining
27:14, 201:21,
219:5
pete
201:5
pga
5:16
ph
1:15, 7:2, 9:2,
24:14, 40:17,
40:18, 64:18,
194:15, 344:2
phoenix
36:13
phone
196:13
photo
174:4, 175:18,
175:19, 176:20,
182:13, 182:22,

183:14
photographic
144:12, 146:3,
174:2, 175:16,
176:2, 176:16
phrase
148:11, 252:11
phrased
218:11
phrasing
51:17, 51:21
pi
201:15
picky
149:17
picture
125:3, 126:6,
126:17
piece
70:14, 150:8
pieces
314:3
piemonte
150:7, 150:20,
151:9, 151:22
pima
201:6
pinellas
4:18, 4:20
pl
3:20, 5:7
place
174:16, 175:6,
175:10, 175:22,
180:18, 184:5,
329:16, 343:15
placed
302:3
places
79:15, 187:4,
237:9, 237:13
placing
33:18
plaintiff
12:3, 28:19,
29:8, 98:18,
221:9, 226:1,
287:13

plaintiffs
1:7, 2:5, 2:12,
9:8, 9:16, 14:1,
15:13, 28:22,
29:21, 40:6,
57:4, 63:9,
63:11, 64:14,
66:21, 67:5,
70:20, 73:5,
89:11, 98:20,
99:3, 99:10,
104:1, 190:2,
190:9, 206:7,
212:21, 213:7,
222:18, 226:1,
230:12, 244:19,
245:11, 261:8,
320:22, 321:6,
324:3, 324:8,
324:10, 326:14,
342:19, 343:19
plan
207:22, 208:4,
209:5, 210:11,
213:18, 326:16,
327:5, 327:18,
329:22, 330:3,
330:6, 330:7,
330:10, 330:13
plane
208:11
plans
42:12, 43:15,
197:19
plant
28:10, 41:13
play
52:19, 224:21
pleadings
40:5, 55:22,
56:10, 63:9,
68:12, 98:19,
191:13, 245:11
please
10:18, 11:5,
16:9, 16:13,
50:4, 87:22,
88:13, 138:7,

138:8, 190:4,
191:7, 231:19,
281:20, 343:15
plenty
241:20, 268:1,
334:9
pllc
3:6
point
11:4, 11:11,
19:16, 56:18,
78:11, 103:11,
146:9, 150:5,
150:15, 150:22,
151:17, 167:6,
190:4, 190:19,
214:1, 216:17,
227:22, 233:10,
247:21, 252:20,
270:7, 271:17,
271:21, 285:21,
290:2, 296:22,
298:7, 300:1,
308:10, 312:10,
325:3, 329:10,
331:6, 336:12,
337:11, 337:20,
337:21, 338:13
pointed
101:12, 200:5,
261:20, 268:1,
317:19
pointing
342:3
points
89:21, 251:7
policies
71:15, 167:14
policy
24:3, 179:17,
192:7, 192:11
political
22:4, 22:21,
70:3, 80:14,
126:3, 156:7,
159:9, 193:21,
194:18, 196:6,
207:6, 305:17,

305:20, 306:10,
306:15, 306:21,
310:17, 316:12
**politically**
167:14
**politics**
195:3
**poll**
200:18, 201:12,
201:21, 202:9,
202:10
**polling**
174:16, 175:6,
175:10, 175:22,
180:17, 184:5,
186:9, 187:3,
315:19
**polls**
182:13, 182:22
**pons**
180:8
**poor**
31:14, 73:20
**popped**
185:22
**popular**
224:10
**population**
81:21, 142:3,
159:7, 167:15,
250:18, 258:1,
258:13, 259:5,
259:19, 263:13,
264:1, 268:11,
273:8, 274:6,
276:14, 276:16,
277:15, 281:13,
281:19, 293:14,
295:14, 298:15,
300:4, 308:13,
308:17, 314:2,
327:13, 327:17,
329:12
**populations**
32:12, 72:11,
72:13, 92:19,
176:17, 210:3,
279:1, 292:7,

327:4, 330:1
**pork**
195:1, 195:3
**portion**
50:14, 52:2,
59:11, 75:16,
189:7, 198:22,
200:10, 233:20,
234:2, 275:15,
275:16, 276:6,
280:5, 280:17,
284:19, 292:10,
293:9, 337:19,
337:22, 341:1
**portions**
221:8, 222:2,
222:7, 222:17,
225:2, 251:8,
307:17, 309:2
**pose**
80:22
**posed**
10:22, 97:9,
97:12
**positing**
103:16, 110:16
**position**
54:10
**positioned**
236:10
**positions**
69:7
**positive**
20:2, 21:21,
162:17, 163:10,
169:9, 170:9,
170:16, 170:21,
178:15, 180:19,
187:1, 187:16,
187:22, 306:11,
324:13, 327:5,
329:20, 330:5
**posits**
157:13
**possibility**
85:4, 91:11,
105:22, 250:9,
269:21, 296:13

**possible**
104:11, 233:16,
234:6, 234:14,
234:20, 234:22,
236:3, 251:20,
264:17, 300:6,
300:11, 300:15,
300:18, 300:22,
301:5
**possibly**
80:4, 244:10
**post**
255:16, 263:22,
264:21, 292:21,
297:2, 312:13,
315:14
**postal**
316:17
**potential**
106:4, 107:19,
109:3, 109:20,
110:10, 111:10,
112:1, 112:8,
156:14, 182:21,
263:18, 322:20
**potentially**
242:10, 251:10,
253:15, 288:16
**power**
28:10, 41:13
**practice**
203:15
**pratt**
3:4, 16:6,
16:18, 17:8,
38:6, 47:3,
53:19, 54:16,
56:1, 88:12,
103:6, 103:22,
111:1, 111:5,
124:17, 136:7,
138:7, 139:8,
140:16, 163:5,
169:16, 221:18,
269:5, 289:14,
342:18, 343:3,
343:9
**pre**
255:15

**preceded**
114:6, 138:11
**preceding**
238:4, 292:8
**precinct**
317:4
**precincts**
150:1
**precise**
66:20, 110:13,
169:14
**preclude**
176:6
**precluding**
178:16
**predict**
155:19
**predicted**
170:8, 242:7
**prediction**
148:3, 153:10,
153:17, 155:10,
155:12, 240:22
**predictions**
152:18, 152:22,
153:3, 153:5,
153:7, 153:13,
153:21, 154:5,
241:13, 243:7,
243:15
**predominantly**
273:16
**preferable**
155:14
**preferential**
286:21
**preferred**
72:2, 132:5,
255:6, 261:15,
266:19, 267:20,
268:8, 277:10,
286:21, 288:4
**preliminary**
191:17
**premarked**
13:10, 20:8,
33:4, 64:16,
65:8, 74:4,

117:8, 158:6,
177:21, 180:22
**prepare**
13:17, 13:20,
21:6, 63:19
**prepared**
35:13, 67:15,
292:15
**preparedness**
28:10, 41:14
**preparing**
49:21, 61:22,
64:3, 320:8
**preregister**
209:1
**preregistration**
161:21, 162:13,
163:7, 208:21
**present**
15:1, 36:17,
229:1, 263:16
**presentations**
228:8
**presented**
99:9, 241:16,
258:18, 287:6,
288:20
**presents**
265:3
**presidency**
238:12
**presidential**
183:12, 237:17,
237:21, 238:5,
238:11, 268:4,
312:12, 312:14,
312:16, 326:7
**press**
30:4, 224:10
**presume**
146:3, 176:13
**pretty**
14:5, 21:20,
23:13, 73:18,
73:22, 195:9,
206:22, 270:12,
337:2
**prevail**
243:13

**prevent**
111:13
**prevented**
253:9
**preventing**
109:10
**prevents**
110:11
**previous**
33:5, 135:8
**previously**
73:7, 152:18,
152:21, 153:4,
154:2, 199:12,
206:9, 339:1
**pride**
70:19
**primarily**
52:3, 53:15,
59:14, 60:16
**primary**
47:18, 52:17,
61:8, 61:18,
64:22, 114:9,
193:6
**principal**
201:15
**principally**
194:22, 202:1
**prior**
13:4, 37:11,
40:18, 41:21,
42:5, 45:12,
46:4, 57:15,
57:20, 58:4,
328:16
**privilege**
16:13, 16:18,
17:8, 47:4,
221:19
**privileged**
17:13
**proactive**
211:12
**probabilistic**
153:14, 241:3,
242:7
**probability**
145:11

**probably**
10:3, 21:11,
23:19, 24:17,
25:7, 25:10,
26:3, 27:19,
27:20, 29:19,
30:4, 34:20,
35:19, 39:11,
40:10, 40:11,
45:21, 48:11,
59:5, 146:6,
150:7, 151:21,
155:9, 172:6,
185:2, 185:17,
193:3, 194:6,
195:11, 200:6,
203:13, 206:20,
233:3, 238:16,
257:1, 270:5,
278:2, 308:19,
320:2, 335:18,
337:5, 338:8,
339:10
**problem**
15:5, 118:20,
259:22, 313:13,
331:19, 334:10
**problematic**
78:7, 268:6
**problems**
178:8, 178:21
**procedure**
57:2, 60:9
**procedures**
30:22, 311:19,
311:21
**proceed**
70:22, 185:13,
190:13
**process**
228:16, 245:15
**processes**
228:12, 228:15
**produce**
145:22, 146:16,
179:15, 187:3
**produced**
16:8, 146:7,

148:15, 177:7,
177:15, 206:9,
213:21, 221:9,
222:18
**produces**
82:6
**producing**
153:15
**profession**
156:9
**professor**
13:22, 15:14,
15:15, 16:6,
43:9, 45:9,
47:7, 47:16,
48:19, 52:18,
54:1, 56:5,
56:6, 56:22,
61:10, 80:2,
81:15, 84:21,
84:22, 85:2,
85:3, 85:9,
85:10, 85:11,
85:13, 85:15,
87:18, 89:21,
93:5, 96:9,
96:15, 100:2,
101:3, 101:8,
101:11, 134:5,
144:21, 145:7,
154:4, 156:15,
191:21, 204:19,
215:5, 217:12,
217:13, 217:14,
217:21, 218:7,
224:15, 236:12,
236:19, 239:2,
239:17, 239:21,
242:4, 244:15,
247:15, 249:22,
251:17, 254:5,
258:19, 259:3,
267:11, 267:22,
268:2, 269:20,
275:3, 275:5,
277:4, 281:17,
282:1, 287:16,
290:18, 292:3,

297:4, 297:17,
299:15, 303:7,
303:10, 304:11,
312:4, 321:8,
322:15
**proffer**
246:6
**program**
12:1, 12:9
**prohibited**
111:21
**project**
2:8, 3:17,
48:13, 48:16,
49:1, 49:12,
49:16
**projects**
45:4, 46:12,
47:1, 208:21,
211:4
**prolific**
336:19
**promulgated**
16:16
**pronounce**
207:10
**proper**
202:17
**properly**
44:4
**proportion**
77:7, 77:22,
78:12, 81:1,
82:1, 89:8,
100:10, 100:15,
142:2, 247:16,
251:18, 251:22,
269:22, 275:4,
275:6, 281:4,
282:2, 304:13,
304:17, 315:17,
327:16
**proportionately**
294:19
**proportions**
101:4
**propose**
290:15

**proposition**
171:13, 177:14
**propositions**
239:19
**protect**
244:21
**protocol**
185:17
**provide**
37:16, 63:6,
94:6, 96:16,
107:19, 109:4,
180:17, 219:16,
246:12, 256:15,
280:10, 287:9,
311:9
**provided**
16:3, 63:13,
76:19, 93:14,
98:1, 98:10,
229:19, 230:5,
231:4, 273:15,
289:8, 289:12,
339:14
**provides**
86:21, 87:3,
94:14, 227:1
**providing**
154:22, 217:2
**provisions**
108:9, 131:10,
248:16, 249:3,
253:5, 253:8,
285:4, 293:4,
294:22, 311:13,
320:16, 321:5,
321:22, 322:4,
322:9
**psychology**
208:7
**public**
2:2, 28:15,
71:15, 179:16,
192:11, 197:1
**publication**
116:3, 116:6,
167:7, 334:4,
336:2

**publications**
21:4, 21:13,
22:13, 24:17,
25:15, 68:18,
172:3, 217:9
**publish**
22:12
**published**
24:1, 25:7,
26:18, 42:2,
62:20, 64:6,
70:22, 112:17,
113:15, 115:12,
124:6, 125:11,
148:8, 149:2,
172:6, 174:21,
199:9, 211:9,
278:6, 318:9
**publishing**
41:8, 194:16
**pull**
90:17, 204:2,
214:7
**pulled**
118:9, 302:22
**pulling**
269:15
**purchasing**
31:2
**pure**
309:17
**purely**
288:1
**purport**
112:8, 151:12,
159:17, 160:1,
161:17
**purported**
289:1
**purports**
160:12, 160:19,
164:19
**purpose**
107:3, 243:1,
243:2, 310:13
**purposes**
75:19, 245:13,
271:20

**pursuant**
2:1
**pursue**
236:3
**pursued**
104:17, 249:22
**purview**
221:21
**put**
20:8, 59:7,
75:12, 118:9,
118:18, 211:7,
216:12, 223:10,
231:16, 302:19,
302:20, 309:22,
342:1
**putting**
283:15, 290:4
**puzzle**
159:1

**Q**

**qualifications**
21:2, 107:4
**qualified**
37:16
**qualifies**
254:18
**qualify**
173:21
**quality**
287:15, 287:16,
287:17
**quantitative**
218:3, 221:2,
221:8, 221:12,
225:12, 226:6,
226:12
**quarterly**
316:13
**questioned**
334:6
**questioning**
9:17, 93:20,
251:7, 326:13
**questions**
10:15, 11:14,
12:21, 14:9,

32:18, 40:9,
45:7, 80:7,
82:14, 122:8,
122:14, 122:20,
126:13, 127:6,
185:9, 185:13,
185:15, 188:5,
188:11, 190:10,
191:5, 191:9,
202:2, 202:3,
202:9, 202:10,
202:13, 202:16,
204:17, 216:21,
222:1, 238:17,
240:19, 294:12,
309:1, 321:9,
323:17, 324:8,
324:10, 342:14,
342:19, 343:10
**quibbling**
140:8
**quick**
75:9, 311:3
**quicker**
340:12
**quickly**
89:5, 107:8,
307:20
**quite**
194:12, 195:14,
196:3, 196:5,
197:1, 204:22,
210:8, 222:10,
229:9, 239:2,
288:7
**quiz**
265:15
**quote**
136:8, 145:12,
154:21, 165:14,
178:21, 183:18,
183:22, 233:15,
246:11, 247:14,
247:20, 248:12,
255:13, 256:4,
256:15, 269:20,
270:18, 271:9,
271:12, 272:11,

272:12, 275:2,
280:9, 283:8,
284:5, 284:11,
290:2, 292:3,
292:16, 297:2,
304:11, 305:16,
305:17, 305:21,
311:5
**quoted**
184:13
**quotes**
234:6

## R

**race**
32:22, 115:9,
133:3, 138:2,
165:1, 165:14,
166:4, 166:9,
166:15, 180:12,
219:8, 238:12,
275:5, 281:9,
281:13, 282:13,
282:14, 282:18,
282:22, 284:16,
285:19, 293:18,
303:19, 306:3,
306:10, 306:13,
307:8, 307:13,
307:22, 308:3,
308:8, 308:18,
313:17, 329:13
**racial**
72:15, 82:5,
117:6, 119:17,
123:8, 126:16,
127:8, 165:8,
167:15, 178:7,
205:18, 248:12,
257:19, 276:19,
277:9, 298:15,
303:5, 314:5
**raise**
167:18, 175:14,
248:16, 250:9,
263:17, 280:20,
338:14
**raised**
85:3, 85:14,

121:17, 224:11,
231:11, 250:4,
268:4, 285:2,
286:17, 294:14,
312:10
**raises**
290:21, 336:9
**raising**
299:21
**randomize**
328:9
**randomized**
327:19, 327:22,
329:6
**randomly**
82:3
**range**
28:8, 70:5,
71:15, 298:8
**rare**
323:3
**rate**
19:1, 19:11,
19:13, 19:17,
19:22, 20:1,
20:4, 82:6,
89:12, 95:21,
131:22, 234:14,
235:15, 264:19,
264:20, 266:3,
266:4, 266:5,
276:10, 276:13,
282:17, 298:7,
305:2, 318:12,
329:21, 329:22,
331:1
**rates**
34:17, 95:15,
113:18, 120:18,
123:20, 129:9,
131:11, 132:4,
132:13, 159:19,
160:3, 160:6,
161:10, 168:6,
168:8, 173:16,
176:14, 187:22,
235:1, 256:22,
276:8, 281:18,

284:6, 284:14,
284:17, 290:6,
290:7, 290:20,
293:18, 295:7,
296:17, 298:14,
299:13, 303:18,
320:7, 325:18,
332:16, 333:5
**rather**
46:22, 51:8,
80:1, 148:3,
170:9, 226:13,
258:16, 287:9,
310:19, 332:2,
336:19, 342:9
**ratio**
250:15, 250:17,
258:4, 258:9,
263:12, 263:13,
267:1, 281:17
**ratio-of-ratio**
258:3
**rational**
145:21, 155:19,
156:6, 170:7,
170:8
**ratios**
254:22, 255:5,
255:12, 263:11,
264:13, 277:3,
277:13, 285:18,
287:1, 292:5,
295:11
**raw**
277:16
**reach**
53:9, 114:13,
251:11, 278:15,
320:14
**reached**
39:17, 255:12,
304:5
**reaches**
294:16
**reaching**
255:1, 255:6,
266:11, 278:10
**reaction**
272:15

**reading**
34:7, 34:11,
45:8, 48:10,
92:4, 111:7,
119:12, 121:8,
134:22, 136:10,
137:13, 138:18,
152:13, 182:12,
203:21, 219:9,
245:10, 264:9,
283:17, 283:21,
307:20, 325:5,
345:8
**ready**
35:10, 189:18
**real**
246:7, 287:11,
289:2, 329:5,
340:18
**realize**
337:17
**realized**
67:21, 337:20,
337:22
**really**
23:16, 27:9,
36:16, 134:6,
212:1, 287:12,
313:9, 331:13,
340:17
**reanalysis**
279:5
**reason**
12:19, 37:20,
81:20, 131:20,
136:22, 139:11,
196:13, 223:8,
260:17
**reasonable**
126:6, 138:20,
153:12, 321:9,
321:16
**reasonably**
286:15
**reasoning**
314:22, 316:18
**reasons**
156:3, 257:14,

290:21, 320:13
**rebuttal**
7:12, 8:14,
14:2, 15:13,
65:7, 65:9,
65:17, 67:5,
67:9, 67:18,
92:4, 92:17,
93:4, 93:5,
115:19, 123:3,
126:22, 147:4,
147:10, 204:19,
205:2, 213:20,
232:13, 237:3,
246:21, 247:6,
247:10, 247:13,
249:6, 251:9,
255:10, 256:20,
270:14, 272:6,
280:2, 280:17,
283:5, 283:11,
284:20, 288:18,
289:9, 289:13,
289:21, 290:11,
292:13, 292:15,
293:9, 296:5,
305:11, 307:4,
311:4, 325:5
**recall**
32:13, 34:5,
39:16, 44:22,
50:8, 50:12,
50:15, 51:11,
51:13, 51:16,
51:18, 54:20,
55:1, 55:8,
61:7, 73:11,
154:16, 161:3,
161:8, 161:11,
163:17, 164:9,
172:18, 189:9,
189:13, 189:15,
202:7, 202:11,
202:13, 207:2,
230:8, 247:9,
278:17, 278:20,
324:11, 325:6,
328:10, 333:9

**receive**
17:21
**received**
13:15, 19:7,
38:15, 38:16,
194:15
**recent**
26:4, 27:3,
27:7, 35:16,
150:21, 151:1,
151:4, 193:14,
260:16
**recently**
10:2, 98:13,
336:21
**recess**
66:6, 113:11,
188:7, 269:9,
323:14
**recognize**
13:14, 20:12,
64:21, 65:9,
74:7, 227:15,
232:18, 247:3,
309:21, 310:10
**recollection**
14:19, 28:3,
28:13, 35:22,
54:17, 63:17,
98:19, 98:22,
112:11, 114:4,
180:20, 202:6,
210:5, 210:8,
326:22
**recommend**
70:15, 266:22
**recommendation**
285:22, 298:13
**recommendations**
15:20, 179:17
**recommended**
38:14, 197:21,
285:18, 286:11
**reconstruct**
45:2
**record**
9:12, 10:19,
12:17, 65:22,

66:4, 66:8,
68:4, 75:12,
81:13, 84:6,
91:5, 92:9,
92:12, 92:21,
113:9, 113:12,
123:13, 139:3,
188:5, 196:10,
208:5, 223:16,
223:21, 269:8,
269:10, 272:22,
320:20, 321:2,
323:13, 323:15,
334:1, 342:13,
343:20, 345:5
**records**
39:10, 44:10,
178:9
**recover**
178:15
**recruitment**
200:19
**redistricting**
42:11, 42:15,
42:19, 43:15,
44:13, 45:3,
46:2, 197:18
**redraw**
43:15
**reduce**
145:17, 156:21,
245:13
**reduced**
296:13, 345:7
**redundancy**
191:7
**refer**
214:2, 220:4,
223:6, 276:3,
278:4
**reference**
107:20, 133:3,
144:8, 144:9,
221:17, 222:8,
328:2
**referenced**
144:10, 144:11,
193:12, 216:3,

297:1, 325:1,
332:4
**referencing**
130:7, 216:2,
332:9
**referred**
246:1
**referring**
16:9, 38:6,
96:6, 129:16,
181:9, 190:8,
242:14, 243:16,
246:18
**refers**
129:14, 130:13,
130:14, 143:18,
144:5, 244:3,
271:15
**reflect**
304:15, 312:3
**reflected**
200:6
**reflects**
57:14, 154:19,
311:7, 312:5
**reform**
187:8, 241:6
**reforms**
26:2, 26:8,
71:2, 71:20,
159:6, 159:13,
159:15
**refrain**
16:9
**refresh**
32:17, 34:13
**refreshes**
33:7
**regard**
148:22
**regarding**
14:14, 15:20,
51:5, 57:11,
130:11, 135:8,
226:2, 229:20,
231:9, 249:3,
293:5, 295:1,
311:13

**regardless**
97:18
**regards**
219:1, 240:14
**register**
76:3, 76:10,
77:16, 79:15,
81:18, 82:4,
82:10, 82:11,
82:16, 82:17,
82:20, 82:21,
83:5, 83:15,
84:1, 84:8,
84:9, 84:13,
84:16, 86:18,
87:10, 88:8,
95:14, 97:4,
98:5, 98:13,
101:5, 101:6,
104:5, 108:11,
108:15, 109:8,
109:15, 109:18,
109:21, 110:1,
110:4, 110:5,
111:11, 131:15,
131:17, 132:1,
134:2, 139:10,
141:16, 142:2,
142:16, 145:4,
168:10, 168:12,
174:2, 174:4,
174:11, 175:16,
175:18, 176:12,
208:2, 208:19,
211:20, 235:9,
247:17, 248:8,
249:18, 253:7,
254:20, 257:18,
266:1, 271:13,
275:7, 279:13,
282:3, 298:22,
300:7, 300:12,
300:16, 300:19,
310:9, 314:2,
314:15, 316:16,
317:13, 326:2
**registered**
72:14, 77:8,

78:13, 80:13,
83:3, 86:14,
87:5, 98:3,
98:4, 98:12,
100:11, 100:12,
100:17, 109:20,
110:10, 111:14,
123:16, 131:15,
133:12, 135:20,
137:12, 137:18,
137:19, 140:1,
140:2, 176:1,
202:8, 235:8,
248:1, 248:20,
248:21, 250:2,
251:19, 253:7,
263:20, 265:12,
265:13, 265:15,
265:19, 265:22,
266:3, 268:9,
268:10, 273:6,
274:6, 276:11,
276:12, 276:18,
279:12, 286:16,
298:21, 299:11,
300:4, 304:14,
305:20, 306:1,
306:12, 306:18,
306:22, 308:16,
311:14, 327:15,
327:17, 328:18,
328:20, 329:17,
330:2
**registering**
78:17, 80:3,
80:16, 82:12,
82:18, 84:2,
84:10, 84:14,
89:20, 91:20,
94:9, 95:1,
95:5, 95:13,
100:8, 100:21,
108:8, 109:18,
142:15, 145:2,
150:9, 150:10,
164:4, 175:11,
208:4, 253:9,
253:15, 270:1,

270:19, 270:20,
271:1, 271:5,
275:4, 297:20,
297:21, 301:12,
305:9, 310:3,
311:17, 314:6,
314:8, 314:12,
318:7, 318:18,
318:21
**registers**
248:13, 319:2
**registrants**
115:10, 167:17,
250:16, 250:17,
257:22, 258:10,
286:14
**registrars**
205:11
**regression**
305:5, 305:16,
306:2, 306:8
**regressions**
121:9
**regular**
343:16
**regularly**
241:9, 311:15,
313:1
**regulate**
169:14, 243:19
**regulations**
242:15, 300:14,
302:2, 302:8,
319:11, 320:10
**rejection**
50:18, 166:9
**related**
190:10, 206:10,
216:21, 242:22,
310:22, 318:14,
318:15, 345:9
**relates**
92:13
**relating**
25:17, 97:21
**relation**
129:18, 218:12
**relationship**
110:9, 111:10,

140:11, 140:15,
149:10, 157:7,
157:14, 159:2,
165:10, 166:3,
166:6, 166:9,
167:1, 293:16,
310:7
**relationships**
148:18, 148:20,
201:13
**relative**
246:15, 268:10,
273:7, 273:8,
274:5, 296:18,
314:1, 329:4,
329:11
**relatively**
174:20
**release**
334:5
**relevance**
252:11, 252:14,
252:18, 253:11
**relevant**
63:4, 156:13,
182:5, 228:3,
228:8, 228:14,
228:17, 229:1,
229:12, 231:7,
254:8, 303:13
**reliance**
135:10, 155:18
**relied**
17:3, 62:2,
62:11, 62:16,
63:7, 68:18,
76:9, 76:14,
98:13, 136:4,
172:20, 191:16,
203:16, 205:1,
217:1, 217:5,
277:21
**relies**
162:7, 217:7,
275:3
**religious**
167:16
**rely**
16:22, 77:1,

77:5, 77:9,
78:1, 78:6,
78:10, 133:13,
133:19, 134:6,
134:12, 138:12,
217:9, 218:2,
246:6, 278:9,
309:9
**remain**
183:10
**remains**
128:7
**remember**
15:3, 27:14,
39:7, 84:20,
152:10, 201:6,
210:10, 212:8,
240:17, 278:2,
299:4, 319:6,
326:17, 330:11,
336:12, 336:17,
336:18
**remembered**
336:15
**reminder**
10:6
**remote**
11:15
**remove**
187:1
**renewed**
299:10
**reorganized**
59:4, 59:7
**repeat**
47:9, 53:12,
83:19, 102:19,
136:15, 141:14,
160:7, 220:11,
223:18, 225:5,
261:3, 261:22,
263:1, 272:21,
276:4, 276:7,
281:3, 281:14,
293:11
**repeated**
224:9, 300:2
**repeatedly**
182:12

**repeating**
217:16
**repetition**
216:7
**rephrase**
11:6, 53:13,
53:14, 68:9,
83:9, 148:1
**report's**
248:19, 272:11
**reported**
1:22, 75:4,
117:4, 125:12,
292:4, 297:3,
304:15, 307:6,
318:5
**reporter**
343:14, 345:1
**reporting**
125:15
**reports**
12:4, 12:6,
14:1, 14:2,
14:6, 15:14,
15:16, 36:1,
37:12, 41:1,
41:17, 55:22,
56:20, 63:8,
64:14, 65:2,
65:7, 66:18,
66:21, 67:5,
67:9, 67:14,
67:15, 68:7,
69:4, 73:5,
84:20, 88:21,
92:17, 93:5,
93:7, 93:11,
96:9, 104:1,
104:8, 130:21,
131:7, 146:11,
155:7, 172:8,
174:17, 174:21,
177:13, 180:3,
190:12, 203:16,
204:19, 205:2,
206:8, 206:10,
212:22, 213:18,
217:7, 219:1,

219:5, 219:10,
221:2, 221:8,
221:12, 222:18,
222:20, 224:20,
225:1, 230:9,
231:9, 275:6,
282:1, 305:7,
320:22, 321:11,
325:6
**represent**
9:15, 30:19,
33:2, 79:9,
104:16, 151:12,
190:8, 236:20,
239:6
**representation**
42:22, 329:11
**representations**
245:6, 289:2
**representative**
288:6
**represented**
29:19, 29:21,
32:16
**representing**
324:7
**represents**
260:15
**reproduced**
112:21, 114:19,
118:1
**reproduction**
61:4
**republican**
81:2, 81:17,
305:8, 306:20
**reputation**
44:2
**request**
17:7, 17:21
**requested**
42:20, 215:13
**requesting**
209:9, 342:12
**require**
32:8, 32:21,
109:5, 109:6,
174:2, 174:3,

174:4, 174:7,
174:10, 175:15,
175:18, 175:19
**required**
34:15, 72:7,
108:21, 179:16,
225:16, 341:20
**requirement**
32:5, 49:8,
102:6, 102:10,
102:15, 104:21,
109:9, 174:13,
175:5, 177:4
**requirements**
108:10, 108:18,
173:13, 173:15,
174:20, 174:22,
175:10, 176:19,
177:6, 180:17,
182:17, 183:5,
186:13, 192:12
**requires**
176:12, 281:9
**requiring**
104:3, 182:21
**reread**
13:22, 14:1,
14:3, 15:15,
15:17, 74:15,
161:3, 307:19,
338:17
**reschooling**
194:14
**research**
15:11, 22:12,
25:16, 28:7,
39:1, 39:4,
41:4, 41:6,
41:7, 41:11,
48:21, 48:22,
89:6, 89:15,
143:18, 148:13,
148:17, 149:3,
149:4, 152:1,
155:20, 156:4,
156:13, 156:19,
157:12, 157:22,
162:6, 162:16,

165:5, 165:9,
169:11, 172:8,
175:2, 176:5,
177:5, 178:22,
179:7, 179:10,
179:18, 192:9,
195:10, 197:2,
200:13, 200:18,
203:3, 206:4,
207:19, 208:14,
210:19, 211:4,
242:9, 243:9,
246:3, 266:21,
278:3, 278:4,
278:6, 287:17,
290:15, 290:18,
294:2, 294:11,
311:6, 311:8,
312:18, 313:6,
313:7, 316:12,
318:8, 326:22
**researched**
203:6, 203:9
**researcher**
208:5
**researchers**
71:19, 217:8,
309:21, 328:13
**researching**
47:19, 61:19,
62:18
**resemble**
117:19
**reshare**
119:2
**residing**
137:17, 139:22
**resisting**
78:9
**resolve**
190:5
**respectfully**
104:8, 122:13
**respectively**
297:6, 297:10
**respond**
12:20, 81:8,
215:14, 215:19,

218:13, 221:16,
222:16, 223:9,
223:10, 223:12,
224:3, 224:7,
224:19, 224:22,
225:3, 225:13,
225:15, 225:16,
225:19, 225:20,
231:9, 232:2,
252:21, 273:11,
274:8, 307:2
**responded**
67:6, 225:4
**responding**
218:22
**responds**
288:18
**response**
147:4, 204:19,
225:5, 249:6,
249:8, 256:18,
270:15, 272:5,
280:17, 284:19,
290:10, 293:8,
305:12
**responsibility**
61:8, 114:10
**responsible**
49:17, 201:13
**responsive**
72:19, 202:21,
204:6, 272:18,
274:10, 285:21,
294:13
**rest**
182:8, 190:15
**restraints**
150:9
**restrict**
31:12, 139:12,
139:13, 142:4,
248:16
**restricting**
135:17, 136:16,
136:22, 137:8
**restriction**
254:10
**restrictions**
138:14, 145:8,

235:3, 257:16,
319:17, 319:21
**restrictive**
174:10, 183:13
**result**
85:18, 90:4,
96:19, 104:19,
104:20, 108:17,
216:6, 232:6,
241:19, 257:10,
262:5, 290:7
**resulting**
187:5
**results**
177:7, 177:15,
179:16, 183:18,
183:19, 305:16,
306:8
**resume**
10:2, 21:19,
27:20, 44:16,
69:21, 206:19,
211:2, 230:9
**retained**
10:14, 37:1,
37:9, 42:16,
43:15
**retention**
200:19
**retire**
340:5
**retooling**
194:14
**return**
108:11, 108:21,
134:14, 172:14,
315:12, 315:13
**returning**
331:11
**review**
18:3, 66:17,
66:20, 181:17,
216:15, 226:1,
230:17, 244:13,
247:6, 284:1,
287:7, 313:11,
334:2, 335:5,
335:10, 335:13,

339:3, 339:4,
339:14, 339:18,
341:8
**reviewed**
16:17, 64:13,
65:3, 65:6,
68:3, 68:12,
68:16, 86:1,
86:9, 87:1,
98:16, 99:9,
172:7, 173:1,
173:2, 173:5,
174:15, 191:12,
204:1, 206:5,
215:1, 244:8,
278:5, 283:10,
301:15, 320:19,
325:3, 325:11
**reviewers**
334:5
**reviewing**
64:1, 68:4,
105:19, 118:16,
119:13, 181:20,
214:21, 233:5,
247:9, 280:6,
336:14
**revisions**
335:14
**rice**
44:11, 44:15,
44:18, 45:9,
45:15, 45:17,
45:19, 46:1,
46:3, 46:5,
191:21, 192:3
**richey**
171:13
**rigby**
171:10, 171:13
**rights**
2:8, 3:16,
28:19, 29:1,
35:5, 196:5
**rise**
326:9
**rival**
313:4

**rmr**
1:22, 2:2
**robert**
1:15, 7:2, 9:2,
40:17, 344:2
**robust**
179:16, 195:10
**role**
47:18, 49:20,
52:19, 52:22,
55:13, 56:18,
61:19, 224:21,
336:13
**roll**
225:7, 307:15
**room**
11:16, 12:16
**rooms**
11:16
**roper**
5:18
**rose**
184:12, 297:9
**rosen**
145:13, 184:11
**rosenbloom**
6:3
**rosenstone**
145:13, 148:6,
149:18, 184:9,
184:10, 184:11,
184:12, 184:18,
184:19, 309:15
**rosenstone's**
309:16
**rough**
29:15
**roughly**
255:20, 256:8,
263:4, 279:14,
279:20, 292:17,
292:19
**rpr**
1:22, 2:2
**rule**
198:17, 328:16,
328:17, 328:19,
328:21

**rule-making**
16:15
**rules**
7:17, 10:6,
16:16, 158:7,
161:18, 162:11,
163:3, 163:19,
164:3, 190:14,
190:18, 196:12,
311:18, 311:21,
324:13, 329:16
**rulings**
15:19
**run**
198:18
**rush**
336:17
**rushed**
301:7
**rutahindurwa**
2:14, 214:11

**S**

**s**
41:10, 44:17,
46:10, 195:8,
218:9, 245:7,
249:2, 293:4,
294:22, 306:1,
306:2, 306:5,
311:12, 312:13,
319:11, 319:17
**s&pq**
334:2
**said**
27:12, 36:13,
38:21, 39:21,
48:16, 61:14,
72:4, 74:11,
82:15, 83:12,
83:17, 83:19,
86:1, 86:9,
90:8, 90:11,
91:21, 92:8,
101:7, 117:20,
125:7, 128:10,
133:22, 136:1,
139:3, 139:6,

141:11, 150:21,
152:4, 155:12,
160:11, 160:13,
164:6, 166:13,
176:18, 189:7,
197:11, 197:16,
198:9, 198:22,
212:2, 212:8,
229:15, 231:19,
235:13, 238:8,
251:15, 252:6,
253:19, 260:13,
262:14, 263:8,
274:12, 276:7,
280:21, 281:7,
282:16, 293:11,
298:9, 299:16,
301:10, 302:17,
324:11, 333:13,
333:16, 336:16,
336:18, 336:20,
336:21, 337:1,
337:18, 338:10,
338:17, 340:14,
340:15, 340:19,
341:13, 342:4,
342:6, 345:5
**same**
12:15, 14:16,
37:4, 38:5,
42:16, 60:9,
60:14, 62:5,
67:20, 68:2,
95:15, 101:14,
109:19, 128:8,
143:20, 165:1,
165:15, 165:16,
166:4, 166:7,
166:16, 167:3,
169:18, 178:13,
182:20, 184:7,
190:14, 190:18,
196:11, 218:20,
219:4, 219:10,
236:1, 244:7,
247:20, 263:13,
288:13, 293:11,
298:13, 307:7,

328:8, 344:4
**same-day**
161:19, 162:11,
162:17, 163:9,
169:4, 169:7,
169:18, 170:1,
186:15, 324:20
**sarah**
4:13
**save**
288:16, 316:4
**saw**
115:16, 143:8,
223:8, 303:4,
336:7, 338:18,
339:14
**saying**
57:12, 69:16,
77:11, 77:12,
88:10, 103:9,
104:6, 108:6,
113:16, 122:11,
122:18, 122:20,
123:11, 123:14,
124:1, 124:13,
126:4, 133:8,
133:16, 139:18,
140:5, 140:11,
140:13, 151:5,
166:14, 169:7,
180:7, 231:3,
233:15, 240:11,
273:11, 286:7,
307:21, 310:4,
312:17, 330:4
**says**
30:16, 40:16,
52:15, 60:1,
105:15, 109:14,
109:21, 110:3,
112:16, 118:1,
119:15, 126:4,
129:13, 133:9,
136:15, 137:8,
139:1, 139:2,
139:5, 151:11,
154:4, 154:6,
154:8, 154:10,

156:12, 158:17,
158:22, 165:14,
167:13, 178:5,
186:21, 259:3,
262:17, 290:4,
298:16, 308:18,
340:5
**scale**
211:22
**scenario**
234:7
**scenarios**
236:4
**scheme**
24:4
**schlozman**
149:20
**scholar**
172:5, 172:11,
172:15, 194:22,
196:3, 229:9
**scholarly**
46:6, 291:4,
312:4
**scholars**
64:5, 148:21,
149:9, 194:3,
207:14, 210:20,
211:6, 217:5,
217:8, 311:15,
312:22
**scholarship**
193:8, 193:9,
193:13
**school**
30:10, 42:9,
42:12, 43:1,
43:21, 208:20,
208:22, 211:5
**schooled**
203:20
**science**
22:4, 22:21,
156:7, 193:21,
194:7, 311:6,
311:7
**sciences**
23:5

**scientist**
126:3
**scientists**
207:7
**scope**
17:10, 161:14,
172:1, 221:14,
225:18, 225:19,
225:22, 226:4,
226:19, 227:3,
227:6, 227:13,
227:17, 231:8,
231:11
**scoping**
47:11
**scores**
209:17
**scott**
5:18
**scratching**
210:13
**screen**
11:18, 12:1,
12:14, 13:1,
13:6, 65:7,
70:12, 90:22,
91:4, 105:17,
118:21, 119:2,
127:19, 180:21,
186:1, 188:11,
225:10, 325:8,
326:15, 332:6
**screens**
11:20
**scroll**
21:18, 21:22,
40:15, 47:21,
58:12, 64:16,
73:14, 99:15,
99:17, 114:18,
115:6, 119:8,
121:18, 143:17,
144:18, 181:19,
181:22, 214:17,
219:11, 274:22
**scrolling**
33:13, 39:13,
52:8, 54:7,

54:12, 59:22,
60:13, 60:17,
60:18, 107:7,
118:3
**se**
4:6
**seal**
345:14
**search**
16:3, 144:13,
161:4, 172:4,
172:10, 172:14,
339:19
**searches**
15:11, 15:17,
172:14
**season**
192:19, 192:20
**second**
59:19, 100:15,
105:15, 118:19,
118:21, 126:9,
132:16, 135:16,
143:20, 146:18,
146:19, 157:11,
157:12, 204:3,
220:3, 258:4,
259:13, 259:14,
262:14, 263:13,
263:21, 280:4,
291:3, 291:14,
291:21, 300:1
**secretary**
1:10, 3:2,
15:18, 102:11,
103:10
**secretary's**
343:17
**section**
27:8, 48:17,
49:19, 50:20,
51:2, 51:9,
51:14, 52:6,
52:12, 54:18,
54:21, 54:22,
55:2, 55:9,
55:13, 56:17,
57:1, 57:10,

58:9, 59:14,
60:7, 91:8,
91:17, 94:1,
105:14, 114:8,
114:11, 147:12,
154:14, 156:10,
161:14, 170:6,
181:10, 181:17,
185:19, 186:5,
189:9, 189:10,
221:5, 283:7,
283:10, 283:14,
283:20, 313:11,
336:6, 338:6

**sections**
14:4, 47:15,
49:6, 53:15,
54:15, 57:3,
57:6, 57:9,
58:14, 61:17,
62:11, 62:16,
62:22, 107:6,
200:6

**secure**
244:21

**securing**
245:13

**security**
32:6, 32:10,
32:19, 32:22,
34:4, 34:16

**see**
13:4, 13:7,
17:7, 20:9,
20:20, 24:17,
27:20, 29:17,
30:7, 33:7,
34:2, 34:3,
34:8, 34:14,
36:5, 36:8,
44:17, 56:13,
60:15, 63:15,
63:16, 74:18,
82:20, 91:2,
101:2, 101:15,
107:5, 107:7,
107:9, 108:16,
116:2, 117:1,

117:3, 117:18,
122:3, 128:20,
136:2, 143:1,
144:19, 161:14,
161:21, 163:14,
171:9, 178:5,
179:7, 181:12,
181:15, 182:17,
185:21, 188:4,
188:14, 195:19,
219:9, 219:11,
223:7, 227:4,
231:7, 231:16,
233:18, 242:10,
250:11, 252:3,
253:11, 254:12,
254:13, 254:14,
262:14, 277:14,
284:4, 284:7,
286:12, 286:13,
297:18, 300:3,
303:20, 305:6,
316:20, 317:5,
325:16, 328:17,
328:19, 330:7,
335:20, 337:2,
337:4, 337:6,
340:12, 340:14,
340:17, 340:20,
343:5

**seeing**
45:16, 316:22

**seek**
79:15, 137:17,
139:22

**seeking**
79:13, 79:22,
271:13

**seem**
52:8, 149:8,
174:15, 216:16,
216:17, 217:12,
218:7, 236:17,
254:8, 320:5,
334:21

**seemed**
69:5, 199:22,
217:15, 225:5

**seemingly**
272:10, 314:19

**seems**
78:21, 136:21,
142:1, 170:5,
236:15, 237:1,
250:3, 299:19,
334:14

**seen**
208:14, 214:18,
229:16, 245:17,
245:20, 259:5,
261:16, 316:20,
316:21, 340:11

**sees**
208:5

**select**
260:5

**self-addressed**
315:13

**semester**
192:10, 193:4

**seminal**
70:4

**seminar**
192:9

**send**
56:14

**sense**
18:12, 28:21,
338:11

**sensical**
331:14

**sent**
40:4, 55:21,
56:4, 209:10

**sentence**
66:14, 94:3,
94:16, 94:22,
109:3, 112:16,
120:11, 128:20,
129:15, 136:14,
137:8, 138:1,
139:19, 140:5,
141:8, 141:18,
158:22, 166:8,
183:9, 183:19,
215:15, 220:3,

244:1, 246:10,
246:11, 258:4,
259:13, 259:14,
262:14, 264:9,
272:8, 280:9,
305:15, 325:21

**sentences**
140:21, 141:2,
233:22

**separate**
11:15, 222:4,
233:11

**separated**
42:9

**separately**
131:7

**september**
39:8, 86:20,
297:8

**series**
64:14, 65:6,
68:17, 71:22,
75:20, 84:4,
87:3, 89:21,
162:3

**serious**
167:18

**serve**
155:1

**service**
273:14, 316:17

**session**
188:8

**set**
172:22, 300:7,
300:12, 345:13

**setting**
94:17, 96:4,
313:19

**setup**
11:15

**seven**
279:7

**several**
9:21, 14:6,
25:7, 30:1,
34:3, 34:8,
161:18, 194:1,

200:20, 247:11,
280:22, 306:14
**share**
13:1, 13:6,
20:7, 54:1,
74:22, 79:19,
88:8, 89:17,
91:4, 117:7,
118:21, 158:5,
167:15, 177:20,
180:21, 188:11,
204:10, 251:4,
281:1, 296:14,
308:11, 308:15,
319:22, 325:8,
332:7
**shared**
51:3, 55:18
**shares**
159:6, 160:20
**sharing**
64:15, 65:7,
326:15, 332:6
**sheet**
18:16, 40:11,
344:7
**sheets**
19:9, 39:19,
40:7
**shift**
41:16, 123:4
**shifted**
195:7
**shilpa**
5:21
**short**
71:17, 254:16,
303:4, 329:6
**shortened**
32:10
**shorter**
108:11
**shorthand**
258:22, 271:16,
345:1
**shorting**
182:7
**shortly**
323:10

**shortness**
313:21
**should**
10:21, 26:7,
32:9, 44:5,
55:14, 70:22,
83:18, 113:7,
125:18, 148:9,
148:12, 148:15,
148:22, 149:5,
151:9, 154:22,
163:13, 167:18,
172:21, 176:6,
201:9, 208:16,
231:21, 258:2,
262:13, 264:13,
270:5, 281:17,
282:9, 282:11,
287:3, 288:2,
290:16, 291:2,
291:10, 294:7,
294:12, 299:21,
301:6, 314:20,
333:22, 334:10,
334:19, 337:11,
340:3
**shouldn't**
88:6, 93:9
**show**
33:4, 33:11,
34:19, 87:4,
89:15, 89:16,
89:18, 90:17,
99:12, 106:16,
123:6, 124:18,
125:3, 126:3,
126:6, 142:20,
248:6, 281:16,
286:3, 288:9,
294:20, 295:15,
297:4, 305:17,
306:9, 318:10,
329:15
**showed**
77:14, 116:12,
324:12, 336:22
**showing**
70:11, 131:9,

162:3, 262:4,
288:19, 330:2
**shown**
89:12, 100:2,
131:13, 131:20,
152:1, 156:20,
163:9, 296:12,
296:16, 319:20,
320:1, 320:5
**shows**
79:20, 87:9,
90:2, 95:10,
131:13, 134:11,
148:13, 158:18,
235:20, 250:5,
250:20, 292:16,
315:2, 328:15
**sic**
189:12, 325:9
**sidenote**
306:13
**signature**
36:2, 344:11
**signature-mig2k**
345:18
**signed**
344:7
**significance**
122:1, 124:21,
124:22
**significant**
113:17, 114:15,
115:1, 117:2,
120:3, 120:15,
120:17, 121:12,
123:6, 126:11,
126:15, 127:13,
128:1, 128:3,
129:9, 145:10,
156:19, 163:10,
170:21, 170:22,
241:17, 303:12,
305:7, 306:3,
306:4, 306:6,
306:11, 308:1,
331:15, 332:21,
333:9, 333:14,
335:8, 337:8,

337:13, 340:20,
342:7, 342:10
**significantly**
95:12, 100:13,
100:18, 102:1,
115:22, 117:5,
121:19, 121:21,
122:4, 122:6,
128:1, 128:9,
275:6, 275:9,
282:1, 282:4,
326:8, 334:13
**signing**
345:8
**silent**
140:18
**similar**
59:9, 199:17,
221:5, 237:10,
240:18, 241:21,
268:15, 268:22,
271:17, 274:15,
318:5
**similarly**
236:10
**simple**
254:17, 268:7,
310:6, 326:2
**simplicity**
322:6
**simply**
77:21, 88:5,
99:9, 110:6,
110:11, 111:15,
151:11, 153:11,
153:18, 167:3,
236:15, 239:20,
239:22, 250:9,
258:18, 260:13,
263:19, 263:20,
273:4, 285:11,
289:4, 293:11,
294:3, 294:16,
295:18, 296:12,
299:21, 304:15,
307:12, 308:10,
308:18, 309:22,
317:11, 317:18

simultaneously
222:20
since
14:7, 15:10,
21:4, 21:16,
24:13, 24:14,
27:9, 27:12,
27:19, 28:18,
36:16, 41:15,
41:17, 44:11,
44:13, 45:11,
45:19, 46:9,
46:11, 65:5,
69:18, 93:7,
148:8, 236:1,
305:15, 335:17
single
42:21, 177:1,
200:1, 219:17,
280:11
sir
122:13
sit
29:2
sitting
35:7, 201:4,
202:20, 209:20,
220:18, 321:3
situation
110:16
six
121:11, 279:7,
279:14
size
259:18
sjostrom
5:3
skewed
131:19
skills
28:14
slightly
156:4
slope
125:21, 126:1,
126:7, 126:10,
303:6, 303:11,
303:16, 332:4,

333:9, 337:5
slopes
115:22, 116:13,
117:5, 121:17,
121:19, 123:7,
124:2, 124:14,
125:2, 125:4,
125:5, 125:9,
126:15, 127:21,
128:3, 128:8,
128:12, 332:9,
332:22, 333:11,
334:13, 335:8,
340:15, 342:4
sloping
115:2
slow
25:21
small
158:18, 159:7,
173:8, 270:7,
342:9
smaller
277:8
smartphone
12:15
smith
4:20, 7:11,
7:12, 7:14,
48:19, 60:16,
61:9, 64:18,
80:2, 83:2,
83:13, 85:9,
85:11, 86:8,
87:18, 91:17,
93:6, 96:10,
96:16, 97:8,
97:22, 98:9,
104:2, 105:14,
106:14, 107:3,
107:13, 112:18,
114:9, 114:13,
117:12, 123:3,
123:14, 124:7,
130:2, 131:2,
131:3, 133:17,
134:7, 134:17,
136:5, 136:14,

144:17, 144:21,
145:7, 146:11,
156:15, 184:8,
184:15, 184:17,
204:20, 205:3,
217:14, 218:13,
218:18, 218:21,
219:2, 224:11,
243:12, 244:16,
248:6, 267:11,
268:1, 278:11,
288:3, 303:10,
304:5
smith's
15:15, 54:13,
56:6, 56:9,
60:1, 60:6,
61:4, 64:21,
65:9, 75:17,
75:18, 76:1,
76:8, 76:18,
77:1, 77:14,
84:17, 84:22,
85:2, 86:1,
94:14, 106:10,
115:20, 131:8,
132:10, 134:9,
134:22, 135:6,
142:10, 143:8,
143:12, 144:3,
164:19, 188:12,
188:20, 189:8,
189:11, 216:4,
217:13, 218:6,
220:13, 287:17,
301:16, 301:22
snarky
287:13
social
32:6, 32:10,
32:19, 32:22,
34:4, 34:15,
192:7, 210:6,
311:6, 311:7,
316:20
soe
4:20, 5:18
soes
4:9

solely
26:18, 26:21
solicit
79:6, 79:7,
87:21, 88:7,
90:12
solicitation
80:1, 88:4
solicitations
205:17, 299:8
solicited
299:6
soliciting
87:14
solid
31:4
some
13:2, 15:18,
21:3, 21:8,
21:13, 25:15,
28:2, 32:18,
34:19, 43:1,
43:2, 59:4,
64:7, 65:20,
69:3, 70:17,
74:15, 75:5,
80:6, 80:14,
150:12, 151:11,
169:11, 170:12,
185:2, 189:14,
191:6, 197:16,
198:10, 200:17,
210:9, 213:17,
213:19, 216:22,
227:15, 230:7,
230:12, 235:11,
237:15, 238:17,
242:22, 243:12,
244:21, 245:12,
246:1, 254:5,
254:13, 255:11,
259:7, 264:21,
298:6, 300:16,
309:15, 309:19,
310:8, 313:17,
316:13, 317:9,
317:19, 318:8,
318:9, 318:22,

320:4, 324:9,
330:18, 331:14,
337:9, 342:12,
343:11
**somebody**
45:1, 81:20,
197:11, 273:17
**somehow**
251:12
**someone**
38:22, 101:7,
208:11, 310:9
**something**
28:11, 48:19,
80:1, 109:7,
111:3, 118:22,
140:13, 153:18,
157:21, 161:7,
185:8, 185:22,
197:8, 207:21,
214:1, 241:8,
264:21, 269:18,
274:11, 297:1,
309:3, 309:8,
327:7
**sometime**
19:14
**sometimes**
45:4, 67:19,
72:4, 90:13,
145:20, 210:21,
240:6, 240:12,
240:20
**somewhere**
174:9, 335:13
**soon**
190:20, 340:5
**sorry**
37:6, 37:8,
42:18, 43:10,
45:18, 45:19,
48:4, 50:3,
50:10, 55:5,
55:7, 56:16,
66:13, 70:11,
77:4, 78:18,
78:19, 83:15,
86:3, 86:5,

88:15, 89:2,
111:2, 115:3,
116:20, 119:1,
126:18, 130:12,
153:1, 223:18,
225:7, 289:10,
300:2, 314:10,
314:11, 318:3,
332:6, 336:1,
337:16
**sort**
13:4, 18:13,
25:16, 72:21,
93:10, 107:20,
118:21, 127:4,
147:7, 157:6,
175:11, 182:20,
185:17, 198:2,
201:15, 327:8
**sought**
79:1, 211:15
**sound**
10:10, 11:2,
16:15, 90:6,
116:14
**sounds**
21:8, 31:3,
36:7, 90:7,
122:11, 122:17,
269:7
**source**
87:15, 265:6,
265:8
**sources**
51:22, 62:2,
62:10, 62:15,
63:5, 63:7,
68:5, 171:16,
172:19, 212:22,
304:20
**sourcing**
51:7, 51:13
**south**
3:7, 5:19,
41:13
**speak**
10:8, 77:4,
122:15, 126:2

**speaking**
10:9, 10:17,
119:15, 120:1
**speaks**
24:19, 69:22
**special**
3:19
**specialization**
22:7, 22:10,
22:19, 23:3,
24:9, 24:11
**specific**
46:22, 47:11,
51:14, 66:11,
69:19, 79:3,
82:5, 86:13,
194:4, 198:11,
211:5, 220:5,
235:11, 238:18,
238:22, 239:2,
309:1
**specifically**
11:1, 14:14,
15:14, 24:10,
25:1, 25:18,
29:4, 31:11,
47:6, 51:19,
92:19, 159:14,
160:6, 161:4,
164:7, 167:18,
177:14, 183:21,
190:10, 205:6,
207:4, 220:19,
230:6, 322:15,
324:17
**specification**
179:14
**specifics**
251:15
**speculate**
235:5, 238:9,
243:4, 262:17,
263:17, 264:3,
267:2
**speculating**
216:18, 291:8
**speculation**
105:22, 123:18,

226:14, 243:14
**speculations**
321:8
**speculative**
147:15, 216:4,
220:5, 220:7,
220:10, 220:15,
220:19, 231:14,
233:16, 234:3,
236:1, 241:12,
241:14, 242:7,
254:13, 261:21,
293:15
**speed**
120:9, 343:16
**spell**
207:13
**spend**
213:17, 343:11
**spent**
18:7, 18:13,
35:9, 194:12
**spoke**
14:4, 14:10,
14:11
**spoken**
15:7
**spreadsheets**
19:7
**spring**
29:7, 30:10,
31:22, 42:7,
43:20
**squinch**
340:20
**sr**
5:9
**ss**
330:16
**staff**
3:16
**staffed**
23:10
**stage**
59:13
**stamped**
315:13
**stand**
45:18, 210:10

stand-alone
141:1
standard
19:17, 69:9,
69:11, 69:17,
71:14, 172:4,
172:9, 172:10,
172:14, 217:9,
316:6, 328:1,
333:19, 337:6,
337:9, 340:17,
340:21, 341:3
standardize
276:21
standardizing
300:3
starnes
4:10
stars
194:8
start
10:17, 21:10,
33:8, 48:17,
54:7, 54:18,
54:19, 64:15,
69:16, 75:15,
208:12, 214:8,
215:10, 233:14,
251:9, 255:13,
258:20, 266:15,
274:21, 305:14,
330:21, 331:9
started
40:12, 41:16,
45:22, 52:5,
60:2, 119:4,
120:14, 194:15,
194:21, 195:9
starting
20:20, 24:17,
48:11, 48:15,
49:8, 54:11,
60:5, 112:16,
123:13, 146:20,
158:17, 178:4,
283:6, 325:16
starts
183:9, 246:11,

275:1
starving
185:4
state
1:4, 1:11, 3:3,
29:10, 30:11,
32:7, 32:9,
32:16, 37:2,
37:9, 43:16,
76:1, 102:11,
102:21, 158:20,
175:15, 175:17,
176:11, 179:12,
200:17, 228:22,
265:14, 265:20,
268:10, 289:2,
313:15, 315:5,
320:9, 320:15,
345:22
state's
15:18, 31:15,
311:18
stated
10:20, 154:20,
252:20
statement
129:12, 136:13,
136:21, 166:13,
166:14, 215:18,
237:19, 239:11,
272:11, 290:13,
310:6, 312:21,
323:7
statements
138:19, 153:14,
155:8, 228:2
states
1:1, 29:19,
32:8, 32:21,
34:15, 74:14,
169:17, 169:22,
170:1, 174:1,
174:7, 174:9,
176:15, 177:5,
178:13, 178:20,
206:2, 310:20,
315:6, 315:11,
315:18, 326:5

statistical
126:20, 128:11
statistically
113:17, 114:14,
117:2, 117:5,
120:14, 120:16,
121:12, 126:14,
127:13, 129:8,
303:12, 306:3,
331:15, 332:21,
335:8, 342:9
statistics
76:2
statute
63:10
statutes
63:10
stayed
330:15
steep
337:4
steeper
115:16, 125:22,
127:10, 303:7,
330:18
stein
1:15, 7:2, 7:8,
7:9, 8:3, 8:7,
8:10, 9:2, 9:11,
9:19, 16:17,
17:18, 40:17,
88:14, 154:4,
162:5, 180:2,
214:18, 221:20,
323:16, 324:6,
342:16, 343:5,
344:2
stein-alford
7:10, 247:15,
248:18, 256:14,
270:18, 270:21,
271:11, 271:14,
271:17, 271:22,
272:11, 280:9
stenographer
83:21
stenographically
345:6

step
55:14
stephanie
3:18
stephen
5:9
still
21:1, 59:14,
110:4, 110:5,
179:15, 181:15,
207:7, 235:9,
331:3, 331:4,
342:22
stipulate
183:14
stop
8:5, 48:9,
52:8, 58:13,
93:22, 118:14,
118:20, 120:5,
150:19, 152:8,
181:1, 286:1,
326:15, 335:2
straight
330:12
strategy
281:10, 287:19,
295:19
street
2:9, 2:16, 3:7,
4:6, 4:11
strict
8:4, 174:22,
179:19, 181:1,
181:11, 182:16,
183:4, 183:9
strikes
273:2
strong
142:11, 187:5,
255:1
stronger
308:4, 308:19
strongest
150:8
strongly
334:3
student
26:4

students
201:16, 205:10,
208:19, 208:20,
208:22, 341:15,
341:20
studied
25:5, 180:16,
194:3, 195:2,
242:14
studies
149:14, 162:3,
162:19, 162:22,
170:13, 170:15,
170:21, 171:3,
171:17, 171:21,
173:2, 173:8,
174:14, 184:2,
200:16, 206:21,
207:22, 209:7,
209:12, 212:16,
242:13, 243:17,
243:18, 318:10,
318:13, 328:2,
329:15
study
25:4, 25:12,
26:12, 149:12,
160:19, 201:7,
201:8, 203:2,
206:2, 209:3,
311:17, 317:17,
318:15
studying
158:16
stuff
90:9, 198:4
subject
22:15, 28:4,
50:17, 165:9,
175:13, 236:2,
254:4, 297:14,
326:5
submit
18:15, 22:13,
51:5
submitted
12:6, 17:22,
18:4, 18:18,

19:6, 19:8,
20:13, 20:22,
36:7, 39:13,
40:19, 65:5,
65:16, 67:2,
67:8, 68:13,
75:1, 98:17,
98:18, 154:16,
304:21, 339:19,
341:8
submitting
15:10
subscribe
53:22
subsection
179:6, 179:9
subsections
49:11
subsequent
115:21, 283:13
subsidy
273:20
substance
32:14
substantial
146:5, 165:5
substantially
122:21
substantiated
142:19
substantive
189:14, 189:15
substitute
298:19
substituted
91:12, 270:2
substituting
297:20
substitution
297:15, 298:4,
298:6, 299:14,
299:17, 299:20
subtracting
290:7
success
325:17
suffer
166:22

suffered
119:17, 120:2,
120:3
sufficient
78:5, 97:14,
144:13, 241:16,
254:11, 295:15,
339:6
suggest
78:21, 78:22,
80:3, 81:13,
91:19, 92:9,
97:2, 126:7,
135:1, 136:22,
138:11, 138:14,
139:9, 139:10,
147:13, 147:16,
167:8, 235:14,
235:17, 236:2,
239:16, 241:2,
253:8, 271:11,
282:8
suggested
51:7, 53:3,
85:16, 103:13,
115:21, 117:4,
132:5, 142:12,
149:6, 241:1,
273:14, 277:2,
308:7, 335:14
suggesting
88:5, 102:20,
103:1, 103:7,
176:6, 254:8,
261:14, 299:21,
317:10
suggestion
92:11, 294:5
suggestions
50:1, 50:6,
50:9, 50:13,
50:16, 51:4
suggestive
128:7, 236:1,
264:7, 297:15
suggests
78:12, 141:15,
145:6, 170:6,

288:5, 307:12
suit
236:15, 236:17,
237:1
suite
3:7, 5:16, 5:19
summaries
49:5
summarize
21:1
summarizes
157:21, 165:13,
284:10
summary
58:17, 58:20,
58:22, 86:12,
86:13, 91:10,
91:15, 107:4,
132:9, 132:11,
133:6
summation
90:5, 90:7,
90:8
summer
102:6
superior
268:12, 289:18
supervisor
4:3, 4:13,
4:19, 5:15
supervisors
3:11
supplemental
147:8, 147:9
support
69:5, 69:7,
76:2, 93:15,
96:16, 97:14,
100:2, 123:18,
150:2, 179:16,
210:22, 216:8,
334:3, 334:21,
336:2, 338:11
supported
137:4, 246:2
supportive
97:10
supports
136:20

suppose
28:6
supposed
24:5, 36:12,
197:5
suppress
178:6, 249:19
suppresses
249:17
suppressing
245:3
sure
10:4, 10:9,
13:3, 16:11,
21:3, 22:1,
25:14, 28:11,
40:7, 45:7,
53:14, 55:15,
56:11, 60:14,
62:5, 62:9,
63:22, 67:19,
68:11, 71:3,
77:19, 81:9,
83:20, 86:8,
94:13, 110:13,
114:20, 118:15,
121:22, 123:2,
123:10, 135:4,
135:22, 136:9,
138:10, 140:14,
144:4, 144:7,
144:8, 144:9,
152:12, 155:15,
159:21, 160:9,
162:11, 165:22,
166:11, 168:19,
169:21, 171:19,
173:20, 176:18,
180:7, 209:15,
217:4, 218:19,
222:14, 240:17,
245:5, 261:5,
269:5, 278:19,
302:21, 307:16,
328:14, 329:2,
331:21, 332:13,
339:9, 339:12,
340:8, 342:22

surprise
81:22, 93:9
surprised
80:19, 80:22,
151:2, 288:6,
337:4
surprising
88:6, 341:2
surprisingly
192:21
surrebuttal
67:19
survey
28:7, 41:4,
41:6, 41:7,
41:11, 74:20,
178:9, 192:9,
202:2, 202:12,
202:15, 202:16
surveyed
201:14
surveys
28:8, 28:15,
203:1
suspect
268:12, 305:2
swain
4:3
sworn
9:3
syllabi
206:20, 341:11
syllabus
209:16
systematic
224:12
systems
12:14

**T**

table
59:17, 59:19,
85:15, 114:19,
115:16, 123:4,
125:20, 235:19,
236:18, 250:5,
284:5, 284:11,
284:12, 286:1,

288:20, 292:2,
292:14, 292:16,
293:22, 294:20,
299:15, 304:16,
305:6, 306:1,
306:2, 306:5,
306:6, 306:13
tables
87:3, 99:16,
126:3, 255:14,
256:5, 256:11,
297:3
take
27:7, 31:8,
47:18, 48:9,
66:1, 75:9,
92:8, 106:16,
106:22, 119:9,
134:13, 138:13,
146:10, 147:17,
172:22, 182:6,
183:7, 185:1,
188:3, 190:21,
208:11, 215:4,
215:8, 232:17,
243:8, 244:2,
244:5, 246:20,
259:7, 266:2,
269:12, 280:1,
282:16, 282:17,
282:18, 282:22,
283:2, 285:12,
293:12, 294:4,
303:2, 309:3,
311:3, 315:21,
317:13, 323:9,
325:15, 331:1,
332:14
taken
66:6, 113:11,
188:7, 269:9,
281:17, 282:9,
282:11, 323:14,
345:3, 345:6
takes
119:16
taking
134:8, 136:20,

316:9
talk
13:2, 14:17,
15:6, 23:18,
47:11, 48:14,
61:17, 81:4,
101:8, 101:10,
110:6, 124:18,
143:11, 150:16,
158:16, 168:2,
173:12, 174:12,
185:18, 232:11,
241:5, 260:4,
299:5, 324:17,
327:7
talked
38:3, 40:8,
61:12, 101:16,
101:18, 130:1,
130:2, 130:3,
154:2, 163:20,
200:21, 250:5,
327:9
talking
16:14, 40:1,
48:18, 71:4,
89:5, 119:22,
143:11, 175:4,
182:12, 210:19,
283:12, 310:14
talks
163:6, 163:7,
164:15, 186:5,
313:12
tallahassee
1:3, 3:8, 3:21,
5:7, 201:5
tampa
5:12
target
72:11, 72:13,
72:14, 92:18,
159:6, 167:14,
249:15, 251:3,
252:13, 253:3,
253:21, 271:12,
271:19, 274:13,
304:18, 308:13,

308:19
**targeted**
32:12, 79:2,
159:8, 205:6,
205:16, 211:15,
273:16, 320:2
**targeting**
79:21, 274:15,
307:13
**targets**
81:21
**tasks**
208:12
**taught**
192:6, 192:8,
192:15, 193:4,
206:13, 206:16,
206:17, 206:18
**teach**
22:15, 192:10,
198:20
**teaches**
192:18
**teaching**
24:13, 62:19,
192:2, 192:11,
192:18, 207:2
**team**
9:15
**technical**
190:6
**techniques**
331:14
**tedious**
213:22, 227:16
**tell**
11:5, 11:7,
11:19, 32:2,
43:16, 90:19,
115:4, 115:6,
140:20, 204:15,
212:2, 316:3,
316:14
**telling**
93:3, 128:2,
165:17
**tells**
126:17

**tempered**
148:5
**temple**
207:8
**temporal**
18:3
**ten**
304:20
**tend**
31:7
**tended**
219:9
**tends**
196:8
**tenet**
313:7
**tenor**
220:10
**term**
78:7, 161:18,
251:14
**terms**
22:17, 23:11,
97:3, 111:20,
116:12, 222:22,
311:5, 314:19,
329:9
**test**
71:16, 112:19,
124:7, 124:21,
125:4, 125:15,
126:21, 128:21,
129:3, 129:14,
129:17, 129:20,
130:10, 130:15,
131:3, 143:2,
151:10, 235:6,
239:19, 254:6,
254:15, 259:13,
259:20, 260:14,
265:1, 293:20,
297:18, 303:21
**tested**
296:11, 298:10
**testified**
9:5, 28:5,
35:4, 35:17,
35:19, 36:14,

191:20, 199:18,
213:13, 240:6,
240:12, 248:4,
254:21, 255:4,
258:21, 266:9,
304:1, 324:16
**testify**
9:4, 35:14,
36:9
**testifying**
326:17
**testimony**
27:3, 27:7,
28:17, 37:12,
37:14, 37:16,
37:19, 37:22,
55:16, 80:10,
83:16, 217:3,
220:2, 223:11,
261:7, 276:4,
278:3, 297:2,
344:4, 344:6,
345:5, 345:6
**testing**
254:5
**tests**
124:22, 125:12,
130:20, 235:1,
321:16
**texas**
41:13, 212:12
**text**
50:1, 61:11,
101:14, 116:15,
120:10
**th**
2:9, 2:16,
5:12, 206:3,
268:21
**thank**
9:13, 16:10,
18:6, 20:6,
73:18, 138:8,
323:16, 343:3,
343:4
**thanks**
342:15
**themselves**
12:6, 267:4

**then-president**
30:12
**theories**
52:13, 244:3,
246:1, 246:6
**theory**
143:6, 143:12,
144:3, 144:14,
145:20, 145:21,
147:12, 147:13,
155:19, 156:6,
165:13, 170:7,
170:8, 233:17,
244:2, 309:6,
309:13, 309:18,
309:20, 310:4
**thereafter**
345:7
**therefore**
135:12, 277:10
**thing**
25:16, 67:20,
152:16, 157:7,
162:21, 185:17,
189:4, 293:11,
337:16
**things**
12:5, 14:16,
14:17, 40:5,
59:10, 63:12,
64:8, 69:6,
83:10, 104:4,
109:5, 143:7,
216:22, 226:4,
234:7, 310:18,
312:19, 314:19,
317:19, 331:6,
333:17
**thinking**
43:11
**thinks**
44:4
**thomas**
31:14, 73:20
**thought**
39:4, 56:21,
70:11, 88:15,
89:2, 115:11,

116:12, 126:19,
146:6, 225:6,
231:10, 273:20,
298:9, 299:14,
303:13, 332:6,
334:16, 341:4
**thoughts**
58:7
**thousand**
276:13, 276:14,
276:17
**threat**
263:18
**three**
49:10, 114:21,
117:3, 119:16,
121:10, 171:3,
193:5, 209:18,
219:9, 243:13,
273:9, 315:19,
316:7, 317:22,
324:20, 332:20,
334:1
**through**
10:5, 13:2,
26:9, 29:3,
29:9, 33:16,
44:3, 49:15,
49:21, 52:2,
59:22, 60:3,
60:13, 60:17,
60:18, 60:19,
60:22, 77:8,
77:22, 78:13,
82:21, 83:3,
83:5, 85:7,
86:18, 87:5,
87:10, 88:9,
91:1, 94:10,
95:15, 109:15,
131:15, 132:1,
133:7, 134:2,
144:18, 157:15,
168:19, 172:13,
179:22, 180:3,
189:11, 191:3,
209:16, 220:8,
220:20, 228:13,

235:4, 235:8,
235:12, 242:12,
250:7, 251:6,
251:7, 251:8,
252:4, 255:16,
255:17, 255:19,
255:20, 263:3,
263:5, 323:11
**throughout**
237:9, 237:13
**ticket**
36:12, 208:11
**time**
9:22, 14:11,
18:13, 18:15,
19:9, 20:5,
28:18, 28:22,
35:18, 39:19,
40:7, 40:11,
44:21, 45:22,
56:12, 66:1,
69:8, 71:22,
74:15, 79:19,
89:20, 93:16,
95:7, 103:11,
108:12, 108:22,
120:22, 121:14,
121:21, 122:6,
123:9, 124:22,
125:1, 125:7,
125:16, 125:19,
141:15, 154:20,
175:6, 176:20,
180:18, 183:10,
198:6, 213:17,
233:1, 242:10,
252:11, 259:7,
260:8, 263:13,
263:15, 264:18,
264:19, 268:3,
268:5, 269:3,
269:6, 276:20,
277:9, 277:13,
280:2, 284:1,
303:19, 309:14,
311:4, 313:21,
316:4, 317:8,
324:16, 327:9,

327:17, 328:15,
333:10, 339:21,
341:2, 342:15,
343:11
**timeline**
337:16
**times**
9:19, 14:6,
35:3, 35:4,
98:4, 121:11,
139:3, 139:7,
142:13, 187:4,
188:17, 191:12,
213:22, 272:16,
279:14, 279:20,
280:22, 300:2,
306:14, 327:10,
332:3
**titled**
49:6, 49:7,
49:8, 158:7,
177:22, 284:5
**titles**
204:1
**today**
9:13, 9:18,
12:21, 38:4,
67:15, 68:11,
88:11, 93:16,
104:15, 104:20,
147:4, 190:10,
201:4, 227:9,
269:19, 327:10
**today's**
10:6, 13:18,
15:8, 18:10
**todd**
5:9
**together**
42:2, 42:8,
44:21, 151:12,
169:8, 192:15,
197:17, 272:17,
320:5, 328:13
**told**
35:2, 35:13,
52:8, 55:18,
68:11, 86:21,

114:7, 172:19,
176:1, 196:15,
205:5
**tomorrow**
200:2
**took**
24:14, 46:9,
61:7, 110:2,
116:5, 137:7,
285:22, 332:15
**top**
20:21, 40:15,
54:7, 60:19,
209:21, 215:12,
219:13, 281:21,
304:20
**topic**
24:17, 24:20,
37:17
**topics**
22:14, 28:9,
63:4, 199:10
**torchinsky**
3:6
**tortured**
295:4
**total**
14:19, 18:10,
27:18, 77:13,
101:5, 131:18,
142:3, 171:17,
172:12, 172:13,
219:13, 252:5,
254:19, 258:10,
263:12, 263:14,
275:12, 276:11,
277:5, 277:18,
281:8, 281:11,
281:12, 281:19,
282:6, 282:9,
282:11, 282:12,
282:13, 282:19,
282:21, 285:5,
285:12, 285:15,
285:19, 286:13,
286:16
**totally**
185:5

touch
25:8, 342:12
touched
27:3, 202:6
touches
23:7, 26:5
toward
41:16, 173:3
towards
131:19
tracked
238:21
transcribed
10:8
transcript
7:7, 8:2, 8:7,
13:13, 20:11,
33:5, 33:21,
64:20, 65:11,
74:6, 86:4,
117:10, 158:10,
178:3, 181:5,
214:16, 232:16,
247:2, 325:13,
343:15, 343:17,
345:4
transcription
344:5
transfers
195:2
transition
305:16
transposed
51:18
transposing
51:21
travel
319:3
tread
17:13
treat
271:15
treatment
210:5, 330:19
trend
330:5
trial
35:4, 35:6,

35:19, 36:9
tribe
73:16
tried
249:9, 339:3
true
37:4, 57:22,
62:5, 91:18,
103:16, 103:18,
104:9, 105:3,
139:19, 140:6,
166:13, 176:13,
229:9, 262:21,
314:5, 344:4,
345:4
trump
30:13
truth
9:4, 9:5
truthfully
12:21
try
11:6, 62:21,
83:7, 83:11,
191:8, 208:2
trying
17:17, 18:2,
56:11, 63:22,
69:2, 77:17,
81:7, 84:3,
89:4, 91:8,
95:17, 104:8,
130:5, 130:7,
133:17, 141:13,
161:1, 164:15,
171:11, 195:17,
252:22, 268:3,
282:8, 313:9,
319:6
turn
106:2, 122:15,
168:1, 181:6,
209:1, 247:12,
270:14, 274:19,
295:7, 299:11,
308:21
turning
182:15

turnout
7:21, 23:22,
24:22, 25:13,
26:1, 26:6,
26:12, 26:20,
49:10, 52:7,
52:13, 52:16,
69:14, 70:1,
70:16, 71:1,
71:5, 89:1,
106:6, 146:8,
147:12, 149:5,
150:6, 150:11,
155:3, 156:12,
158:19, 159:7,
159:13, 160:1,
160:3, 160:12,
160:16, 160:19,
162:4, 162:7,
162:18, 163:1,
163:11, 167:9,
169:3, 170:10,
170:13, 170:22,
171:17, 173:9,
175:22, 176:10,
177:6, 177:17,
178:1, 178:6,
178:16, 179:19,
180:12, 185:20,
187:2, 187:11,
187:17, 198:14,
206:21, 208:15,
209:6, 213:11,
238:13, 241:7,
243:5, 244:10,
244:18, 245:4,
245:19, 310:15,
310:18, 310:19,
324:14, 327:6
turnouts
167:17, 177:8
twice
70:21
two
29:20, 32:7,
40:21, 43:14,
48:21, 48:22,
49:2, 49:4,

49:5, 52:14,
52:17, 52:20,
52:22, 53:5,
57:13, 84:20,
100:1, 101:1,
131:7, 140:21,
141:1, 156:13,
156:18, 160:10,
167:2, 169:8,
170:17, 184:2,
193:5, 193:6,
193:20, 196:3,
199:19, 203:16,
209:18, 236:20,
243:12, 243:15,
249:17, 256:10,
260:22, 261:8,
263:11, 263:15,
277:3, 277:13,
285:18, 287:1,
294:21, 316:6,
320:4, 333:10
two-year
261:6, 262:3
twofold
256:21
tying
328:21
type
131:12, 182:6,
183:4, 183:13,
230:17, 231:3,
231:21, 242:5,
258:22, 266:22,
291:9, 296:4,
310:8, 328:4,
330:20
types
102:16, 153:16,
210:4, 245:8,
255:2, 324:20,
326:21
typewriting
345:7
typical
19:10, 19:22
typically
10:21, 26:11,

230:17, 230:20
**typo**
270:6, 270:8
**typographical**
189:14
**typos**
51:17

---
**U**
---

**uc**
210:1
**uh-humh**
30:17
**ultimate**
160:12
**ultimately**
219:7, 341:8
**unanswered**
128:7
**under**
23:8, 91:4,
154:8, 227:9,
292:2, 300:9,
300:14, 345:7
**undercount**
76:19
**undergraduate**
192:9, 192:12
**undermine**
252:22, 253:1
**underrepresented**
176:17, 177:9,
211:20, 308:14,
327:4, 327:14
**understand**
11:5, 11:7,
11:8, 12:20,
16:11, 17:12,
23:12, 40:2,
43:4, 50:19,
53:12, 68:8,
77:11, 83:6,
83:8, 83:15,
84:12, 87:15,
88:10, 88:20,
94:13, 95:16,
95:18, 96:21,
97:11, 103:17,

110:14, 111:17,
122:9, 122:10,
130:5, 132:7,
140:10, 140:14,
141:12, 156:2,
159:21, 159:22,
160:11, 173:20,
215:19, 218:10,
222:11, 224:21,
227:17, 236:9,
252:14, 252:22,
328:14, 330:4,
339:13, 341:6
**understanding**
66:12, 66:15,
66:19, 72:13,
112:4, 131:5,
131:6, 134:11,
142:14, 157:7,
183:6, 199:19,
205:2, 205:19,
212:18, 213:4,
216:12, 217:22,
218:8, 223:7,
229:1, 229:5,
237:7, 238:3,
245:6, 253:4,
260:9, 260:21,
267:13, 268:14,
268:20, 276:5,
291:19, 310:21,
321:1, 332:14
**understood**
83:22, 141:11,
209:20, 222:12,
233:7
**undertaken**
290:16
**undertook**
57:3
**underwrite**
80:3
**unfortunate**
239:18, 259:12,
259:21
**unimpeded**
149:10
**unintended**
187:10

**union**
2:5, 9:8, 324:2
**unique**
212:9, 217:19
**united**
1:1, 31:18
**units**
1:6
**universe**
205:20, 205:21,
283:15
**university**
43:18, 44:3,
44:4, 191:21,
192:3
**unless**
10:22, 108:19,
185:4, 186:15,
227:4, 299:5
**unpublished**
25:8
**unquote**
271:12, 305:18,
305:21
**unregistered**
208:1, 212:3,
253:7
**unrelated**
27:18
**unresponsive**
294:3
**until**
44:15, 291:3,
291:5, 336:7,
338:16, 338:18,
340:14
**update**
76:14, 98:5,
98:13, 137:20,
140:3
**updated**
36:20
**updates**
21:9
**updating**
79:2, 94:9,
95:1, 95:5
**upload**
13:4

**uptick**
85:17
**urban**
194:22
**urge**
110:4
**usage**
305:19, 305:22
**use**
69:10, 69:11,
69:17, 70:5,
71:20, 77:20,
78:1, 78:2,
78:6, 78:9,
79:12, 88:4,
100:4, 147:17,
153:10, 153:18,
155:10, 161:19,
172:8, 196:2,
204:18, 210:17,
217:13, 241:12,
243:9, 253:10,
261:16, 278:14,
279:12, 284:13,
300:18, 301:3,
311:9, 311:17
**useful**
31:9
**users**
293:6
**uses**
237:8, 237:12,
265:6, 265:8,
313:6
**using**
75:2, 78:7,
79:22, 172:5,
179:17, 240:18,
262:3, 287:11,
287:14, 314:15
**usually**
208:3, 210:6
**utah**
315:5

---
**V**
---

**valid**
148:4, 182:6,

237:5
**value**
316:21, 318:6
**variable**
308:19, 310:17
**variables**
149:7, 243:9,
310:12, 331:20
**variety**
43:18
**various**
42:22, 76:2,
163:2, 237:9,
271:1, 271:5,
301:13
**vary**
276:19
**vast**
148:7
**vehicle**
235:22
**vehicles**
85:8, 211:13,
235:10
**verba**
149:20
**verbal**
10:9, 86:3
**verification**
36:22
**verify**
56:2
**vermont**
315:6
**version**
239:8
**versions**
238:20, 239:8
**versus**
9:16, 30:5,
31:18, 31:22,
73:19, 73:21,
125:1, 264:18,
300:5, 330:6
**vet**
36:18
**via**
11:19, 123:16,

247:17, 248:1,
248:8, 248:14,
248:21, 257:16,
270:20, 271:5,
271:22, 272:13,
275:7, 282:3,
293:7, 301:12,
304:14, 306:12,
306:18, 306:22
**videoconference**
1:14
**view**
31:7, 53:10,
53:17, 237:1,
321:13
**virginia**
8:11, 29:7,
31:14, 31:22,
32:6, 73:13,
74:3, 197:22
**virtually**
28:13, 194:14
**visit**
208:8
**visually**
116:8, 116:12,
119:10, 119:15,
120:1, 128:7
**vitae**
20:21, 24:16,
149:2, 194:13,
195:19, 198:1,
206:18, 208:17,
312:5, 315:1
**vogel**
3:5
**voice**
36:18
**volumes**
172:7
**volunteer**
79:22
**volunteerism**
79:13, 87:13,
87:21, 88:5
**volusia**
4:13
**vot**
250:15

**vota**
36:4, 79:4,
80:9, 211:1,
211:3, 213:3
**vota's**
213:4
**vote**
23:20, 24:22,
30:22, 76:10,
77:8, 77:16,
79:8, 81:19,
83:14, 89:14,
94:9, 95:1,
95:5, 95:13,
97:4, 97:17,
100:8, 100:11,
100:12, 100:17,
100:21, 108:8,
111:14, 135:20,
137:12, 137:18,
137:19, 140:1,
140:2, 142:15,
146:1, 146:2,
146:4, 160:20,
163:7, 174:3,
174:5, 174:11,
175:12, 175:19,
176:12, 185:4,
186:6, 186:12,
186:22, 187:4,
201:11, 208:2,
208:13, 235:9,
247:17, 248:13,
248:21, 251:19,
257:18, 263:20,
265:22, 270:1,
270:19, 270:20,
271:1, 271:5,
271:14, 275:4,
275:7, 279:14,
282:3, 297:21,
300:8, 300:13,
300:17, 300:20,
301:12, 304:14,
306:12, 306:18,
306:22, 310:9,
311:17, 313:13,
314:6, 314:9,

314:12, 315:7,
318:7, 318:11,
318:19, 327:18,
329:17, 329:22,
330:2, 330:14
**voter's**
186:10

---
**W**
---

**wait**
118:13, 211:12,
260:22, 261:8,
291:5, 342:5
**waited**
291:2
**waiting**
187:4, 201:11
**waive**
343:14
**waived**
345:9
**walk**
10:5, 251:6,
315:18, 316:7,
316:18, 317:2
**walked**
242:12
**walking**
127:11
**waller**
30:5, 73:21,
73:22
**wandering**
31:13, 73:19
**want**
10:5, 16:12,
17:13, 22:1,
30:15, 44:16,
47:9, 48:9,
54:6, 75:15,
78:2, 78:3,
79:19, 85:20,
90:9, 93:21,
94:13, 96:22,
97:12, 100:6,
101:11, 106:13,
118:14, 120:9,
121:6, 121:17,

136:10, 137:7,
137:19, 138:22,
140:2, 144:16,
148:21, 149:17,
156:18, 158:15,
168:1, 171:7,
171:10, 173:19,
174:12, 195:14,
198:17, 204:17,
220:9, 241:4,
264:15, 266:20,
272:8, 276:3,
276:5, 276:17,
280:8, 286:17,
287:15, 294:10,
299:10, 307:19,
310:5, 312:11,
312:15, 314:20,
315:17, 315:20,
315:21, 316:10,
316:19, 317:4,
323:11, 327:21,
331:21, 332:13,
337:15, 339:12,
342:21

**wanted**
48:14, 64:10,
66:10, 188:19,
191:11, 325:15,
343:18

**wants**
273:17, 313:7

**washington**
2:10, 2:17,
315:5

**watchers**
202:9

**water**
113:3

**way**
17:2, 17:5,
60:14, 82:10,
82:11, 82:12,
82:16, 82:17,
82:18, 82:20,
83:14, 83:15,
84:1, 84:2,
84:8, 84:9,

84:10, 84:13,
84:15, 89:19,
99:13, 104:13,
104:15, 105:5,
116:21, 126:5,
126:21, 130:11,
175:9, 193:22,
211:7, 215:5,
216:12, 223:10,
224:13, 226:22,
227:10, 231:15,
231:17, 238:7,
239:10, 239:12,
245:21, 265:10,
268:21, 276:20,
278:13, 286:22,
287:21, 315:3,
315:4, 315:8,
316:9, 316:16,
341:12, 342:1,
342:2

**ways**
71:18, 235:7,
250:8, 316:15

**we'll**
11:12, 15:6,
16:18, 21:22,
66:4, 71:21,
156:2, 214:13,
215:8, 215:10,
232:17, 233:13,
235:11, 237:5,
246:21, 247:12,
251:6, 260:4,
266:14, 269:12,
269:17, 271:8,
281:21, 284:2,
292:13, 296:19,
299:5, 309:2,
311:3, 323:10,
343:14, 343:15

**we're**
9:11, 11:15,
12:16, 54:7,
59:19, 66:7,
84:3, 108:6,
119:4, 121:1,
122:2, 122:3,

127:4, 136:20,
190:8, 213:17,
217:11, 218:19,
226:14, 232:11,
233:8, 246:10,
250:19, 252:6,
274:18, 274:20,
283:18, 286:6,
286:7, 289:22,
291:14, 296:21,
299:20, 304:3,
330:5

**we've**
15:6, 38:3,
43:22, 44:21,
61:12, 94:3,
114:22, 197:16,
197:18, 218:5,
321:15, 340:6

**weak**
177:7

**websites**
210:7

**wednesday**
1:16

**week**
342:17, 343:7

**weekly**
341:14

**weeks**
329:7

**welcome**
165:22

**well-accepted**
266:6, 266:9,
267:6

**well-outside**
231:11

**well-respected**
199:15

**well-versed**
244:8

**went**
14:3, 14:15,
55:5, 57:19,
92:10, 190:14,
191:3, 223:3,
223:15, 257:11,

273:6, 274:5,
314:1, 330:12,
330:17, 332:16,
338:7

**weren't**
97:1, 317:19,
317:20

**whatever**
10:21, 284:2,
310:2

**whenever**
200:2

**whereof**
345:13

**whether**
17:18, 32:9,
32:18, 32:20,
34:14, 50:8,
50:12, 54:20,
55:1, 55:8,
61:7, 78:15,
83:4, 87:13,
88:20, 94:17,
96:4, 96:7,
97:1, 97:14,
97:16, 101:22,
103:12, 121:17,
121:20, 122:5,
124:2, 126:14,
127:6, 127:13,
128:11, 161:8,
183:11, 183:13,
191:16, 208:6,
218:20, 218:22,
219:5, 221:15,
222:6, 224:13,
227:1, 227:9,
228:7, 228:21,
229:5, 231:20,
237:7, 238:3,
242:20, 243:18,
245:16, 249:1,
251:12, 252:12,
257:2, 257:9,
260:9, 262:10,
262:11, 265:10,
267:7, 267:14,
268:14, 268:21,

273:5, 278:8,
278:14, 283:3,
283:20, 285:2,
289:15, 291:19,
299:17, 302:19,
303:15, 303:17,
306:12, 307:1,
307:8, 310:21,
313:22, 318:5,
321:18, 322:3,
327:7, 332:21,
335:7
**white**
90:13, 91:21,
95:22, 96:12,
96:18, 98:4,
98:12, 100:10,
100:18, 109:7,
120:3, 120:18,
121:1, 125:2,
142:22, 246:15,
247:17, 250:17,
250:18, 251:18,
274:2, 275:12,
276:15, 279:15,
279:20, 282:6,
284:14, 284:17,
286:14, 288:12,
292:5, 292:6,
292:18, 292:22,
293:3, 303:7,
303:16, 304:13,
306:17, 325:4,
325:10, 331:10,
334:11, 334:12,
334:20, 340:22
**whitened**
340:19
**whites**
112:20, 113:18,
114:16, 115:15,
115:17, 120:21,
120:22, 121:4,
121:14, 122:4,
122:5, 123:17,
124:9, 124:20,
125:14, 125:22,
126:8, 126:12,

127:10, 129:10,
131:16, 132:4,
141:17, 248:2,
275:7, 282:2,
296:18, 333:17,
337:5, 342:5
**whoa**
299:16
**whole**
9:4, 35:9,
71:15, 86:22,
90:8, 136:22,
145:16, 146:10,
162:21, 182:1,
183:18, 195:19,
206:20
**wide**
28:8, 62:19,
70:5
**widely**
137:5, 208:7,
254:22, 266:18,
309:18, 310:10
**widened**
288:11
**widespread**
178:5
**wife**
196:15
**willing**
39:22
**wins**
7:18, 158:8,
159:2
**wisconsin**
174:3
**wish**
204:5
**withdraw**
10:22, 43:12
**withhold**
303:3
**within**
23:14, 46:9,
179:9, 221:21,
231:7, 247:11,
304:2, 329:17,
332:15

**without**
216:8, 259:12,
259:17, 259:18,
287:12, 329:15
**witness**
21:15, 27:13,
27:17, 30:3,
36:21, 38:21,
47:4, 111:3,
113:2, 113:7,
152:19, 152:22,
153:6, 153:9,
154:5, 154:6,
196:14, 207:12,
223:14, 323:19,
342:15, 342:17,
342:20, 343:7,
345:13
**witnesses**
98:18
**witnessing**
28:1
**wolfinger**
149:18, 184:10,
184:11, 184:18,
309:16
**woman**
210:2
**wonderful**
195:17
**wondering**
126:14, 337:21
**word**
27:22, 35:9,
35:11, 40:5,
42:7, 42:10,
48:12, 50:17,
59:5, 71:20,
77:5, 77:9,
77:20, 78:1,
78:9, 87:20,
88:4, 95:17,
106:22, 119:10,
120:17, 133:18,
134:6, 144:12,
153:10, 153:17,
153:20, 155:10,
155:11, 196:2,

202:11, 203:12,
204:14, 209:17,
211:18, 216:16,
231:6, 231:7,
231:13, 235:17,
241:12, 245:11,
253:10, 260:12,
334:17
**wording**
147:15
**words**
22:18, 59:5,
59:6, 95:20,
100:4, 147:18,
155:6, 196:19,
240:18, 310:6
**work**
11:9, 18:17,
21:2, 21:15,
23:15, 23:20,
23:22, 24:22,
25:11, 27:17,
28:1, 28:3,
28:14, 28:22,
29:3, 29:14,
32:1, 34:19,
36:1, 39:3,
39:17, 40:12,
40:19, 41:4,
41:6, 41:7,
42:16, 43:3,
44:2, 46:2,
46:7, 47:1,
48:12, 48:15,
49:2, 49:5,
49:11, 49:15,
62:20, 62:21,
63:3, 64:6,
70:22, 73:8,
134:17, 148:22,
149:1, 152:18,
152:22, 153:5,
153:8, 156:7,
162:8, 174:21,
193:14, 194:22,
195:16, 195:18,
197:15, 197:20,
199:6, 199:7,

199:11, 207:6,
207:15, 207:18,
208:18, 209:4,
211:9, 217:5,
217:10, 217:15,
218:6, 226:4,
242:1, 242:17,
243:2, 267:3,
277:22, 287:13,
291:5, 294:7,
309:15, 309:16,
312:4, 312:5,
328:4, 328:13
**worked**
29:10, 29:17,
31:11, 41:21,
42:4, 42:8,
42:11, 42:14,
42:17, 43:17,
45:11, 46:13,
69:18, 197:17,
199:7, 211:3
**worker**
200:18
**workers**
201:12, 201:22,
202:10
**working**
18:8, 19:15,
38:5, 44:21,
45:14, 56:14,
56:15, 111:11,
196:7, 207:8,
213:2
**works**
66:5, 180:2,
229:11, 269:5
**world**
149:20, 150:15,
265:12
**worries**
186:3
**wouldn't**
25:9, 80:12,
81:22, 153:10,
203:13, 204:11,
204:18, 205:13,
233:4, 264:3,

264:4, 307:5
**wrap**
323:10
**wrap-up**
188:4
**write**
57:8, 67:17,
147:7, 168:21,
215:6, 215:15,
216:5, 221:1,
234:4, 264:4,
275:15, 292:2,
313:5, 338:15,
338:21, 341:16
**writer**
136:14
**writes**
145:7, 247:14,
248:12, 264:5,
284:11, 290:1,
305:14
**writeup**
339:17
**writing**
40:13, 49:18,
57:5, 57:20,
67:6, 201:17,
247:21
**written**
26:19, 26:21,
52:3, 59:6,
67:8, 78:20,
93:4, 147:9,
200:15, 215:22,
218:5, 222:2,
225:17, 320:21,
335:17, 341:9,
341:13, 341:15,
341:17
**wrong**
43:11, 104:5,
119:2, 140:20,
151:20, 152:9,
211:18, 231:12,
231:20, 240:20,
243:7, 264:8,
289:16, 290:6,
294:6, 335:15,

335:16, 336:10
**wrote**
24:18, 51:2,
51:15, 54:18,
54:21, 57:19,
70:17, 93:7,
127:2, 147:5,
154:20, 195:3,
200:11, 215:6,
215:13, 215:17,
219:20, 219:22,
233:20, 263:1,
269:20, 270:11,
270:12, 270:17,
274:10, 275:2,
275:16, 283:8,
292:10, 292:16,
297:2, 304:11,
311:5, 312:1,
313:11, 315:2,
330:17, 336:6
**wyoming**
315:6

**Y**

**yeah**
12:10, 18:15,
20:18, 21:3,
31:5, 32:4,
33:14, 35:13,
44:18, 44:19,
44:20, 45:21,
47:10, 58:19,
67:19, 67:20,
95:8, 99:18,
115:5, 127:12,
129:19, 149:17,
153:16, 161:1,
162:7, 168:18,
171:8, 172:2,
176:11, 176:22,
196:21, 202:5,
204:6, 208:9,
217:4, 251:2,
307:19, 307:21,
329:1, 337:1,
340:15
**year**
19:9, 44:17,

193:4, 287:2,
316:13, 318:1,
339:5, 343:8
**year's**
14:7
**years**
24:16, 44:1,
44:7, 44:8,
44:9, 44:12,
70:17, 146:14,
193:3, 194:1,
194:12, 194:14,
195:5, 236:10,
237:16, 237:21,
238:4, 238:19,
238:22, 260:22,
261:8, 309:19,
339:7, 339:8,
339:20, 340:7
**yep**
119:14
**yesterday**
233:3
**young**
163:8, 329:12
**younger**
176:16, 177:10,
340:4
**yourself**
33:9, 105:17,
154:4, 162:22,
200:11, 280:3,
299:11
**youth**
1:5

**Z**

**zero**
183:11, 298:8
**zoom**
10:17, 11:19,
12:1, 36:14,
88:13, 127:12,
181:14

**$**

**$600**
18:22, 19:10,

19:16

**.**

**.2**
283:14

**0**

**01**
3:20, 5:7
**0671**
2:11
**07**
1:17, 9:12
**09**
323:15

**1**

**1**
188:8
**1,000**
327:15
**1.82**
326:4
**10**
8:7, 8:8, 33:5,
33:17, 33:18,
33:20, 36:3,
48:1, 60:19,
66:4, 66:6,
66:7, 94:11,
112:15, 132:20,
153:22, 154:18,
164:10, 193:22,
194:13, 195:5,
269:3, 272:17,
297:11, 323:9,
330:22, 331:10,
339:7, 339:20,
340:7
**100**
127:11, 298:9
**105**
289:22
**1050**
3:21, 5:8,
179:5
**11**
8:9, 60:22,

113:10, 113:11,
113:13, 123:13,
132:20, 248:3,
268:21, 297:7
**113**
307:15
**114**
305:13
**1168**
4:12
**117**
7:14
**118**
270:15, 270:17
**119**
3:7, 271:9
**12**
4:6, 8:10,
60:22, 66:4,
66:6, 74:4,
74:5, 132:20,
154:6, 188:6,
188:7, 214:11,
247:12
**123**
4:15
**125**
311:4, 312:1
**13**
2:16, 7:9,
8:12, 27:6,
52:11, 61:12,
128:19, 130:12,
132:22, 143:5,
189:12, 214:14,
214:15, 251:1,
251:2, 297:3,
297:11, 332:8
**1350**
130:13
**1355**
7:15, 112:18,
112:19, 113:16,
113:20, 113:22,
114:17, 117:12,
124:7, 124:8,
124:20, 125:13,
127:8, 129:11,

130:6, 130:10,
130:13, 301:17,
302:1, 302:8,
333:13, 334:8,
334:18
**14**
8:13, 48:11,
48:15, 48:18,
49:14, 49:21,
51:5, 52:2,
52:5, 52:15,
53:18, 55:4,
55:10, 63:1,
132:22, 133:1,
133:3, 143:5,
146:20, 154:8,
155:18, 188:8,
232:14, 232:15,
242:18, 248:12,
249:6, 252:21,
307:5, 307:19
**15**
2:9, 8:14,
14:20, 49:7,
133:1, 133:2,
133:5, 133:7,
133:8, 134:7,
134:21, 135:7,
136:21, 138:4,
138:5, 138:9,
138:11, 138:20,
139:2, 139:5,
139:16, 140:12,
140:14, 140:22,
141:3, 141:9,
141:15, 141:22,
142:17, 149:13,
168:18, 188:16,
247:1, 247:3,
256:2, 297:3,
297:7, 306:7,
307:5, 325:9,
325:16, 331:10,
340:7
**158**
7:16
**16**
8:15, 49:8,

106:20, 107:10,
113:10, 113:11,
135:22, 136:12,
138:11, 138:13,
138:21, 139:11,
139:19, 140:12,
140:13, 141:8,
142:17, 143:10,
144:1, 144:2,
154:10, 168:18,
325:12
**17**
66:4, 113:13,
204:12, 305:6,
306:1, 306:13
**1715**
4:11
**178**
7:19
**18**
66:7, 189:11,
209:1, 292:20,
306:6
**181**
8:4
**19**
45:11, 45:17,
155:2, 186:21,
201:10, 206:3,
255:19, 263:3,
263:19, 265:5
**190**
7:4
**1978**
149:14, 149:19,
184:8, 184:11
**1979**
27:19, 44:11
**1980**
27:19, 35:20,
44:14
**1981**
45:15
**1985**
45:9, 45:12,
46:11
**1993**
145:14, 148:7,

149:12, 149:14
**1994**
24:18
**1995**
149:15
**1996**
326:6
**1st**
4:6, 290:3

**2**

**2**
269:5, 269:9,
269:10
**2.1**
161:14
**20**
7:10, 9:22,
49:15, 49:21,
51:5, 52:2,
53:18, 55:4,
55:10, 74:20,
115:10, 194:1,
195:5, 285:11,
331:2
**2000**
195:8, 195:11
**20005**
2:10, 2:17
**2003**
204:12
**2007**
119:19
**2008**
181:2
**2011**
114:3, 119:18,
129:18, 149:15
**2012**
297:2, 335:18
**2013**
149:15, 151:17,
335:18
**2014**
27:12, 27:13,
28:18, 41:15,
69:18, 74:19,
127:3, 303:11,

303:21, 335:17
**2016**
74:20
**2018**
74:20, 149:15,
181:3
**2019**
237:8, 237:13,
237:20, 288:19,
289:7, 289:11,
290:5, 290:7,
292:22
**202**
2:18
**2020**
70:6, 151:3
**2021**
236:6, 236:9,
238:18, 239:7,
260:16, 261:16,
262:3, 284:7,
285:11, 286:2,
297:8
**2022**
259:6, 260:10
**2023**
20:22, 21:16,
27:9, 36:5,
151:2, 236:7,
236:9, 237:8,
237:13, 237:20,
239:8, 259:1,
259:8, 260:7,
290:3, 290:7,
290:9, 291:3,
291:13, 291:15,
291:21, 292:22,
297:8, 318:1
**2024**
1:16, 9:12,
345:15
**2025**
345:17
**204**
5:16
**21**
39:14, 255:14,
256:5, 285:11

**214**
8:12
**215**
1:9
**216**
1:10
**218**
1:11, 2:6, 9:9,
324:4
**22**
20:15, 255:14,
256:5, 326:5
**23**
1:9, 1:10,
1:11, 8:8,
20:20, 306:2,
306:5
**232**
8:13
**239**
4:12
**247**
8:14
**25**
24:15, 46:18
**255**
5:19
**26**
8:8, 165:16,
292:18
**2617**
183:8
**2618**
183:8
**2624**
181:6
**2636**
182:15
**27**
5:12, 39:14,
71:3
**272**
5:13
**28**
256:8, 283:6
**2925**
5:16
**297**
119:8, 121:6

**298**
119:5
**2a**
181:10, 181:17

**3**

**3**
323:14
**3,390,000**
326:4
**30**
24:15, 29:19,
188:13, 309:19
**31**
255:9, 262:22,
343:20
**32**
255:10, 256:3
**32301**
3:8
**32399**
3:21, 5:7
**324**
7:5
**325**
8:15
**32601**
4:7
**32720**
4:16
**32803**
5:20
**33**
8:7
**3339**
3:9
**33410**
5:17
**33602**
5:13
**33901**
4:12
**344**
4:12
**345**
1:21
**35**
27:5

**352**
4:7
**36**
297:6
**3635**
5:8
**3664**
3:22
**37**
188:6, 188:7,
297:6
**374**
4:7
**386**
4:17
**39**
270:16
**3pvro**
82:21, 83:3,
83:5, 86:19,
92:13, 98:13,
248:14, 248:21,
270:20, 272:1,
272:13, 284:6,
284:13, 284:17,
293:7, 297:6,
297:11, 305:19,
305:22, 306:12,
306:18, 306:22,
319:2
**3pvro's**
271:12
**3pvros**
76:3, 76:9,
76:14, 77:2,
77:15, 86:15,
87:6, 87:10,
90:12, 91:20,
94:10, 98:6,
123:16, 133:13,
134:2, 135:17,
136:17, 137:9,
164:7, 168:14,
175:11, 248:1,
248:17, 274:13,
293:5, 300:8,
300:13, 302:3,
302:8, 311:13

**3rd**
9:12

---
**4**
---
**4**
323:15, 343:20
**40**
18:10, 18:14,
29:19, 33:6,
44:1, 44:7,
44:8, 44:9
**407**
5:20
**41**
33:16
**414**
3:22, 5:8
**42**
167:11, 297:10
**425**
3:17
**44**
269:9, 297:10
**4490**
2:18
**45**
44:12
**4700**
5:17
**4:-cv--mw**
1:9, 1:10, 1:11

---
**5**
---
**5.2**
283:14
**5.8**
163:2
**50**
30:5, 30:14,
98:12, 206:2,
316:1, 316:2,
339:5, 340:5
**500**
3:7
**51**
292:13, 292:16
**5150**
5:20

**516**
3:17
**518912**
1:20
**5218**
4:7
**53**
188:13, 188:20,
189:2
**55**
269:5, 269:10
**561**
5:17
**5670**
5:13
**59**
323:14
**5950**
4:17
**5th**
345:14

---
**6**
---
**60**
29:19, 339:5
**600**
2:16
**610**
5:11
**626**
5:17
**63**
280:2, 316:5
**632**
2:11
**64**
7:11
**65**
7:12

---
**7**
---
**70**
29:19, 46:10
**700**
2:16
**736**
4:17
**74**
8:10

**740**
2:11
**750**
5:19
**77**
283:12

---
**8**
---
**80**
41:10, 44:17,
46:10, 195:8,
247:19, 331:11
**81**
44:20
**813**
5:13
**8400**
3:17
**85**
44:19, 45:18,
45:21, 154:3
**850**
3:9, 3:22, 5:8
**86**
284:10
**879**
3:9
**897**
5:20

---
**9**
---
**9**
1:17, 9:12
**90**
41:10, 195:8,
258:11, 339:2
**915**
2:9
**968**
2:18