

# Transcript of Elizabeth Guzzo, Designated Representative

**Date:** December 19, 2023
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

```
---------------------------x
FLORIDA STATE CONFERENCE   :
OF BRANCHES AND YOUTH      :
UNITS OF THE NAACP, et al.,:
          Plaintiffs,      :
   v                       : Case Nos.:
CORD BYRD, in his official : 4:23-cv-215-MW/MAF
capacity as Florida        : 4:23-cv-216-MW/MAF
Secretary of State, et al.,: 4:23-cv-218-MW/MAF
          Defendants.      :
---------------------------x
```

(Caption continued on next page)

Videoconference Deposition of

OFFICE OF FLORIDA ATTORNEY GENERAL,

By and through its Designated Representative,

ELIZABETH GUZZO

Conducted Virtually

Tuesday, December 19, 2023

10:05 a.m. EST

Job No: 518700

Pages: 1- 151

Reported by: Suja Nair

(Caption continued from previous page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

---------------------------x

LEAGUE OF WOMEN VOTERS OF :
FLORIDA, INC., et al., :
Plaintiffs, :
v : Case Nos.:
ASHLEY MOODY, in her : 4:23-cv-215-MW/MAF
official capacity as : 4:23-cv-216-MW/MAF
Attorney General of : 4:23-cv-218-MW/MAF
Florida, et al., :
Defendants. :

---------------------------x

HISPANIC FEDERATION, :
et al., :
Plaintiffs, :
v :
CORD BYRD, in his official :
capacity as Secretary of :
State of Florida, et al., :
Defendants. :

---------------------------x

Videoconference deposition of ELIZABETH GUZZO, conducted virtually.

Pursuant to Notice, before Suja Nair, a Court Reporter and Notary Public in and for the State of Maryland.

A P P E A R A N C E

ON BEHALF OF HISPANIC FEDERATION, ET AL.:

MEGAN C. KEENAN, ESQUIRE
DAYTON CAMPBELL-HARRIS, ESQUIRE
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
18th Floor
New York, New York 10004
(212) 549-2500

ON BEHALF OF NAACP PLAINTIFFS:

MAKEBA RUTAHINDURWA, ESQUIRE
ELIAS LAW GROUP, LLP
1700 Seventh Avenue
Suite 2100
Seattle, Washington, 98101
(206) 656-0177

A P P E A R A N C E   C O N T I N U E D

ON BEHALF OF LEAGUE OF WOMEN VOTERS OF FLORIDA:

BRENT FERGUSON, ESQUIRE
CAMPAIGN LEGAL CENTER
1101 14th Street, NW
Suite 400
Washington, DC 20005
(202) 266-5747

ON BEHALF OF NAACP PLAINTIFFS:

RENATA O'DONNELL, ESQUIRE
ELIAS LAW GROUP, LLP
250 Massachusetts Avenue, NW
Suite 400
Washington, DC 20001
(202) 498-8556

A P P E A R A N C E   C O N T I N U E D

ON BEHALF OF ALACHUA COUNTY SUPERVISOR OF ELECTIONS:

BOB SWAIN, ESQUIRE
ALACHUA COUNTY ATTORNEY'S OFFICE
12 SE 1st Street
Gainesville, Florida 32601
(352) 374-5218

ON BEHALF OF JULIE MARCUS, PINELLAS COUNTY SUPERVISOR OF ELECTIONS:

MATT SMITH, ESQUIRE
PINELLAS COUNTY SUPERVISOR OF ELECTIONS
13001 Starkey Road
Largo, Florida 33773
(727) 464-5751

A P P E A R A N C E C O N T I N U E D

ON BEHALF OF SUPERVISOR OF ELECTIONS
FOR BREVARD COUNTY, ET AL.:

FRANK MARI, ESQUIRE
ROPER, P.A.
2707 East Jefferson Street
Orlando, Florida 32803
(407) 897-5150

ON BEHALF OF PALM BEACH COUNTY
SUPERVISOR OF ELECTIONS:

BEN KOON, ESQUIRE
THE MARKARIAN GROUP
2925 PGA Boulevard
Suite 204
Palm Beach Gardens, Florida 33410
(561) 626-4700

A P P E A R A N C E   C O N T I N U E D

ON BEHALF OF SUPERVISOR OF ELECTIONS FOR BAKER COUNTY, ET AL.:

LEIGH F. ROSENBLOOM, ESQUIRE
MARKS GRAY, P.A.
1200 Riverplace Boulevard
Suite 800
Jacksonville, Florida 32207
(904) 807-2127

ON BEHALF OF PINELLAS COUNTY SUPERVISOR OF ELECTIONS:

JARED D. KAHN, ESQUIRE
PINELLAS COUNTY ATTORNEY'S OFFICE
315 Court Street
6th Floor
Clearwater, Florida 33756
(727) 464-3354

A P P E A R A N C E   C O N T I N U E D

ON BEHALF OF FLORIDA ATTORNEY GENERAL:

NOAH SJOSTROM, ESQUIRE
OFFICE OF THE FLORIDA ATTORNEY GENERAL
PL-01 The Capitol
Tallahassee, Florida 32399
(850) 414-3635

ON BEHALF OF PAUL A. LUX, OKALOOSA COUNTY SUPERVISOR OF ELECTIONS:

MATTHEW R. SHAUD, ESQUIRE
NABORS GIBLIN & NICKERSON, P.A.
1500 Mahan Drive
Suite 200
Tallahassee, Florida 32308
(850) 224-4070

A P P E A R A N C E C O N T I N U E D

ON BEHALF OF SUPERVISOR OF ELECTIONS FOR GLADES COUNTY, ET AL.:

JERRY OLIVO, ESQUIRE
HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
1715 Monroe Street
Fort Myers, Florida 33901
(239) 344-1168

ON BEHALF OF FLORIDA SECRETARY OF STATE:

JOSHUA PRATT, ESQUIRE
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
119 S. Monroe Street
Suite 500
Tallahassee, Florida 32301
(850) 270-5938

A P P E A R A N C E C O N T I N U E D

ON BEHALF OF SUPERVISOR OF ELECTIONS FOR CITRUS COUNTY:

DALE A. SCOTT, ESQUIRE
ROPER, P.A.
2707 East Jefferson Street
Orlando, Florida 32803
(407) 897-5150

ON BEHALF OF HILLSBOROUGH COUNTY SUPERVISOR OF ELECTIONS:

STEPHEN TODD, ESQUIRE
HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
601 E. Kennedy Boulevard
FI 27
Tampa, Florida 33602
(813) 272-5670

A P P E A R A N C E   C O N T I N U E D

ON BEHALF OF FLORIDA OFFICE OF THE ATTORNEY GENERAL:

STEPHANIE A. MORSE, ESQUIRE
FLORIDA OFFICE OF THE ATTORNEY GENERAL
107 W. Gaines Street
Tallahassee, Florida 32399
(850) 414-3664

ALSO PRESENT:

Ms. Colleen O'Brien
Mr. Zack Bennington
Ms. Shilpa Jindia
Ms. Ashley Davis

C O N T E N T S

| EXAMINATION OF ELIZABETH GUZZO | PAGE |
|---|---|
| By Ms. Keenan | 15 |
| By Ms. Rutahindurwa | 80 |
| By Mr. Ferguson | 91 |

E X H I B I T S

(Attached to transcript)

| GUZZO DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | - |
| Exhibit 2 | Answers to Interrogatories | - |
| Exhibit 3 | Request for Production of Documents | - |
| Exhibit 7 | Bill Analysis | - |
| Exhibit 8 | Email | - |
| Exhibit 9 | Senate Amendment | - |
| Exhibit 10 | Emails | - |
| Exhibit 11 | Emails | - |
| Exhibit 36 | 3PVRO Registration Form | - |
| Exhibit 37 | Enrolled SB 7050 | - |
| Exhibit 33 | Emails | - |
| Exhibit 34 | Letter | - |
| Exhibit 35 | Emails | - |
| Exhibit 38 | Article | - |

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 39 | Voter Registration Receipt | - |
| Exhibit 40 | Answers to Interrogatories | - |
| Exhibit 41 | Overview for Supervisors of Elections' Offices | - |
| Exhibit 42 | Answers to Interrogatories | - |

(Exhibits not marked during deposition.)

P R O C E E D I N G S

Whereupon,

ELIZABETH GUZZO,

was called for examination by counsel and, after having been duly sworn, was examined and testified as follows:

DIRECT-EXAMINATION

BY MS. KEENAN:

Q. Good morning. So my name is Megan Keenan. I'm an attorney with the ACLU. I'm part of a team of attorneys who represent the Plaintiffs in a case called Hispanic Federation versus Byrd. That's Case Number 4:23-cv-218, in the Northern District of Florida.

Is it Ms. Guzzo or Guzza? How do you pronounce it?

A. Guzzo.

Q. Ms. Guzzo, have you ever been deposed before?

A. Yes.

Q. Okay. How many times?

A. Three.

Q. How many of those were on behalf of the Florida AG's office?

A. Three.

Q. Okay. What types of cases were those?
A. Prior legislative cases, as well.
Q. And how long ago were those depositions?
A. Anywhere from, I mean, one to three years ago.
Q. Okay. Have you ever given trial testimony?
A. No.
Q. Okay. To go back to the depositions for a minute. Did any of those involve election-related cases?
A. Yes.
Q. And do you remember which case that was?
A. It was regarding Senate Bill 90. So I'm not sure exactly what the case title specifically was.
Q. Okay. That's enough information for me to -- to get it.
Did that case involve third-party voter registration organizations?
A. To the best of my knowledge, yes.
Q. Okay. I want to go over a couple of

deposition basics just before we get started into the -- the bulk of the questions.

First, everything is being transcribed here, so we need to speak clearly and avoid speaking over each other.

Is that okay with you?

A. Yes, ma'am.

Q. All right. We have a court reporter participating today, who is transcribing the conversation. Please make sure your responses are verbal because the court reporter can't take down gestures, nods, or grunts.

Does that sound okay?

A. Yes.

Q. Okay. There are a lot of lawyers here attending for other parties. Your counsel, Ms. Morse, has the right to object to -- to my questions as we go. So if -- if your lawyers or others on the Zoom start speaking when I complete a question, please do give them a moment to get any objections on the record. But once the objections are stated, you should typically answer the question unless I withdraw it, with the exception of any objection related to privilege.

Does all of that make sense?

A. Yes.

Q. If at any point you don't understand a question that I ask, please do tell me, and I can try to explain or rephrase.

Is that all right with you?

A. Yes.

Q. Okay. And if you don't ask me to explain or rephrase, I will assume you've understood the question as I've asked it. So please make sure that if there's any question you have for me, you go ahead and ask.

If you -- if you need a break at any point, also, please just say so. We'll do our best to accommodate that, as long as there's no question pending.

And then, lastly, can you think of any reason why you might not be able to understand or respond accurately and truthfully to my questions today?

A. No.

Q. Okay. I'm noting for the record, this is a remote deposition. We're in separate rooms. I see Ms. Morse in the room with you today.

Is there anybody else in the room with you?

A. No, ma'am.

Q. Okay. And it doesn't look like you have any screens or documents in front of you; is that right?

A. No, I don't.

Q. Okay. And no smartphone, either?

A. No. I mean, it's in a bag behind me.

Q. That's okay. I can't see the table in front of you, so I just wanted to check.

A. Okay.

Q. And then my last note --

A. Do I need to --

Q. No. No. You're fine. You're fine. I'd ask that you leave the smartphone aside while we're on the record. So I just wanted to check.

And my last note, in light of this being a virtual deposition, is if, for any reason, our internet connection breaks up, we'll all go off the record until we figure out what the problem is, and then we'll just get everybody back here in the session.

Does that sound okay with you?

A. Yes.
Q. Okay. Ms. Guzzo, how long have you worked with the Florida Attorney General's office?
A. A little over ten years.
Q. And what is your job title?
A. Currently, it is the director of legislative affairs.
Q. Has all of your work with the attorney general's office been with the Office of Legislative Affairs?
A. Yes.
Q. Can you describe the responsibilities that you've held with the Office of Legislative Affairs?
A. I initially started as a assistant, so clerical work, phones. Then I became an aide. So I was assisting the director and the special -- not the special -- the assistant deputy. And, then, a few years ago, I became the director of legislative affairs. So those are the three roles.
Q. And what is your -- what is your day-to-day role as the director of the Office of Legislative Affairs?

A. I coordinate between the legislator members' offices. So any ideas that the attorney general is interested in throughout her office, I work with the legislature. We're situationally aware of things as they're moving.

Q. Can you tell me a little bit about your educational background prior to joining the Florida Attorney General's office?

A. Sure.

I graduated from Florida State in 2010 with a Bachelor's in family and child sciences.

Q. Okay. And is the Bachelor's degree the last one that you completed?

A. Yes.

Q. Okay. In your role with the Office of Legislative Affairs, do you play any role in investing -- investigating cases with the attorney general's office?

A. No.

Q. And do you play any role in deciding whether to prosecute a case?

A. No.

Q. Do you know about the processes

 involved in deciding whether to prosecute a case with the attorney general's office?

A. No.

Q. Okay. So your work is limited to the legislative side of the office; is that correct?

A. Yes.

Q. Okay. How many attorneys are employed by the Office of Legislative Affairs?

A. It's myself in the legislative division, the chief of staff, his attorney, and he oversees -- I -- I direct report to him, so -- so one.

Q. Okay. And how many other staffers are employed by the Office of Legislative Affairs?

A. Currently, it's just myself.

Q. Okay. You mentioned earlier that the SB 90 case that you worked on involved third-party voter registration organizations, to the best of your recollection.

Are you generally familiar with third-party voter registration organizations?

MS. MORSE: Objection to form.

A. I mean, generally, yes. As it

relates to any questions that were previously answered, I did say that.

Q. Okay. Would you know what I was referring to if I called them 3PVROs throughout this deposition today?

A. Yes.

Q. Okay. And how much have you worked on issues involving 3PVROs?

MS. MORSE: Objection to form.

A. I have not worked on that issue.

Q. Okay. So is -- have you consulted personally on any legislative issues involving 3PVROs?

A. No.

Q. Okay. I'm now going to share on the screen the document that's been premarked as Exhibit 1.

Okay. Are you able to see the document on my screen?

A. Yes.

Q. Okay. I'm going to scroll down to page 2.

MS. KEENAN: And just for the record, the documents are premarked by number. I will ask the court reporter to mark each of the

exhibits that I talk about consistent with the number that the exhibit is premarked as. So I'll ask the court reporter to mark this as Exhibit 1.

Q. Can you see on page 2, the title of this document is, Plaintiffs' Notice of Taking Deposition of Office of Florida Attorney General Pursuant to Federal Rule of Civil Procedure 30(b)(6)?

A. Yes.

Q. Okay. And if you scroll down to page 6, you can see there are a series of definitions and instructions, correct?

A. Yes.

Q. Okay. And if we scroll down, starting on page 9, you can see there are a series of deposition topics, right?

A. Yes.

Q. Did you review the topics listed in this notice for today?

A. Yes. I reviewed the ones that I was designated for.

Q. And do you recall which topics you were designated to testify on behalf of the Florida Attorney General's office about?

A. Yes. I don't -- I mean, the -- do you want me to list the numbers?

Q. I can walk through them, just to make sure we're on the same page. My understanding is, it's topics 1, part of topic 2, and then topics -- I'll scroll down to page 11 -- topics 12 through 15.

Does that -- does that match with your understanding of what you've been designated to testify about?

A. Yes.

Q. What, if anything, did you do to prepare yourself to speak about these topics on behalf of the Florida Attorney General's office?

A. I read through the topics. I referenced the documents provided that were associated with my name, and -- so discovery -- and I spoke with my attorney.

Q. Okay. Did you speak with any other staff of the Florida Attorney General's office?

A. I asked the chief of staff one question.

Q. Okay. I guess I'll ask what you asked him, but I'll let your counsel object if

that's privileged. I'm just not sure, given the nature of the relationship.

MS. MORSE: We are going to object to the extent the work product -- any work product is implicated. And I'm going to instruct the -- the witness not to reveal any work product information.

MS. KEENAN: Sure.

Q. That's fine, if you don't think you can answer it without revealing work product.

Other than the chief of staff, did you speak with anybody else at the Florida Attorney General's office in preparation for this deposition?

A. No, ma'am.

Q. Now, you mentioned you reviewed some documents produced in discovery.

Are you aware that the Florida Attorney General's office has responded to some written discovery responses -- or written discovery requests in this case?

A. Yes.

Q. Did you, personally, assist counsel in responding to those written discovery responses?

A. No. I -- I discussed with the attorney, but I did not write anything. No.

Q. Okay. I'm now going to share on my screen the document that's been premarked as Exhibit 2. These are the Florida Attorney General's responses to the Plaintiffs' first set of interrogatories in the Hispanic Federation case.

MS. KEENAN: I'll ask the court reporter to mark that as Exhibit 2.

Q. Have you see the responses provided by the attorney general's office starting on page 2 of this document?

A. Yes.

Q. Okay. I'm going to scroll down to page 3. Interrogatory three says that John -- and I'm not sure I'm going to pronounce this right -- but Bajger, B-A-J-G-E-R, was consulted for the information on which the answers were based.

Do you work with John Bajger?

MS. MORSE: I'm going to object to form, just generally, because this witness didn't sign these interrogatories.

But you can answer.

A. I do not work with John Bajger.
Q. Okay. Do you know which part of the office he's in?
A. He is an attorney for, I believe, the civil division.
Q. Okay. I'm now going to share on my screen what was premarked as Exhibit 3. These are the Florida Attorney General's response to Hispanic Federation's first request for production.
MS. KEENAN: I'll ask the court reporter to mark this as Exhibit 3.
Q. Have you seen these responses before, Ms. Guzzo?
A. Yes.
Q. Okay. What role, if any, did you play in preparing the document production in this case?
A. The document production?
Q. Yes.
The -- the documents that were turned over in discovery, what role, if any, did you play in preparing those documents to be turned over?
A. The office has a discovery -- or a

public records division, and they did an internal search. So the attorneys handled it. I know that there is a -- a process for the search terms, et cetera.

So the attorneys produced the documents. I know there was litigation hold for the documents. I did not have anything else that was responsive.

Q. Okay. Did you review the documents produced by the Florida Attorney General's office in this litigation?

A. Not all of them.

Q. Okay. You mentioned earlier that you reviewed the ones that had your name associated with them.

Did you review any other documents besides the ones that had your name on them?

A. No.

Q. Okay. So let's go back to Exhibit 1, the deposition notice. We're going to walk through some of those topics we just discussed, but I want to go a bit out of order here. So I'm going to start with topic 13. That's on page 11 of the document.

Topic 13 says, The role of the

office, if any, in the enactment and passage of the challenged provisions.
Did I read that correctly?
A. Yes.
Q. Okay. Does the attorney general's office represent the Florida State Legislature or any individual legislator?
MS. MORSE: Objection to form.
A. No, not to my knowledge, are we representing.
Q. Okay. And what about the Florida Secretary of State? Does OAG represent the Florida Secretary of State?
MS. MORSE: Objection to form.
A. Not that I'm aware of.
Q. Okay. Going back in time to before SB 7050 was passed. Was the AG's office consulted at all during the drafting of SB 7050?
MS. MORSE: I'm going to object here to the extent the question implicates the deliberative process privilege.
To the extent you can answer without revealing privileged information, you can answer.

A. No, not that I'm aware of, were we consulted.
Q. Okay. And what about during the drafting of any related predecessor bills that came before SB 7050?
MS. MORSE: Objection to form.
A. Not that I'm aware of.
Q. Okay. Let's turn to after the bill SB 7050 was proposed, then. What, if any, role did the AG's office play while SB 7050 was being considered and debated by the legislature?
MS. MORSE: Objection to the extent this implicates a deliberative process privilege, but the witness can answer to the extent she's able.
A. We did not have a role.
Q. Did any members of the legislature consult the AG's office about 7050 while it was being considered?
A. No, not that I'm aware of.
Q. What about any legislative staff?
A. No, not that I'm aware of.
Q. Did anyone from the Secretary of State's office consult the attorney general's

office about SB 7050 while it was being considered?

MS. MORSE: Objection to form and objection to the deliberative process privilege regarding -- we -- we're asserting the deliberative process privilege.

But you can answer.

A. I'm sorry. You asked did the Secretary of State's office consult with us?

Q. Yes.

A. No, not that I'm aware of.

Q. And what about any private parties? Did they consult you about SB 7050?

A. No, not that I'm aware of.

Q. Okay. Are you aware of whether the AG's office provided any input to anybody about SB 7050 while it was being considered?

MS. MORSE: Objection to form.

And I do want to clarify. Are you -- when you're referring to SB 7050, are you referring mainly to the challenged provisions or the entirety of the bill?

MS. KEENAN: I'm referring mainly to the challenged provisions. Yeah. I --

MS. MORSE: Okay.

MS. KEENAN: I can limit it to that. And I -- I, more specifically going forward, will talk about the citizenship requirement, but right now my questions are focused on the challenged provisions within SB 7050.

A. Can you just state your question again?

Q. Sure.

Did the AG's office provide any input to anybody about SB 7050 while it was being considered by the legislature?

MS. MORSE: Objection.

A. No, not that I'm aware of.

Q. Okay. Did anyone from the AG's office testify before the legislature about SB 7050?

A. No.

Q. Okay. Did the AG's office take any position either publicly -- well, I'll -- I'll break that up.

Did the AG's office take any public position on SB 7050 regarding its support for the bill?

MS. MORSE: Objection to form.

A. No.

Q. And did the AG's office support the bill in any communications with other offices?

A. No.

Q. I'm now going to show you what's been premarked as Exhibit 7, which the AG's office produced as OAG_001069.

MS. KEENAN: I'm going to ask the court reporter to mark this as Exhibit 7.

Q. Do you recognize this document, Ms. Guzzo?

A. Yes. I know what it is.

Q. Can you explain what it is?

A. It is a bill analysis that the legislature provides. So this one is on Senate Bill 7050.

Q. Does the -- does the House staff provide that analysis to the attorney general's office?

A. No.

Q. Do you know how OAG received this document?

A. It's a public document.

Q. Okay. And I want to go to page 6 of the document. About halfway down, you can see the phrase, Effect of the Bill.

Do you see that?

A. Yes.

Q. Okay. In the second paragraph below, Effect of the Bill, this memo says, The Bill requires 3PVROs to submit certain affirmations at the time of registration. 3PRVOs -- that's a typo -- must affirm that each person collecting or handling voter applications has not been convicted of a felony violation of the Florida election code, criminal use of personal identifying information, or unlawfully possessing the personal identification of another person.

Do you see that sentence?

A. Yes.

Q. And the following sentence says, 3PVROs must also affirm that each person collecting or handling voter applications is a citizen of the United States.

Do you see that sentence?

A. Yes.

Q. Would you agree that the words, Collecting, and, Handling, are italicized in both of those sentences?

A. Yes. They are written italicized.

Q. Okay. You mentioned you're familiar with these sorts of staff analysis. Do you -- do you happen to know what italicizing words typically means in this context?

A. No.

Q. Okay. Do you have any idea whether italicizing indicates that these are terms of art being used by the staff?

A. I'm sorry. Can you repeat that? If they're used -- being used by who? If the staff is doing that?

Q. Whether the staff is italicizing them to use them as terms of art, is what I said.

A. Oh. No. I don't -- I -- I'm not aware of what the staff process is.

Q. Okay.

MS. KEENAN: I'm now going to show the witness what's been premarked as Exhibit 8, which the AG's office produced as OAG_001117. I'll ask the court reporter to mark this as Exhibit 8.

Q. Do you recognize this email?

A. Yes.

Q. This is one of the ones you sent, right?

A. Correct.
Q. Do you recall what the link is that you sent here?
A. Yes. It was the link to the -- the language. You can -- I can see that it says, 7050.
Q. Right.
And so if I -- if I represent that I clicked the link, and it took me to Senator Hutson's proposed amendment to SB 7050, which was produced as OAG_001118, marked here as Exhibit 9, would -- would that sound right to you?
MS. MORSE: Objection to form.
A. Yes. I would say that the link would take you to the legislative language.
Q. Okay.
MS. KEENAN: I'm now showing the witness what's been premarked as Exhibit 9, which the AG's office produced as OAG_001118.
Q. Ms. Guzzo, do you recall why you sent this email containing Senator Hutson's amendment here?
A. Part of my job is to be situationally aware as legislative proposals move through the

legislative process. So it is part of my daily role during the legislative session to sent [sic] either language or amendments that have either been proposed or notify -- if I get a notification through LobbyTools that it has certain words, then I would send that out.

Q. And when you say, Certain words, what kinds of words might trigger you sending it out?

A. You know, The Attorney General, Department of Legal Affairs, Statewide Prosecutor, anything that touches our office, in that sense. So even if it's already current language in statute, I get a notification. So that would have been why I sent this.

Q. Okay. I'm going to go back to Exhibit -- oops -- Exhibit 8 for a moment.

You sent this to James Percival and John Guard. Can you identify who those folks are within the attorney general's office?

A. Yes.

James Percival is the chief of staff, and John Guard is the chief deputy attorney general.

Q. Okay. So to focus on the draft

language that we were discussing for a moment, did OAG identify any problems with the draft language in SB 7050?

MS. MORSE: Objection to form to the extent it implicates the deliberative process privilege.

You can answer.

A. No, not that I'm aware of. This was just a situational awareness email.

Q. Okay. I'm going to show the witness what's been marked as Exhibit 10, which the AG's office produced as OAG_001376.

MS. KEENAN: I'll ask the court reporter to mark that as Exhibit 10.

Q. Ms. Guzzo, do you work at all with Timothy Vaccaro, who is in the, To, field here?

A. No.

Q. Okay. You can see from his email signature, if you scroll down to page 2 of the document, that he's the executive director of the Florida Elections Commission, right?

A. Yes.

Q. Do you know what the Florida Elections Commission is?

A. Yes.

Q. And what is it? What do you understand that entity to be?
A. It's -- the Florida Elections Commission, they are housed under us in the sense of a budgetary structure. We do not oversee them in any work or anything like that.
Q. Okay.
A. It is truly a -- a structural way that they're just housed under our office.
Q. Okay. Do you work with Edward -- and I'm not sure how to pronounce this. Is it Tellechea or Tellechia (phonetic)?
A. Tellechea.
Q. Tellechea.
Do you work with Edward Tellechea?
A. I do sometimes.
Q. Okay. You know that Mr. Tellechea works with the attorney general's office, right?
A. Yes.
Q. He works for the Administrative Law Bureau, as you can see in his signature block here?
A. Correct.
Q. What is the role of that bureau in

the attorney general's office?

A. I'm not sure of what their entire role is. The -- I don't work with him in any sense of how he's connected to the elections commission. I know that any rule-making authority that we have, that the admin law section is over that.

Q. Okay. And so how does that -- how does the admin law bureau interact with the Office of Legislative Offers, to the extent they interact at all?

A. I work with Mr. Tellechea. Part of the attorney general's authority is emergency scheduling certain substances, and so Ed Tellechea is the one who helps us do the emergency ruling. He files it with the registrar. So he helps build out that for us. And, then, part of my interaction with that is then having to codify that within the legislature.

Q. Okay. Do you know whether Stephanie Cunningham -- going back to the, To, field -- also works with the attorney general's office?

A. I don't know her, but her email address is with the attorney general's office.

Q. Okay. But you don't know which bureau or which office she's in within the attorney general's office?

A. No, ma'am.

Q. Okay. Looking at the first page of this document -- and I can highlight it here -- Mr. Vaccaro indicates that he's -- it's unclear what parts of SPB 7050 -- again, in the first sentence here -- mean.

Do you agree with that?

MS. MORSE: Objection to form.

And I'm going to ask if you could let the witness see the entire document.

MS. KEENAN: Sure.

Q. I'll do that first. So this is the first page. Let me know when you've had a chance to skim it, and I will go ahead and move to the next page.

A. Okay. Next page.

Q. Okay. Most of the top of this is just email signatures, so I'm going to scroll past that to give you a chance to see the next part.

This is, again, from Timothy Vaccaro. You can go ahead and read his email.

A. Okay.

Q. Okay. And, then, down to the next email. I'm going to scroll down so you can see the bottom email, but I won't be asking you about this one. So this is just for situational awareness.

Let me know when you want me to scroll.

A. You can scroll.

Q. Okay. And that's the bottom.

A. Okay.

Q. Okay. So we're going back up. And you can see this email from Timothy Vaccaro on April 4th is about SPB 7050, right?

A. Yes. That's what it says.

Q. You understand that to be Senate Proposed Bill 7050, right?

A. Yes.

Q. And after reviewing SPB 7050, Mr. Vaccaro sent an email that said, It is unclear what the factor of three means.

Do you see that here in this email?

A. Yes, I see it there.

Q. Okay. He drafts an email for the attorney general's office to consider, to a

person named Dawn, right?

A. That's what it says.

Q. Okay. And that email seeks clarification of certain language in SB 7050, right?

A. That's what the email says. Yes.

Q. Okay. Specifically, the last sentences says, Clarification of these issues will provide the Commission necessary guidance for implementation, right?

A. Yes. That's what that says.

Q. Okay. And, then, going back up to the top of this. Mr. Tellechea says, Looks good to me, in response to that draft email sent by Mr. Vaccaro, right?

A. Yes. That's what that says.

Q. Okay. Next, we're going to take a look at what's been premarked as Exhibit 11.

I'm going to scroll through the entire document so you have a chance to take a look at it. Not a lot of text on this one, so let me know when you're ready for me to scroll.

A. You can scroll.

Q. Okay.

A. Okay.

Q. Okay. This is the bottom of that email. Have you had a chance to review it in full?
A. Yes.
Q. Okay. Have you seen this email before?
A. No.
Q. Okay. We see Mr. Vaccaro and Mr. Tellechea again on this email, right?
A. Yes.
Q. And you can see that on page 2 of the email thread, Mr. Vaccaro has contacted Dawn Roberts from the Florida Senate's office, right?
A. Yes.
Q. You recall that that last draft email we saw was also directed to Dawn, right?
A. Yes.
Q. Okay. And you can see that Mr. Vaccaro is contacting Dawn Roberts at the Florida Senate to propose an amendment to the language of SB 7050, right?
MS. MORSE: I'm going to object to form, to the extent this appears to be beyond the deposition topics for which this witness is

noticed.

MS. KEENAN: I'm -- I'm happy to just explain on the record. She was noticed as somebody who was going to talk -- was designated to talk about the role of the office, if any, and the enactment and passage of the challenged provisions.

This is the AG's office commenting on draft language of SB 7050 before it was passed, so I think it's within the notice topics.

MS. MORSE: No. Those aren't the challenged provisions. The challenged provisions are contained in a different statute section.

MS. KEENAN: This relates to the challenged provisions in a -- in a way that we'll get to in a couple of subsequent questions regarding the type of amendment that was requested and rejected and that doesn't appear in the challenged provisions, either. It relates to -- to the authority that the state has with respect to the challenged provisions, as well.

MS. MORSE: I'm maintaining the objection. You know, the document appears to

speak for itself. But if you have questions, please, you know, go ahead.

MS. KEENAN: Okay.

Q. So are you aware of whether these kinds of proposed edits to legislative language are common practice from the AG's office?

A. I'm not aware of these proposed amendments. This was not a legislative priority. If there would be an amendment coming from our office, such as I mentioned regarding, you know, the statutory authority we have for the scheduling of drugs, for example, if there was something that was incorrectly drafted or proposed, then, yes, we would submit an amendment in that sense.

Q. Okay. And you understand that you were -- you were designated to talk not just about the Office of Legislative Affairs, but the attorney general's office's role in the enactment and passage of statutes, right?

A. Yes.

Q. Okay.

MS. MORSE: Objection to form. Objection. Form. That statute is generally 7050 --

MS. KEENAN: Okay.
MS. MORSE: -- the challenged provisions.
MS. KEENAN: Sure.
Q. So if we go back up to page 1, you can see that Mr. Vaccaro says, FYI, they didn't add our suggested amendment, right?
A. Yes.
Q. When he says, Our amendment, he's talking to Mr. Tellechea, again, from the OAG's office?
A. That's what the email says.
Q. Okay. In response to that, Mr. Tellechea from OAG said, No bueno, right?
A. Yes. That's what the email says.
Q. Okay. Going back to page 2, the amendment highlighted hear that was requested, would have included the language, In accordance with rules promulgated by the Commission, right?
A. Yes. That's what the highlighted portion says.
Q. And you mentioned earlier that Mr. Tellechea's office works about -- sorry -- works on rule-making issues; is that right?

A. Yes. I said that.
Q. Okay. And do you understand that language to authorize the Elections Commission to undertake rule-making?
A. Can you restate that?
Q. Sure.
Do you understand this highlighted language to authorize the Commission to undertake rule-making?
A. It could either mean undertake or rules that have already been in place. Yes.
Q. Okay. And you'd agree that based on this email exchange, that amendment was not added to the thread -- or sorry -- added to the bill, right?
A. Yes. That's what the email states.
Q. Okay. Are you aware of any other concerns about the draft language of SB 7050 that the AG's office identified concerns about?
A. No, not to my knowledge.
Q. Okay. I'm going to go back to what's been marked as Exhibit 1, and I want to jump now to topic 2. That's on page 9. Topic 2 says, The office's role in implementing and/or enforcing SB 7050 and any guidance the office

has provided to anyone relating to the challenged provisions.

Have I read that correctly?

A. Yes.

Q. Okay. What, if any, role has the attorney general's office had in implementing the citizenship requirement contained in FL SB 7050?

MS. MORSE: I'm going to object to form here in that the witness was not disclosed to respond to that portion of the -- of the topic.

MS. KEENAN: Can you please clarify which portion of the topic the witness was designated to talk about?

MS. MORSE: Any guidance the office provided regarding the draft challenged provisions.

MS. KEENAN: So it's -- you're -- I just want to be clear for the record, because we can save some of these questions for tomorrow.

It's your position that Ms. Guzzo was not designated to talk about the office's role in implementing and/or enforcing SB 7050; is

that right?

MS. MORSE: That's correct. That's the substance of my communication about this deposition.

MS. KEENAN: Okay. So I'll skip to my question about the guidance.

Q. Are you aware of any guidance that the AG's office has created concerning the administration and enforcement of SB 7050's prohibition on noncitizens handling or collecting voter registration documents?

A. No, not to my knowledge.

Q. Do you know whether the AG's office has conducted any search to determine whether that guidance exists?

A. I'm generally aware that there was a -- a search done of, you know, records by the office for search terms that were given.

Q. Okay. I'm going to move back to Exhibit 2 momentarily, and I'm taking a look at Interrogatory Number One.

Do you see that Interrogatory Number One asks the attorney general's office to identify all training materials, guidance documents, advisories, and other formal or

informal instructions that have been provided or will be provided to you and your agents concerning the administration and enforcement of SB 7050's prohibition on noncitizens handling or collecting voter registration documents?

Did I read that correctly?

A. Yes.

Q. And are you aware the attorney general's office has turned over no documents responsive to this interrogatory?

A. That is what the response says. Yes.

Q. Are you aware of whether the attorney general's office has provided any guidance about what it means to collect voter registration applications in the context of SB 7050?

A. No. I'm not aware of any guidance.

Q. Okay. And what about to handle voter registration applications under SB 7050?

A. No. I'm not aware of any guidance.

Q. Okay.

MS. KEENAN: And just to be clear, Ms. Morse, she won't -- she's not here to talk about anything relating to the enforcement

authority of the attorney general's office; is that right? That will all be Mr. Cox tomorrow?

MS. MORSE: True. Mr. Cox is going to cover criminal enforcement.

MS. KEENAN: What about civil enforcement?

MS. MORSE: (No verbal response.)

MS. KEENAN: I just want to make sure that we don't miss the opportunity to ask this witness questions that Mr. Cox won't be prepared to answer tomorrow.

MS. MORSE: You can ask her generally about civil enforcement. He may also have information, but you can ask the witness about civil matters.

MS. KEENAN: Okay.

Q. Are you familiar -- let me take one step back.

Have you reviewed the text of Senate Bill 7050?

A. Not in preparation for this. I was not --

Q. You --

A. I'm --

Q. Sorry. You can answer.

A. Yeah. That wasn't one of the documents that I read prior to this.

Q. But you mentioned that in your role with the Office of Legislative Affairs, part of your job is to be at least situationally aware of the provisions that implicate the attorney general's office; is that right?

A. Yes.

Q. Okay. Are you familiar with the attorney general's office enforcement authority under SB 7050 as it relates to the citizenship requirement?

A. I'm generally aware of it. Yes.

Q. Okay. Are you familiar with the form on which 3PVROs have to affirm that no noncitizens are collecting or handling applications on the organization's behalf?

A. No. It's not a -- a form I've seen.

Q. Okay.

MS. KEENAN: I'm going to show the witness what's been premarked as Exhibit 36.

Q. The title of this form reads, 3PVRO Registration Form; is that right?

A. That's what it says.

Q. Okay. And on page 2, Section 7,

there's a -- a box that includes the word, Affirmations; is that right?
A. Yes. That's what it says.
Q. Okay. Take a moment to read to yourself the two oaths that are included in this document, and let me know when you're finished.
A. Okay. I've read the two affirmations.
Q. Okay. And just to refresh your memory, I'm now going to show you what's been premarked as Exhibit 37, which I'll ask the court reporter to mark as Exhibit 37.
You can see that this is the enrolled version of SB 7050, right?
A. Yes.
Q. Okay. I'm going to go to page 13. You can see that this page discusses Section 97.0575 of the Florida statutes, right?
A. Yes.
Q. Okay. And, then, I'm going to scroll down to Subsection 8 of that section. You agree that Subsection 8 provides the attorney general with authority to institute a civil action for a violation of this section or to

prevent a violation of this section, right?
MS. MORSE: Objection to form.
A. Yes. I would -- that is what the language that was in the current statute said.
Q. Okay. And, then, just to confirm, I'm scrolling back up to Subsection 1F, down here at the bottom of page 14.
Can you read 1F to yourself, and let me know when you're finished?
A. Okay. I read Section F.
Q. Okay. Now, Section 1 -- Subsection 1F here in SB 7050 tracks with the affirmation included in the 3PVRO registration form in Exhibit 36; is that right?
MS. MORSE: Objection to form.
A. Yes. It -- it reflects the -- the two pieces there.
Q. Okay. And based on what you read in Subsection 8 of 97.0575, you would agree that if a 3PVRO violates one of these oaths, then the attorney general's office can civilly -- can bring a civil enforcement action?
MS. MORSE: Objection to form.
A. I would say that, yes, in -- in current law or as it was listed there, that we

already have the authority to bring that. They didn't amend that besides the re-referencing of the number.

Q. Right.

And so the -- the creation -- the -- what -- what the -- what SB 7050 did was add this affirmation to the list of things that counted as a violation, right?

A. That's accurate of what this section said.

Q. Okay. Nothing in this form indicates that 3PVROs do not have to complete the second oath about whether each person collecting or handling voter registration applications on behalf of the 3PVRO is a U.S. citizen, does it?

MS. MORSE: Objection to form.

A. Nothing in where?

Q. Nothing in this form you're looking at, nothing in point seven, or I'm happy to scroll through the rest of the form if you'd like.

MS. MORSE: I'm going to ask you to let her look at the entire form. I don't know if --

MS. KEENAN: Yeah. That's no

problem.

A. There's, like, a -- (inaudible) -- that's showing. Can --

MS. MORSE: There's something -- there's something on our screen. Hold on. Okay.

THE WITNESS: Okay.

MS. MORSE: Our screen was covered. Sorry.

MS. KEENAN: No worries.

Q. Let me know when you've had a chance --

MS. MORSE: Okay.

Q. -- to read the first page here.

A. I'm sorry. Your question is that nothing on this form says that they have to --

Q. Can you --

A. -- (inaudible) -- portions?

Q. Sorry.

Nothing indicates that 3PVROs have -- do not have to complete that oath. That is, this form suggests that 3PVROs do have to complete that second oath?

A. I can't speak to the origination of the form, but it -- there are no instructions,

I would say, that you would fill out a form in its entirety.

Q. Okay. You would agree that this form, at the bottom here, says, 9/26/2023; is that right?

A. Yes. That's what it says.

Q. Okay. Okay. I think those are all the questions I have about this document.

Now I want to go back to Exhibit 1, again. So now let's take a look at topic number one. It says -- actually, I realize we're at the hour. Is it a good time to take a quick break before I start into this next topic?

A. I'm fine.

Q. Okay. I'm -- I'm fine to keep going, as well. I just wanted to give you an opportunity at the hour mark. We can keep going.

So the next topic is, Each state interest, if any, that the office believes or contends each of the challenged provisions serves, promotes, or advance, and all facts and evidence supporting a connection between the challenged provisions and the state interests.

Have I read that correctly?
A. That's what it says.
Q. What, if any, state interest does the AG's office believe is furthered by banning noncitizens from handling or collecting voter registration applications on behalf of 3PVROs?
MS. MORSE: I'm going to object to the extent the question implicates the work product privilege, and instruct the witness not to reveal any work product information.
But you can answer.
A. Sure.
I would say that we don't have a state interest in this; that we defer to the legislature and other election officials to -- to relay what the state interest is, if there is one, and that we defer to them because they are the ones who write the laws.
Q. Okay. So the AG's office, itself, is not supporting that there's any state interest furthered by banning noncitizens from handling or collecting voter registration applicants; is that right?
MS. MORSE: Objection to form. That's a mischaracterization of her testimony.

Q. I'm asking if it's right. You can tell me if it's not.

A. No. I said we -- you know, I wouldn't say that we have a state interest; that we defer to those who are in the legislature and other election officials to let us know what the state interest is, as they are the ones who are crafting the legislation.

Q. So the state interest that the AG's office has identified is deference to the state legislature; is that right?

MS. MORSE: Objection to form.

A. Yes. Basically, we're not taking a state interest; that they are the ones -- we rely on the legislature and other elected officials. They are the ones who are writing these laws.

Q. Okay. And so there's not any other substantive interest that the AG believes this law is furthered and necessary -- or sorry -- is necessary to further?

MS. MORSE: Objection to the extent it implicates work product.

Without -- if you can answer without revealing the work product information, you can

answer.

A. I would -- yes. I would reference back to my prior answer about not having a state interest, and that we are deferring to this legislator -- legislators and the legislative process and elected officials.

Q. And the AG's office --

A. Elections --

Q. Oh. Go ahead.

A. Sorry. Elections officials.

Q. Okay. And the AG's office has not identified any concerns about noncitizens working for 3PVROs that it would put forward as an independent state interest?

MS. MORSE: Objection to the extent it implicates work product privilege.

A. I keep going back to my same answer about the state interest. I'm not aware of anything else.

Q. Okay. I might come back to the state interest question a little bit later, but for now, I'm going to jump to -- to topic number 12. So I'm looking at Exhibit Number 1, page 11. And that topic says, The office's tracking and/or awareness of the racial

breakdown of voters registered via 3PVROs in Florida.

Did I read that correctly?

A. Yes. That's what it says.

Q. Okay. What, if anything, did the AG's office do to track the racial breakdown of voters registered by 3PVROs in Florida?

A. I'm not aware of any tracking that our office maintains.

Q. Okay. Does the AG's office have any awareness of the racial breakdown of voters registered by 3PVROs in Florida?

MS. MORSE: Objection to form.

A. No. As I stated, I'm not aware of any tracking that our office maintains or that has been participated in.

Q. Okay. And so you're not aware of any sort of estimate or ballparking that the AG's office has done relating to the racial breakdown of voters registered by 3PVROs in Florida, right?

A. No.

Q. Okay. We've already discussed topic 13, so I'm going to jump to topic number 14 next. This topic says, Any communications

between the office and the Florida Governor, the Florida Legislature, and/or the Florida Secretary of State regarding the challenged provisions from January '22 to present.

Did I read that correctly?

A. Yes.

Q. Okay. What, if any, communications did the AG's office have with the Florida Governor or his staff regarding SB 7050 from January of '22 to the present?

MS. MORSE: Objection to -- to the extent it implicates a deliberative process privilege. We're asserting that.

You can answer.

A. No communications between us and the governor's office, that I am aware of.

Q. Okay. And what did you do to confirm whether any communications took place between the AG's office and the Florida Governor or his staff?

A. There was -- as a -- I guess, when I sent the email. Like I said, it's a situational awareness, so this was not something that our office was involved in the proposal of. It was not a legislative priority

of our office, so we were not engaged in any communications as the bill was being drafted or moving through the legislator, that I'm aware of.

Q. Okay. When -- when a bill is a legislative priority for your office, is it common for the Office of Legislative Affairs to be in communication with other offices of Florida government?

A. Yes.

Q. Okay. Including the Florida Governor?

A. It can be. Yes.

Q. Okay. And including members of the Florida Legislature?

A. Yes.

Q. Okay. I want to go to the legislature next.

What, if any, communications did the AG's office have with the Florida Legislature or its staff regarding SB 7050 from January '22 to the present?

A. I'd go back to my answers related to -- with the governor's office, as well. Not that I'm aware of. This was not a legislative

priority. You know, we were situationally aware as it was moving through the process, so we were not engaged.

Q. Okay. And what, if any, communications did the AG's office have with the Florida Secretary of State or his staff regarding SB 7050 from January 2022 to the present?

MS. MORSE: Objection to the extent it implicates the deliberative -- deliberative process privilege. We're asserting that. But the witness can answer.

A. Same as before. We were not engaged. We were -- no communications, that I'm aware of.

Q. Okay.

MS. KEENAN: I am -- I'm going to show the witness what's been premarked as Exhibit 33, which was produced by the attorney general's office as OAG_000594. I'll ask the court reporter to mark that as Exhibit 33.

Q. Would you agree this is an email from Brad McVay from the secretary of state's office to Nick Cox at the AG's office?

A. Yes. Brad McVay -- McVay sent Nick

Cox an email.

Q. Okay. And this email references the OECS annual report that was submitted to the legislature last weekend; is that right?

MS. MORSE: Objection to form.

Did you say last weekend?

MS. KEENAN: I'm just reading the quote.

MS. MORSE: Oh.

A. Yes. That's what the email says.

Q. When the email says, Last weekend, the date the email was sent was January 20th of 2023, just to be clear for the record, right?

A. Yes, ma'am.

Q. Okay. Are you familiar with what OECS is?

A. Yes. It's Office of Elections Crimes.

Q. Have -- have you worked at all with the Office of Election Crimes and Security?

A. No, I have not.

Q. Are you aware of OAG's interactions, as a whole, with the Office of Election Crimes and Security?

A. I'm aware that the -- you know, the

statewide prosecutor has had conversations, such as this email. But as the -- as far as the detailed interactions, I can't speak to those.

Q. Okay. And I understand you're not designated to talk about enforcement, so I'm -- I'm just asking about your awareness as it relates to the topics you -- you are designated to talk about.

Have you read the Office of Election Crimes and Security annual report that's referenced here?

A. I have not.

Q. Okay.

MS. KEENAN: I now want to show the witness what's been premarked as Exhibit 34, which the AG's office produced as OAG_000859. I'll ask the court reporter to mark that as Exhibit 34.

Q. Have you reviewed this letter before?

A. No, not that I'm aware of. Not that I can recall.

Q. Okay. You'd agree this is a letter from Brad McVay, again, from the secretary of state's office to the Florida Attorney General,

right?

A. Yes.

Q. Okay. Can you take a second to just review -- the second page of the letter is just a -- a list of who is copied on the letter.

Could you take a minute to review this first page here?

A. Okay.

Q. And then I'm going to scroll. The second page includes who's copied.

And go ahead and take a look at this page, and let me know when you've finished it.

A. Okay.

Q. Okay. And one -- one last page here. Let me know when you're ready.

A. Okay.

Q. Okay. So I just want to make clear what this letter is and isn't about. This letter talks about voter registration efforts undertaken by the Voter Participation Center or the Center for Voter Information.

Do you see that here?

A. Yes, ma'am.

Q. Okay. Nowhere in the letters that you just read do the Supervisors of Elections

discuss any issues relating to noncitizens registering voters in Florida, do they?

A. Not that I recall.

Q. Okay. The letter doesn't say anything about problems with noncitizens working on behalf of 3PVROs, right?

A. Not that I saw.

Q. Okay.

MS. KEENAN: I'm now showing the witness what's been premarked as Exhibit 35, which the AG's office produced as OAG_HF_1stRFP_000001. I'll ask the court reporter to mark that as Exhibit 35.

Q. Thankfully, this one is a bit shorter. This is an email exchange between OAG staff and Peter Antonacci at the secretary of state's office, right?

A. Yes. That's what it says.

Q. And Mr. Antonacci purports to be providing a list of noncitizens who voted in the 2020 general election; is that right?

A. (No verbal response.)

Q. You can take a minute to review the email.

A. Okay.

Q. You'd agree this email purports to provide a list of noncitizens who voted in the 2020 general election, right?

A. Yes. That's what it says.

Q. Okay. But, again, this email doesn't contain any allegation tying those noncitizens voting to noncitizens working at 3PVROs, right?

MS. MORSE: I'm going to object to questions related to this document, and that it's beyond the scope of the topic she's noticed for.

A. Sorry. Can you say the question again? It doesn't -- yeah. Can you just say it again?

Q. Sure.

It doesn't tie any allegation about the list of noncitizens who voted in the 2020 general election to noncitizens who worked for 3PVROs in Florida?

A. The email just discusses noncitizens voting.

Q. Okay. Now I'm going to move on to -- back to Exhibit 1 and topic 15 -- sorry -- which says, The office's process for producing documents in response to Plaintiffs' request

for the production of documents, including but not limited to the sources of documents that were collected, the means by which such documents were searched and reviewed, any sources of potentially responsive documents that were not collected, searched, and reviewed.

Did I read that correctly?

A. Yes, ma'am.

Q. So you talked a little bit about this earlier, about how there's a -- did you call it a public records unit or can you remind me of the name of that office?

A. Yeah. I believe it's the public records division.

Q. Okay. Apart from that division, did any staff at the Florida AG's office assist with collecting documents for this litigation?

MS. MORSE: Objection to -- to the extent it implicates the work product privilege.

A. I can't speak as to who the specific individuals were. I -- I just am aware that there is a process that there was a litigation hold letter that was sent out, you know,

stating to not disregard any potential documents we may have.

So who was -- for, you know, litigation purposes, I -- I can't speak as to who was in charge of that. I know that there is a general process, as I mentioned, as to the search of agency emails.

Q. Do you know how staff at the OAG's office are instructed to maintain records in the ordinary course?

A. We're instructed to follow Florida's Public Records Law.

Q. Okay. And do you know how long Florida's Public Records Law requires retaining documents?

A. I can't speak to the specifics. I know there's different retention schedules for items. I can't -- off the top of my head, I'm not sure what the -- the year threshold is exactly, but --

Q. That's okay.

How did the retention schedules change whenever a litigation hold is in place at the Florida Attorney General's office?

A. I believe, as the litigation hold

says, we're -- we're instructed to not -- not get rid of any documents.

Q. Okay. I want to talk about the potential sources of documents.

Does the AG's office have an electronic record system?

A. Such as? What would that include?

Q. Does the AG's office store records electronically in a database? I -- I guess I'm -- to give you an -- some context, records can be stored electronically. They can be stored on disks or drives. They can be stored in paper copies.

I'm asking about the record retention methods of the AG's office.

A. Yeah. We do have a -- a -- a data -- I guess, a database so that documents are stored in there, or however long, you know, any -- I guess when things are turned over or that they have access to through the, you know, IT division.

Q. Okay. And do you know when the electronic database was created for storage of records?

A. I do not.

Q. Do you know whether that electronic database is searchable?

A. Yes. To the best of my knowledge, they're -- all documents are able to be searched. You know, there's a -- through the litigation division, so whether it's emails or other documents that are stored in there.

Q. And do you know how those documents can be searched, for example, by -- by keyword, by date, by document title?

To -- to your -- to the best of your knowledge, do you know how those documents can be searched?

A. I mean, to the best of my knowledge, I know that there, you know, generally was a process of keyword terms that were provided to our office to search through to help narrowly tailor some of the discovery that was potentially applicable so that it was down to just things that were actually related to this versus other common keywords that could have been, you know, benign to this topic.

Q. And so to the best of your knowledge, the AG's office did conduct a search using those keywords on the electronic database for

relevant documents?

A. Yes.

Q. Does the AG's office also maintain copies of records on disks or flash drives that cannot be searched through the electronic database?

MS. MORSE: Objection. Form.

A. Like, I can't speak to that, so not that I'm aware of, if anybody individually has that.

Q. Okay. What about paper copies of records? Does the AG's office maintain any paper copies of records that cannot be accessed through the electronic database?

MS. MORSE: Objection to form.

A. Not that I'm aware of, unless someone had -- I can't speak to what an individual may have printed out, but not that I'm aware of.

Q. Sure.

But to -- to your knowledge, and as the -- the designee for the Florida Attorney General's office on this topic, is the only place that the OAG searched for documents in that electronic database?

MS. MORSE: Objection to the extent

it implicates the work product privilege.

A. It would be in the litigation, when we were asked to keep any documents, whether electronic or not, that was applicable to this. So if someone had that, that would been required to turn over for review of discovery.

Q. And are you aware of any sources of potentially responsive documents that the Florida AG's office did not search?

A. No.

Q. Okay. At this point, we are nearing 11:30. I'm going to request a -- I'd request a ten-minute break, because I think I'm nearing the end of my questions. I just want to go through -- through my notes.

MS. KEENAN: So can we go off the record at 11:27 here and return at 11:37?

MS. MORSE: Okay. Returning at 11:37? Okay.

MS. KEENAN: Thanks. Thanks, All.

(A recess was taken.)

BY MS. KEENAN:

Q. I have a handful of follow-up questions before I pass to my -- my co-counsel in this case.

First, you explained earlier, as I understood it, that the challenged provisions of SB 7050 weren't a legislative priority for the attorney general's office and that the attorney general's office didn't communicate with the offices of the governor, secretary of state, or legislators about those challenged provisions. But I have a few follow-up questions, just to make sure I understand what you mean by that.

So, first, during the drafting of SB 7050, did OAG provide any of those offices with examples of investigations or prosecutions of noncitizens working with 3PVROs?

MS. MORSE: Objection to the extent it implicates the deliberative process privilege.

But if you can answer without divulging privileged information, please do.

A. No. I'm not aware of any guidance that was provided.

Q. And is the answer the same during the legislators' consideration of SB 7050, that OAG didn't provide any such examples during that phase, either?

MS. MORSE: Same objection.

A. Same answer.

Q. Okay. Are you aware of any OAG investigation or prosecution of noncitizens working with 3PVROs that could support a state interest that the citizenship requirement would further?

MS. MORSE: Objection to form.

A. Am I aware of any OAG investigation or -- please repeat the question.

Q. Of noncitizens working with 3PVROs that could support a state interest in a citizenship requirement.

MS. MORSE: Objection to form.

A. No, I'm not, but that is also something that the statewide prosecutor would be able to address tomorrow.

Q. Thanks. I'll be sure to ask him more about it tomorrow.

MS. KEENAN: Nothing further for this witness from me, but I'll pass the witness to -- I can't remember which of my co-counsel is going next. So I'll just pass the witness for the Hispanic Federation Plaintiffs.

MS. RUTAHINDURWA: Brent, if you

don't mind, I think I'm going to jump in and ask a couple questions.

MR. FERGUSON: Yeah. Go ahead.

MS. RUTAHINDURWA: Okay. Thanks.

CROSS-EXAMINATION

BY MS. RUTAHINDURWA:

Q. Hi. My name is Makeba. I represent the NAACP Plaintiffs in this matter. Thank you so much for your time today. I'm going to try very hard not to repeat any of the questions that has already been asked by counsel.

But I just want to circle back to the beginning in terms of preparation for this deposition. You said you met with your attorneys.

How many times did you meet with them?

A. We chat -- we met once, and we talked twice.

Q. And how long was the meeting?

A. About an hour.

Q. And, then, the talking two times that you don't consider to be a meeting, how long was that?

A. To clarify, meeting in person.

Q. Okay.
A. You know, maybe 30 minutes each time.
Q. And did you review the responses to interrogatories that the AG produced in this litigation?
A. Yes.
Q. And did you review the Third Amended Complaint that's been filed in this litigation?
A. Briefly. It was provided.
Q. I'm going to attempt to share my screen and pull up the Third Amended Complaint.
Do you see that? Am I screen sharing the Third Amended Complaint here? It's titled, Document 184.
A. Yes.
Q. On page 6, it says, Third Amended Complaint for Declaratory and Injunctive Relief, right?
A. Yes. That's what it says.
Q. I'm going to scroll down to paragraph 57. And can you just read paragraph 57 for me? And I'm happy to scroll when you need me to, and then I'm going to ask you a couple of questions.
A. It says -- am I reading it out loud?

Q. Nope. You can read it to yourself, and let me know --
A. Okay.
Q. -- when you're done.
A. Can you scroll?
Okay.
Q. So now, this paragraph about the attorney general's responsibilities as it relates to the challenged provisions that Plaintiffs are challenging here, do you agree with everything that's been stated in this paragraph?
MS. MORSE: Objection to form. And we're asserting the work product privilege, to the extent this question implicates the work product privilege, and objection that these are allegations. You're basically asking the witness if she's agreeing with your allegations.
A. I would say that that -- you guys are referencing portions of the legislation that was enacted as it pertains to certain portions that have actions within our office.
Q. And so do you agree that the attorney general is specifically tasked with enforcing

the newly created and amended civil and criminal penalties against 3PVROs provided in SB 7050?

MS. MORSE: Objection to form. The document speaks for itself.

A. That's what the document says, and, you know, I would have to reference the end of it or specific legislation to see if it matches word for word.

Q. In your own words, can you describe what role the attorney general has in enforcing the -- the provisions of SB 7050?

MS. MORSE: Objection to form.

A. I believe that would be something that the statewide prosecutor is supposed to be answering tomorrow. His portion was of the enforcement.

Q. Do you know if the attorney general's office tracks the racial breakdown of voters in the state?

MS. MORSE: Objection to form. Asked and answered.

A. Yeah. As I stated before, that is not something that we track.

Q. And you mentioned earlier that you

were deposed in SB 90, right?

A. Yes.

Q. And in that case, you were asked about the racial breakdown and demographics that 3PVROs serve. Am I right?

A. I don't recall every question that was asked.

Q. Okay. You generally recall that in that litigation, you were asked about the types of communities that 3PVROs serve in the state?

MS. MORSE: Objection to form.

A. Yes. I would say that was a -- a general topic that would have been asked during that deposition.

Q. And since that deposition and since the litigation in SB 90, has the AG's office learned about what racial groups and communities 3PVROs serve?

MS. MORSE: Objection to form.

A. Not that I'm aware of. And as I stated before, that's not something that our office is -- that we track.

Q. Do you think it would be important information to learn, as the entity that's tasked with enforcement of civil and criminal

penalties against 3PVROs?

MS. MORSE: Objection to form.

A. I can't speak as to what the office should -- should or shouldn't learn because that is not my role within the office.

Q. You were asked some questions about interrogatories. I'm going to share my screen.

Are you able to see my screen?

A. Yes.

Q. So Ms. Keenan asked you if you knew who Mr. Bajger was -- and I -- apologies if I'm mispronouncing that name -- and you said that you were aware of him and worked with him generally, but -- but not closely.

Is that a good understanding of your relationship?

A. I said that, yeah, I knew that it was, I believe, the civil division that he works with. I have not, you know, personally engaged with him on this or, you know, many other matters, and I don't know if I said I work generally with someone else.

Q. Do you know which division is responsible for issuing civil penalties against 3PVROs?

A. Our civil division.
Q. Okay. So that would be under Mr. Bajger's role as part of the civil division, to issue civil penalties?
A. Like I said, I'm not exactly sure of what his title is, so I can't speak to what his role is.
Q. Does the office of the statewide prosecutor issue civil penalties at all?
A. That is something you can ask Mr. Cox about, but they are in charge of criminal prosecutions.
Q. And so you don't know one way or another whether you were asked to be the designee responsible for any interrogatory responses that Mr. Bajger helped respond to in this litigation?
MS. MORSE: Objection to form.
A. Yeah. What -- what is the actual question?
Q. Yeah.
Do you know whether or not you were designated as the attorney general's representative to respond to the interrogatories that Mr. Bajger helped respond

to?

A. Yeah. Like I said, I -- I work generally with him. I -- I did not sign these. I would -- you know, they are part of the topic of the depositions listed.

Q. Going back to Interrogatory Number One. The answer about describing state interests that you provided to the NAACP Plaintiff was that SB 7050 was not a priority legislation for the Office of the Attorney General; is that right?

A. Can you try and fix your screen? When you scroll, it, like, cut the language off.

Q. Oh. I'm sorry.

A. That's okay.

There we go.

Q. All right. Can you see?

A. Yes.

MS. MORSE: She can't see the -- could you let her see the entire answer?

Q. Is that good?

A. Yes.

Q. Great.

So the answer to Interrogatory Number

one is that SB 7050 was not a priority legislation for the Office of the Attorney General; is that right?

MS. MORSE: Objection to form.

A. Yes. That's what we stated on this document.

Q. Can you identify what were priority legislations for the attorney general in 2023?

A. Sure.

We worked on some human trafficking legislation; a drug scheduling legislation, that I mentioned before. I recall a child deposition protections legislation. I believe those were our -- listed as our top three.

Q. And how does the attorney general make those determinations about what is and is not a priority to the office?

MS. MORSE: Objection to form to the extent it implicates the thought processes of the attorney general.

A. I would say that we designate things that are our priority legislation out of ideas or topics that the office has -- you know, either we have the authority to do within, such as the drug scheduling. We saw how it was

causing a rise in deaths, and that was within our authority to scope.

Human trafficking is a -- a priority issue that the attorney general has been engaged in since the beginning. The other one, you know, related to the protection of children, another issue that she has been engaged in since the beginning. So when I say, Priority, it's ones that we were personally engaged in.

Q. And the bottom of the answer, it says, The OAG's evaluation of the state's interest in the 3PVRO -- 3PVRO canvasser restrictions is ongoing.

And I'd like to just take a step back, and I will represent to you that they respond that way to all of the other challenged provisions in the interrogatory responses, that the evaluation of the state interest is ongoing.

So sitting here today, does the attorney general have any position or state interest that it has not yet identified in this litigation or at this deposition?

MS. MORSE: Objection to the extent

it implicates the work product privilege.

A. I mean, as you're aware, that we did sign onto a brief. Also, I think as I mentioned before, you know, the legislative intent is brought up from the legislators and other election officials, and that's clearly stated.

So we did not take a position during the legislative process. And I think, as the answer says, that it's still ongoing.

Q. Yeah.

I'm -- I'm -- I guess, I'm going to rephrase the question.

Can you identify any state interests in the challenged provisions that the attorney general has yet to communicate with Plaintiffs in this litigation?

MS. MORSE: Objection to form to the extent it implicates the work product privilege.

A. I'll just defer back to my answer previously that, you know, we did not take a position. We have joined in the brief, as that is stated, and, you know, the state interest is clearly stated in the legislative intent from

the legislators and the other election officials, and, then, with our brief, joining on with the Secretary of State, as well.

Q. I think those are all the questions I have. Thank you.

CROSS-EXAMINATION

BY MR. FERGUSON:

Q. Good morning, Ms. Guzzo. My name is Brent Ferguson. I'm attorney representing the League of Women Voters of Florida. I'm going to ask some questions, as well.

Are you good to keep going without taking a break at this point?

A. Yeah. Thank you.

Q. Excellent. No problem.

You talked previously, some, about the -- the citizenship provision of SB 7050. I'd like to start by asking you some questions about the felony volunteer restriction.

Do you know what I'm talking about when I say the, Felony Volunteer Restriction?

A. Yes. From the form prior?

Q. From SB 7050. It's 97.0575, 1E, and it's the provision relating to how 3PVROs might -- may work with people with certain previous

felony convictions.

Is that -- are you aware of that provision?

A. I -- yes. I'm generally aware of it.

Q. Okay. Can you give me, I guess, your general understanding of what it prohibits?

A. Is this -- I believe this is something that Nick was designated for. No?

Q. So we'll certainly ask Mr. Cox questions about this. You're designated under topic number one to talk about state interests in each of the challenged provisions. And so we're going to talk some about that today, and so I wanted to get a sense of your understanding of what the provision covers before we talk about that.

MS. MORSE: Objection to form, if there's a question.

Q. I'm just asking, again, if you can give me your awareness. If -- if you're unable to -- to explain the provision, that's fine, and we can go into it. I just want to doublecheck.

A. Yeah. Let's just go into the questions.

Q. Sure.
Okay. So let's move -- one moment -- and pull up what's been marked as Exhibit 37. And I'm going to share my screen momentarily.
Okay. Can you see that?
A. Yes.
Q. Okay. So this is a document you've seen before, an enrolled version of SB 7050. And do you see about at the middle of the page, line 390, where it says, Subdivision E, and it starts, An affirmation?
I'll just give you a couple moments to take a look at that.
A. (No verbal response.)
Q. Okay. Have you had a chance to take a look?
A. Almost finished.
Q. Sure.
A. Okay.
Q. Okay. So this provision is one that's been referred to as the felony volunteer restriction, so that's how I'll refer to it here today.
Essentially, what this is doing is saying if a person has been convicted of one of

a certain number of underlying felonies, then they're prohibited from working with a 3PVRO, in certain situations.

Is that your understanding?

A. That is what it states. Yes.

Q. Okay. Before SB 7050 was enacted, did your office provide the legislature or any government officials with information about people who had been convicted of one of these underlying felonies here and then later committed misconduct regarding voter registration?

MS. MORSE: Objection to form. And I'm going to object that I think it's outside the scope of her topics.

MR. FERGUSON: I'll just state for the record, I believe this relates to topics 13 and 14, communications between the office and the Florida Governor and the Florida Legislature regarding the challenged provisions.

MS. MORSE: I believe your question was about prior to the legislation, but if I misremembered --

MR. FERGUSON: That is my question.

Topic 13 talks about the role and enactment and passage, as well, so -- and I believe the law was also passed after January of 2022. And that's within the timeframe of topic 14.

A. So the question -- can you state it again, please?

Q. Sure. No problem.

So before the law was enacted, did your office provide the legislature or any government official with a list of persons who had committed one of these underlying felonies that we've been talking about and then committed some type of misconduct with regard to voter registration?

MS. MORSE: Object to form.

A. No, not that I'm aware of, did we provide anything that you mentioned.

Q. Okay. Are you aware of any information your office had with that same -- that same information that I described?

A. No, I'm not.

Q. Okay. What are the state interests in this provision, the felony volunteer restriction?

MS. MORSE: Objection to form. Asked

and answered.

A. Yeah. I would defer back to what I had said previously if -- that we didn't take a position on this and that the legislative intent was clearly listed out with the state interests listed. And, you know, the legislature and other election officials are the ones that have brought those forward, along with the appeal that we have joined.

Q. Okay. We'll get to that appeal. So I think we've established that you've been designated to talk about the state interest of all of these provisions.

And you're aware, correct, that your office has asserted state interests defending this provision in this case, correct?

MS. MORSE: Objection to form. And to the extent it implicates the work product privilege, I object.

A. Yes.

Q. Okay. And so I'm not asking this question about the attorney general's office in particular, but the state's interests in the felony volunteer restriction.

And so can you tell me, is your

answer now that the state interests in the felony volunteer restriction are simply those that you've already answered in the briefing in this case?

MS. MORSE: Same objection. And to the extent it implicates the -- the question implicates the work product privilege, I'll object.

A. So you're -- can you say that again, please? The -- the appeal is where the state interests are listed? Is that what you asked?

Q. So I'm asking -- you've said basically, you know, that there's -- there's an appeal in this case and -- and a lawsuit going on in which the state has asserted certain interests.

Is your testimony today that the interests -- the state's interests are exactly those that have been included in the attorney general's briefing in this case?

MS. MORSE: Object to form. I'm going to object to the -- to the extent it implicates the work product privilege and instruct the witness not to answer to the extent it involves -- the answer would involve

any work product.

If you can answer without revealing work product, you may.

A. I mean, as we have -- you know, I think our answers are listed within the interrogatories and within our brief and from other things that have been asked and answered. So that's what I would say, that --

Q. Okay.

A. -- we're representing --

Q. Sorry. Go ahead.

A. No. I was just saying that that's what has been represented.

Q. Sure.

Okay. Does the state -- did the state enact the felony volunteer restriction, in part, to prevent fraud?

MS. MORSE: Objection to form.

A. Like I said before, we weren't involved in -- in the enactment of this legislation. Whatever the legislative intent, I guess, listed out that the legislature provided, that's what I would defer to.

Q. Okay. Could you explain how the felony volunteer restriction prevents fraud?

MS. MORSE: Objection to form.

A. I would say as it's listed, that's what it is lined out to do. And, once again, I would defer to the legislative analysis. We were not involved in the creation or, you know, passage and enactment of this.

Q. I understand that.

This is a deposition topic notice for today, and I'm not familiar with the -- I guess the legislative intent that you're referring to. So I'm just asking you to give me your understanding today of how the felony volunteer restriction prevents fraud.

MS. MORSE: Objection to form, particularly to the extent that fraud is a criminal matter and is not within her -- her topics, and asked and answered.

MR. FERGUSON: Counsel, I -- I understand. We're not talking about any kind of criminal enforcement here. I'm asking very squarely about deposition topic one, which is on state interests.

MS. MORSE: Same objection. Asked and answered.

A. The legislative intent, I would say,

is listed out in the analysis, which was one of the documents. And I'm going to keep repeating the same thing, that we were not responsible for the passage of this legislation.

Q. Okay. So just to be clear, you can't explain for me today how the felony volunteer restriction prevents fraud?

MS. MORSE: Objection. Objection to form, and to the extent it involves the work product privilege.

Subject to not providing privileged information, you can answer.

A. I mean, what -- what are you asking, if -- can I explain -- explain it today? I think I've stated where it would come from or if it's -- you have another opportunity to speak to the statewide prosecutor tomorrow, as well.

Q. Are people who are convicted of murder or sexual misconduct offenses more likely to commit fraud in the future?

A. I don't know that answer.

Q. Are they more likely to commit other kinds of election misconduct?

A. I don't know.

Q. Do you know if your office has any information indicating that they would be more likely to commit fraud or election misconduct?

A. No.

Q. So we took a look at the -- the felony volunteer restriction a few moments ago. Do you have a general understanding of the underlying felonies that are listed there and that you read? I've mentioned murder and -- and sexual offenses. There's a whole other list of felonies.

Are -- do you have any understanding of what kinds of felonies are included on that list?

A. I would have to see the statues that are enumerated in the section to speak to them.

Q. Sure.

So I'll represent to you that a lot of -- there -- there's a long list of felonies, and I wouldn't expect anyone to know all of them. A lot of them are related to fraud and dishonesty.

My question is: Are people who commit those fraud and dishonesty felonies more likely to turn voter registration applications

in late, beyond the statutory deadline?

MS. MORSE: Objection to form.

A. I don't know.

Q. Okay. Can you tell me, if someone has committed one of these underlying felonies that we're talking about here, what does the law prevent them from doing with regard to voter registration?

A. I'm sorry. What did you ask? If someone committed one of these felonies, what?

Q. Right.

So they're covered -- they're covered by law because they were convicted of one of these felonies. And, then, what's your understanding of what that person is prevented from doing because of that conviction?

A. As listed on the page, it says that they are not to be collecting or handling the voter registration applications.

Q. Okay. Are they allowed to work for a 3PVRO and supervise other volunteers as long as they don't touch any completed application forms?

MS. MORSE: Objection to form, and objection to the extent the question implicates

the work product privilege. I'm instructing the witness not to reveal any work product information.

A. I would say what is laid out in the statute would be what I would defer you back to, but that is not something within my role. So I cannot speak to that.

Q. Okay. So you don't know for sure?

MS. MORSE: Objection to form.

A. I don't.

Q. Okay. And do you know if it matters -- in that situation that I just described where a -- a volunteer is supervising, but not touching forms, do you know if it -- if it matters whether that supervisor is having a conversation with people who have completed voter registration applications and encouraging them to vote and things like that?

A. I do not. I would defer you back to the statute.

Q. Is the state's interest in the felony voter registration to try to prevent people with these underlying felony convictions from having sole custody of the completed voter

registration forms?

MS. MORSE: Objection to form. Asked, answered.

A. No. I would refer back to previous answers about the state interest. I cannot speak to that question.

Q. What is your office's position on what punishment is necessary to deter 3PVROs from violating the felony volunteer restriction?

MS. MORSE: Objection to form to the extent it implicates the work product privilege or the deliberative process privilege.

A. What is our position on what?

Q. What punishment is necessary to deter 3PVROs from violating this provision.

A. I -- that is not something that we would have a -- a position on, not that I'm --

Q. I'm sorry. Go ahead.

A. Not that I can answer anything on. I'm not sure --

Q. Do you know --

A. -- what for.

Q. Sorry to talk over you. I apologize.

Did you have anything else to say?

A. No.
Q. Do you know what the fine is in SB 7050 for a 3PVRO failing to comply with this provision?
MS. MORSE: Do you want to let her --
A. Yeah. I was going to say I read it earlier. I don't want to misspeak to what the actual number is.
Q. Yeah.
I'll point out that it's on line 398 of --
A. Oh. I'm sorry.
Yeah. So it's, as the paper states, $50,000.
Q. Okay. Did your office play any role in determining that amount?
A. As stated before, we were not involved with this legislation.
Q. Okay. Do you think that that $50,000 fine could discourage 3PVROs from doing voter registration at all because of the risk of that penalty?
MS. MORSE: Objection. Calls for a legal conclusion. I'm going to instruct the witness not to answer to the extent it involves

the work product privilege.

A. Yeah. I would say, once again, we were not involved with this legislation, so nothing to speak on that provision.

Q. Sure.

Well, I'm not asking, in this question, about your involvement in the provision. I'm asking the -- in your capacity as the representative for the attorney general's office do you think that the $50,000 fine could discourage 3PVROs from doing voter registration work?

MS. MORSE: Same objection. Objection to form. It calls for a legal conclusion.

A. Yeah. I have nothing else to add.

Q. So you don't have any knowledge of whether it could discourage them or not? Is that the answer?

A. Yeah. I'm not aware of anything that would be applicable to this.

Q. Are you familiar with a receipt requirement in SB 7050? Do you know what I'm talking about when I say that?

A. Could you put it up there?

Q. Yeah.

Okay. So it starts at line 432 there. I'll give you a -- a few moments to take a look.

A. Okay.

Q. Were you aware of that requirement before you just read it?

A. Yeah. I was generally aware of the provisions in the bill.

Q. Okay. Do you know what the receipt has to contain that's referenced here?

MS. MORSE: Objection to form.

A. It must include what is listed on page 16 of this document.

Q. Okay. And, again, what is the state's interest in the receipt requirement?

MS. MORSE: Objection to form.

A. I would say that it's what has been asserted prior to this, so anything that we mentioned already.

Q. Any of the interests we've already talked about?

A. Hm-mmm.

Q. Okay.

A. Yes.

Q. Well, the one that we've talked about thus far is fraud. Are -- so --
A. My answers that were provided saying what the state's interests were.
Q. Okay. And does the state have -- is the receipt requirement intended to prevent fraud?
MS. MORSE: Objection to form.
A. We were not involved in the drafting of this. And as I mentioned prior, other parts of the analysis from the legislature, it would -- it would mention the intent and the intentions of the legislature. So if that was listed, then that would be on there.
Q. Does the state have an interest in making sure that 3PVRO volunteers know that they can be identified by a voter registration applicant after they've helped someone register to vote?
MS. MORSE: Objection to form.
A. Yeah. Can you please say that again?
Q. Yeah. For sure.
Does the state have an interest in making sure that a volunteer with a 3 -- 3PVRO knows that they can be personally identified

after they help someone register to vote?

MS. MORSE: Same objection.

A. I would say same answer as to other questions as it relates to the state interests.

Q. So you're not sure, sitting here today?

MS. MORSE: Objection to form. That's not her testimony.

Q. Well, your testimony is --

A. Deferring back --

Q. Sorry. Go ahead.

A. Deferring back to the answers that I've said prior of -- excuse me -- about what the state interests were, and the legislature and other election officials and our sign-on with the secretary of state.

Q. Yeah. I understand that, and I don't want to, you know, go over this many, many times, for sure.

I'm just asking, without referencing those other documents or briefs, if you can answer today whether the state has an interest in making sure those volunteers know that they can be identified after they help someone register.

MS. MORSE: Objection to the extent that question implicates the work product privilege.

A. Yes. I can't speak to that.

Q. If the state's interest is to allow a voter registration applicant to follow up to check on their application, if that's a state interest in the receipt requirement, is it necessary that the receipt contains the full name of an individual volunteer?

MS. MORSE: Objection to form.

A. That's not something I can speak to.

Q. You testified earlier that you have some familiarity with 3PVROs; is that correct?

A. Yes. I'm generally aware. Yes.

Q. Okay. And you're aware that some of these are larger organizations and that in some situations, like the one I described before, there might be some volunteers who take voter registration applications and, then, others who are supervisors that might collect them and might do quality control?

Are you aware of that?

A. That is what you said, and, you know, I don't know the structure of these

organizations always.

Q. Sure. Sure.

Is it true that in many instances, a volunteer who collects an application and writes a receipt, as required by this law, won't be the one turning in the voter registration application; is that correct?

MS. MORSE: Objection to form.

A. I can't speak to the process of those organizations.

Q. Are you aware of a concern in Florida over instances of harassment or intimidation of election workers?

MS. MORSE: Objection to form.

A. I'm sorry. Am I aware of -- sorry.

Q. Yeah.

A. Can you say that again?

Q. Yeah.

Are you aware of a -- a concern in Florida about threats of violence or harassment or intimidation of people who work in elections?

MS. MORSE: Objection to form.

A. So that's not something I can speak to, as well.

Q. So you have -- you have not read any news stories or ever heard someone in recent years talk about those kinds of threats or intimidation?

A. I'd -- I'd say I don't recall the details, so it's not something I can speak to.

Q. Right.

I'm not asking about details. I'm just saying, is it something you've heard of before?

MS. MORSE: Objection to form. Asked and answered.

A. Yeah. It's -- generally aware of, yes.

Q. Okay. I'm going to bring up a document here, which we can mark as an exhibit. If you'll give me just a moment.

MR. FERGUSON: And I'll put it in the chat so the court reporter has it.

Q. Do you see that?

A. Yes.

Q. Could you just read the headline for the record, please?

A. Okay.

Q. Would you mind reading just the --

the main headline out loud for the record?

A. It's a Scary Time; Florida Election Workers Deal with Threats and Harassment.

Q. Okay. And we don't need to go through this whole news story. I'll scroll down, just so you're aware of --

MS. MORSE: I'm sorry.

Q. -- what's on here.

MS. MORSE: Hold on, Brent.

MR. FERGUSON: Yeah.

MS. MORSE: I'm trying to change our view. I made it too small. Oh. Hold on. Oh, no. Oh. I disconnected. Damn.

THE WITNESS: I think you're still on the thread.

MS. MORSE: Hold on. The cursor -- the mouse isn't working, and I think --

THE WITNESS: Isn't that it down there?

MS. MORSE: Let me see.

THE WITNESS: There you go.

MS. MORSE: Hold on. Hold on. We're having a technical --

THE WITNESS: You just need to go up.

MS. MORSE: -- issue here.

MR. FERGUSON: You want to --

MS. MORSE: Can we do --

MR. FERGUSON: -- take a quick break for --

MS. MORSE: No. The mouse -- I'm just -- I'm trying to -- the mouse isn't working. I think we can scroll pretty soon. Hold on.

I was trying to get it to a size that she could see better on our end, and I think we were close to getting that.

Okay. I -- sorry. I think we can -- I think she's able to scroll now or -- are you handling the scrolling or are we --

MR. FERGUSON: Yeah. I --

MS. MORSE: -- able to --

MR. FERGUSON: I can scroll down.

MS. MORSE: Oh.

MR. FERGUSON: Are you seeing the scroll here?

MS. MORSE: Oh, yeah.

THE WITNESS: Yeah.

MS. MORSE: Yeah. We're seeing it now.

MR. FERGUSON: Okay.

MS. MORSE: Sorry, Brent.

Q. So, again, I'm not asking you to read this whole thing. I'll read from the top up here. And I realize it's partially cut off, so I apologize for that.

On the top of page 2 it says, Election workers in Florida have faced an increasing amount of harassment and threats leading up to the 2022 election. Some Florida Supervisors of Elections fear the trend will keep volunteers away and lead for nonpartisan workers to quit, eroding trust in the election system.

Do you see that?

A. Yes.

Q. Okay. So I'm -- that's all I want to read on this. I'll just scroll slowly so you have a chance to see the whole document. And I think it's done here.

So considering those concerns from the Supervisors of Elections, do you think it's reasonable for volunteers in -- working in elections to have concerns about harassment?

MS. MORSE: Objection to form.

A. I would say I can't speak to what

concerns someone may or may not have. I mean, the article listed out the headline or, you know, whatever quote is listed there from the different supervisors. I'd say they -- they speak for it.

Q. Yeah.

And I'm just asking about your opinion here and asking whether that concern is reasonable.

MS. MORSE: Objection to form.

A. I'd say, once again, it's listed on the document. I don't think that we take an opinion on that matter. We have deferred what is stated in the article.

Q. Right.

And I was showing you the article for general awareness of concerns of the supervisors, and I'm asking you not to -- I'm -- I'm not asking you to describe the concerns of any particular volunteer or what the supervisors think. I'm asking whether you think that such a concern is reasonable.

MS. MORSE: Objection to form.

But you can answer.

A. I mean, I would say if there are

valid instances, then potentially a reasonable concern. I'm not speaking to specifics, either.

Q. Certainly.

And following up on that. In that situation that you described where those concerns could potentially be valid, do you think it's reasonable for a volunteer to be concerned about giving up their full name?

MS. MORSE: Objection to form. Calls for speculation.

A. Yeah. I would say I'm not describing any situations, either, so I can't guess on how someone may or may not feel.

Q. Do you agree that in -- in those situations that you described where a concern over harassment could be valid -- so I'm not, again, asking for a specific situation or anything, but in that subgroup of situations that you mentioned, do you think it's reasonable that a volunteer would not want to disclose their name?

MS. MORSE: Objection to form.

A. I'm not sure. I can't speak to that, how they would feel or not.

Q. Did your office provide anyone in the Florida government with information about voter registration applicants who sought to identify specific 3PVRO volunteers?

MS. MORSE: Objection to form to the extent it implicates the work product privilege.

A. Yeah. Not that I'm aware of.

Q. Okay. Do you know if your office has any evidence that there are such applicants?

A. Not that I'm aware of.

Q. So we talked about the specific receipt form. Let's -- I'm going to bring it up on the screen, just for ease of reference.

MR. FERGUSON: And I'll, again, add it to the chat for the court reporter. And could we mark this as the next exhibit? I don't know which exhibit number we're on right now.

MS. MORSE: I'm sorry. I'm sorry about that. We were just talking about the chat function --

MR. FERGUSON: No problem.

MS. MORSE: -- and how to --

MR. FERGUSON: Yeah. This -- I mean,

I'm going to share it on the screen. I'm just including it here for the court reporter so she has it. And I'm asking it to be marked as the next exhibit after --

MS. MORSE: Okay.

MR. FERGUSON: -- the previous document. And I want to just doublecheck that they've both been marked.

(A discussion was held off the record.)

Q. Okay. So -- okay.

Can you see that document on the screen now?

A. Yes.

Q. Okay. Great.

And you see that it has applicant's name and -- and other information, and then the last blank is the name of the person who collected the application?

A. Yes, on the top portion.

Q. And part of the reason for including that is so someone who -- someone who puts in an application with a 3PVRO gets this receipt, and then they can have that person's name afterwards; is that correct?

MS. MORSE: Objection to form. Objection to the form of the question, to the extent, you know, you're familiar with this document.

A. Yeah. I mean, I'm -- I'm not familiar with it. We didn't create it. You know, it's -- it says it's a receipt, so that is what is listed there.

Q. How -- so if an applicant has this receipt with just someone's full name -- the full name of the person who collected the application, do you know how the applicant would go about contacting or finding the person, the volunteer?

A. I don't. Like I said, this was not something that, you know, I created or that we had an involvement in.

Q. Right.

I'm not asking about your involvement in creating the receipt. I'm asking if you know how someone would go about tracking down the volunteer just based on a full name.

A. No, I do not.

Q. Okay. Are you familiar with the provision of law called the -- what's been

called the voter information restriction or the information retention ban?

A. I'm -- yes. I'm generally aware of it.

Q. Okay. Do you have an awareness of -- or I guess -- sorry. Withdraw that.

Could you just give me your basic understanding of -- of what it is?

A. I mean, I'd prefer if you could put it on the screen, and we could just discuss it that way.

Q. Yeah. Sure.

Okay. So it starts there at line 506. Can you see that?

A. Yes.

Q. I'll give you a few moments.

A. Okay.

Q. So before SB 7050 was enacted, did you ever provide anyone in Florida government with information about instances in which a 3PVRO volunteer kept an applicant's personal information so they could engage in some kind of misconduct?

MS. MORSE: Objection to form.

A. No, not that I'm aware of.

Q. And do you know if your office had any of that information?

MS. MORSE: I'm going to object to form; object to this line of questioning to the extent it relates to the criminal provision. This is not within her topics for prior criminal information.

A. Yeah. No. I -- not something I can speak to. I would say the statewide prosecutor's office would have a better idea.

Q. Does this restriction here prevent a 3PVRO volunteer from keeping an applicant's name or contact information?

MS. MORSE: Again, the same objection. This is squarely outside of -- of her listed topics. She's not speaking to criminal prosecution or investigation of criminal matters. This is a criminal provision.

A. I would defer to tomorrow's -- Nick Cox tomorrow.

Q. Sure.

MR. FERGUSON: And I'll -- I'll just say for the record, I'm asking here about the state interests, as we've discussed before, and

certainly trying to clarify what is contained in this provision as it relates to the state interest.

Q. So keeping it to that, you may be aware that the -- the state has represented in this case that this provision, the voter information restriction, does not prevent from retaining someone's name and contact information.

Is it true that the state doesn't have an interest in preventing 3PVROs from retaining that information?

MS. MORSE: Objection to form, again, to the extent it implicates the work product privilege. But I disagree with your rationale. I think you're asking her about a criminal provision and trying, on the back end, to link it to a state interest, which she's answered ad nauseam. I'm going to object to this question.

But to the extent you know, without revealing privilege, you can answer.

A. Yeah. It's not something I can speak to. I would just defer back to the language on -- I'm sorry -- on line 506, and also to, as Stephanie said, the prior answers.

Q. If the state has not -- so your prior answers on state interests have wholly incorporated previous answers from briefing; is that correct?

MS. MORSE: Objection to form.

A. Yeah. Can you clarify what you're saying? I don't want what --

Q. Yeah. Sure.

A. -- I said to be mis-summarized.

Q. Yeah.

So we've been -- with several different provisions here, we've been talking about the state interests. And, in large part, my understanding is that you have not talked about specific interest, but instead referred to the state's previous arguments and briefs in this case.

Is that accurate?

A. Yes. I've referenced back to that, and also, as I said, with the legislature and other statewide -- or excuse me -- other election officials and the -- you know, relaying the legislative intent. Those are all things I mentioned multiple times.

Q. And if that -- those things that

you've referenced just now, if the state has not ever expressed an interest in or explained an interest in preventing 3PVROs from retaining someone's name and contact information, is it correct that there is no state interest in doing so?

MS. MORSE: Objection to form.

A. I would say that I -- what you just paraphrased of my answers was not accurate, that I never pointedly said that there is no state interest.

Q. And I'll represent to you that the state has not put forth such an interest, and so I'm asking you today if there is a state interest.

MS. MORSE: Objection to form.

A. That is not something I can speak to.

Q. Okay. So just to clarify, one of the deposition topics for today, number one, is each state interest that the office believes and contends supports the challenged provisions.

Thus far, we have not received any answer on the state interest in preventing 3PVROs from retaining someone's name and

contact information. And your answer is that you can't answer that today?

MS. MORSE: Objection to form. I object to the characterization that you have not received information on state interests. I'm going to -- I object to the extent the question implicates the work product privilege.

A. Yes. I said that's something I can't speak to.

Q. Okay. We've been going for almost another hour and a half. I'm going to propose a ten-minute break.

MR. FERGUSON: Does that work for everyone?

MS. MORSE: How much longer do you have? I mean, is it -- should we just take a longer lunch break, if you're going to continue questioning?

MR. FERGUSON: (No verbal response.)

MS. MORSE: It's 1:00.

MR. FERGUSON: Yeah. I don't know exactly how long; more than a few minutes. And assuming that others might have time on cross, I'm happy to take a longer lunch break if everyone is good with that.

MS. MORSE: Well, what others are you talking about? Because you're the third Plaintiff to ask questions, so --

MR. FERGUSON: If that -- yeah. Sorry. I said on cross. If -- I don't know if the defense plans to ask questions or not.

MS. MORSE: Yeah. I'm interested in taking just a little bit longer than the ten minutes. I, you know --

MR. FERGUSON: Sure.

MS. MORSE: But I don't want to keep -- I don't want to keep -- (inaudible) -- and take more than ten minutes.

THE WITNESS: No. No. We can't. I don't want to take an hour.

MS. MORSE: I don't want to take an hour.

THE WITNESS: Okay. I have work to get to.

MR. FERGUSON: How about 30 minutes? Does that work for everyone?

THE WITNESS: Sure.

MS. MORSE: Yeah. That's fine.

MR. FERGUSON: All right. So I've got 12:55 right now. 1:25?

MS. MORSE: 1:25. Sure.

MR. FERGUSON: And could we go off the record now?

(A recess was taken.)

BY MR. FERGUSON:

Q. Okay. I'd like to move on to part of 70 -- sorry -- SB 7050 that shortened the deadline for 3PVROs to turn in applications from 14 to 10 days.

Ms. Guzzo, are you aware of -- of that provision?

A. Yeah. But will you put it on the screen, as well?

Q. Yeah. I will. Just a moment.

Okay. Okay. This is a longer one. The provision I'm talking about starts at 442, but you can see at page -- at line 449, the -- the change to ten days.

A. Okay.

Q. So just confirming, as we have with our other questions, your office didn't have any communications with the legislature or anyone else in government about that part of 7050; is that correct?

MS. MORSE: Objection to the extent

it implicates the deliberative process privilege -- deliberative process.

You can answer.

A. Yes. We were not engaged in the legislative process with this.

Q. Okay. Can you tell me the state's interest in changing the deadline from 14 days to 10 days?

MS. MORSE: Objection to form and also -- oh. Objection to form.

A. Once again, we're repeating my same response from before as to what the state's interests are.

Q. Sure.

Okay. We -- I think you discussed a little bit previously about your office's answers to the interrogatories in this case.

Do you recall that?

A. Yeah. We discussed this.

Q. Yeah.

Okay. I'm going to put those up on the screen, again. And I'll just scroll to the top. And that says, Responses to Plaintiffs' First Set of Interrogatories to the Attorney General, and the case caption there is Florida

State Conference of the NAACP versus Byrd, 23-cv-215; is that correct?

A. Yes.

MR. FERGUSON: And I'm not sure if this was marked as an exhibit before, but I will add it to the chat just to make sure.

Q. So I'm scrolling down to Interrogatory Number 4. And before we -- before I give you time to read it, I'll represent that this provision that we just looked at, which is codified at 97.0575 5A is referred to in this litigation as the 3PVRO fines provision or the delivery penalties.

So could you take a few moments just to read Interrogatory Number 4 and the answer?

A. Okay.

Q. Okay. And I think we discussed something like this before, but in -- in your office's answer it says -- I'm going to highlight, just for ease of reference -- The OAG has joined the initial brief filed by the secretary of state in the 11th Circuit Court of Appeals regarding the appeal of the preliminary injunction entered in this case. And it says, Information on state interest can be gleaned

from that brief.

Do you see that?

A. Yes.

Q. Okay. Are you aware that the preliminary injunction entered in this case and the resulting appeal on the 11th Circuit has nothing to do with the fines provision that's mentioned in this interrogatory?

MS. MORSE: Objection to form. I'm going to assert the work product privilege to the extent the question implicates that.

A. So are you asking if I'm aware of the different portions?

Q. I'm asking are you aware that the brief referenced does not contain anything referencing the fines provision that's the subject of this interrogatory?

MS. MORSE: Objection to form.

A. Yeah. I would just say defer back to the pleadings that -- I don't have them in front of me. I can't speak to the specifics of it.

Q. So you're not aware whether it contains anything about that or not?

A. No. I said I'd just refer back to

what is listed, and I don't want to answer something that's not up there.

Q. Right.

So I'm not asking you to -- to answer something that's not up there. I'm saying, as you sit here today, without looking, you're not aware whether that brief mentions the fines provision at all; is that correct?

A. I'm not sure.

Q. You're not sure if you know whether it mentions that?

A. No. I -- I'm not sure what -- yeah, the specifics of what is entailed.

Q. You're not sure of the specifics in that brief?

MS. MORSE: Objection to form. Asked and answered.

Q. I'm sorry. I'm just trying to get the answer to a simple question, if you know whether the brief contains any material on the fines provision.

MS. MORSE: Same objection.

A. Same answer.

Q. And this answer below also says -- I'm going to highlight it -- The OAG's

evaluation of the state's interest in the 3PVRO fines provision is currently ongoing.

Do you see that?

A. Yes.

Q. Okay. And I believe this document was submitted in September of this year, so about three months ago.

Can you tell me how that evaluation proceeded between the date that this was submitted and today?

MS. MORSE: Objection to form to the extent it implicates the work product privilege. Discovery hasn't ended, and our communications after this litigation started are work product.

A. Yeah. So I can't speak to that.

Q. Are you invoking the privilege or are you saying that you don't have any information outside the privilege?

A. Yeah. I don't have any additional information.

Q. Can you tell me what problem it creates for the state if an application comes in 11 days after it is completed by a voter?

MS. MORSE: Objection to form and

object to the extent she's being asked about a different agency's operations.

A. Yeah. I would say that's something that would most likely be a role of the secretary of state. It's not something that the Office of the Attorney General is involved in.

Q. Okay.

MR. FERGUSON: I'm -- I'm adding these documents right now to the chat for the court reporter.

Q. I'm going to pull up a -- one more document here.

Okay. Can you see that on the screen?

A. Yes.

Q. Is that coming up?

Okay. Let me -- we're going to look at this page, but let me go to the beginning just so you can see what it is.

This is from the Department of State, and it says it's an overview for Supervisors of Elections' offices.

Do you see that?

MS. MORSE: Is there a Bates number

on this?

MR. FERGUSON: Yeah. It's pretty small. Can you see it? It's right below the --

MS. MORSE: I can, but my eyesight is not that great, so -- I think Elizabeth is going to -- is closer to the -- can you see it?

THE WITNESS: It's small, but I think it says, what, SB7050, dash, what, SO, maybe?

MR. FERGUSON: It says SO. I think there might be numbers cut off. I'm not really sure. I can -- Stephanie, if you want, I can get that full Bates number after this, if you'd like. I can represent this was -- sorry. Go ahead.

MS. MORSE: Oh. Yeah. That -- you probably were going to answer my next question. I was just wondering -- yeah. I would like to get the full Bates number and know where it was from.

MR. FERGUSON: Yes. Sorry. I don't know if it was cut off on our end or what, but I will send that to you.

Q. Okay. So I'm -- we saw the first page. I'm going down to page 23 here, and that

says, Consequences For Voter.
Do you see that?
A. Yes.
Q. Okay. And, then, the -- the first bullet there is, If an application is untimely submitted or never submitted by a 3PVRO.
Do you see that?
A. Yes.
Q. Okay. And I'll give you just a moment to take a look at the -- the list that's there.
A. Okay.
Q. Okay. And I'll read it for the record. So the -- the top bullet was, If application is untimely submitted or never submitted by a 3PVRO. The sublets are -- there's four of them -- voter is not registered for an election; voter cannot vote; voter is not able to change party affiliation in time to vote for party races in a primary election; and the voter encounters problems at the polling place during early voting or election day.
I'd just like to ask. If -- if a 3PVRO turns in a registration application 11 days after it's completed by the applicant and

it's not near the voter registration deadline, can you tell me which of these consequences that's listed here would apply to that voter?

MS. MORSE: Objection to form.

And I'm sorry. Could you -- could you scroll through the document and just let her see the whole document?

MR. FERGUSON: Yeah. It's 40 pages long, so it's going to be a little bit difficult, but I'll go back up to the top.

Q. And so it's an overview of voter registration. And so you can see here that it's produced by the secretary of state. And I'll go down to the table of contents, which maybe is helpful.

A. I mean, I would just say that this wasn't something that our office created or we had a part in, so I can't speak to, you know --

Q. Sure.

A. -- what -- what applies or what, you know, the actual contents are. I've never seen it before.

Q. Sure.

Would you still like me to scroll through the whole thing?

MS. MORSE: Yeah. I'd like to see the whole thing before you question the witness about it.

MR. FERGUSON: I'll also just note, if you can access the chat, the whole document is there, if it's easier to look that way.

Q. So I'll note on page 16 here is the 3PVRO section that I was talking --

MS. MORSE: Okay. We may try to do it in the chat, but I think we had a little disaster before when I tried to --

MR. FERGUSON: Yeah. Yeah. Whatever is --

MS. MORSE: I -- I --

MR. FERGUSON: Whatever is easier for you.

MS. MORSE: I disconnected the call. Okay.

Q. So this is the one we looked at. And I'll keep going just so you have a --

MS. MORSE: That's it.

Q. Okay. So we're beyond the 3PVRO section here. I don't think this is going to be relevant to us at all. I'll go back to that page.

And just for clarity, my question here is about the state's interest in the provision we just looked at, the fines provision or delivery penalties. And I'm trying to get a sense of if an application is turned in just beyond the ten-day deadline, if it's not near a registration deadline, is it true that that voter will not be registered for the election?

MS. MORSE: Objection to form.

A. Like I said before, you know, this is not a document that we created. This is not an OAG-related question. I would, you know, direct this towards the secretary of state.

Q. And we certainly, likely, will do that. I'm just asking the more specific question.

If someone -- if that application I described comes in 11 days after it's signed, is it correct, in your understanding, that the voter will not be registered for the election?

MS. MORSE: I'm going to object to form and object to the number of times this has been asked.

You can answer.

A. I mean, I would say, you know, whatever the statute says for the timeframe is what would be applied.

Q. Okay. So -- and just briefly, you discussed the citizenship requirement with Ms. Keenan at the -- at the beginning of the deposition.

Do you remember that?

A. Yes.

Q. And so just as a -- as a refresher, that provision is one that says people who have not -- who -- who are not U.S. citizens may not collect or handle voter registration applications on behalf of a 3PVRO.

Is that your general understanding?

MS. MORSE: Objection to form.

A. Yeah. Yeah. That's what I -- you know, what the statute says about who can handle it and who can't. I would say that is general understanding.

Q. Okay. And is that volunteer -- let's say a person who's not a citizen is volunteering with the 3PVRO at, let's say, a booth at a parade where the 3PVRO is helping people register.

In your understanding, is that volunteer collecting people's forms, are they part of the election administration process?

MS. MORSE: Objection to form. Asked and answered. And to the extent it implicates the work product privilege, I object on those grounds, but the witness can answer.

A. I mean, I think I said -- as I said before, you know, I can't speak to the organizational structure of those organizations as to who has what role.

Q. Right.

So I'm not asking at all about the organizational structure. I'm asking about the state's interest here and how the state has described the 3PVRO and its volunteers.

I'll -- I'll just represent to you that the state, on its website, describes 3PVROs as fiduciaries. And I'm happy to look at the website together if it's helpful. So I'm -- I'm not asking what the 3PVRO thinks or anything like that.

I'm asking what the state thinks, and I'm asking if that person is, in the state's view, part of the election administration

process.

A. If that is something that the secretary of state has on there, maybe that's more appropriately designated there. I don't believe the attorney general's office has that on there.

Q. The secretary of state doesn't say that there -- doesn't answer the specific question in describing the -- the state's position taken in this litigation and briefing by the attorney general and secretary of state and, then, on the state website that describes these volunteers as fiduciaries.

And so my question isn't about what's on the website or anything like that. My question is whether that volunteer is part of the election administration process.

MS. MORSE: Objection to form.

A. That's not something I can answer.

Q. Okay. And if someone is supervising that volunteer and oversees the volunteer, is that person part of the election administration process?

MS. MORSE: Objection to form. Speculative.

A. Yeah. I'd say I can't answer that question.

Q. Okay. I'm going to talk about one final provision in the law that's referred to as the re-registration requirement. And I can pull that up for you, as well, if you'd like.

A. Yes, please.

Q. Okay. Can you see that?

A. Yes.

Q. Okay. So the relevant provision here is split up, unfortunately, but I can point you to it.

We're at 9.0575 1D, so that's line 387.

A. Okay.

Q. And since it's -- this part is short, I'll read it for the record. Beginning November 6, 2024, the specific general election cycle for which the third-party voter registration organization is registering persons -- persons to vote.

Do you see that?

A. Yes.

Q. Okay. And I'll scroll up for context. The precursor to that is on page 13,

subdivision one, where it says, Before engaging in any voter registration activities, the 3PVRO must register and provide to the division the following information.

Do you see that?

A. Yes.

Q. Okay. So we've read D, saying that the 3PVRO has to say the specific election cycle.

And then I'm scrolling down on page 15 to sub two, which starts at 413. I'll read it, again. Beginning November 6, 2024, the registration of a third-party voter registration organization automatically expires at the conclusion of the specific general election cycle for which it is registered.

So to your understanding, does this require 3PVROs to re-register every general election cycle?

MS. MORSE: Objection to form.

A. I'd say the document on the page, which is the current statute, gives an expiration for the election cycle that they are registered for. So I'd say that lays it out.

Q. And before -- before this provision

was enacted, your office didn't talk to anyone in Florida government about this requirement; is that correct?

MS. MORSE: Objection. Form.

You can answer.

A. As stated, yes. We were not engaged in the -- in this legislation creation or process.

Q. Okay. So I'd like to, once again, ask a similar question on this that we just went through with the previous requirement about interrogatory answers and reference to the 11th Circuit Brief. Just in terms of efficiency, I'll share my screen.

Can you see that?

A. Yeah.

Q. Okay.

A. Yes.

Q. And this is another set of Answers to Interrogatories. This one is to the -- in the League of Women Voters case, 23-cv-216.

Do you see that at the top?

A. Hm-mmm.

Q. Okay.

A. Yes.

Q. Okay. So I'm going to give you a moment to read Interrogatory Number Two and your office's response that's up here on page 3.

A. Okay.

Q. Okay. And I don't want to go over this in as much detail as we just did, but you see the portion of the answer that refers to that same 11th Circuit Brief that we talked about a few minutes ago, correct?

A. Correct.

Q. And are you aware that that brief and the appeal that it's referring to do not involve the re-registration requirement that's mentioned in this interrogatory?

MS. MORSE: Objection to form.

A. Yeah. Can you re-ask that?

Q. Are you aware that that 11th Circuit Brief does not mention the re-registration requirement at all?

A. Yes.

And I'd say, you know, as we mentioned in the prior discussion, same answers would apply.

Q. Okay. Again, this answer also says

that your office's evaluation of the state's interest is ongoing.

Can you tell me if that evaluation has continued since these answers were provided?

MS. MORSE: Objection to form to the extent -- or objection to the extent it implicates the work product privilege, and I'm going to caution the witness not to reveal any work product information.

A. Yeah. There's -- I have no additional information.

Q. Okay. I'll take that off the screen.

Does the -- does this re-registration requirement that we've been discussing help prevent fraud?

A. That's not something that I can speak to.

Q. Okay.

MR. FERGUSON: Those are all of my questions, Counsel. I don't know if any of the other Plaintiffs' counsel has any follow up to what we've discussed.

MS. MORSE: Well, she's answered every Plaintiff groups' question, so I think

we're done with Plaintiffs.

If the Secretary of State has anything they want to -- in cross, they could let us know on the record. If not -- okay.

I don't have any questions for the witness.

MR. FERGUSON: Okay. Sorry. I'll give a moment to see if anyone has anything else.

I will say I think it's probably necessary to keep the deposition open, giving the -- given the lack -- inability to answer questions, especially on deposition topic one.

I'll give some time for anyone else to add to that, if they'd like.

MS. MORSE: And we object to that. Contrary to your assertion, this witness did answer deposition topic number one multiple times, over and over. We object to leaving the deposition open.

MS. RUTAHINDURWA: This is Makeba from Elias Law Group. I join in Plaintiffs' objection to the witness's inability to respond to state interests, and so we join with -- with that position.

MS. KEENAN: And for the Hispanic Federation Plaintiffs, I think we would just say that if the Office of the Attorney General intends to rely on any state interest, independent of what the secretary highlights in their briefing, then we would -- we would request to keep the deposition open, as well.

MS. MORSE: And, again, the Attorney General objects to keeping this deposition open.

And, Madam Court Reporter, this witness is going to read the -- read the deposition. We are not waiving the reading. We'll read and sign.

THE COURT REPORTER: Okay. Did you want a copy of the transcript, Ms. Morse?

MS. MORSE: If it's ordered by the other parties, by whoever took the depo, but we reserve the right to read it.

THE COURT REPORTER: Ms. Keenan?

MS. KEENAN: I think we need to talk with co-counsel about what orders have already been placed, but I can send you an email afterwards with our order, if that works.

(Off the record at 1:58 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, ELIZABETH GUZZO, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata sheet signed by me.

______________ ______________________

DATE SIGNATURE CERTIFICATE

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, SUJA NAIR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me electronically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 19th day of DECEMBER, 2023.

My commission expires: April 21, 2027

Suja Nair
__________________________________

A

**able**
18:18, 23:18, 31:16, 75:4, 79:17, 85:8, 114:13, 114:16, 136:19
**access**
74:20, 138:5
**accessed**
76:13
**accommodate**
18:15
**accordance**
48:18
**accurate**
57:9, 124:18, 125:9
**accurately**
18:19
**acknowledge**
150:3
**acknowledgment**
150:1
**aclu**
15:10
**action**
55:25, 56:22
**actions**
82:23
**activities**
144:2
**actual**
86:19, 105:8, 137:21
**actually**
59:11, 75:20
**ad**
123:18
**add**
48:7, 57:6, 106:16, 118:15, 130:6, 148:15
**added**
49:14
**adding**
134:9
**additional**
133:20, 147:12
**address**
41:25, 79:17
**admin**
41:6, 41:9
**administration**
51:9, 52:3, 141:3, 141:25, 142:17, 142:22
**administrative**
40:21
**advance**
59:23
**advisories**
51:25
**affairs**
20:8, 20:11, 20:15, 20:21, 20:25, 21:18, 22:9, 22:16, 38:11, 47:18, 54:4, 65:7
**affiliation**
136:19
**affirm**
35:7, 35:17, 54:15
**affirmation**
56:12, 57:7, 93:11
**affirmations**
35:5, 55:2, 55:9
**affixed**
151:15
**after**
15:5, 31:8, 43:19, 95:3, 108:18, 109:1, 109:24, 119:4, 133:14, 133:24, 135:13, 136:25, 139:19
**afterwards**
119:25, 149:24
**ag**
61:19, 81:4
**ag's**
15:24, 30:17, 31:10, 31:19, 32:16, 33:9, 33:14, 33:18, 33:21, 34:1, 34:5, 36:19, 37:20, 39:12, 46:8, 47:6, 49:19, 51:8, 51:13, 60:4, 60:19, 61:9, 62:7, 62:11, 63:6, 63:10, 63:18, 64:8, 64:19, 65:20, 66:5, 66:24, 68:17, 70:11, 72:17, 74:5, 74:8, 74:15, 75:24, 76:3, 76:12, 77:9, 84:16
**again**
33:7, 42:8, 42:24, 45:9, 48:10, 59:10, 68:24, 71:5, 71:13, 71:14, 92:19, 95:6, 97:9, 99:3, 106:2, 107:15, 108:21, 111:17, 115:2, 116:11, 117:18, 118:15, 122:14, 123:13, 129:11, 129:22, 144:12, 145:9, 146:25, 149:8
**against**
83:2, 85:1, 85:24
**agency**
73:7
**agency's**
134:2
**agents**
52:2
**ago**
16:4, 16:7, 20:20, 101:6, 133:7, 146:10
**agree**
35:22, 42:10, 49:12, 55:23, 56:19, 59:3, 66:22, 68:23, 71:1, 82:10, 82:24, 117:15
**agreeing**
82:18
**ahead**
18:12, 42:17, 42:25, 47:2, 62:9, 69:11, 80:3, 98:11, 104:19, 109:11, 135:15
**aide**
20:18
**al**
1:7, 1:12, 2:7, 2:13, 2:17, 2:22, 4:2, 7:3, 8:3, 10:3
**alachua**
6:2, 6:5
**all**
17:8, 18:1, 18:6, 19:22, 20:9, 29:12, 30:18, 39:15, 41:11, 51:24, 53:2, 59:7, 59:23, 67:19, 75:4, 77:20, 86:9, 87:18, 89:17, 91:4, 96:13, 101:20, 105:21, 115:16, 124:23, 127:24, 132:8, 138:24, 141:13, 146:20, 147:20
**allegation**
71:6, 71:16

**allegations**
82:17, 82:19
**allow**
110:5
**allowed**
102:20
**almost**
93:17, 126:10
**along**
96:8
**already**
38:13, 49:11, 57:1, 63:23, 80:11, 97:3, 107:20, 107:21, 149:22
**also**
12:12, 18:14, 35:17, 41:23, 45:17, 53:13, 76:3, 79:15, 90:3, 95:3, 123:24, 124:20, 129:10, 132:24, 138:4, 146:25
**always**
111:1
**amend**
57:2
**amended**
81:7, 81:11, 81:13, 81:16, 83:1
**amendment**
13:17, 37:10, 37:23, 45:21, 46:18, 47:9, 47:15, 48:7, 48:9, 48:17, 49:13
**amendments**
38:3, 47:8
**american**
4:5
**amount**
105:16, 115:8
**analysis**
13:15, 34:13, 34:17, 36:2, 99:4, 100:1, 108:11
**annual**
67:3, 68:11
**another**
35:13, 86:14, 89:7, 100:16, 126:11, 145:19
**answer**
17:23, 26:10, 27:25, 30:23, 30:25, 31:15, 32:7, 39:7, 53:11, 53:25, 60:11, 61:24, 62:1, 62:3, 62:17, 64:14, 66:12, 78:18, 78:22, 79:2, 87:7, 87:21, 87:25, 89:11, 90:10, 90:21, 97:1, 97:24, 97:25, 98:2, 100:12, 100:22, 104:20, 105:25, 106:19, 109:3, 109:22, 116:24, 123:21, 125:24, 126:1, 126:2, 129:3, 130:15, 130:19, 132:1, 132:4, 132:19, 132:23, 132:24, 135:17, 139:25, 141:7, 142:8, 142:19, 143:1, 145:5, 146:8, 146:25, 148:12, 148:18
**answered**
23:2, 83:22, 96:1, 97:3, 98:7, 99:17, 99:24, 104:3, 112:12, 123:18, 132:17, 141:5, 147:24
**answering**
83:16
**answers**
13:12, 14:2, 14:5, 27:19, 65:23, 98:5, 104:5, 108:3, 109:12, 123:25, 124:2, 124:3, 125:9, 129:17, 145:12, 145:19, 146:23, 147:4
**antonacci**
70:16, 70:19
**anybody**
19:1, 26:12, 32:16, 33:10, 76:9
**anyone**
31:24, 33:14, 50:1, 101:20, 118:1, 121:19, 128:23, 145:1, 148:8, 148:14
**anything**
25:12, 27:2, 29:7, 38:12, 40:6, 52:25, 62:19, 63:5, 70:5, 95:17, 104:20, 104:25, 106:20, 107:19, 117:19, 131:15, 131:24, 141:22, 142:15, 148:3, 148:8
**anywhere**
16:6
**apart**
72:16
**apologies**
85:11
**apologize**
104:24, 115:5
**appeal**
96:9, 96:10, 97:10, 97:14, 130:23, 131:6, 146:13
**appeals**
130:23
**appear**
46:20, 150:7
**appears**
45:24, 46:25
**applicable**
75:19, 77:4, 106:21
**applicant**
108:18, 110:6, 120:9, 120:12, 136:25
**applicant's**
119:16, 121:21, 122:12
**applicants**
60:22, 118:3, 118:10
**application**
102:22, 110:7, 111:4, 111:7, 119:19, 119:23, 120:12, 133:23, 136:5, 136:15, 136:24, 139:5, 139:18
**applications**
35:8, 35:18, 52:16, 52:20, 54:17, 57:14, 60:6, 101:25, 102:19, 103:18, 110:20, 128:8, 140:14
**applied**
140:3
**applies**
137:20
**apply**
137:3, 146:24
**appropriately**
142:4
**april**
43:14, 151:17
**aren't**
46:11

**arguments**
124:16
**art**
36:8, 36:13
**article**
13:25, 116:2, 116:14, 116:16
**ashley**
2:10, 12:16
**aside**
19:16
**asked**
18:10, 25:22, 25:25, 32:8, 77:3, 80:11, 83:21, 84:3, 84:7, 84:9, 84:13, 85:6, 85:10, 86:14, 95:25, 97:11, 98:7, 99:17, 99:23, 104:3, 112:11, 132:16, 134:1, 139:24, 141:4
**asking**
43:4, 61:1, 68:7, 74:14, 82:17, 91:18, 92:19, 96:21, 97:12, 99:11, 99:20, 100:13, 106:6, 106:8, 109:20, 112:8, 115:2, 116:7, 116:8, 116:18, 116:19, 116:21, 117:18, 119:3, 120:19, 120:20, 122:24, 123:16, 125:14, 131:12, 131:14, 132:4, 139:16, 141:13, 141:14, 141:21, 141:23, 141:24
**asks**
51:23
**assert**
131:10
**asserted**
96:15, 97:15, 107:19
**asserting**
32:5, 64:13, 66:11, 82:14
**assertion**
148:17
**assist**
26:23, 72:17
**assistant**
20:16, 20:19
**assisting**
20:18
**associated**
25:18, 29:14
**assume**
18:9
**assuming**
126:23
**attached**
13:9, 150:7
**attempt**
81:10
**attending**
17:16
**attorney**
1:17, 2:12, 9:2, 9:4, 12:3, 12:5, 15:10, 20:3, 20:10, 21:3, 21:9, 21:20, 22:2, 22:11, 24:7, 24:25, 25:14, 25:19, 25:21, 26:13, 26:19, 27:2, 27:5, 27:12, 28:4, 28:8, 29:10, 30:5, 31:25, 34:17, 38:10, 38:20, 38:23, 40:18, 41:1, 41:13, 41:23, 41:25, 42:3, 43:25, 47:19, 50:6, 51:23, 52:9, 52:13, 53:1, 54:6, 54:10, 55:23, 56:21, 66:19, 68:25, 73:24, 76:21, 78:4, 78:5, 82:8, 82:24, 83:11, 83:18, 86:23, 87:10, 88:2, 88:8, 88:15, 88:20, 89:4, 89:22, 90:15, 91:9, 96:22, 97:19, 106:9, 129:24, 134:6, 142:5, 142:11, 149:3, 149:8
**attorney's**
6:5, 8:15, 11:14
**attorneys**
15:11, 22:8, 29:2, 29:5, 80:15
**authority**
41:6, 41:13, 46:21, 47:11, 53:1, 54:10, 55:24, 57:1, 88:24, 89:2
**authorize**
49:3, 49:8
**automatically**
144:14
**avenue**
4:16, 5:15
**avoid**
17:5
**aware**
21:5, 26:18, 30:15, 31:1, 31:7, 31:21, 31:23, 32:11, 32:14, 32:15, 33:13, 36:15, 37:25, 39:8, 47:4, 47:7, 49:17, 51:7, 51:16, 52:9, 52:13, 52:18, 52:21, 54:5, 54:13, 62:18, 63:8, 63:14, 63:17, 64:16, 65:3, 65:25, 66:2, 66:14, 67:22, 67:25, 68:21, 72:23, 76:9, 76:16, 76:18, 77:7, 78:20, 79:3, 79:9, 84:20, 85:13, 90:2, 92:2, 92:4, 95:16, 95:18, 96:14, 106:20, 107:6, 107:8, 110:15, 110:16, 110:23, 111:11, 111:15, 111:19, 112:13, 113:6, 118:8, 118:11, 121:3, 121:25, 123:5, 128:10, 131:4, 131:12, 131:14, 131:23, 132:7, 146:12, 146:18
**awareness**
39:9, 43:6, 62:25, 63:11, 64:23, 68:7, 92:20, 116:17, 121:5
**away**
115:11

**B**

**b)(6**
24:9
**b-a-j-g-e-r**
27:18
**bachelor's**
21:12, 21:14
**back**
16:11, 19:24,

29:19, 30:16,
38:16, 41:22,
43:12, 44:12,
48:5, 48:16,
49:21, 51:19,
53:18, 56:6,
59:9, 62:3,
62:17, 62:20,
65:23, 71:23,
80:12, 87:6,
89:16, 90:21,
96:2, 103:5,
103:20, 104:4,
109:10, 109:12,
123:17, 123:23,
124:19, 131:19,
131:25, 137:10,
138:24
**background**
21:8
**bag**
19:9
**bajger**
27:18, 27:21,
28:1, 85:11,
86:16, 86:25
**bajger's**
86:3
**baker**
8:3
**ballparking**
63:18
**ban**
121:2
**banning**
60:4, 60:21
**baran**
10:14
**based**
27:20, 49:12,
56:18, 120:22
**basic**
121:7
**basically**
61:13, 82:17,
97:13
**basics**
17:1

**bates**
134:25, 135:13,
135:19
**beach**
7:11, 7:17
**became**
20:17, 20:20
**because**
17:11, 27:23,
50:20, 60:17,
77:13, 85:4,
102:13, 102:16,
105:21, 127:2
**been**
15:5, 15:18,
20:10, 23:16,
25:9, 27:4,
34:4, 35:9,
36:18, 37:19,
38:4, 38:15,
39:11, 44:18,
49:11, 49:22,
52:1, 54:21,
55:11, 63:16,
66:18, 68:16,
70:10, 75:22,
77:5, 80:11,
81:8, 82:11,
84:13, 89:4,
89:7, 93:3,
93:21, 93:25,
94:9, 95:12,
96:11, 97:19,
98:7, 98:13,
107:18, 119:8,
120:25, 124:11,
124:12, 126:10,
139:24, 147:15,
149:23
**before**
3:10, 15:19,
17:1, 28:13,
30:16, 31:5,
33:15, 45:6,
46:9, 59:13,
66:13, 68:20,
77:24, 83:23,
84:21, 88:12,

90:4, 92:16,
93:8, 94:6,
95:8, 98:19,
105:17, 107:7,
110:18, 112:10,
121:18, 122:25,
129:12, 130:5,
130:8, 130:9,
130:18, 137:22,
138:2, 138:11,
139:11, 141:9,
144:1, 144:25,
151:3
**beginning**
80:13, 89:5,
89:8, 134:19,
140:6, 143:17,
144:12
**behalf**
4:2, 4:13, 5:2,
5:12, 6:2, 6:11,
7:2, 7:11, 8:2,
8:12, 9:2, 9:11,
10:2, 10:12,
11:2, 11:11,
12:2, 15:23,
24:24, 25:14,
54:17, 57:15,
60:6, 70:6,
140:14
**behind**
19:9
**being**
17:3, 19:20,
31:11, 31:20,
32:1, 32:17,
33:10, 36:8,
36:10, 65:2,
134:1
**believe**
28:4, 60:4,
72:14, 73:25,
83:14, 85:18,
88:13, 92:7,
94:17, 94:22,
95:2, 133:5,
142:5
**believes**
59:21, 61:19,

125:20
**below**
35:3, 132:24,
135:3
**ben**
7:13
**benign**
75:22
**bennington**
12:14
**besides**
29:17, 57:2
**best**
16:24, 18:15,
22:21, 75:3,
75:11, 75:14,
75:23
**better**
114:10, 122:10
**between**
21:1, 59:24,
64:1, 64:15,
64:18, 70:15,
94:18, 133:9
**beyond**
45:24, 71:10,
102:1, 138:22,
139:6
**bill**
13:15, 16:17,
31:8, 32:22,
33:23, 34:2,
34:13, 34:15,
34:25, 35:4,
43:17, 49:15,
53:20, 65:2,
65:5, 107:9
**bills**
31:4
**bit**
21:7, 29:22,
62:21, 70:14,
72:10, 127:8,
129:16, 137:9
**blank**
119:18
**block**
40:22

**bob**
6:4
**booth**
140:24
**both**
35:24, 119:8
**bottom**
43:4, 43:10, 45:1, 56:7, 59:4, 89:11
**boulevard**
7:15, 8:6, 11:15
**box**
55:1
**brad**
66:23, 66:25, 68:24
**branches**
1:6
**break**
18:13, 33:20, 59:13, 77:13, 91:13, 114:3, 126:12, 126:17, 126:24
**breakdown**
63:1, 63:6, 63:11, 63:20, 83:19, 84:4
**breaks**
19:21
**brent**
5:4, 79:25, 91:9, 113:9, 115:1
**brevard**
7:3
**brief**
90:3, 90:23, 91:2, 98:6, 130:21, 131:1, 131:15, 132:7, 132:15, 132:20, 145:13, 146:9, 146:12, 146:19
**briefing**
97:3, 97:20, 124:3, 142:10, 149:6
**briefly**
81:9, 140:4
**briefs**
109:21, 124:16
**bring**
56:22, 57:1, 112:15, 118:13
**broad**
4:7
**brought**
90:5, 96:8
**budgetary**
40:5
**bueno**
48:14
**build**
41:17
**bulk**
17:2
**bullet**
136:5, 136:14
**bureau**
40:22, 40:25, 41:9, 42:2
**byrd**
1:10, 2:20, 15:13, 130:1

**C**

**call**
72:11, 138:17
**called**
15:4, 15:12, 23:4, 120:25, 121:1
**calls**
105:23, 106:14, 117:10
**came**
31:5
**campaign**
5:5
**campbell-harris**
4:4
**can't**
17:11, 19:10, 58:24, 68:3, 72:22, 73:4, 73:16, 73:18, 76:8, 76:17, 79:22, 85:3, 86:6, 87:20, 100:5, 110:4, 111:9, 115:25, 117:13, 117:24, 126:2, 126:8, 127:14, 131:21, 133:16, 137:18, 140:19, 141:9, 143:1
**cannot**
76:5, 76:13, 103:7, 104:5, 136:18
**canvasser**
89:13
**capacity**
1:11, 2:11, 2:21, 106:8
**capitol**
9:6
**caption**
1:15, 2:1, 129:25
**case**
1:9, 2:9, 15:12, 15:13, 16:15, 16:18, 16:22, 21:23, 22:2, 22:19, 26:21, 27:8, 28:18, 77:25, 84:3, 96:16, 97:4, 97:14, 97:20, 123:6, 124:17, 129:17, 129:25, 130:24, 131:5, 145:21, 151:12
**cases**
16:1, 16:3, 16:13, 21:19
**causing**
89:1
**caution**
147:9
**center**
5:5, 69:20, 69:21
**certain**
35:5, 38:6, 38:7, 41:14, 44:4, 82:22, 91:25, 94:1, 94:3, 97:15
**certainly**
92:9, 117:4, 123:1, 139:15
**certificate**
150:25, 151:1
**certify**
151:5
**cetera**
29:4
**challenged**
30:2, 32:21, 32:24, 33:5, 46:7, 46:12, 46:16, 46:20, 46:22, 48:2, 50:2, 50:17, 59:22, 59:25, 64:3, 78:2, 78:7, 82:9, 89:17, 90:15, 92:12, 94:20, 125:21
**challenging**
82:10
**chance**
42:17, 42:22, 44:20, 45:2, 58:11, 93:15, 115:18
**change**
73:23, 113:11, 128:18, 136:19
**changing**
129:7
**characterization**
126:4
**charge**
73:5, 86:11

**chat**
80:18, 112:19,
118:16, 118:22,
130:6, 134:10,
138:5, 138:10
**check**
19:11, 19:18,
110:7
**chief**
22:11, 25:22,
26:11, 38:22,
38:23
**child**
21:12, 88:12
**children**
89:7
**circle**
80:12
**circuit**
130:22, 131:6,
145:13, 146:9,
146:18
**citizen**
35:19, 57:15,
140:22
**citizens**
140:12
**citizenship**
33:3, 50:7,
54:11, 79:6,
79:13, 91:17,
140:5
**citrus**
11:3
**civil**
4:5, 24:8,
28:5, 53:5,
53:13, 53:15,
55:24, 56:22,
83:1, 84:25,
85:18, 85:24,
86:1, 86:3,
86:4, 86:9
**civilly**
56:21
**clarification**
44:4, 44:8
**clarify**
32:19, 50:13,

80:25, 123:1,
124:6, 125:18
**clarity**
139:1
**clear**
50:20, 52:23,
67:13, 69:17,
100:5
**clearly**
17:4, 90:6,
90:25, 96:5
**clearwater**
8:18
**clerical**
20:17
**clicked**
37:9
**close**
114:11
**closely**
85:14
**closer**
135:7
**co-counsel**
77:24, 79:22,
149:22
**code**
35:10
**codified**
130:11
**codify**
41:19
**collect**
52:15, 110:21,
140:13
**collected**
72:3, 72:6,
119:19, 120:11
**collecting**
35:8, 35:18,
35:23, 51:11,
52:5, 54:16,
57:13, 60:5,
60:22, 72:18,
102:18, 141:2
**collects**
111:4
**colleen**
12:13

**come**
62:20, 100:15
**comes**
133:23, 139:19
**coming**
47:10, 134:17
**commenting**
46:8
**commission**
39:21, 39:24,
40:4, 41:5,
44:9, 48:19,
49:3, 49:8,
151:17
**commit**
100:21, 100:23,
101:3, 101:24
**committed**
94:11, 95:11,
95:13, 102:5,
102:10
**common**
47:6, 65:7,
75:21
**communicate**
78:5, 90:16
**communication**
51:3, 65:8
**communications**
34:2, 63:25,
64:7, 64:15,
64:18, 65:2,
65:19, 66:5,
66:14, 94:18,
128:22, 133:14
**communities**
84:10, 84:18
**complaint**
81:8, 81:11,
81:13, 81:17
**complete**
17:20, 57:12,
58:21, 58:23,
150:5
**completed**
21:15, 102:22,
103:17, 103:25,
133:24, 136:25

**comply**
105:3
**concern**
111:11, 111:19,
116:8, 116:22,
117:2, 117:16
**concerned**
117:9
**concerning**
51:8, 52:3
**concerns**
49:18, 49:19,
62:12, 115:20,
115:23, 116:1,
116:17, 116:20,
117:7
**conclusion**
105:24, 106:15,
144:15
**conduct**
75:24
**conducted**
1:20, 3:2,
51:14
**conference**
1:5, 130:1
**confirm**
56:5, 64:17
**confirming**
128:20
**connected**
41:4
**connection**
19:21, 59:24
**consequences**
136:1, 137:2
**consider**
43:25, 80:23
**consideration**
78:23
**considered**
31:11, 31:20,
32:2, 32:17,
33:11
**considering**
115:20
**consistent**
24:1

**consult**
31:19, 31:25, 32:9, 32:13
**consulted**
23:11, 27:18, 30:18, 31:2
**contact**
122:13, 123:8, 125:4, 126:1
**contacted**
45:12
**contacting**
45:20, 120:13
**contain**
71:6, 107:11, 131:15
**contained**
46:13, 50:7, 123:1
**containing**
37:22
**contains**
110:9, 131:24, 132:20
**contends**
59:22, 125:21
**contents**
137:14, 137:21
**context**
36:4, 52:16, 74:10, 143:25
**continue**
126:17
**continued**
1:15, 2:1, 147:4
**contrary**
148:17
**control**
110:22
**conversation**
17:10, 103:16
**conversations**
68:1
**convicted**
35:9, 93:25, 94:9, 100:19, 102:13
**conviction**
102:16
**convictions**
92:1, 103:24
**coordinate**
21:1
**copied**
69:5, 69:10
**copies**
74:13, 76:4, 76:11, 76:13
**copy**
149:16
**cord**
1:10, 2:20
**correct**
22:6, 24:13, 37:1, 40:24, 51:2, 96:14, 96:16, 110:14, 111:7, 119:25, 124:4, 125:5, 128:24, 130:2, 132:8, 139:20, 145:3, 146:10, 146:11, 150:5, 151:6
**corrections**
150:6
**correctly**
30:3, 50:3, 52:7, 60:1, 63:3, 64:5, 72:8
**could**
42:12, 49:10, 69:6, 75:21, 79:5, 79:12, 87:21, 98:24, 105:20, 106:11, 106:18, 106:25, 112:22, 114:10, 117:7, 117:17, 118:17, 121:7, 121:9, 121:10, 121:22, 128:2, 130:14, 137:5, 148:3
**counsel**
15:4, 17:17, 25:25, 26:23, 80:11, 99:18, 147:21, 147:22, 151:10
**counted**
57:8
**county**
6:2, 6:5, 6:12, 6:14, 7:3, 7:11, 8:3, 8:12, 8:15, 9:12, 10:3, 11:3, 11:11, 11:14
**couple**
16:25, 46:17, 80:2, 81:23, 93:12
**course**
73:10
**court**
1:1, 2:2, 3:11, 8:16, 17:8, 17:11, 23:25, 24:3, 27:9, 28:11, 34:8, 36:20, 39:13, 55:13, 66:21, 68:18, 70:12, 112:19, 118:16, 119:2, 130:22, 134:11, 149:11, 149:15, 149:20
**cover**
53:4
**covered**
58:8, 102:12
**covers**
92:15
**cox**
53:2, 53:3, 53:10, 66:24, 67:1, 86:10, 92:9, 122:21
**crafting**
61:8
**create**
120:6
**created**
51:8, 74:23, 83:1, 120:16, 137:17, 139:12
**creates**
133:23
**creating**
120:20
**creation**
57:5, 99:5, 145:7
**crimes**
67:18, 67:20, 67:23, 68:11
**criminal**
35:10, 53:4, 83:2, 84:25, 86:11, 99:16, 99:20, 122:5, 122:7, 122:17, 122:18, 123:16
**cross**
126:23, 127:5, 148:3
**cross-examination**
80:5, 91:6
**cunningham**
41:22
**current**
38:13, 56:4, 56:25, 144:22
**currently**
20:7, 22:17, 133:2
**cursor**
113:16
**custody**
103:25
**cut**
87:13, 115:4, 135:11, 135:22
**cv**
145:21
**cv-**
130:2
**cycle**
143:19, 144:9, 144:16, 144:19, 144:23

**D**

**daily**
38:1

**dale**
11:4
**damn**
113:13
**dash**
135:9
**data**
74:16
**database**
74:9, 74:17, 74:23, 75:2, 75:25, 76:6, 76:14, 76:24
**date**
67:12, 75:10, 133:9, 150:25
**davis**
12:16
**dawn**
44:1, 45:12, 45:17, 45:20
**day**
136:22, 151:16
**day-to-day**
20:24
**days**
128:9, 128:18, 129:7, 129:8, 133:24, 136:25, 139:19
**dayton**
4:4
**dc**
5:8, 5:17
**deadline**
102:1, 128:8, 129:7, 137:1, 139:6, 139:7
**deal**
113:3
**deaths**
89:1
**debated**
31:11
**december**
1:21, 151:16
**deciding**
21:22, 22:1
**declaratory**
81:17
**defendants**
1:13, 2:14, 2:23
**defending**
96:15
**defense**
127:6
**defer**
60:14, 60:17, 61:5, 90:21, 96:2, 98:23, 99:4, 103:5, 103:20, 122:20, 123:23, 131:19
**deference**
61:10
**deferred**
116:13
**deferring**
62:4, 109:10, 109:12
**definitions**
24:13
**degree**
21:14
**deliberative**
30:22, 31:14, 32:4, 32:6, 39:5, 64:12, 66:10, 78:16, 104:13, 129:1, 129:2
**delivery**
130:13, 139:4
**demographics**
84:4
**department**
38:11, 134:21
**depo**
149:18
**deponent**
150:1
**deposed**
15:18, 84:1
**deposition**
1:16, 3:1, 13:10, 13:11, 14:6, 17:1, 18:23, 19:20, 23:5, 24:7, 24:17, 26:14, 29:20, 45:25, 51:4, 80:14, 84:14, 84:15, 88:13, 89:24, 99:8, 99:21, 125:19, 140:7, 148:11, 148:13, 148:18, 148:20, 149:7, 149:9, 149:13, 151:4
**depositions**
16:5, 16:11, 87:5
**deputy**
20:20, 38:23
**describe**
20:13, 83:10, 116:19
**described**
95:20, 103:13, 110:18, 117:6, 117:16, 139:19, 141:16
**describes**
141:18, 142:12
**describing**
87:7, 117:12, 142:9
**designate**
88:21
**designated**
1:18, 24:22, 24:24, 25:10, 46:5, 47:17, 50:15, 50:24, 68:6, 68:8, 86:23, 92:8, 92:10, 96:12, 142:4
**designee**
76:21, 86:15
**detail**
146:7
**detailed**
68:3
**details**
112:6, 112:8
**deter**
104:8, 104:15
**determinations**
88:16
**determine**
51:14
**determining**
105:16
**different**
46:13, 73:17, 116:4, 124:12, 131:13, 134:2
**difficult**
137:10
**direct**
22:12, 139:14
**direct-examinati-on**
15:7
**directed**
45:17
**direction**
151:9
**director**
20:7, 20:18, 20:21, 20:24, 39:20
**disagree**
123:15
**disaster**
138:11
**disclose**
117:22
**disclosed**
50:10
**disconnected**
113:13, 138:17
**discourage**
105:20, 106:11, 106:18
**discovery**
25:18, 26:17, 26:20, 26:21, 26:24, 28:22,

28:25, 75:18, 77:6, 133:13
**discuss**
70:1, 121:10
**discussed**
27:1, 29:21, 63:23, 122:25, 129:15, 129:19, 130:17, 140:5, 147:23
**discusses**
55:18, 71:20
**discussing**
39:1, 147:15
**discussion**
119:9, 146:23
**dishonesty**
101:22, 101:24
**disks**
74:12, 76:4
**disregard**
73:1
**district**
1:1, 1:2, 2:2, 2:3, 15:14
**division**
1:3, 2:4, 22:11, 28:5, 29:1, 72:15, 72:16, 74:21, 75:6, 85:18, 85:23, 86:1, 86:3, 144:3
**divulging**
78:19
**document**
23:16, 23:19, 24:6, 27:4, 27:13, 28:17, 28:19, 29:24, 34:9, 34:21, 34:22, 34:24, 39:20, 42:6, 42:13, 44:20, 46:25, 55:6, 59:8, 71:9, 75:10, 81:14, 83:5, 83:6, 88:6, 93:7, 107:14, 112:16, 115:18, 116:12, 119:7, 119:12, 120:4, 133:5, 134:13, 137:6, 137:7, 138:5, 139:12, 144:21
**documents**
13:14, 19:5, 23:24, 25:17, 26:17, 28:21, 28:23, 29:6, 29:7, 29:9, 29:16, 51:11, 51:25, 52:6, 52:10, 54:2, 71:25, 72:1, 72:2, 72:4, 72:5, 72:18, 73:2, 73:15, 74:2, 74:4, 74:17, 75:4, 75:7, 75:8, 75:12, 76:1, 76:23, 77:3, 77:8, 100:2, 109:21, 134:10
**doing**
36:11, 93:24, 102:7, 102:16, 105:20, 106:11, 125:6
**done**
51:17, 63:19, 82:4, 115:19, 148:1
**doublecheck**
92:23, 119:7
**down**
17:12, 23:21, 24:11, 24:15, 25:6, 27:15, 34:24, 39:19, 43:2, 43:3, 55:22, 56:6, 75:19, 81:20, 113:6, 113:18, 114:17, 120:21, 130:7, 135:25, 137:14, 144:10
**draft**
38:25, 39:2, 44:14, 45:16, 46:9, 49:18, 50:17
**drafted**
47:14, 65:2
**drafting**
30:18, 31:4, 78:11, 108:9
**drafts**
43:24
**drive**
9:15
**drives**
74:12, 76:4
**drug**
88:11, 88:25
**drugs**
47:12
**duly**
15:5
**during**
14:6, 30:18, 31:3, 38:2, 78:11, 78:22, 78:24, 84:13, 90:8, 136:22

**E**

**each**
17:5, 23:25, 35:7, 35:17, 57:13, 59:20, 59:22, 81:2, 92:12, 125:20
**earlier**
22:18, 29:13, 48:23, 72:11, 78:1, 83:25, 105:7, 110:13
**early**
136:22
**ease**
118:14, 130:20
**easier**
138:6, 138:15
**east**
7:6, 11:6
**ed**
41:14
**edits**
47:5
**educational**
21:8
**edward**
40:10, 40:15
**effect**
34:25, 35:4
**efficiency**
145:14
**efforts**
69:19
**either**
19:8, 33:19, 38:3, 38:4, 46:20, 49:10, 78:25, 88:24, 117:3, 117:13
**elected**
61:15, 62:6
**election**
35:10, 60:15, 61:6, 67:20, 67:23, 68:10, 70:21, 71:3, 71:18, 90:6, 91:1, 96:7, 100:24, 101:3, 109:15, 111:13, 113:2, 115:7, 115:9, 115:12, 124:22, 136:18, 136:20, 136:22, 139:9, 139:21, 141:3, 141:25, 142:17, 142:22, 143:18, 144:8, 144:16, 144:19, 144:23
**election-related**
16:13
**elections**
6:3, 6:12,

6:15, 7:2, 7:12,
8:2, 8:13, 9:12,
10:2, 11:2,
11:12, 14:4,
39:21, 39:24,
40:3, 41:4,
49:3, 62:8,
62:10, 67:17,
69:25, 111:22,
115:10, 115:21,
115:23, 134:23
**electronic**
74:6, 74:23,
75:1, 75:25,
76:5, 76:14,
76:24, 77:4
**electronically**
74:9, 74:11,
151:7
**elias**
4:15, 5:14,
148:22
**elizabeth**
1:19, 3:2,
13:2, 15:3,
135:6, 150:2
**else**
19:1, 26:12,
29:8, 62:19,
85:22, 104:25,
106:16, 128:23,
148:9, 148:14
**email**
13:16, 36:22,
37:22, 39:9,
39:18, 41:24,
42:21, 42:25,
43:3, 43:4,
43:13, 43:20,
43:22, 43:24,
44:3, 44:6,
44:14, 45:2,
45:5, 45:9,
45:12, 45:16,
48:12, 48:15,
49:13, 49:16,
64:22, 66:22,
67:1, 67:2,

67:10, 67:11,
67:12, 68:2,
70:15, 70:24,
71:1, 71:5,
71:20, 149:23
**emails**
13:18, 13:19,
13:22, 13:24,
73:7, 75:6
**emergency**
41:13, 41:16
**employed**
22:9, 22:15,
151:11
**enact**
98:16
**enacted**
82:22, 94:6,
95:8, 121:18,
145:1
**enactment**
30:1, 46:6,
47:20, 95:1,
98:20, 99:6
**encounters**
136:21
**encouraging**
103:18
**end**
77:14, 83:7,
114:10, 123:17,
135:22
**ended**
133:13
**enforcement**
51:9, 52:3,
52:25, 53:4,
53:6, 53:13,
54:10, 56:22,
68:6, 83:17,
84:25, 99:20
**enforcing**
49:25, 50:25,
82:25, 83:11
**engage**
121:22
**engaged**
65:1, 66:3,

66:13, 85:20,
89:5, 89:8,
89:10, 129:4,
145:6
**engaging**
144:1
**enough**
16:20
**enrolled**
13:21, 55:14,
93:8
**entailed**
132:13
**entered**
130:24, 131:5
**entire**
41:2, 42:13,
44:20, 57:23,
87:21
**entirety**
32:22, 59:2
**entity**
40:2, 84:24
**enumerated**
101:16
**eroding**
115:12
**errata**
150:7
**especially**
148:13
**esquire**
4:3, 4:4, 4:14,
5:4, 5:13, 6:4,
6:13, 7:4, 7:13,
8:4, 8:14, 9:3,
9:13, 10:4,
10:13, 11:4,
11:13, 12:4
**essentially**
93:24
**est**
1:22
**established**
96:11
**estimate**
63:18
**et**
1:7, 1:12, 2:7,

2:13, 2:17,
2:22, 4:2, 7:3,
8:3, 10:3, 29:4
**evaluation**
89:12, 89:19,
133:1, 133:8,
147:1, 147:3
**even**
38:13
**ever**
15:18, 16:8,
112:2, 121:19,
125:2
**every**
84:6, 144:18,
147:25
**everybody**
19:24
**everyone**
126:14, 126:25,
127:21
**everything**
17:3, 82:11
**evidence**
59:24, 118:10
**exactly**
16:18, 73:20,
86:5, 97:18,
126:22
**examination**
13:2, 15:4
**examined**
15:5, 150:3
**example**
47:12, 75:9
**examples**
78:13, 78:24
**excellent**
91:15
**exception**
17:24
**exchange**
49:13, 70:15
**excuse**
109:13, 124:21
**executive**
39:20
**exhibit**
13:10, 13:11,

13:12, 13:13, 13:15, 13:16, 13:17, 13:18, 13:19, 13:20, 13:21, 13:22, 13:23, 13:24, 13:25, 14:1, 14:2, 14:3, 14:5, 23:17, 24:2, 24:4, 27:5, 27:10, 28:7, 28:12, 29:19, 34:5, 34:8, 36:18, 36:21, 37:12, 37:19, 38:17, 39:11, 39:14, 44:18, 49:22, 51:20, 54:21, 55:12, 55:13, 56:14, 59:9, 62:23, 66:19, 66:21, 68:16, 68:19, 70:10, 70:13, 71:23, 93:3, 112:16, 118:17, 118:18, 119:4, 130:5
**exhibits**
14:6, 24:1
**exists**
51:15
**expect**
101:20
**expiration**
144:23
**expires**
144:14, 151:17
**explain**
18:5, 18:9, 34:12, 46:3, 92:21, 98:24, 100:6, 100:14
**explained**
78:1, 125:2
**expressed**
125:2
**extent**
26:4, 30:21, 30:23, 31:13, 31:16, 39:5, 41:10, 45:24, 60:8, 61:22, 62:15, 64:12, 66:9, 72:20, 76:25, 78:15, 82:15, 88:19, 89:25, 90:19, 96:18, 97:6, 97:22, 97:25, 99:15, 100:9, 102:25, 104:12, 105:25, 110:1, 118:6, 120:3, 122:5, 123:14, 123:20, 126:6, 128:25, 131:11, 133:12, 134:1, 141:5, 147:7
**eyesight**
135:5

**F**

**faced**
115:7
**factor**
43:21
**facts**
59:23
**failing**
105:3
**familiar**
22:22, 36:1, 53:17, 54:9, 54:14, 67:15, 99:9, 106:22, 120:3, 120:6, 120:24
**familiarity**
110:14
**family**
21:12
**far**
68:2, 108:2, 125:23
**fear**
115:10
**federal**
24:8
**federation**
2:16, 4:2, 15:12, 27:8, 79:24, 149:2
**federation's**
28:9
**feel**
117:14, 117:25
**felonies**
94:1, 94:10, 95:11, 101:8, 101:11, 101:13, 101:19, 101:24, 102:5, 102:10, 102:14
**felony**
35:9, 91:19, 91:21, 92:1, 93:21, 95:23, 96:24, 97:2, 98:16, 98:25, 99:12, 100:6, 101:6, 103:22, 103:24, 104:9
**ferguson**
5:4, 13:5, 80:3, 91:7, 91:9, 94:16, 94:25, 99:18, 112:18, 113:10, 114:1, 114:3, 114:15, 114:17, 114:19, 114:25, 118:15, 118:23, 118:25, 119:6, 122:23, 126:13, 126:19, 126:21, 127:4, 127:10, 127:20, 127:24, 128:2, 128:5, 130:4, 134:9, 135:2, 135:10, 135:21, 137:8, 138:4, 138:12, 138:15, 147:20, 148:7
**few**
20:20, 78:8, 101:6, 107:3, 121:16, 126:22, 130:14, 146:10
**fi**
11:16
**fiduciaries**
141:19, 142:13
**field**
39:16, 41:22
**figure**
19:22
**filed**
81:8, 130:21
**files**
41:16
**fill**
59:1
**final**
143:4
**financial**
151:12
**finding**
120:13
**fine**
19:15, 26:9, 59:15, 59:16, 92:21, 105:2, 105:20, 106:11, 127:23
**fines**
130:13, 131:7, 131:16, 132:7, 132:21, 133:2, 139:3
**finished**
55:7, 56:9, 69:12, 93:17
**first**
17:3, 27:6, 28:9, 42:5, 42:8, 42:15, 42:16, 58:14, 69:7, 78:1, 78:11, 129:24, 135:24, 136:4
**fix**
87:12

**fl**
50:7
**flash**
76:4
**floor**
4:8, 8:17
**florida**
1:2, 1:5, 1:11, 1:17, 2:3, 2:7, 2:13, 2:22, 5:3, 6:7, 6:17, 7:7, 7:17, 8:8, 8:18, 9:2, 9:4, 9:7, 9:17, 10:8, 10:12, 10:18, 11:7, 11:17, 12:2, 12:5, 12:8, 15:14, 15:24, 20:3, 21:9, 21:11, 24:7, 24:25, 25:14, 25:21, 26:12, 26:18, 27:5, 28:8, 29:10, 30:6, 30:11, 30:13, 35:10, 39:21, 39:23, 40:3, 45:13, 45:21, 55:19, 63:2, 63:7, 63:12, 63:21, 64:1, 64:2, 64:8, 64:19, 65:9, 65:11, 65:15, 65:20, 66:6, 68:25, 70:2, 71:19, 72:17, 73:24, 76:21, 77:9, 91:10, 94:19, 111:11, 111:20, 113:2, 115:7, 115:9, 118:2, 121:19, 129:25, 145:2
**florida's**
73:11, 73:14
**focus**
38:25
**focused**
33:4
**folks**
38:19
**follow**
73:11, 110:6, 147:22
**follow-up**
77:23, 78:8
**following**
35:16, 117:5, 144:4
**follows**
15:6
**foregoing**
150:4, 151:4, 151:5
**formal**
51:25
**forms**
102:23, 103:14, 104:1, 141:2
**fort**
10:8
**forth**
125:13
**forward**
33:2, 62:13, 96:8
**foundation**
4:6
**four**
136:17
**frank**
7:4
**franklin**
10:5
**fraud**
98:17, 98:25, 99:13, 99:15, 100:7, 100:21, 101:3, 101:21, 101:24, 108:2, 108:7, 147:16
**front**
19:5, 19:11, 131:21
**full**
45:3, 110:9, 117:9, 120:10, 120:11, 120:22, 135:13, 135:19
**function**
118:22
**further**
61:21, 79:7, 79:20
**furthered**
60:4, 60:21, 61:20
**future**
100:21
**fyi**
48:6

**G**

**gaines**
12:7
**gainesville**
6:7
**gardens**
7:17
**general**
1:17, 2:12, 9:2, 9:5, 12:3, 12:6, 21:3, 24:8, 38:10, 38:24, 55:24, 68:25, 70:21, 71:3, 71:18, 73:6, 82:25, 83:11, 84:13, 87:11, 88:3, 88:8, 88:15, 88:20, 89:4, 89:22, 90:16, 92:6, 101:7, 116:17, 129:25, 134:6, 140:15, 140:20, 142:11, 143:18, 144:15, 144:18, 149:3, 149:9
**general's**
20:3, 20:10, 21:9, 21:20, 22:2, 24:25, 25:14, 25:21, 26:13, 26:19, 27:6, 27:12, 28:8, 29:10, 30:5, 31:25, 34:17, 38:20, 40:18, 41:1, 41:13, 41:23, 41:25, 42:3, 43:25, 47:19, 50:6, 51:23, 52:10, 52:14, 53:1, 54:7, 54:10, 56:21, 66:20, 73:24, 76:22, 78:4, 78:5, 82:8, 83:18, 86:23, 96:22, 97:20, 106:10, 142:5
**generally**
22:22, 22:25, 27:23, 47:24, 51:16, 53:12, 54:13, 75:15, 84:8, 85:14, 85:22, 87:3, 92:4, 107:8, 110:15, 112:13, 121:3
**gestures**
17:12
**getting**
114:11
**giblin**
9:14
**give**
17:21, 42:22, 59:17, 74:10, 92:5, 92:20, 93:12, 99:11, 107:3, 112:17, 121:7, 121:16, 130:9, 136:9, 146:1, 148:8, 148:14
**given**
16:8, 26:1,

51:18, 148:12, 150:6, 151:6
**gives**
144:22
**giving**
117:9, 148:11
**glades**
10:3
**gleaned**
130:25
**go**
16:11, 16:25, 17:18, 18:12, 19:22, 29:19, 29:22, 34:23, 38:16, 42:17, 42:25, 47:2, 48:5, 49:21, 55:17, 59:9, 62:9, 65:17, 65:23, 69:11, 77:14, 77:16, 80:3, 87:17, 92:22, 92:24, 98:11, 104:19, 109:11, 109:18, 113:4, 113:21, 113:24, 120:13, 120:21, 128:2, 134:19, 135:14, 137:10, 137:14, 138:24, 146:6
**going**
23:15, 23:21, 26:3, 26:5, 27:3, 27:15, 27:17, 27:22, 28:6, 29:20, 29:23, 30:16, 30:20, 33:2, 34:4, 34:7, 36:17, 38:16, 39:10, 41:22, 42:12, 42:21, 43:3, 43:12, 44:12, 44:17, 44:19, 45:23, 46:4, 48:16, 49:21, 50:9, 51:19, 53:3, 54:20, 55:11, 55:17, 55:21, 57:22, 59:16, 59:19, 60:7, 62:17, 62:22, 63:24, 66:17, 69:9, 71:8, 71:22, 77:12, 79:23, 80:1, 80:9, 81:10, 81:20, 81:23, 85:7, 87:6, 90:12, 91:10, 91:12, 92:13, 93:4, 94:14, 97:14, 97:22, 100:2, 105:6, 105:24, 112:15, 118:13, 119:1, 122:3, 123:19, 126:6, 126:10, 126:11, 126:17, 129:21, 130:19, 131:10, 132:25, 134:12, 134:18, 135:7, 135:17, 135:25, 137:9, 138:20, 138:23, 139:22, 143:3, 146:1, 147:9, 149:12
**good**
15:9, 44:14, 59:12, 85:15, 87:22, 91:8, 91:12, 126:25
**government**
65:9, 94:8, 95:10, 118:2, 121:19, 128:23, 145:2
**governor**
64:1, 64:9, 64:19, 65:12, 78:6, 94:19
**governor's**
64:16, 65:24
**graduated**
21:11
**gray**
8:5
**great**
87:24, 119:15, 135:6
**grounds**
141:7
**group**
4:15, 5:14, 7:14, 148:22
**groups**
84:17, 147:25
**grunts**
17:12
**guard**
38:19, 38:23
**guess**
25:24, 64:21, 74:9, 74:17, 74:19, 90:12, 92:5, 98:22, 99:9, 117:13, 121:6
**guidance**
44:9, 49:25, 50:16, 51:6, 51:7, 51:15, 51:24, 52:14, 52:18, 52:21, 78:20
**guys**
82:20
**guzza**
15:15
**guzzo**
1:19, 3:2, 13:2, 13:10, 15:3, 15:15, 15:17, 15:18, 20:2, 28:14, 34:10, 37:21, 39:15, 50:23, 91:8, 128:10, 150:2

**H**

**half**
126:11
**halfway**
34:24
**hand**
151:15
**handful**
77:23
**handle**
52:19, 140:13, 140:19
**handled**
29:2
**handling**
35:8, 35:18, 35:23, 51:10, 52:5, 54:16, 57:14, 60:5, 60:21, 102:18, 114:14
**happen**
36:3
**happy**
46:2, 57:19, 81:22, 126:24, 141:19
**harassment**
111:12, 111:20, 113:3, 115:8, 115:23, 117:17
**hard**
80:10
**head**
73:18
**headline**
112:22, 113:1, 116:2
**hear**
48:17
**heard**
112:2, 112:9
**held**
20:14, 119:9
**help**
75:17, 109:1, 109:24, 147:15
**helped**
86:16, 86:25, 108:18
**helpful**
137:15, 141:20

**helping**
140:24
**helps**
41:15, 41:17
**henderson**
10:5
**here**
17:4, 17:16, 19:24, 29:22, 30:20, 37:3, 37:11, 37:23, 39:16, 40:23, 42:6, 42:9, 43:22, 50:10, 52:24, 56:7, 56:12, 58:14, 59:4, 68:12, 69:7, 69:14, 69:22, 77:17, 81:13, 82:10, 89:21, 93:23, 94:10, 99:20, 102:6, 107:11, 109:5, 112:16, 113:8, 113:25, 114:20, 115:4, 115:19, 116:8, 119:2, 122:11, 122:24, 124:12, 132:6, 134:13, 135:25, 137:3, 137:12, 138:7, 138:23, 139:2, 141:15, 143:10, 146:3
**hereby**
150:2, 151:4
**hereunto**
151:14
**hi**
80:7
**highlight**
42:6, 130:20, 132:25
**highlighted**
48:17, 48:21, 49:7
**highlights**
149:5
**hillsborough**
11:11, 11:14
**hispanic**
2:16, 4:2, 15:12, 27:7, 28:9, 79:24, 149:1
**hm-mmm**
107:23, 145:23
**hold**
29:6, 58:5, 72:25, 73:23, 73:25, 113:9, 113:12, 113:16, 113:22, 114:8
**holt**
10:5
**holtzman**
10:14
**hour**
59:12, 59:18, 80:21, 126:11, 127:15, 127:17
**house**
34:16
**housed**
40:4, 40:9
**however**
74:18
**human**
88:10, 89:3
**hutson's**
37:10, 37:22

**I**

**idea**
36:6, 122:10
**ideas**
21:2, 88:22
**identification**
35:12
**identified**
49:19, 61:10, 62:12, 89:23, 108:17, 108:25, 109:24
**identify**
38:19, 39:2, 51:24, 88:7, 90:14, 118:3
**identifying**
35:11
**implementation**
44:10
**implementing**
49:24, 50:6, 50:25
**implicate**
54:6
**implicated**
26:5
**implicates**
30:21, 31:14, 39:5, 60:8, 61:23, 62:16, 64:12, 66:10, 72:20, 77:1, 78:16, 82:15, 88:19, 90:1, 90:19, 96:18, 97:6, 97:7, 97:23, 102:25, 104:12, 110:2, 118:6, 123:14, 126:7, 129:1, 131:11, 133:12, 141:5, 147:8
**important**
84:23
**inability**
148:12, 148:23
**inc**
2:7
**include**
74:7, 107:13
**included**
48:18, 55:5, 56:13, 97:19, 101:13
**includes**
55:1, 69:10
**including**
65:11, 65:14, 72:1, 119:2, 119:21
**incorporated**
124:3
**incorrectly**
47:13
**increasing**
115:8
**independent**
62:14, 149:5
**indicates**
36:7, 42:7, 57:11, 58:20
**indicating**
101:2
**individual**
30:7, 76:17, 110:10
**individually**
76:9
**individuals**
72:23
**informal**
52:1
**information**
16:20, 26:7, 27:19, 30:24, 35:11, 53:14, 60:10, 61:25, 69:21, 78:19, 84:24, 94:8, 95:19, 95:20, 100:12, 101:2, 103:3, 118:2, 119:17, 121:1, 121:2, 121:20, 121:22, 122:2, 122:7, 122:13, 123:7, 123:9, 123:12, 125:4, 126:1, 126:5, 130:25, 133:18, 133:21, 144:4, 147:10, 147:12
**initial**
130:21
**initially**
20:16
**injunction**
130:24, 131:5
**injunctive**
81:17

**input**
32:16, 33:9
**instances**
111:3, 111:12, 117:1, 121:20
**instead**
124:15
**institute**
55:24
**instruct**
26:5, 60:9, 97:24, 105:24
**instructed**
73:9, 73:11, 74:1
**instructing**
103:1
**instructions**
24:13, 52:1, 58:25
**intended**
108:6
**intends**
149:4
**intent**
90:5, 90:25, 96:5, 98:21, 99:10, 99:25, 108:12, 124:23
**intentions**
108:13
**interact**
41:9, 41:11
**interaction**
41:18
**interactions**
67:22, 68:3
**interest**
59:21, 60:3, 60:14, 60:16, 60:20, 61:4, 61:7, 61:9, 61:14, 61:19, 62:4, 62:14, 62:18, 62:21, 79:6, 79:12, 89:13, 89:19, 89:23, 90:24, 96:12, 103:22, 104:5, 107:16, 108:15, 108:23, 109:22, 110:5, 110:8, 123:3, 123:11, 123:18, 124:15, 125:2, 125:3, 125:5, 125:11, 125:13, 125:15, 125:20, 125:24, 129:7, 130:25, 133:1, 139:2, 141:15, 147:2, 149:4, 151:12
**interested**
21:3, 127:7
**interests**
59:25, 87:8, 90:14, 92:11, 95:22, 96:6, 96:15, 96:23, 97:1, 97:11, 97:16, 97:18, 99:22, 107:21, 108:4, 109:4, 109:14, 122:25, 124:2, 124:13, 126:5, 129:13, 148:24
**internal**
29:2
**internet**
19:21
**interrogatories**
13:12, 14:2, 14:5, 27:7, 27:24, 81:4, 85:7, 86:25, 98:6, 129:17, 129:24, 145:20
**interrogatory**
27:16, 51:21, 51:22, 52:11, 86:15, 87:6, 87:25, 89:18, 130:8, 130:15, 131:8, 131:17, 145:12, 146:2, 146:15
**intimidation**
111:12, 111:21, 112:4
**investigating**
21:19
**investigation**
79:4, 79:9, 122:17
**investigations**
78:13
**investing**
21:19
**invoking**
133:17
**involve**
16:12, 16:22, 97:25, 146:14
**involved**
22:1, 22:19, 64:24, 98:20, 99:5, 105:18, 106:3, 108:9, 134:6
**involvement**
106:7, 120:17, 120:19
**involves**
97:25, 100:9, 105:25
**involving**
23:8, 23:12
**issue**
23:10, 86:4, 86:9, 89:4, 89:7, 113:25
**issues**
23:8, 23:12, 44:8, 48:25, 70:1
**issuing**
85:24
**italicized**
35:23, 35:25
**italicizing**
36:3, 36:7, 36:12
**items**
73:18
**itself**
47:1, 60:19, 83:5

**J**

**jacksonville**
8:8
**james**
38:18, 38:22
**january**
64:4, 64:10, 65:21, 66:7, 67:12, 95:3
**jared**
8:14
**jefferson**
7:6, 11:6
**jerry**
10:4
**jindia**
12:15
**job**
1:23, 20:6, 37:24, 54:5
**john**
27:16, 27:21, 28:1, 38:19, 38:23
**join**
148:22, 148:24
**joined**
90:23, 96:9, 130:21
**joining**
21:8, 91:2
**josefiak**
10:15
**joshua**
10:13
**julie**
6:11
**jump**
49:22, 62:22, 63:24, 80:1

**K**

**kahn**
8:14

**keenan**
4:3, 13:3, 15:8, 15:10, 23:23, 26:8, 27:9, 28:11, 32:23, 33:1, 34:7, 36:17, 37:18, 39:13, 42:14, 46:2, 46:15, 47:3, 48:1, 48:4, 50:13, 50:19, 51:5, 52:23, 53:5, 53:8, 53:16, 54:20, 57:25, 58:10, 66:17, 67:7, 68:15, 70:9, 77:16, 77:20, 77:22, 79:20, 85:10, 140:6, 149:1, 149:20, 149:21
**keep**
59:16, 59:18, 62:17, 77:3, 91:12, 100:2, 115:11, 127:11, 127:12, 138:20, 148:11, 149:7
**keeping**
122:12, 123:4, 149:9
**kennedy**
11:15
**kept**
121:21
**keyword**
75:9, 75:16
**keywords**
75:21, 75:25
**kind**
99:19, 121:22
**kinds**
38:8, 47:5, 100:24, 101:13, 112:3
**knew**
85:10, 85:17
**knowledge**
16:24, 30:9, 49:20, 51:12, 75:3, 75:12, 75:14, 75:23, 76:20, 106:17
**knows**
108:25
**koon**
7:13

L

**lack**
148:12
**laid**
103:4
**language**
37:5, 37:16, 38:3, 38:14, 39:1, 39:3, 44:4, 45:22, 46:9, 47:5, 48:18, 49:3, 49:8, 49:18, 56:4, 87:13, 123:23
**large**
124:13
**larger**
110:17
**largo**
6:17
**last**
19:13, 19:19, 21:15, 44:7, 45:16, 67:4, 67:6, 67:11, 69:14, 119:18
**lastly**
18:17
**late**
102:1
**later**
62:21, 94:10
**law**
4:15, 5:14, 40:21, 41:6, 41:9, 56:25, 61:20, 73:12, 73:14, 95:2, 95:8, 102:7, 102:13, 111:5, 120:25, 143:4, 148:22
**laws**
60:18, 61:17
**lawsuit**
97:14
**lawyers**
17:15, 17:19
**lays**
144:24
**lead**
115:11
**leading**
115:9
**league**
2:6, 5:2, 91:10, 145:21
**learn**
84:24, 85:4
**learned**
84:17
**least**
54:5
**leave**
19:16
**leaving**
148:19
**legal**
5:5, 38:11, 105:24, 106:14
**legislation**
61:8, 82:21, 83:8, 87:10, 88:2, 88:11, 88:13, 88:22, 94:23, 98:21, 100:4, 105:18, 106:3, 145:7
**legislations**
88:8
**legislative**
16:3, 20:8, 20:11, 20:14, 20:21, 20:25, 21:18, 22:5, 22:9, 22:10, 22:15, 23:12, 31:22, 37:16, 37:25, 38:1, 38:2, 41:10, 47:5, 47:8, 47:18, 54:4, 62:6, 64:25, 65:6, 65:7, 65:25, 78:3, 90:4, 90:9, 90:25, 96:4, 98:21, 99:4, 99:10, 99:25, 124:23, 129:5
**legislator**
21:1, 30:7, 62:5, 65:3
**legislators**
62:5, 78:7, 78:23, 90:5, 91:1
**legislature**
21:4, 30:6, 31:12, 31:18, 33:11, 33:15, 34:14, 41:20, 60:15, 61:6, 61:11, 61:15, 64:2, 65:15, 65:18, 65:20, 67:4, 94:7, 94:20, 95:9, 96:7, 98:22, 108:11, 108:13, 109:14, 124:20, 128:22
**leigh**
8:4
**let's**
29:19, 31:8, 59:10, 92:24, 93:2, 118:13, 140:21, 140:23
**letter**
13:23, 68:20, 68:23, 69:4,

69:5, 69:18,
69:19, 70:4,
72:25
**letters**
69:24
**liberties**
4:5
**light**
19:19
**likely**
100:21, 100:23,
101:3, 101:25,
134:4, 139:15
**limit**
33:1
**limited**
22:4, 72:2
**line**
93:10, 105:10,
107:2, 121:13,
122:4, 123:24,
128:17, 143:13
**lined**
99:3
**link**
37:2, 37:4,
37:9, 37:15,
123:17
**list**
25:2, 57:7,
69:5, 70:20,
71:2, 71:17,
95:10, 101:11,
101:14, 101:19,
136:10
**listed**
24:19, 56:25,
87:5, 88:14,
96:5, 96:6,
97:11, 98:5,
98:22, 99:2,
100:1, 101:8,
102:17, 107:13,
108:14, 116:2,
116:3, 116:11,
120:8, 122:16,
132:1, 137:3
**litigation**
29:6, 29:11,

72:18, 72:24,
73:4, 73:23,
73:25, 75:6,
77:2, 81:5,
81:8, 84:9,
84:16, 86:17,
89:24, 90:17,
130:12, 133:14,
142:10
**little**
20:5, 21:7,
62:21, 72:10,
127:8, 129:16,
137:9, 138:10
**llp**
4:15, 5:14
**lobbytools**
38:5
**long**
16:4, 18:15,
20:2, 73:13,
74:18, 80:20,
80:24, 101:19,
102:21, 126:22,
137:9
**longer**
126:15, 126:17,
126:24, 127:8,
128:15
**look**
19:4, 44:18,
44:21, 51:20,
57:23, 59:10,
69:11, 93:13,
93:16, 101:5,
107:4, 134:18,
136:10, 138:6,
141:19
**looked**
130:11, 138:19,
139:3
**looking**
42:5, 57:18,
62:23, 132:6
**looks**
44:13
**lot**
17:15, 44:21,

101:18, 101:21
**loud**
81:25, 113:1
**lunch**
126:17, 126:24
**lux**
9:11

**M**

**ma'am**
17:7, 19:3,
26:15, 42:4,
67:14, 69:23,
72:9
**madam**
149:11
**made**
113:12
**maf**
1:10, 1:11,
1:12, 2:10,
2:11, 2:12
**mahan**
9:15
**main**
113:1
**mainly**
32:21, 32:23
**maintain**
73:9, 76:3,
76:12
**maintaining**
46:24
**maintains**
63:9, 63:15
**make**
17:10, 18:1,
18:11, 25:3,
53:8, 69:17,
78:9, 88:16,
130:6
**makeba**
4:14, 80:7,
148:21
**making**
108:16, 108:24,
109:23
**many**
15:21, 15:23,

22:8, 22:14,
80:16, 85:20,
109:18, 111:3
**marcus**
6:11
**mari**
7:4
**mark**
23:25, 24:3,
27:10, 28:12,
34:8, 36:20,
39:14, 55:13,
59:18, 66:21,
68:18, 70:13,
112:16, 118:17
**markarian**
7:14
**marked**
14:6, 37:11,
39:11, 49:22,
93:3, 119:3,
119:8, 130:5
**marks**
8:5
**maryland**
3:12
**massachusetts**
5:15
**match**
25:8
**matches**
83:8
**material**
132:20
**materials**
51:24
**matt**
6:13
**matter**
80:8, 99:16,
116:13
**matters**
53:15, 85:21,
103:12, 103:15,
122:18
**matthew**
9:13
**maybe**
81:2, 135:9,

137:15, 142:3
**mcvay**
66:23, 66:25, 68:24
**mean**
16:6, 19:9, 22:25, 25:1, 42:9, 49:10, 75:14, 78:10, 90:2, 98:4, 100:13, 116:1, 116:25, 118:25, 120:5, 121:9, 126:16, 137:16, 140:1, 141:8
**means**
36:4, 43:21, 52:15, 72:3
**meet**
80:16
**meeting**
80:20, 80:23, 80:25
**megan**
4:3, 15:9
**members**
21:2, 31:18, 65:14
**memo**
35:4
**memory**
55:11
**mention**
108:12, 146:19
**mentioned**
22:18, 26:16, 29:13, 36:1, 47:10, 48:23, 54:3, 73:6, 83:25, 88:12, 90:4, 95:17, 101:9, 107:20, 108:10, 117:20, 124:24, 131:8, 146:15, 146:23
**mentions**
132:7, 132:11
**met**
80:14, 80:18
**methods**
74:15
**middle**
93:9
**might**
18:18, 38:8, 62:20, 91:24, 110:19, 110:21, 110:22, 126:23, 135:11
**mind**
80:1, 112:25
**minute**
16:12, 69:6, 70:23
**minutes**
81:2, 126:22, 127:9, 127:13, 127:20, 146:10
**mis-summarized**
124:9
**mischaracterization**
60:25
**misconduct**
94:11, 95:13, 100:20, 100:24, 101:3, 121:23
**mispronouncing**
85:12
**misremembered**
94:24
**miss**
53:9
**misspeak**
105:7
**moment**
17:21, 38:17, 39:1, 55:4, 93:2, 112:17, 128:14, 136:10, 146:2, 148:8
**momentarily**
51:20, 93:4
**moments**
93:12, 101:6, 107:3, 121:16, 130:14
**monroe**
10:7, 10:16
**months**
133:7
**moody**
2:10
**more**
33:2, 79:18, 100:20, 100:23, 101:2, 101:24, 126:22, 127:13, 134:12, 139:16, 142:4
**morning**
15:9, 91:8
**most**
42:20, 134:4
**mouse**
113:17, 114:5, 114:6
**move**
37:25, 42:17, 51:19, 71:22, 93:2, 128:6
**moving**
21:6, 65:3, 66:2
**much**
23:7, 80:9, 126:15, 146:7
**multiple**
124:24, 148:18
**murder**
100:20, 101:9
**must**
35:7, 35:17, 107:13, 144:3
**myers**
10:8
**myself**
22:10, 22:17

**N**

**naacp**
1:7, 4:13, 5:12, 80:8, 87:8, 130:1
**nabors**
9:14
**nair**
1:25, 3:10, 151:3
**name**
15:9, 25:18, 29:14, 29:17, 72:13, 80:7, 85:12, 91:8, 110:10, 117:9, 117:22, 119:17, 119:18, 119:24, 120:10, 120:11, 120:22, 122:13, 123:8, 125:4, 125:25
**named**
44:1
**narrowly**
75:17
**nature**
26:2
**nauseam**
123:19
**near**
137:1, 139:7
**nearing**
77:11, 77:13
**necessary**
44:9, 61:20, 61:21, 104:8, 104:15, 110:9, 148:11
**need**
17:4, 18:13, 19:14, 81:22, 113:4, 113:24, 149:21
**neither**
151:10
**never**
125:10, 136:6, 136:15, 137:21
**new**
4:9
**newly**
83:1
**news**
112:2, 113:5

**next**
1:15, 42:18, 42:19, 42:22, 43:2, 44:17, 59:13, 59:20, 63:25, 65:18, 79:23, 118:17, 119:4, 135:17
**nick**
66:24, 66:25, 92:8, 122:20
**nickerson**
9:14
**noah**
9:3
**nods**
17:12
**noncitizens**
51:10, 52:4, 54:16, 60:5, 60:21, 62:12, 70:1, 70:5, 70:20, 71:2, 71:6, 71:7, 71:17, 71:18, 71:20, 78:14, 79:4, 79:11
**nonpartisan**
115:11
**nope**
82:1
**northern**
1:2, 2:3, 15:14
**nos**
1:9, 2:9
**notarial**
151:15
**notary**
3:11
**note**
19:13, 19:19, 138:4, 138:7
**notes**
77:15
**nothing**
57:11, 57:17, 57:18, 57:19, 58:16, 58:20, 79:20, 106:4, 106:16, 131:7
**notice**
3:10, 13:11, 24:6, 24:20, 29:20, 46:10, 99:8
**noticed**
46:1, 46:3, 71:11
**notification**
38:5, 38:14
**notify**
38:4
**noting**
18:22
**november**
143:18, 144:12
**nowhere**
69:24
**number**
15:13, 23:24, 24:2, 51:21, 51:23, 57:3, 59:11, 62:23, 63:24, 87:6, 87:25, 92:11, 94:1, 105:8, 118:18, 125:19, 130:8, 130:15, 134:25, 135:13, 135:19, 139:23, 146:2, 148:18
**numbers**
25:2, 135:11
**nw**
5:6, 5:15

**O**

**o'brien**
12:13
**o'donnell**
5:13
**oag**
30:12, 34:6, 34:20, 36:19, 37:11, 37:20, 39:2, 39:12, 48:14, 66:20, 68:17, 70:15, 76:23, 78:12, 78:23, 79:3, 79:9, 130:21
**oag's**
48:10, 67:22, 73:8, 89:12, 132:25
**oag-related**
139:13
**oag_hf_1strfp**
70:12
**oath**
57:13, 58:21, 58:23
**oaths**
55:5, 56:20
**object**
17:17, 25:25, 26:3, 27:22, 30:20, 45:23, 50:9, 60:7, 71:8, 94:14, 95:15, 96:19, 97:8, 97:21, 97:22, 122:3, 122:4, 123:19, 126:4, 126:6, 134:1, 139:22, 139:23, 141:6, 148:16, 148:19
**objection**
17:25, 22:24, 23:9, 30:8, 30:14, 31:6, 31:13, 32:3, 32:4, 32:18, 33:12, 33:24, 37:14, 39:4, 42:11, 46:25, 47:23, 47:24, 56:2, 56:15, 56:23, 57:16, 60:24, 61:12, 61:22, 62:15, 63:13, 64:11, 66:9, 67:5, 72:19, 76:7, 76:15, 76:25, 78:15, 79:1, 79:8, 79:14, 82:13, 82:16, 83:4, 83:13, 83:21, 84:11, 84:19, 85:2, 86:18, 88:4, 88:18, 89:25, 90:18, 92:17, 94:13, 95:25, 96:17, 97:5, 98:18, 99:1, 99:14, 99:23, 100:8, 102:2, 102:24, 102:25, 103:9, 104:2, 104:11, 105:23, 106:13, 106:14, 107:12, 107:17, 108:8, 108:20, 109:2, 109:7, 110:1, 110:11, 111:8, 111:14, 111:23, 112:11, 115:24, 116:10, 116:23, 117:10, 117:23, 118:5, 120:1, 120:2, 121:24, 122:15, 123:13, 124:5, 125:7, 125:16, 126:3, 128:25, 129:9, 129:10, 131:9, 131:18, 132:16, 132:22, 133:11, 133:25, 137:4, 139:10, 140:16, 141:4, 142:18, 142:24, 144:20, 145:4, 146:16, 147:6, 147:7, 148:23
**objections**
17:21, 17:22
**objects**
149:9

**oecs**
67:3, 67:16
**offenses**
100:20, 101:10
**offers**
41:10
**office's**
47:19, 49:24, 50:24, 62:24, 71:24, 104:7, 129:16, 130:19, 146:3, 147:1
**officer**
151:3
**offices**
14:4, 21:2, 34:2, 65:8, 78:6, 78:12, 134:23
**official**
1:10, 2:11, 2:20, 95:10
**officials**
60:15, 61:6, 61:16, 62:6, 62:10, 90:6, 91:2, 94:8, 96:7, 109:15, 124:22
**oh**
36:14, 62:9, 67:9, 87:15, 105:12, 113:12, 113:13, 114:18, 114:21, 129:10, 135:16
**okaloosa**
9:11
**olivo**
10:4
**once**
17:22, 80:18, 99:3, 106:2, 116:11, 129:11, 145:9
**one**
16:6, 21:15, 22:13, 25:22, 34:14, 36:24, 41:15, 43:5, 44:21, 51:21, 51:23, 53:17, 54:1, 56:20, 59:11, 60:17, 69:14, 70:14, 86:13, 87:7, 88:1, 89:5, 92:11, 93:2, 93:20, 93:25, 94:9, 95:11, 99:21, 100:1, 102:5, 102:10, 102:13, 108:1, 110:18, 111:6, 125:18, 125:19, 128:15, 134:12, 138:19, 140:11, 143:3, 144:1, 145:20, 148:13, 148:18
**ones**
24:21, 29:14, 29:17, 36:24, 60:18, 61:8, 61:14, 61:16, 89:9, 96:8
**ongoing**
89:14, 89:20, 90:10, 133:2, 147:2
**only**
76:22
**oops**
38:17
**open**
148:11, 148:20, 149:7, 149:10
**operations**
134:2
**opinion**
116:8, 116:13
**opportunity**
53:9, 59:18, 100:16
**order**
29:22, 149:24
**ordered**
149:17
**orders**
149:22
**ordinary**
73:10
**organization**
143:20, 144:14
**organization's**
54:17
**organizational**
141:10, 141:14
**organizations**
16:23, 22:20, 22:23, 110:17, 111:1, 111:10, 141:10
**origination**
58:24
**orlando**
7:7, 11:7
**other**
17:5, 17:16, 22:14, 25:20, 26:11, 29:16, 34:2, 49:17, 51:25, 60:15, 61:6, 61:15, 61:18, 65:8, 75:7, 75:21, 85:21, 89:5, 89:17, 90:6, 91:1, 96:7, 98:7, 100:23, 101:10, 102:21, 108:10, 109:3, 109:15, 109:21, 119:17, 124:21, 128:21, 147:22, 149:18
**others**
17:19, 110:20, 126:23, 127:1
**otherwise**
151:13
**out**
19:22, 29:22, 38:6, 38:9, 41:17, 59:1, 72:25, 76:18, 81:25, 88:22, 96:5, 98:22, 99:3, 100:1, 103:4, 105:10, 113:1, 116:2, 144:24
**outcome**
151:13
**outside**
94:14, 122:15, 133:19
**over**
16:25, 17:5, 20:5, 28:22, 28:24, 41:7, 52:10, 74:19, 77:6, 104:24, 109:18, 111:12, 117:17, 146:6, 148:19
**oversee**
40:6
**oversees**
22:12, 142:21
**overview**
14:3, 134:22, 137:11
**own**
83:10

**P**

**page**
1:15, 2:1, 13:2, 13:10, 23:22, 24:5, 24:12, 24:16, 25:4, 25:6, 27:13, 27:16, 29:24, 34:23, 39:19, 42:5, 42:16, 42:18, 42:19, 45:11, 48:5, 48:16, 49:23, 54:25, 55:17, 55:18, 56:7, 58:14,

62:24, 69:4,
69:7, 69:10,
69:12, 69:14,
81:16, 93:9,
102:17, 107:14,
115:6, 128:17,
134:19, 135:25,
138:7, 138:25,
143:25, 144:10,
144:21, 146:3

**pages**
1:24, 137:8

**palm**
7:11, 7:17

**paper**
74:13, 76:11,
76:13, 105:13

**parade**
140:24

**paragraph**
35:3, 81:20,
81:21, 82:7,
82:12

**paraphrased**
125:9

**part**
15:11, 25:5,
28:2, 37:24,
38:1, 41:12,
41:18, 42:23,
54:4, 86:3,
87:4, 98:17,
119:21, 124:13,
128:6, 128:23,
137:18, 141:3,
141:25, 142:16,
142:22, 143:16

**partially**
115:4

**participated**
63:16

**participating**
17:9

**participation**
69:20

**particular**
96:23, 116:20

**particularly**
99:15

**parties**
17:16, 32:12,
149:18, 151:11

**parts**
42:8, 108:10

**party**
136:19, 136:20

**pass**
77:24, 79:21,
79:23

**passage**
30:1, 46:6,
47:20, 95:2,
99:6, 100:4

**passed**
30:17, 46:9,
95:3

**past**
42:22

**paul**
9:11

**penalties**
83:2, 85:1,
85:24, 86:4,
86:9, 130:13,
139:4

**penalty**
105:22

**pending**
18:16

**people**
91:25, 94:9,
100:19, 101:23,
103:16, 103:23,
111:21, 140:11,
140:25

**people's**
141:2

**percival**
38:18, 38:22

**person**
35:7, 35:13,
35:17, 44:1,
57:13, 80:25,
93:25, 102:15,
119:18, 120:11,
120:14, 140:22,
141:24, 142:22

**person's**
119:24

**personal**
35:10, 35:12,
121:21

**personally**
23:12, 26:23,
85:19, 89:9,
108:25

**persons**
95:10, 143:21

**pertains**
82:22

**peter**
70:16

**pga**
7:15

**phase**
78:25

**phones**
20:17

**phonetic**
40:12

**phrase**
34:25

**pieces**
56:17

**pinellas**
6:11, 6:14,
8:12, 8:15

**pl**
9:6

**place**
49:11, 64:18,
73:23, 76:23,
136:22

**placed**
149:23

**plaintiff**
87:9, 127:3,
147:25

**plaintiffs**
1:8, 2:8, 2:18,
4:13, 5:12,
15:12, 24:6,
27:6, 71:25,
79:24, 80:8,
82:10, 90:16,

129:23, 147:22,
148:1, 148:22,
149:2

**plans**
127:6

**play**
21:18, 21:22,
28:17, 28:23,
31:10, 105:15

**pleadings**
131:20

**please**
17:10, 17:20,
18:4, 18:11,
18:14, 47:2,
50:13, 78:19,
79:10, 95:6,
97:10, 108:21,
112:23, 143:7

**pllc**
10:15

**point**
18:3, 18:14,
57:19, 77:11,
91:13, 105:10,
143:11

**pointedly**
125:10

**polling**
136:21

**portion**
48:22, 50:11,
50:14, 83:16,
119:20, 146:8

**portions**
58:18, 82:21,
82:22, 131:13

**position**
33:19, 33:22,
50:23, 89:22,
90:8, 90:23,
96:4, 104:7,
104:14, 104:18,
142:10, 148:25

**possessing**
35:12

**potential**
73:1, 74:4

**potentially**
72:5, 75:19, 77:8, 117:1, 117:7
**practice**
47:6
**pratt**
10:13
**precursor**
143:25
**predecessor**
31:4
**prefer**
121:9
**preliminary**
130:23, 131:5
**premarked**
23:16, 23:24, 24:2, 27:4, 28:7, 34:5, 36:18, 37:19, 44:18, 54:21, 55:12, 66:18, 68:16, 70:10
**preparation**
26:13, 53:21, 80:13
**prepare**
25:13
**prepared**
53:11
**preparing**
28:17, 28:23
**present**
12:12, 64:4, 64:10, 65:22, 66:8
**pretty**
114:7, 135:2
**prevent**
56:1, 98:17, 102:7, 103:23, 108:6, 122:11, 123:7, 147:16
**prevented**
102:15
**preventing**
123:11, 125:3, 125:24
**prevents**
98:25, 99:13, 100:7
**previous**
2:1, 91:25, 104:4, 119:6, 124:3, 124:16, 145:11
**previously**
23:1, 90:22, 91:16, 96:3, 129:16
**primary**
136:20
**printed**
76:18
**prior**
16:3, 21:8, 54:2, 62:3, 91:22, 94:23, 107:19, 108:10, 109:13, 122:6, 123:25, 124:1, 146:23
**priority**
47:9, 64:25, 65:6, 66:1, 78:3, 87:9, 88:1, 88:7, 88:17, 88:22, 89:3, 89:9
**private**
32:12
**privilege**
17:25, 30:22, 31:15, 32:4, 32:6, 39:6, 60:9, 62:16, 64:13, 66:11, 72:21, 77:1, 78:17, 82:14, 82:16, 90:1, 90:20, 96:19, 97:7, 97:23, 100:10, 103:1, 104:12, 104:13, 106:1, 110:3, 118:7, 123:15, 123:21, 126:7, 129:2, 131:10, 133:13, 133:17, 133:19, 141:6, 147:8
**privileged**
26:1, 30:24, 78:19, 100:11
**probably**
135:17, 148:10
**problem**
19:23, 58:1, 91:15, 95:7, 118:23, 133:22
**problems**
39:2, 70:5, 136:21
**procedure**
24:9
**proceeded**
133:9
**process**
29:3, 30:22, 31:14, 32:4, 32:6, 36:15, 38:1, 39:5, 62:6, 64:12, 66:2, 66:11, 71:24, 72:24, 73:6, 75:16, 78:16, 90:9, 104:13, 111:9, 129:1, 129:2, 129:5, 141:3, 142:1, 142:17, 142:23, 145:8
**processes**
21:25, 88:19
**produced**
26:17, 29:5, 29:10, 34:6, 36:19, 37:11, 37:20, 39:12, 66:19, 68:17, 70:11, 81:4, 137:13
**producing**
71:24
**product**
26:4, 26:7, 26:10, 60:9, 60:10, 61:23, 61:25, 62:16, 72:20, 77:1, 82:14, 82:16, 90:1, 90:19, 96:18, 97:7, 97:23, 98:1, 98:3, 100:10, 103:1, 103:2, 104:12, 106:1, 110:2, 118:6, 123:14, 126:7, 131:10, 133:12, 133:15, 141:6, 147:8, 147:10
**production**
13:13, 28:10, 28:17, 28:19, 72:1
**prohibited**
94:2
**prohibition**
51:10, 52:4
**prohibits**
92:6
**promotes**
59:23
**promulgated**
48:19
**pronounce**
15:16, 27:17, 40:11
**proposal**
64:25
**proposals**
37:25
**propose**
45:21, 126:11
**proposed**
31:9, 37:10, 38:4, 43:17, 47:5, 47:7, 47:14
**prosecute**
21:23, 22:1

**prosecution**
79:4, 122:17
**prosecutions**
78:13, 86:12
**prosecutor**
38:12, 68:1, 79:16, 83:15, 86:9, 100:17
**prosecutor's**
122:10
**protection**
89:6
**protections**
88:13
**provide**
33:9, 34:17, 44:9, 71:2, 78:12, 78:24, 94:7, 95:9, 95:17, 118:1, 121:19, 144:3
**provided**
25:17, 27:11, 32:16, 50:1, 50:17, 52:1, 52:2, 52:14, 75:16, 78:21, 81:9, 83:2, 87:8, 98:23, 108:3, 147:5
**provides**
34:14, 55:23
**providing**
70:20, 100:11
**provision**
91:17, 91:24, 92:3, 92:15, 92:21, 93:20, 95:23, 96:16, 104:16, 105:4, 106:4, 106:8, 120:25, 122:5, 122:19, 123:2, 123:6, 123:17, 128:11, 128:16, 130:10, 130:13, 131:7, 131:16, 132:8, 132:21, 133:2, 139:3, 139:4, 140:11, 143:4, 143:10, 144:25
**provisions**
30:2, 32:21, 32:24, 33:5, 46:7, 46:12, 46:13, 46:16, 46:20, 46:23, 48:3, 50:2, 50:18, 54:6, 59:22, 59:25, 64:4, 78:2, 78:8, 82:9, 83:12, 89:18, 90:15, 92:12, 94:21, 96:13, 107:9, 124:12, 125:22
**public**
3:11, 29:1, 33:21, 34:22, 72:12, 72:14, 73:12, 73:14, 151:1
**publicly**
33:19
**pull**
81:11, 93:3, 134:12, 143:6
**punishment**
104:8, 104:15
**purports**
70:19, 71:1
**purposes**
73:4
**pursuant**
3:10, 24:8
**put**
62:13, 106:25, 112:18, 121:9, 125:13, 128:12, 129:21
**puts**
119:22

Q

**quality**
110:22
**question**
17:20, 17:23, 18:4, 18:10, 18:11, 18:16, 25:23, 30:21, 33:6, 51:6, 58:15, 60:8, 62:21, 71:12, 79:10, 82:15, 84:6, 86:20, 90:13, 92:18, 94:22, 94:25, 95:5, 96:22, 97:6, 101:23, 102:25, 104:6, 106:7, 110:2, 120:2, 123:19, 126:7, 131:11, 132:19, 135:17, 138:2, 139:1, 139:13, 139:17, 142:9, 142:14, 142:16, 143:2, 145:10, 147:25
**questioning**
122:4, 126:18
**questions**
17:2, 17:18, 18:20, 23:1, 33:4, 46:18, 47:1, 50:21, 53:10, 59:8, 71:9, 77:14, 77:24, 78:9, 80:2, 80:10, 81:24, 85:6, 91:4, 91:11, 91:18, 92:10, 92:25, 109:4, 127:3, 127:6, 128:21, 147:21, 148:5, 148:13
**quick**
59:13, 114:3
**quit**
115:12
**quote**
67:8, 116:3

R

**races**
136:20
**racial**
62:25, 63:6, 63:11, 63:19, 83:19, 84:4, 84:17
**rationale**
123:15
**re-ask**
146:17
**re-referencing**
57:2
**re-register**
144:18
**re-registration**
143:5, 146:14, 146:19, 147:14
**read**
25:16, 30:3, 42:25, 50:3, 52:7, 54:2, 55:4, 55:8, 56:8, 56:10, 56:18, 58:14, 60:1, 63:3, 64:5, 68:10, 69:25, 72:8, 81:21, 82:1, 101:9, 105:6, 107:7, 112:1, 112:22, 115:2, 115:3, 115:17, 130:9, 130:15, 136:13, 143:17, 144:7, 144:11, 146:2, 149:12, 149:14, 149:19, 150:3
**reading**
67:7, 81:25, 112:25, 149:13, 151:9
**reads**
54:22
**ready**
44:22, 69:15

**realize**
59:11, 115:4
**really**
135:11
**reason**
18:18, 19:21,
119:21
**reasonable**
115:22, 116:9,
116:22, 117:1,
117:8, 117:21
**recall**
24:23, 37:2,
37:21, 45:16,
68:22, 70:3,
84:6, 84:8,
88:12, 112:5,
129:18
**receipt**
14:1, 106:22,
107:10, 107:16,
108:6, 110:8,
110:9, 111:5,
118:13, 119:23,
120:7, 120:10,
120:20
**received**
34:20, 125:23,
126:5
**recent**
112:2
**recess**
77:21, 128:4
**recognize**
34:9, 36:22
**recollection**
22:21
**record**
17:22, 18:22,
19:17, 19:22,
23:23, 46:3,
50:20, 67:13,
74:6, 74:14,
77:17, 94:17,
112:23, 113:1,
119:10, 122:24,
128:3, 136:14,
143:17, 148:4,

149:25, 151:6
**records**
29:1, 51:17,
72:12, 72:15,
73:9, 73:12,
73:14, 74:8,
74:10, 74:24,
76:4, 76:12,
76:13
**reduced**
151:8
**refer**
93:22, 104:4,
131:25
**reference**
62:2, 83:7,
118:14, 130:20,
145:12
**referenced**
25:17, 68:12,
107:11, 124:19,
125:1, 131:15
**references**
67:2
**referencing**
82:21, 109:20,
131:16
**referred**
93:21, 124:15,
130:12, 143:4
**referring**
23:4, 32:20,
32:21, 32:23,
99:10, 146:13
**refers**
146:8
**reflects**
56:16
**refresh**
55:10
**refresher**
140:10
**regard**
95:13, 102:7
**regarding**
16:17, 32:5,
33:22, 46:18,
47:11, 50:17,

64:3, 64:9,
65:21, 66:7,
94:11, 94:20,
130:23
**register**
108:18, 109:1,
109:25, 140:25,
144:3
**registered**
63:1, 63:7,
63:12, 63:20,
136:17, 139:8,
139:21, 144:16,
144:24
**registering**
70:2, 143:20
**registrar**
41:17
**registration**
13:20, 14:1,
16:23, 22:20,
22:23, 35:6,
51:11, 52:5,
52:16, 52:20,
54:23, 56:13,
57:14, 60:6,
60:22, 69:19,
94:12, 95:14,
101:25, 102:8,
102:19, 103:17,
103:23, 104:1,
105:21, 106:12,
108:17, 110:6,
110:20, 111:7,
118:3, 136:24,
137:1, 137:12,
139:7, 140:13,
143:20, 144:2,
144:13, 144:14
**rejected**
46:19
**related**
17:25, 31:4,
65:23, 71:9,
75:20, 89:6,
101:21, 151:11
**relates**
23:1, 46:15,

46:21, 54:11,
68:8, 82:9,
94:17, 109:4,
122:5, 123:2
**relating**
50:1, 52:25,
63:19, 70:1,
91:24
**relationship**
26:2, 85:16
**relay**
60:16
**relaying**
124:23
**relevant**
76:1, 138:24,
143:10
**relief**
81:18
**rely**
61:15, 149:4
**remember**
16:15, 79:22,
140:8
**remind**
72:12
**remote**
18:23
**renata**
5:13
**repeat**
36:9, 79:10,
80:10
**repeating**
100:2, 129:11
**rephrase**
18:5, 18:9,
90:13
**report**
22:12, 67:3,
68:11
**reported**
1:25
**reporter**
3:11, 17:8,
17:11, 23:25,
24:3, 27:10,
28:12, 34:8,

36:20, 39:14,
55:13, 66:21,
68:18, 70:13,
112:19, 118:16,
119:2, 134:11,
149:11, 149:15,
149:20
**reporter-notary**
151:1
**represent**
15:11, 30:6,
30:12, 37:8,
80:7, 89:16,
101:18, 125:12,
130:10, 135:14,
141:17
**representative**
1:18, 86:24,
106:9
**represented**
98:13, 123:5
**representing**
30:10, 91:9,
98:10
**request**
13:13, 28:9,
71:25, 77:12,
149:7
**requested**
46:19, 48:17,
151:10
**requests**
26:21
**require**
144:18
**required**
77:6, 111:5
**requirement**
33:3, 50:7,
54:12, 79:6,
79:13, 106:23,
107:6, 107:16,
108:6, 110:8,
140:5, 143:5,
145:2, 145:11,
146:14, 146:20,
147:15
**requires**
35:5, 73:14

**reserve**
149:19
**respect**
46:22
**respond**
18:19, 50:11,
86:16, 86:24,
86:25, 89:17,
148:23
**responded**
26:19
**responding**
26:24
**response**
28:8, 44:14,
48:13, 52:12,
53:7, 70:22,
71:25, 93:14,
126:19, 129:12,
146:3
**responses**
17:10, 26:20,
26:25, 27:6,
27:11, 28:13,
81:3, 86:16,
89:18, 129:23
**responsibilities**
20:13, 82:8
**responsible**
85:24, 86:15,
100:3
**responsive**
29:8, 52:11,
72:5, 77:8
**rest**
57:20
**restate**
49:5
**restriction**
91:19, 91:21,
93:22, 95:24,
96:24, 97:2,
98:16, 98:25,
99:13, 100:7,
101:6, 104:10,
121:1, 122:11,
123:7
**restrictions**
89:14

**resulting**
131:6
**retaining**
73:14, 123:8,
123:12, 125:3,
125:25
**retention**
73:17, 73:22,
74:14, 121:2
**return**
77:17
**returning**
77:18
**reveal**
26:6, 60:10,
103:2, 147:9
**revealing**
26:10, 30:24,
61:25, 98:2,
123:21
**review**
24:19, 29:9,
29:16, 45:2,
69:4, 69:6,
70:23, 77:6,
81:3, 81:7
**reviewed**
24:21, 26:16,
29:14, 53:19,
68:20, 72:4,
72:7
**reviewing**
43:19
**rid**
74:2
**right**
17:8, 17:17,
18:6, 19:6,
24:17, 27:18,
33:4, 36:25,
37:7, 37:12,
39:21, 40:19,
43:14, 43:17,
44:1, 44:5,
44:10, 44:15,
45:9, 45:14,
45:17, 45:22,
47:20, 48:7,

48:14, 48:20,
48:25, 49:15,
51:1, 53:2,
54:7, 54:23,
55:2, 55:15,
55:19, 56:1,
56:14, 57:4,
57:8, 59:5,
60:23, 61:1,
61:11, 63:21,
67:4, 67:13,
69:1, 70:6,
70:17, 70:21,
71:3, 71:7,
81:18, 84:1,
84:5, 87:11,
87:18, 88:3,
102:11, 112:7,
116:15, 118:18,
120:18, 127:24,
127:25, 132:3,
134:10, 135:3,
141:12, 149:19
**rise**
89:1
**risk**
105:21
**riverplace**
8:6
**road**
6:16
**roberts**
45:13, 45:20
**role**
20:24, 21:17,
21:18, 21:22,
28:16, 28:22,
29:25, 31:9,
31:17, 38:2,
40:25, 41:3,
46:5, 47:19,
49:24, 50:5,
50:24, 54:3,
83:11, 85:5,
86:3, 86:7,
95:1, 103:6,
105:15, 134:4,
141:11

**roles**
20:22
**room**
18:24, 19:1
**rooms**
18:24
**roper**
7:5, 11:5
**rosenbloom**
8:4
**rule**
24:8
**rule-making**
41:5, 48:25, 49:4, 49:9
**rules**
48:19, 49:11
**ruling**
41:16
**rutahindurwa**
4:14, 13:4, 79:25, 80:4, 80:6, 148:21

**S**

**s**
51:9, 52:4
**said**
36:13, 43:20, 48:14, 49:1, 56:4, 57:10, 61:3, 64:22, 80:14, 85:12, 85:17, 85:21, 86:5, 87:2, 96:3, 97:12, 98:19, 109:13, 110:24, 120:15, 123:25, 124:9, 124:20, 125:10, 126:8, 127:5, 131:25, 139:11, 141:8, 151:7
**same**
25:4, 62:17, 66:13, 78:22, 79:1, 79:2, 95:19, 95:20, 97:5, 99:23, 100:3, 106:13, 109:2, 109:3, 122:14, 129:11, 132:22, 132:23, 146:9, 146:23, 150:4
**save**
50:21
**saw**
45:17, 70:7, 88:25, 135:24
**say**
18:14, 23:2, 37:15, 38:7, 56:24, 59:1, 60:13, 61:4, 67:6, 70:4, 71:12, 71:13, 82:20, 84:12, 88:21, 89:8, 91:21, 97:9, 98:8, 99:2, 99:25, 103:4, 104:25, 105:6, 106:2, 106:24, 107:18, 108:21, 109:3, 111:17, 112:5, 115:25, 116:4, 116:11, 116:25, 117:12, 122:9, 122:24, 125:8, 131:19, 134:3, 137:16, 140:1, 140:19, 140:22, 140:23, 142:7, 143:1, 144:8, 144:21, 144:24, 146:22, 148:10, 149:3
**saying**
93:25, 98:12, 108:3, 112:9, 124:7, 132:5, 133:18, 144:7
**says**
27:16, 29:25, 35:4, 35:16, 37:5, 43:15, 44:2, 44:6, 44:8, 44:11, 44:13, 44:16, 48:6, 48:9, 48:12, 48:15, 48:22, 49:24, 52:12, 54:24, 55:3, 58:16, 59:4, 59:6, 59:11, 60:2, 62:24, 63:4, 63:25, 67:10, 67:11, 70:18, 71:4, 71:24, 74:1, 81:16, 81:19, 81:25, 83:6, 89:12, 90:10, 93:10, 102:17, 115:6, 120:7, 129:23, 130:19, 130:24, 132:24, 134:22, 135:9, 135:10, 136:1, 140:2, 140:11, 140:18, 144:1, 146:25
**sb**
13:21, 22:19, 30:17, 30:18, 31:5, 31:9, 31:10, 32:1, 32:13, 32:17, 32:20, 33:5, 33:10, 33:15, 33:22, 37:10, 39:3, 44:4, 45:22, 46:9, 49:18, 49:25, 50:7, 50:25, 51:9, 52:4, 52:16, 52:20, 54:11, 55:15, 56:12, 57:6, 64:9, 65:21, 66:7, 78:3, 78:11, 78:23, 83:3, 83:12, 84:1, 84:16, 87:9, 88:1, 91:17, 91:23, 93:8, 94:6, 105:2, 106:23, 121:18, 128:7, 135:9
**scary**
113:2
**schedules**
73:17, 73:22
**scheduling**
41:14, 47:12, 88:11, 88:25
**sciences**
21:13
**scope**
71:10, 89:2, 94:15
**scott**
11:4
**screen**
23:16, 23:19, 27:4, 28:7, 58:5, 58:8, 81:11, 81:12, 85:7, 85:8, 87:12, 93:4, 118:14, 119:1, 119:13, 121:10, 128:13, 129:22, 134:15, 145:14, 147:13
**screens**
19:5
**scroll**
23:21, 24:11, 24:15, 25:6, 27:15, 39:19, 42:21, 43:3, 43:8, 43:9, 44:19, 44:22, 44:23, 55:21, 57:20, 69:9, 81:20, 81:22, 82:5, 87:13, 113:5, 114:7, 114:13, 114:17,

114:20, 115:17,
129:22, 137:6,
137:24, 143:24
**scrolling**
56:6, 114:14,
130:7, 144:10
**se**
6:6
**seal**
151:15
**search**
29:2, 29:4,
51:14, 51:17,
51:18, 73:7,
75:17, 75:24,
77:9
**searchable**
75:2
**searched**
72:4, 72:6,
75:5, 75:9,
75:13, 76:5,
76:23
**seattle**
4:18
**second**
35:3, 57:12,
58:23, 69:3,
69:4, 69:10
**secretary**
1:12, 2:21,
10:12, 30:12,
30:13, 31:24,
32:9, 64:3,
66:6, 66:23,
68:24, 70:16,
78:6, 91:3,
109:16, 130:22,
134:5, 137:13,
139:14, 142:3,
142:7, 142:11,
148:2, 149:5
**section**
41:7, 46:14,
54:25, 55:18,
55:22, 55:25,
56:1, 56:10,
56:11, 57:9,

101:16, 138:8,
138:23
**security**
67:20, 67:24,
68:11
**see**
18:24, 19:10,
23:18, 24:5,
24:12, 24:16,
27:11, 34:24,
35:1, 35:14,
35:20, 37:5,
39:18, 40:22,
42:13, 42:22,
43:3, 43:13,
43:22, 43:23,
45:8, 45:11,
45:19, 48:6,
51:22, 55:14,
55:18, 69:22,
81:12, 83:8,
85:8, 87:18,
87:20, 87:21,
93:5, 93:9,
101:15, 112:20,
113:20, 114:10,
115:14, 115:18,
119:12, 119:16,
121:14, 128:17,
131:2, 133:3,
134:14, 134:20,
134:24, 135:3,
135:7, 136:2,
136:7, 137:7,
137:12, 138:1,
143:8, 143:22,
144:5, 145:15,
145:22, 146:8,
148:8
**seeing**
114:19, 114:23
**seeks**
44:3
**seen**
28:13, 45:5,
54:18, 93:8,
137:21
**senate**
13:17, 16:17,

34:14, 43:16,
45:21, 53:19
**senate's**
45:13
**senator**
37:9, 37:22
**send**
38:6, 135:23,
149:23
**sending**
38:8
**sense**
18:1, 38:13,
40:5, 41:4,
47:15, 92:14,
139:5
**sent**
36:24, 37:3,
37:21, 38:2,
38:15, 38:18,
43:20, 44:15,
64:22, 66:25,
67:12, 72:25
**sentence**
35:14, 35:16,
35:20, 42:9
**sentences**
35:24, 44:8
**separate**
18:23
**september**
133:6
**series**
24:12, 24:17
**serve**
84:5, 84:10,
84:18
**serves**
59:23
**session**
19:24, 38:2
**set**
27:7, 129:24,
145:19, 151:15
**seven**
57:19
**seventh**
4:16

**several**
124:11
**sexual**
100:20, 101:10
**share**
23:15, 27:3,
28:6, 81:10,
85:7, 93:4,
119:1, 145:14
**sharing**
81:12
**shaud**
9:13
**sheet**
150:7
**shilpa**
12:15
**short**
143:16
**shortened**
128:7
**shorter**
70:15
**shorthand**
151:1
**should**
17:23, 85:4,
126:16
**shouldn't**
85:4
**show**
34:4, 36:17,
39:10, 54:20,
55:11, 66:18,
68:15
**showing**
37:18, 58:3,
70:9, 116:16
**sic**
38:3
**side**
22:5
**sign**
27:24, 87:3,
90:3, 149:14
**sign-on**
109:15
**signature**
39:19, 40:22,

150:25
**signature-k9lvk**
151:20
**signatures**
42:21
**signed**
139:19, 150:7
**signing**
151:9
**similar**
145:10
**simple**
132:19
**simply**
97:2
**since**
84:15, 89:5,
89:8, 143:16,
147:4
**sit**
132:6
**sitting**
89:21, 109:5
**situation**
103:12, 117:6,
117:18
**situational**
39:9, 43:6,
64:23
**situationally**
21:5, 37:24,
54:5, 66:1
**situations**
94:3, 110:18,
117:13, 117:16,
117:19
**size**
114:9
**sjostrom**
9:3
**skim**
42:17
**skip**
51:5
**slowly**
115:17
**small**
113:12, 135:3,

135:8
**smartphone**
19:8, 19:16
**smith**
6:13
**sole**
103:25
**some**
26:16, 26:19,
29:21, 50:21,
74:10, 75:18,
85:6, 88:10,
91:11, 91:16,
91:18, 92:13,
95:13, 110:14,
110:16, 110:17,
110:19, 115:9,
121:22, 148:14
**somebody**
46:4
**someone**
76:16, 77:5,
85:22, 102:4,
102:10, 108:18,
109:1, 109:24,
112:2, 116:1,
117:14, 119:22,
120:21, 139:18,
142:20
**someone's**
120:10, 123:8,
125:4, 125:25
**something**
47:13, 58:4,
58:5, 64:24,
79:16, 83:14,
83:24, 84:21,
86:10, 92:8,
103:6, 104:17,
110:12, 111:24,
112:6, 112:9,
120:16, 122:8,
123:22, 125:17,
126:8, 130:18,
132:2, 132:5,
134:3, 134:5,
137:17, 142:2,
142:19, 147:17

**sometimes**
40:16
**soon**
114:7
**sorry**
32:8, 36:9,
48:24, 49:14,
53:25, 58:9,
58:15, 58:19,
61:20, 62:10,
71:12, 71:23,
87:15, 98:11,
102:9, 104:19,
104:24, 105:12,
109:11, 111:15,
113:7, 114:12,
115:1, 118:20,
121:6, 123:24,
127:5, 128:7,
132:18, 135:14,
135:21, 137:5,
148:7
**sort**
63:18
**sorts**
36:2
**sought**
118:3
**sound**
17:13, 19:25,
37:12
**sources**
72:2, 72:5,
74:4, 77:7
**spb**
42:8, 43:14,
43:19
**speak**
17:4, 25:13,
25:20, 26:12,
47:1, 58:24,
68:3, 72:22,
73:4, 73:16,
76:8, 76:17,
85:3, 86:6,
100:17, 101:16,
103:7, 104:6,
106:4, 110:4,

110:12, 111:9,
111:24, 112:6,
115:25, 116:5,
117:24, 122:9,
123:22, 125:17,
126:9, 131:21,
133:16, 137:18,
141:9, 147:17
**speaking**
17:5, 17:20,
117:2, 122:16
**speaks**
83:5
**special**
20:19
**specific**
72:22, 83:8,
117:18, 118:4,
118:12, 124:15,
139:16, 142:8,
143:18, 144:8,
144:15
**specifically**
16:19, 33:2,
44:7, 82:25
**specifics**
73:16, 117:2,
131:21, 132:13,
132:14
**speculation**
117:11
**speculative**
142:25
**split**
143:11
**spoke**
25:19
**squarely**
99:21, 122:15
**staff**
22:11, 25:21,
25:22, 26:11,
31:22, 34:16,
36:2, 36:8,
36:11, 36:12,
36:15, 38:22,
64:9, 64:20,
65:21, 66:6,

70:16, 72:17,
73:8
**staffers**
22:14
**starkey**
6:16
**starnes**
10:5
**start**
17:19, 29:23,
59:13, 91:18
**started**
17:1, 20:16,
133:14
**starting**
24:16, 27:12
**starts**
93:11, 107:2,
121:13, 128:16,
144:11
**state**
1:5, 1:12,
2:22, 3:12,
10:12, 21:11,
30:6, 30:12,
30:13, 33:6,
46:22, 59:20,
59:25, 60:3,
60:14, 60:16,
60:20, 61:4,
61:7, 61:9,
61:10, 61:14,
62:4, 62:14,
62:18, 62:20,
64:3, 66:6,
78:7, 79:5,
79:12, 83:20,
84:10, 87:7,
89:19, 89:22,
90:14, 90:24,
91:3, 92:11,
94:16, 95:5,
95:22, 96:5,
96:12, 96:15,
97:1, 97:10,
97:15, 98:15,
98:16, 99:22,
104:5, 108:5,

108:15, 108:23,
109:4, 109:14,
109:16, 109:22,
110:7, 122:25,
123:2, 123:5,
123:10, 123:18,
124:1, 124:2,
124:13, 125:1,
125:5, 125:11,
125:13, 125:14,
125:20, 125:24,
126:5, 130:1,
130:22, 130:25,
133:23, 134:5,
134:21, 137:13,
139:14, 141:15,
141:18, 141:23,
142:3, 142:7,
142:11, 142:12,
148:2, 148:24,
149:4
**state's**
31:25, 32:9,
66:23, 68:25,
70:17, 89:12,
96:23, 97:18,
103:22, 107:16,
108:4, 110:5,
124:16, 129:6,
129:12, 133:1,
139:2, 141:15,
141:24, 142:9,
147:1
**stated**
17:22, 63:14,
82:11, 83:23,
84:21, 88:5,
90:7, 90:24,
90:25, 100:15,
105:17, 116:14,
145:6
**states**
1:1, 2:2,
35:19, 49:16,
94:5, 105:13
**statewide**
38:11, 68:1,
79:16, 83:15,

86:8, 100:17,
122:9, 124:21
**stating**
73:1
**statues**
101:15
**statute**
38:14, 46:13,
47:24, 56:4,
103:5, 103:21,
140:2, 140:18,
144:22
**statutes**
47:20, 55:19
**statutory**
47:11, 102:1
**step**
53:18, 89:15
**stephanie**
12:4, 41:21,
123:25, 135:12
**stephen**
11:13
**still**
90:10, 113:14,
137:24
**storage**
74:23
**store**
74:8
**stored**
74:11, 74:12,
74:18, 75:7
**stories**
112:2
**story**
113:5
**street**
4:7, 5:6, 6:6,
7:6, 8:16, 10:7,
10:16, 11:6,
12:7
**structural**
40:8
**structure**
40:5, 110:25,
141:10, 141:14
**sub**
144:11

**subdivision**
93:10, 144:1
**subgroup**
117:19
**subject**
100:11, 131:17
**sublets**
136:16
**submit**
35:5, 47:14
**submitted**
67:3, 133:6,
133:10, 136:6,
136:15, 136:16
**subsection**
55:22, 55:23,
56:6, 56:11,
56:19
**subsequent**
46:17
**substance**
51:3
**substances**
41:14
**substantive**
61:19
**suggested**
48:7
**suggests**
58:22
**suite**
4:17, 5:7,
5:16, 7:16, 8:7,
9:16, 10:17
**suja**
1:25, 3:10,
151:3
**supervise**
102:21
**supervising**
103:14, 142:20
**supervisor**
6:2, 6:12,
6:14, 7:2, 7:12,
8:2, 8:12, 9:12,
10:2, 11:2,
11:12, 103:16
**supervisors**
14:3, 69:25,

110:21, 115:10, 115:21, 116:4, 116:18, 116:21, 134:22
**support**
33:22, 34:1, 79:5, 79:12
**supporting**
59:24, 60:20
**supports**
125:21
**supposed**
83:15
**sure**
16:18, 17:10, 18:11, 21:10, 25:4, 26:1, 26:8, 27:17, 33:8, 40:11, 41:2, 42:14, 48:4, 49:6, 53:8, 60:12, 71:15, 73:19, 76:19, 78:9, 79:18, 86:5, 88:9, 93:1, 93:18, 95:7, 98:14, 101:17, 103:8, 104:21, 106:5, 108:16, 108:22, 108:24, 109:5, 109:19, 109:23, 111:2, 117:24, 121:12, 122:22, 124:8, 127:10, 127:22, 128:1, 129:14, 130:4, 130:6, 132:9, 132:10, 132:12, 132:14, 135:12, 137:19, 137:23
**swain**
6:4
**sworn**
15:5
**system**
74:6, 115:13

**T**

**table**
19:10, 137:14
**tailor**
75:18
**take**
17:12, 33:18, 33:21, 37:16, 44:17, 44:20, 53:17, 55:4, 59:10, 59:12, 69:3, 69:6, 69:11, 70:23, 89:15, 90:8, 90:22, 93:13, 93:15, 96:3, 107:4, 110:19, 114:3, 116:12, 126:16, 126:24, 127:13, 127:15, 127:16, 130:14, 136:10, 147:13
**taken**
77:21, 128:4, 142:10, 151:4, 151:7
**taking**
24:6, 51:20, 61:13, 91:13, 127:8
**talk**
24:1, 33:3, 46:4, 46:5, 47:17, 50:15, 50:24, 52:24, 68:6, 68:9, 74:3, 92:11, 92:13, 92:16, 96:12, 104:24, 112:3, 143:3, 145:1, 149:21
**talked**
72:10, 80:18, 91:16, 107:22, 108:1, 118:12, 124:14, 146:9
**talking**
48:10, 80:22, 91:20, 95:12, 99:19, 102:6, 106:24, 118:21, 124:12, 127:2, 128:16, 138:8
**talks**
69:19, 95:1
**tallahassee**
1:3, 2:4, 9:7, 9:17, 10:18, 12:8
**tampa**
11:17
**tasked**
82:25, 84:25
**team**
15:11
**technical**
113:23
**tell**
18:4, 21:7, 61:2, 96:25, 102:4, 129:6, 133:8, 133:22, 137:2, 147:3
**tellechea**
40:12, 40:13, 40:14, 40:15, 40:17, 41:12, 41:15, 44:13, 45:9, 48:10, 48:14
**tellechea's**
48:24
**tellechia**
40:12
**ten**
20:5, 127:8, 127:13, 128:18
**ten-day**
139:6
**ten-minute**
77:13, 126:12
**terms**
29:4, 36:7, 36:13, 51:18, 75:16, 80:13, 145:13
**testified**
15:6, 110:13
**testify**
24:24, 25:10, 33:15
**testimony**
16:9, 60:25, 97:17, 109:8, 109:9, 150:4, 150:6, 151:6, 151:7
**text**
44:21, 53:19
**th**
4:8, 5:6, 67:12, 130:22, 131:6, 145:13, 146:9, 146:18, 151:16
**thank**
80:8, 91:5, 91:14
**thankfully**
70:14
**thanks**
77:20, 79:18, 80:4
**thereafter**
151:8
**they'd**
148:15
**thing**
100:3, 115:3, 137:25, 138:2
**things**
21:5, 57:7, 74:19, 75:20, 88:21, 98:7, 103:19, 124:24, 124:25
**think**
18:17, 26:9, 46:10, 59:7, 77:13, 80:1, 84:23, 90:3, 90:9, 91:4, 94:14, 96:11, 98:5, 100:15,

105:19, 106:10,
113:14, 113:17,
114:7, 114:10,
114:12, 114:13,
115:19, 115:21,
116:12, 116:21,
116:22, 117:8,
117:20, 123:16,
129:15, 130:17,
135:6, 135:8,
135:10, 138:10,
138:23, 141:8,
147:25, 148:10,
149:2, 149:21
**thinks**
141:21, 141:23
**third**
81:7, 81:11,
81:13, 81:16,
127:2
**third-party**
16:22, 22:20,
22:23, 143:19,
144:13
**thought**
88:19
**thread**
45:12, 49:14,
113:15
**threats**
111:20, 112:3,
113:3, 115:8
**three**
15:22, 15:25,
16:6, 20:22,
27:16, 43:21,
88:14, 133:7
**threshold**
73:19
**through**
1:18, 25:3,
25:7, 25:16,
29:21, 37:25,
38:5, 44:19,
57:20, 65:3,
66:2, 74:20,
75:5, 75:17,
76:5, 76:14,

77:15, 113:5,
137:6, 137:25,
145:11
**throughout**
21:3, 23:4
**tie**
71:16
**time**
30:16, 35:6,
59:12, 80:9,
81:2, 113:2,
126:23, 130:9,
136:19, 148:14
**timeframe**
95:4, 140:2
**times**
15:21, 80:16,
80:22, 109:19,
124:24, 139:23,
148:19
**timothy**
39:16, 42:24,
43:13
**title**
16:18, 20:6,
24:5, 54:22,
75:10, 86:6
**titled**
81:13
**today**
17:9, 18:20,
18:25, 23:5,
24:20, 80:9,
89:21, 92:13,
93:23, 97:17,
99:9, 99:12,
100:6, 100:14,
109:6, 109:22,
125:14, 125:19,
126:2, 132:6,
133:10
**todd**
11:13
**together**
141:20
**tomorrow**
50:22, 53:2,
53:11, 79:17,

79:19, 83:16,
100:17, 122:21
**tomorrow's**
122:20
**took**
37:9, 64:18,
101:5, 149:18
**top**
42:20, 44:13,
73:18, 88:14,
115:3, 115:6,
119:20, 129:23,
136:14, 137:10,
145:22
**topic**
25:5, 29:23,
29:25, 49:23,
50:12, 50:14,
59:10, 59:14,
59:20, 62:22,
62:24, 63:23,
63:24, 63:25,
71:10, 71:23,
75:22, 76:22,
84:13, 87:4,
92:11, 95:1,
95:4, 99:8,
99:21, 148:13,
148:18
**topics**
24:17, 24:19,
24:23, 25:5,
25:6, 25:13,
25:16, 29:21,
45:25, 46:10,
68:8, 88:23,
94:15, 94:17,
99:17, 122:6,
122:16, 125:19
**torchinsky**
10:15
**touch**
102:22
**touches**
38:12
**touching**
103:14
**towards**
139:14

**track**
63:6, 83:24,
84:22
**tracking**
62:25, 63:8,
63:15, 120:21
**tracks**
56:12, 83:19
**trafficking**
88:10, 89:3
**training**
51:24
**transcribed**
17:4
**transcribing**
17:9
**transcript**
13:9, 149:16,
151:5
**transcription**
150:5
**trend**
115:10
**trial**
16:8
**tried**
138:11
**trigger**
38:8
**true**
53:3, 111:3,
123:10, 139:8,
150:4, 151:5
**truly**
40:8
**trust**
115:12
**truthfully**
18:19
**try**
18:5, 80:9,
87:12, 103:23,
138:9
**trying**
113:11, 114:6,
114:9, 123:1,
123:17, 132:18,
139:5

**tuesday**
1:21
**turn**
31:8, 77:6, 101:25, 128:8
**turned**
28:21, 28:23, 52:10, 74:19, 139:6
**turning**
111:6
**turns**
136:24
**twice**
80:19
**two**
55:5, 55:8, 56:17, 80:22, 144:11, 146:2
**tying**
71:6
**type**
46:18, 95:13
**types**
16:1, 84:9
**typewriting**
151:8
**typically**
17:23, 36:4
**typo**
35:7

**U**

**unable**
92:20
**unclear**
42:7, 43:20
**under**
40:4, 40:9, 52:20, 54:11, 86:2, 92:10, 151:8
**underlying**
94:1, 94:10, 95:11, 101:8, 102:5, 103:24
**understand**
18:3, 18:19, 40:2, 43:16, 47:16, 49:2, 49:7, 68:5, 78:9, 99:7, 99:19, 109:17
**understanding**
25:4, 25:9, 85:15, 92:6, 92:15, 94:4, 99:12, 101:7, 101:12, 102:15, 121:8, 124:14, 139:20, 140:15, 140:20, 141:1, 144:17
**understood**
18:10, 78:2
**undertake**
49:4, 49:9, 49:10
**undertaken**
69:20
**unfortunately**
143:11
**union**
4:6
**unit**
72:12
**united**
1:1, 2:2, 35:19
**units**
1:7
**unlawfully**
35:11
**unless**
17:23, 76:16
**until**
19:22
**untimely**
136:5, 136:15
**use**
35:10, 36:13
**using**
75:24

**V**

**vaccaro**
39:16, 42:7, 42:24, 43:13, 43:20, 44:15, 45:8, 45:12, 45:20, 48:6
**valid**
117:1, 117:7, 117:17
**verbal**
17:11, 53:7, 70:22, 93:14, 126:19
**version**
55:15, 93:8
**versus**
15:13, 75:21, 130:1
**via**
63:1
**videoconference**
1:16, 3:1
**view**
113:12, 141:25
**violates**
56:20
**violating**
104:9, 104:16
**violation**
35:9, 55:25, 56:1, 57:8
**violence**
111:20
**virtual**
19:20
**virtually**
1:20, 3:2
**vogel**
10:14
**volunteer**
91:19, 91:21, 93:21, 95:23, 96:24, 97:2, 98:16, 98:25, 99:12, 100:6, 101:6, 103:13, 104:9, 108:24, 110:10, 111:4, 116:20, 117:8, 117:21, 120:14, 120:22, 121:21, 122:12, 140:21, 141:2, 142:16, 142:21
**volunteering**
140:23
**volunteers**
102:21, 108:16, 109:23, 110:19, 115:11, 115:22, 118:4, 141:16, 142:13
**vote**
103:18, 108:19, 109:1, 136:18, 136:20, 143:21
**voted**
70:20, 71:2, 71:17
**voter**
14:1, 16:23, 22:20, 22:23, 35:8, 35:18, 51:11, 52:5, 52:15, 52:19, 57:14, 60:5, 60:22, 69:19, 69:20, 69:21, 94:11, 95:14, 101:25, 102:8, 102:19, 103:17, 103:23, 103:25, 105:20, 106:11, 108:17, 110:6, 110:19, 111:6, 118:2, 121:1, 123:6, 133:24, 136:1, 136:17, 136:18, 136:21, 137:1, 137:3, 137:11, 139:8, 139:21, 140:13, 143:19, 144:2, 144:13
**voters**
2:6, 5:2, 63:1, 63:7, 63:11, 63:20, 70:2,

83:19, 91:10, 145:21
**voting**
71:7, 71:21, 136:22

**W**

**waiving**
149:13
**walk**
25:3, 29:20
**want**
16:25, 25:2, 29:22, 32:19, 34:23, 43:7, 49:22, 50:20, 53:8, 59:9, 65:17, 68:15, 69:17, 74:3, 77:14, 80:12, 92:22, 105:5, 105:7, 109:18, 114:1, 115:16, 117:21, 119:7, 124:7, 127:11, 127:12, 127:15, 127:16, 132:1, 135:12, 146:6, 148:3, 149:16
**wanted**
19:11, 19:17, 59:17, 92:14
**washington**
4:18, 5:8, 5:17
**way**
40:8, 46:16, 86:13, 89:17, 121:11, 138:6
**we'll**
18:14, 19:22, 19:23, 46:17, 92:9, 96:10, 149:14
**we're**
18:23, 19:17, 21:4, 25:4, 29:20, 32:5, 43:12, 44:17, 59:12, 61:13, 64:13, 66:11, 73:11, 74:1, 82:14, 92:13, 98:10, 99:19, 102:6, 113:22, 114:23, 118:18, 129:11, 134:18, 138:22, 143:13, 148:1
**we've**
63:23, 95:12, 96:11, 107:21, 108:1, 122:25, 124:11, 124:12, 126:10, 144:7, 147:15, 147:23
**website**
141:18, 141:20, 142:12, 142:15
**weekend**
67:4, 67:6, 67:11
**went**
145:11
**weren't**
78:3, 98:19
**whatever**
98:21, 116:3, 138:12, 138:15, 140:2
**whenever**
73:23
**whereof**
151:14
**whereupon**
15:2
**whether**
21:23, 22:1, 32:15, 36:6, 36:12, 41:21, 47:4, 51:13, 51:14, 52:13, 57:13, 64:18, 75:1, 75:6, 77:3, 86:14, 86:22, 103:15, 106:18, 109:22, 116:8, 116:21, 131:23, 132:7, 132:10, 132:20, 142:16
**whoever**
149:18
**whole**
67:23, 101:10, 113:5, 115:3, 115:18, 137:7, 137:25, 138:2, 138:5
**wholly**
124:2
**withdraw**
17:24, 121:6
**within**
33:5, 38:20, 41:19, 42:2, 46:10, 82:23, 85:5, 88:24, 89:1, 95:4, 98:5, 98:6, 99:16, 103:6, 122:6
**without**
26:10, 30:23, 61:24, 78:18, 91:12, 98:2, 109:20, 123:20, 132:6
**witness**
26:6, 27:23, 31:15, 36:18, 37:19, 39:10, 42:13, 45:25, 50:10, 50:14, 53:10, 53:14, 54:21, 58:7, 60:9, 66:12, 66:18, 68:16, 70:10, 79:21, 79:23, 82:18, 97:24, 103:2, 105:25, 113:14, 113:18, 113:21, 113:24, 114:22, 127:14, 127:18, 127:22, 135:8, 138:2, 141:7, 147:9, 148:6, 148:17, 149:12, 151:14
**witness's**
148:23
**women**
2:6, 5:2, 91:10, 145:21
**wondering**
135:18
**word**
55:1, 83:9
**words**
35:22, 36:3, 38:6, 38:7, 38:8, 83:10
**work**
20:9, 20:17, 21:4, 22:4, 26:4, 26:6, 26:10, 27:21, 28:1, 39:15, 40:6, 40:10, 40:15, 41:3, 41:12, 60:8, 60:10, 61:23, 61:25, 62:16, 72:20, 77:1, 82:14, 82:15, 85:22, 87:2, 90:1, 90:19, 91:25, 96:18, 97:7, 97:23, 98:1, 98:3, 100:9, 102:20, 103:1, 103:2, 104:12, 106:1, 106:12, 110:2, 111:21, 118:6, 123:14, 126:7, 126:13, 127:18, 127:21, 131:10, 133:12, 133:15, 141:6, 147:8, 147:10
**worked**
20:3, 22:19,

23:7, 23:10,
67:19, 71:18,
85:13, 88:10
**workers**
111:13, 113:3,
115:7, 115:12
**working**
62:13, 70:6,
71:7, 78:14,
79:5, 79:11,
94:2, 113:17,
114:7, 115:22
**works**
40:18, 40:21,
41:23, 48:24,
48:25, 85:19,
149:24
**worries**
58:10
**wouldn't**
61:4, 101:20
**write**
27:2, 60:18
**writes**
111:5
**writing**
61:16
**written**
26:20, 26:24,
35:25

**Y**

**yeah**
32:24, 54:1,
57:25, 71:13,
72:14, 74:16,
80:3, 83:23,
85:17, 86:19,
86:21, 87:2,
90:11, 91:14,
92:24, 96:2,
105:6, 105:9,
105:13, 106:2,
106:16, 106:20,
107:1, 107:8,
108:21, 108:22,
109:17, 111:16,
111:18, 112:13,

113:10, 114:15,
114:21, 114:22,
114:23, 116:6,
117:12, 118:8,
118:25, 120:5,
121:12, 122:8,
123:22, 124:6,
124:8, 124:10,
126:21, 127:4,
127:7, 127:23,
128:12, 128:14,
129:19, 129:20,
131:19, 132:12,
133:16, 133:20,
134:3, 135:2,
135:16, 135:18,
137:8, 138:1,
138:12, 140:17,
143:1, 145:16,
146:17, 147:11
**year**
73:19, 133:6
**years**
16:7, 20:5,
20:20, 112:3
**york**
4:9
**yourself**
25:13, 55:5,
56:8, 82:1
**youth**
1:6

**Z**

**zack**
12:14
**zoom**
17:19

**$**

**$50,000**
105:14, 105:19,
106:10

**0**

**00**
126:20
**000001**
70:12

**000594**
66:20
**000859**
68:17
**001069**
34:6
**001117**
36:19
**001118**
37:11, 37:20
**001376**
39:12
**01**
9:6
**0177**
4:19
**05**
1:22

**1**

**1**
1:24, 126:20,
127:25, 128:1,
149:25
**10**
1:22, 13:18,
39:11, 39:14,
128:9, 129:8
**10004**
4:9
**107**
12:7
**11**
13:19, 25:6,
29:24, 44:18,
62:24, 77:12,
77:17, 77:19,
130:22, 131:6,
133:24, 136:24,
139:19, 145:13,
146:9, 146:18
**1101**
5:6
**1168**
10:9
**119**
10:16
**12**
6:6, 25:7,

62:23, 127:25
**1200**
8:6
**125**
4:7
**13**
29:23, 29:25,
55:17, 63:24,
94:17, 95:1,
143:25
**13001**
6:16
**14**
5:6, 56:7,
63:24, 94:18,
95:4, 128:9,
129:7
**15**
13:3, 25:7,
71:23, 144:11
**1500**
9:15
**151**
1:24
**16**
107:14, 138:7
**1700**
4:16
**1715**
10:7
**18**
4:8
**184**
81:14
**19**
1:21, 151:16
**1d**
143:13
**1e**
91:23
**1f**
56:6, 56:8,
56:12
**1st**
6:6

**2**

**20**
67:12

**200**
9:16
**20001**
5:17
**20005**
5:8
**2010**
21:12
**202**
5:9, 5:18
**2020**
70:21, 71:3, 71:17
**2022**
66:7, 95:3, 115:9
**2023**
1:21, 59:4, 67:13, 88:8, 151:16
**2024**
143:18, 144:12
**2027**
151:17
**204**
7:16
**206**
4:19
**21**
151:17
**2100**
4:17
**212**
4:10
**2127**
8:9
**215**
1:10, 2:10, 130:2
**216**
1:11, 2:11, 145:21
**218**
1:12, 2:12, 15:13
**22**
64:4, 64:10, 65:21
**224**
9:18
**23**
1:10, 1:11, 1:12, 2:10, 2:11, 2:12, 15:13, 130:2, 135:25, 145:21
**239**
10:9
**25**
127:25, 128:1
**250**
5:15
**2500**
4:10
**26**
59:4
**266**
5:9
**27**
11:16, 77:17
**270**
10:19
**2707**
7:6, 11:6
**272**
11:18
**2925**
7:15

**3**

**30**
24:9, 77:12, 81:2, 127:20
**315**
8:16
**32207**
8:8
**32301**
10:18
**32308**
9:17
**32399**
9:7, 12:8
**32601**
6:7
**32803**
7:7, 11:7
**33**
13:22, 66:19, 66:21
**33410**
7:17
**3354**
8:19
**33602**
11:17
**33756**
8:18
**33773**
6:17
**33901**
10:8
**34**
13:23, 68:16, 68:19
**344**
10:9
**35**
13:24, 70:10, 70:13
**352**
6:8
**36**
13:20, 54:21, 56:14
**3635**
9:8
**3664**
12:9
**37**
13:21, 55:12, 55:13, 77:17, 77:19, 93:3
**374**
6:8
**38**
13:25
**387**
143:14
**39**
14:1
**390**
93:10
**398**
105:10
**3prvos**
35:6
**3pvro**
13:20, 54:22, 56:13, 56:20, 57:15, 89:13, 94:2, 102:21, 105:3, 108:16, 108:24, 118:4, 119:23, 121:21, 122:12, 130:12, 133:1, 136:6, 136:16, 136:24, 138:8, 138:22, 140:14, 140:23, 140:24, 141:16, 141:21, 144:2, 144:8
**3pvros**
23:4, 23:8, 23:13, 35:5, 35:17, 54:15, 57:12, 58:20, 58:22, 60:6, 62:13, 63:1, 63:7, 63:12, 63:20, 70:6, 71:7, 71:19, 78:14, 79:5, 79:11, 83:2, 84:5, 84:10, 84:18, 85:1, 85:25, 91:24, 104:8, 104:16, 105:20, 106:11, 110:14, 123:11, 125:3, 125:25, 128:8, 141:19, 144:18

**4**

**40**
14:2, 137:8
**400**
5:7, 5:16
**407**
7:8, 11:8
**4070**
9:18

**41**
14:3
**413**
144:11
**414**
9:8, 12:9
**42**
14:5
**432**
107:2
**442**
128:16
**449**
128:17
**464**
6:18, 8:19
**4700**
7:18
**498**
5:18
**4:-cv**
15:13
**4:-cv--mw**
1:10, 1:11,
1:12, 2:10,
2:11, 2:12
**4th**
43:14

**5**

**50**
128:7
**500**
10:17
**506**
121:14, 123:24
**5150**
7:8, 11:8
**518700**
1:23
**5218**
6:8
**549**
4:10
**55**
127:25
**561**
7:18

**5670**
11:18
**57**
81:21
**5747**
5:9
**5751**
6:18
**58**
149:25
**5938**
10:19
**5a**
130:11

**6**

**601**
11:15
**626**
7:18
**656**
4:19
**6th**
8:17

**7**

**70**
128:7
**7050**
13:21, 30:17,
30:19, 31:5,
31:9, 31:10,
31:19, 32:1,
32:13, 32:17,
32:20, 33:5,
33:10, 33:16,
33:22, 34:15,
37:6, 37:10,
39:3, 42:8,
43:14, 43:17,
43:19, 44:4,
45:22, 46:9,
47:25, 49:18,
49:25, 50:8,
50:25, 51:9,
52:4, 52:17,
52:20, 53:20,
54:11, 55:15,

56:12, 57:6,
64:9, 65:21,
66:7, 78:3,
78:12, 78:23,
83:3, 83:12,
87:9, 88:1,
91:17, 91:23,
93:8, 94:6,
105:3, 106:23,
121:18, 128:7,
128:24, 135:9
**727**
6:18, 8:19

**8**

**80**
13:4
**800**
8:7
**807**
8:9
**813**
11:18
**850**
9:8, 9:18,
10:19, 12:9
**8556**
5:18
**897**
7:8, 11:8

**9**

**9.0575**
143:13
**90**
16:17, 22:19,
84:1, 84:16
**904**
8:9
**91**
13:5
**97.0575**
55:19, 56:19,
91:23, 130:11
**98101**
4:18