

# Transcript of Andrew Darlington, Designated Representative

**Date:** January 4, 2024
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF FLORIDA

3                  TALLAHASSEE DIVISION

4   FLORIDA STATE            :

5   CONFERENCE OF            :

6   BRANCHES AND YOUTH       :   Case Nos.

7   UNITS OF THE NAACP,      :   4:23-cv-215-MW/MAF

8   et al.,                  :   4:23-cv-216-MW/MAF

9           Plaintiffs,      :   4:23-cv-218-MW/MAF

10     v.                    :

11  CORD BYRD, in his        :

12  official capacity as     :

13  Florida Secretary of     :

14  State, et al.,           :

15           Defendants.     :

16  - - - - - - - - - - - - - -x

17   Deposition of the OFFICE OF THE FLORIDA SECRETARY

18                      OF STATE

19     By and Through Its Designated Representative

20            ANDREW DARLINGTON, ESQUIRE

21               Conducted Virtually

22             Thursday, January 4, 2024

23                  9:01 a.m. EST

24   Job No.: 518939

25   Pages: 1 - 314      Reported by: Cynthia A. Whyte

```
1    (Caption Continued from Previous Page)

2    - - - - - - - - - - - - -x

3    LEAGUE OF WOMEN            :

4    VOTERS OF FLORIDA,         :

5    INC., et al.,              :

6              Plaintiffs,      :

7      v.                       :

8    ASHLEY MOODY, in her       :

9    official capacity as       :

10   Attorney General of        :

11   Florida, et al.,           :

12             Defendants.      :

13   - - - - - - - - - - -      :

14   HISPANIC FEDERATION,       :

15   et al.,                    :

16             Plaintiffs       :

17     V.                       :

18   CORD BYRD, in his          :

19   official capacity as       :

20   SECRETARY OF STATE OF      :

21   FLORIDA, et al.,           :

22      Defendants              :

23

24    - - - - - - - - - - - - -x

25
```

1   Deposition of ANDREW DARLINGTON, ESQUIRE, conducted

2   virtually:

3

4

5

6

7

8

9

10

11

12

13

14

15   Pursuant to notice, before Cynthia A. Whyte, Notary

16   Public in and for the State of Maryland.

17

18

19

20

21

22

23

24

25

1             A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFFS FLORIDA STATE CONFERENCE OF

4   BRANCHES OF YOUTH UNITS OF THE NAACP; VOTERS OF

5   TOMORROW ACTION, INC.; DISABILITY RIGHTS FLORIDA;

6   ALIANZA FOR PROGRESS; ALIANZA CENTER; UNIDOS US;

7   FLORIDA ALLIANCE FOR RETIRED AMERICANS; SANTIAGO

8   MAYER ARTASANCHEZ; AND ESPERANZA SANCHEZ:

9       MELINDA JOHNSON, ESQUIRE

10      ELIAS LAW GROUP, LLP

11      250 Massachusetts Avenue, NW

12      Suite 400

13      Washington, D.C.  20001

14      (202) 968-4490

15

16  ON BEHALF OF PLAINTIFF LEAGUE OF WOMEN VOTERS OF

17  FLORIDA, INC:

18      BRENT FERGUSON, ESQUIRE

19      MICHAEL ORTEGA, ESQUIRE

20      CAMPAIGN LEGAL CENTER

21      1101 14th Street, NW

22      Suite 400

23      Washington, D.C.  20005

24      (202) 736-2200

25

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2

 3   ON BEHALF OF PLAINTIFF HISPANIC FEDERATION:

 4      MIRANDA GALINDO, ESQUIRE

 5      LatinoJustice PRLDEF

 6      475 Riverside Drive

 7      Suite 1901

 8      New York, New York  10115

 9      (212) 219-3360

10

11   ON BEHALF OF PLAINTIFF FLORIDA NAACP:

12      FRITZ WERMUTH, ESQUIRE

13      KING, BLACKWELL, ZENDER & WERMUTH, P.A.

14      25 East Pine Street

15      Orlando, Florida  32801

16      (407) 422-2472

17

18   ON BEHALF OF SECRETARY OF STATE CORD BYRD:

19      MOHAMMAD O. JAZIL, ESQUIRE

20      JOSHUA PRATT, ESQUIRE

21      HOLTZMAN VOGEL

22      119 South Monroe Street

23      Suite 500

24      Tallahassee, Florida  32301

25      (850) 270-5938
```

```
 1              A P P E A R A N C E S   C O N T I N U E D

 2

 3     ON BEHALF OF SUPERVISOR OF ELECTIONS OF BREVARD,

 4     CITRUS, DESOTO, FLAGLER, GILCHRIST, HIGHLANDS,

 5     JEFFERSON AND MADISON COUNTIES:

 6         FRANK M. MARI, ESQUIRE

 7         DALE SCOTT, ESQUIRE

 8         ANNA ENGELMAN SCOTT, ESQUIRE

 9         ROPER, P.A.

10         2707 East Jefferson Street

11         Orlando, Florida  32803

12         (407) 897-5150

13

14     ON BEHALF OF SUPERVISOR OF ELECTIONS OF ALACHUA

15     COUNTY:

16         MARGOT DuVAL, ESQUIRE

17         ASSISTANT COUNTY ATTORNEY

18         12 Southeast 1st Street

19         Floor 2

20         Gainesville, Florida  32601

21         (352) 374-5218

22

23

24

25
```

```
 1            A P P E A R A N C E S   C O N T I N U E D

 2

 3     ON BEHALF OF SUPERVISOR OF ELECTIONS OF GLADES,

 4     HARDEE, HENDRY, HOLMES, LEVY AND OKEECHOBEE

 5     COUNTIES:

 6         GERALDO F. OLIVO, III, ESQUIRE

 7         HENDERSON FRANKLIN

 8         1750 Monroe Street

 9         P.O. Box 280

10         Fort Myers, Florida  33902

11         (239) 344-1100

12

13   ON BEHALF OF SUPERVISOR OF ELECTIONS OF BROWARD

14   COUNTY:

15         DEVONA ALICIA REYNOLDS PEREZ, ESQUIRE

16         BROWARD COUNTY ATTORNEYS OFFICE

17         115 South Andrews Avenue

18         Suite 423

19         Fort Lauderdale, Florida  33301

20         (954) 357-7600

21

22

23

24

25
```

```
1            A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF SUPERVISOR OF ELECTIONS FOR BAKER,

4    BAY, BRADFORD, CALHOUN, COLUMBIA, DIXIE, FRANKLIN,

5    GADSDEN, GULF, HAMILTON, JACKSON, LAFAYETTE,

6    LIBERTY, NASSAU, PUTNAM, SANTA ROSA, ST. JOHNS,

7    SUMTER, SUWANNEE, TAYLOR, UNION, WAKULA, WALTON AND

8    WASHINGTON COUNTIES:

9        LEIGH F. ROSENBLOOM, ESQUIRE

10       MARKS GRAY, P.A.

11       1200 Riverplace Boulevard

12       Suite 800

13       Jacksonville, Florida  32207

14       (904) 399-8440

15

16   ON BEHALF OF SUPERVISOR OF ELECTIONS OF PINELLAS

17   COUNTY:

18       JARED DOUGLAS KAHN, ESQUIRE

19       MATTHEW W. SMITH, ESQUIRE

20       PINELLAS COUNTY ATTORNEYS OFFICE

21       315 Court Street

22       Clearwater, Florida  33756-5165

23       (727) 464-3354

24

25
```

```
 1              A P P E A R A N C E S   C O N T I N U E D

 2

 3    ON BEHALF OF PLAINTIFF HISPANIC FEDERATION:

 4        ESTEE KONOR, ESQUIRE

 5        ASSOCIATE DIRECTOR OF LITIGATION

 6        DEMOS

 7        80 Broad Street

 8        New York, New York  10004

 9        (212) 633-1405

10

11   ON BEHALF OF SUPERVISOR OF ELECTIONS OF VOLUSIA

12   COUNTY:

13        SARAH JONES, ESQUIRE

14        SARAH JONES LAW

15        922 Florida Highway 60

16        Lake Wales, Florida  33853

17        (863) 455-4811

18

19   ON BEHALF OF THE ATTORNEY GENERAL:

20        STEPHANIE ANNE MORSE, ESQUIRE

21        OFFICE OF THE ATTORNEY GENERAL

22        1 The Capitol

23        #Pl - 01

24        Tallahassee, Florida  32399

25        (850) 414-3300
```

1            A P P E A R A N C E S   C O N T I N U E D

2

3    ON BEHALF OF SUPERVISOR OF ELECTIONS FOR PALM BEACH

4    COUNTY:

5        JUANITA SOLIS, ESQUIRE

6        THE MARKARIAN GROUP

7        2925 PGA Boulevard

8        Suite 204

9        Palm Beach Gardens, Florida  33410

10       (561) 335-3202

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C O N T E N T S

2   EXAMINATION OF ANDREW DARLINGTON, ESQUIRE    PAGE

3    By Ms. Johnson                               13

4    By Mr. Ferguson                             236

5    By Ms. Konor                                310

6

7                    E X H I B I T S

8              (Attached to the Transcript)

9   DARLINGTON DEPOSITION EXHIBITS               PAGE

10   Exhibit 1     Notice of Deposition           56

11   Exhibit 2     Declaration of Andrew

12                 Darlington, App. 0089 to

13                 App. 0095                      102

14   Exhibit 3     The Guardian Article          148

15   Exhibit 4     Documents related to Cody

16                 Case, SB7050-SOS-00094401

17                 to SB7050-SOS-00094417        238

18   Exhibit 5     807.802(1)                    259

19   Exhibit 6     SB7050                        259

20   Exhibit 7     Secretary of State's Response

21                 In Opposition to Motion for

22                 Preliminary Injunction and

23                 Incorporated Memorandum of

24                 Law                           270

25
```

```
 1              E X H I B I T S   C O N T I N U E D

 2                 (Attached to the Transcript)

 3    DARLINGTON DEPOSITION EXHIBITS                PAGE

 4    Exhibit 8      Non-Felon Declaration          272

 5    Exhibit 9      3PVRO Voter Registration

 6                   Application Receipt            286

 7    Exhibit 10     Secretary Byrd's Responses

 8                   and Objections to the League

 9                   of Women Voters Plaintiffs'

10                   First Set of Interrogatories   293

11    Exhibit 11     OECS Report                    306

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2               ANDREW DARLINGTON, ESQUIRE

3    having been duly sworn, testified as follows:

4    BY MS. JOHNSON:

5        Q    Good morning, Mr. Darlington.

6        A    Good morning.

7        Q    Would you please go ahead and state your

8    full name for the record.

9        A    Andrew Darlington.

10       Q    My name is Mindy Johnson and I represent

11   some of the plaintiffs in this litigation,

12   specifically Florida NAACP, UnidosUS, Alianza,

13   Voters of Tomorrow, Esperanza Sanchez, Santiago

14   Mayer, Umberto Pierto, and Disability Rights of

15   Florida and Florida Alliance for Retired

16   Americans.

17            I'm going to be the one asking you some

18   questions to start off today, and then I do

19   believe some other plaintiffs' counsel will have

20   some questions for you as well.  Okay?

21       A    Understood.

22       Q    Have you ever been deposed before?

23       A    No.

24       Q    Have you ever testified in court before?

25       A    I've never testified in court.  I am a
```

1  practicing attorney so I have appeared in court

2  before.

3      Q    Understood.  So that's a helpful

4  clarification.  You've never testified as a

5  witness before in court.

6      A    No, ma'am.

7      Q    Okay.  There are a few ground rules that

8  I think may make things easier today.  You might

9  have experience from being a practicing attorney,

10 but just a few things that should make it easier

11 for the court reporter and for both of us as we go

12 through the questioning today.

13         The first is that everything is being

14 transcribed so we'll need you to give verbal

15 answers to all questions instead of an uh-huh or a

16 nod just so that the record is clear.  Is that

17 okay?

18     A    Yes.

19     Q    With Zoom there's sometimes a slight bit

20 of a delay, so I think it's best practice if you

21 will pause just a second to make sure I finish my

22 question and I will also try and do the same to

23 make sure you completely finish your answer before

24 asking the next question so that there is not

25 overlapping speaking that makes it difficult for

1    the court reporter to transcribe.

2         A    Understood.

3         Q    Okay.  If you don't understand any of the

4    questions I ask, please do ask for clarification

5    or ask me to repeat the question; otherwise, I

6    will understand that you understood the question

7    if you go ahead and give your answer.  Does that

8    make sense?

9         A    Yes.

10         Q    If you need a break at any point, feel

11   free to ask.  The only general rule to follow is

12   that if there's a question pending, you go ahead

13   and answer the question that is pending before we

14   take that break.

15         A    Understood.

16         Q    You are being deposed today as a

17   representative of the Office of the Secretary of

18   State.  Do you understand that?

19         A    Yes.

20         Q    And so you understand that your answers

21   are binding on the Office of the Secretary of

22   State of Florida?

23         A    Yes, I do.

24         Q    Okay.  If I use the word "you" today in

25   the deposition, I will generally be referring to

1    the Secretary of State's Office.  But if at any

2    point you need clarification of whether I'm asking

3    about you individually or the office, please feel

4    free to just ask.

5         A    Understood.

6         Q    Your attorney may lodge objections to

7    some of my questions, but generally unless your

8    attorney instructs you not to answer, I would ask

9    that you still answer the question.

10        A    Understood.

11        Q    You may not communicate with your

12   attorney while we are on the record during the

13   deposition.  I know it would probably be quite

14   obvious given that you're both on camera together,

15   but I would just ask if there is any

16   communication, you make me aware of that.

17   Understood?

18        A    Yes, ma'am.

19        Q    Is there anyone else in the room with you

20   today?

21        A    No, ma'am.

22        Q    Okay.  And can you think of any reason

23   why you could not give truthful and full testimony

24   today.

25        A    No, there are no reasons.

1      Q     Do you have a computer open at all with

2   any windows?

3      A     I do not.  And I can put away my Idea.

4      Q     Oh, great.  And no papers in the room

5   with you right now?

6      A     There are no papers.  I'll put away my

7   pen as well.  I do have this, but I think you can

8   see that.

9      Q     Coffee is allowed, probably helpful.

10            And you don't have your phone with you

11   right now?

12      A     I do not.

13      Q     Okay.  Can you go ahead and tell me what

14   your current job title is?

15      A     My current job title is director of the

16   Office of Election Crimes and Security.

17      Q     And how long have you been in that

18   position?

19      A     I was appointed on or about March 30 of

20   this -- excuse me -- last year.  March 30, 2023.

21      Q     And who appointed you to the position?

22      A     The Florida Secretary of State.

23      Q     What are your general job

24   responsibilities as the director of the Office of

25   Election Crimes and Security?

1      A      First I would point you to Florida

2   Statute 97.022, which outlines our jurisdictional

3   grant.  As the director I oversee the office in

4   accomplishing those jurisdictional grants, which

5   include investigating allegations of crime, fraud,

6   or irregularity regarding the election system all

7   the way through to submitting an annual report to

8   the Florida legislature.

9      Q      Okay.  If I refer to the Office of

10  Election Crimes and Security as OECS at points of

11  this deposition, will you understand what I mean?

12     A      Can you say that one more time, please?

13     Q      Absolutely.  I said if I refer to the

14  Office of Election Crimes and Security as OECS at

15  points of this deposition, will you understand

16  what I mean?

17     A      Yes.  Thank you.

18     Q      How long is your term in your position?

19  Is it temporally limited?

20     A      It is not temporally limited.

21     Q      And is it accurate to say that OECS is

22  part of the Florida Department of State?

23     A      Yes.

24     Q      Do you report to Secretary Byrd in your

25  role?

1        A     He is certainly in my chain of command --

2   and I use that term just from my time in the

3   Marine Corps -- but he is not my direct

4   supervisor.

5        Q     Okay.  Can you describe for me who your

6   direct supervisor is?

7        A     Administratively I report to the Deputy

8   Secretary of State.

9        Q     Okay.  Anyone else?

10       A     No.

11       Q     Do you consider OECS to operate

12  independently?

13       A     Can you define "independently"?  We are

14  tucked into the Department of State so I don't --

15  I'm not sure I understand the question.

16       Q     I think that was my main question, of

17  whether the office does operate within the

18  Department or if you're considered to be an

19  independent entity from the Department of State.

20       A     Generally speaking, I would point you to

21  97.022 Florida statutes, which outlines our

22  jurisdictional grant and responsibilities as an

23  office.  And those ultimately keep us within the

24  Department of State.

25       Q     Do you have regular meetings or check-ins

1  with the Deputy Secretary?

2       A    They're not regularly scheduled, but I do

3  meet with the Deputy Secretary from time to time.

4       Q    Do you have reporting obligations to the

5  Deputy Secretary separate from the annual report

6  that you referenced earlier?

7       A    Additionally, no.  As in what we submit

8  to the legislature, that subject matter is what I

9  discuss from time to time with the Deputy

10  Secretary.

11       Q    Okay.  Have you held any other positions

12  within the Florida Department of State?

13       A    Yes, I have.

14       Q    And what are those positions?

15       A    Previously I was assistant general

16  counsel.

17       Q    Is that the position you held immediately

18  prior to your current position?

19       A    Yes, ma'am.

20       Q    And how long were you in that role?

21       A    Approximately six months.

22       Q    If I'm doing the math right, that's

23  roughly fall of 2022?

24       A    Yes.  I began as assistant general

25  counsel the Tuesday after the three-day weekend in

1    October of 2022.

2         Q     And did you have any other positions at

3    the Secretary of State's Office before you were

4    assistant general counsel?

5         A     No, ma'am.

6         Q     To go back to the Deputy Secretary that

7    you mentioned, can you clarify which Deputy

8    Secretary it is that you report to?

9         A     I believe we only have one Deputy

10   Secretary of State.

11        Q     Okay.  And what's the name?

12        A     Brad McVay.

13        Q     What were some of your responsibilities

14   as assistant general counsel of the Department of

15   State.

16        A     My responsibilities included assisting

17   with fulfilling public records requests.

18   Additionally I had a variety of tasks in support

19   of the Florida Division of Elections.  And I also

20   handled some internal matters, anything from

21   updating Department procedures to identifying

22   potentially new policies that the Department may

23   want to adopt.  And then I'd say I took on

24   whatever other tasks that the general counsel

25   suite might need help with.  So there was legal

1    research involved.  I mean, it was kind of a wide

2    variety of roles and responsibilities, to be

3    honest.

4        Q    When you say new policies that the office

5    may need to adopt or want to adopt, do you mean

6    internal policies or external policies for others

7    in Florida?

8        A    Yes, sorry, internal policies.  So

9    anything from there was a leave policy that I

10   assisted in drafting to I helped update the

11   meritorious bonus policy.  So it was all internal

12   Department-facing policies.

13       Q    And you also mentioned that you assisted

14   with some tasks related to the Division of

15   Elections.  Can you describe what kinds of tasks

16   you assisted the Division of Elections with in

17   your role?

18       A    Yes.  One of the tasks that I assisted

19   the division with was issuing -- excuse me --

20   reviewing complaints from supervisors of elections

21   offices to the Division of Elections regarding

22   third-party voter registration organizations.

23            Additionally, there were some...

24            MS. JOHNSON:  Mr. Scott, I think you may

25   need to go on mute.

1          Thank you.

2      Q    Go ahead, Mr. Darlington.

3      A    And in addition to that, there were just

4  some Bureau of Records assignments really.  And

5  then the other related matters I was working

6  directly for an attorney and that was in support

7  of active litigation.

8      Q    Okay.  What active litigation did you

9  work on in your role?

10      A    She gave me two legal research

11  assignments, and I just provided, you know, my

12  response based on what I reviewed.  They were not

13  particularly lengthy assignments.

14      Q    And without needing to go into the detail

15  on the research you completed, were these cases

16  related to election law litigation?

17      A    Yes.

18      Q    What was the general subject matter of

19  those litigations?

20      A    One assignment had to do with a

21  third-party voter registration organization and

22  the other was in anticipation of litigation.

23      Q    Okay.  For the litigation involving the

24  third-party voter registration organization, what

25  was the issue being litigated?

1          A     The third-party voter registration

2     organization elected to take their disagreement

3     with our issuance of fines to the Florida

4     Department of Administrative Hearings.

5          Q     Do you recall what year the fines were

6     issued that they were litigating?

7          A     Yes; 2022.

8          Q     And do you recall the name of the

9     organization?

10          A     I do.

11          Q     What was that organization?

12          A     Hard Knocks.

13          Q     Do you know the outcome of that

14     litigation?

15          A     Yes.

16          Q     What was the outcome?

17          A     The case settled.

18          Q     Is that settlement information public to

19     your knowledge?

20          A     I'm just being honest here, because I

21     didn't file anything with DOAH.  I don't know, to

22     be honest with you.

23          Q     Okay.  You also just testified that you

24     reviewed complaints regarding third-party voter

25     registration organizations submitted by

1    supervisors of elections.  Is that correct?

2         A    Yes.

3         Q    Would those have all been complaints

4    submitted during the time that you were in your

5    role as an assistant general counsel?

6         A    The complaints received by the

7    supervisors, some of -- one of them, I believe,

8    was received while I was in the general counsel

9    suite; however, the others predated when I began.

10        Q    Were they all from the calendar year

11   2022?

12        A    No.

13        Q    Do you remember how far back the

14   complaints you reviewed went?

15        A    I believe 2021 was the earliest year.

16        Q    Okay.  And do you remember roughly how

17   many complaints you reviewed.

18        A    Well, there were four batches of -- I

19   believe someone just spoke over me.

20        Q    I didn't hear anything so I apologize if

21   it was me rustling around.

22        A    Okay.  There were four batches of

23   complaints, but please keep in mind that -- please

24   keep in mind that a complaint can contain a number

25   of voter registration applications in support of

1    that complaint.

2         Q    And so when you say "four batches of

3    complaints," would you call that four complaints

4    that were submitted?

5         A    No.  That's not the way these complaints

6    regarding third-party voter registration

7    organizations are tracked.  Each improper

8    submission of a voter registration application is

9    considered one complaint; however, the supervisor

10   of elections typically sends them in batches for

11   the Florida Division of Elections, sends it in a

12   batch.  So that way they're not having to stop

13   what they do every single time and every single

14   application and send it in.

15        Q    So would a batch all be from the same

16   supervisor of elections or not necessarily?

17        A    One batch could be one supervisor of

18   elections.  Then again, one batch that I have

19   handled had as many as five total supervisors of

20   elections or five total complainants, which could

21   include the Florida Division of Elections.

22        Q    Do you recall how many individual

23   complaints as you just defined them were included

24   within those four batches roughly?

25        A    With Hard Knocks alone with those four

1    there were at least -- there were at least around

2    250 voter registration applications that were

3    submitted in violation of Florida law.

4          Q    And did I understand you correctly that

5    they were all related to the third-party voter

6    registration organization Hard Knocks?

7          A    Yes.

8          Q    Did you review any complaints about any

9    other third-party voter registration organizations

10   in your role as assistant general counsel?

11         A    Yes.

12         Q    Which other complaints do you recall

13   reviewing separate from any related to Hard

14   Knocks?

15         A    Well, there were a host of complaints

16   that I reviewed.  So the total number of voter

17   registration applications that I reviewed while

18   assistant general counsel, there was a lot.  I

19   don't know if I can give you a precise answer on

20   that.

21         Q    Do you have a ballpark?

22         A    Ballpark, probably -- probably around --

23   you know, to provide a conservative estimate,

24   somewhere around 550 or 600 voter registration

25   applications submitted under Florida law.

1       Q      Do you recall the names of any other

2  third-party voter registration organizations who

3  you received complaints about?

4       A      Yes.

5       Q      Which other organizations come to mind?

6       A      As assistant general counsel or since I

7  have been with the Department?

8       Q      As assistant general counsel for now.

9       A      The Florida Republican Party -- or,

10  excuse me, the Republican Party of Florida, the

11  Democratic Party of Florida, Black Pack, Hard

12  Knocks, Mi Vecino, Alianza.  But there are two

13  third-party voter registration relations that I'm

14  aware of with the word "Alianza."  It was one of

15  the third-party voter registration organizations.

16  Hispanic Federation.  And I believe it was the

17  Republican party of either Pinellas County or Clay

18  County but I can't remember which one.  It was one

19  of those.  It was a county Republican Party

20  registered as a third-party voter registration

21  organization.

22       Q      Any others that come to mind sitting

23  here?

24       A      During my time as assistant general

25  counsel?

1        Q     Yes.

2        A     There were a few more.  I can't remember

3   their names at this time.

4        Q     Of those you just named, were there any

5   you remember reviewing more complaints for out of

6   the list?

7        A     What do you mean "reviewing more

8   complaints"?

9        Q     I know you already mentioned receiving

10  roughly 250 complaints about Hard Knocks, for

11  example.  Of the list of other third-party voter

12  registration organizations you just named, do you

13  recall receiving a higher number of complaints

14  about any of the others comparatively?

15       A     Of those that I personally reviewed while

16  assistant general counsel, no.  Of the voter

17  registration applications that I reviewed during

18  my time as assistant general counsel Hard Knocks

19  was the most in terms of number of voter

20  registration applications that violated Florida

21  law.

22       Q     And when you say the voter registration

23  application violated Florida law, what do you

24  mean?

25       A     Well, when we received complaints from

1    either County supervisors of elections or the

2    Florida Division of Elections, the complaint

3    submitted addresses either a statutory violation

4    or a regulatory violation, and within Florida

5    Statue 97.0575 there are a host of statutory

6    requirements.  And then the implementing

7    regulation as well, Florida Administrative Code

8    1S-2.042 also contains a number of regulatory

9    requirements.  So when we receive a complaint,

10   there is a batch of voter registration

11   applications with a cover sheet and that cover

12   sheet says -- and this isn't a comprehensive list

13   of what the cover sheet says, but this -- you

14   know, the complainant, whether it's the County

15   supervisor of elections or the Florida Division of

16   Elections is sending to us the third-party voter

17   registration organization with a brief summary,

18   very brief summary, sometimes just a few words,

19   stating what the violation is, whether it is a

20   regulatory violation, a statutory violation, or

21   some other issue.

22        Q    And what are some examples of let's start

23   with statutory violations that you reviewed in

24   your role as assistant general counsel?

25        A    I would point you to Florida Statute

1    97.0575, within that statute.  And it's been

2    updated over the last few years, but within that

3    statute there are submission requirements either

4    defining a proper recipient of a collected voter

5    registration application.  There are also

6    timelines set forth by the statute that are

7    required -- you know, are requirements for the

8    third-party voter registration applications to

9    comply with, and then there is a fiduciary duty

10   attached between the third-party voter

11   registration organization agent and the voter

12   submitting a voter registration application.

13          That's not a comprehensive list of all

14   versions of the statute, but those are typically

15   the statutory violations that are reported about

16   these third-party voter registration

17   organizations.

18       Q    So when you say "typically," is it fair

19   to say that most of the complaints you were

20   reviewing related to either returning the

21   applications after the time period outlined in

22   Section 97.0575 or returning them to the wrong

23   location?

24       A    No, that is not a fair statement, to be

25   honest with you, because there are other

1  regulatory requirements as well.  And then there

2  are clerical errors that occur.  So it's not

3  really a fair statement to say, it's just those

4  two things.

5      Q    Yes.  My question was about the majority.

6  And it's certainly okay if your answer is still

7  no, but just to clarify what my question was.

8      A    Yeah, it's not fair to say the majority.

9      Q    What would you call the majority of the

10  complaints that you reviewed?

11      A    The majority of the complaints I

12  reviewed?

13      Q    Yes.

14      A    What do you mean by -- the majority of

15  what?

16      Q    The issue that was underlying the

17  complaint.

18      A    Well, the majority of issues -- the

19  majority of issues -- it's kind of a higher-level

20  answer, the majority of issues relates --

21          THE COURT REPORTER:  You cut out for me

22  right there, sir.

23      A    The majority of issues turn on voter

24  registration agents fulfilling their fiduciary

25  obligation on collecting and handling these.  And

1    there are a wide variety of examples of issues

2    with that, but really it turns on the moment that

3    voter registration application is given back from

4    the new voter registering or the registered voter

5    updating their information.

6         Q    Sure.  And I think accepting that the

7    complaints related to issues with third-party

8    organization submission of voter registration

9    applications, I'm trying to get a sense of the

10   breakdown of what more specific issues you were

11   seeing in the complaints.

12             So was there a clear majority of

13   subissues beyond just the general issue of

14   collecting and handling applications that you saw

15   when reviewing complaints in your role as the

16   assistant general counsel?

17        A    In my role as assistant general counsel

18   what I personally observed or reviewed, I don't

19   have one clear majority issue.

20        Q    Do you have what you would call the most

21   common issues that you saw?

22        A    No, I don't, because, again, there are

23   several requirements that continue to come across

24   our desk.  So there's not one.  You know,

25   sometimes it was just statutory violations,

1    sometimes it was regulatory violations.  But there

2    is not one clear problem with the type of

3    violation.  It was more -- it was more -- again,

4    it just generally dealt with the issues concerning

5    one set of applications handed back to the

6    third-party voter registration organization agent.

7         Q    So not meaning to limit yourself to one

8    issue at this point, what would you consider the

9    prominent issues that you saw in reviewing these

10   complaints?

11        A    The common issues I'd say -- first off,

12   there were certainly -- first off, the party

13   submissions of these voter registration

14   applications were common.  Additionally,

15   violations where applications were collected

16   before book closing but submitted after book

17   closing, that was a common fine we levied.

18             Additionally, there were problems with

19   voter registration agents -- and when I say "voter

20   registration agents," I obviously mean someone

21   working for -- whether paid or unpaid, working for

22   a third-party voter registration organization, but

23   there were common issues with submitting the

24   collective voter registration applications to the

25   improper county, meaning the county in which the

1    voter does not reside.

2           And then there were other technical

3    violations of the rule, including not placing --

4    not placing the third-party voter registration

5    organization number that was submitting that voter

6    registration application, not complying with the

7    date requirements.

8           We saw common issues of different aspects

9    of criminal fraud when these applications are

10   submitted, dates being changed to avoid a late

11   penalty.  There were investigations.  It's

12   contained in your production, but there were

13   investigations that resulted in convictions of

14   theft of personal information, personally

15   identifiable information.

16          There were also issues with submitting

17   voter registration applications for individuals

18   that never even touched the application.  And,

19   again, there were kind of a lot of common issues,

20   whether there were criminal violations, you know,

21   criminal conduct, just statutory violations, some

22   of which we've discussed, and the regulatory

23   violations as well.

24       Q    You just mentioned a conviction related

25   to theft of personally identifiable information.

1    Can you elaborate on what investigation or

2    conviction you're referring to?

3         A    Sure.  I mean, one example which is

4    contained in the production we've given you is

5    Roderica Corey (sic), a convicted felon, who in

6    her sworn investigation to the Florida Department

7    of Law Enforcement admitted to criminally using

8    personally identifiable information and that

9    resulted in a conviction, in another felony

10   conviction.  And there have been a number of

11   those.

12        Q    Can you think of any others specifically?

13        A    Well, when you say "those," I'm not going

14   to comment on active investigations, but I would

15   want to point to the production we've given you

16   and I can certainly discuss specific examples that

17   you pull.

18        Q    Yes.  I'm asking you to name any other

19   specific examples that you can think of sitting

20   here.

21        A    Sure.  There were five individuals who

22   were -- I don't remember if they were paid or

23   unpaid, but they were working for Hard Knocks.

24   And when I say "working for Hard Knocks," they

25   were collecting voter registration applications in

1    Charlotte and Lee County.  And, you know, if you

2    can give me a specific time period, I can better

3    elaborate, but, you know, these issues have

4    certainly predated my employment with the

5    Department of State.

6         Q    Yeah.  I think my question is to any that

7    you are aware of.  You know, it could still

8    predate your time working in the organization, but

9    any that you have now become aware of that you can

10   testify here to today.

11        A    Yeah.  Again, I would point you to the

12   production that we have given you.

13        Q    For the five individuals at Hard Knocks,

14   do you understand how they were using the

15   information that you said they received from voter

16   registration applications?

17        A    Well, every case was obviously factually

18   different in terms of the number of victims and

19   their specific information used.  But, generally

20   speaking, these fraudulent actors would use

21   information that are contained on Excel

22   spreadsheets, databases that kind of compile from

23   different publicly available sources, personally

24   identifiable information, and then they would --

25   these fraudulent actors would go ahead and fill

1    out the voter registration application and then

2    submit it on behalf of the victim.  Sometimes

3    there were forged signatures.  There were examples

4    of changing the political party affiliation of the

5    voter.  And that is not a comprehensive list, but

6    that is certainly -- those are certainly some of

7    the common issues.

8         Q    So just to make sure I'm understanding,

9    in the Hard Knocks investigations that you're

10   aware of, the issue there was voter registration

11   agents getting information from sources other than

12   voter registration applications and then using

13   that information to complete a voter registration

14   application.  Is that what I'm understanding?

15        A    Can you say that again?

16        Q    Sure.  I'm just trying to understand I

17   think directionally and so I apologize if my

18   phrasing isn't perfect here, feel free to correct

19   me.  But I understood what you just testified to

20   to be that these individuals were accessing voter

21   information from sources other than applications

22   that voters completed and then were using that

23   information to fill out a voter registration

24   application on behalf of the voter.  Did I

25   understand that correctly?

1      A    No, because a lot of this publicly

2    available information can -- it is stored on these

3    Excel spreadsheets and databases that these

4    third-party voter registration organizations have

5    that stem from previously submitted voter

6    registration applications.  And so the information

7    can originate from the voter, it just depends on

8    the source from where these third-party voter

9    registration organization agents are then

10   utilizing that information about the victim and

11   submitting a fraudulent application.

12      Q    Do you have knowledge about what specific

13   databases the Hard Knocks individuals accessed in

14   this investigation?

15      A    I don't on those specific cases.

16      Q    And so do you know whether the

17   information they accessed did in fact originate

18   from voter registration applications?

19      A    Not specifically voter registration

20   applications but based on their sworn statements,

21   they were getting information from sources that

22   were affiliated with the third-party voter

23   registration organization.

24      Q    And you mentioned that the databases were

25   what you called publicly available.  Can you

1    describe what you meant by that?

2        A     No.  So what I said is that in their

3    sworn statements they were utilizing information

4    from spreadsheets.  And so, generally speaking,

5    these spreadsheets would have Andrew Darlington

6    resides at this address, you know, political

7    affiliation.  It would have enough information to

8    provide a completed voter registration

9    application.  But the information that these

10   organizations were using or these groups of

11   individuals were using based on those sworn

12   statements came from -- this information could

13   come from a variety of different sources.  But the

14   fraudulent actors that were charged in these

15   specific cases were getting information from

16   someone else from what I'm calling a spreadsheet.

17       Q     And so do you know what information the

18   spreadsheet in that case contained?

19       A     I was not part of that investigation.

20       Q     Okay.  So you don't know whether, for

21   example, Social Security numbers were included

22   within that spreadsheet?

23       A     So, generally speaking, in these

24   spreadsheets sometimes a Social Security number is

25   contained.  But keep in mind a completed voter

1    registration application does not require a Social

2    Security number.  That is one element of Line 5

3    that is required.  But the applicant can affirm

4    that they don't have a driver's license number or

5    a Social Security number.  And that completed --

6    that otherwise completed voter registration

7    application can still be accepted by the proper

8    recipients.

9         Q    And to confirm what I think you just

10   said, it can be accepted if the voter affirms on

11   the application that they do not have an

12   identification number or Social Security number?

13        A    Correct.  Regardless of whoever fills out

14   that voter registration application, Florida

15   statute I believe it's 97.014 does state -- does

16   provide the ability for someone to submit an

17   application without a Social Security number.

18        Q    For the first investigation that you

19   mentioned, do you understand how the individual

20   accessed voter information or whatever information

21   was accessed in that case?

22        A    To which investigation are you referring?

23        Q    The first one -- and, I apologize, I can

24   look back at the name on the transcript -- it was

25   the one you mentioned, it's the first answer to my

1   question of a conviction related to identity

2   theft.

3       A    So you're referring to Roderica Corey?

4       Q    I believe that's the one.

5       A    Okay.  And I apologize.  Now can you

6   state the question again?

7       Q    Absolutely.  My question is, do you know

8   what information was accessed in that case?

9       A    Well, she submitted a number of

10  applications that were criminally fraudulent, so

11  it depends on the application submitted.  But,

12  again, I wasn't a part of that investigation so I

13  can't tell you which specific voter registration

14  applications resulted in a conviction.  I just

15  know that the Florida Department of Law

16  Enforcement got a sworn statement from her and

17  then prosecutors charged her with fraudulent acts

18  regarding a number of voter registration

19  applications.

20      Q    And do you have an understanding from

21  that investigation of whether she also accessed a

22  database, for example?

23      A    For further detail than I have already

24  elaborated, I would point you to the Florida

25  Department of Law Enforcement.

1      Q    Do you know what third-party voter

2    registration organization she worked with?

3      A    Yes.  I believe she was with -- I believe

4    she was with Hard Knocks.

5      Q    What exactly would you do with the voter

6    registration application complaints that you

7    reviewed in your role as assistant general

8    counsel?

9      A    In my role as assistant general counsel

10   these voter registration applications, if you're

11   talking about ones that were submitted with

12   complaint forms, what I would do is essentially

13   review every voter registration application to

14   determine what violation, if any, actually

15   occurred and then from there, you know, determine

16   within that batch what the total number of

17   technical -- and when I say "technical

18   violations," I mean nonfineable offenses or, you

19   know, just voter registration applications that

20   are not submitted in accordance with the

21   regulations.

22     Q    I'm getting an echo now.  I don't know if

23   it's the speaker in your room.  I don't think I

24   hear it anymore.

25     A    Sorry.  Are we good?

1        Q      I think we're good now.  I apologize.

2        A      Can you state the question again?  I

3   apologize.

4        Q      No.  I think you were already answering

5   it.  My question was what you do with the voter

6   registration application complaints that you

7   received.  I think you were explaining that you

8   look at whether there was a violation.

9        A      Yes, ma'am.  So, again, the complaint

10  forms submitted by the complainant, whether the

11  supervisor of elections, the Florida Division of

12  Elections, is a statement, is essentially -- and

13  this isn't a comprehensive list of what is on the

14  form, but a statement saying this third party --

15  we believe this third-party voter registration

16  organization committed the following violations.

17  And it can be the technical or regulatory

18  violations I was discussing with you, it could be

19  statutory fineable offenses, or they could be

20  essentially an initial criminal referral that says

21  we have reason to believe that these voter

22  registration applications were submitted on behalf

23  of someone who did not fill this form out.  So --

24  or it could contain any combination of that,

25  right.

1          But ultimately when I got them, what I

2    would do is I would look at the cover sheet, but

3    that was essentially guidance as to what was

4    believed to be wrong.  But I would then review it.

5    And when I say "review it," I mean I would review

6    every single voter registration application to

7    confirm its compliance with all legal requirements

8    for a voter registration application and then I

9    would essentially tally up what I believed were

10   the actual violations.  And my numbers did not

11   always concur with the complainant.  Sometimes I

12   arrived at numbers that were less than them,

13   sometimes I disagreed with them that a fineable

14   offense was committed, and other times we would

15   just arrive at the same answer or different

16   answers and then I would draft up either a warning

17   letter or a fine letter and then issue it to the

18   third-party voter registration organization.

19        Q    And so when you were in this role as

20   assistant general counsel, you were the one who

21   had actually drafted and would you sign the fine

22   letters that you then sent out or warning letters?

23        A    I signed the warning or fine letters that

24   I drafted.  And I only drafted letters that

25   addressed batches of complaints that I personally

1    reviewed.  And if I can clarify here, when I

2    say -- I'm saying warning or fine letter.  A

3    warning letter is a letter that just notifies the

4    third-party voter registration organization that

5    they submitted applications that were not -- voter

6    registration applications that were not in

7    compliance with Florida Rule 1S-2.042, the

8    implementing third-party voter registration

9    organization rule.

10           If the only issues with those voter

11   registration applications were issues with

12   nonfineable offenses per the rule, then it would

13   be a warning letter.  I mean, I'd just issue

14   notification saying, you know, these voter -- and

15   this is just one example, but these voter

16   registration applications did not have the

17   third-party voter registration number on the back

18   of the form like it's supposed to essentially.

19       Q    Were there others in the Secretary of

20   State's Office that would also issue fine or

21   warning letters during your time in the office?

22       A    The previous director -- or, excuse me,

23   the previous assistant director of the Office of

24   Election Crimes and Security did issue one letter

25   that is in your production.  Sorry; the assistant

1    director of the Florida Office of Election Crimes

2    and Security, the previous director, he issued one

3    letter that's in your production.  And then for

4    the others I would have to point you to the

5    production.

6         Q    Did you understand it to be the

7    responsibility of someone else in the Secretary of

8    State's Office other than you during that time to

9    issue fine and warning letters?

10        A    During what time?

11        Q    During the time that you were assistant

12   general counsel.

13        A    Not that I'm aware of outside of that one

14   letter that was issued by the assistant director

15   of the Office of Election Crimes and Security.

16        Q    Do you have an understanding of why the

17   one letter was issued by the assistant director of

18   the Office of Election Crimes and Security?

19        A    I don't.

20        Q    Is the awarding of fines discretionary?

21        A    What do you mean when you say

22   "discretionary"?

23        Q    If an offense, as you called it, or a

24   violation is fineable, did you have discretion in

25   determining whether or not to actually levy the

1   fine on the third-party voter registration

2   organization?

3       A    I think Florida statute -- and there have

4   been several versions recently, but I think

5   Florida Statute 97.0575 is pretty clear on that

6   question.

7       Q    Do you have an understanding of whether

8   the Secretary of State's Office in the past has

9   received warning letters for fineable offenses

10  under Section 97.0575?

11      A    Can you state that again?  If the

12  Secretary's Office what?

13      Q    Do you have an understanding of whether

14  the Secretary's Office had issued warning letters

15  for what would be fineable offenses under Section

16  97.0575 in the past?

17      A    So when you say the Secretary's Office,

18  is there a certain part -- I mean, the Department

19  of State is kind of a large Department.  So if

20  you're talking about the Secretary of State

21  themselves, I would point you to the secretaries

22  that were in the role prior to my joining the

23  Department of State.  But to better assist in

24  answering questions, what do you mean by the

25  Secretary's Office?

1      Q    I think it would probably generally be

2   the General Counsel's Office, but the individuals

3   tasked with issuing fine or warning letters to

4   third-party voter registration organizations in

5   the past.

6      A    I would point you to the production that

7   you've received.  I do believe prior to me joining

8   the Department of State it would be the general

9   counsel suite.  But, again, you know, without a

10  more clear time period and without going back in

11  time when I wasn't in the Department, I don't

12  know -- I don't know how specifically I can answer

13  other than to say I do believe so, that it was

14  just the general counsel suite.

15     Q    I'm sorry; I think the answer might have

16  been no to this question, but just for

17  clarification, are you aware of whether

18  predecessors in issuing fine or warning letters in

19  your position chose to issue warning letters

20  instead of levying fines on third-party voter

21  registration organizations for offenses that could

22  be fineable under Section 97.0575?

23     A    Again, I would point you to the specific

24  signatory of the letter you're addressing.

25     Q    And is the answer, no, that you are not

1   aware of those examples?

2           A    I just can't answer yes or no because,

3   again, prior to me joining the Department of

4   State, I can't speak to what other attorneys did.

5           Q    Okay.

6           A    It would just be incredibly burdensome

7   for me to stop what I'm doing and stop and review

8   the years of warning letters or fine letters and

9   attached voter registration applications.

10          Q    Are you aware some of these letters were

11  attached to the declaration you submitted in

12  support of the preliminary injunction?

13          A    Yes.  But, again, I didn't sign those

14  letters so those are examples of warning or fine

15  letters that were issued.  So in terms of

16  discretion, the implementing statute is very

17  clear, but I can't speculate on what other

18  attorneys' decision-making process was.

19          Q    And so for you, when you have been

20  reviewing voter registration application

21  complaints, you don't consider yourself to have

22  discretion under the implementing statutes and

23  regulations to decide whether to issue a fine to a

24  third-party voter registration organization.  Is

25  that an accurate characterization of your

1    testimony?

2         A    I think the statute is very clear on

3    what -- if a certain violation occurs, what sort

4    of financial penalties should be assessed.  The

5    statute also contains provisions regarding

6    affirmative offenses that should be received.  The

7    statute is also very clear that the Attorney

8    General may have the ability -- excuse me.  We may

9    refer to the Attorney General for civil

10   enforcement, any sort of civil remedy we seek.

11   So, again, I think the statute is pretty clear and

12   our office in turn just enforces these without

13   regard to the third-party voter registration

14   organization.  We simply apply law to fact and I

15   issue the letter accordingly.

16        Q    Do you recall ever referring any of the

17   civil enforcements to the Attorney General's

18   Office during your time as assistant general

19   counsel?

20        A    I personally do not.

21        Q    Is there a certain situation or policy

22   that recommends when it does make sense to refer

23   civil enforcement to the Attorney General's

24   Office?

25        A    Well, at some point it would, but I would

1   need to get to that point before making a decision

2   to issue a referral.

3       Q    And so you don't have a sense of what

4   that situation or scenario would be sitting here?

5       A    I do.  You know, within the Office of

6   Election Crimes and Security our policy is we

7   issue the fine letter and then, as we still have

8   some ongoing appeals from these organizations, I

9   personally review them.  I personally review the

10  appeals and review what the third-party voter

11  registration organization is saying they believe

12  is incorrect with the fine letter we've issued.

13  And then if we arrive at an impasse, at the point

14  of impasse where we are right and the third-party

15  voter registration organization will not comply

16  with the law, at that point I would refer to the

17  Attorney General's Office.

18      Q    And so I know I've asked before about

19  when you were assistant general counsel, so just

20  now to ask since you have been director of OECS,

21  have you referred any such investigations or --

22  excuse me; whatever we would call them -- have you

23  referred any civil enforcement, let's say, to the

24  Attorney General's Office in your role as

25  director?

1        A     I have not.

2        Q     What did you do before working as

3   assistant general counsel for the Department of

4   State?

5        A     Before working as assistant general

6   counsel at the Department of State, after college

7   I became a United States Marine.  I served in

8   Afghanistan twice as a Marine infantry officer.  I

9   then got out in late -- I got out of the Marine

10  Corps in 2014 and I took a few months to study for

11  the LSAT, applied to law school.

12             Between that point and the beginning of

13  law school I worked briefly as a paralegal

14  assistant, a phenomenal firm in New Orleans, but I

15  just did that for a few months to gain some

16  experience and insight into how law firms operate.

17             I attended law school for three years and

18  then became a -- excuse me; I took a brief

19  one-year -- right after law school my wife, she

20  had a phenomenal one-year opportunity as a post

21  med school doctor, and so briefly for that one

22  year, since we didn't know where we were going to

23  live, I co-founded one startup and served as an

24  informal adviser, trying to develop good business

25  models and then moved to Florida, became a

1   prosecutor.  I was in civil litigation for about a

2   year and some change and then I joined the Florida

3   Department of State.

4        Q    What year did you graduate law school?

5        A    I graduated law school May 2018.

6        Q    And what types of startups did you say

7   that you were involved in?

8        A    Well, the startup that I tried cofounding

9   was a fintech company.  We raised some money, but

10  we didn't get it off the ground so we returned

11  most of the money back to investors.  And then the

12  other companies, the other two, were -- they were

13  more B to B, business to business, type platforms,

14  essentially automation, and neither one of those

15  got off the ground.

16       Q    And what year did you say you moved to

17  Florida?

18       A    I moved to Florida in 2019.

19       Q    And how many years were you a prosecutor

20  in Florida?

21       A    I was a prosecutor for two years.

22       Q    And what types of cases did you say you

23  worked on as a prosecutor in Florida?

24       A    There were a wide variety.  I was a

25  prosecutor in Miami.  And in Miami-Dade State

1    Attorney's Office you start in one of two tracks.

2    You either start in domestic violence misdemeanor

3    or you start in what we just called misdemeanor,

4    which was essentially every other type of

5    misdemeanor.  I was in misdemeanor.  I did not do

6    the domestic violence route, I went misdemeanor

7    route.  And I was probably there for seven months

8    or so.

9             And then from there -- and I don't know

10   how the other prosecutor offices are, but from

11   there you then move to the juvenile division.  So

12   I was in the juvenile division as a prosecutor for

13   three or four months and then from there you

14   become essentially a line prosecutor.  You start

15   as primarily prosecuting third-degree felonies.

16   And, again, that's kind of a wide variety of

17   cases.  And essentially we call it a C prosecutor

18   or third-degree felony prosecutor.  I was a C

19   prosecutor for the remainder of my time.

20        Q    And did you prosecute any cases related

21   to election fraud or voter fraud during your time

22   as a prosecutor?

23        A    No, because those cases are prosecuted by

24   prosecutors -- it was called a specialized unit,

25   but there were prosecutors in the specialized unit

1    that handled those cases.  Those cases were not

2    part of the line prosecutors' cases.

3         Q    Okay.

4              MS. JOHNSON:  So I think we can go ahead

5    and take a look at what I will mark as Exhibit 1

6    for today's deposition, which is the notice of

7    today's deposition.  I think Fritz is going to

8    help me with screen sharing and we will also put

9    it in the chat.

10             (Darlington Deposition Exhibit 1 marked

11   for identification and is attached to the

12   transcript.)

13        Q    You will have the document in the chat if

14   you do need to look and scroll or we're also happy

15   to scroll as we look at it together.  But my first

16   question for you -- and we're happy to scroll

17   through -- is whether you've seen this document

18   before.

19        A    I have, yes.

20        Q    Did you review all of the topics listed

21   starting in Schedule A before today's deposition?

22        A    Yes.

23        Q    And do you understand that you have been

24   designated to testify on behalf of the Secretary

25   of State's Office in response to each of these

1    topics?

2          A    Yes.

3          Q    What did you do to prepare yourself to

4    testify about these topics today?

5          A    I had two to three preparation sessions

6    with our outside counsel.  I reviewed pleadings

7    and filings that are part of this case.  I also

8    reviewed a number of internal documents, whether

9    they were referral letters or active

10   investigations.  And I also just refamiliarized

11   myself on how the Department operates as regards

12   to the issued -- the topics that are contained in

13   this Notice of Deposition.

14         Q    So to start with the last thing you just

15   said, how was it that you refamiliarized yourself

16   with how the Department operates?

17         A    I reviewed statutes, whether federal or

18   state, State of Florida statutes.  I reviewed

19   implementing regulations.  I reviewed internal

20   policies and procedures.

21         Q    You also mentioned that you reviewed

22   pleadings and filings in this case.  Can you

23   specify which pleadings and filings you reviewed?

24         A    Sure.  I reviewed the Complaint, I

25   reviewed -- I reviewed some of the discovery

1    requests and responses as well, and then I

2    reviewed -- I reviewed a number of the documents

3    in production.

4         Q    And when you say "the requests and

5    responses," do you mean the Secretary's responses

6    to discovery?

7         A    Yes.

8         Q    Did you review any of the preliminary

9    injunction briefing or supporting exhibits?

10        A    I did.

11        Q    Did you review the attached declarations

12   from plaintiffs with the preliminary injunction

13   briefing?

14        A    No.  For the preliminary injunction I

15   only reviewed certain matters from what I believe

16   is the ongoing appeal.

17        Q    And when you say matters related to the

18   ongoing appeal, do you mean the briefing filed in

19   the 11th Circuit?

20        A    Yes.

21        Q    You also mentioned that you reviewed

22   Complaints.  And so just for clarity, there are

23   three cases that have been consolidated, each with

24   separate Complaints.  Did you review each of the

25   three Complaints?

1        A    Yes.

2        Q    Did you speak with any staff at the

3   Department of State in preparation?

4        A    I did.

5        Q    Who did you speak with?

6        A    I spoke with an attorney in the general

7   counsel suite and I also spoke with the director

8   of the Division of Elections, Maria Matthews.

9        Q    What was the subject matter of your

10  conversation with Maria Matthews?

11       A    With Maria Matthews the discussion was

12  centered on the division of elections procedures

13  that would be relevant to this case.

14       Q    When did you speak with Maria Matthews?

15       A    Just in preparation for this case?

16       Q    Yes.

17       A    Within the last two weeks.

18       Q    And about how long was that conversation?

19       A    I don't have the exact time.  If I

20  ventured a guess, maybe -- I don't even want to

21  speculate.  I don't really clock my conversations,

22  but because -- because our offices coordinate

23  regularly, we speak even when not related to this

24  case.  We do speak often.  So I can't tell you a

25  specific amount of time in preparation for this

1    case alone.

2          Q     Who was it that you spoke with in the

3    General Counsel's Office?

4          A     Ashley Davis.

5          Q     How many times did you speak to Ashley

6    Davis?

7          A     Probably twice.

8          Q     And about how long were those

9    conversations?

10         A     Maybe an hour give or take.

11         Q     You also said that you met with outside

12   counsel in preparation two to three times; is that

13   right?

14         A     Yes.

15         Q     How long were those meetings?

16         A     One was approximately three hours --

17   excuse me; about three hours.  And then the others

18   were probably closer to two hours or so.

19         Q     Was anyone present at those meetings

20   other than outside counsel?

21         A     For one there was another attorney

22   present; yes.

23         Q     Who was that attorney?

24         A     Brad McVay.

25         Q     Was there anyone else there at any of

1   those prep sessions?

2       A    No.

3       Q    And did you speak with anyone else in

4   preparation for the deposition that we haven't

5   already discussed?

6       A    In preparation for the deposition, no.

7       Q    You mentioned that you reviewed the

8   Secretary of State's responses to written

9   discovery in this case.  And my question is, did

10  you personally assist counsel in responding to

11  written discovery in this case?

12      A    Yes.

13      Q    And what was your role in helping to

14  respond to written discovery?

15      A    I assisted with drafting the declaration

16  in support of -- or, excuse me, my affidavit filed

17  in the preliminary injunction matter.  And then I

18  also assisted in my response to the Request for

19  Admissions and response to your Request for

20  Production and the responses to the

21  Interrogatories.

22      Q    And when you say you "assisted," were you

23  the primary point person, as you understood it,

24  for responding to discovery?

25      A    I was one of several attorneys.  I didn't

1  label myself the primary point.

2      Q    Okay.

3          MS. JOHNSON:  I think this might be a

4  good time for just a quick break, maybe five

5  minutes, and then we can continue on.  Does that

6  work?

7              THE WITNESS:  Yes, that works.

8              MS. JOHNSON:  Off the record.

9              (A recess was taken.)

10  BY MS. JOHNSON:

11      Q    Now I would like to turn and talk about

12  the specific topics that we noticed for your

13  deposition today.  So to start with Topic 1, and I

14  will read it for the record:  "Each State

15  interest, if any, that the Secretary believes or

16  contends each of the Challenged Provisions serves,

17  promotes, or advances, and all facts and evidence

18  supporting a connection between the Challenged

19  Provisions and the State interest(s)."

20              What did you do to prepare to testify

21  about this topic today?

22      A    To prepare for this topic?  I reviewed

23  the previously listed -- the previously stated

24  documents that we discussed and then as well just

25  identified certainly not a comprehensive list, but

1  certainly identified a number of State interests

2  and examples that pertain to those State

3  interests.

4      Q   Okay.  So to start, what are all of the

5  interests that the Secretary of State's Office

6  believes are furthered by banning noncitizens from

7  handling or collecting voter registration

8  applications on behalf of third-party voter

9  registration organizations?

10     A   Can you say that again?

11     Q   What are all of the State interests that

12  the Secretary of State's Office believes are

13  furthered by banning noncitizens from handling or

14  collecting voter registration applications on

15  behalf of third-party voter registration

16  organizations?

17     A   Well, I don't have a comprehensive list

18  of all potential State interests, but certainly

19  State interests include safeguarding election

20  integrity, preventing voter fraud, ensuring a

21  timely submission of voter registration

22  applications, and then otherwise promoting

23  uniformity, efficiency, and confidence in the

24  election system.

25     Q   Okay.  We'll go through each of those.

1    But to start, I know you said you didn't have a

2    comprehensive list today.  Did you review that

3    State interests were a topic for today's

4    deposition?

5         A    I did, yes.  I reviewed every topic that

6    was listed in the notice.

7         Q    And you testified that you prepared to

8    testify about this topic?

9         A    Correct, yes.

10        Q    Why is it that you don't have a

11   comprehensive list of State interests to offer in

12   testimony today?

13        A    Well, because I think I've identified

14   what are certainly compelling interests.

15        Q    Are there interests other than the three

16   you just named that are State interests you

17   believe are served by the citizenship requirement

18   in SB 7050?

19        A    Are there interests what?

20        Q    Are there any other interests other than

21   those you just named that you believe are served

22   by the citizenship requirement in SB 7050?

23        A    Well, I would say for now I listed what I

24   believe to be compelling interests.

25        Q    And it's interests that you're testifying

1    the Secretary's Office believes are compelling

2    interests; correct?

3        A    Yes.

4        Q    So to start, the first one you named was

5    voter fraud.  How does banning noncitizens from

6    collecting or handling voter registration

7    applications serve a State interest to prevent

8    voter fraud?

9        A    Well, it -- there are a number of

10   different ways that you can prevent voter fraud

11   from occurring.  And keep in mind voter fraud is

12   quite a broad topic of a variety of violations.

13   But to start, when we talk about noncitizens,

14   we're talking about anyone from permanent

15   residents through individuals who are here

16   illegally.  And so without -- to better assist you

17   I guess within kind of a wide array of a group of

18   people and a wide array of voter fraud violations

19   that can occur, do you have a -- is there a more

20   specific area or direction we can head in?

21       Q    You had offered voter fraud as a

22   rationale, so my question is what you mean by

23   saying that voter fraud is a State interest served

24   by banning noncitizens from collecting or handling

25   voter registration applications.

1    A    Certainly.  An individual with

2   citizenship elsewhere typically after the conduct

3   of a crime.  And, additionally, there is an

4   indication that if you're already continually

5   breaking one law, you could be prone to breaking

6   another law.

7    Q    You just testified that the term

8   "noncitizen" does include individuals who are in

9   the United States legally?

10    A    I testified that permanent residents

11   could be included in that; yes.

12    Q    Do you have any examples of a noncitizen

13   leaving the country after committing a

14   voting-related crime?

15    A    So my office can only verify citizenship

16   in very, very narrow terms.  That information is

17   strictly guarded with the federal government, with

18   the federal agency, the United States Customs and

19   Immigration Service.  So without the ability to

20   verify someone's citizenship, I just can't answer

21   that question.

22    Q    And when you say your office, do you mean

23   OECS?

24    A    Yes.

25    Q    Are you aware of whether the Secretary of

1  State's Office has access to the citizenship

2  status of individuals in Florida?

3      A    They also -- again, if granted access by

4  this federal database, they could if they have all

5  the requisite information about the individual.

6  But it is not something that is freely given even

7  if you have access to this federal database,

8  meaning you can't just put a name into this

9  federal database and then get someone's

10  citizenship status in return, if that makes sense.

11      Q    I understand you're testifying to

12  limitations in verifying citizenship, but just to

13  go back to my question, do you have any examples

14  you can name of individuals who are noncitizens

15  leaving the United States after committing a

16  voting-related offense?

17      A    I personally have never received a

18  complaint regarding a crime where a crime occurred

19  and then the complaint stated that it was a

20  noncitizen who left, because that information,

21  again, is closely guarded.  There are a number of

22  arrest affidavits that are still essentially in a

23  capias standing because the people can't be

24  located.

25           So since I don't have the ability to

1  verify whether they left the country or they just

2  left the State, I can't answer that question

3  specifically.  What I will tell you is it's

4  certainly in our interest to take preventative

5  measures to ensure in the end that these voter

6  registration applications are submitted timely and

7  that we're otherwise safeguarding election

8  integrity by just being sure that voters who are

9  either submitting an application or updating their

10  registration know that that form will be properly

11  collected and handled from there.

12      Q    And so you began your answer to my

13  question by saying you're personally not aware.

14  Are you aware of whether the Secretary of State

15  has any records of something like a noncitizen

16  fleeing the United States after committing an

17  election-related offense has occurred?

18      A    Again, because -- the way you're phrasing

19  your question, it is incredibly difficult -- not

20  impossible, but it is difficult -- to verify

21  someone's citizenship.  And, frankly, we don't

22  have access to records that would monitor --

23  because we have no subpoena power and no

24  prosecutorial authority, we could not access those

25  records as well.

1          So based on the complaints we've

2     received, we have received complaints regarding

3     noncitizens.  But, again, because of how closely

4     guarded that information is, we -- you know,

5     without someone disclosing to the voter who has

6     submitted the application that they're a

7     noncitizen and they're about to flee, that

8     information would probably not be included in the

9     initial complaint.

10         Q     You just testified that you have received

11    complaints about noncitizens.  What are those

12    complaints?

13         A     Those complaints -- and this isn't a

14    comprehensive list, but the Office of Election

15    Crimes and Security has received complaints

16    regarding noncitizens who vote, noncitizens who

17    have falsely affirmed that they are citizens and

18    have the legal right to register.  And the

19    Department of State receives a variety of pieces

20    of information that indicate that noncitizens are

21    on the voter rolls.  When I say voter rolls, I

22    mean the list of eligible voters in the State of

23    Florida.

24         Q     And when your office has received these

25    complaints, how do you go about verifying whether

1    the individual is in fact a citizen?

2         A    Well, when you say my office, do you mean

3    the Secretary of State or the Office of Election

4    Crimes and Security?

5         Q    I mean the Secretary of State's Office.

6         A    Well, the Secretary of State is the chief

7    election officer.  He himself is not conducting

8    these investigations.

9         Q    I mean the Office of the Secretary of

10   State.  How does the Office of the Secretary of

11   State verify complaints it receives about

12   noncitizens voting or registering to vote?

13        A    So within the Department of State the

14   Office of Election Crimes has the jurisdiction

15   under 97.022 to conduct preliminary

16   investigations, which would include what you're

17   talking about.  And so within the Office of

18   Election Crimes and Security if we have the

19   requisite pieces of information, we can then

20   access someone's citizenship status from that

21   federal database.

22        Q    If the citizenship requirement goes into

23   effect, how does your office plan to enforce the

24   citizenship provision which would seem to require

25   verifying candidates' citizenship status?

1        A    So prosecutorial authority is very

2    tightly controlled by the Florida State

3    Constitution, so I wouldn't -- the Office of

4    Election Crimes and Security, including myself as

5    a practicing attorney, would not have the ability

6    to prosecute those crimes.  However, enforcement

7    could include anything from a notification from

8    the Office of Election Crimes and Security to the

9    Florida Division of Elections that an individual

10   who is a part of a third-party voter registration

11   organization violated Florida law and notifying

12   the division to conduct list maintenance

13   activities to ensure that person is not on the

14   list of eligible voters within the State of

15   Florida.

16           It could also include -- if the provision

17   goes into effect, it could include a fine or it

18   could include, if we received the requisite pieces

19   of information -- and, again, this is in lieu of

20   subpoena authority, but -- if the Office of

21   Election Crimes and Security receives the

22   requisite pieces of information, then if a

23   crime -- if we believe a crime occurred based on

24   all relevant documents and records, we would refer

25   it to the appropriate law enforcement.

1       Q     SB 7050 includes a fiscal penalty for

2    noncitizens collecting or handling voter

3    registration applications; correct?

4       A     If the provision goes into effect.

5       Q     My question is, how would your office

6    plan to enforce the civil penalty associated with

7    noncitizens collecting or handling voter

8    registration applications should the provision go

9    into effect?

10      A     If we received confirmation that a

11   noncitizen violated the provision, should it go

12   into effect, and that person committed the

13   violation after the effective date of the

14   provision, then we would issue a fine letter.

15      Q     What do you mean by a confirmation?

16      A     Well, as I said earlier, the Florida

17   Office of Election Crimes and Security has a very

18   narrow ability to access someone's citizenship

19   status.  So when I say confirmation, what I mean

20   is either confirmation from that federal database

21   in the narrow instances or if I receive records

22   from law enforcement or prosecutor's office that

23   confirms it.  But, again, without, you know, the

24   specific instance coming across my desk, I can't

25   go into -- I can't speculate as to how

1    specifically, but with confirmation from

2    prosecutor's office or law enforcement and the

3    requisite documents or showing needed, we would

4    then issue that fine.

5        Q    Have you received reports of any specific

6    instances of noncitizens leaving the country after

7    committing an election-related offense?

8        A    Well, we don't have access to records to

9    really monitor people's travels.  So can I point

10   to a specific example?  No.  But it certainly --

11   it's certainly in the interest of safeguarding

12   election integrity to take a proactive measure to

13   ensure that only those with a stake in the

14   election actually have the ability to fulfill

15   their fiduciary duty as owed to the voter, whether

16   a new registrant or a voter updating their

17   registration.

18       Q    Are canvassers or let's call them voter

19   registration agents, which I believe is the term

20   you used earlier, required to be registered voters

21   in Florida?

22       A    Not as of now.

23       Q    Are they required to be Florida

24   residents?

25       A    Not as of now.  We do have individuals

1    who will register availing themselves of Florida

2    jurisdiction, meaning they'll avail themselves of

3    the Florida courts, but no.

4         Q    Are they required to be 18 years old?

5         A    I believe so, yes.

6         Q    You're not sure or you are sure?

7         A    I believe so.

8         Q    Okay.  Let's talk about the second

9    interest that you named, which was the timely

10   submission of voter registration applications.

11   Are you aware of any instances of a noncitizen

12   failing to submit a voter registration application

13   on time pursuant to the deadlines outlined in

14   Section 97.0575?

15        A    Again, because our ability to check

16   citizenship is so limited, I can't point you to

17   one specific instance that I personally -- that I

18   personally have referred because I can't -- I only

19   have a limited ability to verify someone's

20   citizenship and I don't have the ability to

21   monitor people's travels.

22        Q    And in your preparation for the

23   deposition today as well as your past role in the

24   Secretary of State's Office, you're not aware of

25   the Secretary of State having a record of a

1    noncitizen failing to submit a voter registration

2    application consistent with the timeline outlined

3    in Section 97.0575?

4        A    Well, if it exists, I would point you to

5    somewhere around 90,000 pages we've produced to

6    you in six months.

7        Q    You're not aware of any record sitting

8    here today?

9        A    Since I have been with the Department of

10   State, I personally have not issued a referral to

11   law enforcement for a noncitizen committing a

12   criminal violation and then leaving the country.

13       Q    And separate from the criminal violation,

14   my question now is in response to your stated

15   interest of timely submission in voter

16   registration applications.  So focusing on the

17   civil violation of failing to submit an

18   application on time, are you aware of any record

19   in the Secretary of State's Office of a noncitizen

20   ever failing to submit a voter registration

21   application on time?

22       A    I don't have personal knowledge of every

23   single record contained within the Department of

24   State since we also serve as the State's archives

25   in a number of ways.  I can tell you as it relates

1    to this that during my time I have not personally

2    observed or issued a referral of any kind for this

3    scenario.

4         Q    And the last thing you named was

5    uniformity.  How does the ban on allowing

6    noncitizens to collect or handle voter

7    registration applications serve any State interest

8    in uniformity?

9         A    Well, again, because supervisors of

10   elections, all 67 offices, as well as the Florida

11   Division of Elections, receive a number of

12   voter -- a wide -- a large number of voter

13   registration applications, uniformity assists

14   those 68 offices total in operating in an

15   efficient manner so that there is not a lot of

16   speculation as to what's contained within those

17   four corners of the document.

18             There are, I believe, somewhere around

19   14, 14-1/2 million registered voters just within

20   the State of Florida, so you can imagine the paper

21   flow that occurs just with voter registration

22   activities.  So the goal in maintaining uniformity

23   is simply allowing that employee, whether it's in

24   a county supervisor of elections office that only

25   has four employees, to larger operations like

1    Hillsborough or Dade County and every office in

2    between, it enables them to operate efficiently.

3              As pertains to your question regarding

4    noncitizens now, the concern is individuals who

5    either are actively committing a crime every day

6    to individuals who really don't have much stake in

7    the election at all regardless were concerned

8    about their fulfillment of the fiduciary

9    obligation to the voter, including ensuring that

10   uniformly completed applications are submitted and

11   processed in time so that that applicant or that

12   voter who is updating their registration can vote

13   come election day when they want to.

14       Q    Do you have any knowledge of noncitizens

15   failing to submit a completed or compliant, I

16   think is what you call it, voter registration

17   application in Florida?

18       A    Well, as I continue to state, it's

19   certainly within the State's interest to take a

20   proactive stance or measure to ensure fiduciary

21   obligations are completed.

22              Now, keep in mind when I receive an

23   election -- when I receive a complaint form

24   regarding voter registration application

25   violations, I can't speak for access to these

1   federal databases that -- or, excuse me, the

2   federal database that supervisors of elections

3   office employees may have, but they're not sending

4   in these complaints regarding whether or not the

5   voter registration agent is a noncitizen because

6   up until SB 7050 we had no idea -- once these

7   applications are turned in to the supervisors of

8   elections office, the Florida Department of State

9   has no idea who submitted them because there is no

10  record on the application.

11          So it would take extensive investigation

12  that, frankly, we just don't -- I don't think any

13  government agency would have the manpower and

14  resources to just investigate every single

15  third-party voter registration agent.

16      Q    In order to enforce the citizenship

17  requirement, should it go into effect, would the

18  Secretary of State's Office need to investigate

19  the citizenship status of voter registration

20  agents?

21      A    I would point you to, first, the United

22  States Customs and Immigration Service because of

23  the fact that there have been instances where data

24  was incomplete, there was a receipt from the

25  database, and then again, as I told you earlier,

1    only in very narrow instances can we actually

2    verify from that database whether or not -- what

3    that individual's citizenship status is.  So

4    that's the primary point where I would point you.

5            Would we need to access it?  I think the

6    answer would be, whether it's our office or a

7    prosecutor's office or a law enforcement office,

8    to be able to show that someone was a noncitizen,

9    yes, they would need access to information

10   regarding their citizenship status.

11       Q    Do you believe that's going to create

12   additional burdens on your office?

13       A    No, because the Office of Election Crime

14   and Security can still enforce that provision as

15   long as, again, one of the wide variety of

16   agencies or offices that I listed previously can

17   access the citizenship status; right?  So whether

18   it's our office having the ability to pull that

19   information or another agency or office

20   providing -- excuse me -- our office with the

21   records required to enforce it, the fine, it's not

22   going to be incredibly burdensome, it'll just be

23   another addition to the specific jurisdictional

24   grants to ensure we safeguard the election

25   integrity and we promote confidence in the

1  election system.

2      Q    You also mentioned efficiency.  How does

3  banning noncitizens from collecting or handling

4  voter registration applications serve a state

5  interest in efficiency?

6      A    I will tell you overall, to provide

7  context for your question, there are thousands of

8  voter registration applications that somehow

9  violate a Florida requirement, whether from

10 technical to criminal violation.  And when I say

11 "thousands," that's just in one year.  It could be

12 even more.  It could be tens of thousands just in

13 one year.

14          And so when you think about the resources

15 necessary for either a County supervisors of

16 election office or the Florida Division of

17 Elections or any other office within the

18 Department of State, uniformity is important

19 because we're stewards of taxpayer money.  So in

20 the end we have a finite amount of budget, which

21 means we can only hire a finite number of people.

22 And so the goal would obviously be in the end to

23 efficiently process these applications and

24 efficiently maintain the list of eligible voters

25 on an appropriate budget with the appropriate

1    amount of people.

2              So the more individuals within these

3    offices or within the division have to stop and

4    focus on a single voter registration application

5    to discern whether or not it's properly delivered

6    or properly complies with the requirements.  We

7    certainly want individuals -- we certainly want

8    voter registration agents who take that fiduciary

9    obligation serious to be the ones submitting those

10   voter registration applications.

11       Q    Would banning voter registration agents

12   entirely increase efficiency in the voter

13   registration process?

14       A    Would banning the voter registration

15   agents completely?  I think the legislature has

16   spoken on that point.  Since I believe 1995

17   third-party voter registration organizations have

18   been in existence, which means people can register

19   to vote.  It's incredibly easy to register to vote

20   in the State of Florida whether it's in a Walmart

21   parking lot, DHSMV, or anywhere in between.

22       Q    Do you have any evidence to suggest that

23   any noncitizen voter registration agent has failed

24   to take their fiduciary duty seriously?

25       A    Again, because our office is limited in

1    accessing citizenship information, I can't tell

2    you from investigations that have been referred to

3    law enforcement a specific instance since I have

4    been with the Department of State.  So I would

5    point you to other agencies that have an easier

6    ability to pull those records.

7        Q    Let's move on and talk about another

8    provision that plaintiffs challenge in this

9    litigation.  My question is what, if any, State

10   interest does the Secretary of State's Office

11   believe are furthered by banning 3PVROs from

12   retaining voters' personal information?

13       A    We could start by discussing the

14   previously discussed criminal cases that resulted

15   in felony convictions.  There are a number of

16   State interests, whether we take a proactive

17   stance to try to prevent others from stealing

18   personal information to pointing to criminal

19   convictions throughout the years for theft of

20   personal identifiable information from these voter

21   registration applications.

22       Q    So my question is asking you for a

23   comprehensive list.  So aside from what you have

24   already testified to, and I'll ask about that in

25   more detail, what other interests do you believe

1   are served by banning third-party voter

2   registration information organizations from

3   retaining voters' personal information?

4       A    Well, I believe that the interests

5   include, but it's not a comprehensive list,

6   safeguarding election integrity, preventing voter

7   fraud, ensuring the timely submission of voter

8   registration applications, and promoting

9   uniformity, efficiency, and confidence in the

10  election system.

11      Q    Why isn't that a comprehensive list?

12      A    Well, I think these are certainly the

13  compelling interests.  But it's not a

14  comprehensive list.

15      Q    And my question is, why are you not able

16  to provide a comprehensive list?

17      A    Well, those are very, very important

18  interests and those are certainly among the most

19  compelling interests.

20      Q    Did you prepare to testify about Topic 1

21  specifically as it relates to the ban on allowing

22  third-party voter registration organizations from

23  retaining personal information of voters?

24      A    Yes, I did.

25      Q    Do you have any other State interests

1   that you can name sitting here today?

2        A    Sure.  An additional one that certainly

3   is a State interest is especially in today's

4   society we still want people to have confidence

5   when they want to go vote.  We don't want some

6   lingering concern.  And much like credit card

7   theft, they're going to submit an application and

8   then, as evidenced by the criminal convictions

9   over the years, someone is going to take and steal

10  that information and use it for improper use.  So

11  we still want -- we still want voter registration

12  agents to fulfill that fiduciary obligation so

13  that people maintain an interest in voting, which

14  is certainly among the most sacred aspects of our

15  democracy.

16       Q    Anything else you can think of?

17       A    I'm sure there are a number of other

18  compelling interests.

19       Q    Are there any others that you can

20  identify sitting here now?

21       A    Not at this time, no.

22       Q    We'll go through the interests that you

23  just named.  The first one relates to preventing

24  identity theft.  Do you have an understanding of

25  whether identity theft or misuse of information

1    was criminalized already before the passage of SB

2    7050?

3         A    Yes, I do.

4         Q    And what is your understanding?

5         A    Yes, it was.

6         Q    And was Ms. Cody, who we've discussed a

7    few times during today's deposition, prosecuted

8    under something other than SB 7050 for her crimes?

9         A    Yes.  She was -- that charging document

10   was filed prior to SB 7050.

11        Q    The second issue you mentioned is voter

12   fraud.  How does banning third-party voter

13   registration organizations from retaining any

14   voter personal information serve the State's

15   interest in preventing voter fraud?

16        A    Because they can't then take that

17   information and submit voter registration

18   applications prior to the actual voter filling out

19   that form; right?  So it helps prevent voter

20   disenfranchisement in part because given this one

21   example:  Someone is registered in one political

22   party, but then based on the use of personal

23   information, personally identifiable information,

24   gathered previously and retained by that

25   third-party voter registration organization, they

1    then submit a voter registration application that

2    updates illegally the previous voter registration

3    application so when that victim goes to vote, they

4    find out at best they will have to submit a

5    provisional ballot because the information

6    contained on the voter roll's list differs from

7    what that voter previously submitted.

8         So that is one example of many that the

9    State has an interest in preventing.

10        Q    In order for this scenario you just

11   described to occur, would third-party voter

12   registration organizations need to retain all of a

13   voter's personal information that's included on a

14   voter registration application?

15        A    No.

16        Q    Can you explain why your answer is no?

17        A    Well, you could change the address, you

18   could change the political party, you could affirm

19   that you don't have a driver's license or Social

20   Security number anymore, you can sign with a

21   different signature and update your registration

22   in a different county.  I mean, those are one of

23   many examples.

24        Q    If a voter registration organization only

25   retained, for example, a voter's name and e-mail

1  address, would they be able to commit the type of

2  fraud that you're describing?

3      A     Yes.

4      Q     How so?

5      A     Because, as I stated just now, someone

6  can take my name, Andrew Darlington, fill out the

7  rest of the application and submit it to another

8  county in which I don't reside, and then that

9  could become my updated voter information just

10  with my name and my e-mail address.

11     Q     Can someone who is not associated with a

12  voter registration organization find names and

13  e-mail addresses online?

14     A     Potentially.

15     Q     Could they do the exact same type of

16  activity you're describing where they submit an

17  application for someone else using information

18  that they find online, for example?

19     A     They might be able to, depending on

20  someone's Internet presence.  But the State's

21  interest is certainly deterring that action and

22  then even more so making it harder for them to

23  commit that type of action.  So the State's

24  interest here in large part centers on protecting

25  the eligible voter.

1        Q     The second thing you described is that

2   the State's interest in banning third-party voter

3   registration organizations from retaining voter

4   information furthers the timely submission of

5   voter registration applications.

6             So my question is, why does the Secretary

7   of State's Office believe that banning third-party

8   voter registration organizations from retaining

9   voter information will further the timely

10  submission of applications?

11       A     Well, it will further the timely

12  submission of applications because in large part

13  you're not flooding the system with a bunch of

14  fraudulent applications so it doesn't overburden

15  some of these supervisors of elections or division

16  of elections.

17            And keep in mind, pursuit to the Voter

18  Registration Act, the way federal law mandates

19  voter registration, it's register first and then

20  you can go through a removal process if allowed by

21  federal and State law.  So it assists with the

22  timely submission because you don't have voter

23  registration applications that shouldn't be

24  clogging the system.

25       Q     Does the number of applications received

```
1    by a particular supervisor of elections have any

2    bearing on whether a third-party voter

3    registration organization returns a voter

4    registration application on time?

5         A    Can you say that again?  I'm sorry.

6         Q    Does the number of applications received

7    by a supervisor of elections office have any

8    bearing on whether a third-party voter

9    registration organization submits a particular

10   voter registration application on time?

11        A    No, not necessarily.  But, again, keep in

12   mind, the State's interest overall is protecting

13   the currently eligible voter.  So I understand in

14   some ways you're looking at timely submission

15   versus a receipt in processing of that

16   application, but what you're at this point talking

17   about is a differentiation between the timely

18   submission of an illegal application versus the

19   timely submission of a legal application.  And the

20   timely submission of a legal application has

21   certainly been an issue over the years.

22        Q    I'm using the words "timely submission"

23   because I understood that to be the State interest

24   that you identified.  So can you please clarify

25   what you mean when you say that the Secretary of
```

1    State's Office believes banning 3PVROs from

2    retaining voter information furthers timely

3    submission?

4         A    Sure.  I'll give you a specific example.

5    I register in a timely manner in County 1, the

6    county in which I reside, and that application is

7    timely processed and then that application is -- I

8    become eligible on the voter list, the voter rolls

9    or the list of eligible voters in the State of

10   Florida.

11            And then after I submit a proper

12   application, a fraudulent -- and, again, this is a

13   hypothetical.  I'm not saying this is an

14   investigation my office has handled.  But in this

15   hypothetical a fraudulent actor, after I am

16   properly registered on the rolls, a fraudulent

17   actor submits my application -- a fraudulent

18   application using personally identifiable

19   information to then essentially either change my

20   registration so I can't vote or create some sort

21   of fictional character.

22            By federal law at some point there is

23   book closing -- or, excuse me, by federal and

24   State law there is a combination of book closing

25   and then an inability to conduct list maintenance

1   activities from there.  And so at some point in

2   this hypothetical when that submission -- when

3   that fraudulent submission occurred, it certainly

4   does inhibit the timely submission of my legal

5   vote because now I can't vote.  I don't become

6   eligible anymore.  And so the process to cure

7   could absolutely in this hypothetical, if I show

8   up on election day and try to vote, prevent my

9   vote all because the timely submission of a legal

10  application couldn't occur.

11      Q    And you mentioned that that was a

12  hypothetical.  Are you aware of that ever

13  occurring?

14      A    In terms of fraudulent registrations?

15      Q    In terms of a voter not being able to

16  vote because a fraudulent application was also

17  submitted on the voter's behalf.

18      A    I do not know the end result of the

19  counting of the ballot, but I am familiar with

20  cases where individuals either received notice

21  while vote-by-mail ballots are being sent out to

22  voters or when they show up and have to submit a

23  provisional ballot because their voter

24  registration was changed without them actually

25  changing it.  So I did not go to their specific

1    ballot, but I do know that a number of these cases

2    have occurred over the years.

3         Q    Part of the interest that you just

4    mentioned was voters who are eligible being able

5    to successfully register to vote; is that correct?

6         A    Part of the State's interest, yes, is

7    that legal voters -- excuse me -- voters who have

8    the legal right to vote can vote when they want to

9    vote.

10        Q    Do you have any knowledge about

11   third-party voter registration organizations'

12   attempt to contact voters in order to fix errors

13   in applications for voters that they have helped

14   to register?

15        A    Since I don't work with any third-party

16   voter registration organizations and my contact

17   with them is very limited, I can't speculate as to

18   their attempts.

19        Q    So you have no knowledge about how they

20   would use personal information to contact a voter

21   to correct errors in voter registration

22   applications?

23        A    Can you explain your hypothetical a

24   little more?  What sort of instance are you

25   referring to right now regarding correcting

1    information on a voter registration application?

2        Q    Sure.  If a voter registration agent

3    notices that a certain portion of an application

4    was left blank, for example, the voter forgot to

5    sign the application, and the voter registration

6    agent uses the phone number on the application to

7    reach out to the voter to get them to sign the

8    application so that it can be properly submitted

9    to the elections office, are you aware of whether

10   that is something that third-party voter

11   registration organizations will do in contacting

12   voters?

13       A    I am not.  But I would say in keeping

14   with a fiduciary duty, that conversation should

15   probably occur when the voter is there, present

16   with the voter registration application -- or,

17   excuse me, that conversation should occur when the

18   voter registration agent is collecting the

19   completed application from the voter.

20       Q    Why is it your opinion that that

21   conversation needs to happen while the voter is

22   still standing there?

23       A    I think pursuant to the statutory --

24   excuse me -- pursuant to the fiduciary obligation,

25   the voter registration agent is required to do

1    what's in the best interest of the voter or the

2    applicant with regards to the submission of a

3    completed voter registration application.

4         Q    And so how is contacting a voter to

5    correct an error or to finish filling out an

6    application not acting in the best interest of the

7    voter to complete a completed voter registration

8    application?

9         A    I didn't say it's not.  I said that

10   conversation probably should occur at the time the

11   voter registration agent is in person with the

12   voter or the applicant.  And I understand in this

13   hypothetical there could be one good actor, but,

14   again, based on the number of criminal complaints

15   and the number of criminal cases over the years,

16   it is clear that use of personally identifiable

17   information can be used illegally, which in turn

18   disenfranchises voters.

19        Q    Does SB 7050 use the term "personally

20   identifiable information"?

21        A    I believe the specific term is the

22   voter's personal information and then it lists

23   including a few items.

24        Q    The next thing you listed was uniformity.

25   How does banning third-party voter registration

1    organizations from retaining personal information

2    serve the Secretary of State's Office stated

3    interest in uniformity?

4         A    Certainly.  So the way voter registration

5    works in the State of Florida, when a voter

6    registration application is submitted, that

7    application, just upon receipt by either the

8    Florida Division of Elections or the supervisors

9    of elections offices, that application will right

10   then and there to maintain compliance with federal

11   law receive a voter registration identification

12   number right then and there.  Regardless of

13   whether or not they're eligible to vote,

14   regardless of whether it's incomplete or complete,

15   that submitted voter registration application will

16   receive an identification number.

17          So then the next step is confirming it's

18   completed.  If it's completed, then that

19   application is listed as completed, but there is a

20   system in place to either check whether it's an

21   individual that has moved or it is otherwise some

22   sort of duplicate.  And if it is, there's a cure

23   process.  But uniformity in filling out these

24   voter registration applications is certainly

25   helpful in streamlining the process to ensure that

1    there is only one right registration for each

2    specific legal voter to be on the rolls in Florida

3    so that it prevents disenfranchisement of voters,

4    it enables uniformity submission of these

5    applications, enables efficiency within these

6    supervisors of elections officers.  So uniformity

7    has a number of secondary and tertiary effects

8    that in the end assist the supervisors of

9    elections offices and the Division of Elections in

10   the administration of elections and it assists the

11   voter in just making sure they can vote how they

12   want when they want.

13        Q    Moving to the next provision, what State

14   interest does the Secretary of State's Office

15   believe are furthered by increasing the fines on

16   delivering applications after ten days by 3PVROs

17   to daily fines with a $250,000 cap?

18        A    Well, truthfully, this conversation --

19   and this is contained in your production and it

20   predates me joining the Florida Department of

21   State, but truthfully this conversation began

22   with -- you'll have to forgive me; I can't

23   remember if she was a State senator or State

24   representative, but Annette Taddeo contacted the

25   Florida Department of State regarding one of the

1   many examples we've discussed with fraudulent

2   submission of voter registration applications and

3   was deeply concerned about this.  And I believe

4   when she was in the legislature, she was one of

5   the sponsors in increasing -- the Florida

6   Department of State, again, I know that many

7   examples are contained within the production that

8   we provided you, but the initial fine cap of

9   $1,000 clearly was not having the deterrent effect

10  necessary to just have these third-party voter

11  registration organizations operate in the best

12  interest of the voter.

13          And so what are the State's interests?

14  The State's interests are the interests I've

15  continued to describe during this deposition.  And

16  there is a specific -- there is a specific

17  organization, Hard Knocks again, that the fine

18  letter specifically stated that but for --

19  essentially but for the fine cap, the total fine

20  amount would have been $191,000.

21          And so that's certainly a glaring example

22  of wanton disregard of the law.  But, nonetheless,

23  that just goes to show you that when the statutory

24  cap was capped at a thousand dollars a year, it

25  really had no effect at all in -- I shouldn't say

1   no effect.  That low cap certainly facilitated

2   certain third-party voter registration

3   organizations from operating within the confines

4   of their fiduciary duty.

5        Q    Are you aware that the cap on aggregate

6   fines was already increased to $50,000 in 2022?

7        A    Yes.

8        Q    When was this conversation between the

9   Secretary of State's Office and the legislature

10  that you mentioned?  When did it occur?

11       A    I would point you to the production

12  because I don't have the specific date of the

13  letter memorized, but I do know that that answer

14  is contained in the production.

15       Q    Do you have a year that you can provide?

16       A    I don't want to speculate because I know

17  that the right answer is in the production.

18       Q    Do you have a recollection of what

19  complaint or issue she was referring to when she

20  reached out?

21       A    It was regarding issues with a

22  constituent of hers voting.

23       Q    And do you recall the specific facts of

24  that instance?

25       A    I was not personally involved in that

1    conversation.

2         Q    So I think you said your answer on State

3    interest would be the same, which is voter fraud,

4    uniformity, and timely submission of applications.

5    Is that fair?

6         A    Well, I listed more, but, generally

7    speaking, my testimony right now is consistent

8    with what I've said previously.

9         Q    What are others beyond the three that I

10   just named that you think is served by increasing

11   fines to daily fines and instituting a $250,000

12   aggregate cap?

13        A    Well, this isn't a comprehensive list,

14   but the interests certainly include safeguarding

15   election integrity, preventing voter fraud, and

16   promoting uniformity, efficiency, and confidence

17   in the election system.

18        Q    Anything else?

19        A    Again, that is not a comprehensive list,

20   but those are certainly compelling State

21   interests.

22        Q    Did you prepare to testify about Topic 1

23   as it relates to the fines provisions contained in

24   Section 97.0575?

25        A    Yes.

1          Q      So why is it that you're not able to

2     provide a comprehensive list of State interests

3     served by the provisions?

4          A      Well, I've certainly listed compelling

5     State interests.

6          Q      What does the Secretary of State's Office

7     believe is served by changing fines for late

8     delivery of applications from one-time fines to

9     daily fines?

10         A      Well, the State interests certainly

11    included what I've stated previously.  But, again,

12    the most direct and obvious answer to that is

13    ensuring timely submission of voter registration

14    applications.

15         Q      Prior to the passage of SB 7050 did the

16    Secretary of State's Office have authority to

17    investigate voter fraud?

18         A      Prior to the passage of -- I apologize.

19    I was turning up the volume on this thing.

20         Q      Prior to the passage of SB 7050, yes.

21         A      Prior to the passage of 7050 did the

22    Secretary of State's Office have the ability to

23    investigate election fraud?

24         Q      Yes, or voter fraud.

25         A      Yes, prior to the passage of SB 7050, the

1    Department of State did have the ability to

2    investigate.

3          Q     And the Department of State had authority

4    to award civil fines of up to $50,000 to

5    third-party voter registration organizations

6    before --

7          A     At one point -- my apologies.

8          Q     I'm sorry; I was just adding before 7050

9    to clarify the time period.

10         A     Yes.  At one point the fine cap was

11   $50,000.

12         Q     And so immediately prior to 7050's

13   passage, the Secretary of State's Office had

14   authority to levy fines of up to $50,000 on

15   third-party voter registration organizations?

16         A     The Department of State had the ability

17   to levy fines per statute up to $50,000 per

18   calendar year per organization.

19         Q     And before SB 7050 was passed, the

20   Secretary of State's Office also had the authority

21   to refer prosecutions for voting or

22   election-related crimes; is that correct?

23         A     Yes, that's correct.

24         Q     Okay.  I think we will take a look at our

25   second exhibit that I will label as Exhibit 2 for

1    purposes of this deposition, and it's going to be

2    a copy of a declaration you mentioned earlier.

3              (Darlington Deposition Exhibit 2 marked

4    for identification and is attached to the

5    transcript.)

6              MR. JAZIL:  Do you mind if we take a

7    five-minute break before we move on?

8              MS. JOHNSON:  No problem.

9              (A recess was taken.)

10   BY MS. JOHNSON:

11        Q    I'm going to show you what I'll label as

12   Exhibit 2.  Do you recognize this document?

13        A    Yes.

14        Q    What is it?

15        A    This is my declaration in support of the

16   response in opposition to motion for preliminary

17   injunction.

18        Q    Do you believe that this document is

19   still accurate today?

20        A    Yes.

21        Q    Do you recall that in this declaration

22   you identified State interests in the challenged

23   provisions of SB 7050?

24        A    Yes.

25        Q    Okay.  I know we've just talked about

1    them, but I want to look at a few of the things

2    you mentioned in your declaration.  So we will go

3    to Paragraph 17 to start.

4             And, again, I know this is kind of a

5    limitation of the format.  If you need to see

6    paragraphs above or below at any point, just let

7    me know, but my questions are fairly targeted.

8             So I will start by reading Paragraph 17.

9    You wrote:  "With non-citizens, there is an issue

10   of whether collected and handled applications will

11   be submitted to election officials on time.

12   Non-citizens include illegal aliens, who are

13   actively breaking the law and are subject to

14   deportation at any time.  Even those here on a

15   temporary basis, such as those on student visas,

16   pose similar risks; the temporary visitors might

17   leave the country (or the State) without first

18   delivering the completed voter registration

19   applications in their custody...  For resident

20   aliens, the Florida Legislature has made the

21   determination that only U.S. citizens -- those who

22   can vote -- can conduct the most critical aspect

23   of the voter-registration process:  Ensuring that

24   a completed application gets properly submitted on

25   time.  In other words, citizens have the most

1    direct stake in the results of elections, and the

2    Florida Legislature determined that they should be

3    entrusted with that position."

4            So my question is in regards to the first

5    sentence:  What evidence do you have that

6    noncitizens submitted applications late or are

7    more likely to submit applications late?

8        A    Well, again, consistent with my testimony

9    earlier to you, this is in part a proactive

10   measure because if individuals are leaving the

11   country prior to the submission of those handled

12   or collected applications, then it could result in

13   the disenfranchisement of a voter.

14       Q    Do you have any example of noncitizens

15   being deported from the country with voter

16   registration applications still in their

17   possession?

18       A    I have not personally observed that.

19       Q    Do you have any knowledge about whether

20   voter registration agents typically turn in all

21   applications they collect to a supervisor or to a

22   field office every day?

23       A    I can't speculate as to every single

24   voter registration and whether or not they submit

25   every single one.

1    Q    So you have no knowledge about whether or

2  not that is true?

3    A    That every single voter registration

4  agent in the State of Florida submits every single

5  application they receive?

6    Q    We can make it any.  Do you have

7  knowledge of whether any voter registration agents

8  follow the practice of turning in applications

9  they collect each day to a supervisor or field

10  office every day?

11    A    I don't know whether they do it --

12  whether every voter registration agent does it

13  every day.

14    Q    Do you know if any voter registration

15  agents follow that practice?

16    A    So voter registration agents certainly at

17  some point deliver at least some voter

18  registration applications in their possession.  I

19  can't speculate against the amount in their

20  possession.

21    Q    And so my question is specifically

22  whether you're aware of whether voter registration

23  agents follow a practice of handing off

24  applications that they've collected to a

25  supervisor or to a field office every day?

1         A    I don't know if voter registration agents

2    do this every single day.

3         Q    Okay.  Would you agree that if

4    applications are handed off from the possession of

5    a noncitizen to a supervisor or a field office,

6    that it would undercut the rationale stated in

7    Paragraph 17 for the citizenship requirement?

8              MR. JAZIL:  Object to form.

9              You can answer.

10        A    Would it undercut the rationale?

11        Q    Yes.

12        A    No, because, again -- my apologies.

13        Q    I was just saying, yes, that was my

14   question.  I didn't know if that was a question to

15   me.

16        A    Yeah, I didn't mean to talk over you.

17             Would it undercut the rationale?  No,

18   because, again, the legislature has spoken and

19   this law was signed to become effective because of

20   the preventative or proactive stance and measure

21   to protect voters and the election system as a

22   whole.  So, no, I don't think that undercuts the

23   rationale.

24        Q    Do you have an understanding as to

25   whether lawful permanent residents can be deported

1   on short notice without process?

2        A    For that question I would defer you to

3   the appropriate agency that conducts deportations.

4        Q    So my question is whether you have

5   knowledge about that.

6        A    Whether permanent -- can you restate the

7   question, please?

8        Q    Yes.  Do you know whether lawful

9   permanent residents can be deported on short

10  notice without process?

11       A    Again, I would point you to the

12  appropriate agency.  The Florida Department of

13  State doesn't conduct deportations.

14       Q    And so is the answer that you don't

15  personally have knowledge and would direct me to

16  the relevant agency?

17       A    In my duties as director of the Office of

18  Election Crimes and Security I do not at all touch

19  deportation matters.

20       Q    What evidence do you have that lawful

21  permanent residents are less trustworthy than

22  citizens in collecting voter registration

23  applications?

24       A    Again, what I would say is citizens

25  have -- as the legislature has spoken, citizens

1    have the greatest stake in the election system

2    because they have the legal right to vote.

3        Q    So is your testimony that anyone that has

4    the right to vote is more trustworthy in handling

5    voter registration applications than those who are

6    not registered to vote?

7        A    The State's interest is that those with

8    the legal right to vote have the greatest stake in

9    the election system.

10       Q    You would agree with me that SB 7050

11   doesn't ban all individuals not registered to vote

12   in Florida from collecting or handling voter

13   registration applications; right?

14       A    Correct.

15       Q    It specifically only bans noncitizens

16   from handling or collecting voter registration

17   applications; is that correct?

18       A    Correct.  And so within that citizens

19   have -- the States interpret that citizens have

20   the greatest stake in the election.

21       Q    Are you aware that lawful permanent

22   residents are allowed to work as postal workers

23   who sometimes in their jobs come in contact with

24   completed voter registration applications in the

25   mail?

1      A     I don't have personal knowledge of the

2  United States Postal Service's employment

3  requirements, to be honest.

4      Q     Do you have any basis to dispute that

5  it's true that lawful residents are allowed to

6  work for the United States Postal Service?

7      A     I can't confirm and I can't dispute

8  because I don't know the United States Postal

9  Service's employment requirements.

10     Q     Do you dispute that postal workers will

11 handle or collect completed voter registration

12 applications via the mail?

13     A     I just can't answer that because the

14 United States Postal Service is a large

15 organization so I would defer you to them.

16     Q     Are you aware that completed voter

17 registration applications can be submitted through

18 the mail?

19     A     Yes.

20     Q     Are you aware that lawful permanent

21 residents are allowed to hold positions within the

22 Florida Department of State and other Florida

23 government departments that have access to voters'

24 personal information?

25     A     Yes.

1      Q      And are you aware that lawful permanent

2   residents are allowed to under Florida law work at

3   supervisor of elections offices in Florida?

4      A      Again, I would defer you to the

5   employment requirements of the supervisors of

6   elections office.

7      Q      You don't have any knowledge about the

8   employment requirements of supervisor of elections

9   offices in Florida?

10     A      So County supervisors of elections are a

11  separate constitutional officer under the Florida

12  State Constitution, so I don't want to speculate

13  as to what their employment requirements could be.

14     Q      Okay.  What evidence do you have that

15  immigrants who are authorized to work in the

16  United States but are not lawful permanent

17  residents pose, and I'll quote it here, similar

18  risks, is what you have at the last line on the

19  bottom of Page 5 in Paragraph 17, to voter

20  registration work as immigrants who do not have

21  lawful status?

22     A      Do you mind stating that again?

23     Q      Yes, absolutely.  What evidence do you

24  have that immigrants who are authorized to work in

25  the United States but are not lawful permanent

1    residents post, quote, similar risks, to voter

2    registration work as immigrants who do not have

3    lawful status to be in the United States?

4         A    Because of the fact that they're here

5    temporarily, that means that their legal status

6    could end.  And so either staying here illegally

7    and actively breaking the law or leaving the

8    country without submitting voter registration

9    applications, those are just two examples of the

10   risks that exist.

11        Q    Do you have any knowledge about whether

12   all immigrants with work authorizations have

13   temporal limitations on their permission to work

14   in the United States?

15        A    Again, I would defer you to -- I believe

16   it's only federal agencies that handle

17   immigration, but I would defer you to those

18   agencies to answer questions regarding immigration

19   law.

20        Q    Do United States citizens have freedom of

21   travel in and out of the United States?

22        A    I think generally and I don't know if

23   it's an absolute right.  I'm no Constitution

24   scholar, but there is generally a right to travel

25   within the United States, yes.

1       Q     And is there also a right of U.S.

2   citizens generally to travel outside of the United

3   States?

4       A     Again, I don't know the laws of every

5   country in the world, but, yes, there is an

6   ability to leave the country as a U.S. citizen.

7       Q     Is there an ability for U.S. citizens to

8   leave the country on short notice?

9       A     I'm sure a hypothetical exists in keeping

10   with that question; yeah.

11       Q     Could I book a plane ticket to fly out of

12   the country later today?

13       A     I mean, I suspect the airline would want

14   to see proof that you could enter the other

15   country, but I'm sure there is a hypothetical that

16   satisfies that question; yes.

17       Q     Let's take a look at Paragraph 25 next in

18   your declaration.  So here you are talking about

19   what you call the voter information retention

20   restriction, which is the restriction on

21   third-party voter registration organizations

22   retaining a voter's personal information.  Is that

23   correct?

24       A     Yes.

25       Q     Okay.  You wrote in Paragraph 25, and I

1  will read it again:  "The Voter Information

2  Retention Restriction protects the applicant:  A

3  3PVRO agent should not be able to retain a voter's

4  private information that is not generally

5  available to the public."

6          Does Section 97.0575(7) use the term

7  "private information"?

8      A    I believe it uses either private

9  information or personally identifiable

10  information.

11      Q    Do you know which one the statute uses?

12      A    I believe it uses either one and then

13  provides several examples.  It states "including"

14  and then it talks about Social Security number,

15  driver's license number.

16      Q    Which do you believe is a clearer term,

17  "personal information" or "private information"?

18          MR. JAZIL:  Object to form.

19          You can answer.

20      A    I would defer you to legislature because

21  they actually draft the legislation.

22      Q    What do you mean in Paragraph 25 when you

23  refer to "a voter's private information"?

24      A    In Paragraph 25 there is a qualifier that

25  says "that is not generally available to the

1    public."

2         Q    And is that your definition for private

3    information?

4         A    In part.

5         Q    What's the other part?

6         A    Generally speaking, private information.

7         Q    I'm sorry; I didn't hear you.

8         A    Generally speaking, private information.

9    So it can include information not generally

10   available to the public.

11        Q    And I believe you said that was part of

12   the definition.  So I'm asking you for what your

13   complete definition of voter's private information

14   is as --

15        A    Well, when we interpret statute -- I'm

16   sorry.

17        Q    That was my fault.  I was just going to

18   say as used in Paragraph 25 just to be clear.

19        A    So you're asking me about my definition.

20   But, again, with any sort of question about why

21   it's drafted that way, I would defer you to the

22   legislature.

23        Q    And so my question here is about drafting

24   of your personal declaration that we are looking

25   at now.  So I'm asking how you interpreted the

1    term "voter's private information" as you wrote it

2    in Paragraph 25.

3         A    Again, it includes information that is

4    not generally available to the public.

5         Q    Okay.  And that's how you would define

6    private information?

7         A    Yes; in large part.

8         Q    Are you aware of whether Section 97.0575

9    includes a definition of personal information that

10   includes that it is not generally available to the

11   public?

12        A    I believe 97 -- well, I believe SB 7050

13   and the challenged provision here includes

14   examples of information not generally available to

15   the public.

16        Q    Are you aware of whether the statutory

17   text includes the qualification that the

18   information is not generally available to the

19   public?

20        A    I'm aware that the statute includes

21   examples of information not generally available to

22   the public.

23        Q    Right.  And just to answer my specific

24   question, do you know if the words "not generally

25   available to the public" are included in the

1    statutory text?

2         A    I am not.

3         Q    You're not familiar one way or the other?

4         A    Correct.  I provided that in Paragraph

5    25.

6         Q    Okay.  Are phone numbers something you

7    would consider generally available to the public?

8         A    I guess if phone books still exist; yes.

9    I haven't seen one in a while.

10        Q    So does your answer depend on the

11   continued existence of phone books?

12        A    It's one way.  I mean, if someone, for

13   example, posts a phone number on their LinkedIn

14   profile or something like that, then that's

15   another way it could become personally available.

16        Q    And how would you make the determination

17   of whether a phone number is generally available

18   to the public?

19        A    How would I make the determination of

20   whether or not a phone number is generally

21   available to the public?  Can you rephrase the

22   question?  I'm not sure how to answer that.  In my

23   job I don't spend time determining whether or not

24   a phone number exists.

25        Q    Sure.  I think if I was trying to make

1   sure I was in compliance with a law that said you

2   can only use information not generally

3   available -- that is generally available to the

4   public, how would you determine if a phone number

5   is something that's generally available to the

6   public?

7       A    How would I -- so if there was -- and

8   this is hypothetical.  If there was a law on the

9   books that you couldn't retain a phone number

10  generally available to the public, how would I --

11      Q    Information not generally available to

12  the public.  How would you treat a phone number?

13      A    Well, if the phone number is not

14  generally available to the public, then I would

15  say it meets that definition.

16      Q    And how would you go about determining

17  whether a particular phone number is generally

18  available to the public?

19      A    I guess I would defer you to a phone

20  company that matches phone numbers to individuals.

21      Q    Do you consider all phone numbers

22  generally available to the public?

23      A    It could be, I guess.  Again, I -- do I

24  consider all phone numbers to be generally

25  available to the public?  I mean, anyone can

1    create a ten-digit phone number.  The importance

2    here is more tying that number to the individual.

3    And so I haven't seen phone books in a while so

4    I'm not sure I can answer your question on this

5    one.

6         Q    So you don't know one way or the other

7    whether you would consider phone numbers generally

8    available to the public?

9         A    Again, phone numbers could be -- I mean,

10   you know, anyone can create a ten-digit phone

11   number, but it's whether or not it's tied to the

12   individual that makes it an accurate phone number.

13        Q    What about mailing addresses; would you

14   consider mailing addresses to be generally

15   available to the public?

16        A    Would I consider mailing addresses

17   generally available to the public?  Well, in

18   Florida if the individual is a homeowner and the

19   home title is in that homeowner's name, that could

20   be one example where it's available -- where it's

21   publicly available.

22        Q    What about all mailing addresses; do you

23   consider all mailing addresses to be information

24   generally available to the public?

25        A    Every single mailing address in the

1    United States?

2         Q     In Florida we can say.

3         A     Florida.  I'm not sure I have the

4    knowledge to answer that question.  I don't know.

5         Q     Okay.  Do you consider an individual's

6    phone number and mailing address to be personal to

7    them?

8         A     What do you mean when you say "personal"?

9         Q     However you would interpret that name for

10   the purposes of this question.

11        A     My phone number is tied to me.  It's not

12   tied to anyone else.  My mailing address -- I

13   mentioned my wife earlier.  We live at the same

14   address so it's tied not just to me.  So I don't

15   know.  I'm trying to answer your question.  I

16   don't know how you define personal there.

17        Q     Do you agree that individuals will

18   sometimes give out their e-mail address or their

19   phone number for a variety of reasons?

20        A     I'm sure examples like that exist, yes.

21        Q     For example, marketing and advertising

22   companies will collect phone numbers, mailing

23   addresses, e-mail addresses, for example?

24        A     I would defer you to those agencies.  I

25   don't work for a marketing agency.

1          Q      You're not aware of that as a general

2     marketing practice?

3          A      It could be.  It could be done without

4     the person's consent; right?  We have Internet

5     cookies today that swipe up information whether or

6     not the user is aware of it.  So I think it -- you

7     know, it would depend on a specific example that

8     you have.

9          Q      Can you think of any valid reasons why a

10    third-party voter registration organization may

11    want to retain voters' contact information?

12         A      I would defer you to those organizations.

13         Q      We'll look back at the list of topics

14    again and take a look at the second topic.  If you

15    can give Fritz just a minute to pull that up.

16              I can read it from my notes and then

17    we'll verify it once it's on the screen.  Topic 2

18    is the Office's role in implementing and/or

19    enforcing SB 7050 and any guidance the office has

20    provided to anyone relating to the challenged

21    provisions.  That's No. 2 that is now on the

22    screen.

23              What did you do to prepare to testify

24    about Topic 2?

25         A      I would point you to my testimony

1   earlier. I think I've answered this a few times.

2   I reviewed a series of documents and prepared to

3   answer questions regarding this topic.

4      Q   And just to preview, I'm planning to ask

5   it about every topic. It's completely fine if the

6   answer is the same. I'm just asking if there is

7   anything you haven't already testified to that you

8   did to prepare for Topic No. 2.

9      A   Okay. Got it.

10      No. I mean, my answer is pretty

11   consistent with what I testified previously.

12      Q   Okay. What role has the Secretary of

13   State's Office had in implementing the citizenship

14   requirement contained in SB 7050?

15      A   What role has the Secretary's Office had

16   in implementing?

17      Q   Yes.

18      A   With the citizenship provision? I

19   believe the preliminary injunction -- I believe

20   the preliminary injunction went into effect prior

21   to the ability to enforce a provision due to the

22   90-day notice provision at the end of the statute,

23   toward the end of the statute.

24      Q   And so are you aware of any preparations

25   in the Secretary of State's Office for

1    implementation of the citizenship provision?

2         A    I am.

3         Q    What are they?

4         A    The Office of Election Crimes and

5    Security has developed an all-season procedures.

6    They're still in draft.  But we are certainly

7    making ourselves ready when the provision goes

8    into effect, but it's still -- we're still

9    discussing them and I'm still thinking about them

10   because I don't know where the injunction

11   litigation is, meaning I don't know what -- I

12   don't know if the provision will be enjoined in

13   part or in full.  So we just don't know -- we

14   can't predict what final effect this litigation

15   will have, therefore I don't have the finite

16   procedure or policy yet to implement that

17   provision.

18        Q    What policies and procedures is OECS

19   drafting related to the citizenship provision?

20        A    Well, I'm confident that's in our

21   production, so I would point you to documents that

22   were produced to you.

23        Q    Are you confident that policies and

24   procedures drafted by OECS have been provided in

25   discovery?

1        A     Yes.

2        Q     What types of policies and procedures are

3   you referring to related to the citizenship

4   requirement?

5             MR. JAZIL:  Mr. Darlington, I'm going to

6   advise you not to discuss any policies and

7   procedures that are undergoing legal review with

8   the Office of General Counsel.  If you want to

9   talk about any rules or anything like that, that's

10  fair game.

11       A     So based on the advice of counsel, I --

12  do you have a specific policy or procedure you

13  want to discuss?

14       Q     Yes.  My question was just any related to

15  the citizenship requirement.

16       A     As I said, you know, because there's no

17  final draft yet -- or, excuse me, there is no --

18  the injunction litigation hasn't ended, I don't

19  have a specific policy yet.  I have consulted

20  with -- I have consulted with another attorney

21  within the Department of State, but, again, it

22  centers primarily on the provision that is still

23  being litigated.

24       Q     What role do you see OECS taking in

25  enforcing the citizenship requirement should the

1   injunction be lifted?

2      A    If the injunction is lifted, I would

3   point you to the statute.  We would -- the Office

4   of Election Crimes and Security would issue a fine

5   letter when a violation of the provision has

6   occurred.  And from there, depending on the third

7   party's actions, we would operate in accordance

8   with the statute as a whole.

9      Q    Have you consulted with any other offices

10  in order to determine how to interpret the

11  citizenship requirement?

12     A    What do you mean "interpret the

13  citizenship requirement"?

14     Q    Has OECS coordinated with any other

15  offices either within the Secretary of State's

16  Office or outside in order to understand how to

17  interpret the terms in the citizenship

18  requirement?

19     A    Any offices within the Department of

20  State -- we have -- not on interpretation, but

21  again, that's partially because we're just waiting

22  on the litigation to be complete.

23     Q    Same question with regards to

24  enforcement:  Have you consulted with any other

25  offices in order to plan for enforcement related

1   to the citizenship requirement?

2       A    No, because, again, my -- you know, my

3   recommendations for enforcement really would only

4   be submitted to anyone else once I know exactly

5   how the law will read.

6       Q    Are you aware of any formal or informal

7   instructions that the Secretary of State's Office

8   has created concerning the administration and

9   enforcement of SB-7050's prohibition on

10  noncitizens handling or collecting voter

11  registration applications?

12      A    On a noncitizen's handling of voter

13  registration applications?

14      Q    Yes.

15      A    If those policies and procedures exist, I

16  would point you to the production that has been

17  given to you.

18      Q    Are you aware of any formal or informal

19  instructions of that nature?

20      A    Again, if those instructions exist,

21  whether formal or informal, I would point you to

22  the production that has been given to you.

23      Q    Yes.  My question is whether you are

24  aware of any formal or informal instructions.

25      A    Again, if those exist, I would point you

1    to the production that's been given to you.

2         Q     That is not responsive to my question.

3    Separate from any production I'm asking whether

4    you personally are aware of any formal or informal

5    instructions related to the citizenship

6    requirement.

7         A     So when you say "informal," you know, I

8    do want to take a step back and say the Department

9    of State only operates within the confines and all

10   of offices contained therein, they only operate

11   within the confines of the law.  So when you say

12   "informal," there's a slippery slope I guess to

13   suggest that it's almost like just an operating as

14   we wish sort of mentality in the Department of

15   State.  So I do want to say any policies or

16   procedures, generally speaking, would be within

17   the confines of the law and certainly wouldn't

18   just be changing how we operate simply because

19   someone decides informally they want to proceed

20   that way.

21            In terms of formal or informal policies

22   or procedures regarding the noncitizen provision,

23   again, the Office of Elections Crimes and Security

24   is certainly waiting to finalize procedures and

25   policies once this litigation wraps up and the

1    appropriate -- or, excuse me, the final version of

2    the statute, whatever comes out of this

3    litigation, goes into effect.

4         Q    Is that answer also true for the

5    Secretary of State's Office as a whole?

6         A    Yes.  The Department would not create

7    policies and procedures to enforce a law that is

8    either enjoined by Court order or does not exist.

9         Q    Your point about informal or formal,

10   you're aware that sometimes the Secretary of

11   State's Office engages in published rulemaking?

12        A    Yes.

13        Q    Are you also aware that sometimes the

14   Secretary of State's Office will send out notices

15   to supervisors of elections?

16        A    Yes.

17        Q    Do you have an understanding that the

18   Secretary of State's Office engages in varied ways

19   in order to provide instructions on statutory

20   provisions?

21        A    The Department does use various ways to

22   communicate with other offices and agencies, yes.

23        Q    I'm switching to the next provision that

24   we're discussing.  What role does the Secretary of

25   State's Office have in implementing Section

1    97.0575, which bans the retention of voters'

2    personal information?

3         A    Are you asking what policies or

4    procedures currently exist?

5         Q    The first question I'm asking is what

6    role the Secretary of State's Office plays in

7    implementing that provision.

8         A    Well, that role would be laid out in

9    whatever version of the statute exists at the end

10   of this litigation whenever the statute goes into

11   effect -- or, excuse me, those provisions go into

12   effect.

13        Q    Have there been any steps taken to

14   prepare to implement Section 97.0575(7)?

15        A    Well, you know, within the general

16   counsel suite there have been discussion among

17   attorneys.  But, again, there are discussions

18   that -- there are no final policies or procedures

19   that have been laid out in anticipation of the end

20   of this litigation or really in anticipation of

21   the final effective statute.

22        Q    Are you aware that there has been

23   proposed rulemaking associated with Section

24   97.0575(7)?

25        A    Yes, there's proposed rulemaking process,

1    but the rulemaking process is primarily conducted

2    by the general counsel suite.

3         Q    What role does the Secretary of State's

4    Office play in enforcing Section 97.0575(7)?

5         A    The ban on personal information --

6         Q    Yes.

7         A    -- retention?

8              Our role would clearly be defined -- or,

9    excuse me, our role would be defined by whatever

10   statutory provision goes into effect.

11        Q    Has there been any discussion of which

12   office will handle the enforcement of this

13   provision?

14        A    There have been discussions.  In terms of

15   enforcement there have been discussions, but

16   nothing has been finalized.

17        Q    Has the Secretary of State's Office

18   consulted with any other offices to determine how

19   to interpret this provision?

20        A    What do you mean "offices"?

21        Q    Have there been discussions outside of

22   the Secretary of State's Office with other

23   government offices about how to interpret Section

24   97.0575(7)?

25        A    Not that I'm aware of.

1      Q    Are you aware of any formal or informal

2 instructions that the Secretary of State's Office

3 has created concerning the administration and

4 enforcement of SB 7050's ban on retaining voters'

5 personal information?

6      A    Can you say that question again?

7      Q    Yes.  Are you aware of any formal or

8 informal instructions that the Secretary of

9 State's Office has created concerning the

10 administration and enforcement of SB 7050's ban on

11 retaining voters' personal information?

12     A    No formal instructions have been given

13 simply because, again, we're awaiting the final

14 effect of this provision, if at all.

15     Q    Is it accurate to say that to date the

16 Secretary of State's Office has not enforced SB

17 7050 citizenship requirement because of the

18 injunction currently in place?

19     A    Yes.

20     Q    And is that answer also the same for the

21 information retention ban?

22     A    Yes.

23     Q    Are you aware of any investigations or

24 prosecutions related to noncitizens working on

25 behalf of the 3PVROs?

1        A      Any investigations where noncitizens are

2   working on behalf of the third-party voter

3   registration organizations?  Yes, I am aware of

4   investigations that are ongoing.

5        Q      Which investigations are you aware of?

6        A      Without commenting on specific details of

7   ongoing investigations, yes, there is another --

8   there is at least one other law enforcement agency

9   in the State of Florida that is investigating

10  allegations concerning noncitizens working for

11  third-party voter registration organizations.

12       Q      Which agency?

13       A      I do know that the Miami-Dade State

14  Attorney Office has received allegations regarding

15  noncitizens working for third-party voter

16  registration organizations.

17       Q      When you say allegations of noncitizens

18  working for third-party voter registrations

19  organizations, what do you mean?

20       A      Conducting voter registration activities.

21  And since I'm not conducting those investigations

22  myself, I can't comment on what the specifics of

23  those investigations are.

24       Q      Because the citizenship requirement is

25  currently enjoined, is it your understanding that

1   noncitizens are allowed to conduct voter

2   registration activities?

3        A    Yes, I believe so.

4        Q    Is your understanding that there is

5   illegal activity being investigated by the

6   Miami-Dade offices related to noncitizens engaged

7   in voter registration work?

8        A    For any further detail I would point you

9   to them.  I just -- it's an ongoing active

10  investigation so I'm not the one conducting it.

11       Q    So you don't know exactly what is being

12  investigated?

13       A    What specific crimes are being

14  investigated?  No.

15       Q    How do you know that it's noncitizens

16  that are being investigated?

17       A    I just represented to you what was told

18  to me.

19       Q    What -- I'm sorry; go ahead.

20       A    What was your question?

21       Q    I didn't mean to interrupt you if you

22  were still answering.

23       A    No, I was just going to say I have

24  represented to you what was told to me.

25       Q    In what form was this information passed

1    to you?

2         A     Verbally.

3         Q     And when was this conversation?

4         A     I don't have a specific date.  It was

5    certainly within the time of my employment with

6    the Office of Election Crimes and Security and I

7    can't remember the specific date.

8         Q     Was it within the last few months?

9         A     I'm not -- I don't remember when it

10   specifically occurred.  Within a few months.  I

11   mean, I've been with the office for nine months

12   and some change.  So it would be within that time

13   frame, if that's a few.  Several.

14        Q     Who did you speak with in the Miami-Dade

15   State Attorney's Office?

16        A     I can't remember the attorney -- the

17   investigator's name.  It was an investigator

18   within the office.  I can't remember his name.

19        Q     Did you have an understanding why the

20   investigator was reaching out to you?

21        A     I can't remember who reached out to who.

22   I can say that one of the -- I can say that we

23   talked about several issues including that.

24        Q     Are you aware of whether any indictments

25   or arrests have come out of the investigation?

1     A    I'm not.  I would defer you to that

2  agency.

3     Q    So you don't know one way or the other

4  whether the allegations being investigated turned

5  out to be meritorious?

6     A    I would point you to that agency to

7  answer that.

8     Q    Okay.

9          MS. JOHNSON:  I know we said 12:30.  I

10  think this is another breaking point between

11  topics.  Does it make sense just to break now?

12          MR. JAZIL:  Does that work for you?

13          THE WITNESS:  I'm okay with that, yeah.

14          MS. JOHNSON:  Okay.  We will go off the

15  record.

16          (A recess was taken.)

17          MR. JAZIL:  Counsel, I have put in front

18  of the witness a few documents that he may

19  reference as he's answering questions.  The

20  documents are clean copies; i.e., no notes,

21  annotations, et cetera, of 97.0575 of the Florida

22  statutes, the 2023 version; Rule 1S2.055, together

23  with the relevant forms; Rule 1S2.042 together

24  with the relevant forms.

25          MS. JOHNSON:  Thank you, counsel.

1    BY MS. JOHNSON:

2        Q    And, Mr. Darlington, I would just ask if

3    at any point you are referencing these materials

4    in order to answer my questions, if you'll let me

5    know that that's what you're doing.

6        A    Yes, ma'am, will do.

7        Q    Great.  So we'll look next at Topics 3

8    and 4 and I will ask questions about these topics

9    together, but I will read them first.

10           Topic 3 is "The process and procedures

11   for investigating and fining 3PVROs and their

12   agents" and Topic 4 is "The role of Office of

13   Election Crimes and Security in investigating,

14   prosecuting, and/or fining 3PVROs and their

15   agents."

16           My first question is, is there anything

17   you did to prepare to testify about these topics

18   that you haven't already discussed in the

19   deposition?

20       A    No.

21       Q    Who is responsible for issuing civil

22   penalties to 3PVROs who violate the law?

23       A    I am the signatory of the fine letters

24   that are issued to third-party voter registration

25   organizations.  The Office of Election Crimes and

1    Security is overall the office within the

2    Department of State that issues those fine

3    letters.

4         Q    And before OECS was in existence, which

5    Department of the Secretary of State's Office did

6    you understand was responsible for issuing fine

7    letters to 3PVROs?

8         A    The general counsel suite.

9         Q    Okay.  How are incidents of issues with

10   3PVROs such as late delivery or delivery to the

11   wrong county brought to OECS' attention?

12        A    Well, I would like to break those two up

13   if I can.  So if a voter registration application

14   is submitted late, then it can be either the

15   County Supervisor of Elections Office that

16   receives that application or it can be the Florida

17   Division of Elections that receives that

18   application.  Any of those two options, as long as

19   they are the recipient, can make the initial

20   determination that pursuant to the government

21   statute and rules, the application was submitted

22   untimely.  And then from there a referral is made,

23   as I testified previously, to the Office of

24   Election Crimes and Security.

25             And then what was the second type of

1    violation you mentioned?

2         Q    The second violation was delivery to the

3    wrong county.

4         A    Delivery to the wrong county.  In that

5    instance, because third-party voter registration

6    organizations are provided safe harbor with the

7    Division of Elections, the Division of Elections

8    may initially receive the complaint by county

9    supervisor of elections, but per the statute only

10   the County Supervisor of Elections Office will

11   notify -- if they're the recipient of an

12   improperly submitted application, will notify the

13   division with the required complaint form and the

14   applications in question.

15        Q    When these incidents are referred to

16   OECS, what is it that you receive from either the

17   County supervisor or the Division of Elections,

18   what materials?

19        A    I think I accidentally talked over you.

20        Q    That's fine.  I thought maybe it was

21   unclear, so I was just clarifying what materials

22   do you receive as part of the referral.

23        A    Sure.  The materials I receive are the

24   voting -- the voter registration applications in

25   question.  Sometimes I receive the full batch of

1    the entire submission from a voter registration

2    organization, third-party voter registration

3    organization.  But oftentimes it's just the

4    applications in question that the initial

5    recipient, whether supervisor of elections office

6    or the Division of Elections, believe have somehow

7    violated either statute.

8           And then on top of those applications,

9    whether it's the ones in question or the entire

10   batch admitted, there is a cover sheet that

11   provides the information I previously testified,

12   the third-party voter registration organization,

13   and then enough information to discern what the

14   believed or alleged violation is.

15        Q    Is there a specific name for the cover

16   sheet under Florida law?

17        A    There is.  I would point you to the

18   implementing regulation.

19        Q    Okay.  What is OECS' role in

20   investigating the complaints once it receives

21   them?

22        A    Well, OECS' role is once we receive the

23   complaint package -- I'm calling it the complaint

24   package; the cover sheet and at least the

25   application in question -- then there is a review

1    of what the allegation or allegations are, and

2    then reviewing the application, the voter

3    registration applications submitted to us, to make

4    an actual determination.

5            As I said previously, the cover sheet is

6    an indication of the violations, but I personally

7    review every single application to actually make a

8    determination as to what violations, if any,

9    occurred.

10       Q    Are you aware of whether there is any

11   investigation into the allegation before it's

12   referred to OECS?

13       A    When you say "investigation," I guess we

14   would have to go by potential violation.  So to

15   properly answer that, I mean, what type of

16   allegation I guess are you thinking about when you

17   ask the question about am I aware of the

18   investigation?

19       Q    Sure.  So let's start with applications

20   submitted after the deadline outlined in Section

21   97.0575.  Are you aware of whether before it gets

22   to OECS there is any investigation done by the

23   Secretary of State's Office or the supervisor of

24   elections to determine whether there was in fact a

25   violation or what caused the violation?

1       A      So for specific processes within County

2    Supervisors of Elections Offices, I would defer

3    you to them.

4           Now, what I will say is the requirements

5    for timely submission are laid out and defined in

6    the statute and the implementing regulation.  So

7    once OECS receives the complaint package, I'm

8    aware of how we handle it, but -- I just answered

9    that -- I can't answer the specific processes and

10   procedures of the individual County supervising

11   the elections.

12      Q     Are you aware of any investigation that

13   the Division of Elections does before referring

14   complaints to OECS?

15      A     Again, what type of complaint?

16      Q     Let's stick with the same example for

17   now, an application submitted later than the

18   statutory deadline for submitting voter

19   registration applications.

20      A     So for that specific example, the

21   investigation, as you're calling it, for that just

22   one allegation it's limited to the complaint

23   package, the cover sheet and then the applications

24   in question, because per the rule there are

25   several different ways you can determine whether

1    or not a voter registration application is

2    submitted late.

3           And the rule really provides, I think --

4    how do I phrase this?  It provides -- the way I

5    would describe it is -- well, I would just say

6    that the rule lays out how the division or OECS is

7    to determine tardiness, and it begins with if

8    it's -- it turns on whether it's mailed or handed

9    in in person.  But the earliest date, if mailed,

10   that can be used is the postmark date, per the

11   rule, the postmark of the mailed voter

12   registration applications, and then the rule lays

13   out the other ways to determine when the voter

14   registration application is actually submitted to

15   the proper recipient.

16       Q    Does OECS communicate with the 3PVROs

17   that it is investigating for potential civil

18   penalties?

19       A    When you say "investigating," what part

20   of the chain of events are we talking here?  What

21   part of the chain of events are we talking here?

22       Q    Fair.  So when OECS receives a complaint

23   concerning a 3PVRO, does it contact the 3PVRO

24   about the complaint received?

25       A    I do not notify the third-party voter

1    registration organization that I have received a

2    complaint regarding them at that moment.

3        Q    At what point in the chain of events, as

4    you described it, does OECS contact 3PVRO?

5        A    If I make a determination that a

6    violation of the rule, a violation of the statute,

7    and/or a violation of any criminal statute occurs,

8    I issue a letter informing them of the regulatory

9    or statutory violation or violations.  And if

10   there is a criminal violation, I issue that to a

11   law enforcement agency or an appropriate

12   prosecutor's office.

13       Q    So is it accurate to say that the 3PVRO

14   is not contacted about a complaint until OECS

15   reaches a determination on whether there has been

16   a violation of the law?

17       A    If there has been a violation of untimely

18   submission, yes, just sticking with your example.

19   If I make a determination that untimely submission

20   occurred, then, yes, I issue the fine letter and I

21   provide -- I notify that third-party voter

22   registration organization of our decision.

23       Q    What about other types of investigations,

24   like, for example, potential criminal conduct like

25   you mentioned?

1      A      If there is a determination that criminal

2  conduct occurred, then I issue a notice to --

3  excuse me -- a referral to the appropriate law

4  enforcement agency or prosecutor's office.  Yeah,

5  it's more a referral to the appropriate law

6  enforcement agency.

7      Q      Do you contact the 3PVRO at the same time

8  you make the referral?

9      A      It depends.  If there is a criminal

10  allegation alone, I do not provide notice that

11  they're under investigation.

12      Q      Do you ever provide notices to 3PVROs

13  that they're under investigation?

14      A      I have not during my time with the Office

15  of Elections Crime and Security.

16      Q      What do you understand the purpose to be

17  of changing the deadline for 3PVROs to deliver

18  voter registration applications to 10 days from 14

19  days?

20      A      For that I would point you to the

21  legislative records to determine the purpose.

22      Q      You don't have any understanding of the

23  purpose of that change?

24      A      Again, I would point you to the

25  legislature for the legislature's findings

1   regarding purpose.

2       Q    If an individual voter signs their voter

3   registration form but does not mail it for two

4   weeks, is that unlawful under Florida's Election

5   Code?

6       A    If who mails it into --

7       Q    The voter.  The voter.

8       A    Again, I'm just trying to understand

9   this.  So a voter has a voter registration

10  application that they fill out and retain for two

11  weeks.

12      Q    Right.

13      A    And then send it -- on Day 1 they sign

14  it, they fill it out and sign it, and then on Day

15  14 they themselves, without delivering it to

16  anyone else, mail it?

17      Q    Yes, that's my question, whether that is

18  unlawful under Florida's election laws.

19      A    No, I don't believe so.

20      Q    What is the harm created by a 3PVRO

21  organization that turns in an application on the

22  same timeline?

23      A    Well, we've addressed this previously

24  during this deposition as well in our filings in

25  court, but to address the specific scenario what

1    is the harm, I would point you first to the

2    statute that mandates a future duty to the voter

3    by the voter registration agent, the third-party

4    voter registration organization.  And, again, as

5    the statute makes clear, as does other provisions

6    in the Election Code, there is very real harm --

7    and this is just one example of many -- where if

8    an application is submitted after book closing,

9    for example, that the voter cannot vote in that

10   election despite their goals or desires to do so.

11       Q    If an application is submitted by a 3PVRO

12   eleven days after it's completed but before book

13   closing deadline, what harm is created?

14       A    I would point you to the statute and say

15   that they violated the statute.

16       Q    Under that situation where a voter

17   application is returned 11 days after it's

18   completed but before book closing deadline, is the

19   voter registered to vote?

20       A    It could be, but it becomes a --

21   depending on where the voter application is sent

22   and, again, depending on whether or not it's a

23   complete application, there are a number of

24   different directions this hypothetical could go.

25   So in isolation, if you're focusing on 11 days

1    versus ten days, I would defer you to the

2    legislature.

3         Q    So the issues you identified of an

4    incomplete application or being sent to the wrong

5    place, those are separate from the timing of

6    submitting an application; is that right?

7         A    Can you say that again?

8         Q    The issues you just identified as

9    potential problems of an incomplete application or

10   the application being sent to the wrong place, you

11   would agree that those are separate from the

12   timing of submitting an application; correct?

13        A    No, I would not.  There can be examples

14   where there are a combination of those problems.

15        Q    Certainly.  But a late submitted

16   application is not necessarily incomplete;

17   correct?

18        A    There can be completed applications that

19   are submitted late and there can be incomplete

20   applications that are also submitted late.

21        Q    So if an application is complete and

22   submitted to the right county 11 days after it is

23   completed but before book closing deadline, will

24   that voter be registered to vote?

25        A    Barring any other practical or legal

1   issues, they could be, yes.

2        Q    Do you agree or disagree that 3PVROs

3   should review applications for quality control to

4   make sure that they're complete before they submit

5   them?

6        A    I do believe that is in keeping with

7   their fiduciary obligation; yes.

8        Q    And do you believe that process may in

9   some instances take some time to complete?

10       A    I think the voter registration

11   application is kind of a short amount of

12   information.  And when we say quality control,

13   what I would define as quality control is simply

14   confirming that the application complies with

15   Florida law, and that is a quick conversation with

16   the applicant.

17       Q    Are you aware of instances where a voter

18   has listed their county incorrectly?

19       A    I'm sure that occurs.  But, again, I'm

20   not involved in these conversations specifically

21   between the voter and the third-party voter

22   registration organization agent.

23       Q    Under Section 97.0575 a 3PVRO can be

24   fined $500 per application submitted to the wrong

25   county; is that correct?

1      A     Yes.

2      Q     Some voters may live on the border of a

3   certain county?

4      A     On the border.  They could live close,

5   but no two counties tax a property.  So there is

6   always a determination as to where that residence

7   is located.

8           MS. JOHNSON:  I would like to pull up

9   another exhibit.  This is an article by The

10  Guardian related to this issue we're discussing

11  now.  So give Fritz just a second to pull it up.

12  And I will mark this as Exhibit 3.

13          (Darlington Deposition Exhibit 3 marked

14  for identification and is attached to the

15  transcript.)

16          MR. WERMUTH:  Sorry; give me just a

17  minute.

18          MS. JOHNSON:  No problem.

19      Q     I can ask a few other questions while we

20  get that pulled up just to not waste time.

21          Do you have an understanding of what kind

22  of quality control processes 3PVROs engage in?

23      A     I would defer you to the third-party

24  voter registration organization to answer that.

25      Q     And you believe it is a bigger problem to

1   send in an application after ten days or to send

2   in an application with incomplete information that

3   won't result in its successful registration?

4        A    What do you mean "bigger"?  What do you

5   mean by "bigger problem"?

6        Q    Do you have a sense of whether it's worse

7   to send a completed application in after ten days

8   but before book closing or whether it would be

9   better to be timely and submit an incomplete voter

10  registration application?

11       A    I don't know that one is bigger than the

12  other because, again, the purpose of the -- the

13  purpose of the deadline is to simply ensure that

14  third-party voter registration organizations

15  submit these applications in a timely manner.

16       Q    One other question and then we'll look at

17  the article that we're getting pulled up.

18            Under Section 97.0575(a)(1), which I know

19  you now have in front of you and are welcome to

20  look at, a 3PVRO can be fined $2,500 if one of its

21  volunteers, quote, acted willfully, unquote, when

22  sending in an application after ten days.

23            And my question for you is whether you

24  have a definition of what it means to act

25  willfully in this context.

1     A     May I reference a statute?

2     Q     Absolutely, yes.

3     A     Thank you.  Willfully in this context

4   means some sort of intentional conduct to not turn

5   the voter registration application in within the

6   statutory deadline.

7     Q     What intentional conduct do you mean?

8     A     Intentionality and willful action can

9   manifest themselves in a number of ways.  I would

10   have to -- I'd have to give a specific instance to

11   better answer your question.

12     Q     Is whether something is willful something

13   you have to see before you know whether in fact

14   it's willful?

15     A     What do you mean?  When you say "you," do

16   you mean I see it before I know it?

17     Q     Yes.  I can rephrase.  How would a voter

18   registration agent know whether they were

19   committing a willful act under this provision of

20   the law?

21     A     Well, it would certainly be more than

22   just a tardy submission.  And when I say "tardy,"

23   I mean beyond the statutory deadline.  But there

24   is no -- there is not a narrow set of

25   circumstances that would determine.  Again,

1  willfulness can manifest itself in a variety of

2  ways, but obviously it's elevated from just

3  submitting the voter registration applications

4  like beyond the statutory deadline.

5      Q    Let's take a look now at The Guardian

6  article.  I will go to the top first.  My first

7  question is have you seen this article before?

8      A    I don't believe so.

9      Q    If at any point you need a moment to

10  review again content above or below, just let me

11  know, but I'm going to ask about a specific part

12  of this article.  So we can scroll down.

13      A    Okay.  Do you mind, can you zoom in a

14  little bit just so I can see it a little bit

15  bigger, if that's possible?

16      Q    Yes, I think we can do that.

17          MR. WERMUTH:  Is that better?

18          THE WITNESS:  Yes, that's helpful.  Thank

19  you.

20          MS. JOHNSON:  Scroll down a little bit

21  further.

22      Q    Okay.  The portion I want to focus on is

23  "A 'gross misapplication' of the Law."  I'll read

24  it and then ask you questions.  "In mid-May, the

25  nonprofit Hispanic Federation received a letter

1   from the office of election crime and security

2   notifying it that it was being fined $7,500.

3   Fifteen of the applications it collected were

4   submitted to the wrong county - Polk county, in

5   Central Florida, when the voters lived elsewhere.

6   Those 15 applications represented a tiny sliver of

7   the more than 16,500 voter registration

8   applications the group collected in 2022 but still

9   resulted in a fine."

10          And if we scroll down, I want to ask you

11  about this graphic "Florida fined Hispanic

12  Federation for registering voters outside Polk

13  County.  At least 10 voters analyzed lived within

14  3 miles of the county line."  Underneath the

15  graphic:  "Through a public records request, the

16  Guardian reviewed several of the applications the

17  Hispanic Federation submitted that were flagged

18  for fines.  In nearly all of them, the voter

19  incorrectly wrote on their own applications that

20  they live in Polk county.  In many cases, the

21  address they listed was just over the county line

22  in Osceola county."

23          My question to you earlier was:  Are you

24  aware of circumstances where the voters lived near

25  the county lines and might mistakenly write the

1    wrong county on their voter registration

2    application?

3         A    I believe your question said on the

4    county line, and that's why I clarified about a

5    residence being in one county or the other.  I am

6    aware of this example that The Guardian is

7    addressing.

8         Q    And do you have any reason to dispute any

9    of what The Guardian found in analyzing these ten

10   applications?

11        A    Well, I'll just say, you know, I

12   understand they drew the map and placed red dots

13   on county lines.  Can you scroll up again?

14        Q    Absolutely.  And I think some of the

15   details on the dots are below so just let us know

16   if you need us to scroll.

17        A    Thank you.

18             Yes, so I'm familiar with this.  So

19   sorry; what was your question?  Do I dispute what?

20        Q    Any reason to dispute any of what The

21   Guardian found in reviewing these ten

22   applications?

23             MR. JAZIL:  Object to form.

24             You can answer.

25        A    Well, I can't speak to their

1    investigative process, but I understand that they

2    made a public record request and then received the

3    applications in question and then made a

4    determination that the voter was wrong based on

5    what they've written here.

6          But in the end the fiduciary obligation

7    to submit them to the proper place does include a

8    safe harbor as the Florida Division of Elections,

9    so third-party voter registration organizations do

10   have the ability to either send it to safe harbor

11   or the county listed on the application.

12       Q    Do you believe it's fair for 3PVROs to

13   get fined when a voter writes the wrong county on

14   their application and they send the application to

15   the county the voter wrote on the application?

16          MR. JAZIL:  Object to form.

17          You can answer.

18       A    I won't speak to the legislative purpose

19   that resulted in the final draft of the statute,

20   but I will say that the statutes are enforced

21   equally and certainly with the appropriate amount

22   of review prior to applying law to fact and then

23   making a determination.

24       Q    And in fining 3PVROs for sending

25   applications to the wrong county in 2022, you

1   didn't investigate whether it was the 3PVRO or the

2   voter that got the county wrong?

3       A    I just looked through the four corners of

4   the application.  And then when there are disputes

5   regarding which county that residence is located

6   in, we utilize the Florida -- the respective

7   county property appraiser's website to make a

8   determination about which county the residence is

9   located in.

10      Q    Do you believe the wrong county fine

11  provision increases the burden on 3PVROs to

12  undertake a similar exercise to verify the

13  counties of all voters before they submit voter

14  registration applications?

15           MR. JAZIL:  Object to form.

16           You can answer.

17      A    No, I do not, because safe harbor is

18  provided such that they consented to the Division

19  of Elections and completely avoid complying with

20  these issues.

21      Q    Do you have any concerns about burdens on

22  the Division of Elections should 3PVROs decide to

23  submit all voter registration applications to the

24  Division of Elections?

25      A    No, I do not.

1      Q    Can a 3PVRO be fined for a combination of

2    wrong county and late submission applications if

3    it takes a supervisor of elections additional days

4    to divert an application to the correct county?

5      A    I think I'm a little confused by your

6    question.  So are you asking when timely delivery

7    is determined?

8      Q    That's part of the question, yes, whether

9    timely delivery could be affected by a wrong

10   county submission.

11     A    Hypothetically, yes, in the sense that --

12   well, based on what you just said, there can be a

13   wrong county delivery and also a determination per

14   the rule that the third-party voter registration

15   organization delivered it untimely and to the

16   wrong county.  But please keep in mind that per

17   the rule delivery is clocked.  And when I say

18   "clocked," you know, let me rephrase, the date

19   that the initial recipient receives it, whether

20   the county supervisor of election or the Florida

21   Division of Elections.  And when I say

22   "supervisor," it could be the wrong supervisor.

23   But that's when delivery -- that's when the

24   delivery date is stamped.  As I said earlier, per

25   the rule if they're mailed, it can be as early as

1   the postmark that's clearly on the envelope

2   through the other defined ways that delivery can

3   be determined.  But delivery date is determined by

4   the individual recipient.

5       Q    That's helpful.  That was my question.

6            Do you know how many 3PVROs had fines

7   that would have exceeded $50,000 in 2022 but for

8   the cap?

9       A    Yeah.  I'm confident that the fine

10  letters that have been issued have been produced

11  to you, so I point you to production for the

12  specific number.

13      Q    You testified earlier that you prepared

14  to testify about Topics 3 and 4?

15      A    Yes.

16      Q    Okay.  So I'll ask again my question that

17  relates to Topics 3 and 4.  How many 3PVROs had

18  fines that would have exceeded $50,000 in 2022 but

19  for the cap?

20      A    Again, I would point you to the

21  production that your office -- that you received

22  at this time.

23      Q    Do you understand that documents produced

24  in discovery was another separate topic that was

25  noticed for this deposition?

1       A     I understand that -- if you scroll down,

2    I understand that one topic was the process of

3    production; right?

4       Q     Yes.  It is also, I think, No. 17,

5    "Documents produced by the secretary in discovery

6    in this litigation..."

7       A     Yes.  You know, I don't have them in

8    mind, all 7,500 documents that we produced, but I

9    did prepare to discuss this topic.

10      Q     And you testified earlier that you were

11   the signatory on the fine letters in 2022?

12      A     I joined the Florida Department of State

13   in -- it was the Tuesday after the three-day

14   weekend in October of 2022.  So I did sign some.

15   I am not the signatory on every single fine letter

16   that was submitted -- or, excuse me, issued during

17   calendar year 2022.

18      Q     My question was unclear.  I meant to

19   describe the May 2023 letters related to 2022

20   3PVRO conduct.  So to ask a clearer question, were

21   you the signatory to all 2023 letters issued to

22   third-party voter registration organizations?

23      A     In May of 2022?  Yes.

24      Q     2023, yes.

25      A     Sorry; yes.  May of 2023.  I apologize.

1    May of 2023 I was the signatory to all fine

2    letters that were issued.

3        Q    Okay.  Before May 24, 2023, it's accurate

4    to say that the fine cap for third-party voter

5    registration organizations was $50,000.  Is that

6    correct?

7        A    I want to make sure what you're asking

8    me.  So prior to May 24, 2023, the fine cap would

9    have been $50,000 per calendar year per

10    organization?

11        Q    Yes, that's my question.

12        A    Yes.  Yes, I believe so.

13        Q    So of the fine letters that you issued in

14    2023, are you aware of how many of the 3PVROs

15    would have had fines that exceeded the $50,000 but

16    for the cap?

17        A    There was at least one.

18        Q    Which one are you thinking of?

19        A    I know Hard Knocks was an organization

20    where the fine amount but for the cap would have

21    been much greater than the fine cap.

22        Q    Can you think of any others sitting here?

23        A    I would point you to the production you

24    received.

25        Q    But to answer my question, no others that

1   you can name right now?

2        A    I would point you to the production you

3   received.

4        Q    I understand that.  You've said that.

5   But I'm asking you to answer my question, which is

6   can you name any others sitting here right now?

7        A    Not at this moment.

8        Q    Are you aware of how many registered

9   3PVROs there are in Florida?

10       A    Since that list as currently maintained

11  is a gigantic archive of both organizations

12  registered and then, for whatever reason,

13  terminated that specific organization's activities

14  through a list of active organizations, which,

15  again, is an archival list really dating back to

16  when the legislature created this ability.

17       Q    Are you aware that that list is labeled

18  as active third-party voter registration

19  organizations on Florida's website?

20       A    There is that list; yes.

21       Q    And do you know how many 3PVROs are on

22  that list?

23       A    I don't.

24       Q    Do you dispute that it's over 2,000?

25       A    No.  I believe it is probably over 2,000.

1      Q    Do you believe that fining 3PVROs up to

2  $250,000 achieves the State's interest that you

3  testified to earlier?

4      A    Yes, I do.

5      Q    Do you know how many 3PVROs in Florida

6  have funding that exceeds $250,000?

7      A    I do not.

8      Q    If these fines cause 3PVROs in Florida to

9  stop operating, would you say that that achieves

10  the law's purpose?

11         MR. JAZIL:  Object to form.

12         You can answer.

13     A    This law -- I won't speak to the

14  legislature's purpose to the final draft, but I

15  will say the law as written certainly accomplishes

16  the State's interest that I previously listed in

17  my testimony.

18     Q    Do you believe it's a foreseeable

19  consequence of the increase in fines that less

20  3PVROs will operate in Florida?

21         MR. JAZIL:  Object to form.

22         You can answer.

23     A    I can't speculate to that.

24     Q    Do you agree the less 3PVROs in Florida

25  operate the less voters will be registered as a

1    result?

2            MR. JAZIL:  Object to form.

3            But you can answer.

4        A    No, I do not.

5        Q    Why don't you agree?

6        A    Voter registration in Florida is very

7    easy as currently allowed by statute.  The

8    third-party voter registration organizations are

9    only one way of many where individuals can

10   register to vote.  So, no, I don't agree at all.

11       Q    Is your testimony that if one method of

12   registration is removed, there will be perfect or

13   a hundred percent substitution into other voter

14   registration methods?

15       A    I can't speculate as to 100 percent shift

16   here or there.  What I can tell you is that it's

17   certainly already incredibly easy to register in

18   Florida because of the number of different ways,

19   including third-party voter registration

20   organizations -- excuse me -- including utilizing

21   third-party voter registration organizations to

22   register to vote.

23       Q    Do you agree that it's possible that some

24   voters will not register at all if they do not

25   have access to registration through 3PVROs?

1          MR. JAZIL:  Object to form.

2          You can answer.

3     A    Your question is if there are no more

4  third-party voter registration organizations,

5  would that prevent someone from being able to

6  register to vote?  Is that your question?

7     Q    My question is whether you believe it's

8  possible that some voters will not register to

9  vote at all if they no longer have access to

10  3PVROs?

11          MR. JAZIL:  Object to form.

12          You can answer.

13     A    I can't speculate it to a possibility

14  where hypotheticals could take different

15  directions.

16     Q    We will move on to the next topic, which

17  is No. 5.  I will read it first.  "Personnel in

18  the Secretary's office, including the Office of

19  Election Crimes and Security, whose work relates

20  to 3PVROs, and their names, titles, and specific

21  roles."

22          My first question is, how many employees

23  are there in OECS?

24     A    Currently in OECS we have -- as of this

25  date currently working for OECS, eight.

1        Q      How many of the OECS employees work on

2   cases involving 3PVROs?

3        A      My apologies.  May I amend my answer?  I

4   just totaled them.  It's actually nine, not eight.

5        Q      So same question:  How many of the nine

6   employees at OECS work on matters involving

7   3PVROs?

8        A      Two.

9        Q      And what are the titles of those two

10  individuals?

11       A      The title -- my title -- I am one of the

12  two and my title is director.  The other

13  individual, currently her title is Government

14  Operations Consultant II, is her official state

15  title.

16       Q      And what is her name?

17       A      Lenore Linares.

18       Q      What are her job responsibilities?

19       A      She receives the complaint package,

20  which, you know, from earlier as I've defined the

21  application in question, cover sheet, she receives

22  the complaint package and initially processes the

23  complaint package.

24       Q      And when you say "initially processes,"

25  what do you mean?

1       A    So initially we receive a complaint

2   package, we scan it in and essentially intake the

3   complaint, meaning we create a new complaint, case

4   file in our file system.  And from there she will

5   make a determination as to whether or not we

6   concur with whatever allegations are on the

7   complaint if there is no criminal allegation on

8   the complaint.

9       Q    And how does that process change if there

10  are criminal allegations on the complaint?

11      A    It comes directly to me.

12      Q    Do you consider work related to 3PVROs a

13  big part of what OECS does?

14      A    How do you define "big part"?

15      Q    I can ask it a different way.  What

16  portion of all employee time at OECS is spent on

17  work related to 3PVROs?

18      A    Well, we -- you know, we're not on a time

19  system in terms of clocking how much time is spent

20  on 3PVRO work generally.  Please keep in mind, I

21  mean, these complaint packages can be upwards of

22  almost 2,000 pages.  So every complaint is going

23  to take a different amount of time and I don't

24  even have, you know, a specific answer in terms of

25  how much time per application or this or that.  I

1   will say the office certainly receives a lot of

2   complaints.

3        Q    So to try and get a rough sense of how

4   much time you mean, is it 20 percent of your time

5   in your role as director?

6        A    I don't clock my time.  So I can tell you

7   we spend a lot of time analyzing complaints

8   against third-party voter registration

9   organization actions, but I can't speculate as to

10  percentage.

11       Q    Can you quantify "a lot"?

12       A    I would say it's certainly a good amount

13  of our time.

14       Q    Do you have any specific estimate of how

15  much time is spent on work related to 3PVROs at

16  OECS?

17       A    I don't have a specific estimate.  Again,

18  it's a good amount of our time.

19       Q    How many employees at the Department of

20  State have worked on matters related to 3PVROs?

21       A    Work on matters generally with 3PVROs?

22  Anything from registration through anything?

23       Q    Yes.

24       A    I'm sorry?

25       Q    Yes.

1      A    Well, there would be attorneys in the

2  general counsel suite, there are team members

3  within the Division of Elections.  Rough estimate?

4  Somewhere around 20 is ballpark.

5      Q    And I know you mentioned that some of

6  those individuals are in the general counsel

7  suite.  Can you identify the titles or divisions

8  of the other individuals you're thinking of?

9      A    Within the Division of Elections the

10  titles would be 3PVRO coordinator, supervisor, and

11  again, depending on the party that you are talking

12  about, it could go all the way through the

13  director if it's within -- you know, if it's

14  something she needs to be involved in or otherwise

15  within her job duties.

16      Q    What are the names of those individuals?

17      A    The director is Maria Matthews and then

18  Tiffany Morley is her supervisor.  I don't know --

19  because I don't interact directly with them

20  myself, I don't know who specifically are 3PVRO

21  coordinators.  I would point you to her testimony

22  whenever it occurs.

23      Q    Who is it that you do interact with at

24  the Secretary of State's Office on matters related

25  to 3PVROs?

1          A     On matters related to 3PVROs that I

2     personally interact with?

3          Q     Yes.

4          A     I really just interact with Lenore, who

5     essentially processes and prepares these

6     noncriminal allegations for me.

7          Q     Are you aware of who her main points of

8     contact are?

9          A     Yes.  It would be -- she receives these

10    complaints with a routing sheet that will

11    typically have the supervisor's name on it.

12         Q     You mean the supervisor Tiffany Morley?

13         A     Yes.  Yeah, sorry; the supervisor from

14    the Division of Elections.

15         Q     Got it.  So other than those three

16    individuals and attorneys within the General

17    Counsel's Office, is there anyone else at the

18    Department of State that you know works on matters

19    related to 3PVROs?

20         A     Well, works on matters.  Since I've been

21    director of the Office of Election Crimes and

22    Security, no, not directly working on matters.

23         Q     And so you're not aware of anyone else?

24         A     No.

25         Q     Let's look at Topic 6 then and I will

1    read it.  "The Secretary's process for referring

2    cases related to alleged misconduct by 3PVROs to

3    the Office of Election Crimes and Security and/or

4    state attorneys and/or the Office of the Attorney

5    General."

6            First question is whether you did

7    anything else to prepare for this topic separate

8    from what we've already discussed?

9        A    No.

10       Q    I know we've already talked about the

11   referral process to OECS, but can you explain when

12   you would refer a case related to misconduct by

13   3PVROs to a State Attorney's Office?

14       A    As I stated earlier in the deposition,

15   the decision point there really we arrive at --

16   and when I say "we," the Office of Election Crimes

17   and Security would arrive at -- that point when

18   essentially we reach an impasse with a third-party

19   voter registration organization on this issue.  So

20   there would be likely but not necessarily

21   always -- you know, I can't speak to everything

22   the 3PVRO would dispute, but likely the scenario

23   would be I issue a fine letter, they respond.  We

24   call it an appeal.  It's obviously not filed with

25   the first ECA or anything, but we issue a fine

1    letter, they appeal to us and say we disagree with

2    this fine amount because of, for example, the

3    article you showed, Hispanic Federation contacted

4    us and said, well, we dispute X number of voter

5    registration applications that the Office of

6    Elections Crime and Security says violated the

7    specific fine statute listed.

8            They appeal and say, no, we don't think

9    all of these do.  When we receive that appeal

10   notice from the organization, it comes directly to

11   me and I essentially double-check my work.  So if

12   they say, well, four of these were submitted to

13   the right county, I will absolutely confirm

14   whether or not I was right.  And if I was wrong, I

15   will waive that fine amount as we have done in the

16   past with certain third-party voter registration

17   organizations.

18           If I'm right, then the scenario would be

19   at some point I provide notice to the organization

20   in this hypothetical that I think I'm right and I

21   don't agree with either part or all of their

22   appeal.  And then consistent with the timeline

23   that we provide other organizations to pay, we

24   would provide that timeline.  And then the

25   scenario would be from there if they decline to

1  pay the fine -- and, again, this is just this

2  hypothetical -- then what would happen is I would

3  make a determination as to whether or not I

4  believe it should be referred and then I would

5  pass it to the General Counsel's Office.

6      Q    So General Counsel's Office at the

7  Secretary of State?

8      A    Yes.  Sorry; the Department of State's

9  general counsel suite.

10     Q    Do you ever make referrals directly to

11 State Attorney's Offices without going through the

12 General Counsel's Office?

13     A    Regarding what type of case?

14     Q    Anything related to 3PVRO conduct.

15     A    Prior to OECS' inception, prior to the

16 inception of the Office of Election Crimes and

17 Security, the General Counsel's Office did make

18 referrals to State Attorney Offices regarding

19 third-party voter registration organizations.

20     Q    So my question is since OECS has been in

21 existence, have you ever made a referral directly

22 to a State Attorney's Office about a 3PVRO without

23 going through the General Counsel's Office?

24     A    I haven't made a referral to the State --

25 to a State Attorney Office directly regarding a

1    3PVRO.  You have there alleged misconduct, but

2    obviously I don't refer a criminal allegation to a

3    State Attorney Office.

4         Q    Is the only situation in which you would

5    refer an issue related to third-party voter

6    registration organizations to a State Attorney's

7    Office related to the fine dispute issue you've

8    described?

9         A    I wouldn't say the fine issue I

10   described.  You know, I'll say wrong county.  If

11   they appeal, I disagree and think at least some

12   fine should be levied because of wrongly submitted

13   applications and they decline, I wouldn't in that

14   scenario refer it to the State Attorney Office.

15        Q    Just to make sure I'm understanding, I

16   thought part of what you had testified to a moment

17   ago is if there is an appeal process related to a

18   fine in certain situations, you'll refer it to a

19   State Attorney's Office, or did I misunderstand?

20        A    I did not say State Attorney Office.

21        Q    Where would you refer those issues?  Only

22   to the General Counsel's Office?

23        A    No.  I would make -- so I would hand --

24   when we say "refer," I define refer as leaving the

25   Department of State and heading to where the

1    statute provides it can go.  But I would not act

2    unilaterally in that scenario.  In that scenario,

3    I would give my recommendations to the general

4    counsel suite within the Department of State, and

5    then there would be an agreement as to whether or

6    not it should be referred from the Department of

7    State to the Attorney General's Office.  And that

8    is governed by the referral provision in 97.0575.

9        Q    What kinds of cases related to 3PVROs

10   would you refer to a State Attorney's Office?

11       A    Well, it would only be a criminal

12   allegation because, again, the statute says that

13   we can refer the scenario we were talking about

14   earlier, the fine issue, we can refer that to the

15   Attorney General's Office for civil enforcement.

16   The only allegation regarding third-party voter

17   registration organizations that would initiate

18   with my office and end up in the State Attorney's

19   Office, you know, the respective State Attorney's

20   Office, would be criminal allegations only.  There

21   would not be civil allegations attached to it.

22       Q    And have you made any such referrals to

23   State Attorney's Offices related to criminal

24   conduct of 3PVROs?

25       A    I personally have not referred a

1    specific -- a 3PVRO specific case to a State

2    Attorney Office.

3         Q    And so I think you've answered this in

4    part already, but just to then ask about the

5    Office of the Attorney General, separate from what

6    you have already testified to, are there any other

7    types of referrals you had made to the Office of

8    the Attorney General?

9         A    Yes.

10        Q    What other kinds of matters related to

11   3PVROs?

12        A    The Office of Statewide Prosecution is an

13   office within the Attorney General's Office, and

14   so we would refer criminal allegations to the

15   Office of Statewide Prosecution.

16        Q    And have you made any referrals to the

17   Office of Statewide Prosecution related to 3PVROs?

18        A    Yes.

19        Q    And what were the allegations in that

20   matter?

21        A    I'm going to say on a general level

22   because it's an ongoing investigation, but theft

23   of personal information.

24        Q    Do you understand where the theft of the

25   personal information was alleged to have occurred

1    from?

2         A    What do you mean where from?

3         Q    Do you have an understanding of whether

4    the personal information that was alleged to have

5    been stolen came from a voter registration

6    application?

7         A    So as in the voter registration

8    application was given to the third-party voter

9    registration organization agent and then they

10   stole the information from that application?

11        Q    Yes, that's my question.

12        A    No.  This had to do with a fraudulently

13   filled out application.

14        Q    Okay.  Thank you.  That is helpful to

15   clarify.  I have what I think are going to be two

16   very quick topics, so if it is okay with you, we

17   can tackle those quickly and then take another

18   short break.  Does that work?

19        A    I'm okay with that, yes.

20        Q    We will look at Topic 7, which I think

21   you've already answered so I will just make sure.

22   Topic 7 reads:  "Any instances of alleged,

23   suspected, or confirmed unlawful conduct that were

24   reported to or by, referred to or by, investigated

25   by, or otherwise handled by the Secretary,

1   including the Office of Election Crimes and

2   Security, involving noncitizens mishandling voter

3   registration applications."

4          The first question is, did you prepare to

5   testify about this topic?

6       A    Yes, I did.

7       Q    And did you do anything different to

8   prepare than what you've already testified to?

9       A    No.

10      Q    And I believe you have already answered

11  this question in the course of discussing State

12  interests, so my question is just are there any

13  instances of alleged suspected or confirmed

14  unlawful conduct that were reported to or by,

15  referred to or by, investigated by, or otherwise

16  handled by the secretary, including OECS involving

17  noncitizens mishandling voter registration

18  applications that you haven't already discussed

19  today?

20      A    Again, I would point to our filings and

21  my testimony today, my prior testimony today.

22      Q    Okay.  So just to answer my question,

23  nothing else to disclose responsive to this topic

24  that you can think of sitting here?

25      A    Again, I would point you to our filings

1    and my prior testimony.

2         Q    Okay.  We will take a look at Topic 8,

3    which I think will be similar.  "Any instances of

4    alleged, suspected, or confirmed unlawful conduct

5    that were reported to or by, referred to or by,

6    investigated by, or otherwise handled by the

7    Secretary, including the Office of Election Crimes

8    and Security, involving alleged, suspected, or

9    confirmed unlawful conduct relating to identity

10   theft or other information security breaches from

11   information retained from voter registration

12   applications."

13        So my question is, again, is there any

14   instance responsive to this topic that we haven't

15   already discussed today?

16        A    Is there any interest?

17        Q    Instance.

18        A    Instance.  Is there any additional

19   instance of any of these --

20        Q    I can read it again.  I was just trying

21   to save having to hear it twice, but, yes, any

22   instance as it relates to Topic 8.

23        A    I would point you to our production.

24        Q    So nothing else to testify to sitting

25   here?

1        A     Again, I would point you to our

2   production.

3        Q     To answer my question, you don't have

4   anything else responsive to testify sitting here?

5        A     I would point you to my prior testimony

6   and our production.

7        Q     Are you refusing to answer my question of

8   whether you have anything else to testify sitting

9   here?

10       A     Again, I'm happy to answer questions

11  regarding any instances you want to discuss, but

12  have we in this deposition discussed every single

13  possible instance?  No.

14       Q     Every instance that you are familiar with

15  is my question.

16       A     Without any specification of a specific

17  time period you're talking about, I don't think I

18  can answer the question comprehensively for you.

19       Q     I'm happy to break down the time period.

20  So starting with when you first started working

21  for the Department of State to today, do you have

22  any other instances as it relates to Topic 8 of

23  unlawful conduct related to identity theft or

24  information security breaches by 3PVROs that you

25  haven't already discussed today?

1       A    We do have ongoing and active

2  investigations, yes.

3       Q    There was one you just mentioned;

4  correct?

5       A    Yes.

6       Q    Are there any others?

7       A    Yes.

8       Q    And what are those instances?

9       A    I'm not going to comment on specific

10 details of active investigations.

11      Q    But your testimony is that they relate to

12 identity theft or information security breaches by

13 3PVROs?

14      A    Yes.

15      Q    Are these investigations going to be

16 included in the next version of OECS' annual

17 report?

18      A    Yes.  The annual report -- the annual

19 report would contain -- would contain the

20 information that the statute requires us to report

21 to the legislature, yes.

22      Q    And when is the next version of OECS'

23 annual report going to be published?

24      A    Our statutory deadline is January 15.

25      Q    So do you anticipate that information

1  related to investigations of 3PVROs and misconduct

2  related to identity theft or information security

3  breaches will be included in the January 15, 2024,

4  report?

5       A    Of those cases that our office has, the

6  report will certainly reflect the statutorily

7  required information regarding those cases; yes.

8       Q    How many cases are you referring to?

9       A    Well, our office just surpassed 4,100

10  complaints regarding any allegation in violation

11  of the Election Code, so I can't give you a

12  specific number, but we certainly have ongoing

13  active investigations regarding these instances.

14       Q    My question is specifically related to

15  identity theft or information security breaches by

16  3PVROs or their agents.  How many ongoing cases do

17  you have related to that particular issue?

18       A    When you say "cases," do you mean the

19  number of applications that were fraudulently

20  filled out or number of victims?  I mean, what --

21  how would you define a case I guess?

22       Q    How many separate 3PVROs are you

23  investigating for issues related to identity theft

24  or information security breaches?

25       A    How many separate 3PVROs?

1        Q     Yes.

2        A     How many separate 3PVROs?  Probably --

3    probably five.

4        Q     And how many voter registration agents

5    are you investigating for issues related to

6    identity theft or other information security

7    breaches.

8        A     I don't have that specific number because

9    of the organizations that we're investigating.

10   Some of the complaint packages are pretty small

11   and then some of them are very large batches where

12   several different voter registration agents

13   collected and handled these applications.

14       Q     Have any of these investigations

15   concluded?

16       A     No.  We're scheduling them now.  No.

17   They're still ongoing.

18       Q     And only one of the five 3PVROs

19   investigations has been referred to the Office of

20   Statewide Prosecution; is that accurate?

21       A     You're saying have all the investigations

22   regarding the five third-party voter registration

23   organizations, all the investigations I'm

24   discussing now, have they all been referred to the

25   statewide prosecutor?

1    Q    I said my understanding was only one was

2    referred to the statewide prosecutor; is that

3    accurate?

4    A    Ever?

5    Q    Of the ones we are discussing right now,

6    yes.

7    A    Of the five organizations we're

8    discussing now, no, not only -- there has been

9    more than one.

10    Q    How many?

11    A    Again, which time period are you

12    discussing?  The ones that since I joined the

13    office?

14    Q    Yes, any that you have knowledge of as

15    responsive to Topic 8.

16    A    Well, let's see.  Any that are responsive

17    to Topic 8.  In Charlotte and Lee Counties there

18    were five individuals charged and convicted of

19    felony theft of personally identifiable

20    information that were acting as voter registration

21    agents.  And there are certainly -- you know,

22    those five.  There are other individuals that are

23    being investigated now, but as far as -- you know,

24    I don't have insight into every investigation

25    going in every State Attorney Office.  So I can't

1    give you a specific number in terms of results.

2        Q    You were asked to testify about instances

3    or investigations within the Department of State

4    and OECS; is that correct?

5        A    That's what Topic 8 is; yes.

6        Q    So speaking on behalf of the Department

7    of State and OECS, are you aware of how many of

8    those investigations have been referred to the

9    Office of Statewide Prosecution?

10       A    Since I have been with OECS, I am aware

11   of two.

12       Q    Is only one of those two investigations

13   ongoing currently?

14       A    You know, in terms of the current status

15   I would defer you to a Statewide Prosecutor

16   Office.

17       Q    Have the 3PVROs that are being

18   investigated for issues related to identity theft

19   or other information security breaches been

20   notified of these issues?

21       A    I have not notified them of our

22   investigations, no.

23       Q    Is there a reason that you haven't

24   notified them so that they might be able to

25   alleviate or correct any issues?

1          A     The office generally doesn't provide any

2     comment regarding ongoing criminal investigations.

3          Q     Do you believe it would be in voters'

4     best interests to notify the 3PVRO if there's

5     issues of use of voter information at a certain

6     3PVRO?

7                MR. JAZIL:  Object to form.

8                But you can answer.

9          A     So you're asking me essentially should I

10    notify them and see if there is an attempt to

11    cure?

12         Q     Or the ability to cure if they're made

13    aware of the information.

14         A     I guess I don't follow your question

15    because I don't know how you cure theft of

16    personally identifiable information that there is

17    a fraudulent actor somewhere that stole

18    information and somehow pushed it along.  So once

19    a voter registration application is fraudulently

20    submitted using stolen application, how do you

21    cure that?  I just don't follow your question.  I

22    don't know how you would undo the submission of a

23    false voter registration application.

24         Q     Sure.  If you informed the 3PVRO which

25    voter registration agents submitted the fraudulent

1    application, a 3PVRO could, for example, terminate

2    a relationship with that voter registration agent;

3    correct?

4        A    Could they terminate it?  I mean, I can't

5    speak to what a third-party voter registration

6    organization would do.  I don't know if there is

7    one size fits all.

8        Q    My question is just whether it's possible

9    that if they were made aware of fraudulent

10   activity by a voter registration agent, the 3PVRO

11   could choose to no longer engage with that voter

12   registration agent.

13       A    Is it possible?  Generally, perhaps.

14   But, again, I just can't speak to how specifically

15   every third-party voter registration organization

16   runs.

17       Q    And if you informed a 3PVRO of how

18   certain voter information was accessed, could the

19   3PVRO change its practices about how information

20   is stored?

21       A    Again, you're asking could, could they.

22   I can't speak for the third-party voter

23   registration organizations.

24       Q    Do you have any understanding of how

25   3PVROs store voter information currently?

1          A      I don't know if there is a

2     one-size-fits-all approach.

3          Q      Do you have any understanding of how any

4     particular 3PVROs stores voter information

5     currently?

6          A      Well, based on investigations, I have an

7     understanding as to how the information was stored

8     in those investigations.

9          Q      Do you know one way or the other whether

10    a certain 3PVRO used physical lockboxes to store

11    voter registration applications?

12         A      I assume it could be possible.

13         Q      Do you know one way or the other whether

14    certain 3PVROs limit which personnel have access

15    to voter information within the organization?

16         A      Again, you know, with these possibilities

17    I can't speak to specific third-party voter

18    registration organizations.  So I don't -- I don't

19    have -- I don't know how each one stores

20    information.

21         Q      So you don't know one way or the other

22    about what other methods 3PVROs might use in order

23    to secure voters' information?

24         A      Oh, there could be any variety of ways

25    they store information.

1      Q    Okay.

2           MS. JOHNSON:  I think now is another good

3      time for a break.  We can go off the record.

4           (A recess was taken.)

5      BY MS. JOHNSON:

6      Q    So just briefly to return to Topic 7, I

7      wanted to ask does the State of Florida currently

8      make citizenship determinations to your knowledge?

9      A    Does the State of Florida make

10     citizenship determinations in what regard?

11     Q    Does the State of Florida have the

12     ability to discern whether or not someone is a

13     United States citizen?

14     A    As I said earlier in the deposition, as

15     I'm here representing Office of Election Crimes

16     and the Department of State, if approved, we can

17     access the U.S. Customs and Immigration Service

18     database, but that access is controlled by the

19     federal agency.  So in terms of who has access and

20     who doesn't, I would defer you to the United

21     States Customs and Immigration Service.

22     Q    So is it accurate to say that you rely on

23     the federal government in determining an

24     individual's citizenship status?

25     A    Well, that's not the only way we can

1   determine someone's citizenship, but if there is

2   an allegation of a noncitizen, then our only

3   attempt to verify that allegation would be to

4   access the federal database I keep referencing.

5       Q    Are you aware of whether a third-party

6   voter registration organization has access to the

7   federal database you've referenced?

8       A    I would defer you to those organizations

9   and I would defer you to the United States Customs

10  and Immigration Service.

11      Q    Do you have an understanding of whether

12  Florida plans to provide access to third-party

13  voter registration organizations to the federal

14  database?

15      A    I can speak to the Department of State.

16  I can't speak to the rest of the State of Florida.

17      Q    Do you have any understanding of whether

18  the Department of State plans to provide access to

19  third-party voter registration organizations to

20  the federal immigration database?

21      A    That's not ours to grant because the

22  process of gaining that access is the person who

23  wants access sends in the requisite forms to

24  request access and then access is approved by the

25  Customs and Immigration Service.  So we can't

1   delegate access to a federal database.

2       Q    Okay.  Topic 9 I'm going to skip for now

3   because I understand other plaintiffs' counsel

4   will cover that topic with you.  So I will move on

5   to Topic 10.

6       A    Uh-huh.  Sorry; yes.  I didn't mean to

7   say uh-huh.

8       Q    I will read it first.  "Any instances of

9   alleged, suspected, or confirmed unlawful conduct

10  relating to a request for a vote-by-mail ballot

11  for a non-family member in Florida that were

12  reported to or by, referred to or by, investigated

13  by, or otherwise handled by the Secretary."

14           Did you prepare to testify about this

15  topic?

16      A    Yes, I did.

17      Q    And did you do anything different than

18  what you've already described in preparation to

19  testify about this topic?

20      A    No, ma'am.

21      Q    Do you consider improper absentee ballot

22  requests to be a problem in Florida?

23      A    I'm sorry; you said improper or proper?

24      Q    Improper.

25      A    Improper.  Yes, it's a problem in

1    Florida.

2        Q    Are you aware that the January 15, 2023,

3    OECS report reflects only eight issues related to

4    unwanted or improper use of absentee ballots?

5        A    Only eight?  If that's what the report

6    says, then that's accurate.

7        Q    Do you have any knowledge about whether

8    these eight instances involve someone

9    misrepresenting that they were assisting a voter

10   in requesting an absentee ballot?

11       A    Further investigation by a sworn

12   investigator could certainly uncover that fact.

13   These investigations start with the voter

14   receiving a vote-by-mail ballot and then informing

15   the supervisor that they never requested one.

16       Q    So my question is whether you have any

17   knowledge of whether these eight instances

18   involved a misrepresentation that an individual

19   was helping someone else in requesting an absentee

20   ballot.

21       A    Was helping someone else?

22       Q    Yes.

23       A    They wouldn't proceed and keep open an

24   active criminal investigation if there was consent

25   and that consent was legal to request a

1   vote-by-mail ballot.

2        Q    And my question was about whether these

3   instances involved a misrepresentation that one

4   person was helping another person in obtaining an

5   absentee ballot.

6        A    What type of misrepresentation?

7        Q    They were not in fact authorized or the

8   voter did not give the consent to assist them in

9   requesting an absentee ballot.

10       A    The voter not giving consent to request

11  that vote-by-mail ballot is one of many reasons

12  why that criminal case would proceed.

13       Q    And do you have any understanding of

14  whether the eight instances related to absentee

15  ballots in the January 15, 2023, OECS report were

16  related to this kind of conduct?

17       A    As I keep saying, if the voter did not

18  provide consent for someone else to request a

19  vote-by-mail ballot for them, that is one of many

20  ways these criminal cases would stay open.  That's

21  my understanding.

22       Q    And my question is whether the eight

23  specific cases referenced in the January 15, 2023,

24  report related to an unauthorized request by

25  another on behalf of a voter for an absentee

1    ballot.

2         A    These cases likely would not originate

3    without the voter saying I didn't request a

4    vote-by-mail ballot.  So that implies there

5    wouldn't be consent.

6         Q    An individual could request a ballot for

7    someone else in more ways than one; is that

8    correct?  Fraud can occur in multiple ways related

9    to absentee ballots?

10        A    Yes.

11        Q    Are you aware that Florida law provides

12   that any elector applying to cast a vote by

13   mail-in ballot who requires assistance to vote by

14   reason of blindness or disability or inability to

15   read or write may request the assistance of some

16   person of his or her own choice?

17        A    I would defer you to the statute as to

18   how it's specifically written.  There are ways

19   where someone can request a vote-by-mail ballot

20   for someone else, yes.

21        Q    And so I was quoting Florida Statute

22   Section 101.0513 when I was reading that language.

23   So would you agree that that is something that

24   Florida law provides?

25        A    Yes.

1        Q     Are you aware that federal law also

2    provides that, quote, any voter who requires

3    assistance to vote by reason of blindness,

4    disability, or inability to read or write may be

5    given assistance by a person of the voter's

6    choice, end quote?

7        A     I don't have the statute in front of me

8    so I can't say verbatim, but I believe that is

9    from the National Voter Registration Act, yes.

10       Q     Would you agree that not every voter has

11   an immediate family member that can assist them

12   with requesting an absentee ballot if they need

13   it?

14       A     How do you define immediate family

15   member?

16       Q     The same way that it is defined in

17   Florida Statute Section 101.051.

18             I'm sorry; that's not the right section.

19   In the vote-by-mail provision as challenged in

20   this lawsuit.  And I'll grab the exact quote.

21       A     I was just turning the volume up.  That's

22   why I was touching the computer.

23       Q     So Florida Statute 101.62 is one of the

24   provisions that plaintiffs challenge.  Are you

25   aware of that?

1          A    Yes.

2          Q    And in that provision it states:  The

3    supervisor shall accept a request for a

4    vote-by-mail ballot only from a voter or, if

5    directly instructed by the voter, a member of the

6    voter's immediate family or the voter's legal

7    guardian.

8               So my question is whether you're aware

9    that some voters might not have an immediate

10   family member or legal guardian to assist them as

11   it's defined in Section 101.62.

12         A    I'm not personally aware of anyone.  I'm

13   not personally aware of anyone.

14         Q    Do you believe it's possible that a voter

15   doesn't have an immediate family member that could

16   assist them in requesting a vote-by-mail ballot?

17         A    Is it possible that there is an eligible

18   voter without a grandparent through grandson or

19   the equivalent from a spouse or a legal guardian?

20   I can't testify that that is a 100 percent

21   impossibility.

22         Q    And if a voter in that situation wanted

23   to request a vote-by-mail ballot, do you believe

24   they would still have a right to do so?

25         A    If they were not in compliance with the

1    law -- with effective laws at the date of request,

2    then that would make a request outside the scope

3    of the law.

4         Q    And do you believe that causes a conflict

5    with the two statutes related to access for

6    disability that I just read?

7         A    No.

8         Q    Why not?

9         A    Because individuals when we talk about --

10   was that just my speaker?

11        Q    I think so.

12        A    Okay.  When we talk about a request for a

13   vote-by-mail ballot, we're talking about one

14   specific way of voting.  So while the challenged

15   provision clarifies who is an immediate family

16   member and who is a legal guardian, I can't tell

17   you how many people in the State of Florida might

18   not meet that specific scenario.  But the State of

19   Florida also provides for the ability for that

20   person to be escorted by an individual, assuming

21   they meet the requirements and fill out the right

22   ADA form, to assist that person at least in

23   getting inside the polling place to the point

24   where they can fill out a ballot.

25        Q    So is your testimony that a voter who

1    does not have an immediate family member to assist

2    them in requesting a vote-by-mail ballot would

3    therefore need to vote in person?

4        A    No, because even if you don't have an

5    immediate family member as per the challenge

6    definition, you could still utilize a legal

7    guardian.

8        Q    So is your testimony that an individual

9    who does not have an immediate family member or a

10   legal guardian to assist them in requesting a

11   vote-by-mail ballot would therefore need to vote

12   in person?

13            MR. JAZIL:  Counsel, I'm sorry, I'm a

14   little confused by the question.  Are you talking

15   about a disabled voter who does not have an

16   immediate family member or a legal guardian?

17       Q    My question right now is a voter, but I

18   can ask a clarifying question if necessary.

19       A    If we're talking about any voter, then,

20   yeah, I think any voter who doesn't meet that

21   specific scenario and doesn't otherwise request a

22   vote-by-mail ballot themselves, if they don't

23   request it by themselves, then they would go in

24   person.

25       Q    And is your answer the same for a

1   disabled voter?

2       A   Well, with a disabled voter they could be

3   escorted in.  So they can be escorted into the

4   in-person polling place.  So no, because they can

5   receive assistance getting into the voting booth.

6       Q   My question is if a disabled voter does

7   not have an immediate family member or a legal

8   guardian that can assist them in requesting a

9   vote-by-mail ballot, is your testimony that the

10  disabled voter would therefore need to go vote in

11  person?

12      A   No, because they could also request it

13  themselves.

14      Q   If a disabled voter is unable to request

15  a vote-by-mail ballot themselves and they do not

16  have access to an immediate family member or a

17  legal guardian to assist them, is your testimony

18  that the disabled voter would need to vote in

19  person?

20      A   Not alone, but likely, yes.

21      Q   Moving on to Topic 11, it states:  "The

22  Secretary's definition of 'collecting' and

23  'handling' and 'voter registration application' as

24  used in the Citizenship Requirement and the bases

25  for that definition."

1          Did you prepare to testify on that Topic

2    11?

3         A    Yes.

4         Q    And did you do anything different than

5    what you have already testified to to prepare to

6    testify about Topic 11?

7         A    No.

8         Q    Let's take a look at Section

9    97.0575(1)(b) -- I'm sorry; (1)(f).  And I know

10   you had it in front of you or we can share it on

11   the screen if that's helpful.

12        A    Whichever you prefer.  If you want to

13   share it, I'll read it off the screen.

14        Q    Okay.  We'll do that.

15        A    Thank you.  This appears to be a draft.

16   Do you mind if I just reference the statute in

17   front of me?

18        Q    Sure, you're welcome to.  This is, I will

19   represent to you, the final version of SB 7050

20   which shows the line changes that were made to the

21   relevant statutes, but happy to have you reference

22   your version of the statute as well.  It should be

23   the exact same thing.

24        A    Okay.  Thank you.  I'm going to reference

25   this.

1      Q    So looking at 97.0575(1)(f), what do you

2    understand the word "collecting" to mean in the

3    context of prohibiting noncitizens from collecting

4    voter registration application materials?

5      A    I would point you to the implementing

6    regulation.  But, generally speaking, it turns on

7    taking possession of that voter registration

8    application from the voter applicant or the voter

9    who is updating the registration.

10     Q    And what do you understand the word

11   "handling" to mean in the same statutory

12   provision?

13     A    Again, for the specific definition I

14   would point to the implementing regulation.

15     Q    Do you believe there is a single

16   definition of the word "handling" as used as a

17   verb?

18     A    You said a single?

19     Q    Yes.

20     A    Again, I don't know -- for the definition

21   I would point you to the implementing regulation.

22     Q    And my question was whether you believe

23   there's a single definition of the word "handling"

24   as it's used as a verb.

25     A    One single definition of handling in the

1    English language?

2        Q    Correct.

3        A    I'm not here as a linguist, you know, an

4    expert on that topic, but, generally speaking, I

5    would point you in terms of interpretation of

6    collecting or handling to the implementing

7    regulation.

8        Q    And, again, that's not my question.  My

9    question is whether you believe that there is a

10   single definition of "handle" as it's used as a

11   verb.

12       A    Well, the modification or differences

13   wouldn't be great.  I'm sure that they could be

14   slightly different regarding -- or, excuse me, you

15   know, hypothetically speaking, depending on what

16   dictionary you look at.

17       Q    And are you familiar with leading

18   dictionaries that define "to handle" as to have an

19   overall responsibility for supervising?

20       A    I think it's possible, yeah.  But, again,

21   you're asking a hypothetical if there's a

22   dictionary out there.  I didn't study dictionaries

23   in preparation for today.

24       Q    My question there wasn't hypothetical; it

25   was whether you're familiar with a leading

1    dictionary's definition of "to handle" as to have

2    an overall responsibility for supervising.

3         A     If I'm familiar of a leading dictionary?

4         Q     Yes.  With a leading dictionary's

5    definition of "to handle" as to have an overall

6    responsibility for supervising?

7         A     What is a leading dictionary?

8         Q     Miriam Webster Dictionary as cited in

9    briefing related to the preliminary injunction.

10        A     If that is Miriam Webster's definition,

11   then yes.

12        Q     Do you agree with that definition of

13   "handle"?

14        A     It's not my place to agree with Miriam

15   Webster's definition.

16        Q     Are you aware that Florida statutes

17   define "handle" differently?

18        A     There could be a statute that does.  I

19   don't -- I don't have memorized verbatim every

20   single Florida statute that's effective on the

21   books.

22        Q     Under the citizenship provision of SB

23   7050 can noncitizens physically touch blank voter

24   registration applications?

25        A     Hypothetically?

1     Q    No.  I'm asking if this provision were in

2     effect, can noncitizens physically touch blank

3     voter registration applications?

4     A    Could a noncitizen touch a voter

5     registration application?

6     Q    That is blank.

7     A    That are blank.  One legal way for them

8     to do it is to go online and just print out a

9     voter registration application.  That in and of

10    itself I do not believe is an illegal act.

11    Q    What if they are in the field and

12    canvassing and take physical possession of a stack

13    of blank voter registration applications, is that

14    something that would violate this provision of SB

15    7050?

16    A    I would need to know more.  Where are

17    they receiving these voter registration

18    applications from?  When you say "canvassing," I

19    guess I would need to know more details on this,

20    more facts on this hypothetical to then give you

21    an answer.

22    Q    Can noncitizens move completed voter

23    registration applications around within their

24    organization's field office?

25    A    Could noncitizens move voter registration

1    applications around within their organization's

2    office?

3        Q     Yes, without violating this provision of

4    SB 7050.

5        A     When we say "move," is it in their

6    possession?

7        Q     Physically touching the applications,

8    yes.

9        A     May I reference the statute?  I'm trying

10   to get a hold on this.

11       Q     Definitely.

12       A     I have the statute in my hand.  May I now

13   reference the implementing regulation?

14       Q     Yes, absolutely.

15       A     Thank you.  And in this hypothetical,

16   please forgive me, these are completed?  Are these

17   blank or not blank?

18       Q     Not blank, completed.

19       A     I don't think necessarily it does in this

20   specific hypothetical.

21       Q     And what's your basis for saying not

22   necessarily?

23       A     Well, there's a carveout in the

24   implementing regulation regarding -- I think

25   there's a possible scenario -- well, no.  I think

1    in that -- actually, if I may, I'd like to amend

2    my answer.  I do think in that scenario it would

3    likely violate the statute in this hypothetical,

4    yeah.

5         Q    Can noncitizens be in the same office

6    with completed voter registration applications?

7         A    Could they just be in the office?  Are

8    they -- it depends on what they're doing in the

9    office.

10        Q    So why does it depend?

11        A    Well, sorry, I just glanced down at the

12   statute.  That's what I was looking at.

13        Q    Okay.

14        A    I mean, the statute governs actions

15   regarding a third-party voter registration

16   organization agent.  So in this scenario -- I

17   mean, take, for example, I'm in I think it's a

18   six-story building.  Let's say I was conducting

19   third-party -- I was conducting voter registration

20   activities on behalf of a third-party voter

21   registration organization.  If a noncitizen were

22   just in this building, no, that fact in isolation

23   does not violate the statute.

24        Q    What about if they're in the same room

25   with a set of completed voter registration

1     applications?

2          A     In this hypothetical are they -- are they

3     collecting and handling voter registration

4     applications?

5          Q     That's my question for you, is whether

6     being in the same room working for a third-party

7     voter registration organization that contains a

8     set of completed voter registration applications

9     would be a violation of the section of SB 7050.

10         A     Do they conduct voter registration

11    activity for the third-party voter registration

12    organization?

13         Q     Let's say no, they have another role with

14    the organization.

15         A     If they are in the same room, they are

16    not affiliated with the third-party voter

17    registration organization, and they're not

18    collecting or handling voter registration --

19    nonblank voter registration applications, just in

20    that hypothetical, being in the same room?  No,

21    that does not violate, in my opinion, SB 7050.

22         Q     Does your answer change if the individual

23    is associated with the third-party voter

24    registration organization?

25         A     Well, if -- likely, yes.  I mean --

1   especially if they have an affirmation on file

2   that -- well, even if there is not an affirmation,

3   that would make the organization liable for a fine

4   as listed in the statute.

5       Q    Could noncitizens view scans of completed

6   voter registration applications?

7       A    Again, if they are in the room, not

8   affiliated with a third-party voter registration

9   organization, and a scanned application is, you

10  know, let's say on this big screen that I'm

11  looking at, that hypothetical alone would not

12  violate SB 7050.

13      Q    What if a noncitizen who is associated

14  with a third-party voter registration organization

15  is viewing the scans of the applications in order

16  to ensure that they're complete?

17      A    Well, it depends on why they're viewing

18  these scans.

19      Q    What if it's for the reason I said, that

20  they're attempting to ensure that the voter

21  completed all fields of the application?

22      A    Well, if they're doing a quality check,

23  then they've taken possession of that application

24  from the voter, which would then, yes, violate, SB

25  7050 in my opinion.

1        Q      What if a noncitizen associated with a

2    third-party voter registration organization views

3    a scan of a voter registration application in

4    order to call the voter and remind them to vote?

5        A      In order to remind them to vote.

6              May I reference the statute again?

7        Q      Absolutely.

8        A      I think that would, yes, because they're

9    still acting on behalf of the third-party voter

10   registration organization.

11       Q      If a noncitizen was cleaning a 3PVRO's

12   office and bumped into a stack of completed voter

13   registration applications and picked them up to

14   put them back on the table, would that violate

15   this portion of SB 7050?

16       A      No, I don't think so because they're

17   cleaning, they're not acting on behalf of the

18   third-party voter registration organization.

19   Third-party voter registration organizations are a

20   statutory creation that can be anything from just

21   one person, Andrew Darlington, to a large group of

22   individuals across the State for the purpose of

23   conducting voter registration activities.

24       Q      Does your answer change if the

25   third-party voter registration organization pays

1    the individual who is cleaning the office?

2         A    I don't -- you know, I don't know how

3    many third-party voter registration organizations

4    are registered to conduct other lines of business

5    or otherwise employ others for the purpose of

6    that.  Hypothetically could it?  Possibly.  Yes,

7    possibly.

8         Q    What is the consequence for a 3PVRO if a

9    noncitizen is found to handle the voter

10   registration application?

11        A    Is the handling on behalf of the

12   third-party voter registration organization?

13        Q    Yes.  So put differently what is the

14   consequence for a 3PVRO if they are found to

15   violate this section of SB 7050?

16        A    They're liable for a fine.

17        Q    And how much is that fine?

18        A    $50,000.

19        Q    Do you agree that $50,000 is a large

20   fine?

21        A    Well, large in what context?

22        Q    Yes or no.  In your opinion is $50,000 a

23   large fine?

24        A    Well, again, it relates to just generally

25   fines out there or the statutes?  I don't know all

1    the fines that exist.  I mean, is 50,000 more than

2    50 bucks a day or something like that?  Yeah,

3    likely.

4         Q    It's $50,000.

5         A    Okay.  But large, I mean, you know, in

6    sum, I don't know how you define large.  Is it a

7    chunk of change?  Yes.

8         Q    Is it similar to the average household

9    income in the United States?

10         A    In preparation for today's testimony I

11    did not memorize the average income in the United

12    States.

13         Q    And you don't have any estimate for the

14    rough estimate for the average household income in

15    the United States?

16         A    Where this line of questioning is going,

17    I assume we're somewhere around it.

18         Q    Do you have a sense of whether $50,000 is

19    larger than the annual budget for some 3PVROs in

20    Florida?

21         A    I don't track financial statements from

22    third-party voter registration organizations.

23         Q    So it's fair to say you don't know one

24    way or the other?

25         A    Yeah, that's correct.  I don't have

1    insight into the finances of third-party voter

2    registration organizations.  And, truthfully, I

3    don't think outside of -- you know, I don't think

4    I have the statutory authority to gain insight

5    into that.

6         Q    Do you have any idea where the $50,000

7    figure for fines in violation of this provision

8    came from?

9         A    I would point you to the public record

10   regarding the debate surrounding this provision in

11   the legislature.

12        Q    Do you have an understanding of how

13   3PVROs can still employ noncitizens and still be

14   in compliance with this portion of Florida law?

15        A    Well, I don't want to provide a

16   hypothetical that potentially violates other

17   federal or state laws.  So I don't know -- you

18   know, without further preparation regarding

19   employment laws, I don't know how I can give you a

20   good answer to that.

21        Q    I can amend my question.  If an

22   immigrant, a noncitizen immigrant, is legally

23   authorized to work in the United States, do you

24   have an understanding of how the 3PVRO could still

25   employ this individual and still be in compliance

1     with this portion of Florida law?

2           A     May I briefly reference the statute?

3           Q     Absolutely.

4           A     So in this scenario a third-party voter

5     registration organization employs a noncitizen who

6     is legally authorized to work.  Can there be such

7     employment where it doesn't violate this statute?

8           Q     That's my question.

9           A     Okay.  Thank you.  Yes, there is a way

10    for that to occur.  Take, for example, a large

11    organization.  You know, let's take a larger

12    organization; not a single person, but a large

13    organization in my hypothetical.  A large

14    organization can be a company already in existence

15    and in operation for other reason than voter

16    registration activities.  There is no statutory

17    provision prohibiting that company from then

18    registering as a third-party voter registration

19    organization.  And in compliance with Florida laws

20    and regulations, well, federal and Florida laws

21    and regulations, they can be both, a company or an

22    entity employing a noncitizen that is legally

23    authorized to work and separate from that

24    employment conducting voter registration

25    activities, agents of their company conducting

1    voter registration activities, that is possible,

2    yes.

3         Q    How does your answer change if it is a

4    third-party voter registration organization that

5    it's only purpose is voter registration in Florida

6    that would like to employ legally authorized

7    noncitizens but avoid liability under this section

8    of the law.  Is it possible?

9         A    If there is -- if there is employment by

10   an organization that is only a registered

11   third-party voter registration organization of a

12   noncitizen legally authorized to work?

13        Q    Yes.

14        A    Can there be such employment that it

15   doesn't violate this?  Yes, that is possible.

16        Q    And how would that work?

17        A    As long as the -- as long as the person

18   in question, not the organization, but the person

19   that organization employs, as long as they're not

20   collecting or handling voter registrations on

21   behalf of the 3PVRO.

22             So going back to one of your recent

23   hypotheticals about third-party voter registration

24   organizations being in the same room with a

25   noncitizen, it's entirely possible that there is

1   some sort of corporate entity that's in existence,

2   even if they haven't filed with the Florida

3   Division of Corporations, it's entirely possible

4   for them to have some sort of employment, in fact

5   solely proclaiming, as long as they are not

6   collecting or handling nonblank voter registration

7   applications.

8       Q    Would you agree that the safest way for

9   3PVROs to comply with this portion of SB 7050 is

10  to not employ any noncitizens at all?

11          MR. JAZIL:  Object to form.

12          You can answer if you want.

13      A    I didn't catch two words you said at the

14  beginning.

15      Q    Sure.  I said do you agree that the

16  safest way for 3PVROs to comply with this portion

17  of SB 7050 restricting collecting and handling

18  applications to citizens is not to employ any

19  noncitizens at all?

20      A    No, I do not.  And, again, I point to my

21  previous answer where there are employment

22  possibilities as long as they're not collecting or

23  handling nonblank voter registration applications

24  on behalf of the third-party voter registration

25  organization.

1        Q    Okay.  We're going to move to Topic 12.

2   And I think Fritz might take a second to put it

3   back on the screen.  I'll read it, but we can

4   verify once it is on the screen.

5            Topic 12 was:  "The Secretary's

6   definition of 'personal information' and 'in

7   compliance with this Section' as used in the

8   Information Retention Ban and the bases for that

9   definition."

10           My first question is whether you're

11  prepared to testify about Topic 12.

12       A    Yes, I am.

13       Q    And did you do anything different than

14  what you have already described to prepare to

15  testify regarding Topic 12?

16       A    No, I did not.

17       Q    Okay.  Let's look back --

18           MS. JOHNSON:  I apologize, Fritz.

19       Q    -- to the Statutory Code.  Again, you're

20  welcome to reference.  I know you have it in front

21  of you as well.

22       A    I do.

23       Q    So we are scrolling to 97.0575(7).  It's

24  just another page down.  It's actually one more

25  page.

1           There we go.

2           So my first question for you is do you

3    see where the section of SB 7050 includes the

4    terms "such as"?

5       A    Yes, I see the two words "such as" in

6    this provision.

7       Q    Do you understand the phrase "such as" to

8    mean an exclusive list?

9       A    No.

10      Q    Under SB 7050 and this provision

11   specifically, can 3PVROs retain a voter's address?

12      A    Under this provision can 3PVROs retain

13   the address?  Maybe.  If the person collecting the

14   applications is a one-person 3PVRO -- well, yeah,

15   actually I do think they could retain the address.

16      Q    And what's your basis for believing that

17   3PVROs are still able to retain addresses under

18   this provision of SB 7050?

19      A    Well, I think -- two things I'd say.  May

20   I reference the implementing regulation as well?

21      Q    Absolutely, yes.

22      A    Thank you.

23           MR. JAZIL:  There, that's the rest of it.

24      A    So your question was can they retain the

25   address?

1          Q     Yes, the voter's address.

2          A     I think they could, yes.

3          Q     And what's your basis for saying you

4    believe voter registration agents and

5    organizations could still retain a voter's

6    address?

7          A     I think they could because, first off,

8    it's not specifically excluded from the statute.

9                And, second, as long as it's, you know,

10   in one hypothetical to provide -- and I'm quoting

11   Subsection 7 of the statute -- as long as it's to

12   provide such application or information to the

13   3PVRO in compliance with this section, then I

14   think that would be -- when we say retain that

15   information, I think that's one hypothetical where

16   it would be legal or within the scope of the

17   statute.

18         Q     Could a 3PVRO retain a voter's mailing

19   address in order to send them a mailer to remind

20   them to vote?

21         A     Send them a reminder to vote.  I think

22   they could.

23         Q     What's your basis for saying that you

24   believe they could retain a voter's mailing

25   address from their voter registration application

1   in order to send them a mailer to remind them to

2   vote?

3        A    May I reference --

4        Q    Yes, absolutely.

5        A    Okay.  Thank you.

6             So I think they could, again if that

7   information is generally available to the public.

8   And so following that line, I think it's possible

9   they could if there is not another reason why, for

10  example, Florida Statute Chapter 119 would

11  prohibit, say, a property appraiser from

12  publishing that information or otherwise

13  preventing that information from being publicly

14  known.

15       Q    Are you aware of whether all mailing

16  addresses are public in Florida?

17       A    You know, for specific instances where

18  it's not public, I would point you to Florida

19  Statute Chapter 119 or any other governing rule.

20       Q    How do you understand the term "in

21  compliance with this section" as used in Florida

22  Statute 97.0575(7)?

23       A    "In compliance with this section" in

24  isolation to me --

25       Q    As used in the statute.

1      A      Right.  So those words in the statute

2  mean in compliance with Section 97.075.

3      Q      .075?

4      A      Yes.  I'm looking at the screen.  We're

5  referencing the third-party voter registration

6  organization statute; correct?

7      Q      So you believe the words "this section"

8  relate to this exact provision?

9      A      Yes, it relates to this provision.

10     Q      If a 3PVRO retains a copy of voter

11 registration applications to ensure that they can

12 follow up with voters to make sure they receive

13 their voter registration card, would that be in

14 compliance with this section?

15     A      If a person -- please say it one more

16 time; I'm sorry.

17     Q      If a voter registration agent retains a

18 copy of a voter registration application to ensure

19 that they can follow up with a voter and make sure

20 they receive their voter registration card, would

21 that be in compliance with this section?

22     A      Well, I guess -- I'm trying to answer

23 your questions.  I'm not trying to be difficult,

24 but I do have two questions for this hypothetical.

25     Q      Sure.

1       A    First, what would following up to ensure
2   the voter gets their ID card mean?
3       Q    Let's make it more specific.  Calling the
4   voter to ask if they received their voter
5   registration card.
6       A    Okay.  And in this scenario they received
7   a nonblank activity application back from the
8   voter that they're then calling?
9       Q    Yes.  They've already submitted the
10  others registration application and have retained
11  the voter's phone number to call the voter and
12  make sure they ultimately received their voter
13  registration card.
14      A    As long as that phone number is generally
15  available to the public, then I would say yes.
16      Q    How would the 3PVRO know whether the
17  phone number was generally available to the
18  public?
19      A    Yeah, I know it wasn't particularly
20  funny, but I used the phone book as an example.  I
21  don't see those anymore today so how would they
22  know?  I think legally notice in the State of
23  Florida is generally defined as there is an
24  effective law on the books.  As to whether or not
25  it's actually tied to an individual, you know, how

1    would they know if that number tied to the

2    individual is generally available to the public?

3            You know, the only way I can answer your

4    question right now is to say, you know, numbers

5    can be published on the Internet even if it's

6    illegal, so whether or not a person knows if that

7    number is generally available to the public, I

8    think it would depend on more specific instances I

9    guess.  You know, there are disclosure -- there

10   are a number of disclosure -- excuse me --

11   exemptions from public disclosure, so I point you

12   to certain specific examples to Florida Statute

13   119 for that.  But is it possible a voter

14   registration agent could access or really anyone

15   in the public access a number that shouldn't be

16   available?  It's possible.

17       Q    If a third-party voter registration

18   organization agent retains a copy of a voter

19   registration application in order to contact the

20   voter and ask them if they're interested in

21   volunteering with the organization, do you believe

22   that would be in compliance with this section?

23       A    How would they contact the voter?

24       Q    Let's say e-mail address for this

25   example.

1      A    Well, there is a possibility by e-mail if

2  they contact the individual, it would not violate

3  Florida law.

4      Q    How would the voter registration agent

5  know whether that was a violation of this

6  provision of SB 7050?

7      A    Well, how would they know in that

8  specific scenario whether or not that violates

9  this provision?  Well -- all right.  So the voter

10 registration agent acting on behalf of the

11 third-party voter registration organization for

12 this provision either copied -- they either copied

13 or retained the voter's application or personal

14 information for any reason other than to provide

15 such application or information to the 3PVRO,

16 yeah, I do think that would in fact violate this

17 section.

18          And to get to the second part of your

19 question, how would they know, again I think

20 generally -- and I'm sure there are exceptions;

21 I'm no constitutional scholar here, but I think,

22 generally speaking, in the United States of

23 America, including in Florida, if a law is on the

24 books, then generally notice is equally satisfied.

25     Q    What are the consequences for an

1    individual if they are found to retain personal

2    information that is not in compliance with Section

3    97.0575(7)?

4         A    Of a person?

5         Q    Yes.

6         A    Sorry; can you say that again?

7         Q    Sure.  What are the consequences

8    associated with a violation of Section 97.0575(7)?

9         A    The consequences are that a felony of the

10   third degree, I'm referencing what you have on the

11   screen here, but a person commits a felony of the

12   third degree and it's punishable by the different

13   criminal sentencing statutes.

14        Q    Do you know how many years in prison a

15   conviction under 97.0575(7) can carry?

16        A    Well, generally speaking, in Florida the

17   maximum exposure for a third-degree felony without

18   any sort of criminal enhancement in the different

19   ways sentences can be enhanced, the maximum

20   exposure can be five years, but there's no -- you

21   know, it depends on a number of things.  And so

22   the maximum exposure of a third-degree felony in

23   isolation without any other enhancements can be

24   five years.

25             So it could be anything from pretrial

1    diversion, where the case is dismissed upon the

2    completion of certain terms, to the necessary five

3    years.

4        Q    Do you agree that a felony with the

5    possible sentence of five years in prison is a

6    serious offense?

7        A    Well, criminal law certainly

8    differentiates between felonies and misdemeanors,

9    and sentences for felonies are greater than

10   sentences for misdemeanors.

11       Q    Would you want to be a hundred percent

12   certain of the meaning of words within a statute

13   if the potential consequences for getting it wrong

14   was five years in prison?

15       A    I think that the statute makes clear

16   enough a delineation between what's legal and

17   what's not.  So I'm happy to -- we all have as

18   lawyers legal philosophies out there, but as it

19   relates to this provision, this is a clear

20   delineation between what's a crime and what's not.

21       Q    Okay.  We'll move on to Topic 13, and

22   we'll get that on the screen, but I will go ahead

23   and read it.  It is:  "The role of the Secretary,

24   if any, in the enactment and passage of the

25   Challenged Provisions."

1          What did you do to prepare to testify

2     about Topic 13?

3          A    Nothing different from what I've

4     testified so far.

5          Q    Are you prepared to testify about this

6     topic?

7          A    Yes.  For Topic 13, yes.

8          Q    Was the Secretary of State's Office

9     consulted during the drafting of SB 7050?

10         A    Consulted by who?

11         Q    Anyone in the legislature that was

12    involved in drafting.

13         A    In what way?  I mean, as in did someone

14    from the legislature initiate the conversation

15    regarding SB 7050?

16         Q    I'm not asking necessarily who initiated

17    it, but was there consultation with the Secretary

18    of State's Office when SB 7050 was being drafted?

19         A    Well, there are certainly communications

20    between the Department of State and the

21    legislature even speaking outside of just SB 7050.

22         Q    I'm asking specifically about 7050.  Are

23    you aware of whether there were conversations

24    between the Secretary of State's Office and the

25    legislature about the drafting of SB 7050?

1      A     That answer applies -- I'm sorry; I

2   shouldn't have said outside of SB 7050.  That

3   answer applies to SB 7050 as well.

4      Q     And what was the substance of those

5   conversations?

6      A     Again, I'm not being difficult.  It

7   depends on who you're asking.  We're a large

8   Department so it depends on -- if you're talking

9   about the Secretary's public testimony at any

10  time, I would point you to the legislative record.

11  But if you have a specific instance of a

12  communication, something like that, I can try to

13  better answer you.

14     Q     Yeah, I'm not asking about public

15  communications.  I'm asking about any

16  conversations that happened between the Secretary

17  of State's Office and the legislature related to

18  the drafting of SB 7050.

19     A     Conversations occurred, yes.

20     Q     And what was the substance of those

21  conversations?

22     A     The substance of conversations differed

23  regarding who was talking, but the conversations

24  that occurred between the Department and the

25  legislature were involving the challenged

1   provisions.

2       Q    And what specifically about the

3   challenged provisions was discussed during those

4   conversations?

5       A    Again, which -- let me take it a step

6   back from specific conversations.  What type of

7   conversations are you asking that occurred?  And

8   then I can try to better provide the substance.

9       Q    Sure.  Anything that relates to the

10  drafting of the challenged provisions within SB

11  7050.

12      A    The substance, generally speaking,

13  included the challenged provisions.

14      Q    What advice did the Secretary of State's

15  Office provide about the drafting of the

16  provisions in SB 7050?

17      A    Well, the Department of State as a whole

18  does provide legislative proposals.  So regarding

19  SB 7050 the proposals included the challenged

20  provisions.

21      Q    So is it your understanding that the

22  Secretary of State's Office proposed the changes

23  made in SB 7050 that are being challenged in this

24  litigation to the legislature?

25      A    It's my understanding that the Department

1  of State was certainly -- although we don't draft

2  the final law, the Department of State was

3  involved in discussions regarding these challenged

4  provisions.

5       Q    Are you aware of whether the Secretary of

6  State's Office proposed the citizenship

7  requirement that was ultimately a part of SB 7050?

8       A    So when you say Secretary's Office, the

9  Department of State did submit proposals and I do

10 believe that the citizenship requirement was a

11 consideration of the Department of State.

12      Q    When you say "a consideration," you mean

13 that the Secretary of State's Office proposed the

14 citizenship requirement to the legislature?

15      A    I believe it was included in our

16 proposals, but keep in mind we're not the only

17 entity that makes proposals to the legislature.

18      Q    Do you know whether the Secretary of

19 State's Office provided a recommendation to

20 include the information retention ban, Section

21 97.0575(7) in SB 7050?

22      A    Yes, I believe the Department of State

23 did make proposals regarding the information

24 retention ban.

25      Q    And do you have an understanding of

1    whether the Secretary of State's Office proposed

2    the increased fines that were included as part of

3    SB 7050?

4          A    Yes.  I believe the Department of State

5    did include in its proposals increasing the fine

6    caps.

7          Q    Are you aware if anyone from the

8    Secretary of State's Office did in fact testify

9    before the legislature?

10         A    I believe they did.  And for the

11   substance of that I would point you to the

12   legislative record.

13         Q    Are you aware of whether the Secretary of

14   State's Office supported the bill?

15         A    What do you mean support?

16         Q    Did the Secretary of State's Office take

17   a position on whether they supported or were

18   against SB 7050?

19         A    You know, in the end the Department makes

20   its legislative proposals, but we enforce whatever

21   the Governor signs into law that's given the

22   Governor by the legislature.

23         Q    My question is whether the Secretary of

24   State's Office took a public position in support

25   of SB 7050.

1      A     The Department is a large organization so

2   I can't speak to the collective opinions regarding

3   the passage of SB 7050.

4      Q     Let's do one more topic and then we can

5   take another short break.

6            Look at Topic 16:  "The Secretary's

7   tracking and/or awareness of the racial breakdown

8   of voters registered via 3PVROs in Florida."  Are

9   you prepared to testify about this topic?

10     A     Yes, ma'am.

11     Q     And did you do anything different to

12  prepare to testify about this topic?

13     A     No, ma'am.

14     Q     What has the Secretary of State's Office

15  done to track the racial breakdown of voters

16  registered to vote by 3PVROs in Florida?

17     A     To track the racial breakdown of voters

18  registered via 3PVROs, in terms of "track," what

19  do you mean by that?

20     Q     Are you aware of any data sources that

21  include the race of voters registered by 3PVROs in

22  Florida?

23     A     Yes.  There are data sources that the

24  Department has access to that could include the

25  voter's race, yes.

1      Q    And are you aware of any review or

2  analysis done of that data contained within those

3  data sources?

4      A    No.

5      Q    Are you familiar with Senate Bill, SB, 90

6  that passed in 2021?

7      A    Yes.

8      Q    And did you know that Drs. Michael Herron

9  and Dan Smith provided expert reports in that

10 litigation with findings that black and Hispanic

11 voters registered through 3PVROs at higher rates

12 than white voters?

13     A    I'm not personally.

14     Q    You have no knowledge of that?

15     A    I wasn't a part of that litigation.

16     Q    Are you aware of whether the Secretary of

17 State was a defendant in that litigation?

18     A    Yes.

19     Q    And do you know whether or not the

20 Secretary of State was a defendant in that

21 litigation?

22     A    Yes.

23     Q    Is your answer, yes, that the secretary

24 of state was a defendant in that litigation?

25     A    Yes.

1          Q     Is it a general practice of the Secretary

2    of State's Office to review adverse expert reports

3    in litigation?

4          A     Yes.

5          Q     And are you aware that the same

6    statistics that black and Hispanic voters are

7    significantly more likely to register through a

8    3PVRO were brought up by speakers during the

9    legislative hearing for SB 7050?

10         A     For the speaker's comments I would point

11   you to the legislative record.

12         Q     Was there any discussion within the

13   Secretary of State's Office of these statistics

14   while SB 7050 was being proposed and debated?

15         A     Well, when you say a "discussion," the

16   Department of State has access to voter

17   registration -- excuse me -- to -- it could have

18   access to the race of a registered voter if that

19   information is provided to the Department via a

20   database that the Department can access.  So when

21   we talk about -- when you're talking about

22   discussions of racial breakdowns, keep in mind a

23   submitted voter registration application can be

24   processed and that person can become eligible to

25   vote without race being denoted.  So, you know, as

1    we talk about statistics and data and things like

2    that, the Department is limited to tracking

3    information only that it has access to.

4         Q    Understood.  My question was whether

5    there was any discussion of the statistics raised

6    during the hearings on SB 7050 about the disparate

7    racial breakdown of voters registered via 3PVRO?

8         A    I didn't personally have any discussions

9    and, you know, if there was any sort of written

10   record of that, I'm confident it's been produced

11   to you.

12        Q    And you're not aware of anyone else in

13   the Secretary of State's Office having

14   conversations about these racial disparities in

15   registering via 3PVROs?

16        A    I'm one person in a large organization

17   and I do not track these conversations.

18        Q    Understood.  And you're aware that Topic

19   16 asked for the tracking and awareness of the

20   racial breakdown of voters registered via 3PVRO in

21   Florida?

22        A    I am.

23        Q    And so as you testified before, you did

24   prepare to testify about Topic 16?

25        A    Yes, I did.

1        Q    And you're not aware of any conversations

2    within the Secretary of State's Office related to

3    the racial breakdown of voters who registered via

4    3PVRO?

5        A    That topic says "tracking and/or

6    awareness of the racial breakdown," and I provided

7    to you how we could access that information if we

8    have access to the databases that contain that

9    information.  So a voter registration application

10   in isolation, if it doesn't contain the race of

11   the individual, then we don't have access to that

12   individual's race except if we have access to

13   another database that has that individual's race.

14           So I am answering about any possibility

15   of tracking and/or awareness of the racial

16   breakdown of the voters registered via 3PVROs.

17   I'm not disputing what you provided earlier was

18   the testimony of these experts.  I'm trying to

19   explain how the Department as a whole can access

20   race.

21       Q    And I do think I understand that and just

22   think my question is slightly different about

23   whether there were then any discussions about the

24   results of what your office is able to track and

25   see about the racial breakdown of voters

1    registered via 3PVRO.

2         A    Again, I'm unaware of any analysis that

3    you're asking.  And that is separate from this

4    topic because to conduct some sort of racial

5    analysis, sure, that would have access to race if

6    we have access to that individual's race, but

7    analysis is separate from just tracking and/or

8    awareness.  Do we store people's race if it's

9    contained on the voter registration application?

10   Yes.  So if you want to say tracking is simply

11   storage on an electronic database that we have

12   access to, then, yes, tracking in that sense is

13   conducted.

14             But as I'm trying to explain to you, we

15   can't possibly track every single instance of the

16   racial breakdown of voters registered via 3PVROs

17   because there's no statute that requires that

18   piece of information to be submitted every single

19   time an individual -- every single time an

20   individual is registered by a 3PVRO.  So are we

21   aware of the racial breakdown of voters registered

22   via 3PVROs in Florida?  I can't tell you we have

23   tracking and/or awareness of the race of every

24   single person that has ever been registered by a

25   3PVRO in the State of Florida.  I just can't.

1       Q     Okay.

2             MS. JOHNSON:  I think this is a good

3    place for another break.  We can go off the

4    record.

5             (A recess was taken.)

6             MS. JOHNSON:  Mr. Darlington, I don't

7    have any additional questions for you at this

8    time.  I understand that other plaintiffs' counsel

9    do, so I will let them take it from here and

10   appreciate your time today.

11            THE WITNESS:   Thank you.

12   BY MR. FERGUSON:

13      Q     Good afternoon, Mr. Darlington.  My name

14   is Brent Ferguson.  I'm counsel for the League of

15   Women Voters of Florida, plaintiffs.

16            Just for you and for Mo, I'm not exactly

17   sure of the time this is going to take.  It's

18   possible it will be around two hours.  I'm going

19   to try to go as quickly as possible so I want to

20   work out with you beforehand how to handle that if

21   it does go over the seven hours today.

22            MR. JAZIL:  Brent, hopefully you won't

23   overlap with some of the questions that Mindy

24   asked.  And assuming you don't, we have no

25   problems with you going two hours.  So that's

1    fine.

2              MR. FERGUSON:  Okay.  And you want to

3    keep that this afternoon as well?

4              MR. JAZIL:  Yes.

5              MR. FERGUSON:  I definitely won't

6    overlap.  And, as you know, we have I think three

7    unique claims that aren't covered by the other

8    plaintiffs so I will be focusing on those.

9              Fritz, do you mind, I think you're still

10   sharing the screen.  Do you mind taking that down.

11   Thanks a lot.  So I will be sharing my screen at

12   some point here.

13   BY MR. FERGUSON:

14        Q    Mr. Darlington, I would like to start by

15   talking about what we've been calling the felony

16   volunteer restriction that's in 97.0575(1)(e).

17   Are you familiar with that part of the law?

18        A    Yes, sir.

19        Q    Great.  And, of course, feel free to take

20   a look at it.  I know that's in front of you as

21   well.

22              So you testified recently that the

23   Secretary of State had communication with the

24   legislature about some of the challenged

25   provisions.  I believe you talked about the

1    noncitizen provision in particular.  Did the

2    Secretary of State's Office propose the felony

3    volunteer restriction to the legislature?

4         A    There was a proposal of the felon

5    volunteer restriction, as we're calling it, to the

6    legislature.

7         Q    And when you say "a proposal," do you

8    mean that it was different than the one that was

9    finally enacted?

10        A    I believe it was pretty similar.

11        Q    Okay.  Are you aware of any specific

12   differences that you can talk about today?

13        A    I don't think there were major

14   substantive differences.

15        Q    Okay.  And before that provision was

16   enacted, did your office provide the legislature

17   or any Florida government officials with

18   information about people who had been convicted of

19   one of the underlying felonies listed in the law

20   and then had later committed misconduct related to

21   voter registration?

22        A    Yes.

23        Q    Okay.  And can you give me some more

24   detail about what that included?

25        A    Sure.  One example would be Ms. Roderica

1    Corey.  She had prior convictions which included

2    felony convictions within Florida Statute 817 and

3    then subsequently pled guilty to the misuse of

4    information for -- the fundamental misuse of

5    information for voter registration activities.

6        Q    That's helpful.  We can talk about

7    potential other instances as well, but I'm just

8    going to ask you about is it Roderica Cody or

9    Corey?  I'm seeing Cody on the documents I have.

10   Does that sound right?

11       A    My apologies; Cody.

12       Q    No problem.  So I want to take a look to

13   understand more about that specific case.  So I'm

14   going to share in the chat some of your office's

15   productions about that and then we can take a

16   look.

17            MR. FERGUSON:  So this is what I

18   premarked as Document 15, but it will be Exhibit

19   4, for the record, and it's in the chat for

20   everyone and I will share my screen momentarily.

21            (Darlington Deposition Exhibit 4 marked

22   for identification and is attached to the

23   transcript.)

24       Q    Can you see that?

25       A    Yes.

1      Q     It's several pages of documents your

2   office produced.  I'll scroll onto the Bates

3   number there.  Do you recognize this as documents

4   from a Circuit Court in Lee County related to

5   Ms. Cody's case?

6      A     Yes.

7      Q     And I just want to get a better

8   understanding of what you said about the

9   underlying felonies she's committed, which I think

10  you said some of which were found in Chapter 817,

11  which, just so we're clear, that's one of the

12  underlying felonies contained in SB 7050's felony

13  volunteer restriction; is that correct?

14     A     Yes.

15     Q     And so this document I think talks about

16  the voter registration misconduct that you

17  testified about earlier, is that right, this one

18  we are looking at, which is Page 1 of Exhibit 4?

19     A     This first page that I'm talking about

20  looks to be the charging document, the

21  information, yes.

22     Q     So this is the one that relates to her

23  work as a voter registration canvasser; is that

24  correct?  I can scroll down if that will help a

25  little bit.

1       A       Yes.  Can you also zoom in a little bit,

2    please?

3       Q       Yes, I will.  How is that?

4       A       That's better, thank you.

5       Q       Sorry; I didn't catch if you answered the

6    question.  So this is the charging document for

7    the voter registration-related misconduct that you

8    testified about earlier?

9       A       Yes, it appears to be.

10      Q       Okay.  And do you know what the

11   underlying felonies that Ms. Cody committed were

12   that fell under Chapter 817?

13      A       The specific ones, no.  And I should

14   probably -- I should probably -- "underlying" is

15   probably the wrong term.  The prior criminal

16   convictions is really a better way to describe it.

17      Q       Sure, yeah.  I want to be as clear as

18   possible for the record.  So the felony volunteer

19   restriction prohibits certain people from

20   collecting or handling voter registration

21   applications on behalf of the 3PVRO, and those

22   certain people are people that have been convicted

23   of one of a list of felonies that I have been

24   calling underlying felonies.  Is that your

25   understanding?

1          A      Yes; certain felony offenses.

2          Q      Okay, great.  So that's what I mean if I

3    say "underlying felonies."  And your testimony is

4    you don't remember for sure right now what those

5    prior felony convictions were?

6          A      I don't have her complete criminal

7    history or criminal record.

8          Q      Sure.  No problem.  So in this same set

9    of documents that you produced I think I've only

10   found one reference to prior felonies so I'm going

11   to take you to that and let me know if you're

12   aware of other ones.

13              So this is Page 15 of the pdf of Exhibit

14   4 that we've been looking at.  There are a lot of

15   page numbers on this document so I want to be

16   clear.  It's the third-to-last page.  And I've

17   highlighted this third paragraph on the page and I

18   will read for the record.  It says:  "Ms. Cody as

19   well, had been convicted of Battery two or more

20   times along with petit theft."

21              So these are some of her previous

22   convictions; is that correct?

23         A      I have no reason to dispute the

24   information, yes.

25         Q      Okay.  So are you aware -- I know you

1    don't remember off the top of your head -- of

2    where there would be other information about prior

3    crimes that Ms. Cody was convicted of?

4        A    Yeah.  And that's all publicly available.

5    So when someone is sentenced for a crime, whether

6    a misdemeanor or felony, that sentencing document

7    will be available on the County Clerk's website.

8    So anyone can access the County Clerk's website,

9    put in the name, and if that conviction occurred

10   in that County, they could see it.  There are

11   other databases as well, some of which I have

12   access to and some of which I don't.

13       Q    Okay.  And so when your office shared

14   information on Ms. Cody with the legislature, what

15   did you provide to show that she had been

16   convicted of felonies under Chapter 817?

17       A    Well, first off, let me say at the outset

18   I am confident that we wouldn't disclose anything

19   that would be illegal to disclose.

20            In terms of what specifically about her

21   to the legislature, I mean, keep in mind she was

22   not the only person who had somehow violated 817

23   and then conducted voter registration activities

24   that we've seen -- excuse me -- that then

25   conducted a criminal violation like we're talking

1    about here.

2          But, you know, what specifically was

3    provided, certainly if there's a record of it, I'm

4    confident it's in your production.

5          Q    Okay.  So just to be clear, you don't

6    remember today what specifically was provided

7    regarding her prior convictions?

8          A    When we say provided to the legislature,

9    you know, as I said earlier, I don't have every

10   conversation verbal and written memorized so I

11   can't try and answer that.  And then in terms of

12   written documents that were provided to the

13   legislature, as long as there is no privilege or

14   exemption that would exist either disclosing that

15   information to the legislature or disclosing that

16   to you here, then I'm confident you have a

17   7,500-some-odd document production that you have.

18         Q    Can you tell me, other than Roderica

19   Cody, what other cases or instances did you

20   provide to the legislature involving someone who

21   committed election-related misconduct involving a

22   3PVRO after having committed one of those

23   underlying felonies in the felony volunteer

24   restriction?

25         A    What information we provided about

1   third-party voter registration organization agents

2   that then -- who violated one of the felon

3   volunteer restriction numerated offenses and then

4   went on -- in that category who did we provide to

5   the legislature?

6       Q    Correct.

7       A    Again, I would point you to the

8   production barring what I've stated earlier.

9       Q    And, again, I'm asking for your awareness

10  of any specific instance here.

11      A    Well, I know that data was provided in

12  terms of, you know, general data sets.  In terms

13  of specific defendants?  I don't have that list

14  memorized.  And, again, as I've said earlier, you

15  know, I understand that you're interested in the

16  debate and the conversation regarding SB 7050, but

17  it is in keeping with the State's interests to

18  take a preventative or proactive stance even if I

19  can only sit here today and list one specific

20  individual to you.

21      Q    Yeah, I understand that.  Thanks for

22  that.

23           I guess you mentioned a list that you

24  provided and I know you've been referring to the

25  document productions.  I haven't seen any kind of

1  list like that.  Are you aware of a list of cases

2  fitting the description we've been talking about

3  that was provided to the legislature?

4      A    Well, I'm confident that information we

5  could disclose was provided.  Again, when we say

6  "list," I mean, I don't have specific Excel

7  spreadsheets memorized or anything like that.  But

8  I am confident in the fact that any discussions

9  that were had, whether on the record or verbally

10  or otherwise, were conducted in a professional

11  manner in keeping with disclosure requirements and

12  at the same time providing what data sets we do

13  have.

14      Q    And are you aware when that information

15  was provided if your office specified the

16  underlying felonies that the person in question

17  had committed?

18      A    Again, for specifics like this I would

19  point you to production.  I'm confident if it was

20  turned over to them, it was turned over to you.

21      Q    Okay.  What's the State interest in the

22  felony volunteer restriction?

23      A    Clearly the State's interests are the

24  fact that, you know, first off, we're only talking

25  about certain crimes that would then prevent

1   someone from conducting voter registration

2   organization activities.  So right off the bat if

3   you look at the enumerated types of crimes that

4   would prevent someone if convicted of one was to

5   then conduct voter registration activities, it's

6   certainly indicative -- that conviction is

7   certainly indicative of felony.

8        Q    Sorry; I missed the last part.  It's

9   indicative of what?

10       A    Can you hear me better?  I apologize.

11       Q    Yes, it was just one word you cut out

12  for.  You said it's indicative of something that I

13  didn't catch.

14       A    It's indicative of the individual

15  possibly not being -- not conducting themselves in

16  accordance with the fiduciary obligations set

17  forth in the statute.

18       Q    And does that concern that you just

19  discussed apply to anyone who has been convicted

20  of a felony?

21       A    Does that concern apply to anyone

22  convicted of a felony?

23       Q    Right.

24       A    It depends on the type of felony

25  conviction.

1      Q    Okay.  And you discussed your declaration

2 a little bit before, which I'm happy to bring up

3 on the screen if it would be helpful.  But do you

4 recall with regard to the felony volunteer

5 restriction you mentioned State interest in

6 safeguarding election integrity and preventing

7 voter fraud, ensuring timely processing of

8 applications, and promoting confidence?

9      A    Was there --

10      Q    I'm just asking if you recall that those

11 were the interests you mentioned in your

12 declaration.

13      A    Well, verbatim I would point you to the

14 declaration.

15      Q    Yes, that's what it says.  I'm just

16 asking if you remember or if you would like to

17 take a look, I can bring it up.

18      A    Sure.  Let's do it.

19      Q    Sounds good.  And this has already been

20 marked as Exhibit 2.  Can you see that now?

21      A    Yes, I can.  Do you mind just scrolling

22 up so I can see the section it's in?

23      Q    Yes, yes.

24      A    Okay.  Yes, sir.  Yes.

25      Q    And then I'm looking at Paragraph 14, if

1    you want to take a look.

2         A    Sure.

3              Yep.

4         Q    So in your office's brief in this case

5    involving a preliminary injunction motion filed by

6    the plaintiffs you also argued that the felony

7    volunteer restriction was intended to avoid

8    confusion or frustration of the democratic

9    process.  Do you also believe that that's a State

10   interest in addition to the ones that you've

11   listed in your declaration here?

12        A    I think it could be, yes.

13        Q    Could you explain how the felony

14   volunteer restriction helps avoid confusion?

15        A    Sure.  There was an example I talked

16   about earlier today regarding -- and this is just

17   one of what could be many examples -- where Andrew

18   Darlington sends in an updated, we'll even say

19   through a third-party, voter registration

20   organization.  My voter information is updated and

21   now I'm legally allowed to vote in the county

22   where I now reside.

23              Confusion could stem from the fact that

24   someone submits after that a voter registration

25   application that then changes my information in

1   the system and then prevents me from voting

2   somehow.  Even if not necessarily prevented from

3   voting, confusion still occurs when a provisional

4   ballot is submitted because even though I thought

5   I was properly registered, the system is showing

6   I'm not.

7           And I think personally that's very

8   concerning even if it's just one legal vote that

9   is prevented from some sort of instance like this.

10  And then that -- you know, that is just -- those

11  are just two examples of where confusion occurs

12  for the voter, confusion occurs with voter

13  registration when conflicting information about a

14  person is submitted.

15          And let's say that information is from a

16  fraudulent application, confusion occurs where a

17  deceased person is signed up to vote and a vote is

18  cast for that person after they're -- let me give

19  a better timeline for this deceased person.

20          A dead person, a person passes away, and

21  then after the death there is a fraudulent

22  application submitted and after that fraudulent

23  application, voter registration application, is

24  submitted, Election Day comes or voting day we'll

25  say, primary, whatever, voting day comes before

1    those vital records come back to the supervisor or

2    the Division of Elections.

3            I would argue that's confusion as well

4    because that's an illegal vote cast that should

5    never have been submitted.  But that's also a

6    voter registration aspect because now you have a

7    deceased person on the rolls.

8        Q    Okay.  I think I understand.  And so with

9    both of those examples you gave, the idea is that

10   someone who has committed one of the underlying

11   felonies in the felony volunteer restriction is

12   more likely to engage in some kind of misconduct

13   that will lead to that confusion.  Is that your

14   testimony?

15       A    I think convictions of those enumerated

16   categories of offenses certainly indicate a higher

17   degree -- I don't have a specific degree or

18   degrees of how much higher than others, but I

19   think certainly, especially when you talk about

20   perjury, any sort of theft violation, murder,

21   sexual offenses, yeah, I do think there is a

22   higher degree of mistrust in that person than

23   others in society.

24       Q    Okay.  And have you seen evidence that

25   people who have been convicted of murder or sexual

1    offenses are more likely to commit

2    election-related misconduct?

3        A    Well, when you say "election-related

4    misconduct," I don't have comprehensive records

5    from the United States of America.  And even

6    within Florida there is no comprehensive set of

7    records because you don't catch every crime that

8    is committed.

9        Q    Okay.  We're going back to the list of

10   State interests supported under the felony

11   volunteer restriction that we just discussed.  You

12   mentioned fraud, and I think you testified earlier

13   that that's a broad term.  And I agree that it

14   could encompass quite a few different things.

15   Some of your testimony earlier talked about people

16   who essentially would steal personal information

17   perhaps to engage in some kind of financial fraud.

18   In this context when we're talking about the

19   felony volunteer restriction, when you say it

20   prevents fraud, do you mean fraud relating solely

21   to the election system?

22       A    I'm not sure I understand the question.

23   I didn't mean to interrupt.  I was just saying

24   this provision, this challenged provision, the

25   felon volunteer restriction provision, as you

1    title it, is solely related to voter registration

2    activities; right?  So I guess that's why I don't

3    understand your question.

4        Q    Well, you would agree that there could be

5    financial fraud and election fraud separately;

6    right?  And so I'm asking whether this provision

7    is a State interest in election-related fraud or

8    in protecting people's information from financial

9    fraud?

10       A    The State's interest as -- interests

11   pleural -- pertains to this provision protect both

12   fraud regarding the election system, but when we

13   say we are preventing individuals who have been

14   convicted of at least some of the most egregious

15   criminal violations that exist, there is a

16   secondary effect of preventing the voter who

17   provided that information to that person from

18   being harmed by other crimes as well.

19            So I would argue that the provision, you

20   know, has effects that protect the election system

21   and protect the voter.

22       Q    And when we talk about that list of

23   underlying felonies that would trigger the felony

24   volunteer restriction -- feel free to refer to it

25   on your version of the statute -- you mentioned

1    murder and sexual offenses and then there is a

2    list of other offenses; is that correct?

3        A    Yes.  There are more than just murder and

4    sex offenses.

5        Q    And how would you characterize the

6    additional felonies that are listed there?

7        A    How would I characterize them?  As in

8    what are they or --

9        Q    Yes, just summarizing the topics that

10   they include.

11       A    Well, if I can reference my statute here?

12       Q    Yep.

13       A    Okay.  Well, obviously -- you know, I

14   would say the first enumerated category offense is

15   a felony violation of the Election Code.  And I

16   think the State has an interest in preventing

17   repeat offenders, at least denying them the

18   opportunity to commit another violation of the

19   Election Code.

20           Next I would say, you know, is we look

21   to -- we talked about Chapter 817, which deals

22   with theft and fraudulent practices.  I would say

23   forgery and perjury apply here as well, forgery

24   for forging a signature, perjury if you've lied

25   under oath once, there is an indication that you

1    could do it again.  So I guess I'm trying to

2    characterize them in keeping with what I think the

3    call of the question is.

4         Q    Sure.  So do you believe that those were

5    included because they are crimes that relate to

6    trust or mistrust?

7         A    Well, these crimes were included not just

8    because of trust or mistrust of the person

9    convicted of these crimes, but, again, once a

10   voter registration agent -- and I'm just -- I'm

11   using this as an example, but what I'm holding up

12   is just the statute, nothing more, but once a

13   voter registration application is submitted to the

14   voter registration agent, a variety of crimes can

15   occur.  So I can't narrow it into one specific

16   direction, but I can say trust and mistrust is

17   included in the number of directions the crimes

18   that could occur that the provision certainly

19   would make criminal.

20        Q    Okay.  So looking more specifically at

21   Chapter 817, which is one of the sets of

22   underlying felonies, that includes quite a number

23   of different felonies; is that correct?

24        A    In Chapter 817, yes.

25        Q    And so to take one example, there is a

1    Section 817.802(1), which I'm happy to bring up

2    for you -- just let me know if you would like to

3    see it -- that criminalizes charging a fee in

4    excess of $50 for an initial debt management

5    consultation.  Can you tell me why that was

6    included in the felony volunteer restriction?

7         A    Can you share your screen, please?  I

8    don't have that provision memorized.

9         Q    Yes, yes.  Can you see that?

10        A    If you could zoom in.

11             That's good, thank you.

12             May I reference Statute 97.0575 as well?

13        Q    Yes.

14        A    I have it in front of me so we don't need

15   to change your share screen.

16             Is this a complete -- is this a

17   complete -- and I'm not saying this towards you.

18   I'm just asking you is this the complete statute

19   of 817.802?

20        Q    To my knowledge, yes.  This is from the

21   Florida Senate's statutes.  Everything that I've

22   seen would indicate that.

23        A    Okay.  Then I believe in Florida you

24   might -- you might reference the criminal

25   sentencing statutes, but I believe in Florida when

1    a penalty, a specific penalty, for example, a

2    degree of offense isn't listed, then I believe

3    Florida criminal statutes revert to a misdemeanor.

4    I haven't since I was a prosecutor really taken a

5    deep dive into Florida's sentencing statutes, but

6    for purposes of Florida Statute 97.0575, based on

7    what you're showing me, that conviction in

8    isolation I don't believe prevents someone from

9    then conducting voter registration activities.

10   But, again, I'm solely basing that on what I'm

11   seeing here on your screen that you've shared and

12   the Florida Statute 97.0575.

13        Q    So I guess a couple of things.  My

14   understanding from previous research is that it is

15   a felony.  I don't want to get sidetracked and

16   take time on cross-referencing.  We can obviously

17   figure that out later, whether it's included.  My

18   question is, let's stipulate that it's a felony

19   for the moment.  Can you tell me why this is a

20   crime that would be used as a basis to prevent

21   someone from engaging in voter registration

22   activity?

23        A    Again, based on my personal knowledge I

24   can't stipulate to that because I think that

25   stipulation is false.  I don't believe in Florida

1    in criminal statutes you can be sentenced to a

2    felony unless it states it's a felony.  So I just

3    can't stipulate to that.

4        Q    Okay.  So you don't know of a reason

5    separately why this would prevent someone from

6    engaging in voter registration activities?

7        A    There is no sentencing provision in what

8    you're showing me.  So I can't answer that

9    question because it's not clear if it is a

10   misdemeanor upon a conviction or a felony.

11       Q    Okay.  Let's move on.  Do you think that

12   people who are convicted of the crimes listed, the

13   felonies listed in Chapter 817, are more likely to

14   turn in applications late, voter registration

15   applications?

16       A    Well, there's kind of a wide variety of

17   crimes in that category so it's certainly

18   possible.

19       Q    Okay.  And by that do you mean that would

20   be true of some of the crimes in Chapter 817?

21       A    I think it's certainly possible, again,

22   more likely than moot.  But, yes, I think,

23   generally speaking, it's certainly a possibility.

24       Q    I want to talk a little bit about what

25   exactly the felony volunteer restriction prevents.

1    And I guess the first question I want to ask has

2    to do with your testimony with Ms. Johnson about

3    the noncitizen restriction.

4            So I'm sure you're aware from reading

5    those two provisions they're relatively similar in

6    using the terms "collect" and "handle."  Do you

7    interpret the felony volunteer restriction

8    identically to the noncitizen restriction other

9    than the group of people that it prohibits from

10   taking action?

11       A    Do I view them as identical other than a

12   group of people?

13       Q    Let me rephrase just to make sure we are

14   clear.

15           Do they prevent the same actions?  I know

16   they apply to different groups of people, but do

17   they prevent the same actions?

18       A    They certainly prevent some of the same

19   actions, yes.

20       Q    Okay.  So you're saying they're

21   overlapping but you don't think they're

22   necessarily identical?

23       A    I don't believe they are one hundred

24   percent identical, no.

25       Q    Let's take a look at the statute just

1    because I want to figure out how they might be

2    applied differently.  So I'm going to pull it up

3    on my screen here:

4                MR. JAZIL:  Counsel, my colleague Josh

5    Pratt just walked into the room.  He is sitting

6    here, he is not on screen.  But I'll make a

7    representation there will be no hand signals or

8    anything.

9                MR. FERGUSON:  Thanks for letting me

10   know.

11               One thing I want to do is add that last

12   statutory section to the chat briefly so we don't

13   forget.  And that I believe will be Exhibit 5.

14   That is 818.802(1).

15               (Darlington Deposition Exhibit 5 marked

16   for identification and is attached to the

17   transcript.)

18               MR. FERGUSON:  Then I'm going to share my

19   screen with a copy of SB 7050.

20               (Interruption by court reporter.)

21               MR. FERGUSON:  This is Exhibit 6 and this

22   is a copy of the enrolled version of SB 7050.

23               (Darlington Deposition Exhibit 6 marked

24   for identification and is attached to the

25   transcript.)

1    Q    Is the statute up there on the screen?

2    A    Not yet.  I see your background.

3    Q    Okay.

4    A    It has blue stuff on it.

5    Q    Let me try to redo that.

6         How is that?

7    A    Yes, I see SB 7050 on your screen.  Do

8    you mind if I continue to reference my statute?

9    Q    No, go ahead.  So maybe I'll just give

10   you a few moments so you can see that we have the

11   felony volunteer restriction, which is followed

12   immediately by the noncitizen restriction in

13   Subsection (f) and you're welcome to look at it on

14   your own.

15        Can you tell me I guess if you see

16   anything in there that would mean that the two

17   statutes, the two provisions, would be applied

18   differently other than the people who they

19   prohibit from acting?

20   A    Well, they're similar in that they

21   require the affirmation as stated and then they're

22   similar in that they -- that a third-party voter

23   registration organization could be liable for a

24   fine in the amount of $50,000 per each person

25   conducting -- you know, that meets the criteria of

1    the statute.

2              But, again, the affirmations are

3    regarding different past histories so, you know,

4    generally speaking, are they structured similarly?

5    Yes.  Again, I guess my answers previously had to

6    do with the use of identical.  They're generally

7    structured similarly, yes.

8         Q    Okay.  Sure.  And I don't want us to take

9    too much time on this.  Can we agree that both

10   provisions prevent a certain group of people from

11   collecting or handling voter registration

12   applications on behalf of a 3PVRO?

13        A    Well, you know, no law prevents a crime,

14   but -- no law prevents a crime, but they certainly

15   dictate what is a crime and what isn't.

16        Q    Sure.

17        A    But this law being effective won't 100

18   percent prevent anyone who meets this criteria

19   from actually doing it.

20        Q    Yes.  So I don't mean to talk about it's

21   affecting this.  I'm just trying to ask you, each

22   provision makes it unlawful for a certain group of

23   people to collect or handle voter registration

24   applications on behalf of a 3PVRO, and my question

25   is do you define the term "collecting" or

1    "handling" any differently with regard to the

2    felony volunteer restriction than you do with the

3    noncitizen provision?

4         A    No.  I would utilize -- I would point to

5    the rules and utilize that as my interpretation.

6         Q    Sure.  So you gave several answers to

7    hypothetical situations that Ms. Johnson asked,

8    and I'm happy to go through a few of those.  Some

9    of them involved 3PVRO employees, you know, in a

10   field office or something like that.  Would your

11   answers be the same when applied to the felony

12   volunteer restriction assuming that the person in

13   question is not a noncitizen but is someone who

14   had been convicted of one of the underlying

15   felonies listed in the felony volunteer

16   restriction?

17        A    I know we just did it, but I feel like I

18   ran through a number of examples.  I can't give a

19   blanket answer because I can't remember the

20   specifics of each one.

21        Q    Sure.  So I'll give you my memory and I

22   can just ask the hypothetical, it will be easier.

23   If someone who works for a 3PVRO is sitting in the

24   3PVRO's office and a stack of completed

25   applications are in the same office but that

1    person doesn't touch them in any way, has that

2    person or 3PVRO violated the felony volunteer

3    restriction?

4          A    May I reference the implementing

5    regulation?

6          Q    Yes.

7          A    And to be clear, you said that these

8    are -- I was using the term "nonblank" before,

9    but...

10         Q    Yes.  Nonblank is good, correct.

11         A    If that individual is a convicted felon

12   of one of the enumerated felony offenses and then

13   is in the same room as where these nonblank

14   applications are with the third-party voter

15   registration organization, if they do not exercise

16   physical custody of the voter registration

17   applications, then I do not believe it's a

18   violation of the statute.

19         Q    Okay.  Thank you.  And if they were to

20   pick up those nonblank applications just to put

21   them in the mail, would that violate the statute?

22         A    Is the convicted felon of an enumerated

23   offense affiliated with a third-party voter

24   registration organization?

25         Q    Yes.  Same hypothetical as before, the

1    only difference is this time they are picking up

2    the nonblank applications to put them in a

3    mailbox.

4         A    And that's in keeping with the

5    third-party voter registration organization

6    activities?

7         Q    Yes.

8         A    Then, yes, I believe that likely violates

9    law.

10        Q    So let's change it slightly to a voter

11   registration drive.  Let's say the 3PVRO is

12   operating at a parade and there is a handful of

13   volunteers that are asking people to fill out

14   applications and then taking the completed

15   applications.  Someone who is covered by the

16   felony volunteer restriction is just supervising

17   them and making sure they're doing their job, but

18   that supervisor is not touching any of the

19   completed forms.  Does that violate the statute?

20        A    May I reference the statute?

21        Q    Yes.

22        A    Now may I reference the implementing

23   regulation?

24        Q    Yes, go ahead.

25        A    And you said the voter registration

1    applications in this example are nonblank?

2         Q    Right.  People are filling them out,

3    completing them, and giving them to volunteers,

4    and this person is supervising those volunteers.

5         A    So supervising means this person in this

6    hypothetical does not touch the applications?

7         Q    Correct.

8         A    They're just observing the individuals

9    handling these.

10        Q    Correct.

11        A    I don't believe that in and of itself is

12   a violation.

13        Q    Okay.  Is the purpose of the felony

14   volunteer restriction to prevent people with these

15   underlying convictions from having sole custody of

16   the completed forms?

17        A    Well, I can't speak to the legislative

18   purpose.  I would point you to the legislature for

19   that.  But I can tell you that the State has a

20   number of interests in this provision that in the

21   end just care to promote confidence in the

22   election system and the State's interests that I

23   previously stated.

24        Q    Okay.  Let's go back briefly to that

25   hypothetical we just discussed most recently where

1  the 3PVROs had a voter registration drive and you

2  testified that the supervisor who is not touching

3  the applications wouldn't be violating the

4  statute.  Does it matter in that situation whether

5  the supervisor is approaching registrants and

6  talking to them and encouraging them to register,

7  talking to them about, you know, important

8  political issues, but still not touching any

9  applications?  Would that change your answer at

10  all?

11      A    May I again very, very briefly reference

12  the statute?

13      Q    Yes, no problem.

14      A    And in this hypothetical they are not

15  touching the voter registration applications that

16  are nonblank?

17      Q    That's correct.

18      A    I do not believe that in isolation would

19  violate the statute.

20      Q    And would you say in that hypothetical

21  that the supervisor that we're talking about is

22  participating in the election administration

23  process?

24      A    Well, I promise I'm not trying to be

25  difficult, how would you define the election

1    administration process?

2        Q    I'm more interested in how you understand

3    it.  I understand that people could, you know, see

4    that term differently.  Would you define that

5    action as part of the election administration

6    process?

7        A    Touching the nonblank applications or not

8    touching them?

9        Q    Sorry; not touching them but having that

10   conversation with registrants, encouraging them to

11   vote, things like that.

12       A    This someone who meets this criteria

13   speaking verbally with someone else and

14   encouraging them to go vote, is it part of the

15   election administrative process?

16       Q    Uh-huh.

17       A    Because, you know, we've possibly defined

18   that differently.  What I would say is that's part

19   of encouraging someone to go vote, which I

20   don't -- other than that, I don't know how to

21   answer your question.

22       Q    Sure.  And is it the same then for the

23   other volunteers that are there that are

24   physically taking the applications?

25       A    Is my answer the same even if that person

1    were not convicted of a felony?

2         Q     The thing I'm changing here is for the

3    other volunteers in this hypothetical where

4    they're not convicted of a felony and they're the

5    ones that are physically taking the applications

6    from the registrants.

7         A     And what is the question regarding the

8    nonconvicted felons who are touching these?

9         Q     Would you say they a part of the election

10   administration process?

11        A     I would say they're conducting voter

12   registration activities, certainly.

13        Q     Okay.  Does the felony volunteer

14   restriction apply to someone for the rest of their

15   life after they have been convicted of one of the

16   underlying felonies?

17        A     Not necessarily.

18        Q     Okay.  And can you explain that answer a

19   little bit?

20        A     Well, one example would be where an

21   individual receives clemency.  And I don't have

22   memorized the statutory provisions regarding

23   clemency, but typically when someone receives some

24   sort of pardon or clemency, it is no longer

25   considered a part of their record.  Now, I know

1    some of these enumerated offenses, for example,

2    murder, I know for a fact you can't receive

3    clemency.  I will speculate there are other

4    enumerated offenses as well where you cannot

5    receive clemency.  But I think that's one example

6    where -- I think outside of those examples I'm

7    talking about I think it is possible to receive a

8    conviction and then somehow your status changes

9    and that's no longer considered part of your

10    record.

11        Q    Okay.  If someone is convicted of a crime

12    in another state that's analogous to one of the

13    underlying felonies listed in the felony volunteer

14    restriction, is that person also prohibited by the

15    felony volunteer restriction?

16        A    In this hypothetical someone is convicted

17    of a felony in another state under state law?

18        Q    Yes.

19        A    And then would that in isolation trigger

20    this requirement?

21        Q    Correct.

22        A    May I reference the statute?

23        Q    Uh-huh.

24        A    I don't believe so because these

25    enumerated offenses reference crimes that occur

1    under Florida state law.

2        Q    Okay.  I want to pull up your office's

3    brief in the preliminary injunction briefing that

4    we discussed a moment ago so I'm going to open

5    that.

6              MR. FERGUSON:  And I will share my

7    screen.  Actually, I don't think this has been

8    marked as an exhibit either so let me mark it.

9              (Darlington Deposition Exhibit 7 marked

10   for identification and is attached to the

11   transcript.)

12       Q    Can you see that on the screen?

13       A    Yes, I can, thank you.

14       Q    And do you recognize that as the

15   Secretary of State's response brief in the

16   preliminary injunction motion in this case?

17       A    Yes, I do.

18       Q    So I would like you to take a look at

19   Footnote 7.  Can you read that on the screen?

20       A    Footnote 7, I see it.  It seems to be

21   part of a sentence?

22       Q    Yes.  So I will scroll down to the rest

23   of it.  I just want to make sure you can see that

24   part.

25       A    I can, yes.

1        Q      Okay.

2        A      You can scroll.

3        Q      So I'm highlighting a portion of Footnote

4    7 that is on Page 22 that says:  "Regardless, the

5    Secretary reads the statutory prohibition to apply

6    to any person who has been convicted of any

7    similar felony offense committed in another

8    jurisdiction -- including any federal or

9    out-of-state conviction -- which would be an

10   offense listed in the statute if it had been

11   committed in violation of the laws of this State."

12       A      Yes, I see that.

13       Q      Do you believe if someone has been

14   convicted of an out-of-state felony that that

15   would violate the felony volunteer restriction?

16       A      Well, I do because actually -- and I

17   think this is a good opportunity to amend my

18   answer because the offenses enumerated -- the

19   felony convictions occurring out of state would be

20   comparable to the ones on -- the felony offenses

21   that are effective in Florida statutes.

22       Q      Okay.  I'll pull that down now and I'd

23   like to go to one other thing here.  Are you aware

24   of Form DS-DE 127, which is called the "Non-Felon

25   Declaration"?

1          A     Yes.  And I have a copy of it here.  May

2     I reference it?

3          Q     Yes, okay.

4                MR. FERGUSON:  And I will put it in the

5     chat for anyone else that needs to see it.  That

6     should be Exhibit 8, and that is Form DS-DE 127

7     that is in the chat now.

8                (Darlington Deposition Exhibit 8 marked

9     for identification and is attached to the

10    transcript.)

11         Q     If you're looking at it there, I won't

12    share it unless you would like me to.

13               So on this exhibit it says "Non-Felon

14    Declaration" at the top; is that correct?

15         A     Yes.

16         Q     And this is a form that your office, the

17    Secretary's Office, has produced to allow 3PVROs

18    to ask potential employees or volunteers whether

19    they have been convicted of a felony listed on the

20    felony volunteer restriction and to promise under

21    penalties of perjury that they have not been; is

22    that correct?

23         A     Yes.  This is a form promulgated by rule.

24         Q     Okay.  And so this form includes the list

25    from the statute of underlying felonies, the same

1    list as the statute, right, so it is Section

2    825.103, Chapter 817, and several other ones?  Is

3    that correct?

4         A    May I just briefly reference the statute?

5         Q    Yes.

6         A    Yes, that's correct.

7         Q    And this form doesn't make any reference

8    to similar out-of-state or federal laws; is that

9    correct?

10        A    I don't see an explicit reference.

11        Q    Okay.  So it is correct that someone

12   could fill out this form accurately and because

13   they haven't violated any of the listed laws, yet

14   the 3PVRO could still be fined $50,000 for

15   violating the statute because the person had

16   committed a similar out-of-state law; is that

17   correct?

18             MR. JAZIL:  Object to form.

19             You can answer.

20        A    Could a third-party voter registration

21   organization be fined if there is a false

22   affirmation?  Yes.

23        Q    Okay.  And when you say "false

24   affirmation," what do you mean by that?

25        A    If there has been a conviction that meets

1    the criteria on the form and then it's signed and

2    submitted.

3        Q    Okay.  So I have a separate question,

4    which is if the person truthfully signs this

5    because they haven't been convicted of any of the

6    felonies listed here but they have been convicted

7    of a similar felony, could the 3PVRO be fined in

8    that situation?

9             MR. JAZIL:  Object to form.

10            You can answer.

11       A    If they are convicted of a crime that is

12   comparable to one of the enumerated offenses,

13   then, yes, that could result in a fine.

14       Q    Okay.  Despite the fact that nothing on

15   this form says anything about out-of-state or

16   federal law violations; correct?

17            MR. JAZIL:  Object to form.

18            You can answer.

19       A    Well, as I stated earlier, there is no

20   specific reference to out-of-state criminal

21   violations.

22       Q    Okay.  Is the felony volunteer

23   restriction a strict liability statute or does the

24   3PVRO have to have a certain level of awareness

25   before being fined for violating it?

1          A      May I reference the statute?

2          Q      Yes.

3          A      I am familiar with the fact that in law

4     generally, unless there is a strict liability

5     provision, I do not believe -- and, again, I'm no

6     scholar, but I don't believe -- that the law can

7     be applied with strict liability, meaning there

8     could never be a defense of some sort raised.

9          Q      Okay.  And do you know then what mental

10    state would be required for the 3PVRO -- excuse

11    me -- to be fined under this provision?

12         A      Well, my office would be the office -- if

13    this provision as we're referencing goes into

14    effect, my office would be the office that would

15    issue the fine letter.  And our processes are such

16    that we do receive appeals.  And, as I said

17    earlier in the deposition, I personally review

18    these appeals and assess their -- assess the

19    merits of what's being stated and then make a

20    determination based on their request for some sort

21    of modification.  So I would not enforce this with

22    strict liability.

23              MR. FERGUSON:  Okay.  I am going to move

24    on to a new topic now.  I don't know if anyone

25    else wants to take a break.  I'm happy to just

1  continue in the interest of time, but I'm open to

2  either.

3            MR. JAZIL:  Want to take a five-minute

4  break to stretch your legs?

5            (A recess was taken.)

6  BY MR. FERGUSON:

7       Q    In your experience within the OECS how

8  often do you encounter voter registration

9  applicants who are seeking the name of the person

10 who worked for a 3PVRO and accepted their

11 registration form?

12      A    Well, so the voter who submitted the

13 voter registration application then coming back to

14 OECS and asking for that person's name?

15      Q    Yes.  Or not necessarily asking OECS, but

16 asking someone in government and then you being

17 aware of that.

18      A    I can't speak to conversations that are

19 had across the State government agencies.  I mean,

20 when we talk about the name of the voter

21 registration applicant being placed -- or, excuse

22 me, the initial that we see being placed on there,

23 the conversation that I am privy to are

24 investigators for our office receiving that

25 information.  Let me rephrase that; I apologize.

1          When our office has received information

2     regarding who the voter registration agent

3     actually was and when there are criminal

4     allegations regarding some sort of criminal act

5     affecting a voter registration application we'll

6     say, the investigators need to find that

7     information.

8          Q    They need to find the information of the

9     person who is assisting the registrant?

10         A    Well, I mean, if a criminal act occurred,

11    they need to know who committed the criminal act;

12    right?  So when you say "assisted," if it's legal

13    assistance, that's not a crime.  But if it's, you

14    know, for lack of better words, nonconsensual

15    assistance that somehow violates a criminal

16    statute, then that would be a crime and there is a

17    need to know who specifically committed that

18    singular act.

19         Q    Okay.  So let's take that in a few parts.

20    I think the situation you're describing here is

21    someone engaging in a criminal act, perhaps

22    filling out a voter registration form for someone

23    who didn't consent to it.  Is that what you mean

24    essentially?

25         A    That can be one example, yeah, yeah.

1        Q      And so in that situation, even with the

2    receipt requirement in SB 7050, the receipt

3    requirement wouldn't apply, right, because there

4    is no person actually registering; is that

5    correct?

6        A      There is no -- can you provide me a

7    hypothetical where the receipt requirement is

8    triggered but there's no receipt issued?

9        Q      Yes.  So let's just walk through a

10   hypothetical.  And I was trying to understand your

11   example.  I thought you were talking about

12   instances of fraud in which a canvasser doesn't

13   actually interact with a registrant but steals

14   some kind of information and fills out the form on

15   their own to submit a false registration.  Is that

16   what you meant?

17       A      Again, that could be one hypothetical,

18   yes.

19       Q      Okay.  So that's the situation I'm

20   describing, where they wouldn't provide a receipt

21   to any applicant because there would be no actual

22   applicant; correct?

23       A      If a voter registration agent submits an

24   application and the application was not provided

25   by the voter, there would not be in that scenario

1    the voter to receive that receipt, yes.

2         Q    Okay.  And in your experience, you

3    mentioned Roderica Cody before and I think you

4    brought up a couple of other instances of fraud.

5    Many people who are committing some kind of

6    misconduct are doing so on a systematic basis,

7    meaning they're doing so with regard to multiple

8    applications; is that correct?

9         A    I never said many people.  No, that's not

10   correct.

11        Q    It's not correct that they would be doing

12   so with regard to multiple applications?

13        A    They could.  But, again, your question

14   was about my testimony earlier, and I -- I've

15   never used the word "systematic" in this

16   deposition.

17        Q    Okay, sure.  And I don't want to misstate

18   your testimony so I will try to rephrase and see.

19   We can just leave your previous testimony aside.

20             If someone is committing the kind of

21   fraud that your office is concerned with, is it

22   likely they will do so with multiple applications

23   rather than one?

24        A    So it is possible.  If I may, I would

25   like to take a step back.  When you say the type

```
1    of fraud my office is concerned with, my office

2    operates within the confines of our statutory

3    grant of authority and then we enforce whatever

4    statutory provisions we have the legal authority

5    to enforce.  So when you say "concern," I'm going

6    to interpret concern in what I just described.

7         Q    Yep.

8         A    Now, with how my office operates, can I

9    say specifically with 100 percent certainty that

10   they would do it many times?  No.  But I tend

11   to -- and I'm going to paraphrase here -- I tend

12   to agree with the Carter-Baker report.  I think

13   even one illegal vote is one too many.  And to

14   take it a step further, I think one legal vote

15   that is diluted at all illegally is one too many.

16   So when we say concern, we just enforce the law

17   when they're just showing that the law was

18   violated regardless of provision.

19        Q    When you investigate or see election

20   fraud, is it more common for an individual to

21   commit misconduct with regard to multiple

22   applications or a single application?

23        A    Does misconduct include technical and

24   civil violations?  Like does misconduct encompass

25   criminal, civil, and we'll call them regulatory or
```

1    administrative requirements?

2         Q    Yes.

3         A    Yeah, I think it's more common than not

4    for more than one misconduct being criminal,

5    civil, and/or regulatory violation to occur by one

6    voter registration agent, yes.

7         Q    And in some cases that misconduct is

8    intentional; correct?

9         A    In some of those cases, yes, the conduct

10   is intentional.

11        Q    And in those situations do you think that

12   the person committing this conduct would willingly

13   provide their real name to an applicant on a

14   receipt?

15             MR. JAZIL:  Object to form.

16             You can answer.

17        A    If they're not legally required to?  They

18   may not.

19        Q    If they are legally required to.

20        A    If they're legally required to and they

21   don't, then that's a violation of the law.

22        Q    Right.  And given that they are

23   intentionally violating the law otherwise, do you

24   think it's likely that they would provide a

25   receipt with their real name on it?

1          MR. JAZIL:  Object to form.

2      A    You know, I've said this before and the

3  reason why is just in my experience with the

4  Office of Election Crimes and Security there is

5  just no one-size-fits-all shoe that can apply to

6  every single voter registration agent.  Just being

7  honest, we've received a third-party voter

8  registration organization complaint packet, as I

9  previously defined, just to be clear, application

10  in question and the cover sheet, regarding just

11  one application that was somehow in violation.

12  And then, you know, we've received batches into

13  the hundreds.

14          We've also had, you know, instances where

15  over a thousand people are affected.  So there's

16  just -- and the different types of misconduct, as

17  we've said here.  There are different types, so I

18  can't say -- I can't give a one-size-fits-all

19  answer.

20      Q    Okay.  Let's go back to my original

21  question on the provision.  Are you aware of

22  instances in which a voter registration applicant

23  has asked for the identity of the 3PVRO worker who

24  assisted them with the application?

25      A    Asked me or asked anyone generally?

1          Q     Just your awareness of asking generally.

2          A     Well, I don't personally deal with

3     many -- I don't typically deal with the voter that

4     would end up being somehow wronged by the voter

5     registration agent and I can't speak to

6     conversations elsewhere.  But what I will say is

7     it is -- it is helpful to both the third-party

8     voter registration organizations and to our office

9     to know exactly who collected and handled that --

10    sorry; what I'm showing is just the statute, it's

11    just an example.

12             It is helpful to both the third-party

13    voter registration organization and to our office

14    and to -- if there's a criminal allegation, for

15    any criminal investigation by law enforcement and

16    prosecutors.  And I will give you two examples.

17             In one, in a very recent appeal with one

18    organization we were in -- and this is in the

19    production.  There is an e-mail chain between

20    myself and the attorney representing this

21    third-party group where the attorney provides to

22    me an appeal that essentially says, well, the

23    person was told to do the wrong thing and that was

24    really the appeal.  So my response was can you

25    provide me more information.  And he -- without me

1    stating specifically who was it, part of their

2    digging had to be who within the organization

3    actually handled this to then figure out what sort

4    of showing, beyond just saying, well, I was told

5    to do the wrong thing, can equip the attorney to

6    then appeal to me successfully and advocate for

7    the client.

8           Now, on the other end of the spectrum it

9    does improve efficiency of criminal investigations

10   if there is a known person who actually committed

11   this crime instead of, well, someone generally

12   within Hard Knocks or, you know, pick either one

13   of the political parties that have operations

14   throughout all 67 counties.  So it's beneficial to

15   both.  I know you're asking me am I aware of

16   conversations generally.  That's my awareness.

17       Q    And I certainly don't want to dispute

18   that law enforcement and investigative interest.

19   Is it correct that that would be served if the

20   3PVRO volunteer's name was provided with the

21   application when they turned it in?

22       A    Yes.  But, again, the receipt requirement

23   as promulgated by rule also assists the voter

24   because the voter is equipped with knowing who did

25   whatever the misconduct was.  I mean, if I get --

1    if I register to vote and the violation is the

2    voter registration agent didn't put their initials

3    on the form, I'm never going to hear about it.  So

4    the conversations that are really going to be had,

5    I can't speculate as to all of them, but I will

6    say they probably primarily center on some sort of

7    disenfranchisement of the voter, which again, as

8    I've said earlier regarding other provisions,

9    that's certainly in the State's interest to at

10   least take preventive or proactive measures to

11   ensure not even one person is disenfranchised.

12        Q    And if the voter wants to follow up

13   because of some concern about disenfranchisement,

14   how would they best go about doing that using the

15   receipt?

16        A    I mean, it depends on -- I would need a

17   little more factual assistance to answer that.

18        Q    Let me back up.  Part of I think what

19   you're saying is part of the interest, the State's

20   interest, behind the receipt requirement is to

21   allow the voter themselves to follow up if there

22   is any problem with their application.  Is that

23   correct?

24        A    Yes, it's certainly correct that the

25   receipt would allow the voter in the event of

1   misconduct to follow up with the voter

2   registration agent; and in part because of what we

3   previously discussed in the deposition regarding

4   the sensitivity of some of the information that is

5   required to be -- the sensitivity of the

6   information that's required to be placed on the

7   application to be considered complete.

8        Q    And does the receipt requirement mandate

9   that the receipt contain some kind of contact

10  information for the 3PVRO or the volunteer?

11       A    Can I reference the receipt?

12       Q    Sure.

13       A    Yes, it does.

14       Q    You're looking at the statute; is that

15  right?

16       A    No; sorry.  I'm referencing -- my

17  apologies; I'm referencing the receipt.

18       Q    The receipt for it.  Okay.  Let me pull

19  that up.

20            MR. FERGUSON:  Okay.  I don't think we

21  have that as an exhibit so I'm going to add that

22  very quickly.

23            (Darlington Deposition Exhibit 9 marked

24  for identification and is attached to the

25  transcript.)

1      Q     And since you have it -- and we'll put it

2    up on the screen; I have it up, too -- can you

3    tell me where on the application receipt it has

4    that contact information?

5      A     Yes; the third-party voter registration

6    organization ID number.

7      Q     ID number, okay.  And that's the part

8    that will allow the voter to follow up; is that

9    correct?

10      A     It is, because you take that voter

11    registration organization ID number, go on to the

12    Department of State's third-party voter

13    registration organization database, and what's

14    publicly available is from there the registration

15    agent, which is contained on the receipt, or they

16    will know the phone number and mailing address for

17    the third-party voter registration organization

18    that the individual worked for, so they can then

19    contact the organization's registered agent if the

20    voter registration agent did not provide his or

21    her name.

22      Q     Okay.  Would you agree that in some

23    scenarios if there's a problem with an

24    application, the registration agent that met with

25    the applicant will not be the one that turned in

1    the application?

2          A    Yes.  I think it's possible that the

3    registered agent is not the one conducting voter

4    registration activities always with any agreed

5    voter.

6          Q    And so in that situation it wouldn't be

7    helpful to have the name of the registration agent

8    on the receipt; is that correct?

9          A    No, that is not correct.

10         Q    Okay.  What would the purpose be in that

11   situation?

12         A    Well, I'll give you another example.  In

13   one example to which I was privy to it was

14   apparent that the third-party voter registration

15   organization was able to get -- and this is a

16   larger organization -- they were able to get

17   information and submit an appeal in a very, very

18   quick manner regarding voter registration

19   applications that were submitted in another part

20   of the State.  It was kind of far away.  The

21   registered agent was here in Leon County and the

22   applications in question were down in Polk and

23   Osceola Counties.

24              And I say that to say the quickness makes

25   clear that they can identify who was collecting

1    these applications.  How they did it, I can't

2    speak to every third-party voter registration

3    organization's processes or procedures, but that's

4    an example where I am pretty sure that that

5    organization keeps detailed logs of who was in

6    what vicinity and who submitted which

7    applications.

8         Q    Okay.  Do you think there are any

9    situations where a 3PVRO volunteer wouldn't want

10   to provide their full name to an applicant?

11             MR. JAZIL:  Object to form.

12        A    Is there a possible scenario?  I can't

13   think of one.  But I can't also -- do you have

14   possible scenarios in mind and then I can try to

15   address them?

16        Q    Well, let me ask this:  So are you aware

17   of concern in Florida over instances of harassment

18   or intimidation of election workers?

19        A    Am I aware of harassment or intimidation

20   of election workers?  Election workers meaning

21   who?

22        Q    You know, anyone volunteering for

23   elections.  So that could be poll workers or 3PVRO

24   volunteers.

25        A    I can't sit here and tell you that never

1   in the history of Florida has that occurred, but I

2   don't know.

3       Q    And I'm not limiting this to Florida.  Of

4   course, they're saying that it's only happening

5   there.  But the question is generally are you

6   aware of a concern election workers have about

7   their safety?

8       A    In preparation for today's deposition I

9   did not review surveys of election workers.  And

10  my job with your definition of election worker, I

11  don't think my duties would require me to

12  personally know that.  I don't work in a polling

13  place.

14      Q    Do you think that concerns a 3PVRO

15  volunteer might have about harassment could be

16  valid?

17      A    I think in the age of information today I

18  can't tell you that there is no way with just the

19  name and a third-party voter registration

20  organization ID number that an individual can't

21  track that person down at their home or anywhere

22  else.  I don't know the frequency that that occurs

23  in the United States.  I don't know specific

24  details regarding the sentiments of election

25  workers as you define them and -- well, your

1    question was more specific to third-party voter

2    registration organizations, voter registration

3    agents.  I don't know specific sentiments that

4    exist.

5         Q    Does the state have an interest in making

6    sure that 3PVRO volunteers know that they can be

7    identified after they help someone register to

8    vote?

9         A    Again, I think so much information about

10   people is accessible today that it's almost a fact

11   in society.

12        Q    And is that one of the State's interests

13   in the receipt requirement in SB 7050?

14        A    That third-party voter registration

15   organization agents know that there is a chance,

16   however small, that they could be tracked down at

17   some point?  I'm unfamiliar with discussions that

18   occurred regarding that specific issue.

19        Q    Is the receipt requirement one of the

20   provisions that your office proposed to the

21   legislature?

22        A    There were proposals regarding a receipt

23   requirement.

24        Q    And were those substantially the same as

25   the one that we're discussing today?

1     A     Yes, sir.

2     Q     Okay.  Let's move on to the

3  re-registration requirement that is found in

4  97.0575(1)(d) and Sub ii.  Are you familiar with

5  those provisions?

6     A     I am.

7     Q     Okay.  And the same question I just

8  asked:  Did your office propose the

9  re-registration requirement to the legislature?

10     A     We proposed a substantively similar

11  proposal; yes.

12     Q     To your knowledge has your office ever

13  investigated or fined a 3PVRO for failing to

14  update its registration materials?

15     A     So when you say "investigate," I wouldn't

16  be conducting a criminal investigation

17  necessarily.  But, yes, I mean, there are specific

18  examples where we have an old e-mail address that

19  doesn't work anymore, we have physical mailing

20  addresses where we get mail returned to us, you

21  know, I've received notice that someone isn't

22  active anymore.  Yeah, there are a variety of

23  issues our office has dealt with while I've been

24  director that are related to the re-registration

25  requirement.

1      Q     Okay.  And I want to pull up quickly your

2   office's Answers to Interrogatories in this case,

3   which I will add in the chat.

4            MR. FERGUSON:  And we can mark this as

5   Exhibit 10.

6            (Darlington Deposition Exhibit 10 marked

7   for identification and is attached to the

8   transcript.)

9      Q     Do you recognize that document as your

10  office's answers to the First League of Women

11  Voters Interrogatories in this case?

12     A     Yes.  I mean, I don't see the PACER or

13  filing head; but, yes, it looks to be what it is,

14  yes.

15     Q     So I want to go to Question and Answer 3

16  on this document, which is on Page 11.  So this

17  asks you to identify and describe the State

18  interest in the re-registration requirement.  Is

19  that correct?

20     A     Can you scroll up to the Interrogatory?

21     Q     Yes.

22     A     Yes.  Interrogatory No. 3 relates to the

23  requirement, yes.

24     Q     And then I have highlighted part of your

25  answer that says:  "The State has compelling

1    interests in safeguarding election integrity,

2    preventing voter fraud, ensuring voter

3    registration applications are timely processed,

4    and promoting confidence in the election system."

5    Is that correct?

6        A    Yes.

7        Q    And this list of compelling interests is

8    identical to one that you have named with other

9    provisions, challenged provisions, of the law; is

10   that correct?

11       A    I have certainly identified those

12   interests listed there as being State's interests

13   for other provisions that we've discussed; yes.

14       Q    Okay.  And can you explain how the

15   re-registration requirement will prevent voter

16   fraud?

17       A    Sure.  If we have accurate information

18   about who is conducting voter registration

19   activities within the State of Florida, then it

20   makes it much easier for any sort of criminal

21   investigation to occur.  The civil penalties, as

22   your co-counsel was implying earlier, she was

23   making them sound very Draconian, which implies

24   they serve as a deterrent.  So all in all the

25   re-registration requirement simply provides an

1  understanding of who is conducting -- what

2  third-party voter registration organizations are

3  conducting voter registration activities because

4  then there is an awareness with both parties that

5  if a crime occurs, we will have a very clear

6  picture or get there very quick in terms of who

7  conducted -- who committed the crime, which in

8  turn certainly serves as a deterrent.

9      Q    Okay.  So essentially the basis for this

10  is that the re-registration requirement will

11  require 3PVROs to update their information,

12  meaning that your office has more accurate

13  information, correct, that it can then lead you to

14  investigate fraud?

15      A    It's certainly a basis.  And when we

16  say -- when you say my office, I'm saying the

17  Department of State, whether it's the Florida

18  Division of Elections or my office.

19      Q    Yes.

20      A    Yes, that's a basis certainly.  And keep

21  in mind again when we talk about preventing voter

22  fraud, one aspect of voter fraud is a vote

23  submitted on behalf of someone who should not be

24  on the voter rolls for whatever reason.  And to

25  your example earlier when you talked about someone

1  utilizing personal information, filling out a

2  voter application, and also just filling out a

3  receipt that ends up going to no recipient except

4  maybe the garbage can, that voter registration

5  application submission, even if there's no illegal

6  vote, is still another aspect of voter fraud.  And

7  so deferring voter fraud and preventing voter

8  fraud is certainly a State interest and is

9  realized by this requirement.

10      Q    Is it correct that the law separately

11  requires 3PVROs to update their information if

12  anything has changed?

13      A    That requirement generally exists.  And I

14  can tell you from personal experience that as much

15  as that is currently on the books, it is not

16  complied with by every single third-party voter

17  registration organization.  In fact, there are a

18  number of examples where it's not.

19      Q    Okay.  And does your office attempt to

20  enforce that requirement now?

21      A    Well, that requirement is a regulatory

22  requirement with no penalty in and of itself

23  unless there is some sort of violation of 817.155

24  or another criminal violation.  So since it's not

25  a criminal or civil violation, when you say

1    "enforce," the enforcement mechanism we have

2    currently is to simply write a warning letter and

3    say we sent you mail, you didn't register --

4    excuse me -- you didn't update your information as

5    required.

6        Q    And do you know what the penalty is for

7    failing to re-register?

8        A    Re-register now or if the challenged

9    provision goes into effect?

10       Q    If it's -- I mean, I believe it's now in

11   effect.  I don't think it has been enjoined.  I

12   know that it doesn't apply until 2024.  But, yes,

13   under that provision of SB 7050.

14       A    I'm pretty sure the penalty is that the

15   third-party voter registration organization

16   becomes inactive.

17       Q    Okay.  So this will essentially encourage

18   3PVROs to re-register because they will not be

19   treated as 3PVROs if they fail to do so; correct?

20       A    You say "not be treated."  I think -- I'm

21   sorry; go ahead.

22       Q    I can rephrase.  If they fail to

23   re-register and they continue to operate as a

24   3PVRO they are breaking the law by operating as an

25   unregistered 3PVRO?

1         A     After that provision goes into effect and

2     if they don't comply with it, then they would be

3     in violation of the provision.

4         Q     Okay.  Your office is generally able to

5     review and assess a 3PVRO's compliance with the

6     law regardless of whether the re-registration

7     requirement exists; is that correct?

8         A     No, I think that is incorrect.

9         Q     Okay.  And why is that incorrect?

10        A     Right now what is contained on the

11    third-party voter registration organization

12    database is an archival list since 1995, and a lot

13    of that information -- on or about 1995.  I don't

14    know the specific date that that database started.

15    But suffice it to say that list of everything in

16    there, of all the, quote/unquote, active

17    third-party voter registration organizations, are

18    simply organizations that have not, you know --

19    and I'm going to use plain English here, but they

20    haven't hit the radar yet and so we have no reason

21    to believe whether or not they are operating in

22    violation of the law.

23             With that database comes a whole bunch of

24    information, including the third-party voter

25    registration organization ID number that an

1   individual could use to then start submitting

2   voter registration applications.  So this takes it

3   a step further and says -- its effect is once this

4   goes into effect, if we don't hear from you, there

5   is an assumption you're not active unless, after

6   you're provided notice, you say, no, no, I want to

7   be active and I want to be a third-party voter

8   registration organization.

9           So this is a step further in just

10  identifying who is conducting these voter

11  registration activities so that they can't be

12  defrauded and voters can't be defrauded as well.

13  So, no, that's why I disagree with your

14  characterization.

15       Q    Okay.  I'm going to move on.

16           MR. FERGUSON:  I'll let you all know we

17  are getting relatively close here so I appreciate

18  you bearing with me.

19       Q    Does your office, being OECS, have any

20  policy prohibiting noncitizens from working there?

21       A    Well, my employment policies are the

22  employment policies of the Department which are

23  controlled by federal and state laws.  As long as

24  there is legal authorization to work for the

25  Department of State regardless if it's my office,

1    the Division of Elections, or anywhere else, I

2    don't increase any restrictions against

3    noncitizens for working in my office.

4        Q     And noncitizens are permitted to work in

5    the Secretary of State's Office generally under

6    that policy you mentioned; correct?

7        A     Well, noncitizens that have legal

8    authorization to work may be hired, getting

9    through the rest of the hiring.

10       Q     Sure.  And is there any policy by the

11   Secretary of State's Office preventing hiring of

12   people with felony convictions?

13       A     Is there -- yes.  If you're -- if you're

14   convicted of a felony, I think, generally

15   speaking, you -- by Florida State law I think,

16   generally speaking, you can't work for an agency.

17       Q     Convicted of any felony; is that correct?

18       A     Here is what I will say:  When you apply

19   to work for the Department of State, there is a

20   box you check that says please check this if

21   you've been convicted of a felony or first-degree

22   misdemeanor.  I'm not familiar with every single

23   employment law, but I think, generally speaking, a

24   felony would preclude you from being hired by the

25   Department of State.

1      Q     Okay.  On the noncitizen provision,

2  previously you talked about the State interests in

3  that provision.  Is it a State interest to exclude

4  noncitizens from being part of the democratic

5  process?

6            MR. JAZIL:  Object to form.

7            You can answer.

8      A     Again, noncitizens kind of encompasses a

9  wider array of people.  So I'd point to my prior

10  testimony depending on which group within

11  noncitizens you're talking about.

12      Q     Let's say legal permanent residents.

13      A     Well, as I stated earlier, you know,

14  generally speaking, citizens that could vote have

15  a greater stake in the election, in the election

16  system, than legal permanent residents.

17      Q     And so my question is because of that

18  greater interest you're testifying about, is it a

19  State interest to exclude legal permanent

20  residents from the democratic process?

21      A     There is a possibility that a legal

22  permanent resident for whatever -- you know,

23  whatever legal reason has their citizenship

24  changed.  So there is a chance that a person who

25  is a legal resident conducting voter registration

1      activities while still in possession of a voter

2      registration application does have their status

3      changed.  There is a chance of that.

4          Q     You mean status changed to be no longer a

5      legal permanent resident?  Is that what you mean?

6          A     Yes.

7          Q     Okay.  So I will agree that that's

8      possible.  And my question is whether the State's

9      interest is in excluding that person from being

10     part of the democratic process.

11             MR. JAZIL:  Object to form.

12         A     Does the State have an interest in

13     excluding them from the democratic process?  I can

14     testify to SB 7050 provisions, but in my opinion,

15     you know, the democratic process can include

16     serving in my beloved Marine Corps.  So what

17     aspect of the democratic process are you talking

18     about?

19         Q     Collecting and handling voter

20     registration applications.

21         A     The State has an interest in safeguarding

22     the election system, and that is one of many

23     interests that I have already identified in

24     support of this provision we're discussing.

25         Q     Are you aware whether the rate of voter

1    registration fraud in Florida has gone up or down

2    in the last two years?

3         A    Well, there are a number of different

4    types of crimes that could be grouped together in

5    any number of ways or in isolation, and I don't

6    have every single statistic memorized.  Do you

7    have a specific example?

8         Q    No, I don't have an example.  I just mean

9    as a general matter things that you would classify

10   as voter registration fraud the same way that

11   you've defined it in your Interrogatory Answers

12   and declaration.  And, you know, if you are not

13   aware of any change, that's fine, I'm just asking

14   if you're aware of that.

15        A    Honestly, as I stated earlier, our office

16   has surpassed 4,100 complaints generally of any

17   type of voter-related crime fraud or irregularity.

18   So am I aware of changes?  I mean, it depends on

19   when the act occurred.  Again, election law is

20   just very, very nuanced and so I think that

21   general fact, in my opinion, supports the State's

22   interest in taking a proactive or preventative

23   measure in part because -- in part because in the

24   end, you know, whether -- I keep going back to the

25   bigger part, whether it's one illegal vote, one

1    legal vote diluted, that's one too many.  So I

2    don't know the specific rates of each crime that

3    have been going on in the last two years.  I do

4    know that the State certainly has an interest in

5    preventing these types of crimes.

6         Q    And is your answer the same for the last

7    period of the last three months, let's say since

8    the beginning of October?  Are you aware of any

9    increase or decrease in fraud?

10        A    Well, again, that's going to be a very

11   reactive assessment because, you know, issues can

12   occur and it can take a long period of time for

13   our office to discern that.  So it would have to

14   be a very -- I can't sit here and give you a

15   comprehensive answer because that would have to be

16   a very retroactive answer.

17        Q    And is it the same with regard to just

18   timeliness of applications that you might, you

19   know, be aware of in that same time period of the

20   last three months?

21        A    Well, in the last three months timeliness

22   may be easier to discern because of how timeliness

23   is measured.

24        Q    Sure.

25        A    Now, there could be voter registration

1    applications that are still billed out and

2    floating out there and we don't have an answer.

3    But timeliness in isolation would be easier.  We

4    couldn't get a perfect comprehensive answer, but

5    that in and of itself would be easier, yes.

6         Q    So do you know the answer to that,

7    whether it's has gone up or down?

8         A    No.  And I wouldn't at this time because

9    I receive complaints about voter registration

10   applications as far as two and a half years before

11   when I'm receiving them.  So it just depends.

12        Q    Are you aware of any allegations that the

13   felony volunteer restriction has been violated

14   since it became enforceable?

15        A    I personally have not received a

16   complaint yet.

17        Q    Okay.  Are you aware of any situation

18   involving the receipt requirement since it has

19   been in place in which someone used a receipt to

20   locate a 3PVRO volunteer?

21        A    I have not personally received any

22   information regarding that.

23        Q    Okay.  I'm almost finished here.  I would

24   like to bring up one document that we haven't

25   looked at yet.

1          MR. JAZIL:  I have a hard stop at 6:10.

2          MR. FERGUSON:  Okay.  Let's do six more

3     minutes.  Does that work for everyone?

4          MR. JAZIL:  Let's go.

5          MR. FERGUSON:  I'm going to do this

6     quickly.

7       Q    Just so you know, I'm pulling up the OECS

8     report that you mentioned in your declaration.  I

9     assume you're familiar with that?

10      A    Yes, I am.

11      Q    So I want to ask just a couple questions

12    about it right now.

13          (Darlington Deposition Exhibit 11 marked

14    for identification and is attached to the

15    transcript.)

16      Q    There are about 3,026 entries on this

17    report.  Does that sound right to you?

18      A    It sounds about right.  I think the exact

19    number is listed on the report.

20          MR. FERGUSON:  So, for the record, I'm

21    going to Page 90 of the pdf that shows the last

22    entry on the chart.

23      Q    Do you see that?

24      A    Yes, I do.  I see the number 3,026.

25      Q    Okay.  And so this chart is a list of

1   election-related complaints and investigations

2   performed by OECS in 2022; is that right?

3       A    Yes.

4       Q    And it helps demonstrate problems with

5   3PVROs that SB 7050 is trying to help fix; is that

6   correct?

7       A    Does this report demonstrate that fact?

8       Q    Yes.

9       A    There would be cases listed in that

10  exhibit.  Sorry; are you talking about the list of

11  cases that we were looking at or?

12      Q    Yes, sorry, I'm tying to move quickly.

13  Yes, I mean, the bulk of this report is the list

14  of cases, I think you're familiar.  So I'm asking

15  is that list of cases just helping demonstrate

16  3PVRO problems along with other problems that SB

17  7050 is trying to help fix?

18      A    That list of cases is a snapshot of all

19  cases that essentially are touched by the Office

20  of Elections Crime and Security since from

21  inception in 2022 to December 31, 2022.

22      Q    Sure.  And I've counted 17 out of these

23  3,026 that refer to 3PVROs.  We obviously can't go

24  through and count today, but do you have any

25  reason to believe that's incorrect?

1          A      Well, I mean, as we look at this page

2     here regarding the fine letters, I think 17 is an

3     underestimation.  And to be fair, I'm not saying

4     it was you, but I do believe 17 alone does not

5     encompass all violations conducted by third-party

6     groups.

7          Q      Right.  So it doesn't include the 3,000

8     timeliness ones mentioned on Page 5 here, but it

9     includes complaints and investigations that were

10    brought to OECS; is that correct?

11         A      That would at least be some of them;

12    yeah.

13         Q      Okay.  So I'm calculating 17 of 3,026 to

14    be 0.56 percent.  Does that seem to you like a

15    significant portion of the complaint's

16    investigations into election misconduct?

17               MR. JAZIL:  Object to form.

18         A      Well, I know where you're going with this

19    and, again, I go back to just one is too many.  So

20    it may be some sort of a disagreement between you

21    and I, but whether it's significant or not, the

22    State has an interest in protecting one of the

23    most sacred aspects of our democracy.

24         Q      But would you say that that amount

25    demonstrates that 3PVROs are especially

1    problematic when it comes to election misconduct?

2        A    I mean, I would use the analogy I think

3    the number of murders compared to total crimes in

4    the United States is very, very low, but does that

5    make murder any less a problem?

6        Q    Do you think 3PVRO misconduct is somehow

7    worse than other election misconduct such that it

8    would be analogous to murder?

9        A    No, I don't compare the two crimes.  But

10   you're hanging up on this insignificant or

11   significant point, and so I just use that as

12   another example.  Why does it matter?  Regardless

13   of the degree of crime, misdemeanor felony or

14   administrative regulation, if it somehow

15   disenfranchises the voter or otherwise caused the

16   effective operations of County supervisors of

17   elections or the Division of Elections, then why

18   would we just ignore it?

19       Q    And so this will be the end here.  Of the

20   17 I have counted on here, 16 of them say the

21   investigation is pending and one is closed by

22   OECS.  So is it correct that of the cases listed

23   on here, none of the charges have been proven at

24   the time that this report was submitted?  Is that

25   correct?

1      A    If it says pending, then, yes, that

2    means -- when you say charges proven, I'm assuming

3    you mean some sort of guilty conviction, whether

4    plea or trial?

5      Q    Correct.

6      A    If it says "pending," then that means

7    that at the time the report was submitted that

8    case did not reach a guilty resolution.

9           MR. FERGUSON:  Okay.  I guess we'll need

10   to wrap there.  Thanks very much for your time

11   this afternoon, for staying past 5:00.  I

12   appreciate it.

13          MS. KONOR:  Do we have time for just one

14   additional follow-up question?

15          MR. JAZIL:  If we make it short, go

16   ahead.

17          MS. KONOR:  Okay.

18   BY MS. KONOR:

19     Q    So, Mr. Darlington, hi.  My name Estee

20   Konor.  I represent the Hispanic Federation

21   plaintiffs and I just have one follow-up question

22   for you.

23          When Mr. Ferguson was asking you whether

24   immigrants who were lawfully present in the United

25   States can participate in the democratic process,

1  you stated that participating in the democratic

2  process might include, as you stated, serving in

3  your beloved Marine Corps.  Why is it that

4  noncitizens have a stake in defending American

5  democracy by serving in the military but do not

6  have a sufficient stake in U.S. elections to do

7  voter registration work?

8         MR. JAZIL:  Object to form,

9  argumentative.

10        You can go ahead and answer.

11    A    Well, I don't think my answer was

12  implying that.  I would disagree with that

13  characterization.

14    Q    So you would say that your answer did not

15  imply that noncitizens have the ability to serve

16  in the U.S. military?

17    A    Are you asking me did my answer imply

18  they could not?

19    Q    No.  Your answer seemed to imply that

20  they could in fact serve in the U.S. military if

21  they were lawfully present in the United States.

22    A    It is possible and it did occur during

23  one of my deployments to Afghanistan.  Someone was

24  naturalized and then became a citizen, yes.

25        MS. KONOR:  No further questions.  Thank

1    you.

2            MR. JAZIL:  I have no questions.

3            We'll read, thank you.

4            THE COURT REPORTER:  Ms. Johnson, do you

5    want me to go ahead and transcribe this?

6            MS. JOHNSON:  Yes.  We'll order a copy.

7            MR. FERGUSON:  I will order one, too,

8    Madam Court Reporter.

9            MS. MORSE:  Madam Court Reporter, the

10   Attorney General would like a copy, please.

11            (Off the record at 6:12 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                ACKNOWLEDGEMENT OF DEPONENT

2    I, ANDREW DARLINGTON, ESQUIRE, do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony and the same is a true,

5    correct and complete transcription of the

6    testimony given by me and any corrections appear

7    on the attached Errata Sheet signed by me.

8

9

10   _____        _____

11   (DATE)                      (SIGNATURE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, Cynthia A. Whyte, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    supervision; that reading and signing was

9    requested; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13              IN WITNESS WHEREOF, I have hereunto set

14   my hand and affixed my notarial seal this 12th day

15   of February, 2024.

16

17   My commission expires:

18   October 30, 2026

19

20

21   _Cynthia A. Whyte_

22   _____

23   CYNTHIA A. WHYTE

24   NOTARY PUBLIC IN AND FOR THE

25   STATE OF MARYLAND

**A**

**a) (1**
149:18
**ability**
41:16, 51:8,
66:19, 67:25,
71:5, 72:18,
73:14, 74:15,
74:19, 74:20,
79:18, 82:6,
100:22, 101:1,
101:16, 112:6,
112:7, 121:21,
154:10, 160:16,
184:12, 187:12,
195:19, 311:15
**able**
79:8, 83:15,
87:1, 87:19,
91:15, 92:4,
100:1, 113:3,
163:5, 183:24,
215:17, 233:24,
288:15, 288:16,
298:4
**above**
103:6, 151:10
**absentee**
189:21, 190:4,
190:10, 190:19,
191:5, 191:9,
191:14, 191:25,
192:9, 193:12
**absolute**
111:23
**absolutely**
18:13, 42:7,
91:7, 110:23,
150:2, 153:14,
170:13, 203:14,
207:7, 211:3,
215:21, 217:4
**accept**
194:3
**accepted**
41:7, 41:10,
276:10

**accepting**
33:6
**access**
67:1, 67:3,
67:7, 68:22,
68:24, 70:20,
72:18, 73:8,
77:25, 79:5,
79:9, 79:17,
109:23, 162:25,
163:9, 186:14,
187:17, 187:18,
187:19, 188:4,
188:6, 188:12,
188:18, 188:22,
188:23, 188:24,
189:1, 195:5,
197:16, 220:14,
220:15, 229:24,
231:16, 231:18,
231:20, 232:3,
233:7, 233:8,
233:11, 233:12,
233:19, 234:5,
234:6, 234:12,
242:8, 242:12
**accessed**
39:13, 39:17,
41:20, 41:21,
42:8, 42:21,
185:18
**accessible**
291:10
**accessing**
38:20, 82:1
**accidentally**
137:19
**accomplishes**
161:15
**accomplishing**
18:4
**accordance**
43:20, 124:7,
246:16
**accordingly**
51:15
**accurate**
18:21, 50:25,

102:19, 118:12,
130:15, 142:13,
159:3, 181:20,
182:3, 187:22,
190:6, 294:17,
295:12
**accurately**
273:12
**achieves**
161:2, 161:9
**acknowledge**
313:3
**acknowledgement**
313:1
**across**
33:23, 72:24,
207:22, 276:19
**act**
88:18, 149:24,
150:19, 173:1,
193:9, 202:10,
277:4, 277:10,
277:11, 277:18,
277:21, 303:19
**acted**
149:21
**acting**
94:6, 182:20,
207:9, 207:17,
221:10, 260:19
**action**
4:5, 87:21,
87:23, 150:8,
258:10, 267:5
**actions**
124:7, 166:9,
204:14, 258:15,
258:17, 258:19
**active**
23:7, 23:8,
36:14, 57:9,
132:9, 160:14,
160:18, 179:1,
179:10, 180:13,
190:24, 292:22,
298:16, 299:5,
299:7
**actively**
77:5, 103:13,

111:7
**activities**
71:13, 76:22,
91:1, 131:20,
132:2, 160:13,
204:20, 207:23,
211:16, 211:25,
212:1, 238:5,
242:23, 246:2,
246:5, 252:2,
256:9, 257:6,
264:6, 268:12,
288:4, 294:19,
295:3, 299:11,
302:1
**activity**
87:16, 132:5,
185:10, 205:11,
219:7, 256:22
**actor**
90:15, 90:17,
94:13, 184:17
**actors**
37:20, 37:25,
40:14
**acts**
42:17
**actual**
45:10, 85:18,
139:4, 278:21
**actually**
43:14, 45:21,
47:25, 73:14,
79:1, 91:24,
113:21, 139:7,
141:14, 164:4,
204:1, 214:24,
215:15, 219:25,
261:19, 270:7,
271:16, 277:3,
278:4, 278:13,
284:3, 284:10
**ada**
195:22
**add**
259:11, 286:21,
293:3
**adding**
101:8

addition
23:3, 79:23,
248:10

additional
79:12, 84:2,
156:3, 177:18,
235:7, 253:6,
310:14

additionally
20:7, 21:18,
22:23, 34:14,
34:18, 66:3

address
40:6, 86:17,
87:1, 87:10,
118:25, 119:6,
119:12, 119:14,
119:18, 144:25,
152:21, 215:11,
215:13, 215:15,
215:25, 216:1,
216:6, 216:19,
216:25, 220:24,
287:16, 289:15,
292:18

addressed
45:25, 144:23

addresses
30:3, 87:13,
118:13, 118:14,
118:16, 118:22,
118:23, 119:23,
215:17, 217:16,
292:20

addressing
49:24, 153:7

administration
96:10, 125:8,
130:3, 130:10,
266:22, 267:1,
267:5, 268:10

administrative
24:4, 30:7,
267:15, 281:1,
309:14

administratively
19:7

admissions
61:19

admitted
36:7, 138:10

adopt
21:23, 22:5

advances
62:17

adverse
231:2

advertising
119:21

advice
123:11, 226:14

advise
123:6

adviser
53:24

advocate
284:6

affected
156:9, 282:15

affecting
261:21, 277:5

affidavit
61:16

affidavits
67:22

affiliated
39:22, 205:16,
206:8, 263:23

affiliation
38:4, 40:7

affirm
41:3, 86:18

affirmation
206:1, 206:2,
260:21, 273:22,
273:24

affirmations
261:2

affirmative
51:6

affirmed
69:17

affirms
41:10

affixed
314:14

afghanistan
53:8, 311:23

after
20:25, 31:21,
34:16, 53:6,
53:19, 66:2,
66:13, 67:15,
68:16, 72:13,
73:6, 90:11,
90:15, 96:16,
139:20, 145:8,
145:12, 145:17,
146:22, 149:1,
149:7, 149:22,
158:13, 243:22,
248:24, 249:18,
249:21, 249:22,
268:15, 291:7,
298:1, 299:5

afternoon
235:13, 236:3,
310:11

against
105:19, 166:8,
228:18, 300:2

age
290:17

agencies
79:16, 82:5,
111:16, 111:18,
119:24, 127:22,
276:19

agency
66:18, 78:13,
79:19, 107:3,
107:12, 107:16,
119:25, 131:8,
131:12, 134:2,
134:6, 142:11,
143:4, 143:6,
187:19, 300:16

agent
31:11, 34:6,
78:5, 78:15,
81:23, 93:2,
93:6, 93:18,
93:25, 94:11,
105:4, 105:12,
113:3, 145:3,
147:22, 150:18,

175:9, 185:2,
185:10, 185:12,
204:16, 218:17,
220:14, 220:18,
221:4, 221:10,
254:10, 254:14,
277:2, 278:23,
281:6, 282:6,
283:5, 285:2,
286:2, 287:15,
287:19, 287:20,
287:24, 288:3,
288:7, 288:21

agents
32:24, 34:19,
34:20, 38:11,
39:9, 73:19,
78:20, 81:8,
81:11, 81:15,
84:12, 104:20,
105:7, 105:15,
105:16, 105:23,
106:1, 135:12,
135:15, 180:16,
181:4, 181:12,
182:21, 184:25,
211:25, 216:4,
244:1, 291:3,
291:15

aggregate
98:5, 99:12

ago
172:17, 270:4

agree
106:3, 108:10,
119:17, 146:11,
147:2, 161:24,
162:5, 162:10,
162:23, 170:21,
192:23, 193:10,
201:12, 201:14,
208:19, 213:8,
213:15, 223:4,
251:13, 252:4,
261:9, 280:12,
287:22, 302:7

agreed
288:4

agreement
173:5
ahead
13:7, 15:7,
15:12, 17:13,
23:2, 37:25,
56:4, 132:19,
223:22, 260:9,
264:24, 297:21,
310:16, 311:10,
312:5
airline
112:13
al
1:8, 1:14, 2:5,
2:11, 2:15, 2:21
alachua
6:14
alianza
4:6, 13:12,
28:12, 28:14
alicia
7:15
aliens
103:12, 103:20
all
14:15, 17:1,
18:6, 22:11,
25:3, 25:10,
26:15, 27:5,
31:13, 45:7,
56:20, 62:17,
63:4, 63:11,
63:18, 67:4,
71:24, 76:10,
77:7, 86:12,
91:9, 97:25,
104:20, 107:18,
108:11, 111:12,
117:21, 117:24,
118:22, 118:23,
126:9, 130:14,
152:18, 155:13,
155:23, 158:8,
158:21, 159:1,
162:10, 162:24,
163:9, 165:16,
167:12, 170:9,

170:21, 181:21,
181:23, 181:24,
185:7, 206:21,
208:25, 213:10,
213:19, 217:15,
221:9, 223:17,
242:4, 266:10,
280:15, 284:14,
285:5, 294:24,
298:16, 299:16,
307:18, 308:5
all-season
122:5
allegation
139:1, 139:11,
139:16, 140:22,
143:10, 165:7,
172:2, 173:12,
173:16, 180:10,
188:2, 188:3,
283:14
allegations
18:5, 131:10,
131:14, 131:17,
134:4, 139:1,
165:6, 165:10,
168:6, 173:20,
173:21, 174:14,
174:19, 277:4,
305:12
alleged
138:14, 169:2,
172:1, 174:25,
175:4, 175:22,
176:13, 177:4,
177:8, 189:9
alleviate
183:25
alliance
4:7, 13:15
allow
272:17, 285:21,
285:25, 287:8
allowed
17:9, 88:20,
108:22, 109:5,
109:21, 110:2,
132:1, 162:7,

248:21
allowing
76:5, 76:23,
83:21
almost
126:13, 165:22,
291:10, 305:23
alone
26:25, 60:1,
143:10, 197:20,
206:11, 308:4
along
184:18, 241:20,
307:16
already
29:9, 42:23,
44:4, 61:5,
66:4, 82:24,
85:1, 98:6,
121:7, 135:18,
162:17, 169:8,
169:10, 174:4,
174:6, 175:21,
176:8, 176:10,
176:18, 177:15,
178:25, 189:18,
198:5, 211:14,
214:14, 219:9,
247:19, 302:23
also
14:22, 21:19,
22:13, 24:23,
30:8, 31:5,
35:16, 42:21,
46:20, 51:5,
51:7, 56:8,
56:14, 57:7,
57:10, 57:21,
58:21, 59:7,
60:11, 61:18,
67:3, 71:16,
75:24, 80:2,
91:16, 101:20,
112:1, 127:4,
127:13, 130:20,
146:20, 156:13,
158:4, 193:1,
195:19, 197:12,

240:1, 248:6,
248:9, 250:5,
269:14, 282:14,
284:23, 289:13,
296:2
although
227:1
always
45:11, 148:6,
169:21, 288:4
amend
164:3, 204:1,
210:21, 271:17
america
221:23, 251:5
american
311:4
americans
4:7, 13:16
among
83:18, 84:14,
128:16
amount
59:25, 80:20,
81:1, 97:20,
105:19, 147:11,
154:21, 159:20,
165:23, 166:12,
166:18, 170:2,
170:15, 260:24,
308:24
analogous
269:12, 309:8
analogy
309:2
analysis
230:2, 234:2,
234:5, 234:7
analyzed
152:13
analyzing
153:9, 166:7
andrew
1:20, 3:1,
11:2, 11:11,
13:2, 13:9,
40:5, 87:6,
207:21, 248:17,

313:2
**andrews**
7:17
**anna**
6:8
**anne**
9:20
**annette**
96:24
**annotations**
134:21
**annual**
18:7, 20:5,
179:16, 179:18,
179:23, 209:19
**another**
36:9, 60:21,
66:6, 79:19,
79:23, 82:7,
87:7, 116:15,
123:20, 131:7,
134:10, 148:9,
157:24, 175:17,
187:2, 191:4,
191:25, 205:13,
214:24, 217:9,
229:5, 233:13,
235:3, 253:18,
269:12, 269:17,
271:7, 288:12,
288:19, 296:6,
296:24, 309:12
**answered**
121:1, 140:8,
174:3, 175:21,
176:10, 240:5
**answering**
44:4, 48:24,
132:22, 134:19,
233:14
**answers**
14:15, 15:20,
45:16, 261:5,
262:6, 262:11,
293:2, 293:10,
303:11
**anticipate**
179:25

**anticipation**
23:22, 128:19,
128:20
**anymore**
43:24, 86:20,
91:6, 219:21,
292:19, 292:22
**anyone**
16:19, 19:9,
60:19, 60:25,
61:3, 65:14,
108:3, 117:25,
118:10, 119:12,
120:20, 125:4,
144:16, 168:17,
168:23, 194:12,
194:13, 220:14,
224:11, 228:7,
232:12, 242:8,
246:19, 246:21,
261:18, 272:5,
275:24, 282:25,
289:22
**anything**
21:20, 22:9,
24:21, 25:20,
71:7, 84:16,
99:18, 121:7,
123:9, 135:16,
166:22, 169:7,
169:25, 171:14,
176:7, 178:4,
178:8, 189:17,
198:4, 207:20,
214:13, 222:25,
226:9, 229:11,
242:18, 245:7,
259:8, 260:16,
274:15, 296:12
**anywhere**
81:21, 290:21,
300:1
**apologies**
101:7, 106:12,
164:3, 238:11,
286:17
**apologize**
25:20, 38:17,

41:23, 42:5,
44:1, 44:3,
100:18, 158:25,
214:18, 246:10,
276:25
**app**
11:12, 11:13
**apparent**
288:14
**appeal**
58:16, 58:18,
169:24, 170:1,
170:8, 170:9,
170:22, 172:11,
172:17, 283:17,
283:22, 283:24,
284:6, 288:17
**appeals**
52:8, 52:10,
275:16, 275:18
**appear**
313:6
**appeared**
14:1
**appears**
198:15, 240:9
**applicant**
41:3, 77:11,
94:2, 94:12,
113:2, 147:16,
199:8, 276:21,
278:21, 278:22,
281:13, 282:22,
287:25, 289:10
**applicants**
276:9
**applied**
53:11, 259:2,
260:17, 262:11,
275:7
**applies**
225:1, 225:3
**apply**
51:14, 246:19,
246:21, 253:23,
258:16, 268:14,
271:5, 278:3,
282:5, 297:12,

300:18
**applying**
154:22, 192:12
**appointed**
17:19, 17:21
**appraiser**
217:11
**appraiser's**
155:7
**appreciate**
235:10, 299:17,
310:12
**approach**
186:2
**approaching**
266:5
**appropriate**
71:25, 80:25,
107:3, 107:12,
127:1, 142:11,
143:3, 143:5,
154:21
**approved**
187:16, 188:24
**approximately**
20:21, 60:16
**archival**
160:15, 298:12
**archive**
160:11
**archives**
75:24
**area**
65:20
**aren't**
236:7
**argue**
250:3, 252:19
**argued**
248:6
**argumentative**
311:9
**around**
25:21, 27:1,
27:22, 27:24,
75:5, 76:18,
167:4, 202:23,
203:1, 209:17,

235:18
**array**
65:17, 65:18,
301:9
**arrest**
67:22
**arrests**
133:25
**arrive**
45:15, 52:13,
169:15, 169:17
**arrived**
45:12
**artasanchez**
4:8
**article**
11:14, 148:9,
149:17, 151:6,
151:7, 151:12,
170:3
**ashley**
2:8, 60:4, 60:5
**aside**
82:23, 279:19
**asked**
52:18, 183:2,
232:19, 235:24,
262:7, 282:23,
282:25, 292:8
**asking**
13:17, 14:24,
16:2, 36:18,
82:22, 114:12,
114:19, 114:25,
121:6, 126:3,
128:3, 128:5,
156:6, 159:7,
160:5, 184:9,
185:21, 200:21,
202:1, 224:16,
224:22, 225:7,
225:14, 225:15,
226:7, 234:3,
244:9, 247:10,
247:16, 252:6,
255:18, 264:13,
276:14, 276:15,
276:16, 283:1,

284:15, 303:13,
307:14, 310:23,
311:17
**asks**
293:17
**aspect**
103:22, 250:6,
295:22, 296:6,
302:17
**aspects**
35:8, 84:14,
308:23
**assess**
275:18, 298:5
**assessed**
51:4
**assessment**
304:11
**assignment**
23:20
**assignments**
23:4, 23:11,
23:13
**assist**
48:23, 61:10,
65:16, 96:8,
191:8, 193:11,
194:10, 194:16,
195:22, 196:1,
196:10, 197:8,
197:17
**assistance**
192:13, 192:15,
193:3, 193:5,
197:5, 277:13,
277:15, 285:17
**assistant**
6:17, 20:15,
20:24, 21:4,
21:14, 25:5,
27:10, 27:18,
28:6, 28:8,
28:24, 29:16,
29:18, 30:24,
33:16, 33:17,
43:7, 43:9,
45:20, 46:23,
46:25, 47:11,

47:14, 47:17,
51:18, 52:19,
53:3, 53:5,
53:14
**assisted**
22:10, 22:13,
22:16, 22:18,
61:15, 61:18,
61:22, 277:12,
282:24
**assisting**
21:16, 190:9,
277:9
**assists**
76:13, 88:21,
96:10, 284:23
**associate**
9:5
**associated**
72:6, 87:11,
128:23, 205:23,
206:13, 207:1,
222:8
**assume**
186:12, 209:17,
306:9
**assuming**
195:20, 235:24,
262:12, 310:2
**assumption**
299:5
**attached**
11:8, 12:2,
31:10, 50:9,
50:11, 56:11,
58:11, 102:4,
148:14, 173:21,
238:22, 259:16,
259:24, 270:10,
272:9, 286:24,
293:7, 306:14,
313:7
**attempt**
92:12, 184:10,
188:3, 296:19
**attempting**
206:20
**attempts**
92:18

**attended**
53:17
**attention**
136:11
**attorney**
2:10, 6:17,
9:19, 9:21,
14:1, 14:9,
16:6, 16:8,
16:12, 23:6,
51:7, 51:9,
51:17, 51:23,
52:17, 52:24,
59:6, 60:21,
60:23, 71:5,
123:20, 131:14,
133:16, 169:4,
171:18, 171:25,
172:3, 172:14,
172:20, 173:7,
173:15, 174:2,
174:5, 174:8,
174:13, 182:25,
283:20, 283:21,
284:5, 312:10
**attorney's**
55:1, 133:15,
169:13, 171:11,
171:22, 172:6,
172:19, 173:10,
173:18, 173:19,
173:23
**attorneys**
7:16, 8:20,
50:4, 50:18,
61:25, 128:17,
167:1, 168:16,
169:4
**authority**
68:24, 71:1,
71:20, 100:16,
101:3, 101:14,
101:20, 210:4,
280:3, 280:4
**authorization**
299:24, 300:8
**authorizations**
111:12

**authorized**
110:15, 110:24,
191:7, 210:23,
211:6, 211:23,
212:6, 212:12
**automation**
54:14
**avail**
74:2
**available**
37:23, 39:2,
39:25, 113:5,
113:25, 114:10,
115:4, 115:10,
115:14, 115:18,
115:21, 115:25,
116:7, 116:15,
116:17, 116:21,
117:3, 117:5,
117:10, 117:11,
117:14, 117:18,
117:22, 117:25,
118:8, 118:15,
118:17, 118:20,
118:21, 118:24,
217:7, 219:15,
219:17, 220:2,
220:7, 220:16,
242:4, 242:7,
287:14
**availing**
74:1
**avenue**
4:11, 7:17
**average**
209:8, 209:11,
209:14
**avoid**
35:10, 155:19,
212:7, 248:7,
248:14
**awaiting**
130:13
**award**
101:4
**awarding**
47:20
**awareness**
229:7, 232:19,

233:6, 233:15,
234:8, 234:23,
244:9, 274:24,
283:1, 284:16,
295:4
**away**
17:3, 17:6,
249:20, 288:20

**B**

**back**
21:6, 25:13,
33:3, 34:5,
41:24, 46:17,
49:10, 54:11,
67:13, 120:13,
126:8, 160:15,
207:14, 212:22,
214:3, 214:17,
219:7, 226:6,
250:1, 251:9,
265:24, 276:13,
279:25, 282:20,
285:18, 303:24,
308:19
**background**
260:2
**baker**
8:3
**ballot**
86:5, 91:19,
91:23, 92:1,
189:10, 189:21,
190:10, 190:14,
190:20, 191:1,
191:5, 191:9,
191:11, 191:19,
192:1, 192:4,
192:6, 192:13,
192:19, 193:12,
194:4, 194:16,
194:23, 195:13,
195:24, 196:2,
196:11, 196:22,
197:9, 197:15,
249:4
**ballots**
91:21, 190:4,

191:15, 192:9
**ballpark**
27:21, 27:22,
167:4
**ban**
76:5, 83:21,
108:11, 129:5,
130:4, 130:10,
130:21, 214:8,
227:20, 227:24
**banning**
63:6, 63:13,
65:5, 65:24,
80:3, 81:11,
81:14, 82:11,
83:1, 85:12,
88:2, 88:7,
90:1, 94:25
**bans**
108:15, 128:1
**barring**
146:25, 244:8
**based**
23:12, 39:20,
40:11, 69:1,
71:23, 85:22,
94:14, 123:11,
154:4, 156:12,
186:6, 256:6,
256:23, 275:20
**bases**
197:24, 214:8
**basing**
256:10
**basis**
103:15, 109:4,
203:21, 215:16,
216:3, 216:23,
256:20, 279:6,
295:9, 295:15,
295:20
**bat**
246:2
**batch**
26:12, 26:15,
26:17, 26:18,
30:10, 43:16,
137:25, 138:10

**batches**
25:18, 25:22,
26:2, 26:10,
26:24, 45:25,
181:11, 282:12
**bates**
239:2
**battery**
241:19
**bay**
8:4
**beach**
10:3, 10:9
**bearing**
89:2, 89:8,
299:18
**became**
53:7, 53:18,
53:25, 305:14,
311:24
**become**
37:9, 55:14,
87:9, 90:8,
91:5, 106:19,
116:15, 231:24
**becomes**
145:20, 297:16
**been**
13:3, 13:22,
17:17, 25:3,
28:7, 31:1,
36:10, 48:4,
49:16, 50:19,
52:20, 56:23,
58:23, 75:9,
78:23, 81:18,
82:2, 82:4,
89:21, 97:20,
122:24, 125:16,
125:22, 126:1,
128:13, 128:16,
128:19, 128:22,
129:11, 129:14,
129:15, 129:16,
129:21, 130:12,
133:11, 142:15,
142:17, 157:10,
159:9, 159:21,

168:20, 171:20,
175:5, 181:19,
181:24, 182:8,
183:8, 183:10,
183:19, 232:10,
234:24, 236:15,
237:18, 240:22,
240:23, 241:14,
241:19, 242:15,
244:24, 245:2,
246:19, 247:19,
250:5, 250:25,
252:13, 262:14,
268:15, 270:7,
271:6, 271:10,
271:13, 272:19,
272:21, 273:25,
274:5, 274:6,
292:23, 297:11,
300:21, 304:3,
305:13, 305:19,
309:23
**before**
3:15, 13:22,
13:24, 14:2,
14:5, 14:23,
15:13, 21:3,
34:16, 52:1,
52:18, 53:2,
53:5, 56:18,
56:21, 85:1,
101:6, 101:8,
101:19, 102:7,
136:4, 139:11,
139:21, 140:13,
145:12, 145:18,
146:23, 147:4,
149:8, 150:13,
150:16, 151:7,
155:13, 159:3,
228:9, 232:23,
237:15, 247:2,
249:25, 263:8,
263:25, 274:25,
279:3, 282:2,
305:10, 314:2
**beforehand**
235:20

**began**
20:24, 25:9,
68:12, 96:21
**beginning**
53:12, 213:14,
304:8
**begins**
141:7
**behalf**
4:3, 4:16, 5:3,
5:11, 5:18, 6:3,
6:14, 7:3, 7:13,
8:3, 8:16, 9:3,
9:11, 9:19,
10:3, 38:2,
38:24, 44:22,
56:24, 63:8,
63:15, 91:17,
130:25, 131:2,
183:6, 191:25,
204:20, 207:9,
207:17, 208:11,
212:21, 213:24,
221:10, 240:21,
261:12, 261:24,
295:23
**behind**
285:20
**being**
14:9, 14:13,
15:16, 23:25,
24:20, 35:10,
68:8, 91:15,
91:21, 92:4,
104:15, 123:23,
132:5, 132:11,
132:13, 132:16,
134:4, 146:4,
146:10, 152:2,
153:5, 163:5,
182:23, 183:17,
205:6, 205:20,
212:24, 217:13,
224:18, 225:6,
226:23, 231:14,
231:25, 246:15,
252:18, 261:17,
274:25, 275:19,

276:16, 276:21,
276:22, 281:4,
282:6, 283:4,
294:12, 299:19,
300:24, 301:4,
302:9
**believe**
13:19, 21:9,
25:7, 25:15,
25:19, 28:16,
41:15, 42:4,
43:3, 44:15,
44:21, 49:7,
49:13, 52:11,
58:15, 64:17,
64:21, 64:24,
71:23, 73:19,
74:5, 74:7,
76:18, 79:11,
81:16, 82:11,
82:25, 83:4,
88:7, 94:21,
96:15, 97:3,
100:7, 102:18,
111:15, 113:8,
113:12, 113:16,
114:11, 115:12,
121:19, 132:3,
138:6, 144:19,
147:6, 147:8,
148:25, 151:8,
153:3, 154:12,
155:10, 159:12,
160:25, 161:1,
161:18, 163:7,
171:4, 176:10,
184:3, 193:8,
194:14, 194:23,
195:4, 199:15,
199:22, 200:9,
202:10, 216:4,
216:24, 218:7,
220:21, 227:10,
227:15, 227:22,
228:4, 228:10,
236:25, 237:10,
248:9, 254:4,
255:23, 255:25,

256:2, 256:8,
256:25, 258:23,
259:13, 263:17,
264:8, 265:11,
266:18, 269:24,
271:13, 275:5,
275:6, 297:10,
298:21, 307:25,
308:4
**believed**
45:4, 45:9,
138:14
**believes**
62:15, 63:6,
63:12, 65:1,
90:1
**believing**
215:16
**beloved**
302:16, 311:3
**below**
103:6, 151:10,
153:15
**beneficial**
284:14
**best**
14:20, 86:4,
94:1, 94:6,
97:11, 184:4,
285:14
**better**
37:2, 48:23,
65:16, 149:9,
150:11, 151:17,
225:13, 226:8,
239:7, 240:4,
240:16, 246:10,
249:19, 277:14
**between**
31:10, 53:12,
62:18, 77:2,
81:21, 89:17,
98:8, 134:10,
147:21, 223:8,
223:16, 223:20,
224:20, 224:24,
225:16, 225:24,
283:19, 308:20

beyond
33:13, 99:9,
150:23, 151:4,
284:4
big
165:13, 165:14,
206:10
bigger
148:25, 149:4,
149:5, 149:11,
151:15, 303:25
bill
228:14, 230:5
billed
305:1
binding
15:21
bit
14:19, 151:14,
151:20, 239:25,
240:1, 247:2,
257:24, 268:19
black
28:11, 230:10,
231:6
blackwell
5:13
blank
93:4, 201:23,
202:2, 202:6,
202:7, 202:13,
203:17, 203:18
blanket
262:19
blindness
192:14, 193:3
blue
260:4
bonus
22:11
book
34:16, 90:23,
90:24, 112:11,
145:8, 145:12,
145:18, 146:23,
149:8, 219:20
books
116:8, 116:11,

117:9, 118:3,
201:21, 219:24,
221:24, 296:15
booth
197:5
border
148:2, 148:4
both
14:11, 16:14,
160:11, 211:21,
250:9, 252:11,
261:9, 283:7,
283:12, 284:15,
295:4
bottom
110:19
boulevard
8:11, 10:7
box
7:9, 300:20
brad
21:12, 60:24
bradford
8:4
branches
1:6, 4:4
breaches
177:10, 178:24,
179:12, 180:3,
180:15, 180:24,
181:7, 183:19
break
15:10, 15:14,
62:4, 102:7,
134:11, 136:12,
175:18, 178:19,
187:3, 229:5,
235:3, 275:25,
276:4
breakdown
33:10, 229:7,
229:15, 229:17,
232:7, 232:20,
233:3, 233:6,
233:16, 233:25,
234:16, 234:21
breakdowns
231:22

breaking
66:5, 103:13,
111:7, 134:10,
297:24
brent
4:18, 235:14,
235:22
brevard
6:3
brief
30:17, 30:18,
53:18, 248:4,
270:3, 270:15
briefing
58:9, 58:13,
58:18, 201:9,
270:3
briefly
53:13, 53:21,
187:6, 211:2,
259:12, 265:24,
266:11, 273:4
bring
247:2, 247:17,
255:1, 305:24
broad
9:7, 65:12,
251:13
brought
136:11, 231:8,
279:4, 308:10
broward
7:13, 7:16
bucks
209:2
budget
80:20, 80:25,
209:19
building
204:18, 204:22
bulk
307:13
bumped
207:12
bunch
88:13, 298:23
burden
155:11

burdens
79:12, 155:21
burdensome
50:6, 79:22
bureau
23:4
business
53:24, 54:13,
208:4
byrd
1:11, 2:18,
5:18, 18:24
byrd's
12:7

C

calculating
308:13
calendar
25:10, 101:18,
158:17, 159:9
calhoun
8:4
call
26:3, 32:9,
33:20, 52:22,
55:17, 73:18,
77:16, 112:19,
169:24, 207:4,
219:11, 254:3,
280:25
called
39:25, 47:23,
55:3, 55:24,
271:24
calling
40:16, 138:23,
140:21, 219:3,
219:8, 236:15,
237:5, 240:24
came
40:12, 175:5,
210:8
camera
16:14
campaign
4:20
can't
28:18, 29:2,

42:13, 50:2,
50:4, 50:17,
59:24, 66:20,
67:8, 67:23,
68:2, 72:24,
72:25, 74:16,
74:18, 77:25,
82:1, 85:16,
90:20, 91:5,
92:17, 96:22,
104:23, 105:19,
109:7, 109:13,
122:14, 131:22,
133:7, 133:16,
133:18, 133:21,
140:9, 153:25,
161:23, 162:15,
163:13, 166:9,
169:21, 180:11,
182:25, 185:4,
185:14, 185:22,
186:17, 188:16,
188:25, 193:8,
194:20, 195:16,
229:2, 234:15,
234:22, 234:25,
243:11, 254:15,
256:24, 257:3,
257:8, 262:18,
262:19, 265:17,
269:2, 276:18,
282:18, 283:5,
285:5, 289:1,
289:12, 289:13,
289:25, 290:18,
290:20, 299:11,
299:12, 300:16,
304:14, 307:23

**candidates**
70:25

**cannot**
145:9, 269:4

**canvasser**
239:23, 278:12

**canvassers**
73:18

**canvassing**
202:12, 202:18

**cap**
96:17, 97:8,
97:19, 97:24,
98:1, 98:5,
99:12, 101:10,
157:8, 157:19,
159:4, 159:8,
159:16, 159:20,
159:21

**capacity**
1:12, 2:9, 2:19

**capias**
67:23

**capitol**
9:22

**capped**
97:24

**caps**
228:6

**caption**
2:1

**card**
84:6, 218:13,
218:20, 219:2,
219:5, 219:13

**care**
265:21

**carry**
222:15

**carter-baker**
280:12

**carveout**
203:23

**case**
1:6, 11:16,
24:17, 37:17,
40:18, 41:21,
42:8, 57:7,
57:22, 59:13,
59:15, 59:24,
60:1, 61:9,
61:11, 165:3,
169:12, 171:13,
174:1, 180:21,
191:12, 223:1,
238:13, 239:5,
248:4, 270:16,
293:2, 293:11,

310:8, 314:11

**cases**
23:15, 39:15,
40:15, 54:22,
55:17, 55:20,
55:23, 56:1,
56:2, 58:23,
82:14, 91:20,
92:1, 94:15,
152:20, 164:2,
169:2, 173:9,
180:5, 180:7,
180:8, 180:16,
180:18, 191:20,
191:23, 192:2,
243:19, 245:1,
281:7, 281:9,
307:9, 307:11,
307:14, 307:15,
307:18, 307:19,
309:22

**cast**
192:12, 249:18,
250:4

**catch**
213:13, 240:5,
246:13, 251:7

**categories**
250:16

**category**
244:4, 253:14,
257:17

**cause**
161:8

**caused**
139:25, 309:15

**causes**
195:4

**center**
4:6, 4:20,
285:6

**centered**
59:12

**centers**
87:24, 123:22

**central**
152:5

**certain**
48:18, 51:3,

51:21, 58:15,
93:3, 98:2,
148:3, 170:16,
172:18, 184:5,
185:18, 186:10,
186:14, 220:12,
223:2, 223:12,
240:19, 240:22,
241:1, 245:25,
261:10, 261:22,
274:24

**certainly**
19:1, 32:6,
34:12, 36:16,
37:4, 38:6,
62:25, 63:1,
63:18, 64:14,
66:1, 68:4,
73:10, 73:11,
77:19, 81:7,
83:12, 83:18,
84:2, 84:14,
87:21, 89:21,
91:3, 95:4,
95:24, 97:21,
98:1, 99:14,
99:20, 100:4,
100:10, 105:16,
122:6, 126:17,
126:24, 133:5,
146:15, 150:21,
154:21, 161:15,
162:17, 166:1,
166:12, 180:6,
180:12, 182:21,
190:12, 223:7,
224:19, 227:1,
243:3, 246:6,
246:7, 250:16,
250:19, 254:18,
257:17, 257:21,
257:23, 258:18,
261:14, 268:12,
284:17, 285:9,
285:24, 294:11,
295:8, 295:15,
295:20, 296:8,
304:4

**certainty**
280:9
**certificate**
314:1
**certify**
314:4
**cetera**
134:21
**chain**
19:1, 141:20,
141:21, 142:3,
283:19
**challenge**
82:8, 193:24,
196:5
**challenged**
62:16, 62:18,
102:22, 115:13,
120:20, 193:19,
195:14, 223:25,
225:25, 226:3,
226:10, 226:13,
226:19, 226:23,
227:3, 236:24,
251:24, 294:9,
297:8
**chance**
291:15, 301:24,
302:3
**change**
54:2, 86:17,
86:18, 90:19,
133:12, 143:23,
165:9, 185:19,
205:22, 207:24,
209:7, 212:3,
255:15, 264:10,
266:9, 303:13
**changed**
35:10, 91:24,
296:12, 301:24,
302:3, 302:4
**changes**
198:20, 226:22,
248:25, 269:8,
303:18
**changing**
38:4, 91:25,

**100:7, 126:18,**
143:17, 268:2
**chapter**
217:10, 217:19,
239:10, 240:12,
242:16, 253:21,
254:21, 254:24,
257:13, 257:20,
273:2
**character**
90:21
**characterization**
50:25, 299:14,
311:13
**characterize**
253:5, 253:7,
254:2
**charged**
40:14, 42:17,
182:18
**charges**
309:23, 310:2
**charging**
85:9, 239:20,
240:6, 255:3
**charlotte**
37:1, 182:17
**chart**
306:22, 306:25
**chat**
56:9, 56:13,
238:14, 238:19,
259:12, 272:5,
272:7, 293:3
**check**
74:15, 95:20,
206:22, 300:20
**check-ins**
19:25
**chief**
70:6
**choice**
192:16, 193:6
**choose**
185:11
**chose**
49:19
**chunk**
209:7

**circuit**
58:19, 239:4
**circumstances**
150:25, 152:24
**cited**
201:8
**citizen**
70:1, 112:6,
187:13, 311:24
**citizens**
69:17, 103:21,
103:25, 107:22,
107:24, 107:25,
108:18, 108:19,
111:20, 112:2,
112:7, 213:18,
301:14
**citizenship**
64:17, 64:22,
66:2, 66:15,
66:20, 67:1,
67:10, 67:12,
68:21, 70:20,
70:22, 70:24,
70:25, 72:18,
74:16, 74:20,
78:16, 78:19,
79:3, 79:10,
79:17, 82:1,
106:7, 121:13,
121:18, 122:1,
122:19, 123:3,
123:15, 123:25,
124:11, 124:13,
124:17, 125:1,
126:5, 130:17,
131:24, 187:8,
187:10, 187:24,
188:1, 197:24,
201:22, 227:6,
227:10, 227:14,
301:23
**citrus**
6:4
**civil**
51:9, 51:10,
51:17, 51:23,
52:23, 54:1,

**72:6, 75:17,**
101:4, 135:21,
141:17, 173:15,
173:21, 280:24,
280:25, 281:5,
294:21, 296:25
**claims**
236:7
**clarification**
14:4, 15:4,
16:2, 49:17
**clarified**
153:4
**clarifies**
195:15
**clarify**
21:7, 32:7,
46:1, 89:24,
101:9, 175:15
**clarifying**
137:21, 196:18
**clarity**
58:22
**classify**
303:9
**clay**
28:17
**clean**
134:20
**cleaning**
207:11, 207:17,
208:1
**clear**
14:16, 33:12,
33:19, 34:2,
48:5, 49:10,
50:17, 51:2,
51:7, 51:11,
94:16, 114:18,
145:5, 223:15,
223:19, 239:11,
240:17, 241:16,
243:5, 257:9,
258:14, 263:7,
282:9, 288:25,
295:5
**clearer**
113:16, 158:20

clearly
97:9, 129:8,
157:1, 245:23
clearwater
8:22
clemency
268:21, 268:23,
268:24, 269:3,
269:5
clerical
32:2
clerk's
242:7, 242:8
client
284:7
clock
59:21, 166:6
clocked
156:17, 156:18
clocking
165:19
clogging
88:24
close
148:4, 299:17
closed
309:21
closely
67:21, 69:3
closer
60:18
closing
34:16, 34:17,
90:23, 90:24,
145:8, 145:13,
145:18, 146:23,
149:8
co-counsel
294:22
co-founded
53:23
code
30:7, 144:5,
145:6, 180:11,
214:19, 253:15,
253:19
cody
11:15, 85:6,

238:8, 238:9,
238:11, 240:11,
241:18, 242:3,
242:14, 243:19,
279:3
cody's
239:5
coffee
17:9
cofounding
54:8
colleague
259:4
collect
76:6, 104:21,
105:9, 109:11,
119:22, 258:6,
261:23
collected
31:4, 34:15,
68:11, 103:10,
104:12, 105:24,
152:3, 152:8,
181:13, 283:9
collecting
32:25, 33:14,
36:25, 63:7,
63:14, 65:6,
65:24, 72:2,
72:7, 80:3,
93:18, 107:22,
108:12, 108:16,
125:10, 197:22,
199:2, 199:3,
200:6, 205:3,
205:18, 212:20,
213:6, 213:17,
213:22, 215:13,
240:20, 261:11,
261:25, 288:25,
302:19
collective
34:24, 229:2
college
53:6
columbia
8:4
combination
44:24, 90:24,

146:14, 156:1
come
28:5, 28:22,
33:23, 40:13,
77:13, 108:23,
133:25, 250:1
comes
127:2, 165:11,
170:10, 249:24,
249:25, 298:23,
309:1
coming
72:24, 276:13
command
19:1
comment
36:14, 131:22,
179:9, 184:2
commenting
131:6
comments
231:10
commission
314:17
commit
87:1, 87:23,
251:1, 253:18,
280:21
commits
222:11
committed
44:16, 45:14,
72:12, 237:20,
239:9, 240:11,
243:21, 243:22,
245:17, 250:10,
251:8, 271:7,
271:11, 273:16,
277:11, 277:17,
284:10, 295:7
committing
66:13, 67:15,
68:16, 73:7,
75:11, 77:5,
150:19, 279:5,
279:20, 281:12
common
33:21, 34:11,

34:14, 34:17,
34:23, 35:8,
35:19, 38:7,
280:20, 281:3
communicate
16:11, 127:22,
141:16
communication
16:16, 225:12,
236:23
communications
224:19, 225:15
companies
54:12, 119:22
company
54:9, 117:20,
211:14, 211:17,
211:21, 211:25
comparable
271:20, 274:12
comparatively
29:14
compare
309:9
compared
309:3
compelling
64:14, 64:24,
65:1, 83:13,
83:19, 84:18,
99:20, 100:4,
293:25, 294:7
compile
37:22
complainant
30:14, 44:10,
45:11
complainants
26:20
complaint
25:24, 26:1,
26:9, 30:2,
30:9, 32:17,
43:12, 44:9,
57:24, 67:18,
67:19, 69:9,
77:23, 98:19,
137:8, 137:13,

138:23, 140:7,
140:15, 140:22,
141:22, 141:24,
142:2, 142:14,
164:19, 164:22,
164:23, 165:1,
165:3, 165:7,
165:8, 165:10,
165:21, 165:22,
181:10, 282:8,
305:16
**complaint's**
308:15
**complaints**
22:20, 24:24,
25:3, 25:6,
25:14, 25:17,
25:23, 26:3,
26:5, 26:23,
27:8, 27:12,
27:15, 28:3,
29:5, 29:8,
29:10, 29:13,
29:25, 31:19,
32:10, 32:11,
33:7, 33:11,
33:15, 34:10,
43:6, 44:6,
45:25, 50:21,
58:22, 58:24,
58:25, 69:1,
69:2, 69:11,
69:12, 69:13,
69:15, 69:25,
70:11, 78:4,
94:14, 138:20,
140:14, 166:2,
166:7, 168:10,
180:10, 303:16,
305:9, 307:1,
308:9
**complete**
38:13, 94:7,
95:14, 114:13,
124:22, 145:23,
146:21, 147:4,
147:9, 206:16,
241:6, 255:16,

255:17, 255:18,
286:7, 313:5
**completed**
23:15, 38:22,
40:8, 40:25,
41:5, 41:6,
77:10, 77:15,
77:21, 93:19,
94:3, 94:7,
95:18, 95:19,
103:18, 103:24,
108:24, 109:11,
109:16, 145:12,
145:18, 146:18,
146:23, 149:7,
202:22, 203:16,
203:18, 204:6,
204:25, 205:8,
206:5, 206:21,
207:12, 262:24,
264:14, 264:19,
265:16
**completely**
14:23, 81:15,
121:5, 155:19
**completing**
265:3
**completion**
223:2
**compliance**
45:7, 46:7,
95:10, 117:1,
194:25, 210:14,
210:25, 211:19,
214:7, 216:13,
217:21, 217:23,
218:2, 218:14,
218:21, 220:22,
222:2, 298:5
**compliant**
77:15
**complied**
296:16
**complies**
81:6, 147:14
**comply**
31:9, 52:15,
213:9, 213:16,

298:2
**complying**
35:6, 155:19
**comprehensive**
30:12, 31:13,
38:5, 44:13,
62:25, 63:17,
64:2, 64:11,
69:14, 82:23,
83:5, 83:11,
83:14, 83:16,
99:13, 99:19,
100:2, 251:4,
251:6, 304:15,
305:4
**comprehensively**
178:18
**computer**
17:1, 193:22
**concern**
77:4, 84:6,
246:18, 246:21,
280:5, 280:6,
280:16, 285:13,
289:17, 290:6
**concerned**
77:7, 97:3,
279:21, 280:1
**concerning**
34:4, 125:8,
130:3, 130:9,
131:10, 141:23,
249:8
**concerns**
155:21, 290:14
**concluded**
181:15
**concur**
45:11, 165:6
**conduct**
35:21, 66:2,
70:15, 71:12,
90:25, 103:22,
107:13, 132:1,
142:24, 143:2,
150:4, 150:7,
158:20, 171:14,
173:24, 175:23,

176:14, 177:4,
177:9, 178:23,
189:9, 191:16,
205:10, 208:4,
234:4, 246:5,
281:9, 281:12
**conducted**
1:21, 3:1,
129:1, 234:13,
242:23, 242:25,
245:10, 295:7,
308:5
**conducting**
70:7, 131:20,
131:21, 132:10,
204:18, 204:19,
207:23, 211:24,
211:25, 246:1,
246:15, 256:9,
260:25, 268:11,
288:3, 292:16,
294:18, 295:1,
295:3, 299:10,
301:25
**conducts**
107:3
**conference**
1:5, 4:3
**confidence**
63:23, 79:25,
83:9, 84:4,
99:16, 247:8,
265:21, 294:4
**confident**
122:20, 122:23,
157:9, 232:10,
242:18, 243:4,
243:16, 245:4,
245:8, 245:19
**confines**
98:3, 126:9,
126:11, 126:17,
280:2
**confirm**
41:9, 45:7,
109:7, 170:13
**confirmation**
72:10, 72:15,

72:19, 72:20,
73:1
**confirmed**
175:23, 176:13,
177:4, 177:9,
189:9
**confirming**
95:17, 147:14
**confirms**
72:23
**conflict**
195:4
**conflicting**
249:13
**confused**
156:5, 196:14
**confusion**
248:8, 248:14,
248:23, 249:3,
249:11, 249:12,
249:16, 250:3,
250:13
**connection**
62:18
**consent**
120:4, 190:24,
190:25, 191:8,
191:10, 191:18,
192:5, 277:23
**consented**
155:18
**consequence**
161:19, 208:8,
208:14
**consequences**
221:25, 222:7,
222:9, 223:13
**conservative**
27:23
**consider**
19:11, 34:8,
50:21, 116:7,
117:21, 117:24,
118:7, 118:14,
118:16, 118:23,
119:5, 165:12,
189:21
**consideration**
227:11, 227:12

**considered**
19:18, 26:9,
268:25, 269:9,
286:7
**consistent**
75:2, 99:7,
104:8, 121:11,
170:22
**consolidated**
58:23
**constituent**
98:22
**constitution**
71:3, 110:12,
111:23
**constitutional**
110:11, 221:21
**consultant**
164:14
**consultation**
224:17, 255:5
**consulted**
123:19, 123:20,
124:9, 124:24,
129:18, 224:9,
224:10
**contact**
92:12, 92:16,
92:20, 108:23,
120:11, 141:23,
142:4, 143:7,
168:8, 220:19,
220:23, 221:2,
286:9, 287:4,
287:19
**contacted**
96:24, 142:14,
170:3
**contacting**
93:11, 94:4
**contain**
25:24, 44:24,
179:19, 233:8,
233:10, 286:9
**contained**
35:12, 36:4,
37:21, 40:18,
40:25, 57:12,

75:23, 76:16,
86:6, 96:19,
97:7, 98:14,
99:23, 121:14,
126:10, 230:2,
234:9, 239:12,
287:15, 298:10
**contains**
30:8, 51:5,
205:7
**contends**
62:16
**content**
151:10
**context**
80:7, 149:25,
150:3, 199:3,
208:21, 251:18
**continually**
66:4
**continue**
33:23, 62:5,
77:18, 260:8,
276:1, 297:23
**continued**
2:1, 97:15,
116:11
**control**
147:3, 147:12,
147:13, 148:22
**controlled**
71:2, 187:18,
299:23
**conversation**
59:10, 59:18,
93:14, 93:17,
93:21, 94:10,
96:18, 96:21,
98:8, 99:1,
133:3, 147:15,
224:14, 243:10,
244:16, 267:10,
276:23
**conversations**
59:21, 60:9,
147:20, 224:23,
225:5, 225:16,
225:19, 225:21,

225:22, 225:23,
226:4, 226:6,
226:7, 232:14,
232:17, 233:1,
276:18, 283:6,
284:16, 285:4
**convicted**
36:5, 182:18,
237:18, 240:22,
241:19, 242:3,
242:16, 246:4,
246:19, 246:22,
250:25, 252:14,
254:9, 257:12,
262:14, 263:11,
263:22, 268:1,
268:4, 268:15,
269:11, 269:16,
271:6, 271:14,
272:19, 274:5,
274:6, 274:11,
300:14, 300:17,
300:21
**conviction**
35:24, 36:2,
36:9, 36:10,
42:1, 42:14,
222:15, 242:9,
246:6, 246:25,
256:7, 257:10,
269:8, 271:9,
273:25, 310:3
**convictions**
35:13, 82:15,
82:19, 84:8,
238:1, 238:2,
240:16, 241:5,
241:22, 243:7,
250:15, 265:15,
271:19, 300:12
**cookies**
120:5
**coordinate**
59:22
**coordinated**
124:14
**coordinator**
167:10

**coordinators**
167:21
**copied**
221:12
**copies**
134:20
**copy**
102:2, 218:10,
218:18, 220:18,
259:19, 259:22,
272:1, 312:6,
312:10
**cord**
1:11, 2:18,
5:18
**corey**
36:5, 42:3,
238:1, 238:9
**corners**
76:17, 155:3
**corporate**
213:1
**corporations**
213:3
**corps**
19:3, 53:10,
302:16, 311:3
**correct**
25:1, 38:18,
41:13, 64:9,
65:2, 72:3,
92:5, 92:21,
94:5, 101:22,
101:23, 108:14,
108:17, 108:18,
112:23, 116:4,
146:12, 146:17,
147:25, 156:4,
159:6, 179:4,
183:4, 183:25,
185:3, 192:8,
200:2, 209:25,
218:6, 239:13,
239:24, 241:22,
244:6, 253:2,
254:23, 263:10,
265:7, 265:10,
266:17, 269:21,

272:14, 272:22,
273:3, 273:6,
273:9, 273:11,
273:17, 274:16,
278:5, 278:22,
279:8, 279:10,
279:11, 281:8,
284:19, 285:23,
285:24, 287:9,
288:8, 288:9,
293:19, 294:5,
294:10, 295:13,
296:10, 297:19,
298:7, 300:6,
300:17, 307:6,
308:10, 309:22,
309:25, 310:5,
313:5, 314:5
**correcting**
92:25
**corrections**
313:6
**correctly**
27:4, 38:25
**couldn't**
91:10, 117:9,
305:4
**counsel**
13:19, 20:16,
20:25, 21:4,
21:14, 21:24,
25:5, 25:8,
27:10, 27:18,
28:6, 28:8,
28:25, 29:16,
29:18, 30:24,
33:16, 33:17,
43:8, 43:9,
45:20, 47:12,
49:9, 49:14,
51:19, 52:19,
53:3, 53:6,
57:6, 59:7,
60:12, 60:20,
61:10, 123:8,
123:11, 128:16,
129:2, 134:17,
134:25, 136:8,

167:2, 167:6,
171:9, 173:4,
189:3, 196:13,
235:8, 235:14,
259:4, 314:9
**counsel's**
49:2, 60:3,
168:17, 171:5,
171:6, 171:12,
171:17, 171:23,
172:22
**count**
307:24
**counted**
307:22, 309:20
**counties**
6:5, 7:5, 8:8,
148:5, 155:13,
182:17, 284:14,
288:23
**counting**
91:19
**country**
66:13, 68:1,
73:6, 75:12,
103:17, 104:11,
104:15, 111:8,
112:5, 112:6,
112:8, 112:12,
112:15
**county**
6:15, 6:17,
7:14, 7:16,
8:17, 8:20,
9:12, 10:4,
28:17, 28:18,
28:19, 30:1,
30:14, 34:25,
37:1, 76:24,
77:1, 80:15,
86:22, 87:8,
90:5, 90:6,
110:10, 136:11,
136:15, 137:3,
137:4, 137:8,
137:10, 137:17,
140:1, 140:10,
146:22, 147:18,

147:25, 148:3,
152:4, 152:13,
152:14, 152:20,
152:21, 152:22,
152:25, 153:1,
153:4, 153:5,
153:13, 154:11,
154:13, 154:15,
154:25, 155:2,
155:5, 155:7,
155:8, 155:10,
156:2, 156:4,
156:10, 156:13,
156:16, 156:20,
170:13, 172:10,
239:4, 242:7,
242:8, 242:10,
248:21, 288:21,
309:16
**couple**
256:13, 279:4,
306:11
**course**
176:11, 236:19,
290:4
**court**
1:1, 8:21,
13:24, 13:25,
14:1, 14:5,
14:11, 15:1,
32:21, 127:8,
144:25, 239:4,
259:20, 312:4,
312:8, 312:9
**courts**
74:3
**cover**
30:11, 30:13,
45:2, 138:10,
138:15, 138:24,
139:5, 140:23,
164:21, 189:4,
282:10
**covered**
236:7, 264:15
**create**
79:11, 90:20,
118:1, 118:10,

127:6, 165:3
**created**
125:8, 130:3,
130:9, 144:20,
145:13, 160:16
**creation**
207:20
**credit**
84:6
**crime**
18:5, 66:3,
66:14, 67:18,
71:23, 77:5,
79:13, 143:15,
152:1, 170:6,
223:20, 242:5,
251:7, 256:20,
261:13, 261:14,
261:15, 269:11,
274:11, 277:13,
277:16, 284:11,
295:5, 295:7,
303:17, 304:2,
307:20, 309:13
**crimes**
17:16, 17:25,
18:10, 18:14,
46:24, 47:1,
47:15, 47:18,
52:6, 69:15,
70:4, 70:14,
70:18, 71:4,
71:6, 71:8,
71:21, 72:17,
85:8, 101:22,
107:18, 122:4,
124:4, 126:23,
132:13, 133:6,
135:13, 135:25,
136:24, 163:19,
168:21, 169:3,
169:16, 171:16,
176:1, 177:7,
187:15, 242:3,
245:25, 246:3,
252:18, 254:5,
254:7, 254:9,
254:14, 254:17,

257:12, 257:17,
257:20, 269:25,
282:4, 303:4,
304:5, 309:3,
309:9
**criminal**
35:9, 35:20,
35:21, 44:20,
75:12, 75:13,
80:10, 82:14,
82:18, 84:8,
94:14, 94:15,
142:7, 142:10,
142:24, 143:1,
143:9, 165:7,
165:10, 172:2,
173:11, 173:20,
173:23, 174:14,
184:2, 190:24,
191:12, 191:20,
222:13, 222:18,
223:7, 240:15,
241:6, 241:7,
242:25, 252:15,
254:19, 255:24,
256:3, 257:1,
274:20, 277:3,
277:4, 277:10,
277:11, 277:15,
277:21, 280:25,
281:4, 283:14,
283:15, 284:9,
292:16, 294:20,
296:24, 296:25
**criminalized**
85:1
**criminalizes**
255:3
**criminally**
36:7, 42:10
**criteria**
260:25, 261:18,
267:12, 274:1
**critical**
103:22
**cross-referencing**
256:16
**cure**
91:6, 95:22,

184:11, 184:12,
184:15, 184:21
**current**
17:14, 17:15,
20:18, 183:14
**currently**
89:13, 128:4,
130:18, 131:25,
160:10, 162:7,
163:24, 163:25,
164:13, 183:13,
185:25, 186:5,
187:7, 296:15,
297:2
**custody**
103:19, 263:16,
265:15
**customs**
66:18, 78:22,
187:17, 187:21,
188:9, 188:25
**cut**
32:21, 246:11
**cynthia**
1:25, 3:15,
314:2, 314:23

**D**

**dade**
77:1
**daily**
96:17, 99:11,
100:9
**dale**
6:7
**dan**
230:9
**darlington**
1:20, 3:1,
11:2, 11:9,
11:12, 12:3,
13:2, 13:5,
13:9, 23:2,
40:5, 56:10,
87:6, 102:3,
123:5, 135:2,
148:13, 207:21,
235:6, 235:13,

236:14, 238:21,
248:18, 259:15,
259:23, 270:9,
272:8, 286:23,
293:6, 306:13,
310:19, 313:2
**data**
78:23, 229:20,
229:23, 230:2,
230:3, 232:1,
244:11, 244:12,
245:12
**database**
42:22, 67:4,
67:7, 67:9,
70:21, 72:20,
78:2, 78:25,
79:2, 187:18,
188:4, 188:7,
188:14, 188:20,
189:1, 231:20,
233:13, 234:11,
287:13, 298:12,
298:14, 298:23
**databases**
37:22, 39:3,
39:13, 39:24,
78:1, 233:8,
242:11
**date**
35:7, 72:13,
98:12, 130:15,
133:4, 133:7,
141:9, 141:10,
156:18, 156:24,
157:3, 163:25,
195:1, 298:14,
313:11
**dates**
35:10
**dating**
160:15
**davis**
60:4, 60:6
**day**
77:5, 77:13,
91:8, 104:22,
105:9, 105:10,

105:13, 105:25,
106:2, 121:22,
144:13, 144:14,
209:2, 249:24,
249:25, 314:14

**days**
96:16, 143:18,
143:19, 145:12,
145:17, 145:25,
146:1, 146:22,
149:1, 149:7,
149:22, 156:3

**dead**
249:20

**deadline**
139:20, 140:18,
143:17, 145:13,
145:18, 146:23,
149:13, 150:6,
150:23, 151:4,
179:24

**deadlines**
74:13

**deal**
283:2, 283:3

**deals**
253:21

**dealt**
34:4, 292:23

**death**
249:21

**debate**
210:10, 244:16

**debated**
231:14

**debt**
255:4

**deceased**
249:17, 249:19,
250:7

**december**
307:21

**decide**
50:23, 155:22

**decides**
126:19

**decision**
52:1, 142:22,

169:15

**decision-making**
50:18

**declaration**
11:11, 12:4,
50:11, 61:15,
102:2, 102:15,
102:21, 103:2,
112:18, 114:24,
247:1, 247:12,
247:14, 248:11,
271:25, 272:14,
303:12, 306:8

**declarations**
58:11

**decline**
170:25, 172:13

**decrease**
304:9

**deep**
256:5

**deeply**
97:3

**defendant**
230:17, 230:20,
230:24

**defendants**
1:15, 2:12,
2:22, 244:13

**defending**
311:4

**defense**
275:8

**defer**
107:2, 109:15,
110:4, 111:15,
111:17, 113:20,
114:21, 117:19,
119:24, 120:12,
134:1, 140:2,
146:1, 148:23,
183:15, 187:20,
188:8, 188:9,
192:17

**deferring**
296:7

**define**
19:13, 115:5,

119:16, 147:13,
165:14, 172:24,
180:21, 193:14,
200:18, 201:17,
209:6, 261:25,
266:25, 267:4,
290:25

**defined**
26:23, 129:8,
129:9, 140:5,
157:2, 164:20,
193:16, 194:11,
219:23, 267:17,
282:9, 303:11

**defining**
31:4

**definitely**
203:11, 236:5

**definition**
114:2, 114:12,
114:13, 114:19,
115:9, 117:15,
149:24, 196:6,
197:22, 197:25,
199:13, 199:16,
199:20, 199:23,
199:25, 200:10,
201:1, 201:5,
201:10, 201:12,
201:15, 214:6,
214:9, 290:10

**defrauded**
299:12

**degree**
222:10, 222:12,
250:17, 250:22,
256:2, 309:13

**degrees**
250:18

**delay**
14:20

**delegate**
189:1

**delineation**
223:16, 223:20

**deliver**
105:17, 143:17

**delivered**
81:5, 156:15

**delivering**
96:16, 103:18,
144:15

**delivery**
100:8, 136:10,
137:2, 137:4,
156:6, 156:9,
156:13, 156:17,
156:23, 156:24,
157:2, 157:3

**democracy**
84:15, 308:23,
311:5

**democratic**
28:11, 248:8,
301:4, 301:20,
302:10, 302:13,
302:15, 302:17,
310:25, 311:1

**demonstrate**
307:4, 307:7,
307:15

**demonstrates**
308:25

**demos**
9:6

**denoted**
231:25

**denying**
253:17

**department**
18:22, 19:14,
19:18, 19:19,
19:24, 20:12,
21:14, 21:21,
21:22, 24:4,
28:7, 36:6,
37:5, 42:15,
42:25, 48:18,
48:19, 48:23,
49:8, 49:11,
50:3, 53:3,
53:6, 54:3,
57:11, 57:16,
59:3, 69:19,
70:13, 75:9,
75:23, 78:8,
80:18, 82:4,

96:20, 96:25,
97:6, 101:1,
101:3, 101:16,
107:12, 109:22,
123:21, 124:19,
126:8, 126:14,
127:6, 127:21,
136:2, 136:5,
158:12, 166:19,
168:18, 171:8,
172:25, 173:4,
173:6, 178:21,
183:3, 183:6,
187:16, 188:15,
188:18, 224:20,
225:8, 225:24,
226:17, 226:25,
227:2, 227:9,
227:11, 227:22,
228:4, 228:19,
229:1, 229:24,
231:16, 231:19,
231:20, 232:2,
233:19, 287:12,
295:17, 299:22,
299:25, 300:19,
300:25
**department-facing**
22:12
**departments**
109:23
**depend**
116:10, 120:7,
204:10, 220:8
**depending**
87:19, 124:6,
145:21, 145:22,
167:11, 200:15,
301:10
**depends**
39:7, 42:11,
143:9, 204:8,
206:17, 222:21,
225:7, 225:8,
246:24, 285:16,
303:18, 305:11
**deployments**
311:23

**deponent**
313:1
**deportation**
103:14, 107:19
**deportations**
107:3, 107:13
**deported**
104:15, 106:25,
107:9
**deposed**
13:22, 15:16
**deposition**
1:17, 3:1,
11:9, 11:10,
12:3, 15:25,
16:13, 18:11,
18:15, 56:6,
56:7, 56:10,
56:21, 57:13,
61:4, 61:6,
62:13, 64:4,
74:23, 85:7,
97:15, 102:1,
102:3, 135:19,
144:24, 148:13,
157:25, 169:14,
178:12, 187:14,
238:21, 259:15,
259:23, 270:9,
272:8, 275:17,
279:16, 286:3,
286:23, 290:8,
293:6, 306:13,
314:3
**deputy**
19:7, 20:1,
20:3, 20:5,
20:9, 21:6,
21:7, 21:9
**describe**
19:5, 22:15,
40:1, 97:15,
141:5, 158:19,
240:16, 293:17
**described**
86:11, 88:1,
142:4, 172:8,
172:10, 189:18,

214:14, 280:6
**describing**
87:2, 87:16,
277:20, 278:20
**description**
245:2
**designated**
1:19, 56:24
**desires**
145:10
**desk**
33:24, 72:24
**desoto**
6:4
**despite**
145:10, 274:14
**detail**
23:14, 42:23,
82:25, 132:8,
237:24
**detailed**
289:5
**details**
131:6, 153:15,
179:10, 202:19,
290:24
**determination**
103:21, 116:16,
116:19, 136:20,
139:4, 139:8,
142:5, 142:15,
142:19, 143:1,
148:6, 154:4,
154:23, 155:8,
156:13, 165:5,
171:3, 275:20
**determinations**
187:8, 187:10
**determine**
43:14, 43:15,
117:4, 124:10,
129:18, 139:24,
140:25, 141:7,
141:13, 143:21,
150:25, 188:1
**determined**
104:2, 156:7,
157:3

**determining**
47:25, 116:23,
117:16, 187:23
**deterrent**
97:9, 294:24,
295:8
**deterring**
87:21
**develop**
53:24
**developed**
122:5
**devona**
7:15
**dhsmv**
81:21
**dictate**
261:15
**dictionaries**
200:18, 200:22
**dictionary**
200:16, 200:22,
201:3, 201:7,
201:8
**dictionary's**
201:1, 201:4
**differed**
225:22
**difference**
264:1
**differences**
200:12, 237:12,
237:14
**different**
35:8, 37:18,
37:23, 40:13,
45:15, 65:10,
86:21, 86:22,
140:25, 145:24,
162:18, 163:14,
165:15, 165:23,
176:7, 181:12,
189:17, 198:4,
200:14, 214:13,
222:12, 222:18,
224:3, 229:11,
233:22, 237:8,
251:14, 254:23,

258:16, 261:3,
282:16, 282:17,
303:3
**differentiates**
223:8
**differentiation**
89:17
**differently**
201:17, 208:13,
259:2, 260:18,
262:1, 267:4,
267:18
**differs**
86:6
**difficult**
14:25, 68:19,
68:20, 218:23,
225:6, 266:25
**digging**
284:2
**diluted**
280:15, 304:1
**direct**
19:3, 19:6,
100:12, 104:1,
107:15
**direction**
65:20, 254:16
**directionally**
38:17
**directions**
145:24, 163:15,
254:17
**directly**
23:6, 165:11,
167:19, 168:22,
170:10, 171:10,
171:21, 171:25,
194:5
**director**
9:5, 17:15,
17:24, 18:3,
46:22, 46:23,
47:1, 47:2,
47:14, 47:17,
52:20, 52:25,
59:7, 107:17,
164:12, 166:5,

167:13, 167:17,
168:21, 292:24
**disability**
4:5, 13:14,
192:14, 193:4,
195:6
**disabled**
196:15, 197:1,
197:2, 197:6,
197:10, 197:14,
197:18
**disagree**
147:2, 170:1,
172:11, 299:13,
311:12
**disagreed**
45:13
**disagreement**
24:2, 308:20
**discern**
81:5, 138:13,
187:12, 304:13,
304:22
**disclose**
176:23, 242:18,
242:19, 245:5
**disclosing**
69:5, 243:14,
243:15
**disclosure**
220:9, 220:10,
220:11, 245:11
**discovery**
57:25, 58:6,
61:9, 61:11,
61:14, 61:24,
122:25, 157:24,
158:5
**discretion**
47:24, 50:16,
50:22
**discretionary**
47:20, 47:22
**discuss**
20:9, 36:16,
123:6, 123:13,
158:9, 178:11
**discussed**
35:22, 61:5,

62:24, 82:14,
85:6, 97:1,
135:18, 169:8,
176:18, 177:15,
178:12, 178:25,
226:3, 246:19,
247:1, 251:11,
265:25, 270:4,
286:3, 294:13
**discussing**
44:18, 82:13,
122:9, 127:24,
148:10, 176:11,
181:24, 182:5,
182:8, 182:12,
291:25, 302:24
**discussion**
59:11, 128:16,
129:11, 231:12,
231:15, 232:5
**discussions**
128:17, 129:14,
129:15, 129:21,
227:3, 231:22,
232:8, 233:23,
245:8, 291:17
**disenfranchised**
285:11
**disenfranchiseme-
nt**
85:20, 96:3,
104:13, 285:7,
285:13
**disenfranchises**
94:18, 309:15
**dismissed**
223:1
**disparate**
232:6
**disparities**
232:14
**dispute**
109:4, 109:7,
109:10, 153:8,
153:19, 153:20,
160:24, 169:22,
170:4, 172:7,
241:23, 284:17

**disputes**
155:4
**disputing**
233:17
**disregard**
97:22
**district**
1:1, 1:2
**dive**
256:5
**diversion**
223:1
**divert**
156:4
**division**
1:3, 21:19,
22:14, 22:16,
22:19, 22:21,
26:11, 26:21,
30:2, 30:15,
44:11, 55:11,
55:12, 59:8,
59:12, 71:9,
71:12, 76:11,
80:16, 81:3,
88:15, 95:8,
96:9, 136:17,
137:7, 137:13,
137:17, 138:6,
140:13, 141:6,
154:8, 155:18,
155:22, 155:24,
156:21, 167:3,
167:9, 168:14,
213:3, 250:2,
295:18, 300:1,
309:17
**divisions**
167:7
**dixie**
8:4
**doah**
24:21
**doctor**
53:21
**document**
56:13, 56:17,
76:17, 85:9,

102:12, 102:18,
238:18, 239:15,
239:20, 240:6,
241:15, 242:6,
243:17, 244:25,
293:9, 293:16,
305:24

**documents**
11:15, 57:8,
58:2, 62:24,
71:24, 73:3,
121:2, 122:21,
134:18, 134:20,
157:23, 158:5,
158:8, 238:9,
239:1, 239:3,
241:9, 243:12

**doing**
20:22, 50:7,
135:5, 204:8,
206:22, 261:19,
264:17, 279:6,
279:7, 279:11,
285:14

**dollars**
97:24

**domestic**
55:2, 55:6

**done**
120:3, 139:22,
170:15, 229:15,
230:2

**dots**
153:12, 153:15

**double-check**
170:11

**douglas**
8:18

**down**
151:12, 151:20,
152:10, 158:1,
178:19, 204:11,
214:24, 236:10,
239:24, 270:22,
271:22, 288:22,
290:21, 291:16,
303:1, 305:7

**draconian**
294:23

**draft**
45:16, 113:21,
122:6, 123:17,
154:19, 161:14,
198:15, 227:1

**drafted**
45:21, 45:24,
114:21, 122:24,
224:18

**drafting**
22:10, 61:15,
114:23, 122:19,
224:9, 224:12,
224:25, 225:18,
226:10, 226:15

**drew**
153:12

**drive**
5:6, 264:11,
266:1

**driver's**
41:4, 86:19,
113:15

**drs**
230:8

**ds-de**
271:24, 272:6

**due**
121:21

**duly**
13:3

**duplicate**
95:22

**during**
16:12, 25:4,
28:24, 29:17,
46:21, 47:8,
47:10, 47:11,
51:18, 55:21,
76:1, 85:7,
97:15, 143:14,
144:24, 158:16,
224:9, 226:3,
231:8, 232:6,
311:22

**duties**
107:17, 167:15,
290:11

**duty**
31:9, 73:15,
81:24, 93:14,
98:4, 145:2

**duval**
6:16

**E**

**e-mail**
86:25, 87:10,
87:13, 119:18,
119:23, 220:24,
221:1, 283:19,
292:18

**each**
26:7, 56:25,
58:23, 58:24,
62:14, 62:16,
63:25, 96:1,
105:9, 186:19,
260:24, 261:21,
262:20, 304:2

**earlier**
20:6, 72:16,
73:20, 78:25,
102:2, 104:9,
119:13, 121:1,
152:23, 156:24,
157:13, 158:10,
161:3, 164:20,
169:14, 173:14,
187:14, 233:17,
239:17, 240:8,
243:9, 244:8,
244:14, 248:16,
251:12, 251:15,
274:19, 275:17,
279:14, 285:8,
294:22, 295:25,
301:13, 303:15

**earliest**
25:15, 141:9

**early**
156:25

**easier**
14:8, 14:10,
82:5, 262:22,
294:20, 304:22,

305:3, 305:5

**east**
5:14, 6:10

**easy**
81:19, 162:7,
162:17

**eca**
169:25

**echo**
43:22

**effect**
70:23, 71:17,
72:4, 72:9,
72:12, 78:17,
97:9, 97:25,
98:1, 121:20,
122:8, 122:14,
127:3, 128:11,
128:12, 129:10,
130:14, 202:2,
252:16, 275:14,
297:9, 297:11,
298:1, 299:3,
299:4

**effective**
72:13, 106:19,
128:21, 195:1,
201:20, 219:24,
261:17, 271:21,
309:16

**effects**
96:7, 252:20

**efficiency**
63:23, 80:2,
80:5, 81:12,
83:9, 96:5,
99:16, 284:9

**efficient**
76:15

**efficiently**
77:2, 80:23,
80:24

**egregious**
252:14

**eight**
163:25, 164:4,
190:3, 190:5,
190:8, 190:17,

191:14, 191:22
**either**
28:17, 30:1,
30:3, 31:3,
31:20, 45:16,
55:2, 68:9,
72:20, 77:5,
80:15, 90:19,
91:20, 95:7,
95:20, 111:6,
113:8, 113:12,
124:15, 127:8,
136:14, 137:16,
138:7, 154:10,
170:21, 221:12,
243:14, 270:8,
276:2, 284:12
**elaborate**
36:1, 37:3
**elaborated**
42:24
**elected**
24:2
**election**
17:16, 17:25,
18:6, 18:10,
18:14, 23:16,
46:24, 47:1,
47:15, 47:18,
52:6, 55:21,
63:19, 63:24,
68:7, 69:14,
70:3, 70:7,
70:14, 70:18,
71:4, 71:8,
71:21, 72:17,
73:12, 73:14,
77:7, 77:13,
77:23, 79:13,
79:24, 80:1,
80:16, 83:6,
83:10, 91:8,
99:15, 99:17,
100:23, 103:11,
106:21, 107:18,
108:1, 108:9,
108:20, 122:4,
124:4, 133:6,

135:13, 135:25,
136:24, 144:4,
144:18, 145:6,
145:10, 152:1,
156:20, 163:19,
168:21, 169:3,
169:16, 171:16,
176:1, 177:7,
180:11, 187:15,
247:6, 249:24,
251:21, 252:5,
252:12, 252:20,
253:15, 253:19,
265:22, 266:22,
266:25, 267:5,
267:15, 268:9,
280:19, 282:4,
289:18, 289:20,
290:6, 290:9,
290:10, 290:24,
294:1, 294:4,
301:15, 302:22,
303:19, 308:16,
309:1, 309:7
**election-related**
68:17, 73:7,
101:22, 243:21,
251:2, 251:3,
252:7, 307:1
**elections**
6:3, 6:14, 7:3,
7:13, 8:3, 8:16,
9:11, 10:3,
21:19, 22:15,
22:16, 22:20,
22:21, 25:1,
26:10, 26:11,
26:16, 26:18,
26:20, 26:21,
30:1, 30:2,
30:15, 30:16,
44:11, 44:12,
59:8, 59:12,
71:9, 76:10,
76:11, 76:24,
78:2, 78:8,
80:17, 88:15,
88:16, 89:1,

89:7, 93:9,
95:8, 95:9,
96:6, 96:9,
96:10, 104:1,
110:3, 110:6,
110:8, 110:10,
126:23, 127:15,
136:15, 136:17,
137:7, 137:9,
137:10, 137:17,
138:5, 138:6,
139:24, 140:2,
140:11, 140:13,
143:15, 154:8,
155:19, 155:22,
155:24, 156:3,
156:21, 167:3,
167:9, 168:14,
170:6, 250:2,
289:23, 295:18,
300:1, 307:20,
309:17, 311:6
**elector**
192:12
**electronic**
234:11
**element**
41:2
**elevated**
151:2
**eleven**
145:12
**elias**
4:10
**eligible**
69:22, 71:14,
80:24, 87:25,
89:13, 90:8,
90:9, 91:6,
92:4, 95:13,
194:17, 231:24
**else**
16:19, 19:9,
40:16, 47:7,
60:25, 61:3,
84:16, 87:17,
99:18, 119:12,
125:4, 144:16,

168:17, 168:23,
169:7, 176:23,
177:24, 178:4,
178:8, 190:19,
190:21, 191:18,
192:7, 192:20,
232:12, 267:13,
272:5, 275:25,
290:22, 300:1
**elsewhere**
66:2, 152:5,
283:6
**employ**
208:5, 210:13,
210:25, 212:6,
213:10, 213:18
**employed**
314:10
**employee**
76:23, 165:16
**employees**
76:25, 78:3,
163:22, 164:1,
164:6, 166:19,
262:9, 272:18
**employing**
211:22
**employment**
37:4, 109:2,
109:9, 110:5,
110:8, 110:13,
133:5, 210:19,
211:7, 211:24,
212:9, 212:14,
213:4, 213:21,
299:21, 299:22,
300:23
**employs**
211:5, 212:19
**enables**
77:2, 96:4,
96:5
**enacted**
237:9, 237:16
**enactment**
223:24
**encompass**
251:14, 280:24,

308:5
**encompasses**
301:8
**encounter**
276:8
**encourage**
297:17
**encouraging**
266:6, 267:10,
267:14, 267:19
**end**
68:5, 80:20,
80:22, 91:18,
96:8, 111:6,
121:22, 121:23,
128:9, 128:19,
154:6, 173:18,
193:6, 228:19,
265:21, 283:4,
284:8, 303:24,
309:19
**ended**
123:18
**ends**
296:3
**enforce**
70:23, 72:6,
78:16, 79:14,
79:21, 121:21,
127:7, 228:20,
275:21, 280:3,
280:5, 280:16,
296:20, 297:1
**enforceable**
305:14
**enforced**
130:16, 154:20
**enforcement**
36:7, 42:16,
42:25, 51:10,
51:23, 52:23,
71:6, 71:25,
72:22, 73:2,
75:11, 79:7,
82:3, 124:24,
124:25, 125:3,
125:9, 129:12,
129:15, 130:4,

130:10, 131:8,
142:11, 143:4,
143:6, 173:15,
283:15, 284:18,
297:1
**enforcements**
51:17
**enforces**
51:12
**enforcing**
120:19, 123:25,
129:4
**engage**
148:22, 185:11,
250:12, 251:17
**engaged**
132:6
**engages**
127:11, 127:18
**engaging**
256:21, 257:6,
277:21
**engelman**
6:8
**english**
200:1, 298:19
**enhanced**
222:19
**enhancement**
222:18
**enhancements**
222:23
**enjoined**
122:12, 127:8,
131:25, 297:11
**enough**
40:7, 138:13,
223:16
**enrolled**
259:22
**ensure**
68:5, 71:13,
73:13, 77:20,
79:24, 95:25,
149:13, 206:16,
206:20, 218:11,
218:18, 219:1,
285:11

**ensuring**
63:20, 77:9,
83:7, 100:13,
103:23, 247:7,
294:2
**enter**
112:14
**entire**
138:1, 138:9
**entirely**
81:12, 212:25,
213:3
**entity**
19:19, 211:22,
213:1, 227:17
**entries**
306:16
**entrusted**
104:3
**entry**
306:22
**enumerated**
246:3, 250:15,
253:14, 263:12,
263:22, 269:1,
269:4, 269:25,
271:18, 274:12
**envelope**
157:1
**equally**
154:21, 221:24
**equip**
284:5
**equipped**
284:24
**equivalent**
194:19
**errata**
313:7
**error**
94:5
**errors**
32:2, 92:12,
92:21
**escorted**
195:20, 197:3
**especially**
84:3, 206:1,

250:19, 308:25
**esperanza**
4:8, 13:13
**esquire**
1:20, 3:1, 4:9,
4:18, 4:19, 5:4,
5:12, 5:19,
5:20, 6:6, 6:7,
6:8, 6:16, 7:6,
7:15, 8:9, 8:18,
8:19, 9:4, 9:13,
9:20, 10:5,
11:2, 13:2,
313:2
**essentially**
43:12, 44:12,
44:20, 45:3,
45:9, 46:18,
54:14, 55:4,
55:14, 55:17,
67:22, 90:19,
97:19, 165:2,
168:5, 169:18,
170:11, 184:9,
251:16, 277:24,
283:22, 295:9,
297:17, 307:19
**est**
1:23
**estee**
9:4, 310:19
**estimate**
27:23, 166:14,
166:17, 167:3,
209:13, 209:14
**et**
1:8, 1:14, 2:5,
2:11, 2:15,
2:21, 134:21
**even**
35:18, 59:20,
59:23, 67:6,
80:12, 87:22,
103:14, 165:24,
196:4, 206:2,
213:2, 220:5,
224:21, 244:18,
248:18, 249:2,

249:4, 249:8,
251:5, 267:25,
278:1, 280:13,
285:11, 296:5
**event**
285:25
**events**
141:20, 141:21,
142:3
**ever**
13:22, 13:24,
51:16, 75:20,
91:12, 143:12,
171:10, 171:21,
182:4, 234:24,
292:12
**every**
26:13, 37:17,
43:13, 45:6,
55:4, 64:5,
75:22, 77:1,
77:5, 78:14,
104:22, 104:23,
104:25, 105:3,
105:4, 105:10,
105:12, 105:13,
105:25, 106:2,
112:4, 118:25,
121:5, 139:7,
158:15, 165:22,
178:12, 178:14,
182:24, 182:25,
185:15, 193:10,
201:19, 234:15,
234:18, 234:19,
234:23, 243:9,
251:7, 282:6,
289:2, 296:16,
300:22, 303:6
**everyone**
238:20, 306:3
**everything**
14:13, 169:21,
255:21, 298:15
**evidence**
62:17, 81:22,
104:5, 107:20,
110:14, 110:23,

250:24
**evidenced**
84:8
**exact**
59:19, 87:15,
193:20, 198:23,
218:8, 306:18
**exactly**
43:5, 125:4,
132:11, 235:16,
257:25, 283:9
**examination**
11:2
**examined**
313:3
**example**
29:11, 36:3,
40:21, 42:22,
46:15, 73:10,
85:21, 86:8,
86:25, 87:18,
90:4, 93:4,
97:21, 104:14,
116:13, 118:20,
119:21, 119:23,
120:7, 140:16,
140:20, 142:18,
142:24, 145:7,
145:9, 153:6,
170:2, 185:1,
204:17, 211:10,
217:10, 219:20,
220:25, 237:25,
248:15, 254:11,
254:25, 256:1,
265:1, 268:20,
269:1, 269:5,
277:25, 278:11,
283:11, 288:12,
288:13, 289:4,
295:25, 303:7,
303:8, 309:12
**examples**
30:22, 33:1,
36:16, 36:19,
38:3, 50:1,
50:14, 63:2,
66:12, 67:13,

86:23, 97:1,
97:7, 111:9,
113:13, 115:14,
115:21, 119:20,
146:13, 220:12,
248:17, 249:11,
250:9, 262:18,
269:6, 283:16,
292:18, 296:18
**exceeded**
157:7, 157:18,
159:15
**exceeds**
161:6
**excel**
37:21, 39:3,
245:6
**except**
233:12, 296:3
**exceptions**
221:20
**excess**
255:4
**exclude**
301:3, 301:19
**excluded**
216:8
**excluding**
302:9, 302:13
**exclusive**
215:8
**excuse**
17:20, 22:19,
28:10, 46:22,
51:8, 52:22,
53:18, 60:17,
61:16, 78:1,
79:20, 90:23,
92:7, 93:17,
93:24, 123:17,
127:1, 128:11,
129:9, 143:3,
158:16, 162:20,
200:14, 220:10,
231:17, 242:24,
275:10, 276:21,
297:4
**exemption**
243:14

**exemptions**
220:11
**exercise**
155:12, 263:15
**exhibit**
11:10, 11:11,
11:14, 11:15,
11:18, 11:19,
11:20, 12:4,
12:5, 12:7,
12:11, 56:5,
56:10, 101:25,
102:3, 102:12,
148:9, 148:12,
148:13, 238:18,
238:21, 239:18,
241:13, 247:20,
259:13, 259:15,
259:21, 259:23,
270:8, 270:9,
272:6, 272:8,
272:13, 286:21,
286:23, 293:5,
293:6, 306:13,
307:10
**exhibits**
11:9, 12:3,
58:9
**exist**
111:10, 116:8,
119:20, 125:15,
125:20, 125:25,
127:8, 128:4,
209:1, 243:14,
252:15, 291:4
**existence**
81:18, 116:11,
136:4, 171:21,
211:14, 213:1
**exists**
75:4, 112:9,
116:24, 128:9,
296:13, 298:7
**experience**
14:9, 53:16,
276:7, 279:2,
282:3, 296:14
**expert**
200:4, 230:9,

| | | | |
|---|---|---|---|
| 231:2 | **fail** | **federal** | **felony** |
| **experts** | 297:19, 297:22 | 57:17, 66:17, | 36:9, 55:18, |
| 233:18 | **failed** | 66:18, 67:4, | 82:15, 182:19, |
| **expires** | 81:23 | 67:7, 67:9, | 222:9, 222:11, |
| 314:17 | **failing** | 70:21, 72:20, | 222:17, 222:22, |
| **explain** | 74:12, 75:1, | 78:1, 78:2, | 223:4, 236:15, |
| 86:16, 92:23, | 75:17, 75:20, | 88:18, 88:21, | 237:2, 238:2, |
| 169:11, 233:19, | 77:15, 292:13, | 90:22, 90:23, | 239:12, 240:18, |
| 234:14, 248:13, | 297:7 | 95:10, 111:16, | 241:1, 241:5, |
| 268:18, 294:14 | **fair** | 187:19, 187:23, | 242:6, 243:23, |
| **explaining** | 31:18, 31:24, | 188:4, 188:7, | 245:22, 246:7, |
| 44:7 | 32:3, 32:8, | 188:13, 188:20, | 246:20, 246:22, |
| **explicit** | 99:5, 123:10, | 189:1, 193:1, | 246:24, 247:4, |
| 273:10 | 141:22, 154:12, | 210:17, 211:20, | 248:6, 248:13, |
| **exposure** | 209:23, 308:3 | 271:8, 273:8, | 250:11, 251:10, |
| 222:17, 222:20, | **fairly** | 274:16, 299:23 | 251:19, 252:23, |
| 222:22 | 103:7 | **federation** | 253:15, 255:6, |
| **extensive** | **fall** | 2:14, 5:3, 9:3, | 256:15, 256:18, |
| 78:11 | 20:23 | 28:16, 151:25, | 257:2, 257:10, |
| **external** | **false** | 152:12, 152:17, | 257:25, 258:7, |
| 22:6 | 184:23, 256:25, | 170:3, 310:20 | 260:11, 262:2, |
| **F** | 273:21, 273:23, | **fee** | 262:11, 262:15, |
| **f** | 278:15 | 255:3 | 263:2, 263:12, |
| 260:13 | **falsely** | **feel** | 264:16, 265:13, |
| **facilitated** | 69:17 | 15:10, 16:3, | 268:1, 268:4, |
| 98:1 | **familiar** | 38:18, 236:19, | 268:13, 269:13, |
| **fact** | 91:19, 116:3, | 252:24, 262:17 | 269:15, 269:17, |
| 39:17, 51:14, | 153:18, 178:14, | **fell** | 271:7, 271:14, |
| 70:1, 78:23, | 200:17, 200:25, | 240:12 | 271:15, 271:19, |
| 111:4, 139:24, | 201:3, 230:5, | **felon** | 271:20, 272:19, |
| 150:13, 154:22, | 236:17, 275:3, | 36:5, 237:4, | 272:20, 274:7, |
| 190:12, 191:7, | 292:4, 300:22, | 244:2, 251:25, | 274:22, 300:12, |
| 204:22, 213:4, | 306:9, 307:14 | 263:11, 263:22 | 300:14, 300:17, |
| 221:16, 228:8, | **family** | **felonies** | 300:21, 300:24, |
| 245:8, 245:24, | 193:11, 193:14, | 55:15, 223:8, | 305:13, 309:13 |
| 248:23, 269:2, | 194:6, 194:10, | 223:9, 237:19, | **ferguson** |
| 274:14, 275:3, | 194:15, 195:15, | 239:9, 239:12, | 4:18, 11:4, |
| 291:10, 296:17, | 196:1, 196:5, | 240:11, 240:23, | 235:12, 235:14, |
| 303:21, 307:7, | 196:9, 196:16, | 240:24, 241:3, | 236:2, 236:5, |
| 311:20 | 197:7, 197:16 | 241:10, 242:16, | 236:13, 238:17, |
| **facts** | **far** | 243:23, 245:16, | 259:9, 259:18, |
| 62:17, 98:23, | 25:13, 182:23, | 250:11, 252:23, | 259:21, 270:6, |
| 202:20 | 224:4, 288:20, | 253:6, 254:22, | 272:4, 275:23, |
| **factual** | 305:10 | 254:23, 257:13, | 276:6, 286:20, |
| 285:17 | **fault** | 262:15, 268:16, | 293:4, 299:16, |
| **factually** | 114:17 | 269:13, 272:25, | 306:2, 306:5, |
| 37:17 | **february** | 274:6 | 306:20, 310:9, |
| | 314:15 | **felons** | 310:23, 312:7 |
| | | 268:8 | |

few
14:7, 14:10,
29:2, 30:18,
31:2, 53:10,
53:15, 85:7,
94:23, 103:1,
121:1, 133:8,
133:10, 133:13,
134:18, 148:19,
251:14, 260:10,
262:8, 277:19
fictional
90:21
fiduciary
31:9, 32:24,
73:15, 77:8,
77:20, 81:8,
81:24, 84:12,
93:14, 93:24,
98:4, 147:7,
154:6, 246:16
field
104:22, 105:9,
105:25, 106:5,
202:11, 202:24,
262:10
fields
206:21
fifteen
152:3
figure
210:7, 256:17,
259:1, 284:3
file
24:21, 165:4,
206:1
filed
58:18, 61:16,
85:10, 169:24,
213:2, 248:5
filing
293:13
filings
57:7, 57:22,
57:23, 144:24,
176:20, 176:25
fill
37:25, 38:23,

44:23, 87:6,
144:10, 144:14,
195:21, 195:24,
264:13, 273:12
filled
175:13, 180:20
filling
85:18, 94:5,
95:23, 265:2,
277:22, 296:1,
296:2
fills
41:13, 278:14
final
122:14, 123:17,
127:1, 128:18,
128:21, 130:13,
154:19, 161:14,
198:19, 227:2
finalize
126:24
finalized
129:16
finally
237:9
finances
210:1
financial
51:4, 209:21,
251:17, 252:5,
252:8, 314:11
find
86:4, 87:12,
87:18, 277:6,
277:8
findings
143:25, 230:10
fine
34:17, 45:17,
45:21, 45:23,
46:2, 46:20,
47:9, 48:1,
49:3, 49:18,
50:8, 50:14,
50:23, 52:7,
52:12, 71:17,
72:14, 73:4,
79:21, 97:8,

97:17, 97:19,
101:10, 121:5,
124:4, 135:23,
136:2, 136:6,
137:20, 142:20,
152:9, 155:10,
157:9, 158:11,
158:15, 159:1,
159:4, 159:8,
159:13, 159:20,
159:21, 169:23,
169:25, 170:2,
170:7, 170:15,
171:1, 172:7,
172:9, 172:12,
172:18, 173:14,
206:3, 208:16,
208:17, 208:20,
208:23, 228:5,
236:1, 260:24,
274:13, 275:15,
303:13, 308:2
fineable
44:19, 45:13,
47:24, 48:9,
48:15, 49:22
fined
147:24, 149:20,
152:2, 152:11,
154:13, 156:1,
273:14, 273:21,
274:7, 274:25,
275:11, 292:13
fines
24:3, 24:5,
47:20, 49:20,
96:15, 96:17,
98:6, 99:11,
99:23, 100:7,
100:8, 100:9,
101:4, 101:14,
101:17, 152:18,
157:6, 157:18,
159:15, 161:8,
161:19, 208:25,
209:1, 210:7,
228:2
fining
135:11, 135:14,

154:24, 161:1
finish
14:21, 14:23,
94:5
finished
305:23
finite
80:20, 80:21,
122:15
fintech
54:9
firm
53:14
firms
53:16
first
12:10, 14:13,
18:1, 34:11,
34:12, 41:18,
41:23, 41:25,
56:15, 65:4,
78:21, 84:23,
88:19, 103:17,
104:4, 128:5,
135:9, 135:16,
145:1, 151:6,
163:17, 163:22,
169:6, 169:25,
176:4, 178:20,
189:8, 214:10,
215:2, 216:7,
219:1, 239:19,
242:17, 245:24,
253:14, 258:1,
293:10
first-degree
300:21
fiscal
72:1
fits
185:7
fitting
245:2
five
26:19, 26:20,
36:21, 37:13,
62:4, 181:3,
181:18, 181:22,

182:7, 182:18,
182:22, 222:20,
222:24, 223:2,
223:5, 223:14
**five-minute**
102:7, 276:3
**fix**
92:12, 307:5,
307:17
**flagged**
152:17
**flagler**
6:4
**flee**
69:7
**fleeing**
68:16
**floating**
305:2
**flooding**
88:13
**floor**
6:19
**florida's**
144:4, 144:18,
160:19, 256:5
**flow**
76:21
**fly**
112:11
**focus**
81:4, 151:22
**focusing**
75:16, 145:25,
236:8
**follow**
15:11, 105:8,
105:15, 105:23,
184:14, 184:21,
218:12, 218:19,
285:12, 285:21,
286:1, 287:8
**follow-up**
310:14, 310:21
**followed**
260:11
**following**
44:16, 217:8,

219:1
**follows**
13:3
**footnote**
270:19, 270:20,
271:3
**foregoing**
313:4, 314:3,
314:4
**foreseeable**
161:18
**forged**
38:3
**forgery**
253:23
**forget**
259:13
**forging**
253:24
**forgive**
96:22, 203:16
**forgot**
93:4
**form**
44:14, 44:23,
46:18, 68:10,
77:23, 85:19,
106:8, 113:18,
132:25, 137:13,
144:3, 153:23,
154:16, 155:15,
161:11, 161:21,
162:2, 163:1,
163:11, 184:7,
195:22, 213:11,
271:24, 272:6,
272:16, 272:23,
272:24, 273:7,
273:12, 273:18,
274:1, 274:9,
274:15, 274:17,
276:11, 277:22,
278:14, 281:15,
282:1, 285:3,
289:11, 301:6,
302:11, 308:17,
311:8
**formal**
125:6, 125:18,

125:21, 125:24,
126:4, 126:21,
127:9, 130:1,
130:7, 130:12
**format**
103:5
**forms**
43:12, 44:10,
134:23, 134:24,
188:23, 264:19,
265:16
**fort**
7:10, 7:19
**forth**
31:6, 246:17
**found**
153:9, 153:21,
208:9, 208:14,
222:1, 239:10,
241:10, 292:3
**four**
25:18, 25:22,
26:2, 26:3,
26:24, 26:25,
55:13, 76:17,
76:25, 155:3,
170:12
**frame**
133:13
**frank**
6:6
**franklin**
7:7, 8:4
**frankly**
68:21, 78:12
**fraud**
18:5, 35:9,
55:21, 63:20,
65:5, 65:8,
65:10, 65:11,
65:18, 65:21,
65:23, 83:7,
85:12, 85:15,
87:2, 99:3,
99:15, 100:17,
100:23, 100:24,
192:8, 247:7,
251:12, 251:17,

251:20, 252:5,
252:7, 252:9,
252:12, 278:12,
279:4, 279:21,
280:1, 280:20,
294:2, 294:16,
295:14, 295:22,
296:6, 296:7,
296:8, 303:1,
303:10, 303:17,
304:9
**fraudulent**
37:20, 37:25,
39:11, 40:14,
42:10, 42:17,
88:14, 90:12,
90:15, 90:16,
90:17, 91:3,
91:14, 91:16,
97:1, 184:17,
184:25, 185:9,
249:16, 249:21,
249:22, 253:22
**fraudulently**
175:12, 180:19,
184:19
**free**
15:11, 16:4,
38:18, 236:19,
252:24
**freedom**
111:20
**freely**
67:6
**frequency**
290:22
**fritz**
5:12, 56:7,
120:15, 148:11,
214:2, 214:18,
236:9
**front**
134:17, 149:19,
193:7, 198:10,
198:17, 214:20,
236:20, 255:14
**frustration**
248:8

**fulfill**
73:14, 84:12
**fulfilling**
21:17, 32:24
**fulfillment**
77:8
**full**
13:8, 16:23,
122:13, 137:25,
289:10
**fundamental**
238:4
**funding**
161:6
**funny**
219:20
**further**
42:23, 88:9,
88:11, 132:8,
151:21, 190:11,
210:18, 280:14,
299:3, 299:9,
311:25
**furthered**
63:6, 63:13,
82:11, 96:15
**furthers**
88:4, 90:2
**future**
145:2

**G**

**gadsden**
8:5
**gain**
53:15, 210:4
**gainesville**
6:20
**gaining**
188:22
**galindo**
5:4
**game**
123:10
**garbage**
296:4
**gardens**
10:9

**gathered**
85:24
**gave**
23:10, 250:9,
262:6
**general**
2:10, 9:19,
9:21, 15:11,
17:23, 20:15,
20:24, 21:4,
21:14, 21:24,
23:18, 25:5,
25:8, 27:10,
27:18, 28:6,
28:8, 28:24,
29:16, 29:18,
30:24, 33:13,
33:16, 33:17,
43:7, 43:9,
45:20, 47:12,
49:2, 49:8,
49:14, 51:8,
51:9, 51:18,
52:19, 53:3,
53:5, 59:6,
60:3, 120:1,
123:8, 128:15,
129:2, 136:8,
167:2, 167:6,
168:16, 169:5,
171:5, 171:6,
171:9, 171:12,
171:17, 171:23,
172:22, 173:3,
174:5, 174:8,
174:21, 231:1,
244:12, 303:9,
303:21, 312:10
**general's**
51:17, 51:23,
52:17, 52:24,
173:7, 173:15,
174:13
**generally**
15:25, 16:7,
19:20, 34:4,
37:19, 40:4,
40:23, 49:1,

99:6, 111:22,
111:24, 112:2,
113:4, 113:25,
114:6, 114:8,
114:9, 115:4,
115:10, 115:14,
115:18, 115:21,
115:24, 116:7,
116:17, 116:20,
117:2, 117:3,
117:5, 117:10,
117:11, 117:14,
117:17, 117:22,
117:24, 118:7,
118:14, 118:17,
118:24, 126:16,
165:20, 166:21,
184:1, 185:13,
199:6, 200:4,
208:24, 217:7,
219:14, 219:17,
219:23, 220:2,
220:7, 221:20,
221:22, 221:24,
222:16, 226:12,
257:23, 261:4,
261:6, 275:4,
282:25, 283:1,
284:11, 284:16,
290:5, 296:13,
298:4, 300:5,
300:14, 300:16,
300:23, 301:14,
303:16
**geraldo**
7:6
**getting**
38:11, 39:21,
40:15, 43:22,
149:17, 195:23,
197:5, 223:13,
299:17, 300:8
**gigantic**
160:11
**gilchrist**
6:4
**give**
14:14, 15:7,

16:23, 27:19,
37:2, 60:10,
90:4, 119:18,
120:15, 148:11,
148:16, 150:10,
173:3, 180:11,
183:1, 191:8,
202:20, 210:19,
237:23, 249:18,
260:9, 262:18,
262:21, 282:18,
283:16, 288:12,
304:14
**given**
16:14, 33:3,
36:4, 36:15,
37:12, 67:6,
85:20, 125:17,
125:22, 126:1,
130:12, 175:8,
193:5, 228:21,
281:22, 313:6,
314:5
**giving**
191:10, 265:3
**glades**
7:3
**glanced**
204:11
**glaring**
97:21
**go**
13:7, 14:11,
15:7, 15:12,
17:13, 21:6,
22:25, 23:2,
23:14, 37:25,
56:4, 63:25,
67:13, 69:25,
72:8, 72:11,
72:25, 78:17,
84:5, 84:22,
88:20, 91:25,
103:2, 117:16,
128:11, 132:19,
134:14, 139:14,
145:24, 151:6,
167:12, 173:1,

187:3, 196:23,
197:10, 202:8,
215:1, 223:22,
235:3, 235:19,
235:21, 260:9,
262:8, 264:24,
265:24, 267:14,
267:19, 271:23,
282:20, 285:14,
287:11, 293:15,
297:21, 306:4,
307:23, 308:19,
310:15, 311:10,
312:5

**goal**
76:22, 80:22

**goals**
145:10

**goes**
70:22, 71:17,
72:4, 86:3,
97:23, 122:7,
127:3, 128:10,
129:10, 275:13,
297:9, 298:1,
299:4

**going**
13:17, 36:13,
49:10, 53:22,
56:7, 79:11,
79:22, 84:7,
84:9, 102:1,
102:11, 114:17,
123:5, 132:23,
151:11, 165:22,
171:11, 171:23,
174:21, 175:15,
179:9, 179:15,
179:23, 182:25,
189:2, 198:24,
209:16, 212:22,
214:1, 235:17,
235:18, 235:25,
238:8, 238:14,
241:10, 251:9,
259:2, 259:18,
270:4, 275:23,
280:5, 280:11,

285:3, 285:4,
286:21, 296:3,
298:19, 299:15,
303:24, 304:3,
304:10, 306:5,
306:21, 308:18

**gone**
303:1, 305:7

**good**
13:5, 13:6,
43:25, 44:1,
53:24, 62:4,
94:13, 166:12,
166:18, 187:2,
210:20, 235:2,
235:13, 247:19,
255:11, 263:10,
271:17

**governed**
173:8

**governing**
217:19

**government**
66:17, 78:13,
109:23, 129:23,
136:20, 164:13,
187:23, 237:17,
276:16, 276:19

**governor**
228:21, 228:22

**governs**
204:14

**grab**
193:20

**graduate**
54:4

**graduated**
54:5

**grandparent**
194:18

**grandson**
194:18

**grant**
18:3, 19:22,
188:21, 280:3

**granted**
67:3

**grants**
18:4, 79:24

**graphic**
152:11, 152:15

**gray**
8:10

**great**
17:4, 135:7,
200:13, 236:19,
241:2

**greater**
159:21, 223:9,
301:15, 301:18

**greatest**
108:1, 108:8,
108:20

**gross**
151:23

**ground**
14:7, 54:10,
54:15

**group**
4:10, 10:6,
65:17, 152:8,
207:21, 258:9,
258:12, 261:10,
261:22, 283:21,
301:10

**grouped**
303:4

**groups**
40:10, 258:16,
308:6

**guarded**
66:17, 67:21,
69:4

**guardian**
11:14, 148:10,
151:5, 152:16,
153:6, 153:9,
153:21, 194:7,
194:10, 194:19,
195:16, 196:7,
196:10, 196:16,
197:8, 197:17

**guess**
59:20, 65:17,
116:8, 117:19,
117:23, 126:12,
139:13, 139:16,

180:21, 184:14,
202:19, 218:22,
220:9, 244:23,
252:2, 254:1,
256:13, 258:1,
260:15, 261:5,
310:9

**guidance**
45:3, 120:19

**guilty**
238:3, 310:3,
310:8

**gulf**
8:5

**H**

**half**
305:10

**hamilton**
8:5

**hand**
172:23, 203:12,
259:7, 314:14

**handed**
34:5, 106:4,
141:8

**handful**
264:12

**handing**
105:23

**handle**
76:6, 109:11,
111:16, 129:12,
140:8, 200:10,
200:18, 201:1,
201:5, 201:13,
201:17, 208:9,
235:20, 258:6,
261:23

**handled**
21:20, 26:19,
56:1, 68:11,
90:14, 103:10,
104:11, 175:25,
176:16, 177:6,
181:13, 189:13,
283:9, 284:3

**handling**
32:25, 33:14,

63:7, 63:13,
65:6, 65:24,
72:2, 72:7,
80:3, 108:4,
108:12, 108:16,
125:10, 125:12,
197:23, 199:11,
199:16, 199:23,
199:25, 200:6,
205:3, 205:18,
208:11, 212:20,
213:6, 213:17,
213:23, 240:20,
261:11, 262:1,
265:9, 302:19
**hanging**
309:10
**happen**
93:21, 171:2
**happened**
225:16
**happening**
290:4
**happy**
56:14, 56:16,
178:10, 178:19,
198:21, 223:17,
247:2, 255:1,
262:8, 275:25
**harassment**
289:17, 289:19,
290:15
**harbor**
137:6, 154:8,
154:10, 155:17
**hard**
24:12, 26:25,
27:6, 27:13,
28:11, 29:10,
29:18, 36:23,
36:24, 37:13,
38:9, 39:13,
43:4, 97:17,
159:19, 284:12,
306:1
**hardee**
7:4
**harder**
87:22

**harm**
144:20, 145:1,
145:6, 145:13
**harmed**
252:18
**head**
65:20, 242:1,
293:13
**heading**
172:25
**hear**
25:20, 43:24,
114:7, 177:21,
246:10, 285:3,
299:4
**hearing**
231:9
**hearings**
24:4, 232:6
**held**
20:11, 20:17
**help**
21:25, 56:8,
239:24, 291:7,
307:5, 307:17
**helped**
22:10, 92:13
**helpful**
14:3, 17:9,
95:25, 151:18,
157:5, 175:14,
198:11, 238:6,
247:3, 283:7,
283:12, 288:7
**helping**
61:13, 190:19,
190:21, 191:4,
307:15
**helps**
85:19, 248:14,
307:4
**henderson**
7:7
**hendry**
7:4
**here**
24:20, 28:23,
36:20, 37:10,

38:18, 46:1,
52:4, 65:15,
75:8, 84:1,
84:20, 87:24,
103:14, 110:17,
111:4, 111:6,
112:18, 114:23,
115:13, 118:2,
141:20, 141:21,
154:5, 159:22,
160:6, 162:16,
176:24, 177:25,
178:4, 178:9,
187:15, 200:3,
221:21, 222:11,
235:9, 236:12,
243:1, 243:16,
244:10, 244:19,
248:11, 253:11,
253:23, 256:11,
259:3, 259:6,
268:2, 271:23,
272:1, 274:6,
277:20, 280:11,
282:17, 288:21,
289:25, 298:19,
299:17, 300:18,
304:14, 305:23,
308:2, 308:8,
309:19, 309:20,
309:23
**hereby**
313:2, 314:3
**hereunto**
314:13
**herron**
230:8
**hi**
310:19
**higher**
29:13, 230:11,
250:16, 250:18,
250:22
**higher-level**
32:19
**highlands**
6:4
**highlighted**
241:17, 293:24

**highlighting**
271:3
**highway**
9:15
**hillsborough**
77:1
**himself**
70:7
**hire**
80:21
**hired**
300:8, 300:24
**hiring**
300:9, 300:11
**hispanic**
2:14, 5:3, 9:3,
28:16, 151:25,
152:11, 152:17,
170:3, 230:10,
231:6, 310:20
**histories**
261:3
**history**
241:7, 290:1
**hit**
298:20
**hold**
109:21, 203:10
**holding**
254:11
**holmes**
7:4
**holtzman**
5:21
**home**
118:19, 290:21
**homeowner**
118:18
**homeowner's**
118:19
**honest**
22:3, 24:20,
24:22, 31:25,
109:3, 282:7
**honestly**
303:15
**hopefully**
235:22

host
27:15, 30:5
hour
60:10
hours
60:16, 60:17,
60:18, 235:18,
235:21, 235:25
household
209:8, 209:14
however
25:9, 26:9,
71:6, 119:9,
291:16
hundred
162:13, 223:11,
258:23
hundreds
282:13
hypothetical
90:13, 90:15,
91:2, 91:7,
91:12, 92:23,
94:13, 112:9,
112:15, 117:8,
145:24, 170:20,
171:2, 200:21,
200:24, 202:20,
203:15, 203:20,
204:3, 205:2,
205:20, 206:11,
210:16, 211:13,
216:10, 216:15,
218:24, 262:7,
262:22, 263:25,
265:6, 265:25,
266:14, 266:20,
268:3, 269:16,
278:7, 278:10,
278:17
hypothetically
156:11, 200:15,
201:25, 208:6
hypotheticals
163:14, 212:23

I

id
219:2, 287:6,

287:7, 287:11,
290:20, 298:25
idea
17:3, 78:6,
78:9, 210:6,
250:9
identical
258:11, 258:22,
258:24, 261:6,
294:8
identically
258:8
identifiable
35:15, 35:25,
36:8, 37:24,
82:20, 85:23,
90:18, 94:16,
94:20, 113:9,
182:19, 184:16
identification
41:12, 56:11,
95:11, 95:16,
102:4, 148:14,
238:22, 259:16,
259:24, 270:10,
272:9, 286:24,
293:7, 306:14
identified
62:25, 63:1,
64:13, 89:24,
102:22, 146:3,
146:8, 291:7,
294:11, 302:23
identify
84:20, 167:7,
288:25, 293:17
identifying
21:21, 299:10
identity
42:1, 84:24,
84:25, 177:9,
178:23, 179:12,
180:2, 180:15,
180:23, 181:6,
183:18, 282:23
ignore
309:18
ii
164:14, 292:4

iii
7:6
illegal
89:18, 103:12,
132:5, 202:10,
220:6, 242:19,
250:4, 280:13,
296:5, 303:25
illegally
65:16, 86:2,
94:17, 111:6,
280:15
imagine
76:20
immediate
193:11, 193:14,
194:6, 194:9,
194:15, 195:15,
196:1, 196:5,
196:9, 196:16,
197:7, 197:16
immediately
20:17, 101:12,
260:12
immigrant
210:22
immigrants
110:15, 110:20,
110:24, 111:2,
111:12, 310:24
immigration
66:19, 78:22,
111:17, 111:18,
187:17, 187:21,
188:10, 188:20,
188:25
impasse
52:13, 52:14,
169:18
implement
122:16, 128:14
implementation
122:1
implementing
30:6, 46:8,
50:16, 50:22,
57:19, 120:18,
121:13, 121:16,

127:25, 128:7,
138:18, 140:6,
199:5, 199:14,
199:21, 200:6,
203:13, 203:24,
215:20, 263:4,
264:22
implies
192:4, 294:23
imply
311:15, 311:17,
311:19
implying
294:22, 311:12
importance
118:1
important
80:18, 83:17,
266:7
impossibility
194:21
impossible
68:20
improper
26:7, 34:25,
84:10, 189:21,
189:23, 189:24,
189:25, 190:4
improperly
137:12
improve
284:9
in-person
197:4
inability
90:25, 192:14,
193:4
inactive
297:16
inc
2:5, 4:5, 4:17
inception
171:15, 171:16,
307:21
incidents
136:9, 137:15
include
18:5, 26:21,

63:19, 66:8,
70:16, 71:7,
71:16, 71:17,
71:18, 83:5,
99:14, 103:12,
114:9, 154:7,
227:20, 228:5,
229:21, 229:24,
253:10, 280:23,
302:15, 308:7,
311:2

**included**
21:16, 26:23,
40:21, 66:11,
69:8, 86:13,
100:11, 115:25,
179:16, 180:3,
226:13, 226:19,
227:15, 228:2,
237:24, 238:1,
254:5, 254:7,
254:17, 255:6,
256:17

**includes**
72:1, 115:3,
115:9, 115:10,
115:13, 115:17,
115:20, 215:3,
254:22, 272:24,
308:9

**including**
35:3, 71:4,
77:9, 94:23,
113:13, 133:23,
162:19, 162:20,
163:18, 176:1,
176:16, 177:7,
221:23, 271:8,
298:24

**income**
209:9, 209:11,
209:14

**incomplete**
78:24, 95:14,
146:4, 146:9,
146:16, 146:19,
149:2, 149:9

**incorporated**
11:23

**incorrect**
52:12, 298:8,
298:9, 307:25

**incorrectly**
147:18, 152:19

**increase**
81:12, 161:19,
300:2, 304:9

**increased**
98:6, 228:2

**increases**
155:11

**increasing**
96:15, 97:5,
99:10, 228:5

**incredibly**
50:6, 68:19,
79:22, 81:19,
162:17

**independent**
19:19

**independently**
19:12, 19:13

**indicate**
69:20, 250:16,
255:22

**indication**
66:4, 139:6,
253:25

**indicative**
246:6, 246:7,
246:9, 246:12,
246:14

**indictments**
133:24

**individual**
26:22, 41:19,
66:1, 67:5,
70:1, 71:9,
95:21, 118:2,
118:12, 118:18,
140:10, 144:2,
157:4, 164:13,
190:18, 192:6,
195:20, 196:8,
205:22, 208:1,
210:25, 219:25,
220:2, 221:2,

222:1, 233:11,
234:19, 234:20,
244:20, 246:14,
263:11, 268:21,
280:20, 287:18,
290:20, 299:1

**individual's**
79:3, 119:5,
187:24, 233:12,
233:13, 234:6

**individually**
16:3

**individuals**
35:17, 36:21,
37:13, 38:20,
39:13, 40:11,
49:2, 65:15,
66:8, 67:2,
67:14, 73:25,
77:4, 77:6,
81:2, 81:7,
91:20, 104:10,
108:11, 117:20,
119:17, 162:9,
164:10, 167:6,
167:8, 167:16,
168:16, 182:18,
182:22, 195:9,
207:22, 252:13,
265:8

**infantry**
53:8

**informal**
53:24, 125:6,
125:18, 125:21,
125:24, 126:4,
126:7, 126:12,
126:21, 127:9,
130:1, 130:8

**informally**
126:19

**informed**
184:24, 185:17

**informing**
142:8, 190:14

**inhibit**
91:4

**initial**
44:20, 69:9,

97:8, 136:19,
138:4, 156:19,
255:4, 276:22

**initially**
137:8, 164:22,
164:24, 165:1

**initials**
285:2

**initiate**
173:17, 224:14

**initiated**
224:16

**injunction**
11:22, 50:12,
58:9, 58:12,
58:14, 61:17,
102:17, 121:19,
121:20, 122:10,
123:18, 124:1,
124:2, 130:18,
201:9, 248:5,
270:3, 270:16

**inside**
195:23

**insight**
53:16, 182:24,
210:1, 210:4

**insignificant**
309:10

**instance**
72:24, 74:17,
82:3, 92:24,
98:24, 137:5,
150:10, 177:14,
177:17, 177:18,
177:19, 177:22,
178:13, 178:14,
225:11, 234:15,
244:10, 249:9

**instances**
72:21, 73:6,
74:11, 78:23,
79:1, 147:9,
147:17, 175:22,
176:13, 177:3,
178:11, 178:22,
179:8, 180:13,
183:2, 189:8,

190:8, 190:17,
191:3, 191:14,
217:17, 220:8,
238:7, 243:19,
278:12, 279:4,
282:14, 282:22,
289:17
**instead**
14:15, 49:20,
284:11
**instituting**
99:11
**instructed**
194:5
**instructions**
125:7, 125:19,
125:20, 125:24,
126:5, 127:19,
130:2, 130:8,
130:12
**instructs**
16:8
**intake**
165:2
**integrity**
63:20, 68:8,
73:12, 79:25,
83:6, 99:15,
247:6, 294:1
**intended**
248:7
**intentional**
150:4, 150:7,
281:8, 281:10
**intentionality**
150:8
**intentionally**
281:23
**interact**
167:19, 167:23,
168:2, 168:4,
278:13
**interest**
62:15, 65:7,
65:23, 68:4,
73:11, 74:9,
75:15, 76:7,
77:19, 80:5,

82:10, 84:3,
84:13, 85:15,
86:9, 87:21,
87:24, 88:2,
89:12, 89:23,
92:3, 92:6,
94:1, 94:6,
95:3, 96:14,
97:12, 99:3,
108:7, 161:2,
161:16, 177:16,
245:21, 247:5,
248:10, 252:7,
252:10, 253:16,
276:1, 284:18,
285:9, 285:19,
285:20, 291:5,
293:18, 296:8,
301:3, 301:18,
301:19, 302:9,
302:12, 302:21,
303:22, 304:4,
308:22, 314:11
**interest(s**
62:19
**interested**
220:20, 244:15,
267:2
**interests**
63:1, 63:3,
63:5, 63:11,
63:18, 63:19,
64:3, 64:11,
64:14, 64:15,
64:16, 64:19,
64:20, 64:24,
64:25, 65:2,
82:16, 82:25,
83:4, 83:13,
83:18, 83:19,
83:25, 84:18,
84:22, 97:13,
97:14, 99:14,
99:21, 100:2,
100:5, 100:10,
102:22, 176:12,
184:4, 244:17,
245:23, 247:11,

251:10, 252:10,
265:20, 265:22,
291:12, 294:1,
294:7, 294:12,
301:2, 302:23
**internal**
21:20, 22:6,
22:8, 22:11,
57:8, 57:19
**internet**
87:20, 120:4,
220:5
**interpret**
108:19, 114:15,
119:9, 124:10,
124:12, 124:17,
129:19, 129:23,
258:7, 280:6
**interpretation**
124:20, 200:5,
262:5
**interpreted**
114:25
**interrogatories**
12:10, 61:21,
293:2, 293:11
**interrogatory**
293:20, 293:22,
303:11
**interrupt**
132:21, 251:23
**interruption**
259:20
**intimidation**
289:18, 289:19
**investigate**
78:14, 78:18,
100:17, 100:23,
101:2, 155:1,
280:19, 292:15,
295:14
**investigated**
132:5, 132:12,
132:14, 132:16,
134:4, 175:24,
176:15, 177:6,
182:23, 183:18,
189:12, 292:13

**investigating**
18:5, 131:9,
135:11, 135:13,
138:20, 141:17,
141:19, 180:23,
181:5, 181:9
**investigation**
36:1, 36:6,
39:14, 40:19,
41:18, 41:22,
42:12, 42:21,
78:11, 90:14,
132:10, 133:25,
139:11, 139:13,
139:18, 139:22,
140:12, 140:21,
143:11, 143:13,
174:22, 182:24,
190:11, 190:24,
283:15, 292:16,
294:21, 309:21
**investigations**
35:11, 35:13,
36:14, 38:9,
52:21, 57:10,
70:8, 70:16,
82:2, 130:23,
131:1, 131:4,
131:5, 131:7,
131:21, 131:23,
142:23, 179:2,
179:10, 179:15,
180:1, 180:13,
181:14, 181:19,
181:21, 181:23,
183:3, 183:8,
183:12, 183:22,
184:2, 186:6,
186:8, 190:13,
284:9, 307:1,
308:9, 308:16
**investigative**
154:1, 284:18
**investigator**
133:17, 133:20,
190:12
**investigator's**
133:17

**investigators**
276:24, 277:6
**investors**
54:11
**involve**
190:8
**involved**
22:1, 54:7,
98:25, 147:20,
167:14, 190:18,
191:3, 224:12,
227:3, 262:9
**involving**
23:23, 164:2,
164:6, 176:2,
176:16, 177:8,
225:25, 243:20,
243:21, 248:5,
305:18
**irregularity**
18:6, 303:17
**isolation**
145:25, 204:22,
217:24, 222:23,
233:10, 256:8,
266:18, 269:19,
303:5, 305:3
**issuance**
24:3
**issue**
23:25, 30:21,
32:16, 33:13,
33:19, 34:8,
38:10, 45:17,
46:13, 46:20,
46:24, 47:9,
49:19, 50:23,
51:15, 52:2,
52:7, 72:14,
73:4, 85:11,
89:21, 98:19,
103:9, 124:4,
142:8, 142:10,
142:20, 143:2,
148:10, 169:19,
169:23, 169:25,
172:5, 172:7,
172:9, 173:14,

180:17, 275:15,
291:18
**issued**
24:6, 47:2,
47:14, 47:17,
48:14, 50:15,
52:12, 57:12,
75:10, 76:2,
135:24, 157:10,
158:16, 158:21,
159:2, 159:13,
278:8
**issues**
32:18, 32:19,
32:20, 32:23,
33:1, 33:7,
33:10, 33:21,
34:4, 34:9,
34:11, 34:23,
35:8, 35:16,
35:19, 37:3,
38:7, 46:10,
46:11, 98:21,
133:23, 136:2,
136:9, 146:3,
146:8, 147:1,
155:20, 172:21,
180:23, 181:5,
183:18, 183:20,
183:25, 184:5,
190:3, 266:8,
292:23, 304:11
**issuing**
22:19, 49:3,
49:18, 135:21,
136:6
**it'll**
79:22
**items**
94:23
**itself**
151:1, 202:10,
265:11, 296:22,
305:5

**J**

**jackson**
8:5

**jacksonville**
8:13
**january**
1:22, 179:24,
180:3, 190:2,
191:15, 191:23
**jared**
8:18
**jazil**
5:19, 102:6,
106:8, 113:18,
123:5, 134:12,
134:17, 153:23,
154:16, 155:15,
161:11, 161:21,
162:2, 163:1,
163:11, 184:7,
196:13, 213:11,
215:23, 235:22,
236:4, 259:4,
273:18, 274:9,
274:17, 276:3,
281:15, 282:1,
289:11, 301:6,
302:11, 306:1,
306:4, 308:17,
310:15, 311:8,
312:2
**jefferson**
6:5, 6:10
**job**
1:24, 17:14,
17:15, 17:23,
116:23, 164:18,
167:15, 264:17,
290:10
**jobs**
108:23
**johns**
8:6
**johnson**
4:9, 11:3,
13:4, 13:10,
22:24, 56:4,
62:3, 62:8,
62:10, 102:8,
102:10, 134:9,
134:14, 134:25,

135:1, 148:8,
148:18, 151:20,
187:2, 187:5,
214:18, 235:2,
235:6, 258:2,
262:7, 312:4,
312:6
**joined**
54:2, 158:12,
182:12
**joining**
48:22, 49:7,
50:3, 96:20
**jones**
9:13, 9:14
**josh**
259:4
**joshua**
5:20
**juanita**
10:5
**jurisdiction**
70:14, 74:2,
271:8
**jurisdictional**
18:2, 18:4,
19:22, 79:23
**juvenile**
55:11, 55:12

**K**

**kahn**
8:18
**keep**
19:23, 25:23,
25:24, 40:25,
65:11, 77:22,
88:17, 89:11,
156:16, 165:20,
188:4, 190:23,
191:17, 227:16,
231:22, 236:3,
242:21, 295:20,
303:24
**keeping**
93:13, 112:9,
147:6, 244:17,
245:11, 254:2,

264:4
**keeps**
289:5
**kind**
22:1, 32:19,
35:19, 37:22,
48:19, 55:16,
65:17, 76:2,
103:4, 147:11,
148:21, 191:16,
244:25, 250:12,
251:17, 257:16,
278:14, 279:5,
279:20, 286:9,
288:20, 301:8
**kinds**
22:15, 173:9,
174:10
**king**
5:13
**knocks**
24:12, 26:25,
27:6, 27:14,
28:12, 29:10,
29:18, 36:23,
36:24, 37:13,
38:9, 39:13,
43:4, 97:17,
159:19, 284:12
**knowing**
284:24
**knowledge**
24:19, 39:12,
75:22, 77:14,
92:10, 92:19,
104:19, 105:1,
105:7, 107:5,
107:15, 109:1,
110:7, 111:11,
119:4, 182:14,
187:8, 190:7,
190:17, 230:14,
255:20, 256:23,
292:12
**known**
217:14, 284:10
**knows**
220:6

**konor**
9:4, 11:5,
310:13, 310:17,
310:18, 310:20,
311:25

## L

**label**
62:1, 101:25,
102:11
**labeled**
160:17
**lack**
277:14
**lafayette**
8:5
**laid**
128:8, 128:19,
140:5
**lake**
9:16
**language**
192:22, 200:1
**large**
48:19, 76:12,
87:24, 88:12,
109:14, 115:7,
181:11, 207:21,
208:19, 208:21,
208:23, 209:5,
209:6, 211:10,
211:12, 211:13,
225:7, 229:1,
232:16
**larger**
76:25, 209:19,
211:11, 288:16
**last**
17:20, 31:2,
57:14, 59:17,
76:4, 110:18,
133:8, 246:8,
259:11, 303:2,
304:3, 304:6,
304:7, 304:20,
304:21, 306:21
**late**
35:10, 53:9,

100:7, 104:6,
104:7, 136:10,
136:14, 141:2,
146:15, 146:19,
146:20, 156:2,
257:14
**later**
112:12, 140:17,
237:20, 256:17
**latinojustice**
5:5
**lauderdale**
7:19
**law**
4:10, 9:14,
11:24, 23:16,
27:3, 27:25,
29:21, 29:23,
36:7, 42:15,
42:25, 51:14,
52:16, 53:11,
53:13, 53:16,
53:17, 53:19,
54:4, 54:5,
66:5, 66:6,
71:11, 71:25,
72:22, 73:2,
75:11, 79:7,
82:3, 88:18,
88:21, 90:22,
90:24, 95:11,
97:22, 103:13,
106:19, 110:2,
111:7, 111:19,
117:1, 117:8,
125:5, 126:11,
126:17, 127:7,
131:8, 135:22,
138:16, 142:11,
142:16, 143:3,
143:5, 147:15,
150:20, 151:23,
154:22, 161:13,
161:15, 192:11,
192:24, 193:1,
195:1, 195:3,
210:14, 211:1,
212:8, 219:24,

221:3, 221:23,
223:7, 227:2,
228:21, 236:17,
237:19, 261:13,
261:14, 261:17,
264:9, 269:17,
270:1, 273:16,
274:16, 275:3,
275:6, 280:16,
280:17, 281:21,
281:23, 283:15,
284:18, 294:9,
296:10, 297:24,
298:6, 298:22,
300:15, 300:23,
303:19
**law's**
161:10
**lawful**
106:25, 107:8,
107:20, 108:21,
109:5, 109:20,
110:1, 110:16,
110:21, 110:25,
111:3
**lawfully**
310:24, 311:21
**laws**
112:4, 144:18,
195:1, 210:17,
210:19, 211:19,
211:20, 271:11,
273:8, 273:13,
299:23
**lawsuit**
193:20
**lawyers**
223:18
**lays**
141:6, 141:12
**lead**
250:13, 295:13
**leading**
200:17, 200:25,
201:3, 201:4,
201:7
**league**
2:3, 4:16,

12:8, 235:14,
293:10
**least**
27:1, 105:17,
131:8, 138:24,
152:13, 159:17,
172:11, 195:22,
252:14, 253:17,
285:10, 308:11
**leave**
22:9, 103:17,
112:6, 112:8,
279:19
**leaving**
66:13, 67:15,
73:6, 75:12,
104:10, 111:7,
172:24
**lee**
37:1, 182:17,
239:4
**left**
67:20, 68:1,
68:2, 93:4
**legal**
4:20, 21:25,
23:10, 45:7,
69:18, 89:19,
89:20, 91:4,
91:9, 92:7,
92:8, 96:2,
108:2, 108:8,
111:5, 123:7,
146:25, 190:25,
194:6, 194:10,
194:19, 195:16,
196:6, 196:10,
196:16, 197:7,
197:17, 202:7,
216:16, 223:16,
223:18, 249:8,
277:12, 280:4,
280:14, 299:24,
300:7, 301:12,
301:16, 301:19,
301:21, 301:23,
301:25, 302:5,
304:1

**legally**
66:9, 210:22,
211:6, 211:22,
212:6, 212:12,
219:22, 248:21,
281:17, 281:19,
281:20
**legislation**
113:21
**legislative**
143:21, 154:18,
225:10, 226:18,
228:12, 228:20,
231:9, 231:11,
265:17
**legislature**
18:8, 20:8,
81:15, 97:4,
98:9, 103:20,
104:2, 106:18,
107:25, 113:20,
114:22, 143:25,
146:2, 160:16,
179:21, 210:11,
224:11, 224:14,
224:21, 224:25,
225:17, 225:25,
226:24, 227:14,
227:17, 228:9,
228:22, 236:24,
237:3, 237:6,
237:16, 242:14,
242:21, 243:8,
243:13, 243:15,
243:20, 244:5,
245:3, 265:18,
291:21, 292:9
**legislature's**
143:25, 161:14
**legs**
276:4
**leigh**
8:9
**lengthy**
23:13
**lenore**
164:17, 168:4
**leon**
288:21

**less**
45:12, 107:21,
161:19, 161:24,
161:25, 309:5
**let's**
30:22, 52:23,
73:18, 74:8,
82:7, 112:17,
139:19, 140:16,
151:5, 168:25,
182:16, 198:8,
204:18, 205:13,
206:10, 211:11,
214:17, 219:3,
220:24, 229:4,
247:18, 249:15,
256:18, 257:11,
258:25, 264:10,
264:11, 265:24,
277:19, 278:9,
282:20, 292:2,
301:12, 304:7,
306:2, 306:4
**letter**
45:17, 46:2,
46:3, 46:13,
46:24, 47:3,
47:14, 47:17,
49:24, 51:15,
52:7, 52:12,
72:14, 97:18,
98:13, 124:5,
142:8, 142:20,
151:25, 158:15,
169:23, 170:1,
275:15, 297:2
**letters**
45:22, 45:23,
45:24, 46:21,
47:9, 48:9,
48:14, 49:3,
49:18, 49:19,
50:8, 50:10,
50:14, 50:15,
57:9, 135:23,
136:3, 136:7,
157:10, 158:11,
158:19, 158:21,

159:2, 159:13,
308:2
**letting**
259:9
**level**
174:21, 274:24
**levied**
34:17, 172:12
**levy**
7:4, 47:25,
101:14, 101:17
**levying**
49:20
**liability**
212:7, 274:23,
275:4, 275:7,
275:22
**liable**
206:3, 208:16,
260:23
**liberty**
8:6
**license**
41:4, 86:19,
113:15
**lied**
253:24
**lieu**
71:19
**life**
268:15
**lifted**
124:1, 124:2
**likely**
104:7, 169:20,
169:22, 192:2,
197:20, 204:3,
205:25, 209:3,
231:7, 250:12,
251:1, 257:13,
257:22, 264:8,
279:22, 281:24
**limit**
34:7, 186:14
**limitation**
103:5
**limitations**
67:12, 111:13

**limited**
18:19, 18:20,
74:16, 74:19,
81:25, 92:17,
140:22, 232:2
**limiting**
290:3
**linares**
164:17
**line**
41:2, 55:14,
56:2, 110:18,
152:14, 152:21,
153:4, 198:20,
209:16, 217:8
**lines**
152:25, 153:13,
208:4
**lingering**
84:6
**linguist**
200:3
**linkedin**
116:13
**list**
29:6, 29:11,
30:12, 31:13,
38:5, 44:13,
62:25, 63:17,
64:2, 64:11,
69:14, 69:22,
71:12, 71:14,
80:24, 82:23,
83:5, 83:11,
83:14, 83:16,
86:6, 90:8,
90:9, 90:25,
99:13, 99:19,
100:2, 120:13,
160:10, 160:14,
160:15, 160:17,
160:20, 160:22,
215:8, 240:23,
244:13, 244:19,
244:23, 245:1,
245:6, 251:9,
252:22, 253:2,
272:24, 273:1,

294:7, 298:12,
298:15, 306:25,
307:10, 307:13,
307:15, 307:18
**listed**
56:20, 62:23,
64:6, 64:23,
79:16, 94:24,
95:19, 99:6,
100:4, 147:18,
152:21, 154:11,
161:16, 170:7,
206:4, 237:19,
248:11, 253:6,
256:2, 257:12,
257:13, 262:15,
269:13, 271:10,
272:19, 273:13,
274:6, 294:12,
306:19, 307:9,
309:22
**lists**
94:22
**litigated**
23:25, 123:23
**litigating**
24:6
**litigation**
9:5, 13:11,
23:7, 23:8,
23:16, 23:22,
23:23, 24:14,
54:1, 82:9,
122:11, 122:14,
123:18, 124:22,
126:25, 127:3,
128:10, 128:20,
158:6, 226:24,
230:10, 230:15,
230:17, 230:21,
230:24, 231:3
**litigations**
23:19
**little**
92:24, 151:14,
151:20, 156:5,
196:14, 239:25,
240:1, 247:2,

257:24, 268:19,
285:17
**live**
53:23, 119:13,
148:2, 148:4,
152:20
**lived**
152:5, 152:13,
152:24
**llp**
4:10
**locate**
305:20
**located**
67:24, 148:7,
155:5, 155:9
**location**
31:23
**lockboxes**
186:10
**lodge**
16:6
**logs**
289:5
**long**
17:17, 18:18,
20:20, 59:18,
60:8, 60:15,
79:15, 136:18,
212:17, 212:19,
213:5, 213:22,
216:9, 216:11,
219:14, 243:13,
299:23, 304:12
**longer**
163:9, 185:11,
268:24, 269:9,
302:4
**look**
41:24, 44:8,
45:2, 56:5,
56:14, 56:15,
101:24, 103:1,
112:17, 120:13,
120:14, 135:7,
149:16, 149:20,
151:5, 168:25,
175:20, 177:2,

198:8, 200:16,
214:17, 229:6,
236:20, 238:12,
238:16, 246:3,
247:17, 248:1,
253:20, 258:25,
260:13, 270:18,
308:1
**looked**
155:3, 305:25
**looking**
89:14, 114:24,
199:1, 204:12,
206:11, 218:4,
239:18, 241:14,
247:25, 254:20,
272:11, 286:14,
307:11
**looks**
239:20, 293:13
**lot**
27:18, 35:19,
39:1, 76:15,
81:21, 166:1,
166:7, 166:11,
236:11, 241:14,
298:12
**low**
98:1, 309:4
**lsat**
53:11

|           M           |
|:---------------------:|

**ma'am**
14:6, 16:18,
16:21, 20:19,
21:5, 44:9,
135:6, 189:20,
229:10, 229:13
**madam**
312:8, 312:9
**made**
103:20, 136:22,
154:2, 154:3,
171:21, 171:24,
173:22, 174:7,
174:16, 184:12,
185:9, 198:20,

226:23
**madison**
6:5
**maf**
1:7, 1:8, 1:9
**mail**
108:25, 109:12,
109:18, 144:3,
144:16, 263:21,
292:20, 297:3
**mail-in**
192:13
**mailbox**
264:3
**mailed**
141:8, 141:9,
141:11, 156:25
**mailer**
216:19, 217:1
**mailing**
118:13, 118:14,
118:16, 118:22,
118:23, 118:25,
119:6, 119:12,
119:22, 216:18,
216:24, 217:15,
287:16, 292:19
**mails**
144:6
**main**
19:16, 168:7
**maintain**
80:24, 84:13,
95:10
**maintained**
160:10
**maintaining**
76:22
**maintenance**
71:12, 90:25
**major**
237:13
**majority**
32:5, 32:8,
32:9, 32:11,
32:14, 32:18,
32:19, 32:20,
32:23, 33:12,

33:19
**make**
14:8, 14:10,
14:21, 14:23,
15:8, 16:16,
38:8, 51:22,
105:6, 116:16,
116:19, 116:25,
134:11, 136:19,
139:3, 139:7,
142:5, 142:19,
143:8, 147:4,
155:7, 159:7,
165:5, 171:3,
171:10, 171:17,
172:15, 172:23,
175:21, 187:8,
187:9, 195:2,
206:3, 218:12,
218:19, 219:3,
219:12, 227:23,
254:19, 258:13,
259:6, 270:23,
273:7, 275:19,
309:5, 310:15
**makes**
14:25, 67:10,
118:12, 145:5,
223:15, 227:17,
228:19, 261:22,
288:24, 294:20
**making**
52:1, 87:22,
96:11, 122:7,
154:23, 264:17,
291:5, 294:23
**management**
255:4
**mandate**
286:8
**mandates**
88:18, 145:2
**manifest**
150:9, 151:1
**manner**
76:15, 90:5,
149:15, 245:11,
288:18

**manpower**
78:13
**many**
25:17, 26:19,
26:22, 54:19,
60:5, 86:8,
86:23, 97:1,
97:6, 145:7,
152:20, 157:6,
157:17, 159:14,
160:8, 160:21,
161:5, 162:9,
163:22, 164:1,
164:5, 166:19,
180:8, 180:16,
180:22, 180:25,
181:2, 181:4,
182:10, 183:7,
191:11, 191:19,
195:17, 208:3,
222:14, 248:17,
279:5, 279:9,
280:10, 280:13,
280:15, 283:3,
302:22, 304:1,
308:19
**map**
153:12
**march**
17:19, 17:20
**margot**
6:16
**mari**
6:6
**maria**
59:8, 59:10,
59:11, 59:14,
167:17
**marine**
19:3, 53:7,
53:8, 53:9,
302:16, 311:3
**mark**
56:5, 148:12,
270:8, 293:4
**markarian**
10:6
**marked**
56:10, 102:3,

**manpower** / etc.
148:13, 238:21,
247:20, 259:15,
259:23, 270:8,
270:9, 272:8,
286:23, 293:6,
306:13
**marketing**
119:21, 119:25,
120:2
**marks**
8:10
**maryland**
3:16, 314:25
**massachusetts**
4:11
**matches**
117:20
**materials**
135:3, 137:18,
137:21, 137:23,
199:4, 292:14
**math**
20:22
**matter**
20:8, 23:18,
59:9, 61:17,
174:20, 266:4,
303:9, 309:12
**matters**
21:20, 23:5,
58:15, 58:17,
107:19, 164:6,
166:20, 166:21,
167:24, 168:1,
168:18, 168:20,
168:22, 174:10
**matthew**
8:19
**matthews**
59:8, 59:10,
59:11, 59:14,
167:17
**maximum**
222:17, 222:19,
222:22
**maybe**
59:20, 60:10,
62:4, 137:20,

215:13, 260:9,
296:4
**mayer**
4:8, 13:14
**mcvay**
21:12, 60:24
**mean**
18:11, 18:16,
22:1, 22:5,
29:7, 29:24,
32:14, 34:20,
36:3, 43:18,
45:5, 46:13,
47:21, 48:18,
48:24, 58:5,
58:18, 65:22,
66:22, 69:22,
70:2, 70:5,
70:9, 72:15,
72:19, 86:22,
89:25, 106:16,
112:13, 113:22,
116:12, 117:25,
118:9, 119:8,
121:10, 124:12,
129:20, 131:19,
132:21, 133:11,
139:15, 149:4,
149:5, 150:7,
150:15, 150:16,
150:23, 164:25,
165:21, 166:4,
168:12, 175:2,
180:18, 180:20,
185:4, 189:6,
199:2, 199:11,
204:14, 204:17,
205:25, 209:1,
209:5, 215:8,
218:2, 219:2,
224:13, 227:12,
228:15, 229:19,
237:8, 241:2,
242:21, 245:6,
251:20, 251:23,
257:19, 260:16,
261:20, 273:24,
276:19, 277:10,

277:23, 284:25,
285:16, 292:17,
293:12, 297:10,
302:4, 302:5,
303:8, 303:18,
307:13, 308:1,
309:2, 310:3
**meaning**
34:7, 34:25,
67:8, 74:2,
122:11, 165:3,
223:12, 275:7,
279:7, 289:20,
295:12
**means**
80:21, 81:18,
111:5, 149:24,
150:4, 265:5,
310:2, 310:6
**meant**
40:1, 158:18,
278:16
**measure**
73:12, 77:20,
104:10, 106:20,
303:23
**measured**
304:23
**measures**
68:5, 285:10
**mechanism**
297:1
**med**
53:21
**meet**
20:3, 195:18,
195:21, 196:20
**meetings**
19:25, 60:15,
60:19
**meets**
117:15, 260:25,
261:18, 267:12,
273:25
**melinda**
4:9
**member**
189:11, 193:11,

193:15, 194:5,
194:10, 194:15,
195:16, 196:1,
196:5, 196:9,
196:16, 197:7,
197:16
**members**
167:2
**memorandum**
11:23
**memorize**
209:11
**memorized**
98:13, 201:19,
243:10, 244:14,
245:7, 255:8,
268:22, 303:6
**memory**
262:21
**mental**
275:9
**mentality**
126:14
**mentioned**
21:7, 22:13,
29:9, 35:24,
39:24, 41:19,
41:25, 57:21,
58:21, 61:7,
80:2, 85:11,
91:11, 92:4,
98:10, 102:2,
103:2, 119:13,
137:1, 142:25,
167:5, 179:3,
244:23, 247:5,
247:11, 251:12,
252:25, 279:3,
300:6, 306:8,
308:8
**meritorious**
22:11, 134:5
**merits**
275:19
**met**
60:11, 287:24
**method**
162:11

**methods**
162:14, 186:22
**mi**
28:12
**miami**
54:25
**miami-dade**
54:25, 131:13,
132:6, 133:14
**michael**
4:19, 230:8
**mid-may**
151:24
**might**
14:8, 21:25,
49:15, 62:3,
87:19, 103:16,
152:25, 183:24,
186:22, 194:9,
195:17, 214:2,
255:24, 259:1,
290:15, 304:18,
311:2
**miles**
152:14
**military**
311:5, 311:16,
311:20
**million**
76:19
**mind**
25:23, 25:24,
28:5, 28:22,
40:25, 65:11,
77:22, 88:17,
89:12, 102:6,
110:22, 151:13,
156:16, 158:8,
165:20, 198:16,
227:16, 231:22,
236:9, 236:10,
242:21, 247:21,
260:8, 289:14,
295:21
**mindy**
13:10, 235:23
**minute**
120:15, 148:17

**minutes**
62:5, 306:3
**miranda**
5:4
**miriam**
201:8, 201:10,
201:14
**misapplication**
151:23
**misconduct**
169:2, 169:12,
172:1, 180:1,
237:20, 239:16,
240:7, 243:21,
250:12, 251:2,
251:4, 279:6,
280:21, 280:23,
280:24, 281:4,
281:7, 282:16,
284:25, 286:1,
308:16, 309:1,
309:6, 309:7
**misdemeanor**
55:2, 55:3,
55:5, 55:6,
242:6, 256:3,
257:10, 300:22,
309:13
**misdemeanors**
223:8, 223:10
**mishandling**
176:2, 176:17
**misrepresentation**
190:18, 191:3,
191:6
**misrepresenting**
190:9
**missed**
246:8
**misstate**
279:17
**mistakenly**
152:25
**mistrust**
250:22, 254:6,
254:8, 254:16
**misunderstand**
172:19

**misuse**
84:25, 238:3,
238:4
**mo**
235:16
**models**
53:25
**modification**
200:12, 275:21
**mohammad**
5:19
**moment**
33:2, 142:2,
151:9, 160:7,
172:16, 256:19,
270:4
**momentarily**
238:20
**moments**
260:10
**money**
54:9, 54:11,
80:19
**monitor**
68:22, 73:9,
74:21
**monroe**
5:22, 7:8
**months**
20:21, 53:10,
53:15, 55:7,
55:13, 75:6,
133:8, 133:10,
133:11, 304:7,
304:20, 304:21
**moody**
2:8
**moot**
257:22
**more**
18:12, 29:2,
29:5, 29:7,
33:10, 34:3,
49:10, 54:13,
65:19, 80:12,
81:2, 82:25,
87:22, 92:24,
99:6, 104:7,

108:4, 118:2,
143:5, 150:21,
152:7, 163:3,
182:9, 192:7,
202:16, 202:19,
202:20, 209:1,
214:24, 218:15,
219:3, 220:8,
229:4, 231:7,
237:23, 238:13,
241:19, 250:12,
251:1, 253:3,
254:12, 254:20,
257:13, 257:22,
267:2, 280:20,
281:3, 281:4,
283:25, 285:17,
291:1, 295:12,
306:2
**morley**
167:18, 168:12
**morning**
13:5, 13:6
**morse**
9:20, 312:9
**most**
29:19, 31:19,
33:20, 54:11,
83:18, 84:14,
100:12, 103:22,
103:25, 252:14,
265:25, 308:23
**motion**
11:21, 102:16,
248:5, 270:16
**move**
55:11, 82:7,
102:7, 163:16,
189:4, 202:22,
202:25, 203:5,
214:1, 223:21,
257:11, 275:23,
292:2, 299:15,
307:12
**moved**
53:25, 54:16,
54:18, 95:21
**moving**
96:13, 197:21

**much**
77:6, 84:6,
159:21, 165:19,
165:25, 166:4,
166:15, 208:17,
250:18, 261:9,
291:9, 294:20,
296:14, 310:10
**multiple**
192:8, 279:7,
279:12, 279:22,
280:21
**murder**
250:20, 250:25,
253:1, 253:3,
269:2, 309:5,
309:8
**murders**
309:3
**mute**
22:25
**myers**
7:10
**myself**
57:11, 62:1,
71:4, 131:22,
167:20, 283:20

## N

**naacp**
1:7, 4:4, 5:11,
13:12
**name**
13:8, 13:10,
21:11, 24:8,
36:18, 41:24,
67:8, 67:14,
84:1, 86:25,
87:6, 87:10,
118:19, 119:9,
133:17, 133:18,
138:15, 160:1,
160:6, 164:16,
168:11, 235:13,
242:9, 276:9,
276:14, 276:20,
281:13, 281:25,
284:20, 287:21,

288:7, 289:10,
290:19, 310:19
**named**
29:4, 29:12,
64:16, 64:21,
65:4, 74:9,
76:4, 84:23,
99:10, 294:8
**names**
28:1, 29:3,
87:12, 163:20,
167:16
**narrow**
66:16, 72:18,
72:21, 79:1,
150:24, 254:15
**nassau**
8:6
**national**
193:9
**naturalized**
311:24
**nature**
125:19
**near**
152:24
**nearly**
152:18
**necessarily**
26:16, 89:11,
146:16, 169:20,
203:19, 203:22,
224:16, 249:2,
258:22, 268:17,
276:15, 292:17
**necessary**
80:15, 97:10,
196:18, 223:2
**need**
14:14, 15:10,
16:2, 21:25,
22:5, 22:25,
52:1, 56:14,
78:18, 79:5,
79:9, 86:12,
103:5, 151:9,
153:16, 193:12,
196:3, 196:11,

197:10, 197:18,
202:16, 202:19,
255:14, 277:6,
277:8, 277:11,
277:17, 285:16,
310:9
**needed**
73:3
**needing**
23:14
**needs**
93:21, 167:14,
272:5
**neither**
54:14, 314:9
**never**
13:25, 14:4,
35:18, 67:17,
190:15, 250:5,
275:8, 279:9,
279:15, 285:3,
289:25
**new**
5:8, 9:8,
21:22, 22:4,
33:4, 53:14,
73:16, 165:3,
275:24
**next**
14:24, 94:24,
95:17, 96:13,
112:17, 127:23,
135:7, 163:16,
179:16, 179:22,
253:20
**nine**
133:11, 164:4,
164:5
**nod**
14:16
**non-citizens**
103:9, 103:12
**non-family**
189:11
**non-felon**
12:4, 271:24,
272:13
**nonblank**
205:19, 213:6,

213:23, 219:7,
263:8, 263:10,
263:13, 263:20,
264:2, 265:1,
266:16, 267:7
**noncitizen**
66:8, 66:12,
67:20, 68:15,
69:7, 72:11,
74:11, 75:1,
75:11, 75:19,
78:5, 79:8,
81:23, 106:5,
126:22, 188:2,
202:4, 204:21,
206:13, 207:1,
207:11, 208:9,
210:22, 211:5,
211:22, 212:12,
212:25, 237:1,
258:3, 258:8,
260:12, 262:3,
262:13, 301:1
**noncitizen's**
125:12
**noncitizens**
63:6, 63:13,
65:5, 65:13,
65:24, 67:14,
69:3, 69:11,
69:16, 69:20,
70:12, 72:2,
72:7, 73:6,
76:6, 77:4,
77:14, 80:3,
104:6, 104:14,
108:15, 125:10,
130:24, 131:1,
131:10, 131:15,
131:17, 132:1,
132:6, 132:15,
176:2, 176:17,
199:3, 201:23,
202:2, 202:22,
202:25, 204:5,
206:5, 210:13,
212:7, 213:10,
213:19, 299:20,

300:3, 300:4,
300:7, 301:4,
301:8, 301:11,
311:4, 311:15
**nonconsensual**
277:14
**nonconvicted**
268:8
**noncriminal**
168:6
**none**
309:23
**nonetheless**
97:22
**nonfineable**
43:18, 46:12
**nonprofit**
151:25
**northern**
1:2
**nos**
1:6
**notarial**
314:14
**notary**
3:15, 314:1,
314:24
**notes**
120:16, 134:20
**nothing**
129:16, 176:23,
177:24, 224:3,
254:12, 274:14
**notice**
3:15, 11:10,
56:6, 57:13,
64:6, 91:20,
107:1, 107:10,
112:8, 121:22,
143:2, 143:10,
170:10, 170:19,
219:22, 221:24,
292:21, 299:6
**noticed**
62:12, 157:25
**notices**
93:3, 127:14,
143:12

**notification**
46:14, 71:7
**notified**
183:20, 183:21,
183:24
**notifies**
46:3
**notify**
137:11, 137:12,
141:25, 142:21,
184:4, 184:10
**notifying**
71:11, 152:2
**nuanced**
303:20
**number**
25:24, 27:16,
29:13, 29:19,
30:8, 35:5,
36:10, 37:18,
40:24, 41:2,
41:4, 41:5,
41:12, 41:17,
42:9, 42:18,
43:16, 46:17,
57:8, 58:2,
63:1, 65:9,
67:21, 75:25,
76:11, 76:12,
80:21, 82:15,
84:17, 86:20,
88:25, 89:6,
92:1, 93:6,
94:14, 94:15,
95:12, 95:16,
96:7, 113:14,
113:15, 116:13,
116:17, 116:20,
116:24, 117:4,
117:9, 117:12,
117:13, 117:17,
118:1, 118:2,
118:11, 118:12,
119:6, 119:11,
119:19, 145:23,
150:9, 157:12,
162:18, 170:4,
180:12, 180:19,

180:20, 181:8,
183:1, 219:11,
219:14, 219:17,
220:1, 220:7,
220:10, 220:15,
222:21, 239:3,
254:17, 254:22,
262:18, 265:20,
287:6, 287:7,
287:11, 287:16,
290:20, 296:18,
298:25, 303:3,
303:5, 306:19,
306:24, 309:3
**numbers**
40:21, 45:10,
45:12, 116:6,
117:20, 117:21,
117:24, 118:7,
118:9, 119:22,
220:4, 241:15
**numerated**
244:3
**nw**
4:11, 4:21

---

**O**

**oath**
253:25
**object**
106:8, 113:18,
153:23, 154:16,
155:15, 161:11,
161:21, 162:2,
163:1, 163:11,
184:7, 213:11,
273:18, 274:9,
274:17, 281:15,
282:1, 289:11,
301:6, 302:11,
308:17, 311:8
**objections**
12:8, 16:6
**obligation**
32:25, 77:9,
81:9, 84:12,
93:24, 147:7,
154:6

**obligations**
20:4, 77:21,
246:16
**observed**
33:18, 76:2,
104:18
**observing**
265:8
**obtaining**
191:4
**obvious**
16:14, 100:12
**obviously**
34:20, 37:17,
80:22, 151:2,
169:24, 172:2,
253:13, 256:16,
307:23
**occur**
32:2, 65:19,
86:11, 91:10,
93:15, 93:17,
94:10, 98:10,
192:8, 211:10,
254:15, 254:18,
269:25, 281:5,
294:21, 304:12,
311:22
**occurred**
43:15, 67:18,
68:17, 71:23,
91:3, 92:2,
124:6, 133:10,
139:9, 142:20,
143:2, 174:25,
225:19, 225:24,
226:7, 242:9,
277:10, 290:1,
291:18, 303:19
**occurring**
65:11, 91:13,
271:19
**occurs**
51:3, 76:21,
142:7, 147:19,
167:22, 249:3,
249:11, 249:12,
249:16, 290:22,

295:5
**october**
21:1, 158:14,
304:8, 314:18
**oecs**
12:11, 18:10,
18:14, 18:21,
19:11, 52:20,
66:23, 122:18,
122:24, 123:24,
124:14, 136:4,
136:11, 137:16,
138:19, 138:22,
139:12, 139:22,
140:7, 140:14,
141:6, 141:16,
141:22, 142:4,
142:14, 163:23,
163:24, 163:25,
164:1, 164:6,
165:13, 165:16,
166:16, 169:11,
171:15, 171:20,
176:16, 179:16,
179:22, 183:4,
183:7, 183:10,
190:3, 191:15,
276:7, 276:14,
276:15, 299:19,
306:7, 307:2,
308:10, 309:22
**offenders**
253:17
**offense**
45:14, 47:23,
67:16, 68:17,
73:7, 223:6,
253:14, 256:2,
263:23, 271:7,
271:10
**offenses**
43:18, 44:19,
46:12, 48:9,
48:15, 49:21,
51:6, 241:1,
244:3, 250:16,
250:21, 251:1,
253:1, 253:2,

253:4, 263:12,
269:1, 269:4,
269:25, 271:18,
271:20, 274:12
**offer**
64:11
**offered**
65:21
**office's**
120:18, 238:14,
248:4, 270:2,
293:2, 293:10
**officer**
53:8, 70:7,
110:11, 314:2
**officers**
96:6
**offices**
22:21, 55:10,
59:22, 76:10,
76:14, 79:16,
81:3, 95:9,
96:9, 110:3,
110:9, 124:9,
124:15, 124:19,
124:25, 126:10,
127:22, 129:18,
129:20, 129:23,
132:6, 140:2,
171:11, 171:18,
173:23
**official**
1:12, 2:9,
2:19, 164:14
**officials**
103:11, 237:17
**often**
59:24, 276:8
**oftentimes**
138:3
**oh**
17:4, 186:24
**okeechobee**
7:4
**old**
74:4, 292:18
**olivo**
7:6

**once**
78:6, 120:17,
125:4, 126:25,
138:20, 138:22,
140:7, 184:18,
214:4, 253:25,
254:9, 254:12,
299:3
**one-person**
215:14
**one-size-fits-all**
186:2, 282:5,
282:18
**one-time**
100:8
**one-year**
53:19, 53:20
**ones**
43:11, 81:9,
138:9, 182:5,
182:12, 240:13,
241:12, 248:10,
268:5, 271:20,
273:2, 308:8
**ongoing**
52:8, 58:16,
58:18, 131:4,
131:7, 132:9,
174:22, 179:1,
180:12, 180:16,
181:17, 183:13,
184:2
**online**
87:13, 87:18,
202:8
**only**
15:11, 21:9,
45:24, 46:10,
58:15, 66:15,
73:13, 74:18,
76:24, 79:1,
80:21, 86:24,
96:1, 103:21,
108:15, 111:16,
117:2, 125:3,
126:9, 126:10,
137:9, 162:9,
172:4, 172:21,

173:11, 173:16,
173:20, 181:18,
182:1, 182:8,
183:12, 187:25,
188:2, 190:3,
190:5, 194:4,
212:5, 212:10,
220:3, 227:16,
232:3, 241:9,
242:22, 244:19,
245:24, 264:1,
290:4
**open**
17:1, 190:23,
191:20, 270:4,
276:1
**operate**
19:11, 19:17,
53:16, 77:2,
97:11, 124:7,
126:10, 126:18,
161:20, 161:25,
297:23
**operates**
57:11, 57:16,
126:9, 280:2,
280:8
**operating**
76:14, 98:3,
126:13, 161:9,
264:12, 297:24,
298:21
**operation**
211:15
**operations**
76:25, 164:14,
284:13, 309:16
**opinion**
93:20, 205:21,
206:25, 208:22,
302:14, 303:21
**opinions**
229:2
**opportunity**
53:20, 253:18,
271:17
**opposition**
11:21, 102:16

**options**
136:18
**order**
78:16, 86:10,
92:12, 124:10,
124:16, 124:25,
127:8, 127:19,
135:4, 186:22,
206:15, 207:4,
207:5, 216:19,
217:1, 220:19,
312:6, 312:7
**organization's**
160:13, 202:24,
203:1, 287:19,
289:3
**organizations**
22:22, 24:25,
26:7, 27:9,
28:2, 28:5,
28:15, 29:12,
31:17, 39:4,
40:10, 49:4,
49:21, 52:8,
63:9, 63:16,
81:17, 83:2,
83:22, 85:13,
86:12, 88:3,
88:8, 92:11,
92:16, 93:11,
95:1, 97:11,
98:3, 101:5,
101:15, 112:21,
120:12, 131:3,
131:11, 131:16,
131:19, 135:25,
137:6, 149:14,
154:9, 158:22,
159:5, 160:11,
160:14, 160:19,
162:8, 162:20,
162:21, 163:4,
170:17, 170:23,
171:19, 172:6,
173:17, 181:9,
181:23, 182:7,
185:23, 186:18,
188:8, 188:13,

188:19, 207:19,
208:3, 209:22,
210:2, 212:24,
216:5, 283:8,
291:2, 295:2,
298:17, 298:18
**original**
282:20
**originate**
39:7, 39:17,
192:2
**orlando**
5:15, 6:11
**orleans**
53:14
**ortega**
4:19
**osceola**
152:22, 288:23
**others**
22:6, 25:9,
28:22, 29:14,
36:12, 46:19,
47:4, 60:17,
82:17, 84:19,
99:9, 159:22,
159:25, 160:6,
179:6, 208:5,
219:10, 250:18,
250:23
**otherwise**
15:5, 41:6,
63:22, 68:7,
95:21, 167:14,
175:25, 176:15,
177:6, 189:13,
196:21, 208:5,
217:12, 245:10,
281:23, 309:15,
314:12
**ourselves**
122:7
**out**
29:5, 32:21,
38:1, 38:23,
41:13, 44:23,
45:22, 53:9,
85:18, 86:4,

87:6, 91:21,
93:7, 94:5,
95:23, 98:20,
111:21, 112:11,
119:18, 127:2,
127:14, 128:8,
128:19, 133:20,
133:21, 133:25,
134:5, 140:5,
141:6, 141:13,
144:10, 144:14,
175:13, 180:20,
195:21, 195:24,
200:22, 202:8,
208:25, 223:18,
235:20, 246:11,
256:17, 259:1,
264:13, 265:2,
271:19, 273:12,
277:22, 278:14,
284:3, 296:1,
296:2, 305:1,
305:2, 307:22
**out-of-state**
271:9, 271:14,
273:8, 273:16,
274:15, 274:20
**outcome**
24:13, 24:16,
314:12
**outlined**
31:21, 74:13,
75:2, 139:20
**outlines**
18:2, 19:21
**outset**
242:17
**outside**
47:13, 57:6,
60:11, 60:20,
112:2, 124:16,
129:21, 152:12,
195:2, 210:3,
224:21, 225:2,
269:6
**over**
25:19, 31:2,
84:9, 89:21,

92:2, 94:15,
106:16, 137:19,
152:21, 160:24,
160:25, 235:21,
245:20, 282:15,
289:17
**overall**
80:6, 89:12,
136:1, 200:19,
201:2, 201:5
**overburden**
88:14
**overlap**
235:23, 236:6
**overlapping**
14:25, 258:21
**oversee**
18:3
**owed**
73:15
**own**
152:19, 192:16,
260:14, 278:15

**P**

**pacer**
293:12
**pack**
28:11
**package**
138:23, 138:24,
140:7, 140:23,
164:19, 164:22,
164:23, 165:2
**packages**
165:21, 181:10
**packet**
282:8
**page**
2:1, 11:2,
11:9, 12:3,
110:19, 214:24,
214:25, 239:18,
239:19, 241:13,
241:15, 241:16,
241:17, 271:4,
293:16, 306:21,
308:1, 308:8

**pages**
1:25, 75:5,
165:22, 239:1
**paid**
34:21, 36:22
**palm**
10:3, 10:9
**paper**
76:20
**papers**
17:4, 17:6
**parade**
264:12
**paragraph**
103:3, 103:8,
106:7, 110:19,
112:17, 112:25,
113:22, 113:24,
114:18, 115:2,
116:4, 241:17,
247:25
**paragraphs**
103:6
**paralegal**
53:13
**paraphrase**
280:11
**pardon**
268:24
**parking**
81:21
**part**
18:22, 40:19,
42:12, 48:18,
56:2, 57:7,
71:10, 85:20,
87:24, 88:12,
92:3, 92:6,
104:9, 114:4,
114:5, 114:11,
115:7, 122:13,
137:22, 141:19,
141:21, 151:11,
156:8, 165:13,
165:14, 170:21,
172:16, 174:4,
221:18, 227:7,
228:2, 230:15,

236:17, 246:8,
267:5, 267:14,
267:18, 268:9,
268:25, 269:9,
270:21, 270:24,
284:1, 285:18,
285:19, 286:2,
287:7, 288:19,
293:24, 301:4,
302:10, 303:23,
303:25
**partially**
124:21
**participate**
310:25
**participating**
266:22, 311:1
**particular**
89:1, 89:9,
117:17, 180:17,
186:4, 237:1
**particularly**
23:13, 219:19
**parties**
284:13, 295:4,
314:10
**parts**
277:19
**party**
28:9, 28:10,
28:11, 28:17,
28:19, 34:12,
38:4, 44:14,
85:22, 86:18,
167:11
**party's**
124:7
**pass**
171:5
**passage**
85:1, 100:15,
100:18, 100:20,
100:21, 100:25,
101:13, 223:24,
229:3
**passed**
101:19, 132:25,
230:6

**passes**
249:20
**past**
48:8, 48:16,
49:5, 74:23,
170:16, 261:3,
310:11
**pause**
14:21
**pay**
170:23, 171:1
**pays**
207:25
**pdf**
241:13, 306:21
**pen**
17:7
**penalties**
51:4, 135:22,
141:18, 272:21,
294:21
**penalty**
35:11, 72:1,
72:6, 256:1,
296:22, 297:6,
297:14
**pending**
15:12, 15:13,
309:21, 310:1,
310:6
**people**
65:18, 67:23,
80:21, 81:1,
81:18, 84:4,
84:13, 195:17,
237:18, 240:19,
240:22, 250:25,
251:15, 257:12,
258:9, 258:12,
258:16, 260:18,
261:10, 261:23,
264:13, 265:2,
265:14, 267:3,
279:5, 279:9,
282:15, 291:10,
300:12, 301:9
**people's**
73:9, 74:21,

234:8, 252:8
**percent**
162:13, 162:15,
166:4, 194:20,
223:11, 258:24,
261:18, 280:9,
308:14
**percentage**
166:10
**perez**
7:15
**perfect**
38:18, 162:12,
305:4
**performed**
307:2
**perhaps**
185:13, 251:17,
277:21
**period**
31:21, 37:2,
49:10, 101:9,
178:17, 178:19,
182:11, 304:7,
304:12, 304:19
**perjury**
250:20, 253:23,
253:24, 272:21
**permanent**
65:14, 66:10,
106:25, 107:6,
107:9, 107:21,
108:21, 109:20,
110:1, 110:16,
110:25, 301:12,
301:16, 301:19,
301:22, 302:5
**permission**
111:13
**permitted**
300:4
**person**
61:23, 71:13,
72:12, 94:11,
141:19, 188:22,
191:4, 192:16,
193:5, 195:20,
195:22, 196:3,

196:12, 196:24,
197:11, 197:19,
207:21, 211:12,
212:17, 212:18,
215:13, 218:15,
220:6, 222:4,
222:11, 231:24,
232:16, 234:24,
242:22, 245:16,
249:14, 249:17,
249:18, 249:19,
249:20, 250:7,
250:22, 252:17,
254:8, 260:24,
262:12, 263:1,
263:2, 265:4,
265:5, 267:25,
269:14, 271:6,
273:15, 274:4,
276:9, 277:9,
278:4, 281:12,
283:23, 284:10,
285:11, 290:21,
301:24, 302:9
**person's**
120:4, 276:14
**personal**
35:14, 75:22,
82:12, 82:18,
82:20, 83:3,
83:23, 85:14,
85:22, 86:13,
92:20, 94:22,
95:1, 109:1,
109:24, 112:22,
113:17, 114:24,
115:9, 119:6,
119:8, 119:16,
128:2, 129:5,
130:5, 130:11,
174:23, 174:25,
175:4, 214:6,
221:13, 222:1,
251:16, 256:23,
296:1, 296:14
**personally**
29:15, 33:18,
35:14, 35:25,

36:8, 37:23,
45:25, 51:20,
52:9, 61:10,
67:17, 68:13,
74:17, 74:18,
75:10, 76:1,
85:23, 90:18,
94:16, 94:19,
98:25, 104:18,
107:15, 113:9,
116:15, 126:4,
139:6, 168:2,
173:25, 182:19,
184:16, 194:12,
194:13, 230:13,
232:8, 249:7,
275:17, 283:2,
290:12, 305:15,
305:21
**personnel**
163:17, 186:14
**pertain**
63:2
**pertains**
77:3, 252:11
**petit**
241:20
**pga**
10:7
**phenomenal**
53:14, 53:20
**philosophies**
223:18
**phone**
17:10, 93:6,
116:6, 116:8,
116:11, 116:13,
116:17, 116:20,
116:24, 117:4,
117:9, 117:12,
117:13, 117:17,
117:19, 117:20,
117:21, 117:24,
118:1, 118:3,
118:7, 118:9,
118:10, 118:12,
119:6, 119:11,
119:19, 119:22,

219:11, 219:14,
219:17, 219:20,
287:16
**phrase**
141:4, 215:7
**phrasing**
38:18, 68:18
**physical**
186:10, 202:12,
263:16, 292:19
**physically**
201:23, 202:2,
203:7, 267:24,
268:5
**pick**
263:20, 284:12
**picked**
207:13
**picking**
264:1
**picture**
295:6
**piece**
234:18
**pieces**
69:19, 70:19,
71:18, 71:22
**pierto**
13:14
**pine**
5:14
**pinellas**
8:16, 8:20,
28:17
**pl**
9:23
**place**
95:20, 130:18,
146:5, 146:10,
154:7, 195:23,
197:4, 201:14,
235:3, 290:13,
305:19
**placed**
153:12, 276:21,
276:22, 286:6
**placing**
35:3, 35:4

**plain**
298:19
**plaintiff**
4:16, 5:3,
5:11, 9:3
**plaintiffs**
1:9, 2:6, 2:16,
4:3, 12:9,
13:11, 13:19,
58:12, 82:8,
189:3, 193:24,
235:8, 235:15,
236:8, 248:6,
310:21
**plan**
70:23, 72:6,
124:25
**plane**
112:11
**planning**
121:4
**plans**
188:12, 188:18
**platforms**
54:13
**play**
129:4
**plays**
128:6
**plea**
310:4
**pleadings**
57:6, 57:22,
57:23
**please**
13:7, 15:4,
16:3, 18:12,
25:23, 89:24,
107:7, 156:16,
165:20, 203:16,
218:15, 240:2,
255:7, 300:20,
312:10
**pled**
238:3
**pleural**
252:11
**point**
15:10, 16:2,

18:1, 19:20,
30:25, 34:8,
36:15, 37:11,
42:24, 47:4,
48:21, 49:6,
49:23, 51:25,
52:1, 52:13,
52:16, 53:12,
61:23, 62:1,
73:9, 74:16,
75:4, 78:21,
79:4, 81:16,
82:5, 89:16,
90:22, 91:1,
98:11, 101:7,
101:10, 103:6,
105:17, 107:11,
120:25, 122:21,
124:3, 125:16,
125:21, 125:25,
127:9, 132:8,
134:6, 134:10,
135:3, 138:17,
142:3, 143:20,
143:24, 145:1,
145:14, 151:9,
157:11, 157:20,
159:23, 160:2,
167:21, 169:15,
169:17, 170:19,
176:20, 176:25,
177:23, 178:1,
178:5, 195:23,
199:5, 199:14,
199:21, 200:5,
210:9, 213:20,
217:18, 220:11,
225:10, 228:11,
231:10, 236:12,
244:7, 245:19,
247:13, 262:4,
265:18, 291:17,
301:9, 309:11
**pointing**
82:18
**points**
18:10, 18:15,
168:7

policies
21:22, 22:4,
22:6, 22:8,
22:12, 57:20,
122:18, 122:23,
123:2, 123:6,
125:15, 126:15,
126:21, 126:25,
127:7, 128:3,
128:18, 299:21,
299:22
policy
22:9, 22:11,
51:21, 52:6,
122:16, 123:12,
123:19, 299:20,
300:6, 300:10
political
38:4, 40:6,
85:21, 86:18,
266:8, 284:13
polk
152:4, 152:12,
152:20, 288:22
poll
289:23
polling
195:23, 197:4,
290:12
portion
93:3, 151:22,
165:16, 207:15,
210:14, 211:1,
213:9, 213:16,
271:3, 308:15
pose
103:16, 110:17
position
17:18, 17:21,
18:18, 20:17,
20:18, 49:19,
104:3, 228:17,
228:24
positions
20:11, 20:14,
21:2, 109:21
possession
104:17, 105:18,

105:20, 106:4,
199:7, 202:12,
203:6, 206:23,
302:1
possibilities
186:16, 213:22
possibility
163:13, 221:1,
233:14, 257:23,
301:21
possible
151:15, 162:23,
163:8, 178:13,
185:8, 185:13,
186:12, 194:14,
194:17, 200:20,
203:25, 212:1,
212:8, 212:15,
212:25, 213:3,
217:8, 220:13,
220:16, 223:5,
235:18, 235:19,
240:18, 257:18,
257:21, 269:7,
279:24, 288:2,
289:12, 289:14,
302:8, 311:22
possibly
208:6, 208:7,
234:15, 246:15,
267:17
post
53:20, 111:1
postal
108:22, 109:2,
109:6, 109:8,
109:10, 109:14
postmark
141:10, 141:11,
157:1
posts
116:13
potential
63:18, 139:14,
141:17, 142:24,
146:9, 223:13,
238:7, 272:18
potentially
21:22, 87:14,

210:16
power
68:23
practical
146:25
practice
14:20, 105:8,
105:15, 105:23,
120:2, 231:1
practices
185:19, 253:22
practicing
14:1, 14:9,
71:5
pratt
5:20, 259:5
precise
27:19
preclude
300:24
predate
37:8
predated
25:9, 37:4
predates
96:20
predecessors
49:18
predict
122:14
prefer
198:12
preliminary
11:22, 50:12,
58:8, 58:12,
58:14, 61:17,
70:15, 102:16,
121:19, 121:20,
201:9, 248:5,
270:3, 270:16
premarked
238:18
prep
61:1
preparation
57:5, 59:3,
59:15, 59:25,
60:12, 61:4,

61:6, 74:22,
189:18, 200:23,
209:10, 210:18,
290:8
preparations
121:24
prepare
57:3, 62:20,
62:22, 83:20,
99:22, 120:23,
121:8, 128:14,
135:17, 158:9,
169:7, 176:4,
176:8, 189:14,
198:1, 198:5,
214:14, 224:1,
229:12, 232:24
prepared
64:7, 121:2,
157:13, 214:11,
224:5, 229:9
prepares
168:5
presence
87:20
present
60:19, 60:22,
93:15, 310:24,
311:21
pretrial
222:25
pretty
48:5, 51:11,
121:10, 181:10,
237:10, 289:4,
297:14
prevent
65:7, 65:10,
82:17, 85:19,
91:8, 163:5,
245:25, 246:4,
256:20, 257:5,
258:15, 258:17,
258:18, 261:10,
261:18, 265:14,
294:15
preventative
68:4, 106:20,

244:18, 303:22
**prevented**
249:2, 249:9
**preventing**
63:20, 83:6,
84:23, 85:15,
86:9, 99:15,
217:13, 247:6,
252:13, 252:16,
253:16, 294:2,
295:21, 296:7,
300:11, 304:5
**preventive**
285:10
**prevents**
96:3, 249:1,
251:20, 256:8,
257:25, 261:13,
261:14
**preview**
121:4
**previous**
2:1, 46:22,
46:23, 47:2,
86:2, 213:21,
241:21, 256:14,
279:19
**previously**
20:15, 39:5,
62:23, 79:16,
82:14, 85:24,
86:7, 99:8,
100:11, 121:11,
136:23, 138:11,
139:5, 144:23,
161:16, 261:5,
265:23, 282:9,
286:3, 301:2
**primarily**
55:15, 123:22,
129:1, 285:6
**primary**
61:23, 62:1,
79:4, 249:25
**print**
202:8
**prior**
20:18, 48:22,

49:7, 50:3,
85:10, 85:18,
100:15, 100:18,
100:20, 100:21,
100:25, 101:12,
104:11, 121:20,
154:22, 159:8,
171:15, 176:21,
177:1, 178:5,
238:1, 240:15,
241:5, 241:10,
242:2, 243:7,
301:9
**prison**
222:14, 223:5,
223:14
**private**
113:4, 113:7,
113:8, 113:17,
113:23, 114:2,
114:6, 114:8,
114:13, 115:1,
115:6
**privilege**
243:13
**privy**
276:23, 288:13
**prldef**
5:5
**proactive**
73:12, 77:20,
82:16, 104:9,
106:20, 244:18,
285:10, 303:22
**probably**
16:13, 17:9,
27:22, 49:1,
55:7, 60:7,
60:18, 69:8,
93:15, 94:10,
160:25, 181:2,
181:3, 240:14,
240:15, 285:6
**problem**
34:2, 102:8,
148:18, 148:25,
149:5, 189:22,
189:25, 238:12,

241:8, 266:13,
285:22, 287:23,
309:5
**problematic**
309:1
**problems**
34:18, 146:9,
146:14, 235:25,
307:4, 307:16
**procedure**
122:16, 123:12
**procedures**
21:21, 57:20,
59:12, 122:5,
122:18, 122:24,
123:2, 123:7,
125:15, 126:16,
126:22, 126:24,
127:7, 128:4,
128:18, 135:10,
140:10, 289:3
**proceed**
126:19, 190:23,
191:12
**process**
50:18, 80:23,
81:13, 88:20,
91:6, 95:23,
95:25, 103:23,
107:1, 107:10,
128:25, 129:1,
135:10, 147:8,
154:1, 158:2,
165:9, 169:1,
169:11, 172:17,
188:22, 248:9,
266:23, 267:1,
267:6, 267:15,
268:10, 301:5,
301:20, 302:10,
302:13, 302:15,
302:17, 310:25,
311:2
**processed**
77:11, 90:7,
231:24, 294:3
**processes**
140:1, 140:9,

148:22, 164:22,
164:24, 168:5,
275:15, 289:3
**processing**
89:15, 247:7
**proclaiming**
213:5
**produced**
75:5, 122:22,
157:10, 157:23,
158:5, 158:8,
232:10, 239:2,
241:9, 272:17
**production**
35:12, 36:4,
36:15, 37:12,
46:25, 47:3,
47:5, 49:6,
58:3, 61:20,
96:19, 97:7,
98:11, 98:14,
98:17, 122:21,
125:16, 125:22,
126:1, 126:3,
157:11, 157:21,
158:3, 159:23,
160:2, 177:23,
178:2, 178:6,
243:4, 243:17,
244:8, 245:19,
283:19
**productions**
238:15, 244:25
**professional**
245:10
**profile**
116:14
**progress**
4:6
**prohibit**
217:11, 260:19
**prohibited**
269:14
**prohibiting**
199:3, 211:17,
299:20
**prohibition**
125:9, 271:5

prohibits
240:19, 258:9
prominent
34:9
promise
266:24, 272:20
promote
79:25, 265:21
promotes
62:17
promoting
63:22, 83:8,
99:16, 247:8,
294:4
promulgated
272:23, 284:23
prone
66:5
proof
112:14
proper
31:4, 41:7,
90:11, 141:15,
154:7, 189:23
properly
68:10, 81:5,
81:6, 90:16,
93:8, 103:24,
139:15, 249:5
property
148:5, 155:7,
217:11
proposal
237:4, 237:7,
292:11
proposals
226:18, 226:19,
227:9, 227:16,
227:17, 227:23,
228:5, 228:20,
291:22
propose
237:2, 292:8
proposed
128:23, 128:25,
226:22, 227:6,
227:13, 228:1,
231:14, 291:20,

292:10
prosecute
55:20, 71:6
prosecuted
55:23, 85:7
prosecuting
55:15, 135:14
prosecution
174:12, 174:15,
174:17, 181:20,
183:9
prosecutions
101:21, 130:24
prosecutor
54:1, 54:19,
54:21, 54:23,
54:25, 55:10,
55:12, 55:14,
55:17, 55:18,
55:19, 55:22,
181:25, 182:2,
183:15, 256:4
prosecutor's
72:22, 73:2,
79:7, 142:12,
143:4
prosecutorial
68:24, 71:1
prosecutors
42:17, 55:24,
55:25, 56:2,
283:16
protect
106:21, 252:11,
252:20, 252:21
protecting
87:24, 89:12,
252:8, 308:22
protects
113:2
proven
309:23, 310:2
provide
27:23, 40:8,
41:16, 80:6,
83:16, 98:15,
100:2, 127:19,
142:21, 143:10,

143:12, 170:19,
170:23, 170:24,
184:1, 188:12,
188:18, 191:18,
210:15, 216:10,
216:12, 221:14,
226:8, 226:15,
226:18, 237:16,
242:15, 243:20,
244:4, 278:6,
278:20, 281:13,
281:24, 283:25,
287:20, 289:10
provided
23:11, 97:8,
116:4, 120:20,
122:24, 137:6,
155:18, 227:19,
230:9, 231:19,
233:6, 233:17,
243:3, 243:6,
243:8, 243:12,
243:25, 244:11,
244:24, 245:3,
245:5, 245:15,
252:17, 278:24,
284:20, 299:6
provides
113:13, 138:11,
141:3, 141:4,
173:1, 192:11,
192:24, 193:2,
195:19, 283:21,
294:25
providing
79:20, 245:12
provision
70:24, 71:16,
72:4, 72:8,
72:11, 72:14,
79:14, 82:8,
96:13, 115:13,
121:18, 121:21,
121:22, 122:1,
122:7, 122:12,
122:17, 122:19,
123:22, 124:5,
126:22, 127:23,

128:7, 129:10,
129:13, 129:19,
130:14, 150:19,
155:11, 173:8,
193:19, 194:2,
195:15, 199:12,
201:22, 202:1,
202:14, 203:3,
210:7, 210:10,
211:17, 215:6,
215:10, 215:12,
215:18, 218:8,
218:9, 221:6,
221:9, 221:12,
223:19, 237:1,
237:15, 251:24,
251:25, 252:6,
252:11, 252:19,
254:18, 255:8,
257:7, 261:22,
262:3, 265:20,
275:5, 275:11,
275:13, 280:18,
282:21, 297:9,
297:13, 298:1,
298:3, 301:1,
301:3, 302:24
provisional
86:5, 91:23,
249:3
provisions
51:5, 62:16,
62:19, 99:23,
100:3, 102:23,
120:21, 127:20,
128:11, 145:5,
193:24, 223:25,
226:1, 226:3,
226:10, 226:13,
226:16, 226:20,
227:4, 236:25,
258:5, 260:17,
261:10, 268:22,
280:4, 285:8,
291:20, 292:5,
294:9, 294:13,
302:14
public
3:16, 21:17,

24:18, 113:5,
114:1, 114:10,
115:4, 115:11,
115:15, 115:19,
115:22, 115:25,
116:7, 116:18,
116:21, 117:4,
117:6, 117:10,
117:12, 117:14,
117:18, 117:22,
117:25, 118:8,
118:15, 118:17,
118:24, 152:15,
154:2, 210:9,
217:7, 217:16,
217:18, 219:15,
219:18, 220:2,
220:7, 220:11,
220:15, 225:9,
225:14, 228:24,
314:1, 314:24
**publicly**
37:23, 39:1,
39:25, 118:21,
217:13, 242:4,
287:14
**published**
127:11, 179:23,
220:5
**publishing**
217:12
**pull**
36:17, 79:18,
82:6, 120:15,
148:8, 148:11,
259:2, 270:2,
271:22, 286:18,
293:1
**pulled**
148:20, 149:17
**pulling**
306:7
**punishable**
222:12
**purpose**
143:16, 143:21,
143:23, 144:1,
149:12, 149:13,

154:18, 161:10,
161:14, 207:22,
208:5, 212:5,
265:13, 265:18,
288:10
**purposes**
102:1, 119:10,
256:6
**pursuant**
3:15, 74:13,
93:23, 93:24,
136:20
**pursuit**
88:17
**pushed**
184:18
**put**
17:3, 17:6,
56:8, 67:8,
134:17, 207:14,
208:13, 214:2,
242:9, 263:20,
264:2, 272:4,
285:2, 287:1
**putnam**
8:6

---
**Q**
---

**qualification**
115:17
**qualifier**
113:24
**quality**
147:3, 147:12,
147:13, 148:22,
206:22
**quantify**
166:11
**questioning**
14:12, 209:16
**questions**
13:18, 13:20,
14:15, 15:4,
16:7, 48:24,
103:7, 111:18,
121:3, 134:19,
135:4, 135:8,
148:19, 151:24,

178:10, 218:23,
218:24, 235:7,
235:23, 306:11,
311:25, 312:2
**quick**
62:4, 147:15,
175:16, 288:18,
295:6
**quickly**
175:17, 235:19,
286:22, 293:1,
306:6, 307:12
**quickness**
288:24
**quite**
16:13, 65:12,
251:14, 254:22
**quote**
110:17, 111:1,
149:21, 193:2,
193:6, 193:20,
298:16
**quoting**
192:21, 216:10

---
**R**
---

**race**
229:21, 229:25,
231:18, 231:25,
233:10, 233:12,
233:13, 233:20,
234:5, 234:6,
234:8, 234:23
**racial**
229:7, 229:15,
229:17, 231:22,
232:7, 232:14,
232:20, 233:3,
233:6, 233:15,
233:25, 234:4,
234:16, 234:21
**radar**
298:20
**raised**
54:9, 232:5,
275:8
**ran**
262:18

**rate**
302:25
**rates**
230:11, 304:2
**rather**
279:23
**rationale**
65:22, 106:6,
106:10, 106:17,
106:23
**re-register**
297:7, 297:8,
297:18, 297:23
**re-registration**
292:3, 292:9,
292:24, 293:18,
294:15, 294:25,
295:10, 298:6
**reach**
93:7, 169:18,
310:8
**reached**
98:20, 133:21
**reaches**
142:15
**reaching**
133:20
**reactive**
304:11
**read**
62:14, 113:1,
120:16, 125:5,
135:9, 151:23,
163:17, 169:1,
177:20, 189:8,
192:15, 193:4,
195:6, 198:13,
214:3, 223:23,
241:18, 270:19,
312:3, 313:3
**reading**
103:8, 192:22,
258:4, 314:8
**reads**
175:22, 271:5
**ready**
122:7
**real**
145:6, 281:13,

281:25
**realized**
296:9
**really**
23:4, 32:3,
33:2, 59:21,
73:9, 77:6,
97:25, 125:3,
128:20, 141:3,
160:15, 168:4,
169:15, 220:14,
240:16, 256:4,
283:24, 285:4
**reason**
16:22, 44:21,
153:8, 153:20,
160:12, 183:23,
192:14, 193:3,
206:19, 211:15,
217:9, 221:14,
241:23, 257:4,
282:3, 295:24,
298:20, 301:23,
307:25
**reasons**
16:25, 119:19,
120:9, 191:11
**recall**
24:5, 24:8,
26:22, 27:12,
28:1, 29:13,
51:16, 98:23,
102:21, 247:4,
247:10
**receipt**
12:6, 78:24,
89:15, 95:7,
278:2, 278:7,
278:8, 278:20,
279:1, 281:14,
281:25, 284:22,
285:15, 285:20,
285:25, 286:8,
286:9, 286:11,
286:17, 286:18,
287:3, 287:15,
288:8, 291:13,
291:19, 291:22,

296:3, 305:18,
305:19
**receive**
30:9, 72:21,
76:11, 77:22,
77:23, 95:11,
95:16, 105:5,
137:8, 137:16,
137:22, 137:23,
137:25, 138:22,
165:1, 170:9,
197:5, 218:12,
218:20, 269:2,
269:5, 269:7,
275:16, 279:1,
305:9
**received**
25:6, 25:8,
28:3, 29:25,
37:15, 44:7,
48:9, 49:7,
51:6, 67:17,
69:2, 69:10,
69:15, 69:24,
71:18, 72:10,
73:5, 88:25,
89:6, 91:20,
131:14, 141:24,
142:1, 151:25,
154:2, 157:21,
159:24, 160:3,
219:4, 219:6,
219:12, 277:1,
282:7, 282:12,
292:21, 305:15,
305:21
**receives**
69:19, 70:11,
71:21, 136:16,
136:17, 138:20,
140:7, 141:22,
156:19, 164:19,
164:21, 166:1,
168:9, 268:21,
268:23
**receiving**
29:9, 29:13,
190:14, 202:17,

276:24, 305:11
**recent**
212:22, 283:17
**recently**
48:4, 236:22,
265:25
**recess**
62:9, 102:9,
134:16, 187:4,
235:5, 276:5
**recipient**
31:4, 136:19,
137:11, 138:5,
141:15, 156:19,
157:4, 296:3
**recipients**
41:8
**recognize**
102:12, 239:3,
270:14, 293:9
**recollection**
98:18
**recommendation**
227:19
**recommendations**
125:3, 173:3
**recommends**
51:22
**record**
13:8, 14:16,
16:12, 62:8,
62:14, 74:25,
75:7, 75:18,
75:23, 78:10,
134:15, 154:2,
187:3, 210:9,
225:10, 228:12,
231:11, 232:10,
235:4, 238:19,
240:18, 241:7,
241:18, 243:3,
245:9, 268:25,
269:10, 306:20,
312:11, 314:5
**records**
21:17, 23:4,
68:15, 68:22,
68:25, 71:24,

72:21, 73:8,
79:21, 82:6,
143:21, 152:15,
250:1, 251:4,
251:7
**red**
153:12
**redo**
260:5
**reduced**
314:7
**refamiliarized**
57:10, 57:15
**refer**
18:9, 18:13,
51:9, 51:22,
52:16, 71:24,
101:21, 113:23,
169:12, 172:2,
172:5, 172:14,
172:18, 172:21,
172:24, 173:10,
173:13, 173:14,
174:14, 252:24,
307:23
**reference**
134:19, 150:1,
198:16, 198:21,
198:24, 203:9,
203:13, 207:6,
211:2, 214:20,
215:20, 217:3,
241:10, 253:11,
255:12, 255:24,
260:8, 263:4,
264:20, 264:22,
266:11, 269:22,
269:25, 272:2,
273:4, 273:7,
273:10, 274:20,
275:1, 286:11
**referenced**
20:6, 188:7,
191:23
**referencing**
135:3, 188:4,
218:5, 222:10,
275:13, 286:16,

286:17
**referral**
44:20, 52:2,
57:9, 75:10,
76:2, 136:22,
137:22, 143:3,
143:5, 143:8,
169:11, 171:21,
171:24, 173:8
**referrals**
171:10, 171:18,
173:22, 174:7,
174:16
**referred**
52:21, 52:23,
74:18, 82:2,
137:15, 139:12,
171:4, 173:6,
173:25, 175:24,
176:15, 177:5,
181:19, 181:24,
182:2, 183:8,
189:12
**referring**
15:25, 36:2,
41:22, 42:3,
51:16, 92:25,
98:19, 123:3,
140:13, 169:1,
180:8, 244:24
**reflect**
180:6
**reflects**
190:3
**refusing**
178:7
**regard**
51:13, 187:10,
247:4, 262:1,
279:7, 279:12,
280:21, 304:17
**regarding**
18:6, 22:21,
24:24, 26:6,
42:18, 51:5,
67:18, 69:2,
69:16, 77:3,
77:24, 78:4,

79:10, 92:25,
96:25, 98:21,
111:18, 121:3,
126:22, 131:14,
142:2, 144:1,
155:5, 171:13,
171:18, 171:25,
173:16, 178:11,
180:7, 180:10,
180:13, 181:22,
184:2, 200:14,
203:24, 204:15,
210:10, 210:18,
214:15, 224:15,
225:23, 226:18,
227:3, 227:23,
229:2, 243:7,
244:16, 248:16,
252:12, 261:3,
268:7, 268:22,
277:2, 277:4,
282:10, 285:8,
286:3, 288:18,
290:24, 291:18,
291:22, 305:22,
308:2
**regardless**
41:13, 77:7,
95:12, 95:14,
271:4, 280:18,
298:6, 299:25,
309:12
**regards**
57:11, 94:2,
104:4, 124:23
**register**
69:18, 74:1,
81:18, 81:19,
88:19, 90:5,
92:5, 92:14,
162:10, 162:17,
162:22, 162:24,
163:6, 163:8,
231:7, 266:6,
285:1, 291:7,
297:3
**registered**
28:20, 33:4,

73:20, 76:19,
85:21, 90:16,
108:6, 108:11,
145:19, 146:24,
160:8, 160:12,
161:25, 208:4,
212:10, 229:8,
229:16, 229:18,
229:21, 230:11,
231:18, 232:7,
232:20, 233:3,
233:16, 234:1,
234:16, 234:20,
234:21, 234:24,
249:5, 287:19,
288:3, 288:21
**registering**
33:4, 70:12,
152:12, 211:18,
232:15, 278:4
**registrant**
73:16, 277:9,
278:13
**registrants**
266:5, 267:10,
268:6
**registration-rel-
ated**
240:7
**registrations**
91:14, 131:18,
212:20
**regular**
19:25
**regularly**
20:2, 59:23
**regulation**
30:7, 138:18,
140:6, 199:6,
199:14, 199:21,
200:7, 203:13,
203:24, 215:20,
263:5, 264:23,
309:14
**regulations**
43:21, 50:23,
57:19, 211:20,
211:21

**regulatory**
30:4, 30:8,
30:20, 32:1,
34:1, 35:22,
44:17, 142:8,
280:25, 281:5,
296:21
**relate**
179:11, 218:8,
254:5
**related**
11:15, 22:14,
23:5, 23:16,
27:5, 27:13,
31:20, 33:7,
35:24, 42:1,
55:20, 58:17,
59:23, 122:19,
123:3, 123:14,
124:25, 126:5,
130:24, 132:6,
148:10, 158:19,
165:12, 165:17,
166:15, 166:20,
167:24, 168:1,
168:19, 169:2,
169:12, 171:14,
172:5, 172:7,
172:17, 173:9,
173:23, 174:10,
174:17, 178:23,
180:1, 180:2,
180:14, 180:17,
180:23, 181:5,
183:18, 190:3,
191:14, 191:16,
191:24, 192:8,
195:5, 201:9,
225:17, 233:2,
237:20, 239:4,
252:1, 292:24,
314:10
**relates**
32:20, 75:25,
83:21, 84:23,
99:23, 157:17,
163:19, 177:22,
178:22, 208:24,

218:9, 223:19,
226:9, 239:22,
293:22
**relating**
120:20, 177:9,
189:10, 251:20
**relations**
28:13
**relationship**
185:2
**relatively**
258:5, 299:17
**relevant**
59:13, 71:24,
107:16, 134:23,
134:24, 198:21
**rely**
187:22
**remainder**
55:19
**remedy**
51:10
**remember**
25:13, 25:16,
28:18, 29:2,
29:5, 36:22,
96:23, 133:7,
133:9, 133:16,
133:18, 133:21,
241:4, 242:1,
243:6, 247:16,
262:19
**remind**
207:4, 207:5,
216:19, 217:1
**reminder**
216:21
**removal**
88:20
**removed**
162:12
**repeat**
15:5, 253:17
**rephrase**
116:21, 150:17,
156:18, 258:13,
276:25, 279:18,
297:22

**report**
12:11, 18:7,
18:24, 19:7,
20:5, 21:8,
179:17, 179:18,
179:19, 179:20,
179:23, 180:4,
180:6, 190:3,
190:5, 191:15,
191:24, 280:12,
306:8, 306:17,
306:19, 307:7,
307:13, 309:24,
310:7
**reported**
1:25, 31:15,
175:24, 176:14,
177:5, 189:12
**reporter**
14:11, 15:1,
32:21, 259:20,
312:4, 312:8,
312:9, 314:1
**reporting**
20:4
**reports**
73:5, 230:9,
231:2
**represent**
13:10, 198:19,
310:20
**representation**
259:7
**representative**
1:19, 15:17,
96:24
**represented**
132:17, 132:24,
152:6
**representing**
187:15, 283:20
**republican**
28:9, 28:10,
28:17, 28:19
**request**
61:18, 61:19,
152:15, 154:2,
188:24, 189:10,

190:25, 191:10,
191:18, 191:24,
192:3, 192:6,
192:15, 192:19,
194:3, 194:23,
195:1, 195:2,
195:12, 196:21,
196:23, 197:12,
197:14, 275:20
**requested**
190:15, 314:9
**requesting**
190:10, 190:19,
191:9, 193:12,
194:16, 196:2,
196:10, 197:8
**requests**
21:17, 58:1,
58:4, 189:22
**require**
41:1, 70:24,
260:21, 290:11,
295:11
**required**
31:7, 41:3,
73:20, 73:23,
74:4, 79:21,
93:25, 137:13,
180:7, 275:10,
281:17, 281:19,
281:20, 286:5,
286:6, 297:5
**requirement**
64:17, 64:22,
70:22, 78:17,
80:9, 106:7,
121:14, 123:4,
123:15, 123:25,
124:11, 124:13,
124:18, 125:1,
126:6, 130:17,
131:24, 197:24,
227:7, 227:10,
227:14, 269:20,
278:2, 278:3,
278:7, 284:22,
285:20, 286:8,
291:13, 291:19,

291:23, 292:3,
292:9, 292:25,
293:18, 293:23,
294:15, 294:25,
295:10, 296:9,
296:13, 296:20,
296:21, 296:22,
298:7, 305:18
**requirements**
30:6, 30:9,
31:3, 31:7,
32:1, 33:23,
35:7, 45:7,
81:6, 109:3,
109:9, 110:5,
110:8, 110:13,
140:4, 195:21,
245:11, 281:1
**requires**
179:20, 192:13,
193:2, 234:17,
296:11
**requisite**
67:5, 70:19,
71:18, 71:22,
73:3, 188:23
**research**
22:1, 23:10,
23:15, 256:14
**reside**
35:1, 87:8,
90:6, 248:22
**residence**
148:6, 153:5,
155:5, 155:8
**resident**
103:19, 301:22,
301:25, 302:5
**residents**
65:15, 66:10,
73:24, 106:25,
107:9, 107:21,
108:22, 109:5,
109:21, 110:2,
110:17, 111:1,
301:12, 301:16,
301:20
**resides**
40:6

resolution
310:8
resources
78:14, 80:14
respective
155:6, 173:19
respond
61:14, 169:23
responding
61:10, 61:24
response
11:20, 23:12,
56:25, 61:18,
61:19, 75:14,
102:16, 270:15,
283:24
responses
12:7, 58:1,
58:5, 61:8,
61:20
responsibilities
17:24, 19:22,
21:13, 21:16,
22:2, 164:18
responsibility
47:7, 200:19,
201:2, 201:6
responsible
135:21, 136:6
responsive
126:2, 176:23,
177:14, 178:4,
182:15, 182:16
rest
87:7, 188:16,
215:23, 268:14,
270:22, 300:9
restate
107:6
restricting
213:17
restriction
112:20, 113:2,
236:16, 237:3,
237:5, 239:13,
240:19, 243:24,
244:3, 245:22,
247:5, 248:7,

248:14, 250:11,
251:11, 251:19,
251:25, 252:24,
255:6, 257:25,
258:3, 258:7,
258:8, 260:11,
260:12, 262:2,
262:12, 262:16,
263:3, 264:16,
265:14, 268:14,
269:14, 269:15,
271:15, 272:20,
274:23, 305:13
restrictions
300:2
result
91:18, 104:12,
149:3, 162:1,
274:13
resulted
35:13, 36:9,
42:14, 82:14,
152:9, 154:19
results
104:1, 183:1,
233:24
retain
86:12, 113:3,
117:9, 120:11,
144:10, 215:11,
215:12, 215:15,
215:17, 215:24,
216:5, 216:14,
216:18, 216:24,
222:1
retained
85:24, 86:25,
177:11, 219:10,
221:13
retaining
82:12, 83:3,
83:23, 85:13,
88:3, 88:8,
90:2, 95:1,
112:22, 130:4,
130:11
retains
218:10, 218:17,

220:18
retention
112:19, 113:2,
128:1, 129:7,
130:21, 214:8,
227:20, 227:24
retired
4:7, 13:15
retroactive
304:16
return
67:10, 187:6
returned
54:10, 145:17,
292:20
returning
31:20, 31:22
returns
89:3
revert
256:3
review
27:8, 43:13,
45:4, 45:5,
50:7, 52:9,
52:10, 56:20,
58:8, 58:11,
58:24, 64:2,
123:7, 138:25,
139:7, 147:3,
151:10, 154:22,
230:1, 231:2,
275:17, 290:9,
298:5
reviewed
23:12, 24:24,
25:14, 25:17,
27:16, 27:17,
29:15, 29:17,
30:23, 32:10,
32:12, 33:18,
43:7, 46:1,
57:6, 57:8,
57:17, 57:18,
57:19, 57:21,
57:23, 57:24,
57:25, 58:2,
58:15, 58:21,

61:7, 62:22,
64:5, 121:2,
152:16
reviewing
22:20, 27:13,
29:5, 29:7,
31:20, 33:15,
34:9, 50:20,
139:2, 153:21
reynolds
7:15
right
17:5, 17:11,
20:22, 32:22,
44:25, 52:14,
53:19, 60:13,
69:18, 79:17,
85:19, 92:8,
92:25, 95:9,
95:12, 96:1,
98:17, 99:7,
108:2, 108:4,
108:8, 108:13,
111:23, 111:24,
112:1, 115:23,
120:4, 144:12,
146:6, 146:22,
158:3, 160:1,
160:6, 170:13,
170:14, 170:18,
170:20, 182:5,
193:18, 194:24,
195:21, 196:17,
218:1, 220:4,
221:9, 238:10,
239:17, 241:4,
246:2, 246:23,
252:2, 252:6,
265:2, 273:1,
277:12, 278:3,
281:22, 286:15,
298:10, 306:12,
306:17, 306:18,
307:2, 308:7
rights
4:5, 13:14
risks
103:16, 110:18,

111:1, 111:10
**riverplace**
8:11
**riverside**
5:6
**roderica**
36:5, 42:3,
237:25, 238:8,
243:18, 279:3
**role**
18:25, 20:20,
22:17, 23:9,
25:5, 27:10,
30:24, 33:15,
33:17, 43:7,
43:9, 45:19,
48:22, 52:24,
61:13, 74:23,
120:18, 121:12,
121:15, 123:24,
127:24, 128:6,
128:8, 129:3,
129:8, 129:9,
135:12, 138:19,
138:22, 166:5,
205:13, 223:23
**roles**
22:2, 163:21
**roll's**
86:6
**rolls**
69:21, 90:8,
90:16, 96:2,
250:7, 295:24
**room**
16:19, 17:4,
43:23, 204:24,
205:6, 205:15,
205:20, 206:7,
212:24, 259:5,
263:13
**roper**
6:9
**rosa**
8:6
**rosenbloom**
8:9
**rough**
166:3, 167:3,

209:14
**roughly**
20:23, 25:16,
26:24, 29:10
**route**
55:6, 55:7
**routing**
168:10
**rule**
15:11, 35:3,
46:7, 46:9,
46:12, 134:22,
134:23, 140:24,
141:3, 141:6,
141:11, 141:12,
142:6, 156:14,
156:17, 156:25,
217:19, 272:23,
284:23
**rulemaking**
127:11, 128:23,
128:25, 129:1
**rules**
14:7, 123:9,
136:21, 262:5
**runs**
185:16
**rustling**
25:21

---
**S**
---

**s**
101:12, 130:4,
130:10, 239:12
**sacred**
84:14, 308:23
**safe**
137:6, 154:8,
154:10, 155:17
**safeguard**
79:24
**safeguarding**
63:19, 68:7,
73:11, 83:6,
99:14, 247:6,
294:1, 302:21
**safest**
213:8, 213:16

**safety**
290:7
**said**
18:13, 37:15,
40:2, 41:10,
57:15, 60:11,
64:1, 72:16,
94:9, 99:2,
99:8, 114:11,
117:1, 123:16,
134:9, 139:5,
153:3, 156:12,
156:24, 160:4,
170:4, 182:1,
187:14, 189:23,
199:18, 206:19,
213:13, 213:15,
225:2, 239:8,
239:10, 243:9,
244:14, 246:12,
263:7, 264:25,
275:16, 279:9,
282:2, 282:17,
285:8, 314:6
**same**
14:22, 26:15,
45:15, 87:15,
99:3, 119:13,
121:6, 124:23,
130:20, 140:16,
143:7, 144:22,
164:5, 193:16,
196:25, 198:23,
199:11, 204:5,
204:24, 205:6,
205:15, 205:20,
212:24, 231:5,
241:8, 245:12,
258:15, 258:17,
258:18, 262:11,
262:25, 263:13,
263:25, 267:22,
267:25, 272:25,
291:24, 292:7,
303:10, 304:6,
304:17, 304:19,
313:4
**sanchez**
4:8, 13:13

**santa**
8:6
**santiago**
4:7, 13:13
**sarah**
9:13, 9:14
**satisfied**
221:24
**satisfies**
112:16
**save**
177:21
**saw**
33:14, 33:21,
34:9, 35:8
**saying**
44:14, 46:2,
46:14, 52:11,
65:23, 68:13,
90:13, 106:13,
181:21, 191:17,
192:3, 203:21,
216:3, 216:23,
251:23, 255:17,
258:20, 284:4,
285:19, 290:4,
295:16, 308:3
**says**
30:12, 30:13,
44:20, 113:25,
170:6, 173:12,
190:6, 233:5,
241:18, 247:15,
271:4, 272:13,
274:15, 283:22,
293:25, 299:3,
300:20, 310:1,
310:6
**sb**
11:19, 64:18,
64:22, 72:1,
78:6, 85:1,
85:8, 85:10,
94:19, 100:15,
100:20, 100:25,
101:19, 102:23,
108:10, 115:12,
120:19, 121:14,

130:4, 130:10,
130:16, 198:19,
201:22, 202:14,
203:4, 205:9,
205:21, 206:12,
206:24, 207:15,
208:15, 213:9,
213:17, 215:3,
215:10, 215:18,
221:6, 224:9,
224:15, 224:18,
224:21, 224:25,
225:2, 225:3,
225:18, 226:10,
226:16, 226:19,
226:23, 227:7,
227:21, 228:3,
228:18, 228:25,
229:3, 230:5,
231:9, 231:14,
232:6, 239:12,
244:16, 259:19,
259:22, 260:7,
278:2, 291:13,
297:13, 302:14,
307:5, 307:16
**sb-'s**
125:9
**sb-sos**
11:16, 11:17
**scan**
165:2, 207:3
**scanned**
206:9
**scans**
206:5, 206:15,
206:18
**scenario**
52:4, 76:3,
86:10, 144:25,
169:22, 170:18,
170:25, 172:14,
173:2, 173:13,
195:18, 196:21,
203:25, 204:2,
204:16, 211:4,
219:6, 221:8,
278:25, 289:12

**scenarios**
287:23, 289:14
**schedule**
56:21
**scheduled**
20:2
**scheduling**
181:16
**scholar**
111:24, 221:21,
275:6
**school**
53:11, 53:13,
53:17, 53:19,
53:21, 54:4,
54:5
**scope**
195:2, 216:16
**scott**
6:7, 6:8, 22:24
**screen**
56:8, 120:17,
120:22, 198:11,
198:13, 206:10,
214:3, 214:4,
218:4, 222:11,
223:22, 236:10,
236:11, 238:20,
247:3, 255:7,
255:15, 256:11,
259:3, 259:6,
259:19, 260:1,
260:7, 270:7,
270:12, 270:19,
287:2
**scroll**
56:14, 56:15,
56:16, 151:12,
151:20, 152:10,
153:13, 153:16,
158:1, 239:2,
239:24, 270:22,
271:2, 293:20
**scrolling**
214:23, 247:21
**seal**
314:14
**second**
14:21, 74:8,

85:11, 88:1,
101:25, 120:14,
136:25, 137:2,
148:11, 214:2,
216:9, 221:18
**secondary**
96:7, 252:16
**secretaries**
48:21
**secretary's**
48:12, 48:14,
48:17, 48:25,
58:5, 65:1,
121:15, 163:18,
169:1, 197:22,
214:5, 225:9,
227:8, 229:6,
272:17
**section**
31:22, 48:10,
48:15, 49:22,
74:14, 75:3,
99:24, 113:6,
115:8, 127:25,
128:14, 128:23,
129:4, 129:23,
139:20, 147:23,
149:18, 192:22,
193:17, 193:18,
194:11, 198:8,
205:9, 208:15,
212:7, 214:7,
215:3, 216:13,
217:21, 217:23,
218:2, 218:7,
218:14, 218:21,
220:22, 221:17,
222:2, 222:8,
227:20, 247:22,
255:1, 259:12,
273:1
**secure**
186:23
**security**
17:16, 17:25,
18:10, 18:14,
40:21, 40:24,
41:2, 41:5,

41:12, 41:17,
46:24, 47:2,
47:15, 47:18,
52:6, 69:15,
70:4, 70:18,
71:4, 71:8,
71:21, 72:17,
79:14, 86:20,
107:18, 113:14,
122:5, 124:4,
126:23, 133:6,
135:13, 136:1,
136:24, 143:15,
152:1, 163:19,
168:22, 169:3,
169:17, 170:6,
171:17, 176:2,
177:8, 177:10,
178:24, 179:12,
180:2, 180:15,
180:24, 181:6,
183:19, 282:4,
307:20
**see**
17:8, 103:5,
112:14, 123:24,
150:13, 150:16,
151:14, 182:16,
184:10, 215:3,
215:5, 219:21,
233:25, 238:24,
242:10, 247:20,
247:22, 255:3,
255:9, 260:2,
260:7, 260:10,
260:15, 267:3,
270:12, 270:20,
270:23, 271:12,
272:5, 273:10,
276:22, 279:18,
280:19, 293:12,
306:23, 306:24
**seeing**
33:11, 238:9,
256:11
**seek**
51:10
**seeking**
276:9

seem
70:24, 308:14
seemed
311:19
seems
270:20
seen
56:17, 116:9,
118:3, 151:7,
242:24, 244:25,
250:24, 255:22
senate
230:5
senate's
255:21
senator
96:23
send
26:14, 127:14,
144:13, 149:1,
149:7, 154:10,
154:14, 216:19,
216:21, 217:1
sending
30:16, 78:3,
149:22, 154:24
sends
26:10, 26:11,
188:23, 248:18
sense
15:8, 33:9,
51:22, 52:3,
67:10, 134:11,
149:6, 156:11,
166:3, 209:18,
234:12
sensitivity
286:4, 286:5
sent
45:22, 91:21,
145:21, 146:4,
146:10, 297:3
sentence
104:5, 223:5,
270:21
sentenced
242:5, 257:1
sentences
222:19, 223:9,

223:10
sentencing
222:13, 242:6,
255:25, 256:5,
257:7
sentiments
290:24, 291:3
separate
20:5, 27:13,
58:24, 75:13,
110:11, 126:3,
146:5, 146:11,
157:24, 169:7,
174:5, 180:22,
180:25, 181:2,
211:23, 234:3,
234:7, 274:3
separately
252:5, 257:5,
296:10
series
121:2
serious
81:9, 223:6
seriously
81:24
serve
65:7, 75:24,
76:7, 80:4,
85:14, 95:2,
294:24, 311:15,
311:20
served
53:7, 53:23,
64:17, 64:21,
65:23, 83:1,
99:10, 100:3,
100:7, 284:19
serves
62:16, 295:8
service
66:19, 78:22,
109:6, 109:14,
187:17, 187:21,
188:10, 188:25
service's
109:2, 109:9
serving
302:16, 311:2,

311:5
sessions
57:5, 61:1
set
12:10, 31:6,
34:5, 150:24,
204:25, 205:8,
241:8, 246:16,
251:6, 314:13
sets
244:12, 245:12,
254:21
settled
24:17
settlement
24:18
seven
55:7, 235:21
several
33:23, 48:4,
61:25, 113:13,
133:13, 133:23,
140:25, 152:16,
181:12, 239:1,
262:6, 273:2
sex
253:4
sexual
250:21, 250:25,
253:1
shall
194:3
share
198:10, 198:13,
238:14, 238:20,
255:7, 255:15,
259:18, 270:6,
272:12
shared
242:13, 256:11
sharing
56:8, 236:10,
236:11
sheet
30:11, 30:12,
30:13, 45:2,
138:10, 138:16,
138:24, 139:5,

140:23, 164:21,
168:10, 282:10,
313:7
shift
162:15
shoe
282:5
short
107:1, 107:9,
112:8, 147:11,
175:18, 229:5,
310:15
shorthand
314:1
should
14:10, 51:4,
51:6, 72:8,
72:11, 78:17,
93:14, 93:17,
94:10, 104:2,
113:3, 123:25,
147:3, 155:22,
171:4, 172:12,
173:6, 184:9,
198:22, 240:13,
240:14, 250:4,
272:6, 295:23
shouldn't
88:23, 97:25,
220:15, 225:2
show
79:8, 91:7,
91:22, 97:23,
102:11, 242:15
showed
170:3
showing
73:3, 249:5,
256:7, 257:8,
280:17, 283:10,
284:4
shows
198:20, 306:21
sic
36:5
sidetracked
256:15
sign
45:21, 50:13,

86:20, 93:5,
93:7, 144:13,
144:14, 158:14
**signals**
259:7
**signatory**
49:24, 135:23,
158:11, 158:15,
158:21, 159:1
**signature**
86:21, 253:24,
313:11
**signature-p1kal**
314:20
**signatures**
38:3
**signed**
45:23, 106:19,
249:17, 274:1,
313:7
**significant**
308:15, 308:21,
309:11
**significantly**
231:7
**signing**
314:8
**signs**
144:2, 228:21,
274:4
**similar**
103:16, 110:17,
111:1, 155:12,
177:3, 209:8,
237:10, 258:5,
260:20, 260:22,
271:7, 273:8,
273:16, 274:7,
292:10
**similarly**
261:4, 261:7
**simply**
51:14, 76:23,
126:18, 130:13,
147:13, 149:13,
234:10, 294:25,
297:2, 298:18
**since**
28:6, 52:20,

53:22, 67:25,
75:9, 75:24,
81:16, 82:3,
92:15, 131:21,
160:10, 168:20,
171:20, 182:12,
183:10, 256:4,
287:1, 296:24,
298:12, 304:7,
305:14, 305:18,
307:20
**single**
26:13, 45:6,
75:23, 78:14,
81:4, 104:23,
104:25, 105:3,
105:4, 106:2,
118:25, 139:7,
158:15, 178:12,
199:15, 199:18,
199:23, 199:25,
200:10, 201:20,
211:12, 234:15,
234:18, 234:19,
234:24, 280:22,
282:6, 296:16,
300:22, 303:6
**singular**
277:18
**sir**
32:22, 236:18,
247:24, 292:1
**sit**
244:19, 289:25,
304:14
**sitting**
28:22, 36:19,
52:4, 75:7,
84:1, 84:20,
159:22, 160:6,
176:24, 177:24,
178:4, 178:8,
259:5, 262:23
**situation**
51:21, 52:4,
145:16, 172:4,
194:22, 266:4,
274:8, 277:20,

278:1, 278:19,
288:6, 288:11,
305:17
**situations**
172:18, 262:7,
281:11, 289:9
**six**
20:21, 75:6,
306:2
**six-story**
204:18
**size**
185:7
**skip**
189:2
**slight**
14:19
**slightly**
200:14, 233:22,
264:10
**slippery**
126:12
**sliver**
152:6
**slope**
126:12
**small**
181:10, 291:16
**smith**
8:19, 230:9
**snapshot**
307:18
**social**
40:21, 40:24,
41:1, 41:5,
41:12, 41:17,
86:19, 113:14
**society**
84:4, 250:23,
291:11
**sole**
265:15
**solely**
213:5, 251:20,
252:1, 256:10
**solis**
10:5
**some**
13:11, 13:17,

13:19, 13:20,
16:7, 21:13,
21:20, 22:14,
22:23, 23:4,
25:7, 30:21,
30:22, 35:21,
38:6, 50:10,
51:25, 52:8,
53:15, 54:2,
54:9, 57:25,
84:5, 88:15,
89:14, 90:20,
90:22, 91:1,
95:21, 105:17,
133:12, 147:9,
148:2, 150:4,
153:14, 158:14,
162:23, 163:8,
167:5, 170:19,
172:11, 181:10,
181:11, 192:15,
194:9, 209:19,
213:1, 213:4,
234:4, 235:23,
236:12, 236:24,
237:23, 238:14,
239:10, 241:21,
242:11, 242:12,
249:9, 250:12,
251:15, 251:17,
252:14, 257:20,
258:18, 262:8,
268:23, 269:1,
275:8, 275:20,
277:4, 278:14,
279:5, 281:7,
281:9, 285:6,
285:13, 286:4,
286:9, 287:22,
291:17, 296:23,
308:11, 308:20,
310:3
**some-odd**
243:17
**somehow**
80:8, 138:6,
184:18, 242:22,
249:2, 269:8,

277:15, 282:11,
283:4, 309:6,
309:14
**someone**
25:19, 34:20,
40:16, 41:16,
44:23, 47:7,
69:5, 79:8,
84:9, 85:21,
87:5, 87:11,
87:17, 116:12,
126:19, 163:5,
187:12, 190:8,
190:19, 190:21,
191:18, 192:7,
192:19, 192:20,
224:13, 242:5,
243:20, 246:1,
246:4, 248:24,
250:10, 256:8,
256:21, 257:5,
262:13, 262:23,
264:15, 267:12,
267:13, 267:19,
268:14, 268:23,
269:11, 269:16,
271:13, 273:11,
276:16, 277:21,
277:22, 279:20,
284:11, 291:7,
292:21, 295:23,
295:25, 305:19,
311:23
**someone's**
66:20, 67:9,
68:21, 70:20,
72:18, 74:19,
87:20, 188:1
**something**
67:6, 68:15,
85:8, 93:10,
116:6, 116:14,
117:5, 150:12,
167:14, 192:23,
202:14, 209:2,
225:12, 246:12,
262:10
**sometimes**
14:19, 30:18,

33:25, 34:1,
38:2, 40:24,
45:11, 45:13,
108:23, 119:18,
127:10, 127:13,
137:25
**somewhere**
27:24, 75:5,
76:18, 167:4,
184:17, 209:17
**sorry**
22:8, 43:25,
46:25, 49:15,
89:5, 101:8,
114:7, 114:16,
132:19, 148:16,
153:19, 158:25,
166:24, 168:13,
171:8, 189:6,
189:23, 193:18,
196:13, 198:9,
204:11, 218:16,
222:6, 225:1,
240:5, 246:8,
267:9, 283:10,
286:16, 297:21,
307:10, 307:12
**sort**
51:3, 51:10,
90:20, 92:24,
95:22, 114:20,
126:14, 150:4,
213:1, 213:4,
222:18, 232:9,
234:4, 249:9,
250:20, 268:24,
275:8, 275:20,
277:4, 284:3,
285:6, 294:20,
296:23, 308:20,
310:3
**sound**
238:10, 294:23,
306:17
**sounds**
247:19, 306:18
**source**
39:8

**sources**
37:23, 38:11,
38:21, 39:21,
40:13, 229:20,
229:23, 230:3
**south**
5:22, 7:17
**southeast**
6:18
**speak**
50:4, 59:2,
59:5, 59:14,
59:23, 59:24,
60:5, 61:3,
77:25, 133:14,
153:25, 154:18,
161:13, 169:21,
185:5, 185:14,
185:22, 186:17,
188:15, 188:16,
229:2, 265:17,
276:18, 283:5,
289:2
**speaker**
43:23, 195:10
**speaker's**
231:10
**speakers**
231:8
**speaking**
14:25, 19:20,
37:20, 40:4,
40:23, 99:7,
114:6, 114:8,
126:16, 183:6,
199:6, 200:4,
200:15, 221:22,
222:16, 224:21,
226:12, 257:23,
261:4, 267:13,
300:15, 300:16,
300:23, 301:14
**specialized**
55:24, 55:25
**specific**
33:10, 36:16,
36:19, 37:2,
37:19, 39:12,

39:15, 40:15,
42:13, 49:23,
59:25, 62:12,
65:20, 72:24,
73:5, 73:10,
74:17, 79:23,
82:3, 90:4,
91:25, 94:21,
96:2, 97:16,
98:12, 98:23,
115:23, 120:7,
123:12, 123:19,
131:6, 132:13,
133:4, 133:7,
138:15, 140:1,
140:9, 140:20,
144:25, 150:10,
151:11, 157:12,
160:13, 163:20,
165:24, 166:14,
166:17, 170:7,
174:1, 178:16,
179:9, 180:12,
181:8, 183:1,
186:17, 191:23,
195:14, 195:18,
196:21, 199:13,
203:20, 217:17,
219:3, 220:8,
220:12, 221:8,
225:11, 226:6,
237:11, 238:13,
240:13, 244:10,
244:13, 244:19,
245:6, 250:17,
254:15, 256:1,
274:20, 290:23,
291:1, 291:3,
291:18, 292:17,
298:14, 303:7,
304:2
**specifically**
13:12, 36:12,
39:19, 49:12,
68:3, 73:1,
83:21, 97:18,
105:21, 108:15,
133:10, 147:20,

167:20, 180:14,
185:14, 192:18,
215:11, 216:8,
224:22, 226:2,
242:20, 243:2,
243:6, 254:20,
277:17, 280:9,
284:1
**specification**
178:16
**specifics**
131:22, 245:18,
262:20
**specified**
245:15
**specify**
57:23
**spectrum**
284:8
**speculate**
50:17, 59:21,
72:25, 92:17,
98:16, 104:23,
105:19, 110:12,
161:23, 162:15,
163:13, 166:9,
269:3, 285:5
**speculation**
76:16
**spend**
116:23, 166:7
**spent**
165:16, 165:19,
166:15
**spoke**
25:19, 59:6,
59:7, 60:2
**spoken**
81:16, 106:18,
107:25
**sponsors**
97:5
**spouse**
194:19
**spreadsheet**
40:16, 40:18,
40:22
**spreadsheets**
37:22, 39:3,

40:4, 40:5,
40:24, 245:7
**st**
8:6
**stack**
202:12, 207:12,
262:24
**staff**
59:2
**stake**
73:13, 77:6,
104:1, 108:1,
108:8, 108:20,
301:15, 311:4,
311:6
**stamped**
156:24
**stance**
77:20, 82:17,
106:20, 244:18
**standing**
67:23, 93:22
**start**
13:18, 30:22,
55:1, 55:2,
55:3, 55:14,
57:14, 62:13,
63:4, 64:1,
65:4, 65:13,
82:13, 103:3,
103:8, 139:19,
190:13, 236:14,
299:1
**started**
178:20, 298:14
**starting**
56:21, 178:20
**startup**
53:23, 54:8
**startups**
54:6
**state's**
11:20, 16:1,
21:3, 46:20,
47:8, 48:8,
56:25, 61:8,
63:5, 63:12,
67:1, 70:5,

74:24, 75:19,
75:24, 77:19,
78:18, 82:10,
85:14, 87:20,
87:23, 88:2,
88:7, 89:12,
90:1, 92:6,
95:2, 96:14,
97:13, 97:14,
98:9, 100:6,
100:16, 100:22,
101:13, 101:20,
108:7, 121:13,
121:25, 124:15,
125:7, 127:5,
127:11, 127:14,
127:18, 127:25,
128:6, 129:3,
129:17, 129:22,
130:2, 130:9,
130:16, 136:5,
139:23, 161:2,
161:16, 167:24,
171:8, 224:8,
224:18, 224:24,
225:17, 226:14,
226:22, 227:6,
227:13, 227:19,
228:1, 228:8,
228:14, 228:16,
228:24, 229:14,
231:2, 231:13,
232:13, 233:2,
237:2, 244:17,
245:23, 252:10,
265:22, 270:15,
285:9, 285:19,
287:12, 291:12,
294:12, 300:5,
300:11, 302:8,
303:21
**stated**
62:23, 67:19,
75:14, 87:5,
95:2, 97:18,
100:11, 106:6,
169:14, 244:8,
260:21, 265:23,

274:19, 275:19,
301:13, 303:15,
311:1, 311:2
**statement**
31:24, 32:3,
42:16, 44:12,
44:14
**statements**
39:20, 40:3,
40:12, 209:21
**states**
1:1, 53:7,
66:9, 66:18,
67:15, 68:16,
78:22, 108:19,
109:2, 109:6,
109:8, 109:14,
110:16, 110:25,
111:3, 111:14,
111:20, 111:21,
111:25, 112:3,
113:13, 119:1,
187:13, 187:21,
188:9, 194:2,
197:21, 209:9,
209:12, 209:15,
210:23, 221:22,
251:5, 257:2,
290:23, 309:4,
310:25, 311:21
**statewide**
174:12, 174:15,
174:17, 181:20,
181:25, 182:2,
183:9, 183:15
**stating**
30:19, 110:22,
284:1
**statistic**
303:6
**statistics**
231:6, 231:13,
232:1, 232:5
**statue**
30:5
**status**
67:2, 67:10,
70:20, 70:25,

72:19, 78:19,
79:3, 79:10,
79:17, 110:21,
111:3, 111:5,
183:14, 187:24,
269:8, 302:2,
302:4
**statutes**
19:21, 50:22,
57:17, 57:18,
134:22, 154:20,
195:5, 198:21,
201:16, 208:25,
222:13, 255:21,
255:25, 256:3,
256:5, 257:1,
260:17, 271:21
**statutorily**
180:6
**statutory**
30:3, 30:5,
30:20, 30:23,
31:15, 33:25,
35:21, 44:19,
93:23, 97:23,
115:16, 116:1,
127:19, 129:10,
140:18, 142:9,
150:6, 150:23,
151:4, 179:24,
199:11, 207:20,
210:4, 211:16,
214:19, 259:12,
268:22, 271:5,
280:2, 280:4
**stay**
191:20
**staying**
111:6, 310:11
**steal**
84:9, 251:16
**stealing**
82:17
**steals**
278:13
**stem**
39:5, 248:23
**stenographically**
314:6

**step**
95:17, 126:8,
226:5, 279:25,
280:14, 299:3,
299:9
**stephanie**
9:20
**steps**
128:13
**stewards**
80:19
**stick**
140:16
**sticking**
142:18
**still**
16:9, 32:6,
37:7, 41:7,
52:7, 67:22,
79:14, 84:4,
84:11, 93:22,
102:19, 104:16,
116:8, 122:6,
122:8, 122:9,
123:22, 132:22,
152:8, 181:17,
194:24, 196:6,
207:9, 210:13,
210:24, 210:25,
215:17, 216:5,
236:9, 249:3,
266:8, 273:14,
296:6, 302:1,
305:1
**stipulate**
256:18, 256:24,
257:3
**stipulation**
256:25
**stole**
175:10, 184:17
**stolen**
175:5, 184:20
**stop**
26:12, 50:7,
81:3, 161:9,
306:1
**storage**
234:11

**store**
185:25, 186:10,
186:25, 234:8
**stored**
39:2, 185:20,
186:7
**stores**
186:4, 186:19
**streamlining**
95:25
**street**
4:21, 5:14,
5:22, 6:10,
6:18, 7:8, 8:21,
9:7
**stretch**
276:4
**strict**
274:23, 275:4,
275:7, 275:22
**strictly**
66:17
**structured**
261:4, 261:7
**student**
103:15
**study**
53:10, 200:22
**stuff**
260:4
**sub**
292:4
**subissues**
33:13
**subject**
20:8, 23:18,
59:9, 103:13
**submission**
26:8, 31:3,
33:8, 63:21,
74:10, 75:15,
83:7, 88:4,
88:10, 88:12,
88:22, 89:14,
89:18, 89:19,
89:20, 89:22,
90:3, 91:2,
91:3, 91:4,

91:9, 94:2,
96:4, 97:2,
99:4, 100:13,
104:11, 138:1,
140:5, 142:18,
142:19, 150:22,
156:2, 156:10,
184:22, 296:5
**submissions**
34:13
**submit**
20:7, 38:2,
41:16, 74:12,
75:1, 75:17,
75:20, 77:15,
84:7, 85:17,
86:1, 86:4,
87:7, 87:16,
90:11, 91:22,
104:7, 104:24,
147:4, 149:9,
149:15, 154:7,
155:13, 155:23,
227:9, 278:15,
288:17
**submits**
89:9, 90:17,
105:4, 248:24,
278:23
**submitted**
24:25, 25:4,
26:4, 27:3,
27:25, 30:3,
34:16, 35:10,
39:5, 42:9,
42:11, 43:11,
43:20, 44:10,
44:22, 46:5,
50:11, 68:6,
69:6, 77:10,
78:9, 86:7,
91:17, 93:8,
95:6, 95:15,
103:11, 103:24,
104:6, 109:17,
125:4, 136:14,
136:21, 137:12,
139:3, 139:20,

140:17, 141:2,
141:14, 145:8,
145:11, 146:15,
146:19, 146:20,
146:22, 147:24,
152:4, 152:17,
158:16, 170:12,
172:12, 184:20,
184:25, 219:9,
231:23, 234:18,
249:4, 249:14,
249:22, 249:24,
250:5, 254:13,
274:2, 276:12,
288:19, 289:6,
295:23, 309:24,
310:7
**submitting**
18:7, 31:12,
34:23, 35:5,
35:16, 39:11,
68:9, 81:9,
111:8, 140:18,
146:6, 146:12,
151:3, 299:1
**subpoena**
68:23, 71:20
**subsection**
216:11, 260:13
**subsequently**
238:3
**substance**
225:4, 225:20,
225:22, 226:8,
226:12, 228:11
**substantially**
291:24
**substantive**
237:14
**substantively**
292:10
**substitution**
162:13
**successful**
149:3
**successfully**
92:5, 284:6
**suffice**
298:15

**sufficient**
311:6
**suggest**
81:22, 126:13
**suite**
4:12, 4:22,
5:7, 5:23, 7:18,
8:12, 10:8,
21:25, 25:9,
49:9, 49:14,
59:7, 128:16,
129:2, 136:8,
167:2, 167:7,
171:9, 173:4
**sum**
209:6
**summarizing**
253:9
**summary**
30:17, 30:18
**sumter**
8:7
**supervising**
140:10, 200:19,
201:2, 201:6,
264:16, 265:4,
265:5
**supervision**
314:8
**supervisor**
6:3, 6:14, 7:3,
7:13, 8:3, 8:16,
9:11, 10:3,
19:4, 19:6,
26:9, 26:16,
26:17, 30:15,
44:11, 76:24,
89:1, 89:7,
104:21, 105:9,
105:25, 106:5,
110:3, 110:8,
136:15, 137:9,
137:10, 137:17,
138:5, 139:23,
156:3, 156:20,
156:22, 167:10,
167:18, 168:12,
168:13, 190:15,

194:3, 250:1,
264:18, 266:2,
266:5, 266:21
**supervisor's**
168:11
**supervisors**
22:20, 25:1,
25:7, 26:19,
30:1, 76:9,
78:2, 78:7,
80:15, 88:15,
95:8, 96:6,
96:8, 110:5,
110:10, 127:15,
140:2, 309:16
**support**
21:18, 23:6,
25:25, 50:12,
61:16, 102:15,
228:15, 228:24,
302:24
**supported**
228:14, 228:17,
251:10
**supporting**
58:9, 62:18
**supports**
303:21
**supposed**
46:18
**sure**
14:21, 14:23,
19:15, 33:6,
36:3, 36:21,
38:8, 38:16,
57:24, 68:8,
74:6, 84:2,
84:17, 90:4,
93:2, 96:11,
112:9, 112:15,
116:22, 116:25,
117:1, 118:4,
119:3, 119:20,
137:23, 139:19,
147:4, 147:19,
159:7, 172:15,
175:21, 184:24,
198:18, 200:13,

213:15, 218:12,
218:19, 218:25,
219:12, 221:20,
222:7, 226:9,
234:5, 235:17,
237:25, 240:17,
241:4, 241:8,
247:18, 248:2,
248:15, 251:22,
254:4, 258:4,
258:13, 261:8,
261:16, 262:6,
262:21, 264:17,
267:22, 270:23,
279:17, 286:12,
289:4, 291:6,
294:17, 297:14,
300:10, 304:24,
307:22
**surpassed**
180:9, 303:16
**surrounding**
210:10
**surveys**
290:9
**suspect**
112:13
**suspected**
175:23, 176:13,
177:4, 177:8,
189:9
**suwannee**
8:7
**swipe**
120:5
**switching**
127:23
**sworn**
13:3, 36:6,
39:20, 40:3,
40:11, 42:16,
190:11
**system**
18:6, 63:24,
80:1, 83:10,
88:13, 88:24,
95:20, 99:17,
106:21, 108:1,

108:9, 165:4,
165:19, 249:1,
249:5, 251:21,
252:12, 252:20,
265:22, 294:4,
301:16, 302:22
**systematic**
279:6, 279:15

**T**

**table**
207:14
**tackle**
175:17
**taddeo**
96:24
**take**
15:14, 24:2,
56:5, 60:10,
68:4, 73:12,
77:19, 78:11,
81:8, 81:24,
82:16, 84:9,
85:16, 87:6,
101:24, 102:6,
112:17, 120:14,
126:8, 147:9,
151:5, 163:14,
165:23, 175:17,
177:2, 198:8,
202:12, 204:17,
211:10, 211:11,
214:2, 226:5,
228:16, 229:5,
235:9, 235:17,
236:19, 238:12,
238:15, 241:11,
244:18, 247:17,
248:1, 254:25,
256:16, 258:25,
261:8, 270:18,
275:25, 276:3,
277:19, 279:25,
280:14, 285:10,
287:10, 304:12
**taken**
62:9, 102:9,
128:13, 134:16,

187:4, 206:23,
235:5, 256:4,
276:5, 314:3,
314:6
**takes**
156:3, 299:2
**taking**
123:24, 199:7,
236:10, 258:10,
264:14, 267:24,
268:5, 303:22
**talk**
62:11, 65:13,
74:8, 82:7,
106:16, 123:9,
195:9, 195:12,
231:21, 232:1,
237:12, 238:6,
250:19, 252:22,
257:24, 261:20,
276:20, 295:21
**talked**
102:25, 133:23,
137:19, 169:10,
236:25, 248:15,
251:15, 253:21,
295:25, 301:2
**talking**
43:11, 48:20,
65:14, 70:17,
89:16, 112:18,
141:20, 141:21,
167:11, 173:13,
178:17, 195:13,
196:14, 196:19,
225:8, 225:23,
231:21, 236:15,
239:19, 242:25,
245:2, 245:24,
251:18, 266:6,
266:7, 266:21,
269:7, 278:11,
301:11, 302:17,
307:10
**talks**
113:14, 239:15
**tallahassee**
1:3, 5:24, 9:24

**tally**
45:9
**tardiness**
141:7
**tardy**
150:22
**targeted**
103:7
**tasked**
49:3
**tasks**
21:18, 21:24,
22:14, 22:15,
22:18
**tax**
148:5
**taxpayer**
80:19
**taylor**
8:7
**team**
167:2
**technical**
35:2, 43:17,
44:17, 80:10,
280:23
**tell**
17:13, 42:13,
59:24, 68:3,
75:25, 80:6,
82:1, 162:16,
166:6, 195:16,
234:22, 243:18,
255:5, 256:19,
260:15, 265:19,
287:3, 289:25,
290:18, 296:14
**temporal**
111:13
**temporally**
18:19, 18:20
**temporarily**
111:5
**temporary**
103:15, 103:16
**ten**
96:16, 146:1,
149:1, 149:7,

149:22, 153:9,
153:21
**ten-digit**
118:1, 118:10
**tend**
280:10, 280:11
**tens**
80:12
**term**
18:18, 19:2,
66:7, 73:19,
94:19, 94:21,
113:6, 113:16,
115:1, 217:20,
240:15, 251:13,
261:25, 263:8,
267:4
**terminate**
185:1, 185:4
**terminated**
160:13
**terms**
29:19, 37:18,
50:15, 66:16,
91:14, 91:15,
124:17, 126:21,
129:14, 165:19,
165:24, 183:1,
183:14, 187:19,
200:5, 215:4,
223:2, 229:18,
242:20, 243:11,
244:12, 258:6,
295:6
**tertiary**
96:7
**testified**
13:3, 13:24,
13:25, 14:4,
24:23, 38:19,
64:7, 66:7,
66:10, 69:10,
82:24, 121:7,
121:11, 136:23,
138:11, 157:13,
158:10, 161:3,
172:16, 174:6,
176:8, 198:5,

224:4, 232:23,
236:22, 239:17,
240:8, 251:12,
266:2
**testify**
37:10, 56:24,
57:4, 62:20,
64:8, 83:20,
99:22, 120:23,
135:17, 157:14,
176:5, 177:24,
178:4, 178:8,
183:2, 189:14,
189:19, 194:20,
198:1, 198:6,
214:11, 214:15,
224:1, 224:5,
228:8, 229:9,
229:12, 232:24,
302:14
**testifying**
64:25, 67:11,
301:18
**testimony**
16:23, 51:1,
64:12, 99:7,
104:8, 108:3,
120:25, 161:17,
162:11, 167:21,
176:21, 177:1,
178:5, 179:11,
195:25, 196:8,
197:9, 197:17,
209:10, 225:9,
233:18, 241:3,
250:14, 251:15,
258:2, 279:14,
279:18, 279:19,
301:10, 313:4,
313:6, 314:5,
314:6
**text**
115:17, 116:1
**th**
4:21, 58:19,
314:14
**thank**
18:17, 23:1,

134:25, 150:3,
151:18, 153:17,
175:14, 198:15,
198:24, 203:15,
211:9, 215:22,
217:5, 235:11,
240:4, 255:11,
263:19, 270:13,
311:25, 312:3
**thanks**
236:11, 244:21,
259:9, 310:10
**theft**
35:14, 35:25,
42:2, 82:19,
84:7, 84:24,
84:25, 174:22,
174:24, 177:10,
178:23, 179:12,
180:2, 180:15,
180:23, 181:6,
182:19, 183:18,
184:15, 241:20,
250:20, 253:22
**themselves**
48:21, 74:1,
74:2, 144:15,
150:9, 196:22,
196:23, 197:13,
197:15, 246:15,
285:21
**thereafter**
314:7
**therefore**
122:15, 196:3,
196:11, 197:10
**therein**
126:10
**thing**
57:14, 76:4,
88:1, 94:24,
100:19, 198:23,
259:11, 268:2,
271:23, 283:23,
284:5
**things**
14:8, 14:10,
32:4, 103:1,

215:19, 222:21,
232:1, 251:14,
256:13, 267:11,
303:9
**thinking**
122:9, 139:16,
159:18, 167:8
**third**
44:14, 124:6,
222:10, 222:12,
241:17
**third-degree**
55:15, 55:18,
222:17, 222:22
**third-to-last**
241:16
**thought**
137:20, 172:16,
249:4, 278:11
**thousand**
97:24, 282:15
**thousands**
80:7, 80:11,
80:12
**three**
53:17, 55:13,
57:5, 58:23,
58:25, 60:12,
60:16, 60:17,
64:15, 99:9,
168:15, 236:6,
304:7, 304:20,
304:21
**three-day**
20:25, 158:13
**through**
1:19, 14:12,
18:7, 56:17,
63:25, 65:15,
84:22, 88:20,
109:17, 152:15,
155:3, 157:2,
160:14, 162:25,
166:22, 167:12,
171:11, 171:23,
194:18, 230:11,
231:7, 248:19,
262:8, 262:18,

278:9, 300:9,
307:24
**throughout**
82:19, 284:14
**thursday**
1:22
**ticket**
112:11
**tied**
118:11, 119:11,
119:12, 119:14,
219:25, 220:1
**tiffany**
167:18, 168:12
**tightly**
71:2
**time**
18:12, 19:2,
20:3, 20:9,
25:4, 26:13,
28:24, 29:3,
29:18, 31:21,
37:2, 37:8,
46:21, 47:8,
47:10, 47:11,
49:10, 49:11,
51:18, 55:19,
55:21, 59:19,
59:25, 62:4,
74:13, 75:18,
75:21, 76:1,
77:11, 84:21,
89:4, 89:10,
94:10, 101:9,
103:11, 103:14,
103:25, 116:23,
133:5, 133:12,
143:7, 143:14,
147:9, 148:20,
157:22, 165:16,
165:18, 165:19,
165:23, 165:25,
166:4, 166:6,
166:7, 166:13,
166:15, 166:18,
178:17, 178:19,
182:11, 187:3,
218:16, 225:10,

234:19, 235:8,
235:10, 235:17,
245:12, 256:16,
261:9, 264:1,
276:1, 304:12,
304:19, 305:8,
309:24, 310:7,
310:10, 310:13
**timeline**
75:2, 144:22,
170:22, 170:24,
249:19
**timelines**
31:6
**timeliness**
304:18, 304:21,
304:22, 305:3,
308:8
**timely**
63:21, 68:6,
74:9, 75:15,
83:7, 88:4,
88:9, 88:11,
88:22, 89:14,
89:17, 89:19,
89:20, 89:22,
90:2, 90:5,
90:7, 91:4,
91:9, 99:4,
100:13, 140:5,
149:9, 149:15,
156:6, 156:9,
247:7, 294:3
**times**
45:14, 60:5,
60:12, 85:7,
121:1, 241:20,
280:10
**timing**
146:5, 146:12
**tiny**
152:6
**title**
17:14, 17:15,
118:19, 164:11,
164:12, 164:13,
164:15, 252:1
**titles**
163:20, 164:9,

167:7, 167:10
**today**
13:18, 14:8,
14:12, 15:16,
15:24, 16:20,
16:24, 37:10,
57:4, 62:13,
62:21, 64:2,
64:12, 74:23,
75:8, 84:1,
102:19, 112:12,
120:5, 176:19,
176:21, 177:15,
178:21, 178:25,
200:23, 219:21,
235:10, 235:21,
237:12, 243:6,
244:19, 248:16,
290:17, 291:10,
291:25, 307:24
**today's**
56:6, 56:7,
56:21, 64:3,
84:3, 85:7,
209:10, 290:8
**together**
16:14, 56:15,
134:22, 134:23,
135:9, 303:4
**told**
78:25, 132:17,
132:24, 283:23,
284:4
**tomorrow**
4:5, 13:13
**took**
21:23, 53:10,
53:18, 228:24
**top**
138:8, 151:6,
242:1, 272:14
**topic**
62:13, 62:21,
62:22, 64:3,
64:5, 64:8,
65:12, 83:20,
99:22, 120:14,
120:17, 120:24,

121:3, 121:5,
121:8, 135:10,
135:12, 157:24,
158:2, 158:9,
163:16, 168:25,
169:7, 175:20,
175:22, 176:5,
176:23, 177:2,
177:14, 177:22,
178:22, 182:15,
182:17, 183:5,
187:6, 189:2,
189:4, 189:5,
189:15, 189:19,
197:21, 198:1,
198:6, 200:4,
214:1, 214:5,
214:11, 214:15,
223:21, 224:2,
224:6, 224:7,
229:4, 229:6,
229:9, 229:12,
232:18, 232:24,
233:5, 234:4,
275:24
**topics**
56:20, 57:1,
57:4, 57:12,
62:12, 120:13,
134:11, 135:7,
135:8, 135:17,
157:14, 157:17,
175:16, 253:9
**total**
26:19, 26:20,
27:16, 43:16,
76:14, 97:19,
309:3
**totaled**
164:4
**touch**
107:18, 201:23,
202:2, 202:4,
263:1, 265:6
**touched**
35:18, 307:19
**touching**
193:22, 203:7,

264:18, 266:2,
266:8, 266:15,
267:7, 267:8,
267:9, 268:8
**toward**
121:23
**towards**
255:17
**track**
209:21, 229:15,
229:17, 229:18,
232:17, 233:24,
234:15, 290:21
**tracked**
26:7, 291:16
**tracking**
229:7, 232:2,
232:19, 233:5,
233:15, 234:7,
234:10, 234:12,
234:23
**tracks**
55:1
**transcribe**
15:1, 312:5
**transcribed**
14:14
**transcript**
11:8, 12:2,
41:24, 56:12,
102:5, 148:15,
238:23, 259:17,
259:25, 270:11,
272:10, 286:25,
293:8, 306:15,
314:4
**transcription**
313:5
**travel**
111:21, 111:24,
112:2
**travels**
73:9, 74:21
**treat**
117:12
**treated**
297:19, 297:20
**trial**
310:4

**tried**
54:8
**trigger**
252:23, 269:19
**triggered**
278:8
**true**
105:2, 109:5,
127:4, 257:20,
313:4, 314:4
**trust**
254:6, 254:8,
254:16
**trustworthy**
107:21, 108:4
**truthful**
16:23
**truthfully**
96:18, 96:21,
210:2, 274:4
**try**
14:22, 82:17,
91:8, 166:3,
225:12, 226:8,
235:19, 243:11,
260:5, 279:18,
289:14
**trying**
33:9, 38:16,
53:24, 116:25,
119:15, 144:8,
177:20, 203:9,
218:22, 218:23,
233:18, 234:14,
254:1, 261:21,
266:24, 278:10,
307:5, 307:17
**tucked**
19:14
**tuesday**
20:25, 158:13
**turn**
32:23, 51:12,
62:11, 94:17,
104:20, 150:4,
257:14, 295:8
**turned**
78:7, 134:4,

245:20, 284:21,
287:25
**turning**
100:19, 105:8,
193:21
**turns**
33:2, 141:8,
144:21, 199:6
**twice**
53:8, 60:7,
177:21
**two**
23:10, 28:12,
32:4, 54:12,
54:21, 55:1,
57:5, 59:17,
60:12, 60:18,
111:9, 136:12,
136:18, 144:3,
144:10, 148:5,
164:8, 164:9,
164:12, 175:15,
183:11, 183:12,
195:5, 213:13,
215:5, 215:19,
218:24, 235:18,
235:25, 241:19,
249:11, 258:5,
260:16, 260:17,
283:16, 303:2,
304:3, 305:10,
309:9
**tying**
118:2, 307:12
**type**
34:2, 54:13,
55:4, 87:1,
87:15, 87:23,
136:25, 139:15,
140:15, 171:13,
191:6, 226:6,
246:24, 279:25,
303:17
**types**
54:6, 54:22,
123:2, 142:23,
174:7, 246:3,
282:16, 282:17,

303:4, 304:5
**typewriting**
314:7
**typically**
26:10, 31:14,
31:18, 66:2,
104:20, 168:11,
268:23, 283:3

---

### U

**uh-huh**
14:15, 189:6,
189:7, 267:16,
269:23
**ultimately**
19:23, 45:1,
219:12, 227:7
**umberto**
13:14
**unable**
197:14
**unauthorized**
191:24
**unaware**
234:2
**unclear**
137:21, 158:18
**uncover**
190:12
**under**
27:25, 48:10,
48:15, 49:22,
50:22, 70:15,
85:8, 110:2,
110:11, 138:16,
143:11, 143:13,
144:4, 144:18,
145:16, 147:23,
149:18, 150:19,
201:22, 212:7,
215:10, 215:12,
215:17, 222:15,
240:12, 242:16,
251:10, 253:25,
269:17, 270:1,
272:20, 275:11,
297:13, 300:5,
314:7

**undercut**
106:6, 106:10,
106:17
**undercuts**
106:22
**underestimation**
308:3
**undergoing**
123:7
**underlying**
32:16, 237:19,
239:9, 239:12,
240:11, 240:14,
240:24, 241:3,
243:23, 245:16,
250:10, 252:23,
254:22, 262:14,
265:15, 268:16,
269:13, 272:25
**underneath**
152:14
**understand**
15:3, 15:6,
15:18, 15:20,
18:11, 18:15,
19:15, 27:4,
37:14, 38:16,
38:25, 41:19,
47:6, 56:23,
67:11, 89:13,
94:12, 124:16,
136:6, 143:16,
144:8, 153:12,
154:1, 157:23,
158:1, 158:2,
160:4, 174:24,
189:3, 199:2,
199:10, 215:7,
217:20, 233:21,
235:8, 238:13,
244:15, 244:21,
250:8, 251:22,
252:3, 267:2,
267:3, 278:10
**understanding**
38:8, 38:14,
42:20, 47:16,
48:7, 48:13,

84:24, 85:4,
106:24, 127:17,
131:25, 132:4,
133:19, 143:22,
148:21, 172:15,
175:3, 182:1,
185:24, 186:3,
186:7, 188:11,
188:17, 191:13,
191:21, 210:12,
210:24, 226:12,
226:25, 227:25,
239:8, 240:25,
256:14, 295:1
**understood**
13:21, 14:3,
15:2, 15:6,
15:15, 16:5,
16:10, 16:17,
38:19, 61:23,
89:23, 232:4,
232:18
**undertake**
155:12
**undo**
184:22
**unfamiliar**
291:17
**unidos**
4:6
**unidosus**
13:12
**uniformity**
63:23, 76:5,
76:8, 76:13,
76:22, 80:18,
83:9, 94:24,
95:3, 95:23,
96:4, 96:6,
99:4, 99:16
**uniformly**
77:10
**unilaterally**
173:2
**union**
8:7
**unique**
236:7

**unit**
55:24, 55:25
**united**
1:1, 53:7,
66:9, 66:18,
67:15, 68:16,
78:21, 109:2,
109:6, 109:8,
109:14, 110:16,
110:25, 111:3,
111:14, 111:20,
111:21, 111:25,
112:2, 119:1,
187:13, 187:20,
188:9, 209:9,
209:11, 209:15,
210:23, 221:22,
251:5, 290:23,
309:4, 310:24,
311:21
**units**
1:7, 4:4
**unlawful**
144:4, 144:18,
175:23, 176:14,
177:4, 177:9,
178:23, 189:9,
261:22
**unless**
16:7, 257:2,
272:12, 275:4,
296:23, 299:5
**unpaid**
34:21, 36:23
**unquote**
149:21, 298:16
**unregistered**
297:25
**until**
78:6, 142:14,
297:12
**untimely**
136:22, 142:17,
142:19, 156:15
**unwanted**
190:4
**update**
22:10, 86:21,

292:14, 295:11,
296:11, 297:4
**updated**
31:2, 87:9,
248:18, 248:20
**updates**
86:2
**updating**
21:21, 33:5,
68:9, 73:16,
77:12, 199:9
**upwards**
165:21
**use**
15:24, 19:2,
37:20, 84:10,
85:22, 92:20,
94:16, 94:19,
113:6, 117:2,
127:21, 184:5,
186:22, 190:4,
261:6, 298:19,
299:1, 309:2,
309:11
**user**
120:6
**uses**
93:6, 113:8,
113:11, 113:12
**using**
36:7, 37:14,
38:12, 38:22,
40:10, 40:11,
87:17, 89:22,
90:18, 184:20,
254:11, 258:6,
263:8, 285:14
**utilize**
155:6, 196:6,
262:4, 262:5
**utilizing**
39:10, 40:3,
162:20, 296:1

**V**

**valid**
120:9, 290:16
**varied**
127:18

**variety**
21:18, 22:2,
33:1, 40:13,
54:24, 55:16,
65:12, 69:19,
79:15, 119:19,
151:1, 186:24,
254:14, 257:16,
292:22
**various**
127:21
**vecino**
28:12
**ventured**
59:20
**verb**
199:17, 199:24,
200:11
**verbal**
14:14, 243:10
**verbally**
133:2, 245:9,
267:13
**verbatim**
193:8, 201:19,
247:13
**verify**
66:15, 66:20,
68:1, 68:20,
70:11, 74:19,
79:2, 120:17,
155:12, 188:3,
214:4
**verifying**
67:12, 69:25,
70:25
**version**
127:1, 128:9,
134:22, 179:16,
179:22, 198:19,
198:22, 252:25,
259:22
**versions**
31:14, 48:4
**versus**
89:15, 89:18,
146:1
**via**
109:12, 229:8,

229:18, 231:19,
232:7, 232:15,
232:20, 233:3,
233:16, 234:1,
234:16, 234:22
**vicinity**
289:6
**victim**
38:2, 39:10,
86:3
**victims**
37:18, 180:20
**view**
206:5, 258:11
**viewing**
206:15, 206:17
**views**
207:2
**violate**
80:9, 135:22,
202:14, 204:3,
204:23, 205:21,
206:12, 206:24,
207:14, 208:15,
211:7, 212:15,
221:2, 221:16,
263:21, 264:19,
266:19, 271:15
**violated**
29:20, 29:23,
71:11, 72:11,
138:7, 145:15,
170:6, 242:22,
244:2, 263:2,
273:13, 280:18,
305:13
**violates**
210:16, 221:8,
264:8, 277:15
**violating**
203:3, 266:3,
273:15, 274:25,
281:23
**violation**
27:3, 30:3,
30:4, 30:19,
30:20, 34:3,
43:14, 44:8,

47:24, 51:3,
72:13, 75:12,
75:13, 75:17,
80:10, 124:5,
137:1, 137:2,
138:14, 139:14,
139:25, 142:6,
142:7, 142:9,
142:10, 142:16,
142:17, 180:10,
205:9, 210:7,
221:5, 222:8,
242:25, 250:20,
253:15, 253:18,
263:18, 265:12,
271:11, 281:5,
281:21, 282:11,
285:1, 296:23,
296:24, 296:25,
298:3, 298:22
**violations**
30:23, 31:15,
33:25, 34:1,
34:15, 35:3,
35:20, 35:21,
35:23, 43:18,
44:16, 44:18,
45:10, 65:12,
65:18, 77:25,
139:6, 139:8,
142:9, 252:15,
274:16, 274:21,
280:24, 308:5
**violence**
55:2, 55:6
**virtually**
1:21, 3:2
**visas**
103:15
**visitors**
103:16
**vital**
250:1
**vogel**
5:21
**volume**
100:19, 193:21
**volunteer**
236:16, 237:3,

237:5, 239:13,
240:18, 243:23,
244:3, 245:22,
247:4, 248:7,
248:14, 250:11,
251:11, 251:19,
251:25, 252:24,
255:6, 257:25,
258:7, 260:11,
262:2, 262:12,
262:15, 263:2,
264:16, 265:14,
268:13, 269:13,
269:15, 271:15,
272:20, 274:22,
286:10, 289:9,
290:15, 305:13,
305:20
**volunteer's**
284:20
**volunteering**
220:21, 289:22
**volunteers**
149:21, 264:13,
265:3, 265:4,
267:23, 268:3,
272:18, 289:24,
291:6
**volusia**
9:11
**vote**
69:16, 70:12,
77:12, 81:19,
84:5, 86:3,
90:20, 91:5,
91:8, 91:9,
91:16, 92:5,
92:8, 92:9,
95:13, 96:11,
103:22, 108:2,
108:4, 108:6,
108:8, 108:11,
145:9, 145:19,
146:24, 162:10,
162:22, 163:6,
163:9, 192:12,
192:13, 193:3,
196:3, 196:11,

197:10, 197:18,
207:4, 207:5,
216:20, 216:21,
217:2, 229:16,
231:25, 248:21,
249:8, 249:17,
250:4, 267:11,
267:14, 267:19,
280:13, 280:14,
285:1, 291:8,
295:22, 296:6,
301:14, 303:25,
304:1
**vote-by-mail**
91:21, 189:10,
190:14, 191:1,
191:11, 191:19,
192:4, 192:19,
193:19, 194:4,
194:16, 194:23,
195:13, 196:2,
196:11, 196:22,
197:9, 197:15
**voter's**
86:13, 86:25,
91:17, 94:22,
112:22, 113:3,
113:23, 114:13,
115:1, 193:5,
194:6, 215:11,
216:1, 216:5,
216:18, 216:24,
219:11, 221:13,
229:25
**voter-registrati-
on**
103:23
**voter-related**
303:17
**voters**
2:4, 4:4, 4:16,
12:9, 13:13,
38:22, 68:8,
69:22, 71:14,
73:20, 76:19,
80:24, 82:12,
83:3, 83:23,
90:9, 91:22,

92:4, 92:7,
92:12, 92:13,
93:12, 94:18,
96:3, 106:21,
109:23, 120:11,
128:1, 130:4,
130:11, 148:2,
152:5, 152:12,
152:13, 152:24,
155:13, 161:25,
162:24, 163:8,
184:3, 186:23,
194:9, 218:12,
229:8, 229:15,
229:17, 229:21,
230:11, 230:12,
231:6, 232:7,
232:20, 233:3,
233:16, 233:25,
234:16, 234:21,
235:15, 293:11,
299:12
**voting**
70:12, 84:13,
98:22, 101:21,
137:24, 195:14,
197:5, 249:1,
249:3, 249:24,
249:25
**voting-related**
66:14, 67:16

**W**

**waiting**
124:21, 126:24
**waive**
170:15
**wakula**
8:7
**wales**
9:16
**walk**
278:9
**walked**
259:5
**walmart**
81:20
**walton**
8:7

**want**
21:23, 22:5,
36:15, 59:20,
77:13, 81:7,
84:4, 84:5,
84:11, 92:8,
96:12, 98:16,
103:1, 110:12,
112:13, 120:11,
123:8, 123:13,
126:8, 126:15,
126:19, 151:22,
152:10, 159:7,
178:11, 198:12,
210:15, 213:12,
223:11, 234:10,
235:19, 236:2,
238:12, 239:7,
240:17, 241:15,
248:1, 256:15,
257:24, 258:1,
259:1, 259:11,
261:8, 270:2,
270:23, 276:3,
279:17, 284:17,
289:9, 293:1,
293:15, 299:6,
299:7, 306:11,
312:5
**wanted**
187:7, 194:22
**wanton**
97:22
**wants**
188:23, 275:25,
285:12
**warning**
45:16, 45:22,
45:23, 46:2,
46:3, 46:13,
46:21, 47:9,
48:9, 48:14,
49:3, 49:18,
49:19, 50:8,
50:14, 297:2
**washington**
4:13, 4:23, 8:8
**waste**
148:20

**way**
18:7, 26:5,
26:12, 68:18,
88:18, 95:4,
114:21, 116:3,
116:12, 116:15,
118:6, 126:20,
134:3, 141:4,
162:9, 165:15,
167:12, 186:9,
186:13, 186:21,
187:25, 193:16,
195:14, 202:7,
209:24, 211:9,
213:8, 213:16,
220:3, 224:13,
240:16, 263:1,
290:18, 303:10
**ways**
65:10, 75:25,
89:14, 127:18,
127:21, 140:25,
141:13, 150:9,
151:2, 157:2,
162:18, 186:24,
191:20, 192:7,
192:8, 192:18,
222:19, 303:5
**we'll**
14:14, 63:25,
84:22, 120:13,
120:17, 135:7,
149:16, 198:14,
223:21, 223:22,
248:18, 249:24,
277:5, 280:25,
287:1, 310:9,
312:3, 312:6
**we're**
44:1, 56:14,
56:16, 65:14,
68:7, 80:19,
122:8, 124:21,
127:24, 130:13,
148:10, 149:17,
165:18, 181:9,
181:16, 182:7,
195:13, 196:19,

209:17, 214:1,
218:4, 225:7,
227:16, 237:5,
239:11, 242:25,
245:24, 251:9,
251:18, 266:21,
275:13, 291:25,
302:24
**we've**
35:22, 36:4,
36:15, 52:12,
69:1, 75:5,
85:6, 97:1,
102:25, 144:23,
169:8, 169:10,
236:15, 241:14,
242:24, 245:2,
267:17, 282:7,
282:12, 282:14,
282:17, 294:13
**website**
155:7, 160:19,
242:7, 242:8
**webster**
201:8
**webster's**
201:10, 201:15
**weekend**
20:25, 158:14
**weeks**
59:17, 144:4,
144:11
**welcome**
149:19, 198:18,
214:20, 260:13
**went**
25:14, 55:6,
121:20, 244:4
**wermuth**
5:12, 5:13,
148:16, 151:17
**whatever**
21:24, 41:20,
52:22, 127:2,
128:9, 129:9,
160:12, 165:6,
228:20, 249:25,
280:3, 284:25,

295:24, 301:22,
301:23
**whenever**
128:10, 167:22
**whereof**
314:13
**whichever**
198:12
**white**
230:12
**whoever**
41:13
**whole**
106:22, 124:8,
127:5, 226:17,
233:19, 298:23
**whyte**
1:25, 3:15,
314:2, 314:23
**wide**
22:1, 33:1,
54:24, 55:16,
65:17, 65:18,
76:12, 79:15,
257:16
**wider**
301:9
**wife**
53:19, 119:13
**willful**
150:8, 150:12,
150:14, 150:19
**willfully**
149:21, 149:25,
150:3
**willfulness**
151:1
**willingly**
281:12
**windows**
17:2
**wish**
126:14
**within**
19:17, 19:23,
20:12, 26:24,
30:4, 31:1,
31:2, 40:22,

43:16, 52:5,
59:17, 65:17,
70:13, 70:17,
71:14, 75:23,
76:16, 76:19,
77:19, 80:17,
81:2, 81:3,
96:5, 97:7,
98:3, 108:18,
109:21, 111:25,
123:21, 124:15,
124:19, 126:9,
126:11, 126:16,
128:15, 133:5,
133:8, 133:10,
133:12, 133:18,
136:1, 140:1,
150:5, 152:13,
167:3, 167:9,
167:13, 167:15,
168:16, 173:4,
174:13, 183:3,
186:15, 202:23,
203:1, 216:16,
223:12, 226:10,
230:2, 231:12,
233:2, 238:2,
251:6, 276:7,
280:2, 284:2,
284:12, 294:19,
301:10
**without**
23:14, 41:17,
49:9, 49:10,
51:12, 65:16,
66:19, 69:5,
72:23, 91:24,
103:17, 107:1,
107:10, 111:8,
120:3, 131:6,
144:15, 171:11,
171:22, 178:16,
192:3, 194:18,
203:3, 210:18,
222:17, 222:23,
231:25, 283:25
**witness**
14:5, 62:7,

134:13, 134:18,
151:18, 235:11,
314:13
**women**
2:3, 4:16,
12:9, 235:15,
293:10
**word**
15:24, 28:14,
199:2, 199:10,
199:16, 199:23,
246:11, 279:15
**words**
30:18, 89:22,
103:25, 115:24,
213:13, 215:5,
218:1, 218:7,
223:12, 277:14
**work**
23:9, 62:6,
92:15, 108:22,
109:6, 110:2,
110:15, 110:20,
110:24, 111:2,
111:12, 111:13,
119:25, 132:7,
134:12, 163:19,
164:1, 164:6,
165:12, 165:17,
165:20, 166:15,
166:21, 170:11,
175:18, 210:23,
211:6, 211:23,
212:12, 212:16,
235:20, 239:23,
290:12, 292:19,
299:24, 300:4,
300:8, 300:16,
300:19, 306:3,
311:7
**worked**
43:2, 53:13,
54:23, 166:20,
276:10, 287:18
**worker**
282:23, 290:10
**workers**
108:22, 109:10,

289:18, 289:20,
289:23, 290:6,
290:9, 290:25
**working**
23:5, 34:21,
36:23, 36:24,
37:8, 53:2,
53:5, 130:24,
131:2, 131:10,
131:15, 131:18,
163:25, 168:22,
178:20, 205:6,
299:20, 300:3
**works**
62:7, 95:5,
168:18, 168:20,
262:23
**world**
112:5
**worse**
149:6, 309:7
**wouldn't**
71:3, 126:17,
172:9, 172:13,
190:23, 192:5,
200:13, 242:18,
266:3, 278:3,
278:20, 288:6,
289:9, 292:15,
305:8
**wrap**
310:10
**wraps**
126:25
**write**
152:25, 192:15,
193:4, 297:2
**writes**
154:13
**written**
61:8, 61:11,
61:14, 154:5,
161:15, 192:18,
232:9, 243:10,
243:12
**wrong**
31:22, 45:4,
136:11, 137:3,

137:4, 146:4,
146:10, 147:24,
152:4, 153:1,
154:4, 154:13,
154:25, 155:2,
155:10, 156:2,
156:9, 156:13,
156:16, 156:22,
170:14, 172:10,
223:13, 240:15,
283:23, 284:5

**wronged**
283:4
**wrongly**
172:12
**wrote**
103:9, 112:25,
115:1, 152:19,
154:15

| X |
| --- |

**x**
1:16, 2:2, 2:24

| Y |
| --- |

**yeah**
32:8, 37:6,
37:11, 106:16,
112:10, 134:13,
143:4, 157:9,
168:13, 196:20,
200:20, 204:4,
209:2, 209:25,
215:14, 219:19,
221:16, 225:14,
240:17, 242:4,
244:21, 250:21,
277:25, 281:3,
292:22, 308:12

**year**
17:20, 24:5,
25:10, 25:15,
53:22, 54:2,
54:4, 54:16,
80:11, 80:13,
97:24, 98:15,
101:18, 158:17,
159:9

**years**
31:2, 50:8,
53:17, 54:19,
54:21, 74:4,
82:19, 84:9,
89:21, 92:2,
94:15, 222:14,
222:20, 222:24,
223:3, 223:5,
223:14, 303:2,
304:3, 305:10

**yep**
248:3, 253:12,
280:7
**york**
5:8, 9:8
**yourself**
34:7, 50:21,
57:3, 57:15
**youth**
1:6, 4:4

| Z |
| --- |

**zender**
5:13
**zoom**
14:19, 151:13,
240:1, 255:10

| $ |
| --- |

**$1,000**
97:9
**$191,000**
97:20
**$2,500**
149:20
**$250,000**
96:17, 99:11,
161:2, 161:6
**$50**
255:4
**$50,000**
98:6, 101:4,
101:11, 101:14,
101:17, 157:7,
157:18, 159:5,
159:9, 159:15,
208:18, 208:19,

208:22, 209:4,
209:18, 210:6,
260:24, 273:14
**$500**
147:24
**$7,500**
152:2

| . |
| --- |

**.075**
218:3

| 0 |
| --- |

**0.56**
308:14
**00**
310:11
**00094401**
11:16
**00094417**
11:17
**0089**
11:12
**0095**
11:13
**01**
1:23, 9:23

| 1 |
| --- |

**1**
11:18, 76:19,
255:1, 259:14
**1) (b**
198:9
**1) (d**
292:4
**1) (e**
236:16
**1) (f**
198:9, 199:1
**10**
12:7, 143:18,
152:13, 189:5,
293:5, 293:6,
306:1
**100**
162:15, 194:20,
261:17, 280:9

**10004**
9:8
**101.051**
193:17
**101.0513**
192:22
**101.62**
193:23, 194:11
**10115**
5:8
**102**
11:13
**11**
12:11, 58:19,
145:17, 145:25,
146:22, 197:21,
198:2, 198:6,
293:16, 306:13
**1100**
7:11
**1101**
4:21
**115**
7:17
**119**
5:22, 217:10,
217:19, 220:13
**12**
6:18, 134:9,
214:1, 214:5,
214:11, 214:15,
312:11, 314:14
**1200**
8:11
**127**
271:24, 272:6
**13**
11:3, 223:21,
224:2, 224:7
**14**
4:21, 76:19,
143:18, 144:15,
247:25
**1405**
9:9
**148**
11:14
**15**
152:6, 179:24,

180:3, 190:2,
191:15, 191:23,
238:18, 241:13
**16**
229:6, 232:19,
232:24, 309:20
**16,500**
152:7
**17**
103:3, 103:8,
106:7, 110:19,
158:4, 307:22,
308:2, 308:4,
308:13, 309:20
**1750**
7:8
**18**
74:4
**1901**
5:7
**1995**
81:16, 298:12,
298:13
**1s**
30:8, 46:7,
134:22, 134:23
**1st**
6:18

---

**2**

**2,000**
160:24, 160:25,
165:22
**2.042**
30:8, 46:7,
134:23
**2.055**
134:22
**20**
166:4, 167:4
**20001**
4:13
**20005**
4:23
**2014**
53:10
**2018**
54:5

**2019**
54:18
**202**
4:14, 4:24
**2021**
25:15, 230:6
**2022**
20:23, 21:1,
24:7, 25:11,
98:6, 152:8,
154:25, 157:7,
157:18, 158:11,
158:14, 158:17,
158:19, 158:23,
307:2, 307:21
**2023**
17:20, 134:22,
158:19, 158:21,
158:24, 158:25,
159:1, 159:3,
159:8, 159:14,
190:2, 191:15,
191:23
**2024**
1:22, 180:3,
297:12, 314:15
**2026**
314:18
**204**
10:8
**212**
5:9, 9:9
**215**
1:7
**216**
1:8
**218**
1:9
**219**
5:9
**22**
271:4
**2200**
4:24
**23**
1:7, 1:8, 1:9
**236**
11:4

**238**
11:17
**239**
7:11
**24**
159:3, 159:8
**2472**
5:16
**25**
5:14, 112:17,
112:25, 113:22,
113:24, 114:18,
115:2, 116:5
**250**
4:11, 27:2,
29:10
**259**
11:18, 11:19
**270**
5:25, 11:24
**2707**
6:10
**272**
12:4
**280**
7:9
**286**
12:6
**2925**
10:7
**293**
12:10

---

**3**

**3,000**
308:7
**3,026**
306:16, 306:24,
307:23, 308:13
**30**
17:19, 17:20,
134:9, 314:18
**306**
12:11
**31**
307:21
**310**
11:5

**314**
1:25
**315**
8:21
**3202**
10:10
**32207**
8:13
**32301**
5:24
**32399**
9:24
**32601**
6:20
**32801**
5:15
**32803**
6:11
**3300**
9:25
**33301**
7:19
**33410**
10:9
**335**
10:10
**3354**
8:23
**3360**
5:9
**33756**
8:22
**33853**
9:16
**33902**
7:10
**344**
7:11
**352**
6:21
**357**
7:20
**374**
6:21
**399**
8:14
**3pvro**
12:5, 113:3,

| | | | |
|---|---|---|---|
| 141:23, 142:4, | 157:6, 157:17, | **4490** | **67** |
| 142:13, 143:7, | 159:14, 160:9, | 4:14 | 76:10, 284:14 |
| 144:20, 145:11, | 160:21, 161:1, | **455** | **68** |
| 147:23, 149:20, | 161:5, 161:8, | 9:17 | 76:14 |
| 155:1, 156:1, | 161:20, 161:24, | **464** | **7** |
| 158:20, 165:20, | 162:25, 163:10, | 8:23 | **7** |
| 167:10, 167:20, | 163:20, 164:2, | **475** | 113:6, 128:14, |
| 169:22, 171:14, | 164:7, 165:12, | 5:6 | 128:24, 129:4, |
| 171:22, 172:1, | 165:17, 166:15, | **4811** | 129:24, 214:23, |
| 174:1, 184:4, | 166:20, 166:21, | 9:17 | 217:22, 222:3, |
| 184:6, 184:24, | 167:25, 168:1, | **4:-cv--mw** | 222:8, 222:15, |
| 185:1, 185:10, | 168:19, 169:2, | 1:7, 1:8, 1:9 | 227:21 |
| 185:17, 185:19, | 169:13, 173:9, | **5** | **7,500** |
| 186:10, 208:8, | 173:24, 174:11, | **5** | 158:8, 243:17 |
| 208:14, 210:24, | 174:17, 178:24, | 310:11 | **7050** |
| 212:21, 215:14, | 179:13, 180:1, | **50** | 11:16, 11:17, |
| 216:13, 216:18, | 180:16, 180:22, | 209:2 | 11:19, 64:18, |
| 218:10, 219:16, | 180:25, 181:2, | **50,000** | 64:22, 72:1, |
| 221:15, 231:8, | 181:18, 183:17, | 209:1 | 78:6, 85:2, |
| 232:7, 232:20, | 185:25, 186:4, | **500** | 85:8, 85:10, |
| 233:4, 234:1, | 186:14, 186:22, | 5:23 | 94:19, 100:15, |
| 234:20, 234:25, | 209:19, 210:13, | **5150** | 100:20, 100:21, |
| 240:21, 243:22, | 213:9, 213:16, | 6:12 | 100:25, 101:8, |
| 261:12, 261:24, | 215:11, 215:12, | **5165** | 101:12, 101:19, |
| 262:9, 262:23, | 215:17, 229:8, | 8:22 | 102:23, 108:10, |
| 263:2, 264:11, | 229:16, 229:18, | **518939** | 115:12, 120:19, |
| 273:14, 274:7, | 229:21, 230:11, | 1:24 | 121:14, 125:9, |
| 274:24, 275:10, | 232:15, 233:16, | **5218** | 130:4, 130:10, |
| 276:10, 282:23, | 234:16, 234:22, | 6:21 | 130:17, 198:19, |
| 284:20, 286:10, | 266:1, 272:17, | **550** | 201:23, 202:15, |
| 289:9, 289:23, | 295:11, 296:11, | 27:24 | 203:4, 205:9, |
| 290:14, 291:6, | 297:18, 297:19, | **56** | 205:21, 206:12, |
| 292:13, 297:24, | 307:5, 307:23, | 11:10 | 206:25, 207:15, |
| 297:25, 305:20, | 308:25 | **561** | 208:15, 213:9, |
| 307:16, 309:6 | **4** | 10:10 | 213:17, 215:3, |
| **3pvro's** | **4,100** | **5938** | 215:10, 215:18, |
| 207:11, 262:24, | 180:9, 303:16 | 5:25 | 221:6, 224:9, |
| 298:5 | **400** | **6** | 224:15, 224:18, |
| **3pvros** | 4:12, 4:22 | **6** | 224:21, 224:22, |
| 82:11, 90:1, | **407** | 306:1, 312:11 | 224:25, 225:2, |
| 96:16, 130:25, | 5:16, 6:12 | **60** | 225:3, 225:18, |
| 135:11, 135:14, | **414** | 9:15 | 226:11, 226:16, |
| 135:22, 136:7, | 9:25 | **600** | 226:19, 226:23, |
| 136:10, 141:16, | **422** | 27:24 | 227:7, 227:21, |
| 143:12, 143:17, | 5:16 | **633** | 228:3, 228:18, |
| 147:2, 148:22, | **423** | 9:9 | 228:25, 229:3, |
| 154:12, 154:24, | 7:18 | | 231:9, 231:14, |
| 155:11, 155:22, | | | |

232:6, 239:12,
244:16, 259:19,
259:22, 260:7,
278:2, 291:13,
297:13, 302:14,
307:5, 307:17
**727**
8:23
**736**
4:24
**7600**
7:20

**8**

**80**
9:7
**800**
8:12
**807.802**
11:18
**817**
238:2, 239:10,
240:12, 242:16,
242:22, 253:21,
254:21, 254:24,
257:13, 257:20,
273:2
**817.155**
296:23
**817.802**
255:1, 255:19
**818.802**
259:14
**825.103**
273:2
**8440**
8:14
**850**
5:25, 9:25
**863**
9:17
**897**
6:12

**9**

**9**
1:23
**90**
121:22, 230:5,

306:21
**90,000**
75:5
**904**
8:14
**922**
9:15
**954**
7:20
**968**
4:14
**97**
115:12
**97.014**
41:15
**97.022**
18:2, 19:21,
70:15
**97.0575**
30:5, 31:1,
31:22, 48:5,
48:10, 48:16,
49:22, 74:14,
75:3, 99:24,
113:6, 115:8,
128:1, 128:14,
128:24, 129:4,
129:24, 134:21,
139:21, 147:23,
149:18, 173:8,
198:9, 199:1,
214:23, 217:22,
222:3, 222:8,
222:15, 227:21,
236:16, 255:12,
256:6, 256:12,
292:4
**97.075**
218:2