

# Transcript of Nicholas Bernard Cox

**Date:** December 20, 2023
**Case:** Florida State Conference of Branches, et al. -v- Byrd

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF FLORIDA

 3                  TALLAHASSEE DIVISION

 4     - - - - - - - - - - - x

 5    FLORIDA STATE              :

 6    CONFERENCE OF              :

 7    BRANCHES AND YOUTH         :

 8    UNITS OF THE NAACP,        :

 9    et al.,                    :

10        PLAINTIFFS,            :

11    V.                         :   CASE NO.

12    CORD BYRD, IN HIS          :   4:23-CV-215-MW/MAF

13    OFFICIAL CAPACITY          :   4:23-CV-216-MW/MAF

14    AS FLORIDA SECRETARY       :   4:23-CV-218-MW/MAF

15    OF STATE, ET AL.,          :

16        DEFENDANTS.            :

17    --------------------       :

18    LEAGUE OF WOMEN            :

19    VOTERS OF FLORIDA,         :

20    INC., ET AL.               :

21        PLAINTIFFS,            :

22    V.                         :

23    ASHLEY MOODY, IN HER       :

24    OFFICIAL CAPACITY AS       :

25    ATTORNEY GENERAL OF        :
```

1    FLORIDA, ET AL.,          :

2        DEFENDANTS.           :

3    --------------------- :

4    HISPANIC FEDERATION,      :

5    ET AL.,                   :

6        PLAINTIFFS,           :

7    V.                        :

8    CORD BYRD, IN HIS         :

9    OFFICIAL CAPACITY         :

10   AS THE SECRETARY OF       :

11   STATE OF FLORIDA, ET      :

12   AL.,                      :

13       DEFENDANTS.           :

14    - - - - - - - - - - - - X

15

16           DEPOSITION OF NICHOLAS BERNARD COX

17                 Conducted Virtually

18             Wednesday, December 20, 2023

19                   9:59 a.m. EST

20

21

22

23   Job No.: 518701

24   Pages: 1 - 233

25   Reported By: Paul Smakula

1        Deposition of NICHOLAS BERNARD COX, conducted

2    virtually:

3

4

5

6

7

8

9

10       Pursuant to notice, before Paul Smakula, Notary

11   Public in and for the State of Maryland.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S
 2       ON BEHALF OF PLAINTIFFS NAACP:
 3            RENATA O'DONNELL, ESQUIRE
 4            ELIAS LAW GROUP, LLP
 5            Suite 400
 6            250 Massachusetts Avenue Northwest
 7            Washington, D.C. 20001
 8            (202) 968-4490
 9
10       ON BEHALF OF PLAINTIFFS LEAGUE OF WOMEN
11    VOTERS OF FLORIDA:
12            BRENT FERGUSON, ESQUIRE
13            SHILPA JINIDA, ESQUIRE
14            CAMPAIGN LEGAL CENTER
15            Suite 400
16            1101 14th Street Northwest
17            Washington, D.C. 20005
18            (202) 736-2200
19
20
21
22
23
24
25
```

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2   ON BEHALF OF PLAINTIFFS:

 3        MEGAN C. KEENAN, ESQUIRE

 4        DAYTON CAMPBELL-HARRIS, ESQUIRE

 5        AMERICAN CIVIL LIBERTIES UNION FOUNDATION

 6        125 Broad Street

 7        18th Floor

 8        New York, New York  10004

 9        (212) 549-2500

10

11   ON BEHALF OF FLORIDA NAACP:

12        FREDERICK S. WERMUTH, ESQUIRE

13        KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.

14        P.O. Box 1631

15        Orlando, Florida  32802

16        (407) 422-2472

17

18

19

20

21

22

23

24

25
```

```
1        A P P E A R A N C E S   C O N T I N U E D

2      ON BEHALF OF SUPERVISORS OF ELECTIONS FOR

3   BREVARD, DESOTO, FLAGLER, GILCHRIST, HIGHLANDS,

4   JEFFERSON, AND MADISON COUNTIES:

5           FRANK M. MARI, ESQUIRE

6           DALE A. SCOTT, ESQUIRE

7           ROPER, P.A.

8           2707 East Jefferson Street

9           Orlando, Florida  32803

10          (407) 897-5150

11

12     ON BEHALF OF ALACHUA COUNTY:

13          ROBERT CHARLES SWAIN, ESQUIRE

14          ALACHUA COUNTY ATTORNEY'S OFFICE

15          12 SE 1st Street

16          Floor 2

17          Gainesville, Florida 32601

18          (352) 374-5218

19

20

21

22

23

24

25
```

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2       ON BEHALF OF GLADES, HARDEE, HENDRY, HOLMES,
 3   LEVY, AND OKEECHOBEE COUNTY SUPERVISOR OF
 4   ELECTIONS:
 5           GERALDO F. OLIVO, III, ESQUIRE
 6           HENDERSON FRANKLIN ATTORNEYS AT LAW
 7           Post Office Box 280
 8           1715 Monroe Street
 9           Fort Myers, Florida 33901
10           (239) 344-1168
11
12       ON BEHALF OF ATTORNEY GENERAL ASHLEY
13   MOODY:
14           NOAH TEMPLE SJOSTROM, ESQUIRE
15           OFFICE OF THE ATTORNEY GENERAL
16           PL-01 The Capitol
17           Tallahassee, Florida 32399
18           (850) 414-3635
19
20
21
22
23
24
25
```

```
 1      A P P E A R A N C E S   C O N T I N U E D

 2      ON BEHALF OF BROWARD COUNTY:

 3          DEVONA ALICIA REYNOLDS PEREZ, ESQUIRE

 4          BROWARD COUNTY ATTORNEY'S OFFICE

 5          115 South Andrews Avenue

 6          Suite 423

 7          Fort Lauderdale, Florida 33301

 8          (954) 357-7600

 9

10      ON BEHALF OF SUPERVISORS OF ELECTION FOR BAKER,

11   BAY, BRADFORD, CALHOUN, COLUMBIA, DIXIE, FRANKLIN,

12   GADSDEN, GULF, HAMILTON, JACKSON, LAFAYETTE,

13   LIBERTY, NASSAU, PUTNAM, SANTA ROSA, ST. JOHNS,

14   SUMTER, SUWANNEE, TAYLOR, UNION, WAKULLA, WALTON,

15   AND WASHINGTON COUNTIES:

16          LEIGH F. ROSENBLOOM, ESQUIRE

17          MARKS GRAY, P.A.

18          1200 Riverplace Boulevard

19          Suite 800

20          Jacksonville, Florida 32207

21          (904) 399-8440

22

23

24

25
```

```
 1    A P P E A R A N C E S   C O N T I N U E D

 2   ON BEHALF OF PINELLAS COUNTY:

 3       JARED DOUGLAS KAHN, ESQUIRE

 4       MATTHEW M. SMITH, ESQUIRE

 5       PINELLAS COUNTY ATTORNEY'S OFFICE

 6       315 Court Street

 7       Clearwater, Florida 33756

 8       (727) 464-3354

 9

10   ON BEHALF OF SECRETARY BYRD:

11       JOSHUA E. PRATT, ESQUIRE

12       HOLTZMAN VOGEL

13       Suite 500

14       119 South Monroe Street

15       Tallahassee, Florida 32301

16       (850) 270-5938

17

18

19        BENJAMIN BRADLEY KOON, ESQUIRE

20        THE MARKARIAN GROUP

21        2925 PGA Boulevard

22        Suite 204

23        Palm Beach Gardens, Florida 33410

24        (561) 335-3202

25
```

```
 1        A P P E A R A N C E S   C O N T I N U E D

 2      ON BEHALF OF HILLS. COUNTY SUPERVISOR OF

 3    ELECTIONS:

 4           COLLEEN E. O'BRIEN, ESQUIRE

 5           HILLS. COUNTY SUPERVISOR OF ELECTIONS

 6           601 East Kennedy Boulevard

 7           Floor 16

 8           Tampa, Florida 33602

 9           (813) 574-1285

10

11      ON BEHALF OF THE ATTORNEY GENERAL:

12           STEPHANIE ANNE MORSE, ESQUIRE

13           OFFICE OF THE ATTORNEY GENERAL

14           1 The Capitol

15           # Pl - 01

16           Tallahassee, Florida 32399

17           (850) 414-3300

18

19

20

21

22

23

24

25
```

1                    C O N T E N T S

2   EXAMINATION OF NICHOLAS BERNARD COX              PAGE

3   By Mr. Ferguson                                    13

4   By Ms. Keenan                                     114

5   By Ms. O'Donnell                                  174

6

7                    E X H I B I T S

8              (Attached to transcript.)

9     COX DEPOSITION EXHIBITS                         PAGE

10  Exhibit 1    Notice of Deposition                  24

11  Exhibit 2    Interrogatory Responses               39

12  Exhibit 3    OSP Reports                           39

13  Exhibit 4    2021 Report                           42

14  Exhibit 5    1/15/23 Report                        45

15  Exhibit 6    Probable Cause Affidavit              58

16  Exhibit 7    SB7050                                77

17  Exhibit 9    Amended Responses to Second Set       70

18               of Interrogatories

19  Exhibit 10   Anderson Judgment and Sentence        72

20  Exhibit 12   Motion for Preliminary               84

21               Injunction

22  Exhibit 13   Non-Felon Declaration; DSDE127        85

23  Exhibit 15   Email Chain                          107

24  Exhibit 17   Interrogatory Responses to           114

25               Hispanic Federation

| | | |
|---|---|---|
| 1 | Exhibit 22   Email to AG Staff | 152 |
| 2 | Exhibit 23   2018 Internet Message | 155 |
| 3 | Exhibit 25   OAG_000900 | 157 |
| 4 | Exhibit 26   OAG_000952 | 156 |
| 5 | Exhibit 27   OAG_HF_FIRSTRFP_000006 | 159 |
| 6 | Exhibit 28   OAG_HF_firstRFP_000019 | 161 |
| 7 | Exhibit 29   Email | 163 |
| 8 | Exhibit 30   Affidavit | 166 |
| 9 | Exhibit 31   Warrants | 166 |
| 10 | Exhibit 32   OAG-LWV-RFP2-000025 | 167 |
| 11 | Exhibit 33   OAG_000885 | 169 |
| 12 | Exhibit 34   OAG_000887 | 170 |
| 13 | Exhibit 35   OAG_000889 | 171 |
| 14 | Exhibit 36   OAG_000594 | 172 |
| 15 | Exhibit 37   OAG_000859 | 172 |
| 16 | Exhibit 40   3PVRO Registration Form | 124 |
| 17 | Exhibit 41   SB7050 Enrolled Copy | 127 |
| 18 | Exhibit 42   OAG_HF_FIRSTRFP_000001 | 163 |

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2               NICHOLAS BERNARD COX,

3    having been duly sworn, testified as follows:

4          EXAMINATION BY COUNSEL FOR LEAGUE OF WOMEN

5    VOTERS OF FLORIDA

6    BY MR. FERGUSON:

7        Q  Thanks very much.  Well, good morning,

8    Mr. Cox.  We already spoke a bit.  But for the

9    record, could you state your full name?

10       A  Nicholas Bernard Cox, C-O-X.  I go by

11   Nick.

12       Q  Great.  Thanks for being here today.  My

13   name is Brent Ferguson.  I represent the League of

14   Women Voters of Florida in this case, and I'm with

15   the Campaign Legal Center.  So, we can just start

16   off by talking about some deposition basics.  I'm

17   guessing you're probably familiar with a lot of

18   this, but could you tell me if you've been deposed

19   before?

20       A  Numerous times.  Mostly, Brent, in

21   criminal courts.

22       Q  Okay.  Sounds good.  So you're fairly

23   familiar with how it works?

24       A  I am.

25       Q  Great.  So, I'll just do a shortened

1   version of some of the background and ground rules

2   to make sure we're understanding this.

3        You understand that you're testifying

4   under oath; correct?

5       A  I do.

6       Q  And that a court reporter is transcribing?

7       A  I do.

8       Q  Okay.  So, I just ask you, as you know,

9   answer questions verbally rather than with nodding

10  your head or anything like that; does that work?

11      A  I will.  Yeah.  That's fine.

12      Q  And I'll try to state my questions

13  clearly.  I'm sure if I don't, then your attorney

14  will chime in.  But if you don't understand

15  something I ask, just please let me know, and I'll

16  try to rephrase it and make it clear.  But if you

17  do answer the question, I'll assume that you

18  understood the question; does that work for you?

19      A  That's fair.

20      Q  Okay.  And you might hear your attorney or

21  others object, of course, so please let them

22  finish, and then please go ahead and still answer

23  the question unless your attorney directs you not

24  to answer.  Does that work?

25      A  Okay.

1    Q  Great.  Is there any reason you can't give

2  complete and truthful testimony today?

3    A  Not that I'm aware of.

4    Q  All right.  Great.  So, just let me know

5  if you'd like a break, I'll just -- we can do it

6  whenever you want, we can be flexible about that,

7  just if I have a question pending, please answer

8  before we go on a break.

9    A  You got it.

10    Q  Do you have any materials with you today

11  for the deposition?

12    A  I have -- basically what -- my desk is a

13  mess, but what I have relative to this, is I have

14  copies of the three complaints that have been

15  filed in this case by the parties.  I have copies

16  of the responses, the rogs, essentially, the

17  responses.  I have a copy of Florida statute

18  97.0575.

19    Q  Great.

20    A  I have a copy of the interrogatories,

21  complaint, complaint.  I have a copy of the

22  deposition notice and the deposition topics.  And

23  then finally, I have a copy of a piece of paper I

24  wrote because one of the topics was about who in

25  our office has been handling these cases, and so I

1   had to make a list to remind myself who all had

2   them.

3       Q   Sure.  Okay.  That's all great.  And a lot

4   of those documents I have, too.  And the way that

5   we've been doing it in the past depositions is

6   when we talk about one of those or some other

7   exhibits, I'll just share it on my screen and make

8   sure that we're looking at the same thing.  But a

9   lot of those you mentioned are ones that I'll show

10  you today.

11      A   Okay.

12      Q   So I just ask, of course, case documents

13  like that are fine.  I'd ask during the deposition

14  not to refer to anything else on your computer or

15  smart phone or anything like that.  I know it

16  looks like Ms. Morse is in a different office.

17          Is it is there anyone else in the room

18  with you today?

19      A   No.  I'm in my office.  The door is

20  closed.  I'm here alone.

21      Q   Okay.  Excellent.  So, let's go a little

22  bit into your job and your background and

23  everything.  I know you're, of course, the

24  statewide prosecutor.

25          Can you tell me how long you've been in

1  that role and tell me about your current

2  responsibilities?

3      A  Sure.  I've been the statewide prosecutor

4  since January 4th of 2011.  My responsibilities

5  are basically oversight, management, and, I guess

6  you could say, giving the direction -- in general

7  supervision over the Office of Statewide

8  Prosecution.  That's basically it.  I'm the

9  criminal -- I handle the criminal prosecutions and

10  the oversight of those for the Office of Statewide

11  Prosecution.

12      Q  Okay.  Great.  So, you have a lot on your

13  plate?

14      A  A little bit.

15      Q  I used to be --

16      A  About 60 or 70 lawyers.  It's a little

17  bit.

18      Q  I used to be a prosecutor at the Manhattan

19  DA's office, and I did not have that much

20  responsibility that you have, but I know it's

21  certainly a lot.

22      A  It's a great job.  One of the my best

23  friends was at the Manhattan DA's years and years

24  ago.  Probably before you.

25      Q  Probably.  A lot of people at that place.

1    That's great.

2         Could you -- we'll talk a little bit more

3    about your office and the AG's office in general.

4         So, you described oversight of -- should I

5    call it OSP?

6       A   That's what we refer to it as too, yes,

7    sir.

8       Q   Great.  Could you tell me the main areas

9    of focus of OSP?

10      A   You mean in terms of criminal activity?

11      Q   Yeah, criminal activity.  Yes.

12      A   Our main priorities, as I sit here now, of

13   course, as you know, they can change over time --

14   our main areas at the time right now I would say

15   would be human trafficking, primarily sex

16   trafficking.  We do a lot of gang racketeering

17   activity for, you know, gangs that are operating

18   in areas.  And an awful lot of work on drugs.

19   Right now on of our primary areas of focus other

20   than all of the elicit drugs, also include

21   opioids, but also fentanyl.

22         I don't probably need to go into that for

23   ya'll, but we do an awful lot of that, again,

24   utilizing the racketeering and trafficking

25   statutes to do that.  We do a lot of fraud,

1    general fraud, whether it be a consumer type of

2    fraud or whatever, mortgage fraud, things of that

3    sort.

4         We have just begun -- we were just given

5    positions and dollars to create a cold case

6    homicide unit to assist all over the state with

7    cold case homicides.  We also have focused a lot,

8    especially in the fraud area, on crimes against

9    seniors.  And so those are really our primary

10   areas right now that we focus on.  Also, as an

11   aside, we also have two grand juries going on

12   right now as ordered by the Florida Supreme Court.

13        Q  Yeah.

14        A  Statewide grand juries are different than

15   your typical grand juries that you might be, like,

16   used to in New York where they study issues and

17   they come out with presentations.  One's on

18   immigration; one's on COVID and COVID vaccines.

19   So we're having to do that right now, and so

20   really those are the -- I'd say those are the

21   primary areas that we're working on right now.

22        Q  Okay.  Thanks.  Yeah, I saw in your report

23   something about the statewide grand juries, and I

24   hadn't heard of that before, so that was

25   interesting to learn about, for sure.

1        A   Yeah.  It's interesting.

2            MS. MORSE:  Brent, I'm sorry to interrupt.

3    I was wondering if you could speak up a little

4    bit, because I think when you move, you might get

5    away from your mike a little bit.  I couldn't hear

6    well.

7            MR. FERGUSON:  Sorry about that.  Let me

8    try to move closer.

9            THE WITNESS:  I'm going to assume that's

10   not an issue with me, Stephanie.

11           MS. MORSE:  No.

12           THE WITNESS:  Hearing with me is -- people

13   usually tell me to get the mike a little bit

14   further away.

15           MR. FERGUSON:  All right.  Is this good?

16           MS. MORSE:  Yeah.

17       Q  So, you said you became statewide

18   prosecutor in 2011.

19           Can you give me just a quick overview of

20   what jobs you held before that?

21       A   Sure.  I graduated from law school in

22   1988.  I returned to Florida.  In 1988 to 1997, I

23   was an assistant state attorney in Tampa.  Started

24   out in misdemeanor traffic, and when I left, I was

25   doing the homicide unit and a felony chief.  Then

1    I went from '97 until about 2003, I was here at

2    the Florida Attorney General's office.  I was

3    assigned to the Medicaid fraud control unit for

4    some time, the children's legal services unit,

5    that's for foster care, the consumer protection

6    unit.  I did a smattering of work with the civil

7    rights unit, mainly investigative type of stuff.

8         And then I was also the counsel to the

9    Florida Criminal Justice and Standards and

10   Training Commission.  What that is is it's like

11   the Florida Bar for cops is what it is.  In 2003,

12   I had been teaching as an adjunct professor over

13   at the Stetson University College of Law.  And so

14   from 2003 to 2006, approximately, I went over

15   there full-time as a member of the faculty at

16   Stetson, at the law school.

17      Q  Yeah.

18      A  And then in 2000 -- let me think now.

19   Hang on.  Let me make sure I get this right.  I

20   believe it would have been around 2007 I left

21   Stetson.  I longed for the courtroom again,

22   believe it or not --

23      Q  It happens.

24      A  -- and I went very briefly about a year

25   with a local firm called Bush Graziano & Rice, of

1    counsel, they're an insurance defense firm.

2        Q   Okay.

3        A   After that, my former boss at the Attorney

4    General's office, Bob Butterworth, had asked me --

5    he had become the Secretary of the Department of

6    Children and Families -- and had asked me to come

7    over there, so I joined the Department of Children

8    and Families in Florida as the regional director

9    for the -- essentially Sun Coast region,

10   essentially the west coast of Florida.  That went

11   on until 2011 when Attorney General Bondi

12   appointed me statewide.

13       Q   Okay.  Thanks for that.  Have you had --

14       A   I've had a wild career, but it's been

15   interesting for sure.

16       Q   Yeah.  You got through a lot of things

17   pretty quickly.

18       A   Yeah, it's been a lot of fun.

19       Q   It sounds like it.

20           Have any of those jobs or have you done

21   any work in elections or election administration,

22   aside from anything at your current job?

23       A   No.

24       Q   Okay.

25       A   No, I don't recall anything like this

1    before.  No, sir.

2        Q   Okay.  Sure.  And so would you say your

3    sole work on elections is essentially the cases

4    that you prosecuted or oversee for OSP?

5        A   Yeah, I would say that.  If I did anything

6    before, which nothing's coming to mind, it

7    would've been minor.

8        Q   Okay.

9        A   I can't think of anything, though, so yes,

10   it would have been here.

11       Q   Okay.  Great.  So, right now I'd like to

12   just talk for a few minutes about how you prepared

13   for the deposition.  So, I know you said you had

14   the deposition notice.  But I'll just put it up on

15   the screen to make sure that we're all looking at

16   the same thing.

17           Can you see that?

18       A   I can.

19       Q   Okay.  Great.  So, do you recognize this

20   as the deposition notice you received in this

21   case?

22       A   It is.

23       Q   And --

24       A   I mean, I haven't looked through the whole

25   thing, but based on the title and what you're

1    showing me, that it appears to be it.

2        Q  For the record, we're looking at page 2,

3    which has the title.

4            And if the court reporter could mark this

5    as Exhibit 1, please.

6            (COX Deposition Exhibit 1 marked for

7    identification and attached to the transcript.)

8        Q  So, you understand that you've been

9    designated to testify representing the Attorney

10   General's office today?

11       A  On a criminal basis, yes, sir.

12       Q  Okay.  I was just going to get to that,

13   yeah.  So, we spoke yesterday and previously with

14   Ms. Morse about the topics that you would cover.

15   And my understanding is that I'm going to scroll

16   down to the topics now so we can all see them.

17   That you would be covering part of number two,

18   involving implementing and enforcing SB7050?

19       A  Yes, sir.

20       Q  And then topics 3 through 11?

21       A  Yes, sir.

22       Q  And topics 16 through 21.

23           Is that your understanding as well?

24       A  Yes, sir.

25       Q  Okay.  And you're prepared to answer

1    questions on all of those?

2        A  I believe so, yes, sir.

3        Q  Okay.  Great.  And let's talk a little bit

4    about how you prepared.  Of course, if you

5    discussed something with your attorney, please

6    don't tell me the content, but did you talk to

7    anyone in your office to prepare for this

8    deposition?

9        A  I did.

10       Q  Okay.  Can you tell me who?

11       A  Primarily, it would have been Jonathan

12   Bridges, who is an assistant statewide prosecutor

13   that runs our West Palm Beach office.

14       Q  Okay.

15       A  He is in charge of being, like, the

16   coordinator of the elections work cases.

17       Q  Okay.  Great.

18          And how long were your meetings with him?

19       A  The last time, for instance, was last

20   night.  I think it was for about 10 minutes.  I

21   was just trying to get updates.

22       Q  Sure.  And what were the topics of

23   conversation with him?

24       A  Generally about cases, case statuses, the

25   nature of some of the cases, because the nature of

1    what we're talking about here is -- you know,

2    there's particular areas, and so it was about

3    things like that.

4        Q   Okay.  Great.  And we'll get into those.

5            Did you meet with anyone else?

6        A   Throughout the course of this, I'm going

7    to say yes.  I'm sure that I spoke with some of

8    the attorneys who were assigned to these cases.  I

9    mean, I've obviously done that a lot of just in

10   the course of my job, but in preparation for this,

11   I can't remember the specifics on who or whatever.

12   This has been going on for a while.

13           And in reviewing the rogs, I do remember

14   that I had spoken with John Bajger, who is the

15   chief of civil litigation.  I got to be honest, I

16   don't recall what John and I spoke about at the

17   time.  But accordingly, I did apparently speak

18   with John.  And then other than that, it would

19   have been with counsel.

20       Q   Okay.  Great.  And have you talked with

21   Elizabeth Guzzo at all about this?

22       A   I have not.

23       Q   Okay.  And then other than those meetings

24   you talked previously about some of the documents

25   you've reviewed.

1        Can you tell me a little bit more about --

2   you said the rogs.  Is there anything else you've

3   looked at to prepare?

4        A  Other than what I spoke about earlier that

5   when you asked me what I had.  I was provided, and

6   I don't remember with who it was from Stephanie's

7   office, but basically a -- I don't know if you

8   call it a Dropbox or what of the discovery that's

9   been provided in this thing.

10       I learned subsequently there was like

11  thousands and thousands of pages.  I believe I

12  went through probably in the area of maybe 1,500

13  to 2,000 pages of that stuff.  And I just --

14  business and life got in the way, and so I went so

15  far with that.  I have gone through emails that

16  had been sent to or sent by me.

17       Q  Okay.

18       A  And that's gone, of course, way back at

19  the time when I was, you know, doing public

20  records responses as well.

21       Q  Yeah.

22       A  And I've looked, obviously, at the

23  statutes -- or the statute especially in question

24  which, I think I mentioned, I have that here.

25       Q  Right.

1      A   Generally speaking, that's where I've

2  gone.

3      Q   Okay.  That's helpful.  Thanks very much.

4      A   No problem.

5      Q   Yeah.  Well, I'm impressed that you read

6  1,500.  I don't think anyone has been able to make

7  it through all the documents --

8      A   Maybe I can say that a lot of that was

9  scanning, too.  You get those email chains and all

10  that, and it's just like, oh my Lord.  So -- but

11  yeah, I read quite a bit of it.  But yeah, I

12  tried.

13      Q   Yeah.  Fair enough.  Okay.

14          So I'd like to get a little bit into your

15  office and the AG's office in general, and then

16  its relationship with other Florida investigative

17  entities.  So, just to start out for clarity,

18  because you're representing the AG's office, I'm

19  going to ask you a lot of questions about the AG's

20  office in general, and then specific ones about

21  OSP.

22          So I'm going to try to distinguish which

23  one I'm asking about, but if you're ever unclear

24  on what I'm saying certainly, let me know.  If I

25  refer to the AG's office as a whole, of course, I

1    mean to include OSP within that work.

2        A   Okay.

3        Q   Can you just tell me in general what kinds

4    of election related matters the AG's office

5    handles?

6        A   That the AG's office handles?

7        Q   Including OSP, but as a general matter?

8        A   As a general matter, I am aware -- well,

9    I'm here criminally, so if I may start criminally,

10   it's probably where I'm going to have the bulk of

11   your answer.

12       Q   Sure.

13       A   We have handled -- we handle violations of

14   Florida law, criminal laws, relating to the

15   elections.  Thus far it has involved illegal

16   voting by voters who were exempted for one reason

17   or another -- or not allowed, exempted, I mean,

18   not allowed to vote for one reason or another.  As

19   you know, primarily it started out with convicted

20   felons.  We have -- you know, basically

21   responsible for anything like that.

22           And it would be -- it would involve some

23   of the subject matter that you're talking about

24   here, although we have not had any of that.  And

25   so basically we would be the arm of the AG that

1    would be responsible for any criminal

2    prosecutions.

3            In terms of the civil side of this, I'm

4    really -- I'm not in the position -- I'm not here

5    appearing that way, and if I were to answer that,

6    I would answer that consistent with what the

7    statutes direct.

8        Q  Sure.  Just go ahead --

9        A  I hope that's a fair answer.

10       Q  Yeah.  That's helpful.  And we can explore

11   it a little bit.  Part of that answer you said it

12   would involve, I think you said, the things that

13   we're asking about but we haven't had any of that.

14           Can you tell me in a little bit more

15   detail of what you mean by that?

16       A  In relation to--

17           MS. MORSE:  Objection to form.

18           You can answer.

19       A  I'm sorry.

20           MS. MORSE:  I was just inserting an

21   objection to form.

22           You can answer.

23       A  In relation to 97.0575 of the Florida

24   statutes, as you know, there are criminal

25   provisions in there, and that's what I was

1  referring to.

2      Q   Okay.  So your office has not prosecuted

3  anyone criminally under 97.0575, is that

4  essentially what you mean?

5      A   That's correct.

6      Q   Okay.  Thanks.  So then let's talk about

7  -- we're going to talk about a little bit about

8  investigations or cases that have come up.  And I

9  know that -- let me see if I have a correct sense

10 of what entities in Florida are handling these.

11 So, there's the Office of Election Crimes and

12 Security that's within the Secretary of State's

13 office; is that correct --

14     A   Yes, sir.

15     Q   -- that you work with?  And then there's

16 FDLE, Florida Department of Law Enforcement, that

17 you also work with; is that correct?

18     A   Yes, sir.

19     Q   Okay.  And so if you are referred a case

20 involving election related matters, is it correct

21 to say that it could come from OECS, FDLE or a

22 direct citizen complaint?  Are those the three

23 ways that you might start investigating a matter?

24     A   I would say --

25         MS. MORSE:  Objection to form.  Objection

1    to form.

2          You can answer.

3      A  I would say no, only because we would get

4    them from OECS.

5      Q  Okay.

6      A  We would get them from FDLE.  If I were to

7    get anything from a citizen, I would forward that

8    to the law enforcement agency for them to handle,

9    not me.

10     Q  Okay.

11     A  And then we might -- I don't think it's

12   happened yet, but we could get any of these also

13   from any law enforcement agency in the state of

14   Florida.  I don't think that's happened, though.

15     Q  Okay.  So, the citizen complaint would go

16   somewhere else and then it might eventually make

17   its way to you; is that right?

18     A  Through a law enforcement agency, yes,

19   sir.

20     Q  Sure.  Okay.  That's very helpful.

21   Thanks.  Let's see.

22          So, how -- which cases would OECS or FDLE

23   bring to your office?  How do they decide that it

24   needs to go to OSP?

25          MS. MORSE:  Objection to form.

1          You can answer.

2      A   Honestly, you would have to ask OECS and

3  FDLE that.  Because I'm not familiar with how they

4  determine what they're going to send to us.  I

5  know there is interaction between the two of them.

6  So, you have to ask them.

7      Q   Yeah.  Also, might refer a case to a local

8  state attorney rather than your office; is that

9  right?

10     A   I'm sorry, could you say that again?  I

11  didn't quite hear you.

12     Q   They also might refer a case to a local

13  state attorney instead of your office; right?

14     A   Yes, sir.

15     Q   Okay.

16     A   And just -- I'll add, too, they have.

17     Q   They have?

18     A   Yes, sir.

19     Q   Okay.  And then does the AG's office as a

20  whole ever initiate its own election-related

21  investigations?  And I'll limit it to criminal

22  here, if that's helpful.

23     A   It depends -- I'm not playing word games

24  -- depends on what you mean by initiate.  For

25  instance, what you said earlier, just to

1    illuminate for you?

2        Q    Yeah.

3        A    A citizen wrote a letter to me and said,

4    there's something going on and it needs to be

5    investigated.  You might call it initiating it

6    when I send it to law enforcement and say, hey,

7    here's for your consideration.  I do not direct

8    law enforcement, I don't have the authority to

9    tell them what to do; but I could send it to them

10   and say, take a look, see what you think.

11       Q    Okay.

12       A    If that's initiating, yes.  Other than

13   that, no, sir.

14       Q    Okay.  That's helpful.

15       A    And, by the way, just so I can clarify, we

16   are talking here specifically about elections?

17       Q    Yes.

18       A    Okay.

19       Q    What is the election crimes task force?

20       A    The elections crimes task force, I

21   believe, is really the -- getting into semantics

22   here, it's like the arm of the -- no, that's the

23   wrong way to put it -- the elections crimes task

24   force is us, FDLE, and the Department of State, if

25   that's what you're asking.

1      Q   Yeah.  I didn't know what it was.  I'm

2   just asking, it's basically an umbrella term to

3   describe the different agencies that are working

4   on election crimes, it's not a separate unit is I

5   guess is what I'm asking?

6          MS. MORSE:  Objection to form.

7      A   That's correct, it's not.

8      Q   Okay.

9      A   It's the three of us working together.

10     Q   Okay.  Excellent.  Thank you.

11         Is there any part of the AG's office that

12   handles election-related crimes other than OSP?

13     A   Crimes, no, sir.

14     Q   Okay.  But civil enforcement?

15     A   Correct.

16     Q   So we talked a little bit about OECS and

17   FDLE.

18         Roughly how often does OECS refer an

19   election-related matter to OSP?

20     A   One of your topics is about processes.  I

21   may get into that a little bit now, if that's

22   okay.

23     Q   Of course.

24     A   They do not refer them directly to us.

25   The process would be that OECS would refer matters

1    to the FDLE.  FDLE would investigate, you know, we

2    would support or assist them as needed, and then

3    FDLE refers them to us.

4        Q  I see.

5        A  Among those three.  Again, we can have

6    another law enforcement agency sensed up.  Again,

7    I'm not aware that it's happened yet; but for

8    those three, that's how it works.

9        Q  Okay.  That's helpful.

10           So, let's start with the time period of

11   2023.  You're saying that you're getting the

12   referrals just from FDLE.

13           About how often has that happened in 2023?

14       A  Oh.  I don't know the number.

15       Q  Yeah, that's fine.  I'm just asking

16   generally.

17       A  It's something that's on a rolling regular

18   basis, as would be any other type of criminal

19   effort.  But I don't have a number.  I apologize.

20       Q  No problem.  Would you say it's -- you

21   know, it happens more than once a month?

22       A  Yes.

23       Q  Okay.  That's helpful.  So, we talked a

24   little bit at the very beginning about OSP and its

25   priorities.  You mentioned human trafficking and

1    drug crimes.  You didn't mention election-related

2    investigations.  So would you say that's not one

3    of the priorities of OSP right now?

4        A   It's not one of our primary priorities,

5    correct.  It is a -- it is something that we have

6    been funded and directed by the legislature to

7    handle.  And so it -- so, I don't want to call it

8    not a priority.  I don't want to call anything not

9    a priority when it's criminal; but -- it's not --

10   I wouldn't call it one of our leading priorities

11   that I would call the ones I spoke to you earlier

12   about.  I hope that's answering your question.

13       Q   Yeah, it is.  Thank you.  And so going to

14   your interrogatory responses -- I know you have

15   them, and I'm happy to pull them up if that would

16   be helpful -- but in your answers to several of

17   the responses, it says the SB7050 was not a

18   legislative priority as well.

19           And so, I guess, I'm asking, it's not a

20   priority for OSP or I don't -- sorry, let me

21   withdraw that.

22           It wasn't one of the things you listed at

23   the beginning of the important things that OSP

24   covers, and also SB7050 wasn't a legislative

25   priority for the AG's office as a whole; is that

1  correct?

2      A  I wouldn't -- I don't want to get tied up

3  in semantics.  You had asked me about what were

4  our priorities.  I look at our -- as you can see

5  from our annual reports, they've stayed consistent

6  really pretty much over the years.  Anything like

7  this, I don't want to say it's not a priority

8  because I need to do it.  And so -- I say I -- the

9  Office of Statewide Prosecution needs to do it.

10     Q  Right.

11     A  I don't want to call it not a priority,

12 but it's not one of our zero-tolerance primary

13 things that we're doing.  And we're very dependent

14 on law enforcement in what we do as well.  I don't

15 know if I'm answering.  I'm trying to answer that.

16     Q  That gives me a good sense of it.

17     A  Yeah.  I don't want to give you the sense

18 that we're not concerned about it.  That's

19 certainly not the case, as you know.  But anyway,

20 go ahead, I'm sorry.

21     Q  No problem.  And so I know that you don't

22 work on the legislative side -- although I know

23 you reviewed these rog answers, but you personally

24 didn't have any involvement in review or enactment

25 of SB7050 before it passed; is that right?

1      A   Me, nor the Office of Statewide

2   Prosecution, correct.

3      Q   Okay.  Thank you.  So, let's look at one

4   of those OSP reports that we talked about.  So

5   I'll share my screen again.  And this is going to

6   be Exhibit 3 for the court reporter.

7          (COX Deposition Exhibit 3 marked for

8   identification and attached to the transcript.)

9          MS. MORSE:  I'm sorry, what was Exhibit 2?

10  Did you put Exhibit 2 into the chat?

11         MR. FERGUSON:  So, I didn't pull it up.

12  That's just -- Exhibit 2 is the -- I'm pulling it

13  up here so you can see, it's the rog responses.

14  And I didn't want to pull it up, I just don't want

15  to get out of order, because these are already

16  numbered.

17         MS. MORSE:  Okay.

18         MR. FERGUSON:  I think my colleague can

19  probably put that into the chat to just so you

20  have it.

21         MS. MORSE:  Okay.

22      Q   Mr. Cox, can you see the annual report?

23      A   2022, yes, sir.

24      Q   Okay.  So, I'm going to scroll down to the

25  first -- let's see, this is page 1 marked on the

1   document, and page 5 of the PDF.

2           When was this published?

3       A   This is 2022.  I'm going to have to give

4   you an approximate date.  It would have been

5   sometime after -- I can't remember if it's

6   March 1st or March 30th that these reports are

7   required by statute.  Sometime after March or in

8   March.  I don't remember the specific date.

9       Q   Yeah, that's totally fine.  I just want to

10  get a sense.  It's early 2023, basically?

11      A   Yes, sir.

12      Q   Okay.  Great.  So, I'm going to scroll

13  down to page 3 of the document here.  And I'm

14  going to highlight the paragraph about elections.

15          Can you see that?

16      A   Yes, I see where you've highlighted it,

17  yes, sir.

18      Q   Okay.  And so we don't need to read the

19  whole paragraph, but I'll just represent, is it

20  correct that this is a paragraph about election

21  law violations and OSP's plans to address those?

22      A   I didn't review this in preparation for

23  today.  Can I take a look at it?

24      Q   Yeah, of course.

25      A   Okay.

1          Okay.  I'm sorry.  What was your question?

2     Q  First, I'm just asking am I correct to say

3  that this paragraph is talking about OSP's plans

4  to address election law violations?

5     A  And I think it also mentioned gaming, but

6  yes, it's primarily about elections, yes, sir.

7     Q  Great.  And can you tell me -- so, did you

8  write this paragraph?

9     A  I'm going to say yes, it has my name at

10  the bottom.

11     Q  Great.  Who directed you or your office to

12  begin this focus on election law violations?

13     A  Who directed us -- the Florida legislature

14  and then the governor signed it.  That's what I'm

15  referring to when I say they directed our office.

16     Q  Okay.

17     A  The Florida legislature passed it, and the

18  governor in Florida has to sign it to become law.

19     Q  Okay.  So, this essentially comes from

20  outside the AG's office, essentially, the

21  direction to this focus on election law

22  violations; is that correct?

23     A  Yes, from the legislature and the governor

24  signing.  Yes, sir.

25     Q  Okay.  And -- let's see.  I've looked at a

1     couple of the previous reports, which I can pull

2     up the 2021 one if you'd like, but I didn't see

3     any references in previous reports to election law

4     -- addressing election law.

5           Does that -- is that consistent with your

6     memory?

7       A   I hate to say this, I'd have to look at

8     them.  I don't recall right now what I had in

9     those reports.

10      Q   Sure.  No problem.  Well, let me just pull

11    up the 2021.  And, you know, we don't have to read

12    the whole thing, of course.

13          Okay.  Can you see it?  That's Exhibit 4,

14    for the court reporter.

15          Can you see this is the 2021 report?

16      A   I can.

17          (COX Deposition Exhibit 4 marked for

18    identification and attached to the transcript.)

19      Q   Okay.  Again, I don't want to take a ton

20    of time here, but I'm going to scroll to page 1

21    here that talks about, it looks like some of the

22    priorities.  Maybe take a moment to review that.

23          And you can tell me if you see any

24    references to election law or remember any focus

25    on it from this report?

1      A  I'm not seeing anything on this page based

2   on a quick scan.

3      Q  Okay.  And then I'll scroll to the next

4   page, I think is the end of your introductory

5   message there.

6      A  No, sir, I'm not seeing anything.

7      Q  Okay.  Thanks for that.

8         So, you agree that beginning in the year

9   2023 is the first year your office has focused on

10  election law related matters?

11     A  I'm trying to remember when it was we were

12  -- we -- no, sir, that's not true.

13     Q  Okay.

14     A  It would have been in 2022.

15     Q  Okay.  And that was based on that

16  direction from the legislature and governor that

17  you mentioned before?

18     A  The enactment of the statute.

19     Q  Right.  So it started with that.

20        Do you remember, did you do any kind of

21  election law related investigation or prosecution

22  prior to that?

23     A  Yes, sir.

24     Q  Okay.  And it wasn't a focus, but you did

25  some -- can you tell me, you know, roughly the

1  number of cases that fit that description from,

2  let's say, either 2021 or 2020?

3      A  The description you're referring to is

4  election law violations?

5      Q  Yeah.  And if it's easier -- you know, I'm

6  not asking for specifics here.  If you want to

7  estimate the percentage of OSP's work that

8  involved election law related matters, that would

9  be fine, too.  I just want a rough sense of what

10 it was.

11     A  A rough sense, I'm going to say --

12         MS. MORSE:  Objection to form.

13         THE WITNESS:  I'm sorry.

14         MS. MORSE:  I was just inserting an

15 objection to form.

16         You can answer.

17     A  Number wise -- this is a total estimate --

18 I would say probably between six and ten,

19 somewhere in there.

20     Q  Okay.  Is that total or per year?

21     A  No, sir, I would say that's total, at

22 least since I've been the statewide, which would

23 have been since 2011.

24     Q  And Just to clarify, the six to ten, is

25 that the total number up until today or up until

1    the 2022 point when the legislature and

2    governor --

3         A   You had asked me -- I took it prior to the

4    enactment of the -- yes, so it would be before

5    that.

6         Q   And can you give me a similar rough

7    estimate for then the period between 2022 and

8    today?

9         A   And you're wanting me to give you an

10   estimate on what?

11        Q   The number of investigations or

12   prosecutions, just the same that you did for that

13   previous period that was six to ten, and then now

14   for the period from 2022 to today?

15        MS. MORSE:   Objection to form.

16        A   My last would've been about three weeks

17   that I got a number, and I believe it was at 72.

18        Q   Okay.  Excellent.  Thank you so much.  I'd

19   like to move on now to Exhibit 5.

20        (COX Deposition Exhibit 5 marked for

21   identification and attached to the transcript.)

22        Q   Can you see that on the screen?

23        A   It says the Florida Department of State,

24   OECS.  It's dated January 15th, 2023.

25        Q   Thanks so much.  So, this is the OECS

1   report published in January of 2023.  And if the

2   court reporter could mark that as Exhibit 5,

3   please.

4          Are you familiar with this report?

5      A  I'm familiar with its existence.

6      Q  Okay.  And do you recall that this report

7   is mentioned several times in your office's

8   interrogatory answers in this case?

9      A  I've read that, yes, sir.

10     Q  Okay.  Great.  So, I'm going to scroll

11  down a few pages.  I'm not asking you to read

12  anything closely, but as you can see, this is a

13  very long report.  It's 264 pages.  It has some

14  introductory matter.  And then, am I correct --

15  and then I'm going to scroll to page 10 of the

16  PDF, which is the beginning of a chart -- the bulk

17  of this report is a list of election-related

18  complaints and investigations performed by OECS in

19  2022.

20         Is that your understanding of what this

21  document is?

22     A  Can you scroll back up so I can see what

23  the lead in is?

24     Q  Yeah, I'm happy to.  So, for the record,

25  I'm scrolling to second page, which has the

1    introduction.  So I'll just leave it up there for

2    a moment.

3        A  And your question is, that chart you were

4    showing me, what that represents?

5        Q  Yeah.  And so it might be a little bit

6    easier if I -- just because there's a few pages of

7    lead in, let me take you to the part that talks

8    about this.  So, I'm scrolling to page six, and if

9    you could just read that first paragraph?

10       A  Okay.

11       Q  Okay.  So, my question was just -- my

12   understanding of this report is that it is a list

13   of investigations and complaints performed by OECS

14   in 2022.

15           Is that your understanding based on

16   reading this and just your other knowledge of this

17   document?

18           MS. MORSE:  Objection to form.  To the

19   extent you can answer, go ahead.

20       A  I don't have any other knowledge.  I'm

21   basing this completely on what this says.

22       Q  Okay.

23       A  And that appears to be what it says.

24       Q  Okay.  I'm going to scroll back down to

25   the beginning of this chart.  And so there are --

1    and as you know, this -- and we'll talk about this

2    in more detail -- this case is about SB7050 and

3    its effect on third-party voter registration

4    orientations, which I'll call 3PVROs.

5         There are entries on this list involving

6    3PVROs; is that correct?

7         MS. MORSE:  Objection to form.  You know,

8    to the extent he can't see the entire list, this

9    is a very lengthy document.  If you want to give

10   him time to look through it or -- you know?

11   Q  Yeah.  Well, I mean, I agree it's lengthy.

12   I'm asking partially because this is a document

13   that your office has provided to us as part of the

14   interrogatories.  And I certainly don't want you

15   to ask you to look at the whole list.

16        From your knowledge of this document and

17   this case, I guess, are you aware of some of these

18   being related to 3PRVOs?

19   A  I don't know the answer to that.

20   Q  So, let's move on then.  And I'm going to

21   represent to you that there are 17 entries on this

22   list involving 3PVROs.  And I'll -- I'm going to

23   scroll or take you to the end of this list so just

24   so you have a sense of how many entries that are

25   in here.  And so this is the last page of the

1    chart.

2          And do you see that at the very bottom, it

3    ends at 3,026?

4      A   That's what it says, yes, sir.

5      Q   Okay.  Great.  So, I'm not going to ask

6    you to, you know, verify what I'm saying about

7    this chart, of course.  I'm going to represent

8    that I've counted 17 of these 3,026 that involve

9    3PRVOs.

10          Do you have any -- do you have any

11    knowledge that would indicate that that's

12    incorrect, that there are more than that?

13      A   I have no knowledge.

14      Q   Sure.  Okay.

15      A   -- about what's been referred to FDLE at

16    all.

17      Q   Okay.  And then assuming it's correct that

18    there are 17 of these 3,026, I'm calculating that

19    to be 0.56 percent.  Just accepting that for the

20    purposes of this question, do you believe that

21    that's a significant portion of the complaints and

22    investigation into election misconduct?

23          MS. MORSE:  Objection to form.

24      A   Respectfully, I'm here as an agency

25    representative, and I don't -- I mean,

1    respectfully, I don't think what my opinion is

2    falls into this.  I'm sorry.  I mean, I think your

3    numbers speak for themselves.

4        Q  Okay.  Thanks for that.

5            Does that provide any -- does that

6    demonstrate that 3PRVOs are especially problematic

7    when it comes to election misconduct?

8            MS. MORSE:  Objection to form.

9        A  I'm going to answer that the same way.

10   And I would add that these are not cases from what

11   I'm understanding -- because I'm not familiar with

12   this graph -- are ones that I'm working on.  But

13   when I say I, I mean the Office of Statewide

14   Prosecution.

15       Q  Yeah.  So I -- let's go to some cases that

16   involve your office.

17       A  Okay.

18       Q  And so, again, I realize this is difficult

19   to navigate through.  By my count there are 22

20   investigations on this list that were referred to

21   OSP, 20 of which have been closed.

22           Do you -- does that sound right to you or

23   do you know if --

24           MS. MORSE:  Do you want to scroll to

25   those?  Do you want to just show him?

1          MR. FERGUSON:  Well, of course, it would

2     be difficult to go to all 22.  I'm going to do a

3     couple, if that's okay.

4          MS. MORSE:  Yeah.

5      Q  I'm just asking the prefatory question

6     now, if Mr. Cox has knowledge if that number is

7     correct?

8          MS. MORSE:  Objection to form.

9      A  I don't have knowledge of that.

10          MS. MORSE:  I'm sorry, Stephanie.

11          MS. MORSE:  That's all right.  Objection

12     to form.

13          You can answer.

14      A  I don't have knowledge if that's correct

15     or not.

16      Q  Okay.

17      A  Again, I didn't create or have a hand, to

18     my knowledge, of creating this form.

19      Q  Yeah.

20      A  Or anyone in the OSP, for that matter.

21     I'm not aware.

22      Q  Okay.  I'll show you two of the entries

23     that mention OSP.  And I'll say for the record

24     that in this OECS document, it refers to OSP as

25     SWP.

1       Are you -- does OSP go by that sometimes?

2    A  Yes, sir, both terms.

3    Q  Okay.  Excellent.  So, I'm looking here at

4  line 2717, which I've highlighted.

5       Can you see that?

6    A  I can.

7    Q  Okay.  And I'll just give you a minute to

8  look at this entry here.

9    A  Is there a way I can see what the columns

10  represent for the last four columns?

11    Q  Yeah, certainly.

12    A  Okay.

13    Q  And I don't know if that will all fit on

14  the screen together, but let me -- if I make it a

15  little bit smaller, can you read that?

16    A  I can with my aide here, my glasses.

17       Okay.  Can you take me back to the one --

18  okay.

19    Q  Are you aware of this case?

20    A  I can't say based on what I'm looking at

21  here.

22    Q  Okay.  Just because there's not enough

23  information?

24    A  Right.  I just can't say based on what I'm

25  aware of here.

1      Q  Okay.  And you -- so, you can't say

2  whether or not this allegation involves someone

3  who's not a U.S. citizen; is that correct?

4      A  It doesn't say that here, so I don't know.

5      Q  And then, I'll just ask a couple of follow

6  up questions, even though I think I probably know

7  your answer.

8          So, you're not aware based on this,

9  whether it involves someone who's previously been

10  convicted of a felony before this incident in

11  question?

12      A  I'm not aware based on what I have here,

13  no, sir.

14      Q  Okay.  Same question with:  You're not

15  aware if it involves stealing anyone's personal

16  information off of a voter registration

17  application?

18      A  Not based on this, no, sir.

19      Q  Okay.  Thank you for that.  And then I'm

20  just going to take you to the one other entry I

21  found that involves an open investigation from OSP

22  and that I've scrolled down to is number 2762.

23  And this one is a little clearer, so I can read it

24  for the record as you're reading it.  In column B,

25  which describes the law allegedly violated, it

1    says:  3PVRO collected 243 voter registration

2    applications, and upon processing app, SOE found

3    one application submitted for a deceased voter.

4    And it looks like that shows as pending.

5            Are you aware of this, in particular,

6    case?

7        A  I don't mean to be dense, but on the

8    county in which this occurred, I'm wondering what

9    ORA is.

10       Q  Yeah.  Let's go up and look.  I think

11   there's a --

12       A  I guess that's Orange.  Never mind.  I

13   guess that's Orange County, now that I'm thinking

14   about it.  That must be what they mean.

15       Q  Okay.  I can go to the list to be sure

16   really quick here.  You're right.  Page 9 shows

17   that it is Orange County.  Okay.  Let's go back.

18           Okay.  So the question was:  Are you aware

19   of this specific case?

20       A  I may be aware of it.  Based on this, I'm

21   not able to pinpoint in my head what it is.

22       Q  Okay.  And so I'll just ask the questions

23   I asked with the previous one.  Well, let me be

24   clear, with this one and the previous one, you

25   don't know if these cases are still pending or if

1  they've been, you know, adjudicated in any way; is

2  that -- that's correct?

3       MS. MORSE:  Objection to form.

4    A  Based on this, I don't.

5       THE WITNESS:  I'm sorry.

6       MS. MORSE:  Objection to form.

7    A  I'm not aware.

8    Q  And so you don't know whether this

9  allegation involves a person who's not a U.S.

10  citizen?

11   A  I do not.

12   Q  And you don't know --

13   A  Not based on this.

14   Q  Okay.  And you don't know whether it

15  involves someone who's been convicted of a felony?

16   A  I do not, based on this.

17   Q  Okay.  And you don't know if it involves

18  whether someone stole personal information?

19   A  Based on this, I do not.

20   Q  Okay.  Let's go to -- I want to go to

21  page 5 of this report.  If you could read the

22  first paragraph of page 5.  You can read that to

23  yourself, I'll give you a couple of moments.

24   A  Okay.  I've read the first paragraph.

25   Q  Great.  Thank you.  So, I'll read just a

1    little bit of that for the record.  So, it says

2    that during 2022 OECS reviewed a large number of

3    complaints involving 3PRVOs.

4         And then it goes on to mention 3,077 voter

5    registration applications that were collected and

6    submitted untimely by 3PRVOs.

7         So, understanding that you're not

8    extremely familiar with this chart, to me it

9    doesn't appear that the 3,077 allegedly untimely

10   applications are part of this charter report,

11   that's just a sentence here.

12        Is that -- do you have any awareness of

13   whether that's correct?

14        MS. MORSE:  Objection to form.  I'm going

15   to object based on you questioning him on

16   documents he didn't write.

17        But you can answer if you know, Mr. Cox.

18     A  And that's what I was going to say.  I

19   didn't offer this, so I don't know what it

20   represents.

21     Q  Okay.  Thanks for that.  Okay.  So I see

22   we're getting close to an hour.  I'm going to move

23   on to a different topic.

24     A  Okay.

25     Q  Are you good to keep going?

1      A   Yeah, absolutely.

2      Q   Okay.  Great.  I want to pull up Exhibit 6

3  right now.

4          (COX Deposition Exhibit 6 marked for

5  identification and attached to the transcript.)

6      Q   Okay.  Can you see that on your screen?

7      A   Yes, sir.

8      Q   And so this is a document, you can

9  probably see, that was produced by your office.

10 And at the top it says probable cause.  I will

11 slowly scroll through, just so you can have an

12 awareness of generally what's in here before we

13 talk about it.  But of course, not asking you to

14 read the whole thing.

15         Based on this, can you give me just your

16 understanding of what this is?

17     A   Can you go to the bottom of that probable

18 cause?

19     Q   Yeah, of course.

20     A   To the signature section in the last

21 paragraphs?

22     Q   Yeah.

23     A   Okay.  And can you go down to the

24 signature line?

25     Q   Right here?

1      A   Okay.  Yes, sir.

2      Q   Okay.  Can you just give me your brief

3   understanding of what this document is?

4      A   That appears to be probable cause

5   affidavit for an arrest of a person for the

6   charges and therein.  Let me add, I can't -- you

7   started this by saying this was prepared by OSP, I

8   can't say that it was.

9      Q   Sorry, I didn't mean to imply --

10     A   That's okay.

11     Q   Okay, I said it's been produced by the

12  Attorney General's office in this litigation.

13     A   Gotcha.  Okay.

14     Q   So, I'll summarize.  This is a probable

15  cause statement involving someone named Jasmine

16  Brantley; do you see that name?

17     A   I do.

18     Q   And this -- we're on page 3 now.  And it

19  says:  Your affiant has reason to believe that

20  Jasmine Brantley engaged in systematic ongoing

21  course of conduct during the month of September

22  2019 with the intent to submit a false voter

23  registration consent in the state of Florida; is

24  that right?

25     A   That's what the third paragraph says, yes.

1      Q  Great.  And I don't want to ask you
2   questions about the specifics of this case, I know
3   it was a few years ago, but I'm using this as an
4   example, and I know that you said a few minutes
5   ago you think in the last year or roughly a year
6   your office is receiving, I think you said, 72
7   election law related referrals.
8           So my question, based on this, is:  In
9   your experience, if there's a reason to believe
10  that a 3PVRO volunteer like the one mentioned here
11  is engaged in some kind of fraud, let's say,
12  they're creating fictitious people or stealing
13  personal information -- let's stop there.
14          Have you seen cases like that in your
15  office?
16          MS. MORSE:  Objection to form.
17      A  Have I seen cases of 3PVRO volunteers?
18      Q  Right.  Who are committing some kind of
19  fraud, stealing personal information or
20  fraudulently turning in voter registration
21  applications, things like that?
22          MS. MORSE:  Objection to form.
23      A  You use the word "or."  Yes, I have seen
24  fraud or the other or the other, yes.
25      Q  Okay.  Well, let me clarify that then.

1    Involving fraud -- and I don't remember exactly

2    what I said, but I think it was something --

3    turning in false voter application forms.  Is that

4    what you were referring to?

5         MS. MORSE:  Objection to form.

6    A  Yes.

7    Q  Okay.  In your experience, do those

8    instances involve people who commit that

9    misconduct with regard to multiple applications?

10   A  Does that include, you said, people that

11   have done it multiple times?  Is that what you

12   were asking?

13   Q  I'm saying as a general matter, you know,

14   if someone is turning in false voter registration

15   applications, in general, does that involve doing

16   so with multiple applications?

17   A  Let me answer it this way.  I don't how to

18   say it within general -- it includes that kind of

19   conduct, yes.

20   Q  Okay.  And I don't want to get caught up

21   or be unclear here.  The -- what I'm trying to get

22   at is if this, based on your experience, are you

23   seeing volunteers who are engaging in some kind of

24   scheme that involves, you know, multiple

25   applications rather than one single application?

1        A   Yes.

2            MS. MORSE:  Objection to form.

3            THE WITNESS:  I'm sorry.

4            MS. MORSE:  That's all right.

5        Q   And you said yes?

6        A   Yes.

7        Q   So, in your law enforcement experience if

8    that happens when someone's involved in that kind

9    of scheme, does the person who commits that

10   misconduct provide their real name to the victims?

11           MS. MORSE:  Objection to form.

12       A   Does the person who does that conduct

13   provide their real name to the victims?  I don't

14   know the answer to that.

15       Q   Okay.  Let's move on to a new topic.

16           So, you testified earlier that -- here,

17   let me pull this off the screen just for to help.

18           So, your office did handle some referrals

19   involving election law crimes over the past few

20   years, although that increased in 2022 and '23; is

21   that -- that's correct?

22       A   Yes, sir.

23       Q   And that increase was because of a

24   decision made by the legislature and governor; is

25   that correct?

1    A   The enactment of the statute, yes, sir.

2    Q   To your knowledge, has there been any

3  trend in voter registration fraud in the last few

4  years?  And by that, I mean, has there been more

5  fraud or less fraud?

6        MS. MORSE:  Objection to form.

7    A   I really can't answer that from my

8  standpoint because of the lack of involvement that

9  we kind of had compared to now.

10    Q   Okay.  And then does your office -- when

11  you receive those referrals, do they ever involve

12  simple untimeliness of applications?  And by that

13  I just mean the only election law violation is

14  that an application has been turned in late?

15    A   Just only with the caveat, I'm not going

16  to get into specifics, but no, we have not seen

17  those.

18    Q   Okay.  Going back to that trend, I know --

19  I think you can't answer the question about a

20  trend in fraud because of essentially the changed

21  focus of your office.

22        Have you noticed any trend regarding

23  election related fraud in the past few months,

24  let's say since the beginning of October?

25        MS. MORSE:  Objection to form.

1      A  I'm really not in a position to answer

2   that, because I really focus on the enforcement of

3   what's brought to me by law enforcement.  I

4   apologize.  I think that would probably be a

5   better question for somebody else than me, because

6   we're really involved in the enforcement of it

7   based on what law enforcement brings us.  I can't

8   really say that.

9      Q  Yeah.  Sure.  I think that's fair.  And so

10  let me just narrow the question.  I'm not, you

11  know, asking you to answer based on statewide

12  facts or anything like that.

13       In terms of your enforcement and what you

14  -- referrals you've received, have you noticed any

15  trend in election law related referrals since the

16  beginning of October?

17     A  I don't know that the amount of cases we

18  received would give me an adequate basis to make

19  that conclusion.  In addition, I don't know

20  necessarily how these cases were selected for

21  investigation or where they came from necessarily

22  other than maybe OECS, but I don't know that I'm

23  in a position to be able to really say -- our

24  office has not done any sort of a study on that.

25     Q  Okay.  That's fair.  And so I'm not asking

1    you to draw any overall conclusions based on that,

2    but are you aware if the number -- let's just say

3    the number of referrals has gone up or down or

4    stayed the same?  Are you aware of that since the

5    beginning of October?

6        A   Beginning of October of 2023?

7        Q   Yes.  This year.

8        A   Well, any referrals to us cause our

9    numbers to go up.  So, I mean, since this began

10   our numbers have gone up simply because cases have

11   been referred to us.

12       Q   Sure.  Sorry to interrupt.  And I don't

13   mean the overall numbers, I mean, like, the

14   monthly trend or something like that.  So the --

15   you know, the referrals you might receive every

16   month?

17       A   I'd have to answer the same way.  I don't

18   know.  I'm not quite understanding where you're

19   trying to take me here.  We haven't done studies

20   to see any trends or anything like that in the

21   office -- in the Department of Legal Affairs.  So

22   I'm not sure -- I don't understand.  I don't know

23   the answer to that.

24       Q   Okay.  Are you aware of one of the

25   challenge provisions in this law called the --

1    it's been called in the litigation the felony

2    volunteer restriction, and that's a 97.05751E.

3           Do you know what I'm talking about when I

4    say that?

5        A  Yes.  And in preparing for this, I'm

6    familiar with that.

7        Q  Okay.  Are you aware any investigation or

8    prosecution based on that provision?

9        A  Again, just with the caveat I'm not going

10   to speak to specifics, but I will tell you, no.

11       Q  Okay.  And then similar question for a

12   different provision called the receipt

13   requirement, which is -- are you aware of that

14   one?

15       A  I am.

16       Q  Are you aware of any situation -- well,

17   sorry, let me withdraw that and back up.

18          Are you aware of any investigation or

19   prosecution based on violation of that

20   requirement?

21       A  And again, answering for the Office of

22   Statewide Prosecution, no.

23       Q  And I think I probably know your answer to

24   this based on that, but are you aware of any

25   situation in which an applicant for voter

1    registration has used the receipt that we talked

2    about the receipt requirement, to report a 3PVRO

3    or to aid an investigation?

4        A  No.

5        Q  Okay.  Are you aware of the SB7050's

6    deadline for 3PRVOs to submit a registration

7    application they receive?

8        A  I'm aware of it.  I'd have to refresh my

9    recollection, but I'm aware of it, yes, sir.

10       Q  Sure.  And I'm happy -- we can pull up the

11   language when necessary here, but for this part,

12   does it sound correct that the new law gives

13   3PVROs 10 days to submit a registration

14   application?

15       MS. MORSE:  Objection to form.

16       A  That's what the statute says, yes, sir.

17       Q  And do you know whether that new deadline

18   has affected the instances of fraud or misconduct

19   regarding voter registration?

20       MS. MORSE:  Objection to form.

21       You can answer.

22       A  I'm unaware.

23       Q  Okay.  Let's move a little bit more into

24   the felony volunteer restriction, which I

25   mentioned earlier.

1          Would it be help helpful to take a look at

2     that?

3          A  Depends on the question.

4          Q  Fair.  Okay.  Well, why don't you just let

5     me know if you want to look at it.

6          A  Okay.  I'm just moving the statute closer

7     to me right here.

8          Q  That's totally fine.  So, I asked a few

9     moments ago if anyone has been prosecuted under

10    that provision.  I want to change the focus -- and

11    essentially let's start with this.  You're aware,

12    correct, that in that law it has a list of

13    underlying felonies.  And if someone has been

14    convicted of those felonies, then they're no

15    longer allowed to perform certain functions with

16    3PVROs; is that your understanding?

17         A  Based on the statute, yes, sir.

18         Q  Okay.  Great.  Are you aware of any

19    prosecutions involving 3PVROs that name a

20    defendant who has previously committed one of

21    those felonies that's listed in the felony

22    volunteer restriction?

23         A  Am I aware -- I apologize, could you ask

24    that -- I apologize, I want to make sure I'm

25    following you.

1      Q  No problem.  I understand.

2          So, there's this list of underlying

3  felonies that essentially triggers the felony

4  volunteer restriction; right?

5      A  I'm with you.

6      Q  And that's only been -- that law has only

7  been in place a few months --

8      A  Right.

9      Q  -- but previous to that, before SB7050 was

10 enacted, are you aware of any prosecutions where a

11 volunteer for a 3PVRO was prosecuted, and that

12 person who is prosecuted had committed one of

13 those underlying felonies that's on the list?

14     A  No, sir.

15     Q  Okay.

16     A  Thanks for clarifying for me.

17     Q  No problem.  And so that question was

18 about prosecutions.

19         Are you aware of any investigations that

20 are fitting that same description?

21     A  Again, without going into specifics, but

22 no, sir.

23     Q  Okay.  Thank you.  Okay.  So, I'd like to

24 --

25     A  Let me say -- I want to make sure I'm

1    being complete here -- and I'm not going to give

2    Stephanie heartburn that I'm speaking up -- but

3    part of my preparation for this was going to

4    involve speaking to one of our particular

5    prosecutors about 3PVROs in preparation for this.

6    I have been unable to reach her because she's been

7    in a fraud trial in Pasco County.  However, my

8    answers still stand as I just gave them to you,

9    and my confidence level in them is high.

10        Q   Okay.  Thank you very much.  And that's

11   helpful background.

12            Could you tell me her name?

13        A   Panagiota, P-A-N-A-G-I-O-T-A, Papakos,

14   P-A-P-A-K-O-S.  It's a Greek lady.  She goes by

15   Pota, P-O-T-A.

16        Q   Okay.  Thanks.  Okay.  So, I want to pull

17   up some of your interrogatory answers here once

18   again.  And this -- with apologies, again, for

19   skipping numbers -- this is going to be Exhibit 9,

20   for the court reporter.

21            (COX Deposition Exhibit 9 marked for

22   identification and attached to the transcript.)

23        Q   Can you see that on the screen?

24        A   I can.  Yes, sir.  Just to let you know, I

25   also have a copy, a blank of that in front of me,

1  too.

2      Q  Excellent.  It's much easier to read on

3  paper, I'm sure.

4      A  Especially with my eyes.

5      Q  Yeah.  Well, same here.

6         So, this is your office's amended

7  responses to plaintiff's second set of

8  interrogatories in the League of Women Voters

9  case; is that correct?

10     A  Yes, sir, it appears to be.  And this

11  appears to be dated October 16th of this year.

12     Q  Great.  So I'm going to go down to the

13  second interrogatory and the answer.  So, this is

14  on pages 3 and 4 of that document.  And I'll just

15  pause for a minute here so you can take a look.

16     A  Read the second question and response?

17     Q  You can skim it if you want.  What we're

18  going to talk about here is actually a little bit

19  below with the list of cases.  So I know that you

20  -- I believe you signed these interrogatories, so

21  no need to read it if you're familiar.  But you

22  can just take a look to get a sense of what I'm

23  talking about.

24     A  Just to clarify, it doesn't appear as

25  though I signed this interrogatory.  I think there

1   was a subsequent filing where it was signed for

2   me.

3       Q   Oh, okay.

4       A   There is a declaration, I just don't have

5   the declaration page.

6       Q   okay.

7       A   My bad.  My bad.

8           I'm sorry, back to your question.

9       Q   No problem.  So you can just take a minute

10  to get to a sense of what's in this one, and let

11  me know and when you feel like you understand it.

12      A   You want me to look at it through page

13  five and six as well, just skim the whole thing?

14      Q   Yeah.  Sure.  Just take a quick look.

15  Most of the -- I'm just going to refer to this

16  list that's on page four.

17      A   Okay.

18      Q   Okay.  So -- sorry, go ahead.

19      A   I looked at it real quick.

20      Q   Okay.  So, just for the record, this is --

21  this interrogatory asked for a list of people who

22  are alleged, suspected, or confirmed to have

23  committed unlawful conduct and have one of those

24  felony convictions enumerated in the felony

25  volunteer restriction that we just discussed.

1        So, what I want to do is just take an

2   example of people on this closed list of cases

3   that you've provided.  And so the one that I'm

4   going to use is Michael Anderson.

5        So, do you see his name on page 4 listed

6   at number four?

7      A  I do.

8      Q  Okay.  So let's -- I'm going to pull up a

9   document related to that case.

10       Okay.  So, can you see that on the screen?

11     A  Yes, sir.

12     Q  Okay.  Great.  And this is Exhibit 10, for

13   the court reporter.

14       (COX Deposition Exhibit 10 marked for

15   identification and attached to the transcript.)

16     Q  I'm going to -- this is a few pages, so

17   I'll slowly scroll to let you take a look.  So,

18   just for the record, this document that I'm

19   pulling up, it's from Hillsboro County and it's a

20   judgment and sentence for Michael Keith Anderson;

21   is that correct?

22     A  That's what it appears to be, yes, sir.

23     Q  Okay.  Great.  And can you see the -- it

24   says that a guilty plea has been entered and

25   there's a charge description at the middle of the

1   page that is section 104.15, and it's election

2   voting by an unqualified voter; is that correct?

3        A  Yes, sir.

4        Q  Okay.  And Do you -- I guess, do you

5   remember this case in particular?

6        A  No, sir.

7        Q  Okay.

8        A  I recognize the name is all.

9        Q  Okay.  Great.  And so there's nothing

10  indicating that this crime, this conviction

11  involved a 3PVRO; is that correct?

12       A  That's correct.

13       Q  Okay.  Thank you.  To your knowledge --

14  let me share the list of cases that I had up just

15  a moment ago.

16       To your knowledge, do any of the cases

17  that are listed in this interrogatory response

18  have any relation to a 3PVRO?

19       A  I can't answer that.  I'm sorry.  I can't

20  answer that without being able to look at each and

21  every of the cases.

22       Q  Okay.

23       A  Because I don't know if these people were

24  registered by a 3PVRO or if they did it

25  themselves.

1      Q   Right.

2      A   The question relates to felonies listed

3   under 970575, and I don't know if this will help

4   clarify, but I don't think any of these cases

5   relate to violations of 970575, but these are

6   people that were convicted of felonies.  So,

7   that's probably the reason that I answered in that

8   manner out of completeness, but it asked -- you

9   know, it didn't ask for violations of 0575, but

10   the definition of felonies.

11      Q   Yeah.

12      A   That's what I believe is going on there.

13      Q   Sure.  Thanks for that.  And so is it

14   correct that these cases largely involve people

15   who committed underlying felonies and then

16   illegally voted?

17      A   Yes, sir.

18      Q   Okay.  Thank you.  And I believe that in

19   that OECS report there's a reference to 20

20   individuals previously convicted of felony sex

21   offenses or murder who unlawfully registered to

22   vote and then voted in the 2020 general election.

23          Do you remember that?

24          MS. MORSE:  Objection to form.

25      A   From the OECS report, I don't.

1      Q   Okay.  So let me re-ask.  I think you're

2   probably aware, and I've seen lists put out by the

3   State of Florida, essentially of people who are

4   charged for illegally voting in the 2020 election,

5   who had previously committed felony sex offenses

6   or murder, and therefore were ineligible to vote.

7   Are you -- you're generally aware of that?

8          MS. MORSE:  Objection to form.

9      A   Yes.

10         MS. MORSE:  That's all right.

11     A   Yes, sir.

12     Q   And did you get this list from those

13  reports?

14     A   From those reports?

15         MS. MORSE:  Objection -- I'm sorry,

16  objection to form.  To the extent it implicates

17  any work product privilege, and I'm going to ask

18  the witness to try to answer without disclosing

19  any work product.

20     A   Which reports are you referring to?

21     Q   Yeah.  Sure.  Let me -- I think it'll be

22  easiest just to pull up the OECS one that I was

23  referring to.  So let's -- okay.  So, for the

24  record, I've pulled back up Exhibit 5, and we're

25  on page 4.

1      So, I'm highlighting a part of the third

2   paragraph of -- sorry, this is page 4 of the OECS

3   report.  Can you see that?

4      A  Yes, sir.

5      Q  Okay.  And so that says that in

6   partnership with the Florida Office of the

7   Attorney General and Florida Department of Law

8   Enforcement, OECS announced the arrest of 20

9   individuals previously convicted of felony sex

10  offenses or murder who unlawfully registered to

11  vote and then voted in the 2020 general election.

12     Do you see that?

13     A  Yes, sir.

14     Q  My question is:  Is the list from the

15  interrogatories the same as this list, to your

16  knowledge?

17     A  I'm going to have to say no, sir.

18     Q  Okay.

19     A  Much of it may be, but as I'm looking at

20  this list and the list on the -- the second list,

21  it adds up to like, what, 22 cases.  So there's --

22  it's got some more.

23     Q  Okay.  I realize we're getting to almost

24  an hour and a half.  I've got some more questions

25  on this felony volunteer restriction.

1          Are you okay to go ahead for a little bit

2    and then probably -- I'm guessing most people are

3    ready for a break.  Does that work?

4       A  Up to ya'll.  I'm fine.

5       Q  Okay.  So, are you aware that -- so, we

6    talked about that list of underlying felonies

7    included in the felony volunteer restriction; do

8    you remember that?

9       A  I do.

10      Q  Do you have a general sense of which

11   felonies are included on that list?

12      A  I'd have to look.

13      Q  Okay.  Let's -- I'm going to show you the

14   statute.

15         Okay.  And this is SB7050, and it's been

16   marked as Exhibit 7, I believe, for the court

17   reporter.

18         (COX Deposition Exhibit 7 marked for

19   identification and attached to the transcript.)

20      Q  And so the felony voluntary restrictions

21   starts at line 390 there.  I'll just give you a

22   moment to take a look.

23      A  I've read down to line 396.  Do you want

24   me to keep going?

25      Q  Yeah.  If you could just go down to

1  line 404?

2      A  Sure.

3          Okay.

4      Q  Okay.  So, this essentially contains a

5  list of cross references to other Florida law for

6  the list of the underlying felonies; is that

7  correct?

8      A  It does.

9      Q  And do you have any memory of what -- in

10  general, what felonies are included here?

11      A  Do I have any memory of it?  I don't

12  independently have a memory, but looking at it, I

13  do recognize several.

14      Q  Okay.  And which ones do you recognize?

15      A  Chapter 817 is generally fraud.

16      Q  Okay.

17      A  Chapter 831, if I'm recalling correctly,

18  is going to include things like forgery and

19  uttering forged instruments.  I believe -- 825,

20  I'd be guessing.  I'd have to go look at them.

21      Q  Okay.  And so I agree that this is a list

22  of largely of fraud statutes.  It also, you

23  probably know, includes murder and sexual offense

24  felonies.

25          Do you know why the list of felonies here

1  was included in this law?

2          MS. MORSE:  Objection to form.

3      A  I do not.

4      Q  Okay.  Do you know whether people who

5  commit the crimes, the underlying felonies listed

6  here are more likely to engage in election related

7  crimes?

8          MS. MORSE:  Objection to form.

9      A  I don't have any expertise in behavior or

10  anything like that, and I have not read any

11  studies, so I do not.

12     Q  Okay.  So, let's move on to -- I want to

13  get your sense of what this -- what activities

14  this provision prevents.  So, let's say that if

15  someone who's committed one of these underlying

16  felonies listed here drives a car and that car

17  includes the completed stack of voter registration

18  applications in the back, does that violate the

19  felony volunteer restriction?

20         MS. MORSE:  Objection to form.

21     A  You know, I can't really say without

22  having the entire case file and the consideration

23  of everything.  I can't make these decisions just

24  categorically like that.

25     Q  Yeah.  I understand that.  So, my concern

1    here is that the Attorney General's office has --

2    part of the focus of this litigation is, I guess,

3    the scope of this provision and some of the other

4    ones that we've talked about or that we will talk

5    about.  And it's hard to get a sense of what -- at

6    least the plaintiffs argue that it's difficult to

7    get a sense of what is prohibited here.

8           The topics listed here involve talking

9    about the definition of collecting or handling,

10   which is at the center, of course, of this

11   provision.  Okay.  So -- and the State has

12   represented in this litigation that this provision

13   only involves people who have a physical custody

14   of forms.

15          Are you aware of that representation made

16   by the State?

17          MS. MORSE:  Objection to form.  And can

18   you tell him what portion of the State you're

19   referring to, please?

20      Q  So, the Secretary of State and Attorney

21   General's office, who are both defendants in this

22   case and have filed joint briefs making arguments.

23   So when I say the State, I'm including both the

24   Attorney General's office and the Secretary of

25   State.

1      A  And so the question was, am I aware of?

2      Q  So, the question I asked before Ms. Morse

3   interjected is:  Are you aware of those

4   representations made in this case?

5      A  No, sir.

6      Q  Okay.

7      A  I'm aware of the appeals, the adoptions

8   that were made, whatever else, but no, I'm not

9   aware of that, no, sir.

10     Q  Okay.  Is it your understanding that this

11  provision prevents someone who's convicted of the

12  underlying felonies from exercising any physical

13  custody over completed voter registration forms?

14        MS. MORSE:  Objection to form.

15     A  All I can really say is I'm aware of what

16  the black and white of the statute says as to

17  this.  That's what I'm aware of.  I mean, that's

18  what it -- in the criminal side of this, that is

19  what I would rely on in addition to the knowledge

20  of the overall case.

21     Q  Okay.  So, let's try one more example

22  here, you know, understanding your previous

23  answer.

24        If there is a voter registration drive

25  happening at a parade, and a 3PVRO sends several

1   volunteers and there's five volunteers that are

2   physically walking around talking to people,

3   asking them to complete forms and then collecting

4   those forms, and then there's a supervisor working

5   for the 3PVRO who doesn't touch any of the forms,

6   but simply, you know, ensures that people are

7   doing their jobs and answers questions, perhaps

8   talks to applicants to encourage them to vote.  If

9   that person's been convicted of one of the

10  underlying felonies, are they violating the felony

11  volunteer restriction here?

12      MS. MORSE:  Objection to form.  Objection

13  to form.

14      You can answer.

15    A  I just couldn't make a decision on that

16  just based on what we're talking about here.

17  Again, it would take a review all of the facts,

18  all of the investigation, and then application of

19  this statute to the facts.  And it's -- you know,

20  these things have to be looked at case by case.  I

21  just can't make a generic call on something like

22  that.

23    Q  Yeah.  Given that difficulty, do you think

24  that 3PRVOs can easily navigate what is prevented

25  by the felony volunteer restriction?

1       MS. MORSE:  Objection to form.

2       A  First off, let me say I'm appearing as an

3   agency rep, so what I think -- but I don't know

4   the answer to that because I don't work for, with

5   the 3PRVOs or anything like that.  I would really

6   be speculating.

7       Q  Okay.  So, you've seen this list of

8   underlying felonies here.  If someone has been

9   convicted of a felony in a different state that's

10  analogous to one of the felonies listed here, is

11  that person also prohibited by the felony

12  volunteer restriction?

13      A  I don't know the answer to that yet under

14  this statute because I haven't dealt with it.  So

15  I don't know the answer to that as it applies to

16  this statute.

17      Q  Okay.  I'm going to pull this off the

18  screen for a moment, and I'm going to share

19  Exhibit 12 for the court reporter.

20          (COX Deposition Exhibit 12 marked for

21  identification and attached to the transcript.)

22      Q  Can you see that on the screen?

23      A  Yeah.  And I don't have that in front of

24  me, so I'll need the screen.

25      Q  Okay.  So this is the Secretary of State's

1   response and opposition to the motion for

2   preliminary injunction in this case; is that

3   correct?

4       A   That's what it says, yes, sir.

5       Q   Okay.  So, I'm going to go to page 21 of

6   this document.  And I'm going to ask you to take a

7   look at footnote 7, which starts at page 21 and

8   scrolls down to 22.

9           So, can you see footnote 7 here?

10      A   Okay.

11      Q   Okay.  And then I'll give you a minute to

12  take a look.

13      A   Gotcha.

14      Q   Okay.  Thanks for doing that.  So, I'm

15  going to highlight the part that I'm going to ask

16  here, which says:  Regardless, the secretary reads

17  the statutory prohibition to apply to any person

18  who has been convicted of any similar felony

19  offense committed in another jurisdiction,

20  including any federal or out of state conviction

21  which would be an offense listed in the statute if

22  it had been committed in violation of the laws of

23  this state.

24          Is that correct?  Did I read that

25  correctly?

1        A  That's what it says, yes, sir.

2        Q  Okay.  And so is it your understanding

3  there that the State has argued that this would

4  include analogous out of state convictions?

5        A  It says that the secretary reads that.

6  That's -- yes, sir, that's what it says.

7        Q  Okay.  Great.  Now, I want to move on to

8  another document here that's Exhibit 13.

9          (COX Deposition Exhibit 13 marked for

10  identification and attached to the transcript.)

11       Q  Can you see that on the screen?

12       A  Yes, sir.

13       Q  Do you know what this document is?

14       A  Can you scroll down?  Is it just the one

15  page?

16       Q  Just this page, yeah.

17       A  I do not believe I've seen that, but it --

18       Q  Okay.

19       A  I believe I get an idea of what it does.

20       Q  Sure.  And I'll just say for the record,

21  at the top, this document says, non-felon

22  declaration and this is form DSDE127, which is

23  available on the Secretary of State's website.

24          So, this is a declaration that someone

25  needs to sign before working for a 3PVRO, stating

1  that they have not been convicted of a felony

2  violation of the election code, and this includes

3  a list of the underlying felonies that are part of

4  the felony volunteer restriction that you looked

5  at a moment ago; is that correct?

6         MS. MORSE:  Objection to form.

7      A  It appears to be.  I'd have to go back and

8  cross reference it because they included all of

9  them.

10     Q  Yeah.  I'm not trying to -- it's not a

11 gotcha.  I'm not asking --

12     A  Okay.  It appears to be that, yes, sir.

13     Q  Okay.  Do you see anywhere on here where

14 it makes reference to a conviction from out of

15 state or a federal conviction that's analogous to

16 one of the underlying felonies?

17     A  Not specified in this document, no, sir.

18 It makes reference to these chapters in 98.0751,

19 but I don't see anything in here that references

20 that in particular, no, sir.

21     Q  Okay.  So, if someone signs this

22 declaration before they worked as a 3PVRO and they

23 truthfully sign it because they haven't been

24 convicted of any of the felonies listed on here,

25 but they have been convicted of an analogous out

1    of state felony, they can be prosecuted for

2    violating the felony volunteer restriction under

3    the secretary's reading; is that correct?

4         MS. MORSE:  Objection to form; calls for

5    speculation.

6         A   Under the secretary's reading?

7         Q   Under the reading that we just looked at

8    in that brief that said that the felony volunteer

9    restriction includes out of state felonies?

10        A   That was the argument that was made in

11   what you read to me.

12        Q   Okay.  Do you understand as the head of

13   OSP, which prosecutes cases involving this --

14        A   We don't.  We haven't yet.

15        Q   Okay.  If a case like this came to you,

16   would you be able to prosecute someone for

17   engaging in 3PVRO volunteer work having been

18   convicted of one of those out of state analogous

19   felonies?

20        A   Again, I don't know the answer to that, we

21   haven't been presented with that yet.

22        Q   Okay.  Do you know if the State, if your

23   office, or anyone in the State has any process for

24   informing 3PRVOs what out of state felonies would

25   count and be barred by this restriction?

1    A   I'm unaware of anything like that with the

2   OAG.

3    Q   Okay.

4    A   Within the Department of Legal Affairs.

5    Q   Okay.  Thanks.  And is the -- do you know

6   if the felony volunteer restriction is a strict

7   liability statute?

8    A   I would have to take a look real quick at

9   the statute.  Can I do that?

10   Q   Okay.  Sure.

11   A   Maybe you can help me here real quick for

12  time purposes.  I'm trying to find the section of

13  970575 that speaks to that in particular.

14   Q   So, I'm not aware of that.  And so I'm not

15  -- if you don't know from reading it, I'm not, you

16  know, asking to go to different parts of the

17  statute.  It's fine if you're not aware.  My -- I

18  would say --

19   A   I would -- to answer your question, I

20  would look to the statute to make the

21  determination whether or not it's a specific

22  intent crime or not.

23   Q   Okay.  Great.  Okay.  So, I think it's a

24  good time to take a break.  I would ask if you or

25  others would prefer just to take five or

1  10 minutes or take a little bit longer to allow

2  you to get something to eat.

3      A  Completely up to ya'll.

4      MR. FERGUSON:  Does anyone else have a

5  preference?

6      Okay.  Shall we say -- so, it's 11:48 on

7  my clock.  Shall we just do a quick one?  We can

8  be back on the record at 11:55 a.m.

9      THE WITNESS:  Can we make it noon?

10      MR. FERGUSON:  Sure.  All right.  See you

11  at 12:00.

12      (Off the record from 11:49 a.m. to

13  12:00 p.m.)

14  BY MR. FERGUSON:

15      Q  Okay.  Mr. Cox, I want to move on to a

16  different challenge provision in the law.  This

17  has been called the voter information restriction

18  or information retention ban, and that's at

19  97.05757.

20      Are you familiar with that provision or

21  would you like to take a look at it?

22      A  I'm familiar with it based on my

23  preparation.

24      Q  Great.  Are you aware of any instances in

25  which a 3PVRO volunteer was prosecuted or

1   investigated for taking information from someone's

2   voter registration application to engage in

3   misconduct?

4       A  I'm probably mincing words here.  The

5   answer is going to be for the -- for the Office of

6   Statewide Prosecution, no, beyond the fact that

7   obviously, with some of those original cases where

8   they took an application that was fraudulent and

9   turned it in, you could make an argument.  But no

10  -- what you're getting to, the answer is no.

11      Q  Okay.  I just want to clarify that

12  reference.

13      A  I'm just trying to be careful, make sure I

14  follow your wording right.

15      Q  Yeah, no problem.  Which cases do you

16  mean?  Do you mean about the list of 20 we talked

17  about with the sexual offenses and murder?

18      A  Yeah.  Yeah.  I mean, arguably the way you

19  worded it those could apply, but you're speaking

20  about towards the misuse of information for

21  fraudulent purposes, otherwise, anything like

22  that.  No, sir.

23      Q  And just to be clear, in those cases that

24  we talked about earlier, you're not aware of the

25  involvement of a 3PVRO, you're just saying if one

1  of those people were registered by a 3PVRO, that

2  would create the problem; right?

3      A  I guess it could, yes.

4      Q  Okay.

5      A  I'm not aware of any of those cases being

6  pursued along the lines of the violation, for this

7  in particular; no, sir.

8      Q  Okay.  So I want to talk a bit about the

9  scope of this provision.  And you said you're

10 familiar with it, but I just want to be clear.

11 This -- you're aware that this provision prevents

12 volunteers from retaining, quote, personal

13 information, unquote, in certain circumstances; is

14 that right?

15     A  According to the statute, yes, sir.

16     Q  Okay.  So I'm going to pull up again the

17 State's brief here, which is Exhibit 12.  Let's

18 see.

19         Okay.  So we're on page 28 of the

20 preliminary injunction brief, Exhibit 12, that we

21 looked at previously.

22         Can you see that on your screen?

23     A  Yes, sir.

24     Q  Okay.  Do you see the highlighted sentence

25 in the middle that starts with:  Keeping convicted

1    felons from handling?

2        A  Yes, sir.

3        Q  Okay.  I'll read it for the record while

4    you take a look.  So, this sentence is:  Keeping

5    convicted felons from handling personal voter

6    information on completed voter registration forms

7    information such as home addresses, driver's

8    license numbers, and the last four digits of

9    Social Security number furthers these interests.

10         Does that align with your understanding of

11   what personal information means?

12         MS. MORSE:  Objection to form.  I'm going

13   to ask you to allow him to read that in full

14   context to the extent he needs to.

15         MR. FERGUSON:  Sure.

16         MS. MORSE:  If you want to see the

17   beginning of that, let us know, Mr. Cox.

18       A  I'm wondering, because that sentence ends

19   with furthers these interests, and I don't know

20   what that's talking about.

21       Q  Sure.  Let's scroll up.  And I'm happy to

22   look wherever you want.  If you look at page 27,

23   the last paragraph, it says:  In this instance,

24   the State has a compelling interest in maintaining

25   an orderly election administration.

1         MS. MORSE:  Is the top of that the --

2     what's the heading of the top of that?

3         MR. FERGUSON:  This section?

4         MS. MORSE:  Yeah.

5         MR. FERGUSON:  I don't know exactly.

6     That's where -- for the record, we scrolled to

7     page 23 that has subheading three on it.

8         Q  And I'll go back down to wherever you'd

9     like.

10        A  And I'm -- Brent -- I'm sorry,

11    Mr. Ferguson, I'm --

12        Q  You can call me Brent.  No problem.

13        A  Okay.  This is the exhibit that was

14    drafted -- this is the brief by the Secretary of

15    State?

16        Q  Yes.  And it has been joined by the

17    Attorney General's office, to my understanding.

18        A  I understand.  And your question is:  Does

19    that give me a better -- a definition of personal

20    information?

21        Q  Well, my question is does this align with

22    your understanding of what personal information

23    means in the provision that we are talking about?

24        MS. MORSE:  Objection to form.

25        A  I haven't had one of these before.  And my

1    -- the only way I can answer that is this:  My

2    understanding of what personal voter information

3    is will come from the reading of the statute.

4         Q  Okay.  And so let's --

5         A  It's hard to comment on this is what I'm

6    saying.  I would be looking to the statute.

7         Q  Yeah.

8         A  Our office would.

9         Q  That's fair.  And I'll pull it up just in

10   case we need to look at it.

11        A  I've also got -- just so you know what I

12   got in front of me, I got the statute in front of

13   me still.  Sub 7 is what I'm looking at.

14        Q  Great.  And so I've also pulled that up on

15   the screen for everyone to look at here.

16            Understanding that, you know, you, of

17   course, want to interpret based on the statute

18   rather than the brief, can you tell me your

19   understanding of what personal information means?

20            MS. MORSE:  Objection to form.

21        A  Do you want me to read the statute or --

22   because that's what I'm looking to, and that's

23   what I would look to.

24        Q  Yeah.  The purpose behind this question,

25   of course, is to clarify what 3PVROs and

1    volunteers are prevented from doing.  And so

2    you're welcome to read the statute.  I don't think

3    we need to read it out loud for the record, but

4    you would agree, correct, that in this statute,

5    personal information, there are some examples

6    listed, but I'm asking for your understanding of

7    what kinds of information are included in that

8    term personal information.

9              Sorry, go ahead.

10             MS. MORSE:  You can complete your

11   question.  I was just trying to get an objection

12   before -- sorry, if I cut off the question.

13             MR. FERGUSON:  I can target it more.

14       Q  Do you understand personal information to

15   include home address, as we saw in the brief a

16   moment ago?

17       A  As we saw what?

18             MS. MORSE:  Objection.

19       Q  When we just reviewed the brief, the

20   highlighted portion of personal information?

21             MS. MORSE:  Objection to form.

22       A  I apologize if I missed home address in

23   the brief, but pursuant -- I'm sorry, if I missed

24   that.  I didn't notice that or take note of it.

25   Home address is not listed as one of the examples

1    in subsection seven, though.

2        Q   Okay.  I'm pulling up that portion of the

3    brief just for clarity.

4        A   Home addresses, driver's license numbers,

5    last four digits of the Social Security number --

6    okay.  I'm sorry.  I see it.  Okay.

7        Q   No problem.  So, do you understand

8    personal information to include home address?

9            MS. MORSE:  Objection to form to the

10   extent you're asking about different provisions of

11   the law.

12       A   It is not specifically listed in the

13   statute.  The statute uses the same language,

14   though, as this sentence that's highlighted says,

15   because it says such as, though the examples given

16   in the statute are not exclusive.  So, it leaves

17   -- it appears as though it leaves discretion --

18   discretion, is that the right word -- of what

19   would be a -- what would be something that would

20   be violative under the statute?

21           Did you understand what I just said?

22       Q   Yeah, I do.  So, let me make sure I'm

23   understanding.  So, the statute provides a list,

24   but it could also include something like home

25   address?

1      A  Based on the use -- I'm sorry, you were

2  done?

3      Q  Yeah.

4         MS. MORSE:  Objection.

5      A  Based on the -- I'm sorry, go ahead,

6  Stephanie.

7         MS. MORSE:  Objection to form.

8      A  And for me reading this, based on the use

9  of the word such as in subsection seven, yes.

10     Q  Yes, it could include home address?

11     A  Maybe it could, I don't know.  But this --

12  the list I have here is not exclusive.

13     Q  Okay.

14     A  So that's why I'm answering that question

15  is, you know, I don't think the secretary's

16  necessarily made a wrong statement, no.

17     Q  Okay.  Thank you.  So, I'll move on and

18  I'll take the brief off the screen.  So, I just

19  very quickly on this same provision before we move

20  on.  And I'll pull this up as well.

21        So, do you see, you're looking at the same

22  provision we've been talking about, the voter

23  information restriction.  Do you see the portion

24  on starting on line 513 where it says:  In

25  compliance with this section?

1        A  I'm going to look at the statute real

2    quick, I'm sorry.

3        Q  Yeah, go ahead.

4        A  Wait a minute.  Okay.  Yes, I do see the

5    in compliance with.

6        Q  Don't worry, I'm not going to pull the

7    brief up again, but do you have a -- do you have

8    an understanding of what that phrase, in

9    compliance with this section means?

10           MS. MORSE:  Objection to form.

11           You can go ahead.

12       A  Okay.  Haven't dealt with it.  Haven't

13   addressed it.  Haven't dealt with it.  Don't have

14   any definition specifically other than the plain

15   wording itself.

16       Q  Okay.  Great.

17       A  As I sit here now.

18       Q  So -- and this provision applies to

19   volunteers.  So, just seeing if you -- one more

20   question to see if you have an understanding.

21           If a 3PVRO volunteer collects the voter

22   registration application and provides that to

23   their supervisors at the 3PVRO, who turn the form

24   into the State, but then retain the applicant's

25   name and contact information like their phone

1    number to -- so they can remind them to register

2    to vote, does that violate this provision?

3         MS. MORSE:  Objection to form.  Calls for

4    speculation.

5         A  I can't tell you that based on just those

6    facts.  I would need the whole case,

7    investigation, know about everything.

8         Q  Okay.  Let's move on to a different

9    section of the law called -- again, that's been

10   called delivery penalties or the fines provision.

11   Just to clarify, we're talking about 97.05755A.

12        Should I go into some more detail or do

13   you know what I mean?

14        MS. MORSE:  Are you scrolling to it?

15        Q  Yeah.  So, it's up here starting at page

16   442.  This one is fairly long.  It just has a few

17   alterations, but I don't think we need to look at

18   the whole thing.  I'm just asking if you -- if

19   you're aware of this one?

20        A  Familiar with it, yes.

21        Q  Okay.

22        A  I've reviewed it.

23        Q  Okay.  And I think we mentioned this

24   earlier, but you're aware that it changes the

25   application deadline from 14 days to 10 days?

1      A   I'm aware that it makes it 10 days, I

2   can't say that I was previously aware that it was

3   14 days; but it says 10 days, yes.

4      Q   Yeah.  No problem.  And I think you've

5   said this before, but I just want to double check.

6          You haven't encountered any prosecutions

7   or investigations relating to either a 10-day or a

8   14-day deadline for turning in an application; is

9   that correct?

10         MS. MORSE:  Object to form.  Brent, I'm

11  going to object, and to the extent it appears

12  you're asking him about a provision that doesn't

13  carry a criminal penalty, and Mr. Cox deals with

14  the criminal violations of the law, I think it's

15  outside the scope of his topics.

16     Q   Okay.  So, I'll -- I understand that he is

17  mainly answering based on criminal provisions, and

18  I think we've given some leeway there.  I'll also

19  say that this limitation to criminal is something

20  that was never discussed beforehand, and was not

21  -- we were informed of that basically today, and

22  in yesterday's deposition --

23         MS. MORSE:  That's not true.  That's

24  absolutely not true.  I sent an email about it.

25         MR. FERGUSON:  Okay.  Well, my

1    understanding is the deposition topics, which are

2    listed and that we discussed at the beginning of

3    this deposition, are what controls here.  And if

4    we're going to go through each topic and say that

5    Mr. Cox is unable to talk about any civil

6    provisions, then obviously we'll need someone from

7    your office who can.  I think you'll agree that

8    yesterday Ms. Guzzo was very limited to, I think,

9    five or six topics, and certainly didn't talk

10    about civil enforcement of many of these

11    provisions; is that correct?

12         MS. MORSE:  No, that's not correct.  You

13    did question her extensively.  In fact, I think I

14    objected to the breadth of your questioning of

15    Ms. Guzzo.  I'm happy to talk offline or if you

16    want to meet about this or take a break or

17    something, I'm happy to talk about it but I did

18    disclose and make that clear in the email chains

19    prior to Ms. Guzzo's deposition.

20         MR. FERGUSON:  Okay.  So yeah, I don't

21    think we need to cause any further delay here.

22    But we can perhaps talk about it separately.

23    Assuming you're not directing the witness not to

24    answer these questions; is that correct?

25         MS. MORSE:  You know, not yet, but I'm

1    just -- you know, as a reminder, in terms of

2    topics that are beyond the scope of what he's

3    disclosed to address, the utility of it, you know,

4    I'm questioning it, and I'll direct the witness as

5    needed.

6        Q   Okay.  So let's -- Mr. Cox, if you're

7    ready to continue, I just wanted to clarify the

8    last question.  And I apologize, I don't remember

9    if you answered it, but basically you are not

10   aware of -- you're not aware of situations

11   involving lack of timeliness where this 14-day --

12   previously 14-day and now 10-day deadline hasn't

13   been met?

14       A   I don't know anything about it, because

15   what ya'll were talking about is true, I

16   understood I was here to speak criminally.  And

17   that defining provisions would not impact the

18   criminal aspects of the Department of Legal

19   Affairs, and I would have to rely on somebody

20   else, and I didn't do that because I thought I was

21   here criminally.

22       Q   Understood.  So, are you aware of problems

23   it would create -- let me withdraw that.

24           And I'm going to do my best to tailor this

25   to what you can answer.

1     A  Okay.

2     Q  So, I'll represent to you that in the OECS

3  report that we looked at, and I think you probably

4  saw, there were references to untimeliness of the

5  3PVRO applications.  And I'm happy to pull that up

6  if you'd like, although I don't think it's really

7  --

8     A  I remember there were references.

9     Q  Okay.  So have you, in your experience in

10  your office prosecuting election law related

11  cases, seen any connection between criminal

12  misconduct and timeliness of applications?

13     A  May I ask a question for clarification?

14     Q  Of course.

15     A  When you say connections between the two,

16  do you mean that -- how can I word this -- that

17  the timeliness issue is a part of or contributes

18  to the crime?

19     Q  Yeah.  That's what I'm getting at.

20     A  Not that I'm aware of, no, sir.

21     Q  Okay.  Okay.  Under this provision, and

22  I'm looking now at 5A1, which starts on line 456,

23  would you mind just taking a look at that?

24     A  The one that starts, in the amount of $50?

25     Q  Yes.

1      A  I've read that before.  Yes, sir, I've

2   read it.

3      Q  Okay.  Do you see, starting on line 462,

4   that a fine in the amount of $2,500 for each

5   application received, if the 3PVRO acted willfully

6   -- and acted willfully is down on the next page,

7   465?

8      A  On this exhibit, yes, I see that.  Yes.

9      Q  Okay.  Do you have an understanding of

10  what it means to act willfully in that context?

11     A  That's a civil fine so I'm going to have

12  to say no.

13     Q  Okay.  So, understanding that, I'm just

14  going to ask if you're able to clarify.

15         If a 3PVRO takes an application and takes

16  it to their office to do quality control, follows

17  up with the applicant to try to complete some

18  missing information, and then sends the

19  application to the state one day after the

20  deadline, knowing that they did that, would that

21  be acting willfully?

22         MS. MORSE:  Objection to form; asked and

23  answered.

24     A  Same answer I gave, which is that that's a

25  civil -- that's a civil application of the word

1    willfully.  I don't know if it has the same

2    application as I would use criminally.

3        Q  Okay.  And let's move on to the -- what's

4    been called the citizenship provision or the

5    noncitizen volunteer restriction, which is

6    97.05751E.

7        Are you familiar with that one?

8        A  Yes, sir, I am.

9        Q  Okay.  I'm going to scroll up to it on the

10   screen just so we have it in front of us.

11       How many of your office's prosecutions for

12   election related misconduct involve noncitizens?

13       A  Generally?

14       Q  Yes.

15       A  Generally, I'm going to have to make a

16   guess.  Just a couple, two, three, four, maybe.

17   I'm guessing.  Not a great number of them.

18       Q  Okay.

19       A  And that's generally speaking.

20       Q  Sure.  And you mean generally within

21   election law; right?

22       A  Correct.

23       Q  Okay.  And so that sounds like a small

24   number of cases.  Do those involve -- do all of

25   those involve illegal voting, meaning a non-U.S.

1  citizen who has voted when they're not legally

2  allowed to vote?

3      A  To my knowledge, yes, sir.

4      Q  So you're not aware of any prosecutions

5  involving a non-US citizen who has worked for a

6  3PVRO?

7      A  As to us, no, sir, I'm not aware.

8      Q  Okay.  And so I'm going to ask a couple

9  questions to clarify my understanding of the

10  statute with the understanding that we -- we've

11  gone through this before with a felony volunteer

12  restriction.  I guess my first question is:

13  You're aware that this provision prevents non-U.S.

14  citizens from collecting or handling applications

15  on behalf of a 3PVRO?

16      A  Yes, sir.

17      Q  Okay.  And I'm going to ask the same

18  question I asked before with the felony volunteer

19  restriction.  If someone who is a 3PVRO volunteer

20  is supervising other volunteers and not physically

21  collecting forms, is that -- if that person is a

22  non-U.S. citizen, are they violating the non-U.S.

23  citizen provision?

24      A  I haven't dealt with that or been

25  presented with that question, so I don't know the

1    answer to that.

2        Q  In your view, is that person -- again, the

3    same example I'm talking about, someone who is

4    supervising but not handling the applications, is

5    that person participating in the political

6    process?

7            MS. MORSE:  Objection to form.

8        A  I'm going to have the same answer.

9        Q  Okay.  And are you aware that the State

10   refers to 3PVRO volunteers as fiduciaries?

11       A  Am I familiar that the State -- am I

12   familiar with that?  I'm going to have to say no,

13   I'm not familiar with that.

14       Q  Okay.

15       A  Not surprising, but I'm not familiar.

16           MS. MORSE:  You can show him the statute.

17       Q  I don't know that it's in the statute.

18   It's in -- it's on the State's website and some of

19   the briefing.  Unless you really want to see it, I

20   don't know that it's necessary right now.  I'm

21   going to pull up one more document, which is

22   marked as Exhibit 15.

23           (COX Deposition Exhibit 15 marked for

24   identification and attached to the transcript.)

25       A  Can you see that on the screen?

1      Q  Yes, sir.

2      A  Okay.

3      Q  Okay.  And can you give me a description

4  of what this document is?

5      A  You want me to read it over real quick?

6      Q  Of course.

7      A  I mean, I see that it's an email chain,

8  traffic, whatever you want to call it, between, it

9  looks like just -- let me see it -- Antonacci and

10  myself, I see some members of FDLE there as well.

11      Q  Yeah.  Take a minute to look at it.

12          MS. MORSE:  Can you put that in the chat,

13  please?

14          MR. FERGUSON:  Yes.

15          Did that come up for you, Ms. Morse?

16          MS. MORSE:  Yes.

17          MR. FERGUSON:  Okay.  I can't see the chat

18  when I have my screen shared.

19          MS. MORSE:  Okay.  Thank you.

20      A  Okay.  I read it.

21      Q  Okay.  Excellent.  And this is an email

22  chain involving you and Mr. Antonacci; is that

23  correct?

24      A  And the Florida Department of Law

25  Enforcement.

1      Q   Right.  Can you tell me who Mr. Antonacci

2   was?

3      A   As it relates to this, he was the -- I

4   think I'm going to use the right terminology, but

5   he was the director of the OECS.

6      Q   Okay.

7      A   At the Department of State.

8      Q   And he investigated potential instances of

9   election misconduct involving noncitizens; is that

10  correct?

11     A   The best of my knowledge, he or his staff

12  in OECS did, yes.

13     Q   Okay.  And you -- did you frequently

14  receive communications with him involving a list

15  of noncitizens who are suspected of creating --

16  sorry, not creating -- who are suspected of

17  committing election-related crimes?

18         MS. MORSE:  Objection to form.

19     A   I don't recall if technically speaking I

20  was listed as a CC or in the "to" section, but I

21  remember emails like that, and those would have

22  been directed, as I recall, to the Florida

23  Department of Law Enforcement, and I was on the

24  emails copied as well.

25     Q   Sure.  Right.  So, my question is, I

1   guess, it's not geared toward whether it was going

2   directly to you or not or if you were just CCed,

3   but simply whether he, on a regular basis,

4   investigated and then provided lists of

5   noncitizens who are being investigated for

6   election-related crimes?

7        MS. MORSE:  Objection to form; compound.

8     A   Again, it was either he or his staff that

9   would have engaged in some inquiries, and I say

10  inquiries because I don't know how deep their part

11  of the quote/unquote investigation would have

12  been, because in turning it over to FDLE that

13  would have been for purposes of FDLE to follow up

14  on and investigate.

15    Q   Okay.

16    A   And then I was copied on them.  I hope I

17  answered your question, Brent.  I don't know if I

18  did.

19    Q   Yeah, you did.  And I wasn't trying to get

20  at the depth of his investigation either.  My

21  question is just:  So, are you aware if he ever

22  identified noncitizens working for 3PRVOs who had

23  committed voter registration violations?

24    A   I am not -- wait a minute -- noncitizens

25  working for 3PRVOs, so the employees are the

1    agents.  I am not aware if he did or not.

2        Q  Okay.  Thank you.  So, the last -- I

3    promise we're pretty close --

4        A  Oh, no, don't worry about it.  If you

5    don't mind, I may eat a French fry every now and

6    then.

7        Q  I'm getting pretty close to the end.  I'm

8    going to hand it off to a counsel for other

9    plaintiffs, but I want to just go to the final

10   requirement here that's challenged in our case, at

11   least, it's called the reregistration requirement.

12   That is in 97.05751D and 2.

13        Are you familiar with that one?

14       A  I read it, yes, sir.

15       Q  Okay.  Have you ever dealt with the

16   requirement that 3PVROs register with the State?

17       A  Have I ever dealt with it?  I think that

18   in the sense you're asking whether or not that

19   we've investigated or assisted in an investigation

20   or prosecuted or anything like that; no, sir.

21       Q  Okay.  And do you know if the Attorney

22   General's Office has ever investigated or fined a

23   3PVRO for failing to update its registration

24   materials?

25       A  I am not aware.  That would probably be

1    more on the civil side than criminal.  But I'm not

2    aware of that, no, sir.

3        Q  Sure.  Do you know how requiring a 3PVRO

4    to register every two years would prevent election

5    related misconduct?

6        A  I was not involved --

7            MS. MORSE:  Objection.

8            THE WITNESS:  I'm sorry.

9            MS. MORSE:  Objection to form.  And

10   objection to the line of questions to the civil

11   matters.

12           If you know, you can answer.

13       A  I was not involved in the drafting or the

14   coming up with this provision at all, so I have

15   not really given thought to it.  We haven't

16   handled anything like this criminally.  Not that

17   you could.  I don't think you could.

18       Q  Sure.  And then, to your knowledge, would

19   canceling all 3PVRO registrations of every two

20   years, would that in any way assist the Attorney

21   General's office in enforcing election law?

22           MS. MORSE:  Objection to form.

23       A  Criminally speaking, again, I haven't

24   given any thought to that, and so I haven't dealt

25   with it, so I really I don't know.  I don't have

1    an answer to that.

2        Q  Okay.  Those are all of my questions.  I

3    really appreciate your time this morning.  Thanks

4    for doing this.  I'm going to pass it off.  I

5    believe the next attorney asking questions is

6    Ms. Keenan.

7            MS. KEENAN:  Hi there.

8            THE WITNESS:  Hi there.

9            MS. KEENAN:  Can you hear me?

10           THE WITNESS:  I can hear you, I'm not

11   going to ask you if you can hear me because

12   everyone -- I could probably without the mike and

13   you'd hear me.

14           Court reporters love me, Paul.

15           MS. KEENAN:  My name is Megan Keenan.  I'm

16   the staff attorney with the ACLU, and I'm here

17   representing the Hispanic Federation plaintiffs in

18   this case.

19           MS. KEENAN:  Ms. Morse, let me know what

20   you're thinking, but this seems like a good a time

21   as any for a lunch break, if you want to take

22   30 minutes now before I start into any of my

23   questions.  Does that work for folks?

24           MS. MORSE:  Sure.

25           MS. KEENAN:  Okay.  I could go to 1:00

1    p.m. but if you want the full half hour we could

2    go to 1:10 p.m.?

3        MS. MORSE:  I'd like to go to 1:10 p.m.

4        (Off the record from 12:38 p.m. to

5    1:10 p.m.)

6        EXAMINATION BY COUNSEL FOR PLAINTIFFS

7    BY MS. KEENAN:

8      Q  So, I think I introduced myself right

9    before the break, so I'll just get right into some

10   of the questions here.  I'm going to start with

11   some questions about the rog responses that OAG

12   submitted to the Hispanic Federation plaintiffs.

13   So I'm going to share on my screen what's been

14   premarked as Exhibit 17.

15       (COX Deposition Exhibit 17 marked for

16   identification and attached to the transcript.)

17     Q  Are you able to see that?

18     A  Yes, ma'am.

19     Q  All right.  And you can see Hispanic

20   Federation in the caption here?

21     A  Yes, ma'am.

22     Q  Okay.  Is this one of the documents you

23   have in front of you?

24     A  I'm looking real quick.

25     Q  Sure.

1       A   No, I don't think so.  I have a -- no,

2   that's a complaint.  Excuse me.  Give me a minute.

3       Q   That's okay.  I'm happy to share it on

4   screen if that's easier.

5       A   Yeah, that's fine.  I'm not seeing it.

6   I'm sorry.  My bad.

7       Q   Just for the record, Exhibit 17 is the

8   Hispanic Federation's interrogatories served via

9   the Attorney General's office, and their responses

10  are contained here, starting on page two.  And you

11  can see it says on the screen:  Identify all

12  investigation and prosecutions since

13  January 1, 2013, where a person identified an

14  irregularity, lodged a complaint, or referred a

15  matter to you involving allegations of noncitizens

16  working, volunteering, or otherwise associated

17  with a 3PRVO committing or attempting to commit

18  identity theft or a fraud-related offense.

19          Do you see that?

20      A   Yes, ma'am.

21      Q   Okay.  There are a number of specific

22  things that the plaintiff asked OAG to identify,

23  but I want to scroll past those to the response.

24  You can see the response begins with a number of

25  objections that I've highlighted here; right?

1      A   Yes, ma'am.

2      Q   All right.  And so I want to start with

3   the word otherwise, which is the start of the

4   OAG's substantive response.  It says:  Otherwise,

5   information on reports and referrals to the OAG

6   may be gleaned by review of the January 2023

7   report published by the Secretary of State Office

8   of Election Crime and Security found at, and

9   there's a link provided.

10          Do you see that?

11      A   Yes, ma'am.

12      Q   Okay.  Now, that OECS report is the same

13   one Mr. Ferguson marked as Exhibit 5, which the

14   AG's office produced as OAG_000595.  I'm going to

15   pull that back up on my screen now just so we can

16   take a look at it.  And I'm at page 10 of the

17   document here, do you see that in front of you?

18   I'm sorry, I'm not at page 10 --

19      A   Yes, ma'am, I see it.

20      Q   No worries, I'll try to zoom in, too,

21   we're on the smaller page.

22          So, you can see here, this is a series of

23   alleged violations or irregularities that were

24   referenced in the rog responses we just looked at;

25   right?

1        A  Yes, ma'am.

2        Q  Okay.  But I believe you told us earlier

3   that you weren't sure how many of these entries

4   were actually referred to or addressed by OAG; is

5   that right?

6        A  I believe I did.

7        Q  Okay.  And I want to go down but before I

8   go down to page 68, you told us earlier that many

9   of the cases that OECS refers to FDLE didn't make

10  it to OAG; right?

11       A  I'm sorry, the cases that were referred to

12  FDLE what?

13       Q  Many of the cases that OECS refers to FDLE

14  never even make it to the Attorney General's

15  office; right?

16       A  Yes, that can happen.  Yes.

17       Q  Okay.  So, there are -- I'll represent

18  there are over 50 pages worth of entries like

19  this.  The vast majority of these may not have

20  made it to the Attorney General's office; is that

21  right?

22       A  I don't know if it's a majority --

23          MS. MORSE:  Objection to form.

24          You can answer.

25       A  I'm not sure if it's a majority or not,

1  but generally speaking, yes, your statement is

2  true, there's a lot that wouldn't have made it to

3  us.

4      Q  Okay.  I'm going to scroll down to

5  page 68.  Give me one second.

6          You can see that some of these entries on

7  page 68 here, if you look at column D where it

8  says, whether the alleged violation or

9  irregularity was referred to another agency for

10 further investigation or prosecution, and if so to

11 which agency; do you see that column?

12     A  I do.

13     Q  Okay.  And you can see there are some down

14 here that do say AG in that column; right?

15     A  Yes, ma'am.

16     Q  But I think you told Mr. Ferguson that

17 without reviewing each of the case files

18 associated with these, you weren't prepared to

19 speak to the facts of each case that are listed in

20 this column; is that right?

21     A  I am not comfortable doing it because I

22 don't know anything about them other than what's

23 written there.  Yes.  Yes.

24     Q  Okay.  That's fair.  And so as you're

25 sitting here today, you're not aware whether any

1    of the cases in this report involve noncitizens

2    working for 3PVROs; is that fair to say?

3        A  Could you say that one more time?  I'm not

4    aware --

5        Q  Of whether any of the cases in this report

6    involved noncitizens working for 3PVROs,

7    specifically?

8        A  Yes, I'm not aware of whether any of these

9    involved those.

10        Q  Okay.  I'm going to go back to

11    Exhibit 1 --

12        A  Is that what you're asking me?

13        Q  Yes, that's right.  Just making sure

14    you're not aware of any cases involving

15    noncitizens working for 3PVROs.

16        A  Okay.

17        Q  I'm going to go back to Exhibit 1 now.

18    And I want to talk about topic two.

19          Do you see that on the screen in front of

20    you?

21        A  Oh, this is on the -- yes, okay, I see it.

22        Q  Okay.  As I understand it, you've been

23    designated to discuss the first half of this

24    topic, which is the office's role in implementing

25    and/or enforcing SB7050.

1          Is that consistent with your

2      understanding?

3          A  My understanding is I'm addressed -- I

4      would be addressing the enforcing part.

5          Q  Okay.  And is your understanding that your

6      testimony here is limited to the criminal

7      enforcement part or that you're also speaking to

8      the civil enforcement on behalf of the Attorney

9      General's office?

10         A  I'm speaking primarily to criminal, I know

11     a minimal amount about the civil that I can speak

12     to, but I am here on behalf of the criminal.

13         MS. MORSE:  If you want to go off the

14     record, I can explain -- if you want to discuss

15     this, because he is prepared -- he does have some

16     civil information about -- to answer some of the

17     topics on civil, it's just that -- I guess our

18     interpretation of what you meant in those has been

19     different, but -- you know, I'm happy to speak

20     with you about it.

21         MS. KEENAN:  I think we can speak about it

22     off the record after the deposition.  I don't

23     think it'll affect any of the questions that he

24     can answer or not within his personal knowledge.

25     So I'm happy to speak more about how the deponents

1    were designated afterwards, if that's okay,

2    Ms. Morse.

3         MS. MORSE:  Okay.

4       Q  Okay.  So, I want to start with some

5    questions about this topic.

6         Are you able to say what, if any, role the

7    Attorney General's office had in implementing the

8    citizenship requirement contained in SB7050?

9       A  What role they had in implementing the --

10   no, ma'am.

11      Q  Okay.  To your knowledge, does the

12   Attorney General's office consult with the

13   Secretary of State's office determining how to

14   interpret any of the provisions that are

15   challenged in this case?

16      A  I apologize.  Do we -- does the Attorney

17   General's office consult with the Secretary of

18   State on?

19      Q  Determining how to interpret any of the

20   challenge provisions in this case.

21        MS. MORSE:  Objection to form.

22      A  In this case.  I'm going to have to speak

23   --

24      Q  I'm just -- just the provisions that are

25   being challenged in this case.

1      A   Right.  That's what I hear you saying.

2  That's why I wanted to make sure I was clear on.

3  And, again, on that one I'll have to speak from

4  the criminal perspective.  No --

5      Q  Okay.  From the civil perspective, you're

6  not aware?

7      A  -- I haven't had that question come up.

8      Q  Okay.  Sorry to cut you off.

9          From the civil perspective, you're not

10  aware?

11      A  I'm not aware, no, ma'am.

12      Q  What, if any, practices or trainings has

13  OAG implemented in response to the citizenship

14  requirement in SB7050?

15      A  I'm sorry, I heard you say -- did you say

16  practices or policies that we implemented?

17      Q  Practices or trainings is what I said.

18      A  Trainings --

19          MS. MORSE:  Objection to form; compound.

20      Q  I can break it up.  Let's just -- what, if

21  any, practices has OAG implemented in response to

22  the citizenship requirement in SB7050?

23      A  Criminally, haven't had one, haven't

24  developed anything.

25      Q  Okay.  And civilly, you're not sure?

1      A  Civil, I'm not sure.  I don't think

2  they've been presented with anything either,

3  though.

4      Q  Okay.  What about any -- I think your

5  policies -- what about any policies that OAG may

6  or may not have implemented in response to the

7  citizenship requirement?

8      A  Same answer.

9      Q  Okay.  And same answer with respect to

10  trainings?

11      A  Correct.  We haven't developed any

12  trainings on that either.  I haven't had any cases

13  or anything come this way.

14      Q  Okay.  I want to move on to enforcement.

15          Are you familiar with OAG's enforcement

16  authority under SB7050 as it relates to the

17  citizenship requirement, specifically?

18      A  As it relates to the citizenship

19  requirement specifically, no.

20      Q  Okay.  I think you talked a little bit

21  about this with Mr. Ferguson earlier, but are you

22  familiar with any forms that 3PVROs have to use to

23  affirm the citizenship requirement in this case?

24      A  To do what with the citizenship?  You

25  broke up a little bit, I'm sorry.

1      Q  To affirm the citizenship requirement is

2  being complied with.

3      A  Only what Mr. Ferguson showed me earlier.

4         (COX Deposition Exhibit 40 marked for

5  identification and attached to the transcript.)

6      Q  Okay.  I'm going to show you one

7  additional form that's similar in kind.  And this

8  is premarked as Exhibit 40, for the court

9  reporter's benefit.  I'm going to scroll down.

10  You can see that the top of this form is labeled

11  3PVRO registration form?

12     A  Yes, ma'am.

13     Q  Okay.  And here in Box 7, you can see a

14  box labeled affirmations; right?

15     A  Yes, ma'am.

16     Q  The second affirmation in that box says

17  that each person collecting or handling voter

18  registration applications on behalf of the 3PRVOs

19  is a U.S. citizen.

20        Did I read that correctly?

21     A  You did.

22     Q  Underneath that you can see the italicized

23  language that reads:  Under penalties of perjury,

24  I declare that I have read the foregoing, and that

25  the facts stated in it are true.

1        Did I read that correctly?

2     A  Yes, ma'am.

3     Q  I understand perjury to be punishable

4  criminally in Florida as well; is that right?

5     A  Yes, ma'am.

6     Q  And So am I right to understand that your

7  office can investigate and prosecute individuals

8  who violate these oaths?

9     A  If it occurs on a multi-circuit basis,

10 yes, I could.

11    Q  What does multi-circuit mean?

12    A  In order for the Office of Statewide

13 Prosecution to prosecute a case, there has to be

14 the subject matter jurisdiction and there has to

15 be multi-circuit impact.  You know, the reason I

16 said that is because oftentimes people will allege

17 that perjury occurred in one county where the

18 actual statement took place, and they will allege

19 that therefore it's a single circuit violation,

20 which would go to the State attorneys.

21    Q  I see.  And so the distinction is whether

22 it goes to OSP or to a state attorney; right?

23    A  That would be -- you broke up again.  But

24 if you said the question is whether it would go to

25 OSP or a State attorney, I would say yes.

1    Q   Yes.  Okay.  But by one of those two types

2    of offices, individuals could be prosecuted

3    criminally for violating these oaths; is that

4    right?

5    A   You're asking me about that statement.

6    Based on that statement it says that they could

7    be.  It depends on what the case gives me and what

8    I see, because there's a lot more to it than just

9    saying if you lied.  But based on that statement,

10   yes, ma'am.

11   Q   Okay.  Do you know if your office stores

12   these affirmation documents anywhere?

13   A   The Department of Legal Affairs?

14   Q   OAG in general.

15   A   Not to my knowledge.

16   Q   Okay.  I know you testified that you don't

17   work with the civil enforcement team, but you said

18   you're familiar with the operative statute,

19   97.0575; right?

20   A   Yes, ma'am.  I've read it.  I've gone

21   through it.

22   Q   And so you're aware that that statute

23   provides OAG with authority to bring a civil

24   action for any violation of 97.0575; right?

25   A   Let me find the plain reading.  I mean,

1    generally speaking --

2         Q   It's okay.  I can put it on the screen to

3    go through the language.

4         A   Generally speaking, yes.

5             (COX Deposition Exhibit 41 marked for

6    identification and attached to the transcript.)

7         Q   I'm showing the witness what's been

8    premarked as Exhibit 41.  You can see at the top

9    of this document, this is the enrolled copy of

10   SB7050; right?

11        A   Yes, ma'am.

12        Q   I'm going to go to page 13.  You can see

13   this is where 97.0575 begins; right?

14        A   Yes, ma'am.

15        Q   All right.  I'm going to scroll down to

16   subsection eight.  All right.  And I'm just going

17   to read -- I'm going to read the first two

18   sentences of this section which say:  If the

19   Secretary of State reasonably believes that a

20   person has committed a violation of this section,

21   the Secretary may refer the matter to the Attorney

22   General for enforcement.  The Attorney General may

23   institute a civil action for a violation of this

24   section or to prevent a violation of this section.

25            Do you see where it says that?

1      A  Yes, ma'am.

2      Q  Okay.  So, just under the plain text of

3  the statute, OAG may institute a civil action for

4  violations of this section if the Secretary of

5  State refers it to your office; right?

6      A  Yes, ma'am.  My struggle was civil versus

7  criminal, what you were referring to.  But yes,

8  ma'am, you're right.

9      Q  Okay.  And on to the best of your

10  knowledge, 97.0575 hasn't been enforced criminally

11  in your office yet; right?

12      A  That's correct.

13      Q  And it also hasn't been enforced civilly

14  in your office yet as it relates to the

15  citizenship requirement; is that right?

16      A  That's my understanding; yes, ma'am.

17      Q  Okay.  I want to move on to some questions

18  about office personnel involved with enforcing and

19  investigating violations of SB7050.  You mentioned

20  you had a piece of paper with you?

21      A  You want me to grab it?

22      Q  Yes.  Could you hold that up -- yeah,

23  could you hold it up to the camera so I can get a

24  sense of how much information you brought?

25      A  That's it right there.

1    Q  It looks like a list of names and

2  positions; is that what it is?

3    A  Yes, ma'am.

4    Q  Would you mind reading those out for me,

5  just so I have a sense of the information you have

6  on this topic?

7    A  And this is the people from the criminal

8  perspective, from -- these people would be from

9  the Office of Statewide Prosecution.  Myself,

10  Jeremy Scott, he's a bureau chief from the Miami

11  bureau, he was previously coordinating, acting as

12  the coordinator of the elections crimes efforts

13  that we were making.  And he was replaced by

14  Jonathan Bridges, who was a chief out of West Palm

15  Beach, and he's currently handling that

16  coordinating effort.  There's Nathaniel Bahill,

17  who's an assistant statewide prosecutor out of

18  Tampa.

19        As I mentioned earlier, I'll just call her

20  Pota, P-O-T-A, Papakos, P-A-P-A-K-O-S, out of

21  Tampa, she's an attorney.  Reed Haley, Assistant

22  State Attorney from Tallahassee.  Elizabeth

23  Mizrahi, M-I-Z-R-A-H-I, Assistant State Attorney

24  out of Miami.  Robert Finkbeiner, that's

25  F-I-N-K-B-E-I-N-E-R, he's a chief out of our

1   Orlando bureau.  Jaahee Kim, J-A-A-H-E-E Kim,

2   K-I-M, Assistant State Attorney out of

3   Tallahassee.  And then finally Paul Dontenville,

4   D-O-N-T-E-N-V-I-L-L-E, he was really on one case

5   only, but he's out of -- he's the chief out of our

6   Tampa office.  And that's the ones that I

7   understand have been involved with handling these

8   matters.

9        And then civilly, I don't know who's

10  actually been involved in handling these matters

11  or if anything has come up, which I'm not aware of

12  anything.  If it did, my reaction, my

13  understanding would be it would go to Jimmy

14  Percival, who is in Tallahassee with the office of

15  the Attorney General.

16       Q   Okay.  So, just to make sure I understand,

17  everybody before Jimmy Percival was with the

18  Office of the Statewide Prosecution; is that

19  right?

20       A   Yes, ma'am.

21       Q   Okay.  And I know we've also talked in the

22  past couple of days in these depositions about

23  someone named, I think it's John Bajger; are you

24  familiar with him at all?

25       A   Yes, ma'am.

1      Q  Do you know if he has any enforcement

2   authority on the civil side?

3      A  Some of the enforcement authority, if it

4   ever came to be, would probably fall under his

5   office.  He is the -- I'm going to try to use the

6   correct term -- but I think he is the Associate

7   Attorney General for Civil Litigation, associate

8   deputy I think it's called -- Attorney General for

9   litigation.  And his last name, for the court

10   reporter, is B-A-J-G-E-R.

11      Q  And what made you think that Jimmy

12   Percival might be the person on the civil side who

13   would be the person responsible for enforcing this

14   law?

15      A  Basically, he's our chief of staff that

16   would direct anything that had to start happening

17   probably with this if it came in.  That's why I

18   would say it would go to Jimmy, and then he would

19   take it from there to, you know, determine the

20   method it would be set up in.

21      Q  Okay.  Got it.  I want to move next to

22   topic 10, which is back in Exhibit 1.  This is on

23   page 10.

24      Do you see topic 10 on your screen here?

25      A  Yes, ma'am.

1    Q   Okay.  So this is about the office's

2    definition of collecting and handling a voter

3    registration application as used in the

4    citizenship requirement and the bases for that

5    definition.

6         What did you do to prepare to testify

7    about this topic?

8    A   Read the statute.  I read the statute.  In

9    criminal, that's what I would do.

10   Q   Okay.  And would you agree that the

11   statute doesn't provide a definition for the term

12   collecting?

13   A   I would, simply the plain meaning.

14   Q   Right.  Same with handling, no definition?

15   A   Correct.

16   Q   And same with voter registration --

17   A   Same with voter registration application.

18   Q   Okay.  I want to talk about the plain

19   meaning, as you understand it.  Just based on the

20   plain meaning, what does your office understand

21   the word collecting to mean?

22   A   Haven't ever addressed it --

23       MS. MORSE:  Objection to form.

24       THE WITNESS:  Sorry, Stephanie.

25       MS. MORSE:  You can go ahead.  I just

1    inserted an objection to form.

2          But you can go ahead.

3      A  Haven't even dealt with it because we

4    haven't even seen one of these cases yet.  So we

5    haven't even had a case come up to where we had to

6    deal with that issue.

7      Q  I understand you haven't prosecuted it

8    yet, but you understand you are designated to talk

9    about what the office's definition of that term

10   is; right?

11     A  Right.

12     Q  And is it your testimony that the office

13   has no definition of the term collect?

14     A  My testimony is we haven't had a case like

15   that, so we haven't even discussed a definition of

16   collecting, handling, or voter registration

17   application.  Our office would simply look at the

18   plain reading of the statute, and if we had

19   questions, candidly, I would go to either

20   Webster's or Black's Law.

21     Q  Okay.  When you say you would have

22   discussions with folks in the office, is that

23   something that you typically do whenever a statute

24   is passed because you're determining how to

25   enforce it?

1      A  On occasions, yes.  As it relates to this,

2  yes.  As it relates to elections crimes, yes.

3      Q  And so it sounds like you're saying at the

4  time that you would go to enforce this law, you

5  would have to have that conversation within the

6  office; right?

7      A  Would I have to, no, only if the question

8  arose.  If someone had a concern about what does

9  collecting mean, then generally we would have that

10  discussion.

11     Q  Okay.  But you haven't had that discussion

12  yet?

13     A  No, ma'am.

14     Q  It sounds like you don't have a definition

15  ready to go, but I do still want to walk through a

16  series of examples.  I understand that you

17  typically need a full case file to make a decision

18  about whether to prosecute a case.

19         What I'm asking you is, if you only had

20  this information about the conduct, would you be

21  able to prosecute the case or does your office

22  believe it is outside the bounds of the law?

23         Does that kind of question make sense?

24         MS. MORSE:  Objection to form; compound;

25  and calls for speculation.

1        MS. KEENAN:  I'm just trying to set up

2    what I'm going to ask you before I get into the

3    specific question.

4        A  Yeah.  I'm not exactly positive what

5    you're asking there, I'm sorry.

6        Q  Okay.  So, for example, the question I'm

7    going to ask is:  Do you understand SB7050 to ban

8    noncitizens from supervising other canvassers who

9    physically collect applications?

10       A  That SB7050 bans non-canvassers from

11   collecting --

12       Q  Sorry, noncitizens.

13       A  Right.

14       Q  Does it ban noncitizens from supervising

15   other canvassers who physically collect the

16   applications?

17       MS. MORSE:  Objection to form.

18       A  I'll need to look at the statute again,

19   because you're asking about supervisors.

20       Can I look at the statute?

21       Q  Please do.  It's 1F.

22       A  Thank you.  Saved us a lot of time there.

23       Q  No worries.

24       A  Based on the plain reading of the statute,

25   it would depend on whether or not that person is

1   handling.  That's one of the other things.  I

2   mean, whatever that, you know -- what we would

3   have to determine what that would mean, but it

4   doesn't say supervisors.

5       Q   Right.  And so it's your understanding

6   that that kind of conduct might come within the

7   definition of the word handling; right?

8           MS. MORSE:  Objection to form.

9       A   Depending on the facts --

10          THE WITNESS:  I'm sorry.

11          MS. MORSE:  Yeah.  Objection to form.

12          If you can answer, go ahead.

13      A   Depending on the facts, it could.

14      Q   Okay.  But it might not come within the

15  definition of handling?

16      A   Yes, ma'am.

17      Q   Even if all the facts you had, that this

18  person was supervising other canvassers who

19  physically collected the applications but did not

20  touch the applications themselves, would you agree

21  it could go either way?

22      A   I don't know.  But I mean I would have to

23  have so much more, and I'd have to have -- I

24  really would, I would have to have the whole

25  report and the whole file in order to know this

1   stuff.

2        Q   What if that was the only information in

3   the report?

4        MS. MORSE:   Objection to form; asked and

5   answered.

6        Q   I don't think it's been answered, so I'd

7   ask you answer the question, if you can.

8        A   What I will tell you is it's not unusual

9   for prosecutors to send cases back to law

10  enforcement and say, I need something more.

11       Q   If you had a report that contained only

12  that information, would you say you needed more

13  facts?

14       MS. MORSE:   Objection to form.

15       A   I don't know what I would do, whether I

16  would say I need more facts or whether I would say

17  I'm not filing it, I don't know.

18       Q   Okay.   I'm going to go on to the next

19  example.

20       Do you understand SB7050 to ban

21  noncitizens from encouraging eligible citizens to

22  complete applications even if the noncitizen

23  doesn't touch the application?

24       MS. MORSE:   Objection to form.

25       A   One more time.

1      Q  Sure.  Do you understand SB7050 to ban

2   noncitizens from encouraging eligible citizens to

3   complete applications, even if the noncitizen does

4   not touch the application?

5      A  I'm looking to the statute to see if it

6   uses the word encouraging, because I would look to

7   the plain reading of the statute.

8          I'm not seeing the word encouraging.

9      Q  Okay.  And so you don't believe that

10  conduct falls within collecting or handling the

11  applications; is that right?

12     A  I'm not saying that.  I'm saying

13  encouraging is not in the plain reading of the

14  statute.

15     Q  And what I'm asking is:  Do you think that

16  in banning collecting or handling the statutes

17  prohibits encouraging citizens to complete

18  applications if the noncitizen doesn't touch the

19  application?

20         MS. MORSE:  Objection to form.

21     A  Without having dealt with the facts and

22  everything that would apply in making a decision

23  on this case, I can't tell you.  I can't just

24  answer these in a vacuum like that.  Cases are

25  taken -- so we look at cases on a case by case

1    basis.  We don't just have them walk in the door

2    and say, well, that's an A so it's going to be

3    charged as an A.  We look at every single case

4    that walks in the door and make a charging

5    decision.

6        Q  Sure.  What if I change those facts

7    slightly and the person is a noncitizen who was

8    encouraging eligible citizens to vote is

9    physically handling them the voter registration

10   application, does that violate citizenship

11   requirement, as you understand it?

12          MS. MORSE:  Objection to form.

13       A  Same answer.

14       Q  And what was the answer?

15       A  That I need to see the entire file and

16   review the entire file and all the police reports

17   and have an opportunity to know everything and

18   evaluate the case, as I typically would on a case

19   by case basis.

20       Q  I'm positing, though, that the only thing

21   you have in your file is an eyewitness account

22   where somebody watched a noncitizen handing an

23   eligible voter an application and encouraging them

24   to vote it.  If that's all the facts you have in

25   your case file, does that violate the citizenship

1  requirement?

2      A  Same answer.

3      MS. MORSE:  Same objection to form.

4      Q  I'm not sure how that could be the same

5  answer if I've just asked if that's everything you

6  have in your file and the answer was, I would have

7  to review everything I have in my file.  So I just

8  ask you to clarify what you mean.

9      MS. MORSE:  Objection to form.

10     A  As I indicated earlier, there's a number

11 of things that can happen, including sending it

12 back to law enforcement for more information or

13 closing it out.

14     Q  Okay.  I'm going to ask a couple of more

15 of these, just for the record.

16     Do you understand SB7050 to ban

17 noncitizens from assisting voters to complete an

18 online voter registration application?

19     MS. MORSE:  Objection to form.

20     A  I don't know if it refers to online or if

21 it simply says that they cannot assist with the

22 voter's application.  I'd have to look.  Either

23 way, it would seem that the plain reading would

24 suggest yes.

25     Q  Okay.  What about -- do you understand

1    SB7050 to ban noncitizens from being present in an

2    office where applications are being processed?

3         MS. MORSE:  Objection to form.

4    A  Haven't dealt with that kind of question

5    before.  The plain reading of it doesn't

6    specifically say that.

7    Q  Okay.  And I guess, are you saying the

8    plain reading suggests that's not banned or that

9    you would need additional information to determine

10   whether that conduct was banned?

11   A  I would never everything in the case file,

12   everything that the law enforcement has collected.

13   Q  Okay.  And in that example, what

14   additional information would you need to know to

15   determine whether a noncitizen being present in an

16   office where applications are processed violates

17   the citizenship requirement?

18   A  Again, you're asking me to totally

19   speculate on what I may need or may not need.  I

20   just can't make these decisions without having all

21   of the information from the file, anything they

22   have about the defendant, or anything.  We haven't

23   been presented any of these yet.

24   Q  You would agree -- are you the leader of

25   OSP?

1      A   I'm the Statewide Prosecutor.  I'm at the

2   top of the organizational chart for OSP.

3      Q   And so you have the responsibility to

4   decide which cases to prosecute; right?

5      A   I have part of that responsibility, yes,

6   because that responsibility is delegated to each

7   of the assistant state attorneys that take the

8   oath.

9      Q   Okay.  I understand, of course, that you

10  want to review all of the information before you

11  decide to prosecute a case, and I hear you saying

12  that's part of your decision to prosecute; right?

13     A   Right.

14     Q   But when you're reviewing a case, surely

15  you are looking for certain types of information

16  to determine whether a case should be prosecuted;

17  right?

18     A   For certain types of information -- we're

19  looking for information that points to the

20  elements of the crime.  So in that sense, yes.

21     Q   Right.  And so I guess -- let me just give

22  you one of these examples where you said you would

23  need more information.  I'll go with banning

24  noncitizens from reviewing applications.

25     A   Banning what?  I'm sorry.

1          MS. MORSE:  You're breaking up a little

2     bit.

3          Q  Sure.  Banning noncitizens from reviewing

4     applications to make sure they were filled out

5     correctly.

6          So, did you hear that?

7          A  I did.  What was the question with that?

8          Q  The question is:  Earlier I understood you

9     to say you would need more information to

10     determine whether that was a violation; right?

11          A  I might need more information.  It would

12     depend on the situation.

13          Q  But in the file, what types of additional

14     information would you be looking for to determine

15     whether to prosecute that case --

16          A  I don't know what --

17          Q  -- to meet the elements of the crime?

18          So, you don't know what you would be

19     looking for to meet the elements of the crime in

20     this case?

21          MS. MORSE:  Objection to form.

22          A  I don't know --

23          THE WITNESS:  Go ahead.

24          MS. MORSE:  Objection to form.

25          You can answer.

1      A   I don't know, because, again, we have

2   never been presented one of these cases.  We have

3   never dealt with one of these cases yet.

4      Q   Okay.  So, just based on the plain text of

5   the statute, just the words collecting or

6   handling, you don't know what information you

7   would need to look for to satisfy the elements of

8   those crimes?

9      A   Not without knowing what all the facts are

10  and what the basis of law enforcement's allegation

11  is.

12     Q   Okay.  I'm going to move on to a new

13  topic, which is topic four, back on page nine of

14  Exhibit 1.  I think you talked about OAG's

15  referral sources as far as case intake, but does

16  OAG ever refer out cases related to alleged

17  misconduct by 3PVROs and their agents?

18     A   I'm not aware of ever having had that

19  happen.  I will tell you if that had happened, for

20  instance, earlier Brent had brought -- I

21  apologize -- Mr. Ferguson had brought up the idea

22  of whether a citizen made a complaint, it would

23  probably be in the same manner -- no, it would be

24  in the same manner where we would forward it to

25  law enforcement for inquiry, consideration,

1    investigation, whatever you want to call it.

2        Q   Okay.

3        A   I don't know if -- we do not have

4    investigators in the Office of Statewide

5    Prosecution.

6        Q   That's actually the question I have a

7    little later down.  So thanks for -- we'll get

8    back to that in a minute.  There's a question I

9    had in between now and -- or one topic between now

10   and then.

11       A   Okay.

12       Q   This is topic five, which would be on the

13   screen in front of you.  This is the office's

14   process and procedures for investigating and

15   finding 3PVROs and their agents.  So it sounds

16   like there isn't a process for investigating

17   within OAG; is that right?

18       A   For 3PRVOs, and their agents, no, there's

19   not.

20       Q   Okay.  So OAG's role is just assessing the

21   fines; is that right?

22       A   No.  We don't assess the fines.  That

23   would be done civilly.  And it would probably --

24   again, I believe it would be referred if that

25   happened, if we ever had anything like that, would

1    probably go to Jimmy Percival.

2        Q  So, just to be clear, when you say we

3    wouldn't have that, you mean OSP wouldn't assess

4    the fines; right?

5        A  I'm sorry.  Yes, ma'am.  Statewide

6    Prosecutions, yes, ma'am.

7        Q  But OAG, more broadly, would have the

8    power to assess fines; right?  Just in the civil

9    section?

10       A  I believe that that authority lies with

11   OECS -- excuse me, the Department of State,

12   primarily.  I am unaware of the AG's, to my

13   experience, to my knowledge, assessing fines on

14   the election based crimes.

15       Q  Okay.  So it's your -- -- you were

16   designated to talk about this issue, and your

17   understanding is this is not something that's

18   within the OAG's authority; is that right?

19       A  I'm not saying it's not within our

20   authority, it's not within our practice, as I

21   understand it right now, to do that.  It may be

22   within the OAG authority, and if it were, it would

23   go to Jimmy Percival.  But investigating it is not

24   anything that I do, because that goes, you know,

25   with law enforcement or OECS.  But fining is not

1   anything that falls within statewide prosecution.

2   It may within the Attorney General's office.

3       Q  Sure.  I want to scroll just back up to

4   the top of this deposition notice.

5           Do you understand that this notice was of

6   the Florida Attorney General's office; right?

7       A  Was what?  For the Attorney General's

8   office?

9       Q  Yeah.  It says plaintiff's notice of

10  taking deposition of office of Florida Attorney

11  General; right?  Just right here at the top?

12      A  Right.

13      Q  And so for topic five, when you realized

14  it wasn't within OSP's -- sorry, wrong page.

15          For topic five, when you flagged that

16  wasn't within OSP's bailiwick, did you speak to

17  anybody else to determine what authority OAG has

18  to fine 3PVROs and their agents?

19      A  Without discussing anything regarding any

20  conversations with counsel, no.

21      Q  Okay.  I'm going to move on then to topics

22  six to eight, all of which I believe you can see

23  on the screen here.  And these are about instances

24  of alleged, suspected, or confirmed unlawful

25  conduct in various situations.

1          Have you had a chance to review those on

2     the screen before I start asking about them?

3          A  I have and I -- yes, I have.

4          Q  Okay.  Earlier you talked about how OSP

5     worked on cases involving illegal voting and could

6     prosecute other election-related matters; do you

7     recall that?

8          A  That OSP worked on legal voting and other

9     pros -- election-related matters.  Yes.  That's

10    what we would do, yes.

11         Q  Okay.  In that conversation, you talked

12    about the election crimes task force.  And you

13    said OAG, FDLE, and SOS were members of that task

14    force; right?

15         A  I was asked about that, and yes, ma'am, I

16    did.

17         Q  Is OECS a part of that task force?  I'm

18    just trying to understand the structure.

19         A  The Office Of Elections Crimes and

20    Security is within the Department of State, and

21    it's the people that are a part of that office are

22    a part of the Department of State, and they are

23    the ones primarily that work with us and FDLE in

24    handling these cases.

25         Q  Okay.  That's helpful.  I know that OSP

1    doesn't work on investigating cases.

2         Are you aware of whether any other

3    division in OAG has investigatory authority?

4    A   There are other divisions that have

5    investigatory authority generally.  On elections

6    matters, I believe it would have to fall within

7    the civil litigation unit.  I don't know that

8    administrative law, if they would be involved in

9    it necessarily.  I don't know that this invokes

10   Chapter 120, but it -- which is the administrative

11   law section -- but it would be -- it would fall

12   somewhere under civil litigation.

13   Q   And do you know if civil litigation has an

14   investigator function unlike OSP?

15   A   That's a good question.  I don't know if

16   they have an investigator -- I don't know if they

17   have investigators of sorts.  They will engage in

18   investigations on civil matters, I do know that,

19   but I don't know if they have employed separate

20   investigators or not.

21   Q   Okay.  I want to go back to the work that

22   OSP does.  You told us earlier that OSP had not

23   prosecuted any of the noncitizens based on their

24   work with 3PVROs; right?

25   A   That's correct.

1    Q   What about 3PVROs themselves, has OAG ever

2    prosecuted a 3PVRO?

3    A   Prosecuted, no, ma'am.  If you're looking

4    in the air for the words --

5    Q   Yes.

6    A   I'm not going to talk about any active

7    investigations that may be pending.  And that

8    doesn't suggest active investigations regarding

9    the topic we're talking about right now, but we

10   have not prosecuted one.

11   Q   Sure.  That's fair.

12   A   I think that's why you were looking into

13   the air.

14   Q   Yeah.  I'm just trying to figure out why

15   you were clarifying.  That's helpful.

16   A   You were looking up in the air, so...

17   Q   So, is it fair to say that at the time the

18   legislator was considering and passing SB7050,

19   your office had not prosecuted any 3PVRO; is that

20   right?

21   A   I need to --

22        THE WITNESS:  Go ahead.

23        MS. MORSE:  Objection to form.

24   A   I need to clarify that in my time, since

25   January of 2011, that would be true.

1      Q  Okay.

2      A  I can't speak to before my time.

3      Q  Okay.  Are you aware of any instances

4  where a 3PRVO delivered a voter registration

5  application more than 10 days after the

6  application was completed?

7      A  No, ma'am.

8      Q  Okay.

9      A  I'm just saying I'm not aware of it.  I

10  haven't had any involvement on something like

11  that.

12      Q  Sure.  Sure.  I want to talk about some of

13  the other tools that the AG's office has at its

14  disposal to prevent fraud or other irregularities

15  and election related conduct.

16         Would you agree that prior to the passage

17  of SB7050, OAG had the authority to prosecute

18  voter fraud?

19      A  Criminally prosecute, yes, ma'am.  Through

20  the Office of the Statewide Prosecution.

21      Q  Sure.  What about identity theft, could

22  OAG prosecute that case as well?

23      A  Yes, ma'am.

24      Q  It was also already a crime to submit

25  false voter registration information; right?

1      A  I believe it was, yes, ma'am.

2      Q  Okay.  And also a crime to alter a voter

3  registration application without the applicant's

4  consent?

5      A  Yes, ma'am.

6      Q  It was also already a crime to offer an

7  eligible citizen financial consideration in

8  exchange for becoming a registered voter; right?

9      A  Yes, ma'am.

10     Q  Okay.  I know you were noticed to talk

11  about topic 16, which is about the documents

12  produced by the office in discovery in this

13  litigation.  I do want to walk through some of

14  those documents now just to confirm that we have

15  the same understanding of what they show and don't

16  show.

17         So I'm going to start with what's been

18  premarked as Exhibit 22.  This is a two-page

19  document.  If you'd like, I can let you read

20  through it and you can tell me when just scroll

21  down, just so you can see the whole thing.

22     A  Can you scroll?  Because I have a feeling

23  that time wise it goes from bottom to top.

24     Q  Sure.

25     A  I think.

1     MS. MORSE:  Megan, if you can, do you have

2     a way to drop these in the chat so I can open it

3     up on my end?

4          MS. KEENAN:  Yeah.  I uploaded to the

5     link, just like yesterday, but I can load them

6     over to the chat at the same time, if that's

7     helpful.  Give me one second.

8          MS. MORSE:  Yeah.  Thanks.

9          MS. KEENAN:  I may have to stop my screen

10    share for a moment to get the chat function open.

11    So just give me one second to get that up.  Let's

12    start with 22, and -- and I'll continue to add

13    them in the chat as we go through them.

14    Q  Are you able to see it now?

15    A  Yes, ma'am.  Let me -- okay.  If you can

16    look it up a little.

17    Q  Sure.

18    A  If you can keep going.  Okay.

19    Q  Okay.  So, this is an email directing AG's

20    staff to direct calls about voter fraud to the

21    Florida Department of Elections Division of

22    Elections; right?

23    A  Yes, ma'am, it is.  Did you put the -- I

24    mean, is this an exhibit?

25    Q  Yes.  This is Exhibit 22 it was produced

1    by the Attorney General's office.  This is

2    OAG_000947 -- I'm sorry, 883?

3        A   I don't know if it's important, I just

4    wanted to point out that it's September of 2020,

5    but yes, ma'am, it is that.

6        Q   Right.  The only reason I'm going over

7    these with you is that your office produced them

8    to us and we want to make sure we understand what

9    they represent.  So if they seem less than

10   important, that may be why we're asking about

11   them.

12       A   Oh, that's okay.  Okay.

13       Q   Are you aware of how many calls about

14   voter fraud OAG made to the division of elections

15   consistent with this instruction?

16       A   I don't.  I didn't anticipate that

17   question, so I didn't inquiry about that.  So no,

18   I don't know the answer to that.  If I had

19   inquired for that, I would have contacted our

20   citizens services division primarily.

21       Q   Sure.  And so I assume you're not aware

22   how many, if any, of those calls were about

23   noncitizens working for 3PVROs; right?

24       A   I do not.  That's correct.

25       Q   Okay.  I'm going to show you what's been

1    premarked as Exhibit 23, which I'll also try to

2    drop in the chat.

3         (COX Deposition Exhibit 23 marked for

4    identification and attached to the transcript.)

5         A   Is this just a one-pager?

6         Q   It's two again.  Give me one second.

7             All right.  So we start just right here.

8    This is an Internet message received by the OAG's

9    office in 2018 here.

10            You can go ahead and read this bottom

11   message first, and then let me know when you're

12   ready for me to scroll up.

13        A   Okay.

14        Q   All right.  Scroll up now.

15        A   Can you go back down?  I just want to see

16   the name of the person.

17        Q   Of course.

18        A   Okay.

19        Q   All right.  So, the second page of this

20   email where we are now contains fraud allegations

21   made by an individual complainant regarding

22   registration of an elderly, mentally disabled

23   family member.

24            Is that consistent with the quote on this

25   page here?

1     A   That's what it says, yes, ma'am.

2     Q   Okay.  This complaint doesn't tie any

3  allegations to noncitizens working at 3PVROs;

4  right?

5     A   Doesn't say anything about that; yes,

6  ma'am, you're correct.

7        (COX Deposition Exhibit 26 marked for

8  identification and attached to the transcript.)

9     Q   I'm going to now move to what's been

10 premarked as Exhibit 26, which the AG's office

11 produced as OAG_000952.  I'll put that in the chat

12 now.  I'll bring it up on the screen.  Here's the

13 complaint.

14    A   Okay.

15    Q   Let me know when you've read the body of

16 this email.

17    A   Okay.

18    Q   Okay.  So, again, I'm quoting from the

19 email here.  Here an individual complainant

20 alleges that, quote, federal RICO crimes have

21 continuously been done by representatives of the

22 Democrat party against mentally disabled, elderly

23 people and assisted living facilities in Fort

24 Lauderdale.

25        Am I reading that correctly?

1      A  You're reading from Mr. Halpern's

2  complaint.  Yes, ma'am, that's correct.

3      Q  Again, this is back in 2018; right?

4      A  November 2018, yes, ma'am.

5      Q  Okay.  And this complaint also doesn't tie

6  any allegation to noncitizens working at 3PVROs;

7  right?

8      A  I don't see anything like that.

9      Q  Okay.  I just realized that it looks like

10  I went a smidge out of order, so I'm going to go

11  back to what's been premarked as Exhibit 25 now.

12  This has been produced by the Attorney General's

13  office by OAG_000900.  I'll drop that in the chat

14  now.

15         (COX Deposition Exhibit 25 marked for

16  identification and attached to the transcript.)

17      Q  Okay.  I think you can read all of the

18  text of the campaign email here first.  So maybe

19  start with this, if that's okay?

20      A  Sure.  Okay.

21      Q  It reports to be excerpts from the South

22  Florida Sun Sentinel article about the same

23  topics.  I'm not going to going to ask you about

24  -- well, you're welcome to read it if you'd like.

25  Let me know when you're ready for me to scroll.

1     A  If you need me to, I'd be glad to, yeah.

2     Q  The question I'm going to ask shouldn't be

3  a surprise.  It's about whether this email tied to

4  any allegation to noncitizens working at 3PVROs.

5        So I'm happy to let you read it so you can

6  just confirm that it doesn't?

7     A  I've heard that question before.

8     Q  A couple more coming.

9     A  You can move it on up.

10     Q  All right.

11     A  You can move it on up.  I'm just scanning

12  to see if I see anything yet.

13     Q  Of course.

14     A  You can move it on up.

15     Q  All right.  There we go.  That's the

16  bottom there.

17     A  I don't see anything, no, ma'am.

18     Q  Okay.  Great.  The rest is a voter guide,

19  which I can represent that I'm going to going to

20  ask you anything about.  So just to confirm what

21  we're talking about here.  This email alleges that

22  three former residents of Broward County who has

23  passed away were fraudulently registered and added

24  to the voter rolls?

25     A  Yes, ma'am.

1    Q  Okay.  But it doesn't tie any allegation

2  to noncitizens working at 3PRVOs?

3    A  I didn't see anything that did that, no,

4  ma'am.

5    Q  All right.  Next we're going to move on to

6  what's been premarked as Exhibit 27, which the

7  AG's office produced as OAG_HF_FIRSTRFP_000006.

8  I'll pull this in the chat as well.

9       This email is by a person who is sort of

10  what appears to be, a serial emailer, with

11  basically no response from anybody at the OAG's

12  office.  I'm starting at the bottom here, if you'd

13  like to let me know whenever you're ready to

14  scroll up.

15    A  Okay.

16    Q  Okay.

17    A  Can you go back to where that -- there you

18  go.

19    Q  Sorry about that.  That is the top of it.

20  There you go.

21    A  Okay.  If you could go up a little more.

22    Q  Sure.  I can go to the top of the email,

23  if that's easier.

24    A  Yeah.  That'd be great.  Thank you.  You

25  read my mind.

1      Q   No worries.

2      A   Okay.

3      Q   All right.  And then I'll go to the next.

4  This is the same individual.

5      A   Should I anticipate the same question as

6  I've gotten before?

7      Q   You should.

8      A   Just so I know what to read for as well.

9      Q   Of course.  Yeah.

10     A   Go up just a little bit.

11     Q   Here's the next one.

12     A   Go down just a little.

13     Q   Here's the end of it.

14     A   Thank you.

15         All right.

16     Q   Okay.  Getting closer.  Here's the next

17  one.

18     A   Okay.

19     Q   Here's an email.

20     A   Okay.

21     Q   Okay.  Now we'll go up to the next one.

22  This the top of it, but it's a long email, so let

23  me know when you're ready.

24     A   Okay.

25     Q   All right.  And then I think this is the

1    end of it.

2        A  Could you go to the very top?

3        Q  Of course.

4        A  Okay.

5        Q  A lot of different allegations in this

6    very long email; am I right?  You agree that this

7    email doesn't tie any of them to noncitizens of

8    3PVROs?

9        A  I didn't see anything like that, no,

10   ma'am.

11          (COX Deposition Exhibit 28 marked for

12   identification and attached to the transcript.)

13       Q  All right.  We're going to go to the next

14   one which is Exhibit 28, which is the OAG's office

15   produced as OAG_HF_firstRFP_000019.  This one's

16   shorter, and a lot of it's form.

17          But and I can represent to you that it

18   starts really on page 2 here, but the others are

19   just forms.  So if you want to start there.

20       A  Okay.

21       Q  This is the email back.

22       A  Okay.

23       Q  The top doesn't have any content, just the

24   email addresses.  I'll go back down to the

25   complaint here.

1          You can see on the second page of this

2     email that an individual had alleged people were

3     registering illegal immigrants to vote at a

4     Clearwater school; right?

5         A  Correct.

6         Q  But there's no allegation that that work

7     was being done by noncitizens working for 3PVROs;

8     right?

9         A  I don't see anything about noncitizens,

10    that's correct.

11        Q  Okay.  I do briefly want to go back to an

12    exhibit that Mr. Ferguson asked about, but he

13    didn't ask about it for the same reason.  This one

14    is short.  This is the email from Peter Antonacci

15    about the list of the citizens of foreign

16    countries who voted in the 2020 election.

17         Do you recall talking about that email?

18        A  And I spoke with Mr. Ferguson about this?

19        Q  I thought so, but it's possible I had the

20    wrong email.

21        A  I could be wrong, but I don't think I've

22    seen this one today.

23        Q  Okay.  I will go ahead and relabel this

24    one as exhibit -- I think it's 42 is the last

25    number I used, just so we can keep it straight.

1    You can go ahead and take a second to read it

2    then.

3            (COX Deposition Exhibit 42 marked for

4    identification and attached to the transcript.)

5            MS. MORSE:  And does this have a Bates

6    number on it?

7            MS. KEENAN:  Yes.  One is

8    OAG_HF_FIRSTRFP_000001.

9        A  I'm going to go cross-eyed when you move

10   these things looking for Bates numbers.

11           All right.  Okay.

12       Q  Okay.  You would agree this email talks

13   about a list of noncitizens who voted in 2020;

14   right?

15       A  Yes, ma'am.

16       Q  But it doesn't tie that allegation to

17   noncitizens working for 3PVROs; right?

18       A  Not that I see, it does not.

19       Q  Okay.  Let me check one thing about my

20   numbering system.

21           Okay.  Let's go ahead to Exhibit 29.  I'll

22   put that in the chat.  Give me one second.

23           This is just on one page really, but I'll

24   let you read the first email.

25           (COX Deposition Exhibit 29 marked for

1    identification and attached to the transcript.)

2        A  Okay.

3        Q  Okay.  And a short email from the

4    assistant Attorney here.  Let me know when you're

5    finished with that.

6        A  Okay.

7        Q  So, I realized what I did about Exhibit 6,

8    which I'm now trying to download quickly from

9    Mr. Ferguson.

10       Do you see the name Jasmine Brantley here

11   in this email?

12       A  Yes, ma'am.

13       Q  Okay.  Do you recall talking about Jasmine

14   Brantley and an affidavit of probable cause

15   relating to her earlier today?  So, if you look at

16   the highlighting, this is actually Exhibit 6 that

17   Mr. Ferguson used; do you see that?

18       A  Yes, ma'am.  What you have highlighted,

19   yes, ma'am.  Jasmine Brantley's name is in there.

20       Q  Okay.  Right.  This is the probable cause

21   affidavit about a canvasser who allegedly

22   committed voter fraud; right?

23       A  I believe so, yes, ma'am.

24       Q  Okay.  And then if we go back over to

25   Exhibit 29, you can see that the assistant state

1    attorney declined all warrants that were

2    previously presented to the office for

3    consideration; right?

4         A  Yes, ma'am.

5         Q  Okay.  I also want to ask my standard

6    question.  There's nothing in this email that

7    suggests any of these allegations were related to

8    noncitizens working with 3PVROs; right?

9         A  I don't think so.  Could I go back to the

10   affidavit?

11        Q  Yes.  Absolutely.  Let me know when you

12   want me to scroll down.

13        A  Scroll down, please.  Okay.  I do not see

14   anything about a noncitizen related matter.

15        Q  Okay.  I'm going to back to 29 for just a

16   second.

17            You'd agree that this email from someone

18   at FDLE also includes that based off the

19   investigation they conducted, quote, I do not

20   believe this is an organizational issue?

21            And it says that the 3PVRO has provided

22   several documents to include training material

23   where canvassers appear to be properly trained

24   prior to canvassing events.  Also, the

25   organization appears to have strict and efficient

1    quality control practices, in my opinion.

2        Did I read that correctly?

3    A  You did.

4    Q  Okay.  Next, I want to go to what's been

5    premarked as Exhibit 30.

6        (COX Deposition Exhibit 30 marked for

7    identification and attached to the transcript.)

8    Q  This is another similar affidavit.  If

9    you'd like to let me know when you want me to

10   scroll.

11   A  Okay.

12   Q  I think I left off here.

13   A  Okay.

14   Q  There we go.  So, this is an affidavit in

15   support of a warrant that just describes the

16   investigation of a 3PVRO canvasser; right?

17   A  Yes, ma'am.

18   Q  This affidavit does not suggest that

19   canvasser is a noncitizen?

20   A  It does not.

21   Q  Okay.  Moving on to Exhibit 31.

22   Unfortunately, it's another one of these warrants.

23   Let me know when you'd like me to scroll.

24       (COX Deposition Exhibit 31 marked for

25   identification and attached to the transcript.)

1    Q   While you're reading, I'll just state for

2    the record that what was premarked as Exhibit 30

3    was produced as OAG-LWV-RFP2-000010.  And what's

4    premarked as Exhibit 31 was produced by the OAG's

5    office as OAG-LWV-RFP2-000018.  If for any reason

6    I haven't said any of the Bates numbers, they are

7    included in each of the documents that we've

8    premarked and we will attach to this deposition.

9    A   Okay.  Okay.

10   Q   This is another affidavit described as the

11   investigation of a 3PVRO canvasser; right?

12   A   Yes.

13   Q   But the affidavit does not suggest that

14   the canvasser is a noncitizen; right?

15   A   That's correct.

16   Q   Now I'm going to go to what's been

17   premarked as Exhibit 32, which was produced by the

18   AG's office as OAG-LWV-RFP2-000025.

19       (COX Deposition Exhibit 32 marked for

20   identification and attached to the transcript.)

21   Q   Let me know when you'd like me to scroll.

22   A   All right.

23       MS. MORSE:  While he's reading, can you

24   tell us one more time or put the link into the

25   chat on how we can go directly to these exhibits

1     from the -- to the website?

2          MS. KEENAN:  Sure.  Give me one second.

3     I'll put in the link.

4       Q  All right.  Are you able to read it now?

5       A  Yes, ma'am.

6       Q  All right.  Let me know when you're done

7     that and I will pull the link down in a second.

8       A  Okay.

9          MS. KEENAN:  So, this should give you the

10    link in the chat where you can access them all

11    directly.  I just want you to note that the

12    exhibits I've been using are the ones titled

13    corrected exhibit with a number.  The others were

14    labeled incorrectly.  So just refer to those,

15    please.

16         MS. MORSE:  Okay.  All right.  Thanks.

17         MS. KEENAN:  You'll see that title in the

18    link.

19      A  Okay.  Go up a little, I think.

20      Q  Okay.  That's the end of it.

21      A  Can you go to the very top again really

22    quick?

23      Q  Sure.

24      A  Just wanted to see -- Okay.

25      Q  All right.  Same question.  This is

1   another affidavit describing the investigation of

2   a 3PVRO canvasser; right?

3       A  Yes, ma'am.

4       Q  And this doesn't tie into the noncitizens

5   working at 3PVROs; right?

6       A  Yes, ma'am.

7       Q  Okay.  Now, I think I can't not see

8   because of the -- 32, okay.  So I'll move to 33,

9   which the AD's office produced as OAG_000885.

10  Should be right there.  This one is a blank page

11  on page 2 so it's all one page there.

12          (COX Deposition Exhibit 33 marked for

13  identification and attached to the transcript.)

14      A  There you go.

15      Q  I can scroll whenever you're ready.

16      MS. MORSE:  This is Exhibit 33?

17      MS. KEENAN:  Uh-huh.

18      A  Okay.

19      Q  And then the rest is just a couple of

20  links here; do you see that?

21      A  Right.

22      Q  This email alleges voter registration of

23  people with felony convictions.  I'm just looking

24  at the links that it says FDLE is investigating

25  supervisor --

1       A   Yeah.  And could you get it on to the next

2   one?

3       Q   Sure.

4       A   Okay.  Yeah.  These last ones talks about

5   ineligible felons and sex offenders yes, ma'am.

6       Q   Right.  And the email doesn't tie any

7   allegation to noncitizens working at 3PVROs;

8   right?

9       A   The email doesn't.  I haven't looked at

10   the attachment.  But no, ma'am, I don't see

11   anything in the email that does that.

12       Q   Okay.  Next, I'm going to go to

13   Exhibit 34, which the AG's office produced as

14   OAG_000887.

15          (COX Deposition Exhibit 34 marked for

16   identification and attached to the transcript.)

17       Q   I'll start at the bottom here with the

18   press release.  Let me know when you're done

19   there.  Let me know when you want me to scroll up.

20       A   Okay.

21       Q   All right.  And this one just says FYI

22   here, but let me know if you want to check

23   anything else out.

24       A   Okay.

25       Q   Okay.  And so this is a press release

1    about the arrest of somebody who altered the voter

2    registration of Governor DeSantis; right?

3         A  Yes, ma'am.  That's what it says, yes,

4    ma'am.

5         Q  Okay.  But nothing in the exhibit suggests

6    that the person who did that was a noncitizen;

7    right?

8         A  No, ma'am.

9         Q  Okay.  Next I'm going to move to what's

10   been premarked as Exhibit 35, which OAG produced

11   as OAG_000889.

12            (COX Deposition Exhibit 35 marked for

13   identification and attached to the transcript.)

14        Q  The last page is just called technical

15   notes so I'll let you read this bottom passage and

16   let me know when you want me to scroll up.

17        A  Okay.

18        Q  Okay.  And that's the email.

19        A  Okay.

20        Q  This person seems to be alleging that

21   Steve Bannon unlawfully registered to vote in

22   Florida; right?

23        A  Yes, ma'am.

24        Q  But again, this email doesn't tie any

25   allegation to noncitizens of 3PVROs; right?

1       A   No, ma'am.

2       Q   We're going to move on to the next one.

3   Now we're on exhibit -- no, I'm sorry, I think

4   I've pulled up the wrong one.  Let me check

5   something.

6           (COX Deposition Exhibit 36 marked for

7   identification and attached to the transcript.)

8       Q   Okay.  This is marked Exhibit 36.  It's

9   produced as Bates number OAG_000594.  I don't

10  think I need to ask about this one.  I'm sorry.  I

11  think I meant to cut this one from my outline, so

12  we can just skip ahead to the next one.

13          (COX Deposition Exhibit 37 marked for

14  identification and attached to the transcript.)

15      Q   Okay.  This one is marked as, it looks

16  like Exhibit 37.  Sorry, my own internal number

17  system got a little knocked off of my outline, so

18  I'm just trying to make sure I have the numbers

19  right for the record.  37, yes.

20          And it was produced Bates stamped

21  OAG_000859.  I'll let you go ahead and read this

22  letter.  Just let me know when you want me to

23  scroll.

24      A   Okay.

25      Q   All right.  This bottom part --

 1          A   There you go.  Okay.

 2          Q   Okay.  Here is just a list of the people

 3     copied on that email, so I'll just -- unless you

 4     want to peruse that, I'll scroll down.  Let me

 5     know.

 6          A   Okay.

 7          Q   And then there's a secondary letter here.

 8     Just let me know when you want me to scroll.

 9          A   Okay.  Okay.

10          Q   All right.

11          A   Okay.

12          Q   Here's a signature at the bottom?

13          A   All right.

14          Q   So, you agree this is a series of letters,

15     one from Bradley R. McBay, who's the general

16     counsel at the Department of State, and another

17     from a series of supervisors of elections; do I

18     have that right?

19          A   Yes, ma'am.

20          Q   Okay.  It talks about a senator that sent

21     out mailers with erroneous voter information;

22     right?

23          A   Yes, it does.

24          Q   It doesn't say anything about noncitizens;

25     right?

1      A  It does not.

2         MS. KEENAN:  Okay.  I think that's all

3   that I have for you today.  Thanks for walking

4   through all of those.  I know there is one more

5   counsel group.  I'm not sure if they have

6   additional questions that they'd like to ask, but

7   I'm ready to pass the witness at this time.

8         Ms. O'DONNELL:  And we have some

9   additional questions on behalf of NAACP

10  plaintiffs.  Mr. Cox, would you like a brief

11  five-minute break?  I know that was a long string

12  of question that you've been sitting for.

13        THE WITNESS:  It was a long string of

14  reading, but no, I'm okay.

15        MS. O'DONNELL:  Okay.  Then we'll get --

16        THE WITNESS:  Thank you, though.

17        MS. O'DONNELL:  Absolutely.

18        EXAMINATION BY COUNSEL FOR NAACP

19  BY MS. O'DONNELL:

20     Q  Okay.  First, just by way of introduction,

21  my name is Renata O'Donnell, and I represent

22  several individual and plaintiff groups in this

23  matter.  I'm going to refer to them collectively

24  as NAACP plaintiffs.  So unless I'm referring to

25  one of them specifically, just understand me to

1    mean all of the plaintiffs when I say NAACP

2    plaintiffs.

3         A   Okay.

4         Q   For my own understanding, does the

5    Attorney General's authority include overseeing

6    the Office of Florida Statewide Prosecutor?

7         A   Yes.  In a general sense, yes.  The Office

8    of Statewide Prosecution was created by the voters

9    in 1985 as a -- in an article four of the Florida

10   constitution.  Technically speaking, the statewide

11   prosecutor is an independent constitutional

12   officer -- is an independent constitutional

13   officer, and by statute that we are housed within

14   the Department of Legal Affairs.

15        The statewide prosecutor, by law, is

16   selected by the Attorney General after a culling

17   of applicants by the Supreme Court nominating

18   commission.  So, there is -- we are housed within

19   the Department of Legal Affairs, and we are a part

20   of the Department of Legal Affairs.  But very

21   technically speaking, the statewide prosecutor is

22   a constitutional officer.  The Attorney General,

23   though, has the right of appointment and the right

24   of removal at will.  So to answer your questions

25   day-to-day, I would say yes.  That's the way I've

1    approached it.

2        Q   And the Department of Legal Affairs is

3    housed within the Attorney General; is that right?

4        A   It's the same thing.

5        Q   Does the Office of the Florida Statewide

6    Prosecutor have the responsibility to prosecute

7    any crimes involving voting in an election in

8    which a candidate for office is on the ballot and

9    there's some allegation of misconduct?

10       A   I'd have to look back at 1656.  I want to

11   say there may be some crimes, and I could be

12   wrong.  I want to say there may be some crimes

13   like campaign finance and stuff like that that may

14   not fall under my subject matter, but I'm not

15   going to swear to that.  I'd have to look into

16   that and get back with you.

17       Q   And so outside of campaign finance, when

18   we're talking about voter registration, that's

19   within your wheelhouse?

20       A   Yes.

21       Q   And to your knowledge, is the Attorney

22   General tasked with enforcing the new provisions

23   of SB7050 through your office and through the

24   civil side of the Attorney General's office?

25       A   We -- I think the statute says yeah, I

1   think they use the word we may, but yes, us, along

2   with other multiple other entities are tasked with

3   that, but the answer is yes, we're among them,

4   yes.

5        Q   Great.  And I'll share my screen to make

6   it a little bit easier and actually pull up the

7   language here.

8        A   To look at 0575?  Oh.

9        Q   Can you use the word screen clearly?

10           And I'm looking at Section 8, which begins

11   on page 18.

12       A   And that's where I was referring to the

13   language of may.  In 518, the first word, you

14   know, they use the word may.  That's all I was

15   referring to.  So, yes, ma'am.

16       Q   So, just for the record, it states here in

17   subsection eight:  If the Secretary of State

18   reasonably believes that a person has committed a

19   violation of this section, the secretary may refer

20   the matter to the Attorney General for

21   enforcement.  The Attorney General may institute a

22   civil action for a violation of this section or to

23   prevent a violation of this section.  An action

24   for a relief may include a permanent or temporary

25   injunction, a restraining order, or any other

1    appropriate order.

2        A   Correct.

3        Q   And so, Mr. Cox, could you explain to me

4    what your understanding is of how the Secretary of

5    State and your office as a representative of the

6    Attorney General here in the 30(b)(6) capacity,

7    could you explain to me how this interaction would

8    happen?  So the secretary believe someone might

9    have committed a violation of this section.  What

10   happens from there when they refer it to your

11   office?

12       A   Are you talking for purposes of civil

13   fines or for criminal or for both?

14       Q   Let's start with civil fines.

15       A   My understanding would be that the

16   referral would probably be made to, again, Jimmy

17   Percival, who is our chief of staff.  And another

18   person that would probably be someone they could

19   refer to would be John Bajger, but I believe it

20   would be Jimmy Percival.  And then the

21   determination would be made from there which unit

22   it might go to within the civil litigation

23   division.

24       Q   And how about for criminal?

25       A   In criminal, it would really be referred

1  over to -- from Department of State it would be

2  referred over to the Florida Department of Law

3  Enforcement, or any other law enforcement agency.

4  But here we have been talking about the Florida

5  Department of Law Enforcement, and they would

6  conduct the investigation.  And once they were

7  done with the investigation, it would get to us.

8          Is that answering your question.

9      Q  That answered my question.

10     A  Okay.

11     Q  As you read it, this could be for any

12 provision within 97.0575; is that right?

13         MS. MORSE:  Objection to form.

14     A  Based on subsection A, it appears so.

15     Q  Thank you.  I'll stop sharing my screen

16 for right now.

17         To your knowledge, how were you tasked

18 with being the representative for the Attorney

19 General's office for the topics to which you're

20 circumscribed today?

21         MS. MORSE:  Objection to the extent the

22 question implicates work product.

23         If you can answer, witness, without

24 divulging any work product information, you can go

25 ahead.

1       A   I can give it a shot.  Since I am the -- I

2   hate calling myself the chief or anything, but the

3   chief officer for criminal prosecution within the

4   Department of Legal Affairs, it would seem I'd be

5   the obvious one.

6       Q   And do you feel equipped to testify about

7   civil matters, civil penalties under SB7050 in

8   this case?

9       A   Do I feel about civil matters what?

10      Q   Equipped and prepared to testify about the

11  civil penalties under SB7050 that are pertinent in

12  this case?

13      A   Really beyond what I've already indicated

14  about who they would go to and whether they could

15  do them, I probably wouldn't be able to go much

16  further than that, other than based on the writing

17  of the statute or whatever.

18      Q   You're not fully prepared to talk about

19  the implementation of those civil penalties; is

20  that right, Mr. Cox?

21      A   Of the civil penalties --

22          MS. MORSE:  Objection to form.

23      A   Of the civil penalties beyond that, I'm

24  not.

25      Q   Thank you.  Do you have any authority over

1    the OECS employees that we've talked a little bit

2    about today?

3        A  Do I have any authority over them?

4        Q  Sure.

5        A  No, ma'am.

6        Q  OECS refers cases to your office; is that

7    right?

8        A  No.  They refer them to FDLE.

9        Q  Okay.  And then --

10       A  And then they come to us.  So indirectly,

11   you can say through FDLE, yes.

12       Q  Prior to the creation of OECS, do you know

13   how cases were referred to FDLE?

14       A  By the Department of State?

15       Q  I'm sorry, is that your answer?  To

16   clarify.

17       A  I was asking, do you mean how they were

18   referred by the Department of State to FDLE?

19       Q  Is that the process that they went

20   through?  They would go to the Department of State

21   and then be referred to FDLE?  Or were there any

22   other processes in place for FDLE to receive these

23   kinds of allegations in complaint?

24           MS. MORSE:  Objection to form.

25           If you could just let me get in.

1      A   I apologize, I'm having a hard time

2   hearing you, Ms. O'Donnell.  I'm sorry.

3      Q   Let me get a little closer to the mike.

4      A   Eyes and ears.  It's age, sister, let me

5   tell you.

6      Q   Don't worry about it.  I've gotten this

7   feedback before, so I'll speak up.

8          I'm asking if prior to the creation of

9   OECS, do you know how allegations concerning

10   misconduct in voter registration were referred to

11   FDLE and then got to your office?

12      A   Probably in much the same manner.  I mean,

13   an example may have been, like, the letters we've

14   seen just a few minutes ago, you know, I would

15   think it might be in much the same manner.

16      Q   Has the number of cases referred to your

17   office by FDLE increased since OECS's creation?

18      A   Yes, ma'am.

19      Q   Has the number of voting related

20   investigations increased?

21          MS. MORSE:  Objection to form.

22      A   Yes, ma'am.  As it relates to the

23   Department of Legal Affairs, the statewide, yes,

24   ma'am.

25      Q   And the number of prosecutions have

1    increased?

2        A   Yes, ma'am.

3        Q   And have the number of convictions

4    increased?

5        A   I need to ask you, when you say

6    convictions, you mean either convictions at trial

7    or by plea?

8        Q   Yes.

9        A   Yes, ma'am.

10       Q   Those convictions and prosecutions have

11   not involved in 3PVROs, based on the testimony

12   that you just gave to Ms. Keenan, is that -- am I

13   correct in understanding your testimony?

14       A   They're not of the 3PVROs.

15       Q   Okay.

16       A   Just so you know, I'm saying that because

17   3PVROs could have been a part of the case with the

18   voter that voted illegally.  You understand what

19   I'm saying?  They could have been registered by a

20   3PVRO, but the 3PVRO wasn't involved as a

21   defendant and wasn't the focus of those particular

22   cases.

23       Q   And so I understand it, it sounds like in

24   those investigations it's -- or excuse me, in

25   those convictions and prosecutions, it involves an

1   individual who has voted illegally?

2       A   An individual who what?

3       Q   Has voted illegally?

4       A   Correct.

5       Q   And as you said, the 3PVROs were not the

6   focus of any of those prosecutions or convictions;

7   correct?

8       A   Correct.  Can I use the word target?

9       Q   Sure.

10      A   I feel more comfortable saying they use

11  the word target, yes, ma'am.

12      Q   Understood.  To the extent that OSP and --

13  does OSP ever interact with supervisors of

14  elections in prosecuting a voting-related crime?

15      A   Yes.

16      Q   And how would you interact with

17  supervisors of elections?

18          MS. MORSE:  Objection to form.

19      A   They would be -- it would probably start

20  out by us needing documentation from them.  We --

21  either whether it be by subpoena, whether it be

22  by, you know, just a cooperative letter or

23  whatever it might be, but we would obtain

24  information from them like that.

25          And on the instances where we have to go

1    to trial, we need a witness from the supervisor --

2    the affected supervisor's officer to come in and

3    testify.  Other than that, any other involvement

4    with the supervisors we have attended -- wait a

5    minute, have we attended yet?  I think we have

6    attended trainings where the supervisors were

7    present or something like that.  I believe beyond

8    that, that's really the gist of our contact with

9    the supervisors, both investigatively and then

10   ultimately if we have to go to trial.

11       Q  Do the supervisors ever conduct their own

12   investigations into 3PVROs, to your knowledge?

13       A  I believe some do.  Sometimes when the

14   referrals -- oh, did someone speak?  I'm sorry.

15          Oh.  Sometimes when the referrals have

16   been made to the Secretary of State or FDLE or

17   whomever, you know, I have seen that the

18   supervisors will indicate a letter or whatever,

19   that they have looked into something and this is

20   what they found.  So, along those lines, calling

21   that an investigation, which probably is fair,

22   yes.

23       Q  And in your experience, do they do an

24   effective job with informing those investigations?

25       A  An effective -- they're helpful.  I'm not

1    trying to be coy.  I'm trying to think, an

2    effective job in those investigations.  The

3    information they provide is helpful.  I would call

4    it the starting point, and then law enforcement

5    takes over.

6          I hope that's answering your question.

7    I'm not besmirching at all what they do.  I'm not

8    saying it's poor, I'm just saying, you know, it

9    it's typically not the end all for us.  We need

10   more.

11      Q  Now, I want to talk to you a little bit --

12   I know that you are primarily familiar with the

13   criminal statutes at issue here, but I want to

14   talk to you about a little bit about the civil

15   penalties before we turn to the criminal

16   penalties.  To your knowledge, the Attorney

17   General is responsible for -- or, excuse me --

18   strike that.

19          Who is responsible for issuing civil

20   penalties for 3PVROs who put in noncompliant voter

21   registration application?

22      A  My experience with it has been the

23   Secretary of State's office and the OECS.  I

24   believe the Attorney General can, but that has

25   been exercised, in my experience, with the

1    Secretary of States.

2        Q   How are concerns involving 3PVROs brought

3    to OPS's attention?

4        A   Brought to who?

5        Q   OPS's attention?  Is it always FDLE?

6            MS. MORSE:  Objection to form.

7        A   Do you mean statewide?

8        Q   Yes.

9        A   Oh, I'm sorry, you said OPS.  I got

10   confused.

11       Q   Excuse me.

12       A   Is it always FDLE?  I want to reiterate I

13   didn't get to speak to one of my lawyers to get

14   updated about questions regarding some pending

15   matters.  To my knowledge the answer is yes, as we

16   sit here now.

17       Q   And do you ever get any information, to

18   your knowledge as a representative for the

19   Attorney General's office, concerning late

20   application submitted by 3PVROs?

21       A   Do we get any information about late apps?

22       Q   Yes.

23       A   Not to my knowledge.

24       Q   Do you get any information about

25   applications submitted to the wrong county by

1  3PVROs?

2      A  I'm just thinking here.  No, ma'am, not to

3  my knowledge.

4      Q  Do you know if you get any information

5  about applications submitted after book closing by

6  3PVROs?

7      A  No, ma'am, not to my knowledge.

8      Q  Okay.  Based on your responses to

9  Ms. Keenan, it -- and it sounds like the

10  investigation portion is handled by a couple of

11  different entities, but from the AG's perspective,

12  it's handled by the civil litigation department;

13  am I understanding that correctly?

14      MS. MORSE:  Objection to form.

15      A  As it would relate to civil matters, yes.

16  They may have assistance from other agencies, but

17  yes.

18      Q  What kind of civil matters would the AG be

19  looking into if the AG is not receiving

20  information about late applications, wrong county

21  applications, and other noncompliant applications?

22      A  You're asking me if an investigation --

23  you're asking me if there were anything to go over

24  there, is what I was taking it, would it be

25  handled by civil.  My answer would be yes, because

1   I believe that they conduct investigations on

2   matters that come in there.  I'm unaware of any of

3   these matters that have gone in there, though.

4       Q  So do you know what kind of matters the

5   civil side would be handling involving 3PVROs?

6       MS. MORSE:  Objection to form; asked and

7   answered.

8       A  Beyond the possibility of whether one of

9   the things we've been speaking of showed up, I

10  mean, that's what I would think it might be.

11      Q  Okay.  And then on the criminal side, I

12  understand that your office doesn't handle the

13  investigation.

14      Who was handling the investigation on the

15  criminal side?

16      A  Law enforcement.

17      Q  Okay.  Do you have discretion in deciding

18  whether to prosecute voting and voter registration

19  related crime?

20      MS. MORSE:  Objection to form.

21      A  We do.

22      Q  And to your knowledge, if the civil side

23  were dealing with civil penalties, do they have

24  discretion in deciding whether or not to issue any

25  kind of civil penalties?

1        A   They would.

2        Q   Do you know what authority that would be

3    based on?

4        A   For the criminal or the civil?

5        Q   For the civil side?

6        A   I'm not aware of what authority -- whether

7    an actual authority exists that says that.  It's

8    just like with a prosecutor, you know, we have to

9    make the legal determinations of whether cause,

10   you know, exists to be able to move forward.  I'm

11   not aware of any specific thing in writing in

12   civil.

13       Q   Okay.  Do you know whether the civil side

14   of the Attorney General's office communicates with

15   3PRVOs that they're investigating for potential

16   civil penalties?

17       A   I am not aware of that -- of them doing

18   that.  So I don't have an answer for that because

19   I'm not aware that they've done that.

20       Q   And so are you also unaware of whether a

21   3PVRO would have an opportunity to contest a fine

22   levied by the civil side of the Attorney General's

23   office.

24       MS. MORSE:  Objection to form; assumes

25   facts not in evidence.

1      A   I'm unaware.

2      Q   Okay.  I'm just going to share my screen

3  for a moment here.  And I'm sharing Exhibit 41

4  which Ms. Keenan had entered and marked for the

5  record.

6          MS. MORSE:  What number?

7          MS. O'DONNELL:  It's Exhibit 41, and I'll

8  be scrolling to page 16.

9      A   Okay.

10     Q   Can you see my screen, Mr. Cox?

11     A   Page 15 of 96, yes, ma'am.

12     Q   Yes.  I'm sorry, I misspoke, I'm on 15 for

13  right now.  Scrolling to line 456, so I'm taking

14  us down now to 16.

15         Do you see here where SB7050 changes the

16  fine structure to $50 per each day late for

17  applications that are submitted by 3PVROs?

18     A   As I told Mr. Ferguson earlier, I see

19  where the fine amount is set at $50 per day.  I

20  was not aware of what it was before this.  But

21  that amount is there, yes, ma'am.

22     Q   And do you see where it shortens the

23  deadline for submitting those applications to 10

24  days?

25         MS. MORSE:  Objection to form; asked and

1  answered.

2      A  The shortening, though, I can see where

3  they did cross out 14 and put 10, which indicates

4  a change.

5      Q  Do you know how many 3PRVOs were fined in

6  2022 for late applications?

7          MS. MORSE:  Objection to form.  Fined by

8  who?

9      A  That was my next question.

10     Q  How many were fined by the civil side of

11 the Attorney General's office?

12     A  I'm unaware of any.

13     Q  Are you aware of any that were fined by

14 the Attorney General's office in 2020?

15     A  I am not aware of any.

16     Q  Are you aware of any that were fined in

17 2018?

18     A  I am not aware of any, no, ma'am.

19     Q  Do you have any knowledge about whether

20 the increase in fines will decrease the number of

21 late applications turned in by 3PVROs?

22          MS. MORSE:  Objection to form.

23     A  Do I have any knowledge whether the

24 increase will impact that?

25     Q  Correct.

1      A  I haven't read any studies.  I'm not an

2  expert in anything like that.  So I don't have an

3  answer for that.

4      Q  Are you aware that SB7050 increases fines

5  for applications that 3PVROs returned to the wrong

6  county?

7          MS. MORSE:  Objection to form.

8      A  Based on reading it, I'm aware that there

9  is that provision.  I don't remember if it was a

10  change or not, much like I wasn't sure about the

11  change in the amount, but I've read that.

12     Q  Do you know how many 3PVROs the civil side

13  of the Attorney General's office fined in 2022 for

14  returning applications to the wrong county?

15     A  The civil side?

16         MS. MORSE:  Objection to form.

17     Q  Correct.

18     A  I'm unaware.

19     Q  Do you know how many 3PVROs were fined by

20  the Attorney General's office in 2020 for

21  returning wrong county applications?

22         MS. MORSE:  Objection to form; asked and

23  answered.

24     A  I'm unaware.

25     Q  Do you know if any fines were levied in

1    2021 by the Attorney General's office?

2         A   In 2021, what?

3         Q   Were levied by the Attorney General's

4    office against 3PRVOs?

5         A   I'm unaware.

6         Q   In your view, do you think an increase in

7    fines would decrease the number of wrong county

8    applications submitted by 3PVROs?

9             MS. MORSE:  Objection to form.

10        A   Ms. O'Donnell, I apologize I couldn't

11   quite hear that.

12        Q   That's okay.  I apologize for my

13   communication.

14        A   That's okay.

15        Q   I said, do you know -- or do you have --

16   do you think that the decrease in -- that there

17   would be a decrease in wrong county applications

18   because of the increase in wrong county fines for

19   3PVROs?

20            MS. MORSE:  Objection to form.

21        A   I have no training nor have I reviewed any

22   studies or anything like that, so I don't have

23   that knowledge.

24        Q   Do you have any understanding of the ways

25   in which these types of fines would interact?  How

1    the late application fine would interact with the

2    wrong county fine?

3         A  I do not.

4         Q  So, for instance, if a 3PVRO submitted an

5    application to Leon County but it was supposed to

6    go to Jefferson County and it spends additional

7    time in the mail getting from Leon to Jefferson,

8    you don't know if there would be additional fines

9    for that time spent in the mail that would make it

10   late, do you?

11        A  I do not.

12        Q  Do you know if the Attorney General's

13   office has seen any less incidents of noncompliant

14   applications from 3PVROs since 2022?

15        MS. MORSE:  Objection to form; facts not

16   in evidence.

17        A  And that's nothing that I've studied nor

18   information that I've collected.  I'm unaware.

19        Q  In your experience in the attorney -- in

20   the Attorney General's office, do fines serve any

21   kind of deterrent effect on 3PVROs?

22        MS. MORSE:  Objection to form.

23        A  Having not administered the fines, I do

24   not -- I'm unaware.

25        Q  We've talked a little bit today, and it

1  seems you are aware of the fact that SB7050

2  implements a $50,000 fine on 3PVROs for each

3  noncitizen collecting or handling a voter

4  registration on behalf of the 3PVRO; is that

5  right?

6      A  Yes, ma'am.

7      Q  And to be sure I understand your testimony

8  here, you're not aware of any incidents involving

9  a noncitizen who engaged in unlawful activity

10  related to registering voters on behalf of a

11  3PVRO; correct?

12      MS. MORSE:  Objection to form.

13      A  I'm unaware of any noncitizen.  That's

14  correct.

15      Q  And to your knowledge, has the Attorney

16  General produced any document in this litigation

17  showing that a noncitizen has been involved in any

18  unlawful voter registration activity on behalf of

19  a PVRO?

20      MS. MORSE:  Objection to form in terms of

21  the exemption for pending investigation.

22      A  And in terms of what's been produced, as I

23  indicated earlier, I've reviewed, I'm guessing

24  again, I think that was around 1,500 pages or so

25  of stuff that had been produced in this

1    litigation.  And so I haven't been able to go

2    through every single document to see if that's the

3    case.  I'm sorry.  I've got a day job, too.

4        Q  Limiting to the 1,500 pages or so that you

5    reviewed in anticipation of your deposition, are

6    you aware of any documents that the Attorney

7    General has produced in this litigation showing

8    that a noncitizen engaged in unlawful activity

9    related to registering voters on behalf of a

10   3PVRO?

11        MS. MORSE:  Objection to form.

12        A  Based on what I reviewed, I don't recall

13   anything like that.

14        Q  Do you believe that prohibiting

15   noncitizens from helping people register to vote

16   will prevent or deter noncitizens who are --

17   excuse me -- will deter people from registering to

18   vote in Florida?

19        MS. MORSE:  Objection to form; calls for

20   legal conclusion.

21        A  As an agency rep, I don't believe my

22   opinion is appropriate.  However, I have not seen

23   studies, I'm not trained in that kind of area, so

24   I don't know the answer to that.

25        Q  Prior to SB7050, did the Attorney

1  General's office ever track the citizenship status

2  of those who registered people on behalf of

3  3PVROs?

4      A   Those who registered to vote?

5      Q   Those who helped to register voters, those

6  who were serving as canvassers on behalf of

7  3PVROs.

8          MS. MORSE:   Objection to form.

9      A   I'm unaware of that happening.

10     Q   When investigating any type of application

11  received from a 3PVRO, did the Attorney General's

12  office ever track the citizenship status of the

13  canvasser who helped the 3PRVO collect that

14  application?

15          MS. MORSE:   Objection to form.  And I'm

16  going to object also, a lot this seems to relate

17  to topic 12 which Ms. Guzzo covered thoroughly.

18  She answered that question fully.

19          MS. O'DONNELL:   This is not about the

20  tracking and/or awareness of the racial breakdown

21  of voters.  This is about the canvases who are

22  actually administering this provision.

23          Excuse me.  Who are helping to collect

24  voter registration applications, and so it's

25  relevant to topic six.

1          MS. MORSE:   Topic?

2          MS. O'DONNELL:   Six.

3      Q  Did your office collect -- I'll repeat the

4  question, I know that we --

5      A  Okay.

6      Q  Did your office collect any information

7  relevant to the citizenship status of individuals

8  who collected applications on behalf of 3PVROs?

9      A  Not to my knowledge.

10     Q  And so when the State enacted SB7050, it

11  did not have any data from your office that

12  demonstrated noncitizens were even involved in the

13  collection of noncompliant or suspicious voter

14  registration applications; is that right?

15     A  I am unaware of anything like that.  And

16  we were, as was indicated earlier, not -- what's

17  the word -- sponsors, proponents, involved in the

18  legislative activity on this bill.  To my

19  knowledge, though, no.

20     Q  So to be clear, no data was submitted to

21  your knowledge about noncitizens handling

22  noncompliant or suspicious applications on behalf

23  of the 3PVRO; did I get that right?

24     A  By the Department of Legal Affairs, not to

25  my knowledge.

1      Q  Okay.  I'm going to direct you back to the

2   language of what we're calling the citizenship

3   requirement, which is on page 14.  And I'm happy

4   to share my screen to make it a little bit easier.

5          Okay.  So, looking here, as you can see,

6   the language is:  An affirmation that each person

7   collecting or handling voter registration

8   applications on behalf of the third party voter

9   registration organization is a citizen of the

10  United States.

11         Have I read that correctly?

12     A  I'm sorry, I was looking at the wrong one.

13  Yes, you did.

14     Q  Okay.  And so, to your knowledge, how

15  would the state discern each person who's

16  collecting or handling a voter registration

17  application, how would it discern the citizenship

18  status of each individual canvassing on behalf of

19  a 3PVRO?

20     A  How would they discern the citizenship

21  status of one of them?

22     Q  Yes.

23     A  Based on the questioning earlier, and

24  based on the writing of the statute, it would be

25  based upon the registration by the 3PVRO, the

1  materials that they provide and the forms that are

2  filled out about the citizenship status of the

3  canvassers.

4      Q  So it's your understanding that each 3PVRO

5  would have to list each canvasser operating on its

6  behalf and the person's citizenship status?

7          MS. MORSE:  Objection to form.

8      A  If I'm understanding your question

9  correctly, yes, that's what subsection one calls

10  for.

11     Q  And we can agree that based on that

12  language, it would be a $50,000 fine for each one

13  person who is a noncitizen helping to register

14  another person on behalf of a 3PVRO; is that

15  right?

16         MS. MORSE:  Objection to form.

17     A  Reading 1F, that appears to be true.

18     Q  We can agree that's a lot of money; right,

19  Mr. Cox?

20         MS. MORSE:  Objection to form.

21     A  Again, that's my personal opinion.  I

22  don't think I should be testifying to my personal

23  opinions.

24     Q  Understood.  Moving on.

25         Is the Attorney General aware of any

1   incidents involving identity theft by a person

2   operating on behalf of a third party voter

3   registration organization?

4        MS. MORSE:  Objection.  To the extent this

5   implicates the work product privilege or any

6   pending investigations, I'm going to ask the

7   witness not to divulge any privileged information.

8        A  I'll answer that yes, but I can't go

9   further.

10       Q  Okay.  Before SB7050, do you know who

11  could request a vote by mail provision -- a vote

12  by mail ballot on behalf of a voter?

13       A  Prior to 7050 -- I'm getting confused now.

14  I'm not 100 percent sure prior to 7050.

15       Q  Okay.  I'm going to show you another

16  provision here in Exhibit 41.  I'm going all the

17  way to page 59.  And I'll share my screen to make

18  this a little bit easier.  So, I'm just going to

19  read aloud.  It says here that the supervisor

20  shall accept a request for a vote by mail ballot

21  only from a voter or if directly instructed by a

22  voter, a member of the voter's immediate family,

23  or the voter's legal guardian.

24       Am I reading that right?

25       MS. MORSE:  Which line are you on?

1          Yeah, I'm not --

2          MS. O'DONNELL:  I'm sorry.  I'm on line

3     1704 through 1707.

4          MS. MORSE:  Okay.

5     A  I'm sorry?

6     Q  Have I read that correctly?

7     A  Yes.  I'm not -- that appears to be the

8     new language, if I'm understanding what this is.

9     That appears to be the new language.  I thought

10    you asked me about prior to this.

11    Q  Yes.  So looking at the struck out

12    language here, did it previously say, simply from

13    an elector in person or in writing?

14    A  According to this bill, yes, it did,

15    that's the struck section.  What you read appears

16    to be the new language.

17    Q  Are you aware of any instances of unlawful

18    conduct related to nonimmediate family members

19    requesting a vote by mail ballot on behalf of a

20    voter?

21    A  Let me think just a minute.  I am not.

22    Q  Do you know if your office has ever

23    prosecuted or convicted anyone of allegations

24    related to such an incident?

25    A  Not that I'm aware of.

1      Q   Okay.  Are there any kinds of voter or

2   voter related conduct that your office prosecutes

3   that we haven't discussed today with either me,

4   Ms. Keenan, or Mr. Ferguson?

5          MS. MORSE:  Objection to form.

6      A   We've discussed a lot of what we've done,

7   we've gone through documents that indicate the

8   various cases that we've had, you know, the list

9   that we've gone through and the -- everything I

10  went through with Mr. Ferguson.  I don't know if

11  we -- your question was whether we've handled or

12  prosecuted?

13     Q   I said prosecuted, but we can expand it to

14  handled, if there are.

15     A   I was going to say the only thing that I'm

16  aware of that goes beyond this where I think you

17  probably have gotten documentation were some

18  previous investigations involving acceptance of

19  electronic mail in ballots as opposed to the ones

20  that are done in the mail.  There was one

21  involving one of the parties altering the

22  registration form for vote by mail -- I believe it

23  was vote by mail -- no, it was in the -- I think

24  it was vote by mail, it's been a few years.

25          And then we also had it and we also had --

1    FDLE had looked into a situation involving the

2    Supervisor of Elections Office in Broward County.

3    I don't think we've talked about that.  None of

4    those resulted in any of the arrests or charges.

5        Q  Okay.

6        A  I think everything else we've either

7    talked about or it's been referenced in documents,

8    I believe.

9        Q  Did your office's policies change at all

10   since the passage of SB7050 as related to handling

11   voter registration allegations?

12       A  Office's policies -- no, we didn't do any

13   policy changes.

14       Q  And just so I understand, did your office

15   -- was your office consulted in any way in leading

16   up to SB7050?

17       MS. MORSE:  Objection to form; asked and

18   answered.

19       A  No.

20       Q  Do you know if your office's policies

21   changed after SB70 -- excuse me, SB90's passage,

22   if that led to any changes in your office?

23       MS. MORSE:  Objection to form.  Also, what

24   is 7090?

25       MS. O'DONNELL:  I'm sorry, I said SB90.

1          MS. MORSE:  Oh.

2      A  We haven't changed any of our policies as

3  it relates to any elections matters because we're,

4  quite candidly, handling these in the manner we

5  would handle any other criminal case.

6      Q  Have you required any additional staffing

7  on your part?

8      A  The legislature allocated positions to the

9  office of elections integrity to the Florida

10  Department of Law Enforcement and to OSP.  We were

11  allotted six attorney positions for this effort.

12      Q  And when was that?

13      A  Last year.  Legislative session last year.

14  Not in 2023, the year before that.

15      Q  And have you filled those six attorney

16  positions?

17      A  Can I look at my list?

18      Q  Sure.

19      A  The one I showed you all earlier.  I

20  believe I've got them all filled except for one.

21      Q  And are you currently actively looking to

22  fill that role, to the extent you know?

23      A  We are.

24      Q  I'm going to drop in a document.  I'll

25  first share my screen so you can see what I'm

1    referencing.

2         All right.  Does this document look

3    familiar to you?

4       A  Yes.  I believe I have it in front of me.

5    A blank copy of it.

6       Q  And I'm just going to scroll to the

7    bottom.  It looks like you personally contributed

8    to -- to responding to the interrogatories; is

9    that right?

10      A  I did.  I was in -- I was involved in the

11   discussion, the work on the responses, yes.

12      Q  Okay.  And it looks like based on

13   interrogatory number 18, that someone we talked a

14   bit about the today, John Bajger, was also

15   involved.

16        Do you know which responses John Bajger

17   helped to respond to?

18      A  You know, I really don't remember.  It's

19   been -- when was this?  It's been a little bit of

20   time.  I don't remember what it was, but -- I

21   apologize.

22      Q  Understood.  Do you know -- you mentioned

23   before, he's the chief of civil litigation; is

24   that right?

25      A  Yeah, I think his title is Associate

1    Deputy Attorney General, I believe.  But yes, he

2    basically runs the civil litigation portion of the

3    AG's office.

4        Q  Can you tell us a little bit more about

5    how his office and your office might interact?  On

6    election related matters, excuse me.

7        A  On election related matters?

8        Q  Correct.

9        MS. MORSE:  Objection to form.

10       A  We really -- I really can't say that we

11   have yet.  Let me think.  I wish I remember why I

12   called John.  I haven't experienced a situation

13   where we've had to interact with them on any of

14   the matters that we've been working on.

15       Q  Has a complaint that started off on the

16   civil side of the AG's office ever been escalated

17   to the criminal side for a 3PVRO or for any

18   registration related conduct by a 3PVRO?

19       A  3PVROs.  I can say no on 3PVROs.  I'm not

20   aware of anything else.  I'd have to sit here and

21   think about it.  But no, on the 3PVROs, no.

22       Q  Directing your attention to a response

23   that's on page 10, also up on my screen, but I

24   also know you have it in front of you.  Or, excuse

25   me, I said 10, but I meant -- this is

1    interrogatory 13, which is on page 10.

2            So, here the interrogatory was:  State and

3    explain your definition of the terms collecting

4    and handling as used in the 3PVRO canvasser

5    restrictions.

6            It looks like your response is:  The OAG

7    follows the rules of statutory construction

8    established in judicial precedent.  As such, where

9    terms are not specifically defined in statute, the

10   OAG generally relies on the plain meaning of the

11   terms at issue.

12           Have I read that correctly?

13       A  You have.

14       Q  Can you tell me why you used the word

15   generally there?  What else would you rely on

16   outside of statutory construction?

17       A  As I mentioned earlier --

18           MS. MORSE:  Objection to form.

19           You can answer it.

20       A  As I mentioned earlier, we -- in criminal,

21   you first and foremost looked in the plain

22   reading.  You know, if I went outside of that, I

23   would probably go to something as direct as

24   Webster's or Black's Law dictionary.  You know

25   beyond that, I guess, you could also say that if

1  there were case law -- which I don't believe there

2  is here -- but if there were case law, now that

3  I'm thinking about it, you might look to precedent

4  in case law.

5      Q  And outside of those sources, if there was

6  a definition explicitly provided in statute, would

7  you turn there first before any of those sources?

8      A  Would I turn to that first?

9      Q  Yes.

10     A  Yes.

11     Q  Have you been asked to define, to --

12 excuse me -- opine on the definition of collecting

13 and handling as used in SB7050?

14     A  Not until now.

15     Q  Directing your attention to interrogatory

16 14, which is right under that, it's the same

17 question, but for the term voter registration

18 application.  And you provided the same answer,

19 that you rely on the rules of statutory

20 construction established in judicial precedent,

21 and where something is not specifically defined,

22 you rely on the plain meaning.

23         So, is it the Attorney General's position

24 that this term, voter registration application, is

25 not specifically defined in the statute?

1          MS. MORSE:  Objection to form.

2      A  It's not defined in 950575.  I mean, it's

3  not defined there.  I'm not positive that it is --

4  if it is elsewhere.  I haven't had one of these

5  cases to address that issue.

6      Q  And if the term was explicitly defined in

7  970575, would that be the first place that you

8  would turn for the term voter registration

9  application's definition?

10      A  There or at the beginning of the

11  Chapter 97, which is typically where most

12  definitions are listed.

13      Q  Has the Attorney General been asked to

14  opine on the meaning of the term voter

15  registration application as it's used in this

16  provision?

17      A  I'm thinking.  No, not to my knowledge.

18      Q  To your knowledge, would this term

19  encompass blank application?

20          MS. MORSE:  Objection to form.

21      A  I don't know the answer to that.  Because

22  again, we have not handled one of these.  And I

23  have not had that -- I'm not aware of that

24  question having come up to us.  So I don't know

25  the answer to that yet.  It would probably require

1    me to work on that or whoever else to work on

2    that.

3         Q   And so to your knowledge, you don't know

4    whether, as the SB representative for the Attorney

5    General, this would encompass completed

6    applications at this time; is that right?

7              MS. MORSE:   Objection to form.   That's not

8    his testimony.

9         A   I don't know the answer to that right now

10   because it hasn't been delved into.

11        Q   Are you aware that the State has engaged

12   in rulemaking concerning some of the terms used in

13   SB7050?

14        A   When you say the State, who are you

15   referring to?

16        Q   The Secretary of State, the Department of

17   State.

18        A   Yes, I believe I'm aware they've done it.

19   Yes, I believe I'm aware that's happened.

20        Q   Are you familiar with that rulemaking?

21        A   I am not.   I'm aware of the existence, but

22   I don't think I'm aware of all the detail of it.

23        Q   I'm going to share my screen again, just

24   momentarily here.   I'm going -- I'll represent to

25   you that this is directly from the Department of

1   State's website.  This is the rulemaking that we

2   were just discussing.  I'm scrolling to

3   Section 3C.

4         Looking here, do you see where it says:

5   Collecting or handling for the purposes of

6   Section 97.05751E through FS, means physically

7   exercising custody over voter registration

8   applications containing a voter's personal

9   information.  It does not include distributing

10  blank registration applications, supervising the

11  collecting of or handling of voter registration

12  application, assisting a voter who requests

13  assistance to fill out their voter registration

14  application, or facilitating the voter to

15  registration electronically through registered to

16  Florida.gov -- to voteFlorida.gov?

17        Have I read that correctly?

18     A  Yes, ma'am.

19     Q  Now, do you think that this provides an

20  exhaustive list of what could potentially

21  constitute collecting and handling?

22        MS. MORSE:  Objection to form.

23     A  With the understanding that we haven't

24  tackled this, you know, in the Office of the

25  Statewide Prosecution yet.  And secondly, with all

1   due respect to a sister agency, what their

2   rulemaking says doesn't necessarily provide me

3   with the criminal guidance about whether or not

4   this is actually the appropriate definition.

5       Q   Can you expand on that a little bit more?

6           MS. MORSE:  Objection to form.  Is this an

7   exhibit?  Can you put that in the chat?

8           MS. O'DONNELL:  I'll put it in the chat

9   now.

10      Q   All right.  So, directing your attention

11  back to 3C here.  Can you expand a little bit, I

12  believe is where we were at, on why your sister

13  agency providing this definition doesn't

14  necessarily bind you as criminal -- excuse me, as

15  the Office of the Statewide Prosecutor?

16          MS. MORSE:  Same objection.

17      A   I wasn't saying it didn't bind me, but

18  really the definition by another agency, I would

19  say especially a noncriminal agency, but the

20  definition by an agency such as in this situation

21  doesn't control how the criminal law would view

22  this.  I could go before a judge -- and I'm

23  expanding here for you -- I could go before a

24  judge with this definition and say, well, this is

25  how State says it, and these guys are the top of

1    the ladder, so to speak, as it relates to

2    elections matters.  And use it, try to use it as

3    persuasive evidence if I needed to argue

4    something, you know, that was -- that would assist

5    me based on that.

6          But the Court wouldn't be required to

7    follow it.  The criminal law, unless it's

8    specifically delineated that the Department of

9    State would create such a definition, the criminal

10   law is not bound by an agency's definition.

11     Q  And turning back to the language that is

12   here, it only says -- this section C says, it does

13   not include distributing and then provides a list.

14   And drawing you back to the original question,

15   would you say that this list is in any way

16   exhaustive and says all of the different ways in

17   which exercising physical custody could occur?

18         MS. MORSE:  Objection to form.

19     A  I don't know the answer to that.  I don't

20   know the answer to that.  And it would be

21   something that -- give me a moment.  Let me think

22   about this for a minute.  Do I -- is that an

23   exhaustive list?  Probably, it could or could not

24   be.  I'm just not sure.  I haven't thought about

25   that.

1    Q  It's not entirely clear to you; is that

2 right?

3        MS. MORSE:  Objection to form in terms of

4 characterization of clarity.

5    Q  You can still answer, Mr. Cox.

6        Is it not entirely clear to you based

7 on --

8    A  It's not a matter of whether it's clear to

9 me what they're saying.  It's more a matter of,

10 I'm looking at it from the standpoint, I thought,

11 of whether or not this would apply to the criminal

12 cases we would handle.  And again, I would say

13 again that it would I could use it, I could try to

14 use it as something persuasive, but it would not

15 necessarily rule the day in a criminal case, in a

16 criminal court.

17   Q  And again, saying that you did try to use

18 this as something that's persuasive, would you say

19 that, relying on this, this is an exhaustive list

20 of the behaviors that would be encompassed by this

21 particular provision?

22        MS. MORSE:  Objection; asked and answered.

23   A  I don't know if it's exhaustive or not.  I

24 don't know if it's exhaustive or not.  And I don't

25 know the answer to that.  I'm not sure.

1      Q  And that's based on reading this in

2  section C; correct?

3         MS. MORSE:  Objection to form.

4      A  This is -- yes.  I don't have anything

5  else to compare this to.

6      Q  Okay.  I'm going to turn back to

7  Exhibit 41.  And I'm going to take us to page 18.

8  So I'm looking at the underlined words here.  Is

9  it -- to your knowledge, is it the OAG's position

10  that the term personal information is not

11  specifically defined in the statute?

12     A  That's correct.  Based on my reading of

13  the statute.

14     Q  And is the term in compliance with this

15  section defined in the statute?

16        MS. MORSE:  Objection to form.  He's been

17  asked about this before.

18     A  Not based on my reading of the statute.

19     Q  To your knowledge, has the AG's office

20  been asked to opine on the meaning of the term

21  personal information as it's used in the section

22  on the screen, Section 7?

23        MS. MORSE:  Objection.  And to the extent

24  this question implicates work product or the

25  deliberative process privilege, I'm going to ask

1  the witness not to divulge any work product or

2  otherwise privileged information.

3      A  Not to my knowledge.

4      Q  And does the AG have any definition of

5  personal information that it's operating under?

6          MS. MORSE:  Objection to form; asked and

7  answered.

8      A  And I'm also concerned about the breadth

9  of that, because we do utilize definitions of

10 personal information for other crimes.  But as it

11 relates to this, not to my knowledge.

12     Q  Would the definition be the plain meaning

13 to the extent that the definition is not provided

14 in the statute?

15         MS. MORSE:  Objection to form.

16     A  That's where we first go criminally.

17     Q  Is it clear to you, based on the language

18 on the screen in Section 7, what personal

19 information means under this provision?

20         MS. MORSE:  Objection.

21     A  What personal information means?

22     Q  Correct.

23         THE WITNESS:  Stephanie, were you --

24         MS. MORSE:  I did say objection.

25         You can answer.

1      A   This is the one where it gives the

2  examples, and I may be using the wrong word, but

3  it gives examples or indications of what personal

4  information may be.

5      Q   Correct.  So I'll read, just so we're all

6  on the same page and for the record.

7          If a person collecting voter registration

8  applications on behalf of a third party voter

9  registration organization, copies of voter's

10 application or retain the voter's personal

11 information, such as the voter's Florida driver's

12 license number, Florida identification card

13 number, Social Security number, or signature, for

14 any reason other than to provide such application

15 or information to the third party voter

16 registration organization in compliance with that

17 section, the person commits a felony of the third

18 degree punishable as provided in.  And then it

19 explains a few statutory statute numbers.

20         Have I read that correctly?

21     A   Yes, ma'am.

22     Q   Does the such as clause suggest that the

23 list provided there is not exclusive?

24     MS. MORSE:  Objection; this is asked and

25 answered.  He's been asked questions about this

1    previously by previous attorneys.  This is all

2    just -- -

3        MS. O'DONNELL:  Ms. Morse, is that an

4    objection just to the form?

5        MS. MORSE:  It is an objection to the

6    form, but it's also just an objection, I mean, in

7    terms of just badgering the witness.

8      Q  Mr. Cox, you can answer, specifically just

9    as to the such as clause?

10      A  It suggests to me that it's not exclusive.

11    That that list is not exclusive.

12      Q  Is it clear to you what in compliance with

13    this section might mean?

14        MS. MORSE:  Objection to form.

15      A  Is it clear to me when I would certainly

16    -- I would simply look to the plain meaning of

17    that, since it's not defined anywhere.  I haven't

18    had a case involving this, so I'm not sure beyond

19    the plain meaning what it -- you know, where we

20    would go with that.

21      Q  And do you know if, let's say, a third

22    party voter registration organization retained a

23    copy of the voter registration application to

24    follow up on issues that OECS flagged to them as

25    noncompliant in operating within SB7050, would

1  that be operating in compliance with this section?

2          MS. MORSE:  Objection to form.

3      A  I don't think I can answer that question

4  based on just that.  I would need more

5  information.  Whether it be law enforcement to

6  file whatever or any other legal information.  I

7  don't think I can answer it simply based on that.

8      Q  If a 3PVRO believed that it could retain

9  copies of voter registration applications to help

10 voters with voter registration in compliance with

11 portion of SB7050, do you think that the Office of

12 the Statewide Prosecutor would still have the

13 authority to prosecute that 3PRVO?

14         MS. MORSE:  Objection to form.

15     A  Let me read again.

16         Ms. O'Donnell, you were asking me if they

17 did what now?

18     Q  If they retained a copy of voter

19 registration applications to help voters in order

20 to comply with SB7050, would OSP have the

21 authority to prosecute those 3PRVOs?

22         MS. MORSE:  Same objection.

23     A  It's going to depend on the definition

24 that you're talking about right now, and we

25 haven't dealt with that yet.  And so I'll have a

1    hard time answering that.

2        Q   Understood.   Are you aware that the State

3    has engaged in rulemaking concerning the language

4    in this portion of the statute as well?

5        A   You mean the Department of State?

6        Q   Sure.

7        A   Again, I'm aware that they've engaged in

8    rulemaking.   As to this particular part, I don't

9    know.   I don't have any knowledge, but I know that

10   they've engaged in rulemaking.

11       Q   And I'm turning back to what I had marked

12   as Tab 7 and put into the chat.

13           Are you aware that the -- I'm going to

14   scroll here actually to 3H.   So, this says:

15   Voter's personal information for purposes of

16   Section 97.05757 means a voter's private

17   information that is not generally available to the

18   public, including the voter's driver's license

19   number, Florida identification card, Social

20   Security number, or signature.   It doesn't include

21   information contained in a form DSDE129.

22           Have I read that correctly?

23       A   You have.

24       Q   Okay.   And so, would you say that this

25   list starting after "including" is exhaustive?

1        MS. MORSE:  Objection to form.

2     A  I mean, this is rulemaking, so I'm not

3 reading this with a statutory construction or with

4 anything like that in mind.  I mean, really you're

5 asking me -- this is the Department of State --

6 you're asking me to speculate on what the

7 Department of State meant by this and for what

8 purpose they were wanting to use this for.  From

9 the criminal standpoint, I would maintain the same

10 answer I did earlier as collecting or handling,

11 but do I think this is exhaustive?  I can't say

12 because I didn't -- it's not my agency's document,

13 and I didn't create it, author it.

14     Q  And to be clear about what you're saying

15 would apply here, this rulemaking would not

16 necessarily bind your office, you might present it

17 as persuasive; am I getting that right?

18        MS. MORSE:  Objection to form.

19     A  It would not bind us in a criminal court.

20 A criminal court would not necessarily look to

21 this as precedent that they must comply with.

22     Q  And I'm going to show you one other

23 document here.

24        So, as you can see here, this represents a

25 form DSDE129; is that right?

1     A  Okay.

2     Q  Okay.  And so I will again stop sharing my

3  screen so I can make sure that I put this into the

4  chat.

5          Okay.  And I'll share my screen again

6  here.

7          Are you familiar with this form?  I'll

8  represent to you this is the DSDE129 from the

9  Department of State website.

10         Have you ever had any familiarity with

11  this form?

12     A  Can you scan down a little bit?

13         You can go back to the top again.  It's

14  the same thing, isn't it?

15     Q  Yes.

16     A  I am unsure if I have seen -- I mean, I've

17  seen one of these forms related to this

18  litigation.  I am not sure if I have seen one of

19  these forms related to any cases that we have been

20  involved with.

21     Q  Okay.

22     A  I'm just not sure.

23     Q  So, this DSDE129, it has a space for the

24  applicant's name; is that right?

25     A  Yes.

1       Q  The applicant's party affiliation;

2  correct?

3       A  Yes.

4       Q  County of residence; right?

5       A  Yes.

6       Q  The date collected; right?

7       A  Yes.

8       Q  The 3PVRO ID number; correct?

9       A  Yes.

10      Q  And a registration agent; is that correct?

11      A  Yes.

12      Q  And then looking down here, it's the same

13  information on the second half of the form;

14  correct?

15      A  Yes, ma'am.

16      Q  So, there's no space here for a voter

17  registration applicant's phone number; right?

18      A  I do not see one.

19      Q  There's no space here for an email

20  address; correct?

21      A  I do not see that either.

22      Q  If the Attorney General's office received

23  a referred case for an investigation -- for a

24  potential prosecution based on a 3PVRO retaining a

25  voter's email address, do you think that that

1  would be a violation of the statute?

2      A  I just don't know.

3         MS. MORSE:  Objection to form.

4         You can answer.

5      A  I just don't know, having not been --

6  having addressed anything like this before, not

7  having addressed this particular issue, I just

8  don't know.

9      Q  And, Mr. Cox, we can agree that there is a

10  felony on the line for someone who violates this

11  voter information retention ban; right?

12      A  According to the statute, that's what it

13  calls for is a felony of the third degree.

14      Q  Can we agree that it's important to be

15  specific in criminal statutes to ensure that

16  people know when they're violating the law and

17  could face a felony?

18      A  Criminal statutes are intended to notice

19  the public of what is illegal criminal conduct in

20  a case.  So the intent of a criminal statute is to

21  serve as well as notice to the public.

22      Q  And because the intent of a criminal

23  statute is to inform the public of what is

24  illegal, it's important to be specific in what

25  constitutes misconduct under a criminal statute;

1    correct?

2        A   It's part of --

3            MS. MORSE:  Objection to form.

4        A   It's part of the intent in terms of how

5    specific it has to be, it's really up to the

6    legislature and the courts.  I am an enforcement

7    officer.  We are enforcement officers.

8            MS. O'DONNELL:  Understood.  Would we mind

9    going off the record for five minutes to take a

10   quick break while I consult my notes?  I think I'm

11   at the end of my questioning and I'll wrap up as

12   soon as we come back?

13           MS. MORSE:  Sure.

14           THE WITNESS:  Whatever works for ya'll.

15           MS. O'DONNELL:  Is that okay with you,

16   Ms. Morse?

17           MS. MORSE:  Yes.

18           (Off record from 3:59 p.m. to 4:05 p.m.)

19           MS. O'DONNELL:  At this time I have no

20   additional questions, Mr. Cox.  So, I thank you so

21   much for your time.  I know that it it's been a

22   long day and we appreciate your time very much.

23           THE WITNESS:  No problem.  Thank you.

24           MS. O'DONNELL:  I'm not sure if anyone

25   else has any other questions, but thank you for

1    your time.

2            MS. MORSE:  We don't have any redirect.

3            MS. KEENAN:  Before we close the record, I

4    do want to state and things for the record, but of

5    course, any more questions for Mr. Cox?

6            MR. FERGUSON:  Nothing more for me.

7    Thanks.

8            THE WITNESS:  So should I go ahead and

9    sign off now then?

10           MS. MORSE:  I think you're free to go.  If

11   no one else has anything, you're free to go,

12   Mr. Cox, I believe.

13           THE WITNESS:  Thanks ya'll.  It was nice

14   meeting you.

15           MS. KEENAN:  Oh, hold on one second

16   though.

17           MS. MORSE:  Before he leaves, I want to

18   confirm while the witness is here, that he's going

19   to read the transcript, read and sign.  He's not

20   waiving.

21           THE WITNESS:  I'll read.

22           MS. KEENAN:  And for the Hispanic

23   Federation plaintiffs, at least, we just want the

24   record to be clear, that we intend to leave this

25   deposition open.  No witness from the Attorney

1    General's office has been prepared to testify to

2    civil enforcement, it seems by instruction for how

3    the witnesses were designated.  That has created

4    holes in the record, as to topics 2, 10, and 16 at

5    least.  And so we reserve our right to request

6    another designee and we leave this deposition open

7    as a result.

8         MR. FERGUSON:  And The League of Women

9    Voters of Florida joins that.

10        MS. O'DONNELL:  And the NAACP plaintiffs

11   will join that as well.

12        MS. MORSE:  And I'll state for the record

13   for the Office of Attorney General, we object to

14   that.  We object to leaving it open.  And we

15   dispute the fact that we didn't produce someone

16   who was capable of responding to the topics.  I

17   think you, either not listening to the answers or

18   not liking the answers is different from not

19   receiving answers.  This witness made reasonable

20   inquiry and was reasonably prepared for the

21   deposition topics.

22        To the extent they were poorly worded or

23   ambiguous, it's not the witness's fault.  It

24   sounds to me -- I'm happy to talk afterward or

25   talk offline, but it looks like you all were

1    trying to -- I mean, you're trying to squeeze

2    blood from a turnip.  I think, in terms of, you

3    know -- sometime if there aren't answers to

4    questions, there's just no answer.

5         And we provided the information or the

6    witnesses provided the information and gave you

7    the personnel who handled and the procedure in

8    terms of the receipt of complaints regarding civil

9    matters.  They were adequately prepared and

10   adequately answered the questions, and so we do

11   object.

12        MS. KEENAN:  And, respectfully, ma'am,

13   just to put on the record, multiple times you

14   objected to asking him questions about law

15   enforcement, and specifically some of the statutes

16   that are issued in this case are only able to

17   enforced civilly, so we disagree and we'll be

18   happy to discuss with you or your office after the

19   deposition.

20        MS. MORSE:  Well, some of those questions

21   were -- I'm sorry, some of those questions were

22   answered by another witness, but at the end of day

23   he did, in fact -- he answered questions, I didn't

24   instruct him, he did answer the questions that he

25   was able to on civil that responded to the

1   deposition topics.  So I dispute that.  I think he

2   answered the questions adequately, as did

3   Ms. Guzzo.

4          MS. KEENAN:  Okay.  I think that's for the

5   record, and we can continue to have this

6   discussion off the record.  Thanks so much for

7   everyone's time today.

8          MS. MORSE:  Thank you.

9          THE WITNESS:  Ya'll take care.

10          MS. KEENAN:  I don't think we need to put

11   an additional order in.  One of the plaintiff's

12   groups has already put an order in.

13          MS. MORSE:  If it's been ordered, the

14   Attorney General will take a copy.

15          (Off the record at 4:10 p.m.)

16

17

18

19

20

21

22

23

24

25

1                ACKNOWLEDGMENT OF DEPONENT

2          I, NICHOLAS BERNARD COX, do hereby

3     acknowledge that I have read and examined the

4     foregoing testimony and the same is a true,

5     correct and complete transcription of the

6     testimony given by me and any corrections appear

7     on the attached errata sheet signed by me.

8

9     _____     _____

10         (SIGNATURE)              (DATE)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

 2         I, PAUL P. SMAKULA, the officer before whom

 3   the foregoing deposition was taken, do hereby

 4   certify that the foregoing transcript is a true

 5   and correct record of the testimony given; that

 6   said testimony was taken by me stenographically

 7   and thereafter reduced to typewriting under my

 8   direction; that reading and signing was requested;

 9   and that I am neither counsel for, related to, nor

10   employed by any of the parties to this case and

11   have no interest, financial or otherwise, in its

12   outcome.

13

14   IN WITNESS WHEREOF, I have hereunto set my hand

15   and affixed my notarial seal this 20th day of

16   December, 2023.

17

18   My commission expires:  June 18, 2027.

19

20

21   _____

22   NOTARY PUBLIC IN AND FOR

23   THE STATE OF MARYLAND

24

25
```

| A |
|---|

**able**
28:6, 54:21,
63:23, 73:20,
87:16, 104:14,
114:17, 121:6,
134:21, 153:14,
168:4, 180:15,
190:10, 197:1,
230:16, 230:25
**absolutely**
57:1, 100:24,
165:11, 174:17
**accept**
202:20
**acceptance**
204:18
**accepting**
49:19
**access**
168:10
**according**
91:15, 203:14,
226:12
**accordingly**
26:17
**account**
139:21
**acknowledge**
232:3
**acknowledgment**
232:1
**aclu**
113:16
**act**
104:10
**acted**
104:5, 104:6
**acting**
104:21, 129:11
**action**
126:24, 127:23,
128:3, 177:22,
177:23
**active**
150:6, 150:8
**actively**
206:21

**activities**
79:13
**activity**
18:10, 18:11,
18:17, 196:9,
196:18, 197:8,
199:18
**actual**
125:18, 190:7
**actually**
70:18, 117:4,
130:10, 145:6,
164:16, 177:6,
198:22, 214:4,
222:14
**ad's**
169:9
**add**
33:16, 50:10,
58:6, 153:12
**added**
158:23
**addition**
63:19, 81:19
**additional**
124:7, 141:9,
141:14, 143:13,
174:6, 174:9,
195:6, 195:8,
206:6, 227:20,
231:11
**address**
40:21, 41:4,
95:15, 95:22,
95:25, 96:8,
96:25, 97:10,
102:3, 211:5,
225:20, 225:25
**addressed**
98:13, 117:4,
120:3, 132:22,
226:6, 226:7
**addresses**
92:7, 96:4,
161:24
**addressing**
42:4, 120:4
**adds**
76:21

**adequate**
63:18
**adequately**
230:9, 230:10,
231:2
**adjudicated**
55:1
**adjunct**
21:12
**administered**
195:23
**administering**
198:22
**administration**
22:21, 92:25
**administrative**
149:8, 149:10
**adoptions**
81:7
**affairs**
64:21, 88:4,
102:19, 126:13,
175:14, 175:19,
175:20, 176:2,
180:4, 182:23,
199:24
**affect**
120:23
**affected**
66:18, 185:2
**affiant**
58:19
**affidavit**
11:15, 12:8,
58:5, 164:14,
164:21, 165:10,
166:8, 166:14,
166:18, 167:10,
167:13, 169:1
**affiliation**
225:1
**affirm**
123:23, 124:1
**affirmation**
124:16, 126:12,
200:6
**affirmations**
124:14

**affixed**
233:15
**after**
22:3, 40:5,
40:7, 104:19,
120:22, 151:5,
175:16, 188:5,
205:21, 222:25,
230:18
**afterward**
229:24
**afterwards**
121:1
**ag**
12:1, 29:25,
118:14, 188:18,
188:19, 218:4
**ag's**
18:3, 28:15,
28:18, 28:19,
28:25, 29:4,
29:6, 33:19,
35:11, 37:25,
41:20, 116:14,
146:12, 151:13,
153:19, 156:10,
159:7, 167:18,
170:13, 188:11,
208:3, 208:16,
217:19
**again**
18:23, 21:21,
33:10, 36:5,
36:6, 39:5,
42:19, 50:18,
51:17, 65:9,
65:21, 68:21,
69:18, 82:17,
87:20, 91:16,
98:7, 99:9,
107:2, 110:8,
112:23, 122:3,
125:23, 135:18,
141:18, 144:1,
145:24, 155:6,
156:18, 157:3,
168:21, 171:24,
178:16, 196:24,

201:21, 211:22,
212:23, 216:12,
216:13, 216:17,
221:15, 222:7,
224:2, 224:5,
224:13
**against**
19:8, 156:22,
194:4
**age**
182:4
**agencies**
35:3, 188:16
**agency**
32:8, 32:13,
32:18, 36:6,
49:24, 83:3,
118:9, 118:11,
179:3, 197:21,
214:1, 214:13,
214:18, 214:19,
214:20
**agency's**
215:10, 223:12
**agent**
225:10
**agents**
111:1, 144:17,
145:15, 145:18,
147:18
**ago**
17:24, 59:3,
59:5, 67:9,
73:15, 86:5,
95:16, 182:14
**agree**
43:8, 48:11,
78:21, 95:4,
101:7, 132:10,
136:20, 141:24,
151:16, 161:6,
163:12, 165:17,
173:14, 201:11,
201:18, 226:9,
226:14
**ahead**
14:22, 30:8,
38:20, 47:19,

71:18, 77:1,
95:9, 97:5,
98:3, 98:11,
132:25, 133:2,
136:12, 143:23,
150:22, 155:10,
162:23, 163:1,
163:21, 172:12,
172:21, 179:25,
228:8
**aid**
66:3
**aide**
52:16
**air**
150:4, 150:13,
150:16
**al**
1:9, 1:15,
1:20, 2:1, 2:5,
2:12
**alachua**
6:12, 6:14
**alicia**
8:3
**align**
92:10, 93:21
**all**
15:4, 16:1,
16:3, 18:20,
19:6, 20:15,
23:15, 24:16,
25:1, 26:21,
28:7, 28:9,
49:16, 51:2,
51:11, 52:13,
61:4, 73:8,
75:10, 81:15,
82:17, 82:18,
86:8, 89:10,
105:24, 112:14,
112:19, 113:2,
114:19, 115:11,
116:2, 127:15,
127:16, 130:24,
136:17, 139:16,
139:24, 141:20,
142:10, 144:9,

147:22, 155:7,
155:14, 155:19,
157:17, 158:10,
158:15, 159:5,
160:3, 160:15,
160:25, 161:13,
163:11, 165:1,
167:22, 168:4,
168:6, 168:10,
168:16, 168:25,
169:11, 170:21,
172:25, 173:10,
173:13, 174:2,
174:4, 175:1,
177:14, 186:7,
186:9, 202:16,
205:9, 206:19,
206:20, 207:2,
212:22, 213:25,
214:10, 215:16,
219:5, 220:1,
229:25
**allegation**
53:2, 55:9,
144:10, 157:6,
158:4, 159:1,
162:6, 163:16,
170:7, 171:25,
176:9
**allegations**
115:15, 155:20,
156:3, 161:5,
165:7, 181:23,
182:9, 203:23,
205:11
**allege**
125:16, 125:18
**alleged**
71:22, 116:23,
118:8, 144:16,
147:24, 162:2
**allegedly**
53:25, 56:9,
164:21
**alleges**
156:20, 158:21,
169:22
**alleging**
171:20

**allocated**
206:8
**allotted**
206:11
**allow**
89:1, 92:13
**allowed**
29:17, 29:18,
67:15, 106:2
**almost**
76:23
**alone**
16:20
**along**
91:6, 177:1,
185:20
**aloud**
202:19
**already**
13:8, 39:15,
151:24, 152:6,
180:13, 231:12
**also**
18:20, 18:21,
19:7, 19:10,
19:11, 21:8,
31:17, 32:12,
33:7, 33:12,
37:24, 41:5,
69:25, 78:22,
83:11, 94:11,
94:14, 96:24,
100:18, 120:7,
128:13, 130:21,
151:24, 152:2,
152:6, 155:1,
157:5, 165:5,
165:18, 165:24,
190:20, 198:16,
204:25, 205:23,
207:14, 208:23,
208:24, 209:25,
218:8, 220:6
**alter**
152:2
**alterations**
99:17
**altered**
171:1

altering
204:21
although
29:24, 38:22,
61:20, 103:6
always
187:5, 187:12
ambiguous
229:23
amended
11:17, 70:6
american
5:5
among
36:5, 177:3
amount
63:17, 103:24,
104:4, 120:11,
191:19, 191:21,
193:11
analogous
83:10, 85:4,
86:15, 86:25,
87:18
anderson
11:19, 72:4,
72:20
andrews
8:5
anne
10:12
announced
76:8
annual
38:5, 39:22
another
29:17, 29:18,
36:6, 84:19,
85:8, 118:9,
166:8, 166:22,
167:10, 169:1,
173:16, 178:17,
201:14, 202:15,
214:18, 229:6,
230:22
answer
14:9, 14:17,
14:22, 14:24,

15:7, 24:25,
29:11, 30:5,
30:6, 30:9,
30:11, 30:18,
30:22, 32:2,
33:1, 38:15,
44:16, 47:19,
48:19, 50:9,
51:13, 53:7,
56:17, 60:17,
61:14, 62:7,
62:19, 63:1,
63:11, 64:17,
64:23, 65:23,
66:21, 70:13,
73:19, 73:20,
75:18, 81:23,
82:14, 83:4,
83:13, 83:15,
87:20, 88:19,
90:5, 90:10,
94:1, 101:24,
102:25, 104:24,
107:1, 107:8,
112:12, 113:1,
117:24, 120:16,
120:24, 123:8,
123:9, 136:12,
137:7, 138:24,
139:13, 139:14,
140:2, 140:5,
140:6, 143:25,
154:18, 175:24,
177:3, 179:23,
181:15, 187:15,
188:25, 190:18,
193:3, 197:24,
202:8, 209:19,
210:18, 211:21,
211:25, 212:9,
215:19, 215:20,
216:5, 216:25,
218:25, 220:8,
221:3, 221:7,
223:10, 226:4,
230:4, 230:24
answered
74:7, 102:9,

104:23, 110:17,
137:5, 137:6,
179:9, 189:7,
192:1, 193:23,
198:18, 205:18,
216:22, 218:7,
219:25, 230:10,
230:22, 230:23,
231:2
answering
37:12, 38:15,
65:21, 97:14,
100:17, 179:8,
186:6, 222:1
answers
37:16, 38:23,
46:8, 69:8,
69:17, 82:7,
229:17, 229:18,
229:19, 230:3
anticipate
154:16, 160:5
anticipation
197:5
antonacci
108:9, 108:22,
109:1, 162:14
anybody
147:17, 159:11
anyone
16:17, 25:7,
26:5, 28:6,
31:3, 51:20,
67:9, 87:23,
89:4, 203:23,
227:24
anyone's
53:15
anything
14:10, 16:14,
16:15, 22:22,
22:25, 23:5,
23:9, 27:2,
29:21, 32:7,
37:8, 38:6,
43:1, 43:6,
46:12, 63:12,
64:20, 79:10,

83:5, 86:19,
88:1, 90:21,
102:14, 111:20,
112:16, 118:22,
122:24, 123:2,
123:13, 130:11,
130:12, 131:16,
141:21, 141:22,
145:25, 146:24,
147:1, 147:19,
156:5, 157:8,
158:12, 158:17,
158:20, 159:3,
161:9, 162:9,
165:14, 170:11,
170:23, 173:24,
180:2, 188:23,
193:2, 194:22,
197:13, 199:15,
208:20, 217:4,
223:4, 226:6,
228:11
anyway
38:19
anywhere
86:13, 126:12,
220:17
apologies
69:18
apologize
36:19, 63:4,
67:23, 67:24,
95:22, 102:8,
121:16, 144:21,
182:1, 194:10,
194:12, 207:21
app
54:2
apparently
26:17
appeals
81:7
appear
56:9, 70:24,
165:23, 232:6
appearing
30:5, 83:2
appears
24:1, 47:23,

58:4, 70:10,
70:11, 72:22,
86:7, 86:12,
96:17, 100:11,
159:10, 165:25,
179:14, 201:17,
203:7, 203:9,
203:15
**applicant**
65:25, 104:17
**applicant's**
98:24, 152:3,
224:24, 225:1,
225:17
**applicants**
82:8, 175:17
**application**
53:17, 54:3,
60:3, 60:25,
62:14, 66:7,
66:14, 82:18,
90:2, 90:8,
98:22, 99:25,
100:8, 104:5,
104:15, 104:19,
104:25, 105:2,
132:3, 132:17,
133:17, 137:23,
138:4, 138:19,
139:10, 139:23,
140:18, 140:22,
151:5, 151:6,
152:3, 186:21,
187:20, 195:1,
195:5, 198:10,
198:14, 200:17,
210:18, 210:24,
211:15, 211:19,
213:12, 213:14,
219:10, 219:14,
220:23
**application's**
211:9
**applications**
54:2, 56:5,
56:10, 59:21,
60:9, 60:15,
60:16, 60:25,

62:12, 79:18,
103:5, 103:12,
106:14, 107:4,
124:18, 135:9,
135:16, 136:19,
136:20, 137:22,
138:3, 138:11,
138:18, 141:2,
141:16, 142:24,
143:4, 187:25,
188:5, 188:20,
188:21, 191:17,
191:23, 192:6,
192:21, 193:5,
193:14, 193:21,
194:8, 194:17,
195:14, 198:24,
199:8, 199:14,
199:22, 200:8,
212:6, 213:8,
213:10, 219:8,
221:9, 221:19
**applies**
83:15, 98:18
**apply**
84:17, 90:19,
138:22, 216:11,
223:15
**appointed**
22:12
**appointment**
175:23
**appreciate**
113:3, 227:22
**approached**
176:1
**appropriate**
178:1, 197:22,
214:4
**approximate**
40:4
**approximately**
21:14
**apps**
187:21
**area**
19:8, 27:12,
197:23

**areas**
18:8, 18:14,
18:18, 18:19,
19:10, 19:21,
26:2
**aren't**
230:3
**arguably**
90:18
**argue**
80:6, 215:3
**argued**
85:3
**argument**
87:10, 90:9
**arguments**
80:22
**arm**
29:25, 34:22
**arose**
134:8
**around**
21:20, 82:2,
196:24
**arrest**
58:5, 76:8,
171:1
**arrests**
205:4
**article**
157:22, 175:9
**ashley**
1:23, 7:12
**aside**
19:11, 22:22
**asked**
22:4, 22:6,
27:5, 38:3,
45:3, 54:23,
67:8, 71:21,
74:8, 81:2,
104:22, 106:18,
115:22, 137:4,
140:5, 148:15,
162:12, 189:6,
191:25, 193:22,
203:10, 205:17,
210:11, 211:13,

216:22, 217:17,
217:20, 218:6,
219:24, 219:25
**asking**
28:23, 30:13,
34:25, 35:2,
35:5, 36:15,
37:19, 41:2,
44:6, 46:11,
48:12, 51:5,
57:13, 60:12,
63:11, 63:25,
82:3, 86:11,
88:16, 95:6,
96:10, 99:18,
100:12, 111:18,
113:5, 119:12,
126:5, 134:19,
135:5, 135:19,
138:15, 141:18,
148:2, 154:10,
181:17, 182:8,
188:22, 188:23,
221:16, 223:5,
223:6, 230:14
**aspects**
102:18
**assess**
145:22, 146:3,
146:8
**assessing**
145:20, 146:13
**assigned**
21:3, 26:8
**assist**
19:6, 36:2,
112:20, 140:21,
215:4
**assistance**
188:16, 213:13
**assistant**
20:23, 25:12,
129:17, 129:21,
129:23, 130:2,
142:7, 164:4,
164:25
**assisted**
111:19, 156:23

assisting
140:17, 213:12
associate
131:6, 131:7,
207:25
associated
115:16, 118:18
assume
14:17, 20:9,
154:21
assumes
190:24
assuming
49:17, 101:23
attach
167:8
attached
11:8, 24:7,
39:8, 42:18,
45:21, 57:5,
69:22, 72:15,
77:19, 83:21,
85:10, 107:24,
114:16, 124:5,
127:6, 155:4,
156:8, 157:16,
161:12, 163:4,
164:1, 166:7,
166:25, 167:20,
169:13, 170:16,
171:13, 172:7,
172:14, 232:7
attachment
170:10
attempting
115:17
attended
185:4, 185:5,
185:6
attention
187:3, 187:5,
208:22, 210:15,
214:10
attorney
1:25, 7:12,
7:15, 10:11,
10:13, 14:13,
14:20, 14:23,

20:23, 21:2,
22:3, 22:11,
24:9, 25:5,
33:8, 33:13,
58:12, 76:7,
80:1, 80:20,
80:24, 93:17,
111:21, 112:20,
113:5, 113:16,
115:9, 117:14,
117:20, 120:8,
121:7, 121:12,
121:16, 125:22,
125:25, 127:21,
127:22, 129:21,
129:22, 129:23,
130:2, 130:15,
131:7, 131:8,
147:2, 147:6,
147:7, 147:10,
154:1, 157:12,
164:4, 165:1,
175:5, 175:16,
175:22, 176:3,
176:21, 176:24,
177:20, 177:21,
178:6, 179:18,
186:16, 186:24,
187:19, 190:14,
190:22, 192:11,
192:14, 193:13,
193:20, 194:1,
194:3, 195:12,
195:19, 195:20,
196:15, 197:6,
197:25, 198:11,
201:25, 206:11,
206:15, 208:1,
210:23, 211:13,
212:4, 225:22,
228:25, 229:13,
231:14
attorney's
6:14, 8:4, 9:5
attorneys
7:6, 26:8,
125:20, 142:7,
220:1

author
223:13
authority
34:8, 123:16,
126:23, 131:2,
131:3, 146:10,
146:18, 146:20,
146:22, 147:17,
149:3, 149:5,
151:17, 175:5,
180:25, 181:3,
190:2, 190:6,
190:7, 221:13,
221:21
available
85:23, 222:17
avenue
4:6, 8:5
awareness
56:12, 57:12,
198:20
away
20:5, 20:14,
158:23
awful
18:18, 18:23

**B**

b) (6
178:6
b-a-j-g-e-r
131:10
back
27:18, 46:22,
47:24, 52:17,
54:17, 62:18,
65:17, 71:8,
75:24, 79:18,
86:7, 89:8,
93:8, 116:15,
119:10, 119:17,
131:22, 137:9,
140:12, 144:13,
145:8, 147:3,
149:21, 155:15,
157:3, 157:11,
159:17, 161:21,
161:24, 162:11,

164:24, 165:9,
165:15, 176:10,
176:16, 200:1,
214:11, 215:11,
215:14, 217:6,
222:11, 224:13,
227:12
background
14:1, 16:22,
69:11
bad
71:7, 115:6
badgering
220:7
bahill
129:16
bailiwick
147:16
bajger
26:14, 130:23,
178:19, 207:14,
207:16
baker
8:10
ballot
176:8, 202:12,
202:20, 203:19
ballots
204:19
ban
89:18, 135:7,
135:14, 137:20,
138:1, 140:16,
141:1, 226:11
banned
141:8, 141:10
banning
138:16, 142:23,
142:25, 143:3
bannon
171:21
bans
135:10
bar
21:11
barred
87:25
based
23:25, 43:1,

43:15, 47:15,
52:20, 52:24,
53:8, 53:12,
53:18, 54:20,
55:4, 55:13,
55:16, 55:19,
56:15, 57:15,
59:8, 60:22,
63:7, 63:11,
64:1, 65:8,
65:19, 65:24,
67:17, 82:16,
89:22, 94:17,
97:1, 97:5,
97:8, 99:5,
100:17, 126:6,
126:9, 132:19,
135:24, 144:4,
146:14, 149:23,
165:18, 179:14,
180:16, 183:11,
188:8, 190:3,
193:8, 197:12,
200:23, 200:24,
200:25, 201:11,
207:12, 215:5,
216:6, 217:1,
217:12, 217:18,
218:17, 221:4,
221:7, 225:24
**bases**
132:4
**basically**
15:12, 17:5,
17:8, 27:7,
29:20, 29:25,
35:2, 40:10,
100:21, 102:9,
131:15, 159:11,
208:2
**basics**
13:16
**basing**
47:21
**basis**
24:11, 36:18,
63:18, 110:3,
125:9, 139:1,

139:19, 144:10
**bates**
163:5, 163:10,
167:6, 172:9,
172:20
**bay**
8:11
**beach**
9:23, 25:13,
129:15
**became**
20:17
**because**
15:24, 20:4,
25:25, 28:18,
32:3, 33:3,
38:8, 39:15,
47:6, 48:12,
50:11, 52:22,
61:23, 62:8,
62:20, 63:2,
63:5, 64:10,
69:6, 73:23,
83:4, 83:14,
86:8, 86:23,
92:18, 94:22,
96:15, 102:14,
102:20, 110:10,
110:12, 113:11,
118:21, 120:15,
125:16, 126:8,
133:3, 133:24,
135:19, 138:6,
142:6, 144:1,
146:24, 152:22,
169:8, 183:16,
188:25, 190:18,
194:18, 206:3,
211:21, 212:10,
218:9, 223:12,
226:22
**become**
22:5, 41:18
**becoming**
152:8
**before**
3:10, 13:19,
15:8, 17:24,

19:24, 20:20,
23:1, 23:6,
38:25, 43:17,
45:4, 53:10,
57:12, 68:9,
81:2, 85:25,
86:22, 93:25,
95:12, 97:19,
100:5, 104:1,
106:11, 106:18,
113:22, 114:9,
117:7, 130:17,
135:2, 141:5,
142:10, 148:2,
151:2, 158:7,
160:6, 182:7,
186:15, 191:20,
202:10, 206:14,
207:23, 210:7,
214:22, 214:23,
217:17, 226:6,
228:3, 228:17,
233:2
**beforehand**
100:20
**began**
64:9
**begin**
41:12
**beginning**
36:24, 37:23,
43:8, 46:16,
47:25, 62:24,
63:16, 64:5,
64:6, 92:17,
101:2, 211:10
**begins**
115:24, 127:13,
177:10
**begun**
19:4
**behalf**
4:2, 4:10, 5:2,
5:11, 6:2, 6:12,
7:2, 7:12, 8:2,
8:10, 9:2, 9:10,
10:2, 10:11,
106:15, 120:8,

120:12, 124:18,
174:9, 196:4,
196:10, 196:18,
197:9, 198:2,
198:6, 199:8,
199:22, 200:8,
200:18, 201:6,
201:14, 202:2,
202:12, 203:19,
219:8
**behavior**
79:9
**behaviors**
216:20
**behind**
94:24
**being**
13:12, 25:15,
48:18, 69:1,
73:20, 91:5,
110:5, 121:25,
124:2, 141:1,
141:2, 141:15,
162:7, 179:18
**believe**
21:20, 21:22,
25:2, 27:11,
34:21, 45:17,
49:20, 58:19,
59:9, 70:20,
74:12, 74:18,
77:16, 78:19,
85:17, 85:19,
113:5, 117:2,
117:6, 134:22,
138:9, 145:24,
146:10, 147:22,
149:6, 152:1,
164:23, 165:20,
178:8, 178:19,
185:7, 185:13,
186:24, 189:1,
197:14, 197:21,
204:22, 205:8,
206:20, 207:4,
208:1, 210:1,
212:18, 212:19,
214:12, 228:12

believed
221:8
believes
127:19, 177:18
below
70:19
benefit
124:9
benjamin
9:19
bernard
2:16, 3:1,
11:2, 13:2,
13:10, 232:2
besmirching
186:7
best
17:22, 102:24,
109:11, 128:9
better
63:5, 93:19
between
33:5, 44:18,
45:7, 103:11,
103:15, 108:8,
145:9
beyond
90:6, 102:2,
180:13, 180:23,
185:7, 189:8,
204:16, 209:25,
220:18
bill
199:18, 203:14
bind
214:14, 214:17,
223:16, 223:19
bit
13:8, 16:22,
17:14, 17:17,
18:2, 20:4,
20:5, 20:13,
25:3, 27:1,
28:11, 28:14,
30:11, 30:14,
31:7, 35:16,
35:21, 36:24,
47:5, 52:15,

56:1, 66:23,
70:18, 77:1,
89:1, 91:8,
123:20, 123:25,
143:2, 160:10,
177:6, 181:1,
186:11, 186:14,
195:25, 200:4,
202:18, 207:14,
207:19, 208:4,
214:5, 214:11,
224:12
black
81:16
black's
133:20, 209:24
blackwell
5:13
blank
69:25, 169:10,
207:5, 211:19,
213:10
blood
230:2
bob
22:4
body
156:15
bondi
22:11
book
188:5
boss
22:3
both
52:2, 80:21,
80:23, 178:13,
185:9
bottom
41:10, 49:2,
57:17, 152:23,
155:10, 158:16,
159:12, 170:17,
171:15, 172:25,
173:12, 207:7
boulevard
8:18, 9:21,
10:6

bound
215:10
bounds
134:22
box
5:14, 7:7,
124:13, 124:14,
124:16
bradford
8:11
bradley
9:19, 173:15
branches
1:7
brantley
58:16, 58:20,
164:10, 164:14
brantley's
164:19
breadth
101:14, 218:8
break
15:5, 15:8,
77:3, 88:24,
101:16, 113:21,
114:9, 122:20,
174:11, 227:10
breakdown
198:20
breaking
143:1
brent
4:12, 13:13,
13:20, 20:2,
93:10, 93:12,
100:1, 110:17,
144:20
brevard
6:3
bridges
25:12, 129:14
brief
58:2, 87:8,
91:17, 91:20,
93:14, 94:18,
95:15, 95:19,
95:23, 96:3,
97:18, 98:7,

174:10
briefing
107:19
briefly
21:24, 162:11
briefs
80:22
bring
32:23, 126:23,
156:12
brings
63:7
broad
5:6
broadly
146:7
broke
123:25, 125:23
brought
63:3, 128:24,
144:20, 144:21,
187:2, 187:4
broward
8:2, 8:4,
158:22, 205:2
bulk
29:10, 46:16
bureau
129:10, 129:11,
130:1
bush
21:25
business
27:14
butterworth
22:4
byrd
1:12, 2:8, 9:10

---

**C**

c
217:2
c-o-x
13:10
calculating
49:18
calhoun
8:11

**call**
18:5, 27:8,
34:5, 37:7,
37:8, 37:10,
37:11, 38:11,
48:4, 82:21,
93:12, 108:8,
129:19, 145:1,
186:3
**called**
21:25, 64:25,
65:1, 65:12,
89:17, 99:9,
99:10, 105:4,
111:11, 131:8,
171:14, 208:12
**calling**
180:2, 185:20,
200:2
**calls**
87:4, 99:3,
134:25, 153:20,
154:13, 154:22,
197:19, 201:9,
226:13
**came**
63:21, 87:15,
131:4, 131:17
**camera**
128:23
**campaign**
4:14, 13:15,
157:18, 176:13,
176:17
**campbell-harris**
5:4
**can't**
15:1, 23:9,
26:11, 40:5,
48:8, 52:20,
52:24, 53:1,
58:6, 58:8,
62:7, 62:19,
63:7, 73:19,
79:21, 79:23,
82:21, 99:5,
100:2, 108:17,
138:23, 141:20,

151:2, 169:7,
202:8, 208:10,
223:11
**canceling**
112:19
**candidate**
176:8
**candidly**
133:19, 206:4
**cannot**
140:21
**canvases**
198:21
**canvasser**
164:21, 166:16,
166:19, 167:11,
167:14, 169:2,
198:13, 201:5,
209:4
**canvassers**
135:8, 135:15,
136:18, 165:23,
198:6, 201:3
**canvassing**
165:24, 200:18
**capable**
229:16
**capacity**
1:13, 1:24,
2:9, 178:6
**capitol**
7:16, 10:14
**caption**
114:20
**car**
79:16
**card**
219:12, 222:19
**care**
21:5, 231:9
**career**
22:14
**careful**
90:13
**carry**
100:13
**case**
1:11, 13:14,

15:15, 16:12,
19:5, 19:7,
23:21, 25:24,
31:19, 33:7,
33:12, 38:19,
46:8, 48:2,
48:17, 52:19,
54:6, 54:19,
59:2, 70:9,
72:9, 73:5,
79:22, 80:22,
81:4, 81:20,
82:20, 84:2,
87:15, 94:10,
99:6, 111:10,
113:18, 118:17,
118:19, 121:15,
121:20, 121:22,
121:25, 123:23,
125:13, 126:7,
130:4, 133:5,
133:14, 134:17,
134:18, 134:21,
138:23, 138:25,
139:3, 139:18,
139:19, 139:25,
141:11, 142:11,
142:14, 142:16,
143:15, 143:20,
144:15, 151:22,
180:8, 180:12,
183:17, 197:3,
206:5, 210:1,
210:2, 210:4,
216:15, 220:18,
225:23, 226:20,
230:16, 233:10
**cases**
15:25, 23:3,
25:16, 25:24,
25:25, 26:8,
31:8, 32:22,
44:1, 50:10,
50:15, 54:25,
59:14, 59:17,
63:17, 63:20,
64:10, 70:19,
72:2, 73:14,

73:16, 73:21,
74:4, 74:14,
76:21, 87:13,
90:7, 90:15,
90:23, 91:5,
103:11, 105:24,
117:9, 117:11,
117:13, 119:1,
119:5, 119:14,
123:12, 133:4,
137:9, 138:24,
138:25, 142:4,
144:2, 144:3,
144:16, 148:5,
148:24, 149:1,
181:6, 181:13,
182:16, 183:22,
204:8, 211:5,
216:12, 224:19
**categorically**
79:24
**caught**
60:20
**cause**
11:15, 57:10,
57:18, 58:4,
58:15, 64:8,
101:21, 164:14,
164:20, 190:9
**caveat**
62:15, 65:9
**cc**
109:20
**cced**
110:2
**center**
4:14, 13:15,
80:10
**certain**
67:15, 91:13,
142:15, 142:18
**certainly**
17:21, 28:24,
38:19, 48:14,
52:11, 101:9,
220:15
**certificate**
233:1

certify
233:4
chain
11:23, 108:7,
108:22
chains
28:9, 101:18
challenge
64:25, 89:16,
121:20
challenged
111:10, 121:15,
121:25
chance
148:1
change
18:13, 67:10,
139:6, 192:4,
193:10, 193:11,
205:9
changed
62:20, 205:21,
206:2
changes
99:24, 191:15,
205:13, 205:22
chapter
78:15, 78:17,
149:10, 211:11
chapters
86:18
characterization
216:4
charge
25:15, 72:25
charged
75:4, 139:3
charges
58:6, 205:4
charging
139:4
charles
6:13
chart
46:16, 47:3,
47:25, 49:1,
49:7, 56:8,
142:2

charter
56:10
chat
39:10, 39:19,
108:12, 108:17,
153:2, 153:6,
153:10, 153:13,
155:2, 156:11,
157:13, 159:8,
163:22, 167:25,
168:10, 214:7,
214:8, 222:12,
224:4
check
100:5, 163:19,
170:22, 172:4
chief
20:25, 26:15,
129:10, 129:14,
129:25, 130:5,
131:15, 178:17,
180:2, 180:3,
207:23
children
22:6, 22:7
children's
21:4
chime
14:14
circuit
125:19
circumscribed
179:20
circumstances
91:13
citizen
31:22, 32:7,
32:15, 34:3,
53:3, 55:10,
106:1, 106:5,
106:22, 106:23,
124:19, 144:22,
152:7, 200:9
citizens
106:14, 137:21,
138:2, 138:17,
139:8, 154:20,
162:15

citizenship
105:4, 121:8,
122:13, 122:22,
123:7, 123:17,
123:18, 123:23,
123:24, 124:1,
128:15, 132:4,
139:10, 139:25,
141:17, 198:1,
198:12, 199:7,
200:2, 200:17,
200:20, 201:2,
201:6
civil
5:5, 21:6,
26:15, 30:3,
35:14, 101:5,
101:10, 104:11,
104:25, 112:1,
112:10, 120:8,
120:11, 120:16,
120:17, 122:5,
122:9, 123:1,
126:17, 126:23,
127:23, 128:3,
128:6, 131:2,
131:7, 131:12,
146:8, 149:7,
149:12, 149:13,
149:18, 176:24,
177:22, 178:12,
178:14, 178:22,
180:7, 180:9,
180:11, 180:19,
180:21, 180:23,
186:14, 186:19,
188:12, 188:15,
188:18, 188:25,
189:5, 189:22,
189:23, 189:25,
190:4, 190:5,
190:12, 190:13,
190:16, 190:22,
192:10, 193:12,
193:15, 207:23,
208:2, 208:16,
229:2, 230:8,
230:25

civilly
122:25, 128:13,
130:9, 145:23,
230:17
clarification
103:13
clarify
34:15, 44:24,
59:25, 70:24,
74:4, 90:11,
94:25, 99:11,
102:7, 104:14,
106:9, 140:8,
150:24, 181:16
clarifying
68:16, 150:15
clarity
28:17, 96:3,
216:4
clause
219:22, 220:9
clear
14:16, 54:24,
90:23, 91:10,
101:18, 122:2,
146:2, 199:20,
216:1, 216:6,
216:8, 218:17,
220:12, 220:15,
223:14, 228:24
clearer
53:23
clearly
14:13, 177:9
clearwater
9:7, 162:4
clock
89:7
close
56:22, 111:3,
111:7, 228:3
closed
16:20, 50:21,
72:2
closely
46:12
closer
20:8, 67:6,

160:16, 182:3
**closing**
140:13, 188:5
**coast**
22:9, 22:10
**code**
86:2
**cold**
19:5, 19:7
**colleague**
39:18
**collect**
133:13, 135:9,
135:15, 198:13,
198:23, 199:3,
199:6
**collected**
54:1, 56:5,
136:19, 141:12,
195:18, 199:8,
225:6
**collecting**
80:9, 82:3,
106:14, 106:21,
124:17, 132:2,
132:12, 132:21,
133:16, 134:9,
135:11, 138:10,
138:16, 144:5,
196:3, 200:7,
200:16, 209:3,
210:12, 213:5,
213:11, 213:21,
219:7, 223:10
**collection**
199:13
**collectively**
174:23
**collects**
98:21
**colleen**
10:4
**college**
21:13
**columbia**
8:11
**column**
53:24, 118:7,

118:11, 118:14,
118:20
**columns**
52:9, 52:10
**come**
19:17, 22:6,
31:8, 31:21,
94:3, 108:15,
122:7, 123:13,
130:11, 133:5,
136:6, 136:14,
181:10, 185:2,
189:2, 211:24,
227:12
**comes**
41:19, 50:7
**comfortable**
118:21, 184:10
**coming**
23:6, 112:14,
158:8
**comment**
94:5
**commission**
21:10, 175:18,
233:18
**commit**
60:8, 79:5,
115:17
**commits**
61:9, 219:17
**committed**
67:20, 68:12,
71:23, 74:15,
75:5, 79:15,
84:19, 84:22,
110:23, 127:20,
164:22, 177:18,
178:9
**committing**
59:18, 109:17,
115:17
**communicates**
190:14
**communication**
194:13
**communications**
109:14

**compare**
217:5
**compared**
62:9
**compelling**
92:24
**complainant**
155:21, 156:19
**complaint**
15:21, 31:22,
32:15, 115:2,
115:14, 144:22,
156:2, 156:13,
157:2, 157:5,
161:25, 181:23,
208:15
**complaints**
15:14, 46:18,
47:13, 49:21,
56:3, 230:8
**complete**
15:2, 69:1,
82:3, 95:10,
104:17, 137:22,
138:3, 138:17,
140:17, 232:5
**completed**
79:17, 81:13,
92:6, 151:6,
212:5
**completely**
47:21, 89:3
**completeness**
74:8
**compliance**
97:25, 98:5,
98:9, 217:14,
219:16, 220:12,
221:1, 221:10
**complied**
124:2
**comply**
221:20, 223:21
**compound**
110:7, 122:19,
134:24
**computer**
16:14

**concern**
79:25, 134:8
**concerned**
38:18, 218:8
**concerning**
182:9, 187:19,
212:12, 222:3
**concerns**
187:2
**conclusion**
63:19, 197:20
**conclusions**
64:1
**conduct**
58:21, 60:19,
61:12, 71:23,
134:20, 136:6,
138:10, 141:10,
147:25, 151:15,
179:6, 185:11,
189:1, 203:18,
204:2, 208:18,
226:19
**conducted**
2:17, 3:1,
165:19
**conference**
1:6
**confidence**
69:9
**confirm**
152:14, 158:6,
158:20, 228:18
**confirmed**
71:22, 147:24
**confused**
187:10, 202:13
**connection**
103:11
**connections**
103:15
**consent**
58:23, 152:4
**consideration**
34:7, 79:22,
144:25, 152:7,
165:3
**considering**
150:18

consistent
30:6, 38:5,
42:5, 120:1,
154:15, 155:24
constitute
213:21
constitutes
226:25
constitution
175:10
constitutional
175:11, 175:12,
175:22
construction
209:7, 209:16,
210:20, 223:3
consult
121:12, 121:17,
227:10
consulted
205:15
consumer
19:1, 21:5
contact
98:25, 185:8
contacted
154:19
contained
115:10, 121:8,
137:11, 222:21
containing
213:8
contains
78:4, 155:20
content
25:6, 161:23
contest
190:21
context
92:14, 104:10
continue
102:7, 153:12,
231:5
continuously
156:21
contributed
207:7
contributes
103:17

control
21:3, 104:16,
166:1, 214:21
controls
101:3
conversation
25:23, 134:5,
148:11
conversations
147:20
convicted
29:19, 53:10,
55:15, 67:14,
74:6, 74:20,
76:9, 81:11,
82:9, 83:9,
84:18, 86:1,
86:24, 86:25,
87:18, 91:25,
92:5, 203:23
conviction
73:10, 84:20,
86:14, 86:15
convictions
71:24, 85:4,
169:23, 183:3,
183:6, 183:10,
183:25, 184:6
cooperative
184:22
coordinating
129:11, 129:16
coordinator
25:16, 129:12
copied
109:24, 110:16,
173:3
copies
15:14, 15:15,
219:9, 221:9
cops
21:11
copy
12:17, 15:17,
15:20, 15:21,
15:23, 69:25,
127:9, 207:5,
220:23, 221:18,

231:14
cord
1:12, 2:8
correct
14:4, 31:5,
31:9, 31:13,
31:17, 31:20,
35:7, 35:15,
37:5, 38:1,
39:2, 40:20,
41:2, 41:22,
46:14, 48:6,
49:17, 51:7,
51:14, 53:3,
55:2, 56:13,
61:21, 61:25,
66:12, 67:12,
70:9, 72:21,
73:2, 73:11,
73:12, 74:14,
78:7, 84:3,
84:24, 86:5,
87:3, 95:4,
100:9, 101:11,
101:12, 101:24,
105:22, 108:23,
109:10, 123:11,
128:12, 131:6,
132:15, 149:25,
154:24, 156:6,
157:2, 162:5,
162:10, 167:15,
178:2, 183:13,
184:4, 184:7,
184:8, 192:25,
193:17, 196:11,
196:14, 208:8,
217:2, 217:12,
218:22, 219:5,
225:2, 225:8,
225:10, 225:14,
225:20, 227:1,
232:5, 233:5
corrected
168:13
corrections
232:6
correctly
78:17, 84:25,

124:20, 125:1,
143:5, 156:25,
166:2, 188:13,
200:11, 201:9,
203:6, 209:12,
213:17, 219:20,
222:22
could
13:9, 13:18,
17:6, 18:2,
18:8, 20:3,
24:4, 31:21,
32:12, 33:10,
34:9, 46:2,
47:9, 55:21,
67:23, 69:12,
77:25, 90:9,
90:19, 91:3,
96:24, 97:10,
97:11, 112:17,
113:12, 113:25,
114:1, 119:3,
125:10, 126:2,
126:6, 128:22,
128:23, 136:13,
136:21, 140:4,
148:5, 151:21,
159:21, 161:2,
162:21, 165:9,
170:1, 176:11,
178:3, 178:7,
178:18, 179:11,
180:14, 181:25,
183:17, 183:19,
202:11, 209:25,
213:20, 214:22,
214:23, 215:17,
215:23, 216:13,
221:8, 226:17
couldn't
20:5, 82:15,
194:10
counsel
13:4, 21:8,
22:1, 26:19,
111:8, 114:6,
147:20, 173:16,
174:5, 174:18,

233:9
**count**
50:19, 87:25
**counted**
49:8
**counties**
6:4, 8:15
**countries**
162:16
**county**
6:12, 6:14,
7:3, 8:2, 8:4,
9:2, 9:5, 10:2,
10:5, 54:8,
54:13, 54:17,
69:7, 72:19,
125:17, 158:22,
187:25, 188:20,
193:6, 193:14,
193:21, 194:7,
194:17, 194:18,
195:2, 195:5,
195:6, 205:2,
225:4
**couple**
42:1, 51:3,
53:5, 55:23,
105:16, 106:8,
130:22, 140:14,
158:8, 169:19,
188:10
**course**
14:21, 16:12,
16:23, 18:13,
25:4, 26:6,
26:10, 27:18,
28:25, 35:23,
40:24, 42:12,
49:7, 51:1,
57:13, 57:19,
58:21, 80:10,
94:17, 94:25,
103:14, 108:6,
142:9, 155:17,
158:13, 160:9,
161:3, 228:5
**court**
1:1, 9:6, 14:6,

19:12, 24:4,
39:6, 42:14,
46:2, 69:20,
72:13, 77:16,
83:19, 113:14,
124:8, 131:9,
175:17, 215:6,
216:16, 223:19,
223:20
**courtroom**
21:21
**courts**
13:21, 227:6
**cover**
24:14
**covered**
198:17
**covering**
24:17
**covers**
37:24
**covid**
19:18
**cox**
2:16, 3:1,
11:2, 11:9,
13:2, 13:8,
13:10, 24:6,
39:7, 39:22,
42:17, 45:20,
51:6, 56:17,
57:4, 69:21,
72:14, 77:18,
83:20, 85:9,
89:15, 92:17,
100:13, 101:5,
102:6, 107:23,
114:15, 124:4,
127:5, 155:3,
156:7, 157:15,
161:11, 163:3,
163:25, 166:6,
166:24, 167:19,
169:12, 170:15,
171:12, 172:6,
172:13, 174:10,
178:3, 180:20,
191:10, 201:19,

216:5, 220:8,
226:9, 227:20,
228:5, 228:12,
232:2
**coy**
186:1
**create**
19:5, 51:17,
91:2, 102:23,
215:9, 223:13
**created**
175:8, 229:3
**creating**
51:12, 59:12,
109:15, 109:16
**creation**
181:12, 182:8,
182:17
**crime**
73:10, 88:22,
103:18, 116:8,
142:20, 143:17,
143:19, 151:24,
152:2, 152:6,
184:14, 189:19
**crimes**
19:8, 31:11,
34:19, 34:20,
34:23, 35:4,
35:12, 35:13,
37:1, 61:19,
79:5, 79:7,
109:17, 110:6,
129:12, 134:2,
144:8, 146:14,
148:12, 148:19,
156:20, 176:7,
176:11, 176:12,
218:10
**criminal**
13:21, 17:9,
18:10, 18:11,
21:9, 24:11,
29:14, 30:1,
30:24, 33:21,
36:18, 37:9,
81:18, 100:13,
100:14, 100:17,

100:19, 102:18,
103:11, 112:1,
120:6, 120:10,
120:12, 122:4,
128:7, 129:7,
132:9, 178:13,
178:24, 178:25,
180:3, 186:13,
186:15, 189:11,
189:15, 190:4,
206:5, 208:17,
209:20, 214:3,
214:14, 214:21,
215:7, 215:9,
216:11, 216:15,
216:16, 223:9,
223:19, 223:20,
226:15, 226:18,
226:19, 226:20,
226:22, 226:25
**criminally**
29:9, 31:3,
102:16, 102:21,
105:2, 112:16,
112:23, 122:23,
125:4, 126:3,
128:10, 151:19,
218:16
**cross**
78:5, 86:8,
192:3
**cross-eyed**
163:9
**culling**
175:16
**current**
17:1, 22:22
**currently**
129:15, 206:21
**custody**
80:13, 81:13,
213:7, 215:17
**cut**
95:12, 122:8,
172:11

---

**D**

**d-o-n-t-e-n-v-i--
l-l-e**
130:4

da's
17:19, 17:23
dale
6:6
data
199:11, 199:20
date
40:4, 40:8,
225:6, 232:10
dated
45:24, 70:11
day
100:7, 100:8,
102:11, 102:12,
104:19, 191:16,
191:19, 197:3,
216:15, 227:22,
230:22, 233:15
day-to-day
175:25
days
66:13, 99:25,
100:1, 100:3,
130:22, 151:5,
191:24
dayton
5:4
deadline
66:6, 66:17,
99:25, 100:8,
102:12, 104:20,
191:23
deal
133:6
dealing
189:23
deals
100:13
dealt
83:14, 98:12,
98:13, 106:24,
111:15, 111:17,
112:24, 133:3,
138:21, 141:4,
144:3, 221:25
deceased
54:3
december
2:18, 233:16

decide
32:23, 142:4,
142:11
deciding
189:17, 189:24
decision
61:24, 82:15,
134:17, 138:22,
139:5, 142:12
decisions
79:23, 141:20
declaration
11:22, 71:4,
71:5, 85:22,
85:24, 86:22
declare
124:24
declined
165:1
decrease
192:20, 194:7,
194:16, 194:17
deep
110:10
defendant
67:20, 141:22,
183:21
defendants
1:16, 2:2,
2:13, 80:21
defense
22:1
define
210:11
defined
209:9, 210:21,
210:25, 211:2,
211:3, 211:6,
217:11, 217:15,
220:17
defining
102:17
definition
74:10, 80:9,
93:19, 98:14,
132:2, 132:5,
132:11, 132:14,
133:9, 133:13,

133:15, 134:14,
136:7, 136:15,
209:3, 210:6,
210:12, 211:9,
214:4, 214:13,
214:18, 214:20,
214:24, 215:9,
215:10, 218:4,
218:12, 218:13,
221:23
definitions
211:12, 218:9
degree
219:18, 226:13
delay
101:21
delegated
142:6
deliberative
217:25
delineated
215:8
delivered
151:4
delivery
99:10
delved
212:10
democrat
156:22
demonstrate
50:6
demonstrated
199:12
dense
54:7
department
22:5, 22:7,
31:16, 34:24,
45:23, 64:21,
76:7, 88:4,
102:18, 108:24,
109:7, 109:23,
126:13, 146:11,
148:20, 148:22,
153:21, 173:16,
175:14, 175:19,
175:20, 176:2,

179:1, 179:2,
179:5, 180:4,
181:14, 181:18,
181:20, 182:23,
188:12, 199:24,
206:10, 212:16,
212:25, 215:8,
222:5, 223:5,
223:7, 224:9
depend
135:25, 143:12,
221:23
dependent
38:13
depending
136:9, 136:13
depends
33:23, 33:24,
67:3, 126:7
deponent
232:1
deponents
120:25
deposed
13:18
deposition
2:16, 3:1,
11:9, 11:10,
13:16, 15:11,
15:22, 16:13,
23:13, 23:14,
23:20, 24:6,
25:8, 39:7,
42:17, 45:20,
57:4, 69:21,
72:14, 77:18,
83:20, 85:9,
100:22, 101:1,
101:3, 101:19,
107:23, 114:15,
120:22, 124:4,
127:5, 147:4,
147:10, 155:3,
156:7, 157:15,
161:11, 163:3,
163:25, 166:6,
166:24, 167:8,
167:19, 169:12,

170:15, 171:12,
172:6, 172:13,
197:5, 228:25,
229:6, 229:21,
230:19, 231:1,
233:3
**depositions**
16:5, 130:22
**depth**
110:20
**deputy**
131:8, 208:1
**desantis**
171:2
**describe**
35:3
**described**
18:4, 167:10
**describes**
53:25, 166:15
**describing**
169:1
**description**
44:1, 44:3,
68:20, 72:25,
108:3
**designated**
24:9, 119:23,
121:1, 133:8,
146:16, 229:3
**designee**
229:6
**desk**
15:12
**desoto**
6:3
**detail**
30:15, 48:2,
99:12, 212:22
**deter**
197:16, 197:17
**determination**
88:21, 178:21
**determinations**
190:9
**determine**
33:4, 131:19,
136:3, 141:9,

141:15, 142:16,
143:10, 143:14,
147:17
**determining**
121:13, 121:19,
133:24
**deterrent**
195:21
**developed**
122:24, 123:11
**devona**
8:3
**dictionary**
209:24
**different**
16:16, 19:14,
35:3, 56:23,
65:12, 83:9,
88:16, 89:16,
96:10, 99:8,
120:19, 161:5,
188:11, 215:16,
229:18
**difficult**
50:18, 51:2,
80:6
**difficulty**
82:23
**digits**
92:8, 96:5
**direct**
30:7, 31:22,
34:7, 102:4,
131:16, 153:20,
200:1, 209:23
**directed**
37:6, 41:11,
41:13, 41:15,
109:22
**directing**
101:23, 153:19,
208:22, 210:15,
214:10
**direction**
17:6, 41:21,
43:16, 233:8
**directly**
35:24, 110:2,

167:25, 168:11,
202:21, 212:25
**director**
22:8, 109:5
**directs**
14:23
**disabled**
155:22, 156:22
**disagree**
230:17
**discern**
200:15, 200:17,
200:20
**disclose**
101:18
**disclosed**
102:3
**disclosing**
75:18
**discovery**
27:8, 152:12
**discretion**
96:17, 96:18,
189:17, 189:24
**discuss**
119:23, 120:14,
230:18
**discussed**
25:5, 71:25,
100:20, 101:2,
133:15, 204:3,
204:6
**discussing**
147:19, 213:2
**discussion**
134:10, 134:11,
207:11, 231:6
**discussions**
133:22
**disposal**
151:14
**dispute**
229:15, 231:1
**distinction**
125:21
**distinguish**
28:22
**distributing**
213:9, 215:13

**district**
1:1, 1:2
**division**
1:3, 149:3,
153:21, 154:14,
154:20, 178:23
**divisions**
149:4
**divulge**
202:7, 218:1
**divulging**
179:24
**dixie**
8:11
**document**
40:1, 40:13,
46:21, 47:17,
48:9, 48:12,
48:16, 51:24,
57:8, 58:3,
70:14, 72:9,
72:18, 84:6,
85:8, 85:13,
85:21, 86:17,
107:21, 108:4,
116:17, 127:9,
152:19, 196:16,
197:2, 206:24,
207:2, 223:12,
223:23
**documentation**
184:20, 204:17
**documents**
16:4, 16:12,
26:24, 28:7,
56:16, 114:22,
126:12, 152:11,
152:14, 165:22,
167:7, 197:6,
204:7, 205:7
**doing**
16:5, 20:25,
27:19, 38:13,
60:15, 82:7,
84:14, 95:1,
113:4, 118:21,
190:17
**dollars**
19:5

done
22:20, 26:9,
60:11, 63:24,
64:19, 97:2,
145:23, 156:21,
162:7, 168:6,
170:18, 179:7,
190:19, 204:6,
204:20, 212:18
dontenville
130:3
door
16:19, 139:1,
139:4
double
100:5
douglas
9:3
down
24:16, 39:24,
40:13, 46:11,
47:24, 53:22,
57:23, 64:3,
70:12, 77:23,
77:25, 84:8,
85:14, 93:8,
104:6, 117:7,
117:8, 118:4,
118:13, 124:9,
127:15, 145:7,
152:21, 155:15,
160:12, 161:24,
165:12, 165:13,
168:7, 173:4,
191:14, 224:12,
225:12
download
164:8
drafted
93:14
drafting
112:13
draw
64:1
drawing
215:14
drive
81:24

driver's
92:7, 96:4,
219:11, 222:18
drives
79:16
drop
153:2, 155:2,
157:13, 206:24
dropbox
27:8
drug
37:1
drugs
18:18, 18:20
dsde
11:22, 85:22,
222:21, 223:25,
224:8, 224:23
due
214:1
duly
13:3
during
16:13, 56:2,
58:21

**E**

each
73:20, 101:7,
104:4, 118:17,
118:19, 124:17,
142:6, 167:7,
191:16, 196:2,
200:6, 200:15,
200:18, 201:4,
201:5, 201:12
earlier
27:4, 33:25,
37:11, 61:16,
66:25, 90:24,
99:24, 117:2,
117:8, 123:21,
124:3, 129:19,
140:10, 143:8,
144:20, 148:4,
149:22, 164:15,
191:18, 196:23,
199:16, 200:23,

206:19, 209:17,
209:20, 223:10
early
40:10
ears
182:4
easier
44:5, 47:6,
70:2, 115:4,
159:23, 177:6,
200:4, 202:18
easiest
75:22
easily
82:24
east
6:8, 10:6
eat
89:2, 111:5
effect
48:3, 195:21
effective
185:24, 185:25,
186:2
efficient
165:25
effort
36:19, 129:16,
206:11
efforts
129:12
eight
127:16, 147:22,
177:17
either
44:2, 100:7,
110:8, 110:20,
123:2, 123:12,
133:19, 136:21,
140:22, 183:6,
184:21, 204:3,
205:6, 225:21,
229:17
elderly
155:22, 156:22
election
8:10, 22:21,
29:4, 31:11,

31:20, 34:19,
35:4, 40:20,
41:4, 41:12,
41:21, 42:3,
42:4, 42:24,
43:10, 43:21,
44:4, 44:8,
49:22, 50:7,
59:7, 61:19,
62:13, 62:23,
63:15, 73:1,
74:22, 75:4,
76:11, 79:6,
86:2, 92:25,
103:10, 105:12,
105:21, 109:9,
112:4, 112:21,
116:8, 146:14,
148:12, 151:15,
162:16, 176:7,
208:6, 208:7
election-related
33:20, 35:12,
35:19, 37:1,
46:17, 109:17,
110:6, 148:6,
148:9
elections
6:2, 7:4, 10:3,
10:5, 22:21,
23:3, 25:16,
29:15, 34:16,
34:20, 34:23,
40:14, 41:6,
129:12, 134:2,
148:19, 149:5,
153:21, 153:22,
154:14, 173:17,
184:14, 184:17,
205:2, 206:3,
206:9, 215:2
elector
203:13
electronic
204:19
electronically
213:15
elements
142:20, 143:17,

143:19, 144:7
**elias**
4:4
**elicit**
18:20
**eligible**
137:21, 138:2,
139:8, 139:23,
152:7
**elizabeth**
26:21, 129:22
**else**
16:14, 16:17,
26:5, 27:2,
32:16, 63:5,
81:8, 89:4,
102:20, 147:17,
170:23, 205:6,
208:20, 209:15,
212:1, 217:5,
227:25, 228:11
**elsewhere**
211:4
**email**
11:23, 12:1,
12:7, 28:9,
100:24, 101:18,
108:7, 108:21,
153:19, 155:20,
156:16, 156:19,
157:18, 158:3,
158:21, 159:9,
159:22, 160:19,
160:22, 161:6,
161:7, 161:21,
161:24, 162:2,
162:14, 162:17,
162:20, 163:12,
163:24, 164:3,
164:11, 165:6,
165:17, 169:22,
170:6, 170:9,
170:11, 171:18,
171:24, 173:3,
225:19, 225:25
**emailer**
159:10
**emails**
27:15, 109:21,

109:24
**employed**
149:19, 233:10
**employees**
110:25, 181:1
**enacted**
68:10, 199:10
**enactment**
38:24, 43:18,
45:4, 62:1
**encompass**
211:19, 212:5
**encompassed**
216:20
**encountered**
100:6
**encourage**
82:8
**encouraging**
137:21, 138:2,
138:6, 138:8,
138:13, 138:17,
139:8, 139:23
**end**
43:4, 48:23,
111:7, 153:3,
160:13, 161:1,
168:20, 186:9,
227:11, 230:22
**ends**
49:3, 92:18
**enforce**
133:25, 134:4
**enforced**
128:10, 128:13,
230:17
**enforcement**
31:16, 32:8,
32:13, 32:18,
34:6, 34:8,
35:14, 36:6,
38:14, 61:7,
63:2, 63:3,
63:6, 63:7,
63:13, 76:8,
101:10, 108:25,
109:23, 120:7,
120:8, 123:14,

123:15, 126:17,
127:22, 131:1,
131:3, 137:10,
140:12, 141:12,
144:25, 146:25,
177:21, 179:3,
179:5, 186:4,
189:16, 206:10,
221:5, 227:6,
227:7, 229:2,
230:15
**enforcement's**
144:10
**enforcing**
24:18, 112:21,
119:25, 120:4,
128:18, 131:13,
176:22
**engage**
79:6, 90:2,
149:17
**engaged**
58:20, 59:11,
110:9, 196:9,
197:8, 212:11,
222:3, 222:7,
222:10
**engaging**
60:23, 87:17
**enough**
28:13, 52:22
**enrolled**
12:17, 127:9
**ensure**
226:15
**ensures**
82:6
**entered**
72:24, 191:4
**entire**
48:8, 79:22,
139:15, 139:16
**entirely**
216:1, 216:6
**entities**
28:17, 31:10,
177:2, 188:11
**entries**
48:5, 48:21,

48:24, 51:22,
117:3, 117:18,
118:6
**entry**
52:8, 53:20
**enumerated**
71:24
**equipped**
180:6, 180:10
**errata**
232:7
**erroneous**
173:21
**escalated**
208:16
**especially**
19:8, 27:23,
50:6, 70:4,
214:19
**esquire**
4:3, 4:12,
4:13, 5:3, 5:4,
5:12, 6:5, 6:6,
6:13, 7:5, 7:14,
8:3, 8:16, 9:3,
9:4, 9:11, 9:19,
10:4, 10:12
**essentially**
15:16, 22:9,
22:10, 23:3,
31:4, 41:19,
41:20, 62:20,
67:11, 68:3,
75:3, 78:4
**est**
2:19
**established**
209:8, 210:20
**estimate**
44:7, 44:17,
45:7, 45:10
**et**
1:9, 1:15,
1:20, 2:1, 2:5,
2:11
**evaluate**
139:18
**even**
53:6, 117:14,

133:3, 133:4,
133:5, 133:15,
136:17, 137:22,
138:3, 199:12
**events**
165:24
**eventually**
32:16
**ever**
28:23, 33:20,
62:11, 110:21,
111:15, 111:17,
111:22, 131:4,
132:22, 144:16,
144:18, 145:25,
150:1, 184:13,
185:11, 187:17,
198:1, 198:12,
203:22, 208:16,
224:10
**every**
64:15, 73:21,
111:5, 112:4,
112:19, 139:3,
197:2
**everybody**
130:17
**everyone**
94:15, 113:12
**everyone's**
231:7
**everything**
16:23, 79:23,
99:7, 138:22,
139:17, 140:5,
140:7, 141:11,
141:12, 204:9,
205:6
**evidence**
190:25, 195:16,
215:3
**exactly**
60:1, 93:5,
135:4
**examination**
11:2, 13:4,
114:6, 174:18
**examined**
232:3

**example**
59:4, 72:2,
81:21, 107:3,
135:6, 137:19,
141:13, 182:13
**examples**
95:5, 95:25,
96:15, 134:16,
142:22, 219:2,
219:3
**excellent**
16:21, 35:10,
45:18, 52:3,
70:2, 108:21
**except**
206:20
**excerpts**
157:21
**exchange**
152:8
**exclusive**
96:16, 97:12,
219:23, 220:10,
220:11
**excuse**
115:2, 146:11,
183:24, 186:17,
187:11, 197:17,
198:23, 205:21,
208:6, 208:24,
210:12, 214:14
**exempted**
29:16, 29:17
**exemption**
196:21
**exercised**
186:25
**exercising**
81:12, 213:7,
215:17
**exhaustive**
213:20, 215:16,
215:23, 216:19,
216:23, 216:24,
222:25, 223:11
**exhibits**
11:9, 16:7,
167:25, 168:12

**existence**
46:5, 212:21
**exists**
190:7, 190:10
**expand**
204:13, 214:5,
214:11
**expanding**
214:23
**experience**
59:9, 60:7,
60:22, 61:7,
103:9, 146:13,
185:23, 186:22,
186:25, 195:19
**experienced**
208:12
**expert**
193:2
**expertise**
79:9
**expires**
233:18
**explain**
120:14, 178:3,
178:7, 209:3
**explains**
219:19
**explicitly**
210:6, 211:6
**explore**
30:10
**extensively**
101:13
**extent**
47:19, 48:8,
75:16, 92:14,
96:10, 100:11,
179:21, 184:12,
202:4, 206:22,
217:23, 218:13,
229:22
**extremely**
56:8
**eyes**
70:4, 182:4
**eyewitness**
139:21

**F**

**f-i-n-k-b-e-i-n--**
**e-r**
129:25
**face**
226:17
**facilitating**
213:14
**facilities**
156:23
**fact**
90:6, 101:13,
196:1, 229:15,
230:23
**facts**
63:12, 82:17,
82:19, 99:6,
118:19, 124:25,
136:9, 136:13,
136:17, 137:13,
137:16, 138:21,
139:6, 139:24,
144:9, 190:25,
195:15
**faculty**
21:15
**failing**
111:23
**fair**
14:19, 28:13,
30:9, 63:9,
63:25, 67:4,
94:9, 118:24,
119:2, 150:11,
150:17, 185:21
**fairly**
13:22, 99:16
**fall**
131:4, 149:6,
149:11, 176:14
**falls**
50:2, 138:10,
147:1
**false**
58:22, 60:3,
60:14, 151:25
**familiar**
13:17, 13:23,

33:3, 46:4,
46:5, 50:11,
56:8, 65:6,
70:21, 89:20,
89:22, 91:10,
99:20, 105:7,
107:11, 107:12,
107:13, 107:15,
111:13, 123:15,
123:22, 126:18,
130:24, 186:12,
207:3, 212:20,
224:7
**familiarity**
224:10
**families**
22:6, 22:8
**family**
155:23, 202:22,
203:18
**far**
27:15, 29:15,
144:15
**fault**
229:23
**fdle**
31:16, 31:21,
32:6, 32:22,
33:3, 34:24,
35:17, 36:1,
36:3, 36:12,
49:15, 108:10,
110:12, 110:13,
117:9, 117:12,
117:13, 148:13,
148:23, 165:18,
169:24, 181:8,
181:11, 181:13,
181:18, 181:21,
181:22, 182:11,
182:17, 185:16,
187:5, 187:12,
205:1
**federal**
84:20, 86:15,
156:20
**federation**
2:4, 11:25,

113:17, 114:12,
114:20, 228:23
**federation's**
115:8
**feedback**
182:7
**feel**
71:11, 180:6,
180:9, 184:10
**feeling**
152:22
**felonies**
67:13, 67:14,
67:21, 68:3,
68:13, 74:2,
74:6, 74:10,
74:15, 77:6,
77:11, 78:6,
78:10, 78:24,
78:25, 79:5,
79:16, 81:12,
82:10, 83:8,
83:10, 86:3,
86:16, 86:24,
87:9, 87:19,
87:24
**felons**
29:20, 92:1,
92:5, 170:5
**felony**
20:25, 53:10,
55:15, 65:1,
66:24, 67:21,
68:3, 71:24,
74:20, 75:5,
76:9, 76:25,
77:7, 77:20,
79:19, 82:10,
82:25, 83:9,
83:11, 84:18,
86:1, 86:4,
87:1, 87:2,
87:8, 88:6,
106:11, 106:18,
169:23, 219:17,
226:10, 226:13,
226:17
**fentanyl**
18:21

**ferguson**
4:12, 11:3,
13:6, 13:13,
20:7, 20:15,
39:11, 39:18,
51:1, 89:4,
89:10, 89:14,
92:15, 93:3,
93:5, 93:11,
95:13, 100:25,
101:20, 108:14,
108:17, 116:13,
118:16, 123:21,
124:3, 144:21,
162:12, 162:18,
164:9, 164:17,
191:18, 204:4,
204:10, 228:6,
229:8
**few**
23:12, 46:11,
47:6, 59:3,
59:4, 61:19,
62:3, 62:23,
67:8, 68:7,
72:16, 99:16,
182:14, 204:24,
219:19
**fictitious**
59:12
**fiduciaries**
107:10
**figure**
150:14
**file**
79:22, 134:17,
136:25, 139:15,
139:16, 139:21,
139:25, 140:6,
140:7, 141:11,
141:21, 143:13,
221:6
**filed**
15:15, 80:22
**files**
118:17
**filing**
71:1, 137:17

**fill**
206:22, 213:13
**filled**
143:4, 201:2,
206:15, 206:20
**final**
111:9
**finally**
15:23, 130:3
**finance**
176:13, 176:17
**financial**
152:7, 233:11
**find**
88:12, 126:25
**finding**
145:15
**fine**
14:11, 16:13,
36:15, 40:9,
44:9, 67:8,
77:4, 88:17,
104:4, 104:11,
115:5, 147:18,
190:21, 191:16,
191:19, 195:1,
195:2, 196:2,
201:12
**fined**
111:22, 192:5,
192:7, 192:10,
192:13, 192:16,
193:13, 193:19
**fines**
99:10, 145:21,
145:22, 146:4,
146:8, 146:13,
178:13, 178:14,
192:20, 193:4,
193:25, 194:7,
194:18, 194:25,
195:8, 195:20,
195:23
**fining**
146:25
**finish**
14:22
**finished**
164:5

**finkbeiner**
129:24
**firm**
21:25, 22:1
**first**
39:25, 41:2,
43:9, 47:9,
55:22, 55:24,
83:2, 106:12,
119:23, 127:17,
155:11, 157:18,
163:24, 174:20,
177:13, 206:25,
209:21, 210:7,
210:8, 211:7,
218:16
**fit**
44:1, 52:13
**fitting**
68:20
**five**
71:13, 82:1,
88:25, 101:9,
145:12, 147:13,
147:15, 227:9
**five-minute**
174:11
**flagged**
147:15, 220:24
**flagler**
6:3
**flexible**
15:6
**floor**
5:7, 6:16, 10:7
**florida**
1:2, 1:5, 1:14,
1:19, 2:1, 2:11,
4:11, 5:11,
5:15, 6:9, 6:17,
7:9, 7:17, 8:7,
8:20, 9:7, 9:15,
9:23, 10:8,
10:16, 13:5,
13:14, 15:17,
19:12, 20:22,
21:2, 21:9,
21:11, 22:8,

22:10, 28:16,
29:14, 30:23,
31:10, 31:16,
32:14, 41:13,
41:17, 41:18,
45:23, 58:23,
75:3, 76:6,
76:7, 78:5,
108:24, 109:22,
125:4, 147:6,
147:10, 153:21,
157:22, 171:22,
175:6, 175:9,
176:5, 179:2,
179:4, 197:18,
206:9, 213:16,
219:11, 219:12,
222:19, 229:9
**focus**
18:9, 18:19,
19:10, 41:12,
41:21, 42:24,
43:24, 62:21,
63:2, 67:10,
80:2, 183:21,
184:6
**focused**
19:7, 43:9
**folks**
113:23, 133:22
**follow**
53:5, 90:14,
110:13, 215:7,
220:24
**following**
67:25
**follows**
13:3, 104:16,
209:7
**footnote**
84:7, 84:9
**force**
34:19, 34:20,
34:24, 148:12,
148:14, 148:17
**foregoing**
124:24, 232:4,
233:3, 233:4

**foreign**
162:15
**foremost**
209:21
**forged**
78:19
**forgery**
78:18
**former**
22:3, 158:22
**forms**
60:3, 80:14,
81:13, 82:3,
82:4, 82:5,
92:6, 106:21,
123:22, 161:19,
201:1, 224:17,
224:19
**fort**
7:9, 8:7,
156:23
**forward**
32:7, 144:24,
190:10
**foster**
21:5
**found**
53:21, 54:2,
116:8, 185:20
**foundation**
5:5
**four**
52:10, 71:16,
72:6, 92:8,
96:5, 105:16,
144:13, 175:9
**frank**
6:5
**franklin**
7:6, 8:11
**fraud**
18:25, 19:1,
19:2, 19:8,
21:3, 59:11,
59:19, 59:24,
60:1, 62:3,
62:5, 62:20,
62:23, 66:18,

69:7, 78:15,
78:22, 151:14,
151:18, 153:20,
154:14, 155:20,
164:22
**fraud-related**
115:18
**fraudulent**
90:8, 90:21
**fraudulently**
59:20, 158:23
**frederick**
5:12
**free**
228:10, 228:11
**french**
111:5
**frequently**
109:13
**friends**
17:23
**front**
69:25, 83:23,
94:12, 105:10,
114:23, 116:17,
119:19, 145:13,
207:4, 208:24
**fry**
111:5
**fs**
213:6
**full**
13:9, 92:13,
114:1, 134:17
**full-time**
21:15
**fully**
180:18, 198:18
**fun**
22:18
**function**
149:14, 153:10
**functions**
67:15
**funded**
37:6
**further**
20:14, 101:21,

118:10, 180:16,
202:9
**furthers**
92:9, 92:19
**fyi**
170:21

### G

**gadsden**
8:12
**gainesville**
6:17
**games**
33:23
**gaming**
41:5
**gang**
18:16
**gangs**
18:17
**gardens**
9:23
**gave**
69:8, 104:24,
183:12, 230:6
**geared**
110:1
**general**
1:25, 7:12,
7:15, 10:11,
10:13, 17:6,
18:3, 19:1,
22:11, 28:15,
28:20, 29:3,
29:7, 29:8,
60:13, 60:15,
60:18, 74:22,
76:7, 76:11,
77:10, 78:10,
126:14, 127:22,
130:15, 131:7,
131:8, 147:11,
173:15, 175:7,
175:16, 175:22,
176:3, 176:22,
177:20, 177:21,
178:6, 186:17,
186:24, 196:16,

197:7, 201:25,
208:1, 211:13,
212:5, 229:13,
231:14
**general's**
21:2, 22:4,
24:10, 58:12,
80:1, 80:21,
80:24, 93:17,
111:22, 112:21,
115:9, 117:14,
117:20, 120:9,
121:7, 121:12,
121:17, 147:2,
147:6, 147:7,
154:1, 157:12,
175:5, 176:24,
179:19, 187:19,
190:14, 190:22,
192:11, 192:14,
193:13, 193:20,
194:1, 194:3,
195:12, 195:20,
198:1, 198:11,
210:23, 225:22,
229:1
**generally**
25:24, 28:1,
36:16, 57:12,
75:7, 78:15,
105:13, 105:15,
105:19, 105:20,
118:1, 127:1,
127:4, 134:9,
149:5, 209:10,
209:15, 222:17
**generic**
82:21
**geraldo**
7:5
**getting**
34:21, 36:11,
56:22, 76:23,
90:10, 103:19,
111:7, 160:16,
195:7, 202:13,
223:17
**gilchrist**
6:3

**gist**
185:8
**give**
15:1, 20:19,
38:17, 40:3,
45:6, 45:9,
48:9, 52:7,
55:23, 57:15,
58:2, 63:18,
69:1, 77:21,
84:11, 93:19,
108:3, 115:2,
118:5, 142:21,
153:7, 153:11,
155:6, 163:22,
168:2, 168:9,
180:1, 215:21
**given**
19:4, 82:23,
96:15, 100:18,
112:15, 112:24,
232:6, 233:5
**gives**
38:16, 66:12,
126:7, 219:1,
219:3
**giving**
17:6
**glad**
158:1
**glades**
7:2
**glasses**
52:16
**gleaned**
116:6
**goes**
56:4, 69:14,
125:22, 146:24,
152:23, 204:16
**gone**
27:15, 27:18,
28:2, 64:3,
64:10, 106:11,
126:20, 189:3,
204:7, 204:9
**good**
13:7, 13:22,

20:15, 38:16,
56:25, 88:24,
113:20, 149:15
**gotcha**
58:13, 84:13,
86:11
**gotten**
160:6, 182:6,
204:17
**gov**
213:16
**governor**
41:14, 41:18,
41:23, 43:16,
45:2, 61:24,
171:2
**grab**
128:21
**graduated**
20:21
**grand**
19:11, 19:14,
19:15, 19:23
**graph**
50:12
**gray**
8:17
**graziano**
21:25
**great**
13:12, 13:25,
15:1, 15:4,
15:19, 16:3,
17:12, 17:22,
18:1, 18:8,
23:11, 23:19,
25:3, 25:17,
26:4, 26:20,
40:12, 41:7,
41:11, 46:10,
49:5, 55:25,
57:2, 59:1,
67:18, 70:12,
72:12, 72:23,
73:9, 85:7,
88:23, 89:24,
94:14, 98:16,
105:17, 158:18,

159:24, 177:5
**greek**
69:14
**ground**
14:1
**group**
4:4, 9:20,
174:5
**groups**
174:22, 231:12
**guardian**
202:23
**guess**
17:5, 35:5,
37:19, 48:17,
54:12, 54:13,
73:4, 80:2,
91:3, 105:16,
106:12, 110:1,
120:17, 141:7,
142:21, 209:25
**guessing**
13:17, 77:2,
78:20, 105:17,
196:23
**guidance**
214:3
**guide**
158:18
**guilty**
72:24
**gulf**
8:12
**guys**
214:25
**guzzo**
26:21, 101:8,
101:15, 198:17,
231:3
**guzzo's**
101:19

---
**H**
---

**haley**
129:21
**half**
76:24, 114:1,
119:23, 225:13

**halpern's**
157:1
**hamilton**
8:12
**hand**
51:17, 111:8,
233:14
**handing**
139:22
**handle**
17:9, 29:13,
32:8, 37:7,
61:18, 189:12,
206:5, 216:12
**handled**
29:13, 112:16,
188:10, 188:12,
188:25, 204:11,
204:14, 211:22,
230:7
**handles**
29:5, 29:6,
35:12
**handling**
15:25, 31:10,
80:9, 92:1,
92:5, 106:14,
107:4, 124:17,
129:15, 130:7,
130:10, 132:2,
132:14, 133:16,
136:1, 136:7,
136:15, 138:10,
138:16, 139:9,
144:6, 148:24,
189:5, 189:14,
196:3, 199:21,
200:7, 200:16,
205:10, 206:4,
209:4, 210:13,
213:5, 213:11,
213:21, 223:10
**hang**
21:19
**happen**
117:16, 140:11,
144:19, 178:8
**happened**
32:12, 32:14,

36:7, 36:13,
144:19, 145:25,
212:19
**happening**
81:25, 131:16,
198:9
**happens**
21:23, 36:21,
61:8, 178:10
**happy**
37:15, 46:24,
66:10, 92:21,
101:15, 101:17,
103:5, 115:3,
120:19, 120:25,
158:5, 200:3,
229:24, 230:18
**hard**
80:5, 94:5,
182:1, 222:1
**hardee**
7:2
**hate**
42:7, 180:2
**head**
14:10, 54:21,
87:12
**heading**
93:2
**hear**
14:20, 20:5,
33:11, 113:9,
113:10, 113:11,
113:13, 122:1,
142:11, 143:6,
194:11
**heard**
19:24, 122:15,
158:7
**hearing**
20:12, 182:2
**heartburn**
69:2
**held**
20:20
**help**
61:17, 67:1,
74:3, 88:11,

221:9, 221:19
**helped**
198:5, 198:13,
207:17
**helpful**
28:3, 30:10,
32:20, 33:22,
34:14, 36:9,
36:23, 37:16,
67:1, 69:11,
148:25, 150:15,
153:7, 185:25,
186:3
**helping**
197:15, 198:23,
201:13
**henderson**
7:6
**hendry**
7:2
**here's**
34:7, 156:12,
160:11, 160:13,
160:16, 160:19,
173:12
**hereby**
232:2, 233:3
**hereunto**
233:14
**hey**
34:6
**hi**
113:7, 113:8
**high**
69:9
**highlands**
6:3
**highlight**
40:14, 84:15
**highlighted**
40:16, 52:4,
91:24, 95:20,
96:14, 115:25,
164:18
**highlighting**
76:1, 164:16
**hills**
10:2, 10:5

hillsboro
72:19
hispanic
2:4, 11:25,
113:17, 114:12,
114:19, 115:8,
228:22
hold
128:22, 128:23,
228:15
holes
229:4
holmes
7:2
holtzman
9:12
home
92:7, 95:15,
95:22, 95:25,
96:4, 96:8,
96:24, 97:10
homicide
19:6, 20:25
homicides
19:7
honest
26:15
honestly
33:2
hope
30:9, 37:12,
110:16, 186:6
hour
56:22, 76:24,
114:1
housed
175:13, 175:18,
176:3
however
69:7, 197:22
human
18:15, 36:25

**I**

id
225:8
idea
85:19, 144:21

identification
24:7, 39:8,
42:18, 45:21,
57:5, 69:22,
72:15, 77:19,
83:21, 85:10,
107:24, 114:16,
124:5, 127:6,
155:4, 156:8,
157:16, 161:12,
163:4, 164:1,
166:7, 166:25,
167:20, 169:13,
170:16, 171:13,
172:7, 172:14,
219:12, 222:19
identified
110:22, 115:13
identify
115:11, 115:22
identity
115:18, 151:21,
202:1
iii
7:5
illegal
29:15, 105:25,
148:5, 162:3,
226:19, 226:24
illegally
74:16, 75:4,
183:18, 184:1,
184:3
illuminate
34:1
immediate
202:22
immigrants
162:3
immigration
19:18
impact
102:17, 125:15,
192:24
implementation
180:19
implemented
122:13, 122:16,

122:21, 123:6
implementing
24:18, 119:24,
121:7, 121:9
implements
196:2
implicates
75:16, 179:22,
202:5, 217:24
imply
58:9
important
37:23, 154:3,
154:10, 226:14,
226:24
impressed
28:5
inc
1:20
incident
53:10, 203:24
incidents
195:13, 196:8,
202:1
include
18:20, 29:1,
60:10, 78:18,
85:4, 95:15,
96:8, 96:24,
97:10, 165:22,
175:5, 177:24,
213:9, 215:13,
222:20
included
77:7, 77:11,
78:10, 79:1,
86:8, 95:7,
167:7
includes
60:18, 78:23,
79:17, 86:2,
87:9, 165:18
including
29:7, 80:23,
84:20, 140:11,
222:18, 222:25
incorrect
49:12

incorrectly
168:14
increase
61:23, 192:20,
192:24, 194:6,
194:18
increased
61:20, 182:17,
182:20, 183:1,
183:4
increases
193:4
independent
175:11, 175:12
independently
78:12
indicate
49:11, 185:18,
204:7
indicated
140:10, 180:13,
196:23, 199:16
indicates
192:3
indicating
73:10
indications
219:3
indirectly
181:10
individual
155:21, 156:19,
160:4, 162:2,
174:22, 184:1,
184:2, 200:18
individuals
74:20, 76:9,
125:7, 126:2,
199:7
ineligible
75:6, 170:5
inform
226:23
information
52:23, 53:16,
55:18, 59:13,
59:19, 89:17,
89:18, 90:1,

90:20, 91:13,
92:6, 92:7,
92:11, 93:20,
93:22, 94:2,
94:19, 95:5,
95:7, 95:8,
95:14, 95:20,
96:8, 97:23,
98:25, 104:18,
116:5, 120:16,
128:24, 129:5,
134:20, 137:2,
137:12, 140:12,
141:9, 141:14,
141:21, 142:10,
142:15, 142:18,
142:19, 142:23,
143:9, 143:11,
143:14, 144:6,
151:25, 173:21,
179:24, 184:24,
186:3, 187:17,
187:21, 187:24,
188:4, 188:20,
195:18, 199:6,
202:7, 213:9,
217:10, 217:21,
218:2, 218:5,
218:10, 218:19,
218:21, 219:4,
219:11, 219:15,
221:5, 221:6,
222:15, 222:17,
222:21, 225:13,
226:11, 230:5,
230:6
**informed**
100:21
**informing**
87:24, 185:24
**initiate**
33:20, 33:24
**initiating**
34:5, 34:12
**injunction**
11:21, 84:2,
91:20, 177:25
**inquired**
154:19

**inquiries**
110:9, 110:10
**inquiry**
144:25, 154:17,
229:20
**inserted**
133:1
**inserting**
30:20, 44:14
**instance**
25:19, 33:25,
92:23, 144:20,
195:4
**instances**
60:8, 66:18,
89:24, 109:8,
147:23, 151:3,
184:25, 203:17
**instead**
33:13
**institute**
127:23, 128:3,
177:21
**instruct**
230:24
**instructed**
202:21
**instruction**
154:15, 229:2
**instruments**
78:19
**insurance**
22:1
**intake**
144:15
**integrity**
206:9
**intend**
228:24
**intended**
226:18
**intent**
58:22, 88:22,
226:20, 226:22,
227:4
**interact**
184:13, 184:16,
194:25, 195:1,

208:5, 208:13
**interaction**
33:5, 178:7
**interest**
92:24, 233:11
**interesting**
19:25, 20:1,
22:15
**interests**
92:9, 92:19
**interjected**
81:3
**internal**
172:16
**internet**
12:2, 155:8
**interpret**
94:17, 121:14,
121:19
**interpretation**
120:18
**interrogatories**
11:18, 15:20,
48:14, 70:8,
70:20, 76:15,
115:8, 207:8
**interrogatory**
11:11, 11:24,
37:14, 46:8,
69:17, 70:13,
70:25, 71:21,
73:17, 207:13,
209:1, 209:2,
210:15
**interrupt**
20:2, 64:12
**introduced**
114:8
**introduction**
47:1, 174:20
**introductory**
43:4, 46:14
**investigate**
36:1, 110:14,
125:7
**investigated**
34:5, 90:1,
109:8, 110:4,

110:5, 111:19,
111:22
**investigating**
31:23, 128:19,
145:14, 145:16,
146:23, 149:1,
169:24, 190:15,
198:10
**investigation**
43:21, 49:22,
53:21, 63:21,
65:7, 65:18,
66:3, 82:18,
99:7, 110:11,
110:20, 111:19,
115:12, 118:10,
145:1, 165:19,
166:16, 167:11,
169:1, 179:6,
179:7, 185:21,
188:10, 188:22,
189:13, 189:14,
196:21, 225:23
**investigations**
31:8, 33:21,
37:2, 45:11,
46:18, 47:13,
50:20, 68:19,
100:7, 149:18,
150:7, 150:8,
182:20, 183:24,
185:12, 185:24,
186:2, 189:1,
202:6, 204:18
**investigative**
21:7, 28:16
**investigatively**
185:9
**investigator**
149:14, 149:16
**investigators**
145:4, 149:17,
149:20
**investigatory**
149:3, 149:5
**invokes**
149:9
**involve**
29:22, 30:12,

49:8, 50:16,
60:8, 60:15,
62:11, 69:4,
74:14, 80:8,
105:12, 105:24,
105:25, 119:1
**involved**
29:15, 44:8,
61:8, 63:6,
73:11, 112:6,
112:13, 119:6,
119:9, 128:18,
130:7, 130:10,
149:8, 183:11,
183:20, 196:17,
199:12, 199:17,
207:10, 207:15,
224:20
**involvement**
38:24, 62:8,
90:25, 151:10,
185:3
**involves**
53:2, 53:9,
53:15, 53:21,
55:9, 55:15,
55:17, 60:24,
80:13, 183:25
**involving**
24:18, 31:20,
48:5, 48:22,
56:3, 58:15,
60:1, 61:19,
67:19, 87:13,
102:11, 106:5,
108:22, 109:9,
109:14, 115:15,
119:14, 148:5,
176:7, 187:2,
189:5, 196:8,
202:1, 204:18,
204:21, 205:1,
220:18
**irregularities**
116:23, 151:14
**irregularity**
115:14, 118:9
**issue**
20:10, 103:17,

133:6, 146:16,
165:20, 186:13,
189:24, 209:11,
211:5, 226:7
**issued**
230:16
**issues**
19:16, 220:24
**issuing**
186:19
**it'll**
75:21, 120:23
**italicized**
124:22
**itself**
98:15

### J

**j-a-a-h-e-e**
130:1
**jaahee**
130:1
**jackson**
8:12
**jacksonville**
8:20
**january**
17:4, 45:24,
46:1, 115:13,
116:6, 150:25
**jared**
9:3
**jasmine**
58:15, 58:20,
164:10, 164:13,
164:19
**jefferson**
6:4, 6:8,
195:6, 195:7
**jeremy**
129:10
**jimmy**
130:13, 130:17,
131:11, 131:18,
146:1, 146:23,
178:16, 178:20
**jinida**
4:13

**job**
2:23, 16:22,
17:22, 22:22,
26:10, 185:24,
186:2, 197:3
**jobs**
20:20, 22:20,
82:7
**john**
26:14, 26:16,
26:18, 130:23,
178:19, 207:14,
207:16, 208:12
**johns**
8:13
**join**
229:11
**joined**
22:7, 93:16
**joins**
229:9
**joint**
80:22
**jonathan**
25:11, 129:14
**joshua**
9:11
**judge**
214:22, 214:24
**judgment**
11:19, 72:20
**judicial**
209:8, 210:20
**june**
233:18
**juries**
19:11, 19:14,
19:15, 19:23
**jurisdiction**
84:19, 125:14
**justice**
21:9

### K

**k-i-m**
130:2
**kahn**
9:3

**keenan**
5:3, 11:4,
113:6, 113:7,
113:9, 113:15,
113:19, 113:25,
114:7, 120:21,
135:1, 153:4,
153:9, 163:7,
168:2, 168:9,
168:17, 169:17,
174:2, 183:12,
188:9, 191:4,
204:4, 228:3,
228:15, 228:22,
230:12, 231:4,
231:10
**keep**
56:25, 77:24,
153:18, 162:25
**keeping**
91:25, 92:4
**keith**
72:20
**kennedy**
10:6
**kim**
130:1
**kind**
43:20, 59:11,
59:18, 60:18,
60:23, 61:8,
62:9, 124:7,
134:23, 136:6,
141:4, 188:18,
189:4, 189:25,
195:21, 197:23
**kinds**
29:3, 95:7,
181:23, 204:1
**king**
5:13
**knocked**
172:17
**knowing**
104:20, 144:9
**knowledge**
47:16, 47:20,
48:16, 49:11,

49:13, 51:6,
51:9, 51:14,
51:18, 62:2,
73:13, 73:16,
76:16, 81:19,
106:3, 109:11,
112:18, 120:24,
121:11, 126:15,
128:10, 146:13,
176:21, 179:17,
185:12, 186:16,
187:15, 187:18,
187:23, 188:3,
188:7, 189:22,
192:19, 192:23,
194:23, 196:15,
199:9, 199:19,
199:21, 199:25,
200:14, 211:17,
211:18, 212:3,
217:9, 217:19,
218:3, 218:11,
222:9

**koon**
9:19

**L**

**labeled**
124:10, 124:14,
168:14

**lack**
62:8, 102:11

**ladder**
215:1

**lady**
69:14

**lafayette**
8:12

**language**
66:11, 96:13,
124:23, 127:3,
177:7, 177:13,
200:2, 200:6,
201:12, 203:8,
203:9, 203:12,
203:16, 215:11,
218:17, 222:3

**large**
56:2

**largely**
74:14, 78:22

**last**
25:19, 45:16,
48:25, 52:10,
57:20, 59:5,
62:3, 92:8,
92:23, 96:5,
102:8, 111:2,
131:9, 162:24,
170:4, 171:14,
206:13

**late**
62:14, 187:19,
187:21, 188:20,
191:16, 192:6,
192:21, 195:1,
195:10

**later**
145:7

**lauderdale**
8:7, 156:24

**law**
4:4, 7:6,
20:21, 21:13,
21:16, 29:14,
31:16, 32:8,
32:13, 32:18,
34:6, 34:8,
36:6, 38:14,
40:21, 41:4,
41:12, 41:18,
41:21, 42:3,
42:4, 42:24,
43:10, 43:21,
44:4, 44:8,
53:25, 59:7,
61:7, 61:19,
62:13, 63:3,
63:7, 63:15,
64:25, 66:12,
67:12, 68:6,
76:7, 78:5,
79:1, 89:16,
96:11, 99:9,
100:14, 103:10,
105:21, 108:24,
109:23, 112:21,

131:14, 133:20,
134:4, 134:22,
137:9, 140:12,
141:12, 144:10,
144:25, 146:25,
149:8, 149:11,
175:15, 179:2,
179:3, 179:5,
186:4, 189:16,
206:10, 209:24,
210:1, 210:2,
210:4, 214:21,
215:7, 215:10,
221:5, 226:16,
230:14

**laws**
29:14, 84:22

**lawyers**
17:16, 187:13

**lead**
46:23, 47:7

**leader**
141:24

**leading**
37:10, 205:15

**league**
1:18, 4:10,
13:4, 13:13,
70:8, 229:8

**learn**
19:25

**learned**
27:10

**least**
44:22, 80:6,
111:1, 228:23,
229:5

**leave**
47:1, 228:24,
229:6

**leaves**
96:16, 96:17,
228:17

**leaving**
229:14

**led**
205:22

**leeway**
100:18

**left**
20:24, 21:20,
166:12

**legal**
4:14, 13:15,
21:4, 64:21,
88:4, 102:18,
126:13, 148:8,
175:14, 175:19,
175:20, 176:2,
180:4, 182:23,
190:9, 197:20,
199:24, 202:23,
221:6

**legally**
106:1

**legislative**
37:18, 37:24,
38:22, 199:18,
206:13

**legislator**
150:18

**legislature**
37:6, 41:13,
41:17, 41:23,
43:16, 45:1,
61:24, 206:8,
227:6

**leigh**
8:16

**lengthy**
48:9, 48:11

**leon**
195:5, 195:7

**less**
62:5, 154:9,
195:13

**let's**
16:21, 25:3,
31:6, 32:21,
36:10, 39:3,
39:25, 41:25,
44:2, 48:20,
50:15, 54:10,
54:17, 55:20,
59:11, 59:13,
61:15, 62:24,
64:2, 66:23,

67:11, 72:8,
75:23, 77:13,
79:12, 79:14,
81:21, 91:17,
92:21, 94:4,
99:8, 102:6,
105:3, 122:20,
153:11, 163:21,
178:14, 220:21
**letter**
34:3, 172:22,
173:7, 184:22,
185:18
**letters**
173:14, 182:13
**level**
69:9
**levied**
190:22, 193:25,
194:3
**levy**
7:3
**liability**
88:7
**liberties**
5:5
**liberty**
8:13
**license**
92:8, 96:4,
219:12, 222:18
**lied**
126:9
**lies**
146:10
**life**
27:14
**likely**
79:6
**liking**
229:18
**limit**
33:21
**limitation**
100:19
**limited**
101:8, 120:6
**limiting**
197:4

**line**
52:4, 57:24,
77:21, 77:23,
78:1, 97:24,
103:22, 104:3,
112:10, 191:13,
202:25, 203:2,
226:10
**lines**
91:6, 185:20
**link**
116:9, 153:5,
167:24, 168:3,
168:7, 168:10,
168:18
**links**
169:20, 169:24
**list**
16:1, 46:17,
47:12, 48:5,
48:8, 48:15,
48:22, 48:23,
50:20, 54:15,
67:12, 68:2,
68:13, 70:19,
71:16, 71:21,
72:2, 73:14,
75:12, 76:14,
76:15, 76:20,
77:6, 77:11,
78:5, 78:6,
78:21, 78:25,
83:7, 86:3,
90:16, 96:23,
97:12, 109:14,
129:1, 162:15,
163:13, 173:2,
201:5, 204:8,
206:17, 213:20,
215:13, 215:15,
215:23, 216:19,
219:23, 220:11,
222:25
**listed**
37:22, 67:21,
72:5, 73:17,
74:2, 79:5,
79:16, 80:8,

83:10, 84:21,
86:24, 95:6,
95:25, 96:12,
101:2, 109:20,
118:19, 211:12
**listening**
229:17
**lists**
75:2, 110:4
**litigation**
26:15, 58:12,
65:1, 80:2,
80:12, 131:7,
131:9, 149:7,
149:12, 149:13,
152:13, 178:22,
188:12, 196:16,
197:1, 197:7,
207:23, 208:2,
224:18
**little**
16:21, 17:14,
17:16, 18:2,
20:3, 20:5,
20:13, 25:3,
27:1, 28:14,
30:11, 30:14,
31:7, 35:16,
35:21, 36:24,
47:5, 52:15,
53:23, 56:1,
66:23, 70:18,
77:1, 89:1,
123:20, 123:25,
143:1, 145:7,
153:16, 159:21,
160:10, 160:12,
168:19, 172:17,
177:6, 181:1,
182:3, 186:11,
186:14, 195:25,
200:4, 202:18,
207:19, 208:4,
214:5, 214:11,
224:12
**living**
156:23
**llp**
4:4

**load**
153:5
**local**
21:25, 33:7,
33:12
**lodged**
115:14
**long**
16:25, 25:18,
46:13, 99:16,
160:22, 161:6,
174:11, 174:13,
227:22
**longed**
21:21
**longer**
67:15, 89:1
**look**
34:10, 38:4,
39:3, 40:23,
42:7, 48:10,
48:15, 52:8,
54:10, 67:1,
67:5, 70:15,
70:22, 71:12,
71:14, 72:17,
73:20, 77:12,
77:22, 78:20,
84:7, 84:12,
88:8, 88:20,
89:21, 92:4,
92:22, 94:10,
94:15, 94:23,
98:1, 99:17,
103:23, 108:11,
116:16, 118:7,
133:17, 135:18,
135:20, 138:6,
138:25, 139:3,
140:22, 144:7,
153:16, 164:15,
176:10, 176:15,
177:8, 206:17,
207:2, 210:3,
220:16, 223:20
**looked**
23:24, 27:3,
27:22, 41:25,

71:19, 82:20,
86:4, 87:7,
91:21, 103:3,
116:24, 170:9,
185:19, 205:1,
209:21
**looking**
16:8, 23:15,
24:2, 52:3,
52:20, 76:19,
78:12, 94:6,
94:13, 94:22,
97:21, 103:22,
114:24, 138:5,
142:15, 142:19,
143:14, 143:19,
150:3, 150:12,
150:16, 163:10,
169:23, 177:10,
188:19, 200:5,
200:12, 203:11,
206:21, 213:4,
216:10, 217:8,
225:12
**looks**
16:16, 42:21,
54:4, 108:9,
129:1, 157:9,
172:15, 207:7,
207:12, 209:6,
229:25
**lord**
28:10
**lot**
13:17, 16:3,
16:9, 17:12,
17:21, 17:25,
18:16, 18:18,
18:23, 18:25,
19:7, 22:16,
22:18, 26:9,
28:8, 28:19,
118:2, 126:8,
135:22, 161:5,
161:16, 198:16,
201:18, 204:6
**loud**
95:3

**love**
113:14
**lunch**
113:21

## M

**m-i-z-r-a-h-i**
129:23
**ma'am**
114:18, 114:21,
115:20, 116:1,
116:11, 116:19,
117:1, 118:15,
121:10, 122:11,
124:12, 124:15,
125:2, 125:5,
126:10, 126:20,
127:11, 127:14,
128:1, 128:6,
128:8, 128:16,
129:3, 130:20,
130:25, 131:25,
134:13, 136:16,
146:5, 146:6,
148:15, 150:3,
151:7, 151:19,
151:23, 152:1,
152:5, 152:9,
153:15, 153:23,
154:5, 156:1,
156:6, 157:2,
157:4, 158:17,
158:25, 159:4,
161:10, 163:15,
164:12, 164:18,
164:19, 164:23,
165:4, 166:17,
168:5, 169:3,
169:6, 170:5,
170:10, 171:3,
171:4, 171:8,
171:23, 172:1,
173:19, 177:15,
181:5, 182:18,
182:22, 182:24,
183:2, 183:9,
184:11, 188:2,
188:7, 191:11,

191:21, 192:18,
196:6, 213:18,
219:21, 225:15,
230:12
**made**
61:24, 80:15,
81:4, 81:8,
87:10, 97:16,
117:20, 118:2,
131:11, 144:22,
154:14, 155:21,
178:16, 178:21,
185:16, 229:19
**madison**
6:4
**maf**
1:12, 1:13,
1:14
**mail**
195:7, 195:9,
202:11, 202:12,
202:20, 203:19,
204:19, 204:20,
204:22, 204:23,
204:24
**mailers**
173:21
**main**
18:8, 18:12,
18:14
**mainly**
21:7, 100:17
**maintain**
223:9
**maintaining**
92:24
**majority**
117:19, 117:22,
117:25
**make**
14:2, 14:16,
16:1, 16:7,
21:19, 23:15,
28:6, 32:16,
52:14, 63:18,
67:24, 68:25,
79:23, 82:15,
82:21, 88:20,

89:9, 90:9,
90:13, 96:22,
101:18, 105:15,
117:9, 117:14,
122:2, 130:16,
134:17, 134:23,
139:4, 141:20,
143:4, 154:8,
172:18, 177:5,
190:9, 195:9,
200:4, 202:17,
224:3
**makes**
86:14, 86:18,
100:1
**making**
80:22, 119:13,
129:13, 138:22
**management**
17:5
**manhattan**
17:18, 17:23
**manner**
74:8, 144:23,
144:24, 182:12,
182:15, 206:4
**many**
48:24, 101:10,
105:11, 117:3,
117:8, 117:13,
154:13, 154:22,
192:5, 192:10,
193:12, 193:19
**march**
40:6, 40:7,
40:8
**mari**
6:5
**mark**
24:4, 46:2
**markarian**
9:20
**marked**
24:6, 39:7,
39:25, 42:17,
45:20, 57:4,
69:21, 72:14,
77:16, 77:18,

83:20, 85:9,
107:22, 107:23,
114:15, 116:13,
124:4, 127:5,
155:3, 156:7,
157:15, 161:11,
163:3, 163:25,
166:6, 166:24,
167:19, 169:12,
170:15, 171:12,
172:6, 172:8,
172:13, 172:15,
191:4, 222:11
**marks**
8:17
**maryland**
3:11, 233:23
**massachusetts**
4:6
**material**
165:22
**materials**
15:10, 111:24,
201:1
**matter**
29:7, 29:8,
29:23, 31:23,
35:19, 46:14,
51:20, 60:13,
115:15, 125:14,
127:21, 165:14,
174:23, 176:14,
177:20, 216:8,
216:9
**matters**
29:4, 31:20,
35:25, 43:10,
44:8, 112:11,
130:8, 130:10,
148:6, 148:9,
149:6, 149:18,
180:7, 180:9,
187:15, 188:15,
188:18, 189:2,
189:3, 189:4,
206:3, 208:6,
208:7, 208:14,
215:2, 230:9

**matthew**
9:4
**maybe**
27:12, 28:8,
42:22, 63:22,
88:11, 97:11,
105:16, 157:18
**mcbay**
173:15
**mean**
18:10, 23:24,
26:9, 29:1,
29:17, 30:15,
31:4, 33:24,
48:11, 49:25,
50:2, 50:13,
54:7, 54:14,
58:9, 62:4,
62:13, 64:9,
64:13, 81:17,
90:16, 90:18,
99:13, 103:16,
105:20, 108:7,
125:11, 126:25,
132:21, 134:9,
136:2, 136:3,
136:22, 140:8,
146:3, 153:24,
175:1, 181:17,
182:12, 183:6,
187:7, 189:10,
211:2, 220:6,
220:13, 222:5,
223:2, 223:4,
224:16, 230:1
**meaning**
105:25, 132:13,
132:19, 132:20,
209:10, 210:22,
211:14, 217:20,
218:12, 220:16,
220:19
**means**
92:11, 93:23,
94:19, 98:9,
104:10, 213:6,
218:19, 218:21,
222:16

**meant**
120:18, 172:11,
208:25, 223:7
**medicaid**
21:3
**meet**
26:5, 101:16,
143:17, 143:19
**meeting**
228:14
**meetings**
25:18, 26:23
**megan**
5:3, 113:15,
153:1
**member**
21:15, 155:23,
202:22
**members**
108:10, 148:13,
203:18
**memory**
42:6, 78:9,
78:11, 78:12
**mentally**
155:22, 156:22
**mention**
37:1, 51:23,
56:4
**mentioned**
16:9, 27:24,
36:25, 41:5,
43:17, 46:7,
59:10, 66:25,
99:23, 128:19,
129:19, 207:22,
209:17, 209:20
**mess**
15:13
**message**
12:2, 43:5,
155:8, 155:11
**met**
102:13
**method**
131:20
**miami**
129:10, 129:24

**michael**
72:4, 72:20
**middle**
72:25, 91:25
**might**
14:20, 19:15,
20:4, 31:23,
32:11, 32:16,
33:7, 33:12,
34:5, 47:5,
64:15, 131:12,
136:6, 136:14,
143:11, 178:8,
178:22, 182:15,
184:23, 189:10,
208:5, 210:3,
220:13, 223:16
**mike**
20:5, 20:13,
113:12, 182:3
**mincing**
90:4
**mind**
23:6, 54:12,
103:23, 111:5,
129:4, 159:25,
223:4, 227:8
**minimal**
120:11
**minor**
23:7
**minute**
52:7, 70:15,
71:9, 84:11,
98:4, 108:11,
110:24, 115:2,
145:8, 185:5,
203:21, 215:22
**minutes**
23:12, 25:20,
59:4, 89:1,
113:22, 182:14,
227:9
**misconduct**
49:22, 50:7,
60:9, 61:10,
66:18, 90:3,
103:12, 105:12,

109:9, 112:5,
144:17, 176:9,
182:10, 226:25
**misdemeanor**
20:24
**missed**
95:22, 95:23
**missing**
104:18
**misspoke**
191:12
**misuse**
90:20
**mizrahi**
129:23
**moment**
42:22, 47:2,
73:15, 77:22,
83:18, 86:5,
95:16, 153:10,
191:3, 215:21
**momentarily**
212:24
**moments**
55:23, 67:9
**money**
201:18
**monroe**
7:8, 9:14
**month**
36:21, 58:21,
64:16
**monthly**
64:14
**months**
62:23, 68:7
**moody**
1:23, 7:13
**more**
18:2, 27:1,
30:14, 36:21,
48:2, 49:12,
62:4, 66:23,
76:22, 76:24,
79:6, 81:21,
95:13, 98:19,
99:12, 107:21,
112:1, 119:3,

120:25, 126:8,
136:23, 137:10,
137:12, 137:16,
137:25, 140:12,
140:14, 142:23,
143:9, 143:11,
146:7, 151:5,
158:8, 159:21,
167:24, 174:4,
184:10, 186:10,
208:4, 214:5,
216:9, 221:4,
228:5, 228:6
**morning**
13:7, 113:3
**mortgage**
19:2
**most**
71:15, 77:2,
211:11
**mostly**
13:20
**motion**
11:20, 84:1
**move**
20:4, 20:8,
45:19, 48:20,
56:22, 61:15,
66:23, 79:12,
85:7, 89:15,
97:17, 97:19,
99:8, 105:3,
123:14, 128:17,
131:21, 144:12,
147:21, 156:9,
158:9, 158:11,
158:14, 159:5,
163:9, 169:8,
171:9, 172:2,
190:10
**moving**
67:6, 166:21,
201:24
**much**
13:7, 17:19,
28:3, 38:6,
45:18, 45:25,
69:10, 70:2,

76:19, 128:24,
136:23, 180:15,
182:12, 182:15,
193:10, 227:21,
227:22, 231:6
**multi-circuit**
125:9, 125:11,
125:15
**multiple**
60:9, 60:11,
60:16, 60:24,
177:2, 230:13
**murder**
74:21, 75:6,
76:10, 78:23,
90:17
**must**
54:14, 223:21
**myers**
7:9
**myself**
16:1, 108:10,
114:8, 129:9,
180:2

## N

**naacp**
1:8, 4:2, 5:11,
174:9, 174:18,
174:24, 175:1,
229:10
**name**
13:9, 13:13,
41:9, 58:16,
61:10, 61:13,
67:19, 69:12,
72:5, 73:8,
98:25, 113:15,
131:9, 155:16,
164:10, 164:19,
174:21, 224:24
**named**
58:15, 130:23
**names**
129:1
**narrow**
63:10
**nassau**
8:13

**nathaniel**
129:16
**nature**
25:25
**navigate**
50:19, 82:24
**necessarily**
63:20, 63:21,
97:16, 149:9,
214:2, 214:14,
216:15, 223:16,
223:20
**necessary**
66:11, 107:20
**need**
18:22, 38:8,
40:18, 70:21,
83:24, 94:10,
95:3, 99:6,
99:17, 101:6,
101:21, 134:17,
135:18, 137:10,
137:16, 139:15,
141:9, 141:14,
141:19, 142:23,
143:9, 143:11,
144:7, 150:21,
150:24, 158:1,
172:10, 183:5,
185:1, 186:9,
221:4, 231:10
**needed**
36:2, 102:5,
137:12, 215:3
**needing**
184:20
**needs**
32:24, 34:4,
38:9, 85:25,
92:14
**neither**
233:9
**never**
54:12, 100:20,
117:14, 141:11,
144:2, 144:3
**new**
5:8, 19:16,

61:15, 66:12,
66:17, 144:12,
176:22, 203:8,
203:9, 203:16

**next**
43:3, 104:6,
113:5, 131:21,
137:18, 159:5,
160:3, 160:11,
160:16, 160:21,
161:13, 166:4,
170:1, 170:12,
171:9, 172:2,
172:12, 192:9

**nice**
228:13

**nicholas**
2:16, 3:1,
11:2, 13:2,
13:10, 232:2

**nick**
13:11

**night**
25:20

**nine**
144:13

**noah**
7:14

**nodding**
14:9

**nominating**
175:17

**non-canvassers**
135:10

**non-felon**
11:22, 85:21

**non-u**
105:25, 106:13,
106:22

**non-us**
106:5

**noncitizen**
105:5, 137:22,
138:3, 138:18,
139:7, 139:22,
141:15, 165:14,
166:19, 167:14,
171:6, 196:3,

196:9, 196:13,
196:17, 197:8,
201:13

**noncitizens**
105:12, 109:9,
109:15, 110:5,
110:22, 110:24,
115:15, 119:1,
119:6, 119:15,
135:8, 135:12,
135:14, 137:21,
138:2, 140:17,
141:1, 142:24,
143:3, 149:23,
154:23, 156:3,
157:6, 158:4,
159:2, 161:7,
162:7, 162:9,
163:13, 163:17,
165:8, 169:4,
170:7, 171:25,
173:24, 197:15,
197:16, 199:12,
199:21

**noncompliant**
186:20, 188:21,
195:13, 199:13,
199:22, 220:25

**noncriminal**
214:19

**none**
205:3

**nonimmediate**
203:18

**noon**
89:9

**northern**
1:2

**northwest**
4:6, 4:16

**notarial**
233:15

**notary**
3:10, 233:22

**note**
95:24, 168:11

**notes**
171:15, 227:10

**nothing**
73:9, 165:6,
171:5, 195:17,
228:6

**nothing's**
23:6

**notice**
3:10, 11:10,
15:22, 23:14,
23:20, 95:24,
147:4, 147:5,
147:9, 226:18,
226:21

**noticed**
62:22, 63:14,
152:10

**november**
157:4

**number**
24:17, 36:14,
36:19, 44:1,
44:17, 44:25,
45:11, 45:17,
51:6, 53:22,
56:2, 64:2,
64:3, 72:6,
92:9, 96:5,
99:1, 105:17,
105:24, 115:21,
115:24, 140:10,
162:25, 163:6,
168:13, 172:9,
172:16, 182:16,
182:19, 182:25,
183:3, 191:6,
192:20, 194:7,
207:13, 219:12,
219:13, 222:19,
222:20, 225:8,
225:17

**numbered**
39:16

**numbering**
163:20

**numbers**
50:3, 64:9,
64:10, 64:13,
69:19, 92:8,

96:4, 163:10,
167:6, 172:18,
219:19

**numerous**
13:20

---

**O**

**o'brien**
10:4

**o'donnell**
4:3, 11:5,
174:8, 174:15,
174:17, 174:19,
174:21, 182:2,
191:7, 194:10,
198:19, 199:2,
203:2, 205:25,
214:8, 220:3,
221:16, 227:8,
227:15, 227:19,
227:24, 229:10

**oag**
12:3, 12:4,
12:11, 12:12,
12:13, 12:14,
12:15, 88:2,
114:11, 115:22,
116:5, 116:14,
117:4, 117:10,
122:13, 122:21,
123:5, 126:14,
126:23, 128:3,
144:16, 145:17,
146:7, 146:22,
147:17, 148:13,
149:3, 150:1,
151:17, 151:22,
154:2, 154:14,
156:11, 157:13,
169:9, 170:14,
171:10, 171:11,
172:9, 172:21,
209:6, 209:10

**oag's**
116:4, 123:15,
144:14, 145:20,
146:18, 155:8,
159:11, 161:14,

167:4, 217:9
**oag-lwv-rfp2**
12:10, 167:3,
167:5, 167:18
**oag_hf_firstrfp**
12:5, 12:6,
12:18, 159:7,
161:15, 163:8
**oath**
14:4, 142:8
**oaths**
125:8, 126:3
**object**
14:21, 56:15,
100:10, 100:11,
198:16, 229:13,
229:14, 230:11
**objected**
101:14, 230:14
**objection**
30:17, 30:21,
31:25, 32:25,
35:6, 44:12,
44:15, 45:15,
47:18, 48:7,
49:23, 50:8,
51:8, 51:11,
55:3, 55:6,
56:14, 59:16,
59:22, 60:5,
61:2, 61:11,
62:6, 62:25,
66:15, 66:20,
74:24, 75:8,
75:15, 75:16,
79:2, 79:8,
79:20, 80:17,
81:14, 82:12,
83:1, 86:6,
87:4, 92:12,
93:24, 94:20,
95:11, 95:18,
95:21, 96:9,
97:4, 97:7,
98:10, 99:3,
104:22, 107:7,
109:18, 110:7,
112:7, 112:9,

112:10, 112:22,
117:23, 121:21,
122:19, 132:23,
133:1, 134:24,
136:11, 137:4,
137:14, 137:24,
138:20, 139:12,
140:3, 140:9,
140:19, 141:3,
143:21, 143:24,
150:23, 179:13,
179:21, 180:22,
181:24, 182:21,
184:18, 187:6,
188:14, 189:6,
189:20, 190:24,
191:25, 192:7,
192:22, 193:7,
193:16, 193:22,
194:9, 194:20,
195:15, 195:22,
196:12, 196:20,
197:11, 197:19,
198:8, 198:15,
201:7, 201:16,
201:20, 202:4,
204:5, 205:17,
205:23, 208:9,
209:18, 211:1,
211:20, 212:7,
213:22, 214:6,
214:16, 215:18,
216:3, 216:22,
217:3, 217:16,
217:23, 218:6,
218:15, 218:20,
218:24, 219:24,
220:4, 220:5,
220:6, 220:14,
221:2, 221:14,
221:22, 223:1,
223:18, 226:3,
227:3
**objections**
115:25
**obtain**
184:23

**obvious**
180:5
**obviously**
26:9, 27:22,
90:7, 101:6
**occasions**
134:1
**occur**
215:17
**occurred**
54:8, 125:17
**occurs**
125:9
**october**
62:24, 63:16,
64:5, 64:6,
70:11
**oecs**
31:21, 32:4,
32:22, 33:2,
35:16, 35:18,
35:25, 45:24,
45:25, 46:18,
47:13, 51:24,
56:2, 63:22,
74:19, 74:25,
75:22, 76:2,
76:8, 103:2,
109:5, 109:12,
116:12, 117:9,
117:13, 146:11,
146:25, 148:17,
181:1, 181:6,
181:12, 182:9,
186:23, 220:24
**oecs's**
182:17
**offenders**
170:5
**offense**
78:23, 84:19,
84:21, 115:18
**offenses**
74:21, 75:5,
76:10, 90:17
**offer**
56:19, 152:6
**office's**
46:7, 70:6,

105:11, 119:24,
132:1, 133:9,
145:13, 205:9,
205:12, 205:20
**officer**
175:12, 175:13,
175:22, 180:3,
185:2, 227:7,
233:2
**officers**
227:7
**offices**
126:2
**official**
1:13, 1:24, 2:9
**offline**
101:15, 229:25
**often**
35:18, 36:13
**oftentimes**
125:16
**oh**
28:10, 36:14,
71:3, 111:4,
119:21, 154:12,
177:8, 185:14,
185:15, 187:9,
206:1, 228:15
**okeechobee**
7:3
**olivo**
7:5
**once**
36:21, 69:17,
179:6
**one's**
19:17, 19:18,
161:15
**one-pager**
155:5
**ones**
16:9, 28:20,
37:11, 50:12,
78:14, 80:4,
130:6, 148:23,
168:12, 170:4,
204:19
**ongoing**
58:20

online
140:18, 140:20
only
32:3, 62:13,
62:15, 68:6,
80:13, 94:1,
124:3, 130:5,
134:7, 134:19,
137:2, 137:11,
139:20, 154:6,
202:21, 204:15,
215:12, 230:16
open
53:21, 153:2,
153:10, 228:25,
229:6, 229:14
operating
18:17, 201:5,
202:2, 218:5,
220:25, 221:1
operative
126:18
opine
210:12, 211:14,
217:20
opinion
50:1, 166:1,
197:22, 201:21
opinions
201:23
opioids
18:21
opportunity
139:17, 190:21
opposed
204:19
opposition
84:1
ops
187:9
ops's
187:3, 187:5
ora
54:9
orange
54:12, 54:13,
54:17
order
39:15, 125:12,

136:25, 157:10,
177:25, 178:1,
221:19, 231:11,
231:12
ordered
19:12, 231:13
orderly
92:25
organization
165:25, 200:9,
202:3, 219:9,
219:16, 220:22
organizational
142:2, 165:20
orientations
48:4
original
90:7, 215:14
orlando
5:15, 6:9,
130:1
osp
11:12, 18:5,
18:9, 23:4,
28:21, 29:1,
29:7, 32:24,
35:12, 35:19,
36:24, 37:3,
37:20, 37:23,
39:4, 50:21,
51:20, 51:23,
51:24, 52:1,
53:21, 58:7,
87:13, 125:22,
125:25, 141:25,
142:2, 146:3,
148:4, 148:8,
148:25, 149:14,
149:22, 184:12,
184:13, 206:10,
221:20
osp's
40:21, 41:3,
44:7, 147:14,
147:16
other
16:6, 18:19,
26:18, 26:23,

27:4, 28:16,
34:12, 35:12,
36:18, 47:16,
47:20, 53:20,
59:24, 63:22,
78:5, 80:3,
98:14, 106:20,
111:8, 118:22,
135:8, 135:15,
136:1, 136:18,
148:6, 148:8,
149:2, 149:4,
151:13, 151:14,
177:2, 177:25,
179:3, 180:16,
181:22, 185:3,
188:16, 188:21,
206:5, 218:10,
219:14, 221:6,
223:22, 227:25
others
14:21, 88:25,
161:18, 168:13
otherwise
90:21, 115:16,
116:3, 116:4,
218:2, 233:11
out
19:17, 20:24,
28:17, 29:19,
39:15, 74:8,
75:2, 84:20,
85:4, 86:14,
86:25, 87:9,
87:18, 87:24,
95:3, 129:4,
129:14, 129:17,
129:20, 129:24,
129:25, 130:2,
130:5, 140:13,
143:4, 144:16,
150:14, 154:4,
157:10, 170:23,
173:21, 184:20,
192:3, 201:2,
203:11, 213:13
outcome
233:12

outline
172:11, 172:17
outside
41:20, 100:15,
134:22, 176:17,
209:16, 209:22,
210:5
over
17:7, 18:13,
19:6, 21:12,
21:14, 22:7,
38:6, 61:19,
81:13, 108:5,
110:12, 117:18,
153:6, 154:6,
164:24, 179:1,
179:2, 180:25,
181:3, 186:5,
188:23, 213:7
overall
64:1, 64:13,
81:20
oversee
23:4
overseeing
175:5
oversight
17:5, 17:10,
18:4
overview
20:19
own
33:20, 172:16,
175:4, 185:11

---

P

p-a-n-a-g-i-o-t-a
69:13
p-a-p-a-k-o-s
69:14, 129:20
p-o-t-a
69:15, 129:20
page
11:2, 11:9,
24:2, 39:25,
40:1, 40:13,
42:20, 43:1,
43:4, 46:15,

46:25, 47:8,
48:25, 54:16,
55:21, 55:22,
58:18, 71:5,
71:12, 71:16,
72:5, 73:1,
75:25, 76:2,
84:5, 84:7,
85:15, 85:16,
91:19, 92:22,
93:7, 99:15,
104:6, 115:10,
116:16, 116:18,
116:21, 117:8,
118:5, 118:7,
127:12, 131:23,
144:13, 147:14,
155:19, 155:25,
161:18, 162:1,
163:23, 169:10,
169:11, 171:14,
177:11, 191:8,
191:11, 200:3,
202:17, 208:23,
209:1, 217:7,
219:6
**pages**
2:24, 27:11,
27:13, 46:11,
46:13, 47:6,
70:14, 72:16,
117:18, 196:24,
197:4
**palm**
9:23, 25:13,
129:14
**panagiota**
69:13
**papakos**
69:13, 129:20
**paper**
15:23, 70:3,
128:20
**parade**
81:25
**paragraph**
40:14, 40:19,
40:20, 41:3,

41:8, 47:9,
55:22, 55:24,
58:25, 76:2,
92:23
**paragraphs**
57:21
**part**
24:17, 30:11,
35:11, 47:7,
48:13, 56:10,
66:11, 69:3,
76:1, 80:2,
84:15, 86:3,
103:17, 110:10,
120:4, 120:7,
142:5, 142:12,
148:17, 148:21,
148:22, 172:25,
175:19, 183:17,
206:7, 222:8,
227:2, 227:4
**partially**
48:12
**participating**
107:5
**particular**
26:2, 54:5,
69:4, 73:5,
86:20, 88:13,
91:7, 183:21,
216:21, 222:8,
226:7
**parties**
15:15, 204:21,
233:10
**partnership**
76:6
**parts**
88:16
**party**
156:22, 200:8,
202:2, 219:8,
219:15, 220:22,
225:1
**pasco**
69:7
**pass**
113:4, 174:7

**passage**
151:16, 171:15,
205:10, 205:21
**passed**
38:25, 41:17,
133:24, 158:23
**passing**
150:18
**past**
16:5, 61:19,
62:23, 115:23,
130:22
**paul**
2:25, 3:10,
113:14, 130:3,
233:2
**pause**
70:15
**pdf**
40:1, 46:16
**penalties**
99:10, 124:23,
180:7, 180:11,
180:19, 180:21,
180:23, 186:15,
186:16, 186:20,
189:23, 189:25,
190:16
**penalty**
100:13
**pending**
15:7, 54:4,
54:25, 150:7,
187:14, 196:21,
202:6
**people**
17:25, 20:12,
59:12, 60:8,
60:10, 71:21,
72:2, 73:23,
74:6, 74:14,
75:3, 77:2,
79:4, 80:13,
82:2, 82:6,
91:1, 125:16,
129:7, 129:8,
148:21, 156:23,
162:2, 169:23,

173:2, 197:15,
197:17, 198:2,
226:16
**percent**
49:19, 202:14
**percentage**
44:7
**percival**
130:14, 130:17,
131:12, 146:1,
146:23, 178:17,
178:20
**perez**
8:3
**perform**
67:15
**performed**
46:18, 47:13
**perhaps**
82:7, 101:22
**period**
36:10, 45:7,
45:13, 45:14
**perjury**
124:23, 125:3,
125:17
**permanent**
177:24
**person**
55:9, 58:5,
61:9, 61:12,
68:12, 83:11,
84:17, 106:21,
107:2, 107:5,
115:13, 124:17,
127:20, 131:12,
131:13, 135:25,
136:18, 139:7,
155:16, 159:9,
171:6, 171:20,
177:18, 178:18,
200:6, 200:15,
201:13, 201:14,
202:1, 203:13,
219:7, 219:17
**person's**
82:9, 201:6
**personal**
53:15, 55:18,

59:13, 59:19,
91:12, 92:5,
92:11, 93:19,
93:22, 94:2,
94:19, 95:5,
95:8, 95:14,
95:20, 96:8,
120:24, 201:21,
201:22, 213:8,
217:10, 217:21,
218:5, 218:10,
218:18, 218:21,
219:3, 219:10,
222:15
**personally**
38:23, 207:7
**personnel**
128:18, 230:7
**perspective**
122:4, 122:5,
122:9, 129:8,
188:11
**persuasive**
215:3, 216:14,
216:18, 223:17
**pertinent**
180:11
**peruse**
173:4
**peter**
162:14
**pga**
9:21
**phone**
16:15, 98:25,
225:17
**phrase**
98:8
**physical**
80:13, 81:12,
215:17
**physically**
82:2, 106:20,
135:9, 135:15,
136:19, 139:9,
213:6
**piece**
15:23, 128:20

**pinellas**
9:2, 9:5
**pinpoint**
54:21
**pl**
7:16, 10:15
**place**
17:25, 68:7,
125:18, 181:22,
211:7
**plain**
98:14, 126:25,
128:2, 132:13,
132:18, 132:20,
133:18, 135:24,
138:7, 138:13,
140:23, 141:5,
141:8, 144:4,
209:10, 209:21,
210:22, 218:12,
220:16, 220:19
**plaintiff**
115:22, 174:22
**plaintiff's**
70:7, 147:9,
231:11
**plaintiffs**
1:10, 1:21,
2:6, 4:2, 4:10,
5:2, 80:6,
111:9, 113:17,
114:6, 114:12,
174:10, 174:24,
175:1, 175:2,
228:23, 229:10
**plans**
40:21, 41:3
**plate**
17:13
**playing**
33:23
**plea**
72:24, 183:7
**please**
14:15, 14:21,
14:22, 15:7,
24:5, 25:5,
46:3, 80:19,

108:13, 135:21,
165:13, 168:15
**point**
45:1, 154:4,
186:4
**points**
142:19
**police**
139:16
**policies**
122:16, 123:5,
205:9, 205:12,
205:20, 206:2
**policy**
205:13
**political**
107:5
**poor**
186:8
**poorly**
229:22
**portion**
49:21, 80:18,
95:20, 96:2,
97:23, 188:10,
208:2, 221:11,
222:4
**positing**
139:20
**position**
30:4, 63:1,
63:23, 210:23,
217:9
**positions**
19:5, 129:2,
206:8, 206:11,
206:16
**positive**
135:4, 211:3
**possibility**
189:8
**possible**
162:19
**post**
7:7
**pota**
69:15, 129:20
**potential**
109:8, 190:15,

225:24
**potentially**
213:20
**power**
146:8
**practice**
146:20
**practices**
122:12, 122:16,
122:17, 122:21,
166:1
**pratt**
9:11
**precedent**
209:8, 210:3,
210:20, 223:21
**prefatory**
51:5
**prefer**
88:25
**preference**
89:5
**preliminary**
11:20, 84:2,
91:20
**premarked**
114:14, 124:8,
127:8, 152:18,
155:1, 156:10,
157:11, 159:6,
166:5, 167:2,
167:4, 167:8,
167:17, 171:10
**preparation**
26:10, 40:22,
69:3, 69:5,
89:23
**prepare**
25:7, 27:3,
132:6
**prepared**
23:12, 24:25,
25:4, 58:7,
118:18, 120:15,
180:10, 180:18,
229:1, 229:20,
230:9
**preparing**
65:5

present
141:1, 141:15,
185:7, 223:16
presentations
19:17
presented
87:21, 106:25,
123:2, 141:23,
144:2, 165:2
press
170:18, 170:25
pretty
22:17, 38:6,
111:3, 111:7
prevent
112:4, 127:24,
151:14, 177:23,
197:16
prevented
82:24, 95:1
prevents
79:14, 81:11,
91:11, 106:13
previous
42:1, 42:3,
45:13, 54:23,
54:24, 68:9,
81:22, 204:18,
220:1
previously
24:13, 26:24,
53:9, 67:20,
74:20, 75:5,
76:9, 91:21,
100:2, 102:12,
129:11, 165:2,
203:12, 220:1
primarily
18:15, 25:11,
29:19, 41:6,
120:10, 146:12,
148:23, 154:20,
186:12
primary
18:19, 19:9,
19:21, 37:4,
38:12
prior
43:22, 45:3,

101:19, 151:16,
165:24, 181:12,
182:8, 197:25,
202:13, 202:14,
203:10
priorities
18:12, 36:25,
37:3, 37:4,
37:10, 38:4,
42:22
priority
37:8, 37:9,
37:18, 37:20,
37:25, 38:7,
38:11
private
222:16
privilege
75:17, 202:5,
217:25
privileged
202:7, 218:2
probable
11:15, 57:10,
57:17, 58:4,
58:14, 164:14,
164:20
probably
13:17, 17:24,
17:25, 18:22,
27:12, 29:10,
39:19, 44:18,
53:6, 57:9,
63:4, 65:23,
74:7, 75:2,
77:2, 78:23,
90:4, 103:3,
111:25, 113:12,
131:4, 131:17,
144:23, 145:23,
146:1, 178:16,
178:18, 180:15,
182:12, 184:19,
185:21, 204:17,
209:23, 211:25,
215:23
problem
28:4, 36:20,

38:21, 42:10,
68:1, 68:17,
71:9, 90:15,
91:2, 93:12,
96:7, 100:4,
227:23
problematic
50:6
problems
102:22
procedure
230:7
procedures
145:14
process
35:25, 87:23,
107:6, 145:14,
145:16, 181:19,
217:25
processed
141:2, 141:16
processes
35:20, 181:22
processing
54:2
produce
229:15
produced
57:9, 58:11,
116:14, 152:12,
153:25, 154:7,
156:11, 157:12,
159:7, 161:15,
167:3, 167:4,
167:17, 169:9,
170:13, 171:10,
172:9, 172:20,
196:16, 196:22,
196:25, 197:7
product
75:17, 75:19,
179:22, 179:24,
202:5, 217:24,
218:1
professor
21:12
prohibited
80:7, 83:11

prohibiting
197:14
prohibition
84:17
prohibits
138:17
promise
111:3
properly
165:23
proponents
199:17
pros
148:9
prosecute
87:16, 125:7,
125:13, 134:18,
134:21, 142:4,
142:11, 142:12,
143:15, 148:6,
151:17, 151:19,
151:22, 176:6,
189:18, 221:13,
221:21
prosecuted
23:4, 31:2,
67:9, 68:11,
68:12, 87:1,
89:25, 111:20,
126:2, 133:7,
142:16, 149:23,
150:2, 150:3,
150:10, 150:19,
203:23, 204:12,
204:13
prosecutes
87:13, 204:2
prosecuting
103:10, 184:14
prosecution
17:8, 17:11,
38:9, 39:2,
43:21, 50:14,
65:8, 65:19,
65:22, 90:6,
118:10, 125:13,
129:9, 130:18,
145:5, 147:1,

151:20, 175:8,
180:3, 213:25,
225:24
**prosecutions**
17:9, 30:2,
45:12, 67:19,
68:10, 68:18,
100:6, 105:11,
106:4, 115:12,
146:6, 182:25,
183:10, 183:25,
184:6
**prosecutor**
16:24, 17:3,
17:18, 20:18,
25:12, 129:17,
142:1, 175:6,
175:11, 175:15,
175:21, 176:6,
190:8, 214:15,
221:12
**prosecutors**
69:5, 137:9
**protection**
21:5
**provide**
50:5, 61:10,
61:13, 132:11,
186:3, 201:1,
214:2, 219:14
**provided**
27:5, 27:9,
48:13, 72:3,
110:4, 116:9,
165:21, 210:6,
210:18, 218:13,
219:18, 219:23,
230:5, 230:6
**provides**
96:23, 98:22,
126:23, 213:19,
215:13
**providing**
214:13
**provision**
65:8, 65:12,
67:10, 79:14,
80:3, 80:11,

80:12, 81:11,
89:16, 89:20,
91:9, 91:11,
93:23, 97:19,
97:22, 98:18,
99:2, 99:10,
100:12, 103:21,
105:4, 106:13,
106:23, 112:14,
179:12, 193:9,
198:22, 202:11,
202:16, 211:16,
216:21, 218:19
**provisions**
30:25, 64:25,
96:10, 100:17,
101:6, 101:11,
102:17, 121:14,
121:20, 121:24,
176:22
**public**
3:11, 27:19,
222:18, 226:19,
226:21, 226:23,
233:1, 233:22
**published**
40:2, 46:1,
116:7
**pull**
37:15, 39:11,
39:14, 42:1,
42:10, 57:2,
61:17, 66:10,
69:16, 72:8,
75:22, 83:17,
91:16, 94:9,
97:20, 98:6,
103:5, 107:21,
116:15, 159:8,
168:7, 177:6
**pulled**
75:24, 94:14,
172:4
**pulling**
39:12, 72:19,
96:2
**punishable**
125:3, 219:18

**purpose**
94:24, 223:8
**purposes**
49:20, 88:12,
90:21, 110:13,
178:12, 213:5,
222:15
**pursuant**
3:10, 95:23
**pursued**
91:6
**put**
23:14, 34:23,
39:10, 39:19,
75:2, 108:12,
127:2, 153:23,
156:11, 163:22,
167:24, 168:3,
186:20, 192:3,
214:7, 214:8,
222:12, 224:3,
230:13, 231:10,
231:12
**putnam**
8:13
**pvro**
196:19

---

## Q

**quality**
104:16, 166:1
**question**
14:17, 14:18,
14:23, 15:7,
27:23, 37:12,
41:1, 47:3,
47:11, 49:20,
51:5, 53:11,
53:14, 54:18,
59:8, 62:19,
63:5, 63:10,
65:11, 67:3,
68:17, 70:16,
71:8, 74:2,
76:14, 81:1,
81:2, 88:19,
93:18, 93:21,
94:24, 95:11,

95:12, 97:14,
98:20, 101:13,
102:8, 103:13,
106:12, 106:18,
106:25, 109:25,
110:17, 110:21,
122:7, 125:24,
134:7, 134:23,
135:3, 135:6,
137:7, 141:4,
143:7, 143:8,
145:6, 145:8,
149:15, 154:17,
158:2, 158:7,
160:5, 165:6,
168:25, 174:12,
179:8, 179:9,
179:22, 186:6,
192:9, 198:18,
199:4, 201:8,
204:11, 210:17,
211:24, 215:14,
217:24, 221:3
**questioning**
56:15, 101:14,
102:4, 200:23,
227:11
**questions**
14:9, 14:12,
25:1, 28:19,
53:6, 54:22,
59:2, 76:24,
82:7, 101:24,
106:9, 112:10,
113:2, 113:5,
113:23, 114:10,
114:11, 120:23,
121:5, 128:17,
133:19, 174:6,
174:9, 175:24,
187:14, 219:25,
227:20, 227:25,
228:5, 230:4,
230:10, 230:14,
230:20, 230:21,
230:23, 230:24,
231:2
**quick**
20:19, 43:2,

54:16, 71:14,
71:19, 88:8,
88:11, 89:7,
98:2, 108:5,
114:24, 168:22,
227:10
**quickly**
22:17, 97:19,
164:8
**quite**
28:11, 33:11,
64:18, 194:11,
206:4
**quote**
91:12, 110:11,
155:24, 156:20,
165:19
**quoting**
156:18

**R**

**racial**
198:20
**racketeering**
18:16, 18:24
**rather**
14:9, 33:8,
60:25, 94:18
**re-ask**
75:1
**reach**
69:6
**reaction**
130:12
**read**
28:5, 28:11,
40:18, 42:11,
46:9, 46:11,
47:9, 52:15,
53:23, 55:21,
55:22, 55:24,
55:25, 57:14,
70:2, 70:16,
70:21, 77:23,
79:10, 84:24,
87:11, 92:3,
92:13, 94:21,
95:2, 95:3,

104:1, 104:2,
108:5, 108:20,
111:14, 124:20,
124:24, 125:1,
126:20, 127:17,
132:8, 152:19,
155:10, 156:15,
157:17, 157:24,
158:5, 159:25,
160:8, 163:1,
163:24, 166:2,
168:4, 171:15,
172:21, 179:11,
193:1, 193:11,
200:11, 202:19,
203:6, 203:15,
209:12, 213:17,
219:5, 219:20,
221:15, 222:22,
228:19, 228:21,
232:3
**reading**
47:16, 53:24,
87:3, 87:6,
87:7, 88:15,
94:3, 97:8,
126:25, 129:4,
133:18, 135:24,
138:7, 138:13,
140:23, 141:5,
141:8, 156:25,
157:1, 167:1,
167:23, 174:14,
193:8, 201:17,
202:24, 209:22,
217:1, 217:12,
217:18, 223:3,
233:8
**reads**
84:16, 85:5,
124:23
**ready**
77:3, 102:7,
134:15, 155:12,
157:25, 159:13,
160:23, 169:15,
174:7
**real**
61:10, 61:13,

71:19, 88:8,
88:11, 98:1,
108:5, 114:24
**realize**
50:18, 76:23
**realized**
147:13, 157:9,
164:7
**really**
19:9, 19:20,
30:4, 34:21,
38:6, 54:16,
62:7, 63:1,
63:2, 63:6,
63:8, 63:23,
79:21, 81:15,
83:5, 103:6,
107:19, 112:15,
112:25, 113:3,
130:4, 136:24,
161:18, 163:23,
168:21, 178:25,
180:13, 185:8,
207:18, 208:10,
214:18, 223:4,
227:5
**reason**
15:1, 29:16,
29:18, 58:19,
59:9, 74:7,
125:15, 154:6,
162:13, 167:5,
219:14
**reasonable**
229:19
**reasonably**
127:19, 177:18,
229:20
**recall**
22:25, 26:16,
42:8, 46:6,
109:19, 109:22,
148:7, 162:17,
164:13, 197:12
**recalling**
78:17
**receipt**
65:12, 66:1,

66:2, 230:8
**receive**
62:11, 64:15,
66:7, 109:14,
181:22
**received**
23:20, 63:14,
63:18, 104:5,
155:8, 198:11,
225:22
**receiving**
59:6, 188:19,
229:19
**recognize**
23:19, 73:8,
78:13, 78:14
**recollection**
66:9
**record**
13:9, 24:2,
46:24, 51:23,
53:24, 56:1,
71:20, 72:18,
75:24, 85:20,
89:8, 89:12,
92:3, 93:6,
95:3, 114:4,
115:7, 120:14,
120:22, 140:15,
167:2, 172:19,
177:16, 191:5,
219:6, 227:9,
227:18, 228:3,
228:4, 228:24,
229:4, 229:12,
230:13, 231:5,
231:6, 231:15,
233:5
**records**
27:20
**redirect**
228:2
**reduced**
233:7
**reed**
129:21
**refer**
16:14, 18:6,

28:25, 33:7,
33:12, 35:18,
35:24, 35:25,
71:15, 127:21,
144:16, 168:14,
174:23, 177:19,
178:10, 178:19,
181:8
**reference**
74:19, 86:8,
86:14, 86:18,
90:12
**referenced**
116:24, 205:7
**references**
42:3, 42:24,
78:5, 86:19,
103:4, 103:8
**referencing**
207:1
**referral**
144:15, 178:16
**referrals**
36:12, 59:7,
61:18, 62:11,
63:14, 63:15,
64:3, 64:8,
64:15, 116:5,
185:14, 185:15
**referred**
31:19, 49:15,
50:20, 64:11,
115:14, 117:4,
117:11, 118:9,
145:24, 178:25,
179:2, 181:13,
181:18, 181:21,
182:10, 182:16,
225:23
**referring**
31:1, 41:15,
44:3, 60:4,
75:20, 75:23,
80:19, 128:7,
174:24, 177:12,
177:15, 212:15
**refers**
36:3, 51:24,

107:10, 117:9,
117:13, 128:5,
140:20, 181:6
**refresh**
66:8
**regard**
60:9
**regarding**
62:22, 66:19,
147:19, 150:8,
155:21, 187:14,
230:8
**regardless**
84:16
**region**
22:9
**regional**
22:8
**register**
99:1, 111:16,
112:4, 197:15,
198:5, 201:13
**registered**
73:24, 74:21,
76:10, 91:1,
152:8, 158:23,
171:21, 183:19,
198:2, 198:4,
213:15
**registering**
162:3, 196:10,
197:9, 197:17
**registration**
12:16, 48:3,
53:16, 54:1,
56:5, 58:23,
59:20, 60:14,
62:3, 66:1,
66:6, 66:13,
66:19, 79:17,
81:13, 81:24,
90:2, 92:6,
98:22, 110:23,
111:23, 124:11,
124:18, 132:3,
132:16, 132:17,
133:16, 139:9,
140:18, 151:4,

151:25, 152:3,
155:22, 169:22,
171:2, 176:18,
182:10, 186:21,
189:18, 196:4,
196:18, 198:24,
199:14, 200:7,
200:9, 200:16,
200:25, 202:3,
204:22, 205:11,
208:18, 210:17,
210:24, 211:8,
211:15, 213:7,
213:10, 213:11,
213:13, 213:15,
219:7, 219:9,
219:16, 220:22,
220:23, 221:9,
221:10, 221:19,
225:10, 225:17
**registrations**
112:19
**regular**
36:17, 110:3
**reiterate**
187:12
**relabel**
162:23
**relate**
74:5, 188:15,
198:16
**related**
29:4, 31:20,
43:10, 43:21,
44:8, 48:18,
59:7, 62:23,
63:15, 72:9,
79:6, 103:10,
105:12, 112:5,
144:16, 151:15,
165:7, 165:14,
182:19, 189:19,
196:10, 197:9,
203:18, 203:24,
204:2, 205:10,
208:6, 208:7,
208:18, 224:17,
224:19, 233:9

**relates**
74:2, 109:3,
123:16, 123:18,
128:14, 134:1,
134:2, 182:22,
206:3, 215:1,
218:11
**relating**
29:14, 100:7,
164:15
**relation**
30:16, 30:23,
73:18
**relationship**
28:16
**relative**
15:13
**release**
170:18, 170:25
**relevant**
198:25, 199:7
**relief**
177:24
**relies**
209:10
**rely**
81:19, 102:19,
209:15, 210:19,
210:22
**relying**
216:19
**remember**
26:11, 26:13,
27:6, 40:5,
40:8, 42:24,
43:11, 43:20,
60:1, 73:5,
74:23, 77:8,
102:8, 103:8,
109:21, 193:9,
207:18, 207:20,
208:11
**remind**
16:1, 99:1
**reminder**
102:1
**removal**
175:24

renata
4:3, 174:21
rep
83:3, 197:21
repeat
199:3
rephrase
14:16
replaced
129:13
report
11:13, 11:14,
19:22, 39:22,
42:15, 42:25,
46:1, 46:4,
46:6, 46:13,
46:17, 47:12,
55:21, 56:10,
66:2, 74:19,
74:25, 76:3,
103:3, 116:7,
116:12, 119:1,
119:5, 136:25,
137:3, 137:11
reported
2:25
reporter
14:6, 24:4,
39:6, 42:14,
46:2, 69:20,
72:13, 77:17,
83:19, 131:10
reporter's
124:9
reporter-notary
233:1
reporters
113:14
reports
11:12, 38:5,
39:4, 40:6,
42:1, 42:3,
42:9, 75:13,
75:14, 75:20,
116:5, 139:16,
157:21
represent
13:13, 40:19,

48:21, 49:7,
52:10, 103:2,
117:17, 154:9,
158:19, 161:17,
174:21, 212:24,
224:8
representation
80:15
representations
81:4
representative
49:25, 178:5,
179:18, 187:18,
212:4
representatives
156:21
represented
80:12
representing
24:9, 28:18,
113:17
represents
47:4, 56:20,
223:24
request
202:11, 202:20,
229:5
requested
233:8
requesting
203:19
requests
213:12
require
211:25
required
40:7, 206:6,
215:6
requirement
65:13, 65:20,
66:2, 111:10,
111:11, 111:16,
121:8, 122:14,
122:22, 123:7,
123:17, 123:19,
123:23, 124:1,
128:15, 132:4,
139:11, 140:1,

141:17, 200:3
requiring
112:3
reregistration
111:11
reserve
229:5
residence
225:4
residents
158:22
respect
123:9, 214:1
respectfully
49:24, 50:1,
230:12
respond
207:17
responded
230:25
responding
207:8, 229:16
response
70:16, 73:17,
84:1, 115:23,
115:24, 116:4,
122:13, 122:21,
123:6, 159:11,
208:22, 209:6
responses
11:11, 11:17,
11:24, 15:16,
15:17, 27:20,
37:14, 37:17,
39:13, 70:7,
114:11, 115:9,
116:24, 188:8,
207:11, 207:16
responsibilities
17:2, 17:4
responsibility
17:20, 142:3,
142:5, 142:6,
176:6
responsible
29:21, 30:1,
131:13, 186:17,
186:19

rest
158:18, 169:19
restraining
177:25
restriction
65:2, 66:24,
67:22, 68:4,
71:25, 76:25,
77:7, 79:19,
82:11, 82:25,
83:12, 86:4,
87:2, 87:9,
87:25, 88:6,
89:17, 97:23,
105:5, 106:12,
106:19
restrictions
77:20, 209:5
result
229:7
resulted
205:4
retain
98:24, 219:10,
221:8
retained
220:22, 221:18
retaining
91:12, 225:24
retention
89:18, 226:11
returned
20:22, 193:5
returning
193:14, 193:21
review
38:24, 40:22,
42:22, 82:17,
116:6, 139:16,
140:7, 142:10,
148:1
reviewed
26:25, 38:23,
56:2, 95:19,
99:22, 194:21,
196:23, 197:5,
197:12
reviewing
26:13, 118:17,

142:14, 142:24,
143:3

**reynolds**
8:3

**rice**
21:25

**rico**
156:20

**rights**
21:7

**riverplace**
8:18

**robert**
6:13, 129:24

**rog**
38:23, 39:13,
114:11, 116:24

**rogs**
15:16, 26:13,
27:2

**role**
17:1, 119:24,
121:6, 121:9,
145:20, 206:22

**rolling**
36:17

**rolls**
158:24

**room**
16:17

**roper**
6:7

**rosa**
8:13

**rosenbloom**
8:16

**rough**
44:9, 44:11,
45:6

**roughly**
35:18, 43:25,
59:5

**rule**
216:15

**rulemaking**
212:12, 212:20,
213:1, 214:2,
222:3, 222:8,

222:10, 223:2,
223:15

**rules**
14:1, 209:7,
210:19

**runs**
25:13, 208:2

**S**

**said**
20:17, 23:13,
27:2, 30:11,
30:12, 33:25,
34:3, 58:11,
59:4, 59:6,
60:2, 60:10,
61:5, 87:8,
91:9, 96:21,
100:5, 122:17,
125:16, 125:24,
126:17, 142:22,
148:13, 167:6,
184:5, 187:9,
194:15, 204:13,
205:25, 208:25,
233:6

**same**
16:8, 23:16,
45:12, 50:9,
53:14, 64:4,
64:17, 68:20,
70:5, 76:15,
96:13, 97:19,
97:21, 104:24,
105:1, 106:17,
107:3, 107:8,
116:12, 123:8,
123:9, 132:14,
132:16, 132:17,
139:13, 140:2,
140:3, 140:4,
144:23, 144:24,
152:15, 153:6,
157:22, 160:4,
160:5, 162:13,
168:25, 176:4,
182:12, 182:15,
210:16, 210:18,

214:16, 219:6,
221:22, 223:9,
224:14, 225:12,
232:4

**santa**
8:13

**satisfy**
144:7

**saved**
135:22

**saw**
19:22, 95:15,
95:17, 103:4

**say**
17:6, 18:14,
19:20, 23:2,
23:5, 26:7,
28:8, 31:21,
31:24, 32:3,
33:10, 34:6,
34:10, 36:20,
37:2, 38:7,
38:8, 41:2,
41:9, 41:15,
42:7, 44:2,
44:11, 44:18,
44:21, 50:13,
51:23, 52:20,
52:24, 53:1,
53:4, 56:18,
58:8, 59:11,
60:18, 62:24,
63:8, 63:23,
64:2, 65:4,
68:25, 76:17,
79:14, 79:21,
80:23, 81:15,
83:2, 85:20,
88:18, 89:6,
100:2, 100:19,
101:4, 103:15,
104:12, 107:12,
110:9, 118:14,
119:2, 119:3,
121:6, 122:15,
125:25, 127:18,
131:18, 133:21,
136:4, 137:10,

137:12, 137:16,
139:2, 141:6,
143:9, 146:2,
150:17, 156:5,
173:24, 175:1,
175:25, 176:11,
176:12, 181:11,
183:5, 203:12,
204:15, 208:10,
208:19, 209:25,
212:14, 214:19,
214:24, 215:15,
216:12, 216:18,
218:24, 220:21,
222:24, 223:11

**saying**
28:24, 36:11,
49:6, 58:7,
60:13, 90:25,
94:6, 122:1,
126:9, 134:3,
138:12, 141:7,
142:11, 146:19,
151:9, 183:16,
183:19, 184:10,
186:8, 214:17,
216:9, 216:17,
223:14

**says**
37:17, 45:23,
47:21, 47:23,
49:4, 54:1,
56:1, 57:10,
58:19, 58:25,
66:16, 72:24,
76:5, 81:16,
84:4, 84:16,
85:1, 85:5,
85:6, 85:21,
92:23, 96:14,
96:15, 97:24,
100:3, 115:11,
116:4, 118:8,
124:16, 126:6,
127:25, 140:21,
147:9, 156:1,
165:21, 169:24,
170:21, 171:3,

176:25, 190:7,
202:19, 213:4,
214:2, 214:25,
215:12, 215:16,
222:14
**sb**
11:16, 12:17,
24:18, 37:17,
37:24, 38:25,
48:2, 68:9,
77:15, 119:25,
121:8, 122:14,
122:22, 123:16,
127:10, 128:19,
135:7, 135:10,
137:20, 138:1,
140:16, 141:1,
150:18, 151:17,
176:23, 180:7,
180:11, 191:15,
193:4, 196:1,
197:25, 199:10,
202:10, 205:10,
205:16, 205:21,
205:25, 210:13,
212:4, 212:13,
220:25, 221:11,
221:20
**sb's**
66:5, 205:21
**scan**
43:2, 224:12
**scanning**
28:9, 158:11
**scheme**
60:24, 61:9
**school**
20:21, 21:16,
162:4
**scope**
80:3, 91:9,
100:15, 102:2
**scott**
6:6, 129:10
**screen**
16:7, 23:15,
39:5, 45:22,
52:14, 57:6,

61:17, 69:23,
72:10, 83:18,
83:22, 83:24,
85:11, 91:22,
94:15, 97:18,
105:10, 107:25,
108:18, 114:13,
115:4, 115:11,
116:15, 119:19,
127:2, 131:24,
145:13, 147:23,
148:2, 153:9,
156:12, 177:5,
177:9, 179:15,
191:2, 191:10,
200:4, 202:17,
206:25, 208:23,
212:23, 217:22,
218:18, 224:3,
224:5
**scroll**
24:15, 39:24,
40:12, 42:20,
43:3, 46:10,
46:15, 46:22,
47:24, 48:23,
50:24, 57:11,
72:17, 85:14,
92:21, 105:9,
115:23, 118:4,
124:9, 127:15,
147:3, 152:20,
152:22, 155:12,
155:14, 157:25,
159:14, 165:12,
165:13, 166:10,
166:23, 167:21,
169:15, 170:19,
171:16, 172:23,
173:4, 173:8,
207:6, 222:14
**scrolled**
53:22, 93:6
**scrolling**
46:25, 47:8,
99:14, 191:8,
191:13, 213:2
**scrolls**
84:8

**se**
6:15
**seal**
233:15
**second**
11:17, 46:25,
70:7, 70:13,
70:16, 76:20,
118:5, 124:16,
153:7, 153:11,
155:6, 155:19,
162:1, 163:1,
163:22, 165:16,
168:2, 168:7,
225:13, 228:15
**secondary**
173:7
**secondly**
213:25
**secretary**
1:14, 2:10,
9:10, 22:5,
31:12, 80:20,
80:24, 83:25,
84:16, 85:5,
85:23, 93:14,
116:7, 121:13,
121:17, 127:19,
127:21, 128:4,
177:17, 177:19,
178:4, 178:8,
185:16, 186:23,
187:1, 212:16
**secretary's**
87:3, 87:6,
97:15
**section**
57:20, 73:1,
88:12, 93:3,
97:25, 98:9,
99:9, 109:20,
127:18, 127:20,
127:24, 128:4,
146:9, 149:11,
177:10, 177:19,
177:22, 177:23,
178:9, 203:15,
213:3, 213:6,

215:12, 217:2,
217:15, 217:21,
217:22, 218:18,
219:17, 220:13,
221:1, 222:16
**security**
31:12, 92:9,
96:5, 116:8,
148:20, 219:13,
222:20
**seeing**
43:1, 43:6,
60:23, 98:19,
115:5, 138:8
**seem**
140:23, 154:9,
180:4
**seems**
113:20, 171:20,
196:1, 198:16,
229:2
**seen**
59:14, 59:17,
59:23, 62:16,
75:2, 83:7,
85:17, 103:11,
133:4, 162:22,
182:14, 185:17,
195:13, 197:22,
224:16, 224:17,
224:18
**selected**
63:20, 175:16
**semantics**
34:21, 38:3
**senator**
173:20
**send**
33:4, 34:6,
34:9, 137:9
**sending**
140:11
**sends**
81:25, 104:18
**seniors**
19:9
**sense**
31:9, 38:16,

38:17, 40:10,
44:9, 44:11,
48:24, 70:22,
71:10, 77:10,
79:13, 80:5,
80:7, 111:18,
128:24, 129:5,
134:23, 142:20,
175:7
**sensed**
36:6
**sent**
27:16, 100:24,
173:20
**sentence**
11:19, 56:11,
72:20, 91:24,
92:4, 92:18,
96:14
**sentences**
127:18
**sentinel**
157:22
**separate**
35:4, 149:19
**separately**
101:22
**september**
58:21, 154:4
**serial**
159:10
**series**
116:22, 134:16,
173:14, 173:17
**serve**
195:20, 226:21
**served**
115:8
**services**
21:4, 154:20
**serving**
198:6
**session**
206:13
**set**
11:17, 70:7,
131:20, 135:1,
191:19, 233:14

**seven**
96:1, 97:9
**several**
37:16, 46:7,
78:13, 81:25,
165:22, 174:22
**sex**
18:15, 74:20,
75:5, 76:9,
170:5
**sexual**
78:23, 90:17
**shall**
89:6, 89:7,
202:20
**share**
16:7, 39:5,
73:14, 83:18,
114:13, 115:3,
153:10, 177:5,
191:2, 200:4,
202:17, 206:25,
212:23, 224:5
**shared**
108:18
**sharing**
179:15, 191:3,
224:2
**sheet**
232:7
**shilpa**
4:13
**short**
162:14, 164:3
**shortened**
13:25
**shortening**
192:2
**shortens**
191:22
**shorter**
161:16
**shorthand**
233:1
**shot**
180:1
**should**
18:4, 99:12,

142:16, 160:5,
160:7, 168:9,
169:10, 201:22,
228:8
**shouldn't**
158:2
**show**
16:9, 50:25,
51:22, 77:13,
107:16, 124:6,
152:15, 152:16,
154:25, 202:15,
223:22
**showed**
124:3, 189:9,
206:19
**showing**
24:1, 47:4,
127:7, 196:17,
197:7
**shows**
54:4, 54:16
**side**
30:3, 38:22,
81:18, 112:1,
131:2, 131:12,
176:24, 189:5,
189:11, 189:15,
189:22, 190:5,
190:13, 190:22,
192:10, 193:12,
193:15, 208:16,
208:17
**sign**
41:18, 85:25,
86:23, 228:9,
228:19
**signature**
57:20, 57:24,
173:12, 219:13,
222:20, 232:10
**signature-b7fzp**
233:19
**signed**
41:14, 70:20,
70:25, 71:1,
232:7
**significant**
49:21

**signing**
41:24, 233:8
**signs**
86:21
**similar**
45:6, 65:11,
84:18, 124:7,
166:8
**simple**
62:12
**simply**
64:10, 82:6,
110:3, 132:13,
133:17, 140:21,
203:12, 220:16,
221:7
**since**
17:4, 44:22,
44:23, 62:24,
63:15, 64:4,
64:9, 115:12,
150:24, 180:1,
182:11, 195:14,
205:10, 220:17
**single**
60:25, 125:19,
139:3, 197:2
**sir**
18:7, 23:1,
24:11, 24:19,
24:21, 24:24,
25:2, 31:14,
31:18, 32:19,
33:14, 33:18,
34:13, 35:13,
39:23, 40:11,
40:17, 41:6,
41:24, 43:6,
43:12, 43:23,
44:21, 46:9,
49:4, 52:2,
53:13, 53:18,
57:7, 58:1,
61:22, 62:1,
66:9, 66:16,
67:17, 68:14,
68:22, 69:24,
70:10, 72:11,

72:22, 73:3,
73:6, 74:17,
75:11, 76:4,
76:13, 76:17,
81:5, 81:9,
84:4, 85:1,
85:6, 85:12,
86:12, 86:17,
86:20, 90:22,
91:7, 91:15,
91:23, 92:2,
103:20, 104:1,
105:8, 106:3,
106:7, 106:16,
108:1, 111:14,
111:20, 112:2
**sister**
182:4, 214:1,
214:12
**sit**
18:12, 98:17,
187:16, 208:20
**sitting**
118:25, 174:12
**situation**
65:16, 65:25,
143:12, 205:1,
208:12, 214:20
**situations**
102:10, 147:25
**six**
44:18, 44:24,
45:13, 47:8,
71:13, 101:9,
147:22, 198:25,
199:2, 206:11,
206:15
**sjostrom**
7:14
**skim**
70:17, 71:13
**skip**
172:12
**skipping**
69:19
**slightly**
139:7
**slowly**
57:11, 72:17

**smakula**
2:25, 3:10,
233:2
**small**
105:23
**smaller**
52:15, 116:21
**smart**
16:15
**smattering**
21:6
**smidge**
157:10
**smith**
9:4
**social**
92:9, 96:5,
219:13, 222:19
**soe**
54:2
**sole**
23:3
**some**
13:16, 14:1,
16:6, 21:4,
25:25, 26:7,
26:24, 29:22,
42:21, 43:25,
46:13, 48:17,
50:15, 59:11,
59:18, 60:23,
61:18, 69:17,
76:22, 76:24,
80:3, 90:7,
95:5, 99:12,
100:18, 104:17,
107:18, 108:10,
110:9, 114:9,
114:11, 118:6,
118:13, 120:15,
120:16, 121:4,
128:17, 131:3,
151:12, 152:13,
174:8, 176:9,
176:11, 176:12,
185:13, 187:14,
204:17, 212:12,
230:15, 230:20,

230:21
**somebody**
63:5, 102:19,
139:22, 171:1
**someone**
53:2, 53:9,
55:15, 55:18,
58:15, 60:14,
67:13, 79:15,
81:11, 83:8,
85:24, 86:21,
87:16, 101:6,
106:19, 107:3,
130:23, 134:8,
165:17, 178:8,
178:18, 185:14,
207:13, 226:10,
229:15
**someone's**
61:8, 90:1
**something**
14:15, 19:23,
25:5, 34:4,
36:17, 37:5,
60:2, 64:14,
82:21, 89:2,
96:19, 96:24,
100:19, 101:17,
133:23, 137:10,
146:17, 151:10,
172:5, 185:7,
185:19, 209:23,
210:21, 215:4,
215:21, 216:14,
216:18
**sometime**
40:5, 40:7,
230:3
**sometimes**
52:1, 185:13,
185:15
**somewhere**
32:16, 44:19,
149:12
**soon**
227:12
**sorry**
20:2, 20:7,

30:19, 33:10,
37:20, 38:20,
39:9, 41:1,
44:13, 50:2,
51:10, 55:5,
58:9, 61:3,
64:12, 65:17,
71:8, 71:18,
73:19, 75:15,
76:2, 93:10,
95:9, 95:12,
95:23, 96:6,
97:1, 97:5,
98:2, 109:16,
112:8, 115:6,
116:18, 117:11,
122:8, 122:15,
123:25, 132:24,
135:5, 135:12,
136:10, 142:25,
146:5, 147:14,
154:2, 159:19,
172:3, 172:10,
172:16, 181:15,
182:2, 185:14,
187:9, 191:12,
197:3, 200:12,
203:2, 203:5,
205:25, 230:21
**sort**
19:3, 63:24,
159:9
**sorts**
149:17
**sos**
148:13
**sound**
50:22, 66:12
**sounds**
13:22, 22:19,
105:23, 134:3,
134:14, 145:15,
183:23, 188:9,
229:24
**sources**
144:15, 210:5,
210:7
**south**
8:5, 9:14,

157:21
**space**
224:23, 225:16,
225:19
**speak**
20:3, 26:17,
50:3, 65:10,
102:16, 118:19,
120:11, 120:19,
120:21, 120:25,
121:22, 122:3,
147:16, 151:2,
182:7, 185:14,
187:13, 215:1
**speaking**
28:1, 69:2,
69:4, 90:19,
105:19, 109:19,
112:23, 118:1,
120:7, 120:10,
127:1, 127:4,
175:10, 175:21,
189:9
**speaks**
88:13
**specific**
28:20, 40:8,
54:19, 88:21,
115:21, 135:3,
190:11, 226:15,
226:24, 227:5
**specifically**
34:16, 96:12,
98:14, 119:7,
123:17, 123:19,
141:6, 174:25,
209:9, 210:21,
210:25, 215:8,
217:11, 220:8,
230:15
**specifics**
26:11, 44:6,
59:2, 62:16,
65:10, 68:21
**specified**
86:17
**speculate**
141:19, 223:6

**speculating**
83:6
**speculation**
87:5, 99:4,
134:25
**spends**
195:6
**spent**
195:9
**spoke**
13:8, 24:13,
26:7, 26:16,
27:4, 37:11,
162:18
**spoken**
26:14
**sponsors**
199:17
**squeeze**
230:1
**st**
8:13
**stack**
79:17
**staff**
12:1, 109:11,
110:8, 113:16,
131:15, 153:20,
178:17
**staffing**
206:6
**stamped**
172:20
**stand**
69:8
**standard**
165:5
**standards**
21:9
**standpoint**
62:8, 216:10,
223:9
**start**
13:15, 28:17,
29:9, 31:23,
36:10, 67:11,
113:22, 114:10,
116:2, 116:3,

121:4, 131:16,
148:2, 152:17,
153:12, 155:7,
157:19, 161:19,
170:17, 178:14,
184:19
**started**
20:23, 29:19,
43:19, 58:7,
208:15
**starting**
97:24, 99:15,
104:3, 115:10,
159:12, 186:4,
222:25
**starts**
77:21, 84:7,
91:25, 103:22,
103:24, 161:18
**state**
1:5, 1:15,
2:11, 3:11,
13:9, 14:12,
19:6, 20:23,
32:13, 33:8,
33:13, 34:24,
45:23, 58:23,
75:3, 80:11,
80:16, 80:18,
80:20, 80:23,
80:25, 83:9,
84:20, 84:23,
85:3, 85:4,
86:15, 87:1,
87:9, 87:18,
87:22, 87:23,
87:24, 92:24,
93:15, 98:24,
104:19, 107:9,
107:11, 109:7,
111:16, 116:7,
121:18, 125:20,
125:22, 125:25,
127:19, 128:5,
129:22, 129:23,
130:2, 142:7,
146:11, 148:20,
148:22, 164:25,

167:1, 173:16,
177:17, 178:5,
179:1, 181:14,
181:18, 181:20,
185:16, 199:10,
200:15, 209:2,
212:11, 212:14,
212:16, 212:17,
214:25, 215:9,
222:2, 222:5,
223:5, 223:7,
224:9, 228:4,
229:12, 233:23
**state's**
31:12, 83:25,
85:23, 91:17,
107:18, 121:13,
186:23, 213:1
**stated**
124:25
**statement**
58:15, 97:16,
118:1, 125:18,
126:5, 126:6,
126:9
**states**
1:1, 177:16,
187:1, 200:10
**statewide**
16:24, 17:3,
17:7, 17:10,
19:14, 19:23,
20:17, 22:12,
25:12, 38:9,
39:1, 44:22,
50:13, 63:11,
65:22, 90:6,
125:12, 129:9,
129:17, 130:18,
142:1, 145:4,
146:5, 147:1,
151:20, 175:6,
175:8, 175:10,
175:15, 175:21,
176:5, 182:23,
187:7, 213:25,
214:15, 221:12
**stating**
85:25

**status**
198:1, 198:12,
199:7, 200:18,
200:21, 201:2,
201:6
**statuses**
25:24
**statute**
15:17, 27:23,
40:7, 43:18,
62:1, 66:16,
67:6, 67:17,
77:14, 81:16,
82:19, 83:14,
83:16, 84:21,
88:7, 88:9,
88:17, 88:20,
91:15, 94:3,
94:6, 94:12,
94:17, 94:21,
95:2, 95:4,
96:13, 96:16,
96:20, 96:23,
98:1, 106:10,
107:16, 107:17,
126:18, 126:22,
128:3, 132:8,
132:11, 133:18,
133:23, 135:18,
135:20, 135:24,
138:5, 138:7,
138:14, 144:5,
175:13, 176:25,
180:17, 200:24,
209:9, 210:6,
210:25, 217:11,
217:13, 217:15,
217:18, 218:14,
219:19, 222:4,
226:1, 226:12,
226:20, 226:23,
226:25
**statutes**
18:25, 27:23,
30:7, 30:24,
78:22, 138:16,
186:13, 226:15,
226:18, 230:15

**statutory**
84:17, 209:7,
209:16, 210:19,
219:19, 223:3
**stayed**
38:5, 64:4
**stealing**
53:15, 59:12,
59:19
**stenographically**
233:6
**stephanie**
10:12, 20:10,
51:10, 69:2,
97:6, 132:24,
218:23
**stephanie's**
27:6
**stetson**
21:13, 21:16,
21:21
**steve**
171:21
**still**
14:22, 54:25,
69:8, 94:13,
134:15, 216:5,
221:12
**stole**
55:18
**stop**
59:13, 153:9,
179:15, 224:2
**stores**
126:11
**straight**
162:25
**street**
4:16, 5:6, 6:8,
6:15, 7:8, 9:6,
9:14
**strict**
88:6, 165:25
**strike**
186:18
**string**
174:11, 174:13
**struck**
203:11, 203:15

**structure**
148:18, 191:16
**struggle**
128:6
**studied**
195:17
**studies**
64:19, 79:11,
193:1, 194:22,
197:23
**study**
19:16, 63:24
**stuff**
21:7, 27:13,
137:1, 176:13,
196:25
**sub**
94:13
**subheading**
93:7
**subject**
29:23, 125:14,
176:14
**submit**
58:22, 66:6,
66:13, 151:24
**submitted**
54:3, 56:6,
114:12, 187:20,
187:25, 188:5,
191:17, 194:8,
195:4, 199:20
**submitting**
191:23
**subpoena**
184:21
**subsection**
96:1, 97:9,
127:16, 177:17,
179:14, 201:9
**subsequent**
71:1
**subsequently**
27:10
**substantive**
116:4
**suggest**
140:24, 150:8,

166:18, 167:13,
219:22
**suggests**
141:8, 165:7,
171:5, 220:10
**suite**
4:5, 4:15, 8:6,
8:19, 9:13, 9:22
**summarize**
58:14
**sumter**
8:14
**sun**
22:9, 157:22
**supervising**
106:20, 107:4,
135:8, 135:14,
136:18, 213:10
**supervision**
17:7
**supervisor**
7:3, 10:2,
10:5, 82:4,
169:25, 185:1,
202:19, 205:2
**supervisor's**
185:2
**supervisors**
6:2, 8:10,
98:23, 135:19,
136:4, 173:17,
184:13, 184:17,
185:4, 185:6,
185:9, 185:11,
185:18
**support**
36:2, 166:15
**supposed**
195:5
**supreme**
19:12, 175:17
**sure**
14:2, 14:13,
16:3, 16:8,
17:3, 19:25,
20:21, 21:19,
22:15, 23:2,
23:15, 25:22,

26:7, 29:12,
30:8, 32:20,
42:10, 49:14,
54:15, 63:9,
64:12, 64:22,
66:10, 67:24,
68:25, 70:3,
71:14, 74:13,
75:21, 78:2,
85:20, 88:10,
89:10, 90:13,
92:15, 92:21,
96:22, 105:20,
109:25, 112:3,
112:18, 113:24,
114:25, 117:3,
117:25, 119:13,
122:2, 122:25,
123:1, 130:16,
138:1, 139:6,
140:4, 143:3,
143:4, 147:3,
150:11, 151:12,
151:21, 152:24,
153:17, 154:8,
154:21, 157:20,
159:22, 168:2,
168:23, 170:3,
172:18, 174:5,
181:4, 184:9,
193:10, 196:7,
202:14, 206:18,
215:24, 216:25,
220:18, 222:6,
224:3, 224:18,
224:22, 227:13,
227:24

**surely**
142:14
**surprise**
158:3
**surprising**
107:15
**suspected**
71:22, 109:15,
109:16, 147:24
**suspicious**
199:13, 199:22

**suwannee**
8:14
**swain**
6:13
**swear**
176:15
**sworn**
13:3
**swp**
51:25
**system**
163:20, 172:17
**systematic**
58:20

**T**

**tab**
222:12
**tackled**
213:24
**tailor**
102:24
**take**
34:10, 40:23,
42:19, 42:22,
47:7, 48:23,
52:17, 53:20,
64:19, 67:1,
70:15, 70:22,
71:9, 71:14,
72:1, 72:17,
77:22, 82:17,
84:6, 84:12,
88:8, 88:24,
88:25, 89:1,
89:21, 92:4,
95:24, 97:18,
101:16, 108:11,
113:21, 116:16,
131:19, 142:7,
163:1, 217:7,
227:9, 231:9,
231:14
**taken**
138:25, 233:3,
233:6
**takes**
104:15, 186:5

**taking**
90:1, 103:23,
147:10, 188:24,
191:13
**talk**
16:6, 18:2,
23:12, 25:3,
25:6, 31:6,
31:7, 48:1,
57:13, 70:18,
80:4, 91:8,
101:5, 101:9,
101:15, 101:17,
101:22, 119:18,
132:18, 133:8,
146:16, 150:6,
151:12, 152:10,
180:18, 186:11,
186:14, 229:24,
229:25
**talked**
26:20, 26:24,
35:16, 36:23,
39:4, 66:1,
77:6, 80:4,
90:16, 90:24,
123:20, 130:21,
144:14, 148:4,
148:11, 181:1,
195:25, 205:3,
205:7, 207:13
**talking**
13:16, 26:1,
29:23, 34:16,
41:3, 65:3,
70:23, 80:8,
82:2, 82:16,
92:20, 93:23,
97:22, 99:11,
102:15, 107:3,
150:9, 158:21,
162:17, 164:13,
176:18, 178:12,
179:4, 221:24
**talks**
42:21, 47:7,
82:8, 163:12,
170:4, 173:20

**tallahassee**
1:3, 7:17,
9:15, 10:16,
129:22, 130:3,
130:14
**tampa**
10:8, 20:23,
129:18, 129:21,
130:6
**target**
95:13, 184:8,
184:11
**task**
34:19, 34:20,
34:23, 148:12,
148:13, 148:17
**tasked**
176:22, 177:2,
179:17
**taylor**
8:14
**teaching**
21:12
**team**
126:17
**technical**
171:14
**technically**
109:19, 175:10,
175:21
**tell**
13:18, 16:25,
17:1, 18:8,
20:13, 25:6,
25:10, 27:1,
29:3, 30:14,
34:9, 41:7,
42:23, 43:25,
65:10, 69:12,
80:18, 94:18,
99:5, 109:1,
137:8, 138:23,
144:19, 152:20,
167:24, 182:5,
208:4, 209:14
**temple**
7:14
**temporary**
177:24

**ten**
44:18, 44:24,
45:13
**term**
35:2, 95:8,
131:6, 132:11,
133:9, 133:13,
210:17, 210:24,
211:6, 211:8,
211:14, 211:18,
217:10, 217:14,
217:20
**terminology**
109:4
**terms**
18:10, 30:3,
52:2, 63:13,
102:1, 196:20,
196:22, 209:3,
209:9, 209:11,
212:12, 216:3,
220:7, 227:4,
230:2, 230:8
**testified**
13:3, 61:16,
126:16
**testify**
24:9, 132:6,
180:6, 180:10,
185:3, 229:1
**testifying**
14:3, 201:22
**testimony**
15:2, 120:6,
133:12, 133:14,
183:11, 183:13,
196:7, 212:8,
232:4, 232:6,
233:5, 233:6
**text**
128:2, 144:4,
157:18
**th**
4:16, 5:7,
40:6, 45:24,
70:11, 233:15
**thank**
35:10, 37:13,

39:3, 45:18,
53:19, 55:25,
68:23, 69:10,
73:13, 74:18,
97:17, 108:19,
111:2, 135:22,
159:24, 160:14,
174:16, 179:15,
180:25, 227:20,
227:23, 227:25,
231:8
**thanks**
13:7, 13:12,
19:22, 22:13,
28:3, 31:6,
32:21, 43:7,
45:25, 50:4,
56:21, 68:16,
69:16, 74:13,
84:14, 88:5,
113:3, 145:7,
153:8, 168:16,
174:3, 228:7,
228:13, 231:6
**that'd**
159:24
**theft**
115:18, 151:21,
202:1
**themselves**
50:3, 73:25,
136:20, 150:1
**thereafter**
233:7
**therefore**
75:6, 125:19
**therein**
58:6
**they'd**
174:6
**thing**
16:8, 23:16,
23:25, 27:9,
42:12, 57:14,
71:13, 99:18,
139:20, 152:21,
163:19, 176:4,
190:11, 204:15,

224:14
**things**
19:2, 22:16,
26:3, 30:12,
37:22, 37:23,
38:13, 59:21,
78:18, 82:20,
115:22, 136:1,
140:11, 163:10,
189:9, 228:4
**thinking**
54:13, 113:20,
188:2, 210:3,
211:17
**third**
58:25, 76:1,
200:8, 202:2,
219:8, 219:15,
219:17, 220:21,
226:13
**third-party**
48:3
**thoroughly**
198:17
**thought**
102:20, 112:15,
112:24, 162:19,
203:9, 215:24,
216:10
**thousands**
27:11
**three**
15:14, 31:22,
35:9, 36:5,
36:8, 45:16,
93:7, 105:16,
158:22
**through**
22:16, 23:24,
24:20, 24:22,
27:12, 27:15,
28:7, 32:18,
48:10, 50:19,
57:11, 71:12,
101:4, 106:11,
126:21, 127:3,
134:15, 151:19,
152:13, 152:20,

153:13, 174:4,
176:23, 181:11,
181:20, 197:2,
203:3, 204:7,
204:9, 204:10,
213:6, 213:15
**throughout**
26:6
**tie**
156:2, 157:5,
159:1, 161:7,
163:16, 169:4,
170:6, 171:24
**tied**
38:2, 158:3
**time**
18:13, 18:14,
21:4, 25:19,
26:17, 27:19,
36:10, 42:20,
48:10, 88:12,
88:24, 113:3,
113:20, 119:3,
134:4, 135:22,
137:25, 150:17,
150:24, 151:2,
152:23, 153:6,
167:24, 174:7,
182:1, 195:7,
195:9, 207:20,
212:6, 222:1,
227:19, 227:21,
227:22, 228:1,
231:7
**timeliness**
102:11, 103:12,
103:17
**times**
13:20, 46:7,
60:11, 230:13
**title**
23:25, 24:3,
168:17, 207:25
**titled**
168:12
**to-**
30:16
**today**
13:12, 15:2,

15:10, 16:10,
16:18, 24:10,
40:23, 44:25,
45:8, 45:14,
100:21, 118:25,
162:22, 164:15,
174:3, 179:20,
181:2, 195:25,
204:3, 207:14,
231:7

**together**
35:9, 52:14

**told**
117:2, 117:8,
118:16, 149:22,
191:18

**ton**
42:19

**took**
45:3, 90:8,
125:18

**tools**
151:13

**top**
57:10, 85:21,
93:1, 93:2,
124:10, 127:8,
142:2, 147:4,
147:11, 152:23,
159:19, 159:22,
160:22, 161:2,
161:23, 168:21,
214:25, 224:13

**topic**
56:23, 61:15,
101:4, 119:18,
119:24, 121:5,
129:6, 131:22,
131:24, 132:7,
144:13, 145:9,
145:12, 147:13,
147:15, 150:9,
152:11, 198:17,
198:25, 199:1

**topics**
15:22, 15:24,
24:14, 24:16,
24:20, 24:22,

25:22, 35:20,
80:8, 100:15,
101:1, 101:9,
102:2, 120:17,
147:21, 157:23,
179:19, 229:4,
229:16, 229:21,
231:1

**total**
44:17, 44:20,
44:21, 44:25

**totally**
40:9, 67:8,
141:18

**touch**
82:5, 136:20,
137:23, 138:4,
138:18

**toward**
110:1

**towards**
90:20

**track**
198:1, 198:12

**tracking**
198:20

**traffic**
20:24, 108:8

**trafficking**
18:15, 18:16,
18:24, 36:25

**trained**
165:23, 197:23

**training**
21:10, 165:22,
194:21

**trainings**
122:12, 122:17,
122:18, 123:10,
123:12, 185:6

**transcribing**
14:6

**transcript**
11:8, 24:7,
39:8, 42:18,
45:21, 57:5,
69:22, 72:15,
77:19, 83:21,

85:10, 107:24,
114:16, 124:5,
127:6, 155:4,
156:8, 157:16,
161:12, 163:4,
164:1, 166:7,
166:25, 167:20,
169:13, 170:16,
171:13, 172:7,
172:14, 228:19,
233:4

**transcription**
232:5

**trend**
62:3, 62:18,
62:20, 62:22,
63:15, 64:14

**trends**
64:20

**trial**
69:7, 183:6,
185:1, 185:10

**tried**
28:12

**triggers**
68:3

**true**
43:12, 100:23,
100:24, 102:15,
118:2, 124:25,
150:25, 201:17,
232:4, 233:4

**truthful**
15:2

**truthfully**
86:23

**try**
14:12, 14:16,
20:8, 28:22,
75:18, 81:21,
104:17, 116:20,
131:5, 155:1,
215:2, 216:13,
216:17

**trying**
25:21, 38:15,
43:11, 60:21,
64:19, 86:10,

88:12, 90:13,
95:11, 110:19,
135:1, 148:18,
150:14, 164:8,
172:18, 186:1,
230:1

**turn**
98:23, 186:15,
210:7, 210:8,
211:8, 217:6

**turned**
62:14, 90:9,
192:21

**turning**
59:20, 60:3,
60:14, 100:8,
110:12, 215:11,
222:11

**turnip**
230:2

**two**
19:11, 24:17,
33:5, 51:22,
103:15, 105:16,
112:4, 112:19,
115:10, 119:18,
126:1, 127:17,
155:6

**two-page**
152:18

**type**
19:1, 21:7,
36:18, 198:10

**types**
126:1, 142:15,
142:18, 143:13,
194:25

**typewriting**
233:7

**typical**
19:15

**typically**
133:23, 134:17,
139:18, 186:9,
211:11

---
**U**
---

**uh-huh**
169:17

**ultimately**
185:10
**umbrella**
35:2
**unable**
69:6, 101:5
**unaware**
66:22, 88:1,
146:12, 189:2,
190:20, 191:1,
192:12, 193:18,
193:24, 194:5,
195:18, 195:24,
196:13, 198:9,
199:15
**unclear**
28:23, 60:21
**under**
14:4, 31:3,
67:9, 74:3,
83:13, 87:2,
87:6, 87:7,
96:20, 103:21,
123:16, 124:23,
128:2, 131:4,
149:12, 176:14,
180:7, 180:11,
210:16, 218:5,
218:19, 226:25,
233:7
**underlined**
217:8
**underlying**
67:13, 68:2,
68:13, 74:15,
77:6, 78:6,
79:5, 79:15,
81:12, 82:10,
83:8, 86:3,
86:16
**underneath**
124:22
**understand**
14:3, 14:14,
24:8, 64:22,
68:1, 71:11,
79:25, 87:12,
93:18, 95:14,

96:7, 96:21,
100:16, 119:22,
125:3, 125:6,
130:7, 130:16,
132:19, 132:20,
133:7, 133:8,
134:16, 135:7,
137:20, 138:1,
139:11, 140:16,
140:25, 142:9,
146:21, 147:5,
148:18, 154:8,
174:25, 183:18,
183:23, 189:12,
196:7, 205:14
**understanding**
14:2, 24:15,
24:23, 46:20,
47:12, 47:15,
50:11, 56:7,
57:16, 58:3,
64:18, 67:16,
81:10, 81:22,
85:2, 92:10,
93:17, 93:22,
94:2, 94:16,
94:19, 95:6,
96:23, 98:8,
98:20, 101:1,
104:9, 104:13,
106:9, 106:10,
120:2, 120:3,
120:5, 128:16,
130:13, 136:5,
146:17, 152:15,
175:4, 178:4,
178:15, 183:13,
188:13, 194:24,
201:4, 201:8,
203:8, 213:23
**understood**
14:18, 102:16,
102:22, 143:8,
184:12, 201:24,
207:22, 222:2,
227:8
**unfortunately**
166:22

**union**
5:5, 8:14
**unit**
19:6, 20:25,
21:3, 21:4,
21:6, 21:7,
35:4, 149:7,
178:21
**united**
1:1, 200:10
**units**
1:8
**university**
21:13
**unlawful**
71:23, 147:24,
196:9, 196:18,
197:8, 203:17
**unlawfully**
74:21, 76:10,
171:21
**unless**
14:23, 107:19,
173:3, 174:24,
215:7
**unlike**
149:14
**unqualified**
73:2
**unquote**
91:13, 110:11
**unsure**
224:16
**until**
21:1, 22:11,
44:25, 210:14
**untimeliness**
62:12, 103:4
**untimely**
56:6, 56:9
**unusual**
137:8
**update**
111:23
**updated**
187:14
**updates**
25:21

**uploaded**
153:4
**use**
59:23, 72:4,
97:1, 97:8,
105:2, 109:4,
123:22, 131:5,
177:1, 177:9,
177:14, 184:8,
184:10, 215:2,
216:13, 216:14,
216:17, 223:8
**uses**
96:13, 138:6
**using**
59:3, 168:12,
219:2
**usually**
20:13
**utility**
102:3
**utilize**
218:9
**utilizing**
18:24
**uttering**
78:19

---

**V**

**vaccines**
19:18
**vacuum**
138:24
**various**
147:25, 204:8
**vast**
117:19
**verbally**
14:9
**verify**
49:6
**version**
14:1
**versus**
128:6
**via**
115:8
**victims**
61:10, 61:13

**view**
107:2, 194:6,
214:21
**violate**
79:18, 99:2,
125:8, 139:10,
139:25
**violated**
53:25
**violates**
141:16, 226:10
**violating**
82:10, 87:2,
106:22, 126:3,
226:16
**violation**
62:13, 65:19,
84:22, 86:2,
91:6, 118:8,
125:19, 126:24,
127:20, 127:23,
127:24, 143:10,
177:19, 177:22,
177:23, 178:9,
226:1
**violations**
29:13, 40:21,
41:4, 41:12,
41:22, 44:4,
74:5, 74:9,
100:14, 110:23,
116:23, 128:4,
128:19
**violative**
96:20
**virtually**
2:17, 3:2
**vogel**
9:12
**voluntary**
77:20
**volunteer**
59:10, 65:2,
66:24, 67:22,
68:4, 68:11,
71:25, 76:25,
77:7, 79:19,
82:11, 82:25,

83:12, 86:4,
87:2, 87:8,
87:17, 88:6,
89:25, 98:21,
105:5, 106:11,
106:18, 106:19
**volunteering**
115:16
**volunteers**
59:17, 60:23,
82:1, 91:12,
95:1, 98:19,
106:20, 107:10
**vote**
29:18, 74:22,
75:6, 76:11,
82:8, 99:2,
106:2, 139:8,
139:24, 162:3,
171:21, 197:15,
197:18, 198:4,
202:11, 202:20,
203:19, 204:22,
204:23, 204:24
**voted**
74:16, 74:22,
76:11, 106:1,
162:16, 163:13,
183:18, 184:1,
184:3
**voteflorida**
213:16
**voter**
48:3, 53:16,
54:1, 54:3,
56:4, 58:22,
59:20, 60:3,
60:14, 62:3,
65:25, 66:19,
73:2, 79:17,
81:13, 81:24,
89:17, 90:2,
92:5, 92:6,
94:2, 97:22,
98:21, 110:23,
124:17, 132:2,
132:16, 132:17,
133:16, 139:9,

139:23, 140:18,
151:4, 151:18,
151:25, 152:2,
152:8, 153:20,
154:14, 158:18,
158:24, 164:22,
169:22, 171:1,
173:21, 176:18,
182:10, 183:18,
186:20, 189:18,
196:3, 196:18,
198:24, 199:13,
200:7, 200:8,
200:16, 202:2,
202:12, 202:21,
202:22, 203:20,
204:1, 204:2,
205:11, 210:17,
210:24, 211:8,
211:14, 213:7,
213:11, 213:12,
213:13, 213:14,
219:7, 219:8,
219:15, 220:22,
220:23, 221:9,
221:10, 221:18,
225:16, 226:11
**voter's**
140:22, 202:22,
202:23, 213:8,
219:9, 219:10,
219:11, 222:15,
222:16, 222:18,
225:25
**voters**
1:19, 4:11,
13:5, 13:14,
29:16, 70:8,
140:17, 175:8,
196:10, 197:9,
198:5, 198:21,
221:10, 221:19,
229:9
**voting**
29:16, 73:2,
75:4, 105:25,
148:5, 148:8,
176:7, 182:19,

189:18
**voting-related**
184:14

---
### W
**wait**
98:4, 110:24,
185:4
**waiving**
228:20
**wakulla**
8:14
**walk**
134:15, 139:1,
152:13
**walking**
82:2, 174:3
**walks**
139:4
**walton**
8:14
**want**
15:6, 37:7,
37:8, 38:2,
38:7, 38:11,
38:17, 39:14,
40:9, 42:19,
44:6, 44:9,
48:9, 48:14,
50:24, 50:25,
55:20, 57:2,
59:1, 60:20,
67:5, 67:10,
67:24, 68:25,
69:16, 70:17,
71:12, 72:1,
77:23, 79:12,
85:7, 89:15,
90:11, 91:8,
91:10, 92:16,
92:22, 94:17,
94:21, 100:5,
101:16, 107:19,
108:5, 108:8,
111:9, 113:21,
114:1, 115:23,
116:2, 117:7,
119:18, 120:13,

120:14, 121:4,
123:14, 128:17,
128:21, 131:21,
132:18, 134:15,
142:10, 145:1,
147:3, 149:21,
151:12, 152:13,
154:8, 155:15,
161:19, 162:11,
165:5, 165:12,
166:4, 166:9,
168:11, 170:19,
170:22, 171:16,
172:22, 173:4,
173:8, 176:10,
176:12, 186:11,
186:13, 187:12,
228:4, 228:17,
228:23
**wanted**
102:7, 122:2,
154:4, 168:24
**wanting**
45:9, 223:8
**warrant**
166:15
**warrants**
12:9, 165:1,
166:22
**washington**
4:7, 4:17, 8:15
**watched**
139:22
**way**
16:4, 27:14,
27:18, 30:5,
32:17, 34:15,
34:23, 50:9,
52:9, 55:1,
60:17, 64:17,
90:18, 94:1,
112:20, 123:13,
136:21, 140:23,
153:2, 174:20,
175:25, 202:17,
205:15, 215:15
**ways**
31:23, 194:24,

215:16
**we'll**
18:2, 26:4,
48:1, 101:6,
145:7, 160:21,
174:15, 230:17
**we're**
14:2, 16:8,
19:19, 19:21,
23:15, 24:2,
26:1, 30:13,
31:7, 38:13,
38:18, 56:22,
58:18, 63:6,
70:17, 75:24,
76:23, 82:16,
91:19, 99:11,
101:4, 111:3,
116:21, 142:18,
150:9, 154:10,
158:21, 159:5,
161:13, 172:2,
172:3, 176:18,
177:3, 200:2,
206:3, 219:5
**we've**
16:5, 80:4,
97:22, 100:18,
106:10, 111:19,
130:21, 167:7,
181:1, 182:13,
189:9, 195:25,
204:6, 204:7,
204:8, 204:9,
204:11, 205:3,
205:6, 208:13,
208:14
**website**
85:23, 107:18,
168:1, 213:1,
224:9
**webster's**
133:20, 209:24
**wednesday**
2:18
**weeks**
45:16
**welcome**
95:2, 157:24

**went**
21:1, 21:14,
21:24, 22:10,
27:12, 27:14,
157:10, 181:19,
204:10, 209:22
**weren't**
117:3, 118:18
**wermuth**
5:12, 5:13
**west**
22:10, 25:13,
129:14
**whatever**
19:2, 26:11,
81:8, 108:8,
136:2, 145:1,
180:17, 184:23,
185:18, 221:6,
227:14
**wheelhouse**
176:19
**whenever**
15:6, 133:23,
159:13, 169:15
**whereof**
233:14
**wherever**
92:22, 93:8
**whether**
19:1, 53:2,
53:9, 55:8,
55:14, 55:18,
56:13, 66:17,
79:4, 88:21,
110:1, 110:3,
111:18, 118:8,
118:25, 119:5,
119:8, 125:21,
125:24, 134:18,
135:25, 137:15,
137:16, 141:10,
141:15, 142:16,
143:10, 143:15,
144:22, 149:2,
158:3, 180:14,
184:21, 189:8,
189:18, 189:24,

190:6, 190:9,
190:13, 190:20,
192:19, 192:23,
204:11, 212:4,
214:3, 216:8,
216:11, 221:5
**white**
81:16
**whoever**
212:1
**whole**
23:24, 28:25,
33:20, 37:25,
40:19, 42:12,
48:15, 57:14,
71:13, 99:6,
99:18, 136:24,
136:25, 152:21
**whomever**
185:17
**wild**
22:14
**willfully**
104:5, 104:6,
104:10, 104:21,
105:1
**wise**
44:17, 152:23
**wish**
208:11
**withdraw**
37:21, 65:17,
102:23
**within**
29:1, 31:12,
60:18, 88:4,
105:20, 120:24,
134:5, 136:6,
136:14, 138:10,
145:17, 146:18,
146:19, 146:20,
146:22, 147:1,
147:2, 147:14,
147:16, 148:20,
149:6, 175:13,
175:18, 176:3,
176:19, 178:22,
179:12, 180:3,

220:25
**without**
68:21, 73:20,
75:18, 79:21,
113:12, 118:17,
138:21, 141:20,
144:9, 147:19,
152:3, 179:23
**witness**
20:9, 20:12,
44:13, 55:5,
61:3, 75:18,
89:9, 101:23,
102:4, 112:8,
113:8, 113:10,
127:7, 132:24,
136:10, 143:23,
150:22, 174:7,
174:13, 174:16,
179:23, 185:1,
202:7, 218:1,
218:23, 220:7,
227:14, 227:23,
228:8, 228:13,
228:18, 228:21,
228:25, 229:19,
230:22, 231:9,
233:14
**witness's**
229:23
**witnesses**
229:3, 230:6
**women**
1:18, 4:10,
13:4, 13:14,
70:8, 229:8
**wondering**
20:3, 54:8,
92:18
**word**
33:23, 59:23,
96:18, 97:9,
103:16, 104:25,
116:3, 132:21,
136:7, 138:6,
138:8, 177:1,
177:9, 177:13,
177:14, 184:8,

184:11, 199:17,
209:14, 219:2
**worded**
90:19, 229:22
**wording**
90:14, 98:15
**words**
90:4, 144:5,
150:4, 217:8
**work**
14:10, 14:18,
14:24, 18:18,
21:6, 22:21,
23:3, 25:16,
29:1, 31:15,
31:17, 38:22,
44:7, 75:17,
75:19, 77:3,
83:4, 87:17,
113:23, 126:17,
148:23, 149:1,
149:21, 149:24,
162:6, 179:22,
179:24, 202:5,
207:11, 212:1,
217:24, 218:1
**worked**
86:22, 106:5,
148:5, 148:8
**working**
19:21, 35:3,
35:9, 50:12,
82:4, 85:25,
110:22, 110:25,
115:16, 119:2,
119:6, 119:15,
154:23, 156:3,
157:6, 158:4,
159:2, 162:7,
163:17, 165:8,
169:5, 170:7,
208:14
**works**
13:23, 36:8,
227:14
**worries**
116:20, 135:23,
160:1

**worry**
98:6, 111:4,
182:6
**worth**
117:18
**would've**
23:7, 45:16
**wouldn't**
37:10, 38:2,
118:2, 146:3,
180:15, 215:6
**wrap**
227:11
**write**
41:8, 56:16
**writing**
180:16, 190:11,
200:24, 203:13
**written**
118:23
**wrong**
34:23, 97:16,
147:14, 162:20,
162:21, 172:4,
176:12, 187:25,
188:20, 193:5,
193:14, 193:21,
194:7, 194:17,
194:18, 195:2,
200:12, 219:2
**wrote**
15:24, 34:3

| Y |
| --- |

**ya'll**
18:23, 77:4,
89:3, 102:15,
227:14, 228:13,
231:9
**yeah**
14:11, 18:11,
19:13, 19:22,
20:1, 20:16,
21:17, 22:16,
22:18, 23:5,
24:13, 27:21,
28:5, 28:11,
28:13, 30:10,

33:7, 34:2,
35:1, 36:15,
37:13, 38:17,
40:9, 40:24,
44:5, 46:24,
47:5, 48:11,
50:15, 51:4,
51:19, 52:11,
54:10, 57:1,
57:19, 57:22,
63:9, 70:5,
71:14, 74:11,
75:21, 77:25,
79:25, 82:23,
83:23, 85:16,
86:10, 90:15,
90:18, 93:4,
94:7, 94:24,
96:22, 97:3,
98:3, 99:15,
100:4, 101:20,
103:19, 108:11,
110:19, 115:5,
128:22, 135:4,
136:11, 147:9,
150:14, 153:4,
153:8, 158:1,
159:24, 160:9,
170:1, 170:4,
176:25, 203:1,
207:25
**year**
21:24, 43:8,
43:9, 44:20,
59:5, 64:7,
70:11, 206:13,
206:14
**years**
17:23, 38:6,
59:3, 61:20,
62:4, 112:4,
112:20, 204:24
**yesterday**
24:13, 101:8,
153:5
**yesterday's**
100:22
**york**
5:8, 19:16

**yourself**
55:23
**youth**
1:7

---
**z**
---
**zehnder**
5:13
**zero-tolerance**
38:12
**zoom**
116:20

---
**$**
---
**$2,500**
104:4
**$50**
103:24, 191:16,
191:19
**$50,000**
196:2, 201:12

---
**0**
---
**0.56**
49:19
**00**
89:11, 89:13,
113:25
**000001**
12:18, 163:8
**000006**
12:5, 159:7
**000010**
167:3
**000018**
167:5
**000019**
12:6, 161:15
**000025**
12:10, 167:18
**000594**
12:14, 172:9
**000595**
116:14
**000859**
12:15, 172:21
**000885**
12:11, 169:9

**000887**
12:12, 170:14
**000889**
12:13, 171:11
**000900**
12:3, 157:13
**000947**
154:2
**000952**
12:4, 156:11
**01**
7:16, 10:15
**05**
227:18
**0575**
74:9, 177:8

---
**1**
---
**1**
113:25, 114:2,
114:3, 114:5
**1,500**
27:12, 28:6,
196:24, 197:4
**10**
11:19, 25:20,
46:15, 66:13,
72:12, 72:14,
89:1, 99:25,
100:1, 100:3,
100:7, 102:12,
114:2, 114:3,
114:5, 116:16,
116:18, 131:22,
131:23, 131:24,
151:5, 191:23,
192:3, 208:23,
208:25, 209:1,
229:4, 231:15
**100**
202:14
**10004**
5:8
**104.15**
73:1
**107**
11:23
**11**
24:20, 89:6,

89:8, 89:12
**1101**
4:16
**114**
11:4, 11:24
**115**
8:5
**1168**
7:10
**119**
9:14
**12**
6:15, 11:20,
83:19, 83:20,
89:11, 89:13,
91:17, 91:20,
114:4, 198:17
**120**
149:10
**1200**
8:18
**124**
12:16
**125**
5:6
**127**
11:22, 12:17,
85:22
**1285**
10:9
**129**
222:21, 223:25,
224:8, 224:23
**13**
11:3, 11:22,
85:8, 85:9,
127:12, 209:1
**14**
4:16, 99:25,
100:3, 100:8,
102:11, 102:12,
192:3, 200:3,
210:16
**15**
11:14, 11:23,
45:24, 107:22,
107:23, 191:11,
191:12

**152**
12:1
**155**
12:2
**156**
12:4
**157**
12:3
**159**
12:5
**16**
10:7, 24:22,
70:11, 152:11,
191:8, 191:14,
229:4
**161**
12:6
**163**
12:7, 12:18
**1631**
5:14
**1656**
176:10
**166**
12:8, 12:9
**167**
12:10
**169**
12:11
**17**
11:24, 48:21,
49:8, 49:18,
114:14, 114:15,
115:7
**170**
12:12
**1704**
203:3
**1707**
203:3
**171**
12:13
**1715**
7:8
**172**
12:14, 12:15
**174**
11:5

**18**
5:7, 177:11,
207:13, 217:7,
233:18
**1985**
175:9
**1988**
20:22
**1997**
20:22
**1f**
135:21, 201:17
**1st**
6:15, 40:6

**2**

**2,000**
27:13
**20**
2:18, 50:21,
74:19, 76:8,
90:16, 233:15
**2000**
21:18
**20001**
4:7
**20005**
4:17
**2003**
21:1, 21:11,
21:14
**2006**
21:14
**2007**
21:20
**2011**
17:4, 20:18,
22:11, 44:23,
150:25
**2013**
115:13
**2018**
12:2, 155:9,
157:3, 157:4,
192:17
**2019**
58:22
**202**
4:8, 4:18

**2020**
44:2, 74:22,
75:4, 76:11,
154:4, 162:16,
163:13, 192:14,
193:20
**2021**
11:13, 42:2,
42:11, 42:15,
44:2, 194:1,
194:2
**2022**
39:23, 40:3,
43:14, 45:1,
45:7, 45:14,
46:19, 47:14,
56:2, 61:20,
192:6, 193:13,
195:14
**2023**
2:18, 36:11,
36:13, 40:10,
43:9, 45:24,
46:1, 64:6,
116:6, 206:14,
233:16
**2027**
233:18
**204**
9:22
**21**
24:22, 84:5,
84:7
**212**
5:9
**215**
1:12
**216**
1:13
**218**
1:14
**22**
12:1, 50:19,
51:2, 76:21,
84:8, 152:18,
153:12, 153:25
**2200**
4:18

**23**
1:12, 1:13,
1:14, 2:18,
11:14, 12:2,
61:20, 93:7,
155:1, 155:3
**233**
2:24
**239**
7:10
**24**
11:10
**243**
54:1
**2472**
5:16
**25**
12:3, 157:11,
157:15
**250**
4:6
**2500**
5:9
**26**
12:4, 156:7,
156:10
**264**
46:13
**27**
12:5, 92:22,
159:6
**270**
9:16
**2707**
6:8
**2717**
52:4
**2762**
53:22
**28**
12:6, 91:19,
161:11, 161:14
**280**
7:7
**29**
12:7, 163:21,
163:25, 164:25,
165:15

**2925**
9:21

**3**

**3**
227:18
**3,026**
49:3, 49:8,
49:18
**3,077**
56:4, 56:9
**30**
12:8, 40:6,
113:22, 166:5,
166:6, 167:2,
178:6
**31**
12:9, 166:21,
166:24, 167:4
**315**
9:6
**32**
12:10, 167:17,
167:19, 169:8
**3202**
9:24
**32207**
8:20
**32301**
9:15
**32399**
7:17, 10:16
**32601**
6:17
**32802**
5:15
**32803**
6:9
**33**
12:11, 169:8,
169:12, 169:16
**3300**
10:17
**33301**
8:7
**33410**
9:23
**335**
9:24

**3354**
9:8
**33602**
10:8
**33756**
9:7
**33901**
7:9
**34**
12:12, 170:13,
170:15
**344**
7:10
**35**
12:13, 171:10,
171:12
**352**
6:18
**357**
8:8
**36**
12:14, 172:6,
172:8
**3635**
7:18
**37**
12:15, 172:13,
172:16, 172:19
**374**
6:18
**38**
114:4
**39**
11:11, 11:12
**390**
77:21
**396**
77:23
**399**
8:21
**3c**
213:3, 214:11
**3h**
222:14
**3prvo**
115:17, 151:4,
198:13, 221:13
**3prvos**
48:18, 49:9,

50:6, 56:3,
56:6, 66:6,
82:24, 83:5,
87:24, 110:22,
110:25, 124:18,
145:18, 159:2,
190:15, 192:5,
194:4, 221:21
**3pvro**
12:16, 54:1,
59:10, 59:17,
66:2, 68:11,
73:11, 73:18,
73:24, 81:25,
82:5, 85:25,
86:22, 87:17,
89:25, 90:25,
91:1, 98:21,
98:23, 103:5,
104:5, 104:15,
106:6, 106:15,
106:19, 107:10,
111:23, 112:3,
112:19, 124:11,
150:2, 150:19,
165:21, 166:16,
167:11, 169:2,
183:20, 190:21,
195:4, 196:4,
196:11, 197:10,
198:11, 199:23,
200:19, 200:25,
201:4, 201:14,
208:17, 208:18,
209:4, 221:8,
225:8, 225:24
**3pvros**
48:4, 48:6,
48:22, 66:13,
67:16, 67:19,
69:5, 94:25,
111:16, 119:2,
119:6, 119:15,
123:22, 144:17,
145:15, 147:18,
149:24, 150:1,
154:23, 156:3,
157:6, 158:4,

161:8, 162:7,
163:17, 165:8,
169:5, 170:7,
171:25, 183:11,
183:14, 183:17,
184:5, 185:12,
186:20, 187:2,
187:20, 188:1,
188:6, 189:5,
191:17, 192:21,
193:5, 193:12,
193:19, 194:8,
194:19, 195:14,
195:21, 196:2,
198:3, 198:7,
199:8, 208:19,
208:21

---
**4**

**4**
227:18, 231:15
**40**
12:16, 124:4,
124:8
**400**
4:5, 4:15
**404**
78:1
**407**
5:16, 6:10
**41**
12:17, 127:5,
127:8, 191:3,
191:7, 202:16,
217:7
**414**
7:18, 10:17
**42**
11:13, 12:18,
162:24, 163:3
**422**
5:16
**423**
8:6
**442**
99:16
**4490**
4:8

**45**
11:14
**456**
103:22, 191:13
**462**
104:3
**464**
9:8
**465**
104:7
**48**
89:6
**49**
89:12
**4:-cv--mw**
1:12, 1:13,
1:14
**4th**
17:4

---
**5**

**50**
117:18
**500**
9:13
**513**
97:24
**5150**
6:10
**518**
177:13
**518701**
2:23
**5218**
6:18
**549**
5:9
**55**
89:8
**561**
9:24
**574**
10:9
**58**
11:15
**59**
2:19, 202:17,
227:18

**5938**
9:16
**5a1**
103:22

---
**6**
---

**60**
17:16
**601**
10:6
**68**
117:8, 118:5,
118:7

---
**7**
---

**70**
11:17, 17:16,
205:21
**7050**
11:16, 12:17,
24:18, 37:17,
37:24, 38:25,
48:2, 66:5,
68:9, 77:15,
119:25, 121:8,
122:14, 122:22,
123:16, 127:10,
128:19, 135:7,
135:10, 137:20,
138:1, 140:16,
141:1, 150:18,
151:17, 176:23,
180:7, 180:11,
191:15, 193:4,
196:1, 197:25,
199:10, 202:10,
202:13, 202:14,
205:10, 205:16,
210:13, 212:13,
220:25, 221:11,
221:20
**7090**
205:24
**72**
11:19, 45:17,
59:6
**727**
9:8

**736**
4:18
**7600**
8:8
**77**
11:16

---
**8**
---

**800**
8:19
**813**
10:9
**817**
78:15
**825**
78:19
**831**
78:17
**84**
11:20
**8440**
8:21
**85**
11:22
**850**
7:18, 9:16,
10:17
**883**
154:2
**897**
6:10

---
**9**
---

**9**
2:19
**90**
205:21, 205:25
**904**
8:21
**950575**
211:2
**954**
8:8
**96**
191:11
**968**
4:8
**97**
21:1, 211:11

**97.0575**
15:18, 30:23,
31:3, 126:19,
126:24, 127:13,
128:10, 179:12
**97.05751**
65:2, 105:6,
111:12, 213:6
**97.05755**
99:11
**97.05757**
89:19, 222:16
**970575**
74:3, 74:5,
88:13, 211:7
**98.0751**
86:18