# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

        *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al.*,

        *Defendants*.

Case No. 4:23-cv-00218-MW-MAF

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...............................................................................2

   I.   Third-Party Voter Registration Organizations (3PVROs) ...............................2

       A.   3PVROs' Operations and Impact in Florida ...........................................2

       B.   Florida's Regulation of 3PVROs ............................................................3

   II.   Section 97.0575(1)(f) of the Florida Statutes ...................................................3

       A.   The Non-Citizen Ban ...............................................................................3

       B.   Lack of Supporting Evidence for Purported Rationales for the Non-Citizen Ban................................................................................................4

   III. Plaintiffs ...........................................................................................................13

       A.   Organizational Plaintiffs .......................................................................13

       B.   Individual Plaintiffs...............................................................................13

       C.   Impact of Non-Citizen Ban on Plaintiffs .............................................14

ARGUMENT ......................................................................................................22

   I.   Plaintiffs Are Entitled to Summary Judgment on Their Equal Protection Claim..................................................................................................................22

       A.   The Equal Protection Clause Demands that the Court Apply Strict Scrutiny to the Non-Citizen Ban...............................................................23

       B.   Defendants Have Failed to Put Forth a Compelling Interest to Justify the State's Blanket-Alienage Classification............................................24

       C.   Even if Defendants Had Asserted a Compelling Interest, The Non-Citizen Ban is Not Narrowly Tailored. ..................................................26

       D.   The Political-Function Exception Cannot Save the Non-Citizen Ban. .......................................................................................................28

CONCLUSION...................................................................................................32

LOCAL RULE 7.1(F) CERTIFICATE ....................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Allen v. Tyson Foods, Inc.*,
 121 F.3d 642 (11th Cir. 1997)..........................................................................22

*Bernal v. Fainter*,
 467 U.S. 216 (1984).................................................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections*,
 580 U.S. 178 (2017)..........................................................................................25

*Cabell v. Chavez-Salido*,
 454 U.S. 432 (1982)..........................................................................................29

*Cervantes v. Guerra*,
 651 F.2d 974 (5th Cir. 1981)............................................................................30

*Doe v. Moore*,
 410 F.3d 1337 (11th Cir. 2005)........................................................................23

*Foley v. Connelie*,
 435 U.S. 291 (1978)..............................................................................26, 29, 31

*Gonzalez v. Immigr. & Customs Enf't*,
 416 F.Supp.3d 995 (C.D. Cal. 2019) ...............................................................16

*Gonzalez v. Immigr. & Customs Enf't*,
 975 F.3d 788 (9th Cir. 2020).............................................................................16

*Graham v. Richardson*,
 403 U.S. 365 (1971)..........................................................................................23

*Gregory v. Ashcroft*,
 501 U.S 452 (1991)...........................................................................................28

*In re Griffiths*,
 413 U.S. 717 (1973)....................................................................................23, 30

*League of Women Voters of Fla. v. Browning*,
 863 F.Supp.2d 1155 (N.D. Fla. 2012)................................................................3

*League of Women Voters of Fla. v. Lee*,
   595 F.Supp.3d 1042 (N.D. Fla. 2022).................................................3

*League of Women Voters of Fla. v. Lee*,
   66 F.4th 905 (11th Cir. 2023).............................................................3

*Meyer v. Grant*,
   486 U.S. 414 (1988)...........................................................................27

*Nyquist v. Mauclet*,
   432 U.S. 1 (1977)...............................................................................23

*Plyler v. Doe*,
   457 U.S. 202 (1982)...........................................................................23

*Shotz v. City of Plantation*,
   344 F.3d 1161 (11th Cir. 2003).........................................................22

*Sugarman v. Dougall*,
   413 U.S. 634 (1973)...........................................................................29

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948)...........................................................................24

*United States v. Virginia*,
   518 U.S. 515 (1996)...........................................................................25

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)...........................................................................23

**STATUTES**

Fla. Stat. § 95.0575 ...................................................................*passim*

Fla. Stat. § 97.053 ............................................................................27

Fla. Stat. § 97.057 ............................................................................28

Fla. Stat. § 97.0525 ..........................................................................28

Fla. Stat. § 117.01 ............................................................................28

Fla. Stat. § 448.09 ............................................................................27

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ...................................................................................22

U.S. Const. amend. XIV § 1 .......................................................................22

## <u>INTRODUCTION</u>

Section 97.0575(1)(f) of the Florida Statutes prohibits third-party voter registration organizations from allowing any non-citizen to collect or handle voter registration applications on their behalf ("Non-Citizen Ban"). In doing so, the law draws a facial classification based on alienage, in violation of the Fourteenth Amendment's Equal Protection Clause. Under controlling precedent, the State must show that a blanket-alienage classification can satisfy strict scrutiny.

At the close of discovery, Defendants have failed to put forth any compelling interest to support the Non-Citizen Ban, much less to show that banning an entire class of persons from collecting or handling voter registration applications is narrowly tailored to advance that interest. Concretely, the record lacks evidence that supports the Defendants' articulated justifications: Defendants have not identified even a single example of a non-citizen engaging in fraud, submitting a late application, or otherwise undermining election integrity or efficiency while registering voters. Nor have Defendants sufficiently explained why the narrowest way to address any state interest is banning *all* non-citizens—including permanent residents, and those authorized to work in the United States—from handling voter registration applications. Nor have Defendants explained why non-citizens are banned from performing this ministerial task when they can be employed at Florida's Division of Elections and Supervisor of Elections offices.

This Court should grant partial summary judgment.

1

## STATEMENT OF FACTS

I.   **Third-Party Voter Registration Organizations (3PVROs)**

   A.   **3PVROs' Operations and Impact in Florida**

3PVROs play an important role in registering voters in Florida, both in reaching "people that otherwise haven't thought about voter registration" and populations that are "underserved." ECF 125-1 (Morley Dep.) at 24:18-25:2. According to Florida Division of Elections data that Defendants produced in discovery, as of September 1, 2023: "over 730 thousand voters . . . were registered in Florida due to the activities of 3PVROs," and "at least one in 20 of the 15.1 million registered voters in Florida have relied on 3PVROs to assist them to register to vote or update their voter registrations." ECF 125-2 (Smith Report) ¶¶ 8, 13. And according to data that the State provided to the U.S. Election Assistance Commission, these numbers "are likely an under count, as the total number of registered voters in Florida who have been assisted by 3PVROs since 2013 could exceed 2.1 million." *Id.* ¶ 14.[1]

The data Defendants produced in discovery further establishes that 3PVROs assist Black, Hispanic, and white voters, and voters of other racial and ethnic groups.

---

[1] These conclusions are undisputed: Defendants' experts do not dispute Dr. Smith's conclusions about "the number of Florida voters who have relied on 3PVROs to register to vote" or to "update their voter registration," nor Dr. Smith's conclusions that "these numbers are likely an undercount based on data provided by the Florida Department of Elections." ECF 125-3 (Stein Dep.) at 76:1-77:3, 188:10-189:3; *see also* ECF 125-4 (Alford Dep.) at 177:25-178:4, 180:11-15.

ECF 125-2 ¶ 42 & Table 5. "Black and Hispanic registered voters in Florida are more than five times more likely than White registered voters in Florida to register with, or update their registration, with 3PVROs." ECF 125-5 ¶ 8; ECF 125-2 ¶ 53.[2]

### B.   Florida's Regulation of 3PVROs

In the past two decades, Florida has passed laws that chill third-party voter registration activities. That includes restrictions passed in 2011 that this Court invalidated for placing an undue burden on 3PVROs, *see League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d 1155, 1167-68 (N.D. Fla. 2012), and restrictions passed after the 2020 election that are subject to ongoing litigation, *see League of Women Voters of Fla. v. Lee*, 595 F.Supp.3d 1042 (N.D. Fla. 2022), *aff'd in part, vacated in part, rev'd in part*, 66 F.4th 905 (11th Cir. 2023).

## II.   Section 97.0575(1)(f) of the Florida Statutes

### A.   The Non-Citizen Ban

The Non-Citizen Ban requires that, before engaging in voter registration activities, a 3PVRO must affirm to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications on behalf of" the 3PVRO is "a citizen of the United States." Fla. Stat. § 97.0575(1)(f).

The Non-Citizen Ban imposes a $50,000 fine on 3PVROs for each violation—specifically, for "each such person" collecting or handling applications on the

---

[2] These conclusions are likewise undisputed. ECF 125-3 at 97:21-98:8; *see also* ECF 125-4 at 103:22-104:9, 181:10-23.

organization's behalf. *Id.* The statute contains no cap on the amount that any one organization can be fined for such persons' assistance, nor does the statute require knowledge of the violation to impose fines. *Id.* These fines can quickly add up— receiving assistance from 15 non-citizen volunteers would cost $750,000 in fines, nearly $100,000 more than Hispanic Federation's entire 2022 Florida programming budget. ECF 32-1 (Velez Decl.) ¶ 15.

Section 97.0575(8) of the Florida Statutes authorizes the Secretary of State to refer any instance in which the Secretary "reasonably believes that a person has committed a violation of this section" to the Attorney General for enforcement. *Id.* § 97.0575(8). Upon receiving "a referral from the Secretary of State," the Attorney General "may seek 'a permanent or temporary injunction, a restraining order, or any other appropriate relief' to prevent a violation" of the Non-Citizen Ban, or to "institute a civil cause of action to collect a fine assessed by the Secretary of State, after the exhaustion of administrative remedies." ECF 125-19 (Office of the Attorney General ("OAG") Stip.) ¶¶ 1,7 (quoting Fla. Stat. § 95.0575(8)); *see also* ECF 125-6 (Guzzo Dep.) at 56:11-57:10.

**B.   Lack of Supporting Evidence for Purported Rationales for the Non-Citizen Ban**

*1. Purported Rationales in the Legislative Record*

Only three purported rationales for the Non-Citizen Ban emerged in the legislative record.

First, Senator Burgess stated: "Regarding non-citizens, there are certain rights in our country that only citizens get to enjoy. That includes serving on a jury, running for office, and voting. We're just adding and ensuring that your right to vote is one of them as well." ECF 125-7 (Tr. of Fla. Senate Comm. on Fiscal Policy Meeting (Apr. 20, 2023)) at 94:21-24; *see also* ECF 125-8 (Tr. of Fla. Senate Session (Apr. 26, 2023) at 13:17-23 ("I think the policy call here is that we recognize already that there are certain rights in our country that only citizens get to enjoy including serving on a jury, running for office, and voting."). Notably, however, the Non-Citizen Ban does not regulate who has the right to vote. *See* Fla. Stat. § 97.0575(1)(f).

Second, Senator Hutson stated:

> [W]e've had people register folks and not turn [in] . . . the registration. So people thought that they were registered to go vote and, coincidentally, it was not turned in so they weren't registered. We've had other parties take information and change their information after they signed the form. . . . We want to make sure that we have higher scrutiny on those that are doing this so that, . . . a third-party registration gets someone's information to the supervisor. We want it to be done correct. We want it to be done right. And we want those people to be able to vote.

ECF 125-8 at 4:19-5:10. When Senator Polsky asked if there is any reason to think that "a noncitizen has done those acts more than . . . the average Joe person who just didn't do the job correctly," Senator Hutson provided no examples or justification for such a belief. *Id.* 5:12-6:10.

Third, Senators Hutson and Burgess said the data on voter registration applications "is pretty private and sensitive," and so they "wanted to make sure

you . . . are a legal citizen handling the list and you aren't an illegal doing third-party voter registration." *Id.* 12:17-21 (Hutson); *see also id.* 13:17-20 (Burgess: "it kind of dovetails in line with ensuring that we're protecting the sensitive information that we're collecting from a voter if they are requesting all of that on a voter registration form."). Members of the Legislature repeatedly acknowledged, however, that "non-U.S. citizens are allowed to work for the Division of Elections." ECF 125-8 at 15:11-17; ECF 125-9 (Tr. of Fla. House Session (Apr. 28, 2023)) 7:6-16. When Senator Jones asked why "non-U.S. citizens who have been vetted like legal permanent residents" should be banned from collecting applications if "the concern is about security," Senator Burgess said: "I think I'll fall back on my previous answer kind of related to the decision why. It's ultimately a policy call. But those are the reasons why we decided to land on sticking with non-U.S. citizens." ECF 125-8 at 14:22-15:8.

During the House session, Representative McClure echoed this rationale, stating: "We're just simply saying, in an abundance of caution for that potential voter's personal information, that the time they hand over that sacred information, that it goes to a U.S. citizen for collection and handling purposes only." ECF 125-9 at 6:5-8. When Representative Bracy Davis asked "[w]hat evidence is there that non-citizens, including permanent legal residents, are any less honest or more likely to misuse information than U.S. citizens," Representative McClure testified: "It doesn't. The purpose of that doesn't contemplate the premise of your question. And

instead as it relates to the fines, we are emphasizing and prioritizing that voter's information." *Id.* 19:9-19.

During the House Session, multiple representatives summarized the holes in these purported rationales, and they proposed and supported amendments that would eliminate the Non-Citizen Ban. *Id.* 25:15-28:17, 29:11-31:11. For instance, in proposing one such amendment, Representative Bartleman stated:

> The speaker in questioning said we don't want these people to collect the paperwork. Well, these individuals are legally authorized to work in the United States, and they work for our local election offices, the Florida Department of Highway Safety and Motor Vehicles where they collect or handle voter registration applications . . . And some may even work at the state's Division of Elections. So why are they allowed to work for . . . these government entities and not be allowed to work for a third party?

*Id.* 29:18-30:5; *see also id.* 31:2-11.

Likewise, in support of a similar amendment proposed by Representative Joseph, Representative Eskamani stated:

> It just doesn't make sense that we set restrictions because someone doesn't have citizenship status when we have all of these other statuses and well-vetted programs that ensure that these are individuals who we trust to work in our country. We trust them to be our pharmacists. We trust them to be our doctors. We trust them to handle sensitive data in research. Yet, now we're saying they can't hold a voter registration form? It does not make sense.

*Id.* 27:15-22.[3]

---

[3] Although no one rose to question or challenge these points, both amendments failed. ECF 125-9 at 28:18-29:1; 31:12-17.

Ultimately, as Senator Jones summarized it:

[I]n the amendment, we prohibit non-U.S. citizens with work authorizations from being able to collect and handle registration applications with third-party voter registration organizations. And when I asked Senator Burgess the reasoning, his response was they were just a policy decision. So there was no reason because there is none while we're doing this. Because if an authorized person could work in the Division of Election, they could work in the DMV, or even at the tax collector's office, but suddenly they can't work for a third-party voter registration organization because now, it's all of a sudden, a security issue, what are we talking about?

ECF 125-8 at 144:9-20.

### 2. *Department of State's Purported Rationales*

The Non-Citizen Ban was one of the proposals that the Department of State submitted to the Legislature for consideration during the drafting of S.B. 7050. ECF 125-10 (Darlington Dep.) at 226:14-227:17. In discovery, the Secretary of State's 30(b)(6) witness offered the following state interests that were puportedly "furthered by banning noncitizens from handling or collecting voter registration applications on behalf of" 3PVROs: "safeguarding election integrity, preventing voter fraud, ensuring a timely submission of voter registration applications, and then otherwise promoting uniformity, efficiency, and confidence in the election system." *Id.* 63:11-24; *see also* ECF 122-1 (Darlington Decl.) ¶ 5 (restating same interests).

When asked how the Non-Citizen Ban serves any state interest in safeguarding election integrity, uniformity, or efficiency, the Secretary of State's designated 30(b)(6) witness described non-citizens as "individuals who either are

actively committing a crime every day to individuals who really don't have much stake in the election at all." *Id.* 76:4-8, 77:4-7. He also questioned *all* non-citizens' "fulfillment of the fiduciary obligation to the voter, including ensuring that uniformly completed applications are submitted and processed in time so that, that applicant or that voter who is updating their registration can vote come election day when they want to." *Id.* 77:3-13; *see also id.* 80:2-81:10 (reciting same interest in efficiency); *id.* 73:5-17 (it is "certainly in the interest of safeguarding election integrity to take a proactive measure to ensure that only those with a stake in the election actually have the ability to fulfill their fiduciary duty as owed to the voter, whether a new registrant or a voter updating their registration"). When asked if he had "any knowledge of noncitizens failing to submit a completed or compliant" application in Florida, the Secretary of State's designated 30(b)(6) witness could not provide any examples, and instead stated that it was "within the State's interest to take a proactive stance or measure to ensure fiduciary obligations are completed." *Id.* 77:14-78:15.[4]

---

[4] Tiffany Morley, supervisor in the Division of Election's Bureau of Voter Registration Services, likewise testified that she was "not aware" of any investigation or prosecution "relat[ing] to noncitizens working on behalf of 3PVROs" that her office had referred to the Office of Election Crimes and Security, ECF 125-1 at 139:3-8, nor was she aware of any time that her office had "encountered an issue with a non-citizen canvasser or volunteer" that was working on behalf of a 3PVRO, *id.* 125:5-9.

When asked how the Non-Citizen Ban serves a state interest in preventing voter fraud, the Secretary of State's designated 30(b)(6) witness testified that, "when we talk about noncitizens, we're talking about anyone from permanent residents through individuals who are here illegally," and "there is an indication that if you're already continually breaking one law, you could be prone to breaking another law." ECF 125-10 at 65:4-66:6. But he acknowledged that the term non-citizen includes individuals who are legally present in the United States, including lawful permanent residents. *Id.* 66:7-11. He also suggested that "[a]n individual with citizenship elsewhere typically" goes to that country "after the conduct of a crime," *id.* 66:1-3, but when asked for any examples of "individuals who are noncitizens leaving the United States after committing a voting-related offense," he said he had "never received a complaint regarding a crime where a crime occurred and then the complaint stated that it was a noncitizen who left." *Id.* 67:11-20.

When asked how the Non-Citizen Ban serves a state interest in timely submission of applications, the Secretary of State's designated 30(b)(6) witness was unable to identify "any instances of a noncitizen failing to submit a voter registration application on time," *id.* 74:8-76:3, or "any example of noncitizens being deported from the country with voter registration applications still in their possession," *id.* 104:14-18. He testified instead that this is "a proactive measure because if individuals are leaving the country prior to the submission of those handled or collected applications, then it could result in the disenfranchisement of a voter," *id.*

104:4-13. When asked for any evidence that "lawful permanent residents are less trustworthy than citizens in collecting voter registration applications," he stated that "citizens have the greatest stake in the election system because they have the legal right to vote," *id.* 107:20-108:9, and that "[b]ecause of the fact that they're here temporarily, that means that their legal status could end. And so either staying here illegally and actively breaking the law or leaving the country without submitting voter registration applications, those are just two examples of the risks that exist," *id.* 110:23-111:10.

Finally, the Secretary of State's designated 30(b)(6) witness testified that no similar ban on non-citizens is in place for Florida's Department of State employees: "As long as there is legal authorization to work for the Department of State regardless if it's my office, the Division of Elections, or anywhere else, I don't increase any restrictions against noncitizens for working in my office." *Id.* 299:19-300:9; *see also* ECF 125-1 at 48:8-15. Non-citizens who are authorized to work in the United States can also review completed voter registration forms as employees of Florida's Supervisors of Elections offices. ECF 125-11 (Earley Dep.) at 131:3-8, 135:23-136:17. Likewise, as this Court previously recognized, there is no dispute that "postal workers also collect and handle voter registration applications submitted by mail, and noncitizens are allowed to be postal workers," or that "noncitizens are also permitted to serve on Florida's Elections Commission and work for other state agencies." ECF 68 at 31.

11

### 3. OAG's Purported Rationales

The OAG has asserted no independent state interest that the Non-Citizen Ban furthers.[5] Moreover, OAG's investigations and prosecutions did not provide the rationale for passage of the Non-Citizen Ban: OAG was not consulted during the drafting of the Non-Citizen Ban, ECF 125-6 at 30:16-31:2, nor did OAG have any communications with the Legislature, Governor, or Secretary of State's offices during the drafting of the Non-Citizen Ban, *id.* 64:7-16, 65:19-66:15.

Even if OAG had been consulted, none of the evidence it produced in discovery would have supported the Non-Citizen Ban. Before S.B. 7050, OAG already had authority to prosecute persons for identity theft, voter fraud, submitting false voter registration information, altering a voter registration application without consent of the applicant, and offering an eligible citizen financial consideration in exchange for becoming a registered voter. ECF 125-12 (Cox Dep.) at 151:12-152:9. And yet, at least since 2011,[6] OAG has never prosecuted any non-citizen who was working on behalf of a 3PVRO, or any 3PVRO itself. *Id.* 106:4-7, 149:21-150:25. OAG is also not aware of any documents that it produced in this litigation that

---

[5] ECF 125-6 at 60:3-18 ("I would say that we don't have a state interest in this; that we defer to the legislature and other election officials to . . . relay what the state interest is, if there is one, and that we defer to them because they are the ones who write the laws.").

[6] OAG's designated 30(b)(6) witness had worked at OAG since 2011 and disclaimed any ability to speak to OAG's practices before that time. ECF 125-12 at 150:24-151:2.

indicate any non-citizen engaged in unlawful activity while registering voters on behalf of a 3PVRO. *Id.* 152:10-174:1, 197:4-13.

## III.   Plaintiffs

### A.   Organizational Plaintiffs

Hispanic Federation and Poder Latinx ("Organizational Plaintiffs") are non-profit organizations that are registered to operate as 3PVROs in Florida. ECF 32-1 (Velez Decl.) ¶¶ 6, 12; ECF 32-2 (Batista Decl.) ¶¶ 6-10. Hispanic Federation has registered more than 90,000 voters since the 2016 election cycle, including eligible voters in each of Florida's 67 counties. ECF 32-1 ¶ 11. Poder Latinx has registered over 48,000 eligible Florida voters. ECF 32-2 ¶ 10.

Both Organizational Plaintiffs operate locally and statewide, and they help to reach voters who might not otherwise register to vote, including voters with limited access to technology or limited English-language proficiency. ECF 32-1 ¶¶ 7, 12; ECF 32-2 ¶¶ 7, 11; ECF 125-13 (Velez Dep.) at 71:2-22.

### B.   Individual Plaintiffs

Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico ("Individual Plaintiffs") are non-citizens who are lawfully present and authorized to work in the United States. Plaintiff Herrera-Lucha obtained a law degree in El Salvador and a master's degree in international law in Spain, and she became a lawful permanent resident of the United States in 2007. ECF 66-1 (Herrera-Lucha Decl.) ¶¶ 1, 2, 4. She has been a Florida resident since 2016. *Id.* ¶ 2. Plaintiffs Martínez and Pico

(previously, "A. Doe") both came to the United States from Venezuela and now hold Temporary Protected Status and work authorization. ECF 66-2 (Martínez Decl.) ¶¶ 5-7; ECF 66-3 (Pico Decl.) ¶¶ 5-8.

All three Individual Plaintiffs helped register eligible Floridians on behalf of 3PVROs before the Non-Citizen Ban was passed. Plaintiff Herrera-Lucha has canvassed for 3PVROs since 2016. In her role as State Field Director for Mi Vecino, a registered 3PVRO, she conducted direct canvassing work to register eligible voters and planned and coordinated Mi Vecino's Florida voter registration campaigns. ECF 66-1 ¶¶ 7-10. Plaintiffs Martínez and Pico worked in paid staff positions as canvassers for 3PVROs, likewise helping eligible Floridians register to vote. ECF 66-2 ¶¶ 11-12; ECF 66-3 ¶¶ 12-15, 18.

While Individual Plaintiffs cannot themselves vote, they view voter registration as a way they can help eligible citizens exercise their rights and engage on issues critical to all who live in their communities. Individual Plaintiffs believe that helping eligible citizens in their underrepresented communities to register to vote will help American democracy more fully reflect and promote its constituents' values. ECF 66-1 ¶ 25; ECF 66-2 ¶¶ 16, 23; ECF 66-3 ¶ 11, 19-20.

### C. Impact of Non-Citizen Ban on Plaintiffs

The undisputed facts demonstrate that the Non-Citizen Ban would severely burden Plaintiffs, their voter registration activities, and the communities they serve in at least five distinct ways.

14

*First*, the Non-Citizen Ban would decimate Organizational Plaintiffs' voter registration workforce and paralyze their voter registration work. Concretely, non-citizens comprise 70% of Hispanic Federation's canvassers, ECF 32-1 ¶ 24, and 90% of Poder Latinx's staff. ECF 32-2 ¶ 24. The Non-Citizen Ban would prevent both organizations from allowing those non-citizens to collect and handle voter registration applications on their behalf. ECF 32-1 ¶¶ 24-25; ECF 125-14 (Wassmer Dep.) at 84:4-9. The abrupt loss of these staff and volunteer non-citizens' assistance would severely restrict Organizational Plaintiffs' effectiveness to promote democratic participation. ECF 32-1 ¶¶ 22, 24-26, 43-45; ECF 32-2 ¶¶ 25, 44-46.

*Second*, efforts to comply with the Non-Citizen Ban would significantly drain the Organizational Plaintiffs' resources in two ways: by depleting the organizations' experience and institutional knowledge, ECF 32-1 ¶¶ 25-27; ECF 32-2 ¶¶ 24-28; and by requiring additional staff time and financial resources to comply, ECF 32-1 ¶¶ 30-31, 43; ECF 32-2 ¶¶ 32, 36, 44. *See also* ECF 125-13 at 117:18-119:18.

If the Non-Citizen Ban takes effect, Organizational Plaintiffs would lose many of their most experienced canvassers: people who have risen to senior and leadership positions, those who have developed deep relationships with the communities Plaintiffs serve, and those who train their new canvassers. ECF 32-1 ¶¶ 25-27; ECF 125-14 at 84:4-20, 85:13-22. The Non-Citizen Ban would also reduce the number of businesses that let canvassers register voters on their properties, because the staff that local businesses know and trust could no longer engage in voter registration.

ECF 32-1 ¶ 25; ECF 32-2 ¶ 26. The Non-Citizen Ban would also require Organizational Plaintiffs to redirect funding that would have gone to community programming towards hiring, vetting, and training new staff and volunteers, as well as rebuilding institutional knowledge and relationships. ECF 32-1 ¶¶ 30-31, 43; ECF 32-2 ¶¶ 25, 32, 36, 44; ECF 125-13 at 122:2-123:5, 136:24-139:11; ECF 125-14 at 85:23-86:7. And in preparing for compliance with the Non-Citizen Ban in the weeks before it was scheduled to take effect, Organizational Plaintiffs had *already* diverted resources and suffered concrete harms, including turning down qualified non-citizen applicants for open positions, redirecting staff time toward developing policies to comply with the Non-Citizen Ban, and altering their planning for registering voters in the 2023 election cycle. ECF 32-1 ¶¶ 28, 33-34, 42; ECF 32-2 ¶¶ 31, 43; ECF 125-13 at 57:5-58:18; ECF 125-14 at 87:15-23.

*Third*, the Non-Citizen Ban would force Organizational Plaintiffs to take significant additional measures to ensure their staff and volunteers are citizens, given the strict liability and $50,000 fine for each non-citizen who handles or collects voter registration forms. ECF 32-1 ¶¶ 31, 33, 43; ECF 32-2 ¶¶ 32, 36, 44; ECF 125-13 at 122:3-17, 136:24-139:11. Determining citizenship for any organization is a "complex inquiry" because of "the fluidity [individuals] may experience with respect to immigration status." *Gonzalez v. Immigr. & Customs Enf't*, 416 F.Supp.3d 995, 1004 (C.D. Cal. 2019), *rev'd and vacated on other grounds*, 975 F.3d 788 (9th Cir. 2020). And because Organizational Plaintiffs would be strictly liable for even

inadvertent violations, they would also have to turn away help from *U.S. citizens* whose statuses cannot be readily verified. ECF 32-1 ¶ 32-33; ECF 32-2 ¶¶ 33-34. For example, Hispanic Federation would no longer let individuals assist with voter registration efforts unless they can provide *proof* of citizenship. That would force Hispanic Federation to turn away even U.S.-citizen staff and volunteers who cannot (or do not wish to) furnish requisite proof. ECF 32-1 ¶¶ 32-33. Likewise, Poder Latinx would sever community-service partnerships that enable local student volunteers to register voters because of the added hurdle of confirming students' citizenship statuses. ECF 32-2 ¶¶ 33-34.

*Fourth*, the Non-Citizen Ban would harm the communities and constituents Plaintiffs serve, because Plaintiffs' more limited capacities would result in them registering substantially fewer citizens to vote. Organizational Plaintiffs work closely with Latino citizens to help them register, relying in part on a network of key community activists who help shape the organizations' agendas and who play a critical role in implementing their programs. For the reasons described above, the severe burden the Non-Citizen Ban places on the Organizational Plaintiffs would force them to drastically curtail or potentially end their registration efforts. The Non-Citizen Ban would reduce the political voice of Latino voters who benefit from these programs. ECF 32-1 ¶¶ 44-45; ECF 32-2 ¶¶ 45-47.

Indeed, in response to the Non-Citizen Ban's threat of civil penalties, Organizational Plaintiffs' largest funders have already withheld donations earmarked

for voter registration efforts in Florida because of the threat of costly fines. ECF 32-1 ¶ 37; ECF 32-2 ¶ 38; ECF 125-13 at 105:21-23, ECF 125-14 at 84:4-85:6. Following the Non-Citizen Ban, Poder Latinx lost "a large percentage" of anticipated funding, ECF 125-14 at 84:25-85:6, 86:25-87:14, and Hispanic Federation was unable to secure any private funding for voter registration in 2023 following passage of the Non-Citizen Ban, ECF 125-13 at 105:21-23; *see id.* 28:16-29:20. Because the Non-Citizen Ban delayed Organizational Plaintiffs' voter registration efforts in 2023 and decreased the amount of funding they were able to receive, the Non-Citizen Ban has already decreased the number of voters that Organizational Plaintiffs were able to register in 2023. ECF 125-13 at 134:23-136:23, 139:12-140:15; ECF 125-14 at 86:25-87:14, 87:24-88:6. The Non-Citizen Ban would force Organizational Plaintiffs to consider halting voter registration activities altogether—and even if Plaintiffs did not cease these activities, they would significantly scale back the volume of their voter registration drives because most of their experienced staff and volunteers would be banned from participating. ECF 32-1 ¶¶ 39-42; ECF 32-2 ¶¶ 39-42.

Expert analysis also supports this harm. Because this Court preliminarily enjoined the Non-Citizen Ban, no available data would permit Plaintiffs' expert Dr. Smith to examine the extent of the impact that the law would have on voter

registration rates.[7] But if the new restrictions on 3PVROs were to take effect, experts for both parties agree that at least *some* voters would not register to vote as a result.[8] Moreover, the only evidence cited by any expert in the case about the impact of 3PVRO regulations on voter registration is "The Effects of House Bill 1355 on Voter Registration in Florida," a paper co-authored and published by Daniel A. Smith (Hispanic Federation Plaintiffs' expert witness) and Michael C. Herron (NAACP Plaintiffs' expert witness). ECF 125-15 (Ex. 5 to Stein Dep.). Defendants' expert Dr. Stein testified that he didn't disagree with any of that report's findings, including

---

[7] This was the subject of Defendants' experts' only empirical critique about Dr. Smith's report: that he failed to account for empirical evidence that Dr. Stein and Dr. Alford admitted "could not be evaluated" prior to enforcement of the Non-Citizen Ban. ECF 125-3 at 105:2-9; *see also* ECF 125-4 at 207:5-208:21 (admitting that no graph could show "the result of the law being implemented if the law hasn't been implemented"). To "show that SB 7050 has an actual demonstrated disparate impact in the way" that Defendants' experts propose, "[t]wo empirical conditions need to be shown": that "the difference between the proportion of non-white and white citizen voting age persons who registered to vote and registered to vote by third parties was significantly lower after the adoption of 7050 than before its adoption and implementation," and that any disproportionate "decline in the proportion of non-white citizen voting age persons who registered to vote by a third party" was not "offset by an increase in non-white citizen voting age persons registering to vote by another mode of voter registration." ECF 125-3 at 99:11-100:22. To establish both empirical conditions, "it's important to have a baseline before and after" the law was implemented. *Id.* 101:11-102:4. But because SB 7050's citizenship requirement "has not yet been enforced," that provision "could not be evaluated" based on the before-and-after baseline suggested by Defendants' experts. *Id.* 102:14-105:10.

[8] ECF 125-3 at 300:11-17 ("Q: Do you agree that it's possible that there will be a set of voters who do not register to vote at all now that 3PVROs face additional regulations under SB 7050? A: Absolutely I think it's possible, yes. **There will be some voters who will not register to vote, yes.**") (emphasis added).

that after HB 1355 took effect, registration rates went down for Black, Hispanic, and white voters, and that the drop in Black voters' registrations were "particularly pronounced" and "statistically significant." ECF 125-15 at 298-299; ECF 125-3 at 301:15-304:8, 331:21-333:8. That is, the actual effect of the law on registration rates was negative, consistent with its predicted effect.[9]

*Fifth*, if the Non-Citizen Ban takes effect, none of the Individual Plaintiffs would be legally permitted to continue collecting and handling voter registration applications, which would prevent them from working the jobs they held before the Non-Citizen Ban's enactment. ECF 66-1 ¶¶ 18-25; ECF 66-2 ¶¶ 17-23; ECF 66-3 ¶¶ 21-26. In fact, the Non-Citizen Ban has already imposed personal and professional consequences on the Individual Plaintiffs, both because their employer acted in the summer of 2023 to comply with the Non-Citizen Ban and because their employer ultimately stopped voter registration work after it passed. ECF 125-16 (Martínez Dep.) at 31:21-32:3, 76:22-77:4; ECF 125-18 (Herrera-Lucha Dep.) at

---

[9] None of the papers that Defendants' experts cited to support their conclusions about the perverse, unexpected effects of some election laws studied 3PVROs or voter registration laws. ECF 125-3 at 164:1-9, 176:21-177:3 ("I don't think there's a single citation here dealing with voter registration laws."). Indeed, to the extent the papers cited in Defendants' expert report mentioned voter registration rules, they indicated that registration rules operate differently (and more predictably) than other election rules: specifically, in contrast to the early-voting laws and voter-ID requirements described in Defendants' expert report, registration rules "do have positive effects on turnout," including "significant and positive effects." *Id.* 161:17-163:11; 183:3-184:21 (acknowledging that paper cited in Defendants' expert report contrasts participation effects of voter registration laws with effects of voter ID laws).

70:8-15; ECF 125-17 (Pico Dep.) at 16:25-17:2, 30:2-5. This has impacted each of their employment in distinct ways.

Ms. Martínez testified that her 3PVRO employer's preparations to comply with the Non-Citizen Ban kept her "from earning … a single dollar . . . for longer than a month." ECF 125-16 at 76:22-77:4. In that way, the statute "affected [her] financially at home because during that period of time, [she] wasn't making money. And also [her] family in Venezuela, the family that [she] help[s], they were also affected." *Id.* 77:4-8. Because her employer subsequently stopped doing voter registration work after S.B. 7050 passed, Plaintiff Martínez is no longer employed in a paid staff position as a canvasser. *Id.* 31:21-32:3. She would return to that employer if she had the opportunity to do voter registration work there again. *Id.*; *see also id.* 38:16-39:7.

Plaintiffs Herrera-Lucha and Pico still work for the same employer, but both have been deprived of conducting meaningful voter-registration work that helps ensure their communities receive adequate representation. ECF 66-1 ¶¶ 24-25; ECF 66-3 ¶¶ 21, 25-26; ECF 125-18 at 70:8-15; ECF 125-17 at 16:25-17:2, 30:2-5. For example, Plaintiff Herrera-Lucha is currently employed as the Florida State Field Director for Mi Vecino, and before passage of the Non-Citizen Ban, she oversaw that organization's voter registration activities. ECF 66-1 ¶¶ 8-10. She spent years training and preparing to do this work, and she was able to serve her community by increasing the number of registered eligible voters, including U.S. citizen, vote-

eligible former residents of Puerto Rico who moved to Florida after Hurricane Maria and had not yet registered to vote. *Id.* ¶ 25; ECF 125-18 at 91:18-92:24. Following the passage of the Non-Citizen Ban, her employer stopped conducting voter registration activities, depriving Ms. Herrera-Lucha of the opportunity to do the work that she had "prepared professionally to do" and that she found most "rewarding." ECF 125-18 at 91:18-92:24; *see also* ECF 125-17 at 16:25-17:2, 30:2-5.

## ARGUMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Shotz v. City of Plantation*, 344 F.3d 1161, 1166 (11th Cir. 2003). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

After discovery, Defendants cannot point to any disputed facts that would so affect the outcome of the case. Summary judgment on Plaintiffs' claim that the Non-Citizen Ban violates the Equal Protection Clause is proper.

## I. Plaintiffs Are Entitled to Summary Judgment on Their Equal Protection Claim.

The Non-Citizen Ban unlawfully discriminates against Plaintiffs based on citizenship status, in violation of the Equal Protection Clause.

## A.    The Equal Protection Clause Demands that the Court Apply Strict Scrutiny to the Non-Citizen Ban.

The Fourteenth Amendment protects all persons within the United States from denial of "the equal protection of the laws." U.S. Const. amend. XIV § 1. It applies to all aliens. *See Plyler v. Doe*, 457 U.S. 202, 215 (1982) ("[T]he protection . . . extends to anyone, citizen or stranger, who *is* subject to the laws of a State[.]"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (noting Equal Protection Clause is "universal in [its] application, to all persons . . . without regard to [] differences of race, of color, or of nationality").

Certain Supreme Court-defined classifications are "suspect and subject to heightened scrutiny under the Equal Protection Clause." *Doe v. Moore*, 410 F.3d 1337, 1346 (11th Cir. 2005). That includes classifications based on alienage. *Id.* Because "[a]liens as a class are a prime example of a 'discrete and insular' minority," the Court has long held that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

Laws that facially discriminate on the basis of alienage, like the Non-Citizen Ban, are evaluated under strict scrutiny. "Alienage classifications by a State that do not withstand th[at] stringent examination cannot stand." *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *see also Bernal v. Fainter*, 467 U.S. 216, 219 (1984). And to meet that standard, the State must "show that its purpose . . . is both constitutionally

permissible and substantial, and that its . . . classification is 'necessary . . . to the accomplishment' of its . . . interest.'" *In re Griffiths*, 413 U.S. 717, 721-22 (1973).

Strict scrutiny thus "confine[s]" the "power of a state to apply its laws exclusively to its alien inhabitants *as a class* . . . within narrow limits" of which courts make few exceptions. *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948) (emphasis added). Defendants do not come close to meeting that most-exacting standard.

### B.  Defendants Have Failed to Put Forth a Compelling Interest to Justify the State's Blanket-Alienage Classification.

Defendants have not offered a compelling state interest to justify barring non-citizens as a class from handling and collecting voter registration forms. During legislative debate, the bill's sponsors cited "protecting [] sensitive information" on completed registration forms as the Law's rationale; they also voiced their view "that there are certain rights in our country that only citizens get to enjoy," and stressed that the bill was meant to ensure that "illegal[s]" didn't handle voter registration applications. *See supra*, Statement of Facts § II.B.1. Those suppositions were the extent of any alleged justification for the provision: the legislative record contained no evidence showing that all non-citizens—even lawful permanent residents—are untrustworthy. Nor did it have evidence suggesting the State's concerns about 3PVROs are particularly attributable to their non-citizen staff and volunteers, or that

the Non-Citizen Ban is narrowly tailored to address any such risk. Nor has any evidence to support these propositions come to light in discovery.

The Secretary of State has proposed additional *post-hoc* rationales that purportedly support the passage of the Non-Citizen Ban, including preventing voter fraud, ensuring the timely submission of voter registration applications, and safeguarding election integrity, uniformity, and efficiency. *Supra* Statement of Facts, § II.B.2. But under strict (or even intermediate) scrutiny, the justification for the classification "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189-90 (2017) (looking to "the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not").

Those *post-hoc* rationales should be disregarded. But even had the Legislature considered any of these rationales, there are no facts in the summary-judgment record to suggest that any of them meet the mark. Defendants could not identify even a single instance in which a non-citizen engaged in registration fraud, submitted a late application, or otherwise undermined election integrity or efficiency while working on behalf of a 3PVRO. *See supra*, Statement of Facts § II.B. That lack of any factual support underpinning the purported state interests for the Non-Citizen Ban is consistent with many of Florida's other laws regulating election workers, which do *not* restrict participation based on citizenship. *See* ECF 125-1 at 48:8-15;

ECF 125-10 at 299:19-300:9; ECF 125-11 at 131:3-8, 135:23-136:17. "Without a factual underpinning," the Secretary's asserted concerns about the timely delivery of voter registration applications, preventing fraud, and promoting election integrity "lack[] the weight [the Supreme Court] has required of interests properly denominated as compelling." *Bernal*, 467 U.S. at 228.

Finally, the Secretary's office strains reason by contending that the fact that non-citizens cannot vote means they "really don't have much stake in the election at all" and can therefore be excluded from assisting eligible voters to register. ECF 125-10 at 77:6-7. Indeed, the very reason that the Supreme Court affords "heightened judicial solicitude" to classifications based on alienage is that non-citizens who are "lawfully residing in this society" and contributing to our "nation of immigrants" have "no direct voice in the political processes." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). That lack of a direct voice is not a reason to support discrimination against non-citizens; it is a reason to be protective *against* such discrimination.

## C. Even if Defendants Had Asserted a Compelling Interest, The Non-Citizen Ban is Not Narrowly Tailored.

Even if Defendants had established a factual basis for needing to protect Florida's electorate from non-citizens mishandling voter registration forms, their ban on all non-citizens is in no way tailored to address that interest. *See Bernal*, 467 U.S. at 219 (challenged law must "advance a compelling [] interest" by the "least

restrictive means available"). The record establishes that the Non-Citizen Ban is not tailored in any way (much less narrowly) to advance the State's purported interests.

Defendants have presented no evidence to dispute that the Non-Citizen Ban is not the least restrictive means to advance their claimed interest. As the Court found in its Preliminary Injunction Order, "along with the citizenship requirement, Florida also enacted higher fines for late submissions" and these penalties are "certainly less restrictive than banning an entire class of people from collecting or handling voter registration applications." ECF 68 at 36; *see also Meyer v. Grant*, 486 U.S. 414, 426-27 (1988) (state failed to show challenged procedures were necessary where pre-existing procedures were "adequate to the task of minimizing the risk of improper conduct"). That still holds true, and no facts gleaned in discovery undermine that finding. *See, e.g.*, ECF 122-1 (Secretary's declarant stating the same generic interests discussed *supra*, Statement of Facts § II.B.2, but without any attempt to describe how the Non-Citizen Ban is tailored to those interests or why those interests could not be advanced by narrower restrictions). Indeed, in addition to these fines at the Secretary's disposal, OAG acknowledged that it had a panoply of existing tools to punish various types of misconduct by 3PVROs and employees, ECF 125-12 at 151:12-152:9, further demonstrating that a blanket ban on an entire class of people is not the least restrictive means to advance any state interest in election integrity.

Separately, Defendants cannot dispute that the "employees of several state agencies are also responsible for handling completed voter registration applications,

and the State . . . has not decided to exclude all noncitizens from these positions." ECF 68 at 32 (citing Fla. Stat. §§ 448.09, 97.053(1)). Defendants' admissions and the legislative record establish that Florida vests noncitizens with authority to handle personal information, including the *same information* on voter registration applications, through positions at other state agencies: Florida's Division of Elections, Supervisor of Elections offices, Elections Commissions, and Department of Highway Safety and Motor Vehicles, to name a few. Fla. Stat. §§ 97.0525, 97.057; *see also* ECF 125-1 at 48:8-15; ECF 125-9 at 29:18-30:5; ECF 125-10 at 299:19-300:9; ECF 125-11 at 131:3-8, 135:23-136:17. Permanent residents may also apply and be appointed as a notary public, a position that also involves handling signatures and other personal information. Fla. Stat. § 117.01(1). That is, the law specifies "only one particular post with respect to which the State asserts a right to exclude aliens," while allowing non-citizens to perform similar functions in other offices. *Bernal*, 467 U.S. at 222. Such underinclusivity "tends to undercut the [] claim that the classification serves legitimate political ends." *Bernal*, 467 U.S. at 221.

### D.   The Political-Function Exception Cannot Save the Non-Citizen Ban.

In litigation, Defendants have incorrectly argued that their blanket-alienage classification can be saved by application of the "narrow political-function exception" to strict scrutiny. *Bernal*, 467 U.S. at 221. That limited exception goes to "the authority of the people of the States to determine the qualification of their most

important government officials." *Gregory v. Ashcroft*, 501 U.S 452, 463 (1991). Under this exception, the blanket exclusion of non-citizens from some functions is *not* subject to strict scrutiny so long as the classification: (1) is "sufficiently tailored," such that it is not overinclusive nor underinclusive, and (2) applies "only to 'persons holding state elective or important nonelective executive, legislative, and judicial positions'"—that is, only to "officers who 'participate directly in the formulation, execution, or review of broad public policy." *Bernal*, 467 at 221-22 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 440 (1982)) (citations omitted).

At a minimum, on the first prong, the Non-Citizen Ban is "fatally underinclusive," for the very reasons described above: many other positions that are more integral to election integrity, including supervisory positions within Florida's own Division of Elections, can be held by non-citizens. ECF 125-1 at 48:8-15; ECF 125-10 at 299:19-300:9; ECF 125-11 at 131:3-8, 135:23-136:17.

As to the second prong, the Supreme Court has explained that even if a classification like the Non-Citizen Ban is "sufficiently tailored," the political-function exception "may be applied . . . only to . . . officers who 'participate directly in the formulation, execution, or review of broad public policy.'" *Cabell*, 454 U.S. at 440 (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). Accordingly, the number of functions that the Supreme Court has said fall under this exception is small. Police officers meet the exemption, because they exercise "an almost infinite variety of discretionary powers" that "affect[] members of the public significantly,

and often in the most sensitive areas of daily life." *Foley*, 435 U.S. at 297. Likewise, probation officers exert the state's "sovereign coercive powers" and meet the political-function exemption. *Cabell*, 454 U.S. at 459; *see also id.* at 444. And public school teachers, who are in "direct, day-to-day contact with students" and "by necessity have wide discretion [to] influence the attitudes of students toward government, the political process, and a citizen's social responsibilities," do as well. *Ambach*, 441 U.S. at 78.[10]

On the other hand, in *Bernal*, the Supreme Court underscored that the political-function exception "must be narrowly construed; otherwise the exception will swallow the rule[.]" 467 U.S. at 222 n.7. *Bernal* concluded that Texas's flat ban of all non-citizens from the role of notary public did not come under the political-function exception, because notaries do not "'perform functions that go to the heart of representative government.'" *Id.* at 222 (citation omitted); *see also id.* at 224-27. Despite the "critical need for a notary's duties to be carried out correctly and with integrity,"[11] the Court explained, a notary's responsibilities are "clerical and

---

[10] A precedential Fifth Circuit decision similarly upheld a prohibition restricting non-citizens from serving on the board of directors of a public-private agency, citing members' ability to "exercise discretion" to "design and carry out [policy] programs" as they saw fit. *Cervantes v. Guerra*, 651 F.2d 974, 981 (5th Cir. 1981).

[11] The notarial duties the Court highlighted in *Bernal* were extensive, and surely closer than Plaintiffs' voter registration activities to the "formulation or execution of public policies importantly affecting the citizen population." 467 U.S. at 224. Texas notaries, *Bernal* explained, had "the power to acknowledge instruments such as wills and deeds and leases and mortgages; to take out-of-court depositions; to administer oaths; and the discretion to refuse to perform any of [those] acts." *Id.*

ministerial"—not comparable to those of officers clothed with "the State's monopoly of legitimate coercive force," (*e.g.*, police officers) or "wide discretion" (*e.g.*, public school teachers). *Id.* at 225.

The Non-Citizen Ban is no different. Like membership to the state bar (*Griffiths*) or appointment as a notary (*Bernal*), collecting and handling voter registration forms does not provide someone with "broad discretionary power over the formulation or execution of public policies importantly affecting the citizen population." *Id*. at 223-25. Rather, 3PVRO employees perform tasks that "hardly implicate [] responsibilities that go to the heart of representative government." *Id.* at 225. They are in no way "clothed with authority to exercise [] almost infinite [] discretionary powers . . . involving the most sensitive areas of daily life." *Id.* at 220 (quoting *Foley*, 435 U.S. at 297). Nor does the act of collecting or handling a voter registration application require discretion "that places [a canvasser] in a position of direct authority over other individuals." *Id*.

3PVRO employees and volunteers do not exercise any form of discretionary power akin to designing policy programs or exercising coercive force. Non-citizens who collect and handle voter registration forms are private actors managed by 3PVROs. They are subject to strict regulation and oversight by the state. They perform the ministerial tasks of providing eligible citizens with state-prescribed forms, helping eligible citizens correctly complete those state-prescribed forms, and returning those forms to state actors on a tight, state-mandated timeline.

## CONCLUSION

Plaintiffs respectfully request that this Court grant summary judgment on their claim that Section 97.0575(1)(f) of the Florida Statutes violates the Equal Protection Clause of the Fourteenth Amendment.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 7,966 words.

Dated: January 23, 2024

Respectfully submitted,

/s/ Megan C. Keenan
Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
523 West Colonial Drive
Orlando, FL 32804
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org
dalicea@latinojustice.org

Megan C. Keenan*
Adriel I. Cepeda Derieux*
**American Civil Liberties Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
acepedaderieux@aclu.org
mkeenan@aclu.org

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Estee M. Konor*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301

John A. Freedman*
Jeremy Karpatkin*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

*\* Admitted Pro Hac Vice*

(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

*Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico*