```
                        11th Circuit
                     Atlanta, Georgia


Florida State Conference of
Branches & Youth Units of the
NAACP, Voters of Tomorrow Action,
Inc., Disability Rights Florida,
Alianza for Progress, Alianza
Center, et al.,

vs.                              Case No. 23-12308
                                 Lower Tribunal Case No:
                                 4:23-cv-215 (NDFL)


Florida Secretary of State, et al.
Consolidated with:
Hispanic Federation, et al.,

vs.                              Case No.: 23-12313
                                 Lower Tribunal Case No:
                                 4:23-cv-218 (NDFL)


Florida Secretary of State, et al.
_____/
```

**TRANSCRIPTION OF PROCEEDINGS**

Oral Argument

Before:  Honorable Charles R. Wilson
         Honorable Britt C. Grant
         Honorable Barbara Lagoa



PAGES 1 - 64




Stenographically Transcribed Remotely By:

TRACY BROWN

1    **APPEARANCES:**

2

3    For the Florida Secretary of State:

4    Mohammad O. Jazil, Esquire
     Holtzman Vogel Baran Torchinsky & Josefiak PLLC
5    119 S. Monroe Street, Suite 500
     Tallahassee, Florida 32301

6

7    For NAACP Group, Plaintiffs:

8    Abha Khanna, Esquire
     Elias Law Group LLP
9    1700 Seventh Ave., Suite 2100
     Seattle, Washington 98101
10   (206) 656-0177

11   For Hispanic Federation Group, Plaintiffs:

12   Adriel I. Cepeda Derieux, Esquire
     American Civil Liberties Union Foundation
13   125 Broad Street, 18th Floor
     New York, New York 10004
14   (212) 549-2500

15   For League of Women Voters (Amicus):

16   Brent Ferguson, Esquire
     Campaign Legal Center
17   1101 14th Street NW, Suite 400
     Washington, D.C. 20005
18   (202)736-2200

19

20

21

22   CERTIFICATE OF REPORTER                              64

23

24

25

1    Thereupon,

2         **JUDGE WILSON:**  The next case is the

3    Florida State Conference Branches versus the

4    Florida Secretary of State.  The League of

5    Women Voters of Florida is here as amicus.

6    Mohammed O. Jazil is here for the appellant,

7    the Florida Secretary of State.  Adriel Cepeda

8    Derieux is here for the appellees, Florida

9    State Conference of Branches, along with Abha

10   Khanna.  And Robert B. Ferguson is for the

11   amicus.

12        And, Mr. Jazil, you may begin your

13   argument.

14        **MR. JAZIL:**  Thank you, Your Honor.  May it

15   please the Court, Mohammad O. Jazil for the

16   Florida Secretary of State and the Attorney

17   General.

18        Your Honor, 3PVROs are one of the many

19   ways by which Florida voters can register to

20   vote.  3PVROs in common parlance are the folks

21   who are out in the community as canvassers with

22   a clipboard and a registration form trying to

23   get people to register to vote.

24        Now Florida's experience has been that

25   there are some problems with 3PVROs.  In 2022

4

1       alone, three thousand -- 3,077 voter

2       registration forms were untimely delivered.  In

3       the report that the Florida Secretary of

4       State's Office shared with the legislature in

5       2022, there were third-party voter registration

6       groups who were committing fraud.  They were

7       hiring felons without appropriate checks,

8       et cetera.

9            So the Florida legislature, in response,

10      passed a series of reforms directed at

11      third-party voter registration groups.  Two of

12      those reforms are the subject of this appeal in

13      a preliminary injunction context.  It's the

14      requirement that folks who are collecting

15      third-party voter registration forms for 3PDROs

16      be citizens of the United States.  And second

17      issue concerns what information can be retained

18      from the forms.

19           The first issue is an equal protection

20      issue.  The second one is in the vagueness

21      context.

22           Your Honors, on the citizenship provision,

23      the State's argument is this, that when we're

24      looking at citizenship, it's sui generis.  When

25      we're looking at the equal protection analysis

1        in a facial constitutional challenge context,

2        alienage is unlike race, alienage is unlike

3        religion, alienage is unlike natural origin.

4        Whereas with race, if you're white or black,

5        strict scrutiny applies.  National origin,

6        Irish, Italians, strict scrutiny applies.  With

7        race, the level of scrutiny varies depending on

8        the kind of alien that you are.

9            So for legal permanent residents, strict

10       scrutiny applies.  For everyone else, rational

11       basis is the appropriate test.  And so --

12       **JUDGE GRANT:**  Are you conceding that this

13       rule is invalid for legal permanent residents?

14       **MR. JAZIL:**  I'm not, Your Honor.  I'm not

15       conceding that.  I'm saying that for everyone

16       but the legal permanent resident, rational

17       basis should apply.  And for the legal

18       permanent residents, there's political function

19       exception based on supreme court case law.  And

20       here, what we're contending for the legal

21       permanent residents, the political function

22       exception would apply which then in itself

23       triggers rational basis review.

24           And the political function exception, Your

25       Honor, if we look at the conciliation of our

1    alienage cases, you've got Yick Wo, which is --

2        **JUDGE WILSON:**  What's the origin of this

3    argument?  Because the way I read the statute,

4    the statute itself doesn't make any distinction

5    between lawful and unlawful citizens.

6        **MR. JAZIL:**  Your Honor, it's inherent in

7    the word "citizen."  When you have the word

8    "citizen," included within that word are all

9    the various classes of citizens.  So if, for

10    example, we have a law that says black school

11    children can't use a water fountain, there,

12    you've got a very specific designation that's

13    based on race.  And we know that strict

14    scrutiny applies --

15        **JUDGE WILSON:**  And what's your authority

16    for that, for this bifurcated approach?

17        **MR. JAZIL:**  Your Honor, there is no

18    authority one way or the other on this

19    bifurcated approach for alienage.  My point is

20    this, that the alienage cases make sense and

21    you have to consider in a facial context, the

22    word "citizen" to include all the subclasses of

23    different --

24        **JUDGE LAGOA:**  Well, I guess the -- I guess

25    what Judge Wilson is trying to ask is, there is

```
 1        not a supreme court case that addresses a

 2        classification where it involves both

 3        noncitizens who are here lawfully and

 4        noncitizens who are here unlawfully.

 5            MR. JAZIL:  That's correct, Your Honor.

 6            JUDGE LAGOA:  So the way I understand the

 7        alienage cases is from Graham on is that

 8        they're alienage cases that deal with

 9        noncitizens who are in the country lawfully,

10        that they're lawful permanent residents or they

11        have some kind of VISA, but they normally --

12        that's why they have the strict scrutiny

13        analysis.

14            MR. JAZIL:  Yes, Your Honor.  And I think

15        the key point there is when we look at these

16        cases, it's legal permanent residents who are

17        bringing them.  It's legal permanent residents

18        who are challenging them.  And these cases

19        exist -- the most recent one is 1984, Bernal,

20        three years before Salerno, before we started

21        carving out a clear distinction between facial

22        and as-applied challenges.  And these cases

23        make sense if you consider them as as-applied

24        challenges that are being filed by legal

25        permanent residents.
```

1          Cabell, which is a 1982 case, there was a

2     certified class of legal permanent residents.

3          **JUDGE LAGOA:**  So here what we're talking

4     about is solely a facial constitutional

5     challenge, right?

6          **MR. JAZIL:**  Yes, Your Honor.

7          **JUDGE LAGOA:**  They're not -- it's not an

8     as-applied.

9          **MR. JAZIL:**  It is not an as-applied

10    challenge.

11         **JUDGE LAGOA:**  And so my understanding now

12    is that under, at least I think Scotis

13    (phonetic) at this point has really clarified

14    that there's a strict standard for facial

15    constitutional challenges.

16         **MR. JAZIL:**  Precisely, Your Honor.

17         **JUDGE LAGOA:**  And that's Salerno.

18         **MR. JAZIL:**  Yes, sir (sic).

19         **JUDGE LAGOA:**  And so I guess the question

20    is do we apply Salerno -- does it apply even

21    though you have citizens -- noncitizens who are

22    here -- so you do have two different standards

23    of review.

24         **MR. JAZIL:**  Your Honor, so if we're using

25    Salerno as the framework and we're assessing

1    this as a facial challenge, it's not brought by

2    legal permanent residents as an as-applied

3    class unlike Cabell, for example.  And we're

4    trying to figure out, okay, in this facial

5    challenge, who's the in-group, who's the

6    out-group?  The in-group is US Citizens.  The

7    out-group is noncitizens.  The out-group, the

8    noncitizen group is then by definition, based

9    on the US Supreme Court case law, divided into

10   different subcategories.  For legal permanent

11   residents, strict scrutiny applies.  For

12   everyone else, rational basis applies.

13        So if we're going through a Salerno

14   analysis, then the question becomes, okay, for

15   the out-group, what level of scrutiny should we

16   apply.  And --

17        **JUDGE LAGOA:**  But does -- I guess the

18   question is:  Does it -- does it matter what

19   the level of scrutiny is?  Because don't you

20   have to -- to survive Salerno, the Salerno

21   challenge -- constitutional test, you have to

22   meet every set of circumstances in order for

23   the facial challenge to prevail.

24        **MR. JAZIL:**  Yes, Your Honor.  And so for

25   the plaintiffs to then prevail based on that

```
 1       test, they have to show that the statute would
 2       be unconstitutional when applied to the
 3       temporary worker, the illegal alien, et cetera.
 4       And they can't do that.
 5            JUDGE GRANT:  I think that's a very
 6       reasonable argument based on Salerno.  But the
 7       problem is, it seems like we've already
 8       addressed that in Club Madonna.  And I didn't
 9       see in your briefs where you really dealt with
10       the problem for you presented by Club Madonna.
11            MR. JAZIL:  Thank you, Your Honor.  And
12       I'd like to do that.
13            Club Madonna should be viewed together
14       with the other cases that Club Madonna cites.
15       Club Madonna cites, for example, the DOAH case
16       in the Tenth Circuit.  Club Madonna does not
17       cite Patel, but it's cited in my friend's
18       papers.  And I think what Club Madonna is
19       saying is that when you're looking at a facial
20       challenge and you're assessing whether or not
21       the defendant is trying to put forward a
22       hypothetical, the hypothetical must be relevant
23       to the prohibition that's being applied.
24            In Club Madonna, the argument that was
25       being made by the local government was that,
```

1    hey, our provision concerning the need to check

2    the immigration status of your independent

3    contractors is not relevant because the club

4    has employees.  And the -- I think the way that

5    Club Madonna should be read is the way Patel,

6    Justice Sotomayor described the distinction is

7    the provision that's at issue is not concerned

8    employees.  So having a hypothetical that does

9    not fall within the ambit of the ordinance

10   doesn't make sense.

11       And I think the example is clear if we

12   consider the facts of Patel.  In Patel, it was

13   the City of Los Angeles saying that police

14   officers can go ahead and look at the

15   information for anyone staying at a motel.  And

16   the City defended by say, whoa, look, that's

17   not a problem.  Because in instances where

18   there's a search warrant, not at issue.

19   Perfectly fine.  In instances where the motel

20   consents, not at issue.  Perfectly fine.  And

21   Justice Sotomayor writing for the court said,

22   well, that's a hypothetical.  That's irrelevant

23   to the analysis because the person with the

24   search warrant doesn't fall within its ambit.

25   The person who has consented doesn't fall

1       within its ambit.

2              And so that, to me, is how you look at

3       Club Madonna, Patel, and --

4              **JUDGE GRANT:**  If your statute had separate

5       provisions for legally present immigrants or

6       people and illegally present people, then I

7       think that might be closer.  But the law

8       doesn't distinguish between the two.

9              And I have a little bit of trouble

10      understanding your argument.  Maybe you can

11      help me.  If you say that even the LPR group of

12      people satisfies strict scrutiny because of the

13      public function exception, then why didn't you

14      just rely on that?

15             **MR. JAZIL:**  Your Honor, I'm making a

16      two-part argument.  The public function

17      exception for -- and we've said this in our

18      brief.  It's difficult to sometimes reconcile

19      all the public function cases.  The public

20      function cases -- I might lose on that issue

21      which is why I'm pushing the Salerno argument

22      as well because this is, at its core, a facial

23      challenge.

24             **JUDGE GRANT:**  Are you saying that we --

25      are you wanting us to say because the law would

```
1          be upheld for LPRs -- for illegal immigrants,
2          that we should also uphold it for LPRs?  I'm
3          not sure what relief you're seeking.
4              MR. JAZIL:  Your Honor, the Court can do
5          two things.  The Court can say, look, the law
6          covers within this ambit all kinds of
7          noncitizens, from the illegal alien to the
8          legal permanent resident.  But we know that
9          even for the legal permanent resident, the
10         public -- the political function exception
11         applies, so rational basis the appropriate test
12         and the state prevails.  If the Court concludes
13         that the political function exception does not
14         apply for the legal permanent residents, what
15         the Court can do is say that for everyone but
16         the legal permanent resident, rational basis
17         applies is met.  For the legal permanent
18         residents, the Court can construe their
19         challenges, an as-applied challenge brought by
20         the named legal permanent residents.  Strict
21         scrutiny applies.  The political function
22         exception does not.  And the State loses with
23         respect to the legal permanent residents.
24              So, Your Honor, there's --
25              JUDGE WILSON:  That's a pretty novel
```

14

1        argument.  The problem is that there's no real

2        authority that I see anywhere for the

3        application of such a bifurcated approach.

4             **MR. JAZIL:**  With respect, Your Honor, the

5        authority for the bifurcated approach is

6        inherent in the cases that talk about the

7        political function exception.  Because in every

8        one of those instances, it was a legal

9        permanent resident who was bringing the action.

10            I'd ask the Court to consider this, if in

11       those cases an illegal alien had been the

12       challenger, how would those cases have turned

13       out?  The political function exception --

14            **JUDGE LAGOA:**  Right.  But then if you have

15       an as-applied challenge by someone who's

16       unlawfully in the country, they're not going to

17       prevail.

18            **MR. JAZIL:**  Exactly.  Or if you have an

19       as-applied challenge from a temporary worker

20       who has temporary work authorization, for that

21       person rational basis would still apply and

22       they wouldn't prevail.

23            **JUDGE GRANT:**  What rationales did you

24       offer us for applying the political function

25       exception?

1          **MR. JAZIL:**  Sure, Your Honor.

2          For the political function exception,

3     there is a two-part case that's discussed in

4     the cases.  It's not exhaustive, as we say.

5     And so the argument we make for the political

6     function exception applying is this is a

7     targeted provision, so it's not overinclusive

8     or underinclusive.  Let's focus on third-party

9     voter registration groups.  And for this

10    targeted provision, it goes to something that

11    is critical to the election administration

12    process, elections being critical to the

13    functioning of a representative democracy.

14    This is the language from some of the cases,

15    Your Honor.  And so the political function

16    exception should apply.

17          The argument boils down to this, 3PVROs

18    are fiduciaries of the voter.  They're

19    extensions of the elections officials who help

20    people register to vote.  So the 3PVROs are

21    doing an inherently political function.  They

22    are unlike, for example, the Japanese fishermen

23    who were excluded from fishing three miles off

24    the coast of California shortly after World

25    War II.  They are unlike the laundrymen and

```
1        women in Yick Wo who were pursuing an economic
2        interest.  They're unlike notaries even.
3        Notaries, the alpha and omega for a notary is
4        not to do something that furthers the
5        sovereigns election administration process.
6        Notaries do all kinds of things.
7             3PVROs, the alpha and the omega.  The only
8        thing that they are tasked with doing is taking
9        a form from a voter and giving it to the
10       appropriate elections official.  That's a
11       critical part of the election machinery.  And
12       so --
13            JUDGE GRANT:  For what it's worth, I think
14       that's a pretty good argument.  I don't know,
15       maybe I need to reread your briefs.  I found
16       your briefs a little thin on that point.  It
17       seemed to me that the main argument you were
18       making was that maybe people who are not
19       citizens would suddenly leave the country
20       before handing over the voter registration
21       documents.  That doesn't seem to quite carry
22       the day with me.  I didn't necessarily hear you
23       making these argument you're making now.  Where
24       did I miss those?
25            MR. JAZIL:  Your Honor, they're in the
```

1    papers.  I apologize for not making them in a

2    crisper way.  But the argument about the

3    fiduciary duties that these 3PVROs have is in

4    our initial briefs.  It's -- if you look at the

5    discussions of the Servontis (phonetic) case

6    from the former Fifth Circuit, we talk about

7    how the election administration function is

8    important and it's critical.  And that's in our

9    papers.

10        Yes, Your Honor.

11    **JUDGE WILSON:**  You're about out of time,

12    but this is an important case.  I'd like to

13    give you two more minutes to address the

14    retention provision.

15    **MR. JAZIL:**  Thank you, Your Honor.

16        And for the retention provision, we cite

17    in our briefs a link to the voter registration

18    form.  The voter registration form gives us the

19    ambit of the information that is being

20    exchanged from the voter, the purported

21    potential future vote to the 3PVROs.  And that

22    form says that all the information, your phone

23    number and email address that's provided become

24    public record except for the following:  The

25    Florida driver's license number, Florida ID

1      number and your Social Security number.  We

2      look at the statute that the Florida

3      legislature passed, it said you can retain --

4      pardon me.  That you cannot copy certain

5      information, which is the Florida driver's

6      license number, Florida ID number and the

7      Social Security number.

8          **JUDGE LAGOA:**  And just so, since I had to

9      submit a lot of documents in my time as an

10     official in Florida, that information, though,

11     because it is public, it's still uploaded but

12     it's blacked out, that information, is my

13     understanding of how that works.

14         **MR. JAZIL:**  Your Honor, it is not blacked

15     out for ordinary Floridians.  If you are a

16     judge, for example, or you're a prosecutor,

17     that information is blacked out for other

18     reasons.

19         **JUDGE LAGOA:**  So that information -- so if

20     someone wanted to see the registration

21     information of this individual, that

22     information would be available or it's not

23     available?

24         **MR. JAZIL:**  So, Your Honor, here's the

25     information that's available.  We've got the

1       voter registration form.  It's got the date of

2       birth.  The date of birth is available.  It's

3       got your Florida driver's license number,

4       Social Security number, that is not available.

5           **JUDGE GRANT:**  Okay.  Does it have your

6       mother's maiden name, too?  I mean --

7           **MR. JAZIL:**  It does not, Your Honor.  The

8       form is one page.  The back page is just the

9       addresses for the supervisors of elections.  So

10      the information, the entire universe of

11      information that is included and excluded

12      exists on one side of one piece of paper.  And

13      the Florida statute discusses which things are

14      actually excluded.

15          Now the arguments being made, we don't

16      know what information's excluded, we've got a

17      pretty good list.  And that list is not

18      exclusive because it's got the "such as"

19      showing that it's illustrative.  However, the

20      form, which can be changed through rule

21      making --

22          **JUDGE WILSON:**  Would the statute apply to

23      the mailman who delivers a ballot?

24          **MR. JAZIL:**  It would not apply to the

25      mailman who delivers the ballot.  And, Your

20

```
1     Honor, here's the distinction.  It does not
2     apply to the mailman.  It does not apply to the
3     person who is working in --
4          JUDGE WILSON:  It's clear from the
5     statute?
6          MR. JAZIL:  Yes, Your Honor, it is.
7     Because third-party voter registration
8     organizations is defined elsewhere in the
9     statute.  So the statute would not apply to the
10    postal service.  But, again, Your Honor, postal
11    services are government agencies.  The postal
12    service has its own police force.  3PVROs, we
13    have no oversight over.  We don't know who's
14    training them, how they're being trained, what
15    measures they have.  So it's appropriate to
16    make a distinction between --
17         JUDGE WILSON:  Supervisor and the --
18         MR. JAZIL:  Precisely, Your Honor.  We
19    have a rule, a security rule, for supervisors,
20    for other election administration officials.
21    The postal service has their own police force.
22    For 3PVROs, what do we have?  None of that.  So
23    I think it's appropriate to make a distinction
24    between 3PVROs and others.
25         JUDGE LAGOA:  And for the retention issue,
```

1    the challenge is a vagueness challenge?

2         **MR. JAZIL:**  It is a facial vagueness

3    challenge, yes, Your Honor.

4         **JUDGE WILSON:**  Resulting in criminal

5    penalties.  You can go to jail.

6         **MR. JAZIL:**  Yes, Your Honor, you can go to

7    jail.  But regardless of whether or not

8    criminal penalties are triggered, the test is

9    the same.  The question comes down to is there

10    an understandable core.

11         **JUDGE WILSON:**  We, of course, give less

12    tolerance to statutes carrying criminal

13    penalties if there's a constitutional

14    objection, don't we?

15         **MR. JAZIL:**  That is correct, Your Honor.

16    So I guess one way to consider this -- and,

17    Your Honor, I've lost track of time, but is

18    that --

19         **JUDGE WILSON:**  Answer the question.

20         **MR. JAZIL:**  Yes, Your Honor.  For criminal

21    penalties, we do look at the statutes harder

22    but the test is the same.  So the question

23    still comes down to is there an understandable

24    core.

25         **JUDGE WILSON:**  Got you.  Thank you.  All

1    right.

2        All right.  Mr. Cepeda Derieux.  Am I

3    pronouncing your last name correctly?

4        **MR. CEPEDA DERIEUX:**  Derieux, Your Honor.

5    Cepeda Derieux.

6        Good morning, Your Honors.  And may it

7    please the Court, Adriel Cepeda Derieux for the

8    Hispanic Federation Plaintiffs.  The plaintiffs

9    are splitting their time this morning.  As my

10   clients only bring the equal protection

11   challenge, I'll be speaking to that issue.  And

12   then I'll yield to Ms. Khanna.

13       Your Honors, the defendants ask this Court

14   to blaze a new trail.  And for the first time

15   ever, apply something less than strict scrutiny

16   to a blanket classification based on alienage.

17   But the law here is clear, as the panel just

18   said.  Categorical lines drawn on alienage are

19   inherently suspect.  That's from the Bernal

20   case.  And the supreme court has kept that line

21   each time it has considered a blanket

22   classification that targets alienage starting

23   with Takahashi.  But then through Graham,

24   through Nyquist, Sugarman.  Each of the laws at

25   issue in those cases facially discriminated

```
 1        against all aliens as a class without
 2        differentiation as the law here does.  And the
 3        court said that they were presumptively
 4        unconstitutional and struck them down in full
 5        without differentiation as to the aliens that
 6        could be subclassified under that blanket
 7        classification.
 8             The State, Mr. Jazil, cannot change that
 9        precedent.  Instead, the State looks to the
10        no-set-of-circumstances test or framework that
11        Salerno applies.  But, Judge Grant, you're
12        absolutely right, Judge Marcus' discussion for
13        the court in Club Madonna gives us the best way
14        to look at Salerno.  Salerno asks us to look at
15        the proper constitutional test, the
16        constitutional framework.  Once that test is
17        satisfied or once the Court is satisfied that
18        that is the applicable test, it applies it.
19        And here, that test is strict scrutiny.  Again,
20        those cases, Bernal, Nyquist, a line of at
21        least six cases --
22             JUDGE LAGOA:  But do you agree or not?  I
23        mean, I'm interested in hearing your answer.
24        Do you agree that strict scrutiny is not
25        applied if you consider a noncitizen who is
```

1        unlawfully in the country?

2            **MR. CEPEDA DERIEUX:**  Your Honor, the

3        supreme court has applied a lower tier of

4        scrutiny for undocumented noncitizens.  For

5        example, in the Plyer case.  But the first step

6        is always to look at the law.  Black Letter

7        equal protection law says you look at the

8        classification that the statute draws.  And

9        here, there is no subclassification between

10       undocumented noncitizens.  The law, as written,

11       divides between US Citizens and everyone else.

12           **JUDGE GRANT:**  What about the public

13       function exception, though?  Because it seems

14       that the cases where those laws are found to be

15       equal protection violations were cases where

16       noncitizens were being excluded for more, you

17       know, reason -- intending to exclude those

18       people because they were not citizens, rather

19       than intending to keep the political core

20       function limited to citizens.  I know it can

21       seem like a fine distinction, but I think it's

22       an important one.

23           And it seems to me that there might be

24       some tension in your argument that this is such

25       a -- these third-party voter registration

1        organizations are so crucial for our democracy

2        and crucial for voters and really important to

3        having the people be heard in our democratic

4        process but also there should be, you know,

5        nothing about the kind of political community

6        of citizenship in terms of who gets to be so

7        deeply involved in that process.  Can you sort

8        out that tension for me?

9            **MR. CEPEDA DERIEUX:**  Of course, Your

10       Honor.  And I agree, it's an important

11       distinction.  Things can be two things

12       sometimes.  The 3PVROs can be doing incredibly

13       important work for their communities and to

14       ensure that the voters of Florida are able to

15       register.  But the political function cases,

16       the political function cases are specific and

17       speak to the right of citizens to be governed

18       by other citizens.  They speak to control.

19       That is why it is a very narrow exception that

20       has only been applied by the supreme court in

21       cases like Foley, involving police officers

22       walking the beat.  In cases like Cable,

23       involving probation officers that have control

24       over whether someone is detained or not.  And

25       Ombach which related to public school teachers.

1   And --

2       **JUDGE GRANT:**  And do you think -- I don't

3   necessarily think that today you and your

4   organization would be likely to argue that LPRs

5   should not be able to be public school teachers

6   because that's too central to guiding our

7   children, right?  I mean, it seems that the

8   language of some of these cases maybe runs up

9   against some tension with what they actually

10  do.  I mean, I suspect that many states have

11  allowed a wide variety of people besides

12  citizens to serve as public school teachers.

13      **MR. CEPEDA DERIEUX:**  I would assume so,

14  Your Honor.  I don't know off the top of my

15  head and I would not be making --

16      **JUDGE GRANT:**  No reason -- there would be

17  no reason for you to look into that, but --

18      **MR. CEPEDA DERIEUX:**  But I would point the

19  Court to the very case that the defendants cite

20  for their argument.  The Servontis case from

21  the old Fifth Circuit here makes the point.

22  The exception is so narrow because the -- the

23  board in Servontis was a great example.  That

24  board had power to allocate between 5- to

25  $10 million in 1981, so we're talking over

1    $30 million in today's money, and the court in
2    Servontis said that that level of discretion
3    surpassed even that of a police officer or a
4    public school teacher.
5         So it, again, boils to the fact that the
6    political function exception is about
7    discretion.  It is about the rights to be
8    governed and controlled by other citizens, the
9    issues here are about coercive control in the
10   case of police officers and probation officers.
11        This case, Your Honors, is like Bernal.
12   The notaries at issue in Bernal handled very
13   sensitive matters and had discretion to even
14   refuse to take them on.  Notaries in Bernal had
15   discretion to refuse to notarize deeds, to
16   notarize mortgages, sensitive matters that
17   affect the daily lives of citizens much like
18   police officers, much like public school
19   teachers.  And the supreme court still said
20   that those roles were ministerial and clerical
21   because they were so highly regulated.  The
22   State has been adamant on this, 3PVROs are
23   highly regulated.  They are cogs in the
24   machine.  The State has called them in their
25   briefs.

1       **JUDGE GRANT:**  But notaries, I can't resist

2       asking if you are familiar with the Georgia

3       Hero three-year letterman who is often tweeting

4       about his notary status and how crucial it is.

5       Your face says no.

6           **MR. CEPEDA DERIEUX:**  I'm not familiar,

7       Your Honor.

8           **JUDGE GRANT:**  Anyway, he would definitely

9       agree that notaries are a crucial part of our

10      democracy.

11          **JUDGE LAGOA:**  But notaries have licenses,

12      correct?  I mean, they normally have -- are

13      regulated by -- the State of Florida has -- I'm

14      sure they're part of Department of Business

15      Regulation where they have a business license

16      and they can get their business license

17      suspended.  But here, I mean, if someone is --

18      how is it ministerial for someone to collect

19      registrations?  I mean, there's no -- there's

20      nothing in the state of Florida that says that

21      they regulate these individuals.

22          **MR. CEPEDA DERIEUX:**  Your Honor, I would

23      disagree.  I believe Mr. Jazil explained how

24      highly regulated 3PVROs are in the state of

25      Florida.  And the appellate record that they

1    have submitted has several violations that they

2    have assessed against or levied against 3PVROs.

3        The problem here is that none of those

4    violations go to the problem that they have

5    purportedly identified in saying that by

6    denying all noncitizens the chance to help

7    register other voters, they are somehow

8    furthering the purpose of having timely

9    delivered applications.

10       To borrow from Chief Judge Walker's

11   opinion, they have not married the two at all

12   whatsoever.  And because they have drawn a

13   classic alienage classification, we are in

14   strict scrutiny land and the State can -- just

15   can't meet that test.

16       I see my time is up, Your Honor.

17       **JUDGE WILSON:**  All right.  Thank you,

18   Counsel.

19       Ms. Khanna.

20       **MS. KHANNA:**  Thank you, Your Honors.  Good

21   morning.  May it please the Court, Abha Khanna

22   on behalf of the Florida NAACP Plaintiffs.

23       I'll be addressing both the provisions at

24   issue today.  But I'll quickly pick up where my

25   colleague left off on the political function

1      exception.  I understand the confusion but I

2      think that we can distill it down to a few key

3      factors as set forth very clearly in the Bernal

4      test.

5          In Bernal at page 226, the court raises

6      the same questions Your Honor has raised, Your

7      Honors have raised about, well, isn't this an

8      important exception?  Is this an important

9      function where failure can have really serious

10     consequences?  And what the court says is what

11     distinguishes personnel from those to whom the

12     political function exception applies is that

13     the latter are invested either with

14     policy-making responsibility, broad discretion

15     in the execution of public policy, or the

16     routine exercise of authority over individuals.

17        **JUDGE GRANT:**  But does Bernal really set

18     that up as a test or is that one of many things

19     that describe the exception in that case?  For

20     instance, I see the exception has -- that has

21     been labeled the political function exception

22     applies to laws that exclude aliens from

23     positions intimately related to the process of

24     democratic self-government.  Why isn't

25     registering voters intimately related to the

```
 1          process of democratic self-government?
 2             MS. KHANNA:  Bernal does establish it as a
 3          test.  It's a very clear two-factor test.  And
 4          when it uses that phrase, it uses it as a
 5          modifier for the broad discretion and
 6          policy-making authority that defines the
 7          function, that separates the function from
 8          other things.
 9             And here, the very language that my --
10          that my opposing counsel relied on to suggest
11          that the political function exception should
12          apply actually just says the opposite.
13          Defendants have conceded below that canvassers
14          are not vested with discretion and do not
15          engage in policy-making authority.  Those are
16          the two key portions of the Bernal
17          second-factor test.
18             And here in their brief before this Court,
19          they say, again, just as my colleague said
20          today, that the alpha and omega of a 3PVROs'
21          authority is to deliver a form from one place
22          to another.  That's it.  That is not
23          policy-making authority.  That is not broad
24          discretion.  And that has no authority over any
25          other individual.
```

1      **JUDGE GRANT:**  Then I'll go back to the

2      question I asked your friend at your table,

3      why -- if all it is is dropping things in the

4      mail, then why do your organizations conceive

5      of it as so crucial to the political process to

6      have this -- have this going on?

7      **MS. KHANNA:**  We believe that it is vital,

8      important work.  Is it crucial to the election

9      administration process?  No.  Is it important

10     to the First Amendment rights of our clients?

11     Yes.

12     **JUDGE GRANT:**  But is it vital to the

13     democratic process and political community in

14     our country?

15     **MS. KHANNA:**  I mean, I don't think it is a

16     sine qua non of election administration the way

17     other, you know, political functions would be.

18     This is something that our clients are

19     exercising, we believe, important rights in

20     performing an important service in a private

21     setting, in a private nonprofit setting that is

22     highly regulated.  They have to register with

23     the State of Florida.  And the State of Florida

24     has told them they have no discretion.  They've

25     got no policy-making authority.  They've got no

1        authority whatsoever.

2            **JUDGE WILSON:**  So they're not registering

3        voters, they're just collecting or handling

4        applications, is that my understanding?

5            **MS. KHANNA:**  I think by defendants'

6        concession, they viewed these -- this function

7        as basically a delivery mechanism.

8            **JUDGE LAGOA:**  Why --

9            **MS. KHANNA:**  Not as a political function.

10           **JUDGE LAGOA:**  But the form that they're

11       handing out is a voter registration form, no?

12           **MS. KHANNA:**  Yes, Your Honor.

13           **JUDGE LAGOA:**  Am I correct about that?

14           **MS. KHANNA:**  Absolutely.

15           **JUDGE LAGOA:**  It's not like just

16       collecting general information, it's a voter

17       registration form and then they're supposed to

18       turn that in to the secretary of state or

19       whoever the election official is in the area

20       that they're collecting the materials.

21           **MS. KHANNA:**  Yes.  And you're right, the

22       voter registration form is an important form.

23       Just like the things that notaries document

24       are -- can be highly important.  In fact,

25       notaries often document things that are related

1    to elections.  And in Bernal, the court
2    addressed this --
3        **JUDGE WILSON:**  But they're not
4    contributing anything that forms are -- they're
5    not -- they're just handling, collecting, and
6    sending it back to the supervisor of elections.
7    Is that all they're doing?
8        **MS. KHANNA:**  Exactly.  It's the function,
9    Your Honor.  The importance of the form, the
10   importance of the service is not --
11       **JUDGE LAGOA:**  -- don't have to sign?  They
12   don't have to sign and witness the form or do
13   anything like that?
14       **MS. KHANNA:**  I mean, they don't serve as
15   notaries to be sure.  And while the State makes
16   much of the fact that they serve as
17   fiduciaries, all that basically means is they
18   are -- it's important that the voter
19   registration form --
20       **JUDGE LAGOA:**  I saw a form in the record,
21   but I guess maybe that's just a timesheet
22   maybe.  Do you have like -- it looked like
23   there was a form where it had five hours and
24   then it had a number for the number forms
25   collected.

1          **MS. KHANNA:**  So certainly --

2          **JUDGE LAGOA:**  Maybe that must be like a

3     form that's individual to the organizations?

4          **MS. KHANNA:**  Yeah.  I think that's right,

5     Your Honor.  I think that they keep a number of

6     documents to make sure that they're tracking

7     who they've registered.  Precisely to defend

8     against potential alleged violations here.  But

9     that -- again, the importance of the form is

10    not the key factor.

11         In Bernal, the court said that the notary

12    function is extremely important.  I mean, if

13    we're talking about the -- you know, an

14    examining board on in other cases, the courts

15    have said that members of the State Bar, right,

16    these are -- I mean, a lawyer is as fiduciary

17    to a client like nothing else and these are

18    very important functions.  But the importance

19    of the function is not the same as saying it is

20    a political function exception.  That requires

21    policy-making, that requires broad discretion,

22    and it requires authority.

23         **JUDGE GRANT:**  But do you think teachers

24    make policy?

25         **MS. KHANNA:**  I think teachers exercise

```
1          broad discretion in the classroom and that is
2          exactly what the Ombach case says is that
3          when -- you know, they're not following a
4          script.  They're not doing a road to activity,
5          they are deciding what curriculum and how to
6          deliver that curriculum.  And it is that
7          discretion, that broad discretion that makes it
8          fall clearly within the Bernal test for
9          political function exception.
10             In my remaining time, I'd like to turn to
11         the information retention ban and make clear
12         that the due process violation is inherent in
13         the vagueness of the terms of the statute.
14             The statute prohibits retention of
15         personal information.  But personal information
16         is not a term with a singular meaning, not as a
17         matter of Florida law --
18             JUDGE LAGOA:  Right.  But doesn't the
19         statute specifically say that the information
20         that is -- the problematic information that the
21         State does not want to be retained is the
22         voter's Florida driver's license, the number --
23         the Florida identification card number, or the
24         Social Security number or signature?  I mean,
25         those are all very personal, private
```

1    information that individuals possess.

2         **MS. KHANNA:**  Those are types of

3    information that are prohibited here.  But that

4    is not an exhaustive list.  It is "such as."

5    And so the question remains, what else is

6    possibly included in that?  Florida statutes

7    typically define personal information when they

8    use that term, and they define it in different

9    ways.  Sometimes it is about that most

10   sensitive information that you just outlined.

11   Sometimes it is about personal contact

12   information.  Even as a matter of common

13   understanding, when I go to the doctor's office

14   and they ask for my personal information, what

15   do they usually mean by that?  My contact

16   information?  Probably.  My driver's license

17   information?  Probably not.  There is no

18   uniform definition.  And the fact that they

19   provide this non-exhaustive list, if anything,

20   only doubles down on the confusion.  Sitting

21   here --

22        **JUDGE GRANT:**  Why doesn't it just mean

23   anything about that person, right?  That seems

24   fairly straightforward.

25        **MS. KHANNA:**  And if that's true, Your

1    Honor, then I -- then I, sitting here today, do

2    not know what information is considered

3    personal information.  Is it just

4    highly-sensitive information?  Is my cell phone

5    number and my email address considered my

6    personal information?

7         **JUDGE GRANT:**  I would think of all of it.

8         **MS. KHANNA:**  If that is clear, Your

9    Honor -- that is not at all clear from the

10   statute.  The statute says information like the

11   driver's license number, like Social Security

12   number.  It says nothing about whether or not

13   it sweeps that broadly.  Right.  There are some

14   people for whom my cell phone number, email

15   address feels personal.  It's personal to them.

16   But I believe that the State has argued that it

17   actually doesn't have that broad an ambit --

18        **JUDGE LAGOA:**  But what the statute says is

19   really you can -- it says you can -- you cannot

20   copy.  So just like here, this application that

21   someone filled out, you can't copy it for any

22   other reason other than to provide it to the

23   third-party voter registration organization in

24   compliance with this section.  So basically

25   you're saying, you can't make a copy of this

```
1    and keep it for your personal benefit.  You can

2    copy it and give it to the voter -- to the

3    third-party voter organization, but you can't

4    collect it and copy it for your own reason,

5    your own purpose.  So I'm like, how is that not

6    clear?

7         MS. KHANNA:  Respectfully, Your Honor,

8    there's so many questions inherent to that.

9    The term (sic) says both "copy" and "retain."

10   3PVROs typically get contact information so

11   that they can follow up with these registered

12   voters.  Can they still do that under this

13   provision?  It's unclear.

14        If you read the State's own briefs, what

15   can they do with the -- let's assume that we

16   even do understand what personal information

17   is, and I don't think that is clear at all.

18        JUDGE LAGOA:  I mean it says if a person.

19   It doesn't say an organization.  It says a

20   person.  I mean, the third-party voter

21   organizations are not persons, are they?

22        MS. KHANNA:  I would say not.  However, in

23   the State's brief, they make clear that at some

24   point a person is bound by the information

25   retention ban, such as when a plaintiff is
```

1    collecting.  But they are otherwise not bound

2    by the information retention ban when they're

3    just handling it.  So if they're up the chain

4    of command, then what?  Can they use the

5    personal information for any purpose

6    whatsoever?

7        And if you look at the -- what the -- the

8    supposed regulation that's meant to clarify, it

9    only, again, doubles down on the confusion

10   because there, the State says, actually it does

11   apply to people who -- to the 3PVROs generally.

12   There's several times in the State's brief --

13   on page 24 of the State's brief --

14       **JUDGE LAGOA:**  But it says -- so this

15   really says if a -- it's about the information

16   that you collect with your voter registration

17   applications.  I mean, there's nothing in there

18   that says that at the time that you're

19   registering people, that you can't have a

20   separate thing saying, would you like to

21   become -- would you like to have information

22   collected so that we can contact you for other

23   things?

24       **MS. KHANNA:**  Your Honor, I mean, I think

25   that reasonable minds could be very varied.  I

```
 1          mean, I think that's -- I think that's fair.  I
 2          think it's a fair reading of the statute.  But
 3          all I know is if I -- sitting here as a lawyer
 4          whose job it is to parse the language and spent
 5          days doing that, I don't really understand what
 6          is prohibited and what is not.
 7              And so if -- and that's not just a matter
 8          of idle curiosity.  Here we have ordinary
 9          people who can accidentally, with no sign-to
10          requirement, stumble into a felony conviction
11          because they don't understand what line
12          distinguishes lawful from unlawful.  I would
13          submit that even the State does not understand
14          what line distinguishes lawful from unlawful.
15          And there's nothing in the State's brief,
16          nothing in the statute and nothing in the
17          regulations that clarifies that line for a
18          reasonable person to know, I can do this but I
19          can't do that.  I can do this when I'm acting
20          as a collector.  I can't do this when I'm
21          acting as a handler.  I can collect some
22          personal information but not all personal
23          information.  I can retain it for some purposes
24          and not others.
25              All of these questions remain outstanding.
```

1        And all of these questions remain unanswered by

2        the statute at issue and therefore it is

3        unconstitutionally vague.

4            **JUDGE WILSON:**  All right.  Thank you,

5        Ms. Khanna.

6            **MS. KHANNA:**  Thank you, Your Honors.

7            **JUDGE WILSON:**  Mr. Ferguson, on behalf of

8        the League of Women Voters.

9            **MR. FERGUSON:**  Good morning, Your Honors,

10       Brent Ferguson representing the League of Women

11       Voters of Florida as amicus.

12           May it please the Court.  I'd like to

13       address both points today, the personal

14       information restriction and add a brief point

15       on the citizenship end.  I'd like to start by

16       addressing a question that Judge Lagoa just

17       asked about focusing on who the statute applies

18       to and what they can do with the information.

19           Judge Lagoa, I believe you asked

20       Ms. Khanna if someone is collecting voter

21       registration applications as a volunteer, are

22       they allowed to separately take someone's

23       information and retain that?  And I would argue

24       that by the terms of the statute, that's

25       clearly not allowed, although the State may

1      argue it is.  The statute by its terms, applies

2      to a person collecting voter registration

3      applications on behalf of a 3PVRO and says they

4      can't retain any of the voter's personal

5      information.

6          **JUDGE LAGOA:**  Well, I asked that question

7      because obviously like the League of Women

8      Voters, they're not just in the business of

9      registering voters, you're also -- you also do

10     candidate forms, you also do forms involving

11     particular policy issues.  So I guess the

12     question I have is, I mean, there isn't

13     anything that precludes an individual to say,

14     hey, we have a candidate form coming up on, I

15     don't know, a school board and, you know, would

16     you like us to contact you so that you can

17     attend?

18         **MR. FERGUSON:**  Your Honor, I would say by

19     the terms of the statute, if you do that as

20     part of collecting a voter registration

21     application, it would likely violate the law.

22     I agree that you could separately do that,

23     certainly.  But by the terms of this statute,

24     that wouldn't be allowed and that creates a big

25     problem for the League as you point out.

1    **JUDGE GRANT:**  Isn't it -- couldn't the

2    purpose of that be to keep third-party voter

3    registration organizations to what it is that

4    they say they're doing, which is registering

5    voters rather than kind of reaching these

6    people for other purposes?

7    **MR. FERGUSON:**  Your Honor, that very well

8    may be the purpose, but I think the focus here

9    is on the vagueness of this law and the

10   organizations not knowing what they're allowed

11   to do.

12        Now, of course, there's a First Amendment

13   issue with regard to this provision as well.  I

14   believe the State's making a narrowness

15   argument in response to that.  I do think that

16   there's First Amendment interests that the

17   League and other organizations have in

18   retaining someone's information to ask them to

19   be a member.  That's not at issue right here.

20        But what I'd like to drill down on a

21   little bit that we haven't addressed yet is

22   what I think is the real core problem and the

23   real core vagueness of this statute, and that's

24   who it applies to.

25        So the statute as I just said, applies to

```
1          anyone who's collecting voter registration
2          applications as a part of a 3PVRO.  And the
3          State argues in its briefing that this only
4          applies to volunteers who directly collect an
5          application from a voter.  But, of course, by
6          the terms of the statute, it would also apply
7          to anyone who's a supervisor, supervising
8          several volunteers, and that's because it uses
9          the term "collecting."
10             And if you -- let's start with the text,
11         the first reason that this is unclear.  The
12         State uses Miriam Webster to define the term
13         "collecting" as gathering from a number of
14         persons.  Now clearly, of course, that applies
15         to someone who's a volunteer gathering directly
16         from voters, but it also applies, of course, to
17         someone who's a supervisor, supervising five
18         volunteers who then bring their applications
19         together and the supervisor collects it.
20             And so the State's narrowness argument is
21         simply a textural.  And that creates a problem.
22         The legislature clearly could have written the
23         law to say it only applies to people who are
24         collecting directly from voters and it doesn't
25         do that.
```

1          **JUDGE GRANT:**  What would be the purpose of

2     such a -- I've got questions for them about why

3     they would narrow that it way.  Because if your

4     goal is to avoid these organizations retaining

5     the forms, I don't know why you would intend

6     for it only to be the person who receives it in

7     the first place.

8          **MR. FERGUSON:**  That's exactly my next

9     point, Your Honor.  It's nonsensical to make

10    that argument because it creates such a narrow

11    statute that it doesn't serve their purposes.

12    Now the State argues that its purpose is to, as

13    you said, Your Honor, protect people's private

14    information.  But if it can be completely

15    avoided by simply handing the application to

16    anyone else that works at your organization or

17    really anyone else in the world, then there's

18    no reason to have that statute.

19         And I'll move on to the --

20         **JUDGE LAGOA:**  May I --

21         **MR. FERGUSON:**  Yes, of course.

22         **JUDGE LAGOA:**  -- ask a question?  I'm just

23    kind of curious about the -- sort of the -- how

24    it works.  So when you get this voter

25    registration application, it says you have to

1    provide a valid driver's license or a Florida

2    ID number.  And if you don't have one, then

3    that's when you give the Social Security.

4    card -- your Social Security number.  But do

5    you -- does the person who is registering, do

6    they have to provide the Florida ID to the

7    person who's collecting the information?  I'm

8    just curious.

9        **MR. FERGUSON:**  Do they have to provide

10   their actual ID?

11       **JUDGE LAGOA:**  Like, do they have to -- so

12   the person confirms that this is who the person

13   is or --

14       **MR. FERGUSON:**  I believe, Your Honor, if

15   they're doing the registration online, they do.

16   I don't think they have to -- I don't think

17   there's any rule that they have to hand their

18   ID while they're doing a paper registration but

19   I'm not a hundred percent sure about that.

20       **JUDGE LAGOA:**  Okay.  Thank you.

21       **MR. FERGUSON:**  Very quickly.  The third

22   reason that the State's interpretation doesn't

23   make sense is because it conflicts with the

24   rule they promulgated in this case.  Now the

25   State is arguing on appeal that, as I said,

1 this statute only applies to people directly

2 collecting applications from voters.  But the

3 rule is much broader.  And it says 3PRVOs as a

4 whole aren't allowed to do this.

5   Now as Your Honor, Judge Grant, said, that

6 would make more sense with regard to the

7 purpose of the statute but that's not what the

8 State is arguing here.  And the rule certainly

9 goes far beyond that.

10   Now I'd like to --

11  **JUDGE GRANT:**  By the way, what do we do if

12 the -- if the rule is -- if we think the plain

13 reading of the rule is broader than the State

14 says it is, what does that do?  If I think it

15 just covers everything obviously and the

16 State's saying it covers less, is that still

17 vague or are they just arguing for a too narrow

18 approach to the statute and it can stand

19 because obviously it just covers what it

20 covers?

21  **MR. FERGUSON:**  Of course, the rule isn't

22 being challenged here right now.  And I would

23 say the purpose of this argument here is just

24 to lay bare how the State's narrowness argument

25 doesn't align with their actual belief as to

1    the coverage of the statute.  That's what I --
2    how -- the simplist way to think about it, I
3    think.
4        And I see my time is almost out.
5        I'd like to say very quickly on the
6    citizenship end, the State makes -- mainly
7    makes the Salerno argument arguing the rational
8    basis applies.  The State also gave you the
9    option today of severing the statute and saying
10   that if the statute is unconstitutional as
11   applied to legal permanent residents, then it
12   can be partially struck down.  Now that
13   argument is abandoned.
14       And if, Your Honor, if I could take 30
15   more seconds to go into that.
16       **JUDGE WILSON:**  All right.
17       **MR. FERGUSON:**  Now that argument has been
18   abandoned on appeal.  And the important point
19   here is that if the State wants to argue that a
20   statute should be severed, then that's a
21   complex argument.  Because the supreme court
22   has said in cases like Reno versus ACLU that
23   judges shouldn't rewrite statutes.  They should
24   allow the legislature to do that.  Very rarely
25   does a court go into a statute and strike down

```
 1        part of it and not strike down another.  Now

 2        the State could argue that this is an

 3        appropriate case and they have not done so on

 4        appeal.  And so I think it would be

 5        inappropriate at this point on appeal to do

 6        that severing.

 7              JUDGE WILSON:  All right.  Thank you --

 8              MR. FERGUSON:  Thank you.

 9              JUDGE WILSON:  -- Mr. Ferguson.

10        Mr. Jazil, you reserved some time for

11        rebuttal.

12              MR. JAZIL:  Thank you, Your Honors.

13        I'd like to talk --

14              JUDGE LAGOA:  Can you talk about the

15        last -- the last argument made by counsel for

16        the League which is accurate, which is that we

17        do not rewrite statutes?

18              MR. JAZIL:  That is entirely correct, Your

19        Honor.  And my friend may be misconstruing my

20        argument.  My argument is this, they bring a

21        facial challenge.  The Court can construe a

22        facial challenge as an as-applied challenge.

23        And it would be an as-applied challenge brought

24        by the legal permanent residents who are the

25        named plaintiffs in this case.  If they later
```

1      certify a class of legal permanent residents,

2      that's another issue.  That brings us into the

3      Cabell territory because there, there was a

4      certified class of legal permanent residents

5      who were challenging something.  So my friend

6      seems to be misconstruing that argument.

7           JUDGE GRANT:  So you would want us to say

8      that it is -- the statute is valid as applied

9      to their one plaintiff?

10          MR. JAZIL:  Well, Your Honor, I would like

11     you to say that the statute --

12          JUDGE GRANT:  Well, sure, but --

13          MR. JAZIL:  -- constitutional, but if Your

14     Honor does not believe that the political

15     function exception applies, then Your Honor can

16     construe the plaintiff -- plaintiffs -- I don't

17     remember off the top of my head, Your Honor,

18     how many of them are legal permanent residents,

19     but there is at least one.  That as applied to

20     them, this statute is unconstitutional.  If

21     later they wish to certify a class of legal

22     permanent residents, that would be the

23     appropriate way to get the kind of class-wide

24     relief they're seeking.  But that hasn't

25     happened.

1          **JUDGE GRANT:**  Wouldn't the rules of

2      precedent end up giving them the kind of

3      class-wide relief they're seeking anyway?  I

4      mean, it's different if a district court does

5      it.  But once the circuit court that has

6      authority over Florida says that, then why

7      would they need a class?

8          **MR. JAZIL:**  Fair question, Your Honor.

9      And as a practical matter, the State would

10     abide by the published opinion of the 11th

11     Circuit.

12          Your Honor, I would also like to focus on

13     a couple of other things that were said about

14     the political function exception.  My friends

15     tried to read a rigid formalism into the

16     political function exception's two-part test.

17     That does not exist.

18          Your Honors, as I point you to the Bernal

19     case, which is the one they rely on, Bernal

20     says on page 225 the task under the second

21     prong, which is the discretion, et cetera, is

22     whether or not the exclusion implicates

23     responsibilities that go to the heart of the

24     democratic government.  It talks about how the

25     test is not exclusive.  And then it talks about

1        how the actual function of the position is

2        dispositive.

3            If we look at Servontis, the function

4        prong is what Judge Wisdom, writing for the

5        former Fifth Circuit, focused on.  The function

6        is what's critical.  When we're looking at the

7        function, we know that folks who are sitting on

8        juries can be citizens.  Votes who vote can be

9        citizens.  Lawyers who appear in front of those

10       juries, Griffiths, the United States Supreme

11       Court said they don't need to be citizens.  And

12       so the function is a critical issue.

13           And then my friends --

14       **JUDGE GRANT:**  What about the fact that

15       this is all very rote?  They are supposed to

16       get the form, have the person fill it out,

17       encourage them to fill it out and then turn it

18       in?

19       **MR. JAZIL:**  And as I understand that

20       argument, Your Honor, is that it's rote and

21       therefore there's nothing to see here.  It's

22       not a part of the election administration

23       process.  I vehemently disagree.  If someone

24       turns in a form to one of these organizations

25       and they do not deliver it, the person cannot

54

1        vote.  The person misses their registration

2        deadline, they are not on the voter rolls, they

3        cannot vote.  How does that not go to the very

4        heart of the democratic process?  If you have

5        someone who is responsible for delivering a

6        form and their failure to abide by that one

7        sole task can have this consequence of you

8        being excluded from the political community and

9        having a chance to say what's what, that is a

10       crucial function that goes to the very heart of

11       the democratic process.  And therefore I submit

12       that the political function exception is met,

13       Your Honor.

14            Your Honor, we also talked a bit about

15       Club Madonna and I'd like to hit that point

16       once more.  The argument that's being made that

17       Club Madonna does not -- Club Madonna says that

18       Salerno does not lay out a test for facial

19       challenges.  True.  Facial challenges are

20       assessed based on what the underlying argument

21       is.  So if it's a Fourth Amendment issue, you

22       consider what the Fourth Amendment tests are.

23       If it's a First Amendment issue, you consider

24       what the first Amendment tests are.

25            Here we have an equal protection issue.

```
1          So what is the equal protection test?  The
2     equal protection test requires us to figure out
3     what level of scrutiny applies.  And for
4     citizens, it is unlike race, it is unlike
5     natural origin, it is unlike sex.  For
6     citizens, there are a series of tests, series
7     of levels of scrutiny that could apply.  And
8     that's our Salerno point in a nutshell because
9     when you look at citizens, citizens do not
10    trigger one level of scrutiny.  Different
11    levels of scrutiny are triggered based on --
12         JUDGE LAGOA:  Right.  But that's -- that's
13    really -- that's truly a case of first
14    impression for anyone.
15         MR. JAZIL:  Precisely, Your Honor.  It is
16    case of first impression.
17         JUDGE LAGOA:  I mean, that is an -- it's
18    an alienage case that involves both LPRs,
19    people lawfully in the country, and people
20    unlawfully in the country.  And there clearly
21    are two different standards of review for both.
22         MR. JAZIL:  Precisely, Your Honor.  And I
23    ask the Court to consider this, if in the
24    alienage cases from the United States Supreme
25    Court, someone other than a legal permanent
```

resident had filed the lawsuit, how would those

cases have turned out?  They would have turned

out differently.

So the alienage cases from the United

States Supreme Court, consider them in the

context within which they arose, with legal

permanent residents filing the challenges.

Here we have more than just the legal permanent

residents filing the challenges.

Your Honor, I'd like to move on to the

retention provision briefly.  The argument's

being made that we don't know what information

falls within its ambit.  I ask the Court to

look at the voter registration form.  The voter

registration form on the top left has a section

that says "public record."  It tells you that

all of the information in the form is a matter

of Florida public record.  Anyone can ask for

it with a few exceptions.  And those few

exceptions are then provided as illustrative

lists in the statute.  Why?  Because forms are

a product of rule.

**JUDGE WILSON:**  So the statute does apply

to supervisors who get the -- supervisors of

these third-party voter registration

1    organizations as well as those who bring the

2    applications in?

3        MR. JAZIL:  Your Honor, the limitation on

4    what information can be given out applies to

5    the supervisors as well.  So if you go to

6    supervisor of election and you ask for certain

7    information --

8        JUDGE WILSON:  What about a supervisor at

9    a third-party voter registration organization?

10   Who brings -- who collects it when it comes

11   into the office?

12       MR. JAZIL:  Okay.  So if I understand Your

13   Honor's question, it's a third-party voter

14   registration organization giving a form to the

15   supervisor of elections?

16       JUDGE WILSON:  Right.

17       MR. JAZIL:  So the supervisor of elections

18   takes the form, because they have a statutory

19   obligation to take it and try to put the person

20   on the voter roll, they do actually put the

21   person on voter roll.  So they have this

22   information.  The supervisor's a part of the

23   election administration process and so they

24   must have this information.  The signature is

25   then a crucial component.  We put in our papers

1    about how the signature's used to, A, detect

2    fraud.  And, B, actually ensure the --

3        **JUDGE WILSON:**  If that person copies --

4    retains information from the application, that

5    person is also subject to a third degree

6    felony?

7        **MR. JAZIL:**  That person at the supervisor

8    of election's office?  No, Your Honor.  Because

9    the statute applies to the third-party voter

10   registration organization.

11       **JUDGE GRANT:**  No.  I think my -- perhaps I

12   misunderstood.  My -- I have a related question

13   if I did misunderstand which is if there's a

14   supervisor at the third-party voter

15   registration organizations.  So they send out

16   their five people who collect the applications

17   from people, they bring it back to the man or

18   woman at the head office and they say, here are

19   all these that I collected, and the supervisor

20   of them says, great, I'm going to go put these

21   in the mail.  Is that person subject also to

22   this requirement?

23       **MR. JAZIL:**  Oh, thank you, Your Honor.  I

24   misunderstood.  So it's a supervisor at the

25   third-party voter registration organization,

```
1        not a supervisor of elections?

2            So, Your Honor, that person would not be

3        liable under the statute.  That person would

4        violate the rule.  The rule applies to everyone

5        at the 3PVRO.  The statute talks about

6        collecting.  And the reason why we've taken the

7        position we have is because when you read the

8        3PVRO statute, it uses the words "solicit,

9        collect, handle."  They're used in the

10       different context.  And so we've taken the

11       position that they mean different things.

12           So to --

13       JUDGE WILSON:  What if I'm a college

14       student interning in the office?

15       MR. JAZIL:  Your Honor, if you're a

16       college student interning in the office --

17       JUDGE WILSON:  Am I subject to a third

18       degree felony if I handle or copy?

19       MR. JAZIL:  You are not -- you are not

20       subject to the third degree --

21       JUDGE WILSON:  That's clear from the

22       statute?

23       MR. JAZIL:  Yes, Your Honor, that is clear

24       from the statute.  Because the statute uses

25       three different words:  "Collect, handle,
```

1      solict."  If, for example, that college

2      student is also engaging in the activities of

3      the League of Women Voters, there are two

4      booths, one's --

5           **JUDGE WILSON:**  But if you're handling it,

6      let's say college student interning in the

7      office, take this down to the supervisor of

8      elections office --

9           **MR. JAZIL:**  That --

10          **JUDGE WILSON:**  Is that college student

11     subject to a third degree felony?

12          **MR. JAZIL:**  No, Your Honor, that college

13     student is not subject to a third degree

14     felony.

15          And, Your Honor, to take a step --

16          **JUDGE WILSON:**  That's clear from the

17     statute?

18          **MR. JAZIL:**  Yes, Your Honor, I believe it

19     is clear from the statute.  Because the words

20     "handle, collect and solicit" are used.

21          And, Your Honor, take a step back.  Here

22     is the problem we were having.  You had Rodrico

23     Cory who was arrested and convicted of taking

24     these forms and doing bad things with them.  So

25     if Rodrico Cory or Raul Shepherd, who was

```
1        collecting these forms out in Leon County, if
2        these people are collecting these forms,
3        copying them, taking that information and
4        committing some kind of other identity theft
5        issue, that would be prohibited by this.  This
6        is a check on them.  And 3PVROs, Your Honor,
7        again, they're made up of people.  The
8        collector's collecting the forms and giving
9        them to the 3PVRO.
10            JUDGE GRANT:  But aren't the supervisors
11       people, too?  I mean, I don't completely
12       understand -- I mean, I guess maybe you want to
13       avoid the risk of someone just collecting
14       applications and then copying them for their
15       own purposes and then turning them in.  But
16       couldn't the supervisor at the office do so
17       just as easily?
18            MR. JAZIL:  Your Honor --
19            JUDGE GRANT:  -- institutional trust on
20       the part of Florida for these organizations.
21       So that's an interesting distinction to draw in
22       the statute.
23            MR. JAZIL:  And there is a lot of trust of
24       these organizations.  But if you look at the
25       trust matrix, the person who's actually
```

```
1       canvassing on the ground, the minimum wage

2       worker who's collecting this thing, someone who

3       has a past felony record because they're doing

4       a minimum wage job, that's different than the

5       supervisor who's a salaried employee who's

6       responsible for making sure things are

7       delivered on time so the organization isn't

8       subject to fine.  If you're looking at the

9       level of trust, the level of trust increases as

10      you move up the chain.  And as a practical

11      matter, the rule which does not trigger

12      criminal penalties, to Judge Wilson's earlier

13      questions because the Department of State can't

14      assess criminal penalties, applies to the

15      organization as a whole.  So the organization

16      as a whole is also covered.

17           And, Your Honors, I see my time is

18      expiring -- has expired.  At the risk of being

19      impertinent, I simply note that this case is

20      fast moving.  We're running into Bersell

21      territory soon.  And there are pending summary

22      judgment motions on the citizenship provision

23      which would benefit from this Court's --

24           JUDGE WILSON:  All right.

25           MR. JAZIL:  -- assessment.  Thank you,
```

1    Your Honor.

2         **JUDGE WILSON:**  Thank you, Mr. Jazil.

3         Mind if we take a break now?  Take a

4    break.

5         (End of audio.)

6                   *    *    *

# CERTIFICATE OF REPORTER

**STATE OF FLORIDA**

**COUNTY OF LEON**

      I, Tracy Brown, certify that I was authorized to and did stenographically transcribe the foregoing remote proceedings, and that the transcript is a true and complete record of my stenographic notes.

      Dated this 9th day of February, 2024.


TRACY L. BROWN
1551 Forum Place, Suite 200-E
West Palm Beach, FL  33401
888-811-3408