```
1                UNITED STATES DISTRICT COURT
2                NORTHERN DISTRICT OF FLORIDA
3                    TALLAHASSEE DIVISION
4    FLORIDA STATE              :
5    CONFERENCE OF              :
6    BRANCHES AND YOUTH         : Case Nos.
7    UNITS OF THE NAACP,        : 4:23-cv-215-MW/MAF
8    et al.,                    : 4:23-cv-216-MW/MAF
9            Plaintiffs,        : 4:23-cv-218-MW/MAF
10      v.                      :
11   CORD BYRD, in his          :
12   official capacity as       :
13   Florida Secretary of       :
14   State, et al.,             :
15           Defendants.        :
16   - - - - - - - - - - - - - -x
17    Deposition of the OFFICE OF THE FLORIDA SECRETARY
18                         OF STATE
19      By and Through Its Designated Representative
20              ANDREW DARLINGTON, ESQUIRE
21                   Conducted Virtually
22                Thursday, January 4, 2024
23                      9:01 a.m. EST
24    Job No.: 518939
25    Pages: 1 - 314      Reported by: Cynthia A. Whyte
```

```
 1        A    The third-party voter registration
 2   organization elected to take their disagreement
 3   with our issuance of fines to the Florida
 4   Department of Administrative Hearings.
 5        Q    Do you recall what year the fines were
 6   issued that they were litigating?
 7        A    Yes; 2022.
 8        Q    And do you recall the name of the
 9   organization?
10        A    I do.
11        Q    What was that organization?
12        A    Hard Knocks.
13        Q    Do you know the outcome of that
14   litigation?
15        A    Yes.
16        Q    What was the outcome?
17        A    The case settled.
18        Q    Is that settlement information public to
19   your knowledge?
20        A    I'm just being honest here, because I
21   didn't file anything with DOAH.  I don't know, to
22   be honest with you.
23        Q    Okay.  You also just testified that you
24   reviewed complaints regarding third-party voter
25   registration organizations submitted by
```

                   But ultimately when I got them, what I
would do is I would look at the cover sheet, but
that was essentially guidance as to what was
believed to be wrong.  But I would then review it.
And when I say "review it," I mean I would review
every single voter registration application to
confirm its compliance with all legal requirements
for a voter registration application and then I
would essentially tally up what I believed were
the actual violations.  And my numbers did not
always concur with the complainant.  Sometimes I
arrived at numbers that were less than them,
sometimes I disagreed with them that a fineable
offense was committed, and other times we would
just arrive at the same answer or different
answers and then I would draft up either a warning
letter or a fine letter and then issue it to the
third-party voter registration organization.
          Q    And so when you were in this role as
assistant general counsel, you were the one who
had actually drafted and would you sign the fine
letters that you then sent out or warning letters?
          A    I signed the warning or fine letters that
I drafted.  And I only drafted letters that
addressed batches of complaints that I personally

1  testimony?
2      A    I think the statute is very clear on
3  what -- if a certain violation occurs, what sort
4  of financial penalties should be assessed.  The
5  statute also contains provisions regarding
6  affirmative offenses that should be received.  The
7  statute is also very clear that the Attorney
8  General may have the ability -- excuse me.  We may
9  refer to the Attorney General for civil
10 enforcement, any sort of civil remedy we seek.
11 So, again, I think the statute is pretty clear and
12 our office in turn just enforces these without
13 regard to the third-party voter registration
14 organization.  We simply apply law to fact and I
15 issue the letter accordingly.
16     Q    Do you recall ever referring any of the
17 civil enforcements to the Attorney General's
18 Office during your time as assistant general
19 counsel?
20     A    I personally do not.
21     Q    Is there a certain situation or policy
22 that recommends when it does make sense to refer
23 civil enforcement to the Attorney General's
24 Office?
25     A    Well, at some point it would, but I would

```
 1  need to get to that point before making a decision
 2  to issue a referral.
 3       Q    And so you don't have a sense of what
 4  that situation or scenario would be sitting here?
 5       A    I do.  You know, within the Office of
 6  Election Crimes and Security our policy is we
 7  issue the fine letter and then, as we still have
 8  some ongoing appeals from these organizations, I
 9  personally review them.  I personally review the
10  appeals and review what the third-party voter
11  registration organization is saying they believe
12  is incorrect with the fine letter we've issued.
13  And then if we arrive at an impasse, at the point
14  of impasse where we are right and the third-party
15  voter registration organization will not comply
16  with the law, at that point I would refer to the
17  Attorney General's Office.
18       Q    And so I know I've asked before about
19  when you were assistant general counsel, so just
20  now to ask since you have been director of OECS,
21  have you referred any such investigations or --
22  excuse me; whatever we would call them -- have you
23  referred any civil enforcement, let's say, to the
24  Attorney General's Office in your role as
25  director?
```

1     A    I have not.
2     Q    What did you do before working as
3  assistant general counsel for the Department of
4  State?
5     A    Before working as assistant general
6  counsel at the Department of State, after college
7  I became a United States Marine.  I served in
8  Afghanistan twice as a Marine infantry officer.  I
9  then got out in late -- I got out of the Marine
10 Corps in 2014 and I took a few months to study for
11 the LSAT, applied to law school.
12          Between that point and the beginning of
13 law school I worked briefly as a paralegal
14 assistant, a phenomenal firm in New Orleans, but I
15 just did that for a few months to gain some
16 experience and insight into how law firms operate.
17          I attended law school for three years and
18 then became a -- excuse me; I took a brief
19 one-year -- right after law school my wife, she
20 had a phenomenal one-year opportunity as a post
21 med school doctor, and so briefly for that one
22 year, since we didn't know where we were going to
23 live, I co-founded one startup and served as an
24 informal adviser, trying to develop good business
25 models and then moved to Florida, became a

```
 1   BY MS. JOHNSON:
 2       Q    And, Mr. Darlington, I would just ask if
 3   at any point you are referencing these materials
 4   in order to answer my questions, if you'll let me
 5   know that that's what you're doing.
 6       A    Yes, ma'am, will do.
 7       Q    Great.  So we'll look next at Topics 3
 8   and 4 and I will ask questions about these topics
 9   together, but I will read them first.
10            Topic 3 is "The process and procedures
11   for investigating and fining 3PVROs and their
12   agents" and Topic 4 is "The role of Office of
13   Election Crimes and Security in investigating,
14   prosecuting, and/or fining 3PVROs and their
15   agents."
16            My first question is, is there anything
17   you did to prepare to testify about these topics
18   that you haven't already discussed in the
19   deposition?
20       A    No.
21       Q    Who is responsible for issuing civil
22   penalties to 3PVROs who violate the law?
23       A    I am the signatory of the fine letters
24   that are issued to third-party voter registration
25   organizations.  The Office of Election Crimes and
```

1    ==Security is overall the office within the==
2    ==Department of State that issues those fine==
3    ==letters.==
4         Q    And before OECS was in existence, which
5    Department of the Secretary of State's Office did
6    you understand was responsible for issuing fine
7    letters to 3PVROs?
8         A    The general counsel suite.
9         Q    Okay.  How are incidents of issues with
10   3PVROs such as late delivery or delivery to the
11   wrong county brought to OECS' attention?
12        A    Well, I would like to break those two up
13   if I can.  So if a voter registration application
14   is submitted late, then it can be either the
15   County Supervisor of Elections Office that
16   receives that application or it can be the Florida
17   Division of Elections that receives that
18   application.  Any of those two options, as long as
19   they are the recipient, can make the initial
20   determination that pursuant to the government
21   statute and rules, the application was submitted
22   untimely.  And then from there a referral is made,
23   as I testified previously, to the Office of
24   Election Crimes and Security.
25                   And then what was the second type of