UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

    *Plaintiffs*,

v.

CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,

    *Defendants*.

Case No. 4:23-cv-00218-MW-MAF

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

Defendants' opposition confirms this Court should issue summary judgment in Plaintiffs' favor. There is no dispute that section 97.0575(1)(f) draws a facial classification based on alienage. Sec'y's Resp. to Mot. for Summ. Judgment ("Resp."), ECF 136 at 4. Nor, as Defendants concede, is there any dispute over the material facts Plaintiffs outline in their Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment. *See id.* at 2 ("Material facts aren't in dispute[.]"). Instead, Defendants posit that as a matter of law, Plaintiffs' Equal Protection Clause claim fails. In addition to rehashing arguments this Court already rejected, Defendants recycle *post-hoc* rationales for the Non-Citizen Ban that still flunk strict scrutiny's demanding bar. None of these arguments change what the record makes clear: that the Non-Citizen Ban is a textbook Equal Protection Clause violation. It prohibits *all* non-citizens from "collecting" or "handling" voter registration forms on the basis of alienage—no exceptions. This Court should accordingly grant Plaintiffs' Motion for Partial Summary Judgment.

**I.   There is no need to delay ruling on the motion for partial summary judgment; Plaintiffs strongly oppose any delay in resolution.**

Plaintiffs defer to the Court's discretion on when to decide this motion, but strongly oppose any delay of this matter's resolution, including moving the trial date. There is no need to wait. This is a pure issue of law. Plaintiffs have already prevailed on this issue at the preliminary injunction stage, and as detailed in the opening brief and below, the only facts adduced in discovery further undermine the possibility that

1

any compelling interest exists to support Florida's Non-Citizen Ban, or that the Non-Citizen Ban is narrowly tailored in any way to meet it. There is no reason this Court cannot issue its decision based on the undisputed material facts before it and the current state of the law.

## II. Summary judgment should issue in Plaintiffs' favor.

"Summary judgment is proper only where there is no genuine issue of material fact." *Code Revision Comm'n for Gen. Assembly of Ga. v. Public.Resource.Org. Inc.*, 906 F.3d 1229, 1235 (11th Cir. 2018), *aff'd sub nom. Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498 (2020). Defendants readily admit "[m]aterial facts aren't in dispute," Resp. at 2, and the governing law demands judgment in Plaintiffs' favor. Defendants' misreading of *Salerno* is unavailing, and the Non-Citizen Ban fails under strict scrutiny. As for the political-function exception, this Court has already correctly held it "does not apply here. Full stop." ECF 68 at 33. Governing law and the undisputed record should afford summary judgment in Plaintiffs' favor on their Equal Protection Clause challenge.

### A. Defendants misunderstand *Salerno*.

Defendants point to the discussion of facial challenges in *United States v. Salerno* as support for applying a lower level of scrutiny to the Non-Citizen Ban. *See* Resp. at 4 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). But their *Salerno* argument is wrong. Put simply, their claim that Plaintiffs must "put[] aside permanent residents" to show that the Ban is *also* "*facially* unconstitutional as to

2

temporary residents and illegal aliens," *id.* "misstates the law governing facial challenges." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022) (emphasis added).

To start, as Defendants conceded on appeal, the Supreme Court has repeatedly "criticized" and declined to apply the rigid "no set of circumstances" gloss on *Salerno* that Defendants urge this Court to follow.[1] *See* ECF 133-2 at 28-29. Indeed, the "no set of circumstances" language in *Salerno* is dictum—"unsupported by citation or precedent" and "unnecessary to the holding in the case." *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting denial of cert.). It has "never been the decisive factor in any decision of th[e] [Supreme] Court." *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality op.). Rather, the Court has "properly ignored [it] in subsequent cases." *Janklow*, 517 U.S. at 1175; *see also id.* n.3 (collecting cases); *United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (noting the Supreme Court "has not [] consistently followed" the so-called "rule" and collecting cases).

Defendants also misconstrue the facial-challenge test that *can* be correctly gleaned from *Salerno*. Properly understood, in the equal-protection context, *Salerno*

---

[1] Defendants' sole Eleventh Circuit authority on *Salerno* acknowledges that in "more recent cases the Supreme Court has cut back on the broad statement" that "a successful facial challenge requires a showing that the law in question is unconstitutional in all of its applications." *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1350 (11th Cir. 2024).

3

asks whether no set of facts can justify the *classification made*. That is so because all "*Salerno* requires [the Court] to answer is whether the statute fails the relevant constitutional test." *Club Madonna*, 42 F.4th at 1256.[2] Here, Defendants recognize—as they must—that the statute's plain language classifies against *all* non-citizens, without differentiation. Resp. at 4. That kind of blanket "classification[]," "based on alienage[,] [is] inherently suspect." *Nyquist v. Mauclet*, 432 U.S. 1, 7-8 (1977). So the "relevant constitutional test" is strict scrutiny. *Club Madonna*, 42 F.4th at 1256. *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984). And nothing in *Salerno* asks the Court to examine a clear alienage-based classification under more lenient review on the basis that it *could* have been more narrowly drafted.

Nor does *Salerno* call upon the Court to rewrite the statute or limit it to a narrower, hypothetically constitutional classification. Defendants would have the Court "divorce[] review of the constitutionality of [the] statute from the terms of the statute itself, and . . . engage in hypothetical musings about potentially valid *applications*." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012); *see also Club Madonna*, 42 F.4th at 1256. But since the Legislature facially distinguished between persons who are "citizen[s] of the United States of America"

---

[2] *See also Henry v. Abernathy*, No. 2:21-cv-797, 2022 WL 17816945, at *6 (M.D. Ala. Dec. 19, 2022) ("[D]efendants' free-floating 'no set of circumstances' test . . . does not make sense because one cannot determine whether a law is unconstitutional in all of its applications without applying the relevant constitutional test to the challenged law—be it strict scrutiny, rational basis, or another test.").

4

and those who are "not a citizen," Fla. Stat. Ann. § 97.0575(1)(f), the Court evaluates that classification, not applications of the law to a narrower subgroup of individuals.

### B.  The Non-Citizen Ban fails under strict scrutiny.

The Non-Citizen Ban fails strict scrutiny. Defendants' opposition confirms there is no compelling state interest that justifies prohibiting an entire suspect class from handling and collecting voter registration forms. Under strict scrutiny, the only state interests that matter are those that actually motivated the Legislature, not *post hoc* rationalizations. *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ("The government's justification 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996))).

Defendants' state-interests arguments fail strict scrutiny for several reasons.

*First*, Defendants concede that the Department of State's rationales for the Non-Citizen Ban were contrived *post hoc*: they came about after the Legislature passed the law. *See* Resp. at 6. Those justifications thus cannot show the Legislature's "actual purpose" for the Non-Citizen Ban, as they were presented after the Ban became law. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 730 (1982).

*Second*, considering Defendants' *post hoc* rationale alongside the legislative record does not show a compelling state interest. One sponsor of the Non-Citizen Ban justified it by saying "there are certain rights in our country that only citizens get to enjoy," while another legislator explicitly said the Ban should target

5

"illegal[s]."[3] ECF 32 at 34. These statements are the extent of the Legislature's alleged justification for the provision. The legislative record contained no evidence that non-citizens are dangerous or untrustworthy. And these "overbroad generalizations" are the kind the Supreme Court typically rejects. *See Hogan*, 458 U.S. at 730 n.16; *Orr v. Orr*, 440 U.S. 268, 279-80 (1979); *Stanton v. Stanton*, 421 U.S. 7, 13-14 (1975).

*Third*, even if the legislative record contained evidence of non-citizens mishandling voter registration forms—and it doesn't—"the Legislature must have had a strong basis in evidence to support that justification before it implements the classification." *Shaw*, 517 U.S. at 908 n.4. It "must identify" the problem "with some specificity before they may use" an alienage classification. *Id.* at 909 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504 (1989). Here, Defendants *concede* to a "dearth of evidence involving noncitizens and 3PVRO issues." Resp. at 7. That characterization of the undisputed record lays bare that Defendants fall woefully short of any "strong basis in evidence" standard.

Nor is the Non-Citizen Ban narrowly tailored—or even *rationally* tailored— to address the Legislature's stated interests. "At the very least, Defendants must be

---

[3] "[A] bare [] desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), of course, cannot serve "legitimate state interests," *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring)—*especially* when the challenged law sweeps more broadly than that group alone.

6

able to marry the solution to the problem." ECF 68 at 36. Even after full discovery, Defendants still haven't. Their only purported factual justification for the law—concerns over "untimely submission of forms" and the speculation that non-citizens "may not have ties to communities" and thus "pose a flight risk"—have no operation here. All three individual plaintiffs are authorized by the federal government to work and have either lawful-permanent resident status or pending applications for other permanent status like asylum. Organizational Plaintiffs' employees are similarly federally authorized to work. And the Supreme Court's decades-long application of strict scrutiny to alienage classifications does not carve out immigrants "who have been granted the legal right to reside and work in the United States." *Dandamudi v. Tisch*, 686 F.3d 66, 72 (2d Cir. 2012) (collecting cases).[4]

---

[4] Defendants add a twist to their *post hoc* justification for the Non-Citizen Ban: that because courts have found that certain people detained pre-trial with ties to other countries pose flight risks, the State could make that same judgment about non-citizens *as a class*. Resp. at 7-8 (citing *Alcazar v. State*, 349 So. 3d 930, 933 (Fla. Dist. Ct. App. 2022)). The Court should reject this offensive argument outright, not least because the determination in *Alcazar* was made on a specific factual record: the State presented evidence that the detained individual—a correctional officer charged with murder—was a Mexican citizen with "no connection to Miami-Dade County and significant connections to Mexico," including specific evidence about past travel patterns to Mexico. Here, in contrast, an admitted "dearth of evidence" separates non-citizens as a class from recorded 3PVRO misconduct—or even flight risk. Resp. at 7; *see also* ECF 125-10 at 67:11-20 (asked for examples of "individuals who are noncitizens leaving the United States after committing a voting-related offense," Secretary's 30(b)(6) witness testified he had "never received a complaint regarding a crime where a crime occurred and then the complaint stated that it was a noncitizen who left").

7

This Court should also reject Defendants' attempt to conscript *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021), to say that—even absent evidence connecting non-citizens to misconduct—"[i]t's enough that there have been well-documented issues with 3PVROs" and that "noncitizens, as a whole, *may* not have ties to communities and *may* pose a flight risk." Resp. at 7-8 (emphasis added). The *Brnovich* comparison is inept for the obvious reason that *Brnovich* was not a strict-scrutiny case. *See Brnovich*, 141 S. Ct. at 2336-41 (describing legal test that applies in Voting Rights Act, Section 2 cases). It did not ask the Court to use black-letter, equal-protection law to review a classification drawn against a suspect class. As this Court has already held, the "shoddy tailoring between restriction and government interest" in this case "falls woefully short of satisfying the strict scrutiny this Court must apply" (and even "presents a dubious fit under rational basis review"). ECF 68 at 56.

Defendants also fail to meaningfully grapple with the tailoring problem posed by the State's willingness to employ noncitizens at its Department of State, Department of Highway Safety and Motor Vehicles, and Supervisor of Elections' offices. Indeed, Defendants' rebuttal—"comparing 3PVRO collectors and handlers with notaries and governmental employees isn't a fair comparison," because notaries and governmental employees are "highly regulated" professions, Resp. at 8—just proves Plaintiffs' point. State and local governments often impose regulations—like background checks—to further government interests without imposing blanket

8

classification bans that would target or exclude a suspect class. Nor can Defendants' allusion to "volunteers" at some 3PVROs save the Ban, which does not distinguish between employees and volunteers. The Legislature's choice here to impose a blanket-alienage ban rather than more targeted regulations only further demonstrates why the Non-Citizen Ban is not narrowly tailored.

The Non-Citizen Ban is neither "necessary nor precise." *Examining Bd. of Engr's, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 605 (1976). It fails strict scrutiny.

### C. The Political-Function Exception does not Apply.

Nor is the "'political function' exception" applicable. *Bernal*, 467 U.S. at 220-21. Courts apply a two-step test to determine when a citizenship-based restriction falls within the exception: (1) whether the regulation is "sufficiently tailored," and (2) whether individuals in the regulated position "participate directly in the formulation, execution, or review of broad public policy." *Id.* at 221-22 (internal quotation marks and citations omitted).

Neither factor applies. And the Supreme Court's warning against letting the "narrowly construed" exception "swallow the rule" disfavoring blanket-alienage classifications, *id.* at 222 n.7, undercuts Defendants' suggestion that there are ways other than the Court's articulated two-part test to discern whether a role falls under the exemption—or that the test is somehow not "exhaustive," Resp. at 9.

9

As for the first prong, the Non-Citizen Ban is underinclusive. Many other positions non-citizens can work in bear closer ties to election integrity, including supervisory roles in Florida's Division of Elections. There is no disagreement that non-citizens can work in supervisory roles within Florida's Division of Elections. And in those, non-citizens can handle personal information that includes the same information on voter registration forms. The Non-Citizen Ban is thus fatally underinclusive.

On the second prong, Defendants argue applying the political-function test only to roles with discretionary and policy-making functions would open "TSA screeners," and "military officer[s] carrying the President's nuclear football" to Equal Protection Clause challenges. Resp. at 10. This point ignores critical differences between 3PVRO staff and federal officers. Namely, that Defendants' examples are all *federal* positions where the federal government's interest "is at its zenith." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004); *see also United States v. Alfaro-Moncada*, 607 F.3d 720, 727-28 (11th Cir. 2010). At its core, the political-function exception "restrict[s] aliens from positions . . . closely bound up with the operation of the *state* government." *Jii v. Rhodes*, 577 F. Supp. 1128, 1132 (S.D. Ohio 1983) (emphasis added).[5] Defendants' invocation of national security

---

[5] *See also Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383 (1978) (noting political-function exception recognizes that "[s]ome distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual *States*" (emphasis added)).

10

positions only proves the point; Defendants have made no showing that such sensitivities apply to 3PVRO employees and volunteers.

Nor are these federal officers and individuals assisting people with voter registration forms comparable. Federal officers exercise discretion in a way 3PVRO staff do not—such as when TSA officers decide who can safely board an airplane. In sum, Defendants' examples are inapposite.

### III. Plaintiffs have standing to sue the Attorney General, because the Attorney General has authority to enforce the challenged law.

"To establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show 'that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual.'" *Dream Defs. v. Gov. of the State of Fla.*, 57 F.4th 879, 888-89 (11th Cir. 2023) (quoting *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)[6]). "Plaintiffs must show that their injury is 'fairly traceable to the challenged action of the defendant,

---

[6] The Attorney General misconstrues *Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198, 1203 (11th Cir. 2021), suggesting that the fact that the Attorney General has not yet wielded its authority to enforce the law deprives Plaintiffs of standing. *See* ECF 135 at 4. Although that case spoke about how the government-official defendant "had neither enforced nor threatened to enforce the state law," 8 F.4th at 1203, the Attorney General omits that the Governor "neither ha[d] the **authority to enforce** [the challenged law] nor ha[d] done anything else to cause the plaintiffs' harm." *Id.* at 1203. Here, the Attorney General has not yet enforced the Non-Citizen Ban *because* of the injunction that currently runs against the Secretary and the Attorney General, not a lack of authority to enforce it.

11

and not the result of the independent action of some third party not before the court.'" *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1078 (N.D. Fla. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

Put simply: The question boils down to whether the official has authority to enforce the challenged law. *Compare Dream Defs.*, 57 F.4th at 889 ("Given this clear statutory authority, the traceability and redressability requirements are satisfied."), *with Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (en banc) ("The fact that the Act itself doesn't contemplate enforcement by the Attorney General counts heavily against plaintiffs' traceability argument.").

Here, the statutory authority is clear. The Non-Citizen Ban is enshrined in Section 95.0575(1)(f) of the Florida Statutes. And Section 95.0575(8) states: "The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order."[7]

---

[7] The breadth of the Attorney General's statutory authority refutes its other citation to *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023), for the proposition that traceability is lacking where "the [p]laintiff would have been injured in precisely the same way without" defendant's conduct. ECF 135 at 4. The Attorney General's own briefing explains that the Attorney General and the Secretary are empowered to harm plaintiffs in *different ways*: the Secretary "determines the amounts of fines, issues fine letters to 3PRVROs, and determines whether to waive fines or engage in further administrative proceedings," ECF 135 at 3, whereas the Attorney General has the authority to pursue relief in the form of "a permanent or temporary injunction, a restraining order, or any other appropriate order," Fla. Stat. § 95.0575(8), or to "institute a civil cause of action to collect a fine assessed by the Secretary of State," ECF 125-19 ¶ 7.

12

What's more, the Office of the Attorney General has repeatedly conceded during this litigation its authority to enforce the statue. It stipulated that, upon referral from the Secretary, it has authority to seek "a permanent or temporary injunction, a restraining order, or any other appropriate relief" to prevent a violation of the Non-Citizen Ban, and that it has authority to "institute a civil cause of action to collect a fine assessed by the Secretary of State, after the exhaustion of administrative remedies." ECF 125-19 ¶ 7. And its 30(b)(6) representatives admitted the same. ECF 125-6 at 55:14-56:4 (Attorney General's 30(b)(6) representative agreeing that the statute "provides the attorney general with authority to institute a civil action for a violation of this section or to prevent a violation of this section"); ECF 125-12 at 126:22-128:8 (Attorney General's second 30(b)(6) representative agreeing that, "under the plain text of the statute, OAG may institute a civil action for violations of this section if the Secretary of State refers it to your office").

Given this "clear statutory authority," traceability and redressability are satisfied here. *Dream Defs.*, 57 F.4th at 889.

## CONCLUSION

Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Partial Summary Judgment.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 2,707 words.

Dated: February 20, 2024                    Respectfully submitted,

/s/ Megan C. Keenan

| | |
|---|---|
| Cesar Z. Ruiz* | Megan C. Keenan* |
| **LatinoJustice PRLDEF** | Adriel I. Cepeda Derieux* |
| 475 Riverside Drive, Suite 1901 | **American Civil Liberties** |
| New York, NY 10115 | **Union Foundation** |
| (212) 392-4752 | 915 15th Street NW |
| cruiz@latinojustice.org | Washington, DC 20005 |
| | (212) 549-2500 |
| Roberto Cruz (FBN 18436) | acepedaderieux@aclu.org |
| Miranda Galindo (FBN 1039848) | mkeenan@aclu.org |
| Delmarie Alicea (FBN 1024650) | |
| **LatinoJustice PRLDEF** | Julie A. Ebenstein (FBN 91033) |
| 523 West Colonial Drive | Dayton Campbell-Harris* |
| Orlando, FL 32804 | Sophia Lin Lakin* |
| (321) 754-1935 | **American Civil Liberties** |
| rcruz@latinojustice.org | **Union Foundation** |
| mgalindo@latinojustice.org | 125 Broad Street, 18th Floor |
| dalicea@latinojustice.org | New York, NY 10004 |
| | (212) 549-2500 |
| | jebenstein@aclu.org |
| Estee M. Konor* | dcampbell-harris@aclu.org |
| **Dēmos** | slakin@aclu.org |
| 80 Broad Street, 4th Floor | |
| New York, NY 10004 | Nicholas L.V. Warren (FBN 1019018) |
| (212) 485-6065 | **ACLU Foundation of Florida** |
| ekonor@demos.org | 336 East College Avenue, Suite 203 |
| | Tallahassee, FL 32301 |
| John A. Freedman* | (786) 363-1769 |
| Jeremy Karpatkin* | nwarren@aclufl.org |
| **Arnold & Porter Kaye Scholer LLP** | |
| 601 Massachusetts Avenue, NW | Daniel B. Tilley (FBN 102882) |
| Washington, DC 20001 | Caroline A. McNamara (FBN 1038312) |
| (202) 942-5316 | **ACLU Foundation of Florida** |
| john.freedman@arnoldporter.com | 4343 West Flagler Street, Suite 400 |
| jeremy.karpatkin@arnoldporter.com | Miami, FL 33134 |
| | (786) 363-2714 |
| *Admitted Pro Hac Vice* | dtilley@aclufl.org |
| | cmcnamara@aclufl.org |

14

*Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico*