UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.*,

    *Plaintiffs*,

v.

CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,

    *Defendants*.

Case No. 4:23-cv-00218-MW-MAF

## PLAINTIFFS' MOTION TO LIMIT EXPERT TESTIMONY AND TO EXCLUDE DEFENSE EXPERT DR. ALFORD'S TESTIMONY

Plaintiffs move to prohibit Defendants' proffered experts, Dr. Robert Stein and Dr. John Alford, from testifying to any conclusions in their joint report that they did not draft. Deposition testimony revealed that only the positions of the report that each author drafted is attributable to that author, and the testimony offered by Dr. Stein and Dr. Alford should be appropriately limited to reflect that division of labor.

Plaintiffs additionally move to exclude defense expert Dr. John Alford from testifying as an expert on issues relating to voter registration and 3PVROs. Dr. Alford is a political scientist and has served as an expert witness on other topics—primarily (and exclusively for the last decade), racially polarized voting analysis in redistricting cases. But during his deposition, he disclaimed having knowledge, skill, experience, training, or education in the subject matter that is *actually relevant* to

this case, and disclaimed knowledge of and responsibility for significant portions of the analysis in the joint report. He should be precluded from offering expert testimony outside the scope of his field of expertise.

**I.     Dr. Stein and Dr. Alford did not disclose their division of labor in drafting the joint report until their deposition.**

Dr. Stein and Dr. Alford submitted a joint report in this case. *See* Stein-Alford Report (attached as Exhibit A). That report contained three sections that address each of Plaintiffs' expert reports (Lichtman, Herron, and Smith), *id.* 2–13, as well as a final section purporting to discuss "cost benefit theories of voter registration and turnout," *id.* 13–20. That joint report failed to reveal the division of labor between the two experts.[1] In deposition testimony, however, each expert testified in deposition that the two authors divided up the work as follows:

- Dr. Alford drafted the section entitled "Dr. Lichtman's Report" on pages 2–3 of the joint report.[2] Alford Dep. (ECF No. 125-4) 24:16–21; Stein Dep. (ECF No. 125-3) 54:19–22.

- The experts divided up the section entitled "Dr. Herron's Report" on pages 3–8 of the joint report as follows:

---

[1] Courts have suggested that this is required by Rule 26(a)(2)(B), which requires a disclosure for each "witness." *See, e.g.*, *Adams v. United States*, No. 4:CV 03-49-BLW, 2011 WL 2144574, at *1 (D. Idaho May 29, 2011) ("When two experts work as a team and divide up the work, the report must reveal this division of labor.").

[2] When describing the page ranges of the joint report, the motion uses the label on the bottom center of each page of the report (rather than ECF pagination), in order to track the deposition testimony and avoid confusion.

2

- - o Dr. Alford drafted the introductory section that appears on page 3 of the joint report. Alford Dep. 61:22–62:16; Stein Dep. 58:9–59:1.

  - o Dr. Stein testified that he drafted the three bullets in the subsection entitled "Summary" on page 4 of the joint report, Stein Dep. 58:19–59:1, whereas Dr. Alford testified that they "probably worked on the bullets together" and that Dr. Alford believed he had drafted the first bullet. Alford Dep. 87:12–25.

  - o Dr. Stein drafted the subsection entitled "Missing measures and analysis in the Herron expert report" on pages 4–8 of the joint report. Alford Dep. 96:22–97:11, 118:22–2; Stein Dep. 59:2–8.

- Dr. Alford drafted the section entitled "Dr. Smith's Report" on pages 8–13 of the joint report, including the section of the report about the publication that Dr. Smith and Dr. Herron co-authored in 2013. Alford Dep. 24:22–25:1, 190:6–11; Stein Dep. 52:11–21, 60:5–8, 60:17–61:11.

- Dr. Stein drafted the section entitled "Cost Benefit Theories of Voter Registration and Turnout" on pages 13–20 of the joint report, with the possible exception of the first two framing sentences of that section. Stein Dep. 47:18–49:19 ("I would say that I was responsible for all of the material and the writing in that section" from pages 14 through 20); Alford Dep. 152:4-17, 214:7–217:1.

Therefore, Dr. Stein should be prohibited from testifying about Dr. Lichtman's or Dr. Smith's reports, because he did not write the sections of the report addressing those experts. Similarly, Dr. Alford should be prohibited from testifying about "Cost Benefit Theories of Voter Registration and Turnout" and regarding Dr. Herron's report, Dr. Stein and Dr. Alford should be limited to their respective sections described under the second bullet points.

## II. Dr. Stein and Dr. Alford cannot testify about the portions of the joint report that they were not responsible for drafting.

Courts have acknowledged that joint reports can prove problematic in circumstances "when the offered experts have different areas of expertise and are not individually qualified to testify about each opinion in the report." *State Farm Mut. Auto. Ins. Co. v. Complete Care Centers, LLC*, No. 6:20-CV-1240-WWB-EJK, 2022 WL 18456523, at *3 (M.D. Fla. Dec. 20, 2022), or where "it isn't clear whether both experts adhere to all of the opinions in the report and they do not delineate which opinions belong to which expert," *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 815 (10th Cir. 2013) (citations omitted).

To be clear, co-authored expert reports themselves are not "always and inherently impermissible." *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 815 (10th Cir. 2013). Joint reports are permissible where, for instance, the co-authoring experts "each unequivocally testified that all of the statements and opinions in their joint report are the opinions of each of them individually as well as their mutual and collective opinions." *State Farm Mut. Auto. Ins. Co. v. Complete Care Centers, LLC*, No. 6:20-CV-1240-WWB-EJK, 2022 WL 18456523, at *2 (M.D. Fla. Dec. 20, 2022) (collecting cases).

But that is not the case here. In his deposition, Dr. Alford explained that—unlike in academic articles he has written with co-authors—this report does *not* represent his and his co-author's "collective thinking":

4

> I have written papers that way before where literally every word of the report was, the two people were sitting together in a room and a third person was typing, and the two people who are coauthoring the report were literally filling in beginnings and endings of sentences to the point that you couldn't have taken a single sentence out of the report and said that it wasn't coauthored. **That's not the case here.**
>
> There are sections of this, large sections of the report that were written by Dr. Stein and then pieced into the final report by me. **So we are not coauthors in the sense that everything here reflects our coordinated or collective thinking.** It's coauthored in the sense that we broadly agree, I think with each other, on the contents of the report, but there are sections that are my words and my thoughts, and there are sections that are Dr. Stein's words and Dr. Stein's thoughts.

Alford Dep. 120:22–121:17.

Deposition testimony confirmed why Drs. Alford and Stein should not be permitted to comment on the portions of the report drafted by their co-author. Indeed, while Dr. Alford testified that he "agree[d] with the parts that Dr. Stein authored," he could not "take ownership of" those sections of the report, and compared doing so to "plagiarism." Alford Dep. 118:25-120:1; *see also* Alford Dep. 120:2-10 ("If I didn't write it, it can't be attributed to me."). Dr. Alford explained that he and Dr. Stein have different areas of expertise, Alford Dep. 19:5–20:13, and that he had not confirmed the veracity of some of Dr. Stein's representations in the report, nor could he provide any independent expertise about some of Dr. Stein's findings. *See* Alford Dep. 217:2-19 (testifying that, with respect to pages 14–20 of the joint report: "Again, I can't tell you why he wrote what he wrote, and I can't really provide independent expertise about the findings because it's not my area of expertise, it's

5

his."); Alford Dep. 219:4-220:22 (testifying that he did not "do anything to confirm" Dr. Stein's representation about what the consensus in the literature shows, and that he had not reviewed all of the papers cited as support for this proposition in the report); Alford Dep. 98:10-19 ("I mean you'd be better asking Dr. Stein about what, exactly what he's referring to in that regard. I don't find anything here that I disagree with, but I didn't write it. It's not, you know, it's not the point, the point that I'm particularly making here. So he could tell you about that better than I could. It's his area, it's not really mine. . . . It's also his area of expertise so he'd be the right person to ask."). For example, although the section of the report about Dr. Herron's analysis purports to identify "[t]wo empirical conditions" that "need to be shown," Dr. Alford testified that he did not have any "understanding of how these two empirical conditions were determined to be necessary." Alford Dep. 118:5-24.

Moreover, neither Dr. Stein nor Dr. Alford made major substantive edits that contributed to the work the other author had drafted. Dr. Alford testified that his role with respect to the portions of the report that Dr. Stein had drafted were limited, explaining that he told Dr. Stein that he "would reorganize rather than rewrite the sections [Dr. Stein had] worked on." Alford Dep. 236:23-237:10. When asked about his role with respect to paragraphs that Dr. Alford drafted, Dr. Stein similarly testified: "I read them and made comments and suggested edits, but they were not any more than editorial." Stein Dep. 52:19–53:4.

6

Given this division of labor and lack of meaningful oversight or revision of each other's work, this Court should limit the testimony of Dr. Stein and Dr. Alford to only those conclusions that each expert was responsible for drafting. "While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts ..., such expert must make some findings and not merely regurgitate another expert's opinion." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009); *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) ("One expert may not . . . merely adopt another expert's opinions as his or her own reflexively and without understanding the materials or methods underlying the other expert's opinions.").

Plaintiffs respectfully request that this Court limit the testimony of Dr. Stein and Dr. Alford to only those conclusions for which each of them was respectively responsible for drafting.

### III. Dr. Alford lacks the necessary knowledge, skill, experience, training, or education to opine on matters of voter registration.

Under Rule 702, expert testimony must meet certain familiar conditions to be admissible, including that the expert witness must be "qualified as an expert by knowledge, skill, experience, training or education." Fed. R. Ev. 702. This standard must be rigorously enforced. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) ("In determining the admissibility of expert testimony under Rule 702," courts must consider, among other things, whether "the expert is

7

qualified to testify to competently regarding the matters he intends to address."). The "burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (internal citations omitted).

"The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–92 (D. Md. 2001) (collecting cases). For instance, in *Shreve*, the court held that "an expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering." *See also Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) ("That a witness qualifies as an expert with respect to certain matters or areas of knowledge, does not mean that he or she is qualified to express expert opinions as to other fields.") (cleaned up); *Nimely v. City of N.Y.*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) (just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields"); *United States v. Roldan-Zapata*, 916 F.2d 795, 805 (2d Cir. 1990) ("A witness may be qualified as an expert on certain matters and not others.").

In Dr. Alford's own words: Voter registration is "not an area that I typically do expert work in," Alford Dep. 31:3–4, and "it's not an area that I have any recent experience in or that I would consider to be a major area for my work as a testifying expert," *id.* 227:15–17.

Over the course of the past decade, Dr. Alford has exclusively practiced as an expert in a specific, different field: racially polarized voting analysis in the context of Voting Rights Act redistricting cases. *Id.* 19:23–25, 34:2–4. He has published and presented on issues relating to redistricting, partisanship, and voting behaviors, and he has provided racially polarized voting analysis as an expert witness at least eight times in the last two years. *See* Ex. A at 40–41, 46, 49. Courts have typically concluded that Dr. Alford is qualified to opine about racially polarized voting,[3] and he has not opined as an expert in *any other field* in the last ten years. Alford Dep. 34:2–4.

The fact that Dr. Alford holds a doctorate in political science and has practiced as an expert on certain specific issues, however, does not qualify him to testify as an expert in *all* areas related to political science. *Shreve v. Sears, Roebuck & Co.*, 166

---

[3] Although even in that field, courts have not infrequently criticized his methodology and rejected his conclusions as unhelpful. *See, e.g.*, *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 840–41 (M.D. La.), ("The Court finds that Dr. Alford's opinions border on *ipse dixit*. His opinions are unsupported by meaningful substantive analysis and are not the result of commonly accepted methodology in the field. Other courts have found the same."), *vacated and remanded on other grounds*, 86 F.4th 574 (5th Cir. 2023); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305–06 (N.D. Ga. 2022) (holding that Dr. Alford's "conclusions were not reached through methodologically sound means and were therefore speculative and unreliable").

F. Supp. 2d 378, 391–92 (D. Md. 2001) (collecting cases). Just as "an expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering," *id.*, a political scientist cannot be considered qualified to testify as an expert on any issue in the vast field of political science.

That principle is especially true where, as here, Dr. Alford has *no* experience in the subject matter that is actually relevant to this case. Concretely: Dr. Alford has never "been published on issues related to voter registration." *Id.* 30:3–5. He does not "teach any courses . . . on the effects of voter registration laws." *Id.* 227:6–9. He could not even recall any project in which he had even "researched issues related to voter registration," including any "research into the motivations behind why people register to vote using different voter registration methods" or "any research on third party voter registration organizations." *Id.* 30:6–19. Apart from this current case, he has never "been asked to opine on the impact of third-party voter registration organizations on voter registration or voter turnout," *id.* 33:14–34:4, or more generally on the "effects of voter registration laws or regulations," *id.* 227:10–17.[4] Nor has he "ever testified on behalf of Plaintiffs in a voting case challenging election administration laws" more broadly. *Id.* 231:23–25.

---

[4] Dr. Alford testified that he may have once written an expert report on the "relationship between being registered to vote and being selected to be on the jury wheel," but candidly acknowledged "that's pretty tangential." Alford Dep. 30:20–31:3; *see also id.* 227:10–17.

When asked to describe any training he has had on the effects of voter registration laws, Dr. Alford testified:

> I have a degree in public administration, a master's degree. I have taught graduate level courses on public policy analysis. My first major publication was a public policy analysis. My first peer-reviewed article was a public policy analysis. I don't do a lot of public policy analysis, and haven't done after the early part of my career, but I do have training in that area.
>
> **I'm not trained specifically in this, and it's not, you know, this is not an area that I do research in or typically consult in. Sort of details of third party voter registration organizations are not my thing.**
>
> So I have -- part of what we're, part of what this is about is what does the structure of a policy analysis look like, and I've done policy analysis and I've taught methods for policy analysis so I feel qualified to comment on that, and that's what I'm doing here.
>
> **But it's not, this is not an area that I do research in or follow, and it's not the main area, most of my expert testimony in, particularly in recent decades, has been narrowly focused on racially polarized voting analysis for Gingles 2 and 3, and Senate Factor 2.**

*Id.* 226:2-227:5.

Indeed, in deposition testimony, Dr. Alford explained that when Defendants approached him about work as an expert in a different field—where he has never published, taught, or offered expert testimony before—his first reaction was to note his lack of expertise and offer up the name of a colleague, Dr. Stein. Specifically, Dr. Alford testified that when contacted by Defendants' counsel and asked if this case "was something that [he] might be interested in or had thoughts about," Dr. Alford "indicated that it was really more the kind of work that [his] colleague, Dr.

11

Stein, does" and he "said [he] would put the attorneys in touch with Dr. Stein," who ultimately wrote most of the joint report Defendants submitted in this case. Alford Dep. 11:2–11; *see also id.* 173:18–24 ("I told [Dr. Stein] that I had been contacted by some lawyers with regard to a case in Florida, that it was related to third party registration, that I thought it was more in his area than mine. I told him as much, and that if he was okay with it, I would pass along contact information and have him talk to the lawyers."). Dr. Stein indicated that he "was willing to work on the case," but that he "preferred that [Dr. Alford] be involved as well, mostly because of time constraints, just having somebody to help out a *little bit*." *Id.* 11:19-12:8 (emphasis added). Dr. Alford similarly testified that Dr. Stein "certainly is the author of the bulk of the analysis in the report." *Id.* 24:4–5.

As discussed above, in his deposition, Dr. Alford acknowledged that—unlike some of his academic research with co-authors—his Rule 26(a)(2) disclosure does *not* represent his and his co-author's "collective thinking":

> There are sections of this, large sections of the report that were written by Dr. Stein and then pieced into the final report by me. **So we are not coauthors in the sense that everything here reflects our coordinated or collective thinking** . . . . there are sections that are my words and my thoughts, and there are sections that are Dr. Stein's words and Dr. Stein's thoughts.

Alford Dep. 120:22–121:17.

Dr. Alford further disclaimed that he and Dr. Stein have different areas of expertise, Alford Dep. 19:5–20:13, and that he had not confirmed the veracity of

12

some of Dr. Stein's representations in the report, nor could he provide any independent expertise about some of Dr. Stein's findings. *See* Alford Dep. 217:2-19 (testifying that, with respect to pages 14–20 of the joint report: "Again, I can't tell you why he wrote what he wrote, and I can't really provide independent expertise about the findings because it's not my area of expertise, it's his."); Alford Dep. 219:4–220:22 (testifying that he did not "do anything to confirm" Dr. Stein's representation about what the consensus in the literature shows, and that he had not reviewed all of the papers cited as support for this proposition in the report); Alford Dep. 98:10–19 ("I mean you'd be better asking Dr. Stein about what, exactly what he's referring to in that regard. I don't find anything here that I disagree with, but I didn't write it. It's not, you know, it's not the point, the point that I'm particularly making here. So he could tell you about that better than I could. It's his area, it's not really mine. . . . It's also his area of expertise so he'd be the right person to ask.").

Because he concededly lacks relevant knowledge, expertise, and training on the issues that are relevant to this case, including many of the issues discussed in the joint report, this Court should preclude Dr. Alford from testifying as expert on issues relating to voter registration and 3PVROs. At minimum, because Dr. Alford could not provide any "basis and reasons" for the portions of the report that Dr. Stein wrote, *cf.* Fed. R. Civ. P. 26(a)(2)(b), he should be precluded from testifying about that portion of the analysis.

## **CONCLUSION**

This Court should hold that Dr. Stein and Dr. Alford are prohibited from testifying about any portions of their joint report that their co-author was responsible for drafting. This Court should also conclude that Dr. Alford is not qualified to testify as an expert on issues relating to voter registration and 3PVROs, and should prohibit him from providing expert testimony on those subjects.

## **LOCAL RULE 7.1(F) CERTIFICATE**

This Memorandum contains 3,695 words.

Dated: February 23, 2024

Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
4700 Millenia Blvd.
Suite 500
Orlando, FL 32839
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org
dalicea@latinojustice.org

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Respectfully submitted,

*/s/ Megan C. Keenan*
Megan C. Keenan*
Adriel I. Cepeda Derieux*
**American Civil Liberties Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
acepedaderieux@aclu.org
mkeenan@aclu.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org

14

Estee M. Konor*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
ekonor@demos.org

John A. Freedman*
Jeremy Karpatkin*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com


*Admitted Pro Hac Vice*

dcampbell-harris@aclu.org
slakin@aclu.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

*Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico*

15