IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HISPANIC FEDERATION, et al.,

    *Plaintiffs*,

v.                                              Case. No. 4:23-cv-218-MW/MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

    *Defendants*.

_____/

**THE SECRETARY'S RESPONSES**
**TO PLAINTIFFS' MOTIONS IN LIMINE**

The Secretary responds to Plaintiffs' motions in limine. Docs.141, 142.

1

**Introduction**

Plaintiffs filed two motions in limine: one concerning the State's experts, Dr. Alford and Dr. Stein, Doc.141, and one concerning the Individual Plaintiffs' immigration histories and benefits, Doc.142. For the reasons explained below, this Court should deny the motions.

**I.     This Court Should Deny Plaintiffs' "Motion to Limit Expert Testimony and to Exclude Defense Expert Dr. Alford's Testimony," Doc.141.**

In their first motion in limine, Plaintiffs ask this Court to (1) prevent Dr. Alford and Dr. Stein, respectively, from opining on portions of the joint report that they didn't draft, and (2) prevent Dr. Alford from "testifying as an expert on issues relating to voter registration and 3PVROs." Doc.141 at 1.

**A.** More specifically, Plaintiffs argue that:

> Dr. Stein should be prohibited from testifying about Dr. Lichtman's or Dr. Smith's reports, because he did not write the sections of the report addressing those experts. Similarly, Dr. Alford should be prohibited from testifying about "Cost Benefit Theories of Voter Registration and Turnout" and regarding Dr. Herron's report, Dr. Stein and Dr. Alford should be limited to their respective sections described under the second bullet points.

Doc.141 at 3. Plaintiffs' position has several flaws.

For starters, the *Hispanic Federation* Plaintiffs proffered only Dr. Smith as an expert witness. The *NAACP* Plaintiffs proffered Dr. Lichtman and Dr. Herron. The *League* Plaintiffs didn't proffer an expert witness. It's therefore unclear how the *Hispanic Federation* Plaintiffs can ask this Court to limit testimony concerning the *NAACP*

2

Plaintiffs' expert witnesses. The *NAACP* Plaintiffs didn't ask for this kind of relief, even in their own motion in limine. 4:23-cv-215, Doc.232 (N.D. Fla. Feb. 23, 2024). And the *NAACP* Plaintiffs joined the *Hispanic Federation* Plaintiffs' *other* motion in limine, but not this one. 4:23-cv-215, Doc.230 (N.D. Fla. Feb. 23, 2024).

Even putting that aside, the *Hispanic Federation* Plaintiffs' arguments don't get them far. A joint report, and subsequent joint testimony, is appropriate when the experts "reviewed the same materials and, working together, came to the same opinions." *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 F. App'x 810, 816 (10th Cir. 2013) (Gorsuch, J.). Put differently, two experts can opine on a joint report when both can "unequivocally testif[y] that all of the statements and opinions in their joint report are the opinions of each of them individually as well as their mutual and collective opinions." *Univ. of Fla. Research Found., Inc. v. Motorola Mobility LLC*, No. 13-cv-61120, 2013 U.S. Dist. LEXIS 201302, at *8 (S.D. Fla. Dec. 23, 2013).

That's the case here. During his deposition, for example, Dr. Alford stated that the joint report reflects his opinions, even the portions where Dr. Stein took the lead. *E.g.*, Doc.125-4 34:16-19, 89:19-25, 91:11-13. He also explained the division of labor between with Dr. Stein:

> Q. So it sounds like your understanding of the division of labor is that the bulk and the majority of the substance of this expert report was authored by Dr. Stein with your input and edits and suggestions apart from kind of the introductory materials, introductory paragraphs; is that a fair representation?

3

> A. Yes, just the introductory material and the section that references the figure from the Smith and Herron State Politics article, that's correct. . . . But I just want – we discussed – he provided me with drafts. We discussed those things. We, you know, we, in the final editing there was back-and-forth and discussion. So I wouldn't, I wouldn't say I had no input into what he wrote, either in the sense that we discussed it and we discussed broadly the issues prior to his taking up his writing task and my taking up mine. But in terms of where the, where the first draft of the text came from, it's, I think the discussion we've had is accurate.
>
> Q. And do you endorse everything in the expert report as if it was attributable and written by you?
>
> A. Yes.

*See* Doc.125-4 25:5 – 26:7. Dr. Stein similarly explained that he subscribes to all of the opinions in the joint report. *See* Doc.125-3 53:20 – 54:1 ("[M]aybe the global answer would be we coauthored this expert report and the opinions in here are those that I also subscribe to and share with Professor Alford."). Dr. Alford's and Dr. Stein's deposition testimony is consistent with the fact that their joint report uses the word "we." *See, e.g.*, Doc.141-1 at 2 ("In this report, we will be addressing the quantitative empirical evidence in the reports . . . ."); *id.* at 4 ("We do not find Professor's Herron's conclusion about the discriminatory effect of SB 7050 to be supported by his findings."); *id.* at 18 ("According to rational choice theory, we would expect . . . .").

Plaintiffs try to confuse matters by taking deposition testimony out of context. For instance, they reference a portion of Dr. Alford's deposition testimony, where he stated that he couldn't take "ownership" of some sections of the joint report. Doc.141 at 5. But consider the full colloquy with the deposing attorney, and consider Dr. Alford's answers in light of the recent plagiarism scandals in higher education:

4

Q. And you take ownership of this report as if it's your own?

A. I don't know what that means.

Q. You agree that all of the, everything that's written in this report, you take ownership over as if you had written it on your own, right?

A. I mean that sounds exactly like the definition of plagiarism. I don't take ownership of it. You asked me if I disagreed with anything or if I agree. I've obviously read the whole report. I agree with the parts that Dr. Stein authored, but I don't take ownership of them in the sense of, you know, that these are my words, they're not. But – I don't disagree with that part of the report, but I didn't write that report so I can't take ownership of it.

Q. I didn't mean to interrupt you.

A. I don't know what it means to take ownership of something, but in my view, with scholarship, taking ownership means both credit claiming and basically having been an essential producer of that, of that text and that narrative, and I'm not either of those here. So I'm not disagreeing with it, but I can't explain it in terms of the origin of it much beyond telling you that, at least in my recollection, Dr. Stein wrote this.

Q. And you do agree that you testified earlier that you believe everything in this report can be attributable to you as a coauthor, right?

A. Again, if I said that, I wasn't thinking about what you might mean by, as I should have been, by attributable. Again, attribution is an authorship question. That's an important one in academics. If I didn't write it, it can't be attributed to me.

Q. You coauthored this report?

A. Yes.

Q. And you stand by the assertions that are made in this report regardless of who wrote it?

A. Yes, I do. But I guess there are two ways of thinking, or three ways at least of thinking about coauthorship. You could say a paper is coauthored, meaning that I wrote half of it and Dr. Stein wrote half of it. That's not the case. He wrote more than half of it. You could say it's coauthored in the sense that we both wrote all of it. And I have written papers that way before where literally every word of the report was, the two people were sitting together in a room and a third person was typing,

5

> and the two people who are coauthoring the report were literally filling in beginnings and endings of sentences to the point that you couldn't have taken a single sentence out of the report and said that it wasn't coauthored. That's not the case here. There are sections of this, large sections of the report that were written by Dr. Stein and then pieced into the final report by me. So we are not coauthors in the sense that everything here reflects our coordinated or collective thinking. It's coauthored in the sense that we broadly agree, I think with each other, on the contents of the report, but there are sections that are my words and my thoughts, and there are sections that are Dr. Stein's words and Dr. Stein's thoughts.

Doc.125-4 118:25 – 121:17. Given the full answer and greater context, Dr. Alford and Dr. Stein still agree with one another's position, still stand by the joint report, and should be able to testify about it.

Finally, the Secretary listed both Dr. Alford and Dr. Stein as "will call" witnesses on his witness list. Plaintiffs will therefore have the opportunity to cross examine both State experts. If Dr. Alford or Dr. Stein testify to matters beyond their purview, or if they contradict their deposition testimony, Plaintiffs can confront them on cross examination, and Dr. Alford's and Dr. Stein's answers will go to their credibility and the weight of their testimony. In sum, motions in limine aren't "intended to supplant the adversary system." *Allision v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" contested "but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).

Thus, this Court shouldn't limit Dr. Alford's and Dr. Stein's testimony.

**B.** Next, Plaintiffs contend that Dr. Alford shouldn't be able to opine on "voter registration and 3PVROs." Doc.141 at 1. Plaintiffs, however, aren't entirely clear on what they mean by "voter registration and 3PVROs." At one point in their motion, they suggest that "voter registration and 3PVRO" topics would include "motivations behind why people register to vote using different voter registration methods," as well as why 3PVROs exist and what they do. Doc.141 at 10 (citation omitted).

But Dr. Alford wasn't asked to opine on such topics. And the joint report doesn't offer any opinions on the matter. Instead, Dr. Alford, along with Dr. Stein, was asked to "address[] the quantitative empirical evidence in" the *Hispanic Federation* and *NAACP* Plaintiffs' expert "reports" and the findings of Plaintiffs' experts regarding the purported "impacts, if any, of SB 7050 on Florida voters." Doc.141-1 at 2-3.

To the extent that Plaintiffs seek to prevent Dr. Alford from opining on any and all quantitative empirical analyses and conclusions, including Dr. Smith's analyses and conclusions concerning 3PVROs, then that would be inappropriate. Dr. Alford can and should be able to opine on that (as well as *NAACP* Plaintiffs' Dr. Herron's analyses and conclusions). Dr. Alford is trained in political science and statistics, has been used as an expert witness in over fifteen cases that involve political science and statistics, and has written and published on political science and statistics. *See* Doc.141-4 14:16-18; Doc.141-1 at 37, 48-49; *see also* Doc.141-1 at 36-49 (Dr. Alford's curriculum vitae).[1] This

---

[1] He has also taught courses on elections and voting behavior, to name a few. *See* Doc.141-1 28:12 – 30:2.

7

training, experience, and education makes him qualified to opine on the plaintiffs' experts' political science and statistics. *See United States v. Majors*, 196 F.3d 1206, 1215-16 (11th Cir. 1999); *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, No. 18-cv-21365, U.S. Dist. LEXIS 83961, at *7-9 (S.D. Fla. Mar. 11, 2019).

Indeed, expert qualification "is not a stringent inquiry." *St. Louis Condo. Ass'n*, U.S. Dist. LEXIS 83961, at *8. And, contrary to Plaintiffs' apparent position, this isn't a situation where a biologist is opining on chemistry. *E.g.*, *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005). Or where a clinical psychiatrist is opining on social science and statistics. *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1369 (11th Cir. 2014).

Here, a political scientist with a specialty in statistics is opining on political science and statistics. Even so, Plaintiffs again reference statements made by Dr. Alford in his deposition. Doc.141 at 9-13. And again, Plaintiffs' concerns are better addressed on cross examination, not in a motion in limine—especially a motion in limine before a bench trial.

This situation is no different from *League of Women Voters of Florida v. Florida Secretary of State*, 4:21-cv-186, Doc.422 (N.D. Fla. Jan. 4, 2022). There, the plaintiffs moved to exclude the State's expert witness, arguing that the expert was "not qualified to opine on the issues raised by Plaintiffs' reports." 4:21-cv-186, Doc.422 at 10. The State disagreed, contending that the expert, "as a political scientist," could "comment on the statistical analyses performed by Plaintiffs' political science expert." 4:21-cv-186,

8

Doc.422 at 10. In denying the plaintiffs' motion, this Court stated that "an adversarial presentation at trial will put it in the best position to determine what weight—if any— to give" the expert's "testimony." 4:21-cv-186, Doc.422 at 10; *see also* 4:21-cv-186, Doc.360 at 3 (similar). So too here. If Plaintiffs are concerned about Dr. Alford's testimony, they have the ability to cross examine him.

All told, Plaintiffs' first motion in limine should be denied.

**II.   This Court Should Reject "Plaintiffs' Motion to Limit Evidence Regarding Individual Plaintiffs' Immigration Histories to Current or Pending Immigration Status and to Preclude Evidence of Eligibility for Immigration Benefits," Doc.142.**

In their second motion, Plaintiffs argue that the Individual Plaintiffs' immigration history, status, and benefits are (mostly) irrelevant and could lead to a "waste of time, improper confusion, and unfair prejudice" if introduced at trial. Doc.142 at 1. For ease of reading, the Secretary will generally refer to the Individual Plaintiffs' immigration history, status, and benefits as their "backgrounds."

**A.** Plaintiffs contend that the Individual Plaintiffs' backgrounds are irrelevant— aside from establishing standing. Doc.141 at 3. The issue with this argument is that relevance is a "low bar," *United States v. Chukwu*, 842 F. App'x 314, 319 (11th Cir. 2021), and Federal Rule of Evidence 401's definition of "relevance" "implies a liberal standard of admissibility," Weinstein's Evid. Manual § 6.01[5][a] (2015).

From the jump, Plaintiffs concede that the Individual Plaintiffs' backgrounds are relevant in this case. They admit that they need it to establish standing. Doc.142 at 5.

9

Despite this concession, Plaintiffs still contend that it's irrelevant. Yet they don't fully explain how a fact that is necessary to establish standing is completely irrelevant as to the merits. Plaintiffs' argument wouldn't work in other contexts. It wouldn't work in a Second Amendment case: a plaintiff couldn't argue that it's enough that he possesses a firearm and that the State should be precluded from looking into his firearm history.

Plaintiffs are essentially forcing the State to simply take the Individual Plaintiffs' immigration backgrounds at the Individual Plaintiffs' words. Taken to the extreme, Plaintiffs are preventing the State from asking *any* questions about the Individual Plaintiffs' backgrounds in other countries, questions that could go to their credibility and the weight of their testimony, and may well support the State's rational justifications for enacting the provisions at issue in these consolidated cases. That, of course, thwarts the "adversar[ial]" process. *Allision*, 184 F.3d at 1311.

More to the point, the Individual Plaintiffs' backgrounds have a particular relevance in this case. In passing SB7050, the Florida Legislature concluded that noncitizens, like the Individual Plaintiffs, couldn't collect or handle voter-registration forms for 3PVROs. Thus, for trial, there's a factual issue of whether noncitizens should be able to perform these duties in light of the State's asserted interests in safeguarding election integrity, preventing voter fraud, ensuring voter registration applications are timely processed, and otherwise promoting uniformity, efficiency, and confidence in the election system. The Individual Plaintiffs' backgrounds are certainly relevant to this inquiry. In previous filings, for example, the Secretary argued that noncitizens' lack of

10

legal bonds to a community (and greater bonds to their country of citizenship) justifies SB7050's restrictions. Doc.60 at 28. The Individual Plaintiffs' backgrounds have a "tendency to make" that "consequen[tial]" fact "more" "probable than it would be without the evidence." Fed. R. Evid. 401.

Similarly, in another filing, the Secretary argued that there's a general flight risk with noncitizens, which could lead to untimely submitted voter-registration forms. Doc.136 at 7-8. In this situation, too, the Individual Plaintiffs' backgrounds have a "tendency to make" that "consequen[tial]" fact "more" "probable than it would be without the evidence." Fed. R. Evid. 401.

Plaintiffs can't simply throw a veil over part of the Individual Plaintiffs' lives and simply say, 'nothing to see here.' All relevant information should remain fair game for direct and *cross* examination. That information includes Plaintiffs' backgrounds.

**B.** As an alternative argument, Plaintiffs contend that the Individual Plaintiffs' backgrounds are "outweighed by the potential to waste time, confuse the issues, harass witnesses," and "chill litigants from pursuing meritorious claims" under Federal Rule of Evidence 403. Doc.142 at 5. The issue with this argument is that excluding evidence under Rule 403 "is an extraordinary remedy which should be used sparingly," *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983), and that a balance should be struck in favor of admissibility, *United States v. Stapleton*, 39 F.4th 1320, 1322 (11th Cir. 2014). Each of Plaintiffs' bases prove unavailing.

11

Time won't be wasted. In arguing to the contrary, Plaintiffs point to translation difficulties during the Individual Plaintiffs' depositions. Doc.142 at 6. But potential translation issues shouldn't be used as a basis to prevent the Secretary from obtaining admissible evidence. And to the extent that Plaintiffs quibble with the deposition questions, the point of discovery is to broadly seek information from opposing parties. The deposition questions did just that. Because of the questions asked during the depositions, trial questions can be more refined.

No confusion will be caused. This is a bench trial, not a jury trial. Not satisfied, Plaintiffs contend that there will be misunderstandings in translations if statutory and colloquial terms are used during trial. Doc.142 at 7-8. But that potentiality could arise whenever a case requires translation of legal and non-legal terms into another language. The solution to Plaintiffs' concerns isn't excluding evidence; it's establishing clear definitions and understandings between the attorneys, witnesses, and translators. *See* Fed. R. Evid. 604 ("An interpreter must be qualified and must give an oath or affirmation to make a true translation.").

There will be no impermissible chilling. In denying Plaintiffs' motion to proceed anonymously, this Court found "that mere allegations of threats and harassment is insufficient to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings. This is especially true where the targets of such threats and harassment are not minors and where the subject at issue does not involve matters of utmost intimacy." Doc.78 at 5-6.

So too here. That Plaintiffs can only point to Fair Labor Standards Act cases, where immigration background wasn't the main issue in those cases, does nothing to bolster their arguments. Doc.142 at 9. As Plaintiffs admit (and then attempt to backtrack), the "Individual Plaintiffs' status as non-citizens is highly relevant to their claims." Doc.142 at 10.

All told, this Court should deny Plaintiffs' second motion in limine.

## Conclusion

For the reasons explained above, this Court should reject Plaintiffs' two motions in limine. Docs.141, 142.

Dated: February 29, 2024

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Respectfully submitted,

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Joshua E. Pratt (FB 119347)
jpratt@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

John J. Cycon (NYBN 5261912)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy
Haymarket, VA 20169
Telephone: (212) 701-3402
jcycon@holtzmanvogel.com

*Counsel for Secretary Byrd*

*\*Admitted pro hac vice*

14

## Certificate of Compliance

I certify that this response is 3,197 words, which is under the 8,000-word limit in Local Rule 7.1. I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil

## Certificate of Service

I certify that on February 29, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil