# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al.,*

        *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, et al.,

        *Defendants*.

Case No. 4:23-cv-00218
Consolidated Case No. 4:23-cv-00215

# HISPANIC FEDERATION PLAINTIFFS'
# <u>WRITTEN CLOSING ARGUMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

     A.    Third Party Voter Registration Organizations ("3PVROs") and Voter Registration in Florida ...................................................................3

     B.    The Importance of Non-Citizens to 3PVRO's Registration Efforts in Florida...........................................................................................9

     C.    S.B. 7050's Citizenship Requirement ................................................12

ARGUMENT ....................................................................................13

I.    The Hispanic Federation Plaintiffs have established standing as to each of their claims. ..................................................................................13

     A.    Legal Standards ................................................................................13

     B.    Each Plaintiff has demonstrated an injury in fact. ..............................18

     1.    Individual Plaintiffs: Verónica Herrera-Lucha, Elizabeth Pico, and Norka Martínez ................................................................................20

     2.    Organizational Plaintiffs: Hispanic Federation and Poder Latinx ......25

     C.    Plaintiffs' injuries are traceable to Defendants. ................................39

     1.    Plaintiffs' harms are traceable to the Secretary...................................39

     2.    Plaintiffs' harms are fairly traceable to the Attorney General...........39

     D.    Plaintiffs' injuries would be redressed if Defendants were enjoined from enforcing the Citizenship Requirement. ................................................42

II.    The Citizenship Requirement is unconstitutional..........................................42

A.      The Citizenship Requirement violates the First Amendment. ............44

1.      *The Citizenship Requirement restricts Plaintiffs' core political speech and expression.* ................................................................44

a)      Legal Standard......................................................................44

b)      The voter-registration work that the Citizenship Requirement proscribes is expressive. ....................................................................48

c)      The voter-registration work that the Citizenship Requirement proscribes is associational. ..............................................................55

d)      The Citizenship Requirement reduces the effectiveness and quantum of Plaintiffs' speech and association.................................................57

B.      The Citizenship Requirement cannot survive strict scrutiny. ............61

1.      Strict scrutiny applies. ..........................................................61

2.      The law is unsupported by any compelling state interest. .................64

3.      The law is not narrowly tailored to further any of the interests Defendants have offered. ................................................................75

4.      Even if strict scrutiny does not apply, the Citizenship Requirement cannot survive the Anderson-Burdick framework. ......................................80

C.      The Citizenship Requirement is impermissibly vague and substantially overbroad. ................................................................90

1.      *The Citizenship Provision cannot be construed to avoid vagueness and overbreadth concerns.* ...................................................................91

2.      *The Citizenship Requirement fails to provide adequate notice of the conduct it prohibits.* .......................................................................96

3.      *The Citizenship Requirement's ambiguities authorize arbitrary and discriminatory enforcement.* ......................................................102

4.      *The Citizenship Requirement punishes a substantial amount of protected speech that reaches beyond its legitimate sweep.* .......................104

CONCLUSION ..................................................................................................107

# TABLE OF AUTHORITIES

## Cases

*Agency for International Development v. Alliance for Open Society*
  *International, Inc.*,
  140 S. Ct. 2082 (2020) ........................................................................19

*American Association of People with Disabilities v. Herrera*,
  690 F. Supp. 2d 1183 (D.N.M. 2010) ......................................... 46, 57

*American Booksellers v. Webb*,
  919 F.2d 1493 (11th Cir. 1990) ................................................. 90, 91

*American Civil Liberties Union of Nevada v. Heller*,
  378 F.3d 979 (9th Cir. 2004) ............................................................75

*Arcia v. Florida Secretary of State*,
  772 F.3d 1335 (11th Cir. 2014) ........................................................16

*Arizona Free Enterprise Club's Freedom Club Political Action Committee v.*
  *Bennett*,
  564 U.S. 721 (2011) ........................................................................61

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) ........................................................................14

*Baggett v. Bullitt*,
  377 U.S. ) ........................................................................ 100, 104

*Bloedorn v. Grube*,
  631 F.3d 1218 (11th Cir. 2011) ............................................. 14, 15, 19

*Boos v. Barry*,
  485 U.S. 312 (1988) ........................................................................91

*Brawner v. Scott County, Tennessee*,
  14 F.4th 585 (6th Cir. 2021) ...........................................................43

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ................................................................. 19, 62

*Burdick v. Takushi*,
    504 U.S. 428 (1992)................................................................ 81, 89

*Citizens United v. Federal Election Commission*,
    558 U.S. 310 (2010).......................................................... 61, 62, 63

*Democracy North Carolina v. North Carolina State Board of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020) ................................................46

*Department of Commerce v. New York*,
    139 S. Ct. 2551 (2019).......................................................................34

*Dream Defenders v. Governor of the State of Florida*,
    57 F.4th 879 (11th Cir. 2023) ....................................................... 17, 39

*Ehlert v. United States*,
    402 U.S. 99 (1971)..............................................................................93

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................................43

*First National Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978)............................................................................61

*Florida Democratic Party v. Hood*,
    342 F. Supp. 2d 1073 (N.D. Fla. 2004) .............................................27

*Florida State Conference of Branches & Youth United of the NAACP v. Byrd*,
    680 F. Supp. 3d 1291 (N.D. Fla. 2023). ........................... 1, 39, 64, 71

*Florida State Conference of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) .........................................................16

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*,
    11 F.4th 1266 (11th Cir. 2021) .................................................... 16, 44

*Gooding v. Wilson*,
    U.S. 518 (1972)...................................................................................92

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)...............................................................93

*Harrell v. The Florida Bar*,
608 F.3d 1241 (11th Cir. 2010) .........................................15

*Harriet Tubman Freedom Fighters Corp. v. Lee*,
576 F. Supp. 3d 994 (N.D. Fla. 2021) ...............................81

*Holloman ex rel. Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) .........................................44

*Horne v. Flores*,
557 U.S. 433 (2009)...............................................................13

*In re Georgia Senate Bill 202*,
622 F. Supp. 3d 1312 (N.D. Ga. 2022)...............................64

*Jacobson v. Florida Secretary of State*,
974 F.3d 1236 (11th Cir. 2020) .........................................17

*Johnson v. United States*,
576 U.S. 591 (2015)...............................................................97

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022)...............................................................71

*League of Women Voters of Florida v. Browning*,
575 F. Supp. 2d 1298 (S.D. Fla. 2008)........................ 82, 83

*League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155
(N.D. Fla. 2012) ...................................................................45

*League of Women Voters of Florida v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006) ...............................47

*League of Women Voters of Florida, Inc. v. Lee*,
595 F. Supp. 3d 1042 (N.D. Fla. 2022) ...............................45

*League of Women Voters v. Hargett*,
400 F. Supp. 3d 706 (M.D. Tenn. 2019) .............................45

*Lewis v. Governor of Alabama*,
944 F.3d 1287 (11th Cir. 2019) .........................................................17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................. 17, 18

*Massachusetts v. Oakes*,
491 U.S. 576 (1989)........................................................................104

*Mazo v. N.J. of State*,
54 F.4th 124 (3d Cir. 2022) ...........................................................81

*McCullen v. Coakley*,
573 U.S. 464 (2014)................................................................. 51, 75

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995)........................................................ 61, 64, 80, 81

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)..........................................................................13

*Namphy v. DeSantis*,
493 F. Supp. 3d 1130 (N.D. Fla. 2020) ............................................86

*National Association for Advancement of Colored People v. Button*,
371 U.S. 415 (1963)............................................................... 18, 100

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)..........................................................................62

*Nationalist Movement v. City of Cumming*,
934 F.2d 1482 (11th Cir. 1991) .....................................................104

*New York v. United States Department of Commerce*,
351 F. Supp. 3d 502 (S.D.N.Y.) .......................................................43

*Obama for America v. Husted*,
697 F.3d 423 (6th Cir. 2012) .................................................... 81, 89

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)..............................................................................14

*Pittman v. Cole,*
    267 F.3d 1269 (11th Cir. 2001) .........................................................................14

*Pucci v. Michigan Supreme Court,*
    601 F. Supp. 2d 886 (E.D. Mich. 2009) ...........................................................24

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)...........................................................................................64

*Reno v. American-Arab Anti-Discrimination Committee,*
    525 U.S. 471 (1999)...........................................................................................19

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
    487 U.S. 781 (1988)...........................................................................................48

*Siler v. Louisville & Nashville R. Co.,*
    213 U.S. 175 (1909)...........................................................................................42

*Smith v. California,*
    361 U.S. ...........................................................................................................106

*Smith v. Goguen,*
    415 U.S. 566 (1974).........................................................................................100

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ...........................................................32, 63, 104

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016).............................................................................17, 18, 42

*Sprint Communications Co., L.P. v. APCC Services, Inc.,*
    554 U.S. 269 (2008)...........................................................................................42

*Support Working Animals, Inc. v. Governor of Florida,*
    8 F.4th 1198 (11th Cir. 2021) ............................................................................17

*Tashjian v. Republican Party of Connecticut,*
    479 U.S. 208 (1986)...........................................................................................46

*Tennessee State Conference of N.A.A.C.P. v. Hargett,*
    420 F. Supp. 3d 683 (M.D. Tenn. 2019...........................................47, 48, 55, 60

*Texas v. Johnson,*
    491 U.S. 397 (1989)................................................................44

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997)................................................................82

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990)................................................................19

*United States v. Virginia,*
    518 U.S. 515 (1996)................................................................71

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977)................................................................16

*Village of Hoffman Estates. v. Flipside, Hoffman Estates., Inc.,*
    455 U.S. 489 (1982)........................................................ 91, 104

*Village of Schaumburg v. Citizens for a Better Environment,*
    444 U.S. 620 (1980)......................................................... 48, 60

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988)......................................................... 14, 15

*VoteAmerica v. Schwab,*
    671 F. Supp. 3d 1230 (D. Kan. 2023)........................... 46, 57, 80, 82

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989)...............................................................100

*Warth v. Seldin,*
    422 U.S. 490 (1975)................................................................14

*Weaver v. Bonner,*
    309 F.3d 1312 (11th Cir. 2002) ................................................107

*Willey v. Harris County District Attorney,*
    27 F.4th 1125 (5th Cir. 2022) ....................................................71

*Williams v. Rhodes,*
    393 U.S. 23 (1968)................................................................45

*Wollschlaeger v. Governor, Florida*,
  848 F.3d 1293 (11th Cir. 2017) ............................................................ 14, 90, 100

*Yellowbear v. Lampert*,
  741 F.3d 48 (10th Cir. 2014) ...............................................................................71

**Statutes**

Fla. Stat. § 97.0575 ........................................................................................ *passim*

Fla. Stat. Ann. § 104.011 ........................................................................................80

Fla. Stat. Ann. § 104.012 ........................................................................................80

Fla. Stat. Ann. § 104.42 ..........................................................................................80

Fla. Stat. Ann. § 97.021 ............................................................................................3

**Other Authorities**

Florida Department of State, Forms, *3PVRO Registration Form* (DS-DE-
  119) (last visited Apr. 19, 2024) ..........................................................................31

## INTRODUCTION

The Hispanic Federation Plaintiffs challenge Florida's prohibition on non-citizens working or volunteering on behalf of voter-engagement organizations "handling" or "collecting" voter-registration forms ("Citizenship Requirement"). This irrational restriction on community-based voter-registration organizations carries harsh penalties of $50,000 for each non-citizen an organization employs in essentially any voter-registration activity.

Nine months ago, this Court enjoined SB 7050's Citizenship Requirement because Defendants failed to "identify[] any connective tissue between [their stated] problem and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter registration applications on behalf of 3PVROs." *Fla. State Conf. of Branches & Youth United of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1313–14 (N.D. Fla. 2023). A seven-day trial has shown that nothing has changed. Given the chance to identify evidence to support the Citizenship Requirement, Defendants abdicated: they pulled their only "will-call" fact witness and introduced no testimonial evidence of any state interest justifying the law.

Not only did Defendants fail to present testimony concerning the state's interest, the trial record contains no evidence that any of the problems the State claimed in pre-trial briefing it sought to solve with SB 7050 has ever been attributable to a single non-citizen—let alone non-citizens as a categorical class.

What the record does contain is extensive evidence showing by a preponderance that the Hispanic Federation Plaintiffs engage in core, protected speech and conduct when they help eligible citizens register to vote. The evidence demonstrates that Plaintiffs and similar organizations are already engaging in rational self-censorship, because the law's vagueness leaves Plaintiffs unable to know *what* non-citizens or their employers can do to comply with the law, resulting in Plaintiffs registering fewer would-be voters and encouraging them to register to vote.

The trial record establishes that the law directly abridges Plaintiffs' protected speech and association by imposing oppressive fines on any third-party voter-registration organization for employing non-citizens. It's also loaded with evidence that the Citizenship Requirement has curtailed protected speech and association since its passage, even in the face of this Court's preliminary injunction. And it shows that the law constrains voter-registration organizations' staffing capabilities and chills their efforts, programs, and funding—reducing the quantum of speech, expression, and association with which plaintiff organizations engage.

In short, the trial record conclusively settles what the preliminary injunction and summary judgment proceedings foreshadowed: the Citizenship Requirement is unconstitutional multiple times over. This Court should permanently enjoin Defendants from enforcing it against Plaintiffs and any other individual or organization operating in Florida.

**BACKGROUND**

**A.     Third Party Voter Registration Organizations ("3PVROs") and Voter Registration in Florida**

The definition of "third-party registration organization" is set forth in Section 97.021(40) of the Florida Statutes. Under Florida law, "[t]hird-party registration organization" refers to any person, entity, or organization soliciting or collecting voter-registration applications, except for a:

> "[P]erson who seeks only to register to vote or collect voter registration applications from that person's spouse, child, or parent," or a "person engaged in registering to vote or collecting voter registration applications as an employee or agent of the division, supervisor of elections, Department of Highway Safety and Motor Vehicles, or a voter registration agency."

Fla. Stat. Ann. § 97.021(40). That definition has been in place and effective since January 1, 2008. *See* 2007 Fla. Sess. Laws, c. 2007-30, § 1, eff. Jan. 1, 2008 (C.S. for H.B. 537).

3PVROs play a critical role in allowing Floridians to register to vote and update their voter registrations. In particular, 3PVROs like Hispanic Federation and Poder Latinx play a role in overcoming the "Latino voter registration gap" by tailoring their voter-registration work to engage the eligible Latino electorate. Tr. 570:6–14; *see generally* Tr. 569:21–572:20, 526:21–527:4, 534:14–23. 3PVROs send canvassers into the communities that they serve and concentrate their efforts in locations where the Latino "community feels safe, protected, when [3PVROs are]

able to engage them on registering voters." Tr. 570:15–571:4. 3PVROs also "draft bilingual materials, both in English and Spanish," and "work with groups that are trusted messengers" in the communities they serve to effectively "communicate that . . . Latinos should get registered to vote." Tr. 572:17–20. And in their interactions with eligible voters, 3PVROs can apply a "voter-integrated approach" to "make sure that [they] not only register the voter to be able to participate in the next up-and-coming election, but [] also educate the voter in a nonpartisan way about the issues that are affecting them most." Tr. 526:10–13. 3PVROs' efforts have had outstanding effects: for example, since 2016, Hispanic Federation has registered about 97,000 total voters in the state of Florida. Tr. 571:11–16.

This testimony was corroborated by Plaintiffs' expert Dr. Daniel Smith, who was tendered an expert in political science in the areas of election administration, voter registration, and data analysis. Dr. Smith analyzed multiple sources of data maintained by the Florida Department of State's Division of Elections to reach conclusions about Florida voters' reliance on 3PVROs. Tr. 990:1–992:22.

First, Dr. Smith examined individual-level data that the Florida Department of State produced in litigation about voter registration in Florida (PX 261–262), which identifies each Florida registered voter's most recent method of voter registration, as recorded by the Division of Elections, on two particular dates: September 1, 2023 and August 1, 2021. Tr. 990:23–992:4. Using this individual-

level data from the Florida voter file, Dr. Smith reached the following undisputed[1]

conclusions:

- As of September 1, 2023, more than 730,000 Florida voters had most recently registered or updated their registration via 3PVRO. PX 969; Tr. 999:23–1000:4. Two years earlier, as of August 1, 2021, more than 760,000 voters had done the same. PX 970; Tr. 1021:9–1022:18. These numbers capture only a snapshot of a moment in time, and so undercount the *total* number of Florida voters who have registered or updated their registration using 3PVROs. For instance, more than 145,000 people recorded as having registered via 3PVRO in the 2021 data are *not* shown as having registered via 3PVRO in the 2023 data, whether because they re-registered via a different method in those two years, or because they are no longer on the voter rolls after having

---

[1] *See* Tr. 1714:23–1715:11 (Dr. Stein testifying that he did not dispute Dr. Smith's findings about "the number of Florida voters who have relied on 3PVROs to register to vote, "the number of Florida voters who have relied on 3PVROs to update their voter registration either," or his findings "that those numbers are likely an undercount based on the data provided by the Florida Department of Elections"); *see also* Tr. 1715:21–1716:4 (Dr. Stein testifying that he did not dispute Dr. Smith's findings that "there is a higher proportion of Black and Hispanic voters who have registered through 3PVROs as compared to White voters" or that "and Hispanic voters in Florida are more than five times more likely than White voters in Florida to have registered with or updated their registration with a 3PVRO"); Tr. 1899:16– 1900:5 (Dr. Alford testifying that he did not offer any opinions about Dr. Smith's conclusions in his testimony at trial).

moved or died. Tr. 999:13–22, 1001:6–1002:7, 1026:14–1027:6; *see also* PX 977.

- The Florida Division of Elections began maintaining public records about voters who registered to vote or updated their registration with the assistance of a 3PVRO in 2012. Tr. 997:8–11. Because the individual-level data in the Florida voter file tracks the year in which a voter initially registered to vote, Dr. Smith could examine the set of voters who initially registered in 2012 or later and who were still registered to vote as of September 1, 2023. He determined that more than six percent of that set of voters had most recently registered or updated their registration via 3PVRO. PX 971. The usage of 3PVROs is even higher for voters who registered in particular years since 2012: for example, the September 1, 2023 voter file data shows that 9.8% of all the individuals who initially registered to vote in Florida in 2016 had most recently registered or updated their registration via 3PVRO. Tr. 1008:18–21; *see also* PX 975.

- Tens of thousands of individuals who initially registered to vote prior to 2012 are also recorded in the Florida voter file as having used a 3PVRO as their most recent method of registration. Tr. 1019:16–1020:11; PX 975. Because the Florida Division of Elections did not

begin tracking 3PVROs as a method of registration until 2012, a voter "could not have registered [via 3PVRO] and be recorded as such prior to 2012"—meaning that these voters necessarily *updated* their registration via 3PVRO in 2012 or later. Tr. 1037:25–1038:3.

- 3PVROs help many Florida voters to update their registration, even if those voters initially registered via some other method of registration. Tr. 1030:7–1031:11. By comparing the individual-level data across the 2021 and 2023 snapshots, Dr. Smith identified 108,999 voters whose most recent registration method prior to August 1, 2021 was the DMV, online voter registration, or some other non-3PVRO method; yet whose most recent *update* to their registration as of September 1, 2023 came via 3PVRO. *Id.*; *see also* PX 977.

- Black and Hispanic voters have disproportionately registered to vote or updated their registration via 3PVRO. Tr. 1034:4–1040:9. Of those voters who had most recently registered or updated their registration via 3PVRO as of September 1, 2023, Hispanic and Black voters were five times more likely than white voters to have most recently registered or updated their registration through the assistance of a 3PVRO. Tr. 1034:4–1036:7. These patterns of disproportionate reliance of Black and Hispanic voters on 3PVROs exists for voters

7

who initially registered before and after 2012, meaning that Black and Hispanic voters are also disproportionately likely to update their registration via 3PVRO. Tr. 1037:2–1039:21, 1040:1–9.

- Voters in certain counties have relied disproportionately on 3PVROs as well. For instance, 8.95% of all voters in Orange County, 9.04% of all voters in Leon County, 10.58% of all voters in Miami-Dade County, and 15.02% of all voters in Osceola County had most recently registered or updated their registration via 3PVRO as of September 1, 2023—approximately two to three times higher than the statewide average. Tr. 1041:5–1042:11; PX 974.

Dr. Smith also examined data that the Florida Department of State has publicly reported to the U.S. Election Assistance Commission ("EAC") every two years since 2012. PX 963–967. In particular, the Department of State reported the total number of voter-registration applications that its Division of Elections received from "registration drives" by advocacy groups or political parties[2]—or, in Florida's parlance, 3PVROs. Tr. 992:5–993:5, 1032:14–1034:1.

---

[2] The "registration drives" label is the U.S. Election Assistance Commission's "generic term because they [] collect[] data from all 50 states, Washington, D.C., and the territories." Tr. 1033:8–13. *See* PX 963 at 159 ("Registration Drives"); PX 964 at 183 ("Registration Drives"); PX 965 at 73 ("Registration Drives – Advocacy Groups or Parties"); PX 966 at 74 ("Registration Drives – Advocacy Groups or

Because the individual-level data in the voter file captures only a moment in time, and undercounts the total number of interactions that Florida voters have with 3PVROs, Dr. Smith used the Department of State's self-reporting to the EAC to try to estimate the total number of voters who have either registered or updated their voter registration via 3PVRO. This data showed that, in every two-year period since 2016,[3] the Department of State reported receiving more than 400,000 voter-registration applications from 3PVROs. Tr. 1033:18–25; PX 968. In total, from 2012 to 2022, the Florida Department of State has reported receiving 2,136,529 voter-registration applications from 3PVROs. Tr. 1033:25–1034:1; PX 968.

### B. The Importance of Non-Citizens to 3PVRO's Registration Efforts in Florida

In Florida, approximately 1.6 million non-citizens are legally authorized to work. Tr. 1458:25–1459:2. Roughly 1.3 million of these individuals are authorized to work as legal permanent residents; 297,000 are authorized under Temporary Protected Status; 67,000 are authorized under DACA, and 27,000 are authorized

---

Parties"); PX 967 at 84 ("Registration Drives from Advocacy Groups or Parties"). In Florida, only registered 3PVROs can engage in voter-registration drives. *See* Fl. Stat. §§ 97.021(40) and 97.0575. The "registration drive" category, then, necessarily includes only 3PVROs in the data that Florida reports to the federal government.

[3] The two-year periods run from one book-closing date (29 days before the election) to the next—so, for instance, the 2022 total accounts for all applications that the Florida Division of Elections received from 3PVROs from 29 days before the 2020 election to 29 days before the 2022 election.1045:23–1046:17.

under student visas. Tr. 1458:9–24. The Citizenship Requirement effectively bans all of them from working in any role with a 3PVRO that either "collects" or "handles" voter-registration application forms.

Many Plaintiffs testified about why non-citizens are critical to 3PVROs' efforts to register voters in Florida. For example, Mr. Vélez III Burgos testified about non-citizens' unique perspectives and their effectiveness in convincing eligible citizens of the importance of registering to vote:

> Noncitizens can actually talk about some things to citizens that we might not be comfortable saying. You know, I'm a U.S. citizen since I was born, and I can tell you that I hear our canvassers talk about what it means for them to have left their country, to have had parents who left their country and were never able to vote. You know, we have people who have never been able to vote in their life, and for them to be able to say to other Latino community members, you know, You have a chance to participate in democracy, especially as a Puerto Rican, it's really humbling because I -- I personally really like those conversations -- because you can see when U.S. citizens -- kind of like when it clicks on them, and they're like, Wait. This is a right that I'm not using, and in other places people have to leave because they don't have this right.

Tr. 587:23–588:12.

During trial, Plaintiff Norka Martínez offered insight into why non-citizen canvassers can be so compelling in expressing the importance of the right to vote, becoming emotional on the stand as she explained why registering voters is personally important to her:

> I come from a country where democracy has practically been lost. Therefore, over there people don't believe in the voting process. And

to encourage the people to participate in the voter registration process. . . . And to help the Latino population in this country to support democracy being that they are citizens here. For me, it was very important.

Tr. 512:4–23.

Other 3PVRO representatives testified that at least some organizations prefer to hire non-citizen canvassers. Jared Nordlund, the Florida State Advocacy Director of UnidosUS, testified about how and why non-citizens have community- and language-based connections to the communities of Hispanic voters that they register:

> A lot of our noncitizen canvassers, they obviously live in the community, and so they know where to find people to go register to vote or ask to register to vote. So having a lot of institutional and, like, local knowledge on where people are at, that helps our job. Plus, also retaining people for their institutionality of our campaign makes our job a lot easier.
> . . .
>
> So many of them will know, like, where Venezuelans, or Puerto Ricans, or Cubans, Ecuadorians – they will know where they live in certain conclaves of communities.
>
> . . .
>
> [T]hey typically are Spanish dominant, and so communicating with others who are Spanish dominant or Spanish-only speakers helps out. A lot of people we'd try to register probably are Spanish monolingual, and so they need to have somebody who actually speaks just Spanish. And so we tend to find that ends up being more noncitizens than citizens.

Tr. 95:12–96:13. Mr. Nordlund also testified that it is harder for UnidosUS to both hire and retain citizens than non-citizens, and that in UnidosUS's experience, non-

citizens are more reliable and enthusiastic about the work across election cycles. Tr. 79:22–80:4, 81:4–20, 83:16–84:13, 88:11–20.

Esperanza Sánchez, who has registered voters as an employee at UnidosUS, Hispanic Federation, and Poder Latinx, similarly testified:

> I believe the immigrant comes here looking for work. They come to this land to work. And also I believe that whenever we come, be it from Venezuela or Cuba or Colombia -- just to be able to participate over there is difficult, so when we come here, we do our best to defend that participation.

Tr. 183:24–184:16.

### C.    S.B. 7050's Citizenship Requirement

The Citizenship Requirement, codified at Fla. Stat. § 97.0575(1)(f), requires a 3PVRO to affirm under penalty of perjury to the Florida Department of State's Division of Elections that "each person collecting or handling voter registration applications" on its behalf is "a citizen of the United States." Fla. Stat. § 97.0575(1)(f).

The Citizenship Requirement punishes 3PVROs with a $50,000 fine for each violation—specifically, for "each such person" (*i.e.*, any non-citizen) collecting or handling applications on the organization's behalf. *Id.* A related provision authorizes the Attorney General to enforce the Citizenship Requirement and authorizes the Secretary to refer cases to the Attorney General when he "reasonably believes that a person has committed a violation." *Id.* § 97.0575(8).

The threat of the Citizenship Requirement has already had a dramatic impact on each of the Hispanic Federation Plaintiffs. Because their employer has cancelled its voter-registration events and stopped allowing non-citizens to register voters because of the fear of fines, the three Individual Plaintiffs have not been able to register voters since the law's enactment. Tr. 397:25–398:11, 408:21–409:12, 409:15–22, 429:5–8, 511:4–13. For Organizational Plaintiff Hispanic Federation, 70 percent of its canvassers are non-citizens, and because of the risk of fines it does not permit non-citizen employees to register voters; as a consequence, since the law was passed, it has registered the lowest number of voters in its history in Florida. Tr. 586:6–9, 588:16–589:4, 591:8–595:13, 598:13–15. And for Organizational Plaintiff Poder Latinx, 90 percent of Poder Latinx's staff are non-citizens, and it has decided it would shutter its voter-registration program if the Citizenship Requirement takes effect. Tr. 534:4–9, 538:16–17.

## ARGUMENT

## I. The Hispanic Federation Plaintiffs have established standing as to each of their claims.

### A.   Legal Standards

A plaintiff has Article III standing to bring a claim if they suffered: (a) a cognizable injury; that is (b) "fairly traceable to the challenged action"; and (c) "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

### 1. *Injury-in-Fact*

To establish an injury in fact, plaintiffs must show some "'threatened or actual injury resulting from the putatively illegal action . . . .'" *Warth v. Seldin*, 422 U.S. 490, 499(1975) (citation omitted). *See also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392(1988) (standing satisfied where speech-related law forced plaintiffs "to take significant and costly compliance measures or risk criminal prosecution") (citations omitted); *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988)("likelihood of enforcement . . . is a sufficient threat of actual injury" for standing purposes) (citation omitted).

To demonstrate a threatened injury, a plaintiff need only "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and "a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979).

### a) *Speech and Association: Injuries in Fact*

In the First Amendment context, an *actual* injury-in-fact can accrue before a law has been enforced, because "'an actual injury can exist when the plaintiff is chilled from exercising [their] right to free expression or forgoes expression in order to avoid enforcement consequences.'" *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011) (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001). *See also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en

banc) ("Where the 'alleged danger' of legislation is 'one of self-censorship,' harm 'can be realized even without an actual prosecution.'" (quoting *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 393); *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) ("In the First-Amendment realm, plaintiffs do not have to expose themselves to enforcement in order to challenge a law." (citation omitted)).

Accordingly, the Court "appl[ies] the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citation omitted).

### b) *Vagueness and Overbreadth: Injuries in Fact*

And to show standing to challenge a law as vague or overbroad, "Plaintiffs must demonstrate 'an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest.'" *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1252 (N.D. Fla. 2021) (quoting *LaCroix v. Lee Cnty., Fla.*, 819 F. App'x 839, 842 (11th Cir. 2020); *Bloedorn*, 631 F.3d at 1228).

### c) *Organizational Plaintiffs' Injuries in Fact*

Organizations have standing to challenge statutes that injure them directly. Where the organization itself bears the brunt of the challenged conduct, it can demonstrate standing on its own behalf under "the same inquiry as in the case of an

individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Thus, where an organization's own constitutionally protected activities are infringed, organizations can demonstrate that they have a direct personal stake in a controversy. *See also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261–62 (1977) (organization had standing where challenged action stood as a barrier to a project the organization had contracted to undertake).

An organization can also show that it has the requisite personal stake in the litigation by showing that it diverted resources from activities central to its mission to respond to the challenged conduct. That is, an organization can "sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (citing *Havens Realty Corp.*, 455 U.S. at 379).

The resources shown to be diverted because of the challenged law need not only be financial: re-directed staff or volunteer time suffices for purposes of standing. *See, e.g.*, *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1287 (11th Cir. 2021); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). Important here, "the diversion of personnel and time to help voters" in response to a challenged law that increases "the average cost of registering each

voter" harms "noneconomic goals" like helping voters register. *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1166.

### 2. *Traceability and Redressability*

Traceability requires that a plaintiff's injury is "'fairly traceable to the challenged action of the defendant.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). This prong requires that a plaintiff's injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"To establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show 'that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual.'" *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 888–89 (11th Cir. 2023) (quoting *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021)). Put simply: The question boils down to whether the official has authority to enforce the challenged law. *Compare Dream Defs.*, 57 F.4th at 889 ("Given this clear statutory authority, the traceability and redressability requirements are satisfied."), *with Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (en banc) ("The fact that the Act itself doesn't contemplate enforcement by the Attorney General counts heavily against plaintiffs' traceability argument.").

Lastly, to meet the requisite "redressability" showing, a plaintiff must show that his injuries are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (2016). A party who is directly subject to challenged regulation can often easily make this showing: when a plaintiff is "himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

### B.     Each Plaintiff has demonstrated an injury in fact.

To start, each of the Hispanic Federation Plaintiffs benefit from constitutional protections that the State's laws abridge or injure.

Hispanic Federation and Poder Latinx ("Organizational Plaintiffs") and their staff engage in "modes of expression and association protected by the First and Fourteenth Amendments which [the State] may not prohibit . . . ." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 428–29 (1963). Likewise, as lawfully present non-citizens who are authorized to work in the United States, Verónica Herrera-Lucha, Elizabeth Pico, and Norka Martínez (collectively, the "Individual Plaintiffs") possess expressive and associational freedoms that the Legislature may not lightly infringe. The First Amendment secures the "right of the people" to freely speak, associate, and engage in political expression. This right brooks no distinction between citizens and non-citizens. *Bridges v. Wixon*, 326 U.S.

135, 148, 161 (1945) ("Freedom of speech . . . is accorded aliens residing in this country.") (citation omitted).[4]

By prohibiting non-citizens from collecting and handling voter-registration applications, the Citizenship Requirement has abridged and will continue to curtail each of the Individual Plaintiffs' and Organizational Plaintiffs' First Amendment rights. This constitutional harm is an injury in fact. *Bloedorn*, 631 F.3d at 1228. The merits of Plaintiffs' First Amendment claim, including the issue of why barring non-citizens from collecting and handling voter-registration applications abridges their First Amendment rights, is addressed *infra*. Section II.A. This section (I.B) addresses the way the Citizenship Requirement has impacted each of the Plaintiffs to demonstrate why they have suffered a concrete injury in fact.

---

[4] *See also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) (noting principle is a "well settled" matter of law); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (recounting cases that have upheld constitutional rights for non-citizens, including speech rights, where they are residents with substantial connections to the country); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2086 (2020) (citing *Bridges v. Wixon* among other cases for the proposition that foreign citizens enjoy certain rights).

### 1. *Individual Plaintiffs: Verónica Herrera-Lucha, Elizabeth Pico, and Norka Martínez*

Each Individual Plaintiff is a non-citizen who has already been and will continue to be concretely harmed by the Citizenship Requirement absent an injunction.

The unchallenged testimony demonstrated that each of the individual plaintiffs is a non-citizen who is lawfully present and authorized to work in the United States. Verónica Herrera-Lucha was born in El Salvador, Tr. 387:12–13, and now lives in Osceola County, Florida as a lawful permanent resident of the United States. Tr. 387:14–19; 388:14–16; 388:23–389:1; PX-859. Elizabeth Pico was born in Venezuela, Tr. 427:5–14, and now lives in Osceola County, Florida with temporary protected status and authorization to work in the United States. *Id.* at 5–19. Norka Martínez is also a Venezuelan native who now has temporary protected status and authorization to work in the United States. Tr. 509:8–9, 509:14–510:1; *see also* PX 860.

At the time of the Citizenship Requirement's enactment, each Individual Plaintiff was employed by a 3PVRO to help register eligible voters. Ms. Herrera-Lucha has dedicated much of the past six years to expanding civic engagement in Florida by canvassing for third-party voter registration organizations, both as a volunteer and paid staff member. Tr. 394:6–23. Since 2021, she has worked for Mi Vecino, a registered 3PVRO, where she currently serves as Florida State Director.

*Id.* at 22–23; *id.* at 394:3–5, 393:21–22. Ms. Pico also presently works at Mi Vecino. Tr. 428:3–6. She has engaged potential voters in her community as a canvasser for 3PVROs since 2019. Tr. 435:22–436:8. Ms. Pico testified that she primarily works with Hispanic communities. Tr. 444:25–445:4. And Ms. Martínez was a canvasser for Mi Vecino from 2022 until 2023, when the Citizenship Requirement was enacted. Tr. 510:22–511:13. Ms. Martínez testified that as a canvasser she "would help [voters] understand" how to register and "encourage them, because there's a lot of apathy within the Hispanic community . . . towards the voting process." Tr. 511:19–512:1.

Because each Individual Plaintiff is a non-citizen, the Citizenship Requirement prohibits each of them from exercising their free-speech rights and engaging Florida voters in a meaningful way. Tr. 410:16–25, 439:19–440:16, 511:8–24. The Citizenship Requirement has curtailed each of the Individual Plaintiffs' rights to speech and association because, since its enactment, they cannot work with a 3PVRO to help voters register, update their registration, or review completed voter-registration forms to make sure they comply with Florida law. Tr. 398:2–11, 429:3–8, 439:19–440:1; 511:1–13.

Because the preliminary injunction in this case affords only temporary relief, and Mi Vecino still rationally fears the imposition of fines for non-compliance, Mi Vecino has canceled its voter-registration events and stopped allowing non-citizens

to register voters because of the Citizenship Requirement. Tr. 408:21–409:12, 409:15–22, 429:5–8. As a result, none of the Individual Plaintiffs, as Mi Vecino employees, have been able to personally register any voters as canvassers since the Citizenship Requirement's enactment. Tr. 397:25–398:11, 429:1–8, 511:4–13.

In addition to prohibiting all three Individual Plaintiffs from engaging in their canvassing responsibilities, the law has halted Ms. Herrera-Lucha's ability to carry out her supervisory responsibilities. She testified:

> Part of my responsibilities [are to] go to the Office of Supervisor of Elections and pick up blank registration forms, put them in my car, take them to the office, deposit them in the safe, then hand them over to the canvassers for their job. All this implies handling it with my hands or collecting them. And then being within the [field], I'm not able to touch any registration form. Whenever the canvassers are done, I, similarly, cannot receive any forms or carry out any quality control.

Tr. 409:25–410:9; *see also* Tr. 429:12–430:8, 433:1–434:9.

Indeed, because the Citizenship Requirement's text can reasonably be read to make Mi Vecino liable for non-citizens' work far beyond the act of canvassing itself—picking up blank application forms from Supervisors of Election (Tr. 398:24–399:7); handing canvassers forms to take to the field (Tr. 399:8–14); performing routine quality-control duties (Tr. 400:2–25, 432:16–24); training new canvassers, which requires holding registration forms (Tr. 419:20–24)—the Individual Plaintiffs and other non-citizens employed by Mi Vecino have not

performed *any* of these duties since the Citizenship Requirement was signed into law. Tr. 397:25–398:11, 398:24–399:17, 400:2–25, 432:16–24.

In halting the Individual Plaintiffs' ability to register voters, the Citizenship Requirement dramatically impacted their jobs. Before the Citizenship Requirement, both Ms. Herrera-Lucha and Ms. Pico were slated to receive greater responsibilities and higher pay at Mi Vecino for their voter-registration work. Ms. Herrera-Lucha testified that she was slated for a promotion starting July 1, 2023, which her employers could not consummate out of fear of exposure to the fines that would follow from having a non-citizen in the new role. Tr. 411:23–412:8. That promotion would have come with a "pay increase," which Ms. Herrera-Lucha intended to spend on purchasing a house. Tr. 411:15–22. Likewise, Ms. Pico testified that she "had been proposed for an increase in work hours in my position as quality control and a better salary." Tr. 438:14–16.

Because of the Citizenship Requirement, neither Ms. Herrera-Lucha's nor Ms. Pico's promotions came to fruition. Ms. Herrera-Lucha explained that, because of the Citizenship Requirement, she has not received the promotion or the raise, and has been unable to afford the house as a result. Tr. 411:15–22. And because the Citizenship Requirement would prevent Ms. Pico from handling more-advanced quality control responsibilities, Mi Vecino "informed [her] that with th[e] [new] law taking effect, [she] would have two options." Tr. 438:22–23. She could "leave and

23

find a new job," or be demoted and "go back to being a canvasser" working on issues other than voter registration. Tr. 438:22–439:2. *See, e.g.*, *Pucci v. Mich. Supreme Ct.*, 601 F. Supp. 2d 886, 897 (E.D. Mich. 2009) (where plaintiff's employer's compliance with challenged directive denied the plaintiff a promotion, "the plaintiff has standing to seek redress for the lost promotion, which the directive plainly caused").

Ms. Martínez was financially impacted as well because the Citizenship Requirement resulted in her unemployment. Because Ms. Martínez is a non-citizen, she could no longer work as a voter-registration canvasser for Mi Vecino once the Citizenship Requirement passed—work that was meaningful to Ms. Martínez, because encouraging the Latino population to participate in the voter-registration process is so important to her. Tr. 511:8–13; 512:4–23. Ms. Martínez testified that her employer offered her a role in polling where she would be "gather[ing] the public's opinion on abortion." Tr. 515:16–20. Ms. Martínez testified, however, that this was a nonstarter, because it was incompatible with her religious beliefs. Tr. 515:21–25. As a result, she was forced to find new employment and was unemployed for about a month and a half, during which she lost approximately $3,600 in past salary. Tr. 516:7–13.

### 2. *Organizational Plaintiffs: Hispanic Federation and Poder Latinx*

The evidence presented at trial confirmed Organizational Plaintiffs standing in two ways. First, each has organizational standing because the Citizenship Requirement will directly impact Hispanic Federation's and Poder Latinx's constitutionally protected conduct and their ability to carry out their mission. Second, each has organizational standing because of the resources it has been forced to divert to respond to the Citizenship Requirement.

### a) *Organizational Plaintiffs have shown that the Citizenship Requirement directly impairs their ability to carry out constitutionally protected conduct and their missions.*

Representatives of both Organizational Plaintiffs testified that each is a 3PVRO that has already been and will continue to be concretely harmed by the Citizenship Requirement absent an injunction.

Specifically, testimony established that the mission of each Organizational Plaintiff is to empower Latino communities, in large part by registering and educating eligible voters. Tr. 524:19–23; 526:1–2, 526:8–15, 566:19–21, 567:18–568:8.

Plaintiff Hispanic Federation is a nonprofit organization with the mission of empowering and advancing the interests of the Latino community across the United States in several areas including civic engagement. Tr. 566:19–21, 567:18–568:8. Hispanic Federation's Senior Director of Communications and Community

Outreach, Frederick Vélez III Burgos, testified that a substantial component of Hispanic Federation's civic-engagement program includes educating and registering Latino voters to increase awareness and access to our democracy to diminish the voter-registration gap for Latinos that persists within both Florida and the United States, more broadly. Tr. 568:23–569:3; 570:6–14.

Similarly, Poder Latinx is a nonprofit organization with the mission of promoting civic and social justice for the Latino community and empowering that community to remain civically and socially active. Tr. 524:19–23; 526:1–2. Poder Latinx's Florida State Program Director, Carolina Wassmer, testified that Poder Latinx works to achieve its mission through a "voter-integrated approach" that "not only register[s] the voter to be able to participate in the next up-and-coming election, but [] also educate[s] the voter in a nonpartisan way about the issues that are affecting them most." *Id.* at 526:8–15.

Testimony from each Organizational Plaintiff also demonstrated that, as part of its mission to engage the Latino electorate, each hires non-citizens to register eligible voters and attract members. Non-citizens comprise the bulk of Organizational Plaintiffs' staff and volunteers. Mr. Vélez III Burgos testified that about 70 percent of Hispanic Federation's canvassers are non-citizens. Tr. 586:6–9. In turn, Ms. Wassmer testified that 90 percent of Poder Latinx's staff are non-

citizens. Tr. 536:19–21. The non-citizens employed by both Organizational Plaintiffs are all authorized to work in the United States. Tr. 534:7–9, 586:10–15.

The Citizenship Requirement effectively bars Organizational Plaintiffs from employing non-citizens to register voters. Prohibiting Hispanic Federation and Poder Latinx from culturally competent non-citizens to register Latino voters impedes both organizations from being able to "attract members, raise revenues, [and] fulfill its purposes." *Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004); *see supra*, Background (discussing non-citizens' unique perspectives and their community- and language-based connections to the eligible voters who Organizational Plaintiffs are trying to register).

Each Organizational Plaintiff representative testified that losing its non-citizen workforce would be detrimental to the organization's mission and ability to carry out its work. Mr. Vélez III Burgos testified that if the Citizenship Requirement came into effect, it would "obliterate our workforce," Tr. 587:6–9, and would specifically result in Hispanic Federation's loss of "a lot of veteran canvassers and their institutional knowledge." Tr. 587:9–14. Ms. Wassmer testified that the organization immediately considered the Citizenship Requirement "devastating" to its programs, because Poder Latinx would "no longer be able to" conduct its "voter-integrated approach." Tr. 535:10–20. This testimony went unchallenged on cross-examination.

Each Organizational Plaintiff also testified about the impact the combination of the Citizenship Requirement's undefined terms and its hefty fines would have on their organizations: expansive self-censorship of its speech and expressive conduct. The Citizenship Requirement imposes a $50,000 fine for each non-citizen who collects or handles applications on behalf of the 3PVRO, Tr. 589:5–7; Fla. Stat. § 97.0575(1)(f), and as Mr. Vélez III Burgos testified, "to my understanding, there's not a cap" on the number of $50,000 fines that can be imposed. Tr. 587:9–12.[5] Mr. Vélez III Burgos further testified that Hispanic Federation saw those fines as "an existential threat to our voter-registration program, but also our Florida program and our organization." Tr. 587:12–14. Likewise, when asked how a $50,000 fine would impact Poder Latinx, Ms. Wassmer testified: "I mean, that's somebody's salary on my staff, so it would really continue to detriment our ability to do our work. I'd have to cut programs again and divert job descriptions." Tr. 540:12–15.

As a result, even if the Citizenship Requirement's confusing language could be understood to allow 3PVROs to continue to perform *some* voter-registration activities, representatives of both Organizational Plaintiffs testified that they would engage in rational self-censorship to avoid the risk of being fined for noncompliance.

---

[5] Florida Statute § 97.0575 places a $250,000 cap on fines assessed pursuant to paragraph (5)(a), but that cap applies only to that "paragraph" of the statute, and not to fines assessed pursuant to the Citizenship Requirement contained in paragraph (1)(f).

Mr. Vélez III Burgos testified that Hispanic Federation's leadership reviewed "every job description for canvassers, canvass leads, quality control, canvass directors, the community engagement manager," and determined that because "these fines are literally an existential threat," "everyone in that infrastructure would have to be a citizen" if the Citizenship Requirement were to take effect. Tr. 604:13–24; *see also* Tr. 604:25–605:2 ("[W]e can face millions of dollars in fines. So for us, we just can't expose ourselves to that type of liability."). Mr. Vélez III Burgos also testified about Hispanic Federation's uncertainty about how to organize its physical office space if the Citizenship Requirement takes effect, asking:

> Do we need to -- can we hold events with other groups in our -- in our office if they have noncitizens; right? Do we need to create a citizens-only space in the office? Do we need to lock the room or put a keypad so that we can prove that noncitizens haven't entered this space? Because just the liability is so much that we just can't afford to be fined.
>
> . . .
>
> Most of [Hispanic Federation's] offices -- I think all of them, actually -- were like one-room offices. So that's why, as we were talking about this citizens-only space, we also started thinking about do we need to make changes to these satellite offices that we have? Do we need to spend more money to get an office that has two or three rooms or a place that we can lock under key?

Tr. 607:19–608:14. As a result of these questions and the threat of liability, Hispanic Federation has resolved that it would have to "create protocols for noncitizens to not just be near any forms" if the Citizenship Requirement takes effect. 608:15–18.

Poder Latinx's representative offered similar testimony about her organization's risk calculus. Ms. Wassmer explained that Poder Latinx ordinarily works to achieve its mission of empowering the Latino community through a "voter-integrated approach" that "not only register[s] the voter to be able to participate in the next up-and-coming election, but [] also educate[s] [them] in a nonpartisan way about the issues that are affecting them most." *Id.* at 526:8–15. If the Citizenship Requirement took effect, Poder Latinx's non-citizen canvassers could only work within this voter-integrated approach if they were accompanied by additional *citizen* staff who could then do the "handling or collecting" of voter-registration forms. Tr. 537:18–538:2.

Ms. Wassmer testified that even if each non-citizen in the field were accompanied by a citizen, Poder Latinx's concerns about liability to fines wouldn't be fully assuaged. Confusion would remain over whether the non-citizen and citizen staffers must travel in "two vehicles" such that a non-citizen would never be in a position to be seen as having been "handling" voter-registration forms. Tr. 538:3–6. Indeed, Poder Latinx would not risk having non-citizen staff supervising canvassers, since those roles are in charge of "check[ing] their work" and "transport[ing] them back to the office," which could be seen as "collecting or handling" forms. Tr. 545:5–10. Moreover, Poder Latinx staffs non-citizen employees in quality-control roles responsible for inspecting completed forms. Tr. 545:11–15. And because Poder

Latinx is unwilling to shoulder the risks of noncompliance and heavy fines, Poder Latinx would completely shutter its voter-registration efforts if the Citizenship Requirement takes effect. Tr. 538:16–17.

Hispanic Federation's representative also testified about how the Citizenship Requirement has *already* constrained their organization's speech, even before any enforcement. Even with the injunction in place, Hispanic Federation has remained "very uncomfortable with running the program until a permanent decision was made" about the constitutionality of the Citizenship Requirement, because "it would be really detrimental" to the organization and its workforce "to be running the program at peak and then suddenly for a decision to reverse that and for us to—from one day to the other lose 70 percent of our workforce or even more." Tr. 588:20–589:4.

This discomfort is especially reasonable in light of the State's practices since the injunction was imposed: for example, the *current* form on the Secretary of State's website that individuals and organizations must submit to register as a 3PVRO still currently includes "an affirmation requiring the person submitting the form to attest that each person collecting or handling voter-registration applications on behalf of the 3PVRO is a U.S. citizen," which must be signed "under penalties of perjury."[6]

---

[6] *See* Florida Dep't of State, Forms, *3PVRO Registration Form* (DS-DE-119), at https://files.floridados.gov/media/707607/form-ds-de-119-2023-3pvro-registration-adopted-rev.pdf (last visited Apr. 19, 2024).

Tr. 1945:5–1946:9. Director of Florida's Division of Elections, Maria Matthews, agreed it would not "be smart" for a person submitting that form on behalf of a 3PVRO that employs non-citizens—based just on the face of that form—"to sign it under penalty of perjury." Tr. 1946:10–20.

Mr. Vélez III Burgos also testified that since the Citizenship Requirement's enactment, Hispanic Federation does not currently permit its non-citizen employees to register voters, which prevented the organization from scaling up its 2023 voter-registration program as it had originally planned. Tr. 588:16-589:4, 591:8–595:13. It has also caused the organization to register the lowest number of voters in the history of its program in Florida. Tr. 593:19–23. In this way, the Citizenship Requirement has already chilled Hispanic Federation, its staff, and its volunteers from engaging in constitutionally protected activity. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). This sort of "self-censorship" is itself "sufficiently concrete and particularized to support Article III standing to challenge the enforcement" of the Citizenship Requirement. *Dream Defs.*, 559 F. Supp. at 1257.

The Citizenship Requirement has also already directly impacted the Organizational Plaintiffs' funding. For example, Ms. Wassmer testified that, due to the Citizenship Requirement and the fact that Poder Latinx heavily relies on non-citizens as staff, "funders decided to pull back on investment" in September 2023.

Tr. 540:16–23. She testified that Poder Latinx's funding for voter-registration work plummeted from $876,000 in the year preceding the Citizenship Requirement's enactment to just $67,000 since—a drop of 92.3%. Tr. 540:16–541:12.

Mr. Vélez III Burgos similarly testified about the Citizenship Requirement' impact on Hispanic Federation's funding, including funders' concerns "that we have a high number of noncitizens in our staff." *See* Tr. 590:19–593:7, 595:6–10. Indeed, funders have been leery of the liability that flowed from Hispanic Federation's program as it related to the Citizenship Requirement. As a result, funders didn't accept applications for funding until late September, when rulemaking had concluded, which meant that funding for Hispanic Federation's "first timeline [which] starts around February and ends around August or September . . . never came, and [funders] kept delaying that line for RFPs until the end of the year." Tr. 595:6–4. Mr. Vélez III Burgos explained that lack of funding and the rulemaking's conclusion proximity to book closing made it impossible for Hispanic Federation to run any program at all for the year. Tr. 596:11–22.

This dramatic loss in funding has forced Hispanic Federation and Poder Latinx to aggressively curtail their voter-registration work. And it has naturally and deeply impacted Organizational Plaintiffs' ability to associate with partner organizations, local businesses, and the constituents it aims to serve. For example, Ms. Wassmer testified that because of the Citizenship Requirement, Poder Latinx

had to rely on far fewer of its usual canvassers in 2023 and was only able to register voters in Orange County, whereas it would normally also do so in Seminole, Polk, or Lake Counties. Tr. 541:13–21. And Ms. Wassmer testified that "from being able to have 20 people out in the community or 40 at times," Poder Latinx now has just five. Tr. 542:24–543:2. She also testified that the funding gap also prevented Poder Latinx from undertaking a planned voter-registration expansion into South Florida counties like Palm Beach. Tr. 541:13–542:7. And Mr. Vélez III Burgos testified that the Citizenship Requirement would impact Hispanic Federation's ability to maintain a year-round presence within the Latino community it serves, which harms its "visibility" within the community, its relationships with businesses that are hot spots for registering Latino voters, and its access to partner events—all of which will "decrease the opportunities that we have to register [Latino] voters in places that they feel safe." Tr. 601:16–602:14.

The maintenance and expansion of Organizational Plaintiffs' existing voter-registration program is work that, but for the "predictable effect of" the Citizenship Requirement, Hispanic Federation and Poder Latinx would be continuing today. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (embracing theory of standing that relies "on the predictable effect of Government action on the decisions of third parties").

Fact and expert testimony established that the result of the Citizenship Requirement's restrictions on Organizational Plaintiffs' ability to carry out their mission will be that fewer voters will be able to register or update their registration in Florida. Hispanic Federation's representative demonstrated the stark reality: since 2016, Hispanic Federation has been able to register nearly 100,000 voters, Tr. 571:11–16, and in 2022 alone, Hispanic Federation registered approximately 16,000 voters, Tr. 590:16–18. By contrast, in 2023, Hispanic Federation was only able to register approximately 30 voters, the lowest number of voters it has ever registered in Florida through the program's history. Tr. 593:15–23. Likewise, Ms. Wassmer testified that Poder Latinx has already reduced the number of canvassers it has in the field on any given day from 20-40 canvassers prior to the Citizenship Requirement, to only five canvassers at present, dramatically reducing Poder Latinx's capacity to register voters. Tr. 542:24–543:2.

Dr. Smith's expert testimony bolsters the propriety of third party standing in this case. Dr. Smith explained how the Citizenship Requirement will impose increased costs on eligible citizens' ability to register to vote and will likely cause an overall decrease in voter registration in Florida, particularly for Black and Hispanic voters who disproportionately rely on 3PVROs to register or update their registrations. Tr. 1094:4–1095:1; *see infra*, Section II.A.1.iv (discussing Dr. Smith's conclusions in detail). And even Defendants' experts acknowledged that, as a result

of Senate Bill 7050's restrictions on 3PVROs, some voters who would otherwise have been registered through 3PVROs will not be registered at all, Tr. 1694:9–17, which demonstrates the tangible harm to Organizational Plaintiffs' mission.

**b) *Organizational Plaintiffs have shown that they diverted resources to respond to the Citizenship Requirement.***

Each Organizational Plaintiff's representative also testified about their organization's need to divert resources reserved for registering voters toward retraining and recruiting new staff to comply with the Citizenship Requirement.

For example, Mr. Vélez III Burgos spoke to the resources that Hispanic Federation has already diverted in response to the Citizenship Requirement, and the many additional resources it would need to divert if the Citizenship Requirement took effect. Specifically, he testified about how Hispanic Federation has expended extensive staff time toward determining how to comply with the Citizenship Requirement. Tr. 602:15–22. Mr. Vélez III Burgos also testified about meetings with Hispanic Federation's human resources director, and how the organization has identified various risks if the Citizenship Requirement comes into effect, including that the organization currently screens for work authorization but does not otherwise verify citizenship. 602:23–603:2.

If the Citizenship Requirement were to take effect, Hispanic Federation will need to devote resources toward "creat[ing] a citizenship-verification process that, at this point, does not exist," 607:9–14, and toward hiring "more HR staff members

that can verify the documents that the canvassers are presenting," 607:17–19. In fact, Hispanic Federation has determined that it would need to devote additional staff time and resources toward recruitment given a smaller eligible pool of candidates and difficulties in retention presented by the Citizenship Requirement. Tr. 593:24–595:5. Additionally, Hispanic Federation has concluded that it would have to devote staff time and resources toward creating protocols for how to either organize its physical offices in a way that would not permit any non-citizen employees to be near voter-registration forms or to pay rent on an entire new office space with multiple "rooms or a place that we can lock under key." Tr. 607:19–608:18.

As Mr. Vélez III Burgos testified, the additional costs and burdens on recruitment and human resources will lessen the availability of grants and funding. Tr. 603:20–604:6. The ensuing shortfall will force Hispanic Federation to dip into "discretionary funding" presently reserved for other services the organization provides, including direct services to needy community members and capacity grants to Latino-serving nonprofits. *Id.* Absent the Citizenship Requirement, all of this staff time and resources would instead be expended toward activities that are core to Hispanic Federation's mission, such as its "voter registration, Get Out The Vote, and voter education" programming in Florida. Tr. 568:23–25.

In response to the Citizenship Requirement, Poder Latinx has also had to divert resources from activities that critical to its mission. It has instead expended

those resources to divert and train staff towards activities unrelated to voter registration. Ms. Wassmer explained that Poder Latinx had to "retrain" and "build up" its work force in a way it otherwise would not have because of the Citizenship Requirement. Tr. 541:22–542:7. For example, Poder Latinx transferred voter-registration staff to their environmental justice projects, which required additional computer trainings and community outreach efforts different from voter-registration activities. Tr. 538:25–539:10. And Ms. Wassmer explained that learning to comply with the Citizenship Requirement took temporal resources as well: Poder Latinx's leadership held meetings with legal counsel on how to best navigate Florida's new legal landscape and ensure Poder Latinx did not break federal law when making hiring decisions about non-citizen applicants. Tr. 539:21–540:4.

Had these resources not been diverted to respond to the Citizenship Requirement, they could have been used to support Poder Latinx's other work, including expanding its voter-registration efforts. Tr. 540:5–23, 541:13–542:7, 542:9–25. Ms. Wassmer testified to Poder Latinx diverting funds from expanding voter-registration efforts to South Florida to instead solidifying Poder Latinx's voter-registration efforts in Central Florida as best it could. Tr. 540:16–23. In sum, the Citizenship Requirement forced Poder Latinx to retrain staff, move staff into unfamiliar roles, and move funds around in a way that limited its community

engagement such that Poder Latinx otherwise would not have to if the Citizenship Requirement never became law.

### C.   Plaintiffs' injuries are traceable to Defendants.

The harms Plaintiffs have or will suffer are traceable to the Secretary and Attorney General, because each Defendant has authority to enforce the law in different ways. *See Dream Defs.*, 57 F.4th at 888–89.

### 1.  *Plaintiffs' harms are traceable to the Secretary.*

The Secretary has the authority to issue fines to 3PVROs in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter-registration applications on behalf of a 3PVRO. Fla. Stat. § 97.0575(1)(f); PX 179 ¶ 4. The Secretary also has authority to refer violations of the Citizenship Requirement to the Attorney General for enforcement. *Id.* § 97.0575(8). Further, the Secretary is empowered to cancel a 3PVRO's registration if they do not comply with the Citizenship Requirement. *Id.* § 97.0575(12). Based on these provisions, this Court was correct to find at the preliminary injunction stage that Plaintiffs' pled harms were "fairly traceable" to the Secretary. *Fla. State Conf. of Branches & Youth Units of the NAACP*, 680 F. Supp. 3d at 1306. That calculus has not changed.

### 2.  *Plaintiffs' harms are fairly traceable to the Attorney General.*

As for the Attorney General, Florida Statute § 97.0575(8) provides:

If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter

to the Attorney General for enforcement. The Attorney General may institute a civil action for a violation of this section or to prevent a violation of this section. An action for relief may include a permanent or temporary injunction, a restraining order, or any other appropriate order.

Although the Attorney General contests that Plaintiffs' injuries are traceable to her office, there is no remaining dispute of *fact* as to the Attorney General's enforcement authority. Nicholas Cox, head of Florida's Office of Statewide Prosecution, testified at trial about the Attorney General's authority to enforce the Citizenship Requirement. Tr. 810:16–25. Mr. Cox recognized that the Office of the Attorney General ("OAG") has statutory authority to enforce the Citizenship Requirement through injunctions and restraining orders. Tr. 819:11–25. OAG has stipulated that it *has* that authority, acknowledging that OAG "may seek 'a permanent or temporary injunction, a restraining order, or any other appropriate relief' to prevent a violation of § 97.0575, Fla. Stat., or institute a civil cause of action to collect a fine assessed by the Secretary of State, after the exhaustion of administrative remedies." PX 179 ¶ 7; Tr. 1392:14–1394:24.

The difference between the parties' positions is one of legal interpretation. In litigation, the OAG has represented that it currently interprets Florida Statute § 97.0575(8) to require the referral from the Secretary of State that is contemplated in the first sentence of the statute *before* the Attorney General can exercise the authority bestowed in the second and third sentences. Tr. 820:1–23; PX 179 ¶ 1. But

that limitation is not clear from the statute's plain text. Although the first sentence of § 97.0575(8) authorizes the Secretary to refer violations to the Attorney General, the second and third sentences lack any language indicating that the Attorney General's authority is in any way limited to or *conditioned upon* such a referral. To adopt the Attorney General's reading of the statute, one must infer that the OAG's power is *contingent on* the Secretary's referral merely from the ordering of the sentences.

The parties agree that the OAG has yet to consider any enforcement of the Citizenship Requirement, Tr. 820:24–821:18, so the interpretation the OAG has adopted for purposes of this litigation has not been tested or deployed. The OAG also testified that this interpretation has not been codified or memorialized in any rule or policy. Tr. 820:24–821:18. And the parties agree that OAG's current legal interpretation has no binding effect: a future Attorney General could interpret its statutory authority differently. Tr. 828:7–19. Certainly, if OAG's interpretation of that law changes, then absent an injunction, the Attorney General could enforce the Citizenship Requirement against 3PVROs—even if the Secretary of State is enjoined from enforcing it. Because the statute's text permits the Attorney General to independently enforce the Citizenship Requirement, Plaintiffs' harms are traceable to the Attorney General as well.

**D.   Plaintiffs' injuries would be redressed if Defendants were enjoined from enforcing the Citizenship Requirement.**

Plaintiffs' "injuries are 'likely to be redressed by a favorable judicial decision" in this case. *Spokeo, Inc.*, 578 U.S. at 338. Success in this litigation would redress these harms, because enjoining the Secretary and Attorney General "from enforcing the challenged law has the practical consequence of removing the threat" of enforcement by any entity in Florida. *Dream Defs.*, 559 F. Supp. 3d at 1263; *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). As discussed above, *supra* Section I.B, a permanent injunction against each Defendant is necessary to redress Plaintiffs' injuries because they continue to be harmed by the uncertainty that the preliminary injunction will protect them from future enforcement. *E.g.*, Tr. 1945:23

## II.   The Citizenship Requirement is unconstitutional.

Although the Court has determined that the Citizenship Requirement violates the Equal Protection Clause, nothing in the constitutional avoidance canon prevents it from proceeding to the merits of Plaintiffs' remaining constitutional claims. That doctrine is derived from *Siler v. Louisville & N.R. Co.*, where the Supreme Court held: "Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons." 213 U.S. 175, 193 (1909). But after this Court dismissed Plaintiffs' claim under Section 1981, the only remaining grounds

for challenging the Citizenship Requirement were questions arising under the U.S. Constitution. *Cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (constitutional avoidance is "an interpretive tool[] counseling that ambiguous statutory language be construed to avoid serious constitutional doubts"). So this Court neither is nor was in a position to avoid constitutional questions in this case: the only question is how many such issues the Court chooses to address. *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 593 n.2 (6th Cir. 2021) (constitutional avoidance canon inapposite when claims at issue only alleged constitutional violations and "[t]here are, accordingly, no statutory or alternative grounds on which to decide th[e] case").

In the context of voting rights claims raised in a year with a fast-approaching election—and especially with an appeal pending on the Equal Protection claim that this Court had already decided—there is good reason to address each of Plaintiffs' remaining constitutional claims. Even in cases where other statutory grounds *were* available, federal courts adjudicating such cases have recognized that:

> With time so short and the likelihood that one or both sides will seek appellate relief so high, it is critical to make a comprehensive record in order to facilitate higher court review and to minimize any potential need for a remand. That means reaching most, if not all, issues raised by the parties — even if, in other circumstances, it would be unnecessary or even inadvisable.

*New York v. United States Dep't of Com.*, 351 F. Supp. 3d 502, 517 (S.D.N.Y.), *aff'd sub nom. Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019). Here, where the

countervailing principles underlying the constitutional avoidance doctrine aren't even present, this Court should follow suit and address each of Plaintiffs' constitutional claims in turn.

### A.      The Citizenship Requirement violates the First Amendment.

The Citizenship Requirement violates Plaintiffs' First Amendment rights in multiple ways. It not only abridges their ability to engage in protected speech and expressive conduct, it also chills similarly protected conduct because it is overbroad. The Citizenship Requirement severely burdens and limits Plaintiffs' free-speech and association rights.

#### 1. *The Citizenship Requirement restricts Plaintiffs' core political speech and expression.*

##### a) Legal Standard

"Constitutional protection for freedom of speech 'does not end at the spoken or written word.'" *Ft. Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Texas v. Johnson,* 491 U.S. 397, 404 (1989). The First Amendment also encompasses a right to engage in "expressive conduct." *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). For example, in *Meyer v. Grant*, 486 U.S. 414, 420 (1988), the Supreme Court held that a law that banned paying people who circulated ballot-initiative petitions "restricted political expression," describing the conduct that the law prohibited as "core political speech" involving "interactive communication

concerning political change." *Id.* at 422. *Meyer*, 486 U.S. at 420–22. *See also Buckley*, 525 U.S. at 186–87 (striking down a similar restriction as in *Meyer*).

Just like circulating petitions, "[e]ncouraging others to register to vote is pure speech, and, because that speech is political in nature, it is a core First Amendment activity." *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (quoting *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012)). "Discussion" with would-be voters "of whether or not a person should register to vote . . . inherently 'implicates political thought and expression.'" *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1152 (N.D. Fla. 2022), *rev'd in part on other grounds*, 66 F.4th 905 (11th Cir. 2023) (quoting *Hargett*, 400 F. Supp. 3d at 720). Indeed, because persons seeking to register voters "will no doubt know that sincere reasons for refusing to vote exist . . . [t]he way that the person encouraging registration responds to or preempts the objections people have to voting will [] often bear on fundamental questions at the heart of the political system." *Hargett*, 400 F. Supp. 3d at 724.

Associational activities inherent in voter-registration efforts also support treating voter-registration efforts as conduct protected by the First Amendment. The First Amendment encompasses the right "to associate for the advancement of political beliefs," separate, even, from "the right of qualified voters . . . to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Thus, in assessing

whether voter-registration efforts are protected by the First Amendment, courts have stressed not only that "public endeavors which 'assist people with voter registration are intended to convey a message that voting is important,'" but also that "public endeavors which expend resources 'to broaden the electorate to include allegedly under-served communities' qualify as expressive conduct which implicates the First Amendment freedom of association." *VoteAmerica v. Schwab*, 671 F. Supp. 3d 1230, 1244–45 (D. Kan. 2023) (quoting *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020). *See also Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010)("An organization's attempt to broaden the base of public participation in and support for its activities is conduct 'undeniably central to the exercise of the right of association.'" (quoting *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 214–15 (1986).

Explaining why restrictions on voter-registration efforts regulate protected speech and association, courts have emphasized the expressive and interactive nature of voter-registration efforts. "[A]s part of [] voter registration drives," voter-registration organizations and canvassers "persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions." *League of Women Voters of Fla. v. Cobb*,

447 F. Supp. 2d 1314, 1333 (S.D. Fla. 2006). Because of the expressive and associational conduct that is bound up with the voter-registration process, laws restricting voter-registration activities "reduce[] the quantum of political speech and association." *Cobb*, 447 F. Supp. 2d at 1332 (citation omitted).

Similarly, "limit[ing] the *number of voices* who will convey [a plaintiff's] message" can amount to an impermissible burden on expression, because that limitation on the number of persons who can convey a plaintiff's message in turn "limits the size of the audience they can reach." *Meyer*, 486 U.S. at 422–23; *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 194–95 (1999) (a law that "decreases the pool of potential [petition] circulators" impermissibly burdened political expression).

In assessing whether the conduct prohibited by a law is protected by the First Amendment, courts have resisted efforts to disaggregate the expressive and associational aspects of voter-registration work from any "purely logistical aspects of the voter-registration process." *Tenn. State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683, 699 (M.D. Tenn. 2019). Where the specific conduct that is proscribed "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," courts have refused to artificially distinguish between those different components of the same conduct. *Vill. of Schaumburg v. Citizens for a*

*Better Env't*, 444 U.S. 620, 632 (1980); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (holding that, where "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase," because such "an endeavor would be both artificial and impractical"). In other words, a plaintiff's conduct cannot be "sliced and diced" to avoid constitutional scrutiny of the expressive conduct that a law proscribes. *Tenn. State Conf. of N.A.A.C.P.*, 420 F. Supp. 3d at 699.

### b) The voter-registration work that the Citizenship Requirement proscribes is expressive.

The trial record demonstrates that, when Plaintiffs handle and collect Florida citizens' voter-registration applications, their actions intentionally and inherently convey a message about the importance of registering to vote and broadening the Latino electorate. And in addition to highlighting the message that the prohibited conduct conveys, the record shows this conduct is characteristically intertwined with broader conversations about the importance of voting, civic engagement, and other matters of public concern.

Start with the testimony of the Individual Plaintiffs. Ms. Herrera-Lucha, for example, was clear about the expressive value of registering voters:

> I love communicating with and establishing a relationship with the community, inform them, educate them, that by learning to register how to vote, they are able to change a lot of the situations within their daily

48

> living that can move politicians that affect them within their
> community, amend laws that may be affecting them. And I believe that
> it is an important part of educating the community.

Tr. 412:11–21. She further testified that communicating with voters while helping

them register "is part of providing a civic education to the Hispanic community"—

including educating eligible citizens about the fact that they are able to vote, as well

the many opportunities to do so in presidential, midterm, and local elections—and

that she views her work as "the way in which the Hispanic community can be

educated and learn that they are able to vote and change the problems that affect

them." Tr. 396:16–397:1; *see also* Tr. 402:13–19 (Ms. Herrera-Lucha testifying that

"part of the daily job that the canvassers do or that I do is to empower this

community, that voting is a powerful weapon in order to change everything that may

not serve them"). And Ms. Herrera-Lucha expanded on the importance to her of

registering young voters, whom she aims to "educate [] so they can be involved in

changing the things that their parents' generation was not able to change." Tr. 403:5–

17.

Ms. Pico's testimony reinforced the point: she testified she was drawn to

voter-registration work precisely because she "always liked having contact with

people, with the community and to be able to do so through voter registration," and

because she saw the "possibility of educating people through voter registration and

to contribute to the development of this country." Tr. 437:14–438:2. She also testified that when she registers voters:

> I would create awareness in the -- within the voters of the United States the right and the responsibility that they have to vote, and in order to be able to vote, they have to be previously registered. That gets them involved in the electoral process, in the political process of a country.
>
> When we register someone to vote, it's not merely just showing them how to fill out the registration form. It also informs them of the electoral processes that are carried out every year or every two years, the importance of them getting to know the people that are representing them within their community. They also participate within the political changes that take place within a country.

Tr. 440:2–16.

Ms. Martínez similarly testified that, particularly within Hispanic communities, collecting and handling voter-registration applications is inherently bound up with encouraging eligible citizens to register: her role as a canvasser was to "help them understand how they . . . needed to go about registering, how to fill out the form, and to encourage them, because there's a lot of apathy within the Hispanic community towards the voter registration process." Tr. 511:21–24. As she put it:

> I come from a country where democracy has practically been lost. Therefore, over there people don't believe in the voting process. And to encourage the people to participate in the voter registration process . . . And to help the Latino population in this country to support democracy being that they are citizens here. For me, it was very important.

Tr. 512:11–23.

Ms. Martínez's testimony offers additional insight into the expressive nature of 3PVRO voter-registration canvassers' work. Even while the Citizenship Requirement was temporarily enjoined, her employer Mi Vecino decided that it was too risky to allow non-citizens to continue to conduct voter-registration canvassing work. Tr. 408:21–409:12, 409:15–22, 429:5–8; *see also* Tr. 397:25–398:11, 429:1–8, 511:4–13. And so, Mi Vecino offered its employees a choice: either leave and find a new job, or work as a canvasser on different issues. Tr. 438:22–439:2, 515:16–20. In Ms. Martínez's case, Mi Vecino offered her a job canvassing on issues involving abortion. Tr. 515:16–20. And Ms. Martínez refused, choosing to face unemployment rather than survey people on an issue that was incompatible with her religious beliefs—a choice that plainly highlights the *expressive nature* of Ms. Martínez's work as a canvasser. Tr. 515:21–25. *Cf. McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (discussing First Amendment protections on "one-on-one communication" in context of petition campaigns; noting person-to-person engagement "in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression" (cleaned up) (citations omitted)).

Taken together, the Individual Plaintiffs' testimony paints a clear picture about the expressive nature of the prohibited conduct. Their efforts to register voters inherently express the message that engaging eligible voters in their communities and broadening the electorate matters.

Testimony from the Organizational Plaintiff representatives likewise emphasized that their voter-registration efforts are intended to convey their message about empowering Latino communities and broadening the electorate. As Mr. Vélez III Burgos testified, Hispanic Federation's voter-registration program is a key component of the organization's work to ensure Latino community members are able "to participate in the civic engagement process[] [because] [] [it is] the first step to be able to participate . . . ." Tr. 569:22–570:1. He further testified that Hispanic Federation recognizes that "[a]cross the whole U.S. there is a Latino voter registration gap, and [that] in Florida it exists as well." Tr. 570:8–9. And he testified that Hispanic Federation's robust canvassing programs to register voters, and particularly to register eligible Latino voters in Florida, are a means of expressing Hispanic Federation's objective to eliminate that registration gap. *See* Tr. 570:12–14 (Hispanic Federation firmly believes that the organization's "job is not going to be done until 100 percent of eligible Latino voters are registered in the state of Florida.").

Ms. Wassmer similarly testified about the expressive nature of Poder Latinx's canvassing operations, and particularly how Poder Latinx's voter-registration work is bound up with the other speech and messages it prioritizes. In particular, she testified that Poder Latinx works to achieve its mission of empowering the Latino community through a "voter-integrated approach" that "not only register[s] the voter

to be able to participate in the next up-and-coming election, but [] also educate[s] [them] in a nonpartisan way about the issues that are affecting them most." Tr. 526:8–15. She also testified that Poder Latinx canvassers are usually members of the same community they serve, because it is important to Poder Latinx that voters know they're being engaged by people who understand the issues they face daily and who can "talk to their neighbors and their loved ones about . . . why it's important to be part of the electoral process." Tr. 533:21–534:3. And she testified that while registering voters in the field, Poder Latinx's canvassers also engage voters in their communities on the issues that Poder Latinx prioritizes, including economic justice, immigration justice, and environmental justice. Tr. 532:6–14.

Trial testimony also repeatedly confirmed that Plaintiffs' voter-registration efforts have other hallmarks of protected expressive conduct. For instance, various Plaintiffs testified about how their voter-registration efforts frequently take place in traditional public fora, including parks, sidewalks, sporting events, libraries, public shopping centers, or during public and civic-minded events and dates like the Puerto Rican parade or the Fourth of July. Tr. 30:22–31:1 (Nordlund), 165:25–166:4 (Orjuela), 404:14–23 (Herrera-Lucha), 513:3–8 (Martínez), 570:21–571:8 (Vélez III), 1159:9–21 (Slater), 1202:4–24 (Scoon). And they are open to all who engage with 3PVRO canvassers in that public forum. *See, e.g.*, Tr. 1371:12–14 (Elliot,

testifying that "we don't discriminate in terms of who comes up to the table" to register to vote).

Further, the record demonstrated that a reasonable person would interpret Plaintiffs' conduct as conveying an intended message about seeking to broaden the electorate. For example, Mr. Vélez III Burgos testified that Hispanic Federation canvassers in the field don T-shirts, lanyards, hats, and even umbrellas that bear the organization's logo, and because Hispanic Federation is a "trusted messenger[]" within the Latino community, that logo "communicates to our members of the community that we are a safe organization, that we are trusted, that we're there to really register voters." Tr. 574:23–575:21. Similarly, Ms. Wassmer testified that Poder Latinx's message and mission is known in the community it serves, Tr. 527:11–12, and Poder Latinx's canvassers wear a uniform, T-shirt, and identification that "gives [the] voter confidence" that they are talking to someone from Poder Latinx, Tr. 530:11-20, further clarifying the message canvassers' conduct conveys to voters. Individual Plaintiffs offered similar testimony about how people in the communities where they worked tended to understand that they and other canvassers were there to register voters. *See, e.g.*, Tr. 396:16–397:11, 429:14–21, 514:16–18.

In sum, Plaintiffs' testimony establishes that their efforts to help others register to vote are themselves political statements that signal that Plaintiffs value the democratic process, believe in the capacity of popular will to shape the

government's composition and direction, and desire to broaden the Latino electorate. The record demonstrates that, while collecting and handling voter-registration applications, Individual Plaintiffs and Organizational Plaintiffs' non-citizen staff engage voters in public forums and initiate conversations about the voter-registration process. By providing non-partisan information on how to vote as well as sharing culturally relevant explanations on the importance of voting, Plaintiffs or their agents enlist like-minded individuals to promote shared political, social, and economic positions through the franchise. *See Browning*, 863 F. Supp. 2d at 1333. And the record underscores that this conduct cannot be easily "sliced and diced" to avoid exacting scrutiny. *Tenn. State Conf. of N.A.A.C.P.*, 420 F. Supp. 3d at 699. As Ms. Herrera-Lucha testified, "what use would it be to me to talk to someone about registering to vote if I'm not able to give them the form so that they can register to vote[?]" Tr. 410:23–25.

### c) *The voter-registration work that the Citizenship Requirement proscribes is associational.*

The trial record also contains ample evidence that Plaintiffs' registration work is associational in nature. The Organizational Plaintiff representatives made clear during their testimony that the driving force behind their voter-registration efforts is their objective to broaden the electorate to include eligible Latino voters who disproportionately are not registered to vote. Tr. 527:1–4, 569:22–570:14.

For example, many Plaintiffs testified about how their voter-registration efforts were carefully designed to help engage with specific communities that disproportionately are not registered to vote and are therefore underrepresented in the electorate. Mr. Vélez III Burgos testified that Hispanic Federation addresses the Latino voter-registration gap by concentrating its voter-registration efforts in "high-density areas where Latinos are." Tr. 570:21–22. He further testified that Hispanic Federation canvasses in "places where [the organization] see[s] gaps of voter registration [for] Latinos," including places like "a grocery store, a bakery . . . a church," or other places "where our community feels safe, protected, when [the organization is] able to engage them on registering . . . ." Tr. 570:23, 571:1–4. He testified that Hispanic Federation also works with trusted "community partners" and "organizations that are either holding events or providing services to the community." Tr. 571: 5–8. And he explained that Hispanic Federation also "draft[s] bilingual materials, both in English and Spanish, and [works] with groups that are trusted messengers to kind of communicate that, you know, Latinos should get registered to vote." Tr. 572:14–20.

These practices were common amongst the Plaintiffs. To engage the Latino community, Ms. Wassmer testified that Poder Latinx canvassers "visit a lot of places like . . . supermarkets that are Hispanic-serving places, as well as businesses that are restaurants, churches, or other places where Latinos congregate," Tr. 527:1–4, and

56

sometimes even venture into places like "nail salons, barber shops" to "get creative" about how to engage their communities face-to-face, Tr. 529:15–22. Ms. Martínez similarly testified that, to engage the Latino community, she usually registered voters in "Latin supermarkets, parking lots of a few Walmarts, a few Dollar Trees, and some colleges, and also gatherings where we knew that there would be a significant gathering of Hispanic people, for example, the Puerto Rican parade." Tr. 513:4–8.

These efforts to concentrate voter-registration work within specific communities that are underrepresented in the electorate plainly implicate the freedom of association and further confirm that conduct proscribed by the Citizenship Requirement is constitutionally protected. *See VoteAmerica*, 671 F. Supp. 3d at 1244–45; *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1202.

### d) *The Citizenship Requirement reduces the effectiveness and quantum of Plaintiffs' speech and association.*

The trial record contains critical evidence that the Citizenship Requirement will either stifle or silence the expressive and associational conduct of each of the Hispanic Federation Plaintiffs.

Take the Organizational Plaintiffs. Both representatives testified the Citizenship Requirement would gut the workforce they employed to conduct voter-registration efforts—concretely, it would prohibit 70% of Hispanic Federation's canvassers and 90% of Poder Latinx's employees from collecting and handling

voter-registration applications. Tr. 534:4–9, 586:6–9; *see supra* Section I.B.2. This impact on the workforce alone confirms the Citizenship Requirement's impact on "the number of voices who will convey [Hispanic Federation's and Poder Latinx's] message," and the resulting reduction of the quantum of political speech and association in which Hispanic Federation and Poder Latinx can engage, will severely "limit[] the size of the audience they can reach." *Meyer* 486 U.S. at 422–23.

And the reduction of their voter-registration efforts will have a broader impact on the total quantum of speech with which the Organizational Plaintiffs can engage. Take, for example, Poder Latinx's model. As Ms. Wassmer explained, their "voter-integrated approach" is centered on the premise that a canvasser "not only register[s] the voter to be able to participate in the next up-and-coming election, but [] also educate[s] [them] in a nonpartisan way about the issues that are affecting them most." Tr. 526:8–15. Non-citizens—the vast majority of Poder Latinx's staff—would no longer fit neatly into that model and would have to be accompanied by another citizen staffer who handled the voter-registration aspect of the interaction with an eligible voter, creating redundancies and inefficient staffing rather than allowing each staffer to reach more potential voters. Tr. 535:10–20, 537:16–538:2. Ms. Wassmer testified that even that inefficient model might subject Poder Latinx to too great a risk of the Citizenship Requirement's heavy fines—meaning Poder

Latinx would likely drop voter-registration work from its model altogether, further curtailing its speech and associational efforts. Tr. 538:3–17.

Indeed, by imposing steep fines, the Citizenship Requirement has *already* chilled Plaintiffs' willingness to engage in the solicitation of new voters and collect voter-registration forms. Mr. Vélez III Burgos testified that Hispanic Federation has already made the difficult decision not to permit its non-citizen canvassers to engage in voter-registration efforts until a permanent decision about the Citizenship Requirement's constitutionality has been issued. Tr. 588:20–589:4. And Mr. Vélez III Burgos testified that the consequences have been devastating on Hispanic Federation's ability to engage and register voters: in 2022, Hispanic Federation registered approximately 16,000 people to vote, Tr. 590:3–5, 590:16–18; and in 2023, Hispanic Federation only registered about 20 or 30 people to vote. Tr. 593: 17–18. In this way, the Citizenship Requirement's onerous restrictions and the substantial strict liability fines they threaten have burdened and will continue to burden Plaintiffs' political expression and association, both by diminishing their ability to convey their message and engage more individuals in the political process.

What's more, the Citizenship Requirement has all but shut out Individual Plaintiffs from engaging in core political speech as canvassers, tying their hands and, in so doing, effectively taping their mouths. Most immediately, of course, the Citizenship Requirement would prohibit each of the Individual Plaintiffs from

collecting and handling forms that help voters to register or update their registration. Tr. 398:2–7, 429:3–8. None of the Individual Plaintiffs has been able to personally register any voters as a canvasser since the Citizenship Requirement's enactment, Tr. 397:25–398:12, 409:15–22, 429:5–8, depriving them entirely of the ability to convey, through their canvassing work, the message that engaging eligible voters in their communities and broadening the electorate matters.

And the Citizenship Requirement has stifled Individual Plaintiffs' expression even beyond the act of registering voters. For example, Ms. Herrera-Lucha testified that the Citizenship Requirement's prohibition on non-citizen canvassing has effectively eliminated opportunities for her to speak to voters about the importance of voting, and that she has not been able to speak to voters about the importance of voting since the Citizenship Requirement became law. Tr. 410:17–411:2. Her testimony highlights the way that the acts of collecting and handling a voter's registration application are "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," *Vill. of Schaumburg*, 444 U.S. at 632, and why this Court should not try to slice and dice Plaintiffs' conduct to artificially separate these actions from their expressive elements, *Tenn. State Conf. of N.A.A.C.P.*, 420 F. Supp. 3d at 699.

**B.  The Citizenship Requirement cannot survive strict scrutiny.**

*1.  Strict scrutiny applies.*

The law demands, twice over, that strict scrutiny applies here. *First*, strict scrutiny applies because the Citizenship Requirement restricts core political speech or expression. *See supra*, Section II.A.1. Because "this case involves a limitation on political expression," the Citizenship Requirement must meet "most exacting scrutiny." *Meyer*, 486 U.S. at 420; *see also Buckley*, 525 U.S. at 204; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 786 (1978) ("When a law burdens core political speech, we apply 'exacting scrutiny.'"); *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) ("'Laws that burden political speech are' accordingly 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'") (citations omitted).

*Second*, strict scrutiny is warranted because the Citizenship Requirement "distinguish[es] among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (applying strict scrutiny to law that restricted speech only by certain speakers); *Bellotti*, 435 U.S. at 784 (same). "By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to

strive to establish worth, standing, and respect for the speaker's voice." *Citizens United*, 558 U.S. at 340–41. "The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration,' because the "First Amendment protects speech and speaker, and the ideas that flow from each." *Id.* at 341. As a result, Supreme Court "precedents are deeply skeptical of laws that 'distinguish among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 777–78 (2018) (quoting *Citizens United*, 558 U.S. at 340).

The Citizenship Requirement intentionally targets only specific *speakers*: non-citizens. Of course, "[f]reedom of speech . . . is accorded aliens residing in this country." *Bridges*, 326 U.S. at 148. Yet, for example, the legislative and evidentiary record is clear that, in passing the Citizenship Requirement, the State sought to silence all non-citizens from engaging in a particular kind of speech and expressive conduct. *See* PX 250 at 112:9–14 (Burgess: "And regarding non-citizens, there are certain rights in our country that only citizens get to enjoy. That includes serving on a jury, running for office and voting. We're just adding and ensuring that your right to vote is one of them as well."); PX 252 at 16:18–22 (Burgess: "I think the policy call her[e] is that . . . we recognize already that there are certain rights in our country that only citizens get to enjoy, including serving on a jury, running for office, and voting."); *see also* Tr. 438:6–7 (Pico: "I felt discriminated against for not being a

citizen of the United States in order to be able to register a voter."); Tr. 398:2–3 (Herrera-Lucha: "Unfortunately, the law discriminates against me and I'm not able to do so because I am not a citizen."). "Such speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Family & Life Advocates*, 585 U.S. at 758; *see also Citizens United*, 558 U.S. at 340.

Courts have compared such speaker-based restrictions to content-based restrictions on speech, explaining that "these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340. The Citizenship Requirement has the hallmarks of this same problematic pattern: it specifically targets non-citizens' ability to engage in speech and expressive conduct that conveys specific content: encouraging eligible voters to register. Thus, the Citizenship Requirement is also content-based, because it prohibits "only one perspective": *i.e.*, the importance of political participation by eligible voters. *Speech First, Inc.*, 32 F.4th at 1127. Plaintiffs demonstrated that this is a critical message—*i.e.*, that it is vital to Plaintiffs' communities that eligible voters participate in their democracy—that Plaintiffs communicate as they register voters. Because it prohibits *only* non-citizens from engaging in *only* a particular type of speech that expresses that message, the Citizenship Requirement is the archetypal "facially neutral statute [that] is

nevertheless content-based [because] it regulates speech based on its 'function or purpose.'" *In re Ga. Senate Bill 202*, 622 F. Supp. 3d 1312, 1332 (N.D. Ga. 2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This only further clinches the conclusion that the Citizenship Requirement is subject to strict scrutiny. *See Reed*, 576 U.S. at 166 (strict scrutiny applies to content-based laws).

### 2.   *The law is unsupported by any compelling state interest.*

Strict scrutiny demands *the State* to prove that the challenged restriction "is narrowly tailored to serve an overriding state interest." *McIntyre*, 514 U.S. at 347; *see also Fla. State Conf. of Branches & Youth Units of the NAACP*, 680 F. Supp. 3d at 1313 ("Defendants carry the burden of proving that the challenged provision satisfies strict scrutiny."). Yet the State has failed to establish that the Citizenship Requirement is anywhere near narrowly tailored to achieve a compelling or overriding state interest, and so fails "most exacting" or "strict" scrutiny.

It bears emphasis that the Secretary pulled their only "may call" witness— Andrew Darlington—who was the Secretary's 30(b)(6) witness designated to testify about "state interest." *Compare* Secretary's Witness List, No. 4:23-cv-00215, ECF No. 244-4 *with* Tr. 1935:21–1936:2. In other words, the Defendants presented an "empty-chair" defense—there was simply no testimony from any legislator, other state official, or any other witness about "state interests" that might justify the Citizenship Requirement.

According to the paper evidentiary record, only three purported rationales for the Citizenship Requirement were articulated in the legislative process.

*First*, Senator Burgess stated: "And regarding non-citizens, there are certain rights in our country that only citizens get to enjoy. That includes serving on a jury, running for office and voting. We're just adding and ensuring that your right to vote is one of them as well." PX 250 at 112:9–14; *see also* PX 252 at 16:18–22 (Burgess: "I think the policy call her[e] is that . . . we recognize already that there are certain rights in our country that only citizens get to enjoy, including serving on a jury, running for office, and voting.").

Senator Burgess seemed unaware, however, that the Citizenship Requirement does not actually *address* who has the right to vote. *See* Fla. State. Ann. § 97.0575(1)(f). Moreover, in making these claims, Senator Burgess did not explain why engaging in protected First Amendment activities such as assisting someone to register to vote should be limited to citizens, nor did he address why non-citizens employed by the Secretary of State, Supervisors or Elections, or the Department of Motor Vehicles could assist people to register to vote.

*Second*, Senator Hutson stated:

> [W]e've had people register folks and not turn in the registration, so people thought that they were registered to go vote, and coincidentally, it was not turned in, so they weren't registered. We've had other parties take information and change their information after they signed a form. . . . [W]e want to make sure that we have higher scrutiny on those that are doing this. So that . . . a third-party registration gets someone's

information to the supervisor, we want it to be done correct, we want it
to be done right, and we want those people to be able to vote.

PX 252 at 5:13–6:7. But when Senator Polsky asked if there is any reason to think

that "a non-citizen has done those acts more than . . . the Average Joe, you know,

person who just didn't do the job correctly," neither Senator Hutson nor Senator

Burgess could substantiate the connection between this misconduct and non-

citizens—they provided no examples or justification to connect the two. PX 252 at

6:12–7:13.

*Third*, Senators Hutson and Burgess stated the data on voter-registration

applications "is pretty private and sensitive," and so they "wanted to make sure

you . . . were a legal citizen handling this and you weren't an illegal doing thirdparty

voter registration." PX 252 at 15:7–16 (Hutson); *see also id.* at 16:13–17 (Burgess:

"it kind of dovetails in line with ensuring that we're protecting that sensitive

information that we're collecting from a voter if they are requesting all of that on a

voter registration form."). In debate, however, the bill's sponsors repeatedly

acknowledged that "non-U.S. citizens are allowed to work for the Division of

Elections." PX 252 at 18:21–19:4 (exchange between Senators Jones and Burgess);

PX 254 at 9:10–24 (exchange between Representatives Woodson and McClure); *see*

*also* Tr. 1750:10–15 (Assistant State Attorney VanderGiesen: "If [non-citizens] can

legally work, I'm sure that they can legally work at the state attorney's office."); Tr.

745:6–9 (Supervisor of Elections Mark Earley, testifying that he is not aware of any

law that prohibits supervisors' offices from employing non-citizens to handle voter-registration applications.). When Senator Jones asked why "non-U.S. citizens who have been vetted, like legal, permanent residents" should be banned from collecting applications "if the concern is about security," Senator Burgess said: "I think I'll fall back on my previous answer kind of related to the decision why. It's ultimately a policy call but those are the reasons why we decided to land on sticking with non-U.S. citizens." PX 252 at 18:2–16.

Similarly, during the House session, Representative McClure repeated this claim, stating: "We're just simply saying in an abundance of caution for that potential voter's personal information, that at the time they hand over that sacred information, that it goes to a U.S. citizen for collection and handling purposes only." PX 254 at 7:23–8:2. When asked "what evidence is there that noncitizens, including permanent legal residents, are any less honest or more likely to misuse information than U.S. citizens," Representative McClure testified: "The purpose of that doesn't contemplate the premise of your question. Instead as it relates to the fines, we are emphasizing and prioritizing that voter's information." PX 254 at 25:9–22.

Even before legislative debate had closed, multiple legislators summarized the gaping holes in these purported rationales. PX 254 at 25:7–22; PX 252 at 180:6–183:203 (Sen. Jones). For instance, Representative Bartleman stated:

> The speaker, in questioning, said we don't want these people to collect
> the paperwork. Well, these individuals are legally authorized to work

in the United States, and they work for our local election offices, the
Florida Department of Highway Safety and Motor Vehicles, where they
collect or handle voter registration applications . . . And some may even
work at the State's Division of Elections. So why are they allowed to
work for . . . these government entities and not be allowed to work for
a third party?

PX 254 at 38:16–39:3.; *see also id.* at 40:9–18 (noting, *e.g.*, provision covered

"people who are working in our banks with sensitive information" and "at the DMV

[where] they're collecting this paperwork anyway").

Likewise, Representative Eskamani stated:

It just doesn't make sense that we set restrictions because someone
doesn't have citizenship status when we have all of these other statuses
and well-vetted programs that ensure that these are individuals who we
trust to work in our country. We trust them to be our pharmacists. We
trust them to be our doctors. We trust them to handle sensitive data in
research, and yet, now we're saying they can't hold a voter registration
form. It does not make sense.

PX 254 at 35:24–36:8.

Ultimately, as Senator Jones summarized it:

[I]n the amendment, we prohibit non-U.S. citizens with work
authorizations from being able to collect and handle registration
applications with third-party voter registration organizations. And
when I asked Senator Burgess the reasoning, his response was it was
just a policy decision. And so there was no reason because there is none,
why we're doing this. Because if an authorized person can work in the
Division of Election, they can work in the DMV, or even in the tax
collector's office, but suddenly they can't work for a third-party voter
registration organization because now it's all of a sudden, a security
issue, what are we talking about?

PX 252 at 180:10–24.

At trial, Representative Eskamani further confirmed that no evidence was presented to the legislature that any non-citizen canvasser working on behalf of a 3PVRO had engaged in any voter-registration related misconduct or stolen or misused voter's information during the legislative debate. Tr. 908:9–24. She testified that the single example of a bad actor Secretary Byrd provided the legislature was a 3PVRO named Hard Knocks, but Secretary Byrd did not claim that this issue with Hard Knocks was associated or otherwise attributable to non-citizens; instead, he refused to provide additional details why S.B. 7050 would have addressed Hard Knocks and simply referred to public records. Tr. 909:13–18. As a result, Representative Eskamani testified that the changes that Senate Bill 7050 makes to 3PVRO regulations makes her "more confident in the difficulty of engaging in the new electoral process" than in the integrity of Florida's election systems. Tr. 917:15–18.

In sum, during legislative debate, the bill's sponsors cited "protecting [] sensitive information" on completed registration forms as the justification for the Citizenship Requirement. They also voiced their view "that there are certain rights in our country that only citizens get to enjoy," and stressed that the bill was meant to ensure that "illegal[s]" didn't handle voter-registration applications. Those suppositions were the extent of any alleged justification for the Citizenship Requirement: the legislative record contained no evidence showing that non-citizens

are untrustworthy or incapable of handling sensitive information. Nor did the legislative record contain evidence suggesting the State's general concerns about 3PVROs are particularly attributable to their non-citizen staff and volunteers, or that the Citizenship Requirement is narrowly tailored to address any such risk.

The State had the opportunity—and, indeed, the burden—to put forward a compelling interest at trial to support the Citizenship Requirement. But it did no such thing. After five days of testimony about the harms and constitutional injuries caused by the Citizenship Requirement, Defendants presented nothing to defend the state interest in the provision. In particular, Defendants didn't present any witness to testify about the existence of a state interest that would justify the Citizenship Requirement: the Secretary of State's sole representative to testify at trial, Maria Matthews, didn't testify about any state interest that the Citizenship Requirement promotes. Tr. 1912:24–1947:20.

As a result of its empty-chair defense, the Defendants are left with the same paltry record that this Court considered and ultimately addressed in its July 2023 preliminary injunction order. Nine months later, the State remains unable to meet "identify[] any connective tissue between the problem and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter-registration applications on behalf of 3PVROs." *Fla. State Conf. of Branches & Youth Units of the NAACP*, 680 F. Supp. 3d at 1313–14. Because Defendants

completely and utterly failed in their burden to provide evidence to "marry the solution to the problem," the Citizenship Requirement fails strict scrutiny. *Id.*

To the extent Defendants try to rely on any *post hoc* arguments not found in the legislative record, the Court ought to quickly set those aside as meritless. "Government 'justifications' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996).[7]

As discussed *supra*, at trial, Defendants did not present any witnesses to testify about state interests to justify the Citizenship Requirement. But even if *post hoc* rationales *could* be used to justify the Citizenship Requirement (though they cannot, *see supra*), the record contains no such interest. Indeed, the trial record is devoid of any evidence non-citizens are or are understood to be related to *any* problems that the State has identified with respect to 3PVROs' operations in Florida.

For example, Supervisor of Elections Mark Earley testified that he is not aware of a "single instance in which a noncitizen mishandled a voter registration

---

[7] *See also Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1134 (5th Cir. 2022) (in First Amendment case, noting a "narrowly tailored restriction must also advance the asserted interest well enough to prove that the interest is genuine and not a *post hoc* rationalization"); *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) (in RLUIPA context, where Congress "borrowed its language from First Amendment cases" applying strict scrutiny, noting "post-hoc rationalizations" cannot prove a compelling interest).

application," Tr. 744:24–745:2; or of "any problem that the citizenship requirement solves." Tr. 745:3–4. And the few witnesses the defense called testified similarly. For example, defense witness Tim VanderGiesen, an assistant state attorney in the Miami-Dade State Attorney's office who leads the unit that handles voting-related prosecutions, admitted that when his office investigates complaints about 3PVROs or canvassers, it doesn't treat citizenship status as a "relevant consideration": his office does not gather citizenship data as part of the investigations, and he doesn't know the citizenship status of the few complaints his office has received relating to 3PVROs. Tr. 1741:1–10, 1749:1–10. The other State Attorneys' testimony was in accord. *See* Tr. 1806:2–7 (Amira Fox, State Attorney for the 20th Judicial Circuit, testifying: "Q. Based on your office's investigation, do you have any reason to know the citizenship of any of the seven canvassers who were investigated in that case? A. No. Q. That was not part of your investigation? A. No, it never is."); Tr. 1786:13–23 (William Gladson, State Attorney for the Fifth Judicial Circuit, testifying that he was unaware of the citizenship status of the canvasser he prosecuted, though admitting she was on the voter rolls as a registered Republican and that only citizens can register to vote).

Defense witness Lake County Supervisor of Elections Alan Hays testified similarly. His office has not referred any non-citizens to be investigated for unlawful activity related to assisting voters to register. PX 666 at 4. Nor has his office referred

72

non-citizens to be charged, indicted, or prosecuted for unlawful activity related to assisting voters to register. Tr. 1833:12–1834:5; PX 666 at 4. Nor has his office referred non-citizens to be charged, prosecuted, or investigated for unlawful activity related to mishandling voter-registration applications. Tr. 1834:7-18; PX 666 at 4. When asked whether he could identify a single non-citizen who has mishandled a voter-registration application on behalf of a 3PVRO, Supervisor Hays responded: "No." Tr. 1834:19–22. Just like the "tragic" lies about elections Supervisor Hays testified to hearing from his constituents daily, Tr. 1836:3–1837:2, the Citizenship Requirement lacks any evidentiary support. Instead, the only 3PVRO staff member he testified he was aware of who had engaged in misconduct is a U.S. citizen. Tr. 1841:11–1842:3.

Instead, the record supports that non-citizens have done great work to register voters in Florida and are in no way more likely to cause 3PVRO-related problems— the *opposite* of the point the Defendants asserted they would prove. *See* Sec'y's Opening Br., ECF No. 164 at 8 (postulating Citizenship Requirement is "backed by compelling government interests"). The non-citizen Individual Plaintiffs who testified explained that, in their work for 3PVROs, they had never been subject to discipline or fines for their work. *See, e.g.*, Tr. 406:13–407:4, 437:2–7, 514:24–515:3. Likewise, representatives from 3PVROs testified that they have not identified any problems that are specific to non-citizen canvassers. For example, Mr. Vélez III

Burgos testified that, in his work with Hispanic Federation, he has never "seen anything that might show [him] that noncitizens are either worse or bad or will do a bad job at voter registration." Indeed, some of the Organizational Plaintiff representatives testified that non-citizens may be *more* effective at promoting the message that registering to vote is important, and that at least some organizations prefer to hire non-citizen canvassers. *See supra*, Background.B.

Another example in the record highlights the same disconnect between the trial record and the State's post hoc justifications. The Defendants repeatedly inquired at trial about a 3PVRO called Hard Knocks, which State Attorney Amira Fox identified as the source of all the "fraudulent-looking applications" that her office had investigated. Tr. 1791:17–1792:11, 1804:1–11. Yet the only testimony on the record about the demographics of Hard Knocks's canvassers is from Ms. Herrera-Lucha, who testified that she was the *only* non-citizen working at Hard Knocks during her brief time being employed by that 3PVRO, that she was never disciplined for any misconduct during her time there, and that she had left that organization within two months. Tr. 414:24–415:5, 424:14–23.

Defense witnesses admitted that they have no reason to believe that non-citizens are "less trustworthy" than U.S. citizens. Tr. 1750:16–19 (VanderGiesen). That is reinforced by the fact that non-citizens can occupy other positions in Florida that involve the handling of sensitive information: for instance, Ms. Herrera-Lucha

testified that she is a licensed notary, and that in that position, she is tasked with important responsibilities such as reviewing identification documents, certifying affidavits for U.S.-citizen affiants, and marrying people. Tr. 393:5–18. And officials who took the stand couldn't think of any reason why non-citizens who satisfy the work requirements under state and federal law shouldn't be able to work in their own offices. Tim VanderGiesen, an assistant state attorney in the Miami-Dade State Attorney's office, admitted that he didn't "know any reason why" his office couldn't hire non-citizens who satisfy the work requirements under state and federal law, explaining: "If they can legally work, I'm sure that they can legally work at the state attorney's office." Tr. 1750:10-15; *see also* Tr. 745:6–9 (Supervisor of Elections Mark Earley, testifying that he is not aware of any law that prohibits supervisors' offices from employing non-citizens to handle voter-registration applications).

### 3. *The law is not narrowly tailored to further any of the interests Defendants have offered.*

Strict scrutiny also requires that the challenged law be "the least restrictive means of achieving a compelling state interest." *McCullen* 573 U.S. at 478; *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 992–93 (9th Cir. 2004). Again, there was ample evidence in the record that the Citizenship Requirement is not narrowly tailored to achieve any of the interests that were identified during legislative debates—less restrictive means would plainly address those interests without

trampling Plaintiffs' rights. And the State put forward no evidence at trial that the Citizenship Requirement is tailored to any of those interests.

To start, the legislative record makes clear that multiple legislators highlighted the Citizenship Requirement's tailoring problems. PX 252 at 180:6–183:203 (Sen. Jones); PX 254 at 33:10–36:10 (Rep. Eskamani), 38:8–39:8 (Rep. Bartleman). As detailed above (*supra* Section II.A.2.ii), legislators emphasized particularly that preventing non-citizens from collecting and handling voter-registration applications is an *underinclusive* fix to any interest that the sponsors had identified, because non-citizens are authorized to handle the *same information* contained in voter-registration applications in other jobs—be it at the Florida Division of Elections, Department of Highway Safety and Motor Vehicles, or the tax collector's office. PX 254 at 38:16–25; PX 252 at 180:10–24.

The legislative materials in evidence also confirm that the Citizenship Requirement was not the least restrictive means to further the Defendants' interests. Take one easy example of a narrower alternative. Representative Joseph offered an amendment that she described as follows:

> This amendment is designed to remove language in the bill that intentionally or unintentionally discriminates based on national origin.
>
> . . .
>
> Title VII provides that you cannot discriminate based on national origin. This language removes -- this amendment removes parts of line 405 that say that the third-party voter registration organization has to

employ somebody who is a United States citizen. As this body may recognize, there are lots of people who are legally authorized to work in this country, such as lawful permanent residents, green card holders, some of which may have been engaged to you all at some point. And these people should be allowed to work for these organizations, and we should not force these organizations to illegally discriminate against people in contravention of this country's antidiscrimination laws. So this language tries to help you to make sure that that illegal employment discriminatory action is removed from the bill.

Further, I will add that it has a disproportionate impact on immigrant communities, which is a direct concern as it relates to voting rights, when we're looking at immigrant populations, people who speak English as a secondary language, whether we're talking about people who speak primarily Spanish or Haitian Creole in the state of Florida, and it will have a disproportionate adverse impact on these communities, which directly impacts our ability to engage in the voting process. That is the amendment.

PX 254 at 33:2–34:21.

Representative Bartleman also offered an amendment that would have modified the Citizenship Requirement to allow people with work authorizations to collect or handle voter-registration applications, which she described as follows:

As written, this bill would prevent individuals who are legally authorized in the United States from being employed to collect or handle voter registration applications. This is a large segment of our workforce, and hundreds, if not thousands, of Floridians who are legally authorized to work will lose employment opportunities. This is discriminatory in nature.

The speaker, in questioning, said we don't want these people to collect the paperwork. Well, these individuals are legally authorized to work in the United States, and they work for our local election offices, the Florida Department of Highway Safety and Motor Vehicles, where they collect or handle voter registration applications -- just let me star that

again -- where they collect and handle voter registration applications. And some may even work at the State's Division of Elections.

So why are they allowed to work for all of these government entities and not be allowed to work for a third party? This doesn't make sense. So this amendment would ensure that individuals who are not U. S. citizens but are legally authorized to work in the United States are able to collect or handle voter registration applications on behalf of the organization, and I ask for your support.

. . .

This is discriminatory. These are people who are working in our banks with sensitive information. They are your accountants. They're performing heart surgery on you. They're working in your hospitals. They're taking care of your children. Those are the most important things in our lives, and you propose that they're not qualified or can't be trusted to collect paperwork. And by the way, at the DMV, they're collecting this paperwork anyway. So why don't you just accept this amendment, so we're not discriminating against hardworking people who are legally authorized to work in this country? Thank you very much.

PX 254 at 38:8–40:22. Both amendments failed. PX 254 at 37:9–18, 40:23–41:4.

*See also* Tr. 906:4–907:14 (Rep. Eskamani testifying that she also introduced unsuccessful amendment that would have, among other things, eliminated the Citizenship Requirement); PX 248 at 35:18–41:17 (discussion of Eskamani amendment in legislative record); PX 248 at 38:8–10 (Eskamani: "if we trust our non-citizens to serve in the military, we should trust them to hold a voter reg. form").

Setting aside the question of whether Senator Hutson's purported interest in "mak[ing] sure you . . . weren't an illegal doing third-party voter registration" is sufficiently weighty to justify any restrictions on 3PVROs' conduct, PX 252 at 15:8–

12, the amendments offered by Representative Joseph and Representative Bartleman would at least have more closely tailored the solution to that purported "problem."

The evidence the State adduced at trial fares no better than the legislative record. The glaringly few examples that the Defendants elicited during testimony about some canvassers committing misconduct while working for 3PVROs—*i.e.*, four canvassers prosecuted by the State Attorney's Office for the 20th Judicial Circuit, and one canvasser prosecuted by the Fifth Judicial Circuit—demonstrate the the Citizenship Requirement's underinclusiveness: there is no evidence to suggest that *any* of those canvassers were non-citizens. Tr. 1806:2–7, 1786:13–23. Thus, there is no reason to believe the Citizenship Requirement would prohibit any of the discrete examples of conduct that the State highlighted as a problem.

The testimony at trial also confirmed that the Citizenship Requirement is not effectively tailored to address or prevent any bad conduct by 3PVRO canvassers that wasn't *already* prohibited under Florida law. Prosecutors who testified at trial invariably confirmed that there are already laws on the books to combat misconduct by 3PVROs or the canvassers who work for them, including criminal laws that prosecutors have used to punish voter fraud, identity theft, and submission of false registration information. Tr. 838:16–25, 1796:10–24; *see also* Fla. Stat. Ann. §§ 104.011, 104.012(1), 104.012(4). And Supervisor of Elections Earley similarly testified that, prior to S.B. 7050, he already "had a duty to report any fraud" that his

office identified, and that the new restrictions in S.B. 7050, including the Citizenship Requirement, have not "made it any easier for [him or his] team to detect and investigate any fraud committed by 3PVROs." Tr. 804:13–24; *see also* Fla. Stat. Ann. § 104.42(1) (supervisor of elections has authority "to investigate fraudulent registrations" and report findings to prosecutors).

### 4. *Even if strict scrutiny does not apply, the Citizenship Requirement cannot survive the* Anderson-Burdick *framework.*

Even if this Court determines that strict scrutiny does not apply, the Citizenship Requirement ought to still fall because of the extensive trial evidence concerning its severe burdens on Plaintiffs' speech and association in connection with the right to vote, measured against the Defendants' lack of evidence concerning the state interests.

When a law unduly burdens Plaintiffs' First and Fourteenth Amendment rights in connection with the right to vote, the Supreme Court has applied a different "framework to cases governing the 'mechanics of the electoral process'" rather than "core political speech." *VoteAmerica*, 671 F. Supp. 3d at 1246–47 (quoting *McIntyre*, 514 U.S. at 345). The "*Anderson-Burdick*" framework is therefore appropriate to assess challenges to "a wide range of electoral-process regulations," including "the time, place, and manner of elections, such as notices, registration, supervision of voting, protection of voters," and others. *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 140 (3d Cir. 2022) (quotation marks omitted). That test calls upon the

Court to "weigh 'the character and magnitude of the asserted injury' against the 'precise interests put forward by the State . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

Plaintiffs do not believe the *Anderson-Burdick* is the proper inquiry here because the Citizenship Requirement is a "'regulation of pure speech'" that necessitates exacting scrutiny. *Harriet Tubman Freedom Fighters Corp. v. Lee*, 576 F. Supp. 3d 994, 1003 (N.D. Fla. 2021) (quoting *McIntyre*, 514 U.S. at 345).

Nevertheless, the Citizenship Requirement also fails under *Anderson-Burdick* because its attendant "burdens" on Plaintiffs' speech and association, including in connection with the right to vote, are severe. *See Buckley*, 525 U.S at 192. Because the Citizenship Requirement's burdens are severe, the standard of review does not change if the Court approaches the level of scrutiny through the *Anderson-Burdick* framework: "[r]egulations imposing severe burdens must be narrowly tailored and advance a compelling state interest," just as with strict scrutiny. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351 (1997); *see generally VoteAmerica*, 671 F. Supp. 3d at *1250–51.

There can be no doubt that the burdens created by the Citizenship Requirement are severe. As an initial matter, as established above, the trial evidence

was overwhelming that Citizenship Requirement stifles core political speech. *See generally supra* II.A.2. "[W]hen regulations of core political speech are at issue it makes little difference whether we determine burden first because restrictions on core political speech so plainly impose a 'severe burden.'" *Buckley*, 525 U.S. at 208 (Thomas, J., concurring in the judgment).

Indeed, the Law's burdens on Plaintiffs' speech and association rights are the "direct restrictions or preconditions" on constitutionally protected activity that courts have warned against in the *Anderson-Burdick* context. *See League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008) ("*Browning I*"). For example, in *Browning I*, plaintiffs challenged a measure that imposed disclosure requirements and deadlines on 3PVROs' activities. The district court explained that "Plaintiffs' interactions with prospective voters in connection with their solicitation of voter-registration applications constitutes constitutionally protected activity." *Browning I*, 575 F. Supp. 2d at 1321–22. But there, the Court concluded that the challenged law did *not* "direct[ly] restrict[] or precondition[] [] those interactions," because it did "not . . . restrict[] . . . who is eligible to participate in voter-registration drives or what methods or means [3PVROs] may use to solicit new voters and distribute registration applications." *Id.* Absent that direct restriction or precondition, the "nature of the burden imposed upon Plaintiffs' political speech"

in *Browning I* was distinguishable from cases in which courts applied strict scrutiny. *Id.* at 1320–21.

The Citizenship Requirement does precisely what *Browning I* warned against: it restricts "who is eligible to participate in voter registration drives" and the "methods or means [3PVROs] may use to solicit new voters and distribute registration applications." *Browning I*, 575 F. Supp 2d at 1322. By banning most of Organizational Plaintiffs' staff—and, likewise, precluding Individual Plaintiffs—from participating in voter registration, the Citizenship Requirement limits the means by which Plaintiffs can register voters. *See supra* II.A.2 & II.A.4.

As a result, the Citizenship Requirement will limit the number of people who organizational plaintiffs can register to vote and encourage to attend other civic events. *See supra* II.A.4. And in turn—and in Dr. Smith's expert opinion—the Citizenship Requirement will likely have a negative effect on voter registration overall. *See supra* Background.A.

Dr. Smith's analysis demonstrates that 3PVROs play two important roles in the voter-registration process: not only are they "registering anew all these hundreds of thousands of people moving to Florida or becoming of age," they also perform the function of "updating the registration and helping the State, quite honestly, keep the voter rolls clean by getting those addresses or name changes updated as we would hope." Tr. 1020:5–11. 3PVROs do this work on a massive scale in Florida: in total,

since 2012, 3PVROs have submitted more than 2.1 million voter-registration applications to the Florida Division of Elections. Tr. 1033:25–1034:1; PX 968.

Dr. Smith explained that, because the Citizenship Requirement will curtail the ability of 3PVROs like Hispanic Federation and Poder Latinx to register new voters or update existing voters' registrations, the Citizenship Requirement will "likely lead to an overall decrease in new registrations," and particularly so for the "Black and Hispanic voters [who] disproportionately utilize 3PVROs to register anew or to update their registrations." Tr. 1094:4–1095:1. Dr. Smith supported this conclusion in two ways: first, he used an accepted political-science framework to examine the costs that laws burdening 3PVROs would likely impose on voters' access to registration using a political-science framework, Tr. 1073:4–18, and he coupled that examination of the likely costs of this law with his findings about the demonstrated effect that past laws burdening 3PVROs have had on voter registration in Florida. Tr. 1088:25–1089:19 (HB 1355 paper), 1094:4–1095:12 (synthesis).

Start with Dr. Smith's assessment of the costs. Because the "State does not have an affirmative role in registering people in this country," the decision to register to vote is ordinarily "something that citizens have to initiate themselves to become registered." Tr. 1074:16–19. 3PVROs stand apart from other methods of registration, because they help to "fill th[e] gap" created by the "lack of the State's affirmative role in registering people." Tr. 1077:1–3. Indeed, 3PVROs provide a unique and

convenient service to voters, in that "voluntary organizations—which de Tocqueville called the essential part of American society—are there doing what the State is not doing in terms of helping these people register to vote." Tr. 1031:4–7. The trends in the individual-level data that Dr. Smith examined bear this out: as Dr. Smith explained, "the fact that not only people registering anew but people who . . . had registered previously with a different modality utilize 3PVROs . . . speaks volumes about how they are providing a service that is a lower cost to hundreds of thousands of voters in Florida, including voters who are already registered." Tr. 1084:18–24.

In contrast, because the other methods of registration require the voter to initiate the interaction, they come with attendant costs. For example, to register at a DMV, library, community of assisted living, Armed Forces office, the voter incurs both travel costs to get to the registration site, as well as information costs associated with learning that registration is available at that site to begin with. Tr. 1074:2–1075:5, 1076:19–25. There are multiple types of opportunity costs attendant to the online voter-registration system. First, to register online, the voter must "have access to the Internet," and Dr. Smith testified to "estimates that over 2 million people in Florida do not have high-speed Internet." Tr. 1076:7–9, 1083:10. Second, the voter must "be at the good graces that IT has the system up and running when you want to utilize it," which is "not always the case": "On at least two occasions, the system

has failed right around the time of book closing before a general election," which is "a very important time for people who want to either register before the 29-day cutoff or update their registration so they won't have difficulties being able to vote." Tr. 1083:12-22.[8] And even if the voter can overcome those barriers to access, there are information costs: the voter has to have the "knowledge to be able to use the online voter registration system," and not all voters "are equal in our ability to overcome" those costs of understanding how to navigate the Internet. Tr. 1080:10–16, 1083:10–12. And registering via mail also has attendant opportunity costs, which largely stem from obtaining the registration application—which requires either access to the Internet and a printer, or the time and ability to travel to obtain an application, all of which impose costs on voters. Tr. 1075:6–9. Dr. Smith testified that these additional costs explain why it is "not the case" that "these modalities are completely fungible, that if you shut off one spigot that suddenly the water is going to be flowing and you can go to these other faucets." Tr. 1084:25–1085:3. Indeed, Defendants' expert Dr. Stein likewise testified that he would not predict that "all Black and Hispanic voters in Florida who do not register with third-party voter

---

[8] *See, e.g.*, *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1134 (N.D. Fla. 2020) ("In the final hours of Florida's voter registration period . . . Florida's voter registration website crashed, effectively preventing thousands of potential voters from safely registering to vote before the midnight deadline.").

registration organizations after 7050" would "perfectly substitute into other methods of registration." Tr. 1694:9–13.

In addition to explaining the costs imposed on voters who would no longer able to access 3PVROs' services because of the Citizenship Requirement, Dr. Smith testified about the impact that past laws burdening 3PVROs have had on voter registration in Florida. Using data from before and after the implementation of House Bill 1355—a Florida law that likewise placed burdens on 3PVROs' activities, and that took effect on August 17, 2011—Dr. Smith determined that there was an "overall decline in daily registrations" following the implementation of the law burdening 3PVROs' conduct. Tr. 1087:3–1089:11. That "decline overall in registration rates" confirms that, after House Bill 1355 took effect, "there was not a substitution effect": rather, "3PVROs played an instrumental role," and "[w]hen they were regulated and weren't on the ground, we can see that people did not necessarily move over to another modality to register to vote." Tr. 1089:12–19. And Dr. Smith's analysis of House Bill 1355 also demonstrated the impact of House Bill 1355 on different racial groups: looking at the raw number of voters registered before and after the implementation of House Bill 1355, Dr. Smith determined that the law had a negative net impact on registrations for Black, Hispanic, and white voters. Tr. 1089:22–1092:17. Dr. Smith also ran a regression analysis that established that the decrease in registrations for Black voters was statistically significant, meaning that

the trends in the data for Black voters were sufficiently strong to reject the null hypothesis that House Bill 1355 had no effect on the number of Black voters being registered to vote in Florida. Tr. 1092:21–1093:25; *see also* Tr. 1088:11–19. These data-driven conclusions about the effects that past restrictions on voter-registration organizations have had on voter registration in Florida help to inform and bolster Dr. Smith's conclusions about the likely effect that the Citizenship Requirement would have. Tr. 1094:4–19.

These opinions are largely undisputed: indeed, even Defendants' expert Dr. Stein also agreed that "some voters who would have registered via 3PVRO in Florida will not register at all as a result of SB 7050" and that "there may be a decline in overall registration." Tr. 1694:14–25. And the testimony of other fact witnesses only reinforced Dr. Smith's expert testimony. For example, Senator Torres likewise testified that, if 3PVROs stopped or greatly reduced operations, there would be a "huge drop in registering of the Hispanic/Puerto Rican community." Tr. 465:21–25. Likewise, the record is replete with examples of why other methods are not a substitute for 3PVROs' and their non-citizen employees' efforts to collect and handle voter-registration applications in their communities. For example, with respect to online voter registration, Ms. Herrera-Lucha testified: "A lot of Hispanic people are not technologically inclined, and they even prefer to do so in writing, like [Mi Vecino] does." Tr. 402:13–19.

Taken together, all this evidence makes plain that the burdens that the Citizenship Requirement will impose on Plaintiffs' speech and association—including in connection with the right to vote—are severe. As such, the Citizenship Requirement cannot survive the strict scrutiny that the *Anderson-Burdick* framework dictates, for the same reasons outlined *supra*, in Section II.A.2.

Even, however, were the Court to determine that a lower level of scrutiny applies under the *Anderson-Burdick* framework, the Citizenship Requirement fares no better. Although the result may be especially obvious under strict scrutiny, the discussion in Section II.A.3 makes clear that, in "weigh[ing] 'the character and magnitude of the asserted injury' against the 'precise interests put forward by the State,'" the scale tilts decisively in Plaintiffs' favor, especially when "'taking into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *Obama for Am.*, 697 F.3d at 433 (quoting *Burdick*, 504 U.S. at 434).

Here, the Defendants put forth no evidence about State interests undergirding the Citizenship Requirement, pulling their "will-call" witness (Mr. Darlington) who was designated in discovery to testify about such matters as the State's representative. Tr. 1935:21–1936:2. And for reasons discussed above, the various interests identified during Legislative Debate and adduced at trial were imprecise and unsubstantial. *See supra* II.A.2.ii.

In short, even after trial the observation this Court made in considering the preliminary injunction remains true: the State remains unable to "identify[] any connective tissue between the problem and the state's proposed solution—namely, banning *all* noncitizens from collecting or handling voter-registration applications on behalf of 3PVROs." Prelim. Inj., July 3, 2023, ECF No. 68 at 35. Absent *any* evidence to "marry the solution to the problem," *id.* at 36, the State's handful of purported interests cannot outweigh the harms inflicted on plaintiffs' speech, association, and ability to register eligible voters.

### C. The Citizenship Requirement is impermissibly vague and substantially overbroad.

"Vagueness and overbreadth are interrelated but discrete concepts," which courts frequently address in tandem. *See Dream Defs.*, 559 F. Supp. 3d at 1268 (citing *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990).

A *vague* law violates the Due Process Clause because it "fail[s] to give notice of what [it] prohibit[s]," whether because it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or because "it authorizes or even encourages arbitrary and discriminatory enforcement." *Dream Defs.*, 559 F. Supp. 3d at 1268 (quoting *Wollschlaeger*, 848 F.3d at 1319–20).

In turn, an *overbroad* law violates the First Amendment because it punishes "a substantial amount of protected free speech, judged in relation to the statute's

plainly legitimate sweep." *Dream Defs.*, 559 F. Supp. 3d at 1268 (quoting *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (cleaned up)). When an *indefinite* law gives the government leeway to *punish protected conduct*, then the law is both overbroad and vague—"a concept the Eleventh Circuit has called '[o]verbreadth from indeterminacy.'" *Id.* at 1269 (quoting *Webb*, 919 F.2d at 1505).

### 1.   *The Citizenship Provision cannot be construed to avoid vagueness and overbreadth concerns.*

Before assessing vagueness and overbreadth concerns, this Court must "consider any limiting construction" that the "enforcement agency has proffered," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982), and the Court "has a duty to construe the statute as constitutional if it can." *Dream Defs.*, 559 F. Supp. 3d at 1269 (citing *Boos v. Barry*, 485 U.S. 312, 330 (1988). But "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements." *Dream Defs.*, 559 F. Supp. 3d at 1270 (citations and quotations marks omitted). For that reason, a federal court typically cannot adopt a narrowing construction of a state statute unless that construction is both "reasonable and readily apparent" from the text of the statute. *See Boos*, 485 U.S. at 330;  *see also Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (noting that "[o]nly the [state] courts can supply the requisite construction"

to save an otherwise vague and overbroad statute); *Dream Defs.*, 559 F. Supp. 3d at 1270 (collecting cases).

In their pre-trial opening statement, Defendants, citing a rule promulgated by the Department of State that constructs "collecting and handling." ECF 164 at 4. The Department of State's rule defines "collecting and handling" as "physically exercising custody over voter registration applications containing a voter's personal information," and then goes on to state: "It does not include distributing blank voter registration applications, supervising the collecting or handling of voter registration applications, assisting a voter who requests assistance to fill out their voter registration application, or facilitating the voter to register electronically through registertovoteflorida.gov." DX 95 (the "Rule").

As an initial matter, this Rule does not—and cannot—void the statute's actual text. As this Court has recognized, the Secretary has never offered any "authority for the proposition that he, an executive branch official, can 'fix' a statute enacted by the Florida Legislature, by creating an exception to the statutory language through proposed rulemaking." Order on Cross-Motions for Summary Judgment, *Fla. State Conf. of Branches & Youth Unites of the NAACP v. Byrd*, No. 4:23-cv-215, ECF 251 at 20. And although courts considering whether a law is impermissibly vague can, "to some degree," consider "the interpretation of the statute given by those charged with enforcing it," *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972), the

Supreme Court has indicated that courts are only "obligated to regard as controlling" an administrative interpretation that is "reasonable" and "consistently applied," *Ehlert v. United States*, 402 U.S. 99, 105 (1971). Here, for reasons explained shortly *infra*, the Secretary's Rule fails to offer a reasonable interpretation of the statute's actual text. And because of the injunction, the Secretary's Rule hasn't *ever* been applied, let alone applied consistently. That means the Secretary's Rule is not controlling as to this Court's construction of the text of the statute.

Indeed, the trial record establishes another critical reason why the Secretary's Rule cannot be viewed as controlling over the statute's text: Even if the rule is binding as to the *Department of State*'s interpretation of the law, multiple other state officials testified at trial that it's the *statute*, not the agency rule, that binds other state offices. Mr. Cox, the head of the Office of Statewide Prosecution, testified that rulemaking "does not bind" his office. Tr. 842:23–843:5. Likewise, Supervisor of Elections Mark Earley testified that, when a statute and an administrative rule conflict, he follows the statute. Tr. 745:23–25. Because the Secretary is not the only entity with authority to enforce the Citizenship Provision—namely, the law specifically authorizes enforcement by the Attorney General as well, Fla. Stat. Ann. § 97.0575(8)—the Secretary's rule is insufficient to safeguard Plaintiffs from the statute's ambiguities. Indeed, testimony from the Attorney General's 30(b)(6) representative undermines *multiple* limitations that the rule purports to impose on

the statute's text. For instance, the Attorney General's 30(b)(6) representative testifying that the "plain reading would suggest" that the law *does* "ban noncitizens from assisting voters to complete an online voter registration application." PX 861 at 140:16–24. And he couldn't rule out from the text alone whether the Citizenship Provision applies to a "blank application." PX 861 at 211:13–21.

Both because the Rule has never been applied by the Secretary, and because the Rule does not bind all the entities with authority to enforce the Citizenship Requirement, the Court cannot take Defendants' up on their request to simply supplant the text of the statute with the very different text of the Rule that the Secretary has promulgated.

Instead, this Court retains the familiar duty of determining whether the construction set forth in the Rule is both "reasonable and readily apparent" from the text of the statute, and whether it eliminates the vagueness and overbreadth concerns. *Dream Defs.*, 559 F. Supp. 3d at 1270. It cannot survive either threshold requirement.

*First*, the Rule's construction is neither reasonable nor readily apparent from the text of the statute. Rather than "engage meaningfully with the statute's text," *Dream Defs.*, 559 F. Supp. 3d at 1279, the Rule imposes limitations made from whole cloth that cannot derive from the statute's text alone. Most glaringly, Defendants derived the limitation on the Citizenship Requirement's applicability to

*completed* voter-registration applications, and not to *blank* or apparently even *partially* completed applications (given that the Secretary's Rule purports to carve out "assisting a voter who requests assistance to fill out their voter registration application," DX 95), out of thin air.[9] Because no ordinary reader could divine such limitations from its text, the Court must reject the Rule's attempt to rewrite the statute to avoid the constitutional issues that its text presents.

*Second*, even assuming the Rule should be taken at face value (and it should not, for the reasons explained *supra*), the Rule's interpretation of "collecting and handling" to mean "physically exercising custody over" resolves very few of the concerns enumerated in the record about the statute's vagueness and overbreadth. From a vagueness perspective: even under the Rule's terms, the scope of the prohibited conduct remains sweeping and unclear. For example, Supervisor Earley testified that "the term 'exercising physical custody' might include driving a car with filled-in voter registration applications" if the non-citizen was "the only person in

---

[9] To be sure, it is difficult to imagine how a 3PVRO could even glean, from a requirement that only U.S. citizens can *handle* voter-registration applications on its behalf, that non-citizens may still assist voters with *filling out* those applications. Moreover, that exception seems to directly contradict the legislative record's purported interest in providing only citizens with access to the "sensitive information that [is] collect[ed] from a voter." PX 252 at 16:13–17; *see also id.* 15:7–16.

the car." Tr. 746:22–747:11. Similarly, Mr. Vélez III Burgos testified that Hispanic Federation harbors many of the same outstanding questions after rulemaking:

> If a citizen who collected the registration forms gets into the car of a noncitizen, does the noncitizen have . . . physical custody of the form? . . . If someone bumped into someone and someone helps them collect . . . is that physical custody? If we are leaving the forms in a desk and that desk is assigned to a noncitizen . . . do they have physical custody? When no one's in the office, who's responsible for having that ultimate physical custody?

Tr. 605:22–606:14; *see generally infra* Section II.B.3. And as for overbreadth: prohibiting non-citizens from physically collecting and handling completed voter-registration application still chills substantially more protected speech than conduct that can lawfully be prohibited, because the very voter-registration efforts being prohibited by the Rule are protected speech. *See supra*, Section II.A.1, and *infra*, Section II.B.5; *see also* Tr. 409:15–22 (Ms. Herrera-Lucha testifying that it is "practically impossible to carry out a registration without . . . touching" the application).

### 2. *The Citizenship Requirement fails to provide adequate notice of the conduct it prohibits.*

The trial evidence confirmed that the text of the Citizenship Requirement "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and "authorizes or even encourages arbitrary and discriminatory enforcement." *Johnson v. United States*, 576 U.S. 591, 612 (2015). To comply with the requirement, each 3PVRO must affirm "that each person

collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of America." The penalty is a $50,000 fine "for each such person who is not a citizen and is collecting or handling voter registration applications" on a 3PVRO's behalf.

At trial, many Plaintiff witnesses testified as to uncertainty as to how the provision should be understood, and proffered interpretations of what conduct constituted "handling and collecting voter registration applications" that were varying and inconsistent with Defendants' proposed construction of the Citizenship Requirement discussed *supra*, in Section III.B.

Take Ms. Wassmer's testimony, for example. Reading the Citizenship Requirement, she testified she had no way of understanding what "collecting" or "handling" meant under the statute, nor whether Poder Latinx must know someone's immigration status before being subject to a $50,000 fine. Tr. 544:2–16. She testified that because the Citizenship Requirement "doesn't state if it's" applied to voter-registration forms "before or after forms have been completed," Tr. 545:1–4, Poder Latinx decided it could not allow non-citizen staff to move blank voter-registration forms around the office, Tr. 544:21–24. She further testified that Poder Latinx would not permit non-citizen staff to supervise canvassers, since Poder's supervisors "check" the canvassers' completed forms and "transport them back to the office," which "could be seen as collecting or handling forms." Tr. 545:5–10. The

Citizenship Requirement's vagueness affects Poder Latinx's quality control measures as well. She testified that because the Citizenship Requirement does not specify how close personnel must be to forms to be considered collecting or handling them, nor does it specify whether visually inspecting forms "could be seen as handling forms"—forcing Poder Latinx to remove non-citizen staff from the quality control process entirely. Tr. 545:11–20.

Mr. Vélez III Burgos testified as to similar uncertainty about the meaning of "collecting" and "handling" in determining the scope of Hispanic Federation's liability. As he testified, one of the concerns that came up in conversation "about what collecting and handling could mean" was "what happens if someone—a citizen is carrying voter registration and they slip or they bump into someone and those voter registrations fall and a noncitizen is helping them pick them up, right? Would we be liable for that?" Tr. 589:14–23. Mr. Vélez III Burgos also testified that as a result of this uncertainty surrounding what constitutes collecting and handling, Hispanic Federation has determined that only citizens can only be part of the registration process from start to finish if the Citizenship Requirement takes effect, Tr. 604:17–22, explaining that "as we looked at job descriptions, we saw in each of those job descriptions instances where someone could be in physical custody of the form," Tr. 606:23–25.

Individual non-citizen canvassers and 3PVRO employees experienced the same difficulty in understanding what conduct was prohibited by the Citizenship Requirement. For example, Marcos Vilar, the Executive Director of 3PVRO Alianza, testified that handling "could be interpreted in many ways": "It could be a noncitizen driving a car that's taking a citizen to deposit the cards in—in—you know, to the supervisor of elections. Someone moving an envelope, a sealed envelope, from one desk to another, just clear it—you know, by chance in the presence of a citizen but that person is a noncitizen, is that considered handling? It's not very—you know, there's no definite explanation of what 'handling' means." Tr. 699:15–22. As a result, Alianza, would not feel comfortable instructing employees on the meaning of "handling" as it is used in the portion of SB 7050, because it "could be interpreted very loosely to fine Alianza as well." Tr. 700:14–21. For that reason, Alianza's "interpretation is that in order to be safe, we shouldn't have, you know, any person that's a non-citizen near voter registration." Tr. 700:1–3.

Ms. Herrera-Lucha testified that her 3PVRO employer, Mi Vecino, has run into the same trouble in interpreting what its non-citizen canvassers may or may not do based on the text of the Citizenship Requirement. She testified that "[t]he law is not clear" and "does not explain what it means to collect or to handle" voter-registration forms. Tr. 398:3–7, 409:15–22. She further testified that the Citizenship Requirement's opaqueness over "whether" the forms must be "blank or filled out"

to "handle them" leaves her and her employer uncertain about how she and other non-citizen canvassers can lawfully help register voters. Tr. 399:2–7.

"Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Moreover, the "wide scope of potential interpretations for individuals" evident in the trial record is particularly disfavored in laws that restrict First Amendment rights. *Dream Defs.*, 559 F. Supp. 3d at 1280, 1281. "While 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity' . . . 'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'" *Id*. at 1280 (quoting *Wollschlaeger*, 848 F.3d at 1320; *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), and *Button*, 371 U.S. at 433).

"Special sensitivity" is proper here: Vague laws like the Citizenship Requirement "force potential speakers to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech than intended.'" *Dream Defs.*, 559 F. Supp. 3d at 1280. (quoting *Wollschlaeger*, 848 F.3d at 1320; *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). The trial record demonstrates the myriad ways in which the unclear terms of the Citizenship Requirement have resulted in Organizational Plaintiffs choosing to

err in favor of silencing large swaths of speech, rather than face the "existential threat" posed by the Citizenship Requirement's fines. Tr. 587:9–14 (Mr. Vélez III Burgos testifying that Hispanic Federation saw those fines as "an existential threat to our voter registration program, but also our Florida program and our organization."); Tr. 604:13–605:2 (Mr. Vélez III Burgos, testifying that Hispanic Federation's leadership reviewed "every job description for canvassers, canvass leads, quality control, canvass directors, the community engagement manager," and determined that because "these fines are literally an existential threat" and the organization "can't expose [itself] to that type of liability," "everyone in that infrastructure would have to be a citizen" if the Citizenship Requirement were to take effect); Tr. 607:19–608:1, 608:15–18 (Mr. Vélez III Burgos, testifying that the undefined terms create uncertainty about how Hispanic Federation can organize its physical office space without running afoul of the Citizenship Requirement, and because "just the liability is so much that we just can't afford to be fined," the organization would have to create protocols for non-citizens to not even be near any forms if the Citizenship Requirement takes effect); Tr. 526:8–15, 537:18–538:6, 538:16–17 (Ms. Wassmer, testifying that because Poder Latinx is unwilling to shoulder the risks of noncompliance and heavy fines, Poder Latinx would completely shutter its voter-registration efforts if the Citizenship Requirement takes effect rather than risk an adaption to its voter-integrated approach that might still run

afoul of the undefined terms); 83:3–84:18 (Mr. Nordlund, testifying that "fewer Hispanics would be registered to vote" and Unidos's "overall collection of voter registrations in terms of quantity would be severely less" if the Citizenship requirement were enforced); 1275:5–25, 1276:1–15 (Ms. Scoon, testifying that the League of Women Voters of Florida "would be very hesitate to do joint voter registration drives" with organizations "like Poder Latinx" that "historically have relied upon noncitizens to help them").

In other words, the trial record confirms that by failing to provide notice as to what activities are prohibited by the Citizenship Requirement, it has served to extensively chill protected speech.

### 3. *The Citizenship Requirement's ambiguities authorize arbitrary and discriminatory enforcement.*

The Citizenship Requirement's sweeping and undefined terms, which leave Defendants with a great deal of arbitrary discretion with respect to enforcement.

And the record suggests that there is good reason to believe arbitrary and discriminatory enforcement has and will continue to take place, based on the State's past practices. Trial testimony demonstrated that Florida has limited 3PVROs' work in recent years, and the Secretary of State has been actively involved in that enforcement through fine letters. Tr. 545:21–546:5. More than 50% of fines were made against grassroots 3PVROs that have a presence in Central Florida and serve Hispanics. Tr. 697:5–21; PX 264. *See also* Tr. 698:6–12 (Vilar testimony: Q.

"Hypothetically, if 34 percent of the total fines in 2023 listed here in Exhibit 264 correspond to applications for voters who self-identify their country of birth as . . . Puerto Rico . . . what would that indicate to you regarding the State's enforcement against 3PVROs?" A. "It would indicate that . . . there's a target on our back."). Indeed, a substantial number of the fines assessed since Secretary Byrd has taken office have targeted 3PVROs that had sued the Secretary of State. *See* PX 316 (Florida Rising Together), PX 347 (Faith in Florida). PX 364 (Poder Latinx), PX 389 (Alianza Center), PX 406 (Dream Defenders), PX 411 (Harriet Tubman Freedom Fighters), PX 414 (Hispanic Federation), PX 430 (Mi Familia Vota), PX 459 (UnidosUS).[10]

Conversely, while the Republican Party of Florida is a classic recidivist and has had issues complying with 3PVRO regulations every election cycle, it has received only de minimis fines. *See* DX 10 at 254 (2015 violations imposing $1,000 fine), 256 (2016 violations imposing $1,000 fine), 258 (2018 violations imposing $300 fine), 260 (2020 violations imposing $400 fine),262 (2022 violations imposing $950 fine). 252 (2023 violations imposing $1,000 fines). As Representative Eskamani testified, the Secretary of State has discretion in issuing fines, and she

---

[10] *See Fla. Rising Together v. Lee*, No. 4:21-cv-201 (N.D. Fla.) (Florida Rising Together, Poder Latinx, Faith in Florida, UnidosUS, Hispanic Federation, and Poder Latinx plaintiffs); *Harriet Tubman Freedom Fighters v. Lee*, No. 4:21-cv-242 (N.D. Fla.); *Dream Defenders et al. v. DeSantis*, No. 1:20-cv-57 (N.D. Fla.).

agreed with Representative Perez's statement in the legislative record that, if there were issues with the Republican Party of Florida's voter-registration efforts, there is no guarantee that organization would be fined. Tr. 892:18–25.

### 4. *The Citizenship Requirement punishes a substantial amount of protected speech that reaches beyond its legitimate sweep.*

"[O]verbreadth doctrine is designed 'to prevent the chilling of protected expression.'" *Speech First*, 32 F.4th at 1125 (quoting *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989)); *Nationalist Movement v. City of Cumming*, 934 F.2d 1482, 1485 (11th Cir. 1991). Because "ambiguous meanings cause citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,'" courts "evaluate the ambiguous as well as the unambiguous scope of the enactment" in assessing whether a statute is overbroad. *Vill. of Hoffman Estates*, 455 U.S. at 494 n.6 (quoting *Baggett*, 377 U.S. at 372). In this way, a law's vagueness can contribute to its overbreadth.

To the extent Section 97.0575 lawfully proscribes *any* conduct, the testimony at trial showed that the Citizenship Requirement's ambiguities ensure that it chills *substantially more protected speech* than conduct that can lawfully be prohibited.

For instance, several witnesses testified that they had stopped non-citizen staff from distributing *blank* applications to comply with the law, since those who distribute blank applications would surely be "handling" them and the text of the statute says nothing about whether the form must be complete. *See* Fla. Stat. Ann.

§ 97.0575(1)(f); *see, e.g.*, Tr. 398:24–399:7, 544:21–24; *see also* PX 861 at 211:13–21 (Attorney General's 30(b)(6) representative testifying that he "d[id]n't know" whether the Citizenship Provision applies to a "blank application"). Plaintiffs' decision to stop distributing *blank* applications to comply with the Citizenship Requirement ends all speech that would have flowed from that initial interaction, including the act of registration. This chilling effect on Plaintiffs does not advance *any* interest advanced identified by the State at trial. For example, prohibiting a non-citizen from distributing a blank form does not advance the interest identified during legislative debate of protecting voters' personal information. PX 252 at 15:8–12).

This is just one example of how the Citizenship Provision has already deterred Plaintiffs from engaging in a substantial amount of expressive and associational activity. As described repeatedly *supra* in Sections I.B.2.a and III.B, the record demonstrates other ways that the unclear terms of the Citizenship Requirement would result in Organizational Plaintiffs choosing to err in favor of silencing substantial amounts of expressive conduct—including, for Poder Latinx, by shuttering its voter-registration operations altogether—rather than facing the "existential threat" posed by the Citizenship Requirement's fines. Tr. 526:8–15, 537:18–538:6, 538:16–17, 587:9–14, 604:13–605:2, 607:19–608:1, 608:15–18.

These many acts of "self-censorship, compelled by the State," have reduced Organizational Plaintiffs' ability to engage in plainly lawful and protected activities

to broaden the electorate, and so their burden will "become the public's burden," resulting in fewer eligible Floridians registering to vote. *Smith v. California*, 361 U.S. 147, 153–54 (1959). Thus, taken together, the conduct being prohibited is substantially, if not entirely, protected speech. *See supra*, Section II.A.1.

The fact that the Citizenship Requirement, on its face, indicates that it will be enforced on a strict liability basis further amplifies the overbreadth problem. Strict liability "cannot be applied in settings where [it has] the collateral effect of inhibiting freedom of expression, by making the individual the more reluctant to exercise it." *Smith*, 361 U.S. at 150–51; *see also Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 611 (6th Cir. 2005) ("any statute that chills the exercise of First Amendment rights must contain a knowledge element") (citation omitted).

The Citizenship Requirement contains no such knowledge element. *See* Fla. Stat. Ann. § 97.0575(1)(f). Representatives from both Poder Latinx and Hispanic Federation confirmed their concerns about the absence of any knowledge requirement in the Citizenship Requirement. Ms. Wassmer testified that the Citizenship Requirement does not mention any requirement that the organization must know someone's immigration status before being subject to a $50,000 fine. Tr. 544:2–16. And Mr. Vélez III Burgos testified that the Citizenship Requirement does not state whether the non-citizen canvasser must know that they handled a voter-registration application to render a 3PVRO liable, or whether accidental handling in

a 3PVRO's office would be sufficient. Tr. 589:14–23. These problems drive the self-censorship in which each organization has already engaged and will engage in if the Citizenship Requirement takes effect. Thus, the Citizenship Requirement's strict liability penalties chill speech and create "indirect burdens on speech," further expanding the law's overbreadth and confirming its unconstitutionality. *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002).

## CONCLUSION

The trial record conclusively demonstrates that the Citizenship Requirement violates Plaintiffs' First and Fourteenth Amendment rights. This Court should permanently enjoin Defendants from enforcing it.

Dated: April 22, 2024

Respectfully submitted,

/s/ Megan C. Keenan
Megan C. Keenan*
Adriel I. Cepeda Derieux*
**American Civil Liberties**
**Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
mkeenan@aclu.org
acepedaderieux@aclu.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
Victoria Ochoa*
**American Civil Liberties**
**Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org
vochoa@aclu.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org

Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 418-6354
dalicea@latinojustice.org

Roni Druks*
Phi Nguyen*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
rdruks@demos.org
pnguyen@demos.org

John A. Freedman†
Jeremy Karpatkin†
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001

(202) 942-5316                          dtilley@aclufl.org
john.freedman@arnoldporter.com          cmcnamara@aclufl.org
jeremy.karpatkin@arnoldporter.com

*Admitted Pro Hac Vice*

**Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 25,632 words.  I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

/s/ Megan C. Keenan

Megan C. Keenan

## CERTIFICATE OF SERVICE

I certify that on April 22, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Megan C. Keenan

Megan C. Keenan