IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS OF
THE NAACP, et al.,

      *Plaintiffs*,

v.                                                     Case Nos.: 4:23-cv-215-MW-MAF
                                                                  4:23-cv-216-MW-MAF
                                                                  4:23-cv-218-MW-MAF

CORD BYRD, in his official capacity as
Florida Secretary of State, et al.,

      *Defendants*.

_____/

## THE SECRETARY'S WRITTEN CLOSING

Defendant, Secretary of State Cord Byrd, provides this written closing, presenting his arguments and responding to the most recent filings of the *NAACP* Plaintiffs, Doc.304, 4:23-cv-215; the *League* Plaintiffs, Doc.301, 4:23-cv-216; and the *Hispanic Federation* Plaintiffs, Doc.188, 4:23-cv-218.

In this written closing, page numbers of docketed documents refer to the upper-right, blue page numbers, and not the bottom-center, black page numbers. "PX" refers to a Plaintiffs exhibit, and "DX" refers to a Defendants exhibit. "Tr." refers to the trial transcript and is usually followed by the witness who provided the referenced testimony.

1

*E.g.*, Tr.1175:13-16 (Slater). Similarly, references to the legislative transcripts—PX246, PX248, PX250, PX252, PX254—identify the legislators or individuals who provided the referenced statements. *E.g.*, PX246 110:7-11 (Burgess). References to the *NAACP* Plaintiffs' written closing are identified as "NAACP Br.," and the same convention is applied to the other closings: "League Br." and "Hispanic Federation Br."

For the reasons explained in this closing, this Court should reject Plaintiffs' claims and enter judgment in favor of the Secretary.

## Introduction

As the trial showed, third-party voter registration organizations behave badly. Several steal or alter information on voter-registration applications. Many data-mine information from the applications themselves, without telling their canvassers or voters about it. Others untimely submit voter-registration applications, which could disenfranchise the fiduciaries they serve, or leave for Mexico without delivering those applications. Some even forge voters' signatures on the applications. Problems like these lead to countless complaints from ordinary Floridians, supervisors of elections, and even legislators of both major political parties. They also lead to warning letters, fines, and criminal prosecutions.

SB7050, an omnibus elections package, addresses these and other problems. Among its many, many sections are commonsense 3PVRO provisions. The provisions limit the universe of people collecting or handling voter-registration applications. They protect sensitive information on those applications. They require canvassers to provide voters with a receipt, and they increase fines and shorten the submission window to ensure prompt and proper application delivery. The provisions also ensure that voters have agency when requesting a vote-by-mail ballot.

Yet Plaintiffs take issue with these 3PVRO-related provisions. Plaintiffs contend that the provisions unconstitutionally interfere with their rights and target a subset of voters. Who are these voters? Not the individual Plaintiffs. Not the organizational Plaintiffs.

Rather, the affected voters are the less than two percent of unregistered voters who—without the assistance of a 3PVRO collecting, handling, *and* delivering their voter-registration applications—will not use the many other means of registering to vote in Florida. PX979 (Herron's corrected table). Or so goes Plaintiffs' theory based on a data set where large chunks of data on the method of registration are missing.

The affected voters are also predominantly black and Hispanic, and they may have used another means to register to vote but, without the assistance of a 3PVRO taking physical custody of their application, will not update their registration and won't be able to vote in an upcoming election. Or so goes Plaintiffs' theory based on a data set where large chunks of data on the race of voters is missing.

Put another way, the affected subset of voters Plaintiffs have in mind are those who don't have access to the internet, or a printer, a pen, a pencil, or postage; who don't have a car or access to a bus; who don't go to government buildings or even a Walmart. Most importantly, it's voters who can *only* be assisted by a person or organization engaging in 3PVRO activity—for whom it's *not* enough to be assisted by the *same* person or the *same* entity through an iPad or QR code that links to the online voter-registration portal, or through a blank voter-registration application and a postage stamp to return the completed application.

Among the (many) problems with Plaintiffs' case is an obvious one: Plaintiffs theory of disparate impact (in Fourteenth Amendment parlance) and impact on the right to vote (in *Anderson-Burdick* parlance) rests on a series of suppositions drawn from

incomplete data and based on a methodology with glaring flaws. That Plaintiffs haven't proven discriminatory intent or disparate impact dooms their Fourteenth Amendment claim. The *Anderson-Burdick* claim fails because the right to vote simply isn't implicated in this case brought by canvassers and organizations, not voters; even if it is, the impacts on the right to vote are minimal at best and outweighed by the State's interests in addressing the problems with 3PVROs.

The *NAACP* Plaintiffs' claim concerning a ban assistance for disabled voters requesting a vote-by-mail ballot fares no better. Testimony from supervisors of elections made clear that there is no such ban. Plaintiffs' argument to the contrary insists on giving the words "request" and "assist" the same meaning and otherwise contorting Florida law to create a conflict with federal law when no such conflict exists. Nothing in Florida law precludes a person with disabilities from seeking the *assistance* of the person of their choice when *requesting* a vote-by-mail ballot.

Accordingly, this Court should reject all of Plaintiffs' remaining claims and enter judgment in favor of the Secretary.

## Factual & Procedural Background

## I.   It's Easy to Register to Vote in Florida.

Florida makes it easy to register to vote. A Floridian has many options to register. She can register when she gets her drivers license with the Florida Department of Highway Safety and Motor Vehicles—the DMV. She can also pick up a blank voter-registration application at innumerable public buildings (a supervisor of elections office,

library, tax collector's office, U.S. Department of Veteran Affairs building, and the Social Security Administration, among others), or even Walmart, and then hand deliver or mail the completed application to her supervisor's office or the Division of Elections. *See, e.g.*, Fla. Stat. §§ 97.052(1)(b), 97.052, 97.053, 97.057, 97.0575, 97.058, 97.0583, 97.05831.

Completing the voter-registration application is simple. DX13 (voter-registration application). The document only requires a few affirmations about voting eligibility, a voter's date of birth, drivers license number or Florida identification number and four social-security digits, the voter's name and address, and signature. That's it.

Despite testimony to the contrary, Tr.1079:13-18 (Smith), there's no affidavit requirement in lieu of having a drivers license number, identification number, or social-security number. The application makes clear what's required:

> *Special ID requirements:* If you are registering by mail, have never voted in Florida, and have never been issued one of the ID numbers above, include one of the following with your application, or at a later time before you vote: 1) A copy of an ID that shows your name and photo *(acceptable IDs—* U.S. Passport, debit or credit card, military ID, student ID, retirement center ID, neighborhood association ID, or public assistance ID); **or** 2) A copy of an ID that shows your name and current residence address *(acceptable documents—*utility bill, bank statement, government check, paycheck, or other government document).
>
> The special ID is not required if you are 65 or older, have a temporary or permanent physical disability, are a member of the active uniformed services or merchant marine who is absent from the county for active duty, or a spouse or dependent thereof, or are currently living outside the U.S. but otherwise eligible to vote in Florida.

DX13 (emphases in the original).

If a voter doesn't want to fill out and deliver an application, or register with the DMV, she can register through Florida's online portal. All she needs is a drivers license number or identification number and social-security number. That makes the online portal a convenient and popular way to register, even if it had two web-related issues within the past decade. Tr.1081:2-9 (Smith).

A voter can register with the help of third parties as well. A third party—whether a friend or an organization like the League of Women Voters or NAACP—can give a voter a blank voter-registration application, tell her how to fill it out, and give her a postage stamp, all so that the voter can deliver or mail the completed application herself. The League of Women Voters is now using this option. Tr.1214:8-13 (Scoon). A third party can also use an iPad to direct voters to the online registration portal, as the League of Women Voters now does as well, Tr.1217:9-15 (Scoon), and as Poder Latinx has been for some time as part of its "online first" approach to registration, PX883 at 23 (canvasser PowerPoint). The NAACP's QR codes—directing people to the online voter-registration system—remain available too. DX187 (Slater deposition designations); DX83 (Slater deposition).

Critically, a third-party transforms into a third-party voter registration organization—a 3PVRO—when it "collects" physical "voter registration applications" and "ensure[s]" that they are "promptly delivered" to the right elections official. Fla.

7

Stat. § 97.0575(5)(a).[1] Collection and delivery of someone's voter-registration application is key. *Id.* Before engaging in this activity, a 3PVRO must register with the State. DX96 (registration form); Tr.1921:6 – 1922:10 (Matthews).

The Division of Elections also provides a whitepaper on what counts as a 3PVRO activity. It states that:

> Printing and/or distributing blank voter registration applications or helping a person complete an online application form through Florida's official online voter registration system (RegistertoVoteFlorida.gov) or an online fillable form <u>without collecting</u> the completed applications does not trigger 3PVRO status.

PX780 (whitepaper) (emphasis in the original). 3PVROs also understand this to be the case. The League of Women Voters says so in a post-SB7050 email blast to its members, PX786 at 2 (email), and in testimony at trial from its witnesses, *e.g.*, Tr.1296:4 – 1297:21 (Scoon). The NAACP agrees, as the testimony at trial showed. Tr.1180:9 – 1181:5 (Slater).

What is and isn't 3PVRO activity ultimately gets reflected in the data the State keeps and the statistics it publishes. *E.g.*, PX78 (Department of State statistics on voter-registration rates). When the League of Women Voters or NAACP or Poder Latinx helps someone register to vote *without* engaging in 3PVRO activity, it simply does not get captured as a 3PVRO registration. Tr.1923:6 – 1924:22 (Matthews); Tr.1927:7 –

---

[1] The statute refers to "solicit" or "collect." But, in 2012, this Court concluded that the solicitation trigger violated federal law. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1163-64 (N.D. Fla. 2012). Since then, only the collection prong of the statute has been effective.

1928:24 (Matthews); Tr.1929:16 – 1930:3 (Matthews). Using an iPad to direct people to the online portal is an online voter registration. Telling people to mail back their completed application in a pre-stamped application to their local supervisor of elections counts as a supervisor-related registration. *See generally* Tr.1923:6 – 1924:22 (Matthews); Tr.1927:7 – 1928:24 (Matthews); Tr.1929:16 – 1930:3 (Matthews).

Finally, just as with registering to vote, voting itself remains easy. That's true for disabled voters as well (or those who don't speak English as a first language). Federal and state law allow disabled voters to make vote-by-mail requests with the assistance of anyone eligible to assist under Section 208 of the Voting Rights Act. *See* 52 U.S.C. § 10508; Fla. Stat. § 101.051(3); *see also Wakulla Cnty. Absentee Voter Intervenors v. Flack*, 419 So. 2d 1124, 1126 (Fla. 1st DCA 1982). Anyone—including a 3PVRO volunteer—who has the consent of a Florida voter can assist the voter with requesting a vote-by-mail ballot. Tr.797:13 – 799:12 (Earley); Tr.1825:22 – 1826:20 (Hays).

## II.    Getting Better All the Time.

Florida continues to improve its election administration processes, however. And there's room for improvement when it comes to 3PVRO activity. Indeed, in this case, over 300 exhibits are state officials' allegations of 3PVRO misconduct that justify greater scrutiny and policy changes. PX266 – PX401; PX406 – PX646; DX26 – DX29.

Hard Knocks is the most high-profile case. Tr.1791:17 – 1795:24 (Fox). In less than one year, between 2022 and 2023, Hard Knocks received four letters from the Department of State, alleging a slew of election-law violations. PX266 (first letter);

PX280 (second letter); PX331 (third letter); PX328 (fourth letter). The fourth and final letter alleged that:

> In the two letters last year, dated September 29, 2022 [PX266], and November 29, 2022 [PX280], you were fined a total of $33,400.00. That number could have been as high as $191,500.00 but for a statutory cap of fines. Your actions addressed in those two letters negatively affected approximately 2,779 voter applications and/or registrants.

PX328 at 1.

Hard Knocks's misconduct led to a criminal investigation as well. The investigation linked dozens of fraudulent voter-registration applications to the 3PVRO. Tr.1793:17-22 (Fox). Criminal charges weren't brought against Hard Knocks itself because the prosecutor determined that current laws didn't allow it. Tr.1793:5-11 (Fox). But several Hard Knocks canvassers were charged in February 2023. Tr.1793:1-4 (Fox); Tr.1812:10 – 1813:3 (Fox). The prosecutor made sure that the public was aware of Hard Knocks's misconduct and the criminal charges. Tr.1793:23 – 1795:4 (Fox). Incidentally, that local prosecutor serves the area Senate President Kathleen Passidomo represents. Tr.1791:6-16 (Fox).

There are other high-profile cases. There's Cheryl Hall, who, while working for Florida First, a 3PVRO, changed the party affiliation of over 500 voter-registration applications. Tr.1774:12 – 1776:15 (Gladson); Tr.1823:7 – 1824:8 (Hays). There's also Royal Shepard who altered, omitted, and forged signatures on "hundreds and hundreds" of applications. Tr.790:14 – 791:7 (Earley). He was a canvasser who either "work[ed] for different 3PVROs or a company" hired by many 3PVROs. Tr.792:24 –

793:5 (Earley). Mr. Shepard was eventually caught, in part, by "comparing" the signatures on the fraudulent applications "with other signatures" that were "on file" with the supervisor of elections. Tr.791:8 – 792:8 (Earley).

Florida Democrats—seemingly every Democratic member of the Florida Legislature—also raised the alarm about 3PVRO activity. In 2022, led by then-Senator Taddeo, the Democratic caucus wrote a letter to Attorney General Merrick Garland. Tr.492:2 – 493:1 (Torres); Tr.506:22 – 507:11 (Torres). In it, the Democrats alleged that a 3PVRO changed a South Florida woman's party affiliation on her voter-registration application and asked for help to address this 3PVRO problem. PX983 (letter); PX982 (article on letter).

Those are just the high-profile cases. Countless other cases have an equally detrimental effect. The misconduct, and allegations of misconduct, include:

- Untimely submitting voter-registration applications. *E.g.*, Tr.61:9-10 (Nordlund); Tr.557:20 – 558:3 (Wassmer); Tr.582:11-15 (Velez); Tr.1207:24 – 1208:4 (Scoon).

- Untimely submitting applications after book closing and potentially disenfranchising voters. *E.g.*, PX452 at 2 (People Power fine letter).

- Canvassers (ostensibly) impersonating state officials and getting into altercations with voters. *E.g.*, PX845 (Hispanic Federation incident).

- Canvassers fraudulently signing applications. *E.g.*, Tr.55:19 – 56:6 (Nordlund); Tr.127:4-21 (Nordlund).

- Canvassers registering dead people. *E.g.*, Tr.729:21 – 730:4 (Herrera-Lucha); Tr.1728:6-17 (Van der Giesen).

11

- Canvassers altering information on applications or switching voters' party affiliation. *E.g.*, Tr.792:9-23 (Earley); Tr.1175:13-16 (Slater); Tr.1728:6 – 1729:2 (Van der Giesen).

- Canvassers filling out forms for fictitious people. *E.g.*, Tr.1728:6-13 (Van der Giesen).

*See also* PX266 – PX401; PX406 – PX646; DX26 – DX29. There may or may not be quota requirements for canvassers. Tr.170:3-9 (Orjuela); Tr.192:2 – 193:2 (Sanchez). That's troubling, because quota requirements violate state law. Fla. Stat. § 104.012.

Apparently, some 3PVROs also data-mine information from collected voter-registration applications. They scan the applications on their computers; they redact voters' drivers license numbers, identification numbers, social-security numbers, and signatures; and they upload redacted applications to third-party software, like Blocks and 360. Tr.34:5-13 (Nordlund); Tr.36:8-16 (Nordlund); Tr.38:16-24 (Nordlund); Tr.42:13-18 (Nordlund); Tr.554:19-24 (Wassmer); Tr.611:14-16 (Velez).

Voters aren't informed about the data-mining activity. Tr.121:5-12 (Nordlund); Tr.554:11-13 (Wassmer). Canvassers are left in the dark as well. Tr.152:5-25 (Orjuela); Tr.169:22 – 170:2 (Orjuela); Tr.174:25 – 175:5 (Orjuela); Tr.188:14-21 (Sanchez); Tr.189:11-14 (Sanchez). What's more, the 3PVROs themselves don't even know if they have confidentiality agreements with the third-party software companies. Tr.612:11-15 (Velez); *see also* Tr.795:5-15 (Earley).[2]

_____

[2] To Plaintiffs, datamining isn't "nefarious." NAACP Br. at 25 n.4. Plaintiffs even point out that supervisors of elections use "Voter Focus," a "private" entity that helps supervisors "maintain voter registration logs." NAACP Br. at 25 n.4. But Plaintiffs'

The misconduct isn't limited to citizens helping citizens register to vote. For example, three noncitizen canvassers with Mi Vecino were terminated due to misconduct in Orange County. Tr.407:5-22 (Herrera-Lucha). And in 2022, a Hispanic Federation canvasser "left for Mexico for ten days" and failed to timely deliver three voter-registration applications. PX847 (incident email); Tr.613:17 – 615:5 (Velez). This canvasser was most likely a noncitizen, given that "a little bit higher than 70 percent" of Hispanic Federation canvassers in "2022" were "noncitizens." Tr.586:6-9 (Velez). With noncitizens, there's always a risk that they can leave the State, given their strong ties to other countries, and not turn in applications on time. *See generally* Tr.171:4-19 (Orjuela); Tr.389:8-15 (Herrera-Lucha).

It can also be hard for 3PVROs (and law enforcement) to identify and catch bad-acting canvassers. Not every 3PVRO maintains its records well, Tr.1730:24 – 1731:8 (Van der Giesen), and some 3PVROs operate their canvassing operations like nesting dolls: they may hire a canvassing company, who then hires a subcontractor canvassing company, who then may hire another subcontractor canvassing company. *E.g.*, Tr.1731:15 – 1732:6 (Van der Giesen). This makes it difficult to find a particular bad-

---

focus on Voter Focus is a red herring. Supervisor Earley "helped" Voter Focus "develop" its "software," Tr.736:18-13, and Supervisor Earley must comply with the confidentiality requirements imposed by the Florida Election Code. 3PVROs like Hispanic Federation don't even know if they have confidentiality agreements with third-party software companies. *E.g.*, Tr.612:11-15 (Velez). More to the point, 3PVROs data mine information on voter-registration applications, yet Plaintiffs didn't establish that Voter Focus does the same. The comparison between Blocks and 360, on the one hand, and Voter Focus, on the other, misses the mark.

acting canvasser who registered a particular voter for a particular 3PVRO at a particular time. *E.g.*, Tr.1731:15 – 1732:6 (Van der Giesen).

Voters are understandably losing confidence in 3PVROs, and 3PVROs know it. The Polk County Supervisor of Elections, for example, told Hispanic Federation that some voters may be "changing one number of their ID/SS on purpose to ensure their confidential information is not used in fraudulent ways." PX851; Tr.615:23 – 617:6 (Velez). That makes sense, because voters are protective of their sensitive information. As one canvasser put it:

> People on the street don't like to be approached. They don't like people intruding into their privacy. . . . [T]he person out in the streets is very wary of providing their own personal information. Part of our job as a canvasser is to give that voter the assurance that their personal information is going to be turned in directly to the office and that's it, meaning to say we're not going to use that information ourselves.

Tr.181:4-6 (Sanchez); Tr.189:2-7 (Sanchez). Yet voters are being approached *outside* of tax collector's offices, PX845 (Hispanic Federation incident), or Walmarts, Tr.513:1-8 (Martinez)—where voters can register *inside* the building. None of this adds to voter confidence. It does add to voter confusion. After all, as described during trial, voters in Orlando thought that a Hispanic Federation canvasser was a tax collector's office employee. PX845 (Hispanic Federation incident); Tr.617:7 – 620:4 (Velez).

The State is aware of the misconduct. In both 2023 and 2024, the Office of Election Crimes and Security published a report on election misconduct in Florida and discussed misconduct coming from 3PVROs. DX14 (2023 report); DX15 (2024

report). Florida law requires the office to create this report and send it to the senate president and speaker of the house. *See* Fla. Stat. § 97.022(7). The 2023 report—published a few months before the 2023 Florida Legislative session—stated that:

> During 2022, the [office] also reviewed a large number of complaints involving Third Party Voter Registration Organizations (3PVROs). A number of these organizations were reported by election officials for failing to timely comply with statutory obligations—most significantly, failure to timely turn in voter registration applications. The [office] reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Fla. Stat. The [office] assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements. *See* section 97.0575(3)(a)1-3, Fla. Stat.

> The [office] has also made a number of criminal referrals related to 3PVROs; specifically, the referrals targeted voter registration agents employed by 3PVROs, who are alleged to have committed fraud, engaged in identity theft, changed a voter's party affiliation, registered deceased individuals, or registered fake individuals, among other violations. Many of these criminal referrals are still pending and remain under active criminal investigation with law enforcement.

DX14 at 1, 5. The 2024 report—passed after the 2023 Florida Legislative Session—included even more allegations against 3PVROs. *E.g.*, DX15 at 5, 7-9.

The Office of Election Crimes and Security does more than just publish reports. Following its creation, it's the governmental entity responsible for sending letters to 3PVROs that allegedly violated statutory and regulatory law. (Before the office's creation, the general counsel's office in the Department of State sent the letters. *E.g.*, PX620 (letter).)

There are two kinds of violations mentioned in a letter. The first is a statutory violation, which usually comes with a statutorily prescribed fine. *E.g.*, Fla. Stat. § 97.0575(5). The second is a regulatory (Department of State rule) violation, which doesn't come with a fine, because the law doesn't authorize a fine for these violations.

As an example, consider a letter sent to Poder Latinx. PX364. The letter contains both kinds of violations. It contains a statutory violation—failing to deliver voter-registration applications to the right elections official under section 97.0575(3)(a)—which comes with a fine. PX364 at 2. The letter also contains a regulatory violation—not properly dating applications under Rule 1S-2.042(4)(B)—which doesn't carry a fine. PX364 at 2.

Once a fine is assessed, a 3PVRO can either pay it or "respond to" the "letter within 30 days" and "show cause why a fine should not be imposed." PX364 at 2; Tr.708:4 – 709:16 (Vilar). If a 3PVRO responds, and if the office stands by its assessment, the 3PVRO can then take the case to the Division of Administrative Hearings and ask an administrative law judge to make the appropriate findings of fact. *See generally* Fla. Stat. Chpt. 120.

A brief aside before continuing: in their written closing, Plaintiffs contend that the Office of Election Crimes and Security engages in "selective enforcement against those 3PVROs that serve central Florida's (overwhelmingly Puerto Rican) Hispanic population." NAACP Br. at 52; *see also* Hispanic Federation Br. at 113-15 (raising similar

contentions). But the basis for this contention is mere conjecture. After all, Plaintiffs chose not to call Director Darlington, the office's head, as a witness in their case.

Trying to mitigate their tactical error, Plaintiffs try to cobble together an argument based on a chart, PX264, that lists fines and offending 3PVROs. NAACP Br. at 52, 155-58; Hispanic Federation Br. at 113-14. But the chart doesn't list 3PVRO fines *before* September 2022, or *after* May 2023; it captures only a snapshot in time before and during the 2023 legislative session. There's also no accompanying testimony discussing how or why the fines were assessed (other than the fine letters) or whether some fines were successfully appealed or whether some fines were challenged before the Florida Division of Administrative Hearings. Plaintiffs thus put a lot of stock in a document without any testimony (or other evidence) linking the document to their ultimate contention that Florida's Puerto Rican community is being targeted.

Plaintiffs also ignore a failsafe for 3PVROs: the advisory opinion process. If a 3PVRO has a question about complying with statutory or regulatory law, it can seek an advisory opinion from the Division of Elections. Fla. Stat. § 106.23(2); Fla. Admin. R. 1S-2.010; Tr.1932:5-16 (Matthews); Tr.1934:24 – 1935:18 (Matthews). Acting in accordance with the advice shields the requestor from criminal prosecution under the entire election code. In litigation involving felon re-enfranchisement, the Eleventh Circuit and this Court acknowledged much the same; the courts accepted that reliance on an advisory opinion shields the requestor from criminal liability. *Jones v. Governor of*

*Fla.*, 975 F.3d 1016, 1026 (11th Cir. 2020) (en banc); *Jones v. DeSantis*, 462 F. Supp. 3d

1196, 1241-42 (N.D. Fla. 2020).[3]

## III.   The Florida Legislature Passes SB7050.

SB7050 was introduced during the 2023 Florida Legislative Session, when

Republicans had a supermajority in both the senate and house. Tr.919:25 – 920:14

(Eskamani). The bill was an omnibus elections package, addressing election issues as

varied as list maintenance, candidate nicknames, resign to run, and much, much more.

Tr.490:8 – 491:11 (Torres); Tr.921:16 – 922:24 (Eskamani). SB7050 also contained

3PVRO provisions. Senator Burgess, the bill's sponsor, explained the need for

additional 3PVRO regulations:

> [T]hird-party voter registration organizations, they're not an official arm
> of the supervisor of elections office. They're private organizations that are
> electing to again act as a fiduciary. It's an immense responsibility.
>
> And there's currently, I believe, around just under like 2000 that are
> registered in the state of Florida alone. They've been around since, I
> believe, about 2005. There's been regulations on the books for these
> organizations. Every cycle – reading historically and to date – there's
> additional issues that arise with these organizations, which is prompting
> the additional need for enhanced measures of protection for the voter. . .
> .

---

[3] Section 106.23(2) provides that "[a]ny person or organization, acting in good faith upon such an advisory opinion, shall not be subject to any criminal penalty provided for in this chapter." As the department explained in the felon-re-enfranchisement cases, its long-standing position has been that an advisory opinion shields the requestor from liability under the entire election code, not just Chapter 106, because Chapter 106 is replete with cross references to other parts of the code and other parts of the code provide the mechanisms to criminally charge individuals and organizations. *See generally* Fla. Stat. Chpt. 104 (cataloging violations and penalties for the election code as a whole).

[T]his is about the accountability for the voter. At the end of the day, that's what really matters, and regardless of the purpose, you know, for a third-party voter registration organization, we are legislating to protect the voter, and that's the sole purpose of all the provisions within this and the guiding light behind all the third-party voter registration organizations provisions.

PX246 60:8 – 61:10; *see also* PX250 55:18 – 56:5 (Byrd); PX252 27:1 – 28:3 (Burgess).

In relevant part, SB7050's provisions included the following <u>additions</u> and ~~amendments~~

to Florida law:

- The **Citizen Restriction**, Fla. Stat. § 97.0575(1)(f): <u>An affirmation that each person collecting or handling voter registration applications on behalf of the third-party voter registration organization is a citizen of the United States of America. A third-party voter registration organization is liable for a fine in the amount of $50,000 for each such person who is not a citizen and is collecting or handling voter registration applications on behalf of the third-party voter registration organization.</u>

- The **Retention Provision**, Fla. Stat. § 97.0575(1)(e) : <u>If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.</u>

- The **Receipt Provision**, Fla. Stat. § 97.0575(4): <u>A third-party voter registration organization that collects voter registration applications shall provide a receipt to an applicant upon accepting possession of his or her application. The division shall adopt by rule a uniform format for the receipt by October 1, 2023. The format must include, but need not be limited to, the name of the applicant, the date the application is received, the name of the third-party voter registration organization, the name of the registration agent, the applicant's political party affiliation, and the county in which the applicant resides.</u>

- The **Fines Provision**, Fla. Stat. § 97.0575(5):

(5)(a) A third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant and shall ensure, ensuring that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender, is must be promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 10 14 days after the application is was completed by the applicant, but not after registration closes for the next ensuing election. If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections in the county in which the applicant resides, the third-party voter registration organization is liable for the following fines:

1. A fine in the amount of $50 per each day late, up to $2,500, for each application received by the division or the supervisor of elections in the county in which the applicant resides more than 10 14 days after the applicant delivered the completed voter registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf. A fine in the amount of $2,500 $250 for each application received if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

2. A fine in the amount of $100 per each day late, up to $5,000, for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, before book closing for any given election for federal or state office and received by the division or the supervisor of elections in the county in which the applicant resides after the book-closing deadline for such election. A fine in the amount of $5,000 $500 for each application received if the third-party voter registration organization or any person, entity, or agency acting on its behalf acted willfully.

3. A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections in the county in which the applicant resides. A fine in the amount of $5,000 $1,000 for any application not submitted if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

The aggregate fine <u>which may be assessed</u> pursuant to this paragraph ~~which may be assessed~~ against a third-party voter registration organization, including affiliate organizations, for violations committed in a calendar year is <u>$250,000</u> ~~$50,000~~.

(6) If a person collecting voter registration applications on behalf of a third-party voter registration organization alters the voter registration application of any other person, without the other person's knowledge and consent, in violation of s. 104.012(4) and is subsequently convicted of such offense, the applicable third-party voter registration organization is liable for a fine in the amount of <u>$5,000</u> ~~$1,000~~ for each application altered.

In terms of the ten-day delivery window, the **Fines Provision** returns the 3PVRO delivery timeline to its 2012 to 2021 standard. *See League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1168 (N.D. Fla. 2012).

- The **Mail-In Ballot Request Provision**, Fla. Stat. § 101.62(1)(a): The supervisor shall accept a request for a vote-by-mail ballot <u>only from a voter or, if directly instructed by the voter, a member of the voter's immediate family or the voter's legal guardian</u> ~~from an elector in person or in writing~~. <u>A request may be made in person, in writing, by telephone, or through the supervisor's website. The department shall prescribe by rule by October 1, 2023, a uniform statewide application to make a written request for a vote-by-mail ballot which includes fields for all information required in this subsection.</u> . . . .

Senator Burgess introduced SB7050 as a proposed committee substitute on April 4, 2023. There's nothing unusual about proposed committee substitutes. Over half the bills Senator Torres has seen in his long legislative career have been proposed committee substitutes. Tr.487:10 – 488:4. The Senate Rules also explicitly allow for proposed committee substitutes, *see* Fla. Sen. R. 2.39, imposing filing and procedural

requirements that are different than member-filed bills, Tr.487:10-20 (Torres); PX246

110:7-11 (Burgess).

True, SB7050 was introduced around the half-way mark of the sixty-day

legislative session. That means the Florida Legislature still had a month to review the

bill. And, as Senator Burgess explained, it took time to draft the omnibus elections bill:

> [T]here is a lot of components that we're addressing. There's 43 different provisions, some of them more substantial or technical than others, but collectively, that, I think, enhanced our responsibility to try to get it right.
>
> We wanted to when we released the product to have it as close to right as we possibly could fully understanding out the gate – and based on some feedback we've already received from supervisors of elections and input – that obviously our address list maintenance provisions, albeit important in the bill, there is some work that still needs to be done there.
>
> So, you know, we are on day 29, and we do have over halfway to still be able to go through session with multiple stops. And we really want to make sure to get this bill right because it's very technical and mechanical. A lot of it deals with onuses that will be put on the supervisors  themselves in implementing things or the Department of State. And so making sure all those machinations are working is really important, and I think prudence is kind of the operating word I would use in terms of why we released when we did. . . .

PX246 30:24 – 31:25. He added that:

> The bill does not become law today. This is the beginning of a process. There's going to be more committee hearing, and there's going to be a process that will take place in the House as well as a bicameral legislature. And we will have more input to follow upon the completion of today's business. Based on some testimony and feedback, I felt it was important to emphasize that. We also have more than a month of voting in Florida. In Florida, I firmly believe – and I think many agree – it's actually hard not to vote.  Florida is the gold standard for elections, and we should be proud of that. But that doesn't mean that we're not proactive. It doesn't

> mean that after you win the Super Bowl you don't watch the tape and
> improve. . . .

PX246 110:7 – 112:4. In other words, there was plenty of time to get things right on a

very large, technical, and complex elections package.

Again, there was nothing unusual about any of this. Lake County Supervisor of

Elections Hays, a veteran of the Florida Legislature, and the chair of the Florida

Supervisors of Elections Association's Legislative Committee, followed SB7050's

legislative process and reached the same conclusion. Tr.1820:3 – 1821:3.

Other stakeholders provided valuable input on the bill. PX252 203:20 – 204:6

(Burgess). Secretary Byrd and the Department of State contributed to the bill. PX250

34:5-10 (Byrd). The supervisors of elections and their lobbyist contributed. PX246

78:23 – 82:10 (Ramba); PX250 86:14-19 (Earley, although the transcript identifies him

as "Ali"). In fact, this wasn't the first time the supervisors contributed to an omnibus

elections package. When the legislature was considering SB90 during the 2021 session,

the supervisors championed the bill's requirement that voter-registration applications

be sent by 3PVROs to the voter's county of residence. Tr.1821:4-21 (Hays). It was a

priority of the supervisors to alleviate burdens on some supervisors. Tr.1821:4-21

(Hays).

The 2023 Office of Election Crimes and Security Report was mentioned during

SB7050's legislative debates as well. Senator Burgess often referenced data that came

straight out of the report:

> And in 2022 alone, the OECS – the Office of Election Crimes and
> Security – reviewed approximately – it was over 3000 voter registration
> applications that were collected and submitted untimely by third-party
> voter registration organizations, which is a violation of the statute. The
> assessed fines in 2022 were in excess of $41,000 against those.

PX246 34:22 – 35:4; DX14 at 5 (report); *see also* PX252 33:10 – 34:2 (Burgess) (same).

The office, again, has the statutory obligation to send the report to the senate president

and speaker of the house. Fla. Stat. § 97.022(7). As Senator Torres explained, reports

written by state agencies and sent to legislative leaders may get forwarded to individual

legislators. Tr.488:11 – 489:14. Senator Torres and Representative Eskamani even

received and read the 2023 report; both of them are Democrats. Tr.499:1-4 (Torres);

Tr.925:2-6 (Eskamani).

Hard Knocks was also mentioned during the legislative debates. After all, much

of Hard Knock's misconduct happened in Senate President Passidomo's district.

Tr.1791:6-16 (Fox). And Senator Torres reminded us that the senate president's office

is supremely important; what she wants, she gets. Tr.488:21-23.

Secretary Byrd even testified before the legislature about Hard Knock's

misconduct. *E.g.*, PX248 67:16 – 68:22. He further noted that the Department of State

"put out a press release" about the Hard Knocks scandal. PX250 54:1 – 55:6; *see also*

PX248 69:25 – 70:1 (Byrd).

SB7050 had its critics, some of whom alleged that the 3PVRO provisions would

disenfranchise voters. Supporters of the bill pushed back, chief among them, Senator

Burgess:

> With respect to third-party voter registration organizations, nothing in this bill or the proposed committee substitute is intended to do away with these organizations and the most important civic activities that they engage in, rather because of the important roll [sic] they play as a fiduciary, we are adding additional guardrails . . . .

PX250 3:22 – 4:4 (Burgess); *see also* PX250 110:23 – 112:24 (Burgess); PX252 205:1 – 206:10 (Burgess).

Although SB7050's supporters—all Republicans—had a supermajority in the legislature, and even though they didn't need to provide a justification for the 3PVRO provisions to get them passed, they offered several on the record:

- The **Citizen Restriction** was justified as a means to protect sensitive information on voter-registration applications and as a means of defining Florida's political community. *See, e.g.*, PX248 3:13-17 (McClure); PX250 112:9-12 (Burgess); PX252 5:10 – 6:7 (Hudson); PX252 15:7-16 (Hudson); PX252 16:7 – 17:16 (Burgess); PX254 7:1-7 (McClure); PX254 7:16 – 8:2 (McClure).

- The **Retention Provision** was justified as another means of protecting sensitive information on applications. *See, e.g.*, PX246 37:4-10 (Burgess); PX246 66:4-21 (Burgess); PX250 14:3-15 (Burgess).

- The **Receipt Provision** ensured 3PVRO accountability and provided a lead on potential 3PVRO misconduct. *See, e.g.*, PX246 35:25 – 36:9 (Burgess); PX248 12:17 – 14:1 (McClure); PX248 17:25 – 19:17 (McClure); PX248 68:23 – 69:6 (Byrd); PX250 29:18 – 30:6 (Burgess); PX250 112:13-24 (Burgess); PX254 23:15 – 24:4 (McClure); PX254 140:1-11 (Sirois).

- The **Fines Provision** was justified as a means to ensure an application's timely delivery to the right elections official. *See, e.g.*, PX246 36:10 – 37:3 (Burgess); PX246 38:3-13 (Burgess); PX250 28:1-11 (Burgess); PX252 22:6 – 23:7 (Burgess); PX252 32:16 – 34:2 (Burgess).

While the legislative record tells a lot, it doesn't tell everything. Not every legislator spoke about his or her support of or opposition to SB7050. As Senator Torres

explained, when he doesn't provide comments on the record about legislation, there's still a reason why he supports or opposes a bill. Tr.495:2-6.

For many legislators who provided comments on the record, their support or opposition wasn't purely based on SB7050's 3PVRO provisions, or any other provision. Some legislators commented on both its 3PVRO provisions *and* its resign-to-run provisions. *E.g.*, Tr.497:5 – 498:16 (Torres); Tr.929:18 – 931:1 (Eskamani). Representative Salzman, for example, focused a *majority* (though not *all*) of her comments on resign-to-run. PX254 146:23 – 148:9. All of that makes it difficult—if not impossible—to determine the legislative intent behind discrete provisions in an omnibus elections package.

Even so, the omnibus elections package passed both chambers of the legislature on April 28, 2023, and was signed by Governor DeSantis on May 24, 2023. He capitalized on SB7050's resign-to-run provision and later began his presidential campaign.

The Department of State then undertook rulemaking. In relevant part, it created the **Receipt Provision**'s receipt. DX12. The receipt contains blank spaces for the applicant's name, party affiliation, and county of residence, the date the application was collected, the 3PVRO number, and the canvasser's ("registration agent") name. DX12 (form). Other regulatory provisions were promulgated, which touch on the **Citizen Restriction** and **Retention Provision**. DX95 (rule).

**IV.    3PVROs, Canvassers, Experts, and State Officials Testify at Trial.**

Plaintiffs sued, and trial happened. The trial testimony revealed (A) how third parties engage with voters (both in their capacity as registered 3PVROs engaging in 3PVRO activity and in a broader sense), (B) the holes in Plaintiffs' experts' analyses, and (C) the state interests behind SB7050.

**A.** Several 3PVRO officers and canvassers explained how they interact with voters and deliver voter-registration applications—both before and after SB7050. Take, for instance, testimony from Humberto Orjuela Prieto and Carolina Wassmer; the former is a canvasser for Poder Latinx, and the latter is its state program director. Both testified about the lifecycle of what's clearly 3PVRO activity under Florida law.

On a typical day, Mr. Orjuela is on a commercial street or near a commercial building. Tr.165:22 – 166:4. He goes up to a voter, or a voter goes up to him, and he introduces himself. Tr.166:8-10. Mr. Orjuela asks the voter whether she's registered to vote, and he informs her of the ways to vote, including online. Tr.155:23 – 156:9; Tr.166:11-15. In his experience, about half of the voters he interacts with want to register online. Tr.166:16 – 167:4. This should come as no surprise, especially when Poder Latinx instructs its canvassers that the "first step" in the registration process "should be" to register voters "online." PX883 at 23 (canvasser PowerPoint).

Mr. Orjuela also talks to the voter about the importance of registering to vote and that it's the voter's "responsibility" to "participate" in "democracy" and in the

electoral process. Tr.155:23 – 156:9. The voter may fill out a voter-registration application with Mr. Orjuela's assistance.

But once he collects or handles the application—when he's in physical possession of it—Mr. Orjuela and the voter "go separate ways." Tr.167:8-10. They "never see each other" or "talk to each other again." Tr.167:11-14. Mr. Orjuela returns to the Poder Latinx office and delivers the applications there. Tr.167:15-24. The completed applications are then reviewed some more. Tr.532:20 – 533:8 (Wassmer). The applications, says Ms. Wassmer, are scanned, uploaded on Poder Latinx's computers, partially redacted, and uploaded to Blocks, a third-party software. Tr.553:9-24 (Wassmer). The completed, physical applications themselves are then delivered to the proper elections official. That's the typical process: after interacting with a voter, it's just collecting, handling, reviewing, scanning, and delivering applications. *E.g.*, Tr.34:5-13 (Nordlund); Tr.180:11-16 (Martinez).

3PVROs engage with voters in other ways as well—ways that are *not* 3PVRO activity under Florida law. The NAACP offers QR codes to voters, so they can access Florida's online registration portal. DX187 (Slater deposition designations); DX83 (Slater deposition). Mi Vecino has canvassers wear a nametag or lanyard that lists the organization's website; the website, in turn, takes voters to the online portal. Tr.405:3-12 (Herrera-Lucha); Tr.417:8-18 (Herrera-Lucha). Canvassers for the League have iPads or other tablets with them, so voters can also access the online portal. Tr.1217:9-15 (Scoon). Blank registration forms that the voters deliver themselves are also available.

28

Tr.1214:8-13 (Scoon). Unidos also has a "digital program," where it "buy[s] Google Facebook ads online and then direct[s]" voters "to" its "website to become a voter, to register to vote online." Tr.66:22-25 (Nordlund).

When canvassers are out in the field, voter registration aside, canvassers can ask voters to become organizational members. That requires someone to provide her name and contact information, and perhaps indicate that she wants to be contacted by the organization. NAACP membership applications are available, separate and apart from voter-registration applications, Tr.1162:9-13 (Slater); Tr.1181:10 – 1182:2 (Slater); Poder Latinx pledge cards are there, too, Tr.551:2 – 552:12 (Wassmer); PX883 at 15 (canvasser PowerPoint); or one can simply write pertinent information down on the League's yellow pad, Tr.1251:24 – 1252:24 (Scoon).

**B.** Dr. Herron and Dr. Smith, two of Plaintiffs' three experts, testified during trial. This Court is aware of the deficiencies in their analyses, like using HB1355 as a comparator to SB7050 and relying on partial data to reach broad conclusions. In fact, this Court summarized it:

> [A]t the end of the day – and just to distill it down, looking at what happened with the prior House Bill [1355] where all you know generally is that a law was passed and you had a decline in registration, you can't, from that, with any degree of certainty or probability, opine anything as it would relate to SB 7050. Moreover, we don't have any data that relates to anybody registering or not registering following SB 7050.
>
> And so to the extent you're trying to rely on this historical data, number one, it excludes other factors that could impact it; and, number two, it doesn't – it's – your slightly mixing apples to oranges doesn't work. Moreover, we don't have anything post-SB 7050 so that maybe you could

use that as a baseline if it was consistent with what happened to SB 7050 and had data post-7050. That might tell you something. But that standing alone doesn't really tell you anything, and you'd really need other data in order to extrapolate anything from this.

Tr.1875:13 – 1876:7. There are numerous other problems as well, as discussed in the upcoming *Anderson-Burdick* analysis.

Dr. Lichtman also testified on SB7050's passage. His testimony was unmoored to any methodology. It was unbounded, with opinions on education policy, economics, demographics, history, immigration policy, and political theory. Tr.1434:6 – 1441:19 (voir dire). Importantly, his testimony did not posit a proposition and then use historical facts to test it. Rather, he started with a proposition and then provided a set of curated facts to support that proposition. Put another way, he assumed that the Florida Legislature acted in bad faith in passing SB7050 and provided *only* the facts he thought supported that proposition.

**C.** State interests were also discussed at trial. The testimony supported and expanded upon Director Darlington's declaration, which provided state interests to some of SB7050's provisions. PX139. The declaration is a Plaintiffs exhibit, and it has been entered into evidence.

Many state officials testified at trial, several of whom were state prosecutors. They testified about their many issues with 3PVROs. Assistant State Attorney Van der Giesen, who leads the public corruption unit at the Miami-Dade County State Attorney's Office, testified that he has ongoing investigations related to 3PVRO

30

misconduct. Tr.1734:7-11. State Attorney Fox testified about her prosecution of the Hard Knocks canvassers. Tr.1791:17 – 1795:24. State Attorney Gladson testified about the complaints he's received about 3PVRO misconduct. Tr.1774:12 – 1775:6.

In providing this testimony, the state prosecutors explained just how hard and resource intensive it is to prosecute election crimes like 3PVRO misconduct. Mr. Van der Giesen explained it this way:

> What I usually do is I will assign both a lawyer and an assistant state attorney and an investigator to vet the complaint and then come back to me and say, Hey, there's enough suspicion here that we should start an investigation, or, There's enough suspicion here that we should reach out and interview the complainant and see if – make sure they didn't make a mistake. . . .

> Probably on a third-party voter registration complaint, you are going to have to start with an historical investigation, because you're not necessarily going to have enough information to know who your suspect is up front. So you may have to start issuing subpoenas to the organization to get documents to find out who possibly filled out this registration, say, for the person. . . .

> So then you have to go the route of historical, issue a subpoena to whoever the vendor is for the third-party registration, and then you have to sort of go up the ladder to figure out who has records and sort of work from there.

Tr.1729:5 – 1730:11. That takes a lot of time. State Attorney Fox similarly testified about the resource-intensive inquiries undertaken by her economic crimes unit, which prosecuted Hard Knocks. Tr.1790:5 – 1791:5; Tr.1792:12-25. So did State Attorney Gladson, for his investigations. Tr.1777:9-25.

It's also just hard to bring charges against 3PVRO canvassers. A prosecutor could issue a subpoena to the organization, but it takes a while to get a response to a subpoena. Tr.1730:12-23 (Van der Giesen). Then, assuming there's a response, there's normally an issue with recordkeeping; the records and files aren't always complete and are often in the hands of some contractor or subcontractor. Tr.1730:24 – 1731:8 (Van der Giesen). Even if a prosecutor gets records, a bad actor may have left the jurisdiction by then or simply can't be found. Tr.1731:9-14 (Van der Giesen). And even assuming that a prosecutor has a subpoena, has a response, has completed records, and knows where the bad actor is, prosecutorial discretion plays a role in bringing charges. Tr.1779:3 – 1780:16 (Gladson). As such, there's a big difference between having a meritless case and having a case that's just tough to prosecute. Tr.1767:8-22 (Van der Giesen); *see also* NAACP Br. at 77.

State officials also testified that SB7050's 3PVRO provisions help law enforcement. For example, the **Retention Provision** protects a voter's signature, which has been and can be used to identify a fraudulently submitted application or signed vote-by-mail ballot. Tr.1825:11-21 (Hays); Tr.1918:14 – 1919:14 (Matthews); Tr.1920:14 – 1921:2 (Matthews). That's partly how Royal Shepard was caught, for example. Tr.791:8 – 792:8 (Earley).

The **Receipt Provision** helps, too. By requiring a canvasser to put his name on a receipt after collecting a completed voter-registration application, the provision provides prosecutors with a lead—a document that could help find and identify a bad

actor. Tr.1732:14 – 1734:3 (Van der Giesen). The more leads law enforcement has, the better. Tr.1768:4-7 (Van der Giesen); Tr.1795:5-24 (Fox). The commonsense undergirding of this requirement is so obvious that 3PVROs themselves use identifying information on voter-registration applications to identify misbehaving canvassers. That's how Mi Vecino identified bad-acting canvassers in Orange County: as a "rule[] of" Mi Vecino, "each canvasser must include their initials on every voter registration application on the back," and the initials were used to identify the misbehaving canvassers. Tr.727:5-12 (Herrera-Lucha). If initials are good when identifying bad actors, *see also* Fla. Admin. R. 1S-2.042(5), then the name is even better.

Supervisors of elections testifying at trial also discussed the **Mail-In Ballot Request Provision**. Both Supervisor Earley and Supervisor Hays follow federal and state elections and disability laws, and both opined that any 3PVRO volunteer—with the express permission by a voter—can *assist* a voter *requesting* a vote-by-mail ballot. The volunteer can assist a disabled voter in several ways. For example, a League volunteer—with the consent of a voter—can drive the voter to a supervisor's office so the voter can request a vote-by-mail ballot. Or the volunteer—with consent—can dial the office so the voter can request a vote-by-mail ballot. Or the volunteer—with consent—can fill out a vote-by-mail application for a voter with a disability. Tr.797:13 – 799:12 (Earley); Tr.1825:22 – 1826:20 (Hays). None of these actions, the supervisors said, would violate state or federal law. The key is simply maintaining the voter's agency when requesting a vote-by-mail ballot.

## Argument

In these consolidated cases, some Plaintiffs have standing to challenge some provisions. Some don't. But even if there's standing, their claims nonetheless fail.

### *NAACP v. Byrd*, 4:23-cv-215

The *NAACP* Plaintiffs challenge four SB7050 provisions: (1) the **Citizen Restriction**, (2) **Retention Provision**, (3) **Fines Provision**, and (4) **Mail-In Ballot Request Provision**.

## I.      The *NAACP* Plaintiffs Lack Standing.

It's Plaintiffs' burden to establish standing, and this Court has an independent obligation to determine its own subject-matter jurisdiction. *Bischoff v. Osceola County*, 222 F.3d 874, 877-78 (11th Cir. 2000). Noncitizen canvassers have standing to challenge the **Citizen Restriction**. But no Plaintiff has standing to challenge the **Retention Provision**, **Fines Provision**, or **Mail-In Ballot Request Provision**.

### A.      No Standing to Challenge the Retention Provision.

As described in the Secretary's response to Plaintiffs' vagueness claim, the **Retention Provision** prevents those who "collect" completed voter-registration applications—i.e., canvassers—from copying or retaining voter-registration information. As such, Plaintiffs needed to identify a canvasser who would copy or retain such information. They didn't establish that. NAACP Br. at 85-92. In fact, canvassers testified that they wouldn't copy or retain *any* information on a voter-registration application. *E.g.*, Tr.190:4-13 (Sanchez).

34

To get around this, Plaintiffs allege organizational standing. It doesn't work. In their written closing, Plaintiffs didn't state that any of Unidos's canvassers copy and retain any personal information from filled-out voter-registration applications. Based on the absence of this evidence, it's speculative whether Unidos would even violate the **Retention Provision**. And because it's speculative whether Unidos would even violate the provision, swirling around organizational time, effort, and resources—all to combat a provision that it may not even violate—doesn't amount to organizational harm. *See City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 637-40 (11th Cir. 2023). The same is true with the other organizations. Plaintiffs' scaled back voter-registration efforts, all to combat a provision they may not even violate, are therefore self-imposed harms. *Id.*

Associational standing doesn't work, either. To have associational standing, Plaintiffs must establish, in part, that one identified member would be harmed by the **Retention Provision**. *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203-04 (11th Cir. 2018). They must name at least one name. Plaintiffs didn't do that: they didn't name one canvasser who wishes to copy or retain any personal information on a filled-out voter-registration application.

## B.   No Standing to Challenge the Fines Provision.

For the **Fines Provision** challenge, Plaintiffs haven't established an injury in fact. The provision only applies to 3PVROs, not individual canvassers. It says so in the statute itself: "the third-party voter registration organization is liable for the following fines." Fla. Stat. § 97.0575(5)(a). The organizational Plaintiffs therefore must establish

that there's a "substantial likelihood that they will suffer a future injury from the" **Fines Provision**—that they will turn in a voter-registration application too late or to the wrong location, that they will be assessed fines, and that their fines appeals will fail. *Worthy v. Phenix City*, 930 F.3d 1206, 1215-16 (11th Cir. 2019); *see also McGee v. Solicitor Gen. of Richmond Cnty.*, 727 F.3d 1322, 1325 (11th Cir. 2013). Plaintiffs haven't established this. If anything, for one week during trial, they put on evidence that demonstrates that they aren't likely to be fined in the future. They further underscored that fact in their written closing. NAACP Br. at 23-28.

Specifically, Unidos's Jared Nordlund testified about the 3PVRO's quality-control process, *e.g.*, Tr.37:5-11, and that Unidos mails voter-registration applications to the safe-harbor Division of Elections, Tr.124:18-22. He even testified that he likes shipping the applications to the division: it "streamline[s] our process more, make[s] it more efficient and then ultimately just reduces the cost, because driving and staff time to do other stuff costs more money than just sending $18 to the post office." Tr.60:5-11. Unidos isn't likely to be fined in the future. It's a "very well-oiled machine," in Mr. Nordlund's words. Tr.54:5.

True, Unidos "received a civil penalty twice." NAACP Br. at 34. But those penalties involved "very limited circumstances." NAACP Br. at 34. As this Court stated, "potential registrants are more likely to be stuck by lightning during their life than to have Unidos turn their application in late." NAACP Br. at 34-35 n.8 (quoting *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1149-50 (N.D. Fla. 2022)).

The other 3PVROs provided similar testimony. Marcos Vilar of Alianza testified that the 3PVRO has a process to "assure that voter registration applications are timely submitted." Tr.633:24 – 634:1. Again, true, Alianza "submitted" "13 applications that were noncompliant" and received letters from the State. NAACP Br. at 35. But "most" of the noncompliant conduct was "for delivery to the wrong county," and those thirteen noncompliant applications were "out of the 7,000 applications submitted on behalf of registrants." NAACP Br. at 35. Even so, courts "generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place" it "at risk of" injury. *Worthy*, 930 F.3d at 1215-16 (cleaned up). Alianza, all told, is therefore unlikely to run into the same noncompliance issues in the future.

Voters of Tomorrow has never registered as a 3PVRO and doesn't conduct 3PVRO activities of its own. Tr.979:5-15 (Mayer). The NAACP hasn't been fined in the last five years, making a future fine anything but imminent. Tr.1174:10-16 (Slater). Disability Rights Florida isn't likely to be fined, either, because it hasn't been able to launch a voter-registration process since at least 2019. Tr.1305:15 – 1306:4 (Babis Keller). It's only been able to register one person. Tr.1306:11-13 (Babis Keller). Given these facts, it's completely speculative as to whether Disability Rights Florida *will* be fined *if* it registers a second person. *City of S. Miami*, 65 F.4th at 637-40.

The facts at trial thus establish that Plaintiffs are unlikely to be assessed a fine. We also don't know whether their appeals to the Office of Election Crimes and Security would fail; or whether a de novo administrative hearing before the Division of

Administrative Hearings would negate any fine. *See, e.g.*, *Worthy*, 930 F.3d at 1215-1216; *McGee*, 727 F.3d at 1325-26.

Swirling around organizational funds, time, and resources can't establish standing here. That's because Plaintiffs fail to show how the **Fines Provision** has or will imminently affect them. *See generally City of S. Miami*, 65 F.4th at 640. Associational standing isn't established, either, because Plaintiffs didn't name a member who is likely to run afoul of the **Fines Provision**. *Ga. Republican Party*, 888 F.3d at 1203-04.

One final point. Plaintiffs (in their reply) may raise the following argument: in one breath, the State described Plaintiffs' 3PVRO misconduct, and yet now, it states that Plaintiffs haven't committed *enough* misconduct to challenge the **Fines Provision**. This argument is misplaced. True, some Plaintiffs were fined for bad acts. But as established at trial, they changed courses and improved. Take Unidos: it was fined, and it then took remedial action to ensure that it wouldn't be fined in the future. Tr.57:19 – 66:17 (Nordlund). Not every 3PVRO in Florida is as diligent. Hard Knocks wasn't. PX266 (first letter); PX280 (second letter); PX331 (third letter); PX328 (fourth letter). Bad-acting 3PVROs are at risk of receiving fines, perhaps even the maximum fines allowed. Those 3PVROs—and not Plaintiffs—have standing to challenge the **Fines Provision**. Hard Knocks, for example, could challenge the **Fines Provision** because its conduct might well reach the new cap on fines. PX328 (fourth letter) at 1.

38

### C.    No Standing to Challenge the Mail-In Ballot Request Provision.

Plaintiffs don't have standing to challenge the **Mail-In Ballot Request Provision**. In their written closing, Plaintiffs only assert associational standing. NAACP Br. at 94. Most of the Plaintiffs fail to name member names who are affected by the provision. Disability Rights Florida's Olivia Babis Keller gets close. She mentioned two organizational members (but named only one). Tr.1332:18 – 1335:8. Yet she didn't connect the dots that needed connecting: she didn't testify that those two members *concretely*—not just *possibly*—intend to vote in an upcoming election, plan to vote by mail, won't have any family members or legal guardians to assist them in requesting a vote-by-mail ballot, and therefore will not be able to vote in the upcoming election. Anything short of a concrete plan to vote by mail is simply speculative and therefore doesn't count as an injury in fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 495-96 (2009).

### D.    No Third-Party Standing.

As a long shot, Plaintiffs also assert third-party standing. NAACP Br. at 97-98. This is a bridge too far. Third-party standing doesn't work when a plaintiff "lacks an injury in fact." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339-40 (11th Cir. 2019). As explained above, Plaintiffs haven't suffered an injury in fact caused by the **Retention Provision** or **Fines Provision**.

## II.    Plaintiffs' Claims Fail.

Even assuming standing, Plaintiffs' claims fail. As a reminder, they claim: (1) that the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** infringe upon First Amendment free speech (Count I); (2) that the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** infringe upon First Amendment free association (Count II); (3) that the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** violate the Equal Protection Clause by discriminating against noncitizens and black and Hispanic voters (Count III, Count V); (4) that the **Citizen Restriction** and **Retention Provision** are vague and overly broad (Count VI); (5) that the **Mail-In Ballot Request Provision** violates Section 208 of the Voting Rights Act (Count VII); and (6) that the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** fail *Anderson-Burdick* balancing under the First and Fourteenth Amendments. Doc.302, 23-cv-215. The last claim will be discussed in the First Amendment free-speech section.

### A.    The Citizen Restriction, Retention Provision, and Fines Provision Don't Violate First Amendment Free Speech.

Plaintiffs' free-speech challenge to the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** fails. That's so, regardless of whether the challenge is analyzed under strict scrutiny, *Anderson-Burdick* balancing, or rational-basis review.

#### 1.    The Provisions Regulate Conduct, Not Speech.

The challenge fails, principally because the three provisions regulate conduct, not speech. Speech is afforded First Amendment protection; conduct isn't. *Rumsfeld v.*

*FAIR*, 547 U.S. 47, 60 (2006). A law that affects what a person "must do," as opposed to a law that affects what a person "may or may not say," is a law that regulates conduct. *Id.* True, some conduct may be afforded First Amendment protection. But that conduct must be "inherently expressive," *id.* at 66, when it's "overwhelmingly apparent" that a message is trying to be conveyed, *Texas v. Johnson*, 491 U.S. 397, 406 (1989).

That's not this case. Here, the **Citizen Restriction** regulates pure conduct: collecting and handling a voter-registration application. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). And "the collection and handling of voter registration applications is not inherently expressive activity." *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1319 (S.D. Fla. 2008). It's just an administrative means of moving a government form from Point A to Point B.

That said, there may be speech *before* a canvasser receives a filled-out application, *e.g.*, NAACP Br. at 30, but what happens *after* is pure conduct. Mr. Orjeula's testimony bears this point out.

When Mr. Orjuela canvasses for Poder Latinx, he approaches a voter, talks to the voter, and explains why it's important to register to vote. Tr.165:22 – 167:4. Like other Plaintiffs, he may even have an organizational t-shirt on, or canvass next to an organizational banner. *E.g.*, League Br. at 65-66; Hispanic Federation Br. at 64-65. But once he receives a completed voter-registration application from the voter, both he and the voter "go separate ways." Tr.167:8-10. They "never see each other" or "talk to each other again." Tr.167:11-14. He then takes the application back to Poder Latinx's office,

it gets reviewed a few more times, and then it's delivered to the proper elections official. There's a clear break between speech and conduct—talking to a voter (speech) and then collecting, handling, reviewing, and delivering an application (conduct). *E.g.*, *Steen*, 732 F.3d at 389-90.

All this makes the challenged provisions conduct-based laws, not speech-based laws. "[T]he conduct" at issue "can[] be separated from" any earlier speech. *Honeyfund.com Inc. v. Governor of Fla.*, 22-13135, 2024 U.S. App. LEXIS 5193, at *10-11 (11th Cir. Mar. 4, 2024).

With the **Citizen Restriction**, moving a piece of paper from Point A to Point B isn't speech. Else, the U.S. Postal Service is the most speech-filled organization on the planet. That's obviously not so. No one would view the service's work as speech or inherently expressive conduct. Nor would someone view a 3PVRO's collecting and handling of a completed voter-registration application as communicating any message.

Same with the **Retention Provision**. It just regulates a person who copies or retains information from a voter-registration application. Copying and retaining is pure conduct, and copying and retaining a voter's social-security number conveys no message at all. So too with the **Fines Provision**. It prevents conduct—delivering an application too late or to the wrong location. There's no speech inherent in this action, either. A 3PVRO doesn't communicate any message by sending an application to a supervisor's office, as opposed to the Division of Elections. No message is being conveyed by turning in an application five days before the deadline, as opposed to one.

Not content, Plaintiffs confuse the issue by broadly describing "voter-registration" activity as "convey[ing] a pro-democracy message that potential voters understand when asked whether they want to register by a 3PVRO canvasser." NAACP Br. at 106. In doing so, Plaintiffs conflate the speech that happens *before* a 3PVRO canvasser gets a completed application with the conduct that results from it. That Plaintiffs need to combine speech with conduct is "strong evidence that the conduct at issue" "is not so inherently expressive that it warrants protection." *Rumsfeld*, 547 U.S. at 66. The U.S. Supreme Court even warned lower courts against combining speech and conduct together: "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968); *see also Rumsfeld*, 547 U.S. at 66.

To get around this, Plaintiffs cite *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999). The cases are distinguishable. Both dealt with petition gathering, and the U.S. Supreme Court viewed petition gathering as pure speech. *E.g.*, 486 U.S. at 421. But petition gathering is fundamentally different than 3PVRO activity. The former rallies people around an idea or proposition. The latter simply gets a voter-registration application from the putative voter to the proper elections official, thus fulfilling a fiduciary duty under Florida law. Fla. Stat. § 97.0575(5)(a). Or as the Southern District of Florida put it when discussing an earlier version of the 3PVRO statute: the State is simply "regulat[ing] an

43

administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants." *Browning*, 575 F. Supp. 2d at 1322 (emphasis in the original).

Put another way, to the extent that any speech is involved, it's the voter's speech. *Steen*, 732 F.3d at 390. A 3PVRO doesn't "speak" by handling someone else's "speech." *Id.*; *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 (5th Cir. 2012). A mailman doesn't "speak" by handling a lot of letters. For the **Citizen Restriction**, a canvasser doesn't "speak" by taking physical possession of a completed voter-registration application. For the **Retention Provision**, a canvasser doesn't "speak" by copying information from someone else's "speech." And for the **Fines Provision**, a 3PVRO doesn't "speak" by timely driving or mailing applications to the Division of Elections.

*Meyer* and *Buckley* were also concerned with the "quantum of speech" being reduced by state action. *E.g.*, 486 U.S. at 423. But the facts in this case show that, even without collecting, handling, copying, or retaining physical voter-registration applications, 3PVROs can still speak to voters. They can still persuade them to register to vote and help them register. DX187 (Slater deposition designations); DX83 (Slater deposition); Tr.405:3-12 (Herrera-Lucha); Tr.417:8-18 (Herrera-Lucha); Tr.1217:9-15 (Scoon); Tr.66:22-25 (Nordlund). That makes Plaintiffs' reactions to SB7050's provisions, particularly the **Citizen Restriction**, self-harm, given that "one-on-one communicati[ons]" with voters can still take place. *Buckley*, 525 U.S. at 215 (O'Connor,

J., concurring in the judgment in part and dissenting in part); *see also* Hispanic Federation Br. at 68-71.

Plaintiffs also describe the **Citizen Restriction** as a content-based restriction. NAACP Br. at 110. They contend that the provision "singles out noncitizen speakers and prevents them from engaging in a specific form of expression—voter registration." NAACP Br. at 110. Again, the issue with this argument is that the provision restricts who can engage in certain conduct; speech isn't restricted in the slightest. Any noncitizen remains free to talk about voter registration with anyone, and remains free to sign up any potential member or volunteer for any organization. No content of speech is being restricted.

In sum, the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** regulate non-expressive conduct, not speech and not expressive conduct.

## 2. The Provisions Satisfy Strict Scrutiny.

Even if the provisions regulate speech (which they don't), and even if strict scrutiny applies (which it doesn't), the provisions satisfy the standard. Strict scrutiny requires a law to be narrowly tailored to serve a compelling governmental interest. *Burson v. Freeman*, 504 U.S. 191, 198 (1992). The three provisions serve the same compelling governmental interests: they prevent voter fraud and promote confidence in the "electoral process[]," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and they maintain fairness and order, and avoid frustration and deception, in elections, *Green v. Mortham*, 155 F.3d 1332, 1336 (11th Cir. 1998).

Director Darlington's declaration—a Plaintiffs exhibit, which is in evidence—provides compelling interests for the **Citizen Restriction** and **Retention Provision**. PX139 at 5-7. So does the 2023 Office of Election Crimes and Security Report. DX14. In it, the report informed legislators that the office made criminal referrals regarding:

> voter registration agents employed by 3PVROs, who are alleged to have committed fraud, engaged in identity theft, changed a voter's party affiliation, registered deceased individuals, or registered fake individuals, among other violations. Many of these criminal referrals are still pending and remain under active criminal investigation with law enforcement.

DX14 at 5. Obviously, these findings provide support for limiting the universe of people collecting and handling forms, as well as limiting the information that can be copied and retained by 3PVROs.

The report also provides bases for the **Fines Provision**. The report stated that the office "reviewed approximately 3,077 voter registration applications that were collected and submitted untimely by 3PVROs, in violation of section 97.0575, Fla. Stat. The [office] assessed statutory fines in the amount of $41,600.00 against those 3PVROs that did not comply with the statutory requirements." DX14 at 5. That $41,600 figure equates to $13.52 per untimely application, less than a parking ticket, because of the then-existing maximums. Consider Hard Knocks. The Department of State alleged that it would have fined the 3PVRO even more, but for the statutory maximums. PX331 (third letter); PX328 (fourth letter).

As detailed at great length above and in trial, 3PVROs and their canvassers have behaved badly—principally in how they (improperly) maintained voter-registration

applications and how they (improperly) delivered the applications to elections officials. The Florida Legislature was aware of these issues: legislators received and read the Office of Election Crimes and Security report and heard testimony about the Hard Knocks scandal. Local prosecutors were also inundated with 3PVRO complaints and cases. And Democratic members of the legislature sent a letter to the Attorney General of the United States not too long ago. PX983 (letter).

Even so, Plaintiffs focus a great deal of attention on the **Citizen Restriction** and contend that the Florida Legislature wasn't presented with any evidence of noncitizens behaving badly. *E.g.*, NAACP Br. at 61. Two points on this.

*First*, the State didn't collect data on noncitizen misconduct. That's because before SB7050, the election code didn't prevent noncitizens from engaging in certain 3PVRO actions. The State therefore didn't need to collect data on this point. Take a look at the pre-SB7050 fine letters: none noted whether a noncitizen (or citizen) engaged in the alleged misconduct. Local prosecutors don't keep data on this point, either. *E.g.*, Tr.1748:19-25 (Van der Giesen). Even though data wasn't collected, it's beyond dispute that noncitizens have behaved badly when canvassing. *E.g.*, Tr.407:5-22 (Herrera-Lucha). One Hispanic Federation canvasser (likely a noncitizen) "left for Mexico for ten days" and failed to deliver voter-registration applications on time. PX847 (incident email); Tr.586:6-9 (Velez); *see also* Tr.171:4-19 (Orjuela); Tr.389:8-15 (Herrera-Lucha).

*And second*, even without data, the State can and should act on election-related issues. The U.S. Supreme Court and the Eleventh Circuit afford the State this wide latitude, because waiting for an incident (or additional incidents) is not an option when the public's confidence depends on perception. *Brnovich v. DNC*, 141 S. Ct. 2321, 2340, 2343 (2021); *Purcell*, 549 U.S. at 4; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194-96 (2008); *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). This also rebuts Plaintiffs' argument that the **Retention Provision** and **Fines Provision** aren't needed, because, as Plaintiffs claim, laws are already on the books to deter bad behavior. NAACP Br. at 143; Hispanic Federation Br. at 90. Putting aside State Attorney Fox's testimony that the then-existing laws on the books were insufficient to go after Hard Knocks directly, Tr.1793:1-11, the challenged provisions help boost confidence in the security of the State's electoral processes.

What's more, the three provisions at issue are narrowly tailored to meet the compelling interests. The provisions regulate and prohibit no more than what's needed. With the **Citizen Restriction**, canvassers can still speak to voters and help them register to vote. Limiting the provision's reach to only illegal aliens wouldn't help. With noncitizens, there's always a risk that they can leave the State, given their strong ties to other countries, and not turn in applications on time. *See generally* Tr.171:4-19 (Orjuela); Tr.389:8-15 (Herrera-Lucha). Plus, the noncitizen bad conduct revealed during trial didn't come from illegal aliens.  Tr.407:5-22 (Herrera-Lucha); PX847 (incident email); Tr.613:17 – 615:5 (Velez).

48

With the **Retention Provision**, voters can still sign up for NAACP, Poder Latinx, and League membership. 3PVROs can also copy some, but not all, information from voter-registration applications. NAACP Br. at 144.

And with the **Fines Provision**, the ten-day deadline still allows 3PVROs to timely deliver applications, and sending applications to the safe-harbor Division of Elections prevents a 3PVRO from sending them to the wrong county. In their written closing, Plaintiffs reference Supervisor Earley's testimony that he may not see a benefit to moving the deadline up, "as long as the application is submitted before book closing." NAACP Br. at 63. But Supervisor Earley later couched his testimony by stating that larger counties might see a benefit with the changed deadlines. Tr.739:1-11.

As for the size of the fines, the Florida Legislature had to draw a line, and it believed that the line it drew was sufficient to deter misconduct, while not penalizing honest mistakes. After all, a 3PVRO that turns in one application one day late before book closing only gets assessed a fine of $50. A 3PVRO can also appeal a fines assessment to Director Darlington, take their case to the Division of Administrative Hearings, or seek an advisory opinion from the Division of Elections.

All told, strict scrutiny is satisfied.

### 3. The Provisions Satisfy *Anderson-Burdick*.

**a.** The **Citizen Restriction**, **Retention Provision**, and **Fines Provision** also satisfy *Anderson-Burdick* balancing. It's a "flexible standard" that assesses the effect of a regulation on the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The "level

of scrutiny" applied to an election law "depends on the severity of the burdens" imposed by the law. *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020). A law that imposes a "[s]evere" burden on voting "must be narrowly tailored to advance a compelling state interest," while a "reasonable, nondiscriminatory" law need only be justified by an important governmental interest. *Id.*

Mere "inconvenience[s]" can't tilt the balance. *Brnovich*, 141 S. Ct. at 2338 n.11. After all, every election law imposes a burden of some kind:

> Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules. . . . [V]oting necessarily requires some effort and compliance with some rules, [ and voters ] must tolerate the "usual burdens of voting."

*Id.* at 2338 (quoting *Crawford*, 553 U.S. at 198). Indeed, "[v]oters must" "take reasonable steps and exert some effort to ensure," for example, "that their ballots are submitted on time." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

*Anderson-Burdick* also doesn't operate as a "one-way ratchet," forever prohibiting States from modifying laws "in a way that might arguably burden some segment of the voting population's right to vote." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). To the contrary, cognizable burdens under *Anderson-Burdick* must "represent a significant increase over the usual burdens of voting." *Curing v. Raffensperger*, 50 F.4th 1114, 1123 (11th Cir. 2022) (quoting *Crawford*, 553 U.S. at 198). They must, for

example, pose a significant "risk of disenfranchisement." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320 (11th Cir. 2019).

Purported burdens can't be based on the "unique set of circumstances" of "specific voters." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 4:21-cv-186, 2024 U.S. Dist. LEXIS 21974, at \*39 (N.D. Fla. Feb. 8, 2024); *see also Crawford*, 553 U.S. at 202-03. And purported burdens can't depend on an isolated reading of certain provisions of the election code; the code as a whole must be considered. *E.g.*, *Brnovich*, 141 S. Ct. at 2344. This was the holding of *New Georgia Project v. Raffensperger*, where the Eleventh Circuit ruled that Georgia's absentee-ballot deadline did "not implicate the right to vote at all," given that "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots." 976 F.3d at 1281.

In defending an election law, moreover, the State can offer post-hoc rationalizations to justify the law. *Mays v. LaRose*, 951 F.3d 775, 789 (6th Cir. 2020). As the Eleventh Circuit put it, "*Anderson* does not require any evidentiary showing or burden of proof to be satisfied by the state government," "[n]or do the more recent decisions in *Burdick* and *Crawford*." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (citations omitted).

Weighing burdens against interests is an important aspect of *Anderson-Burdick*: "[h]owever severe the burden," the law must be "warranted 'by relevant and legitimate state interests sufficiently weighty to justify the limitation.'" *Indep. Party of Fla.*, 967 F.3d at 1281-82 (quoting *Common Cause/Ga.*, 554 F.3d at 1352). But this

51

"examination offers no license for 'second-guessing and interfering with' state decisions; the Constitution charges States, not federal courts, with designing election rules." *Curling*, 50 F.4th at 1122 (quoting *New Ga. Project*, 976 F.3d at 1284). *Anderson-Burdick* can't be used as a means to "redline" and replace a reasonable election law with a "'better' option offered by" a plaintiff. *Id.* at 1125.

One final point. In conducting *Anderson-Burdick* balancing, some courts have considered a particular racial groups' burden under the law being challenged. *E.g.*, *Ohio Democratic Party*, 834 F.3d at 639. But that shouldn't be the case. The analysis "effectively turn[s] back decades of equal-protection jurisprudence." *Crawford*, 553 U.S. at 207 (Scalia, J.,  concurring in judgment). Racial-discrimination claims go through (mostly) the Fourteenth Amendment's Equal Protection Clause, and the clause requires proof of discriminatory impact *and discriminatory intent. Id.* (quoting *Washington v. Davis*, 426 U.S. 299, 248 (1976)). Considering racial disparate impact in an *Anderson-Burdick* analysis— without considering discriminatory intent—does an end-around constitutional standards. While courts have performed this analysis, that doesn't mean that the analysis is constitutionally sound. (As an aside, the Secretary recognizes that the Eleventh Circuit has said that the *Anderson-Burdick* test doesn't require a showing of discriminatory intent, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319; however, the Secretary disagrees and intends to seek en banc review on the issue when appropriate.)

True, in *Crawford v. Marion County Election Board*, and in *Democratic Executive Committee of Florida v. Lee*, the courts considered burdens on particular voters. NAACP

Br. at 126-27. But those voters weren't divided based on race. For *Crawford*, it was "persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of" a photo-identification law—the elderly, those who may have difficulty obtaining a birth certificate, persons who have economic or personal limitations on obtaining a proper identification, homeless persons, and persons with religious objections to being photographed. 553 U.S. at 198-99. In *Democratic Executive Committee*, it was voters who might be disenfranchised by the prevailing signature-matching scheme. 915 F.3d at 1317. The unique circumstances of voters divided by race weren't considered in these cases.

**b.** To recap: *Anderson-Burdick* weighs burdens on the right to vote against state interests. As an initial matter, however, none of the Plaintiffs are voters suing because their right to vote is implicated. The individual canvassers are suing because their ability to work for a 3PVRO is affected. The 3PVROs are suing because they don't like the new statutory provisions; the organizations themselves have no right to vote. So, whether its labeled Article III standing or prudential standing, or a failure to state a claim, there's no *Anderson-Burdick* claim under the circumstances.

Assuming there is an *Anderson-Burdick* claim, Plaintiffs haven't established the burdens that the three provisions impose. Dr. Herron and Dr. Smith both used the calculus-of-voting method to conclude that the regulation of 3PVROs would impact voters. Tr.240:4-8 (Herron); Tr.1073:8-15 (Smith). Both agreed that the calculus of voting comes from principles of microeconomics. Tr.240:9-15 (Herron); Tr.1141:15-17

(Smith). Both also said that there are two components to this analysis: costs and benefits. Tr.240:9-15 (Herron); Tr.1142:6-9 (Smith). The analysis assumes that the person whose behavior is being predicted is a rational actor—someone who wants to "maximize utility." Tr.1142:6-9 (Smith). The analysis applies on an individualized basis to a "specific individual" in a "specific circumstance." Tr.1141:2-14 (Smith).

There are, of course, problems with a methodology that assumes voters to be rational, and that extrapolates from specific instances and specific voters an effect on the larger electorate. As Dr. Stein testified, empirical data undercuts the methodology. Tr.1670:13 – 1674:4 (Stein). Take, for instance, voter-identification laws. They impose a cost, but voter turnout actually increases (rather than decreases) after the passage of such laws. Conversely, additional early-voting days decrease costs, but turnout actually decreases (rather than increases). Tr.1670:13 – 1674:4 (Stein). In real-life then, the methodology is anything but certain to establish an expected impact on voters.

Setting aside the empirical problems with the calculus-of-voting method, neither Dr. Herron nor Dr. Smith assessed the benefits related to SB7050. They held benefits constant. Tr.318:6 – 322:10 (Herron); Tr.1141:25 – 1142:24 (Smith). Though Dr. Herron and Dr. Smith acknowledged that one of the benefits associated with voting is the notion that one's vote will matter, neither would concede that for some voters, some of the time, a sense of greater election integrity (brought by reforms such as SB7050) could increase the benefits. Tr.322:12 – 323:14 (Herron); Tr.1142:25 – 1143:9 (Smith). Failing to concede the obvious undercuts the credibility of these experts.

Importantly, holding one side of the equation constant and then saying that voters are adversely impacted tells only part of the story.

Another principle of microeconomics was ignored: the substitution effect. Plaintiffs' experts studied, to varying degrees, the effect of increasing costs on one mode of voter registration: registration through 3PVRO. *E.g.*, Tr.250:10-19 (Herron); Tr.1089:12-19 (Smith). When asked what constitutes a 3PVRO activity, Dr. Smith sensibly deferred to the State and conceded that he didn't quite know. Tr.1106:12 – 1112:19. Dr. Herron, in the rebuttal case, talked about how the other modes of registering are not substitutes for 3PVRO activity. *E.g.*, Tr.2005:6-10. Yet his testimony proves the opposite. Dr. Herron considers the handing out of blank forms and stamped return envelopes to be a 3PVRO activity (though it's not). Tr.2007:2 – 2011:9. Put another way, he concedes that this method of registering voters is a perfect substitute. It's one the League of Women Voters actually engages in at this very moment. Variations of this are also abound, from Poder Latinx's "online first" method to the use of iPads and QR codes by the same people and same organizations in the same communities. But none of these perfect substitutes were considered in the analysis.

Less-than-perfect substitutes weren't considered either. Dr. Herron agreed that having voter-registration applications available at every public building could affect the outcome. Tr.328:12 – 329:19. He didn't study it though. The problem here is that voter-registration applications are available at nearly every public building from libraries and tax collector's offices to the Social Security Administration and Veterans Affairs

building. They're also available at Walmarts (because people can get hunting or fishing licenses there). These are substitutes. So is voting online or through the DMV. These are substitutes that weren't appropriately considered as offsets to any cost imposed on voters because of the difficulty (however that's measured) imposed through SB7050.

In addition, the data set that Dr. Herron and Dr. Smith relied on is flawed for reasons beyond what this Court recognized in its colloquy with the experts. Both experts used the state voter-registration files to look-up data on the method of registration. *E.g.*, Tr.331:11-14 (Herron); Tr.1113:10-12 (Smith). The data files do not have the method of registration available for all voters; 17.08% of that data is missing in the file. PX969 (table); Tr.1119:16 – 1122:21 (Smith). Even when that data is isolated to registrations since 2012, which Dr. Smith did, over 10% of that data is missing. PX971 (table); Tr.1122:23 – 1124:10 (Smith). The data files were also used to link method of registration to the race of a voter. *E.g.*, Tr.286:1-20 (Herron); Tr.1124:15-25 (Smith). But the reporting of racial data is voluntary, DX13 (voter-registration application); it's not needed to register to vote. Many voters don't report racial data, so there's a gap in the data—the "other" category of registrants outpaces other races in various categories. *E.g.*, PX973 (table); Tr.1126:23 – 1127:21 (Smith). So, when discussing the racial implications of the impacts of SB7050, the experts, all of them, are just guessing. They don't actually know the race of a significant subset of the electorate.

Finally, taking a more holistic look at the analysis presented, Plaintiffs say that the Florida Legislature intended to and did target one of the preferred methods of

registering for black and brown voters. That's just wrong. Start with Dr. Herron's corrected tables comparing citizen-voting age population ("CVAP") to the number of people actually registered to vote. *E.g.*, PX979 (corrected table). Though CVAP isn't a perfect gauge of the number of eligible voters, it's the best we have, because it takes children and non-citizens out of the assessment. *See generally* Tr.1131:14 – 1132:10 (Smith). And looking at that number for all Floridians, regardless of race, reveals that over 90% of eligible Floridians are registered to vote. Tr.350:5-10 (Herron). When broken down by race, over 90% of black Floridians are registered as well. PX979 (corrected table). Of the remaining eligible but unregistered black voters, 9.98%, according to Dr. Herron's assessment, will only use 3PVROs. PX979 (corrected table). So, in Plaintiffs' telling, the Florida Legislature knew enough (using regressions and whatnot) to target a small subset of an even smaller subset of eligible black voters through SB7050. That's hard to believe. And it hasn't been proven.

As such, SB7050's burdens are minimal, if any. The state interests, by comparison, are weighty. As explained in the strict-scrutiny analysis, the State advances compelling interests that are backed in fact. This makes the *Anderson-Burdick* balancing easy: no burdens and weighty interests means that the three provisions withstand scrutiny. Even if the State's interests aren't compelling, they are still important, and the provisions still satisfy *Anderson-Burdick*. *Browning*, 575 F. Supp. 2d at 1324-25.

### 4. The Provisions Satisfy Rational Basis.

If rational basis applies, *Steen*, 732 F.3d at 392-93, the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** satisfy it. Rational-basis review comes with a presumption that the challenged law is constitutionally valid, and it only requires that a law be supported by a reasonable justification. *FCC v. Beach Comm'ns*, 508 U.S. 307, 315 (1993). Rational speculation works, too. *Id.* And it's for the challenging party to "negative every conceivable basis which might support" the law. *Id.*

Under this standard, the provisions are easily constitutional. The interests underlying them are weighty, the issues they prevent are real, and Plaintiffs can't negative every basis to support the provisions.

### B. The Citizen Restriction, Retention Provision, and Fines Provision Don't Violate First Amendment Free Association.

Next, Plaintiffs contend that the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** impede their First Amendment rights to free association. Plaintiffs are wrong. None of the provisions prevent Plaintiffs from associating with anyone while canvassing. Any organization and any canvasser can associate with anyone. Any conversation can be had on any subject by anyone. Any person can join or become a member of any 3PVRO. Even with some of the provisions in place, Plaintiffs have many means to associate with anyone and add members and volunteers.

Put differently, the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** don't limit association; they just prescribe and proscribe certain 3PVRO

conduct—who can collect and handle filled-out voter-registration applications, prohibiting copying and retaining certain information, and requiring applications to be sent to the right place at the right time.

This case isn't the classic free-association case, where a private group tries to prevent association with potential members, and the government tries to compel association. *E.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 560-65 (1995); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 612-17 (1984). The State isn't forcing anyone to associate with anyone. Nor is the State preventing anyone from associating with anyone. The right to free association therefore isn't even triggered in this case.

Even if it was, strict scrutiny, *Anderson-Burdick*, and rational-basis review would be satisfied—for the reasons already expressed. The compelling interests are the same, and narrow tailoring is met, since the provisions don't limit association at all. Plaintiffs just haven't established any concrete evidence that the provisions hamper association. Some 3PVROs may have unnecessarily pared back and adjusted their operations, but Plaintiffs can't self-injure themselves into constitutional harm.

And true, some Plaintiffs have changed their hiring practices due to the **Citizen Restriction**. But the provision affects free association in no way different from laws that prevent certain felons from becoming schoolteachers, prison guards, and lawyers. Doc.87, 4:23-cv-216 (collecting citations). The right to free association doesn't mean that anyone can be hired to do anything.

59

### C.   The Citizen Restriction, Retention Provision, and Fines Provision Don't Violate the Equal Protection Clause.

Plaintiffs then allege that SB7050's **Citizen Restriction**, **Retention Provision**, and **Fines Provision** violate the Equal Protection Clause. This challenge contains two parts. NAACP Br. at 118. The first part is an as-applied equal-protection challenge to the **Citizen Restriction**, even though this Court already granted Plaintiffs' facial, equal-protection challenge to the **Citizen Restriction**. This, of course, is redundant: prevailing on a facial challenge obviates an as-applied challenge. Even if it doesn't, the Secretary already provided his defense of the **Citizen Restriction** earlier in this case, and he incorporates and adopts those arguments here. *E.g.*, Doc.222, 4:23-cv-215.

The second part of Plaintiffs' challenge is an *Arlington Heights* intentional-discrimination claim. True, intentional discrimination doesn't mean discriminatory malice. *E.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269-71 (1993). But intentional discrimination still requires that governmental officials "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its *adverse* effects upon an identifiable group," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (emphasis added). That's not nothing. It's a serious charge: that voters' elected officials acted, at least in part, for impermissible reasons.

Another point bears noting: it's hard to glean the legislative intent of a multi-person body. It's "a problematic and near-impossible challenge." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021). One legislator doesn't

speak for all legislators, *O'Brien*, 391 U.S. at 384, and one legislator's comments on one bill shouldn't be used to glean his intent on another bill, *Greater Birmingham Ministries*, 992 F.3d at 1324.

The task is tough enough when governmental officials act on a single and discrete matter, like hiring or firing one employee. *See generally Matthews v. Columbia County*, 294 F.3d 1294, 1295 (11th Cir. 2002). That's because:

> Lawmakers' support for legislation can come from a variety of sources: one [lawmaker] may support a particular piece of legislation for a blatantly unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionality motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive. If we adopt the rule suggested by Plaintiff, the well-intentioned lawmaker in this hypothetical would be forced to either to vote against his own view of what is best for his [state] or to subject his [state] to Section 1983 liability. We think the law compels no such outcome.

*Matthews*, 294 F.3d at 1298. The task gets significantly harder when the officials act on many matters all at once, like an omnibus elections package. A lawmaker may have supported the package because he liked one non-challenged provision. Or he may have supported a challenged provision for a purely non-discriminatory reason. That makes intent gleaning even more impossible.

All that said, the intentional-discrimination analysis considers several non-exhaustive factors: the impact of the challenged action, historical background, the sequence of events leading up to the action, procedural and substantive departures of

the governmental body in taking the action, contemporary statements and actions of key governmental officials, foreseeability of the disparate impact, knowledge of the impact, and availability of less discriminatory alternatives. *Greater Birmingham Ministries*, 992 F.3d at 1322. If these factors demonstrate discriminatory impact and intent, then the burden shifts to the State to demonstrate that the law would have been enacted regardless of the discriminatory impact or intent. *Id.* at 1321. What's more, throughout the analysis, the presumption of good faith must be applied. *Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018).

**Presumption of Good Faith.** The presumption of good faith is a mandatory presumption. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Under it, elected officials are presumed to have taken constitutional actions.

The presumption means that the parties don't start out with scales in equipoise; instead, the presumption is a default factual inference that governmental officials acted in good faith. *See, e.g.*, *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373-74 (11th Cir. 2022). For example, when a court considers a statement from a legislator, it should presume that the statement was made in good faith, and shouldn't "read" it "to demonstrate discriminatory intent" and impute that intent on "the state legislature." *Id.* at 1373.

Therefore, to overcome the presumption, "only the clearest proof will suffice." *Smith v. Doe*, 538 U.S. 84, 92 (2003); *see also United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). Indeed, the U.S. Supreme Court has reversed discriminatory intent findings

62

even when they were supported by "a modicum of evidence." *Easley v. Cromartie*, 532 U.S. 234, 257 (2001).

Dr. Lichtman's analysis did the opposite. On direct, he testified about legislative details and inferred bad faith from them. He didn't include any kind of exculpatory facts on direct—facts that would weigh against his discriminatory-intent conclusions. When presented with exculpatory facts on cross, he used them to further infer bad intent on the Florida Legislature.

To Dr. Lichtman, his racial-ideology and "immigrant threat narrative" wasn't undermined by the fact that sons and daughters of immigrants, as well as racial minorities, have held and currently hold positions of power in Florida's government. Tr.1614:22 – 1620:5; NAACP Br. at 42. That Florida has a black surgeon general, Dr. Lichtman opined that the surgeon general "may have had black skin, but, in fact, he mirrored a lot of the [racial and radical] ideology of Republicans: He was a vax denier; he didn't hue to proper science; he was found to have misrepresented some of his scientific work," so that "hardly" "demonstrates that this is a guy who's reaching out somehow to enhance the minority community." Tr.1616:1-17. In other words, Dr. Lichtman presumed bad faith.

That two of the highest-ranking education officials in Florida are Hispanic didn't matter, either: "they may have Hispanic surnames, but you often have people who might have Hispanic surnames or black skin who still don't represent a contrary ideology. These are, as I remember correctly," "these are Republican politicians that"

Governor DeSantis "appointed." Tr.1616:19 – 1617:2. Those exculpatory facts didn't matter to Dr. Lichtman. Bad faith was presumed. Same with Governor DeSantis's diverse appointments to the Florida Supreme Court. To Dr. Lichtman, none of it mattered, and bad faith was presumed. Tr.1617:3-13.

Same with the fact that Governor DeSantis won the majority of the Hispanic vote in the last gubernatorial election. A fair and good-faith inference from this fact would be that it would be politically unthinkable for Republicans to target a demographic that contributed to their landslide victory. But to Dr. Lichtman, it was yet another conclusive reason why SB7050 was passed with discriminatory intent. Tr.1617:14 – 1620:5. Bad faith was again presumed.

In short, the presumption of good faith exists to prevent this kind of assume-discrimination-first, view-the-facts-accordingly-second analysis. The presumption holds that voters don't elect officials who take actions for impermissible reasons, and it adheres to federalism principles by respecting the actions of state government.

Chief Justice Marshall put it best: holding that a governmental official had improper intent is "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810). This isn't a doubtful case: Plaintiffs nowhere approach the evidence needed to overcome that presumption.

**Impact.** Plaintiffs failed to prove disparate impact or effect on black and Hispanic voters. As explained in the *Anderson-Burdick* discussion, Dr. Herron and Dr.

Smith don't make the necessary link from the limited data. Plaintiffs' otherwise self-serving testimony doesn't work, either.

All of that means that Plaintiffs failed to prove discriminatory impact or effect. That alone should doom their claim. *See generally Greater Birmingham Ministries*, 992 F.3d at 1321. But for completeness, other factors will be considered.

**Historical Background.** Dr. Lichtman testified about historical background. NAACP Br. at 41. While it "focused almost entirely on twenty-first century history," NAACP Br. at 41, Dr. Lichtman's analysis relied on details that shouldn't be considered in an *Arlington Heights* analysis: mostly, actions by executive agencies and actions by earlier and differently constituted legislatures. That doesn't count. *Greater Birmingham Ministries*, 992 F.3d at 1322-24; *Common Cause Florida v. Byrd*, 4:22-cv-109, 2024 U.S. Dist. LEXIS 54503, at *88-89 (N.D. Fla. Mar. 27, 2024) (three-judge court).

If that wasn't enough, the Eleventh Circuit, in reviewing an overlapping survey of historical background in the SB90 appeal, found that that history didn't demonstrate discriminatory intent. 66 F.4th at 922-24. That conclusion doesn't change here.

**Events Leading Up to SB7050, Procedural and Substantive Departures.** SB7050's legislative history is unremarkable. If anything, it shows there were well-known instances of 3PVRO misconduct before and during the 2023 legislative session. The Hard Knocks scandal was being publicized at the time, and Secretary Byrd further publicized it. Tr.1793:23 – 1795:4 (Fox); PX250 54:1 – 55:6 (Byrd). The Office of Election Crimes and Security published its 2023 report, which documented 3PVRO

issues. DX14 at 5. It was sent to the senate president and speaker of the house, and legislators received it and read it. Tr.499:1-4 (Torres); Tr.925:2-6 (Eskamani); PX246 34:22 – 35:4 (Burgess). This shows that there was a problem with 3PVROs that needed fixing.

There was nothing unusual—procedurally or substantively—about SB7050's introduction or passage. Lake County Supervisor of Elections Hays, a veteran of the Florida Legislature, followed SB7050's legislative process and reached the same conclusion. Tr.1820:3 – 1821:3. Even so, Plaintiffs contend that its introduction, halfway through the legislative session, was odd. *E.g.*, NAACP Br. at 56. It wasn't odd. As Senator Burgess explained, SB7050 didn't become law on April 4, 2023, and it took a while to get a draft of an omnibus elections package. PX246 30:24 – 31:25 (Burgess); PX246 110:7 – 112:4 (Burgess).

That SB7050 was a proposed committee substitute is also unremarkable. According to Senator Torres, he's seen proposed committee substitutes "over 50 percent of the time" in his long legislative career. Tr.487:10 – 488:4. Proposed committee substitutes are expressly allowed by the Senate Rules, Fla. Sen. R. 2.39, and have different filing and procedural requirements than member-filed bills, Tr.487:10 – 488:4 (Torres); PX246 110:7-11 (Burgess). The Florida Legislature can't depart from its own procedures by following its own procedures. *See generally Hall v. Holder*, 117 F.3d 1222, 1230 (11th Cir. 1997).

66

The legislative records demonstrate that SB7050 was debated by legislators, was commented on by members of the public, and received analysis, criticism, and support. Again, none of this is remarkable. Nor is Plaintiffs' focus on public-comment time limitations. NAACP Br. at 136. At most, Plaintiffs assert that "[m]ost committees that Representative Eskamani serves on do not have a time limit at all." NAACP Br. at 56-57. Left unsaid is whether Representative Eskamani's other committees pass high-profile legislation that engenders high-volume public comment and thus time limits on public comment. And left unmentioned is that time limitations were also in place while Secretary Byrd provided his initial public comments on SB7050. PX248 68:19-20.

True, Secretary Byrd provided additional comments, though he provided additional comments after legislators asked him questions. PX248 69:7-8. Including Representative Eskamani. PX248 69:21-25. This too is unremarkable: public commentators with specific subject-matter experience receive questions from legislators after providing initial public comments. *E.g.*, PX248 73:18-20 (Ramba); PX250 88:10-20 (Earley, although the transcript identifies him as "Ali").

If that wasn't enough, Plaintiffs add that Dr. Lichtman "also found two major substantive deviations when he compared SB 7050 to other Florida legislation." NAACP Br. at 136. The first was that noncitizens have never been previously prevented from "current or future employment with" "3PVROs." Tr.1531:12-17 (Lichtman). The second was that the fines amount was, in his estimation, a large "escalation."

Tr.1531:18-22 (Lichtman). (He then discussed other States' practices and processes, but that has no bearing on Florida's substantive procedures. Tr.1531:23-24.)

Dr. Lichtman's findings are unconvincing. For starters, the **Citizen Restriction** doesn't prevent employment; it just states that a noncitizen can't perform a discrete and insular task while working for a 3PVRO. Noncitizens can still work for 3PVROs and help voters register. And as for the escalations, Dr. Lichtman himself stated that fine amounts have been going up: from "just" "[$]1,000 for 15 years" and then recently "$50,000." Tr.1531:18-22 (Lichtman). In this light, the **Fines Provision** hardly seems like a departure from a trend.

All told, there are no substantive and procedural departures.

**Contemporary Statements and Actions.** Plaintiffs rely on the statements, post-hoc descriptions, and historical analysis from SB7050's political opponents, like Senator Torres and Representative Eskamani. *E.g.*, NAACP Br. at 46-47. But "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters of Fla.*, 66 F.4th at 940 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 n.24 (1976)).

Statements from supporters should only be considered. And yet, out of all of the senators and representatives who supported SB7050, only a tiny fraction provided statements on the bill during the legislative session. So Plaintiffs can only rely on a tiny subset of legislative statements. But, as case law makes clear, a handful of statements

from a handful of legislators doesn't lead to the conclusion that "the legislature as a whole was imbued with" particular "motives." *Brnovich*, 141 S. Ct. at 2349-50.

Plus, the Republican's legislative supermajority should also factor into the analysis. As the party with complete legislative power, they didn't need to provide any statement on SB7050 or present any evidence to justify it. And they didn't need to provide any responses to SB7050's critics. Case law doesn't impose a duty on a legislative supermajority to pay attention to its critics, to respond to those critics, and to present courtroom-style evidence to justify legislation.

At best, SB7050's supporters provided commonsense rationales to justify the bill. It makes sense to narrow the universe of people who collect and handle documents with sensitive information. It makes sense to protect that information and to ensure timely and proper delivery of voter-registration applications. SB7050's provisions make sense. Comments from its supporters confirm that.

Plaintiffs are simply wrong in stating that legislators commented that "U.S. citizens" are "superior[]" to noncitizens, and that "all noncitizens" are "illegals." NAACP Br. at 122. These gross mischaracterizations aren't in the legislative record.

**Foreseeability & Knowledge of Disparate Impact.** Again, Plaintiffs didn't prove impact. So, state legislators couldn't foresee and have knowledge of an impact that didn't and couldn't happen. Even so, for this factor to favor Plaintiffs, state legislators would have needed to listen to SB7050's critics' concerns about its potential

impact, and state legislators would have needed to have been shown the kind of advanced calculus used by Plaintiffs' experts.

Plaintiffs can't establish any of this. As explained above, they can't prove that SB7050's supporters were receptive to its critics' statements, and the legislative record doesn't evidence any discussions of difference-in-difference analyses or logical regression analyses. Senator Torres and Representative Eskamani don't remember it. Tr.494:4-13 (Torres); Tr.925:21 – 926:7 (Eskamani).

Plaintiffs also note that "Supervisor Earley testified that he also communicated to individuals at the state level who worked on SB 7050 that the increased fines could have a detrimental impact on 3PVROs." NAACP Br. at 57. Who are those state-level individuals? That remains unclear. Did he speak to only Senator Torres and Representative Eskamani? Still unclear. After all, Representative Eskamani proposed amendments to SB7050, Tr.923:1-9, and therefore "work[ed] on th[e] bill," Tr.742:15-18 (Earley).

Then Plaintiffs mention the "two letters that were sent to members of the legislature that demonstrated that" the members "both knew and should have foreseen 'the crippling effects' that the fines and regulations would have on 3PVROs." NAACP Br. at 58. What members of the legislative majority actually received and read this letter? That still remains unclear.

**Alternatives.** As less-discriminatory alternatives, Plaintiffs propose several: same-day registration, moving book closing, decreasing fines, modifying the **Citizen**

**Restriction** to apply only to illegal aliens, and delaying the implementation of SB7050. NAACP Br. at 58-59.

The first two alternatives aren't alternatives at all. Plaintiffs can't just throw out any alternative and say it's less discriminatory. They have to prove that it's a feasible alternative. They haven't done that for same-day registration: they have provided no evidence whatsoever that it's feasible to make a substantial change to Florida's registration scheme. In fact, Plaintiffs propose this alternative, in spite of the Secretary telling the Florida Legislature that it would be a "terrible idea" that "undermines our very ability to verify whether or not" "individuals are eligible to vote." PX248 69:9-18. The same is true with moving book closing. Not only would this lead to considerable confusion about election deadlines for federal, state, and local elections, not even Dr. Lichtman—Plaintiffs' expert for all seasons—established that it was feasible.

As for the remaining alternatives, the Florida Legislature didn't need to "adopt any amendment that a bill's opponents claim would improve it." *League of Women Voters of Fla.*, 66 F.4th at 940.

**SB7050 Would Have Passed Anyway.** Even assuming that Plaintiffs can make out these factors (which they can't), SB7050 would have passed anyway. Again, it's an omnibus elections package with a resign-to-run provision that helped Governor DeSantis's presidential campaign. SB7050 also addressed Florida's growing problem with 3PVROs. PX246 60:6 – 62:10 (Burgess); DX14; *see also* PX250 55:18- 56:5 (Byrd);

PX252 27:1 – 28:3 (Burgess). Its provisions deter bad conduct and help law enforcement find bad actors. It would have passed anyway.

In sum, Plaintiffs' equal-protection claims fail.

**D.    The Citizen Restriction and Retention Provision Aren't Vague Under the Fourteenth Amendment or Overly Broad Under the First Amendment.**

**1.    The Provisions Aren't Vague.**

Next, Plaintiffs contend that the **Citizen Restriction** and **Retention Provision** are unconstitutionally vague. A vague law must be "utterly devoid of a standard of conduct." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228 (11th Cir. 1982). That means that the law must contain no core meaning. *SisterSong Women of Color Reproduction Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022). But that's just not this case. Here, both provisions have a core and understandable meaning.

**a.    The Citizen Restriction Isn't Vague.**

The **Citizen Restriction** has a core meaning. Plaintiffs know it. The League of Women Voters knows exactly what conduct is being regulated: the "requirements and prohibitions under Senate Bill 7050 are ONLY triggered when volunteers actually collect or physically possess the voter completed [sic] registration application from the applicant." PX786 at 2 (League email). That's exactly right. That's how the State describes the regulated conduct. Doc.92 at 22-24, 4:23-cv-215 (response in opposition to preliminary-injunction motion).

Mr. Norlund seems to understand the meaning of the provision as well:

> Q.   Mr. Nordlund, Unidos, as we just discussed, provides fairly extensive training on how canvassers can do their jobs.
>
> Based on those job responsibilities, would you say that Unidos canvassers engage in any kind of policymaking?
>
> A.   No, they're – they're just there to collect voter registrations.

Tr.50:2-7.

Canvasser-Plaintiffs know what the terms mean. For example, Mr. Orjuela testified that:

> Q.   When you're working as a canvasser, would you say that you collect voter registration applications?
>
> A.   Yes, during the day I hold where I have the registrations that are filled out during the day.
>
> . . .
>
> Q.   And have you, in fact, always turned in all of the voter registration applications you've collected or handled?
>
> A.   Yes, I have always turned them in.

Tr.157:25 – 158:9; Tr.158:23-25.

Even the Southern District of Florida knows what "collect" and "handle" means in the 3PVRO context: "[t]he undersigned agrees that the collection and handling of voter registration applications is not inherently expressive activity." *Browning*, 575 F. Supp. 2d at 1319. Plaintiffs note that Supervisor Earley doesn't understand the meaning of "collecting" or "handling" (or "personal information"), but he doesn't enforce the provision. NAACP Br. at 65-66.

So Plaintiffs (and the Southern District) know the core meaning of a purportedly vague statutory provision. To get around this, Plaintiffs snipe at the edges of the provision's meaning. They throw out endless hypotheticals about activity that might, possibly, maybe, not, fall under the **Citizen Restriction**.

That's not the test. It's not death by a thousand hypotheticals: "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *United States v. Wayerski*, 624 F.3d 1342, 1349 (11th Cir. 2010). And such situations are better served for as-applied challenges, not facial challenges. *SisterSong*, 40 F.4th at 1328. Such situations also provide a reason to seek an advisory opinion.

### b.   The Retention Provision Isn't Vague.

The **Retention Provision** isn't vague, either. This Court already found its core meaning: "the challenged provision prohibits individuals who engage directly with voters and collect completed applications from the voters from copying those completed applications for their own personal use." Doc.101 at 42, 4:23-cv-215. That should be the end of the matter. Even so, the **Retention Provision** clearly explains (1) who it applies to, (2) what information falls under its reach, and (3) what conduct is prohibited.

**i.** The "who" is clear: "a person collecting voter registration applications on behalf of a third-party voter registration organization." Fla. Stat. § 97.0575(7). These are not people who merely solicit applications. We know this because the same statute,

in another subsection, tells us that soliciting is different than collecting. 3PVROs must register and provide to the Department of State the "names, permanent addresses, and temporary addresses" "of each registration agent registering persons to vote in this state on behalf of the organization." *Id.* § 97.0575(1)(c). But the registration requirement "does not apply to persons who only solicit applications and do not collect or handle voter registration applications." *Id.* (emphasis added) So a person who's merely asking a passerby to fill out an application—who's soliciting—isn't subject to the **Retention Provision**.

Nor is a person who's only handling a voter registration application subject to the **Retention Provision** once it's been collected from a prospective voter. The statute, in various subsections, references both collecting and handling. *Id.* § 97.0575(1)(c), (1)(e), (1)(f). In other instances, it refers to just collecting. *Id.* § 97.0575(4), (5)(a)3., (6), (7). The two words thus have different meanings. The commonly understood meaning of "collect" is "to gather" "from a number of persons." Merriam-Webster's Collegiate Dictionary 243 (11th ed. 2005). And the commonly understood meaning of "handle" is to "manage with the hands." *Id.* at 565. Read in the context within which it appears in § 97.0575, a person can "collect or handle voter registration applications," Fla. Stat. § 97.0575(1)(c), though the collecting happens when a person gathers an application from a prospective voter, and the handling happens when a person takes the steps necessary to deliver the completed application to the appropriate elections official. *See id.* § 97.0575(5)(a).

Put another way, the **Retention Provision** applies to Royal Sheperd when he is canvassing—when he is collecting voter-registration applications with a prospective voter's drivers license number, social-security number, and signature on it. And it applies to Esperanza Sanchez, when she's collecting applications, though not when she's handling applications collected by others (perhaps to sort them by the applicant's county of residence) before delivering the applications to the relevant supervisor of elections.

**ii.** The information protected by the provision is also clear: "voter's personal information, such as the voter's Florida driver license number, identification card number, social-security number, or signature." Fla. Stat. § 97.0575(7). To understand "voter's personal information," look at the following list: "Florida driver license number, Florida identification card number, social security number, or signature." It's all sensitive information. It's all information that an elections official would use to confirm a vote-by-mail ballot or to catch election fraud. *E.g.*, Tr.1825:11-21 (Hays); Tr.1918:14 – 1919:14 (Matthews); Tr.1920:14 – 1921:2 (Matthews). It's the information that a supervisor of elections would redact if sent a public-records request. DX13 (voter-registration application). Indeed, as the voter-registration application itself says, it's the *only* information not subject to disclosure. DX13 (voter-registration application).

Accordingly, the **Retention Provision** doesn't protect a voter's name, address, telephone number, email address, party affiliation, or race. Again, all of this information isn't like a drivers license number, identification number, social-security number, or

signature. The **Retention Provision** doesn't protect information that the State would have to turn over in a public-records request.

**iii.** And the prohibited conduct is clear as well. Under the **Retention Provision**, "a person collecting voter registration applications on behalf of a third-party voter registration organization" can't "cop[y] a voter's application or retain[] a voter's personal information" "for any reason other than to provide such application or information to the third-party voter registration organization in compliance with this section." Fla. Stat. § 97.0575(7). This has a simple meaning: "to provide such application or information to the [3PVRO] in compliance with this section" means "turning the applications over to the 3PVRO for delivery to the appropriate elections official within the time afforded by the statute." Doc.101 at 44, 4:23-cv-215.

### 2.     The Provisions Aren't Overly Broad.

Plaintiffs also contend that the **Citizen Restriction** and **Retention Provision** are overly broad. An overbreadth challenge is "strong medicine" and shouldn't be "casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008). An overly broad law must have realistic, and not fanciful, unconstitutional applications, and those unconstitutional applications must be "substantially disproportionate to the" law's "lawful sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939-40 (2023).

Plaintiffs' challenge fails. For starters, neither the **Citizen Restriction** nor **Retention Provision** (or any of the other challenged provisions, for that matter) regulate speech. So Plaintiffs' can't establish an overbreadth challenge. What's more,

Plaintiffs and their experts—throughout trial—have described the speech-related activities that Plaintiffs can still pursue, even with the two provisions. For example, Unidos can still advertise voter-registrations online. Same with Poder Latinx; its policy is to register voters online first. The NAACP can still talk to voters and encourage them to register online. So too with the League. Even with the **Citizen Restriction** and **Retention Provision**, Plaintiffs can still go into the same communities, still engage in the same conversations, and still try to register people to vote. The only difference is that noncitizens can't physically possess filled-out voter-registration applications, and that canvassers can't retain a voter's social-security number.

Sure, Plaintiffs may "conceive some" purported "impermissible applications" of the provisions, "but that alone is insufficient to render the provisions substantially over-broad and therefore facially invalid under the First Amendment." *Cheshire Bridge Holdings, LLC v. City of Atlanta*, 15 F.4th 1362, 1377 (11th Cir. 2021) (cleaned up). "Perfection is not required to survive an overbreadth challenge." *Id.* at 1378 (cleaned up).

### E. The Mail-In Ballot Request Provision Doesn't Violate the Voting Rights Act.

Finally, Plaintiffs contend that the **Mail-In Ballot Request Provision** violates the Voting Rights Act. It doesn't. Section 208 of the VRA provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's

employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Assuming that private parties can enforce § 208, which the Secretary isn't conceding, and that Plaintiffs have standing, which the Secretary disputes, Plaintiffs still can't show that Florida law is inconsistent with (and therefore preempted by) § 208. That's because other provisions of the Florida Election Code, when read together with the **Mail-In Ballot Request Provision**, specifically allow the very thing that § 208 of the VRA guarantees to voters.

Plaintiffs fail to acknowledge that another provision of Florida law—section 101.051(3)—expressly authorizes voters who require assistance to choose their preferred helper. Section 101.051(3) states that "[a]ny elector applying to cast a vote-by-mail ballot," "in any election, who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of some person of his or her own choice, other than the elector's employer, an agent of the employer, or an officer or agent of his or her union, in casting his or her vote-by-mail ballot." Fla. Stat. § 101.051(3) (emphasis added).

To "apply" means "to make an appeal or request esp. in the form of a written application." Merriam-Webster's Collegiate Dictionary at 60 (11th ed. 2005). Common sense and context also makes clear that one must request and receive a ballot before casting it; requesting and receiving are necessary pre-requisites to casting a vote-by-mail ballot. *See id.* Section 101.051(3) thus allows a voter who needs assistance "in casting his or her vote-by-mail ballot" to get assistance in requesting that ballot, *see id.*; that's no

different than § 208 of the VRA, which has nearly identical language, *see* 52 U.S.C. § 10508. Nor can supervisors of elections ignore section 101.051(3) when receiving vote-by-mail requests by citing the **Mail-In Ballot Request Provision**. The rules of statutory construction require that:

- One reads statutes in pari materia and avoids constitutional issues. *See, e.g.*, *Porter v. Inv'rs Syndicate*, 286 U.S. 461, 470 (1932); *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1126 n.12 (11th Cir. 2016).

- A general prohibition can't displace a specific authorization. *See, e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Here, the **Mail-In Ballot Request Provision** and section 101.051(3) both concern vote-by-mail ballots—the same subject—and can be read in pari materia to avoid a conflict: the former imposes a general restriction on who can request vote-by-mail ballots and the latter carves an exception for those with disabilities, allowing them to choose anyone other than their employer (or union official) to help. In this way, the more general provision concerning vote-by-mail ballot requests also does not swallow the more specific provision related to disabled voters. Such a reading avoids a constitutional issue as well, namely preemption. And it's consistent with the Florida Legislature's longstanding record of making voting-related accommodations for the disabled, *see, e.g.*, Fla. Stat. §§ 97.061, 101.051, 101.62(6), 101.655, 101.661, 101.662, and it's consistent with the Florida Legislature's decision not to repeal or amend section 101.051(3) during the most recent legislative session.

Or consider a simpler explanation to avoid a conflict between federal and state law. The assistance provision uses the word "assist." The requesting provision uses the word "request." One can assist someone else request a ballot.

Both Supervisor Earley and Supervisor Hays agree. Both supervisors (one called by Plaintiffs and one by the Secretary) agreed that a volunteer can assist a disabled voter in several ways. For example, a League volunteer—with the consent of a voter—can drive the voter to a supervisor's office so the voter can request a vote-by-mail ballot. Or the volunteer—with consent—can dial the office so the voter can request a vote-by-mail ballot. Or the volunteer—with consent—can fill out a vote-by-mail application for a voter with a disability. Tr.797:13 – 799:12 (Earley); Tr.1825:22 – 1826:20 (Hays). None of these actions, the supervisors opined, would violate federal or state law. The key is simply maintaining the voter's agency when requesting a vote-by-mail ballot.

*     *     *

For these reasons, the *NAACP* Plaintiffs' claims fail. They aren't entitled to their requested relief. They haven't established constitutional or statutory violations. As such, they will not suffer irreparable harm, and the public interest and balance of hardships tips in the State's favor. *Labrador v. Poe*, 23A763, slip op. at *5 (Apr. 15, 2024) (Gorsuch, J., concurring in grant of stay) (collecting cases). Nor are Plaintiffs entitled to fees, should the State appeal any orders in this case and prevail. NAACP Br. at 152-53.

Even if Plaintiffs prevail, *Purcell* bars them immediate relief: we are entering into the *Purcell* window. *League of Women Voters of Fla.*, 32 F.4th at 1371. After all, the

Eleventh Circuit granted the State's stay in the SB90 appeal on May 6, 2022. Just like 2022, 2024 is an election year; the only difference is that 2024 is a presidential election year, with more voters registering to vote or changing their registration information. PX78 (voter-registration table).

[intentionally left blank]

*League of Women Voters of Florida v. Byrd*, 4:23-cv-216

The *League* Plaintiffs challenge four SB7050 provisions: (1) the **Citizen Restriction**, (2) **Retention Provision**, (3) **Fines Provision**, and (4) **Receipt Provision**.

## I.    The *League* Plaintiffs Lack Standing.

To establish standing, Plaintiffs put Cecile Scoon and Dr. Elliot on the stand. Neither witness, however, established Plaintiffs' standing to challenge the four provisions.

### A.    No Standing to Challenge the Citizen Restriction.

Plaintiffs don't have standing to challenge the **Citizen Restriction**. League Br. at 46-51. They don't have associational standing. Just like their challenge to the Felon Restriction, Plaintiffs failed to "identify a single" League "member" who's a noncitizen and would have "collected or handled voter registration applications in the past and planned to do it now but for" the Citizen Restriction. Doc.95 at 10, 4:23-cv-216. Plaintiffs only had to name one name. *Ga. Republican Party*, 888 F.3d at 1204. Yet neither Ms. Scoon nor Dr. Elliot identified such a member. Plaintiffs simply don't ask—and make it a point not to ask—their members or volunteers about their citizenship status. DX2 at 26-28 (League's responses to requests for admissions); Tr.1272:25 - 1273:1 (Scoon); Tr.1274:7-9 (Scoon).

Plaintiffs can't assert organizational standing, either. Without identifying a single affected noncitizen member, Plaintiffs' time, discussion, and resource diversions are

completely self-imposed harms. For example, Plaintiffs didn't have to go to an online voter-registration process, since it's entirely speculative whether a noncitizen would have actually collected or handled completed applications. Plaintiffs purported diversions are nothing more than "a self-imposed injury based on the speculative fear that they may become liable for violating" the Citizen Restriction. Doc.95 at 7, 4:23-cv-216.

**B.      No Standing to Challenge the Retention Provision.**

Plaintiffs don't have standing to challenge the **Retention Provision**, either. League Br. at 31-39. As a reminder, the provision prevents a canvasser from copying or retaining certain pieces of information from a filled-out voter-registration application. Ms. Scoon and Dr. Elliot didn't testify that the League previously violated, or will violate, the **Retention Provision**. In fact, Ms. Scoon testified that she wasn't aware of "any League chapter" retaining "someone's social security number or driver's license number when collecting applications." Tr.1254:2-8. And when asked whether "League members sometimes collect applicant's name and contact information when registering them to vote," she responded that:

> Many of us have a process where we have a yellow pad, and there will be, like, a little sign that's right beside of it, and it says: *If you would like more information from the League, put your name here.* And on our yellow pad would be some, maybe, lines drawn with a ruler that says "Name," "Email," "Phone Number," "What is the issue you're interested in?" "How do you want to be contacted?" or something like that. That was commonplace. But we basically wanted the individual to affirm with us that they wanted to be contacted. We wouldn't just automatically send them notices or reminders or calls or anything like that. . . .

84

> In fact, that yellow pad is where people often put *Hey, I'd like to join the League. I'd like to come to a meeting. Can I come to a meeting before I decide?* And we'd always say, Of course. You can come to as many meetings as you want to before you decide. And so that is the place where we probably get at least a quarter of our volunteers – future volunteers to join the League is when they leave information on that pad and we follow up with them.

Tr.1251:24 – 1252:24 (emphases in the original). In other words, voters themselves provide their contact information on a yellow pad, separate and apart from a voter-registration application. That's not a situation where a League volunteer copies or retains a social-security number from a filled-out voter-registration application. That's not a situation where the **Retention Provision** is triggered.

Because no member has violated the **Retention Provision** or will violate it, Plaintiffs lack associational standing to challenge it. *Ga. Republican Party*, 888 F.3d at 1204. And because it's speculative whether Plaintiffs will violate the provision in the future, Plaintiffs' purported fears of future harm and diversion of resources—all to combat a  provision Plaintiffs have not, and likely will not, even violate—doesn't establish organizational harm. *City of S. Miami*, 65 F.4th at 640.

### C.    No Standing to Challenge the Fines Provision.

Nor have Plaintiffs established standing to challenge the **Fines Provision**. They needed to, but failed to, establish a "substantial likelihood that they will suffer a future injury from the" **Fines Provision**—that they will turn in a voter-registration application too late or to the wrong location, that they will be assessed fines, and that their fine appeals will fail. *Worthy*, 930 F.3d at 1215-16; *see also McGee*, 727 F.3d at 1325.

If anything, Plaintiffs established that they aren't likely to be fined in the future. In fact, this "Court has" "already found that the League" "operate[s]" its "voter registration programs with precision and care." NAACP Br. at 24 n.3 (citing *League of Women Voters of Fla*, 595 F. Supp. 3d at 1149-50). The last time Plaintiffs were fined was back in 2016. DX2 at 18 (Plaintiffs' responses to requests for admissions).

Even so, Plaintiffs assert they have standing. They allege that the **Fines Provision** will cause "League members" "to make more trips to county supervisors' offices to ensure applications are timely submitted. Those trips will take more time and will require local League leaders to spend more money on gas." League Br. at 42 (citation omitted). They also state (in a footnote) that they "determined that sending the applications by mail is not reliable or quick enough to meet the ten-day deadline," and if "volunteers did mail applications rather than deliver them personally, the League would incur significant postage costs to ensure fast delivery." League Br. at 42 n.13. But during trial, Plaintiffs stated that they are no longer collecting completed applications, and are now going to an "online" method of registering voters. Tr.1214:8-13 (Scoon); Tr.1217:9-15 (Scoon). Their email to members made this point clear: "[w]e cannot take possession of the completed forms." PX786 at 2. Plaintiffs' gas, time, and volunteer-mailing expenditures therefore won't happen. (Incidentally, the post-marked date is what counts to ensure timely delivery of a mailed-in voter-registration application. *See* Fla. Admin. R. 1S-2.042(5)(d).)

Again, swirling around resources, time, funds, and fear—all to combat a provision Plaintiffs aren't likely to violate—doesn't establish organizational harm. *City of S. Miami*, 65 F.4th at 640.

### D.    No Standing to Challenge the Receipt Provision.

Plaintiffs also don't have standing to challenge the **Receipt Provision**. For an injury in fact, they only assert "subjective fear[s]" of harm if they comply with the provision. *Pittman v. Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001). The fear is based on a chain of events: a voter must approach a volunteer, must fill out a voter-registration application, must hand over the application to the volunteer, must receive a receipt from the volunteer, and must use the information on the receipt to harass the volunteer. While this tenuous chain of events may establish subjective fear, it doesn't establish an objectively reasonable fear of harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

True, Ms. Scoon testified that, during voter-registration activities, two men harassed her and her fellow League members. Tr.1234:2 – 1236:10. (The incident didn't involve a receipt.) And true, Dr. Elliot testified that she has been harassed while registering people to vote "before SB 7050." Tr.1350:3-15.

This testimony only highlights that Plaintiffs lack standing. The harms they fear stem from actions of unidentified third parties, not the Secretary, and enjoining the **Receipt Provision** won't prevent those third parties from generally harassing Plaintiffs. This raises traceability and redressability issues. *Lewis v. Governor of Ala.*, 944 F.3d 1287,

1296 (11th Cir. 2019) (en banc); *Cousins v. Sch. Bd. of Orange Cnty.*, 6:22-cv-1312, 2023 U.S. Dist. LEXIS 162782, at *38-39 (M.D. Fla. Aug. 16, 2023). Plus, if Plaintiffs want to prevent canvassers from disclosing any personal information to a voter, enjoining the **Receipt Provision** wouldn't solve that problem, either: Plaintiffs still need to comply with the unchallenged state rule that requires 3PVRO canvassers to initial voter-registration applications. Fla. Admin. R. 1S-2.042(5). This raises yet another redressability issue.

Plaintiffs also toss out a fear that "the Office of Election Crimes and Security" will "prosecut[e]" its members, but Plaintiffs haven't established that the office is responsible for enforcing the provision—or even that the office is likely to target League members in any event. League Br. at 25. Plaintiffs' fears remain speculative.

Because a League member doesn't have an objectively reasonable fear of harm, associational standing isn't met. And diverting time, resources, energy, and attention to a statutory provision—that may not even cause harm to the League—doesn't establish organizational harm. That Plaintiffs continue to rely on objected-to hearsay, Tr.1352:7-11, doesn't bolster their arguments.

Plaintiffs' other arguments are equally unconvincing. They allege they have standing because the **Receipt Provision** forces them to dedicate "one extra minute" to fill out. League Br. at 24. How this "minute" harm rises to constitutional dimensions—all to fill out a short governmental form—is unclear. Then Plaintiffs argue that they are harmed, because they "will need to pay to print thousands of receipts and

create receipt books to copy those receipts by 'carbonless' copy." League Br. at 28. Yet the **Receipt Provision** doesn't bar online receipts, and the provision doesn't require carbonless copies.

In short, Plaintiffs haven't established standing to challenge the **Receipt Provision**.

## II.   Plaintiffs' Claims Fail.

Even assuming standing, Plaintiffs' claims fail. Again, they contend that the **Citizen Restriction**, **Retention Provision**, **Fines Provision**, and **Receipt Provision** (1) infringe upon First Amendment free speech (Count I); (2) infringe upon First Amendment free association (Count II); (3) are overly broad (except the **Fines Provision**) (Count III); and (4) are vague (Count IV). Doc.1.

### A.   The Provisions Don't Violate First Amendment Free Speech.

The Secretary already provided his free-speech analysis in responding to the *NAACP* Plaintiffs' free-speech challenge to the **Citizen Restriction**, **Retention Provision**, and **Fines Provision**. To make sure that this written closing isn't over 500 pages, that analysis is incorporated and adopted here.

The Secretary just adds the following. In their written closing, Plaintiffs state that their political speech occurs, in part, "after collecting and handling voter registration applications," such as reminding voters of upcoming elections, giving them political literature, and informing them of upcoming debates. League Br. at 58. But note that this speech doesn't accompany collecting and handling and delivering voter-registration

89

applications—moving them from Point A to Point B. Like the *NAACP* Plaintiffs, the *League* Plaintiffs are just conflating speech and non-speech activities together and calling it all speech.

Plaintiffs still contend that *Meyer* and *Buckley* are on point. Plaintiffs argue that in the cases, it "made no difference that circulators were not directly barred from speaking. Nor should it here." League Br. at 60. That's not quite right. In *Meyer*, for example, paid circulators were prevented from speaking—from circulating a petition. 486 U.S. at 424. So in that case, speech was barred in a very literal sense. That's not this case, though.

Plaintiffs then contend that collecting and handling physical, completed voter-registration applications is the "most effective, fundamental, and perhaps economical avenue of political discourse for advocating their political beliefs." League Br. at 63. Again, that's not quite right. Advocacy isn't effected in the slightest by the challenged provisions. Certain conduct is.

Plaintiffs also raise a viewpoint-based argument, League Br. at 68, but this argument fails, given that all of the challenged provisions regulate conduct, including the **Receipt Provision**, not speech.

That said, the Secretary now addresses Plaintiffs' free-speech challenge to the **Receipt Provision**.

**1.** The challenge doesn't work, principally because the provision regulates conduct, not speech. There are no constitutional rights linked to the completion of this government form. Filling out an applicant's name, party affiliation, county of residence,

collection date, 3PVRO number, and canvasser name requires no speech at all. DX12 (receipt form).

**2.** Plaintiffs contend that canvassers wouldn't register people to vote if they were required to disclose personal information. Plaintiffs' point is a bit incongruitous. According to them, they are engaging in constitutionally protected activity when a voter gives them a form with her name, address, drivers license number, social-security number, and signature. Yet Plaintiffs also claim that *they* are constitutionally harmed when *they* have to give personal information over to the voter.

Plaintiffs' point is also wrong. Trial evidence demonstrates that canvassers aren't afraid to give voters personal information. Far from it:

- Mr. Orjuela: "First I greet them. I introduce myself." Tr.155:23 – 156:4; Tr.166:8-10.

- Ms. Sanchez: "I introduce myself. We normally wear a T-shirt with the logo and ID badge with a photograph – the logo of the organization. And I give my personal introduction: Hello, my name is Esperanza Sanchez." Tr.189:19 – 190:3.

- Ms. Herrera-Lucha: she "introduce[s]" herself "and give[s]" her "name." Tr.416:15-16.

- Ms. Pico: "I would greet them, introduce myself on my own behalf and on behalf of the organization that I was representing." Tr.429:9-21. "I say, My name is Elizabeth Pico, and I work for the Mi Vecino organization. . . . I am working with the community, and they have to know who they are speaking to. And just like I did right here, I introduced myself: My name is Maria Elizabeth Pico." Tr.445:8-18.

- Ms. Martinez: when canvassing, she wears "my uniform T-shirt with the Mi Vecino logo," along with a "picture ID." Tr.514:2-6.

Apparently, only League volunteers are hesitant to give out their names. But this isn't true, either. Even Ms. Scoon would provide her name to voters, if asked. Tr.1291:24 – 1292:1. When she engages in other civic duties, she often provides her name, such as when she filled out a speaker card and spoke in opposition to SB7050 before the Florida Legislature. Tr.1293:2-11. Dr. Elliot, for her part, has her name displayed on the League's website. Tr.1371:15-23. There's no risk of chilling here.

And this doesn't even include the fact that canvassers must initial voter-registration applications by rule. Fla. Admin. R. 1S-2.042(5). Other 3PVROs even internally adopt that rule. Tr.727:5-12 (Herrera-Lucha). This completely undermines any argument that providing identifying information in writing (as opposed to orally) would lead to a greater chill on canvassing activities. Again, to the extent that Plaintiffs seek to prevent canvassers from disclosing any personal information, enjoining the **Receipt Provision** wouldn't remedy that.

Regardless, Plaintiffs point to *Buckley v. American Constitutional Law Foundation*, 525 U.S. at 182, and compare the "identification badge" requirement for "petition circulators" in that case with the **Receipt Provision** here. *Id.* at 197-98. The comparison is inapt. While the U.S. Supreme Court found that badge requirement unconstitutional, it did so based on the "[e]vidence presented to the District Court." *Id.* The evidence established that the badge requirement "inhibit[ed] participation in the petitioning process." *Id.*

92

That's not so in this case. Evidence tilts decidedly in the other direction. While the **Receipt Provision** "compels personal name identification at the precise moment when" a canvasser's "interest in anonymity is greatest," *id.* at 199, canvassers in this case have shown no such interest in anonymity. They actually freely and voluntarily give their names to voters. Noncitizen canvassers have testified to that effect, and in the *Hispanic Federation* case, they have also raised confidentiality and privacy interests in their noncitizen status. Doc.33 (motion to proceed anonymously), Doc.142 (motion to exclude evidence regarding noncitizen status), 4:23-cv-218. Yet they provide their names to voters, nonetheless.

The **Receipt Provision** also has more of a law-enforcement component than the *Buckley* badge requirement. A voter might glimpse at a canvasser's badge, but the **Receipt Provision** provides a voter with a physical document, one that lists the date of collection, canvasser name, and 3PVRO identification number, among other details. According to both Assistant State Attorney Van der Giesen and State Attorney Fox, a receipt could provide an extremely helpful lead to investigate 3PVRO misconduct. Tr.1732:8 – 1734:10 (Van der Giesen); Tr.1768:4-7 (Van der Giesen); Tr.1795:5-24 (Fox). This is especially true, considering that 3PVROs may not keep well-maintained records, Tr.1730:24 – 1731:8 (Van der Giesen), and given that 3PVROs hire canvassing companies and sub-canvassing companies, Tr.1731:15 – 1732:6 (Van der Giesen). That makes identifying a particular canvasser extremely difficult. A receipt can help.

The provision—most importantly of all—empowers the voter herself and gives her information needed to ensure that her voter-registration application is submitted on time and ensure that she can vote in the upcoming election. That's a weighty consideration.

Not content, Plaintiffs claim that the initialing requirement is good enough. League Br. at 74, 76-77. Initialing is good, but providing names is better. Case in point: an attorney in these SB7050 cases initials a document "MJ." Based on that, it's unclear who that attorney is. It could be *NAACP* Plaintiffs' Mindy Johnson, or the Secretary's Mohammad Jazil. There are several differences between the two attorneys. And given the size of a statewide organization like the League, and given its large membership and volunteer base, names are a better identifier than initialing.

What's more, Plaintiffs then pull out every argument as to why a receipt wouldn't be beneficial to law enforcement and 3PVROs. League Br. at 74-77. They even argue that it wouldn't prevent fraudsters from committing fraud, because fraudsters are simply going to commit fraud. League Br. at 76. Yet the commonsense fact remains: that providing a potential lead, when mistakes and voter disenfranchisement has happened, is better than having fewer leads. Tr.1732:4 – 1734:10 (Van der Giesen).

**3.** All told, the **Receipt Provision** regulates conduct, not speech. Even if it regulates speech (which it doesn't), it would satisfy any level of constitutional scrutiny. Strict scrutiny would be met, because the provision deters fraud and ensures election integrity, compelling governmental interests. *Purcell*, 549 U.S. at 4; PX139 at 6-7

94

(Darlington declaration). It also doesn't require disclosure of more information than is necessary. And Plaintiffs remain free to help voters register, without engaging in the conduct that would trigger the **Receipt Provision** (taking physical possession of a voter-registration application for delivery). The League's iPad-registration method doesn't trigger the provision; the iPad method isn't 3PVRO activity. *E.g.*, PX780 (whitepaper).

*Anderson-Burdick* would also be satisfied. Plaintiffs put on no evidence—other than anecdotal evidence and speculation—that the **Receipt Provision** would deter canvassers from registering people to vote, which would then reduce the amount of voters registering to vote *at all*. That makes Plaintiffs' burden nil. And weighed against the State's compelling interests, the **Receipt Provision** satisfies the balancing test.

Rational basis is satisfied, too. There's a reasonable justification for the provision, and Plaintiffs can't negative every conceivable justification of the provision.

As such, the **Receipt Provision**, coupled with the **Citizen Restriction**, **Retention Provision**, and **Fines Provision**, is constitutional.

### B. The Citizen Restriction, Retention Provision, Fines Provision, and Receipt Provision Don't Violate First Amendment Free Association.

In responding to the *NAACP* Plaintiffs' free-association challenge, the Secretary explained why the **Citizen Restriction**, **Retention Provision**, and **Fines Provision** comply with First Amendment free association. He incorporates and adopts those arguments here.

The only difference in the *League* case is the challenge to the **Receipt Provision**. It doesn't change the analysis or the conclusion. The provision doesn't bar Plaintiffs from associating with anyone. Any canvasser can have any conversation with any voter, volunteer, or member, and anyone can become a member of the League. To the extent that the provision would prevent volunteers from canvassing—for fear of revealing identifying, written-down information—those volunteers weren't likely to canvass in the first place, given that volunteers must initial voter-registration applications. Fla. Admin. R. 1S-2.042(5).

### C.   The Citizen Restriction, Retention Provision, and Receipt Provision  Aren't Overly Broad Under the First Amendment.

Plaintiffs contend that the **Citizen Restriction**, **Retention Provision**, and **Receipt Provision** are overly broad. In the *NAACP* case, the Secretary explained why the first two provisions aren't overly broad. He incorporates and adopts those arguments here.

The **Receipt Provision** isn't overly broad, either. There's no speech involved in the activity—giving an administrative document to a voter—so Plaintiffs can't make out an overbreadth challenge. And even with the **Receipt Provision**, Plaintiffs can still go into the same communities, still engage in the same conversations, and still try to register people to vote. The only difference is that a canvasser must provide a voter with a document. In arguing against this, Plaintiffs trot out the same arguments against

the **Receipt Provision**, but those arguments don't get Plaintiffs far. League Br. at 113-15.

### D.   The Provisions Aren't Vague Under the Fourteenth Amendment.

Finally, Plaintiffs contend that the **Citizen Restriction**, **Retention Provision**, **Fines Provision**, and **Receipt Provision** are vague. In the *NAACP* case, the Secretary explained why the first two provisions aren't vague. He incorporates and adopts those arguments here. The **Receipt Provision** and the **Fines Provision** aren't vague, either. In fact, they are pretty easy to understand.

The **Receipt Provision** requires a 3PVRO to give a voter "a receipt," DX12, which is prescribed by "rule," "upon accepting possession of his or her application." Easy. The receipt is easy to fill out as well. It only requires the name of the voter, her political party, county of residence, the date the application was collected, the 3PVRO identification number, and the name of the registration agent. DX12. Out of those six requirements, five are already on the voter-registration application. (On the application, the voter fills out her name, party, county, and date; the application form also has the 3PVRO's number on it. Fla. Admin. R. 1S-2.042(5).)

Contrary to Plaintiffs' position, the information contained on a receipt isn't information that's protected under the **Retention Provision**. League Br. at 101. And though Plaintiffs throw out hypothetical (what happens if a voter doesn't accept a receipt, League Br. at 101), after hypothetical (what happens if a receipt isn't provided,

League Br. at 102), the vagueness test isn't death by a thousand hypotheticals. Plaintiffs' concerns—if they actually manifest—are better served by an as-applied challenge, not a facial one. Or even an advisory opinion from the Division of Elections.

The **Fines Provision** also isn't vague. It clearly states *when* an application should be submitted (10 days) and *where* (voter's county of residence or the safe harbor Division of Elections). Easy again. Yet Plaintiffs claim difficulty. They complain about what's "willful" conduct under the provision. League Br. at 104. Putting aside that SB7050 didn't add this standard to the election code, Plaintiffs need only consult state case law to find out what "willful" means. *See generally Jones v. Hammock*, 179 So. 674, 676 (Fla. 1937) (providing one definition). And Plaintiffs raise additional hypothetical (can a 3PVRO be fined for willful and non-willful conduct at the same time, League Br. at 105), after hypothetical (what happens if a 3PVRO commits multiple errors, League Br. at 105), these concerns are better served by an as-applied challenge. Or an advisory opinion from the Division of Elections.

*        *        *

For these reasons, the *League* Plaintiffs' claims fail.

[intentionally left blank]

*Hispanic Federation v. Byrd*, 4:23-cv-218

The *Hispanic Federation* Plaintiffs only challenge the **Citizen Restriction**.

## I.    The *Hispanic Federation* Plaintiffs' Standing.

One of the canvasser-Plaintiffs may have standing to challenge the provision. But this Court should still satisfy itself that Plaintiffs have standing. *Bischoff*, 222 F.3d at 877-78.

## II.    Plaintiffs' Claims Fail.

The *Hispanic Federation* Plaintiffs claim that the **Citizen Restriction** (1) infringes upon First Amendment free speech and free association (Count I); (2) is overly broad (Count II); (3) burdens political speech and association "in connection with the fundamental right to vote" (Count III); and (4) is vague (Count IV). Doc.79.

### A.    The Citizen Restriction Doesn't Violate the First Amendment.

In responding to the *NAACP* Plaintiffs' free-speech and free-association challenges, the Secretary explained why the **Citizen Restriction** complies with the First Amendment. He incorporates and adopts those arguments here.

A few additional points. Plaintiffs describe the **Citizen Restriction** as a "speaker-based restriction." Hispanic Federation Br. at 74. The description is faulty. Again, the provision regulates conduct, not speech. Again, the provision isn't preventing any noncitizen from speaking to anyone.

99

Plaintiffs also contend that, because noncitizens are employed as state employees, and because state employees review sensitive documents, noncitizen canvassers should collect and handle completed voter-registration applications. Hispanic Federation Br. at 76-77. While noncitizens are state employees, they undergo background checks. *E.g.*, 1768:8-15 (Van der Giesen). This fact was even noted on the floor of the Florida Legislature. *E.g.*, PX252 20:5-16 (Burgess); PX254 11:11-19 (McClure). Many 3PVROs don't conduct background checks. Tr.1157:23-25 (Slater).

## B. The Citizen Restriction Isn't Overly Broad Under the First Amendment.

Plaintiffs contend that the **Citizen Restriction** is overly broad. In the *NAACP* case, the Secretary explained why it isn't. He incorporates and adopts those arguments here.

Two additional points. *First*, Plaintiffs contend that the provision may prevent handing out blank voter-registration applications. Hispanic Federation Br. at 115. This isn't true. The **Citizen Restriction** applies to 3PVRO activity, and 3PVRO activity doesn't include handing out blank applications. The State has been clear on this point:

> Printing and/or distributing blank voter registration applications or helping a person complete an online application form through Florida's official online voter registration system (RegistertoVoteFlorida.gov) or an online fillable form <u>without collecting</u> the completed applications does not trigger 3PVRO status.

PX780 (whitepaper).

*Second*, to the extent that Plaintiffs are unsure about any "knowledge element" in the **Citizen Provision**, *see* Hispanic Federation Br. at 117, they can still have their canvassers complete an affirmation form, which prevents 3PVROs from being liable under the provision. DX11 (form).

### C.    The Citizen Restriction Doesn't Violate the Right to Vote.

Next, Plaintiffs contend that the **Citizen Restriction** violates the right to vote. Plaintiffs aren't right. The provision regulates 3PVROs, and doesn't directly touch voters. Plus, Plaintiffs haven't established that because of the **Citizen Restriction**, voters won't use other means to register to vote, and therefore won't register and vote at all.

What's more, it's not clear that Plaintiffs can even make this claim. They are either noncitizen canvassers, who can't vote, 3PVROs, who can't vote, or a citizen canvasser, who isn't affected by the **Citizen Restriction**.

### D.    The Citizen Restriction Isn't Vague Under the Fourteenth Amendment.

Plaintiffs contend that the **Citizen Restriction** is vague. In the *NAACP* case, the Secretary explained why it isn't. He therefore incorporates and adopts those arguments here.

*      *      *

For these reasons, the *Hispanic Federation* Plaintiffs' claims fail.

**Conclusion**

For these reasons, this Court should reject Plaintiffs' claims and enter judgment in the Secretary's favor.

Dated: April 29, 2024

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

Respectfully submitted,

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

John J. Cycon (NYBN 5261912)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
15405 John Marshall Hwy
Haymarket, VA 20169  Telephone:
(212) 701-3402
jcycon@holtzmanvogel.com

*Counsel for Secretary Byrd*

*\*Admitted pro hac vice*

**Certificate of Compliance**

I certify that this document is 24,773 words. I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil

**Certificate of Service**

I certify that on April 29, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

*/s/ Mohammad O. Jazil*
Mohammad O. Jazil