# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

HISPANIC FEDERATION, *et al*.,

     *Plaintiffs*,

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al.*,

*Defendants*.

Case No. 4:23-cv-00218
Consolidated Case No. 4:23-cv-00215

**HISPANIC FEDERATION
PLAINTIFFS' REBUTTAL
CLOSING ARGUMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................iii

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................2

I.  The First Amendment protects Plaintiffs' voter-registration activity
    (Claims I-IV). ...........................................................................2

    A.  Defendants misunderstand First Amendment law................................2

    B.  Defendants misread *Meyer*...................................................5

    C.  Defendants misapply relevant case law and principles.........................6

II.  The Court should apply strict or most-exacting scrutiny (Claims I-IV). ........8

    A.  The Citizenship Requirement abridges Plaintiffs' core-political
        speech….................................................................9

    B.  The Citizenship Requirement is unlawful content-based
        discrimination........................................................9

    C.  The Citizenship Requirement curtails Plaintiffs' Associational
        Rights…...............................................................10

    D.  The Citizenship Requirement is overbroad from indeterminacy.
        (Vague & Overbroad). .................................................13

        1.  Defendants point to the wrong vagueness framework. .......13

        2.  Neither the Secretary's "whitepaper" nor advisory
            opinions solve the Citizenship Requirement's
            vagueness problem..............................................14

        3.  Defendants don't address Plaintiffs' overbreadth
            arguments. ....................................................16

    E.  *Anderson-Burdick* should not apply but would lead to the same
        result if it does. ...................................................17

        1.   Brnovich's burden framework is inapposite. ........................18

        2.   Post-hoc rationalizations only work on the "low end" of the Anderson-Burdick sliding scale.................................18

III.    The Citizenship Requirement cannot survive any form of scrutiny (Claims I-IV). ............................................................................21

    A.   The Trial Record Does Not Contain Evidence Showing the Citizenship Requirement Even Rationally Serves Defendants' Stated Interests. ...................................................................22

    B.   Defendants don't meaningfully rebut that the Citizenship Requirement is poorly tailored.............................................27

IV.    Plaintiffs have standing to sue the Attorney General (Claims I-V)..............30

CONCLUSION ......................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*American Association of People with Disabilities v. Herrera*,
  580 F. Supp. 2d 1195 (D.N.M. 2008) ..................................................................10

*American Association of People with Disabilities v. Herrera*,
  690 F. Supp. 2d 1183 (D.N.M. 2010) ...................................................................3

*Americans for Prosperity Foundation v. Bonta*,
  141 S. Ct. 2373 (2021)..........................................................................................21

*Buckley v. American Constitutional Law Foundation, Inc.*,
  525 U.S. 182 (1999)................................................................................................5

*California Democratic Party v. Jones*,
  530 U.S. 567 (2000)......................................................................................... 7, 27

*Citizens United v. Federal Election Commission*,
  558 U.S. 310 (2010)................................................................................................9

*Cramp v. Board of Public Instruction of Orange County, Florida*,
  368 U.S. 278 (1961)..............................................................................................13

*Department of Agriculture v. Moreno*,
  413 U.S. 528 (1973)..............................................................................................29

*Dream Defenders v. DeSantis*,
  559 F. Supp. 3d 1238 (N.D. Fla. 2021)................................................................13

*Dream Defenders v. Governor of the State of Florida*,
  57 F. 4th 879 (11th Cir. 2023)..............................................................................29

*Dumiak v. Village of Downers Grove*,
  475 F. Supp. 3d 851 (N.D. Ill. 2020) .....................................................................9

*Edwards v. United States Immigration & Customs Enforcement Division*,
  No. 11-320, 2011 WL 507775 (D. Minn. Aug. 9, 2011) ....................................24

*Fink v. Kirchmeyer*,
  No. 23-CV-05921 (RFL), 2024 WL 1090001 (N.D. Cal. Mar. 13, 2024)..........26

*Florida State Conference of Branches & Youth Units of the NAACP v. Byrd*,
  680 F. Supp. 3d 1291 (N.D. Fla. 2023).................................................... 1, 22, 23

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F. 3d 1235 (11th Cir. 2018) ..........................................................2, 4

*Harriet Tubman Freedom Fighters Corp. v. Lee*,
  576 F.Supp.3d 994 (N.D. Fla. 2021)............................................. 16, 17

*Hispanic Federation v. Byrd*,
  --- F.Supp.3d ---, 2024 WL 906004 (N.D. Fla. Mar. 1, 2024) ...........................27

*Honeyfund.com v. DeSantis*,
  622 F.Supp.3d 1159 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir.
  2024) ..................................................................................30

*Kennedy  v. Bremerton School District*,
  597 U.S. 507 (2022).................................................................. 18, 22

*Konikov v. Orange County, Florida*,
  410 F. 3d 1317 (11th Cir. 2005) ...........................................................14

*League of Women Voters of Florida v. Browning*,
  575 F. Supp. 2d 1298 (S.D. Fla. 2008) ................................................7

*League of Women Voters of Florida v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012).............................................. 5, 10

*League of Women Voters of Florida v. Cobb*,
  447 F. Supp. 2d 1314 ................................................................6

*League of Women Voters v. Hargett*,
  400 F. Supp. 3d 706 (M.D. Tenn. 2019) .........................................4, 7

*Mazo v. New Jersey Secretary of State*,
  54 F.4th 124 (3rd Cir. 2022) ............................................................17

*National Institute of Family & Life Advocates v. Raoul*,
  2023WL5367336 (N.D. Ill. Aug. 4, 2023) ............................................9

*Project Vote v. Blackwell,*
   455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................5

*Rodgers v. Stachey,*
   382 F. Supp. 3d 869 (W.D. Ark. 2019) .................................................9

*Romer v. Evans,*
   517 U.S. 620 (1996) .................................................................................26

*Rubin v. City of Santa Monica,*
   308 F.3d 1008 (9th Cir. 2002) ..............................................................17

*Speiser v. Randall,*
   357 U.S. 513 (1958) ................................................................................15

*Spence v. State of Washington,*
   418 U.S. 405 (1974) ..................................................................................7

*Timmons v. Twin Cities Area New Party,*
   520 U.S. 351 (1997) ................................................................................17

*Turner Broadcasting System, Inc. v. Federal Communications Commission,*
   512 U.S. 622 (1994) ................................................................................26

*U.S. v. Wayerski,*
   624 F.3d 1342 (11th Cir. 2010) ............................................................13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982) ................................................................................13

*Village of Schaumburg v. Citizens for a Better Environment,*
   444 U.S. 620 (1980) ................................................................................27

*Virginia v. American Booksellers Association, Inc.,*
   484 U.S. 383 (1988) ................................................................................14

*Virginia v. Black,*
   538 U.S. 343 (2003) ..................................................................................2

*Voice v. Noem,*
   380 F. Supp. 3d 939 (D.S.D. 2019) .......................................................9

v

*VoteAmerica v. Schwab*,
   671 F. Supp. 3d 1230 (D. Kan. 2023) ...............................................................4, 7

*Voting for America, Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) ...............................................................................6

*Yellowbear v. Lampert*,
   741 F.3d 48 (10th Cir. 2014) ..............................................................................18

## Statutes

8 C.F.R. §103.2(b)(17) .........................................................................................24

Fla. Admin. Code 1S-2.010 ..................................................................................15

Fla. Stat. § 760.021(1) ..........................................................................................30

Fla. Stat. § 760.06(5) ............................................................................................30

Fla. Stat. § 97.0575 ........................................................................................ 12, 29

# INTRODUCTION

Defendants' Closing Arguments underscore that the Court should permanently enjoin the Citizenship Requirement. Defendants concede that the Hispanic Federation Plaintiffs have standing to challenge the Citizenship Requirement. Secretary's Closing Argument ("Arg.") 34, 99.[1] They admit (as they must) that speech and expressive conduct warrant First Amendment protection. *Id.* at 40-41. And the interests they contend justify a law that would curb First Amendment-rights are those proffered post-hoc in preliminary-injunction briefing (*id.* at 30, 46)—*i.e.*, the same justifications this Court found lacked "any connective tissue" with the State's proposed solutions, which were, in turn, "too far removed from the [State's] justifications." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F.Supp.3d 1291, 1313-14, 1322 (N.D. Fla. 2023). Nothing has changed. The Citizenship Requirement is unconstitutional for a myriad of reasons and should be enjoined.[2]

---

[1] This document refers to the Secretary's Closing Argument (No. 4:23-cv-00215, Dkt.311) as "Arg." and to Hispanic Federation's Closing Argument (No. 4:23-cv-00215, Dkt.303) as "HF Arg." Short forms used have the same meaning as Hispanic Federation Plaintiffs' Closing Argument. HF Arg.18. References to "Plaintiffs" are to the Hispanic Federation Plaintiffs, unless specified otherwise.

[2] Unaddressed here, these include the Court's summary-judgment finding that Plaintiffs are entitled to summary judgment with respect to their Equal Protection claim against the Secretary. *Hisp. Fed'n v. Byrd*, --- F.Supp.3d ---, 2024 WL 906004, at *4 (N.D. Fla. Mar. 1, 2024).

1

## ARGUMENT

## I.   The First Amendment protects Plaintiffs' voter-registration activity (Claims I-IV).

The First Amendment protects voter-registration activities from the Citizenship Requirement four times over: (a) Plaintiffs engage in core-political speech as part of their efforts; (b) the conduct intertwined with their voter-registration activity is expressive and protected; (c) the Citizenship Requirement itself is content based; and (d) the Citizenship Requirement severely burdens Plaintiffs' associational activities. *See generally* HF Arg.44-60.

### A.   Defendants misunderstand First Amendment law.

Defendants' refrain is that the Citizenship Requirement curbs "conduct, not speech." Arg.40, 45, 99. What they miss is that political speech isn't limited to *literal* speech. Stringent First Amendment protections also apply to expressive activity that communicates a political message. *See Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("Constitutional protection for freedom of speech does not end at the spoken or written word.") (quotation marks omitted)). When it does, expressive conduct rises to "core political speech." *See Virginia v. Black*, 538 U.S. 343, 345 (2003) (noting "act of burning a cross" may be "core political speech").

Defendants concede (as they must) that the First Amendment protects a non-citizen canvasser's literal "speech *before* [they] receive[] a filled-out application." Arg.41.  But they insist that by somehow divorcing the "collection" and "handling" portion of registering a voter, the Citizenship Requirement only touches non-expressive conduct.  Arg.40-41.  That is wrong both as a matter of fact and law.  Take the factual error: Witness after witness testified about the central role of voter registration as part of their civic-engagement activities.   HF Arg.9-12.   And "facilitating . . . voters to register, may have a ministerial component, and yet acquire First-Amendment protection when done in a setting or manner in which [a] message becomes apparent."  *Am. Ass'n of People with Disabilities v. Herrera*, 690 F.Supp.2d 1183, 1216 (D.N.M. 2010).

Defendants cite a single snippet of testimony in which Mr. Orjuela agreed with counsel's characterization that once he receives a completed registration form, he and the registered voter "go separate ways."  Arg.41 (citing Tr.167:8-10).  But that narrow focus glosses over the bulk of testimony.  For example, when asked the same question—whether a canvasser ever "see[s] the voter again" after filling out a form—Ms. Herrera-Lucha answered: "we are always working at shopping centers or supermarkets where there are a lot of Hispanic people coming and going, so it is possible that we might run into them again."  Tr.418:3-12.

This shows canvassers' expressive conduct continues well after they receive a completed ballot from a would-be voter, because, at a minimum, "efforts to register people to vote communicate[] a message that democratic participation is important." *Herrera*, 690 F.Supp.2d at 1216.  Indeed, the very conduct that Defendants point to—*e.g.*, being in public "on a commercial street or near a commercial building" (Arg.27), "hav[ing] an organizational t-shirt on, or canvass[ing] next to an organizational banner" (Arg.41)—are expressive, conveying "people usually know that [canvassers] were there to help voters register."   Tr.514:16-18 (Martínez). *Cf. Ft. Lauderdale Food Not Bombs*, 901 F.3d at 1240 ("'[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message.'") (quotation omitted).

Now, the legal error: "[a]s a matter of simple behavioral fact . . . the collection *and submission* of the applications gathered in a voter registration drive is intertwined with speech and association." *League of Women Voters v. Hargett*, 400 F.Supp.3d 706, 720-21 (M.D. Tenn. 2019) (emphasis added & cleaned up).  The First Amendment doesn't "countenance slicing and dicing the activities involved in the plaintiffs [voter registration drives]." *VoteAm. v. Schwab*,  (D. Kan. 2023). "[D]oing so would allow the government to burden the protected aspects of the drive indirectly." *Hargett*, 400 F.Supp.3d at 720.  So here, banning non-citizens from the

4

"administrative" (Arg.41) activities would curb (and has curbed) core-political speech and expressive conduct. *See* Tr.408:21-409:12 (Herrera-Lucha, on cancellation of voter registration events); Tr.535:10-16 (Wassmer, testifying on impacted voter-integrated); Tr.601:2-602:14 (Vélez, on reduction in partnership events within the Latino community).

**B.   Defendants misread *Meyer*.**

Defendants fundamentally misread *Meyer v. Grant*, in which the Supreme Court struck down Colorado's ban on paid petition circulators because it "restrict[ed] political expression"—not literal speech.  486 U.S. 414, 422 (1988).  Indeed, their claim that the *Meyer* circulators' "*speech* was barred in a very literal sense" because they were "prevented . . . from circulating a petition" is puzzling.  Arg.90 (emphasis added).   Rather, the *Meyer* Court repeatedly spoke of Colorado's restriction on "expression" and the "circulation of petitions."  *See generally* 486 U.S. at 420-25.  It was that conduct's necessarily expressive character that made it "appropriately described as 'core political speech.'"  *Id.* at 422.

*Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), are the lodestars.  While Defendants argue otherwise (Arg.43-44), Plaintiffs' voter-registration activity—like the petition gathering at issue in *Meyer* and *Buckley*—is "pure speech" and "core First Amendment activity." *League of Women Voters of Fla. v. Browning*, 863 F.Supp.2d

1155, 1158 (N.D. Fla. 2012).   Participation in it "implicates a number of both expressive and associational rights which are protected by the First Amendment." *Project Vote v. Blackwell*, 455 F.Supp.2d 694, 700 (N.D. Ohio 2006).

Moreover, contrary to Defendants' argument (Arg.41), *Meyer* rebuked the suggestion that protected speech or conduct could be severed from other activity just because a petition's proponents could express themselves about the measure they supported so long as they didn't also collect signatures.   *See* 486 U.S. at 418 (rejecting view that ban on "paid circulators did not burden appellees' First Amendment rights because it did not place any restraint on their own expression"). The ban on paid petition circulators in *Meyer* abridged First Amendment rights by both "limit[ing] the number of voices who will convey appellees' message," and "limit[ing] the size of the audience they can reach."   *Id.* at 422-23.   Here too, the Citizenship Requirement limits the number of voices that 3PVROs may use to encourage citizens to register and narrows the audience that they can reach.   *See League of Women Voters of Fla. v. Cobb*, 447 F.Supp.2d 1314, 1332-33 (finding quantum-of-speech-reducing restriction on 3PVROs "analogous to" *Meyer*).

### C.   Defendants misapply relevant case law and principles.

The cases Defendants cite don't change this analysis.   Contrary to what Defendants suggest (Arg.42), *Voting for America, Inc. v. Steen*, accepted the proposition that some "voter registration activities involve speech," among them

"'distributing'" voter registration forms [and] "'helping' voters to fill out their forms." 732 F.3d 382, 389-90 (5th Cir. 2013). Of course, the trial record contains extensive testimony that the Citizenship Requirement has chilled non-citizens and the 3PVROs that employ them from both "distributing" forms and "helping" voters fill them out. Tr.535:10-20 (Wassmer); *id.* at 538:16-17; Tr.588:16-589:4 (Vélez); *id.* at 591:8-595:13. In that sense, *Steen* helps Plaintiffs, not Defendants. And separately, to the extent *Steen* conflicts with *Meyer* by cabining off certain voter-registration activity as non-expressive, it is an outlier that other courts have rightly rejected. *See Schwab*, 671 F.Supp.3d at 1248; *Hargett*, 420 F.Supp.3d at 704, 707.

*League of Women Voters of Florida v. Browning*, 575 F.Supp.2d 1298 (S.D. Fla. 2008) is also inapposite. It involved fines imposed on 3PVROs for not meeting application delivery deadlines, not preventing 3PVROs from employing from engaging in voter-registration activity. In such, *Browning* concluded the law did not burden speech or conduct that accompanied voter-registration activity.

Moreover, it is no answer to say that Plaintiffs who've suffered a First-Amendment injury "can still pursue" other "speech-related activities." Arg.78. The case law is clear that governments cannot justify curtailing First-Amendment activity by saying other means for speech or expression are available. *See California Democratic Party v. Jones*, 530 U.S. 567, 581 (2000); *Spence v. State of Wash.*, 418 U.S. 405, 411 n.4 (1974).

For similar reasons, Defendants attribute undue significance to their suggestion that Poder Latinx prefers to steer voters to online registration.  Arg.7, 8, 27 (citing PX883 at 23).  Defendants make too much of a canvasser PowerPoint that "encourage[s] voters to register online."  Tr.556:17-18 (counsel's question).  On the stand, Poder Latinx representative Ms. Wassmer explained that online registration is just "another way voters can register . . . so it's . . . giving the voter options."[3]  *Id.* at 556:19-20.  But the Citizenship Requirement limits Poder Latinx from engaging in its central method from engaging people to register to vote.  *E.g.*, HF Arg.26-27.

## II.    The Court should apply strict or most-exacting scrutiny (Claims I-IV).

The record adduced at trial demonstrates that the Citizenship Requirement: (i) abridges Plaintiffs' core political speech and expression; (ii) is *not* content-neutral; (iii) curtails protected associational activity; and (iv) is overbroad by indeterminacy.  Each of these warrants subjecting the Citizenship Requirement to strict or "most exacting" scrutiny.

---

[3] Ms. Wassmer's testimony dovetails with many witnesses' testimony that online registration is no substitute to paper-form voter-registration activity. *See* HF Arg.18, 96-97, 99; *see also* Tr.1198:10-16 (Scoon); *id.* at 1220:20-1221:5; Tr.1365:22-1366:3 (Elliott); Tr.145:3-8 (Nordlund).  And the case law recognizes Plaintiffs' First-Amendment right to "select what [they] believe to be the most effective means" of advocating their message. *Meyer*, 486 U.S. at 424.

**A.    The Citizenship Requirement abridges Plaintiffs' core-political speech.**

Defendants don't deny that the Citizenship Requirement affects Plaintiffs' voter-registration activities: they concede it plainly "restricts" Plaintiffs from engaging in certain activity.  Arg.41, 45, 101.  Insofar as they argue the regulated conduct is non-expressive or not "pure speech," they are wrong.  *Supra* Section I.  Plaintiffs have explained how the law abridges their core political speech in their summation.  *See* HF Arg.18-42, 44-55.  This was unrebutted.

**B.    The Citizenship Requirement is unlawful content-based discrimination.**

Plaintiffs explained how the Citizenship Requirement is content-based.  HF Arg.61-64.  Defendants don't engage with settled case law holding that laws that ban specific *speakers* from speech or expressive conduct are, by nature, content-based.  *See* Arg.99; *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others").  Nor do they respond to the fact that the Requirement only prohibits a particular message.  HF Arg.63-64.  They just fall back on their "conduct, not speech" refrain.  Arg.99.  Again, that is wrong.  *See*

HF Arg.48-55.  As a result, the cases that the State ignores have full force and make this a content-based restriction subject to strict scrutiny.[4]

### C.     The Citizenship Requirement curtails Plaintiffs' Associational Rights.

Defendants posit an unsupported, overly-cramped view of the right to expressive association.  Arg.59.  "Organized voter-registration activities *necessarily* involve political association, both within the voter-registration organizations and with the citizens they seek to register."  *Am. Ass'n. of People with Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1229 (D.N.M. 2008) (emphasis added).  Plaintiffs make full use of these rights, both, by (a) seeking out, associating with, and registering citizen-voters—and Latino ones, in particular (HF Arg.56-57)—and (b) "speak[ing] and act[ing] collectively with others" associating via a 3PVRO. *Browning*, 863 F.Supp.2d at 1158.

---

[4] *See Dumiak v. Vill. of Downers Grove*, 475 F.Supp.3d 851, 856 (N.D. Ill. 2020) (panhandler statute unlawful speaker-based discrimination because it exempted charitable organizations but not individuals); *SD Voice v. Noem*, 380 F.Supp.3d 939, 948 (D.S.D. 2019) (ban on out-of-state persons making certain campaign contributions subject to strict scrutiny); *Rodgers v. Stachey*, 382F.Supp.3d 869, 882 (W.D. Ark. 2019) (ordinance prohibiting pedestrians from interacting with vehicle occupants "distinguished physical interaction between certain persons" was content-based restriction); *cf. also Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 2023 WL 5367336, at *8 (N.D. Ill. Aug. 4, 2023).

The trial record shows the Citizenship Requirement abridges these rights. Ms. Herrera-Lucha testified that her employer 3PVRO had to cancel voter-registration events in which she planned to participate despite this Court's July 3 injunction because of the risk of retroactive fines and uncertainty over the law. Tr.408:21-409:13. Ms. Wassmer testified that reduced funding forced Poder Latinx to halt an expansion that would have taken canvassers to new counties and cut back in its normal terrain. HF Arg.25-27; Tr.540:16-541:20; *see also Dep't of Com. v. New York*, 139 S.Ct. 2551, 2566 (2019) (injury caused by "predictable effect" of government action on decisions of third parties).

Defendants *acknowledge* that the Citizenship Requirement has already impinged Plaintiffs' associational rights when they rightly note that some 3PVROs have had to "pare[] back," "adjust[] their operations," or "change[] their hiring practices" "due to the Citizenship Requirement." Arg.59. They just deflect by characterizing this as "self-injur[y]."

There is no self-injury. Insofar as the Organizational Plaintiff 3PVROs and the Individual Plaintiffs' employer have made difficult personnel decisions, those have been rational responses to a law that exposes them to devastating fines if they do not stop the bulk of their voter-registration work. *See* HF Arg.28-33.

For example, Ms. Wassmer testified that Poder Latinx didn't rehire canvassers it knows to be non-citizens. Tr.541:23-542:7; *see also id.* 539:16-20 (Wassmer,

testifying Citizenship Requirement has "made it more difficult for us to be able to hire and ramp up"). That is a reasonable response to the Citizenship Requirement, which would limit these canvassers' usefulness to Poder Latinx and which, though enjoined, Defendants have sought to revive via appeal. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (injury suffered where government acts "in such a manner as to produce causation and permit redressability"). Likewise, Mr. Vélez testified that outside funding for Hispanic Federation's voter-registration program evaporated once the Citizenship Requirement passed (Tr.595:8-6-10, 17-18), so much so that the organization's hiring went from 72 voter-registration staff at its peak to *none* in 2023. Tr.598:10-15 (Vélez).

Separately, Ms. Herrera-Lucha testified about her employer's uncertainty over the law's application and exposure to fines even after this Court's injunction. Tr.412:4-8 (Herrera-Lucha). To avoid risk of liability,[5] her employer rationally decided not to use non-citizen canvassers in voter-registration activities. *Id.* at

---

[5] Who is to say that Defendants wouldn't fine 3PVROs for activity that happened while the law was enjoined if the Circuit reverses the injunction? Notwithstanding the injunction, the 3PVRO registration form on the Secretary's website still requires organizations to certify that they are not employing non-citizens. Tr.1946:10-20 (Dir. Matthews, agreeing it "would not" be smart for a 3PVRO employing non-citizens to sign a form under penalty of perjury). *See generally* HF Arg.31. And defense witnesses confirmed that they believe the Citizenship Requirement is a strict liability statute, Fla. Stat. § 97.0575(1)(f); that means that even if a 3PVRO relied in good faith on the injunction, the Defendants still might fine them.

408:21-409:12; *id.* at 409:15-22; *id.* at 429:5-8. *Cf. Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010) (finding injury where "defendant's actions constrained or influenced" third party in conduct chain of causation).

### D. The Citizenship Requirement is overbroad from indeterminacy. (Vague & Overbroad).

#### 1. *Defendants point to the wrong vagueness framework.*

Defendants rely on *High Ol' Times* and *SisterSong* to argue that the Citizenship Requirement is not unconstitutionally vague. Arg.72. But those are not First-Amendment cases, which demand a "more stringent vagueness test." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). In this context, "[t]he vice of unconstitutional vagueness is [] aggravated" because "the statute in question . . . inhibit[s] the exercise of individual freedoms affirmatively protected by the Constitution." *Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 287 (1961). Defendants offer no answer for this principle.

Likewise, Defendants' cite to *Wayerski* to argue that Plaintiffs' interpretations are meritless hypotheticals suffers the same problem as their cites to *High Ol' Times* and *SisterSong*. Arg.74. By its own terms, *Wayerski* explained that hypotheticals were unhelpful to the vagueness analysis "[w]here, as in [that] case, a vagueness challenge does *not* involve the First Amendment." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010) (emphasis added). That is not this case. The "wide scope of potential interpretations for individuals" evidenced at trial cannot stand in

the face of laws that restrict First Amendment rights.  *Dream Defs. v. DeSantis*, 559 F.Supp.3d 1238, 1281 (N.D. Fla. 2021).

> **2.    Neither the Secretary's "whitepaper" nor advisory opinions solve the Citizenship Requirement's vagueness problem.**

Defendants put too much weight on the Secretary's "whitepaper" to say it's "clear" that the Citizen Restriction would *not* apply to the collecting or handling of blank forms. Arg.100 (citing PX780).  Federal courts cannot "rewrite a state law to conform it to constitutional requirements"—they can only adopt a limiting construction that prevents invalidity if the law is "readily susceptible" to it. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

The Citizenship Requirement is not "readily susceptible" to the Defendants' construction.  The statute applies to non-citizens "collecting or handling voter registration applications on behalf of" a 3PVRO—full stop.  So, while the Secretary may read it to cover those who "collect" or "handle" *completed* voter registration forms as Defendants purport (Arg.72), it can easily (and rationally) be read to capture those who handle blank forms as well.  That is a problem.  *See Konikov v. Orange Cnty., Fla.*, 410 F.3d 1317, 1329 (11th Cir. 2005) ("[T]he Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise . . . of free speech[.]") (citation omitted).

Indeed, the trial record has extensive testimony underscoring that the Citizenship Requirement can easily be read to capture the "collecting" and

"handling" of un-filled voter-registration applications or even other naturally-occurring—even accidental—activity. *See, e.g.*, Tr.746:22-747:11 (Supervisor Earley: "exercising physical custody' might include driving a car with filled-in voter registration applications"); Tr.605:22-606:14 (Vélez, expressing concern on whether helping a person collect fallen forms or leaving forms in a non-citizen's desk amounts to physical custody); Tr.399:2-7 (Herrera-Lucha, explaining it is not clear whether voter registration forms must be "blank or filled out" to "handle them"). These plausible readings can chill—and *have* chilled—Plaintiffs' protected speech and conduct, underscoring the statute's vagueness. *See Speiser v. Randall*, 357 U.S. 513, 526 (1958) (When one must guess what conduct or utterances may lose him his position, one necessarily will "steer far wider of the unlawful zone . . . .").

Defendants describe the Secretary's advisory opinions as a "failsafe" to these vagueness concerns, but they are nothing of the sort. Arg.17, 74. Director Matthews testified that she could not "guarantee a time frame" by which the Department issues an advisory opinion to a 3PVRO. Tr.1944:21. Indeed, there is no deadline by which the Secretary must issue an opinion. Fla. Admin. Code 1S-2.010(5). The Secretary currently has a substantial backlog of "tens of thousands of voter registration applications." Tr.1941:13-1942:24 (Matthews). The evidence shows 3PVROs like the Organizational Plaintiffs must make staffing decisions in the normal course of daily business. *See, e.g.*, Tr.603:1-2 (Vélez, describing screens for work

authorization); Tr.538:25-539:10 (Wassmer, moving staff to other projects); *id.* at 544:21-24 (not allowing non-citizen staff to move blank voter registration forms around the office). Waiting for a determination will inevitably chill their efforts, as it already has.[6]

### 3. *Defendants don't address Plaintiffs' overbreadth arguments.*

Defendants also wrongly argue that the Citizenship Requirement is not overbroad because it doesn't regulate "speech." It certainly does for First-Amendment purposes: voting-registration activity is "pure speech." *Harriet Tubman Freedom Fighters Corp. v. Lee*, 576 F.Supp.3d 994, 1003 (N.D. Fla. 2021). So, Defendants' argument depends on the Court finding that: (a) Plaintiffs' expressive conduct or activity can be disaggregated from their speech (it can't); and (b) that the severable conduct is non-expressive (it's not). *See supra* Section I; *see also* HF Arg.39-42.

It is no answer to say that Plaintiffs can "still go into the same communities, still engage in the same conversations, and still to try register people to vote." Arg.78. Even if the law doesn't prohibit non-citizen canvassers discussing the importance of voting, the Citizenship Requirement's vagueness and its burdensome fines will silence (and has silenced) Plaintiffs from engaging in these forms of

---

[6] Advisory decisions are also individualized and apply only to the requesting organization. Fla. Admin. Code 1S-2.010(3). An opinion issued as to Poder Latinx would not help Hispanic Federation.

expressive and associational activity.   Tr.526:8-15 (Wassmer); *id.* at 537:18-538:6; *id.* at 538:16-17; Tr.587:9-14 (Vélez); *id.* at 604:13-605:2; *id.* at 607:19-608:1; *id.* at 608:15-18.   Defendants' argument also ignores the reality on the ground. As Ms. Herrera-Lucha put it: "[O]f what use would it be to me to talk to someone about registering to vote if I'm not able to give them the form so that they can register to vote."   Tr.410:17-411:2.

### E.   *Anderson-Burdick* should not apply but would lead to the same result if it does.

Plaintiffs maintain that the Citizenship Requirement demands strict scrutiny because it regulates "pure speech."   *Harriet Tubman Freedom Fighters Corp.*, 576 F.Supp.3d at 1003.   "[S]peech that relates to an election but occurs nowhere near the ballot or any other electoral mechanism is treated as core political speech entitled to the fullest . . . protection."   *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 142 (3rd Cir. 2022) (citation omitted).   But because *Anderson-Burdick* has been applied to consider third parties' core political speech even when, as here, it occurs removed from the ballot,[7] Plaintiffs maintain that even viewed through that lens, strict scrutiny would apply to the Citizenship Requirement because of its "severe" burdens.   *See* HF Arg.81.   In any event, Defendants get things wrong on several points:

---

[7] *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-64 (1997); *Mazo*, 54 F.4th at 146-53; *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1017 (9th Cir. 2002).

1. ***Brnovich****'s burden framework is inapposite.*

Defendants are wrong to look to *Brnovich*. Arg.50. *Brnovich* arose under Section 2 of the Voting Rights Act and has no applicability to a First-Amendment framework.

2. **Post-hoc *rationalizations only work on the "low end" of the Anderson-Burdick sliding scale.***

Defendants overshoot in claiming that the "State can offer post-hoc rationalizations" so long as it's "defending an election law." *Post-hoc* rationalizations cannot sustain a law subject to strict or heightened scrutiny. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022); *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.). *Mays* and *Common Cause/Ga.*, the two cases Defendants cite (Arg.51), were on the "low end" of the *Anderson-Burdick* sliding scale—*i.e.*, courts determined the states' interests outweighed plaintiffs' burdens.

3. *Defendants misstate the burdens that Plaintiffs needed to (and did) prove.*

Next (Arg.53), Defendants suggest Plaintiffs failed to prove that the Citizenship Requirement burdens the right to vote. That confuses the issues. *Anderson-Burdick* commonly applies in the context of elections, and therefore frequently implicates the right to vote. But precedent is clear that *Anderson-Burdick* tasks courts, first, to evaluate burdens on the right "that the *plaintiff seeks to*

18

*vindicate*"—here, Plaintiffs' First-Amendment rights, not a right to vote—then consider the "legitimacy and strength" of the state's interest and "the extent to which those interests" make the burdens on plaintiffs "necessary." *Anderson*, 460 U.S. at 789 (emphasis added).

Thus, applied to Plaintiffs' claims, *Anderson-Burdick* tasks the Court with weighing the Citizenship Requirement's burdens on Plaintiffs' protected speech, association, and expressive conduct against the state's interests in keeping the law.

Fact witnesses amply proved the unreasonable burdens on their speech and association. *See* HF Arg.20-39, 57-60. But Plaintiffs' experts established additional burdens on their speech and expression *in connection with* the right to vote. *See id.* at 83-89. That is, Plaintiffs' experts proved the impact that the Citizenship Requirement would have on voters, which further shows the effect of the harm to Plaintiffs' speech and expressive conduct in two ways.

*First*, the expert testimony rounds out Plaintiffs' fact-witness testimony on interactions 3PVROs have with potential voters by showing the direct impact of the speech and association that the Citizenship Requirement chills: fewer people register to vote when 3PVROs' and their canvassers' activities are burdened. Tr.1094:4-1095:12 (Smith). *Second*, because Organizational Plaintiffs seek to empower the Latino electorate by registering and educating voters (HF Arg.48-57; Tr.524:19-23 (Wassmer); *id.* at 526:1-2; *id.* at 526:8-15; Tr.566:19-21 (Vélez); *id.* at 567:18-

19

568:8), the expert testimony shows how the Citizenship Requirement's restrictions will impair their core mission.

Defendants fail to rebut Plaintiffs' expert testimony and evidence about the effect that burdening 3PVROs will have on voters. To start: none of the studies that Defendants claim cast doubt on Dr. Smith's work studied laws that burden 3PVROs or voter registration. Tr.1710:10-1711:15 (Stein). In fact, the only peer-reviewed publication in the record that did study the impact on voter registration of a law burdening 3PVROs is the one authored by Drs. Smith and Herron. PX 814; Tr.1711:12-15 (Stein). That published study found that HB 1355, a Florida law passed in 2011 that imposed burdens on 3PVROs, caused an overall decrease in voter registration. PX 814 at 279, 281, 290-92, 300; Tr.1087:3-1089:11 (Smith).

The overall decrease in Florida voter registration that Dr. Smith and Dr. Herron found in their controlled HB 1355 study is undisputed. Tr.1697:1-5 (Stein). That means that all of Defendants' hypotheticals about possible benefits of voting (Arg.54-55), or, indeed, other methods of voting, that purportedly *could have* offset the losses from 3PVRO registration . . . didn't. Tr.1089:12-15 (Smith). Even Defendants' expert agreed that he wouldn't expect perfect substitution by other methods and *would* expect fewer voters to be registered overall as a result of SB 7050. Tr.1694:9-25 (Stein). No expert testimony undermined Dr. Smith's core conclusions.

20

Cross examination did not cut into Plaintiffs' experts' conclusions, either.  On cross, Dr. Smith exposed why Defendants' efforts to posit that some 90% of eligible Florida voters are already registered to vote—and that only the remaining 10% of voters could be harmed by burdens on 3PVROs—is a myth.  For two reasons: first, because the formula is flawed.  And second, because it fails to account for hundreds of thousands of voters each year who need to register anew or update their registration to cast their vote, whether because they turned 18, moved to or within the State, or otherwise became newly eligible to vote through naturalization or restoration.  Tr.1129:21-1137-25 (Smith); *see also id.*1009:4-1018:12.

## III.   The Citizenship Requirement cannot survive any form of scrutiny (Claims I-IV).

The Citizenship Requirement doesn't come close to meeting strict scrutiny or lesser analysis, like *Anderson-Burdick*'s sliding scale or rational review.  Defendants didn't show that the Citizenship Requirement is narrowly tailored to serve a legitimate interest, let alone a compelling one.  *See Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (narrow tailoring "crucial where First Amendment activity is chilled—even if indirectly—[b]ecause First Amendment freedoms need breathing space to survive" (quotation marks omitted)).  The standard for Defendants to meet "is well-nigh insurmountable.'"  *Meyer*, 486 U.S. at 425.  Their summation shows how short they fall.

**A.    The Trial Record Does Not Contain Evidence Showing the Citizenship Requirement Even Rationally Serves Defendants' Stated Interests.**

Defendants claim that the Citizenship Requirement "prevent[s] voter fraud," "promote[s] confidence in the electoral process," and "maintain[s] fairness and order, and avoid[s] frustration and deception, in elections." Arg.45 (cleaned up). The trial record Defendants cite simply doesn't support these claims. *See, e.g.*, Tr.744:24-745:4 (Earley, unaware of a single instance in which a non-citizen "mishandled a voter or any problem that the citizenship requirement solves"); Tr.1741:1-10 (VanderGiesen); *id.* at 1749:1-10; *id.* at 1750:16-19.

To start, Defendants concede these interests are *post-hoc*. Elsewhere, they list the justifications that the Legislature *actually* offered for the Citizenship Requirement "on the record." Arg.25. These are: "protect[ing] sensitive information on voter-registration applications and . . . defining Florida's political community." *Id.* To be clear, there is no overlap between the "justifications" legislators proffered during legislative debate and Defendants' claimed compelling interests *now*. Indeed, the evidence the Defendants cite for the state interests supporting the Citizenship Requirement is the "Darlington Declaration" (Arg.30, 46), a *post-hoc* document generated in litigation. "Government justifications for interfering with First

Amendment rights must be genuine, not hypothesized or invented . . . in response to litigation."[8] *Kennedy*, 597 U.S. at 543 n.8 (quotation marks omitted).

Nor does the trial record contain evidence that the Citizenship Requirement prevents fraud, promotes confidence, or maintains fairness.

*First*, Defendants insist "there's always a risk" that non-citizens "can leave the State, given their strong ties to other countries." Arg.13, 48.  The argument being that non-citizens are more prone to "not turn in applications on time." *Id.*  But even if this timeliness concern maps onto the proffered compelling interests, Defendants have no evidence—only speculation and decontextualized record mischaracterizations.  Specifically, Defendants cite testimony from Mr. Humberto Orjuela and Ms. Verónica Herrera-Lucha—two impacted Plaintiffs—to suggest past travel abroad shows they're prone to "not turn in applications on time." Arg.48.  The argument is meritless.

The Court has the full picture that Defendants overlook.  It shows that Mr. Orjuela is a permanent resident (Tr.151:22-25); is authorized to work (*id.* at 152-54);

---

[8] Moreover, Director Darlington's declaration—first filed at the case's preliminary-injunction phase—does *not* "provide[] compelling interests for the Citizenship Restriction." Arg.46.  It was the central piece of the same record marked by a "dearth of evidence connecting noncitizens to late-filed voter registration applications." *Fla. Sate Conf. of Branches & Youth Units of the NAACP*, 680 F.Supp.3d at 1314.  And the portions of the Darlington Declaration that Defendants cite (Arg.46), do not point to anything involving non-citizens.

has *never* left the state in possession of voter-registration applications (*id.* at 161:10-13); and considers himself "connected" to this Nation's "political community" (*id.* at 161:18-24).  None of this testimony was contested on cross-examination.

Ms. Herrera-Lucha—who "has spent years registering and encouraging citizens to exercise th[e] solemn right [to vote]"[9]—demolishes Defendants' caricature of non-citizens as flight risks.  She testified to visiting her family in El Salvador—sure. Tr.389:12-15.  But as a lawful-permanent resident, Ms. Herrera-Lucha is completely free to do so.  *See, e.g.*, *Edwards v. U.S. Immig. & Customs Enforcement Div.*, No. 11-320, 2011 WL 507775, at *6 (D. Minn. Aug. 9, 2011) (one of benefits a "lawful permanent resident enjoys is the right to travel abroad and return to the United States" (citing 8 C.F.R. §103.2(b)(17)).  Further, Ms. Herrera-Lucha testified at length about her abiding connections to this country.  She:

- Has lived in the United States for 21 years (Tr.390:4-8);

- Has lived in her home of Osceola County for six years (Tr.388:23-24);

- Lives with her U.S.-citizen husband who is licensed by the State of Florida to be a chiropractor (Tr.388:7-16);

- Lives with her 11-year-old U.S.-citizen son (Tr.388:17-22);

- Has no plans to permanently leave Florida or the United States (Tr.390:9-14);

---

[9] *Id.* at 1323.

- Has been *entrusted and licensed as a notary by the State of Florida since 2018* (Tr.393:5-18).

In short, the witnesses Defendants suggest have "ties" to other countries—strong or otherwise—do not support the State's claim that *all* non-citizens are more likely to abscond abroad with voter applications in tow than anyone else.

*Second*, Defendants highlight a scant few instances of non-citizens "behav[ing] badly" discussed at trial.  None help their case—not least, because these examples were clearly not before the legislature.  They 're as *post-hoc* as it gets.  To start, Defendants point to an instance Ms. Herrera-Lucha testified to in which she had to fire a U.S. citizen and three noncitizens for irregularities in completed applications.  Arg.13, 47-48 (citing Tr.389:8-15).  But this testimony doesn't support Defendants' broader justifications.  First, whether three specific noncitizens engaged in misconduct resulting in application-form irregularities says nothing about how banning *all* noncitizens is even rationally related to stopping similar irregularities.  And second, the fact that Ms. Herrera-Lucha also testified to firing a *U.S. citizen* for the same conduct makes clear that the Citizenship Requirement is not tailored to stop that misconduct.

Separately, Defendants point to an instance to which Hispanic Federation's representative testified where a canvasser "left for Mexico for ten days and failed to timely deliver three voter-registration applications."  Arg.13, 47 (citing PX847;

25

Tr.613:17-615:5).   They then surmise that the canvasser "was most likely a noncitizen, given that 'a little bit higher than 70 percent' of Hispanic Federation canvassers in 2022 were noncitizens."  *Id.*  Setting aside their speculation—which has a 30% chance of being wrong—Defendants were free to probe the issue of the canvasser's citizenship on cross-examination.   They didn't.   *See* Tr.611:4-620:8 (Vélez).  This is speculation, not evidence.

More broadly, Defendants again rely on a flawed premise: even if the canvasser in question was a non-citizen, no evidence supports the notion that she was more likely to leave the state *because* she was a non-citizen.  A law that curbs protected speech and conduct on such flimsy ground cannot survive rational scrutiny, let alone the strict kind.  *See Romer v. Evans*, 517 U.S. 620, 632 (1996) ("even in the ordinary . . . case calling for the most deferential of standards," a law may be struck down if it is "so discontinuous with the reasons offered for it" as to make it irrational).

Defendants haven't shown that the "recited harms are real, not merely conjectural, and that the regulation will . . . alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality op.).

*Third*, the idea that Defendants lack data to connect non-citizens to problems the State sought to solve "*because* before SB7050, the election code didn't prevent

noncitizens from engaging in certain 3PVRO actions," just highlights the dearth of evidence *to support* the Citizenship Requirement.  Arg.47.  The argument swallows itself: it shows the Citizenship Requirement is a solution in search of a problem which ought not survive even rational basis review.  *See Fink v. Kirchmeyer*, No. 23-CV-05921-RFL, 2024 WL 1090001, at *5 (N.D. Cal. Mar. 13, 2024) (defendants failing "low bar" of rational review given "extreme mismatch between the State's interests and the burdens imposed").  And relatedly, even if the State need not commonly "wait[] for an incident" before it "act[s] on election-related issues" (Arg.48), this Court has already correctly noted that this argument falls flat when Defendants face strict scrutiny.  *See Hisp. Fed'n v. Byrd*, --- F.Supp.3d ---, 2024 WL 906004, at *4 (N.D. Fla. Mar. 1, 2024).

## B.  Defendants don't meaningfully rebut that the Citizenship Requirement is poorly tailored.

Defendants still do little to suggest that the Citizenship Requirement is tailored to meet a compelling or legitimate interest.  Arg.99-101.  They note that non-citizen canvassers "can still speak to voters and help them register to vote," so the provision must be rightly tailored.  Arg.48.  That wrongly disaggregates protected conduct from speech that is "characteristically intertwined."  *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see also supra* Section I.  It also asks the Court to "overlook" Defendants' "restriction" upon protected activity just "because it leaves other First Amendment activity unimpaired."  *Jones*, 530 U.S.

at 581.  In interpreting the First Amendment, the Supreme Court has "consistently refused" to parse so finely.  *Id.*; *Meyer*, 486 U.S. at 424.

Separately, Defendants quibble with the notion that the provision is underinclusive because non-citizen state employees with access to sensitive information "undergo background checks." Arg.100.  Four points:

*First*, Defendants rely on the testimony of State Attorney Van der Giesen for the proposition that "state employees . . . undergo background checks." *Id.*  But Defendants cut their cited exchange with the witness short.  Mr. Van der Giesen only confirmed that he knew state attorneys like him, other lawyers in his office, and investigators receive a background check.  Tr.1768:8-15.  Defendants leave out the following—

> Q. How about your legal assistant? Did she go through a background check . . .?
> A. I don't know what the staff protocols are for hiring.  I can't answer that.

Tr.1768:8-19.  So Defendants at best can show Mr. Van der Giesen knew that some roles in his office—none that he would call "staff"—are subject to background checks.  It strains his testimony past the breaking point to suggest *all* state-agency

employees who are non-citizens are subject to a background check while 3PVRO employees aren't.[10]

*Second*, there is nothing in the record to suggest that background checks would prevent or even address the concerns that Defendants say the Citizenship Requirement averts.  Would background checks have stopped violations by Cheryl Hall, a citizen charged with fraudulently changing voter's party affiliation? Tr.1775:4-1776:15 (VanderGiesen); 1823:7-1824:8 (Hays).  Defendants point to nothing that answers that.

*Third*, a related (persistent) problem for Defendants: even if the record showed background checks rooted out misconduct like that of U.S.-citizen Ms. Hall, *e.g.*, that would show that even background checks cannot support the Citizenship Requirement as a valid restriction under anything more stringent than rational

---

[10] Defendants' cites to the legislative record fare no better.  Arg.100.  Senator Burgess spoke of the vetting that may "distin[guish] [] between official employment and being a volunteer for a group."  PX252 20:13-16.  Of course, Plaintiffs "officially employ" dozens of non-citizens whom the Citizenship Requirement will impact— the law doesn't just cover volunteers.  And Senator McClure spoke of "processes, procedures, *sometimes* background checks" in place at state agencies (PX254 11-15 (emphasis added)), suggesting background checks were not the *sine qua non* Defendants may now claim they are.  In any event, Organizational Plaintiffs' non-citizen employees are certainly subject to vetting "processes and procedures": they all complete I-9 forms, for example, and are authorized to work in the United States. *See* Tr.534:4-9 (Wassmer); Tr.586:10-15 (Vélez).

review, since they're also neither narrowly nor substantially tailored to address non-citizen misconduct.  *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

*Fourth*, by pointing to narrower restrictions that could theoretically reduce problems with 3PVRO voter registration (Arg.70-71), Defendants show there are less restrictive means that they suggest could advance their purported interests.  That alone is enough for the Citizenship Requirement to fail strict or any kind of heightened scrutiny in the *Anderson-Burdick* scale.

## IV.  Plaintiffs have standing to sue the Attorney General (Claims I-V).

"The Attorney General may institute a civil action for a violation" of the Citizenship Requirement "or to prevent a violation."  Fla. Stat. § 97.0575(8).  That makes Plaintiffs' injuries traceable to and redressable by an injunction against the Attorney General.  *See Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 888-89 (11th Cir. 2023).  The OAG doesn't refute this.  Its closing argument just strains to rewrite the statutory language, then presents inapposite arguments about separate criminal enforcement authority.

The OAG's main authority supports Plaintiffs' argument.  In *Honeyfund.com, Inc. v. DeSantis*, this Court found that plaintiffs had standing to enjoin both the Attorney General and the Florida Commission on Human Relations (FCHR), but said plaintiffs didn't have standing to sue the Governor.  622 F.Supp.3d 1159, 1172, 1174 (N.D. Fla. 2022), *aff'd sub nom.*, 94 F.4th 1272 (11th Cir. 2024).  That case

challenged part of 2022's HB7, which amended the Florida Civil Rights Act (FCRA) to prohibit workplace training including any of "eight forbidden concepts." *Id.* at 1168-69. Both the Attorney General and FCHR have statutory authority to enforce the FCRA, and accordingly the *Honeyfund.com* plaintiffs had standing to sue them. *See id.* at 1172; Fla. Stat. § 760.021(1); *id.* § 760.06(5). The *Honeyfund.com* plaintiffs also alleged that they had standing to sue the Governor, based on a statement on FHCR's website saying FCHR can refer complaints to the Governor. *See id.* at 1174.

*Honeyfund.com* said that enjoining the FCHR from referring complaints to the Governor made an injunction against him unnecessary, but only because the Governor lacked authority to enforce the FCRA *absent referral* from the FCHR. 622 F.Supp.3d at 1174. That isn't the case here. OAG is empowered to enforce the Citizenship Requirement, just like it was for the FCRA in *Honeyfund.com*. Neither statute requires a referral from another agency for OAG to act, even though they both envision referrals. Here, the Attorney General would make the Secretary's referral a prerequisite by scouring canons of construction to find a way to change the text of § 97.0575(8). But that interpretation of § 97.0575(8) isn't clear, appears tailor-made to avoid the injunction Plaintiffs seek, and doesn't bind future Attorneys General. *See* HF Arg.40-41.

31

Plaintiffs might successfully defend against Attorney-General enforcement of the Citizenship Requirement by asking a state court to impose a mandatory referral requirement.  But Plaintiffs are injured by the threat of strict-liability enforcement. Failed enforcement is still enforcement.  That threat chills Plaintiffs' protected speech, exacerbates the law's vagueness, and imposes unconstitutional discrimination based on alienage.  For these reasons, Plaintiffs need an injunction against the Attorney General to remedy their multiple constitutional injuries.

## CONCLUSION

The trial record conclusively demonstrates that the Citizenship Requirement violates Plaintiffs' First and Fourteenth Amendment rights.  The Court should permanently enjoin Defendants from enforcing it.

Dated: May 3, 2024

Cesar Z. Ruiz*
**LatinoJustice PRLDEF**
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 392-4752
cruiz@latinojustice.org

Roberto Cruz (FBN 18436)
Miranda Galindo (FBN 1039848)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 754-1935
rcruz@latinojustice.org
mgalindo@latinojustice.org

Delmarie Alicea (FBN 1024650)
**LatinoJustice PRLDEF**
5700 Millenia Blvd. Suite 500
Orlando, FL 32839
(321) 418-6354
dalicea@latinojustice.org

Roni Druks*
Phi Nguyen*
**Dēmos**
80 Broad Street, 4th Floor
New York, NY 10004
(212) 485-6065
rdruks@demos.org
pnguyen@demos.org

Respectfully submitted,

*/s/ Adriel I. Cepeda Derieux*
Adriel I. Cepeda Derieux*
Megan C. Keenan*
**American Civil Liberties
Union Foundation**
915 15th Street NW
Washington, DC 20005
(212) 549-2500
acepedaderieux@aclu.org
mkeenan@aclu.org

Julie A. Ebenstein (FBN 91033)
Dayton Campbell-Harris*
Sophia Lin Lakin*
Victoria Ochoa*
**American Civil Liberties
Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org
vochoa@aclu.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

33

Case 4:23-cv-00218-MW-MAF   Document 198   Filed 05/03/24   Page 41 of 41

John A. Freedman[†]
Jeremy Karpatkin[†]
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 942-5316
john.freedman@arnoldporter.com
jeremy.karpatkin@arnoldporter.com

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

*\* Admitted Pro Hac Vice*

*Counsel for Plaintiffs Hispanic Federation, Poder Latinx, Verónica Herrera-Lucha, Norka Martínez, and Elizabeth Pico*

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 6,977 words. I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

/s/ Adriel I. Cepeda Derieux
Adriel I. Cepeda Derieux

## CERTIFICATE OF SERVICE

I certify that on May 3, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Adriel I. Cepeda Derieux
Adriel I. Cepeda Derieux